IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

**JOSEPH PAPIN**                                                                    **PLAINTIFF**

v.                                                                    No. 3:17-cv-763-CWR-FKB

**UNIVERSITY OF MISSISSIPPI MEDICAL CENTER;**           **DEFENDANTS**
**LOU-ANN WOODWARD (official capacity);**
**T. MARK EARL (individual capacity).**                          **(JURY TRIAL DEMANDED)**

## COMPLAINT

This complaint is brought by and on behalf of Joseph Papin, a surgical resident at the Defendant medical center. Dr. Papin has been terminated without due process in violation of his match agreement, his contract and administrative policies applicable thereto, the U.S. Constitution and the Mississippi Constitution. His termination lacked proof of "malfeasance, inefficiency or contumacious conduct" in violation of the Mississippi Constitution and Dr. Papin's contract. Defendants' actions have already injured Plaintiff by depriving him of a year of his career, and the damage will continue unless and until this Court acts to remedy it. In support thereof, COMES NOW THE PLAINTIFF, by and through his attorney, and alleges as follows:

### JURISDICTION, VENUE, JURY TRIAL

1. Jurisdiction is proper in this court under 28 U.S.C. § 1331 because this claim arises in part under 42 U.S.C. § 1983 and the United States Constitution.

2. Venue is proper in this court under 28 U.S.C. § 1391 because the Defendants and

all work at issue are located in and around Jackson.

3. Plaintiff hereby demands trial by jury on all issues so triable.

## PARTIES

4. Plaintiff JOSEPH PAPIN is an adult resident of Mississippi and employee of Defendants.

5. Defendant UNIVERSITY OF MISSISSIPPI MEDICAL CENTER is a subdivision of the UNIVERSITY OF MISSISSIPPI, a organ of the government of the State of Mississippi organized pursuant to the Mississippi Constitution Sec. 213-A.

6. Defendant LOU-ANN WOODWARD is being sued in her official capacity as the chief executive officer of the University of Mississippi Medical Center, and the Vice Chancellor for Health Affairs of the University of Mississippi.

7. Defendant T. MARK EARL is the Program Director of the General Surgical Residency Program at the Defendant medical center. Defendant Earl is directly and personally responsible for the decision to fire Plaintiff, and is being sued in his individual capacity.

## FACTS

8. Plaintiff Joseph Papin graduated from the University of Michigan Medical School with an M.D. in the Spring of 2015.

9. He then completed a one-year Health Services Research Fellowship at the University of Michigan, which he successfully completed in Spring of 2016.

10. He then applied for resident training through the National Resident Matching Program.

11. During his interview at Defendant medical center, Dr. Papin was asked about the geographic locations of the schools to which he was applying, and whether he had applied to any other schools in the South.

12. Dr. Papin was also given copies of medical center contracts, handbooks, and policies which would apply to him if he matched with the medical center.

13. Thereafter, Dr. Papin was matched with the Defendant medical center, and began his residency in general surgery on or before July 1, 2016.

14. On December 6, 2016, Dr. Papin was on-call. At around mid-day, when all was quiet, Dr. Papin texted his chief resident whether he could "go for a run around campus with my pagers and cell" and chief resident replied that this was okay "as long as pagers work."

15. On December 15, 2016, Dr. Papin was on-call. At around 3pm, when all was quiet, Dr. Papin again texted his chief resident asking to go for a run with his pagers. The chief resident responded "Excuse me?" and Dr. Papin replied "I didn't go." The chief resident responded "Like exercise?" and Dr. Papin replied "I'm asking though, haha. Everything is done on my end." The chief resident responded "Are you fucking kidding me?" and Dr. Papin replied "Yes." The chief resident responded "I will give you all the reasons why that is not ok later but #1

is you're first call."

16. Also in mid-December, Dr. Papin was assigned – along with a full team of more experienced residents and attending physicians, as well as nurses and a separate dedicated "wound care team" - to care for a certain paralytic patient. During one examination of this patient, Dr. Papin noticed scar tissue on the patient's back, which he believed to be from a healed or healing bed sore.

17. The wound care team was already aware of this. Specifically, on or before December 11, 2016, the wound care team had examined the sore and recommended a conservative, topical treatment.

18. Nonetheless, the patient was running a mysterious fever, and, on or about December 22, 2016, Dr. Papin consulted again with his chief resident about this. She asked "have you checked his back?" Dr. Papin answered "not today."

19. Thereafter, Dr. Papin checked the patient's back again, and observed the same scar tissue, looking very much like it had in his prior observations. The wound care team also observed the sore on that day, and took a picture of it. The wound care team recommended continuing conservative topical treatment.

20. Dr. Papin thereafter informed his chief resident that the sore was still there, and of the wound care team's recommendation.

21. He then left to catch a plane for his previously scheduled holiday in Florida.

22. The next day, the chief resident sent a text message to Dr. Papin asking for the

name of the patient with the bed sore, and Dr. Papin informed her.

23. While Dr. Papin was on holiday, on information and belief, an attending physician examined the sore more closely, peeling back the scar tissue, and found it far more severe than anyone else had supposed. A few weeks later, the patient's sore was surgically debrided.

24. Thereafter, in a written, signed contract on January 10, 2017, Dr. Papin was placed on a formal remediation plan by the Program Director, Defendant T. Mark Earl. (Exhibit 1)[1]

25. In this document, Defendant Earl alleged that Plaintiff's performance was deficient in five respects:

　1. "Lying and being untruthful about patient care."

　2. "Leaving the hospital during duty hours (to exercise) – dereliction of duty"

　3. "Unwillingness to help with tasks"

　4. "Condescending tone to nurses and fellow residents"

　5. "Poor inter-professional communication"

26. As justification for item 1, "lying" Dr. Earl relied on the incident with the bed sore, claiming that Dr. Papin lied about the treatment he provided.

27. Dr. Papin disputed this characterization of his actions. The medical records will show that Dr. Papin was not and is not lying about his course of treatment, he

---

1 All exhibits are incorporated by reference as if fully set forth herein.

merely made the same mistake that the entire team made in recognizing the severity of this deceptive bed sore.

28. Nonetheless, as a result of this erroneous conclusion, the agreement placed Dr. Papin on "formal remediation and have 60 days from today January 10, 2017, to show significant improvement in the areas and competency domains mentioned above."

29. The agreement defined "significant improvement" specifically as follows:

   1. "zero confirmed or highly suspicious reports of lying"
   2. "zero episodes of dereliction of duty"
   3. "improvement in evaluations . . . "
   4. "zero reports of unwillingness to complete a task unless concerns over patient safety are raised"

30. The agreement also required Dr. Papin to submit a "Personal Study and Action Plan by January 17, 2017" and have bi-monthly progress meetings with the program director.

31. The agreement stated the following as the exclusive next steps, if no such improvement was demonstrated:

   1. If and only if there was a subsequent "safety infraction deemed egregious by the PD [program director]" then Dr. Papin could be referred "to HR and GME Office for immediate termination." Barring that, however, the sole potential

    consequences were:

    2. Non-renewal of contract

    3. Placement on formal probation

    4. Requirement to repeat year of training

32. However, immediately after entering this formal remediation agreement with Dr. Papin, Defendant Earl also informed Dr. Papin that he was being placed on administrative leave effective immediately, and was not permitted to work.

33. Defendant Earl stated that Dr. Papin was to submit to a drug test and fitness for duty examination before returning to work. Again, the stated justification was allegedly lying about the bed sore.

34. No other supervisor was present when this decision was made or communicated to Dr. Papin, nor was any basis for reasonable suspicion articulated, either at that time or at any time thereafter.

35. Dr. Papin underwent the drug test and examination, which came back entirely clean. Dr. Papin was medically cleared to work.

36. However, Defendant Earl said that Dr. Papin had to remain on administrative suspension because an "HR Complaint" had been lodged against Dr. Papin.

37. On information and belief, Defendant Earl himself had lodged the "HR Complaint" and had done so without any new allegation of safety infractions occurring after the formal remediation agreement.

38. In the meantime, Dr. Papin completed and submitted his Personal Study and Action Plan by January 17, 2017, and otherwise complied with all requirements of the formal remediation contract he had entered with Defendant Earl.

39. Nonetheless, on February 20, 2017, Dr. Papin was called in to the workplace for the sole purpose of terminating his residency.

40. Dr. Papin was told that he was being terminated because of his allegedly "lying" about the bed sore in December.

41. Dr. Papin again disputed this characterization of his actions, and was assured that he had the right to appeal guaranteed in the Defendant medical center policies, as well as his contract.

42. On March 3, 2017, Plaintiff retained the undersigned counsel, who submitted a request to exercise this right to appeal in conformity with Defendant medical center policies. (Exhibit 2)

43. Plaintiff heard nothing from Defendant medical center until April 5, 2017, when in-house counsel for the Defendant medical center contacted counsel for the Plaintiff and asked what dates Plaintiff was available for the appeal hearing.

44. On April 12, 2017, counsel for Plaintiff emailed counsel for Defendant medical center of available dates.

45. On April 18, 2017, counsel for Plaintiff again emailed counsel for Defendant medical center about the hearing. Counsel for the Defendant responded "thanks.

We will work to accommodate."

46. Since then, nothing more was heard from the Defendants until after a notice of intent to sue was sent to the Defendants.

47. Plaintiff sent this notice of his intent to bring this lawsuit on June 14, 2017. This notice included a copy of the present Complaint in substantially similar form (omitting this paragraph). Defendant acknowledged receipt by letter dated June 19, 2017. Thereafter, a hearing was held in which Defendants questioned Plaintiff while forbidding any questioning of the Defendants witnesses. Defendants then affirmed the decision to terminate Plaintiff.

**Applicable Contractual Provisions & Policies**

48. Defendants have breached multiple contracts and binding policies which are recited herein.

49. Match program policies state "during the interview and matching processes, it is a breach of the applicable Match Participation Agreement for . . . a program to request applicants to reveal the names, specialties, geographic locations, or other identifying information about programs to which they have or may apply."

50. Match program policies require the program to give copies of relevant policies to the applicant, and to adhere to those contracts and policies in the event of a match.

51. Residents like Dr. Papin are given a "House Officer Contract." (Exhibit 3) In this

contract, Defendant medical center agrees, among other things, that:

1. It will "administer Physician's training program in accordance with the policies, rules and regulations of the Board of Trustees of Institutions of Higher Learning and the University of Mississippi"

2. "Physician shall have the right of appeal [of disciplines and grievances] as stated in the Handbook for Employees for matters related to employment, and general conduct; and shall have the right of appeal to the Graduate Medical Education Committee for all academic and medical matters."

3. The resident's contract will be terminated during a resident year only for "malfeasance, inefficiency or contumacious conduct by Physician."

52. The Defendant medical center also has an "Administrative Policies and Procedures Manual," a "UMMC Faculty and Staff Handbook," "Guidelines for Academic Remediation" and the "House Officer Grievance Policy" which are incorporated by reference in the House Officer Contract. These policies, and others, are the subject of program director trainings, including trainings administered to Defendant Earl.

53. These policies generally require that issues with medical residents be addressed in discrete steps: 1) performance reviews and informal remediation; 2) formal remediation plan; 3) probation; and 4) termination. The exception is for behaviors which "significantly compromise patient care and safety or create a

hostile work environment," which may justify skipping one or more of these steps. (Exhibit 4)

54. Academic due process requires that residents must be given: 1) Notice of performance problems; 2) an opportunity to demonstrate improvement; 3) a reasoned and thoughtful decision regarding termination, extension of training or other adverse consequence; and 4) an opportunity for a hearing on appeal.

55. Employment due process requires that residents must be given: 1) Notice of performance problems, policy or expectation violations; 2) an opportunity to explain and/or correct the behavior or performance problem; 3) a reasonable decision-making process; and 4) an opportunity for a hearing on appeal.

56. The House Officer's grievance procedures states that dismissal is appealed "to a constituted Departmental Grievance Committee composed of selected peers and faculty." From there, further appeal may be had "by petitioning in writing to the Vice Chancellor for Health Affairs within fourteen calendar days of notice of termination from the program director or chairman . . . " Thereupon, "the Vice-Chancellor will select a faculty member of the Graduate Medical Education Committee to chair an appeals committee. The appeals committee chair will appoint an appeals committee of four (4) additional GMEC or RRSC members, including at least 1 (one) member of the House Staff. The appeals committee chair will promptly convene the committee to hear the appeal, generally within

ten (10) business days of the Vice-Chancellor's appointment of the appeals committee chair." (Exhibit 5)

57. The Board of Trustees of Institutions of Higher Learning requires the Defendant medical center to grant residents and professors a bona fide due process opportunity to appeal their termination, including "the right of confrontation, to deliver advance notice of documents to be used in the hearing as well as copies of such documents in advance of the hearing, a hearing officer who is either knowledgeable in due process matters or has access to legal counsel during the course of the hearing to ensure an impartial and fair hearing." MINUTES OF THE BOARD OF TRUSTEES OF STATE INSTITUTIONS OF HIGHER LEARNING (March 17, 2016).

58. In addition to the contract with the residents themselves, the Defendant medical center is also bound to follow these grievance and due process procedures by the Accreditation Council for Graduate Medical Education, including the "ACGME Institutional Requirements," the "ACGME Common Program Requirements," and the "ACGME Program Requirements for Graduate Medical Education in General Surgery." The requirements of these documents are binding on Defendants.

59. In addition, the academic remediation plan entered between Plaintiff and Defendants on January 10, 2017, was itself a binding and enforceable contract in

which Defendants promised to give Plaintiff a 60-day opportunity to improve, and specifically defined both "significant improvement" as well as the limited circumstances under which this 60-day opportunity could be cut short.

## CAUSES OF ACTION

### COUNT 1: Breach of Contract:

60. Plaintiff incorporates all allegations set forth in all other sections of this complaint.

61. Plaintiff and Defendants have entered one or more contracts, making a number of binding promises to each other.

62. Defendants have promised to abide by their policies and the policies of various governing and oversight bodies.

63. Defendants have promised not to terminate Plaintiff except for "malfeasance, inefficiency or contumacious conduct by Physician."

64. Defendants have promised to ensure that any such termination is undertaken in accordance with specific policies and procedures.

65. Defendants have promised to provide notice of deficiencies and an opportunity to demonstrate improvement before termination.

66. Defendants have promised to provide a meaningful opportunity to appeal any such decision.

67. By the allegations heretofore described, Defendants have breached these and

other binding contractual promises to Plaintiff.

68. As a result, Plaintiff has suffered and continues to suffer severe and irreparable harms.

## COUNT 2: Mississippi Constitution: Sec. 213-A

69. Plaintiff incorporates all allegations set forth in all other sections of this complaint.

70. The Mississippi Constitution, Section 213-A, states that the power to terminate contracts during their term is limited to "malfeasance, inefficiency or contumacious conduct, but never for political reasons."

71. Defendants have violated the Mississippi Constitution by terminating Plaintiff without proof of sufficient malfeasance, inefficiency or contumacious conduct.

72. As a result, Plaintiff has suffered and continues to suffer severe and irreparable harms.

## COUNT 3: Section 1983: Mississippi and U.S. Constitutions: Due Process

73. Plaintiff incorporates all allegations set forth in all other sections of this complaint.

74. Plaintiff has constitutionally and statutorily protected interests in procedural and substantive due process as both a student and a government employee.

75. The actions alleged herein are violations of statutes and the Mississippi and United States Constitutions, which protect against the deprivation of such

interests without due process of law.

76. This action is also brought under the Supreme Court's decision in *Monell* and related cases, for practices and policies of the Defendants which violate the civil rights of the Plaintiff.

77. Plaintiff seeks the full remedies available under Section 1983 against any Defendant or any other person hereafter discovered who is responsible for these violations, in their official or individual capacities.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

a. Find that the practices of Defendants described herein violate the law as alleged;

b. Enter final judgment against Defendants;

c. Compensate Plaintiff fully for all actual and consequential harms caused directly or indirectly by the actions alleged herein, including those actions which prevented Plaintiff from advancing academically this school year, and thereby deprived him of at least one year of his ultimate career as a surgeon;

d. Award back wages;

e. Enter an injunction curing the violations alleged herein on a prospective basis, requiring Defendants to comply with these contractual and constitutional guarantees, and prohibiting any future similar violations;

f. Award compensatory damages for emotional distress and any other pecuniary

and non-pecuniary harms flowing from the actions alleged herein;

g. Award any consequential damages flowing from the unlawful acts complained of herein;

h. Award punitive damages against such Defendants which are responsible for the unlawful acts complained of herein, and are not immune from such liability;

i. Require posting of a notice to all medical residents regarding the violations found by this court, and notifying such residents of the order entered proscribing any future similar violations;

j. Award remedies in an amount sufficient to compensate Plaintiff for all other harms suffered;

k. Award interest, costs, and attorney's fees; and

l. Award all other relief available under any law cited herein, or otherwise.

The foregoing Complaint is respectfully submitted on behalf of Plaintiff by and through counsel:

/s/ Joel F. Dillard___Date:_September 20, 2017_____

Joel Dillard
JOEL F. DILLARD, PA
775 N. Congress St.
Jackson, MS 39202
Ph: 601-487-7369
Email: joel@joeldillard.com
M.S. Bar No. 104202
*Counsel for Plaintiff*