# In Re:  Resident Appeal of Joe Papin, MD

## Transcript of Proceedings

### July 18, 2017



EXHIBIT

16



**Mississippi - Louisiana - Tennessee - New York**
**www.brookscourtreporting.com**

IN RE:   RESIDENT APPEAL OF JOE PAPIN, M.D.

TRANSCRIPT OF PROCEEDINGS

Taken at University of Mississippi Medical Center,
2500 North State Street, Room R-227-8, Jackson,
Mississippi, on Tuesday, July 18, 2017, beginning at
4:32 p.m.

REPORTED BY:

SHANNA CUMBERLAND, CCR #1774

THE PANEL:

    Dr. Steven Bondi
    Dr. Ayman Asfour
    Dr. Demondes Haynes
    Dr. Gustavo Luzardo
    Dr. Ricky Clay
    Dr. Lillian Joy Houston

Transcript of Proceedings 7/18/2017

```
 1    APPEARANCES:

 2
           MARK D. RAY, ESQ.
 3         University of Mississippi Medical Center
           2500 North State Street
 4         Jackson, Mississippi  39216-4500
           mdray@umc.edu
 5

 6                    .
           TOMMY WHITFIELD, ESQ.
 7         Whitfield Law Group, PLLC
           660 Lakeland East Drive, Suite 200
 8         Flowood, Mississippi  39232-9777
           tommy@kitchenshardwick.com
 9

10              COUNSEL FOR UMC

11

12         JOEL DILLARD, ESQ.
           Joel F Dillard PA
13         775 North Congress Street
           Jackson, Mississippi  39202-3009
14         joel@joeldillard.com

15              COUNSEL FOR JOE PAPIN, M.D.

16

17

18

19

20

21

22

23

24

25
```

Transcript of Proceedings 7/18/2017

1                          INDEX

2    Style.......................................1

3    Appearances.................................2

4    Index   ....................................3

5    Certificate of Court Reporter ...........116

6

7                        EXHIBITS

8    Exhibit 1   Notice of Hearing ..............4

9               (Retained by Dr. Bondi)

10   Exhibit 2   Documents ......................4

11              (Retained by Dr. Bondi)

12

13                     EXAMINATIONS

14   Dr. Truman Marc Earl.......................11

15   Dr. Meghan Mahoney.........................50

16   Dr. Ashley Griffin Ray....................71

17   Dr. Colin Muncie..........................86

18   William Crews.............................90

19   Dr. Rick Barr.............................99

20

21

22

23

24

25

Transcript of Proceedings 7/18/2017

```
 1              (Exhibit 1 marked for identification.)
 2              (Exhibit 2 marked for identification.)
 3              DR. BONDI:  I'm Steve Bondi.  I think
 4   everybody in here knows me or knows of me.  I have
 5   been asked by the vice chancellor to chair this
 6   committee made up of graduate medical education
 7   committee members, of which we all are.  And I'm
 8   going to have each committee member introduce
 9   themselves in turn in a moment, as well as the other
10   individuals in the room.
11              A couple of preliminaries before we do
12   that.  First of all, this is?
13              COURT REPORTER:  Shanna Cumberland.
14              DR. BONDI:  Who is a reporter, a court
15   reporter, who is transcribing this conversation,
16   this hearing, so that we have everything on the
17   record for future evaluation.
18              MR. DILLARD:  Can you hear, Joe?
19              DR. PAPIN:  Yes.
20              DR. BONDI:  We just had a little cross
21   talk.  Sorry about that.
22              MR. DILLARD:  If you could mute your
23   phone, Joe, until the time is needed for you to
24   un-mute it, I'd appreciate it.
25              DR. PAPIN:  Sure.
```

Transcript of Proceedings 7/18/2017

```
 1              DR. BONDI:  Most of the people in this
 2    room are not used to working with a court reporter,
 3    and we, in medicine, tend to talk a lot and talk
 4    over each other, so I would ask everyone to be
 5    cognizant of that fact and pause and let -- let the
 6    court reporter know who you are when you're -- when
 7    you're speaking.  So that's kind of the first point.
 8              The second point is:  This hearing is
 9    scheduled for an hour-and-a-half.  I don't know how
10    long it's going to take.  We're going to make sure
11    that we get it taken care of.  We're going to be
12    efficient, but we're going to make sure that
13    everything that needs to get heard gets heard.
14              If it looks like we're going over an hour,
15    we'll take a break.  If somebody needs a break
16    before then, please let me know and we'll -- we'll
17    take a break.
18              Why don't we have everyone introduce
19    themselves, and then I'm going to talk a little bit
20    about the ground rules and how we're going to
21    proceed today.
22              Once again, I'm Steven Bondi.  I'm the
23    chair of -- chair of this committee.  I'm also a
24    pediatric ICU physician.
25              DR. HOUSTON:  Joy Houston, program
```

Transcript of Proceedings 7/18/2017

```
 1    director for psychiatry.
 2              DR. CLAY:  Ricky Clay, program director of
 3    plastic surgery.
 4              DR. LUZARDO:  Gustavo Luzardo, program
 5    director for neurosurgery.
 6              DR. WILLIAMS:  Nilda Williams, senior
 7    radiology resident.
 8              DR. HAYNES:  Demondes Haynes, program
 9    director for pulmonary and critical care.
10              DR. ASFOUR:  Ayman Asfour, A-Y-M-A-N,
11    A-S-F-O-U-R, program director for pathology.
12              MR. DILLARD:  Joel Dillard, counselor for
13    Dr. Papin.
14              MR. WHITFIELD:  Tommy Whitfield, outside
15    counsel for University Medical Center.
16              MR. RAY:  I'm Mark Ray, associate general
17    counsel, Office of General Counsel, University
18    Medical Center.
19              DR. EARL:  Truman Marc Earl; I'm the
20    program director for general surgery.
21              DR. BARR:  Rick Barr, I'm the senior
22    associate dean for graduate medical education and
23    designated official of UMC.
24              MS. AINSWRORTH:  I'm Bryce Ainsworth; I'm
25    the senior administrator in graduate medical
```

Transcript of Proceedings 7/18/2017

```
 1   education.
 2              MS. BARNETT:  I'm Tammy Barnett; I'm a
 3   paralegal with the office of general counsel.
 4              MR. DILLARD:  And Joe, could you announce
 5   yourself on the phone.
 6              DR. PAPIN:  Yeah, Joe Papin.
 7              DR. BONDI:  Okay.  Thank you.
 8              There are some other individuals that we
 9   will likely hear from later this afternoon.  They
10   are specific witnesses to some of the conduct that
11   is going to be presented later.  The reason they
12   aren't in the witness is -- or they aren't present
13   is because they've been sequestered.  Dr. Earl as
14   the program director is going to be here during the
15   entire presentation and as is Dr. Barr as the
16   institutional representative for GME.
17              Any questions about that so far?
18              Okay.  So the purpose of this hearing is
19   to evaluate the appropriateness of the termination
20   of Dr. Papin, both the facts and the process, and
21   we're going to talk about -- we're going to go
22   through both of those.
23              The specific procedure today is going to
24   be that Dr. Earl is going to make his presentation
25   first, then we'll give Dr. Papin an opportunity to
```

Transcript of Proceedings 7/18/2017

1    address the committee but not Dr. Earl.  We're going
2    to follow that by any witnesses that Dr. Earl thinks
3    is appropriate.  Dr. Papin will also have the
4    opportunity to specifically address issues that are
5    brought up at that time to the committee.
6           Once that's concluded, Dr. Papin will have
7    an opportunity to address -- address the committee
8    and then Dr. Earl will have an opportunity
9    thereafter.
10          At the end, after everyone's had their
11   opportunity to be heard, the committee is going to
12   meet and -- and discuss the case.  We are not going
13   to come up with a decision today that is going to be
14   published to the group; it may be tomorrow.  But
15   I -- we don't want to feel that time pressure
16   that -- that we're sitting here to publish a
17   decision today.  I just wanted to manage the
18   expectations.
19          Furthermore, this is not a lawyer process.
20   This is an informal graduate medical education
21   process, so I don't expect the counselors for either
22   side to be part of the process directly.
23   Indirectly, if people need advice, that's
24   appropriate.  If we need to take a timeout for that,
25   that will be appropriate as well.

Transcript of Proceedings 7/18/2017

```
 1              Any questions about that going forward?
 2              MR. DILLARD:  I -- I guess I just want
 3   to -- this is Joel Dillard.
 4              I just wanted to clarify that the
 5   attorneys will not be objecting?
 6              DR. BONDI:  Correct.
 7              MR. DILLARD:  And won't be asking
 8   questions?
 9              DR. BONDI:  Correct.
10              MR. DILLARD:  Won't be calling witnesses?
11              DR. BONDI:  The attorneys won't be doing
12   that, but their -- but the individuals, Dr. Earl and
13   Dr. Papin, can certainly do that as necessary.
14              MR. DILLARD:  So the -- the expectation
15   will be that Dr. Papin would call witnesses and
16   question them himself?
17              DR. BONDI:  Yes, or have them speak their
18   narrative, yes.
19              MR. DILLARD:  And is the expectation that
20   Dr. Papin would ask questions of Dr. Earl's
21   witnesses?
22              DR. BONDI:  He can ask -- he can present
23   his questions to the -- to -- he can make his point
24   to the panel, to the committee.
25              MR. DILLARD:  Okay.
```

Transcript of Proceedings 7/18/2017

1              DR. BONDI:  He is not going to be
2    cross-examining the witnesses, which I think is what
3    you're really getting at.
4              MR. DILLARD:  Right.  Thank you.
5              DR. BONDI:  Okay.  The other thing is, I
6    would encourage the panel members to actively ask
7    questions, and I think we're going -- we're going to
8    be doing that.  We need to represent not just the
9    institution but also the house staff and Dr. Papin.
10   So our obligation is to -- is to try to elicit all
11   the facts that we can, so you should be hearing from
12   us, as well.
13             Okay.  All right.  Any further questions
14   or comments before we start?
15             DR. WILLIAMS:  Nilda Williams.  When a
16   resident is fired from a program, are they able to
17   join another program potentially?
18             DR. BONDI:  Potentially, yes, although
19   that's really beyond the scope of what we're talking
20   about today.  I think it does go to the impact on
21   the decision that we have to make, the solemn
22   decision that we have to make.  Yes.
23             DR. ASFOUR:  I have a question.  Was the
24   resident offered the potential to resign?
25             DR. BONDI:  We're going to talk -- that's

1   something that Dr. Earl, when he goes through, you

2   can certainly ask that question after he has an

3   opportunity to present.

4         Go ahead.

5         DR. EARL:  Okay.  So again, I'm Truman or

6   Marc Earl.  If I call myself "Marc," that's my

7   middle name, so sorry.

8         But Dr. Bondi asked me to give a general

9   timeline of events to start with and then go into a

10  more detailed narrative that lead to Dr. Papin's

11  termination.

12        The -- he began his residency as a

13  categorical surgical intern last July, so July 1st,

14  2016.  Within the first month, we had issues that

15  were unique, but I assumed they may just be

16  personality conflicts and we counseled him.  But

17  then, basically, it became a pattern of difficult

18  interprofessional relationships, difficult

19  relationships with other residents that led to

20  multiple counseling sessions throughout -- or

21  meetings with me, as well as other faculty members

22  over the next four months, with guidelines given of

23  things that needed to improve, things that just

24  can't be done.  And that, ultimately, then led to a

25  formal meeting with me on December the 20th, where

Transcript of Proceedings 7/18/2017

1    we documented things that needed to be improved.

2    They were never academic issues; they were

3    professional issues unrelated to the ability to --

4    or excuse me -- unrelated to the medical knowledge

5    of surgery.  They were related to professionalism.

6              December the 20th, we had a meeting and

7    discussed things that needed to improve and that I

8    was -- that he was under scrutiny.

9              After we go through the holidays and

10   multiple reports coming from multiple sources came

11   back to me that we had issues with truthfulness,

12   some of which certainly created the potential for

13   patient harm and possibly contributed to actual

14   patient harm.  And so I counseled Dr. Papin and

15   said, "These are things that cannot happen because

16   patients, individuals could be hurt by this."  And

17   we discussed that.

18             After we talked, I went and met with

19   Dr. Barr in the GME office, who asked me,

20   essentially, "Is this an academic issue or is this

21   an employment or professional issue."  It very much

22   was an employment, professional issue of telling the

23   truth, being on time, doing the things we've said

24   we've done.

25             He, then, recommended or decided, and

Transcript of Proceedings 7/18/2017

```
 1    which I agreed with completely, that this was an
 2    employment issue and needed to be referred to HR.
 3    We referred it to human resources, that then
 4    after -- and we were also advised, because of
 5    concerns of patient safety, that he was to be placed
 6    immediately on administrative leave, which he was.
 7              HR did their investigation and ultimately
 8    came back to us in February -- I don't remember the
 9    exact day; I believe it was February the 11th or
10    something like that -- that Dr. Papin should be
11    terminated for cause.  And I believe it was based on
12    breach of his employment contract.  And therefore,
13    he was -- he was terminated.
14              Now, so that's sort of the timeline of
15    events.  It began in July.  The issues continued.
16    And I think these are -- these were unique issues.
17    These were not -- I was not dealing with a sampling
18    of these various different issues with other
19    trainees and 33 residents.  These were completely
20    unique to Dr. Papin.  Which, again -- and it
21    repeated, so it caused a lot of concern on my part.
22              The specifics of the events that lead to
23    all of this were -- began in the cardiovascular ICU.
24    And as -- as all you guys know, in surgery, we have
25    a lot of touches all over the hospital, ICUs, ERs,
```

Transcript of Proceedings 7/18/2017

```
 1    children's hospital, adult hospital, and so there
 2    were concerns across multiple care environments.
 3              It began in the cardiovascular ICU where
 4    there were multiple reports from nurse
 5    practitioners, nurses, as well as e-mails to me from
 6    cardiovascular ICU faculty about difficult
 7    interprofessional relationships, complaints from
 8    nurse practitioners about not doing tasks that we
 9    were asked to do, that these were beneath the
10    physician.  These were documented in the evaluations
11    from that rotation.
12              You know, as program director, I thought
13    maybe this is just a personality conflict.  And you
14    know, there was one run-in with a specific nurse
15    practitioner that almost turned violent, and I
16    believed then and I believe now, even, that it was
17    both of them contributing to that.
18              But I talked to Dr. Papin and said, you
19    know, "Listen, we've got to -- you've got to walk
20    away from these kinds of situations.  Let's just
21    make sure this doesn't -- this pattern of behavior
22    doesn't continue."
23              Goes to the next rotation, and I have
24    similar complaints from faculty, nurse
25    practitioners, as well as nurses on that floor.  I
```

Transcript of Proceedings 7/18/2017

1    know that the faculty on that service spoke with

2    him.  The same pattern of evaluations continued:

3    Not doing assigned tasks, be it assigned by a nurse

4    practitioner or a clinic nurse or anything like

5    that.  Sort of our ethos in surgery is that, you

6    know, especially as an intern, "You're new to the

7    team; you do whatever you're told; you do whatever

8    you're asked."  And that was not happening.

9            Again, the pattern continued such that

10   then I said, "Okay.  This is unique.  I've -- I've

11   actually never encountered this, continuing across

12   multiple rotations and multiple environments within

13   the hospital.  He's going to come rotate on my

14   service."

15           So he rotated on my service in October.

16   And from multiple sources, again, nurse

17   practitioners, nurses on our transplant floor, OR

18   nurses.  And these were not just random OR nurses

19   that may show up from time to time in our operating

20   room; these are folks that I work with all the time.

21   Same pattern of behavior:  Not willing to do tasks,

22   not willing to help, some concerns of

23   untruthfulness.

24           Again, we go to the next rotation, and I

25   have the same issues.  Met with him again, and I

Transcript of Proceedings 7/18/2017

1    believe I met with him at some point during that
2    time.  I'm not certain.  Met with him again in
3    November, when he was on the general surgery
4    service.  I had complaints from faculty about not
5    showing up on time, not being where he was supposed
6    to be, walking out of the operating room.
7             I met with him November.  I was scrubbing
8    into a case outside of OR 16.  Met with him, laid it
9    out there, "This has to change.  This is now very
10   clearly a you problem because I've got 32 other
11   trainees that this is not a problem for, and -- but
12   this has to improve."
13            Go to the rotation in December, and I
14   start hearing reports of where -- not rounding on
15   patients we say we've rounded on, not giving
16   information that is correct.  I've looked at
17   something I haven't.
18            And so at that point, we met on December
19   the 20th, and I met with Dr. Papin -- our residency
20   program coordinator was there, as well -- and said,
21   "This -- we are -- all these things have to change.
22   These professionalism issues have to change or the
23   consequences will be dire."
24            We were going into the holiday period,
25   which is a tough time in our residency because half

Transcript of Proceedings 7/18/2017

```
 1    our residents get one-half -- you know, get the
 2    Christmas holiday off, the other half get the New
 3    Year holiday off, and so it's the same amount of
 4    work for half the people.
 5              Made it very clear that I would be -- we
 6    were -- you know, I was concerned that I would be
 7    seeking feedback.  I did not seek feedback until
 8    after all this happened.  And many of the folks that
 9    will talk today are the folks that were with him
10    during this time.
11              The untruthfulness became worse, it
12    appeared, and were -- was -- although I never
13    witnessed any of it personally, the sources that
14    were coming back to me were first-hand knowledge and
15    it was really from so many sources.
16              At that point, I -- and there was concern
17    that some un-- that some of the untruthfulness led
18    to potential patient harm, or at least failure of
19    one safety mechanism.  The issue specifically was a
20    patient who wound up with a Stage 4 decubitus ulcer,
21    where the chief resident asked him on two occasions
22    if he had examined the patient's backside on two
23    subsequent Mondays, and the answer that was repeated
24    was what was in the wound care notes from the week
25    prior.
```

Transcript of Proceedings 7/18/2017

```
 1                 Realizing that, you know, it's not just
 2      the physician's responsibility, you know, but
 3      certainly that's one safety mechanism of ensuring
 4      that these types of things are caught early and
 5      treated.  That mechanism failed and certainly that
 6      created the potential for -- or the safety mechanism
 7      that that chief resident was trying to put in place
 8      to examine that patient's backside and try to
 9      prevent things like this from happening failed.
10                 At that point, I did not feel like this
11      was an issue that I could educate somebody out of,
12      that the telling the truth, showing up on -- telling
13      the truth, being honest, making sure that all of
14      your actions are centered on that patient's best
15      possible outcome and not making your -- that are not
16      self-centered, that this was not a -- this was not a
17      "you need to know more about surgery issue; you need
18      to know more about how medicine is practiced."  This
19      was very clearly an issue where we could not trust
20      him to take care of patients safety -- safely.
21                 I would, as a program director, never feel
22      comfortable about him being alone or trust anything
23      that he said about patient care.  And to me, that
24      was -- there was never any way that I was going to
25      be able to advance him, much less put my name on the
```

Transcript of Proceedings 7/18/2017

```
1    bottom of his surgical training saying that he was
2    going to be a safe, competent surgeon.  Not based,
3    again, on his medical knowledge, but solely based on
4    truthfulness.
5            So at that point, I met with him, I told
6    him about all of this.  We discussed that he would
7    have 60 days to make this better.  I did that
8    because I thought I had to.  And I went -- right
9    after that, went to the GME office and met with
10   Dr. Barr.  We went over all the facts of the case.
11   Dr. Barr very explicitly asked me, "Is there
12   anything he can do to where you'll think he will be
13   able to come back and where you can trust him," and
14   I said, "At the point, no."
15           We have had so much scrutiny on him, and
16   as this scrutiny got worse, the evidence of
17   untruthfulness got worse, which, to me, spelled out
18   that I was very concerned that we were more -- that
19   he was more concerned with how he appeared to be
20   performing rather than how he was actually
21   performing.
22           Dr. Barr said this is not an academic
23   issue; this is an employee issue that applies to all
24   employees throughout the entire University, not just
25   GME.  And so -- that we needed to refer to this to
```

Transcript of Proceedings 7/18/2017

```
 1    HR.  And that he felt, and I wholly agreed, that
 2    this was grounds for -- that this was not -- he was
 3    not safe for patient care and that we needed to get
 4    him out of the hospital as soon as we could.
 5              And HR looked over the case, talked with
 6    both of us, with Dr. Barr and myself, and agreed.
 7    And so we put him on administrative leave, had
 8    several meetings -- or HR did their normal process
 9    for this kind of thing, and based on their findings,
10    recommended termination for cause immediately.
11              DR. LUZARDO:  Can we ask questions?
12              DR. BONDI:  Please.
13              DR. EARL:  Please.
14              DR. LUZARDO:  This is Dr. Luzardo from
15    neurosurgery.
16              Where does he come from?  What is his
17    school, medical school?
18              DR. EARL:  University of Michigan.
19              DR. LUZARDO:  Okay.  Do we have any
20    background?
21              DR. EARL:  So actually -- so I mean, for
22    me, I was actually very excited about Joe coming.
23    He actually worked in a lab -- if I remember
24    correctly, I know Joe -- Joe failed a match his
25    first year, and I believe it was in urology, which
```

Transcript of Proceedings 7/18/2017

```
 1    is not uncommon.  It's not an easy thing to match
 2    into.  It's relatively competitive.
 3              But work -- spent a year working in a lab
 4    in a -- in a -- with a transplant surgeon that I
 5    actually know pretty well and came highly
 6    recommended.  But no clinical background.  That was
 7    the only background that I -- that I had.
 8              DR. LUZARDO:  Has he -- does he have any
 9    history, to your knowledge, of mental illness?
10              I mean, let me clarify this.  What is
11    described here is a deranged individual that cannot
12    adapt to reality.  This is not a behavior of
13    somebody who just tried to hide some deficiencies.
14              So does he have any history of mental
15    illness?
16              DR. EARL:  Not to my knowledge.
17              DR. LUZARDO:  Do we have -- or has he, in
18    any, submitted to a drug test?
19              DR. EARL:  Yes.  So as part of our -- as
20    part of our -- the GME process, when I went to
21    Dr. Barr, that was -- and said, you know, "We have a
22    serious problem," the first thing that was done was
23    the fitness for duty evaluation.  So drug testing
24    was done.  And he was put on administrative -- he
25    was immediately put on administrative leave.
```

```
 1              DR. BONDI:  Okay.  This is Steve Bondi.
 2              What opportunities were there where you
 3    interacted with Dr. Papin where there was formal
 4    written feedback either by you or other attendings?
 5              DR. EARL:  Certainly, on December the
 6    20th, we went over all of his written evaluations.
 7    Where there was written provided feedback to him,
 8    that -- that was the only time where I actually
 9    handed him a piece of paper.  The residents have --
10    obviously, have access to all of their evaluations
11    at any point in time.
12              DR. BONDI:  Could you elaborate on that a
13    little bit?  Because not everybody probably knows
14    how -- I know how that process works, but --
15              DR. EARL:  Sure.  And I have all of his
16    evaluations here.
17              The faculty, when they evaluate a
18    resident, the -- they fill out questions regarding
19    all issues surrounding medical practice, medical
20    knowledge, professionalism, things like that, and
21    it's usually rated on a Likert scale.  We use a
22    Likert scale, 1 to 5.
23              But there's also the opportunity to put in
24    comments.  That's done on an online system, which
25    the residents have 24/7 access to.  And there are
```

Transcript of Proceedings 7/18/2017

```
 1    also peer-to-peer evaluations that are done, so
 2    residents evaluate each other.
 3              DR. HOUSTON:  I think I saw, too, that you
 4    had also done his semi-annual evaluation by that
 5    point, right?  I think that was dated for November.
 6              DR. EARL:  That was in November, yes.
 7              DR. HOUSTON:  So that's formal, written
 8    feedback, as well, right?
 9              DR. EARL:  That's written -- written,
10    formal feedback, as well, yes.
11              DR. BONDI:  Do you have that -- I don't
12    know if everybody has read through that.  Do you
13    have that available with you today?
14              DR. EARL:  I don't know that I -- I'll
15    have to -- let me see.
16              DR. CLAY:  Are you referring to his
17    milestones?
18              I'm sorry; Ricky Clay.
19              DR. EARL:  Well, his semi-annual review
20    that, you know, we obviously have to do.
21              DR. BONDI:  Careful, guys, one at a time.
22              DR. EARL:  So here is a copy of the -- the
23    discussion that we outlined.  That's page -- I'm
24    sorry.
25              DR. BONDI:  This is Dr. Bondi.
```

Transcript of Proceedings 7/18/2017

```
 1                We've just got to make sure that we're --
 2   we know what's being referred to.
 3                DR. EARL:  Yes.
 4                DR. BONDI:  So this is an e-mail from --
 5   from Dr. Earl to Molly Brasfield who's one of our --
 6                DR. EARL:  It was actually the e-mail that
 7   was sent to -- I'm sorry -- Marc Earl -- to Renee
 8   Green, is the original --
 9                DR. BONDI:  Right.
10                MR. DILLARD:  Could I -- could I make a
11   point of clarification?
12                DR. BONDI:  Please do.
13                MR. DILLARD:  Maybe what might make sense
14   is if the court reporter has a copy of the documents
15   which have this Bates stamp on it, Papin 01 through
16   this, you refer to them by the Bates stamped number.
17                DR. BONDI:  I'd be happy to do that.
18                MR. DILLARD:  It will make the record
19   clear forever and forever.
20                DR. BONDI:  Okay.  Thank you.  I
21   appreciate that feedback.
22                So we're looking at what's been labeled as
23   Papin 003, and that's the e-mail from Dr. Earl to
24   Renee Green, clarifying what I said before.
25                MR. WHITFIELD:  Dr. Bondi, for
```

Transcript of Proceedings 7/18/2017

```
 1    clarification -- this is for the record -- that's
 2    part of Exhibit Number 2.
 3              DR. BONDI:  Okay.
 4              MR. WHITFIELD:  All the Bates documents
 5    are Exhibit 2.
 6              DR. BONDI:  Okay.
 7              MR. WHITFIELD:  And the notice of the
 8    hearing is Exhibit 1.
 9              DR. BONDI:  Okay.
10              MR. WHITFIELD:  So for record
11    clarification, that's where the documents are
12    located.
13              DR. BONDI:  Okay.  Thank you.
14              DR. EARL:  The other -- I don't -- I don't
15    know -- I don't know that I have a copy of his
16    actual semi-annual review, but I do have copies of
17    his milestones, which he received -- out of 16
18    milestones in general surgery, he received seven
19    critical deficiencies.
20              Our clinical competency committee -- so
21    for those not in the GME world, the clinical
22    competency committee is a ACGME mandated committee
23    of at least three faculty member -- faculty members
24    that then evaluate resident performance based on
25    multiple sources, not just evaluations and hearsay,
```

Transcript of Proceedings 7/18/2017

```
 1    but also other -- and personal experience.  But
 2    all -- all information we have regarding -- or
 3    evaluating resident performance, and then they make
 4    a determination of where that resident stands in the
 5    progression towards competency as a general surgeon.
 6            I am not a voting member of that
 7    committee.  I -- I am not even part of that.  I use
 8    other faculty to do that.  Program directors can be
 9    a part of it, but I -- in our program, I am not.
10            So this was done by other faculty members.
11    He received 7 of 16 critical deficiencies, which,
12    again, is a tremendous outlier.
13            DR. LUZARDO:  Let me ask two questions.
14    The first one is:  What is the purpose of the
15    lawsuit?  What does he expect at the end of this
16    lawsuit?  What is he in search of?
17            It seems to me that this is beyond a point
18    of no return.
19            DR. BONDI:  So we're not talking -- that's
20    not what we're talking about.  What we're talking
21    today here, is he has appealed the determination of
22    the department of surgery and the graduate --
23    graduate medical education department.  And we --
24    our job is to review that decision and see whether
25    he was both given appropriate process and whether
```

Transcript of Proceedings 7/18/2017

```
 1    the facts support that determination.
 2              DR. LUZARDO:  Was he given the opportunity
 3    to resign by HR, to anybody's knowledge?
 4              DR. EARL:  No.  We -- he was terminated.
 5    And there was -- he was -- the determination was
 6    made to terminate with cause, and so that was --
 7              DR. LUZARDO:  Yeah.  But he could have
 8    resigned at any time before?
 9              DR. EARL:  He could have resigned.
10              DR. LUZARDO:  He elected not to?
11              DR. BONDI:  I'd like to ask a follow-up
12    question.
13              So the summative evaluations, did anyone
14    go over those with Dr. Papin?
15              DR. EARL:  Yes, yes.
16              DR. BONDI:  And who was that?
17              DR. EARL:  Me.
18              DR. BONDI:  Okay.  And do you remember
19    about when that was?
20              DR. EARL:  That was during his semi-annual
21    review in November.
22              DR. BONDI:  In November.  Okay.
23              DR. WILLIAMS:  Nilda Williams.
24              In reading his statement, it seemed
25    like -- so if November was when he met with
```

Transcript of Proceedings 7/18/2017

```
 1    (unintelligible) and then January was when he was on
 2    administrative leave, it's kind of -- that's time --
 3    but you're not a lot of time and then just from what
 4    he read, what he had said or whatever, is that he
 5    was unaware of a few of the complaints.  I don't
 6    know.  He -- I mean, a lot -- he said many times,
 7    "It was the first time I've heard of anything like
 8    that."
 9              DR. EARL:  That's -- and throughout all --
10    so having met with him multiple times, literally
11    almost monthly throughout this, that was a constant
12    question.  "I need feedback.  Nobody is telling me
13    anything."  I don't have any other residents I'm
14    meeting with monthly for interprofessional,
15    professional issues, not one.  And so he was always
16    aware of what I was hearing and what I was being
17    told much more so than any other trainee.
18              DR. HOUSTON:  Joy Houston.
19              Just a follow-up on Dr. Luzardo's
20    questions.  Since we hear that pretty much every
21    time it was treated as though it was new
22    information, was there any suspicion of cognitive
23    difficulty?
24              DR. EARL:  No.  I mean, I -- well, I had
25    no suspicion.  I actually think Joe is very, very
```

Transcript of Proceedings 7/18/2017

1    intelligent, and so I never had a concern of -- like
2    I said, of medical knowledge, of cognitive problems.
3    I mean, that never really -- I mean, obviously,
4    substance abuse, things like that were concerning,
5    because the pattern of behavior was so different
6    than standard resident and so unique.  But I never
7    had concern of any sort of cognitive problem.
8              DR. LUZARDO:  Since a recommendation was
9    from an acquaintance of yours at the University of
10   Michigan, then I don't quite see -- did you follow
11   up with that person?  Have you rediscovered anything
12   since all this came to light?
13             DR. EARL:  I have not.
14             DR. BONDI:  I know you said you
15   discussed -- I'm sorry.  Steve Bondi.
16             I know you discussed the specifics with
17   Dr. Papin on several occasions, which you told us.
18   Was there any memorialization of those specific
19   events?  Meaning did you, like, write down "I'm
20   talking to you about this, this and this" or are you
21   memorializing on your own?
22             DR. EARL:  Certainly, there was a review
23   of all of his evaluations at the November
24   semi-annual review, and then, obviously, the e-mail.
25   I think it's Number 3.

Transcript of Proceedings 7/18/2017

```
 1              DR. BONDI:  So let's just make sure we're
 2   referring to -- we're all looking at the same
 3   document.
 4              Is that the same one we're talking about?
 5              DR. EARL:  Yes.
 6              DR. BONDI:  This one here?
 7              DR. EARL:  Yes, December 20th.
 8              DR. BONDI:  So Dr. Earl is referring to
 9   that same Exhibit 2, Bates Number 3 document.
10              One of things you -- you mentioned was
11   that there were multiple episodes of -- of
12   untruthfulness, and you gave quite a bit of detail
13   on the one at the end about the -- about the wound
14   care.
15              DR. EARL:  There were several others.
16              DR. BONDI:  Do you -- do you recall any of
17   the specifics about the other episodes?
18              DR. EARL:  I do.  And I -- I had two
19   senior residents:  One was a senior resident
20   complaining or telling me that he had signed out a
21   patient that was going from ER to ICU when there was
22   no evidence that that ever happened and the ICU
23   didn't know the patient was coming.  Obviously,
24   that's concerning.
25              There was another issue of a wound that
```

Transcript of Proceedings 7/18/2017

```
 1    was claimed to have been washed out.  Two chief

 2    residents -- senior residents -- sorry -- their

 3    senior residents -- there was knowledge of the

 4    bedside nurse -- and this was somebody in the ICU, a

 5    trauma patient that that had ever happened.  And the

 6    senior resident asked him if it had been done;

 7    "yes."  The senior resident went there; the bandage

 8    was still the old bandage.  The senior resident had

 9    to do it.

10              There was, then, unsolicited feedback from

11    a medical student that was on the service with him,

12    and I believe -- I don't know if I need to refer to

13    the actual document, but that document is Exhibit 2,

14    Bates Number 8, from William Crews, who is a -- was

15    a third-year medical student on the trauma service,

16    stating that he would not come in -- he would come

17    in typically after, when the other interns would

18    come in.  The students would see all the patients.

19    He would not have seen any and report to the chief

20    resident that he had seen them.  That occurred on

21    multiple occasions.  And that -- the chief resident

22    suspected that, the medical student corroborated it.

23              I'm trying to think if there's more.

24    There was -- let me look through some of these

25    e-mails.
```

Transcript of Proceedings 7/18/2017

```
 1              One of the issues we had was leaving
 2    campus, as well, while on call to go run or
 3    exercise.  I mean, obviously, during the day and on
 4    first call, that's just not something we do.
 5              There was an issue -- and again -- I mean,
 6    another issue that just sort of, to, me spoke to
 7    professionalism and really went against what I, as
 8    the program director in surgery, think as sort of at
 9    the ethos of surgery -- really, of medicine,
10    frankly.
11              But there was a patient on the service
12    that he was on that coded at or literally minutes on
13    the floor after sign-out.  Patient was not signed
14    out as sick or anything.  It may not have been; I
15    don't know.  But then, when the oncoming intern
16    texted him and asked him, "Come back, help me" --
17    and this was minutes after 6:00 o'clock at which
18    sign-out occurs.  And I've seen the text message
19    that were sent back and forth.
20              It was just he reacted with -- very
21    inappropriately, I thought, very angry at the
22    prospect of, "You need to come back.  We need help.
23    I don't know what's going on with this patient."
24    And one of the senior residents witnessed all that.
25    This is on -- again, on his service, this is his
```

Transcript of Proceedings 7/18/2017

```
 1    patient.
 2            That just, to me, was very, very much not
 3    congruent with the type of surgeon that I want to
 4    train.  If requested, you will always come back.
 5            So those are -- again, this is the same
 6    Exhibit A or whatever, 2, Pages 27 and 28.  If
 7    anybody wants to read those, those are the text
 8    messages that were sent to his co-intern.  And the
 9    timing of those is 6:16.
10            DR. BONDI:  Are there any further
11    questions from the committee members for Dr. Earl at
12    this time?
13            So Dr. Papin -- I'm sorry -- it's Papin.
14    I apologize.  This is Steve Bondi, the -- the chair.
15    We're going to give you a specific opportunity to
16    present your side later, but if you would like to
17    direct specific comments towards what Dr. Earl has
18    said at this time, you're welcome to do that.  I
19    would appreciate if you direct those to the
20    committee.  And we may, after hearing what you have
21    to say, ask some question of Dr. Earl.
22            So you can use this time to do that now,
23    but you'll also get an opportunity to certainly give
24    your -- give your uninterrupted side of -- of this.
25            MR. DILLARD:  Can I have two minutes?
```

```
 1              DR. BONDI:  Of course.  We'll take a brief
 2    break.
 3              (Off the record.)
 4              DR. BONDI:  All right.  So Dr. Papin, what
 5    would you like to add at this point to the
 6    committee?
 7              DR. PAPIN:  Sure.  You know, I'd like to
 8    add, first and foremost, that I think in the six
 9    months I was there, I was never really given an
10    opportunity to show any sort of improvement.  I
11    wasn't given any sort of feedback, based on the
12    small amount of feedback that I was given to improve
13    in any way.
14              And then I -- I think the issue that --
15    that Dr. Earl brought up, I think you can break them
16    down into professionalism and then issues of honesty
17    and then a few other things that he brought up, so
18    I'll go with professionalism first.
19              Even in my evaluation -- and I mean, I'm
20    quoting this -- but I'm polite, I get along with
21    everyone, and then there's others that don't say
22    that.  So at the very least, that's me.
23              Second of all, going on to the same point
24    of professionalism, I asked Dr. Earl, and he was
25    telling me, you know, I'm getting reports from
```

Transcript of Proceedings 7/18/2017

1    nurses, you know, but he wouldn't give me anything
2    specific.  And I think he said that, and he kind of
3    contradicted himself, that he gave me absolutely no
4    specific instances when something was happening,
5    which I would have found incredibly helpful.
6    Because obviously there's a disconnect between, you
7    know, these reports that he's supposedly being given
8    and anything that I'm seeing or experiencing.  So
9    you know, the -- it would be really helpful to see,
10   okay, this is something specific, now, okay, that's
11   when I was unprofessional in some way, and now I can
12   take action.
13            And then, on the points of honesty, he
14   addressed four of those.  There was the decubitus
15   ulcer, the issue with the ICU, and another issue
16   that was within the ICU about a wound washout and
17   then the fact that I, at some point, never saw
18   patients.
19            So when it came to the decubitus ulcer,
20   again, he never mentioned that specifically to me,
21   ever.  What he did tell me in that January 10th
22   meeting is that I -- I had said that I performed a
23   physical exam, and I, in fact, didn't and it led to
24   direct patient harm.  And that was all he would tell
25   me.  In fact, on that -- on that time and other

ac69

Transcript of Proceedings 7/18/2017

1    times when I would ask him specific, he would get
2    angry, irate and tell me, "Joe, you always do this."
3    This is how feedback is in surgery.  A sigh in the
4    operating room for an attending no longer listening
5    to your presentation, that's your feedback.  You
6    know, the big -- and I'm still paraphrasing what he
7    said.  There's a big movement in surgery to get more
8    feedback.  I don't believe in it.  I don't think so.
9    I mean, you know most of the feedback that you get
10   is nonverbal.  So -- so that was that was what I
11   got.
12            I -- once I found out about this decubitus
13   ulcer issue in the HR meeting, I offered evidence
14   from my phone that I, in fact, had communicated all
15   of this information, that it had been documented
16   that this patient had had a decubitus ulcer before I
17   even began and that I wasn't the only resident or
18   nurse practitioner that -- to see him, not that --
19   I'm not a nurse practitioner, but there were nurse
20   practitioners that rotated on and off the service,
21   two of them that alternated.  There was two other
22   interns on the service at the time.  There was a
23   chief resident, Meghan Mahoney.  You know, there
24   were several other people, and it was documented
25   before I even got on the service that this person

Transcript of Proceedings 7/18/2017

```
 1    had a decubitus ulcer and had been being followed by
 2    the decubitus ulcer team.  I went and saw this
 3    patient, I saw the wound.  There was a scab covering
 4    it.  And I communicated that to Meghan Mahoney that
 5    it didn't look that bad.  Well, I didn't realize
 6    that if you peel off the scab, you know, obviously,
 7    it looks much worse.  I wasn't able to see it again.
 8    But I guess it looked much worse when she peeled
 9    that scab off.
10             But when you look at a textbook, you know,
11    the stages of decubitus ulcer, they don't show a
12    scab.  So it wasn't that I wasn't looking at these
13    wounds.  It wasn't that I was lying about having
14    seen these wounds.  There was just a gap in medical
15    knowledge.
16             The wound washout, that was brought up to
17    me.  I did the wound washout.  Moreover, when I did
18    the wound washout, there was a ophthalmology
19    resident in the room conducting -- I believe he was
20    suturing this patient's eyebrows at the head of the
21    bed while I was prepping and I also started doing
22    the washout myself.  So I don't have access to
23    medical records anymore, but it would be pretty easy
24    to see which ophthalmological resident wrote a note,
25    and we can ask him.  I'm sure he would remember me.
```

Transcript of Proceedings 7/18/2017

1    I grabbed a suture for him, helped him out.  We
2    talked in the room.
3            So you know -- and I communicated that to
4    Meghan Mahoney, and nobody said anything to me until
5    days afterwards, until Meghan mentioned something to
6    me and asked me about this.  And I told her the
7    exact same thing.
8            And then the issue of never having seen
9    patients.  (Unintelligible) I arrived, I'd sign out.
10   You've got to sign out with interns, the other
11   intern.  I went back up, saw patients, and then we
12   would round table rounds with the senior resident,
13   Meghan Mahoney about 6:45 most days.
14           So I don't really know the genesis of that
15   story.  Again, this is the first that I heard that
16   this was occurring at all, was in the documents that
17   were sent to my attorney, Joel Dillard.  So you
18   know, I really can't comment much more on that other
19   than to say that that never happened.
20           And then there was another issue which I
21   haven't brought up before, but going to -- Dr. Earl
22   mentioned this.  He mentioned this to me
23   specifically as well.
24           Going out to run and go for exercise.  You
25   know, I've seen many others residents leave the

Transcript of Proceedings 7/18/2017

1    hospital during work hours to go and exercise.  And
2    I asked Meghan Mahoney on one specific instance if
3    it would be okay, you know, if there was nothing
4    going, if it would be okay if I just brought my
5    pager with me and went for a run right around the
6    campus.  She said yes, and this is commemorated by a
7    text.  And she said yes.  I did it; there was no
8    issue.
9             Then you know, sometime later, the same
10   situation happened, again.  It was pretty -- I got
11   all my work done at that point, and I texted her and
12   she became irate, started cursing over the text
13   message, you know, swearing.
14            And evidentially, she shared that with Dr.
15   Earl, and Dr. Earl spoke to me about it.  And what
16   he didn't know was that she had let me go before.
17   And he was surprised, actually, in the meeting when
18   I told him, "Well, she had let me go before, and I
19   was just asking."  It's not like I did it without
20   permission or even getting with them at all.  I did
21   it the one time with permission and that was it.
22   And I offered to show him the text messages but he
23   declined.
24            And that's kind of a pattern.  I was never
25   really able to give any sort of evidence to refute

1    or even know the circumstances under which most

2    things occurred.

3            And then to go back to the issues of

4    honesty, the ICU -- you know, these are -- this

5    isn't unique.  This is -- I mean, this would happen

6    all of the time where a resident would say they had

7    spoken to the ICU, and someone in the shuffle of the

8    ICU wouldn't know that somebody was coming.  But

9    what I had done was I had put in the admission

10   orders for the patient.  I had put in the admission

11   orders for this patient to go to the ICU.  I

12   communicated everything about this patient, status

13   and everything, to the senior residents, and the

14   note was in -- and I had spoken to the ICU.  And

15   evidentially after I had left, a conversation to

16   which I wasn't privy, call and spoke to the ICU --

17   he said he was working an overnight shift, if I

18   remember correctly, and I was done whenever I was

19   done.  He called me -- I was already called when he

20   called me and asked me to confirm that I hadn't

21   spoken to the ICU, and I said, "No, I have."

22           You know, but -- you know, that's -- that

23   was what was occurring and that's not unique.  That

24   happened very frequently.

25           And then, there was some other issues,

Transcript of Proceedings 7/18/2017

1    too, that Dr. Earl brought up that he switched one

2    of my rotations to be on his service, the transplant

3    service, in October.  At the completion of that

4    rotation, I asked him how I had done.  I solicited

5    the feedback.  I asked him, you know, how did I do

6    in his service or something.  He told me I did a

7    great job.  You know, no complaints whatsoever.  And

8    then a few months later, November, December-ish, he

9    told me, "Well, once I spoke to the operating room

10   nurses, actually some of this -- you know, it was

11   communicated to me that" -- you know, whatever it is

12   that was communicated to him, he didn't really

13   expand much on it.  But that I, in fact, hadn't done

14   a good job.  So that, to me, was odd.

15            And then just feedback overall, like I

16   said, it seemed like Dr. Earl correctly

17   characterized the fact that I would ask and not be

18   given instances and facts.  Not -- and denies -- and

19   he would become irate that I would even ask for --

20   you know, when someone is telling you you're doing a

21   poor job in some aspects of your job, what

22   specifically it was.  And I didn't do it in a manner

23   to question it or you know, to attack it; I was

24   doing it to genuinely improve.  And he just

25   didn't -- that wasn't what he described, I suppose.

Transcript of Proceedings 7/18/2017

```
 1            And then there were a few other issues,
 2   you know, that just come up for the very first time.
 3   For example, walking out of the operating room.
 4   Dr. Earl mentioned that.  That's new to me.  Being
 5   late frequently, again, he had never, ever in any of
 6   our conversations, in person, written, in any form
 7   of communication mentioned that I had a problem with
 8   tardiness.  This is all something that's came out
 9   after I was dismissed and in those communications
10   that were sent to my attorney, Joel Dillard.
11            DR. BONDI:  Did you have anything else to
12   add -- this is Steve Bondi, again -- at this time?
13   You're going to have another opportunity to -- after
14   all of the witnesses have spoken, to speak to us
15   again.
16            DR. PAPIN:  No.  That's it.
17            Thank you.
18            DR. BONDI:  Okay.  Do any of the committee
19   members want to ask Dr. Earl any questions based on
20   what we've heard?
21            DR. HOUSTON:  Joy Houston.
22            So speaking of mixed reviews, I know that
23   at least in psychiatry, it's actually kind of
24   uncommon for a faculty to be all that explicit with
25   negative comments.
```

Transcript of Proceedings 7/18/2017

```
 1              DR. EARL:  Yes.
 2              DR. HOUSTON:  Faculty tend to be kind of
 3    reluctant to give negative comments.  Is that the
 4    case with surgery as well?
 5              DR. EARL:  Actually, it -- it's definitely
 6    the case with surgery.  It's hard for us to get
 7    comments, typically, and negative comments are
 8    abnormal.
 9              DR. HOUSTON:  And so would you say that
10    this is an abnormal number of negative comments for
11    a single resident?
12              DR. EARL:  Without a doubt.
13              And I actually ran the statistics on his
14    evaluation numbers, because if you look, three is in
15    the middle.  But when look at it, you run the
16    statistics and you compare it to the other interns,
17    he's actually a standard deviation below the other
18    interns.  And these are evaluations from other
19    residents.  And a lot of -- and yes, so to answer
20    your question, that's true.
21              DR. HOUSTON:  Well, to follow up on the
22    statistics:  In that case, I would assume that
23    similar to probably most of our programs, it's
24    actually rather unusual for any faculty to give
25    someone anything below a three?
```

Transcript of Proceedings 7/18/2017

1              DR. EARL:  That would be correct.  It's
2      unusual.  It does happen from time to time, but yes.
3      That -- that is correct.
4              DR. LUZARDO:  The University -- I would
5      expect that they would have had that.  But there is
6      a timestamp with the use of the badge for people who
7      is on call when they remove the car from the campus.
8      And we don't have that all along during the six
9      months he's here?  That can be graphed very easily,
10     the times he's on call, the times that -- you know,
11     rounds starts at 7:00.  If he started at -- you
12     know, the timestamp to the entrance of the parking
13     lot -- I think that, perhaps, not now -- I don't
14     know if the University has it.
15             But it's a vitals -- we have that,
16     actually, real issues with the staff over
17     documentation of cases of being present for the case
18     where you stamped your parking lot out.  So that
19     would be something to consider.
20             DR. BONDI:  I have a question about the
21     evaluation.  This is Steve Bondi, again.
22             I know that I don't always submit my
23     evaluations on time.  I'm sure everybody on the
24     panel here is scrupulous with their timing.
25             Do you -- and you may not know this.  Do

Transcript of Proceedings 7/18/2017

1    you recall how timely the evaluations were in the

2    system for -- for him?

3            DR. EARL:  I do not.  I know that most --

4    many of these evaluations were available in

5    November.

6            DR. BONDI:  Okay.

7            DR. EARL:  But yes, there is, without a

8    doubt, a lag between the information that I have to

9    give back to the resident and real time, and I do

10   not often have information as it is happening.  So

11   whenever we -- you know, if I -- unless I have a --

12   really, a dire issue where we have a severe patient

13   safety issue that is actively happening and we need

14   to pull somebody out instantly, that information can

15   lag from days to weeks to months, actually.

16           DR. BONDI:  And I have little doubt that

17   you nag your faculty in general, that, "Hey, I need

18   to get the evaluations done."

19           Did you ever do that specifically about

20   him?

21           DR. EARL:  No.  I do it in general all the

22   time, "Please, please do this."  We have an

23   automated system that generates e-mails asking

24   faculty to return this, as we all know well, and

25   specifically, I have to -- but no, I never

Transcript of Proceedings 7/18/2017

```
 1     specifically ask faculty, "Please give me -- fill
 2     out your evaluations for Dr. Papin" specifically.
 3              And these evaluations are actually -- I
 4     had redone them prior to the beginning of the year
 5     such that they are mapped to our milestones and not
 6     just the comments, but the questions, as well, and
 7     were done specifically so that I could get better
 8     feedback for the resident as -- as it relates to the
 9     general surgery ACGME milestones.
10              DR. CLAY:  If I may interject -- Ricky
11     Clay, plastic surgery -- to just point out, in the
12     department of surgery, there is actually an RVU
13     penalty for late evaluations.  It costs us not to
14     send our evaluations in on time.
15              DR. BONDI:  I'm really glad we don't have
16     that in the department of pediatrics.  That's all
17     I'm saying to Dr. Barr, who is the chair of
18     department of pediatrics.
19              Does anybody else have any other questions
20     about what we've heard for Dr. Earl at this point?
21              MR. ASFOUR:  Ayman Asfour, pathology.
22              You have six months evaluation for this?
23              DR. EARL:  Yes, I have all the evaluations
24     that I received.
25              MR. ASFOUR:  And you -- the CCC committee,
```

Transcript of Proceedings 7/18/2017

1    they came out with the decision this person is not

2    fit to go to next stage?

3            DR. EARL:  Well, they -- they -- they --

4    out of 16 general surgery milestones, we had seven

5    critical deficiencies.

6            MR. ASFOUR:  So he had seven documented in

7    the CCC committee?

8            DR. EARL:  Yes.

9            MR. ASFOUR:  So it's not your word

10   against his word?

11           DR. EARL:  This is what the CCC committee

12   came up with.

13           And I believe that I was even absent when

14   they met from that meeting.  I mean, a lot of times,

15   I'll attend and just listen because I -- I like to

16   hear the feedback.  I -- I go sort of out of my way

17   to be quiet, typically, in that committee, because I

18   just want to listen.  Because getting feedback about

19   residents is actually a very hard thing to do from

20   faculty members.  It's not an easy thing to get, and

21   that's a good place for me to get it.  But I think

22   it was absent, but I can't -- I can't say that for

23   sure.

24           DR. BONDI:  Doctor, who would you like to

25   have us hear from next?

Transcript of Proceedings 7/18/2017

```
 1            DR. EARL:  The CCC committee.  I explained
 2   that earlier.
 3            MR. DILLARD:  Are we still aiming to be
 4   done at 6:00?
 5            DR. BONDI:  Well, I don't think -- I mean,
 6   it's a quarter -- it's 25 'til 6:00.  I don't think
 7   that is going to occur.
 8            MR. DILLARD:  Okay.
 9            DR. EARL:  The CCC committee, that's what
10   we were -- the -- it's the clinical competency
11   committee that is made up of three faculty members,
12   that creates the milestone document that advises the
13   program director about a resident's progression
14   towards competency.  And what -- and it is unique to
15   each medical specialty.
16            DR. WILLIAMS:  Nilda Williams.
17            That's just for a problem resident or it's
18   done for each?
19            DR. EARL:  It's done for every resident
20   everywhere.
21            DR. WILLIAMS:  Every six months?
22            DR. EARL:  Every six months.
23            DR. WILLIAMS:  And November was when this
24   meeting happened?
25            DR. EARL:  No.  The CCC committee did his
```

Transcript of Proceedings 7/18/2017

```
 1    milestones -- I would have to look back at the exact
 2    date that it was filled out.
 3              DR. WILLIAMS:  Can I ask Dr. Papin a
 4    question?
 5              When is the first time that you saw an
 6    evaluation, like an evalu, that you recall?
 7              Are you there?
 8              DR. PAPIN:  Are you asking me a question?
 9              DR. WILLIAMS:  Yes, yeah.
10              DR. PAPIN:  I'm sorry.  It's difficult to
11    hear you.
12              DR. WILLIAMS:  No.  That's all right.
13              I was asking when was the first time that
14    you say an evalu, that you read an evalu, that you
15    recall.
16              DR. PAPIN:  On or about probably the
17    beginning of the second month, so August of 2016.
18              DR. WILLIAMS:  And do we have those
19    evaluations?
20              DR. BONDI:  This is Dr. Bondi.
21              There is -- 17, 18, 19.  And they're
22    aggregated as -- which is the way we usually see.
23              I can tell you that as a CCC member in the
24    department of pediatrics critical care, that's the
25    way we see them, as aggregated.  We don't see the
```

Transcript of Proceedings 7/18/2017

```
 1    individual evaluations.
 2              DR. EARL:  Those -- those are the
 3    milestones.
 4              DR. BONDI:  I'm sorry.  What was the date,
 5    Marc?
 6              DR. EARL:  November the 8th, was when the
 7    milestones were put into the ACGME system.
 8              DR. HOUSTON:  So the meeting was before
 9    then?
10              DR. EARL:  Typically, a couple of days or
11    a day before.
12              DR. BONDI:  All right.  Who would you --
13    who would you like to have us listen to next?
14              DR. EARL:  Meghan Mahoney.
15              (Off the record.)
16              DR. BONDI:  Dr. Mahoney, we've met before.
17    I'm Steve Bondi.  You'll remember me from the PICU.
18              You understand why you're here, correct?
19              DR. MAHONEY:  Yes, sir.
20              DR. BONDI:  Okay.  So this is an informal
21    process.  What's going to happen is, is that
22    Dr. Earl is probably just going to ask you to tell
23    what you're here to tell us.  The committee members
24    may ask you some questions.  And then Dr. Papin is
25    on the phone.  He's not going to ask you questions
```

Transcript of Proceedings 7/18/2017

```
 1    directly, but he's going to have an opportunity to
 2    respond, and then we may ask you questions.  So he's
 3    not -- there is not going to be a cross-examination
 4    or anything like that.
 5              DR. MAHONEY:  Sure.
 6              DR. BONDI:  Just so you understand.
 7              So do you have anything specific where you
 8    wanted to start?
 9              DR. EARL:  Yeah.  So I guess what I would
10    be interested in is specifically telling us the
11    events surrounding your experiences:  Number one,
12    the issue of when we left the hospital -- or when
13    we -- we -- Dr. Papin left the hospital to go
14    exercise while on your service, what you knew about
15    that, if you gave permission to do it, and then the
16    events around the patient that had the decubitus
17    ulcer and what you were told by him.
18              DR. MAHONEY:  In regards to the
19    exercising, I was in the operating room, and when I
20    got out, I saw that he had sent a text about 30
21    minutes earlier, asking -- or really just saying,
22    "I'm going to go for a run if that's okay with you.
23    I'll be readily available; I'll have my pagers."
24              And when I saw it, I, you know, sent a
25    text saying, "Are you -- are you joking?"  And he
```

Transcript of Proceedings 7/18/2017

```
 1   said he was.  And I said, you know, "That's not
 2   okay."
 3              So I didn't give him permission.  He said
 4   he didn't go.  But I just found it very
 5   unprofessional for him to ask to go running during
 6   hours when he's in-house and he is first call for
 7   trauma.
 8              DR. LUZARDO:  Was he expected to be in
 9   that surgery?
10              DR. MAHONEY:  No.
11              DR. LUZARDO:  I mean, you were in the OR?
12              DR. MAHONEY:  I was in the OR; he was not
13   expected to be in the OR.
14              DR. BONDI:  And this is Dr. Bondi.
15              Was that the first time you and Dr. Papin
16   had ever discussed exercise or leaving to exercise?
17              DR. MAHONEY:  To my remembrance, yes.
18              DR. HAYNES:  And you never -- Demondes
19   Haynes.
20              You never gave him permission to leave
21   while he was on call?
22              DR. MAHONEY:  No, I did not.
23              DR. LUZARDO:  Was that surgery from your
24   service or was that surgery for somebody else that
25   you were helping operate?
```

Transcript of Proceedings 7/18/2017

```
 1            DR. MAHONEY:  It was a trauma surgery.  It
 2  was a trauma operation.
 3            DR. EARL:  Your service?
 4            DR. MAHONEY:  Yes, my service.
 5            DR. LUZARDO:  Would you say that any other
 6  intern would have been generally expected to show up
 7  to that surgery?
 8            DR. MAHONEY:  No, not necessarily.
 9  There's a midlevel that usually would help me.  And
10  the interns, they're very -- because there's a --
11  it's a large patient census, so they are expected
12  to, you know, work on trying to get the patients
13  discharged and --
14            DR. LUZARDO:  So there was nothing going
15  on, so that's why he --
16            DR. MAHONEY:  I also didn't have them come
17  in if they were first call, because they would get
18  all the floor calls.  So I didn't want that to be in
19  the operating room.
20            DR. EARL:  And then what -- tell us
21  your -- when -- or what your experience was with the
22  patient that had -- that wound up having a decubitus
23  ulcer that was on your service, the events -- the
24  timeline and events that lead up to it.  When did
25  Joe take over caring for the patient, what were the
```

Transcript of Proceedings 7/18/2017

1    questions that were asked and what were the answers

2    that you received?

3            And you can refer to Bates Page 9,

4    Number 9.

5            DR. MAHONEY:  So because I was in ICU for

6    a year, I was very familiar with decubitus ulcers.

7    And knowing that we had a lot of patients on the

8    trauma service, some of which were quadraplegic,

9    paraplegic and could be in-house for a long period

10   of time, I had pretty much an unwritten rule that

11   the interns were told at the beginning of the month,

12   "I want nutrition, labs and the patient's looked on

13   the backside by you every Monday."  Just a specific

14   day, do it every Monday, you know, no questions

15   asked.

16           So on this particular patient, on rounds,

17   I asked if he looked at the backside, and he said,

18   "Yes, everything is okay."  A week later, he -- I

19   asked, again, and he said it was okay.

20           And then, we had -- went into the holiday

21   schedule, and he sent a text -- he was getting ready

22   to leave for the day, I believe, and he sent me a

23   text saying that he put in antibiotics -- or the

24   recommendations for -- wound care recommendation for

25   this person's early decubitus ulcer.  And because he

Transcript of Proceedings 7/18/2017

1    said "early," I thought this was a new finding.

2    He's been telling me everything was okay.  So I made

3    a note to look at it on rounds the next morning.

4            I looked at it on rounds, and it was very

5    large.  I could stick my whole hand in there.  We

6    ended up having to take the patient to the operating

7    room to debride it.  He ended up getting a

8    (unintelligible)ostomy.

9            And it was a very extensive wound.  So

10   I -- you know, in my opinion, I don't see how that

11   could have formed in the week that we had talked.

12           DR. LUZARDO:  Well, let me follow with

13   that.  He has stated -- the implication was that he,

14   perhaps, had not actually examined it.  He stated

15   that he did.  However, it was a gap of knowledge,

16   that he saw a scab and he didn't make much of it.

17   Eventually, you know, by leaving it in the scab, you

18   did, you found out there was a crater.

19           So the only question is:  It is

20   possible -- is it possible that that's the case,

21   that it can't be seen and interpreted as a -- you

22   know, there was maybe a little pressure but not --

23   that it was a gap in knowledge as opposed of that he

24   didn't examine it?  Is that possible?

25           DR. MAHONEY:  I asked them to let me know

Transcript of Proceedings 7/18/2017

```
 1    if they saw anything, so -- because I understand
 2    that interns may not have that knowledge, so
 3    I wanted to know -- and I told them to let me know
 4    if they saw anything.
 5            DR. LUZARDO:  When you saw it, did it have
 6    a scab on top of it?
 7            DR. MAHONEY:  It had a palm-size eschar,
 8    yes.
 9            DR. LUZARDO:  Okay.  And it was black?
10            DR. MAHONEY:  Yes.
11            DR. LUZARDO:  Okay.
12            DR. WILLIAMS:  Nilda Williams.
13            By anything, you mean -- I mean, everybody
14    knew that this patient had a wound, the nurses, or
15    did nobody even know that he had a wound?
16            DR. MAHONEY:  I did not know he had a
17    wound, no.  And that's why I put that rule in place
18    because there are so many -- so many patients, and
19    with operating, I could not look through every
20    patient's chart and at every patient.  So I relied
21    on these residents to let me know.  And that was it,
22    let me know.
23            DR. WILLIAMS:  So anything and all is
24    anything?
25            DR. MAHONEY:  Anything.  Whether it's red
```

Transcript of Proceedings 7/18/2017

1    or you know, necrotic.

2              DR. WILLIAMS:  I don't know if I can ask

3    this question.  I like all the objective facts and

4    everything, but I know Meghan pretty well and I've

5    worked with her for a good while.  Can I ask you

6    subjectively, do you feel that this termination was

7    just?

8              DR. MAHONEY:  Yes.

9              DR. BONDI:  Anything else you'd like to

10   add?  Dr. Earl, is there anything else you would

11   like her to cover -- Dr. Mahoney to cover?

12             DR. EARL:  Just give me 30 seconds.

13             What was your -- what was the feedback you

14   received from nursing staff on the trauma floor

15   during that month?

16             DR. MAHONEY:  So 3 North is pretty much

17   the trauma floor.  And I've known a lot of these

18   nurses for years, since I was an intern, and they,

19   on one occasion in particular, found me -- two of

20   them found me, wanting to talk about Dr. Papin.

21   Another nurse overheard us talking and she said,

22   "Who are y'all talking about?"  And I said, you

23   know, "Papin."  And she made an expression like,

24   "Oh, my God."  And then the next thing you know,

25   there are several people there.

Transcript of Proceedings 7/18/2017

1           And it -- it was obvious that it was an

2    issue.  They said he was very unprofessional, they

3    felt like he wouldn't listen to them.  And I've --

4    I've really never had that many nurses come to me

5    about a particular resident.

6           DR. LUZARDO:  Did you ever communicate any

7    of this to Dr. Papin?

8           DR. MAHONEY:  To him?

9           DR. LUZARDO:  Yes.

10          DR. MAHONEY:  Yes.  In fact --

11          DR. LUZARDO:  You directly?

12          DR. MAHONEY:  Yes.  I talked to him

13   multiple times.  And I recognized his lack of

14   professionalism.  Many of his characteristics were

15   an issue, to the point where I was having to say it

16   multiple times and I did not want to embarrass him

17   in front of people, so we came up with a numbering

18   system where, you know, one was, you know, being

19   rude, and went down to -- I believe it's five.  I

20   can't remember all of them.

21          But if we were in front of people and he

22   was exhibiting that behavior, I would say, "Joe,

23   Number 2."  It got to that point where I felt it was

24   necessary to create a numbering system.

25          DR. BONDI:  Can you remind us what month

Transcript of Proceedings 7/18/2017

```
 1   you're talking about?
 2            DR. MAHONEY:  This is December.
 3            DR. BONDI:  December of '16?
 4            DR. MAHONEY:  Yes.
 5            DR. BONDI:  Okay.
 6            DR. EARL:  Sorry.  I lost my train of
 7   thought there.  And then do you have -- oh, sorry.
 8   Go ahead, Demondes.
 9            DR. HAYNES:  Dr. Demondes Haynes.
10            Do you have students on the service?
11            DR. MAHONEY:  Yes, we had two.
12            DR. HAYNES:  And other residents?
13            DR. MAHONEY:  Yes.
14            DR. HAYNES:  Did they give feedback from
15   that month about Dr. Papin?
16            DR. MAHONEY:  One of the med students
17   found me and conveyed to me that -- it was really
18   about unprofessional behavior, and one of the
19   reasons was there was a female med student that had
20   become uncomfortable around him.  And this male med
21   student came to me and said, you know, "This is a
22   problem; I'd like to talk to you about it."
23            And I did -- the other male resident --
24   the other intern, I asked him if Joe was -- if they
25   worked together, if Joe was helping him or if he was
```

Transcript of Proceedings 7/18/2017

```
 1   gone for long periods of time, and he said that
 2   there were long periods of time where he didn't know
 3   where Joe was but could not prove if he was on
 4   campus, off campus or whatnot.  So I didn't chase
 5   that any further.
 6              DR. HOUSTON:  And so the numbering system
 7   was mapped to specific behaviors, like each number
 8   was a specific thing?
 9              DR. MAHONEY:  Uh-huh (affirmative
10   response).
11              MR. WHITFIELD:  For the record, nods and
12   "uh-huhs" don't translate on the paper.
13              DR. MAHONEY:  Yes.  Yes, it was.
14              MR. WHITFIELD:  So please answer "yes" or
15   "no."
16              DR. MAHONEY:  And I remember -- I can't
17   remember all of them or the specific numbers that
18   they were applied to, but it was things like being
19   rude, showing attention to detail and lying.
20              DR. BONDI:  Unless we have -- unless we
21   have something else significant to add, I'd like to
22   give Dr. Papin an opportunity to once again address
23   the committee about the things that Dr. Mahoney has
24   said rather than direct her.
25              (Off the record.)
```

Transcript of Proceedings 7/18/2017

1        DR. BONDI:  All right.  Dr. Papin, this is
2   your opportunity to respond to the committee about
3   what you've heard Dr. Mahoney say.
4        DR. PAPIN:  Yeah.  Can I have a minute to
5   speak with Joel?
6        DR. BONDI:  Yes, that's -- let's do that.
7        MR. DILLARD:  A short minute, a 30-second
8   minute.
9        DR. BONDI:  Okay.  So we're going to go
10  off the record for a moment.
11       (Off the record.)
12       DR. BONDI:  All right.  Dr. Papin, it's
13  your turn.
14       DR. PAPIN:  All right.  Again, I'll --
15  I'll talk about the issues on a case-by-case basis.
16       So on the issue as I had previously stated
17  about the fact that I had been asking to go running,
18  I'd like to read from my own text messages -- my
19  attorney or whoever, we can provide you the evidence
20  that I've attempted to share many times now.
21       But on Tuesday, December 6th, at 11:44
22  a.m. -- I'm going to read a text message between
23  myself and Meghan Mahoney.  I'm going to read what I
24  said.  "Vascular said we can leave the drain in for
25  Scott and follow up in one week.  Still waiting for

Transcript of Proceedings 7/18/2017

```
 1    the word" --
 2              DR. BONDI:  I'm sorry.  Let me stop you.
 3    Can you be a little slower, please, so the reporter
 4    can catch everything down, please.
 5              DR. PAPIN:  Certainly, certainly.
 6              DR. BONDI:  And speak up because you're a
 7    little muffled, because I'm sure you're reading from
 8    the phone you're talking on.
 9              DR. PAPIN:  Right.
10              DR. BONDI:  Okay.
11              DR. PAPIN:  I'm reading a text message
12    conversation between myself and Meghan Mahoney.
13    This text message is dated Tuesday, December 6th, at
14    11:44 a.m.  And I'm about to read what I said.
15    "Vascular said we can leave the drain in for Scott
16    and follow-up in one week.  Still waiting for word
17    from home health.  Is it okay with you if I go for a
18    run around campus with my pagers and cell while it's
19    dead."
20              And then she responded, "As long as pagers
21    work," to which I responded, "Thank you."
22              DR. BONDI:  All right.  Thank you.
23              DR. PAPIN:  Certainly.
24              And then, the next time is what she
25    describes where asked if I could go and she
```

Transcript of Proceedings 7/18/2017

```
 1    (unintelligible) that information.
 2              The next issue is --
 3              DR. BONDI:  I'm sorry.  What was the --
 4    what was the date of the follow-up text about
 5    running?
 6              MR. DILLARD:  Read those.  Read those.
 7              DR. PAPIN:  I would have to -- I would
 8    have to pull that up, the exact time of the
 9    responses.  They were almost immediate.  I mean,
10    when I provide that for you, I'm sure I can get
11    the -- when it's provided there will be date
12    information.  I just don't have it right now.
13              DR. BONDI:  Okay.
14              DR. PAPIN:  But I mean, there was an
15    immediate conversation.  There was a text message,
16    and then within minutes she responded, and within
17    minutes I responded back.
18              DR. BONDI:  No.  I think what we're
19    talking about was -- we talked about the
20    December 6th conversation.  I was talking about the
21    subsequent conversation, where she told you you
22    weren't allowed to go running.  That's what we were
23    asking about.
24              DR. PAPIN:  Oh, okay.  Yeah.  Again, I
25    have a picture of the text message conversation,
```

Transcript of Proceedings 7/18/2017

```
 1    where it shows where it started, but I don't have
 2    the -- I would have to physically go and find it.
 3              MR. DILLARD:  Read -- read it, Joe.
 4              DR. PAPIN:  Oh, certainly.
 5              So on Thursday, December 15th at 3:20
 6    p.m., I texted Meghan, "Going for a run with my
 7    pagers if that's all right with you.  I'll be in
 8    constant contact if it's okay."
 9              Then she responded, "Excuse me?"
10              I said -- and then I responded, "I didn't
11    go."
12              And she responded, "Like exercise?"
13              And then I said, "I'm asking, though.  Ha,
14    ha.  Everything is done on my end, yeah.  Got some
15    sense from Goodson's son."
16              Then she responded, "Are you fucking
17    kidding me," to which I responded, "Yes."
18              And then she responded, "I will give you
19    all the reasons why that is not okay later, but
20    number one is you're first call."
21              DR. BONDI:  Were you first call on
22    December 6th?
23              DR. PAPIN:  Yes, I believe so.
24              DR. BONDI:  Okay.  And you wanted to
25    address something else as well?
```

Transcript of Proceedings 7/18/2017

```
 1              DR. PAPIN:  Yes, the decubitus ulcer.
 2    Again, I don't have access to the electronic medical
 3    record anymore, but I do know that this patient in
 4    question had the decubitus ulcer before I -- I came
 5    on service.  And again, I wasn't the only intern or
 6    nurse practitioner that saw this patient.  But he
 7    had it documented before I even began the rotation.
 8    So, in fact, I'm actually the first person, I guess,
 9    to have reported the decubitus ulcer to Meghan.
10              And then, I can read you another text
11    message conversation to further confirm that, you
12    know, she was at least aware.
13              So I left on my Christmas vacation on
14    December 20th, so Thursday, December 22nd was the
15    last day.  Then I went on a five-day Christmas
16    vacation.
17              At -- on Friday, December 23rd, at
18    9:07 a.m., Meghan texted me, "Hope you made it
19    safely.  Sorry to bother you, but who had key sacral
20    decub wound, Holder or Newsome?"
21              I responded within five minutes, "I did
22    make it safely.  Newsome is 311, has an eschar at
23    the moment and wound care saw him yesterday and
24    recommended to continue SANTYL."
25              DR. BONDI:  Do you have anything else to
```

Transcript of Proceedings 7/18/2017

```
 1    add -- oh, sorry.
 2              DR. PAPIN:  Yeah.  I mean, I had been
 3    seeing the patient.  We had been communicating,
 4    Meghan and I, and I had told her that -- that the
 5    black eschar that was there was there, and I just
 6    didn't know that you had to peel it off and that
 7    would reveal the -- that the underlying decubitus
 8    ulcer just didn't look that bad to me.  It was just
 9    a black scar on someone's back.
10              And moreover, the wound care team had also
11    been following him and actually dropped in the notes
12    with pictures.  And I told that the note was in from
13    them and also the note contained pictures on
14    December 22nd, the day that I left for Christmas
15    vacation.
16              DR. BONDI:  All right.  Does anybody
17    else --
18              DR. PAPIN:  Oh, go ahead.
19              DR. BONDI:  I'm sorry.  Please go ahead.
20              DR. PAPIN:  The next issue is the nursing
21    complaint.  Again, this was another situation where
22    I was never privy to any of these complaints.
23    Nobody complained to me directly.  I never saw it
24    happen.
25              But I do know that nurses had been
```

Transcript of Proceedings 7/18/2017

```
 1    confusing the other intern on the service, Dr. Will
 2    Brooks and I.  Meghan actually said this to me
 3    directly.  And Will had said the same thing, that
 4    the nurses were confusing him and I frequently.  I
 5    guess we have similar heights, similar build, I
 6    guess looked similar.  So we had been getting
 7    confused.  But the fact -- and he had been getting
 8    several complaints that were attributed to him and I
 9    guess I had several complaints that were actually
10    him or were actually about him but were attributed
11    to me.  So there was a lot of back and forth on
12    that, I know that.
13              Meghan also wrote that she didn't want to
14    embarrass me and -- but had devised the number
15    system.  She did, in fact, devise the number system.
16    The embarrassment was frequent with her.  She -- her
17    nickname in the department and I mean, this is
18    well-known was the "Red Dragon," which she's earned
19    by being just difficult to deal with.
20              She would embarrass me frequently.  It
21    happened so often, so frequently in public that one
22    day we were in the radiology reading room adjacent
23    to the emergency room, down in the ground floor, and
24    there were orthopedic surgery residents down there,
25    there were other interns, there was a urology
```

Transcript of Proceedings 7/18/2017

```
 1    resident down, she was down there, I was down there,
 2    there were radiology techs.  I can't remember or not
 3    if there was an emergency medicine resident down
 4    there or not.  But needless to say, it was -- it was
 5    pretty multi-disciplinary down there.
 6              And for whatever reason I can't recall,
 7    she felt the need to publicly embarrass me by giving
 8    me some sort of feedback that --
 9              So I told her plainly that I disagreed
10    with the way that she gave feedback and I would
11    prefer it to be done privately.  So she became
12    irate, which happened on an almost daily basis, and
13    pulled me outside.  And I expanded on it and I told
14    her, you know, you doing this is, you know -- I
15    appreciate the feedback, and I'm happy to improve
16    with whatever, but you doing this in front of
17    orthopedic surgery residents, you know, emergency
18    medicine residents, if they weren't there at that
19    time, it was in front of them several other times.
20    Urology residents -- I mean, it's embarrassing for
21    this to get outside of the surgery department.  I
22    asked her if she would please stop that.  She
23    didn't, but she devised that number system.
24              Again, I don't exactly recall the number
25    system.  One of them was never lying.  I mean, it
```

Transcript of Proceedings 7/18/2017

```
 1    doesn't even make logical sense.  She would blurt
 2    out a number that would indicate that I was lying to
 3    her.  I don't understand how that makes logical
 4    sense.
 5              But another number was that I was being a
 6    douche.  That one was a frequent one.  I think that
 7    was Number 2.
 8              So she would say two, and that was my cue
 9    that I was being a douche.  And most of the other
10    numbers were in the same thing.  Just, you know, a
11    way to embarrass me because everybody else knew the
12    code.  She wasn't hesitant to hide the code.  I
13    guess it was just a shorthand to save herself
14    breath.
15              And then the last issue is this issue of
16    the mail med student, the female med student.  I'm
17    not sure what that is.  Again that -- the very first
18    time I had read about this was at all was the
19    documents that were sent to Joel Dillard, my
20    attorney.  It was never brought up to me.  This
21    would be the first time I certainly hear about.  And
22    then the first time I've read about it, again, was
23    in those documents.
24              DR. BONDI:  Do any of the committee
25    members have any further questions for Dr. Mahoney,
```

Transcript of Proceedings 7/18/2017

```
 1   based on what we've heard in the last few minutes?
 2             DR. LUZARDO:  Do you run on campus or
 3   outside campus?
 4             DR. PAPIN:  On campus, sir.  Just the
 5   once, but yes, on campus.
 6             DR. BONDI:  Any questions for Dr. Mahoney?
 7             DR. HOUSTON:  Joy Houston.
 8             So Dr. Papin alluded to an incident of
 9   feedback in front of others.  Do you recall what
10   he's talking about?
11             DR. MAHONEY:  I do remember that
12   particular instance at the radiology reading room.
13   We were inside -- a patient was being scanned, so we
14   were inside the area where you look at the monitors.
15   I don't remember exactly what he did, but I asked
16   him to step out into the hallway so I could talk to
17   him.  And when we were in the hallway, there may
18   have been people that passed by at some point that
19   were the other residents.  So I just did not want to
20   do that in front of the team.
21             DR. BONDI:  Any other questions?
22             Thank you.
23             DR. MAHONEY:  Thank you.
24             DR. BONDI:  All right.
25             DR. EARL:  I think one of the things that
```

Transcript of Proceedings 7/18/2017

```
 1   I wanted to -- since it's sort of the -- the "Red
 2   Dragon" nickname was with -- that was given to
 3   Meghan when she was an intern by the chief residents
 4   that were above her that have been some of our most
 5   respected residents that have finished here.  I
 6   think that's important to know.  That was not
 7   something she earned last year by berating interns.
 8              The other thing is that last year with
 9   Will Brook and Meghan Mahoney, I dealt with zero
10   instances of interprofessional behavior issues with
11   the both of them combined.
12              DR. BONDI:  Thank you.
13              I would like to start with the next
14   witness, and then we'll use our break time to allow
15   Dr. Papin to talk to his attorney about that witness
16   so that we can have some efficiency there, if that's
17   okay with everybody.
18              So we're going to get the next witness,
19   who's going to be?
20              DR. EARL:  Ashley Griffin Ray.
21              Are we off the record?
22              DR. BONDI:  We can be if you'd like.
23              DR. EARL:  Oh, no.  I'm fine.
24              DR. BONDI:  No.  You're fine.
25              So I'm Steve Bondi.  I'm chairing the
```

Transcript of Proceedings 7/18/2017

1    committee that's hearing this appeal of a

2    termination.  It's an informal hearing.  The way

3    it's going to go is that Dr. Earl is going to ask

4    you some questions about the issues that we're

5    talking about.

6              DR. RAY:  Okay.

7              DR. BONDI:  The committee members may ask

8    you some questions.  Dr. Papin is conferenced in.

9    He's not going to ask you anything specifically.

10   He -- he has an opportunity to respond to what you

11   said.  The committee members may ask questions based

12   on that.

13             DR. RAY:  Okay.

14             DR. BONDI:  Okay.

15             DR. EARL:  So the first incident I would

16   like to ask you about is the incident that I think

17   you were, at least, there for part of it, of

18   whenever he was asked to come back to a patient that

19   was coding.  And can you just tell us about what --

20   what happened then?

21             DR. RAY:  Yes, sir.  So the interns

22   typically start their shift at 6:00 prior to the new

23   intern rule where they can take 24-hour call again

24   on night float.  So Joe was on trauma at that time.

25   They sign out of 6:00.  It was, I believe, 5:58 or

Transcript of Proceedings 7/18/2017

1    5:59 when a Code Blue was called overhead.

2            Dr. Papin had already signed out to the

3    oncoming intern but the shift wasn't officially

4    over, and he had signed out "no issues with his

5    patient."  However, the patient that was coding was

6    his patient on the floor.

7            Normally, our -- our department's handling

8    of codes is if you hear a code called, we

9    immediately call the floor as to where the code is

10   taking place to see if it's a surgery patient.  If

11   it's a surgery patient, we immediately go, no matter

12   if you're on or not.  Whoever is able to be

13   mobilized goes to the code, whether it's your

14   service, after hours, et cetera.

15           Dr. Papin admits that he heard the code

16   being called overhead, did not check in to see that

17   it was one of his patients, was then notified that

18   it was one of his patients and asked to come help

19   because the sign-out that was received was the

20   patient had been fine.  And then said that he had

21   not received the code or been made aware to me until

22   after the -- he was in his car.  He did not come

23   back to help.

24           And then, there is a series of text

25   messages that were exchanged between he and the

Transcript of Proceedings 7/18/2017

```
 1    intern that were actually on -- was on that night,
 2    that I believe are included in the -- in the packet.
 3              DR. HAYNES:  Demondes Haynes.
 4              What year resident are you?
 5              DR. RAY:  PGY 5.
 6              DR. HAYNES:  So you were in-house this
 7    night?
 8              DR. RAY:  I was the chief on-call that
 9    night, uh-huh (affirmative response).
10              DR. EARL:  And did he offer -- when asked
11    to come back, did he offer to come back, to your
12    knowledge?
13              DR. RAY:  No.  He said he was already in
14    the parking garage when he was made aware of the
15    code.
16              DR. EARL:  Okay.  And then what -- what is
17    your knowledge or -- do you have any about not
18    rounding on patients prior to start of -- prior to
19    rounds with the senior residents or starting a day
20    shift?
21              DR. RAY:  Yes, sir.
22              DR. EARL:  Or starting a day.
23              DR. RAY:  Actually, my experience with
24    this was during the holiday split.  We do a split
25    where half the residents work the Christmas holiday
```

Transcript of Proceedings 7/18/2017

1    split and half the residents work the New Year

2    split.  Y'all may have already heard some of this;

3    I'm not sure.

4              And I actually was working straight nights

5    at that time.  So I was rounding on trauma in the

6    morning with Joe prior to leaving for a few hours

7    and coming back at 5:00.  And I told him he needed

8    to be ready at 7:00 to round with me and staff and

9    we would be rounding at 7:30 with our staff.

10             He told me he was ready to round several

11   times, and I was pulled aside by the medical

12   students who, then, informed me that he had not seen

13   any patients.  And it is out expectation that the

14   interns see all the patients prior to rounding with

15   staff, and if they do not do so because traumas come

16   in and we get busy, then they need to be honest and

17   forthcoming that they have not seen the patients.

18             I was told that he had seen everyone and

19   that he was ready, but then I was pulled aside by a

20   medical student who had informed me otherwise.  And

21   this happened during the week of the New

22   Year's/Christmas holiday split.

23             DR. EARL:  Did you ask him if he had seen

24   everybody?

25             DR. RAY:  He said, "Yes, I'm ready."

Transcript of Proceedings 7/18/2017

```
 1    Those were always the answers.
 2              DR. HAYNES:  Did you have any other
 3    instances -- Demondes Haynes -- where he said he had
 4    seen patients but you thought he had not?
 5              DR. RAY:  No, sir, I didn't work with him
 6    directly very much.
 7              DR. EARL:  Just during the holidays?
 8              DR. RAY:  Just during the holidays.
 9              DR. WILLIAMS:  Nilda Williams.
10              So are you implying by his answer that,
11    "Yes, I'm ready," that he indirectly answered to
12    say, "Yes, I saw the patients and I'm ready"?
13              DR. RAY:  Yes.
14              DR. WILLIAMS:  He just (unintelligible)?
15              DR. RAY:  Yes.  He never, I guess,
16    directly said, "I've seen every one of the
17    patients," but that is our expectation of our
18    interns or our residency.  If we say we're ready,
19    that means that while surprises may happen with
20    rounds and with staff as we all are experienced
21    with, he has seen every patient and is ready to walk
22    around.
23              DR. BONDI:  All right.  Anything else for
24    Dr. Ray?
25              DR. EARL:  No.
```

Transcript of Proceedings 7/18/2017

1           DR. BONDI:  All right.  So we'll take a
2    pause.  We'll go off the record now and we'll let
3    you talk to Dr. Papin.
4           And we'll take -- I'd like to say five
5    minutes -- I understand it may be a little bit
6    longer -- to just let people refresh themselves.
7           (Off the record.)
8           DR. BONDI:  The first thing is, I wanted
9    to comment --
10          MR. DILLARD:  Check to see that he's
11   there.
12          DR. BONDI:  Dr. Papin, are you there?
13          MR. DILLARD:  Because he said he had to
14   step out to the restroom.
15          DR. BONDI:  That's very reasonable.
16          Well, let me just state the other
17   administrative thing, which I don't think he needs
18   to hear -- you can fill him in on that -- is that
19   Dr. Luzardo had to step out.  So he stepped out at
20   about 6:05, so that's about 15 minutes ago.  I just
21   want to let everyone know that we still are well
22   within our quorum of individuals for the committee.
23   And I'm sorry about that.
24          But are you there, Dr. Papin?
25          DR. PAPIN:  I am now, yes.

Transcript of Proceedings 7/18/2017

```
 1              DR. BONDI:  Okay.  All right.  There was
 2   just one follow-up thing that Dr. Ray wanted to
 3   add -- or Dr. Earl wanted to ask of Dr. Ray.
 4              DR. EARL:  Yes.  I wanted you to actually
 5   just comment on your -- your experience with the --
 6   the wound and the trauma patient that happened while
 7   you were a senior resident on that service.
 8              DR. RAY:  Yes, sir.  Again, this was -- I
 9   was on night float sometime -- I believe it was in
10   November or December, sometime around the holidays.
11   I don't remember the exact date.  And again, we had
12   a patient that had a very large torso and upper
13   extremity wound that resulted in an upper extremity
14   amputation eventually.
15              But Joe was instructed to wash the wound
16   out while the patient was in the intensive care
17   unit.  He was on during the day.  And about
18   midnight, I was actually paged by the ICU nurse
19   practitioner because this had not been done yet.  So
20   I personally washed the wound out at midnight and
21   pulled grass and dirt and gravel out of this wound.
22              And I -- I told his chief resident the
23   next morning, I irrigated and packed the extremity
24   and torso.  And that's all.  So just a delay in
25   patient care.
```

Transcript of Proceedings 7/18/2017

```
 1              DR. BONDI:  When asked about that before,
 2   Dr. Papin said that he did wash the wound out and
 3   that he recalls being in the room at the same time
 4   that an ophthalmology resident was suturing the
 5   patient's eyebrow, eyelid, something optho would do.
 6              DR. RAY:  I was called by the nurse
 7   practitioner who said that she had not witnessed the
 8   wound being washed out, the night nurse had not seen
 9   the wound being washed out and the nurse who had
10   come on -- or was on prior to 7:00 shift change said
11   the wound had never been washed out.
12              DR. BONDI:  So in your opinion, as the
13   person who looked at the wound and washed it out, do
14   you believe that it could have been washed out but
15   washed out poorly rather than not washed out?
16              DR. RAY:  I would -- I -- no.  It was
17   dirty.
18              DR. BONDI:  All right.  Do any of the
19   committee members have any questions for Dr. Ray
20   before Dr. Papin addresses his concerns?
21              DR. HOUSTON:  Just a follow-up.
22              I mean, even if the wound had been washed
23   out poorly, you said that you washed it out and
24   packed it, so you would expect a poor washout would
25   be followed by packing, right?
```

Transcript of Proceedings 7/18/2017

```
 1              DR. RAY:  It was not packed.  It was a
 2    loosely placed dressing that had been, obviously,
 3    placed in the trauma bay.  The wound had not been
 4    packed with Betadine, for example.
 5              DR. BONDI:  Okay.  Dr. Papin, you're free
 6    to address any comments to the committee based on
 7    what you've heard Dr. Ray say.
 8              DR. PAPIN:  Thank you.
 9              I'll start with the Code Blue.  I -- I had
10    already signed out.  I did not -- there were no
11    issues with my patient.  I believe the comment was
12    that there were no issues with any of my patients.
13    Certainly, not with any of them and also certainly
14    not with that particular patient, either.
15              At the time -- I'm not sure if everyone is
16    familiar, I'm sure most are, but the -- Code Blue
17    was called, and if it was Code Blue, it will give a
18    rotation.  It doesn't say a specific patient room or
19    anything like that.  So when it happened, I was down
20    there with the entire night team.  Nobody rushed
21    out, nobody sat down -- and Dr. Griffin said it was
22    standard.  Nobody sat down and called -- at least
23    while I was there, called the unit to see who the
24    Code Blue had been called on.
25              So I -- I thought nothing of it and just
```

Transcript of Proceedings 7/18/2017

```
 1    walked out to my car.  Nobody at any point called me
 2    and -- or asked me to return.  I certainly would
 3    have turned around if I had been asked to return.
 4              There's -- in the documents that were
 5    sent, there's a text message conversation between
 6    myself and Erin Moore who is the night intern who I
 7    had signed out to.  But the person who had actually
 8    texted me first and the person who was actually
 9    there was the other intern on the service, Will
10    Brook.  And I'd like to read the text message
11    conversation or exchange between us.
12              On Monday December 12th, at -- or well,
13    it's saying 6:59 p.m., which standard time now, and
14    I think that the iPhone adjusts for that.  So this
15    must have been at 5:59 p.m., Central.  He wrote or
16    he said, "They just called a rapid on
17    (unintelligible)."
18              And I responded, "Oh, shit.  What
19    happened?  I'm already gone.  Can you let me know
20    how he's doing?"  And this was at -- my phone says
21    7:07, but that must have been 6:07.
22              And then he responded, "Yes, sorry.  I was
23    running to grab a (unintelligible).  They think he
24    aspirated.  They called a Code Blue initially, but
25    it took a while for him to get intubated."
```

Transcript of Proceedings 7/18/2017

```
 1              So that was the exchange between me and
 2    Will, and that was the first time that I had been
 3    notified of anything.  And again, nobody was asking
 4    me to come back.  And then the exchange that's
 5    already printed out for you guys, Erin texted, "You
 6    know your patient was coding before 6:00" -- with
 7    ellipses, dot, dot, dot, and that was at 6:15 p.m.
 8    To which I responded to him, and that's all there.
 9              So at no point was I ever called.  I do
10    not know that this was on a patient that I had been
11    seeing.  And while I was down there, the night team
12    was there and you know, no -- it's not like anybody
13    started sprinting for the door, going towards the
14    unit and anything like that.  There were no phone
15    calls made to the unit to figure out whose patient
16    was whose, and frankly, nor have I ever seen that
17    done.  But when I was made aware of it, I took
18    responsibility for it and you know, I realized that
19    yeah, three north or the third floor had a
20    significant concentration of patients.  And from
21    that point forward, if something like that had
22    happened, I would have known, but (unintelligible)
23    people are just absentmindedly continuing to walk
24    out the door.
25              DR. HAYNES:  This is Demondes Haynes.
```

Transcript of Proceedings 7/18/2017

```
 1              Were you -- were you still on campus when
 2    you --
 3              DR. PAPIN:  I'm not able to hear you too
 4    well.
 5              DR. HAYNES:  I'm sorry.  Dr. Papin, this
 6    is Demondes Haynes.
 7              Where were you when you were notified that
 8    the patient was coding?  Were you still on campus?
 9              DR. PAPIN:  When I -- when I received the
10    text message, I was no longer on campus.  But when
11    I -- I mean, I overheard -- I heard the Code Blue
12    being called, but again, there's no specificity to
13    those Code Blues other than the unit.
14              DR. HAYNES:  Okay.
15              DR. BONDI:  Do you have anything else to
16    add at this time?
17              DR. PAPIN:  Yes.  So on the issue of
18    seeing patients.  There was a medical student who
19    informed Ashley, I guess, that I had not rounded on
20    patients beforehand.  Again, categorically, that
21    never happened, meaning that I -- there was never a
22    time where I didn't see patients in the morning and
23    claim that I had or claimed that I was ready to see
24    patients when I had never seen any of them.  I saw
25    patients -- from what I understood from Dr. Griffin,
```

Transcript of Proceedings 7/18/2017

1    they were saying that they hadn't seen me do it.

2    It's not standard for residents to check in with

3    medical students after sign out or you know, to

4    alert them that they will be rounding in any way.

5    So I just went to work immediately.

6            And then the last issue is the washout.

7    So again, that's that washout -- as I said

8    previously, there was an ophthalmology resident in

9    the room with me who I'm certain once we looked up

10   who that was, you can ask.  But also I had a text

11   message from the chief who on duty at that time and

12   myself.  His name is (unintelligible).

13           On Tuesday, December 27th at 6:25 p.m., he

14   texted me, "You washing the shoulder out or what???"

15           And again, this 6:25 p.m. is what you'll

16   see because I'm on Eastern standard time, so this is

17   5:25 p.m.  And then I wrote, "Already did it.  It's

18   washed and packed.  I left two minutes ago."

19           And then from what I remember, the next

20   day or whatever day I heard about this, it was

21   that -- I don't know, for whatever reason, I don't

22   know, but they didn't think that I had actually done

23   it.  So Sid had done it himself.  So for me to do

24   it, then Sid to do it, and then Ashley to see it at

25   a later date, which is my understanding, at that

Transcript of Proceedings 7/18/2017

```
 1    point -- there were three packings at that point,
 2    the initial one, mine in the ICU and then Sid's in
 3    the ICU.  And then Ashley for her to say she was
 4    pulling out dirt and gravel and all this, I don't --
 5    I can't speak to that.
 6             But I believe there was at least two.
 7    Well, I know there was at least two:  The initial
 8    one and mine, and then I believe Sid did another
 9    one.
10             DR. BONDI:  Do you have anything else you
11    want to add about Dr. Ray's comments?
12             DR. PAPIN:  No.
13             DR. BONDI:  Okay.  Do any of the committee
14    members want to address anything that Dr. Ray has
15    said or that Dr. Papin has commented on Dr. Ray?
16             MR. ASFOUR:  Dr. Papin, in your opinion,
17    why do you think they are saying what they say?
18    It's your word or their word.  Why do you think they
19    saying that?  They just don't like you?
20             DR. PAPIN:  I can't comment on the
21    opinions of other residents.
22             MR. ASFOUR:  Okay.  Thank you.
23             DR. BONDI:  Anyone else?
24             DR. WILLIAMS:  Nilda Williams.
25             Is it possible that y'all are talking
```

Transcript of Proceedings 7/18/2017

```
 1    about different patients or something?
 2              DR. RAY:  In this code instance?
 3              DR. WILLIAMS:  No, not --
 4              DR. RAY:  Or in the shoulder?  No.
 5              DR. BONDI:  Any other comments or
 6    questions?
 7              DR. WILLIAMS:  Just regarding the code.
 8    Does he have any animosity with the resident that he
 9    received the sign-out from?
10              DR. RAY:  Not prior to this.  Nothing was
11    noted that I -- that I would be aware of.  It seemed
12    like a very normal, professional relationship.
13              DR. BONDI:  All right.
14              Thank you, Dr. Ray.
15              DR. RAY:  Thank you.
16              DR. EARL:  To assist the court reporter,
17    this is Colin, C-O-L-I-N, Muncie, M-U-N-C-I-E.
18              DR. BONDI:  I'm just going to -- I'm Steve
19    Bondi.  I'm the chair of the committee.  Just to
20    briefly say what we're doing:  Dr. Earl is going to
21    ask you some specific questions; you're going to be
22    able to say -- answer those.  Then we're going to
23    ask Dr. Papin to comment to the committee, based on
24    what you said.  He's not going to ask you any
25    questions.  The committee may ask you some
```

Transcript of Proceedings 7/18/2017

```
 1   questions.
 2             DR. MUNCIE:  Yes, sir.
 3             DR. EARL:  All right.  Please just tell
 4   us, in your own words, what your experience was with
 5   the events of admitting a patient to ICU and then
 6   how that -- all that transpired.
 7             DR. MUNCIE:  So on a Saturday on call
 8   during the late daytime, I had instructed --
 9   instructed Dr. Papin to put in admission orders for
10   a critical patient in the ER and for him to
11   communicate to the ICU that the patient would be
12   coming, which is kind of standard protocol on any
13   patient in the -- on the trauma service.
14             At the end of the shift, I had been
15   notified by the ICU that they did not know that this
16   patient was coming and that they were surprised when
17   the patient arrived.
18             When I confronted Dr. Papin, he
19   confidently told me that he had spoken to someone in
20   the -- in the -- in the resident work room and that
21   they were aware the patient was coming.
22             When I went back to the ICU and found the
23   senior nurse practitioner who was on call for the
24   daytime, I asked her to try to find out who
25   Dr. Papin had talked to so that we could confirm
```

1    that he had, indeed, communicated to the ICU, and

2    she was unable to identify anyone that had spoken

3    with him about that particular patient.

4              DR. WILLIAMS:  Nilda Williams.

5              Is it possible that the person he had

6    spoken to left, like, shift change?

7              DR. MUNCIE:  So it's possible -- you know,

8    I was depending on that nurse practitioner to

9    extensively talk to everyone who was on call so --

10   and I did not perform those interviews, so I can't

11   really speak to that.  I was --

12             DR. WILLIAMS:  So that person would have

13   signed that out to the next person?

14             DR. MUNCIE:  Yes, yes.

15             And I think that -- that Dr. Papin had

16   brought up at one point that, you know, he may have

17   spoken to a nurse, he wasn't sure.  He couldn't tell

18   me who he had spoken with.

19             DR. WILLIAMS:  Speaking to a nurse?

20             DR. MUNCIE:  No, that's not usually

21   standard protocol.

22             DR. BONDI:  Anything else?

23             DR. EARL:  No.

24             DR. BONDI:  Dr. Papin, your response to

25   that?

Transcript of Proceedings 7/18/2017

```
 1             DR. PAPIN:  Sure.  Just give me 30
 2   seconds, please.
 3             DR. BONDI:  Okay.
 4             MR. DILLARD:  You need to talk to me, Joe?
 5             DR. PAPIN:  Yes.
 6             So I agree with everything Collin said.  I
 7   don't recall nor do I think that I ever said that I
 8   communicated with a nurse.  But other than that,
 9   everything -- everything is factual there.
10             And the only other follow-up question that
11   I would have, is how many times has it happened
12   where somebody has said that they communicated with
13   the ICU and they have denied or you know, some
14   medical error or some error has occurred, a break in
15   communication where the ICU wasn't notified for
16   whatever reason?
17             I'm just curious how often that's
18   happened.
19             DR. BONDI:  Okay.  Any other comments or
20   questions for Dr. Muncie?
21             Thank you.
22             DR. MUNCIE:  Thank you.
23             (Off the record.)
24             DR. BONDI:  I'm Dr. Bondi.  I'm chairing
25   the committee for this appeal.
```

Transcript of Proceedings 7/18/2017

```
 1          Dr. Earl is going to ask you some
 2   questions.  You can answer those.  Dr. Papin is
 3   going to have an opportunity to comment on those.
 4   He's not going to ask you any direct questions.  The
 5   committee may also ask you some questions.
 6          MR. RAY:  For the court reporter's
 7   convenience, this is Dr. William Crews, C-R-E-W-S.
 8          MR. CREWS:  Medical student.
 9          MR. RAY:  I'm sorry.
10          MR. CREWS:  Currently fourth-year medical
11   student.  Third-year medical student.
12          MR. RAY:  William Crews, C-R-E-W-S.
13          DR. EARL:  Yeah, William.  Thank you for
14   coming.
15          Tell us your experience when -- about
16   seeing Dr. Papin and your experience with him seeing
17   the patients in the morning and how he communicated
18   with the senior chief residents about patients he
19   had seen while you were on the trauma service last
20   December.
21          MR. CREWS:  So I get there pretty early in
22   the morning with my partner, a fellow M3.  We would
23   go through the list, work through it.  And
24   generally, they would ask us to round by a certain
25   time.
```

Transcript of Proceedings 7/18/2017

```
 1              And it wasn't always, but sometimes
 2    Dr. Papin would show up maybe later than he needed
 3    to, in order -- trauma is a huge service, he had a
 4    lot of patients to see.  And we would be rounding
 5    and he wouldn't have seen some of the patients, but
 6    he would report on them.  And it just alarmed me
 7    that that would happen, and that happened.
 8              DR. EARL:  And was there other residents
 9    that were there working during this time and seeing
10    patients while you were -- while you were there
11    pre-rounding?
12              MR. CREWS:  I believe Will Brooks would --
13    he would some patients before then.  Do his best to
14    see his patients, as well.
15              DR. EARL:  Okay.  And you saw Will those
16    mornings?
17              MR. CREWS:  Most of the time, I believe
18    so.  We were all in the work room.  He would -- he
19    would come in and grab our list sometimes before we
20    would finish the list and do his best to see some
21    patients.
22              DR. EARL:  Okay.
23              DR. HAYNES:  Demondes Haynes.
24              About what time would you get there?
25              MR. CREWS:  3:30 a.m.
```

Transcript of Proceedings 7/18/2017

```
 1              DR. HAYNES:  And about what time would
 2   Dr. Papin get there?
 3              MR. CREWS:  It -- it varied.  Some
 4   mornings it would be 5:00 a.m., some mornings later.
 5   I think one morning it was after 6:00.  There were
 6   just times that I noticed, especially mornings
 7   during the holidays, that's when we were working,
 8   that -- and I would be working with Dr. Griffin,
 9   that there would be short staff and we'd have to
10   round at a certain time, like 7:15.  And Joe said
11   that he had seen his patients by 7:00 and he was
12   just getting there.
13              DR. BONDI:  How many days do you think you
14   worked together total?
15              MR. CREWS:  So I came in as an M3.  We
16   have different rotations than the residents.  I
17   believe I worked with him for maybe a little over a
18   week.  But perhaps, seeing all this, I had been -- I
19   had worked with him before and didn't see a problem,
20   but a big patient load, I think that's when I
21   noticed it.  And I felt like I should say something
22   because I had been warned multiple times for my
23   classmates about his behavior.
24              DR. EARL:  What -- you had been warned
25   about what by your classmates?
```

Transcript of Proceedings 7/18/2017

```
1              MR. CREWS:  That Joe gives false reports
2    on patients, and if he makes a mistake, he'll blame
3    it on the med student sometimes.
4              DR. EARL:  What was the -- you mentioned
5    in your e-mail some interaction between -- or some
6    feelings of -- some interaction of Joe and a female
7    medical student.  Could you describe that to us,
8    your co-medical student that was on service with you
9    then?
10             MR. CREWS:  So, you know, I wasn't quite
11   with her all the time, but she expressed to me that
12   she was feeling very uncomfortable with Joe.  I
13   didn't -- you know, it was kind of a sensitive of
14   topic.  I don't think Joe ever made any physical
15   moves on her, but there were times when it was our
16   duty to see patients, especially on the trauma team
17   as two medical students, and Joe would go out of his
18   way to where it would just be him and my female
19   partner rather than me and my -- me and my medical
20   student partner to go see patients.
21             DR. BONDI:  Okay.  Do you have anything
22   else to add, Dr. Earl?
23             DR. EARL:  I don't.
24             DR. BONDI:  Do any of the committee
25   members have any questions for Mr. Crews?
```

Transcript of Proceedings 7/18/2017

```
 1              DR. HOUSTON:  Really quick.  Joy Houston.
 2   So from what you're saying, Dr. Papin had already
 3   developed a reputation within the M3 class before
 4   you ever got to the rotation?
 5              MR. CREWS:  Yes, ma'am.
 6              DR. WILLIAMS:  And this was passed along
 7   through how many groups of students as far as you're
 8   aware?
 9              MR. CREWS:  So I would -- so we started in
10   June and by the time I got there, this was late
11   November, December.
12              DR. HOUSTON:  And that was a consistent
13   report from like every group from day one?
14              MR. CREWS:  So I mean, you know, I can't
15   say I communicated with every single previous
16   surgery group, but his name came up frequently,
17   saying, you know, "If you don't want to get screwed
18   over, watch out."  And I personally didn't ever have
19   a problem with Joe, but some of the behavior, I did
20   see.  And I think after taking an oath, I felt like
21   I should say something.
22              DR. BONDI:  Dr. Papin, would you like to
23   respond to the committee based on what you heard
24   Mr. Crews say?
25              DR. PAPIN:  Certainly.
```

Transcript of Proceedings 7/18/2017

```
 1            He stated that I arrived maybe later
 2   that -- referring to me.  I'm not sure what that
 3   means.  But again, you're arriving sign out.  You
 4   get signed out from the outgoing night resident or
 5   night intern and then proceed to the floor and start
 6   seeing patients.  So when he saw me, I had already
 7   seen patients by that point, generally, unless they
 8   were present for sign out, which they weren't
 9   generally.
10            I would also ask to know the specific
11   patients that I did not see because just to give you
12   some context, the way that we had patients, for
13   example, there's a 60 patient census, roughly.  And
14   then there was me, another intern and then a nurse
15   practitioner some of the time.  So we divided that
16   either two ways or three ways.  And how we did it
17   varied depending on the day -- relative demand on
18   how we ended up splitting the list.
19            So I mean, it would have been impossible
20   for me to know which patients I was going to have
21   from one day to the next, so I'm not sure how he
22   would have.
23            He went on to say that he saw Will Brook
24   the urology resident who was working with general
25   surgery -- they all work with general surgery their
```

Transcript of Proceedings 7/18/2017

1    first year -- that he saw Will most of the time.  It

2    sounds like a similar story for me.  So I don't know

3    where that differs.

4             And then the last point was asking him to

5    essentially testify to the opinion of another

6    medical student.  And again, this is another

7    instance where this is completely news to me that,

8    one, that there was ever an accusation that I wasn't

9    seeing patients beforehand and a medical student had

10   claimed this.  This was brought up to me in the

11   documents after my dismissal.  During my dismissal

12   meeting with Dr. Earl and the HR representative, I

13   was told that it was specifically for lack of

14   integrity for this decubitus ulcer and that was it.

15            You know, these things keep popping up,

16   and now, you've got Will Crews testifying the

17   opinion of this other female medical student whose

18   supposedly felt uncomfortable around me.  You know,

19   I would think that as a teacher, we would want to

20   investigate that more and talk to someone rather

21   than bring it up after I've already been fired and

22   not say anything to anyone.

23            So that's about all I can say.

24            DR. BONDI:  What time are -- what time is

25   the transfer of care in the morning for surgical

Transcript of Proceedings 7/18/2017

```
 1    interns?
 2              DR. PAPIN:  6:00 a.m. sharp.
 3              DR. BONDI:  Do you come in before then and
 4    pre-round or do anything before that?
 5              DR. PAPIN:  No.  That's if you -- you get
 6    sign out and then you start pre-rounding.  At least
 7    that's how it works in the trauma service; other
 8    services differ.
 9              On the trauma service, you come in at
10    6:00 a.m., you get signed out and then you go and
11    see patients.  And then about 6:45 a.m.-ish, you
12    would table round with the senior resident.  And
13    then later on in the day, depending on attending
14    preferences, you would round as a team with the
15    attending.
16              DR. BONDI:  Do you -- do you have to do
17    any looking up labs or anything or X-rays during
18    that time?
19              DR. PAPIN:  Yes, you do.
20              DR. BONDI:  So you --
21              DR. PAPIN:  You would come in --
22              DR. BONDI:  Sorry.  So you see 30 patients
23    in 45 minutes, including examining the patients and
24    looking up their labs and X-rays?
25              DR. PAPIN:  It was a lot.  It wasn't
```

Transcript of Proceedings 7/18/2017

```
 1    generally 30.  That was when there was only, you
 2    know, two people in the service and that wasn't
 3    treatment, but yes, trauma was a large service, and
 4    there was a lot to get to.
 5              DR. BONDI:  Okay.  Any other questions for
 6    Mr. Crews?
 7              DR. WILLIAMS:  Nilda Williams.
 8              Can you give any specific examples of
 9    incidents where he maybe lied about anything about
10    patients?
11              MR. CREWS:  One frustrating event, I
12    guess, was we were in the ER, we had a recent
13    trauma.  Dr. Sykes had just started -- one of the
14    trauma surgeons, trauma, we were in the room.  Dr.
15    Papin sent me out, said don't worry about him.  I
16    wasn't -- you know, this was -- we had just started
17    trauma service, so I was still kind of getting my
18    bearings.  I wasn't quite sure what was going on,
19    and so I was, I think, waiting for the rest of the
20    team to show up.
21              And then, we had another trauma come in
22    and we started handling that.  Medical students
23    usually go grab stickers, get blankets, you know, do
24    the things that we -- you know, we're not doctors
25    yet, we're learning.  So you do whatever -- you do
```

Transcript of Proceedings 7/18/2017

```
 1    what you can.
 2             Dr. Sykes proceeded to ask about the
 3    previous patient.  Dr. Papin, I guess, wasn't quite
 4    sure, and then he proceeded to say, "Will, what
 5    happened to the patient," as if I was the one that
 6    was supposed to be keeping up with him.  And
 7    obviously, you know I had no idea what was going on.
 8    And then Dr. Sykes proceeded to kind of be as lost
 9    as I was.
10             DR. BONDI:  Okay.  All right.  Thank you,
11    Mr. Crews.  We appreciate your coming to see us.
12             MR. CREWS:  Yes, sir.
13             (Off the record.)
14             DR. BONDI:  Dr. Barr.
15             DR. BARR:  I'm Rick Barr.  I am the
16    associate dean for graduate medical education and
17    designated institution official.  I'll be brief in
18    my comments.
19             I met with Marc Earl, the program director
20    of surgery.  He came to me with serious concerns and
21    wanting guidance as to next steps with
22    Dr. Papin.  He explained the details that have been
23    described to you today, including what he concluded
24    and I concluded, based on hearing the evidence he
25    provided, was multiple episodes of untruthfulness,
```

Transcript of Proceedings 7/18/2017

1    frankly lying, that were corroborated by multiple
2    individuals.  It was not just Dr. Earl's data that
3    he had gathered.  And that some of those episodes
4    had resulted in very serious adverse outcomes for
5    patients.  And in fact, adverse outcomes that had to
6    be reported to CMS, such as a Stage 4 decubitus
7    ulcer.  We have to report that to the Center for
8    Medicaid and Medicare Services, and it really
9    affects our quality outcomes.
10            So we discussed -- we actively discussed
11   whether there was -- you know, what should the step
12   be.  I -- I informed him that my recommendation
13   would be to immediately remove Dr. Papin from any
14   clinical service, that he should be put immediately
15   on administrative leave with pay -- he was put on
16   leave with pay -- until we could do a formal
17   investigation.
18            My first and foremost obligation, as all
19   of ours is in this institution, is to patients and
20   to making -- making sure that we are following
21   through with patient safety and optimal patient
22   care.  And in this case, until we could sort this
23   out further, I needed to protect patients, and Dr.
24   Papin was removed from clinical duty.
25            A formal investigation was -- was

Transcript of Proceedings 7/18/2017

```
 1    performed with human resources with -- legal did not
 2    feel that this was worthy of probation with
 3    remediation -- remediation -- you know, when lying
 4    and dereliction of duty, you know, leaving the
 5    hospital when you're first call and you know,
 6    incidents such as that, I felt were profound enough
 7    that that could not be remediated.  That was my
 8    advice to Dr. Earl, as well as my discussions with
 9    human resources and legal.
10            And the final decision was for
11    termination, which -- which I, from the GME office
12    standpoint, I supported.
13            DR. BONDI:  Any questions for Dr. Barr?
14            I know there were some issues raised
15    earlier about procedure as well.  I think that in
16    terms of the interrelations between the ACGME and
17    their requirements, this would be the time to ask.
18            DR. HAYNES:  Demondes Haynes.
19            Dr. Barr, I know there were a couple of
20    issues that were brought up that Dr. Earl said he
21    told him initially that he would be on probation,
22    but that was purely from an academic standpoint.
23    And it sounds like to me when HR did their
24    investigation -- and this was brought up earlier,
25    and I just wanted to ask you for clarification -- it
```

Transcript of Proceedings 7/18/2017

1    was as an employee the reason for termination so he
2    didn't require this 60 days that Marc had initially
3    told him about.
4            DR. BARR:  Right.  And I think that was
5    Marc and I discussed that.  I think that was Marc's
6    perception, that any residency disciplinary action
7    required probation with remediation.  And we
8    discussed in detail that that is for an academic
9    issue.  And your professionalism can be an academic
10   issue, but this was clearly an employee issue.  You
11   know, lying about patient care and dereliction of
12   duty will get any employee in this institution fired
13   immediately.  I mean, and -- and a nurse or a
14   attending physician could be fired immediately for
15   this type of activity.  And so that -- that was an
16   HR issue that we needed to address.
17           DR. BONDI:  And I would just like to
18   attempt to it put some clarity on this in terms of
19   the policy.  So from the Institutional Guidelines
20   for Academic Remediation Office of Graduate Medical
21   Education, University of Mississippi Medical Center,
22   I'm reading on the second page of this document
23   under "Conclusion," in the last two sentences.  "Any
24   behaviors which could significantly compromise
25   patient care and/or create a hostile work

Transcript of Proceedings 7/18/2017

```
1    environment may be grounds for immediate action up
2    to and including dismissal.  Academic probation is
3    always at the discretion of the program director."
4              Okay.  I just wanted to share that with
5    you.  That is one of the -- that is one of the
6    policies that we can talk about later, but I just
7    wanted everyone to know that that is one of the
8    standards that we have.
9              Does that -- does some of that come from
10   the ACGME, Dr. Barr, kind of the guidelines with
11   which we treat residents?
12             DR. BARR:  Yes, that's some of the ACGME
13   policies that are recommended we follow.
14             DR. BONDI:  What other questions do
15   anybody have for Dr. Barr?
16             DR. WILLIAMS:  Nilda Williams.
17             You said that he had left campus on his
18   first call, but it sounds like he had permission and
19   was still on campus?
20             DR. PAPIN:  I'm sorry.  I didn't hear that
21   question.
22             DR. WILLIAMS:  It wasn't for you.  It was
23   just --
24             Dr. Barr, I'm trying to clarify what
25   everybody's understanding is of what the running
```

Transcript of Proceedings 7/18/2017

1    incidents -- I mean, I can't imagine running when
2    I'm the first call person, but anyway sounds like
3    it's something that happens.
4              And does it happen, Dr. Earl?
5              DR. EARL:  This is the first incident I've
6    ever heard of it happening of a -- of a junior
7    resident, even requesting to do it.
8              DR. BARR:  Yeah.  You know, whether --
9    whether, you know, permission was granted or not,
10   that information was not available at the time we
11   were discussing it.  But going for a run when you're
12   first call, I mean, to me, that -- that's
13   professionalism in and of itself to even request
14   that, the lack of professionalism to request that.
15             DR. WILLIAMS:  If it was the culture of
16   something that happened in that department, then
17   he --
18             DR. EARL:  It is -- I can emphatically say
19   that it is not.  I mean, anybody in -- I would say
20   medicine in general, but certainly within surgery,
21   it's -- that has not ever been the culture anywhere
22   I have ever been.
23             DR. BONDI:  Okay.  Do any of the committee
24   members have any questions for Dr. Barr before
25   Dr. Papin has an opportunity to comment?

Transcript of Proceedings 7/18/2017

```
 1              It's your turn, Dr. Papin.  Any -- any
 2   comments on what Dr. Barr said?
 3              MR. DILLARD:  Can I make a point of
 4   clarification?
 5              DR. BONDI:  Please.  Hold -- hold on one
 6   second.
 7              MR. DILLARD:  Is this our final --
 8              DR. BONDI:  No, no, no.  You -- I'm
 9   going -- we'll -- what I'd like to do is let --
10   address all the witnesses and then Dr. Papin can
11   have the floor to comment --
12              MR. DILLARD:  Okay.
13              DR. BONDI:  -- fully on the entire
14   procedure.
15              MR. DILLARD:  Okay.
16              DR. BONDI:  So just specifically to what
17   Dr. Barr discussed, do you have any comments?
18              DR. PAPIN:  I do.  In the meeting on
19   January 10th, Dr. Earl brought up the academic
20   remediation.  He had already had a typed-up document
21   and contract which he had me sign -- which both of
22   us signed.  And the -- he emphasized that it wasn't
23   probation, that these were distinct deficiencies,
24   and that probation is punitive and academic
25   remediation is not punitive.
```

Transcript of Proceedings 7/18/2017

```
 1              And that should I successfully complete
 2    this period of academic remediation, it would not be
 3    on my record and it was not cumulative in any way.
 4              So I wanted to clarify that, the
 5    circumstances.  You know, he called me into his
 6    office and told me if I didn't sign it and if I
 7    didn't submit to a drug test that I would be
 8    dismissed.
 9              DR. BONDI:  And was this the -- this was
10    in early January?
11              DR. PAPIN:  That's correct.  January 10th.
12              DR. BONDI:  I'm. sorry.  I'm looking at --
13    I don't know if you have the documents in front of
14    you, Dr. Papin, but I'm looking at the Bates
15    Number 22 from Exhibit 2.
16              DR. PAPIN:  20 and 21.
17              DR. BONDI:  Oh, I see.  It's the one
18    before that.
19              Okay.  And if I may ask a question of
20    Dr. Earl, what's this document?  What is 22?
21              DR. EARL:  Twenty-two is the academic
22    remediation protocol checklist that I was given
23    by -- that I got off of the -- the GME website or
24    policies.
25              DR. BONDI:  Was that ever -- was that ever
```

Transcript of Proceedings 7/18/2017

```
 1    used?
 2              DR. EARL:  Was this ever used?
 3              DR. BONDI:  Yes.
 4              DR. EARL:  As far as -- no.  This was
 5    something I got, I believe, that day or I was handed
 6    it that day at -- before, as I was sitting, waiting
 7    to meet with Dr. Barr on the 10th.
 8              DR. BONDI:  Okay.  All right.  I'm sorry,
 9    Dr. Papin.  I just wanted to clarify that.
10              Go ahead, please.
11              DR. PAPIN:  I don't know the document that
12    you're referring to.  I'm sorry.
13              DR. BONDI:  It's -- well, it's -- it's --
14    it's entitled "Academic Remediation Protocol
15    Checklist," and it's actually very brief, and it
16    just has, really, dates that things occurred as
17    opposed to the more significant document, the
18    January 10th document, which is two pages long and
19    has you sign.  I was confused about the two
20    documents.  I wanted to make sure we were talking
21    about the same thing.
22              DR. PAPIN:  Certainly.
23              DR. BONDI:  So go ahead.
24              DR. PAPIN:  And then my final comment was
25    if it's unprofessional to ask to go for a run --
```

Transcript of Proceedings 7/18/2017

```
 1    and I also would like to say that I don't know about
 2    junior residents, but it's certainly something
 3    residents -- surgery residents in general do.  But
 4    if it's unprofessional to ask, why did she grant
 5    permission?
 6              DR. BONDI:  All right.  Does anybody else,
 7    including Dr. Papin, have any other questions for
 8    Dr. Barr?
 9              All right.  I -- I presume you're going to
10    want some time to talk to him?
11              All right.  We can take a -- a brief
12    adjournment so that you can confer with Dr. Papin
13    and then we'll come back and he can address the
14    group.
15              (Off the record.)
16              DR. BONDI:  Dr. Papin, are you on line?
17              DR. PAPIN:  I am.
18              DR. BONDI:  Okay.  This is your
19    opportunity to address any of the concerns that have
20    been raised, to raise any other issues that you
21    would like to.  We'll let you talk and then we will
22    ask you questions.  And then Dr. Earl is going to
23    have the opportunity once again to address the
24    committee but not directly you, just so you know.
25              Go ahead.
```

Transcript of Proceedings 7/18/2017

1            DR. PAPIN:  Okay.  Dr. Earl and I signed a
2     contract that stated that I had 60 days to
3     demonstrate improvement.  We signed it on
4     January 10th; however, I never worked another day
5     for this institution subsequent to that day.  I was
6     never given the opportunity to improve.
7               In terms of the contract itself, the
8     academic remediation contract, what was said is that
9     issues of untruthfulness can change the terms of the
10    contract that he and I signed because they
11    changed -- because now in light of new facts or what
12    have you, Dr. Earl changed what he wanted to do to
13    me, and that is just not -- those were not the terms
14    of the contract.
15              Moreover, the only issue that was brought
16    up to me -- and actually the only issue that was
17    said to me in my dismissal hearing on -- in
18    February, was that I didn't tell the truth about the
19    state of the decubitus ulcer.  That was it.  Now, it
20    becomes quite clear that -- I mean, quite clear to
21    me that the wound care team and I both saw this
22    wound, and we agreed that it didn't look that bad.
23    Tragically, we were wrong, but I didn't lie.
24              And everything else has been brought up
25    for the first time today.  If the intent was for me

Transcript of Proceedings 7/18/2017

```
 1    to improve on this, if the intent was for me to
 2    demonstrate improvement, it seems as if those issues
 3    would have been brought up at any time while I'm
 4    still an employee.  And now it's -- we're throwing
 5    everything at the wall to see what we can hit.
 6              So what I'd like to say is I'm dedicated
 7    to helping people.  I wanted to be and still do want
 8    to be the best physician I can be.  I was always
 9    asking for feedback, and if I had ever been given
10    the chance to improve on concrete actual feedback, I
11    would have proven to the institution that I can do
12    this job.
13              DR. BONDI:  Would any of committee members
14    like to ask Dr. Papin any questions?
15              DR. HAYNES:  Demondes Haynes.
16              Dr. Papin, Dr. Earl had mentioned
17    something I wanted to ask you.  You finished in
18    Michigan, medical school?
19              DR. PAPIN:  That's correct.
20              DR. HAYNES:  And you applied for residency
21    initially in urology?
22              DR. PAPIN:  Neurosurgery, sir.
23              DR. HAYNES:  Neurosurgery.  Okay.  And
24    then, that was just the one year that you didn't
25    match?
```

Transcript of Proceedings 7/18/2017

1              DR. PAPIN:  That's correct.

2              DR. HAYNES:  And then you got this spot

3    here for general surgery?

4              DR. PAPIN:  That's correct.

5              DR. HAYNES:  Okay.

6              DR. HOUSTON:  Joy Houston.

7              Dr. Papin, so it sounds like what happened

8    was HR then became involved with your case.  Were

9    you not aware that HR essentially trumps anything

10   the program director would want to do anyway?

11             DR. PAPIN:  I -- I mean, a lot of

12   questions in that.

13             DR. HOUSTON:  Well, so human resources

14   became involved.  Were you not aware that human

15   resources outranks your program director?

16             DR. PAPIN:  No.  I mean, I'm not aware of

17   the hierarchy of the hospital administration, but

18   Dr. Earl's own statement was that he only entered

19   into that contract because he thought he had to, and

20   that his real intent was to -- was dismissal.

21             DR. BONDI:  Further questions?

22             Does anyone feel that they have a further

23   question for Dr. Earl or for Dr. Barr at this time?

24             I'm going to let Dr. Earl if he needs to

25   say any further comments but -- in a minute.  But

Transcript of Proceedings 7/18/2017

1    any others question that the committee wants to ask?

2              All right.  Do you have any closing

3    comments?

4              DR. EARL:  No.  I mean, I guess I don't.

5    I will say that during our exit interview, there was

6    a representative from HR that was there and we were

7    there to answer any questions.  Again, the decision

8    for termination had come from HR.  And the

9    opportunity to answer any questions or receive any

10   information was there but Dr. Papin got up and left.

11   And I asked him to turn in his badge, or the HR

12   representative did, and he did not.  So the

13   opportunity to ask questions and to look at things

14   was there, but that he did not take advantage of

15   that.

16             DR. BONDI:  All right.  Any other

17   comments, Mr. Dillard?

18             MR. DILLARD:  I --

19             DR. PAPIN:  I'd like to address that last

20   point.

21             DR. BONDI:  Go ahead.

22             DR. PAPIN:  In the meeting, they --

23   paraphrasing what they said, you know, it's due to

24   the lack of integrity, you lied about the sacral

25   decubitus ulcer and it caused direct patient harm;

Transcript of Proceedings 7/18/2017

1     therefore, we're dismissing you.  I asked, "Okay; is
2     there anything else?"  They said, "No."  And it was
3     at that point that I got up and left.  I didn't just
4     storm out of it at any point.
5               DR. BONDI:  All right.  That's fine.
6               I just want to make sure that none of the
7     attorneys have anything they want to add to make
8     sure we're not missing anything.  Mr. Dillard?
9               MR. DILLARD:  This is just a point of
10    clarification, obviously.  I'd love to say a lot of
11    things --
12              DR. BONDI:  I understand.
13              MR. DILLARD:  -- but we have referred to
14    and he has read some text messages.  Are you
15    intending to keep the record open for the submission
16    of those?
17              DR. BONDI:  I -- I don't doubt their
18    existence.  I don't know if any of the committee
19    members have a problem with the existence of those
20    text messages.
21              MR. DILLARD:  Okay.
22              DR. BONDI:  I don't have a reason to doubt
23    them.
24              MR. DILLARD:  Okay.
25              DR. BONDI:  Anything else, Mr. Dillard?

Transcript of Proceedings 7/18/2017

```
 1              Mr. Whitfield?

 2              Mr. Ray?

 3              MR. RAY:  No.

 4              DR. BONDI:  All right.  We're going to

 5     close the record and -- well, actually, don't close

 6     it yet.  Sorry.

 7              One thing is I just want to remind

 8     everyone that this committee is not going to issue a

 9     decision today.  The decision is going to come in

10     writing by me to the vice chancellor, and I just

11     need to consult with Mr. Ray about what he wants

12     that process to be, whether it goes to the vice

13     chancellor first or whether it's going to be

14     distributed contemporaneously to everybody.

15              So it will be quickly done.  It will --

16     once we've met, I'll take some time to write it,

17     review it, and I would expect it next week.

18              Any question or comments?

19              MR. RAY:  Well, I'm just looking at the

20     rules.

21              DR. BONDI:  Okay.  That's why I'm running

22     that by the lawyers.

23              MR. RAY:  The decision of the appeals

24     committee will be submitted to the vice chancellor?

25              DR. BONDI:  Correct.
```

Transcript of Proceedings 7/18/2017

```
 1              MR. RAY:  And the decision of the vice
 2    chancellor shall be final in accordance with bylaws
 3    of DIHL.
 4              DR. BONDI:  All right.
 5              DR. RAY:  So you submit your decision and
 6    she will take it under advisement and make her own
 7    decision.
 8              DR. BONDI:  Okay.  Thank you for that
 9    clarification, Mr. Ray.
10              All right.  We'll close the record here.
11              Thank you very much, Shanna.  We
12    appreciate you.
13              (Off the record.)
14                (Time Noted:  7:15 p.m.)
15
16    ORIGINAL:  MARK D. RAY, ESQ.
17
18
19
20
21
22
23
24
25
```

Transcript of Proceedings 7/18/2017

```
 1          CERTIFICATE OF COURT REPORTER
 2              I, Shanna Cumberland, Court Reporter and
 3   Notary Public, in and for the State of Mississippi,
 4   hereby certify that the foregoing contains a true
 5   and correct transcript, as taken by me in the
 6   aforementioned matter at the time and place
 7   heretofore stated, as taken by stenotype and later
 8   reduced to typewritten form under my supervision by
 9   means of computer-aided transcription.
10              I further certify that under the authority
11   vested in me by the State of Mississippi that the
12   witness was placed under oath by me to truthfully
13   answer all questions in the matter.
14              I further certify that, to the best of my
15   knowledge, I am not in the employ of or related to
16   any party in this matter and have no interest,
17   monetary or otherwise, in the final outcome of this
18   matter.
19              Witness my signature and seal this the 1st
20   day of August, 2017.
21
22              SHANNA CUMBERLAND, CCR #1774
23   My Commission Expires:
     April 25, 2018
24
25
```