Joseph Papin

vs.

University of Mississippi Medical

---

Deposition of:

Steven Bondi

February 03, 2021

*Vol 1*

EXHIBIT

42

exhibitsticker.com

PHIPPS REPORTING

*Raising the Bar!*

Steven Bondi
February 03, 2021

1                IN THE UNITED STATES DISTRICT COURT

2              FOR THE SOUTHERN DISTRICT OF MISSISSIPPI

3                        JACKSON DIVISION

4

5     JOSEPH PAPIN,

6

7                   Plaintiff,

8

9          VS.              CASE NO.:  3:17-CV-763-CWR-FKB

10

11    UNIVERSITY OF MISSISSIPPI MEDICAL

12    CENTER; DR. LOUANN WOODWARD, in her

13    official capacity; and DR. T. MARK EARL,

14    in his individual capacity,

15

16                   Defendants.

17

18              DEPOSITION OF STEVEN BONDI, M.D.

19

20              STIPULATIONS
                IT IS STIPULATED AND AGREED, by and between
21    the parties, through their respective counsel, that the
      deposition of STEVEN BONDI, M.D. may be taken before
22    Mellie Pierce, Commissioner, State of Mississippi at
      Large, at the offices of Brooks Court Reporting, 12
23    Lakeland Circle, Suite A, Jackson, Mississippi, Via Zoom
      on the 3rd day of February, 2021, commencing at or about
24    10:30 a.m.

25

Page 20

```
 1        Q.   In terms of -- I mean as a lawyer, I'm just

 2   going to hit you with this question because you are a

 3   trained legal professional, in terms of substantive and

 4   procedural due process, you are familiar with those

 5   terms?

 6        A.   Of course.

 7        Q.   Okay.  And I guess we'll start off with the

 8   first one.  In what ways as the chairperson over Dr.

 9   Papin's hearing, did Dr. Papin, at least in your

10   opinion, was he provided with procedural due process?

11        A.   I don't --

12             MR. WHITFIELD:  Object to the form.  You

13   can answer the best as you can.

14             THE WITNESS:  Yeah.  I don't think at

15   this point, I can differentiate sufficiently between

16   substantive and procedural due process to answer that

17   question.

18        Q.   (BY MR. SCHMITZ) Okay.  Well what ways was Dr.

19   Papin -- in what ways did Dr. Papin receive due process

20   to the extent that you under -- based on your

21   understanding of what that means?

22        A.   Okay.  With regards to our hearing, he

23   received notice that the hearing was going to occur.  He

24   received notice of what the substance of the hearing was

25   going to be.  He heard what the witnesses had to say.
```

Steven Bondi
February 03, 2021

Page 21

1   And he had the opportunity to rebut what those witnesses

2   had to say.  And he had the opportunity to present

3   evidence on his own behalf.

4        Q.   Did -- in talking about receiving notice of

5   what things were going to be brought against him, do you

6   know if Dr. Papin ever received a copy of the medical

7   records for any of the alleged patient care issues that

8   were brought up at the hearing?

9        A.   I have no idea.

10        Q.   Don't you think that would be something that's

11   important for a hearing regarding allege -- be based on

12   allegedly being a danger to patients for them to be able

13   to look at the records to rebut any instances where they

14   may have deviated from the standard of medical care?

15        A.   I think the individuals that were involved,

16   were testifying firsthand, which Dr. Papin was able to

17   hear.  And he was able to present from his perspective,

18   his view of the events as well.

19        Q.   And but you did not allow -- Dr. Papin had

20   counsel present there; correct?

21        A.   Yes.

22        Q.   And Dr. Papin was attending the hearing

23   remotely?

24        A.   Yes.

25        Q.   And his counsel was attending remotely;

Steven Bondi
February 03, 2021

1   speaking broadly -- during the course of those

2   investigations, you review the underlying documents that

3   are presented to you, and do you go speak with witnesses

4   and people to get firsthand account of what may have

5   taken place?

6       A.   Depending upon what happened, yes, either me

7   or one of the individuals that was working for me.  Yes.

8       Q.   Other than what was presented to you in

9   document form by Dr. Earl prior to Dr. Papin's hearing,

10  did you conduct any investigation into any of the

11  allegations that Dr. Earl had brought forth to you to

12  determine their voracity?

13      A.   I was never asked to investigate anything or

14  examine or to look into anything regarding Dr. Papin.

15  And I will give one caveat to that, in the course of the

16  e-mails that were provided to me to review, there is an

17  e-mail that I sent to Dr. Earl, which I assume was in

18  response to a query that he had asked me to see whether

19  there was anything that risk management had known about

20  Dr. Papin.  With the exception of that, there -- there

21  wasn't anything.

22      Q.   Was there anything that risk management had

23  been aware of Dr. Papin?

24      A.   No.  Not based on the day-to-day search that

25  was done by Darlene Bryant who is the Director of Risk

Steven Bondi
February 03, 2021

Page 26

1   Management who kind of worked with me for me, she was

2   the day-to-day operations person, so she queried both

3   the event reporting data base, as well as the -- as well

4   as the patient complaint data base to see if Dr. Papin's

5   name appeared there.  There is a caveat to that though,

6   in that the event reporting data base is really focused

7   on the patient, not necessarily on the provider.  So

8   frequently events that go into that data base, don't

9   have any physician associated with that.  Or I shouldn't

10  say "physician," any employee associated with that.

11        **Q.   At UMMC, what typically triggers the**

12  **involvement of risk management in a case, like, is it**

13  **when an iCARE report or some type of incident variance**

14  **report is filed?**

15        A.   Yeah.  That's a good question.  So there are

16  really probably two -- I shouldn't say "probably."

17  There are two primary ways we find -- we'd find out

18  about a case.  One is by the use of the iCARE system,

19  which is what UMMC calls its event reporting system.

20  All hospitals are required by CMS to have an event

21  reporting system.  That those -- that's a broad net

22  system.  Any employee can go and put it -- and report an

23  event.  And they are -- the coverage of this system is

24  very very broad.  It could be, you know, appeared to be

25  a slick sidewalk that wasn't attended to.  It could be,

Steven Bondi
February 03, 2021

Page 38

1   professionalism issues, were those presented to you by

2   firsthand accounts by the people who experienced them,

3   or were they mostly by secondhand accounts of people,

4   you know, sort of through the grapevine that they heard

5   that Dr. Papin did this or that?

6        A.   So there -- there was both.  There was the

7   information that was firsthand provided by the

8   individuals who testified at the hearing.  There was

9   also the information that was provided by Dr. Earl that

10  he had gathered.  And then there was also the written

11  evaluations of Dr. Papin, so it was all of those

12  sources.

13       Q.   And you raise the issue of Dr. Papin, you had

14  concerns regarding his candor and truthfulness, what was

15  the basis for your suspicions about his candor and

16  truthfulness?

17       A.   I think it had to do with that same body of

18  material, individuals and materials.  Had to do with his

19  presentation of rounds.  Had to do with in some of the

20  -- if I recall correctly -- some of the evaluations as

21  well.

22       Q.   So him whether or not he was actually doing

23  his rounds as he said he was doing, that was one

24  concern?

25       A.   Yes.

Steven Bondi
February 03, 2021

Page 55

1   situation, or were there other people who handled appeal

2   hearings, you know, acting in a chair role at UMMC?

3        A.   I have no idea.  I was asked -- I was asked to

4   be involved in these cases specifically.  I have no idea

5   about other hearings that may or may not have happened.

6   I suspect they didn't because -- because I was

7   involved --

8        Q.   You would have been told --

9        A.   -- I was involved with the Medical Staff

10  Office too.  I mean I helped them with some stuff, I was

11  a sounding board for, you know, and a lot of that stuff

12  is mine -- that they dealt with was minor.  You know,

13  how do I approach a conversation with this doctor.  But

14  to my knowledge, I don't know, there could have been a

15  hearing, and I wouldn't have had any knowledge of it

16  whatsoever.

17       Q.   And so would it be fair to say, that it's

18  relatively rare that a termination case comes to the

19  Appeal Board for which at UMMC?

20       A.   I would have no idea because I don't know what

21  the denominator is.

22       Q.   Got it.  And how are you selected to be the

23  Chairperson at UMMC for a hearing seeking termination?

24       A.   I was asked by -- in Dr. Papin's case, I was

25  asked by Dr. Woodward, the Vice Chancellor.  I don't

Steven Bondi
February 03, 2021

Page 56

1    know how that decision was made to pick me.

2         Q.   Okay.  Are you aware of anybody else who would

3    be the Chairperson of these hearings or --

4         A.   I don't know anything -- I have no knowledge

5    of any other hearings that happened, other than the ones

6    -- the two we've discussed in terms of termination.

7         Q.   I'm going to share an exhibit.

8         A.   I'm not seeing it.

9              MR. WHITFIELD:  It's in the chat.

10        Q.   (BY MR. SCHMITZ) It's in the chat.  You click

11   the chat button.  That's where the first Exhibit CV was.

12        A.   I don't have a chat button.  Let me change my

13   -- no, that didn't do anything.

14        Q.   It's like at the bottom, like there's a share

15   screen button in the middle, and then to the left of

16   that it's chat.

17        A.   All I'm seeing right now is a stack of

18   pictures.  And it's got you -- it's me on top, the court

19   reporter, whose name I don't know, I'm sorry.  And you,

20   then Tommy, and then the window with Dr. Papin and his

21   gray telephone icon.  Hold on, let me -- of course, I've

22   got a MAC, which works differently than everybody else's

23   computer.

24        Q.   If you move the mouse, you know, like where

25   you can pick to mute the video or stop the video.

Steven Bondi
February 03, 2021

Page 59

```
1        Q.    And why were you asking her to check anything
2   in the system about Dr. Papin, the complaint data bases
3   and whatnot?
4        A.    So I'm making a supposition because I don't
5   remember this at all.
6        Q.    Okay.
7        A.    But based on this, it was not uncommon for
8   people to ask me, "Hey, did you hear about this event or
9   did you hear about something."  Dr. Earl and I knew each
10  other because of our positions at the hospital.  He
11  wasn't a friend of mine, he was a work colleague.  What
12  I suppose -- what I believe happened was he said "Can
13  you look and see if there's anything about this resident
14  in our data bases."  So that's why I asked Darlene
15  because I didn't -- I didn't quarry those data bases
16  myself.  Because I wasn't really in that level of -- at
17  that level, I was kind of -- it sounds conceited -- but
18  I was above -- I was above that.  Right.  The people
19  that worked for me and with me did that.
20            So Darlene would go in and then could search
21  on that name.  And, of course, what you can see here is
22  that she's looking in both -- would be looking -- when I
23  said "our system," that was the iCARE event reporting
24  system.  And she also could -- I don't remember if she
25  had to do it directly, I think she could or would have
```

Steven Bondi
February 03, 2021

Page 60

 1  had somebody in the patient relations search the patient

 2  complaint data base.  Unfortunately, they were

 3  different, which was a source of frustration for us

 4  because it made our jobs harder.  We wanted to have them

 5  do both, but it wasn't practical to do that.

 6      Q.   And if you -- so there's three pages in this

 7  pdf.  Page three of three in the pdf all the way at the

 8  bottom?

 9      A.   Yes.

10      Q.   About two days after you sent the first e-mail

11  inquiring regarding whether there was any reports, you

12  came to the conclusion that Darlene had looked in both

13  the iCARE data base and patient care data base but found

14  nothing on Dr. Papin; correct?

15      A.   I don't recall sending that e-mail.  I have no

16  reason to doubt that that's what happened.

17      Q.   That is your sbondi@umc.edu, that would have

18  been your e-mail?

19      A.   That absolutely is my e-mail.  So, yes, I

20  believe that that is correct.

21      Q.   Okay.  And were you prompted to look at this

22  because Dr. Earl had raised concerns regarding patient

23  care regarding -- with respect to Dr. Papin?

24      A.   Having no specific recollection of the

25  conversation, I can't answer the question directly.  But

Page 72

```
 1   documents.

 2       A.   Right.

 3       Q.   Who at UMMC was responsible for providing Dr.

 4   Papin the documents he would need to rebut the

 5   allegations?

 6       A.   I don't know.  But Mr. Dillard his attorney is

 7   the one who -- he actually specifically pointed out

 8   things in the documents.  And I didn't have the

 9   documents in front of me at the hearing.  He's the one

10   that provided them and the bates numbers.

11       Q.   So to the best of your knowledge, you as the

12   Chairperson of the hearing and no one else on the panel

13   had any responsibility or oversight over the process of

14   providing Dr. Papin the documents in advance -- the

15   relevant documents in advance of the hearing?

16       A.   Certainly, none of us did.  That's correct.

17       Q.   And you have no idea who would have done that?

18       A.   I do not know.  But I know what happened.

19       Q.   So because you had no involvement, you're not

20   sure whether he received a complete set of the documents

21   in advance of the hearing that might be relevant to

22   rebut the things that were brought up at the hearing, so

23   he would not be ambushed by certain things that were

24   going to be brought up?

25            MR. WHITFIELD:  Object to the form.
```

Steven Bondi
February 03, 2021

Page 95

1    the employees.

2             So that's a -- that's a different thought

3    process when you have significant issues with

4    professionalism and interpersonal relationships.

5        **Q.   So are you saying that if someone has**

6    **interpersonal issues with other people, that that is not**

7    **something that anyone could be remediated or**

8    **rehabilitated if those things are brought to their**

9    **attention specifically and are dealt with?**

10       A.   No, I'm not saying that.  What I'm saying is

11   it's a different -- it's different.  And that the focus

12   is different.  And I think in this case, you know, we

13   can talk about the specifics of those, if you'd like, I

14   mean Dr. Papin was giving multiple, multiple, multiple

15   on multiple occasions giving feedback regarding

16   professionals and communication issues, starting in the

17   first month of his residency.

18       **Q.   I want to get back to what I was asking**

19   **before, which was, for purposes of the appeal process,**

20   **how did you determine that he received due process in**

21   **the appeal process?**

22       A.   So we reviewed, and we specifically addressed

23   in the hearing --

24             MR. WHITFIELD:  Object to the form of the

25   question, but you can answer.

Steven Bondi
February 03, 2021

Page 96

1              THE WITNESS:  -- that Dr. Papin had had

2    monthly feedback, had had frequent conversations with

3    Dr. Earl about his deficiencies, both formal written

4    feedback from during his rotations, conversations about

5    that monthly feedback, as well as in I believe in

6    November of his intern year, his first year of

7    residency, that he received a formal summative

8    evaluation of the first half of his residency.

9              So he received notice of what his deficiencies

10   were, he had an opportunity to discuss those

11   deficiencies, he had an opportunity to, you know,

12   discuss those specifically with Dr. Earl.  And he had an

13   opportunity to remediate that entire -- that entire

14   time.

15        Q.   (BY MR. SCHMITZ) Anything else?

16        A.   Our review -- in our review, that was notice

17   an opportunity, and that he had the due proc -- that

18   that constituted due process in terms of his

19   termination.

20        Q.   But we've been talking about HR versus GME and

21   professionalism issues, and we talked earlier, and you

22   said -- I asked you what's the professionalism issues,

23   and you said, well it seems like he may have been lying

24   about whether he was doing his rounds, you know,

25   basically attending to patients, and that really

Steven Bondi
February 03, 2021

Page 97

1    centered around that allegation and regarding whether he

2    ever looked at this decubitus ulcer patient's back to

3    see if there was a decubitus ulcer back there.  And they

4    believe he was not being truthful about that.

5             What investigations, if any, did you order or

6    look into further into those issues to determine whether

7    that was accurate or not?

8        A.   We didn't -- that wasn't our role.  Our role

9    was for review.  It wasn't to -- it wasn't to be the

10   investigator.  Our role was to review the decision and

11   give an opportunity for -- for -- to hear what the

12   witnesses had to say.  And to give Dr. Papin an

13   opportunity to -- Dr. Papin an opportunity to hear that

14   and rebut it.  We heard --

15       Q.   Right.  And Dr. Papin never agreed --

16       A.   -- we heard it first -- we heard firsthand

17   from the witnesses.

18       Q.   -- with those.  Right.  He denied agreed with

19   what those witnesses -- he denied what those witnesses

20   were saying, he denied not seeing the -- he denied not

21   caring for the decubitus ulcer patient.  He denied not

22   doing his pre-rounds and rounds when other people said

23   maybe he was showing up later; right?

24       A.   Well, yeah, he did deny it.  Like I said,

25   twice -- at least twice before, I think that the -- you

Steven Bondi
February 03, 2021

Page 98

1   know, he gave a well-thought rebuttal about the

2   decubitus ulcer, that's in the record, that was in the

3   record.  So, yes, he did deny it.

4        Q.   But he was fired because he was a danger to

5   patients according to HR; right, so was there any

6   investigation regarding how -- why he was investigated,

7   you know, he denied that he was a danger to patients, HR

8   said he was.

9             MR. WHITFIELD:  Object to the form.

10       Q.   (BY MR. SCHMITZ) So was there any

11  investigation done by you to see maybe HR was mistaken

12  or other people were mistaken by looking at any type of

13  medical records associated with any of these patients --

14       A.   Our job was not to perform an investigation.

15  Our job was to give a hearing, we heard witness'

16  testimony.  And Dr. Papin had the opportunity to rebut

17  that testimony.  That was --

18       Q.   Was there any follow-up after the hearing --

19       A.   -- our role.

20       Q.   -- regarding any of the things that Dr. Papin

21  brought up that was in rebuttal to these allegations

22  that were brought against him that he was a danger to

23  patients and he was not rendering patient care?

24       A.   Well we certainly discussed what was brought

25  out at the hearing and --

Steven Bondi
February 03, 2021

1   facts that can otherwise, you know, visually be seen;

2   correct?

3        A.   Yes.

4        Q.   And there was no avenue provided to Dr. Papin

5   to provide any of those exhibits, which he believed

6   exonerated him or at least mitigated against the

7   circumstances of his termination; correct?

8                    MR. WHITFIELD:  Object to the form.

9                    THE WITNESS:  Well he had the

10  opportunity, and his attorney was at the hearing.

11       Q.   (BY MR. SCHMITZ) Right.  But did anybody ever

12  ask him of these things that, you know, at the hearing,

13  did anyone ever ask him, okay, well submit those to me

14  when you're done and we will take that into

15  consideration before we render our decision?

16       A.   I don't believe we specifically asked him

17  that, we offered him the opportunity to present the

18  evidence, so he certainly had the opportunity.

19       Q.   But he wasn't there.  He was just on the phone

20  reading text messages from his phone, so you have no

21  idea whether?

22       A.   Well he was represented by an attorney who was

23  in the room, that was his attorney, not an attorney for

24  the medical center.

25       Q.   And that attorney was not allowed to speak

1    though; correct?

2        A.    That attorney spoke frequently during the

3    hearing.  He was not allowed to question the witnesses.

4    He spoke many times during the hearing.

5        Q.    We're going to go to the next exhibit.

6        A.    Okay.  Is this Notice Letter to Papin?

7        Q.    Yes.

8        A.    Okay.

9        Q.    And was this the Notice Letter prior to the

10   hearing that you conducted on Dr. Papin's termination

11   that he would have received before that hearing took

12   place?

13       A.    I'm not sure I've seen this letter before.

14   But it appears to be what you state it is.  Can I have a

15   minute to read over it?

16       Q.    Yeah.  Go ahead.  Go ahead.  Of course.

17       A.    Okay.

18       Q.    Okay.  So this would have been at the bottom

19   of page one:  "The following notice is hereby provided

20   concerning Mr. Papin's dismissal."  And then there's a

21   rendition of the facts of the case.

22             So he began his residency as a first-year

23   intern, it says here on July 1, 2016; correct?

24       A.    That's what it says.

25       Q.    The first complaint occurred 28 days into his

Steven Bondi
February 03, 2021

Page 103

1    residency.  I guess he had some interactions with nurse

2    practitioners where he was saying something, "I'm a

3    surgeon.  You're not my boss."  He would not check in

4    with them and would not be seen until it was time for

5    evening rounds.  Did you ever follow-up or see any

6    documentation regarding these alleged interactions?

7         A.   Well Dr. Earl spoke about these during the

8    hearing.  And there was -- I saw some of the e-mails,

9    which I believe were part of the documents at the

10   hearing.

11        Q.   Did you ever see any documents regarding the

12   fact that I believe the attending he was working with at

13   this time, had told him that he could go -- and some of

14   is conflict was about the fact that he was told that he

15   could go to the operating -- the OR -- and observe

16   things and the nurse practitioners were trying to tell

17   him to do something else, which was in conflict of what

18   the instructions he had received from his attending --

19        A.   Actually, based on what I saw, it wasn't in

20   conflict because if I recall correctly, the attending

21   had said that when his -- that if his work was done, he

22   could go.  And based on the description of the conflict,

23   the work wasn't done.

24        Q.   On page two of four of this document, it looks

25   like about one, two, three paragraph down.  There's a

Steven Bondi
February 03, 2021

1   seen in my years in license.  There are --

2        Q.   **He didn't get negative reviews from every**

3   **physician that reviewed him?**

4        A.   No.  The pos -- I mean the negatives are bad

5   and the positives are pretty -- they're pretty just

6   boilerplate things.  But when you read through those and

7   especially when you look at the summative evaluation,

8   that's -- that's --

9        Q.   **What made them the worst that you had ever**

10  **seen?**

11       A.   To have that many deficiencies in

12  professionalism and honesty, is I've never seen that

13  before.  No, I haven't seen everybody's.  But I was on

14  the Clinical Competency Committee, which is the

15  equivalent of a resident for review committee at the

16  fellowship level at UMMC for the Pediatric Critical Care

17  Fellows.  I'm a member of the same committee for our

18  fellows here in Rochester.  And to have those

19  deficiencies at that level.  Once again, as we were

20  talking about before, when we see resident efficiencies,

21  they're usually in knowledge base or skills or the

22  ability to get the work done.  We don't really tend to

23  say that that new res -- interns have poor skills

24  because they're expected not to be -- they're not

25  expected not to be great at doing procedures because

Steven Bondi
February 03, 2021

Page 106

1    they haven't learned them yet.  But in terms of

2    knowledge base, that's where we tend to see them or that

3    work efficiency.  That's not what his evaluations were

4    remarking on.  They were remarking on his interpersonal

5    ability to work well with others, which was -- which was

6    very very lowly rate -- low-rated.

7         Q.   So after receiving those written reviews

8    regarding his -- as you described them, poor

9    interpersonal skills working with others, in November

10   they were the worst that, in your opinion, the worst you

11   had ever seen, are you aware of whether Dr. Earl met

12   with him after that to put him on some type of

13   remediation plan, so that he can improve on those

14   interpersonal skills to specifically make him aware in

15   writing that, you know, this person had this problem

16   with you, maybe you should go speak to them and

17   apologize and fix that issue, are you aware of any

18   meetings like that that would have occurred prior to

19   this --

20        A.   Well I don't know --

21        Q.   -- December 20th sit down and between in

22   November to December 20th?

23        A.   I don't know whether anything occurred between

24   the two of them.  And other than the summative

25   evaluation, I have not seen any written plan.

Steven Bondi
February 03, 2021

1    Q.   Would things like that, the interpersonal

2  issues and not being able to work well with others, is

3  that something -- that's something that can be fixed;

4  right, that's not something that you -- that someone

5  can't be a doctor for, there's lots of jerk doctors out

6  there; right?

7    A.   Can it not be fixed?  I think for many people

8  it can be fixed.  I think that, you know, over the

9  course of six months when you've had notice of it for at

10  least five of those six months and it's an ongoing

11  problem and it's getting worse over that period time,

12  I'm thinking maybe it couldn't be fixed.  I mean there

13  was --

14    Q.   He was a -- he was a first-year resident;

15  correct, so this was his first working experience and

16  job?

17    A.   I have no idea -- well, no.  Because I know he

18  had work experience between medical school and residency

19  because he had a year where he worked in a lab I

20  believe.  That was discussed at the hearing.  I mean

21  almost getting the -- the substance of these issues are

22  not -- they're not small and they're not unique to

23  medicine.

24    Q.   So after that, it says Dr. Earl met with Dr.

25  Papin again on the 20th of December in 2016.  This

Steven Bondi
February 03, 2021

Page 108

1    meeting was to address recurring issues of

2    professionalism.  Right.  So up to this point, he

3    allegedly had some issues with -- according to this --

4    the issues that were brought up to this prior to this.

5    If you scroll up, there were issues specifically named

6    up here.  He had some issues with some nurses.  He had a

7    run in with the nurse practitioner.  There was an issue

8    about him not knowing about the coffee pot -- or

9    bringing the drink into a patient's room.  So those are

10   issues that are listed there.  So the meeting was -- I

11   guess these issues had been cropping up, so there was a

12   meeting on December 20th that he was put on notice

13   about.  And at this meeting, it states that Dr. Earl

14   specifically addressed his unwillingness to help with

15   tasks, which that's listed above this; correct, that

16   happened in the beginning of his residency?

17        A.   Yes.  I mean that's what it says.

18        Q.   Okay.  And then there was Dr. Papin leaving

19   during the hospital -- leaving the hospital during duty

20   hours to exercise; correct?

21        A.   That's what it says.

22        Q.   And that issue was brought up specifically at

23   his appeals hearing about him leaving to exercise;

24   correct?

25        A.   Yes.

Steven Bondi
February 03, 2021

Page 109

1      Q.   And Dr. Papin offered text messages showing

2   that he had been approved to do that by his Chief

3   resident to leave -- to leave -- one time he asked to

4   leave and it was approved, and then the next time he

5   asks to go for a run, the Chief resident in this case

6   acted -- reacted very differently and did not approve

7   him going.  He was actually upset the fact that he

8   asked?

9      A.   That's all correct.

10      Q.   I'm sorry.  I was talking too.  What was your

11   answer?

12      A.   I said that's correct.

13      Q.   Okay.

14      A.   That was specifically discussed at the

15   hearing.

16      Q.   And that was -- there were text messages that

17   he was referencing at the hearing that you never sought

18   to get regarding that incident to show that, you know,

19   he was receiving mixed messages from his Chief resident

20   regarding whether that was allowed or permissible or

21   not; correct?

22      A.   That is correct.  But once, again, we took

23   those what Dr. Papin was saying as accurate as to what

24   happened when we had our discussions.  This particular

25   incident about the exercise, it really -- it really

Page 110

1    didn't weigh in the conversation based on what Dr. Papin

2    -- I'm sorry -- conversation only, it didn't really

3    weigh in on our deliberation based on what Dr. Papin

4    said to the Board and him reading the text message.  We

5    found that that was -- that was a, you know, a

6    reasonable explanation of his point of view in that

7    matter.

8         Q.    That was one of the critical deficiencies;

9    however, listed in his summative reviews that his

10   brought notice about on things he needed to improve

11   about; correct?

12        A.    It was a deficiency.  I think that it's -- the

13   episode is interesting.  But, once again, we did not see

14   it as a dereliction that he went for a run.  We -- we --

15   we took him at his word for what he read to us, that he

16   had that documentation, that that e-mail -- so we didn't

17   feel a need to see it because we believed him.  I think

18   this was a misunderstanding.  Although, I do question

19   it, I mean it does show kind of a -- kind of a gap in

20   the way things work.  But it's one of those things that

21   in this situation, it seemed like it was actually

22   corrected.  So it didn't really weigh in on our

23   deliberations about whether his termination was just.

24        Q.    What things did weigh in on it?

25        A.    I think it was the interpersonal relationships

1  with nurses, nurse practitioners, co-workers.  It was

2  the overall work ethic.  Those -- those were the things.

3  And there was a, you know, a tenor of kind of dishonesty

4  and not, you know, just not being professional.

5       Q.   Well and as you see here, the meeting, it's

6  listed as of December 20th, he had not had any issues at

7  least that Dr. Earl brought to his attention regarding

8  dishonesty up to that point; correct?

9       A.   I don't know off the top of my head.  I'd have

10  to look back at the summative evaluation.

11       Q.   Well just looking right here, this Notice

12  Document is not letting him know that there was any

13  issues with his candor prior to December 20th; correct?

14       A.   No.  I disagree with that.  In the paragraph

15  before that, Dr. Earl met with Dr. Papin on numerous

16  occasions and provided feedback and counseling regarding

17  his persistent professionals and honesty issues.

18       Q.   Okay.  Where in this document, this Notice

19  Document that he received prior to the hearing that you

20  conducted does it say he had issues with candor prior to

21  December 20th?

22       A.   Candor and honesty are the same -- are

23  synonyms.

24       Q.   Right.

25       A.   It says it in that sentence right above Dr.

Steven Bondi
February 03, 2021

Page 112

1   Earl met with Joe Papin again on December 20th.  It says
2   it in the sentence right before that.
3        Q.   Okay.  But honesty issues, what honesty did
4   you ever -- are you aware whether Dr. Papin was
5   specifically put on notice other than just the vague one
6   mention of these honesty issues about what these issues
7   were, so he could address them prior to the --
8        A.   I have -- I have no idea about the specific
9   conversations, or I should say I have no specific ideas
10  about what light to this letter.  I wasn't involved in
11  that process.
12       Q.   Okay.  Then it says, "After this meeting, Dr.
13  Papin's performance did not improve and patient safety
14  issues developed concerning Dr. Papin's behavior."  It
15  says, "Renee Greene, Senior Education Administrator,
16  received e-mails concerning Dr. Papin's performance."
17            Do you know whether Dr. Earl or Ms. Greene
18  solicited those e-mails or whether they just came out of
19  the blue?
20       A.   I have no idea.
21       Q.   There's an incident reference on January 3rd
22  where long story short, it basically says that he was
23  suppose to admit a patient into the ICU and call down.
24  And whether the ICU had responded back that the person
25  just never note -- ICU I guess was never notified and

Steven Bondi
February 03, 2021

Page 113

1    just showed up there.  And Dr. Papin at the hearing, did

2    you recall what he testified in response to rebut this

3    allegation?

4         A.   If I recall correctly, my -- it's hard because

5    I've read the transcript, and I also read over the

6    transcript of the HR conversation about this incident.

7    But that he called someone but didn't remember who it

8    was, and that it might have been a nurse.

9         Q.   Okay.  Is that possible, I mean you work in

10   the ICU, it's probably very busy, that's possible he

11   could have spoken to somebody in passing that was busy

12   themselves?

13        A.   ICU admissions aren't something --

14                  MR. WHITFIELD:  Object to the form.

15                  THE WITNESS:  Oh, sorry, Tommy.

16                  MR. WHITFIELD:  Object to the form.  You

17   can answer.

18                  THE WITNESS:  ICU admissions aren't

19   something that are done informally.  These are the

20   sickest patients.  They by definition are gravely ill.

21   So we have -- we have direct conversations with people

22   about admissions.  So as an attending, I receive a call

23   from, typically, they come from, in my case, either the

24   emergency department or from the -- from the operating

25   room.  I receive a phone call from the attending

Steven Bondi
February 03, 2021

 1   emergency physician who identifies themself.  They, you

 2   know, make sure they're talking to me, and we have a

 3   conversation.  For patients that come from the operating

 4   room, I get two phones calls.  I get one from the

 5   attending surgeon, as well as one from the attending

 6   anesthesiologist.  Once again, they're calling me, they

 7   know who I am, and they're giving me a structured

 8   handoff, so that I am prepared to take care of that

 9   patient as soon as they get there because sometimes

10   these patients are unstable upon arrival to the IC Unit.

11           When our residents communicate with one

12   another, they do the same thing at their level.  So the

13   resident calls and talks to the resident and has a

14   handoff.  The nursing handoff is completely different

15   from the physician handoff.  The nurses also have

16   handoff, they call it "calling report."  But their

17   handoff is different.  Those aren't things you mistake

18   for one another.  Certainly, not someone -- and it's not

19   something someone should have -- it's not an error of

20   somebody who had been in the ICU for more than a few

21   days would have made it, if it happened at all.

22           So this is an extremely important issue.  This

23   -- this missed handoff is an extremely important issue.

24       Q.   (BY MR. SCHMITZ) Again, I'm sure that this

25   happens from time to time, in the things that do happen,

Steven Bondi
February 03, 2021

1   it's not unheard of that this happens?

2       A.   When it does, we make a big deal out of it.

3   It's a big deal.

4       Q.   Is it an immediately separable offense on its

5   own right?

6       A.   Based on -- based on one event, probably not.

7   But it's a big deal.

8       Q.   Next there's talking about Dr. William Crews,

9   PGY3 Surgical Resident.  I believe he was only a medical

10  student, at that time, were you aware of that, he was

11  not, in fact, a resident?

12      A.   Yes, I was aware of -- I think that's -- I

13  think they mean MS3, not PGY3, that's a typo.

14      Q.   Okay.  He states: "Dr. Crews reported that

15  Dr. Papin always seemed to show up just before rounds

16  without actually having seen any of the patients and

17  then would lie to residents about what he had done.

18  When caught doing something wrong, he would blame a

19  medical student for his own errors.  Dr. Crews also

20  talked to Dr. Mahoney, Surgery House Officer, about Dr.

21  Papin's behavior."

22           Was there anything done in terms of verifying

23  whether Dr. Papin was doing his rounds or not because

24  certainly someone like Dr. Crews would not always be

25  with Dr. Papin to do pre-rounds in the morning and

Steven Bondi
February 03, 2021

1   whatnot?

2        A.   Well I don't accept -- I don't accept that

3   statement you just made, but I'll answer the question.

4   That's -- there's no -- would have been no easy way to

5   do that other than asking the people who are there.  In

6   this case, the medical students are ever present in the

7   hospital.  If you actually want to know stuff, they --

8   they're everywhere, and they also are unobtrusive

9   because they -- because since they don't have like a

10   direct responsibility, you know, as like the residents

11   do, they are -- they are keen observers.

12            So this was a compelling amount of information

13   that then Mr. Crews, I assume now Dr. Crews provided.

14   Medical students see that kind of stuff.  They stick

15   onto -- they stick onto to residents because they want

16   to make sure they don't miss anything, and they also are

17   very eager to please.

18            Every one of as a resident, as an antidote

19   about a medical student following us into the bathroom

20   because they're so -- they stick to us so much.  So

21   that's why I disagree with your statement about him not

22   seeing things.  I mean if he was on a rotation at the

23   same time as Dr. Papin, I do believe that he would have

24   a sense of when Dr. Papin arrived and when Dr. Papin saw

25   those patients.

Steven Bondi
February 03, 2021

Page 117

 1          The other thing I would add about a medical

 2    student complaint, is for the medical student to

 3    complain about a resident's professionalism, that is

 4    extraordinarily unusual.  Medical students like to lay

 5    low, when they complain, they tend to complain about

 6    things like, you know, not getting, you know -- you

 7    know, having to work long hours, but they do it in

 8    private.  They almost never make formal complaints

 9    because their grades are so important to them.

10          Q.   But you don't know one way or the other

11    whether Dr. Crews was asked if he had any complaints

12    about a doctor or on his own --

13          A.   No.  No.

14          Q.   -- volition and freely --

15          A.   You were just asking me about --

16          Q.   -- submitted a complaint?

17          A.   You were just -- you had made the statement

18    that he would not be in the position to observe, and I

19    disagree with that.  I think he would actually be the

20    ideal person to observe.

21          Q.   But you don't know for sure one way or the

22    other, you weren't there; right?

23          A.   I wasn't there, but I was asked to hear what

24    he said in the hearing, and I found that his testimony

25    was compelling.  I didn't see a reason why he would had

Steven Bondi
February 03, 2021

Page 118

1     a reason to lie or to fabricate the testimony.  And

2     furthermore, he had no reason to bring it up in the

3     first place unless he was really worried about what was

4     going on.

5          Q.   Are you aware of whether Dr. Crews has since

6     ever recanted any of his testimony, and if he did

7     regarding these incidents, would that have changed your

8     -- would that change your opinion materially regarding

9     the fact of whether Dr. Papin, his professionalism and

10    candor issues were as bad as everyone thought they were?

11         A.   You asked a bunch of questions.  But the first

12    one is, I have no idea whether he recanted any of this.

13    My last contact with Dr. Crews was on the day of the

14    hearing.  And once again, I assume he's Dr. Crews now.

15    He was Mr. Crews then.  In terms of whether it would

16    have made a difference, I believe I kind of answered

17    that question at the beginning of the deposition where I

18    said that, you know, there's a bunch of information

19    here.  The information that we reviewed, there's a lot

20    of it.  Any one thing was not a linchpin in terms of our

21    decision to support Dr. Papin's termination.

22              I think -- and if the committee were to, you

23    know, we'd have to basically look at what would have

24    changed.  You know, one thing wouldn't have made a

25    difference.

Steven Bondi
February 03, 2021

Page 131

1   potentially be disciplined if they were to admit to

2   something like that?

3        A.   Well it's not there weren't -- this isn't

4   nurses.  It's nurse practitioners or physicians.

5        Q.   Okay.  So either a nurse practitioner or a

6   physician.  If a nurse practitioner, which that's what

7   Dr. Papin said he spoke to, if it was a nurse

8   practitioner that had potentially made a mistake,

9   wouldn't that person be subject to discipline, if they

10  answered yes to that question?

11       A.   I think anybody that was dishonest in dealing

12  with patient care, there are potential ramifications for

13  that.  Yes.

14       Q.   But yet it was -- but you made the conclusion

15  that only Dr. Papin was dishonest and there was no

16  potential that there was somebody from the --

17                 MR. WHITFIELD:  Object to the form.

18       Q.   (BY MR. SCHMITZ) -- another side of the story

19  with respect to the admittance of the patient into the

20  ICU unit?

21       A.   No.  Because Dr. Papin explained that he

22  talked to somebody, he wasn't sure who it was.  And then

23  maybe -- and then later said maybe it was a nurse.  So

24  we heard his side of the story, and it was clear from

25  what he told us, that he didn't make sure who he talked

Steven Bondi
February 03, 2021

Page 132

 1    to was the right person.

 2        Q.    But there's two sides to that story; right,

 3    there's two potential outcomes.  So either Dr. Papin was

 4    lying or that person on the other end that Dr. Papin

 5    spoke to allegedly; right, was lying?

 6        A.    That's not what I said.

 7        Q.    No.  No.  I'm not saying that's what you said.

 8    I'm saying, there has to be two sides.  So there was

 9    either Dr. Papin was lying or the person who took the

10    phone call that Dr. Papin said he made was lying; right,

11    if --

12        A.    I disagree.

13        Q.    -- that even happened.  Did anybody --

14        A.    I disagree.

15        Q.    Did anybody follow-up -- did anybody

16    investigate that further and write those people up for

17    not receiving the patient or taking those orders as they

18    should have?

19                    MR. WHITFIELD:  Object to the form.  If

20    you can answer that, go for it.

21                    THE WITNESS:  Well it was a couple of

22    statements followed by a question.  So to answer the

23    statements.  It is true that either the call occurred or

24    the call didn't occur.  But there's also a bona fide

25    question as to, if the call did occur, who did Dr. Papin

```
 1    talk to.  And Dr. Papin said that he wasn't sure who he
 2    talked to.  That in of itself is a problem.  When I make
 3    -- when I give sign on, on a critically ill patient, one
 4    of my patients is going to the operating room; for
 5    example, I call the anesthesiologist who is responsible
 6    for that case.  I talk to that person by name.  I
 7    understand that person's role, and then I sign the
 8    patient up -- out.  I just don't call a random person
 9    and sign the patient out not knowing who they are.
10         Q.   (BY MR. SCHWARTZ) But do you remember if you
11    -- 'cause this says on January 3rd, she sent an e-mail
12    to Renee Greene outlining an incident that had occurred
13    the prior weekend.  So by the time Dr. Papin was given
14    notice of this incident, potentially maybe by Dr. Earl,
15    it was three weeks later.  Do you remember three weeks
16    ago if he talked about some patient that -- you know, I
17    mean at three weeks, once that much time goes by,
18    wouldn't it be reasonable to assume that he probably
19    wouldn't remember maybe even seeing that patient at all?
20         A.   Well that's a different -- the latter thing is
21    a different question.  But I take sign out and give sign
22    out the same way every single time I do it.  It's
23    something we focus on.  It's actually -- sign outs are
24    very -- have been identified as a high risk area for
25    patient care.  Every time a patient is handed off,
```

Steven Bondi
February 03, 2021

1   there's a risk to that in terms the information that's

2   exchanged not being done effectively and not harming

3   patient care.

4            So handoffs are huge in patient safety.

5   That's why we make such a big deal out of them, and

6   that's part of the substance of what we're talking

7   about.  So, no, I wouldn't just pick up the phone and

8   say -- and say, "I'm signing this patient out."  I would

9   say, you know, "Is this Dr. Smith, the anesthesiologist

10  who's going to be caring for baby Jones in an hour."

11  And they do likewise to me.  They would call up and --

12  and frankly, I know -- at my level, I know some of these

13  people by name, so.  But even when it's people I don't

14  know, it's an attending from the emergency department.

15  I'll answer the phone, they'll say, "Is this the PICU

16  attending."  I'll say, "Yes.  It's Steve Bondi, I'm the

17  PICU attending that's on today."  And then they'll say,

18  "I have a patient to sign out to you."  And I'll say,

19  you know, "Let me grab a pencil" or whatever.  And then

20  they sign the patient out to me in a structured way.

21            This is -- this is not a -- this is not a spur

22  of the moment conversation.  These are semistructured

23  exchanges of information that are critical for patient

24  for patient.  So, yes, I can say for certain that I

25  signed out three weeks ago or three years ago, that I

Steven Bondi
February 03, 2021

Page 135

1    knew who I was talking to on the other end of the phone
2    because we all -- I always do it the same way.
3         Q.   You would be able to figure that out because
4    you take notes about that?
5         A.   Well I take notes when I receive the
6    information.  But I can tell you that I always identify
7    the person I'm talking to.  The only thing is, I'm not
8    allowed to give patient care information to someone
9    who's not directly involved in the care of that patient.
10   Because that's -- that's -- that's -- all of that's
11   bounded by HIPAA, and we get tons of training on that as
12   well.  We need to make sure that that exchange of
13   information is to the right person.  So that's a
14   critical aspect of this.  You just don't call up and
15   start -- start signing a patient out.
16             The other thing is, is that if a -- you know,
17   it wouldn't make sense for a nurse to take sign out from
18   a doctor anyway.  So I, you know, it'd be unlikely for a
19   nurse just to sit there and get that exchange of
20   information.  I guess that is possible.  But the person
21   making the sign out has an obligation to make sure
22   they're signing out to the right person.
23        Q.   But a nurse practitioner, that's -- that's
24   acceptable scenario?
25        A.   Well nurse practitioner is a different role

Steven Bondi
February 03, 2021

Page 142

1        Q.   Other than those dates, so November, December,

2    we've got two documentations of two meetings between Dr.

3    Earl and Papin, prior to that, there's -- it was just --

4    there's no -- there's no documented counseling --

5        A.   There's no document of the conversation.

6        Q.   -- sessions?

7        A.   There is the -- there are the monthly -- the

8    monthly feedback that one would get after each rotation.

9    But there's no documentation of a conversation between

10   Dr. Papin and Dr. Earl attached to those.  If that's the

11   question?

12       Q.   And you don't recall whether you had any part

13   in providing this Notice Letter or working to provide

14   this Notice Letter to --

15       A.   Oh, I do recall that I did not have -- I did

16   participate in the providing of this Notice Letter.

17   This is the first time I've seen this letter to my --

18   the best of my knowledge.  I certainly did not draft it.

19       Q.   Okay.  All right.  The next exhibit is posted.

20       A.   E-mail-Meeting with Bryce.pdf?

21       Q.   Yes.

22       A.   Okay.

23       Q.   Can you tell me what was discussed during this

24   meeting between you and Bryce?

25       A.   Yes.  It was who was going to be on the

Steven Bondi
February 03, 2021

Page 176

1   stuff?  If it wasn't you, then whose responsibility

2   would it have been?

3        A.   My assumption it would be the GME office.

4        Q.   So Dr. Barr?

5        A.   Well I -- Dr. Barr at that -- like I said, Dr.

6   Barr and Dr. Schlessinger were having that handoff.  I

7   don't know when that formally occurred.  But,

8   ultimately, one of them or both.

9             MR. WHITFIELD:  I'm going to object to

10  that last question.  He wasn't a 30(B)(6) witness for

11  the institution on that topic.  He can answer as best of

12  his knowledge.

13       Q.   (BY MR. SCHMITZ) When did you and the

14  committee afterwards meet to make a decision on Dr.

15  Papin's termination?

16       A.   We met immediately after the hearing.

17       Q.   Everybody was in person, this was a full in

18  person meeting?

19       A.   Correct.

20       Q.   How long did you guys take to discuss the

21  matter?

22       A.   It was over an hour or close to it.  I don't

23  -- I wouldn't remember.  It was not brief because it was

24  late in the day.

25       Q.   Is any portion of that meeting or notes

Steven Bondi
February 03, 2021

Page 180

```
 1                    CERTIFICATE OF THE DEPONENT

 2              DEPONENT: Steven Bondi, M.D.
            DATE: February 3rd, 2021
 3          CASE STYLE:  Joseph Papin vs. University of
     Mississippi Medical Center; Dr. Louann Woodward, Dr. T.
 4   Mark Earl

 5
              I, the above-named deponent in the deposition
 6   taken in the herein styled and numbered cause, certify
     that I have examined the deposition taken on the date
 7   above as to the correctness thereof, and that after
     reading said pages, I find them to contain a full and
 8   true transcript of the testimony as given by me.
              Subject to those corrections listed below, if
 9   any, I find the transcript to be the correct testimony I
     gave at the aforestated time and place.

10
         Page      Line              Comments
11        13         1      replace "bosses" with "boss's"
          40         20     replace "counsels" with "counsel's"
12        40         23            Same
          41         5             Same
13        41         7             Same
          41         16     replace "office" with "officer"
14        44         19     replace "ace" with "and"
          54         4      replace "share" with "chair"
15        55         12     replace "mine" with "minor"
          74         11     change "unjoin" to "enjoin"
16        95         14     change "giving" to "given"
          95         15     change "giving" to "given"
17        95         16     change "professionals" to "professionalism"

18           See Next Page
          This the  21  day of  February  , 2021.
19
                              _____
20                            STEVEN BONDI, M.D.
     State of Mississippi
21   County of _____

22        Subscribed and sworn to before me, this the _____
     day of _____, 2021.
23

24   My Commission Expires:

25   _____         _____
                              Notary Public
```

Steven Bondi
February 03, 2021

Page 180

1                    CERTIFICATE OF THE DEPONENT

2              DEPONENT: Steven Bondi, M.D.
               DATE: February 3rd, 2021
3              CASE STYLE:  Joseph Papin vs. University of
     Mississippi Medical Center; Dr. Louann Woodward, Dr. T.
4     Mark Earl

5

6              I, the above-named deponent in the deposition
     taken in the herein styled and numbered cause, certify
     that I have examined the deposition taken on the date
7     above as to the correctness thereof, and that after
     reading said pages, I find them to contain a full and
8     true transcript of the testimony as given by me.
               Subject to those corrections listed below, if
9     any, I find the transcript to be the correct testimony I
     gave at the aforestated time and place.

10

       Page       Line                    Comments
11     10 5         1      Change "license" to "medicine"
       10 9         7      Change the first "He" to "she"
12     122         11      change "antidotal" to "anecdotal"
       122         16             Same
13     1286         3      change "capability" to "culpability"
       126         23             Same
14     130         22      change first "on" to "out"
       142        15/16    the word "not" should be placed
15                         between "did" and "participate"
       143         21      change "exchange" to "education"
16     164          6      change second "in" to "and"
       170         20      change "voracity" to "veracity"
17      X           X             X

18          This is the second of two pages

               This the 21 day of Februry       , 2021.
19                                                      .

20                         STEVEN BONDI, M.D.
     State of Mississippi
21    County of _____

22          Subscribed and sworn to before me, this the _____
     day of _____, 2021.
23

24    My Commission Expires:

25    _____        _____
                                     Notary Public