**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION**

**JOSEPH PAPIN**                                                                    **PLAINTIFF**

**VS.**                                          **CIVIL ACTION NO.:  3:17-CV-763 KHJ-FKB**

**UMMC, et al.**                                                                    **DEFENDANTS**

**DEFENDANTS' BRIEF IN SUPPORT OF THEIR
MOTION FOR SUMMARY JUDGMENT**

COME NOW, the Defendants and file their Brief in Support of Motion for Summary

Judgment to the Plaintiff's Amended Complaint.

## I.   CASE FACTS

Plaintiff Joseph  Papin was dismissed February 22, 2017 from his employment as a first-

year medical resident at the University of Mississippi Medical Center (UMMC) in the General

Surgery Residency Program for professionalism issues and violations of the UMMC Faculty and

Staff Handbook code of conduct.  *See Dismissal Letter, Exh. 1.*  Dr. Papin chose to appeal  his

dismissal through the Graduate Medical Education Program's grievance policy.  *Exh. 31.*  After a

hearing in which Dr. Papin was allowed to hear all the witnesses and respond to each, the

appeals committee recommended upholding his dismissal.  *See Appeals Committee Decision,*

*Exh. 2*. The decision of the appeals committee was submitted to Dr. Woodward, the Vice

Chancellor of UMMC, and she affirmed the committee's decision.  *See Woodward Decision,*

*Exh. 3.*

**Dr. Papin's Reported Performance Issues**

Dr. Papin matched through the national residency matching program for a categorical

surgical residency with UMMC and began working at UMMC in July 2016.  *See House Officer*

*Contract, Exh. 4 and  Deposition of Joe Papin pg 12, Exh. 5.*  As a first-year resident, Dr. Papin

worked on monthly rotations through various departments of UMMC.  *See Deposition of Mark*

*Earl pg. 31, Exh. 6.*  The reports about Dr. Papin's performance issues began during his very first rotation.

Dr. Papin's first rotation was in the cardiovascular intensive care unit (CVICU) during. *Id. at pg. 65.*  On July 29, 2016, 28 days into his residency, two attending faculty members reported issues with Dr. Papin to his  program director, Dr. Mark Earl.  *See Email of Dr.Ines Berger, Exh. 7.*  Dr. Inez Berger reported to Dr. Earl that four CVICU nurse practitioners and pharmacist had reported issues working with Dr. Papin which included a heated exchange with Josh Sabins, one of the nurse practitioners in the unit.  *Id.*  Dr. Berger also reported that there were issues with Dr. Papin  leaving during his shift when there was work to be done.  She reported that the nurse practitioners stated that they would try to teach Dr. Papin how to do a procedure, or ask him to pull a chest tube, and he would go to the operating room to observe. *Id.*

Dr. Berger reported that she met with Dr. Papin about the perception of him based on the reports she had received and how it was impacting his work performance.  *Id.*  She also talked to him about the role of the nurse practitioners, how to set himself up for success, and the expectations of working with surgical teams.  *Id.*  Dr. Jay Shake, another attending physician on the rotation, talked to Dr. Earl about the very same issues initially reported to him by Dr. Berger, such the heated exchange with the nurse practitioner and him leaving during his shift to go to observe in the operating room.  *Exh. 6, at pg. 117.*

In response, Dr. Earl met with Dr. Papin and discussed the issues brought to his attention by Drs. Shake and Berger, in addition to other issues of which he was aware.  *See Email of Dr. Earl, Exh. 8.*  As it was his first rotation, Dr. Earl gave him the benefit of the doubt and instructed him to walk away from situations, to not be confrontational, and to improve his behavior at the workplace.  *See Exh. 6, at pg. 116 and Exh. 16, pg. 14.*  However, during this time, issues with Dr. Papin's behavior continued, and Dr. Papin received negative feedback

through the online electronic evaluation system through his monthly evaluations from faculty, nurse practitioners and peers.   Exh. 10.  As part of his training and feedback, Dr. Papin was evaluated after each rotation by the faculty, nurse practitioners, and his peers.

In August 2016, Dr. Papin rotated through the cardio thoracic (CT) surgery department. Once again, it was reported to Dr. Earl that he was having issues on this rotation.  Dr. Jacob Moreman, an attending physician, reported to Dr. Earl that Dr. Papin was not completing assigned tasks and was having difficult inter-professional relationships.  *Exh. 6, at pg. 160.* Also, there were continued complaints from nurse practitioners that Dr. Papin was rude and condescending and that when they tried to teach him, he acted as though he had nothing to learn from them.  *See Deposition of Renee Greene pg. 80-84, Exh. 9.*  At the end of his  CT Surgery rotation, Dr. Papin received his evaluations from the attending physicians and nurse practitioners.

On- August 31, 2016, Dr. Moreman reported in Dr. Papin's evaluation that he was:[1] 1)Seen frequently avoiding duties, not present and accounted for during regular hours; 2) an "abysmal communicator"; 3) he seemed almost never to be prepared or recall facts from previous discussions; and 4) he had to be reoriented to missed details almost daily. Other attending physicians reported numerous deficiencies in their evaluations of Dr. Papin, including that he was unprofessional, dismissive and above doing certain work, and had issues with patient care follow-up.[2] [3]

The negative evaluations about Dr. Papins' CT Surgery rotation performance did not end

---

[1]*See Exh. 10, containing the E-value assessment comments by Dr. Jacob Moreman, Assoc. Professor, Papin 471.*

[2]*See Exh. 10, containing the* E-value assessment comments by Dr. Peter De Delva, Assoc. Professor,

[3]*See Exh. 10, containing the E-value assessment comments by Dr. Lawrence Creswell, Assoc. Professor, Papin 471.*

with attending physicians.  Evaluations from nurse practitioners stated that Dr. Papin failed to perform procedures when told, refused to be cooperative or learn when others offered to teach, as well as having poor communication with the team.[4]  Another reported that he was disrespectful to nurses and female support staff, was a poor communicator to the team, had poor insight into his own behavior, would not show up for clinic or be late, would disappear, did not follow instructions concerning discharges and follow up to the team, and that he seemed unteachable with a lack of insight into his own professionalism.[56]

Dr. Moreman, Dr. Lawrence Creswell, Dr. Jay Shake, and Dr. Pierre de Delva all stopped by the Surgery office to complain about Dr. Papin.  *Exh. 9 at pg. 96-99.*  Not only did these physicians provide negative evaluations of Dr. Papin, they each took the unusual step of coming by the surgery office to report directly on Dr. Papin.  Dr. Papin was the only resident that they complained about to the General Surgery Residency office.  *Id.*  As a result, in September, Renee Greene, business administrator for the surgery department, met with Dr. Papin and informed him that she was getting complaints about his behavior, so that he could address it before these complaints escalated further to his program director.  *Exh. 9 at pg. 93-94.*

Because of all the complaints against Dr. Papin, Dr. Earl changed Dr. Papin's rotation schedule for October 2016, placing him in Dr. Earl's own department, transplant surgery.  *Id. at pg. 122-23.*  Dr. Papin was informed by email that this change was occurring due to the  reports about performance issues.  *See Green email to Papin, Exh. 11.*  This was the first time a resident

---

[4]*See Exh. 10, containing the* E-value assessment comments by Penny Vance, Nurse Practitioner

[5]*See Exh. 10, containing the* E-value assessment comments by Gretchen Shull, Nurse Practitioner

[6]The resident evaluation system is electronic, and when a doctor completes an evaluation, it is immediately available for the resident to review.  *Exh. 9 at pg. 100.*  Once an evaluation is completed, the system sends an email notifying the resident, that there is an evaluation available for his review.  *Id. at pg. 100.*

had to be reassigned for observation by the program director due to complaints.  Exh. 9 at pg. 129.

In November 2016, Dr. Earl received a verbal complaint from Dr. Laura Vick, the attending faculty member overseeing Dr. Papin's rotation in the General Surgery Department. *See Earl Deposition, Exh. 6, at pg. 146.*  Dr. Vick confronted Dr. Earl outside of the operating room and informed him that Dr. Papin was conducting rounds[7] without actually seeing patients. *Id.*  This complaint led to a meeting between Dr. Earl and Dr. Papin outside of operating room 16.  *Id.*

On November 8, 2016, the Clinical Competency Committee (CCC) met to review the progress of Dr. Papin during his residency.  Each residency program has a CCC.  For the general surgery residency program, the committee is made up of core faculty members within the department of surgery who meet biannually and evaluate the resident's progress based on faculty evaluations, in training exam performance, peer (co-resident) evaluations, grievances and all other available data. *Exh. 6 at pg. 97-98.*  The CCC scores each resident on 16  "milestones" that are specific to general surgery and based on the 6 core competencies.  The scores range from "critical deficiency" to 4.  Critical deficiencies are rare, even at the intern level.  The milestones are not level specific, i.e. they are the same for 1st year and 5th year residents and meant to measure a resident's progression toward competent, independent practice. *Exh. 52.*  The CCC, of which Dr. Earl is not a member, rated Dr. Papin to have seven (7) critical deficiencies out of sixteen (16) Milestones.[8]  *See Milestone Report on Papin, Exh. 12.*  Also while observing the CCC meeting, Dr. Earl learned that Dr. Papin had broken protocol for patient sign outs by leaving a note instead of having a face to face exchange of information.  *See Exh. 6, pg. 66, 75-*

---

[7]Pre-rounds and rounds are

[8]*See General Surgery Milestones attached as Exh.. XX   Papin 386-404*

76.[9]

On November 29, 2016, Dr. Earl met with Dr. Papin to perform his sem-annual review . During the meeting, Dr. Earl reviewed Dr. Papin's CCC Milestones and his critical deficiencies. Dr. Earl informed Dr. Papin of the communication and professionalism concerns brought by medical and nursing staff.  Dr. Earl instructed Dr. Papin to to take ownership of tasks, Exh. humility, and  to treat nurses and allied health staff with respect.  *See Semi-Annual Review, Exh. 41.*  Dr. Papin signed the semi-annual review acknowledging this counseling by Dr. Earl.  *Id*. During the meeting, he was told that there must be significant improvement in his performance. *See Exh. 41, Meeting notes*.

After the semi-annual review, more complaints regarding Dr. Papin's performance and behavior were reported.  Dr. Earl had a meeting with the chief resident on the trauma service, Dr. Mahoney, who reported issues with  Dr. Papin's performance on the trauma surgery rotation. *See Exh. 6 at pg. 147.*  Based on these complaints, Dr. Earl met with Dr. Papin again on December 20, 2016, to address Dr. Papin's recurring issues of professionalism that had been present through much of the first six months of his residency.  *See Earl Dec. 20 email, Exh. 13.* This meeting specifically addressed:  (1) Dr. Papin's unwillingness to help with tasks;  (2) Dr. Papin leaving the hospital during duty hours to exercise; (3) Dr. Papin's condescending tone to nurses and fellow residents;  (4) Dr. Papin leaving clinics without telling anyone; and (5) Dr. Papin's poor inter-professional communication.  *Exh. 13*.

After this meeting, Dr. Papin's performance did not improve and patient safety issues developed along with a continuation of his professionalism and other issues.  On December 28, 2016, Dr. Earl received an email from the Administrative Chief resident, Dr. Brian Sparkman who reported:

On Papin, he has failed to do several duties this week, such as washing out

_____

[9]*See Exh. 6 pg. 49.*

wounds and completing his floor work per Sid and Ashley.  Ashley has some
valid concerns about coverage over the holidays on trauma.  He is currently the
only intern on over the holidays and her concern is for patient safety.  Do we have
someone that we can swing over to cover trauma with him.

*See Sparkman Email, Exh. 14.*

After the holiday rotations, Renee Greene, Senior Education Administrator, received

emails concerning Dr. Papin's performance.  On January 3, 2017, Dr. Colin Muncie, Pediatric

Surgery Research Fellow, sent an email to Renee Greene outlining an incident that had occurred

the prior weekend that reflected Papin's inefficiency and contumacious conduct.  *See Muncie*

*Email, Exh. 15.*  Dr. Muncie had delegated to Dr. Papin the hand-off of a trauma patient to the

ICU.  Dr. Papin  was specifically instructed to enter orders and sign off to the ICU.  Dr. Muncie

was informed by another resident at the end of shift that the ICU was surprised and never

notified that the patient was coming. When Dr. Muncie confronted Dr. Papin, he confidently told

him that he had spoken with someone, although he could not remember who it was.  *Id.*  Dr.

Muncie followed up with the ICU nurse practitioner, who spoke to everyone who had been on

duty.  It was confirmed that Dr. Papin never spoke with anyone on the ICU team;  he was

untruthful about contacting the ICU; and, he failed to perform the tasks assigned to him.  *See*

*Exh. 15, and the Appeal Hearing Transcript, Exh. 16 at pg. 87-88.*  During the hearing, Dr. Papin

admitted to the facts as described by Dr. Muncie.  *Exh. 16 at pg. 89.*

William Crews, a third year medical student, sent an email on January 3, 2017, to

Administrator Greene about issues of untruthfulness concerning patient care.  *See William Crews*

*Email, Exh. 17.*  Crews reported that Dr. Papin always seemed to show up just before rounds

without actually having seen any of the patients and then would lie to the residents about what he

had done. *Id.*  Dr. Crews also spoke with Dr. Meagan Mahoney, one of the chief residents at this

time, about Dr. Papin's behavior. *Exhibit 43, pg. 57-59.*

On January 10, 2017, Dr. Mahoney emailed Dr. Earl and Administrator Greene about

numerous concerns. These included: (1) Dr. Papin's inattention to detail; (2) Dr. Papin not knowing basic details about his patients during rounds; (3) Behavior issues that were addressed on numerous occasions; and, (4) Dr. Papin often displaying an attitude or reluctance to help with patients. *See Email of Dr. Mahoney, Exh. 18.*  Dr. Papin would using the excuse "that isn't my patient." *Id.*  Dr. Papin had complaints from most of the nurses concerning rudeness and professionalism issues. And, it was also reported that Dr. Papin was lying to the Chief resident about seeing patients before rounds. *Id.*  In addition, Dr. Mahoney reported that she believed Dr. Papin was dishonest about examining a patient that developed a sacral decubitus wound that required surgery. *Id.*

Dr. Ashley Griffin, another chief resident, also sent emails on January 9 and 10, 2017, citing seven incidents involving Dr. Papin.  These included:  (1) Dr. Papin leaving the hospital during a code of one of his patients; (2) Dr. Papin not showing up on time to pre round or to get sign out; (3) Dr. Papin not going to traumas during the holidays; (4) Dr. Papin trying to send a patient home that was not competent despite being warned; (5) Dr. Papin making the female trauma student incredibly uncomfortable; (6) Dr. Papin trying to round with staff without having seen the patients; and (7) Dr. Papin being told to washout a massive wound on a trauma patient in the ICU and he did not do it and left. *See Emails of Dr. Ashley Griffin, Exh. 19.*

Based on these reports, Dr. Earl met with Dr. Papin on January 10, 2017, in order to provide written documentation of the issues and place him on an academic remediation plan.  Dr. Earl discussed the concerns that had been raised regarding him being untruthful about patient care, leaving the hospital in the middle of his shift to exercise, his unwillingness to help with tasks, his condescending tone to nurses and fellow residents, and his poor communication.  Dr. Papin signed acknowledging his receipt of the feedback.  *See Jan. 10, 2017 signed feedback letter, Exh. 20.*

**The Graduate Medical Education (GME) Office**

8

After meeting with Dr. Papin, Dr. Earl met with Dr. Rick Barr, the Associate Dean for Graduate Medical Education (GME), and informed him what had occurred and of his meeting with Dr. Papin.  *See Deposition of Dr. Rick Barr, Exh. 21 at pgs. 21-22, 45-46.*  During the meeting, Dr. Earl outlined his concerns with Dr. Papin's performance, particularly about  Dr. Papin's untruthfulness and the difficult interactions with other members of the care team.  *Exh. 21 at pgs. 71-72.*  Dr. Earl also reported his concerns with reports that Dr. Papin was rounding unprepared and  not examining the patients.  *Exh. 21 at pg. 72.*  Dr. Earl informed Dr. Barr that he intended to do an academic remediation plan with Dr. Papin.  Dr. Barr decided that this was not an academic issue, but a professionalism and patient safety issue that needed to be reported to human resources.  *Exh. 21 at pgs. 77 and 86-87.*  Dr.  Barr recommended immediately removing Dr. Papin from service and placing him on administrative leave while human resources reviewed Papin's conduct and behavior.  *See Appeal Hearing Transcript, Exh. 16 at pg. 100.*  Dr. Barr made this decision based on the obligation to protect patients.  *Exh. 21 at pgs. 92-93.*  Dr. Barr emailed human resources on January 11, 2017, referring the matter to them.  *See Barr Email, Exh. 22.*  Based on the instructions from Dr. Barr, Dr. Earl made the request for human resources to examine the employment related aspects of the behaviors that had been reported concerning Dr. Papin.  *See Exh. 23, Deposition of Molly Brasfield at pg. 31.*

As a medical resident, Dr. Papin occupies two roles at UMMC.  First, he is an employee under a one -year contract of employment.  Second, he is a trainee seeking to advance in the surgery residency program working toward becoming a surgeon capable of independent practice.  Due to his status, he falls under two different sets of rules and policies, the Faculty and Staff Handbook which applies to all employees and the academic requirements and policies of the GME program for his training.  *See Exh. 24, Deposition of Dr. Jimmy Stewart at pg. 45-49.*  Even though there may be overlap, these are two distinct areas, and Dr. Papin's ability to continue at UMMC requires him to remain in good standing for both.  Because Dr. Barr

determined that the issues concerning Dr. Papin's behavior were employee related and not academic, the matter was referred to human resources for review.

**Human Resources**

Upon receipt of the email from Dr. Barr, the  Human Resources Director for Academics and Research, Molly Brasfield, opened a review by human resources into Dr. Papin.  Brasfield requested Dr. Earl provide any documentation so that human resources could review it.  *Exh. 22.*  On January 13, 2017, Dr. Earl emailed Molly the evaluation feedback comments[10], the email complaints[11], and the signed January 10, 2017 letter[12], and described the issues with Dr. Papin to her.  *See Dr. Earl email to HR, Exh. 25.*  Brasfield assigned Human Resource Business Partner Patricia Whitlock to review the issues with Dr. Papin.  *See Exh. 23, Deposition of Brasfield, pg. 39  See also Exh. 25, and Exh. 26.*

On January 27, 2017, Dr. Papin was interviewed by Whitlock.  The issues cited above were discussed with him and he provided a response for each.  *See Exh. 27, Papin HR Statement Transcript.*  Whitlock believed that Dr. Papin did not accept any accountability for his actions and indicated that it was either someone else's fault or no one had given him clear feedback. He did not think he was being rude or condescending and once it was pointed out to him that this was how he was perceived, he was putting forth effort to change.  *See Exh. 28, Whitlock Recommendation email.*

Dr. Papin further maintained that neither Dr. Earl, nor anyone else, had ever given him feedback that there were any concerns.  However, this is contradicted by his own statements to Whitlock where he admits that Dr. Earl had called him in several times to discuss his professionalism issues.  *See Exh. 27 at pg. 26-27.*

---

[10]*See aggregate evaluation comments, Exh. 10.*

[11]S*ee Emails, Exh.s 15, 17, 18, 19*

[12]*See Jan. 10, 2017 feedback letter, Exh. 20*

After her review, Whitlock recommended the dismissal of Dr. Papin to the Employee Relations Director, Cecelia Bass, stating: "UMMC no longer has faith in Dr. Papin's honesty and there is great concern regarding patient safety in allowing him to continue at UMMC." *See Exh. 28.*

After review by the Employee Relations Department of Human Resources at UMMC, Cecelia Bass, the Employee Relations Director approved the decision to dismiss Dr. Papin for violating UMMC's policies. *See Exh. 29, Cecelia Bass email approving dismissal.* The final decision maker to decide whether to dismiss Dr. Papin prior to his hearing was Bass, and Dr. Earl had no role in the decision making after it was referred to human resources. *Exh. 53, Whitlock, pg. 23-26 and Exh. 23, Dep. of Brasfield at pg. 31 and 37.*

After the decision was made by Bass to dismiss Dr. Papin, human resources facilitated a meeting with Dr. Papin on February 22, 2017, to inform him of his dismissal.  At the meeting, it was requested that he turn over his UMMC ID badge.  Dr. Papin refused and stormed out of the room. *See Exh. 30, Email of Whitlock and Exh. 5, Depo of Papin at pg 214.*

**The Appeal**

Dr. Papin, through his attorney Joel Dillard, submitted a notice of appeal to UMMC. *See Exh. 31, Joel Dillard Letter.*  In the letter, Dr. Papin requested to appeal his dismissal through ***the GME grievance procedure***.  *Id.  See also Exh. 48, Request for Admission No. 1.*  Steven Bondi. M.D., J.D., was selected chair of the appeals committee in accordance with the UMMC Evaluation Policy and Grievance Algorithm. *See Exh. 34, Woodward Affidavit, Exh. 42, Deposition of Dr. Steven Bondi pg. 55, and Exh. 35, Dr. Bondi Email to Bryce Ainsworth.*  Prior to the hearing, Dr. Papin was provided with written notice of complaints against him, the documents UMMC intended to rely on during the hearing, and the list of UMMC's potential witnesses. *See Exh. 36 and 37, Notice Letter and documents.*  The notice letter and documents were mailed and emailed to Joel Dillard, Dr. Papin's attorney on July 5, 2017. *See Exh. 38,*

*Brasfield email to Joel Dillard.*

On July 18, 2017, the appeals committee convened and heard the appeal of Dr. Papin's dismissal. *See Exh. 16, Transcript of the Appeal Hearing.  Exh. 48, Request for Admission No. 2.*  The appeals committee consisted of members of the GME committee and one member of the house staff (resident) in accord with the grievance policy, and the hearing was held approximately ten days after Dr. Bondi's appointment as the chair of the appeals committee. *See Exh. 40, Evaluation Policy and Grievance Algorithm.*   During the hearing, Dr. Papin was able to hear the testimony of all the witnesses and respond to each witness. *Exh. 48, No. 7 and 8.*  In addition, the appeals committee was allowed to examine and question each witness and Dr. Papin concerning the claims and their testimony. *See Exh. 16, Hearing Transcript.*

After the hearing, the appeals committee decided  to uphold  the decision to dismiss Dr. Papin's from his employment with UMMC, and that decision was provided in writing to Vice Chancellor Dr. LouAnn Woodward for her consideration. *See Exh. 2, the Committee Letter.*  Dr. Woodward upheld the decision to dismiss Dr. Papin and deny his appeal, based on her independent review of the appeals committee's decision. *See Exh. 3, Woodward Letter.*

## II.   STANDARD OF REVIEW

Summary judgment is proper pursuant to Rule 56 of the Federal Rules of Civil Procedure when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Quality Infusion Care, Inc. v. Health Care Serv. Corp.*, 628 F.3d 725, 728 (5th Cir. 2010). "Rule 56[(a)] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Patrick v. Ridge*, 394 F.3d 311, 315 (5th Cir. 2004).  Additionally, where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant, then summary judgment should be granted. *See Boudreaux*

*v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005). "[C]onclusory allegations, speculation, and unsubstantiated assertions are inadequate to satisfy" the nonmovant's burden in a motion for summary judgment. *Ramsey v. Henderson*, 286 F.3d 264, 269 (5th Cir. 2002).

Application of the foregoing summary judgment standard to the facts of this case demonstrates that the entry of summary judgment in favor of Defendants.

### III.  ARGUMENT

**A.      There Was No Constitutional Due Process Violation.**

**1.      Procedural Due Process**

Plaintiff claims that he was denied procedural due process due to lack of notice and the procedures used during his appeal hearing.  To prevail on a procedural due process claim, a plaintiff must show: "(1) that she was deprived of a property interest protected by the Fourteenth Amendment, and (2) that the process attendant to the deprivation was constitutionally deficient." *McMullen v. Starkville Oktibbeha Consol. Sch. Dist.*, 200 F. Supp. 3d 649, 654–55 (N.D. Miss. 2016). The minimum requirements of procedural due process for public employees include "oral or written notice of the charges, an explanation of the employer's evidence, and an opportunity for the employee to tell his side of the story." *Gilbert*, 520 U.S. at 929.  To determine what process is constitutionally due, the courts have generally balanced three distinct factors:

> "First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest."

*Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976).

The Mississippi Supreme Court has held that the due process protections of the State Constitution under Article III Section 14 are the same as the due process protections of the U.S. Constitution.  *Walters v. Blackledge*, 220 Miss. 485, 71 So.2d 433 (1954), p. 444 states: "The due process required by the Federal Constitution is the same 'due process of law' which is

required by Section 14 of the Constitution of the State of Mississippi." *National Collegiate Athletic Ass'n v. Gillard*, 352 So.2d 1072 (1977).   There cannot be a violation of the one without the other.  Because the analysis is the same for both State and Federal Due Process, the Defendants have combined their arguments.  Further, this claim is brought solely against UMMC pursuant to the Mississippi Tort Claims Act, and not the individually named Defendants. [ECF 50, para. 98.].[13]

### a.   Plaintiff Papin received all notice required for due process.

To satisfy pre-termination due process requirements Plaintiff must receive " 'some kind of hearing' before termination," which "may consist of no more than a meeting at which the employer states the grounds for dismissal and gives the employee an opportunity for rebuttal." *Caine v. Hardy*, 943 F.2d 1406, 1412 (5th Cir.1991)(*citing Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 546 (1985)). "[A] brief pre-termination hearing is satisfactory so long as it is coupled with more formal post-termination proceedings...." *Id.* "[T]he pretermination hearing need not definitively resolve the propriety of the discharge. It should be an initial check against mistaken decisions—essentially, a determination of whether there are reasonable grounds to believe the charges against the employee are true and support the proposed action." *Loudermill*, 470 U.S. at 545–46.  To require more than this prior to termination would intrude to an unwarranted extent on the government's interest in quickly removing an unsatisfactory employee.  *Loudermill*, 470 U.S. at 546.

Dr. Papin received feedback and warning on many occasions during his short tenure with UMMC.  Plaintiff received monthly feedback of his poor performance through written evaluations by physicians and nurse practitioners.  *See Exh. 10, Aggregate Comments.*  Plaintiff admitted to human resources that Dr. Earl met with him on several occasions to address

---

[13]Under the MTCA, the individual defendants have immunity from this claim in their individual capacity.  *See Miss. Code. 11-46-7(2),* and the University has immunity under the MTCA.

professionalism issues.  *See Exh. 27, Papin HR Statement at pg. 26.*  During his semi-annual review, which Plaintiff signed, he again received feedback and was informed that he was critically deficient in numerous categories, and informed that there must be significant improvement.  *See Exh. 41, Semi-Annual Review and meeting notes.*  He was put on notice again in his meeting with Dr. Earl on December 20, 2016, where his deficiencies were again expressed.  *See Exh. 13, Dr. Earl Email.*  Finally, on January 10, 2017, Dr. Papin was placed on administrative leave with pay.  This occurred after a meeting with Dr. Earl where he was provided written feedback concerning his behavior and performance.  *See Exh. 20, Feedback Letter.*

After being placed on administrative leave, Dr. Papin met with Human Resources Business Partner Pat Whitlock who interviewed him as part of her review concerning the allegations against him, and gave him an opportunity to respond.  *See Exh. 27, Transcript of Papin HR Interview.*  During the interview, Whitlock reviewed his argument with the nurse practitioner in the CVICU [pg 3]; his declining tasks [pg. 11]; his leaving during a code [ pg. 13]; the perception of him leaving the hospital early [pg. 14]; exercising during his shift [pg. 16]; his lying about patient care and the decubitus ulcer patient [pg. 17]; his not going on rounds [pg. 21]; his not logging cases [pg. 22]; and the fact that Dr. Papin had several meetings with Dr. Earl concerning his performance [pg. 26-29].  *Id.*  During the questioning by Whitlock, Dr. Papin was able to offer his explanation for each.  *See Exh. 27.*

After being informed of the decision to dismiss him from his employment with UMMC, Dr. Papin exercised his right to an appeal.  Prior to his appeal hearing, Molly Brasfield, the Human Resources Director, provided Dr. Papin with written notice of the reasons for his dismissal, a list of the witnesses who would testify at the hearing, and a description of the evidence that would be presented at his hearing.  *See Exh. 36.*  This notice was both emailed and mailed to Dr. Papin's attorney Joel Dillard on  *July 5, 2017.  See Exh. 36.*  In addition to the

letter, Dr. Papin was provided with 48-pages of documents which UMMC would rely on during the hearing, including the email complaints, evaluations, and the transcript of Dr. Papin's interview with human resources. *Id. and Exh. 37 the Notice Documents.*

The multiple meetings with Dr. Papin prior to his termination to discuss his professionalism issues coupled with his interview with human resources satisfied his pre-termination due process notice, and the notice letter, documents, and witness list provided prior to the hearing satisfied his procedural due process notice requirements and cured any pre-deprivation issues. Therefore, Plaintiff has not established a violation of his procedural due process rights concerning lack of notice, and this claim should be dismissed as a matter of law.

> **b.**     **Plaintiff's appeal hearing provided him with all constitutionally required procedural due process.[14]**

If a public university dismisses a student for "disciplinary reasons," the student is not entitled to a formal hearing but instead to "an 'informal give-and-take' between the student and the administrative body dismissing him that would, at least, give the student 'the opportunity to characterize his conduct and put it in what he deems the proper context.' " *Perez v. Texas A & M Univ. at Corpus Christi*, 589 F. App'x 244, 248–49 (5th Cir. 2014).

The most liberal reading of the Plaintiff's allegations of procedural due process violations during the hearing concern three issues: (1) the ability to cross-examine witnesses; (2) the ability for his counsel to participate in the proceedings; and, (3) the ability to call witnesses in his own defense. The Fifth Circuit has held that none of these are required in student disciplinary actions.

> A student subject to school disciplinary proceedings is entitled to some procedural due process. The student must be given notice of the charges against him, an explanation of what evidence exists against him, and "an opportunity to present his side of the story." ***The student is not entitled to the "opportunity to secure***

---

[14]Academic dismissals require less procedural due process, and UMMC provided all due process required under either standard.

> ***counsel, to confront and cross-examine witnesses supporting the charge, or to call his own witnesses to verify his version of the incident***."

*Willis v. Texas Tech Univ. Health Scis. Ctr.*, 394 F. App'x 86, 87 (5th Cir. 2010)(Unpublished).

> Before a student is dismissed for **disciplinary** reasons, procedural due process requires that he receive notice of the charges and a chance to rebut them. . . .*A court-like hearing that includes an opportunity to cross-examine witnesses is not required*, but the hearing must at least present the decisionmaker with the arguments of both sides in sufficient detail. *Id.*

*Dung Quoc Pham v. Blaylock*, 712 F. App'x 360, 363 (5th Cir. 2017), cert. denied, 138 S. Ct.

1548, 200 L. Ed. 2d 741 (2018)(unpublished).

Assuming the Plaintiff has a liberty interest, the process used did not violate his rights.

### i.   Cross-Examination

The Fifth Circuit recently addressed the issue of procedural due process in university

hearings in *Walsh v. Hodge*, 975 F.3d 475, 483–84 (5th Cir. 2020).  Under the first prong of the

immunity analysis, the Court examined whether the denial of the right to cross-examine a

witness is a deprivation of procedural due process.

> we agree with the position taken by the First Circuit "that due process in the university disciplinary setting requires 'some opportunity for real-time cross-examination, ***even if only through a hearing panel***.' " We stop short of requiring that the questioning of a complaining witness be done by the accused party, as "we have no reason to believe that questioning ... by a neutral party is so fundamentally flawed as to create a categorically unacceptable risk of erroneous deprivation."

*Walsh v. Hodge*, 975 F.3d 475, 483–84 (5th Cir. 2020)(emphasis added).

Under the holding of *Walsh*, there was no deprivation of Dr. Papin's procedural due

process because the appeals committee heard the witnesses' testimony and the it was afforded

the opportunity to question each witness*. Exh. 16.*  In *Walsh*, the accuser was not present at the

hearing, and the panel relied on statements of the accuser made to a university investigator.  The

Court found that:

> we are persuaded that the substitute to cross-examination the University provided Walsh—snippets of quotes from Student #1, relayed by the University's

> investigator—was too filtered to allow Walsh to test the testimony of his accuser and to allow the Committee to evaluate her credibility, particularly here where the Committee did not observe Student #1's testimony.

*Walsh v. Hodge*, 975 F.3d at 483–84 (5th Cir. 2020)..

Unlike Walsh, who did not have the accuser present at the hearing, the appeals committee was able to observe and hear the testimony of the witnesses, Dr. Papin was able to give his side of the story in real-time, and the appeals committee was able to cross-examine and question the witnesses as well as Dr. Papin. *See Exh. 16, Appeal Hearing Transcript.* Because the appeals committee was a neutral body that had the ability to observe the witnesses and their demeanor, as well as, ask questions of the witnesses, there was no procedural due process violation.[15]

### ii.    *Attorney Participation*

Plaintiff had his attorney, Joel Dillard, present in the hearing room. At the beginning of the hearing, Mr. Dillard participated in the hearing and sought clarification of the hearing procedures. *Exh. 16, pg. 9-10.* In addition, the appeals committee took breaks after almost every witness to allow Plaintiff to confer with his attorney before proceeding with his rebuttal or presentation.[16] Although his attorney was not allowed to cross-examine witnesses, he did participate in the hearing process.[17] *See Exh. 42, pgs. 101-102.* Because cross-examination by Dr. Papin himself is not constitutionally required, cross-examination by his attorney is likewise not required. Because Dr. Papin had the assistance of counsel at the hearing, this claim also fails as a matter of law.

---

[15]*All witnesses testified in person except Dr. Papin who chose to appear by telephone. See Request for Admission No. , Exh. 48.*

[16]*The Committee took breaks for Papin to confer with counsel after the testimony of Dr. Earl, transcript pg. 88-89, Megan Mahoney pg. 116, Ashley Griffin, pg. 132; Colin Muncie, pg. 144; Dr. Rick Barr, pg. 163, Exh. 16.*

[17]*See Exh. 16, pg. 9-10, 24, 33, 48, 61, 63-64, 77, 89, 105, 112-113 for Dillard's involvement in the hearing.*

### iii.    *Calling Witnesses*

At the beginning of the hearing, Dr. Bondi informed Papin and his attorney of the procedures for the hearing.  *Exh. 16, pgs. 8-9.*   In an effort to clarify the procedures, Joel Dillard, Plaintiff Papin's attorney asked questions of the chair of the appeals committee, Dr. Bondi.

> Mr. Dillard:   **So the  - - expectation will be that Dr. Papin would call witnesses and question them himself?**
>
> Dr. Bondi:   **Yes, or have them speak their narrative, yes.**

*Exh. 16, pg. 9.*

As the transcript plainly shows, Dr. Papin had the opportunity to call witnesses in his own defense, but he did not call any, nor did he inform the panel that he needed to call witnesses or had witnesses he wanted to call.  *Exh. 48, Admission No. 6.*  Likewise, his attorney did not inform the committee that Dr. Papin had witnesses to call in his own defense or wanted to call witnesses.  *Id*.

Plaintiff's contention that he was denied procedural due process because he was not allowed to call witnesses is not supported by the undisputed transcript of the hearing where he and his attorney were specifically informed of his ability to call witnesses and neither raised the issue to the committee.  Furthermore, as the Fifth Circuit precedent states, calling witnesses is not constitutionally required.  As such, this claim fails as a matter of law.

### c.    **Plaintiff received his hearing within a reasonable time.**

UMMC provided Dr. Papin's hearing just over four months after his request for an appeal was filed.  UMMC worked to put the hearing together and it was held on July 18, 2017.  *Exh. 16.*  While there is no specific time frame within which a hearing must be held and a decision rendered, lack of a speedy resolution of the proceedings may result in a denial of procedural due process. *Loudermill*, 470 U.S. at 547 ("At some point, a delay in the post-termination hearing

would become a constitutional violation.").   However, merely alleging a lengthy delay occurred is insufficient.

> "The chronology of the proceedings set out in the complaint, coupled with the assertion that **nine months** is too long to wait, does not state a claim of a constitutional deprivation."

*Loudermill*, 470 U.S. at 547.

When determining if a hearing delay violates procedural due process, the Court considers "[1] the importance of the private interest and harm to this interest occasioned by delay; [2] the justification offered by the government for delay and its relation to the underlying governmental interest; and [3] the likelihood that the interim decision may have been mistaken." *FDIC v. Mallen*, 486 U.S. 230, 242, 108 S.Ct. 1780, 100 L.Ed.2d 265 (1988).   In *Mallen*, the Supreme Court held that a ***90–day period*** between a suspended bank officer's request for a hearing and a decision did not violate due process, even though the officer would be deprived of his livelihood. *Id*.   In Plaintiff's case, the hearing was provided within 70 days of the dates when the Plaintiff informed UMMC that he and his counsel would be available.

> When delay in the holding of a due process hearing is caused in part by the person whose constitutionally protected property right is being threatened, there is no due process violation provided the hearing is held as soon as circumstances permit. *See Sullivan v. Houston Indep. School District*, 475 F.2d 1071 (5th Cir.1973). Further, to justify relief for a procedural due process failure in an administrative proceeding, there must be a showing of substantial prejudice. *United States v. Lober*, 630 F.2d 335 (5th Cir.1980).

*Joseph v. St. Charles Par. Sch. Bd.*, 736 F.2d 1036, 1038 (5th Cir. 1984)

Plaintiff's counsel conferred with UMMC and it was agreed that Dr. Papin's attorney would inform UMMC of dates that he and his client would be available.  *Exh. 32.* The First available dates provided by Plaintiff and his counsel were in May 2017.  *Exh. 33.*   The two month delay from May to July is not an unreasonable delay that would establish a constitutional violation.  *See Exh. 23, pgs. 59-60.*  Because Dr. Papin's hearing was held within a reasonable

time, and part of the delay was attributable to the Plaintiff, there was no procedural due process

violation and the Plaintiff cannot show substantial prejudice to create such a claim.

### 2.    Substantive Due Process.

The Plaintiff has not established that the Defendants violated his substantive due process

rights.  The standard for establishing a substantive due process violation is "demanding." *Spuler*

*v. Pickar*, 958 F.2d 103, 107 (5th Cir. 1992). This is so because "a federal court is generally not

the appropriate forum in which to review the multitude of personnel decisions that are made

daily by public agencies." *Honore v. Douglas*, 833 F.2d 565, 569 (5th Cir. 1987) *(citing Bishop*

*v. Wood*, 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976)).  *See also, Mills v. Garcia*, 650 F.

App'x 873, 878 (5th Cir. 2016).  However, "to succeed with a claim based on substantive due

process in the public employment context, the plaintiff must show two things: (1) that he had a

property interest/right in his employment, and (2) that the public employer's termination of that

interest was arbitrary or capricious." *Moulton v. Cty. of Beaumont*, 991 F.2d 227, 230 (5th

Cir.1993). "Substantive due process requires only that public officials exercise professional

judgment, in a nonarbitrary and non-capricious manner, when depriving an individual of a

protected property interest." *Texas v. Walker*, 142 F.3d 813, 819 (5th Cir.1998).  The plaintiff

must "demonstrate that the abuse of power by the state official shocks the conscience. "*Lewis v.*

*Univ. of Texas Med. Branch at Galveston*, 665 F.3d 625, 630–31 (5th Cir. 2011).

The Fifth Circuit has also held that there is no substantive due process violation when the

employer acts on the complaints of coworkers in good faith.

> In cases in which an employer discharges an employee based on the complaint of
> another employee, the issue is not the truth or falsity of the allegation, but
> "**whether the employer reasonably believed the employee's allegation and
> acted on it in good faith**."

*Jackson v. Cal-W. Packaging Corp.*, 602 F.3d 374, 379 (5th Cir. 2010) (emphasis added); *See*

*also*, *Chan v. Bd. of Regents of Tex. S. Univ.*, No. H-12-0325, 2012 WL 5832494, at *4

(S.D.Tex. Nov. 16, 2012) ("Federal courts strongly disfavor claims that require judges to second-guess judgments about the academic quality of a students' work.").

As outlined in the case facts above, UMMC received numerous complaints and concerns regarding Dr. Papin during his tenure as medical resident at UMMC, and acted on those complaints.  It is not disputed that these complaints were made.  They began with reports about his behavior by attending physicians during his very first rotation, negative evaluations during subsequent rotations, meetings with his program director to discuss behavior issues and professionalism, critical deficiencies in his semi-annual review,[18] and additional complaints from his chief resident (*Exh. 6, pg147*), which led to an additional meeting with his program director on Dec. 20, 2016.

After the Dec. 20th meeting, it is not disputed that more complaints from his fellow residents and medical students were reported to the general surgery residency program.  S*ee Emails, Exh.s 15, 17, 18, 19*.  As outlined above, these complaints concerned Dr. Papin's behavior on the trauma rotation in December 2016, and were made by Dr. Colin Muncie, Dr. Ashley Griffin, Dr. Megan Mahoney, and medical student William Crews.  In addition to the emailed complaints, Dr. Earl spoke directly to Dr. Mahoney, Dr. Griffin, and Dr. Muncie about their concerns*. See Exh. 6, pg. 133(Muncie), pg. 143-144(Dr. Griffin), and pg 147, 149, 153 (Dr. Mahoney).*

Based on these reports, Dr. Earl met with Dr. Barr, the Dean of Graduate Medical Education about what had occurred.  As the Dean, Dr. Barr recommended Dr. Papin be removed from duty and the matter submitted to  human resources  for review.  Dr. Barr felt that Dr. Papin's conduct was of great professionalism concern and could be detrimental to patient safety. *Exh. 21 pg. 92.*  Based on their review and interview of Dr. Papin, human resources

---

[18]Dr. Papins semi-annual review was one of the worst ever seen by UMMC officials.  *See Exh. 21 pgs. 84-85 and Exh. 42 pgs. 105-106.*

recommended and approved the termination of Dr. Papin after which he appealed to the GME Committee.  *Exh. 31.*

The appeals committee heard the witnesses testify about their complaints and their observations of Dr. Papin's performance, as well as hear Dr. Papin's response.  *See Exh. 16, Hearing Transcript.*  They were able to question the witnesses and Dr. Papin.  *Id.*  After deliberating for an hour on the evidence presented at the hearing, the appeals committee decided to uphold the termination of Dr. Papin, and expressed their opinion and the reasons supporting it in a letter to Dr. Woodward.  *See Exh. 42, pg. 176 and Exh. 2.*  After receiving the letter, Dr. Woodward upheld the decision to dismiss Dr. Papin and denied his appeal, based on her independent review of the appeals committee's decision.  *Exh. 3.*

The faculty and staff of UMMC, including Dr. Earl, Dr. Bondi, and Dr. Woodward, used their professional judgment in their review of Dr. Papin and the many complaints and concerns regarding his behavior, professionalism, and honesty.  As such, there is no substantive due process violation, and this claims should be dismissed as a matter of law.

**B.      Even if the Court finds a Constitutional violation, the Individually named Defendants are entitled to qualified immunity.**

Government officials performing discretionary functions are protected from personal liability by the doctrine of qualified immunity "'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *McClendon v. City of Columbia*, 305 F.3d 314, 322 (5th Cir. 2002). To determine whether an official is entitled to qualified immunity, courts are required to  conduct a two-step inquiry. First, the court must determine whether the plaintiff has alleged facts that, if proven, would establish that the official violated the plaintiff's constitutional rights. *Stotter v. Univ. of Tex.*, 508 F.3d 812, 823 (5th Cir. 2007). If the answer is "no," then the court's analysis ends. *Freeman v. Gore*, 483 F.3d 404, 410-11 (5th Cir. 2007).

However, if the answer is "yes," the court must then consider whether the right was clearly established. *Saucier*, 533 U.S. at 201, 121 S.Ct. 2151. Even if it is determined that a constitutional right has been violated, the official will still be entitled to his defense of qualified immunity unless the court finds that "the official's conduct was objectively unreasonable in light of clearly established law at the time of the state actions at issue." *McClendon*, 305 F.3d at 323. To be actionable, the Fifth Circuit requires that the law "so clearly and unambiguously prohibited the violative conduct that 'every reasonable official would understand that what he is doing violates the law.'" *Morgan v. Swanson*, 659 F.3d 359, 371 (5th Cir. 2011). "[T]he qualified immunity standard 'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'" *Mendenhall v. Riser*, 213 F.3d 226, 230 (5th Cir. 2000).

Although the Defendants maintain there was no Constitutional violation and the Court's inquiry should end after the first prong, the Defendants are still entitled to qualified immunity even if the Court decides that their individual actions constituted a violation because the Defendants individual actions did not violate clearly established law and were objectively reasonable.

1.    **Qualified Immunity is appropriate because at the time of the Plaintiff's hearing, the law was not clearly established.**

In *Walsh v. Hodge*, the Fifth Circuit held that prior to that decision on September 15, 2020**,** the law concerning the process that was due to an employee in a due process hearing had not been clearly established.  *Walsh*, 975 F.3d at 486-87.  The Court in *Walsh* cited to *Plummer v. University of Houston*, which was decided shortly before Papin's hearing on July 18, 2017, to further establish that the Court had not yet decided whether confrontation or cross-examination would ever be constitutionally required in student disciplinary proceedings.  The Court held:

before today we have ***not*** explicitly held that, in university disciplinary hearings

> where the outcome depends on credibility, the Due Process Clause demands the
> opportunity to confront witnesses or some reasonable alternative.

*Walsh v. Hodge*, 975 F.3d 475, 487 (5th Cir. 2020)

Because the law concerning the procedures to be used in disciplinary proceedings was

unsettled at the time of Papin's hearing, the Defendants are entitled to qualified immunity as to

the Plaintiff's procedural due process claim.

### 2.   Defendants are also entitled to immunity because their actions were objectively reasonable.

Even if the Court were to hold that the law for procedural due process was clearly

established, the Defendants would still be entitled to qualified immunity if their conduct was

objectively reasonable.  In reviewing the conduct of each individual defendant, they can only be

viewed in light of their own actions.  To be liable for a violation of Section 1983, a defendant is

only responsible for his own constitutional violations.  A government employee cannot be

vicariously liable under Section 1983.  *Ashcroft v. Iqbal*, 556 U.S. 662, 676, 129 S. Ct. 1937,

1948, 173 L. Ed. 2d 868 (2009).

In addition, the fact that "reasonable minds could disagree on the propriety of [the

plaintiff]'s termination" is insufficient to defeat a public official's qualified immunity against a

substantive due process claim. *Id*. Rather, the plaintiff must show that the decision was "made

without a rational connection between the known facts and the decision or between the found

facts and the evidence." *Meditrust Fin. Servs. Corp. v. Sterling Chems., Inc*., 168 F.3d 211, 215

(5th Cir.1999).

### 3.   Qualified Immunity for Dr. Earl:

#### a.   *Procedural Due Process*

For Procedural Due Process, the conduct of Dr. Earl was objectively reasonable and he is

entitled to qualified immunity.  First, Plaintiff plainly pleads that Dr. Bondi, not Dr. Earl, was

responsible for the procedures used in the hearing. **Plaintiff's complaint [ECF 50, para 55]**, Dr. Earl cannot be held vicariously liable for the actions of Dr. Bondi, Molly Brasfield, or others. After being interviewed by human resources, Dr. Earl had no further decision-making role in Plaintiff's termination. *Exh. 23, pg. 37.* In addition, Dr. Earl had no role in setting up the hearing or in how the appeal hearing would be conducted. *Exh. 6, pg. 237.* Dr. Earl's only participation in the hearing was as a witness putting on the evidence of UMMC. *Exh. 6, pgs. 236-37.* Because Dr. Bondi conducted the hearing and the procedures to be used and Dr. Earl was not responsible for sending the written notice to Dr. Papin, Plaintiff cannot show that Dr. Earl violated his procedural due process rights or that his conduct was objectively unreasonable. Therefore, Dr. Earl is entitled to dismissal and qualified immunity as to this claim.

> b.  *Substantive Due Process:*

The substantive due process claim against Dr. Earl was dismissed at the qualified immunity stage. [ECF 33, pg. 7]. Even if the claim had not been dismissed, it still fails as a matter of law, and Dr. Earl is entitled to qualified immunity. The decision to terminate Dr. Papin was made by the  human resources. The complaints against Dr. Papin were reviewed by the Human Resources Business Partner Pat Whitlock, who made the recommendation to dismiss Dr. Papin to the EEO Director Cecelia Bass. *Exh. 28.* After review by the Employee Relations Office, Bass made the final decision to dismissDr. Papin. *See Exh. 29.* Once the matter was referred to human resource, Dr. Earl had no further role in the decision making process, and Bass made the decision to dismiss Dr. Papin. *Exh. 23, Deposition of Brasfield pg. 37.*

Plaintiff cannot show that Dr. Earl's decision to refer the matter to human resources with a request to dismiss was arbitrary and capricious and lacked his professional judgment. Dr. Papin had a history of complaints from multiple sources to include faculty, nurse practitioners , and residents. These complaints dealt with issues of professionalism, mistreatment of nurses, dishonesty, not being present, and declining to do or complete tasks. These issues were

addressed in his semi-annual review, a meeting on December 20, 2016, and in several meetings

between Dr. Papin and Dr. Earl.  Dr. Earl received additional complaints after the Dec. 20th

meeting that portrayed a serious problem in allowing Dr. Papin to continue.  Dr. Earl met with

the Dean of Graduate Medical Education, Dr. Rick Barr, who made the decision to refer the

matter to human resources.  Based on the totality of the circumstances, Dr. Earl's conduct was

objectively reasonable in responding to the complaints and referring the matter to human

resources.

      **4.**     **Qualified Immunity for Dr. Bondi:**

      *a.*     ***Procedural Due Process***:

For the reasons stated above, Dr. Bondi's conduct in presiding over the hearing was

objectively reasonable, especially since the law was not clearly established at the time of the

hearing.   The format of the hearing allowed Dr. Papin to hear the testimony of each witness,

then he was allowed to confer with his attorney, and then he was allowed to respond to each

witness. *See Exh. 42, Deposition of Bondi pgs. 20-21, and Exh. 16, the Hearing Transcript*.  The

appeals committee was allowed to question the witnesses during the testimony and to question

Dr. Papin during his response to each witness, and provide follow up questions to the witnesses.

Having examination of the witnesses by the appeals committee satisfied due process and was

objectively reasonable.  In addition, Dr. Papin was informed during the hearing by Dr. Bondi that

the expectation would be that he would call his own witnesses and question them or have them

testify in the narrative. *Exh. 6, pgs. 20-21 and the Exh. 16, pg. 9.*  After the hearing, the appeals

committee deliberated for over an hour and made their recommendation to the Vice Chancellor.

*Exh. 6, pg. 176.*

Dr. Bondi had no role in providing the notice to the Plaintiff regarding the hearing.  *Exh.*

*6, pg. 142.*   The notice was prepared by human resources and submitted to Plaintiff through his

attorney. *Exh. 38.*  Dr. Bondi nor anyone else on the committee was tasked to provide notice,

and their role was to hear the evidence and make a decision.  *Exh. 42, pgs. 72, ln 11-16.*

Plaintiff has not established facts that Dr. Bondi's actions in conducting the hearing were objectively unreasonable, or violated clearly established law, and Dr. Bondi is entitled to qualified immunity to Plaintiff's procedural due process claim.

### b.    *Substantive Due Process:*

As the hearing officer for Dr. Papin's appeal, Dr. Bondi was tasked with presiding over the hearing and being a member of the hearing committee which made a recommendation to the Vice Chancellor concerning whether to affirm or reverse the decision to dismiss Dr. Papin's employment.  *Exh. 42, pg. 152.*  Dr. Bondi had no involvement in the Papin matter prior to the hearing, and based his decision solely on the evidence presented in the hearing.[19]  *Exh. 42, pg 98.*  Dr. Bondi heard the evidence during the hearing and used his professional judgment to render a decision.[20]  The testimony of the witnesses establish that the decision to dismiss Papin was not arbitrary and capricious or shocking to the conscious.

### The hearing evidence:

During the hearing, Dr. Bondi was able to hear the witnesses testify, to observe their demeanor, and to hear Dr. Papin's response to their testimony which established a pattern of behavior that was unacceptable.  The professionalism issues were presented by first-hand accounts and documentation at the hearing.  *Exh. 42 pg. 38.*  The hearing testimony established a pattern of behavior, with numerous incidents over time, feedback that was given, and a lack of improvement by Dr. Papin.  *Exh. 2.* In addition to the testimony, Dr. Papin had the worst semi-

---

[19]A request was made to Dr. Bondi to have the complaint database searched for any mentions of Dr. Papin.  This is a routine request to Dr. Bondi anytime information is being sought due to his position as Director of Risk Management.  He reported that there was nothing in the system.  Exh. 42, pgs. 25-26 and 59-60.

[20]It should be noted that Dr. Bondi was one of six members of the committee which unanimously voted to affirm the termination, the committee consisted of five faculty members and one member of the house staff (medical resident); however, Dr. Bondi is the only member of the committee being sued for substantive due process violations.

annual review that Dr. Bondi had ever seen. *Exh. 42  pg. 105.*

**Dr. Earl**:         Dr. Earl testified to the numerous complaints concerning Dr. Papin which began during his first rotation and established a pattern of difficult interpersonal relationships that led to multiple counseling sessions and meetings with Dr. Earl.  *Id*.  Dr. Earl testified to his meetings with Dr. Papin which included his semi-annual review, the December 20, 2016 meeting, a meeting outside of operating room 16, and other informal meetings to discuss his issues and the need to improve.  *Exh. 16, pg. 12.*  Dr. Earl informed the committee of the additional complaints that occurred after the Dec. 20th meeting and that these issues were unique to Dr. Papin.  Dr. Earl was not having these types of issues with any of the other residents.  *Id.*   Dr. Earl testified to the timeline of events with Dr. Papin and his continued issues over multiple rotations.  *Exh. 16, pg. 14-19.*  He also testified as to his meetings with Papin to try and get him to improve.  *Id. pg. 29-31.*

In response, Dr. Papin stated that he was not given feedback or an opportunity to improve during the six months of his residency.  *Exh. 16, pg. 34-45.*  Dr. Papin complained that he got feedback, but it was not specific.  *Id. pg. 41.*

**Dr. Mahoney:**  Mahoney testified that she had a rule where the backsides of patients were to be checked every Monday, and Dr. Papin admits this rule was in effect.  *Exh. 16, Pg. 54 and Exh. 5 pg. 141.*  For this particular patient, Dr. Mahoney would ask Dr. Papin on rounds if he had looked at the patient's backside.  Dr. Papin said, "Yes, everything is ok."  A week later she asked again, and "he said it was okay."  *Exh. 16, pg. 54.*  Then on the afternoon of December 22nd , after Papin left for the holidays, he sent a text saying he put in orders for the "early" decubitus ulcer of the patient.  *Exh. 51, Papin Text.*  Because of his classifying the wound as "early," Dr. Mahoney was led to believe this was a new finding.  The next morning on rounds, she checked the patient and found a massive wound that could not have formed in the week that they had talked.  *Exh. 16 pg. 55.  Exh. 44 the wound care note.*  The patient ended up having surgery that

day to debride the wound. *Exhibit 43, pg. 118.*

In his human resources interview, which was presented to the hearing panel, Dr. Papin blamed it on a lack of knowledge, and took full responsibility. *Exh. 27, pgs. 18-20.* He told human resources that this occurred the day before he went on Christmas vacation (Dec. 22) and the wound nurse put in a note. *Exh. 27, pgs. 18.* He did not address the two prior Mondays when he was asked on rounds about checking the patient. Dr. Mahoney also testified as to the need to implement a numbering system to correct Dr. Papin's behavior due to the frequency of issues. *Exh. 16, Hearing Transcript, pg. 58 an 60.* Dr. Papin admitted that the system was put in place, but claimed it was a form of embarrassment. *Exh. 16, pgs. 67-69.*

**Dr. Muncie**: Dr. Muncie testified as to the incident with the ICU at the hearing, and the failure of Dr. Papin to perform sign out on the patient going to the ICU. Dr. Papin confirmed the factual account by Dr. Muncie and did not contest the facts as testified by Dr. Muncie. *Exh. 16, pgs. 88-89.*

In his deposition, Dr. Bondi explained why this was a big problem and why it was viewed negatively by the appeals committee**.** *Exh. 42 pgs. 132-135.* Hand-offs of a patient are huge in patient safety. *Id*. Every time a patient is handed off, there is a risk to that patient in terms of the information that is exchanged not being done effectively to avoid harming patient care**.** *Exh. 42, pgs. 133-34.* These are structured exchanges of information that are critical for patients. *Id.* In doing a hand-off of a patient, it is important to know who you are talking with and understand that person's role in the patient care. *Id*. Papin admitted that he did not know who he talked with about the patient. *Exh. 16*.

In the appeals committee's judgment, Dr. Papin was not able to adequately explain his actions. *Exh. 42, pgs. 131-132.* As a provider doing a hand-off, Dr. Papin was unable to explain who he talked to in making the patient transition, which is a big deal for patient safety. *Exh. 42, pgs. 132-133.* Further, the testimony of Dr. Muncie detailed his investigation into the matter,

and he could not verify that Papin had made the hand-off of the patient.

***Dr. Griffin  Ray***:  Dr. Griffin testified that Plaintiff Papin left the hospital when one of his patients was coding.  *Exh. 16, pg 72-73.*  Dr. Papin had performed sign out to the oncoming residents, but the shift was not over.  *Id., pg 73.*  Dr. Papin admitted he heard the code, but did not check to see if it was one of his patients and left.  *Id.*  Dr. Papin admitted that when he heard the code he was in the hospital in the resident's lounge.  *Exh. 16, pg. 84, and Exh. 27, pg. 13.*  Dr. Papin stated it was "an absent-minded mistake that never happened again."  *Exh. 27, pg. 13.*  She also testified that Dr. Papin was instructed to wash out a wound of a patient.  *Exh. 16, pg. 78.*  At midnight, Dr. Griffin Ray paged the ICU nurse because the wound had not been washed out.  *Id.*  The committee heard Dr. Papin's testimony that he washed out the wound and sent a text to his senior resident that he had, but Dr. Griffin countered that it had a dressing from the trauma bay and had not been packed.  *Id.*  Dr. Griffin disputed Dr. Papin's claim based on her observations of the wound when she cleaned it out herself.  *Exh. 16, pg 79-80.*

Dr. Griffin Ray also testified that medical students pulled her aside and told her that Dr. Papin was not rounding on patients.  *Id.*

**William Crews**:  Crews, a medical student, testified that on the trauma service Dr. Papin would show up late and round without having seen some of the patients, but he would report on them. Crews testified from his own observations.  In response, Dr. Papin testified that he would examine approximately 30 patients, including reviewing x-rays and labs in approximately 45 minutes.  Dr. Papin argued that Dr. Crews would not be in a position to know whether he rounded or not.  *Exh. 16, Transcript pgs. 95, 97, and 98.*

As the appeals committee reviewed this testimony, they found it to be a compelling amount of information provided by Crews.  *Exh. 42 pgs. 116-117.*  Dr. Bondi explained that as a medical student, he would be in a prime position to observe whether Dr. Papin was present for rounds.  *Id.*  Further, for a medical student to come forward and report misconduct is extremely

rare, and the committee gave a lot of credence to his testimony. *Exh. 42, pgs. 117-118.*

**The Appeals Committee's recommendation:**

Dr. Bondi and the appeals committee were able to hear the testimony of the witnesses and applied their professional judgment in making their recommendation. The numerous issues brought forward of unprofessionalism, patient care issues, dishonesty, and misconduct through the witness testimony provided a substantial basis for Dr. Bondi's decision to affirm the decision.    Further, the Fifth Circuit has held a finding of difficult interpersonal relationships is not arbitrary and capricious:

> We think Everhart's ability to work with others—his interpersonal relationships at the hospital—is a consideration that is reasonably related to the provision of adequate medical care. Consequently, the board's reliance upon this factor to deny staff membership to Everhart was neither arbitrary nor capricious and did not deprive him of substantive due process.

*Everhart v. Jefferson Par. Hosp. Dist. No. 2*, 757 F.2d 1567, 1572 (5th Cir. 1985).

The evidence presented at the hearing established Dr. Bondi's decision was not objectively unreasonable, nor arbitrary and capricious. As such, Dr. Bondi is entitled to qualified immunity.

> **5.** **Qualified Immunity for Dr. Woodward:**
>
> *a.* ***Procedural Due Process***:

Dr. Woodward had no role in the hearing itself or in establishing the procedures that were used during the hearing. *Exh. 34.* Under UMMC's Evaluation Policy and Grievance Algorithm, the only action to be taken by the Vice Chancellor for the hearing is the appointment of the chair of the appeals committee. *See Exh. 40, Grievance policy.* Brian Rutledge, Dr. Woodward's Chief of Staff, informed her in July 2017, that a chair needed to be appointed for an appeal by a member of the house staff. In response, she appointed Dr. Bondi to be the chair. *Exh. 34.* Dr. Woodward felt Dr. Bondi was well qualified to preside over the hearing as a licensed attorney, former FBI Special Agent, as well as a physician at UMMC.

Because she is tasked with being the final decision maker for the Plaintiff's appeal, Dr. Woodward had no involvement in the hearing or providing notice to the Plaintiff.  *Exh. 34*.  After the hearing concluded, Dr. Woodward was provided with a letter that outlined the findings of the committee and their decision to uphold the decision to dismiss the Plaintiff.  Dr. Woodward upheld the decision to dismiss Dr. Papin, based on her independent review of the appeals committee's decision.  Dr. Woodward's conduct was objectively reasonable in light of clearly established law.   The Plaintiff cannot create an issue of fact that Dr. Woodward had any role in providing Dr. Papin notice or in the procedures used in the committee hearing for the appeal.  As such, Dr. Papin's claims against Dr. Woodward fail as a matter of law, and she is entitled to qualified immunity.

### b.      *Substantive Due Process*

Under UMMC and the Board of Trustees for the Mississippi State Institutions of Higher Learning policies, Dr. Woodward receives the appeals committee's findings and decision to make a final determination of Dr. Papin's appeal.  *Exh. 34 and Grievance Policy, Exh. 40.*  Dr. Woodward upheld the decision to dismiss Dr. Papin and deny his appeal finding he violated UMMC policies, based on her independent review of the appeals committee's decision.  *Exh. 34.*  In making her decision, she relied on the knowledge and experience of the appeals committee, which included Dr. Bondi, the appointed faculty members who were all experienced program directors, and a member of the house staff to provide the perspective of a resident on the committee.  *Exh. 34***.**  As experienced educators and medical providers, the appeals committee had the opportunity to hear from the witnesses and use their knowledge and experience to glean the facts and circumstances of Dr. Papin's performance and whether or not he met institutional standards.  *Id*.

Based on their findings, Dr. Woodward found that Dr. Papin's conduct violated the UMMC code of conduct and that dismissal was appropriate.  *Id*.  Plaintiff cannot show based on

the undisputed facts concerning Dr. Woodward's review and judgment of the issues presented to her, that she acted in an arbitrary and capricious manner, or that her conduct was objectively unreasonable.  Therefore, Dr. Papin's claims against Dr. Woodward fail as a matter of law, and she is entitled to qualified immunity.

**C.      Plaintiff's Section 213-A claim fails as a matter of law.[21]**

Dr. Papin has made a claim pursuant to the Mississippi Tort Claims Act alleging a violation of Section 213-A of the Mississippi Constitution; however, because Dr. Papin is not an employee of the Board of Trustees for the Mississippi State Institutions of Higher Learning (IHL) , this section is inapplicable to him.  This Section of the Mississippi Constitution provides that responsibility for the management and control of the institutions of higher learning of this state is vested in the IHL Board.  That section provides, in relevant part:

> [The] board shall have the power and authority to elect the heads of the various institutions of higher learning, and contract ***with all deans, professors and other members of the teaching staff, and all administrative employees*** of said institutions for a term not exceeding four (4); but the board may terminate any such contract at any time for malfeasance, inefficiency or contumacious conduct, but never for political reasons.

Miss. Const. art. 8, § 213A.

As a house officer [medical resident], Papin is a physician in training and a contractual employee of the UMMC, not IHL.  Also, because he is not a dean, professor or other member of the teaching staff, or an administrative employee (i.e. associate dean, department chair, etc.), Section 213-A does not apply to him, and this claim fails as a matter of law.

In the alternative, if Plaintiff maintains that he is in fact an employee of IHL, then his breach of contract claim fails as a matter of law because IHL is not a party to this litigation.

*Whiting v. Univ. of S. Mississippi*, 62 So. 3d 907, 916–17 (Miss. 2011), *overruled by Springer v.*

---

[21]Plaintiff only brings this claim against UMMC, not the individually named Defendants. Even if he had, brought the claim against the individual defendants, they would be immune pursuant to the MTCA. [ECF 50, para. 93.]

*Ausbern Constr. Co.*, 231 So. 3d 980 (Miss. 2017).

> The university and its officers, notwithstanding the fact that they act as agents of the Board, are not parties to any contract formed between the Board and Dr. Whiting. The ***university*** and the other defendants named in their individual capacities therefore are free of liability with respect to whatever contractual obligations the Board may have undertaken with respect to Dr. Whiting.

*Whiting v. Univ. of S. Mississippi*, 62 So. 3d at 916–17 (Miss. 2011), *overruled by Springer v. Ausbern Constr. Co.*, 231 So. 3d 980 (Miss. 2017).  Therefore, if Plaintiff maintains his employment is with IHL, then his breach of contract action against UMMC fails as a matter of law because UMMC is not a party to such contracts.

Finally, for the reasons stated in the breach of contract section below, Plaintiff was terminated for malfeasance, inefficiency, and contumacious conduct; as such, there would be no violation of Section 213-A even if it applied, and his claim fails as a matter of law.

**D.    The Mississippi Tort Claims Act bars Plaintiff's due process and Section 213-A claims**.

Plaintiff specifically plead that he was alleging Counts II and III of his Amended Complaint pursuant to the Mississippi Tort Claims Act.  *See paragraphs 93 and 98 of Plaintiff's Second Amended Complaint [ECF 50]*.  In addition to the arguments above, his state law due process and Section 213-A claim fail under the Mississippi Tort Claims Act because UMMC has immunity under the discretionary function immunity of the MTCA.

Under Mississippi Code Section 11-46-9(1)(d), UMMC  "shall not be liable for any claim ... [b]ased upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a governmental entity or employee thereof, whether or not the discretion be abused[.]"  Very recently, the Court returned to its traditional, two-part, public policy function test to determine when Section 11-46-9(1)(d) applies. *Wilcher v. Lincoln Cty. Bd. of Supervisors*, 243 So.3d 177 (Miss. 2018). Under this test, "[t]his Court first must ascertain whether the activity in question involved an element of choice or judgment." *Id*. at 187 *(quoting*

*Miss. Transp. Comm'n v. Montgomery*, 80 So.3d 789, 795 (Miss. 2012) ).

The decision of how to discipline employees has been held to be a discretionary function entitled to immunity.

> The manner in which a police department supervises, ***disciplines*** and regulates its police officers is a discretionary function of the government and thus the city is immune to suit under § 11–46–9(1)(d).

*City of Jackson v. Powell*, 917 So. 2d 59, 74 (Miss. 2005)(emphasis added)..

The second question is "whether the choice or judgment in involves social, economic or political policy alternatives." *Id*.   Unquestionably, the choice and judgments required of these state workers emanate from, or relate to, matters of human welfare. The policy underlying question (2) is that "[s]tate tort standards cannot adequately control those government decisions in which, to be effective, the decision maker must look to considerations of public policy and not merely to established professional standards or to standards of general reasonableness." *Womble v. Singing River Hosp*., 618 So.2d 1252, 1263 (Miss.1993) (quoting *Pruett v. City of Rosedale*, 421 So.2d 1046, 1051–52 (Miss.1982)).

Moreover, "[w]hen established governmental policy, as expressed or implied by statute, regulation, or agency guidelines, allows a Government agent to exercise discretion, it must be presumed that the agent's acts are grounded in policy when exercising that discretion." Id. at 324, 111 S.Ct. 1267 (emphasis added).  *Dancy v. E. Mississippi State Hosp*., 944 So. 2d 10, 17–18 (Miss. 2006).  Employment decisions made by government officials are discretionary functions. *See, e.g., Patton v. Hinds County Juvenile Det. Ctr. (Henley–Young)*, No. 3:10cv138, 2011 WL 2912897, at *6 (S.D.Miss. July 18, 2011) ("Employment decisions, like that about which Patton complains, are classic discretionary functions ... since they require 'personal deliberation, decision and judgment.' "); *DePree,* 2008 WL 4457796, at *9 ("An employment decision is a classic discretionary function."); *Suddith*, 977 So.2d at 1179 (¶¶ 48–49) (holding that the decision to offer a professor a one-year contract of employment, as opposed to a tenure track

position, was a discretionary act immune from liability under the MTCA).

> We further find that Drs. Lucas and Huffman's judgment regarding the hiring of a faculty member involved important social and public policy, such as providing the students of Mississippi at this public university with the best faculty members possible.

*Suddith v. Univ. of S. Mississippi*, 977 So. 2d 1158, 1179 (Miss. Ct. App. 2007)

Because the decision of whether to remove Dr. Papin from patient care, and ultimately, to dismiss him, involved a choice or judgment that impacted UMMC's policy in providing patient care and educating future medical professionals, UMMC is immune pursuant to the discretionary function immunity of the Mississippi Tort Claims Act, and the Plaintiff's claims should be dismissed as a matter of law.

**E.      UMMC did not breach Plaintiff's House Officer Contract.**

Unlike a traditional employee, Plaintiff was only under contract with UMMC to be a post-graduate trainee (medical resident).  *See Exh. 4, House Officer Contract.*[22]  A "residency program is distinct from other types of employment in that the resident's 'work' is what is academically supervised and evaluated." *See Davis v. Mann*, 882 F.2d 967, 974 (5th Cir. 1989)(describing employment relationship between UMMC and resident).  As such, Plaintiff had both academic and employment related aspects to his contract.  Plaintiff's conduct which formed the basis of his dismissal, as documented in Whitlock's recommendation and Brasfield's notice letter, breached both aspects of the contract.[23]

Under the medical education rubric, the House Officer Contract required Plaintiff "to fulfill all the educational requirements for the program" and "to use best efforts to provide safe and effective patient care."  *Id., Section III (1).*  Further, in an academic context, judicial intervention in any form should be undertaken only with the greatest reluctance. *Univ. of*

---

[22]This was Plaintiff's only contract with UMMC.

[23]*Exh. 28 and Exh. 36*

*Mississippi Med. Ctr. v. Hughes*, 765 So. 2d 528, 532 (Miss. 2000)(*citing Regents v. Ewing*, 474

U.S. 214, 226, 106 S.Ct. 507, 514, 88 L.Ed.2d 523 (1985) (declaring courts unsuited "to evaluate

the substance of the multitude of academic decisions that are made daily by faculty members of

public educational institutions").

> Federal courts strongly disfavor claims that require judges to second-guess
> judgments about the academic quality of a student's work.. . . The Supreme Court
> has held that federal courts should not override grading and similar decisions
> about academic merit unless they so substantially depart from accepted academic
> norms as to demonstrate a failure to exercise professional judgment.

*Chan v. Bd. of Regents of Texas S. Univ.*, No. CIV.A. H-12-0325, 2012 WL 5832494, at *4 (S.D.

Tex. Nov. 16, 2012)(internal citations omitted); *see also Davis*, 882 F.2d at 974 ("Successful

completion of the residency program depends upon subjective evaluations by trained faculty

members into areas of expertise that courts are poorly equipped to undertake in the first instance

or to review.").

Plaintiff chose to appeal his HR termination through the Graduate Medical Education

Committee academic appeal process which reviewed the appropriateness of his dismissal to

include the facts and process. *Dillard Letter and Exh. 16, pg. 7, See also Exh. 4, Section II*

*below*. The appeals committee, which was comprised of medical educators, found Plaintiff's

professionalism and performance issues to be multiple and persistent and he was given ample

opportunity to remediate but failed to improve. *Exh. 2.* For example, the appeals committee

heard testimony that Plaintiff failed to maintain interpersonal relationships with coworkers, was

a poor communicator, and had difficulties with multiple practitioners. In addition, they heard

that he did not properly sign out a patient to the ICU, failed to wash a wound as instructed, lied

to his chief resident about checking a patient's backside during rounds, and was not properly

rounding on patients as required. *Exh. 6, Earl pg. 79-80.* Further, Plaintiff's semi-annual review

was one of the worst ever seen by UMMC officials wherein he was found to be critically

deficient in numerous areas of professional competency.[24]  *See Exh. 12 and Exh. 41; and see Exh. 21 pgs. 84-85 and Exh. 42 pgs. 105-106*.  After hearing the evidence, the appeals committee found that Plaintiff's evaluations by faculty and providers, his semi-annual review, his meetings with the program director, and the testimony at the hearing, established a pattern of short-comings in his performance that supported dismissal and breached his obligations to use his best efforts to provide medical care and progress professionally.  Therefore, UMMC was justified in removing him from the program due to his failure to maintain satisfactory progress in the professionalism components of his training, and there is no breach of his contract.

In addition to the trainee components, Plaintiff's contract contained two additional provisions which allowed UMMC to unilaterally terminate the contract.  First, the Plaintiff also agreed to comply with all regulations and policies of UMMC, which includes the code of conduct in the faculty and staff handbook.  *See Exh. 4, Contract Section III, para. 2.*  The 2016-17 Faculty and Staff Handbook specifically states that the "Medical Center reserves the right to discipline, suspend or terminate an employee for cause.  *Exh. 46.*  It states "serious misconduct or problems in performance can result in disciplinary action, including termination, without prior counseling."  *Id.*[25]

Second, in addition to the provisions of the Faculty and Staff Handbook, UMMC is specifically ***empowered*** to terminate the contract at any time for malfeasance, inefficiency, or contumacious conduct.  *Exh. 4*, *Section IV, 1.*  Because the contract specifically allows for its

---

[24]As a physician in training, professionalism and systems based practice or core competencies of his education.  See Milestone Project, Exh. and Stewart Deposition, Exh.

[25]  Of relevant part, the handbooks provides examples of the code of conduct which allows for the termination of  employees, such as:  inefficiency; negligence in the performance of duty;  leaving the job during working hours without authorization;  conduct detrimental to patient care or general safety; leaving your assigned work area during work hours without permission of your supervisor; and  failure to maintain satisfactory interpersonal relationships with co-workers or supervisors; inappropriate behavior toward, or discourteous treatment of patients, students, visitors, or co-workers. *Exh. 46, pgs. 47-48.*

termination through UMMC's policies and procedures, there is no breach by UMMC.  Human Resources based their decision to terminate the Plaintiff due to violations of UMMC's Code of Conductwhich allowed for Plaintiff to be dismissed under the contract.  These violations also amounted to malfeasance, inefficiency, and contumacious conduct which allowed UMMC to dismiss him.  *Exh. 28 and Exh. 23, pg. 50.*  For malfeasance UMMC found that  Plaintiff refused to do tasks when asked, lied about patient care, did not sign out the patient to the ICU when told, did not see patients during pre-rounds, and did not wash out a wound when told.  *Exh. 6, Earl Deposition pgs. 65-68, and Substantive Due Process Section above.*

In regard to lying about examining the patient's backside, the medical record establishes that the wound care nurse first diagnosed a pressure ulcer on the afternoon of Friday, December 9, 2016.  *Exh. 47.*  The next two Mondays, Dec. 12 and Dec. 19, Plaintiff was the resident assigned to the patient for back checks.  *Exh. 5, pg. 155, 156.*  Dr. Mahoney testified that Plaintiff  never informed her when asked ***during rounds*** on these two Mondays that there was anything on the patient's back, when the record establishes there was.  *Exh. 16, pg.  54-55.*  In his deposition, the Plaintiff admitted that he did not check the patient's backside ***before rounds***, nor was there anything in the medical record before he went on Christmas vacation that would show he examined the patients back.  *Exh. 5 pgs. 142, 155-157.*  He claimed to go back later in the day to check.  He also admits that there is nothing in the record to document his conversations with Dr. Mahoney.  *Exh. 5 pgs. 166-167.*

In his human resources interview, Plaintiff blamed it on a lack of knowledge and took full responsibility.  *Exh. 27, pg. 20.*  Plaintiff's conduct also included leaving the unit without letting others know, not being available during the day, leaving a note for sign-out, and not signing out a patient to the ICU. *Exh. 6, Earl pg. 74.*  As well as contumacious conduct for his interpersonal interactions with other providers and residents, not performing tasks when asked, not signing out the patient to the ICU, not washing out a wound when told, lying about checking a patient's back

side, not rounding on patients as required. *Exh. 6, Earl pg. 79-80*.  See *Zisman v. Mason*, No. CIV.A. 3:04-CV-176HT, 2008 WL 879726, at *6 (S.D. Miss. Mar. 30, 2008)(interpreting similar contract language and finding that contract could be terminated due to contumacious conduct for contentious relationship between supervisors and other faculty, and failure to maintain minimal duty of civility and loyalty).

Plaintiff's breach of contract claim fails for any of the three reasons cited above; however, only one is required.   Therefore, Plaintiff's claim should be dismissed.

**F.      Plaintiff Failed to Mitigate his Damages**

Plaintiff Papin failed to take reasonable steps to mitigate any damages he is claiming concerning the continuation of his medical career or lost earning capacity as a physician. The law requires a plaintiff to use reasonable diligence to mitigate damages by seeking other employment which is substantially equivalent to the job from which the plaintiff was discharged. *Office of the Attorney Gen. of Tex. v. Rodriguez*, 535 S.W.3d 54, 84 (Tex. App.—El Paso 2017, pet. granted)( *See also Gulf Coast Research Lab. v. Amaraneni*, 722 So. 2d 530, 544 (Miss. 1998)(The duty to mitigate has long been a part of Mississippi's jurisprudence and in this case Appellees failed to act consistently with that duty)).

In a wrongful discharge case, the defendant has the burden of proving plaintiff's failure to mitigate damages. *Id*. However, if the defendant establishes that the plaintiff has not made reasonable efforts to obtain work, the defendant is not required to prove that evidence of equivalent work exists and is available. *Powers v. Northside Indep. Sch. Dist*., 951 F.3d 298, 308–09 (5th Cir. 2020).

It is undisputed that Plaintiff unreasonably failed to apply for other medical residencies in an effort to continue his medical career.  *Exh. 48, Request for Admission No. 10.*  Plaintiff admits that during the first year after his termination, he stayed at home with his parents.  *Exh. 5, pg. 8.*

He did not apply to any other medical residency programs during that year.   Plaintiff did not

enter the National Residency Match Program to find another residency in 2017, 2018, or 2019.

In addition to not entering the Match[26], he also did not apply for any unfilled positions outside of

the matching program in 2017, 2018, 2019, and 2020.  *Exh. 5, pgs. 15-16.  Exh. 48, Request for*

*Admission No. 10.*

Plaintiff justifies his inaction by claiming that he did apply to another program because

he felt it would be futile.  He testified that he gleaned this from speaking with classmates, whose

names could not remember and his own intuition.  *Exh. 5, pgs. 13-15.*  The Fifth Circuit has held

this is unacceptable and not a reasonable effort to mitigate damages.

> Plaintiffs justify their lack of efforts to obtain comparable employment by
> contending that any efforts they could have made would have been futile.
> However, Plaintiffs' unilateral decision that their job-seeking efforts would be
> futile does not absolve them of their duty to mitigate damages. . . . Because
> Plaintiffs have failed to exercise reasonable diligence to mitigate their damages,
> they are not entitled to recovery of lost wages.

*Powers v. Northside Indep. Sch. Dist*., 951 F.3d 298, 309 (5th Cir. 2020).

Instead of applying to medical residencies, Plaintiff applied to be a consultant, and is

currently working as a consultant with Accenture for $155,000.00 per year.  *See Exh. 39, offer*

*letter, and Exh. 5, pg. 22.*  Because the Plaintiff admits that he did not seek to match into another

program and failed to take any reasonable steps to continue his medical education, he failed to

mitigate his damages, and should be denied any monetary damages for loss of earning

capacity/income as a physician/surgeon.  *Exh. 48.*

G.    **UMMC, nor Dr. Woodward in her official capacity are persons under**

---

[26]*See Exh. 49 - 2018 NRMP Match Data,* There were 2,692 surgical residency positions
available in the match, and 5 Categorical Surgery Residency positions and 475 Preliminary
Surgery Resident positions unfilled after the match, and 50 preliminary positions remained
unfilled after the Supplemental Offer and Acceptance Program (SOAP).
      *See Exh. 50 - 2019 NRMP Match Data*, There were 2,590 surgical residency positions
available in the match, and 577 Preliminary Surgery Residency positions unfilled after the Match
and 129 positions remained unfilled after the SOAP.

**Section 1983 and money damages are not available.**

Plaintiff has sued UMMC and Dr. Woodward in her official capacity alleging constitutional violations of his Fourteenth Amendment right of due process.  Since UMMC and Dr. Woodward, officially, are not "persons" under 1983, his claims for damages are barred as a matter of law.  While Section 1983 provides a federal forum to remedy many deprivations of civil liberties, it does not provide a federal forum for litigants who seek a remedy against a State for alleged deprivations of civil liberties.  *See Mawson v. Univ. of Miss Med. Ctr.*, Civil Action No. 3:11cv574–DPJ–FKB, 2012 WL 6649323, 2 (S.D.Miss. Dec.20, 2012) ("UMMC, as an arm of the state, is not a 'person' within the meaning of 42 U.S.C. § 1983, and therefore is not a proper defendant in a § 1983 suit.").  Because the Medical Center is not a "person" under Section 1983, any due process claims directly against UMMC must be dismissed.  Any Section 1983 claims against Dr. Woodward in her official capacity for monetary damages are also barred as a matter of law, and must be dismissed.

> **H.**     ***No Evidence to Support Punitive Damages under State or Federal law:***

Plaintiff's claims for punitive damages against UMMC and Dr. Woodward in her official capacity fail as a matter of law.   Further, the Plaintiff has not provided evidence that would establish that the individual defendants acted with evil motive and intent, or recklessness and callous indifference to subject them to punitive damages.  Punitive damages are to punish a wrong-doer. "In the case of a community hospital, or any other governmental entity for that matter, the "punished" is the taxpayer, as it is their funds that pay the damages, or the insurance coverage for such damages." With that in mind, litigants should not be allowed to obtain punitive damages from the public treasury which is filled only by taxpayers.  *Sw. Mississippi Reg'l Med. Ctr. v. Lawrence*, 684 So. 2d 1257, 1267 (Miss. 1996).  In addition, the MTCA bars punitive damages for claims against the State where immunity is waived.  Miss. Code. Ann. § 11-46-15 (West).

Under Mississippi law, the Court has also held that:

> To qualify for punitive damages in a breach of contract case, a plaintiff must prove by a preponderance that the breach was the result of an intentional wrong or that a defendant acted maliciously or with reckless disregard of the plaintiff's rights.

*Hamilton v. Hopkins*, 834 So. 2d 695, 703 (Miss. 2003).

For the individual defendants Section 1983 claims, the Fifth Circuit has held:

> In a Section 1983 action, a plaintiff may be awarded punitive damages if "the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." The latter standard has been further defined as "subjective consciousness of a risk of injury or illegality and a criminal indifference to civil obligations."

*Kohler v. Johnson*, 396 F. App'x 158, 161–62 (5th Cir. 2010)(Internal citations omitted).

Plaintiff cannot show the Defendants acted with a subjective consciousness of injury or illegality or a criminal indifference to civil obligations.  For the reasons stated above, UMMC, and its officials followed their policies and procedures based on the numerous complaints and reported deficiencies in Plaintiff's performance, and Plaintiff cannot establish a basis for punitive damages.  As such, they should be dismissed as a matter of law.

Further, because punitive damages are not allowed, Plaintiff's claim for attorney's fees and costs for his breach of contract claim, likewise fail as a matter of law in addition to being bared by the Tort Claims Act for his state tort claims.[27]

> Since litigation expenses and attorney's fees are not recoverable in a breach of contract case unless punitive damages are recoverable, the magistrate was also correct to dismiss the portion of American's counterclaim which requested the payment of those expenses.

*Guar. Serv. Corp. v. Am. Employers' Ins. Co.*, 898 F.2d 453, 454–55 (5th Cir. 1990)

Plaintiff has not established a genuine issue of fact that would allow for the recovery of punitive damages, or attorney's fees and costs.

---

[27] *Miss. Code Section 11-46-11(2)*

IV.    CONCLUSION

For the reasons stated herein, the Defendants request this Court dismiss the claims in

Plaintiff's Second Amended Complaint, and/or grant the individuals Qualified Immunity.

Respectfully submitted, this the 26th day of February, 2021.

**University of Mississippi Medical Center, Dr. T. Mark Earl, Dr. Steven Bondi and Dr. LouAnn Woodward.**

BY:    */s/ Tommy Whitfield*
**TOMMY WHITFIELD, MSB# 102482**
**tommy@whitfieldlaw.org**

**WHITFIELD LAW GROUP, PLLC**
660 Lakeland East, Suite 200
Flowood, Mississippi 39232
(601) 863-8221 – Telephone
(601) 863-8231 – Facsimile

## CERTIFICATE OF SERVICE

I, Tommy Whitfield, of the Whitfield Law Group, PLLC, the undersigned attorney, do

hereby certify that I have this day electronically filed the above and foregoing with the Clerk of the

Court using the ECF system which sent notification of such filing to the following:

Ryan Morgan
Gregory Schmitz
Jolie Pavlos
Martin Jelliffe
Morgan & Morgan
20 N. Orange Avenue, 15th Floor
Orlando, FL 32801
*Counsel for Plaintiff*

THIS, the 26th day of February, 2021.

*/s/ Tommy Whitfield*
TOMMY WHITFIELD