<div align="center">

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF MISSISSIPPI**
**NORTHERN DIVISION**

</div>

**JOSEPH PAPIN,**

        **Plaintiff,**

                                      **CASE NO:  3:17-CV-763 CWR-FKB**

**vs.**

**UNIVERSITY OF MISSISSIPPI**
**MEDICAL CENTER, LOU-ANN**
**WOODWARD, T. MARK EARL, DR.**
**STEVEN A. BONDI, and JOHN**
**DOES**

        **Defendants.**

_____ /

<div align="center">

**PLAINTIFF'S BRIEF IN SUPPORT OF HIS**
**MOTION FOR PARTIAL SUMMARY JUDGMENT**

</div>

Plaintiff, JOSEPH PAPIN, by and through his undersigned counsel, hereby submits this Brief in Support of his Motion for Partial Summary Judgment.

<div align="center">

**INTRODUCTION**

</div>

Plaintiff, Dr. Joseph Papin, a physician and a former General Surgery resident at UMMC, was deprived of his right to procedural due process when UMMC dismissed him without giving him requisite notice and a meaningful opportunity to be heard. As a surgical resident, Dr. Papin had devoted more than nine (9) years and more than $400,000 pursuing his surgical career. Accordingly, Dr. Papin possessed property rights and was entitled to proper procedural due process safeguards against the risk of an erroneous deprivation of those property rights. Plaintiff will show that the overwhelming weight of the evidence supports the conclusion that Dr. Papin was not afforded the required due process and this resulted in his erroneous termination. In short, Dr. Papin suffered the

<div align="center">

1

</div>

exact ill that the Due Process clauses of the United States and Mississippi Constitutions were designed to prevent.

The evidence will show that UMMC failed to provide Dr. Papin with requisite procedural due process both before his termination and then at his post-termination appeals hearing. Specifically, UMMC failed to provide Dr. Papin with sufficient notice and enough factual detail regarding his alleged performance deficiencies for Dr. Papin to be able to effectively present a defense. UMMC relied on workplace gossip and hearsay and never conducted an independent investigation to determine whether a factual basis existed to support the allegations that he was dishonest and a danger to patients.

Before his termination, Dr. Papin was not provided with the identities of the complainants against him, a description of the precise conduct complained of, or any documentation that would validate or invalidate the propriety of the complaints. Moreover, before his termination "interview," Dr. Papin was not timely provided with a complete accounting of the charges against him so as to allow him sufficient time to prepare. At his termination "interview," Dr. Papin was ambushed with information and expected to present an on-the-fly defense. Then after he was terminated, UMMC conducted a sham appeals hearing in which it was clear that several committee members harbored bias in favor of UMMC and against him. Additionally, Dr. Papin was not allowed to question witnesses and questions Dr. Papin offered to the committee for the witnesses were wholly ignored. The appeals hearing was nothing more than a rubber stamp of Dr. Papin's dismissal.

UMMC's flagrant disregard of Dr. Papin's due process rights has resulted in irreparable harm to him. After the appeals hearing, it was too late for him to enter the resident match program in 2017. Dr. Papin later applied to numerous residency programs in an effort to salvage his medical career but his efforts were fruitless. After being dismissed as a "danger to patients," no other reputable residency program would have him. Dr. Papin's wrongful termination by UMMC proved

to be a Scarlet letter that could not be overcome. Instead, Dr. Papin had to give up his lifelong dream of becoming a surgeon and, to his credit, graduated in May 2020 from the University of Michigan with an M.B.A. with high distinction and a merit award for his top five academic standing. Indeed, this result is the precise reason why stringent application of procedural due process is essential. For this and all of the reasons stated more fully below, this Court should hold that UMMC violated Dr. Papin's procedural due process rights.

With regard to Defendants' Mississippi Tort Claims Act affirmative defense, binding case law is clear that this defense does not apply to Plaintiff's breach of contract claim which is based on express terms of contracts between him and UMMC. As such, this Court should hold that Defendants' Mississippi Tort Claims Act affirmative defense does not apply to Dr. Papin's breach of contract claims.

## PLAINTIFF'S STATEMENT OF MATERIAL FACTS

### I.    Dr. Papin's Employment with UMMC

Plaintiff, Dr. Joseph Papin, grew up with a singular dream – to become a surgeon. *See* Plaintiff's Deposition Transcript (hereinafter "Papin Depo."), attached as **Exhibit A**, at 12:9-14. Dr. Papin graduated from the University of Florida in 2011 with a B.S. in Chemistry with the Howard M. Sheridan award for the top graduating student in Chemistry. *See id.* at 7:21-24. After obtaining his undergraduate degree, Dr. Papin was accepted to and ultimately attended the University of Michigan Medical School in Ann Arbor. *See id.* at 7:25 – 8:1. According to U.S. News & World Report's "Best Graduate Schools," The University of Michigan Medical School ranked #10 of all medical schools in the United States at the time of Dr. Papin's matriculation. *See* U.S. NEWS, BEST GRADUATE SCHOOLS, UNIVERSITY OF MICHIGAN – ANN ARBOR, available at https://ur.umich.edu/1011/Mar21_11/2165-u-m-remains-strong. Dr. Papin then went on to

complete a one-year Postdoctoral Fellowship at the University of Michigan in House Services Research. *See* Papin Depo., at 8:2-6.

In 2015, Dr. Papin began applying for entry into surgical residency programs for the 2016 class cycle. *See id.* at 23:19 – 24:2. He interviewed at multiple institutions. *See id.* at 24:17-24. He ultimately matched with UMMC which was ranked towards the top of his list. *See id.* at 25:7-9. Dr. Papin thereafter moved to Mississippi and began his employment with UMMC on June 28, 2016. *See* Plaintiff's House Officer Contract, attached as **Exhibit B**.

As a medical resident at UMMC, Dr. Papin was subject to a number of different policies and procedures. Some of those policies and procedures apply to all faculty and staff of UMMC – not just residents – and are referred to as HR (Human Resources) policies. *See* Molly Brasfield, Defendant's FRCP 30(b)(6) Corporate Representative's Deposition Transcript (hereinafter "Brasfield Depo."), attached as **Exhibit C**, at 10:25 – 11:19. One of the "HR" policies that applied to Dr. Papin was the Faculty and Staff Handbook. *See id.*, at 15:18 – 16:9; *see also* Dr. T. Mark Earl's Deposition Transcript (hereinafter "Earl Depo."), attached as **Exhibit D**, at 92:12-22. The handbook, which is incorporated by reference into Plaintiff's House Officer Contract with UMMC, requires UMMC supervisors/managers to provide their employees with written notice of unsatisfactory behavior/performance that could lead to termination. *See* excerpts of 2016 Faculty and Staff Handbook, attached as **Exhibit E** (emphasis added); *see also* Jimmy Stewart, Defendant's FRCP 30(b)(6) Corporate Representative's Deposition Transcript (hereinafter "Stewart Depo."), attached as Exhibit F, at 33:16-34:16. Specifically, it states:

> All new staff employees will receive feedback from their supervisor/manager during [the initial employment period] and an initial assessment during their first three to six months of employment. During this period, the supervisor/manager will need to closely monitor the employee's performance and be available for coaching and evaluation. If an employee's performance is substandard, the supervisor/manager **should counsel the employee on areas needing improvement allowing the employee**

> **sufficient time to improve.** Employees are entitled to **written notice** of problems in their work, behavior or conduct that could lead to termination.

*Id.* at p. 40 (emphasis added).

UMMC's residency programs are accredited by the Accreditation Council for Graduate Medical Education ("ACGME"). As such, in addition to the policies and procedures applicable to all employees of UMMC, medical residents are subject to additional "academic" related policies and procedures propounded by UMMC's Graduate Medical Education ("GME") office.

One of the "academic" policies that applied to Dr. Papin was the House Staff Manual. *See* Brasfield Depo., at 12:2-17. The House Staff Manual sets forth separate, additional notice requirements applicable to UMMC medical residents. *See* excerpts of the House Staff Manual, attached as **Exhibit G**. Specifically, it states:

> All residency programs are required to provide regular evaluations to the residents. Programs will provide formal written evaluations from the program director, program residency committee, department chair, or designee at least two times per year or more often if required by the accrediting body for that program. Residents whose performance is below an acceptable standard **must be notified** of deficiencies in their performance.

*Id.* at p. 29 (emphasis added).

In late Fall of 2015, just prior to Dr. Papin's employment with UMMC, Dr. Earl became the Program Director for the General Surgery residency program. *See* Earl Depo., at 17:23 – 18:3. All General Surgery residents, including Dr. Papin, reported to Dr. Earl. *See id.* at 26:20 – 27:1. Residents also report to more senior residents and to attending physicians. *See id.* at 40:15-19. However, residents do not report to the nurses or nurse practitioners (and vice versa) as nurses and physicians possess different job duties. *See id.* at 34:20 – 35:7; see also excepts of nurse practitioner, Joshua Sabins' Deposition Transcript (hereinafter "Sabins Depo."), attached as **Exhibit H**, at 26:16-18.

II.    **Dr. Papin's Conflict with Nurse Practitioner Joshua Sabins**

As a resident in UMMC's General Surgery program, Dr. Papin was assigned to monthly rotations in which, each month, he would work in a new area of the hospital. *See* Papin Depo., at 50:15-20. The first rotation Dr. Papin was assigned to was the Cardiovascular ICU ("CV ICU"). *See id.* The two attending physicians presiding over the CV ICU at that time were Dr. Ines Berger and Dr. Jay Shake. *See id.* at 50:5-12.

At the beginning of his CV ICU rotation, Dr. Shake told Dr. Papin that the main expectation for his first rotation was to learn. *See id.* at 40:21 – 41:8. If there was a lull in attending to patients on the ICU floor he could come down to the operating room to observe and/or assist. *See id.* at 40:21 – 42:14. If an issue were to arise with one of his patients on the ICU floor while he was in the operating room a member of the nursing staff could notify him by phone. *See id.* at 42:15 – 43:14.

As someone who dreamed of becoming a surgeon his whole life, Dr. Papin took every available opportunity to observe/assist in the operating room. Unfortunately, this was taken the wrong way by one of the nurse practitioners, Joshua Sabins, who felt like Dr. Papin should not be leaving the ICU floor under any circumstances – even if there was a "lull." *See* Sabins Depo., at 39:8 – 42:4.

On or about July 29, 2016, at the end of Dr. Papin's first monthly rotation, Mr. Sabins' frustrations peaked and he admitted telling Dr. Papin "...if you're going to go to the OR and you're not going to stay in the ICU on an ICU rotation, I said just get your bag and don't come back. Just don't come back to the ICU. Don't come back to this office. Anyway, because it was our office." *See id.*, at 41:23-25 - 42:1-3. Subsequently, an altercation ensued. *See* Papin Depo., at 47:1 – 48:17 (Dr. Papin's description of the incident); *see also* Sabins Depo., at 39:8 – 42:18 (Mr. Sabins' description of the incident). Dr. Papin and Mr. Sabins dispute many details of the altercation, including who was

the aggressor and who was merely defending themselves. However, they do not dispute that what prompted the altercation was Dr. Papin informing Mr. Sabins that, given the ICU was slow and he had completed his necessary tasks, he was going to go down to the operating room. *See* Papin Depo., at 47:8-11; Sabins Depo., at 42:8-14. Mr. Sabins told Dr. Papin he was not permitted to go down to the operating room, to which Dr. Papin responded that Dr. Shake gave him permission to do so and he wanted to take advantage of that opportunity. *See* Papin Depo., at 47:11-14; Sabins Depo., at 42:18-23.

Mr. Sabins had worked at UMMC for some time; his wife was also a nurse at UMMC; and he was liked by his colleagues. *See* Papin Depo., at 61:9-17. As such, regardless of who was right or wrong, the fact that Dr. Papin had a conflict with Mr. Sabins – especially early in his employment before being able to establish a reputation – acted as a Scarlett Letter. *See* Papin Depo., at 61:18-22. For example, Dr. Cresswell's September 1, 2016 review of Dr. Papin stated:

> **In my personal interactions with Joe, I have not seen problems in this area**, but I have had several negative reports from other non-physician members of our team. In particular, heard reports of things that were deemed 'not my job' and 'incomplete follow-up with assigned tasks as well as general problems relating professionally to other non-physician team members.

*Id.*, at 58:3-12 (emphasis added). Dr. Papin was not provided with any details regarding which non-physician members made negative reports about him or what tasks he did not perform, *see id.* at 58:13 – 59:20, which tends to suggest this links back to his July 29, 2016 conflict with Mr. Sabins, and the perception that followed him of having interpersonal difficulties with nurses. Another example is Dr. De Delva's review of Dr. Papin where he stated:

> Several teams members commented on failure to develop rapport and trust with nurses and nurse practitioners. At times he was seen as dismissive and above doing certain work. **I did not see this personally**, but heard back from team members. I'm afraid if this is an ongoing issue, he will undermine his ability to be a good team leader as he rises in the program. He needs to develop some awareness and insight on how he is perceived.

*Id.*, at 66:7-17 (emphasis added). Again, this comment lacks any details regarding who made these comments about Dr. Papin and exactly what tasks he dismissed performing, suggesting that these feelings shared about Dr. Papin by the nursing staff is the result of his conflict with Mr. Sabins. As explained more fully below, Dr. Earl's position is that these "issues" and "problems" continued throughout Dr. Papin's employment; but Dr. Earl even <u>admits</u> that he never witnessed these issues personally. *See* Dr. Papin's Appeal Hearing Transcript (hereinafter "Appeal Tr.,") attached as **Exhibit I**, at 17:11-15.

### III.   Dr. Papin's Evaluations

The issue of Dr. Papin's reviews/evaluations lacking detail is a theme throughout Dr. Papin's employment. Numerous reviews, in addition to those referenced above, vaguely referenced performance issues without providing the detail necessary for Dr. Papin to understand how to correct his conduct. For example, Dr. De Delva stated, "Joe did a reasonable job in clinic, but failed to demonstrate that he owned the care of the inpatients. He often did not seem to have a finger on the pulse of the patient's situation. I often discovered issues and problems that I would have expected him to recognize." Papin Depo. at 64:2-8. Dr. De Delva never told Joe exactly what these "issues and problems" were for Dr. Papin to be able to correct that behavior moving forward. *See id.*, at 64:9-22.

On November, 29, 2016, Dr. Papin received his first semi-annual review, conducted by Dr. Earl. *See* id., at 119:25 – 120:10; *see also* Resident Performance Profile signed by Dr. Earl and Dr. Papin during the meeting, attached as **Exhibit J**. As reflected by Dr. Earl's notes, Dr. Earl's feedback was: "Communication & professionalism concerns. Ownership of tasks. Communicate concerns. Must treat nurses & allied health staff with respect. Do not be arrogant." Dr. Earl did not provide Dr. Papin with specific examples of when or how he failed to take ownership of tasks, when or how he failed to communicate a concern, or when or how he failed to treat nurses and allied

health professionals with respect. *See* Papin Depo., at 121:9 – 122:3. When Dr. Papin asked Dr. Earl for clarification, Dr. Earl became irate and told him he "needed to start figuring it out for himself," *id.* at 122:9-18, and "Joe, you always do this. This is how feedback is in surgery. A sigh in the operating room or an attending no longer listening to your presentation, that's your feedback. You know, the big . . . there's a big movement in Surgery to get more feedback. I don't believe in it. I don't think so. I mean, you know most of the feedback that you get is nonverbal." *See* Appeal Tr. 36:1-10.

Dr. Papin also had questions about the grading scale reflected on the "Resident Performance Profile." For example, he did not understand why a grade of 2.9 under "System-Based Practice SBP1" was a critical deficiency but a grade of 2.9 under "Patient Care PC1" was not a critical deficiency. *See* Papin. Depo. at 122:19 – 123:6. When Dr. Papin asked for clarification on this Dr. Earl likewise told him to "figure it out." *See id.* at 123:6-7.

Dr. Earl alleges that after Dr. Papin's semi-annual review, he continued to receive complaints about Dr. Papin's attitude and performance, which prompted him to call a meeting on December 20, 2016. *See* Appeal Tr., at 16:13-23. An email dated December 20, 2016, from Dr. Earl to Renee Greene, UMMC's Surgery Education Administrator, with Dr. Papin notably absent from the email, allegedly memorializes this conversation. Earl Depo., at 194:25 – 195:9.

Again, Dr. Earl provides generalized complaints about Dr. Papin's performance including "unwillingness to help with tasks; leaving the hospital during duty hours (to exercise), condescending tone to nurses and fellow residents, leaving clinics without telling anyone, and poor inter-professional communication." *See* December 20, 2016 email, attached as **Exhibit K**.

With regard to leaving the hospital during duty hours to exercise, Dr. Papin was able to prove that his Chief Resident, Dr. Megan Mahoney, explicitly gave him permission to do so. *See* text message exchanges between Dr. Mahoney and Dr. Papin, attached as **Exhibit L**; *see also* Meghan

Mahoney's Deposition Transcript (hereinafter "Mahoney Depo"), attached as **Exhibit M**, at 36:3-14. As it relates to the remaining complaints, Dr. Papin again received insufficient detail to be able to either explain and defend against the complaints or accept responsibility and learn from it. *See* Papin Depo. at 125:14 – 129:13. Dr. Earl then concluded the meeting by informing Dr. Papin he would be **soliciting feedback** regarding Dr. Papin's performance from nurses, residents, and faculty. *See* Dec. 20 email, Ex. K. Dr. Earl acknowledges that this feedback was only provided to Dr. Papin verbally, and he was not afforded written notice of this feedback or any other feedback for that matter. *See* Earl Depo. at 94:15 – 95:9.

## IV.    **The Decubitus Ulcer Patient**

On November 14, 2016, (weeks before Dr. Papin's arrival on the trauma rotation), a paralyzed victim of multiple gunshots with a bullet lodged in his spinal canal at C7, was admitted to the trauma unit. *See* excerpts of pertinent patient medical records (hereinafter "Ulcer Patient Records"), attached as **Exhibit N**, at Papin-3046. He was a recently discovered diabetic with nutritional issues which, when compounded with his new immobility, set him up to develop pressure ulcers on his backside. *See id.* at 3090-91. On admission to the trauma unit, special orders were issued to prevent him from developing pressure sores, including for the floor nurses to turn him every two (2) hours. *See id.* at 3100. Ulcer Patient's medical records are replete with nursing notes documenting his refusals to be turned every two hours. *See id.*

On November 30, 2016, Ulcer Patient developed a tear on his intergluteal cleft (butt cheek) resulting in a consult to UMMC's wound care team, including Nurse Kisha Dyse, who saw him on November 30, December 9, and December 22. *See id.* at 3090-93, 3095. On each of these dates, the experienced wound care team evaluated his lesion, photographed it, and left notes and wound care treatment recommendations in his medical record for daily dressing changes as well as a cream. *See id.* At no time did UMMC's wound care team suspect that Ulcer Patient's lesion was infected or

needed surgical debridement. *See* Ulcer Patient Records at Papin-3090-93, 3095; *see also* Kisha Dyse's Deposition Transcript (hereinafter "Dyse Depo."), attached as **Exhibit O**, at 13:10-14.

On December 1, 2016, fourth year resident Dr. Meagan Mahoney was assigned as the chief resident to the trauma unit, which was the same day Dr. Papin was assigned to the trauma unit. *See* Papin Depo. at 11-3, 134:5-10; By the time Dr. Papin arrived on the rotation, <u>numerous medical professionals</u> had already been treating Ulcer Patient. *See* Ulcer Patient Records, Ex. N. Considering the foregoing, it is abundantly clear from the notes in Ulcer Patient's medical record that he had a pressure ulcer and that numerous members of the trauma team were aware of this.

Unfortunately, pressure ulcers are common and not always preventable. *See* Mahoney Depo. at 70:13-17; Dyse Depo. at 36:7-11. It can be hard for a new resident, like Dr. Papin, to identify the difference between a healing, non-threatening pressure ulcer and one that demands more attention. *See* Papin Depo. at 151:8-25.   Dr. Papin examined Ulcer Patient's backside and saw the scab. However, the wound did not exhibit warning signs of infection such as purulent drainage, redness, or foul smell. *See id.* at 162:25 – 163:14. As such, it did <u>not</u> raise any alarm bells for Dr. Papin or the more experienced UMMC wound care team.  *See id.* at 150:9-11.

However, on December 22, 2016, Ulcer Patient spiked a fever overnight, which could be a sign of infection. Dr. Papin sent a text message to Dr. Mahoney, informing her that "wound care" had made recommendations to continue conservative treatment with regard to Ulcer Patient's "early sacral decub." *See* Dec. 22 text message, Ex. L.  Dr. Papin also met with Dr. Mahoney in the resident lounge to go over his patient list, which included Ulcer Patient, before leaving later that evening for a scheduled Christmas holiday with his family in Florida. *See id.*

Dr. Mahoney alleges this was the first time Dr. Papin told her about the wound, that she had <u>never</u> reviewed Ulcer Patient medical records and depended on the new residents to tell her about pressure sores. *See* Mahoney Depo. at 25:19 - 26:4 Dr. Mahoney complained to Dr. Earl, accusing

Dr. Papin of lying to her about having done an exam on this patient.[1] *See id.* at 117:14 – 118:4. Dr. Mahoney's allegations are contrary to the medical records and wound care notes. Many <u>medical professionals</u>, including herself, had been treating this patient for a month and "rounding" on him twice per day. *See* Ulcer Patient Record, Ex. N.

**V.  <u>Dr. Papin's Termination</u>**

On January 10, 2017, following an email by Dr. Mahoney accusing Dr. Papin of lying to her about the presence of a decubitus ulcer on Ulcer Patient's sacrum, Dr. Papin was called into a meeting with Dr. Earl. *See* Papin Depo. at 203:22-25. He was not notified ahead of time as to the reason for the meeting. *See* Earl Depo. at 203:17-21. Dr. Earl presented him with a "remediation agreement" which informed him he would be given sixty (60) days to improve his performance or would be subject to further discipline including "(1) [r]eferral to HR and GME Office for immediate termination for safety infractions deemed egregious by the PD, (2) non-renewal of contract, (3) placement on formal probation, (4) requirement to repeat year of training." *See* Remediation Agreement, attached as **Exhibit P**. While Dr. Papin disagreed with the reasons for being placed on remediation, he signed the contract in Dr. Earl's presence. *See id.* Dr. Papin ultimately had no other choice. He was given a take it or leave it proposition. Dr. Papin even asked Dr. Earl if he could have time to review the agreement before signing and his request was unequivocally rejected. *See* Papin Depo. at 236:17 – 237:2.

Notably, the only new complaint brought up during the January 10, 2017 meeting was "lying and being untruthful about patient care." *See id.*; *cf* Dec. 20 email, Ex. K. Per his custom, Dr. Earl did not inform Dr. Papin what he supposedly had lied about or the clinical facts regarding this event. *See* Papin Depo. at 206:21-23; 207:6-13; *see also* Earl Depo. at 198:15-19 (testifying that the

---

[1] Whether Dr. Papin told Dr. Mahoney about the wound prior to December 22, 2016 is disputed. However, as evidenced by the running incident, it would not be the first time Dr. Mahoney erroneously accused Dr. Papin of doing something he did not do.

remediation agreement was his "direct feedback" to Dr. Papin during the January 10, 2017 meeting). In fact, as explained more fully below, it was not until January 27, 2017, when he was called into a meeting with UMMC HR representatives, Pat Whitlock and Brenda Traxler, that he learned allegations of lying referenced the decubitus ulcer patient. *See* Dr. Papin's recorded interview (hereinafter, "Interview Tr."), attached as **Exhibit Q**, at 17:4 – 18:15.

Despite being promised a sixty (60) day remediation period, after January 10, 2017, UMMC never permitted Dr. Papin to return to work again. *See* Appeal Tr. at 109:1-6. Following the execution of the remediation agreement Dr. Earl reported Dr. Papin to UMMC Human Resources and Dr. Papin was pulled from duty. *See* Earl Depo. at 208:10 – 210:20.

On January 25, 2017, UMMC Director of Human Resources, Molly Brasfield, asked UMMC Human Resources Representative, Pat Whitlock, to set up an "interview" with Dr. Papin. *See* email dated January 25, 2017, attached as **Exhibit R**. In the email, Ms. Brasfield made clear that Dr. Papin was inquiring about the reason for the meeting and she firmly explained they would not tell him the reason for the meeting and that they would discuss it in person during the interview. *See id.*

The interview was conducted two days later, on January 27, 2017. *See* Interview Tr. at 2:1-2. During the course of the interview, Dr. Papin was notified, for the first time, about several incidents that allegedly supported the basis for his termination. For example, Dr. Papin was told for the first time that the accusation of causing patient harm referred to the decubitus ulcer patient *See id.* at 17:4-16. He was told for the first time that there is a perception of him being in a hurry to leave. *See id.* 13:21 – 14:14:18. Other vague and non-descript complaints previously echoed by Dr. Earl were raised, yet no detail was provided for Dr. Papin to be able to provide an explanation/defense to the same. For example, Ms. Whitlock echoed generalized complaints of "not seeing patients" (with no further detail or examples provided), *see id.* at 21:6-12; and "reports that have come back . . . that [he could] tend to be a little condescending with the nurse practitioners" (no indication of which nurse

practitioner said this and what Dr. Papin said that was interpreted as being condescending). *Id.* at 7:7-12.

On February 14 and February 20, 2017, Dr. Earl emailed Human Resources to inquire about the status of Dr. Papin's employment. *See* email thread dated February 20, 2017, attached as **Exhibit S**. In his email on February 20, 2017, Dr. Earl stated:

> I have heard nothing. If he is not to be renewed in July, I have to fill the slot created by his absence. This must be done by Feb 22 due to National Resident Match Program requirementsI (sic) need to know ASAP and I have someone ready to fill his slot but she must withdraw from the Match no later than Feb 22. If I hear nothing, I will be forced to assume he will not be renewed and fill his residency position in which case he will not have a job here in July, no matter what the HR findings are. **Please help**.

*See id.* (emphasis added). Dr. Earl later testified what he meant by this email was that he believed, even if given a chance, Dr. Papin would inevitably fail remediation and be replaced either way. *See* Earl Depo. at 232:13 – 233:10. Dr. Earl also testified that if Human Resources failed to act before February 22, 2017, he would have potentially lost the opportunity ensure a match with then preliminary resident, Amy Sundeen, or even if UMMC did match with Dr. Sundeen, she would have had to enter as a first-year resident, in essence having to repeat the first year of her residency. *See id.* at 223:10 – 225:15. Several hours after Dr. Earl's February 20, 2017 email, Ms. Whitlock responded confirming approval to officially terminate Dr. Papin. *See* February 20, 2017 email, Ex. S.

## VI.   <u>Dr. Papin's Appeal</u>

On March 3, 2017, Dr. Papin, by and through his counsel, sent a letter to UMMC requesting an appeal of the decision to terminate him. *See* March 3, 2017 letter, attached as **Exhibit T**. On June 8, 2017, <u>nearly five (5) months after Dr. Papin was pulled from duty</u>, Dr. Earl submitted his evaluation of Dr. Papin for his October 2016 rotation through Dr. Earl's Transplant service. *See* Earl Depo. at 121:15 – 122:3. One month later, Dr. Papin was notified that UMMC would finally commence a hearing panel to hear his appeal on July 18, 2017. *See* July 5, 2017 letter from UMMC to Dr. Papin's attorney, attached as **Exhibit U**.

The letter specifically stated Dr. Papin could have counsel present but his counsel would <u>not</u> be permitted to participate. *See id.* The letter included a list of witnesses UMMC intended to call but did not state that Dr. Papin was permitted to call witnesses. *See id.* The letter identified some of the individuals who had complained about him however many of the complaints relayed by the witnesses were not based on personal observations but were based on complaints they had allegedly been told (and the letter did not indicate the identities of the original complainants). *See id.*

As reflected by the Appeal Hearing Transcript, the appeal hearing was held on July 18, 2017. Dr. Steven Bondi was selected to chair the hearing. *See* Appeal Tr. at 4:3-10. At UMMC, Dr. Bondi worked as a Pediatric Critical Care Physician and Director of Risk Management. *See* Steven Bondi's Deposition Transcript (hereinafter, "Bondi Depo"), attached as **Exhibit V**, at 11:22 – 12:13. Prior to joining UMMC, Dr. Bondi was a practicing attorney and graduated from Harvard Law School. *See id.* at 8:4-6, 9:3-14. Dr. Bondi was involved in at least one prior termination appeal at UMMC prior to serving as the chair in Dr. Papin's. Specifically, he was selected to chair a termination appeal hearing of a former employee, Dr. Eklund. *See* letter regarding Eklund hearing, attached as **Exhibit W**. Prior to Dr. Eklund's hearing, the Board of the Trustees of State Institutions of Higher Learning ("IHL Board") reviewed Dr. Eklund's termination and specifically instructed UMMC to provide Dr. Eklund with a due process hearing that included "**<u>the right of confrontation</u>**," to deliver advance notice of documents to be used in the hearing as well as copies of such documents in advance of the hearing, and a hearing officer who is either knowledgeable in due process matters or has access to legal counsel during the course of the hearing to ensure an impartial and fair hearing. *See* March 17, 2016 IHL Board Opinion, attached as **Exhibit X**.

Despite this IHL Board opinion issued less than a year prior to Dr. Papin's termination, and despite many of the issues coming down to an issue of credibility, Dr. Bondi, as the Chair of the Appeal Hearing, chose not to allow Dr. Papin to cross-examine witnesses or present the panel with

a list of cross-examination questions to direct to the witnesses. *See* Appeal Tr. 10:1-3, 50:20 – 51:4; *see also id.* at 85:16-19 (one of the panel members recognizing that it's "[Dr. Papin's] word or [the witnesses'] word."). Additionally, during at least one portion of the hearing, Dr. Papin brought up a question in response to witness testimony and Dr. Bondi neglected to ask the question to the witness or otherwise direct a panel member to ask the question. *See id.* at 89:5-23.

Other comments were made by panel members at the hearing that indicated bias or, by simply mentioning it, could have biased other panel members. For example, during the early part of the hearing, panel member, Dr. Luzardo, asked "what is the purpose of this lawsuit? What does he expect at the end of this lawsuit? What is he in search of? It seems to me that this is beyond a point of no return." *See id.* at 26:13-18. Later in the hearing, during the testimony of witness, Dr. Meghan Mahoney, panel member, Dr. Williams, stated "I know Meghan pretty well and I've worked with her for a good while." *Id.* at 57:4-5.

On July 24, 2017, Dr. Bondi sent Dr. LouAnn Woodward a letter memorializing the panel's decision following the appeal hearing. *See* July 24, 2017 letter, attached as **Exhibit Y**. The panel affirmed Dr. Papin's termination. *See id.*

Following his termination, Dr. Papin tried to salvage his medical career but it became clear that his efforts were fruitless. Given the timing of his termination, in 2017 it was too late for him to enter the match program for the 2018 cycle. *See* Papin Depo. at 8:23 – 9:2. In 2019, he applied to numerous residency programs for the 2020 cycle but received <u>no</u> interviews. *See id.* at 9:3 – 11:13. After being dismissed as a "danger to patients," no other reputable residency program would have him. Defendant Dr. Bondi admitted as much – "I think that it would be extraordinarily challenging to get another job…" *See* Bondi Depo. 177:16-17. Since then, Dr. Papin has worked hard, gone to business school, earned his Master's in Business Administration, and has transitioned into a new career as a consultant. *See id.* at 17:13 – 18:3. But it required accepting that he would no longer work

as a surgeon again, which was his lifelong dream. *See id.* at 12:9-14. It also will never make up for the time and financial resources he sacrificed to complete four years of medical school and postdoctoral fellowship for a career that is now out of reach.

## MEMORANDUM OF LAW

### I.   Motion for Summary Judgment Standard

Pursuant to Fed. R. Civ. P. 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Once a movant submits a properly supported motion, the burden shifts to the nonmovant to show that the court should not grant the motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 321– 25 (1986). The nonmovant then must provide specific facts showing that there is a genuine dispute. *Id.* at 324; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). A dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In deciding a summary judgment motion, the court must draw all reasonable inferences in the light most favorable to the nonmoving party. *Id.* at 255.

### II.   Dr. Papin Did Not Receive Pre-Deprivation Procedural Due Process[2]

---

[2] Plaintiff brought procedural due process claims against UMMC under Miss. Const. Art. 3, § 14, which states: "No person shall be deprived of life, liberty, or property except by due process of law." Plaintiff brought procedural due process claims against Dr. T. Mark Earl, Dr. Steven Bondi, and Dr. LouAnn Woodward, in their individual capacities under 42 U.S.C.A. § 1983 which was passed for the express purpose of enforcing the provisions of the Fourteenth Amendment to the U.S. Constitution. *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 934 (1982). Like Miss. Const. Art. 3, § 14, the Fourteenth Amendment states: "[No state shall] deprive any person of life, liberty, or property, without due process of law." In Mississippi it is presumed that "similar sections of the United States Constitution and the Mississippi Constitution ought to be construed similarly." *Watts v. State*, 818 So. 2d 1207, 1210 (Miss. Ct. App. 2002) (quoting *McCrory v. State*, 342 So.2d 897, 900 (Miss.1977)). Accordingly, case law analyzing due process under 42 U.S.C.A. § 1983 can be equally applied to Plaintiff's claims brought under Miss. Const. Art. 3, § 14.

A plaintiff is entitled to the protections of due process if he has a property interest in his continued employment or education. *Davis v. Mann*, 721 F. Supp. 796, 798 (S.D. Miss. 1988), *aff'd*, 882 F.2d 967 (5th Cir. 1989) (citations omitted). Fifth Circuit case law is clear that government employees, dismissible only for cause, including medical residents of public institutions, have a property interest in their continued employment. *Walsh v. Hodge*, 975 F.3d 475, 481 (5th Cir. 2020); this court is of the opinion that plaintiff was afforded at least as much procedural protection as the fourteenth amendment requires. *Davis*, 721 F. Supp. at 799 (in a medical resident dismissal, the Southern District of Mississippi held "the plaintiff was afforded at least as much procedural protection as the fourteenth amendment requires"). Dr. Papin thus qualifies for the protections of due process in that he was employed by a public institution and was dismissible only for cause.

The essential elements of procedural due process are notice and an opportunity to respond. *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 546 (1985). The extent of due process owed is determined by weighing three factors set forth by *Mathews v. Eldridge*: (1) "the private interest"; (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards"; and (3) "the Government's interest", including the costs of providing additional procedural safeguards. 424 U.S. 319, 335 (1976). Hence, due process is "flexible and calls for such procedural protections as the particular situation demands." *Gilbert v. Homar,* 520 U.S. 924, 903 (1997) (citation omitted).

Turning first to the notice requirement, for notice to be proper it must be apprise the employee in "sufficient detail to permit him to show any error that may exist." *Wells v. Dallas Indep. Sch. Dist.*, 793 F.2d 679, 682 (5th Cir. 1986); s*ee also Davis*, 721 F. Supp. at 803. For example, in *Wells*, the Fifth Circuit Court of Appeals described the following complaints as "vague" and insufficient to establish the plaintiff received sufficiently detailed notice:

> 1. Negligence and misconduct in the management and supervision of the activities and affairs of the department under your control;

4. Approval by you and persons under your direct supervision and control of payments for charges that you knew or should have known were unreasonable and excessive on various construction and repair jobs performed throughout the District;

5. Failure to ensure adequate job site supervision either by DISD staff or outside architects and engineers under contract to the District for such purposes;

6. Attempting, by intimidation or other means, to require principals and other persons at various schools and job sites to improperly and falsely approve work performed on facilities under their control and supervision;

7. Failing to maintain adequate procedural and other safeguards as to competitive bidding;

8. Abuse and misuse of the emergency contract procedures and open purchase order procedures of the District by you and those under your supervision and control.

*Wells*, at 682–83.

In the instant case, the detail provided with respect to Dr. Papin's complaints was equal to, if not less than what is included above, particularly prior to his effective termination. During all of Dr. Earl's meetings or written communications with Dr. Papin, Dr. Earl used vague and generalized complaints about Dr. Papin's performance such as "poor inter-professional communication" and "condescending tone to nurses and fellow residents." *See* Dec. 20 email, Ex. K; *see also* Remediation Agreement, Ex. P. Furthermore, the seminal event triggering the remediation was the allegations of causing "patient harm" and/or moving providing care for patients. *See* Remediation Agreement, Ex. P; Appeal Tr. at 12:9-17, 17:16 – 19:14. Yet Dr. Papin was never given the records for the patient which was identified and was never even told which patient it was! As such, Dr. Papin was left to rebut vague allegations of "patient harm" without any capability of rebuttal. *See* Interview Tr. at 17:4 – 18:15. Without the names of patients he allegedly harmed, the comments he made that were

interpreted as condescending, or the identities of the individuals he allegedly upset, Dr. Papin cannot possibly defend himself against such allegations.

For notice to be perfected, notice must also be timely. *See Davis*, 721 F. Supp. at 803; *Coburn v. City of Bossier City*, No. 5:09-CV-01970, 2012 WL 1071184, at *6 (W.D. La. Mar. 5, 2012), *modified on reconsideration*, No. 5:09-CV-01970, 2012 WL 2427038 (W.D. La. June 26, 2012). In *Davis*, the Southern District of Mississippi held that notice was not timely where the plaintiff was presented with the charges against him at the hearing. 721 F. Supp. at 803. The Court held that "Davis could not have been expected to prepare and present on that day a defense to those charges of which he had not received detailed notice." *Id.* Likewise, in *Coburn*, the Western District of Louisiana held that plaintiff did not receive timely notice where the notice and opportunity to be heard occurred simultaneously with her termination. 2012 WL 1071184, at *6; s*ee also Samuel v. Holmes,* 138 F.3d 173 (5th Cir.1998) (holding notice inadequate for due process purposes where employee received first notice of possible termination twenty minutes prior to meeting).

To the extent UMMC construes Dr. Papin's January 27, 2017 "interview" as a pre-termination due process hearing, such argument will inevitably fail because Dr. Papin did not receive timely notice of the charges against him in advance of the hearing or the opportunity to review any of the relevant records from the patients which were brought to his attention. Prior to the interview, Dr. Papin inquired into the purpose of the meeting and UMMC intentionally withheld information from Dr. Papin regarding what would be discussed at the meeting. *See* Jan. 25 email, Ex. R. Then, during the course of the meeting, UMMC raised brand new complaints or raised new details surrounding former complaints that Dr. Papin was learning for the first time. See Interview Tr. at 13:21 – 14:14-18, 17:4-16. By intentionally ambushing him with new information at the meeting, Dr. Papin did not have time to prepare and present a response. As such, there is no question that Dr. Papin did not receive pre-termination due process.

## II.     Dr. Papin Did Not Receive Post-Deprivation Due Process

While Dr. Papin was provided with a post-termination hearing, it too falls far short of providing the requisite procedural due process required by law. In a faculty dismissal case of a tenured professor, the Fifth Circuit Court of Appeals previously held a plaintiff was entitled to the following:

> (1) [To] be advised of the cause for his termination in sufficient detail so as to enable him to show any error that may exist; (2) be advised of the names and the nature of the testimony of the witnesses against him; (3) a meaningful opportunity to be heard in his own defense within a reasonable time; and (4) a hearing before a tribunal that possesses some academic expertise and an apparent impartiality toward the charges.

*Levitt v. Univ. of Texas at El Paso*, 759 F.2d 1224, 1228 (5th Cir. 1985).Dr. Papin's post-termination hearing provided him with almost none of the above.

As an initial matter, Dr. Papin did not receive sufficient detail supporting the causes of his termination. Many of the complaints addressed at the hearing were the same vague complaints raised in prior conversations between Dr. Earl and Dr. Papin, and likewise in Dr. Papin's "interview." *See* July 5, 2017 letter, Ex. U. As explained above, without sufficient detail regarding the precise conduct complained of and the identity of the individual(s) who witnessed the alleged conduct, Dr. Papin could not possibly prepare and present a defense. *See Wells*, 793 F.2d at 682. Furthermore, while Dr. Papin was eventually provided with the identity of the decubitus ulcer patient he allegedly caused harm to, UMMC failed to identify any other patients he allegedly caused harm to. UMMC could not do so because they admittedly <u>did not conduct any investigation</u> into these alleged instances of "patient harm" or review the medical charts for such patients either. *See* Earl depo. at 78:9 – 79:4.

Dr. Papin also did not receive a meaningful opportunity to be heard in that he was deprived of the opportunity to cross-examine witnesses, or otherwise present the panel with a list of questions for cross-examination. The Supreme Court has described cross-examination as "the law's most

useful weapon against fabrication and falsehood. As a test of the accuracy, truthfulness, and credibility of testimony, there is no other means as effective." *Prewitt v. State*, 156 Miss. 731, 126 So. 824, 825 (1930). Recently, the Fifth Circuit Court of Appeals, in *Walsh v. Hodge*, 975 F.3d 475 (5th Cir. 2020), established that, in cases "where credibility of witnesses is critical and the sanction imposed would result in loss of employment," due process required that the plaintiff have an opportunity to test the witnesses' credibility. *Id.* at 484-85. Specifically, "due process in the university disciplinary setting requires 'some opportunity for real-time cross-examination, even if only through a hearing panel.'" *Id.* at 485 (citing *Haidak v. Univ. of Mass.-Amherst*, 933 F.3d 56, 69 (1st Cir. 2019)). The Fifth Circuit came short of requiring that cross-examination be conducted by the accused party, but noted "we have no reason to believe that questioning . . . by a neutral party is so fundamentally flawed as to create a categorically unacceptable risk of erroneous deprivation." *Id.* (citations omitted).

In light of the foregoing it is abundantly clear there is no legitimate reason why UMMC could not permit Dr. Papin to cross-examine the witnesses or, at a minimum, submit a list of questions for cross-examination to be asked by the panel members. UMMC's insistence on not permitting Dr. Papin to propound his own follow-up questions, going so far as to flagrantly ignore relevant questions Dr. Papin did actually raise at the hearing, evidences their outright disregard for Dr. Papin's due process rights.

It also became evident during Dr. Papin's post-termination hearing that certain panel members evidenced bias towards UMMC and against Dr. Papin. "The Supreme Court has emphasized that a 'fair trial in a fair tribunal is a basic requirement of due process.'" *Walsh*, 875 F.3d at 482 (quoting *Withrow v. Larkin*, 421 U.S. 35, 46 (1975); *In re Murchison*, 349 U.S. 133, 136 (1955)). During Dr. Papin's post-termiantion hearing two panel members made comments evidencing bias of the panel. Dr. Williams stated he knew Dr. Mahoney and worked with her for a good while. *See*

Appeal Tr. at 57:4-5. More alarming, Dr. Luzardo, asked "what is the purpose of this lawsuit? What does he expect at the end of this lawsuit? What is he in search of? It seems to me that this is beyond a point of no return." *See id.* at 26:13-18. Such comments simply do not evidence a fair trial in a fair tribunal, and show a pre-ordained conclusion before the appeal hearing even truly began, and that the appeal was nothing but a formality.

Finally, Dr. Papin did not receive a meaningful opportunity to be heard in that his post-termination hearing was nothing more than a sham. In *Tercero v. Texas Southmost Coll. Dist.*, No. 1:16-CV-282, 2018 WL 4333996 (S.D. Tex. June 4, 2018), the District Court for the Southern District of Texas addressed a similar issue. *Id.* at *4-5. The plaintiff, a college President, argued her termination hearing was nothing more than a sham because (1) her office had been cleared out before the hearing started, (2) TSC Board members had made comments to the local newspaper that could be interpreted as the board members having already decided to fire Tercero, and (3) TSC's interim president announced before the hearing that the District had started the search for a new president. *Id.* at *4. The court agreed and held this was sufficient evidence to allow a reasonable jury to believe the hearing was nothing more than a sham. *See id.* at *5.

The facts of this case go beyond those of *Tercero*. UMMC had already replaced Dr. Papin <u>four months</u> prior to his post-termination hearing. CITE. By the time of his post-termination hearing he had not worked for the medical center for more than six (6) months. Additionally, there is evidence that the decision to terminate Dr. Papin was rushed to ensure a particular favored candidate would be secured the position. CITE. Even setting the timing of Dr. Papin's termination aside, Dr. Earl made clear that he assumed Dr. Papin would fail – going as far as to state that Dr. Papin would not be working at the medical center come July 2017, regardless of HR's determination. *See* Feb. 20, 2017 email thread, Ex. S.

There is no question that the decision-makers in his case – the pre-termination decision-makers (Dr. Earl and HR), and the post-termination decision-makers, the hearing panel – were aligned in having prejudged the outcome of Dr. Papin's future with the medical center long before the hearing ever began. Such conduct could not possibly be construed as the requisite due process afforded to an individual being deprived of their employment and their lifelong dream of working as a surgeon.

**III.   Defendants' Mississippi Tort Claims Act Affirmative Defense Does Not Apply To Plaintiff's Breach of Contract Claim**

In his Second Amended Complaint, Plaintiff alleged a breach of contract claim against Defendant UMMC based on express terms of contracts executed between UMMC and Plaintiff. *See* Second Amended Complaint at D.E. 50, ¶¶ 81 – 89. In response, Defendant UMMC filed its Answer and Affirmative Defenses asserting various affirmative defenses. *See* D.E. 57. Within UMMC's operative Answer, UMMC alleged that "Defendants are immune from claims in this action pursuant to the Mississippi Tort Claims Act…" *Id.*, Third Defense at p. 1. Defendant UMMC did not parcel out which claims it alleges it is or is not immune from under the Mississippi Tort Claims Act (the "MTCA"), but just wholly alleged it is immune for <u>all</u> counts of Plaintiff's Second Amended Complaint, including the breach of contract claim in Count I.

"By enacting Miss. Code Ann. §§ 11–46–1 et seq., the Legislature defined the parameters for sovereign immunity within this state. This group of statutes is commonly known as the "Mississippi Tort Claims Act" and has been amended on numerous occasions since its original enactment in 1984." *City of Jackson v. Estate of Stewart ex rel. Womack*, 908 So.2d 703, 709 (Miss. 2005).  While common torts are subject to the MTCA, certain causes of action are not included or covered by the MTCA. One such cause of action is a breach of contract claim based on express terms of a contract. "The Mississippi Supreme Court has confirmed that the State is not immune from suit for breach of its written contractual obligations." *Weible v. University of Southern Mississippi*, 89 So.3d 51, 59 (Miss.

Ct. App. 2011) (citing *Stewart*, 908 So.2d at 710–11; and *Estate of Spiegel v. Western Sur. Co.*, 908 So.2d 859, 863–64 (¶ 18) (Miss. Ct. App. 2005) (stating *Stewart* reaffirmed that the MTCA does not apply to actions for breach of express contract)). Federal courts in Mississippi have similarly construed the MTCA. *See Dukes v. City of Lumberton*, 2018 WL 1612199, *4 (S.D. Miss. April 3, 2018) ("While the MTCA maintains the sovereign immunity of the State and its political subdivisions against claims for claims of "breach of implied term or condition of any warranty or contract," MISS. CODE ANN. § 11-46-3(1), its provisions do not apply to "actions for breach of the express terms of a contract.") (internal citations omitted).

Here, Plaintiff's breach of contract claim is based on express terms of contracts between him and UMMC. As an example, in his Second Amended Complaint, Plaintiff clearly alleged that he entered into a contract with UMMC that stated UMMC promised not to terminate Plaintiff except for "malfeasance, inefficiency or contumacious conduct." *See* D.E. 50, at ¶¶ 82 and 84.   This contract is attached to this Motion as Exhibit B.   Whether UMMC violated this contract with Plaintiff is riddled with factual disputes and will be decided by a jury after hearing all of the evidence. What is not in dispute is that the breach of contract claim in Count I is based on express terms of a contract, and as such, the MTCA does not apply.   As such, Plaintiff respectfully requests this Court issue summary judgment in Plaintiff's favor and rule that UMMC's MTCA defense does not apply to Plaintiff's breach of contract claim.

**V.   Conclusion**

For the reasons stated more fully above, there is simply no genuine dispute that UMMC failed to provide Dr. Papin with the requisite procedural due process, both immediately preceding his termination and then at his post-termination hearing, by failing to provide him with adequate notice and a meaningful opportunity to be heard. During all times, UMMC failed to provide Dr. Papin with sufficient details regarding his alleged performance deficiencies, relying on nothing more

than generalized workplace gossip and hearsay. Dr. Papin was further not provided with advanced notice of the charges against him and expected to present an on-the-fly defense. Then after he was terminated and he requested an appeal, UMMC conducted a sham hearing in which it was clear that several panel members harbored bias in favor of UMMC and against him, denied any sort of possible cross-examination, and the rubber stamping of his termination was a foregone conclusion. Such conduct falls woefully short of satisfying the minimal procedural safeguards afforded to employees, like Dr. Papin, whose entire career, and years of hard work and financial sacrifice to get there, is on the line.

Accordingly, this Court should hold that UMMC violated Dr. Papin's procedural process rights. Additionally, this Court should hold that Defendants' Mississippi Tort Claims Act defense does not apply to Dr. Papin's breach of contract claims in light of the relevant binding case law cited herein.

Dated: <u>March 1, 2021</u>

<div style="margin-left:40%">

**/s/ C. Ryan Morgan**
C. RYAN MORGAN, ESQ.
(*admitted pro hac vice*)
Florida Bar No.: 0015527
GREGORY R. SCHMITZ, ESQ.
(*admitted pro hac vice*)
Florida Bar No.:  0094694
20 North Orange Avenue, Suite 1400
Orlando, Florida 32801
Telephone:  (407) 204-2170
Facsimile:  (407) 245-3401
E-mail: gschmitz@forthepeople.com
        rmorgan@forthepeople.com
        mbarreiro@forthepeople.com
        egeorge@forthepeople.com

MARTIN R. JELLIFFE, ESQ.
Martin R. Jelliffe, Esq. (MSB#: 3067)
MORGAN & MORGAN, PLLC
4450 Old Canton Road, Suite 200
Jackson, Mississippi 39211
Phone:601-503-1676

</div>

Fax: 601-503-1625
Email: mjelliffe@forthepeople.com

***Attorneys for Plaintiff***


## CERTIFICATE OF SERVICE

I hereby certify that on March 1, 2021, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will automatically send email notification of such filing to all counsel of record.

*/s/ C. Ryan Morgan*
*C. RYAN MORGAN, ESQ.*
*(admitted pro hac vice)*