EXHIBIT "A" - Papin Deposition

# Joseph Papin v. University of Mississippi Medical Center, et al.

## Joseph Papin

## January 22, 2021

All depositions & exhibits are available for downloading at
<www.brookscourtreporting.com>
Please call or e-mail depo@brookscourtreporting.com if you need a
**Username** and **Password.**



**Mississippi - Louisiana - Tennessee - New York**
**1-800-245-3376**

Joseph Papin 1/22/2021

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION


JOSEPH PAPIN

                                    PLAINTIFF


V.          CIVIL ACTION NO. 3:17-CV-763-CWR-FKB


UNIVERSITY OF MISSISSIPPI
MEDICAL CENTER; DR.
LOUANN WOODWARD, IN HER
OFFICIAL CAPACITY; AND
DR. T. MARK EARL, IN HIS
INDIVIDUAL CAPACITY

                                    DEFENDANTS


DEPOSITION OF JOSEPH PAPIN


Taken at the instance of the Defendant at
Whitfield Law Group 660 Lakeland East, Suite 200
Flowood, Mississippi 39232, on Friday,
January 22, 2021,
beginning at 9:30 a.m.


REPORTED BY:

ROBIN G. BURWELL, CCR #1651

Joseph Papin 1/22/2021

```
 1    APPEARANCES:

 2

 3         C. RYAN MORGAN, ESQ.
           Morgan & Morgan
 4         20 North Orange Avenue, Suite 1400
           Orlando, Florida 32801
 5         rmorgan@forthepeople.com

 6

 7              COUNSEL FOR PLAINTIFF

 8

 9         TOMMY WHITFIELD, ESQ.
           Attorney At Law
10         660 Lakeland East, Suite 200
           Flowood, Mississippi 39232
11         tommy@whitfieldlaw.org

12

13              COUNSEL FOR DEFENDANT

14

15

16

17

18

19

20

21

22

23

24

25
```

Joseph Papin 1/22/2021

1                    INDEX

2  Style and Appearances.......................1

3  Index   .....................................4

4  Certificate of Deponent  .................238

5  Certificate of Court Reporter ...........239

6                  EXAMINATIONS

7  Examination By Mr. Whitfield ...............5

8  Examination By Mr. Morgan ................235

9                    EXHIBITS

10  Exhibit 1 Payment History, Programs .......9

11  Exhibit 2 Accenture Contract .............19

12  Exhibit 3 2019 Accenture W2 ..............20

13  Exhibit 4 Answers to Interrogatories .....21

14  Exhibit 5 House Officer Contract .........26

15  Exhibit 6 Trainee Evaluation Summary .....51

16  Exhibit 7 Analysis of Trainee ............56

17            Comments

18  Exhibit 8 E-mails Papin-438 and 439 ......72

19  Exhibit 9 E-mail from Renee Greene .......85

20  Exhibit 10 CCC Meeting, Notes ...........116

21            Papin-649 - 650

22  Exhibit 11 Resident Performance .........119

23            Profile

24  Exhibit 12 E-mail from Dr. Truman .......125

25            Papin-459

Joseph Papin 1/22/2021

1    Exhibit 13 12/27/16 Progress Note .......143

2            Decubitis Ulcer

3    Exhibit 14 Transcript of Papin ..........147

4            Interview with HR

5    Exhibit 15 12/12/16 Progress Notes .......152

6    Exhibit 16 Progress Notes Papin-3353 .....157

7            - 3384

8    Exhibit 17 E-mails Papin-440 - 445 .......193

9    Exhibit 18 Letter Papin-446 - 447 .......203

10   Exhibit 19 Hearing Transcript ............220

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Joseph Papin 1/22/2021

```
 1                    JOSEPH PAPIN,
 2   having been first duly sworn, was examined and
 3   testified as follows:
 4   EXAMINATION BY MR. WHITFIELD:
 5        Q.   Would you state your name for the
 6   record?
 7        A.   Joseph Edward Papin, IV.
 8        Q.   I'm sure your attorney has kind of gone
 9   over with you how a deposition works.  But, have
10   you ever sat for a deposition before?
11        A.   No, I have not.
12        Q.   I'm going to be asking you questions
13   under oath.  We need you to answer yes or no.
14   Head shakes and uh-huhs and huh-huhs don't really
15   translate well because she has to take it all
16   down.  Also, please let me finish my question and
17   then answer.  And I'll try to let you finish your
18   answer before I ask the next question.  Because
19   she gets really mad when we talk over each other,
20   and it messes up her record.  We want to keep her
21   happy today.
22             We'll go through this and we'll take
23   breaks probably every hour, hour-and-a-half, just
24   to give you a chance to refresh and regroup.  If
25   you need a break at anytime, just let me know.
```

Joseph Papin 1/22/2021

```
 1    This isn't a sprint, isn't a marathon.  So if you
 2    need a break, let me know.  I only ask that you
 3    answer the question that's on the table before you
 4    take the break.
 5         A.    Okay.
 6         Q.    I'm going to copy from my colleague here
 7    and ask you two questions.  Have you ever been
 8    convicted of a crime?
 9         A.    No.
10         Q.    Are you under the influence of any drugs
11    or medication that would prevent you from
12    answering truthfully today or affecting your
13    memory?
14         A.    No.
15         Q.    Let's get started.  Will you tell me
16    where you're living now.
17         A.    Orlando, Florida.
18         Q.    And how long have you been in Orlando?
19         A.    Grew up there, but most recently I came
20    back in May of 2020.  May, June-ish.
21         Q.    Where were you before May?
22         A.    Ann Arbor, Michigan.
23         Q.    How long were you in Ann Arbor?
24         A.    Two years, approximately.
25         Q.    And before that, where were you?
```

Joseph Papin 1/22/2021

```
 1        A.    Florida.

 2        Q.    Back in Orlando?

 3        A.    Yes, Orlando area.

 4        Q.    How long were you there?

 5        A.    That would have been, I want to say,

 6  June 2017 through June-ish 2018.

 7        Q.    And before that, where were you?

 8        A.    Brandon, Mississippi.

 9        Q.    And how long were you in Brandon?

10        A.    It was June 2016 to June 2017, or June

11  1st, 2017, if I remember correctly.

12        Q.    And before Brandon?

13        A.    Before Brandon, I was in Ann Arbor,

14  Michigan.

15        Q.    How long were you in Ann Arbor?

16        A.    That would have been five years.

17        Q.    And before that?

18        A.    Gainesville, Florida.

19        Q.    How long were you in Gainesville?

20        A.    Four years.

21        Q.    Starting in Gainesville going back the

22  other direction, why were you in Gainesville?

23        A.    I was an undergraduate at the University

24  of Florida.

25        Q.    What made you move to Ann Arbor?
```

Joseph Papin 1/22/2021

```
 1         A.    Medical school.

 2         Q.    I see you were in Ann Arbor five years.

 3    Medical school is four.  What did you do for the

 4    extra year?

 5         A.    I did a post-doctoral fellowship in

 6    house services research.

 7         Q.    And what brought you to Mississippi?

 8         A.    Surgical residency.

 9         Q.    And then for the year that you were in

10    Florida from June of '17 to June of '18, what were

11    you doing then?

12         A.    Living with my parents.

13         Q.    Were you working anywhere?

14         A.    No.

15         Q.    Why didn't you seek employment?

16         A.    During that time?

17         Q.    Uh-huh.  (Affirmative response.)

18         A.    I did seek employment during that time.

19    I sent out applications to a few consulting

20    companies, sent applications to similar types of

21    companies, to consulting companies, things like

22    that.  I didn't even get an interview offer.

23         Q.    Did you attempt to re-enter the match in

24    2017, 2018?

25         A.    2017 -- by the time I was terminated
```

Joseph Papin 1/22/2021

```
 1    from Mississippi, it was too late to enter the
 2    match.  So 2017, no.  2018, no as well.
 3         Q.   What about 2019?
 4         A.   2019, I did.
 5         Q.   Is that entering in 2019 to match in
 6    2020 or entering in 2018 to match in 2019?
 7         A.   That's a good question.  So it would
 8    have been -- so the application would have gone
 9    out -- if I remember correctly, it would have gone
10    out towards the end of 2018 to begin July of 2019.
11    So entering class of 2019.
12              (Exhibit 1 marked for identification.)
13         Q.   (By Mr. Whitfield)  I'm going to hand
14    you now what's been marked as Exhibit No. 1.
15         A.   Thank you.
16         Q.   This is a document that was provided by
17    your lawyers in discovery for entering the match.
18         A.   Okay.
19         Q.   And it looks like this was entered on
20    January 7th, 2020.
21         A.   Okay.
22         Q.   And you applied to, looks like, nine
23    different programs?
24         A.   Ten.
25         Q.   Is this the entry into the match that
```

Joseph Papin 1/22/2021

```
 1   you're referring to?
 2        A.    Yes.
 3        Q.    So it was actually in 2020, and not --
 4        A.    So this would have been -- okay.  So
 5   this would have been for entering class of 2020
 6   then.  That's correct.
 7        Q.    Entering class of 2020 or entering class
 8   of 2021?
 9        A.    That is a good question.  So the date on
10   this is Thursday, May 28th, 2020.  Oh, right.  So
11   this would have been the entering class of 2020,
12   because I believe --
13        Q.    According to this, there's only about a
14   month between the date you applied and the
15   entering class of 2020.
16        A.    Right.  I don't know what this -- is
17   this -- so this is ERAS, and this was on the -- so
18   the invoice is from -- ours is a little confused.
19   At the top it says May 28th.  I assume that's the
20   retrieval date.  And then on the invoice it's from
21   January 7th, 2020.  So this would have been for
22   the match class entering 2020.
23        Q.    Don't they do interviews and all of that
24   before January of 2020?
25        A.    You can.  Certainly they go through --
```

Joseph Papin 1/22/2021

```
 1    usually the season is December through February,
 2    if I remember correctly, is the interview season.
 3    Applications open sooner than that, and then most
 4    programs enter between December and February.
 5         Q.   So to go back to what we were talking
 6    about a minute ago, you did not apply back to the
 7    match for the 2018 year and you did not apply for
 8    the match for the 2019 year?
 9         A.   That's correct.  It was not 2018, not
10    2019.  It was 2020.
11         Q.   And did you get any interviews or match
12    anywhere?
13         A.   I did not.
14         Q.   Now, I believe there are many, many
15    programs to match into.  Why did you only select
16    10?
17         A.   Well, cost is prohibitive, and I felt
18    like I was, you know -- had there not been this
19    sort of black cloud, I felt like I could have been
20    competitive for a good amount of these programs.
21    But, you know, cost -- the way that the programs
22    are set up is you buy them in bundles.  I can't
23    recall the exact bundles, but it's like you buy
24    10, it's a certain price; you buy 25, it's a much
25    more; you buy another 25, much, much more.  Things
```

Joseph Papin 1/22/2021

1    like that.

2         Q.   Now, it doesn't reflect on here, but was

3    this only for categorical matching?

4         A.   Yes, I believe so.

5         Q.   Why did you not enter for a preliminary

6    spot?

7         A.   I wasn't interested in a preliminary

8    spot.

9         Q.   Did you apply to any other specialties?

10        A.   No.  I wanted to be a surgeon my whole

11   life.  I had trained and done the necessary things

12   to become a surgeon.  So surgery was, within

13   medicine, what I wanted and still would like to

14   be.

15        Q.   Now, the year after you graduated from

16   med school you said you did a post-op research

17   fellow.  Did you not enter the match that year?

18        A.   The year -- sorry, can you --

19        Q.   For your senior year, did you enter the

20   match to match going out of med school?

21        A.   I did.

22        Q.   Did you match anywhere?

23        A.   I did not.  That was in neurosurgery.

24        Q.   So because you didn't match in neuro,

25   you took a research year?

Joseph Papin 1/22/2021

```
 1          A.    I mean, I had been planning on it, but,
 2    you know, once I didn't match, I needed something
 3    to do.  So I wouldn't say that it was definitely
 4    the cause of it, but, you know, be something to do
 5    that year.
 6          Q.    Why didn't you reenter the match for the
 7    2018 and the 2019 cycles?
 8          A.    I was in business school, so I had --
 9    when I was dismissed from the University of
10    Mississippi I studied for the GMAT, took the GMAT,
11    was admitted to the University of Michigan's law
12    school of business.  Went to business school.  I
13    had been advised by several people that having
14    been dismissed -- anytime that you -- when you go
15    to apply to a program, you have to check a box
16    that says you've been dismissed from a program.
17    And that pretty much disqualifies you from just
18    about everything.
19          Q.    Who are these people that advised you
20    that?
21          A.    Some fellow classmates of mine.
22          Q.    What are their names?
23          A.    I don't recall.  It's been four years
24    since then.  But, you know, my own intuitive
25    sense, when you click in -- surgery, medicine in
```

Joseph Papin 1/22/2021

1    general, sometimes there's 5,000 applications for

2    a single seat.  So if somebody has -- I've been

3    dismissed from a program, I've been labeled a

4    danger to patients, they'll go to one of the other

5    4,999 applicants.

6         Q.   So this never came from anywhere

7    official, it came from your classmates and your

8    own intuition?

9         A.   There's no official source of

10   information.  There's no official mentor, you

11   know, like program where you go and you tell

12   someone your statistics and they'll guarantee you

13   a match or anything like that.  Official as it

14   could be, but there's no official -- nobody is

15   official and nobody can tell where you're going to

16   end up or how you'll end up.

17        Q.   But you didn't get that from a program

18   director or somebody working inside a surgery

19   program, you got that from your classmates?

20        A.   Things like that, yeah.  So that was

21   another question, if I start to speak to people

22   about surgery and about my history, it could then

23   close the loop or close that as an avenue for me

24   applying to surgery programs.  So, if I tell a

25   program director in surgery, hey, what do you

Joseph Papin 1/22/2021

```
 1   think, this is what happened, it might be
 2   prejudicial and they may no longer want me.
 3       Q.   That was a decision you came to on your
 4   own?
 5       A.   No.  Again, these were things -- me
 6   partly, yes, but they were things that others
 7   advised too.  Just intuitively being labeled a
 8   danger to patients as a doctor, it's a Scarlet
 9   letter, nobody wants it, nobody would want it for
10   anybody else.
11       Q.   So instead of trying to continue your
12   medical career you decided to go to graduate
13   school?
14       A.   Not instead of.  I went to graduate
15   school, but not instead of my medical career.
16       Q.   Well, you didn't apply to the match
17   which is what you had do to move forward?
18       A.    Well, you don't need to go into the
19   match as far as I have learned.  So you can also
20   send applications outside of the match.  It's
21   easiest and the most organized way is through the
22   match, but once you work -- I believe if you
23   complete six months of your residency -- and this
24   is me, this is kind of a supposition because I'm
25   not giving you guaranteed information, but I
```

Joseph Papin 1/22/2021

```
 1   believe that you can apply outside of the match if
 2   spots open up outside of the match.
 3        Q.   And how many schools did you apply to
 4   outside the match in 2018?
 5        A.   None.
 6        Q.   How many did you apply to in 2019?
 7        A.   None.
 8        Q.   2020?
 9        A.   Outside the match, none.
10        Q.   So if a program didn't fill all of their
11   available spots, you would apply outside the
12   match?
13        A.   So in -- there's another match for that,
14   it's called the SOAP, the supplemental something,
15   something.  So if you go through the match and you
16   as a program have open spots, there's SOAP
17   positions that you then funnel those into the
18   SOAP.  Outside of the match would be like a
19   surgery resident or, you know, quit or was fired
20   seven months in and now they need that spot
21   filled.  So they have an opening.  And they
22   advertise it just like you would, you know, for a
23   job anywhere else.
24        Q.   Did you apply through any of the SOAP
25   positions in 2018?
```

Joseph Papin 1/22/2021

```
1          A.    No, I don't believe you can enter the
2    SOAP unless you've entered the match.
3          Q.    So I'm assuming the same for 2019?
4          A.    That's correct.
5          Q.    And in 2020, did you apply for any of
6    the SOAP positions?
7          A.    No.  I think the SOAP -- no.  I don't
8    believe there were -- and this is just me
9    remembering, but in 2020, I think I looked and
10   there were no SOAP positions available.  I think
11   surgery filled its compliment in 2020.  And they
12   generally do.  It's a competitive match.
13         Q.    What kind of employment have you had
14   since leaving the Med Center?
15         A.    I -- let's see.  I want to make sure I
16   give you the right dates this time.  In June of
17   2019, I started as an intern for Accenture
18   Strategy as a senior consultant -- senior strategy
19   consultant.  Worked there -- it was planned to be
20   three months, I worked there three months.  I
21   believe June, July, and a little part of August.
22   Then I went back to the MBA program.  That's kind
23   of a standard route, you do a summer internship.
24   And then I got a return offer and took that, and
25   then came back to work for Accenture in October of
```

Joseph Papin 1/22/2021

1    2020.  And have been working there ever since.

2         Q.    What do you do for Accenture?

3         A.    I'm a senior strategy consultant.

4         Q.    What does that do?

5         A.    So you advise on gross strategy.  If a

6    company comes to you and they'd like to figure

7    out, you know, where they would want to go with

8    their company, whether they want to acquire

9    others, whether they want to, you know, make a new

10   product, cut out a product line, mergers and

11   acquisitions, helping to integrate companies

12   together, things like that.

13        Q.    Any particular field of companies?

14        A.    Generally life sciences companies is

15   what I've done.  You can align eventually to where

16   you have a specialty.  It just so happens that

17   mine have all been in life sciences companies.

18        Q.    Define more about what life sciences

19   companies is?

20        A.    Like pharmaceutical companies, things

21   like that.

22        Q.    And is that something that they wanted

23   your medical background for?

24        A.    No, I wasn't hired specifically because

25   of my medical background for that.  In fact, most

Joseph Papin 1/22/2021

```
 1    of the people that are senior strategy consultants
 2    and even higher don't have a medical background.
 3    It's just an interest that they may or may not
 4    have.
 5              (Exhibit 2 marked for identification.)
 6         Q.   (By Mr. Whitfield)  I'm going to hand
 7    you what has been marked as Exhibit No. 2.  Now,
 8    is this your current Accenture contract?
 9         A.   I just got through the first page here.
10    This looks like the offer letter.  This was the
11    offer letter.  I don't know if it's, you know,
12    technically called a, you know, the contract and
13    everything like that.  But this is certainly the
14    offer letter.  And I think this is the letter I
15    signed to accept employment there.
16         Q.   This was in August of 2019?
17         A.   That's right.
18         Q.   But you didn't start work for another
19    year?
20         A.   That's right.  So you do your summer
21    internship.  I think it's similar -- somewhat
22    similar to what they do in the law.  You do a
23    summer internship, then you go and finish your
24    second year, which would have been my last year of
25    business school, and then you start after that.
```

Joseph Papin 1/22/2021

```
 1        Q.   Do you get paid while you're in business
 2   school?
 3        A.   No.  That would be nice, though.
 4             (Exhibit 3 marked for identification.)
 5        Q.   (By Mr. Morgan)  I'm going to hand you
 6   now what's been marked as Exhibit No. 3.  This is
 7   your 2019 W2 from Accenture that was provided by
 8   you in discovery.
 9        A.   That's correct.
10        Q.   It says you made a salary of $85,650.69
11   in 2019.
12        A.   That's correct.
13        Q.   So you had a summer internship for
14   24,000?
15        A.   I don't recall that exact number.
16        Q.   You weren't being paid $85,000 for your
17   summer internship.
18        A.   So they give you, obviously, a salary.
19   They give you a bonus for signing.  They give
20   you -- and then once you get a return offer, as
21   you can see in Exhibit 2 here, they give you
22   sign-on bonus and a relocation bonus.  And that's
23   all within 2019.  So that was all counted for
24   income for 2019.
25        Q.   That's your sign-on bonus?
```

Joseph Papin 1/22/2021

```
 1          A.    Full time.
 2          Q.    Your relocation bonus, so now we're up
 3    to 35,000, and then your summer intern money?
 4          A.    Right.   That's correct.
 5                (Exhibit 4 marked for identification.)
 6          Q.    (By Mr. Whitfield)   I'm going to hand
 7    you now what is Exhibit No. 4, which are the
 8    answers to your interrogatories that you provided.
 9    And in interrogatory No. 11, you state that you
10    were hired as an intern for Accenture with an
11    annual salary of 24,000 with no benefits.
12          A.    Do you know the date of this?
13                MR. MORGAN:   Should be at the very end.
14                THE WITNESS:   The date would be helpful.
15    24,000 sounds about right for what I made just in
16    base salary.   But without knowing the date on
17    this, because I would not have known that I was
18    getting -- what I'm guessing is, is that this was
19    probably before I got the full-time offer.
20          Q    (By Mr. Whitfield) These are your
21    answers, so --
22          A.    Right.
23          Q.    And the supplemental answer with your
24    new lawyers.   I'm just asking did you make 24,000
25    on your summer internship program?
```

Joseph Papin 1/22/2021

```
 1        A.   Yeah, I'm telling you that sounds right
 2   in terms of base salary, but there's bonuses that
 3   are not benefits.  I interpreted benefits to be
 4   health insurance, things like that.
 5        Q.   So with the 24,000, the 25,000, the
 6   10,000 relocation bonus, that comes right up to
 7   59,000.  So the other 20,000 is bonuses?
 8        A.   Yeah.  I mean -- I've provided the
 9   breakdown, but the only money that I made is from
10   Accenture.  The only money they've given me is
11   either in salary or bonuses.  So however that
12   breaks down in 2019, I guess the sum of it is
13   $85,650.
14        Q.   From now on it's 155,000 a year plus
15   bonuses?
16        A.   That's right.
17        Q.   How much have you received in bonuses
18   this year?
19        A.   That is new, I think it's just the --
20   don't quote me on this, but on the last page of
21   Exhibit 2, there's a tuition reimbursement.  I
22   don't know that you would call that a bonus, but
23   it's part of the offer where they pay $50,000
24   towards the second year of your primary degree.
25   To my knowledge, that's the -- I don't consider
```

Joseph Papin 1/22/2021

```
 1   that a bonus, it's just a tuition reimbursement.
 2   They've given me that, and then just my base
 3   salary since being at Accenture full time.
 4        Q.   You got a $50,000 tuition --
 5        A.   Reimbursement.
 6        Q.   What tuition did that apply to?
 7        A.   That's for the second year of the MBA
 8   program.
 9             MR. MORGAN:  For the record, I think
10   we'll be coming up here in the next week or so on
11   getting your 2020 W2 -- or 2021 W2 for 2020, and
12   we'll, of course, supplement that.
13        Q.   (By Mr. Whitfield)  Any other jobs or
14   positions outside of Accenture?  Any other
15   consulting work or anything of that nature?
16        A.   Since?
17        Q.   Since you left UMC.
18        A.   I don't believe so, no.
19        Q.   Now I want to go back to, you were in
20   the match for the 2016 cycle, I guess to start
21   school in 20 -- is it a 2015 match or the 2016
22   match?
23        A.   It's confusing.  I would assume -- I
24   think it's the 2016 match.  It's that -- you start
25   in 2015, but it's to enter July 1st, 2016.  I
```

Joseph Papin 1/22/2021

```
 1    would believe -- I believe that's considered the
 2    2016 match.
 3          Q.    Where else did you apply to match?
 4          A.    In general surgery in that match?  It's
 5    been so long I couldn't tell you, but many
 6    programs.
 7          Q.    More than 10?
 8          A.    You know, I can't recall.
 9          Q.    Did you reapply for neurosurgery or just
10    general surgery?
11          A.    Just general surgery.
12          Q.    Did you also apply for categorical and
13    preliminary spots?
14          A.    In 2016?
15          Q.    Yes.
16          A.    You know, I don't recall.
17          Q.    Where all did you interview?
18          A.    In the 2016?
19          Q.    Yes.
20          A.    This isn't going to be a complete list,
21    but the University of Florida, the University of
22    Michigan, the University of Mississippi.  There
23    were more, I just can't remember.  I would say
24    definitely greater than five interviews.
25          Q.    Who were your top choices?
```

Joseph Papin 1/22/2021

```
 1        A.   I don't recall that either.  I think the
 2   University of Florida was probably my top choice.
 3   We submit a rank list in order of our -- of where
 4   we would want to go.  I think the University of
 5   Florida was first on my list that year.  And then
 6   I couldn't tell you what the rest of the list was.
 7        Q.   Was UMC toward the top of your list or
 8   toward the bottom of your list?
 9        A.   Toward the top.
10        Q.   Tell me about your interview with UMC.
11        A.   Anything specifically?
12        Q.   Uh-huh.  (Affirmative response.)
13        A.   I'm asking, is there?
14        Q.   Just in general.
15        A.   I really don't recall too much about it.
16   The only things that I recall is I flew in, was
17   picked up by one of the residents who picked a
18   bunch of us up, drove us to our hotel, and the
19   next day we interviewed, and then I flew out that
20   same day.
21        Q.   Do you know who all you interviewed
22   with?
23        A.   I don't know everybody.  I can recall a
24   few.  I can recall Larry Martin.  I can recall
25   Dr. Earl -- Dr. Larry Martin, Dr. Earl, and
```

Joseph Papin 1/22/2021

```
 1   Dr. Chris Anderson.  There were more, I just can't
 2   remember them all.
 3        Q.   And then you matched apparently with the
 4   University of Mississippi Medical Center?
 5        A.   That's correct.
 6        Q.   To start July 1 --
 7        A.   2016.
 8        Q.   -- 2016.
 9             (Exhibit 5 marked for identification.)
10        Q.   (By Mr. Whitfield)  I'll hand you what
11   has been marked as Exhibit No. 5.
12        A.   Sure.
13        Q.   This is your contract with UMC to be a
14   house officer, correct?
15        A.   That's correct.
16        Q.   That's your signature on the back page?
17        A.   Yeah, it looks like it.  It looks like
18   this has been scanned a few times, but yeah, it
19   looks like it.
20        Q.   And going to the front page, it's
21   between you and the University of Mississippi
22   Medical Center, and they are going to pay you a
23   salary of $47,738 to be a house officer?
24        A.   That's right, yes.
25        Q.   Of course, you would agree with me
```

Joseph Papin 1/22/2021

```
 1    that's less than the 155,000 you're making now?
 2         A.    Sure.
 3         Q.    You started July 1st, 2016?
 4         A.    That's correct.  I think officially that
 5    was my first day -- looking at this contract, now
 6    that I'm looking at it and remembering it, it
 7    looks like June 28th was probably -- you go in for
 8    orientation, things like that, but July 1st would
 9    have been my first day, you know, physically
10    acting in capacity of a doctor.
11         Q.    Do you remember what service you were on
12    to start with?
13         A.    I do.  It was the cardiovascular ICU.  I
14    was the first ever surgical resident to rotate
15    through there.
16         Q.    Resident or intern?
17         A.    Definitely intern.  I believe resident
18    overall.
19         Q.    There was a fellow on that service as
20    well; is that correct, Dr. Miguel Urencio?
21         A.    No.  Dr. Miguel Urencio was a fellow in
22    cardiothoracic surgery, but he wasn't on that
23    service.  I was in the cardiovascular ICU, he was
24    a cardiothoracic surgeon who -- his job was to
25    basically learn how to operate on cardiothoracic
```

Joseph Papin 1/22/2021

```
 1    patients, but he wasn't on the service in any sort
 2    of official capacity with us.
 3         Q.   Tell me about your first rotation.  What
 4    did you do, what were your job duties?
 5         A.   Sure.  So I met with Dr. Shake at the
 6    beginning of the rotation, Dr. Jay Shake.  He was
 7    the attending kind of in charge of the rotation.
 8    And he told me that my responsibilities, you know,
 9    just briefly were, you know, do what you can on
10    the floor.  I realize you're a first month intern,
11    we're not expecting too much of you.  Your job is
12    really just to learn.  That's really the number
13    one responsibility.  And then when -- there will
14    be a lull at some point in the day.  If you want,
15    you can go down to the operating room, just go
16    down, learn what you can there, too.
17              And then in terms of responsibilities,
18    we were assigned some patients.  The nurse
19    practitioners -- it was completely a nurse
20    practitioner run service.  There's an MD attending
21    presiding over everything, but in terms of the
22    day-to-day things, who handled putting in orders,
23    writing, things like that, those are nurse
24    practitioners.  So we would split up the patients.
25    I would see some before they rounded, they would
```

Joseph Papin 1/22/2021

```
 1   see some.  We would go and round.  And then I
 2   would be responsible for putting in the notes,
 3   putting in the orders, and anything else that
 4   might arise throughout the day for them.
 5        Q.   We'll talk about this a lot in more
 6   detail as we go through this deposition today.
 7   Tell me what rounding is.
 8        A.   Sure.  So rounding is, you get -- and
 9   there's different types of rounds.  There's
10   pre-rounding, there's table rounding, there's
11   rounding.  I'll just go into rounding right now.
12   That's where you get the whole team, the
13   multi-disciplinary team, whatever it is.  It's
14   usually an attending and residents, and usually
15   that's the bare minimum.  If there's nurse
16   practitioners on the service, they'll come, too.
17             And you go room to room.  Right outside
18   the person's room you'll discuss their case,
19   what's been going on, any updates, anything that's
20   concerning.  Then you'll go in and you'll see the
21   patient with the attending.  Everyone goes in or
22   just the resident and the attending go in
23   sometimes.  And then I would speak to the patient,
24   elicit a history and a physical as necessary, come
25   back out, kind of finalize the plan.  Move on to
```

Joseph Papin 1/22/2021

```
 1   the next person until the whole list is done.
 2         Q.   You mentioned pre-rounding.  What is
 3   pre-rounding?
 4         A.   Pre-rounding is anytime -- you consider
 5   rounding in the sense that it's used with an
 6   attending physician.  Pre-rounding is when you're
 7   rounding without an attending physician.  So
 8   whether that's just me going around, that's
 9   pre-rounding.  Whether I take a med student,
10   something like that, that's pre-rounding.  When a
11   med student goes, they're pre-rounding, too.
12         Q.   Fair to say that pre-rounding is you
13   getting ready to round with the attending?
14         A.   That's correct.
15         Q.   What are your responsibilities on
16   pre-rounding?
17         A.   So pre-rounding, what you want to do is
18   you want to gather, you know, like the vitals from
19   the night before, things like that, how they've
20   been doing, what they look like.  You want to look
21   at labs that have come out in the morning.
22   Usually, especially in the ICU, there's routine
23   labs that are drawn.  You look at the morning
24   labs.  Any imaging that was done since you last
25   saw, if it was overnight, anything like that.  And
```

Joseph Papin 1/22/2021

```
 1    then you want to -- so that's kind of like the
 2    objective part of it, the data that's coming in
 3    that's feeding through.
 4              Then you want to go to the human aspect.
 5    You go see the patient.  That's the subjective
 6    parts.  You talk to them, see how they're doing,
 7    do they have any pain, do they have any new
 8    symptoms.  Do a physical exam and, you know,
 9    repeat that for all the patients on your -- that
10    have been assigned to you.
11        Q.   What does the physical exam consist of?
12        A.   So you -- initially -- it starts when
13    you come into the room.  So one of the parts is
14    general, how do they look.  Do they look sick, do
15    they look weak, do they look healthy, things like
16    that.  So first part of it is observing, and then
17    you kind of -- there's a full physical exam where
18    you touch on every body's parts.  You assess
19    strength, you assess their sensation, listen to
20    their heart, listen to their lungs, touch their
21    abdomen, listen to their abdomen, things like
22    that.
23              And then there's the more directed
24    physical exam, which is what people tend to do
25    after they've already been admitted and things
```

Joseph Papin 1/22/2021

```
 1   like that.  And you kind of know what you're
 2   looking for.  If anything is going wrong.  You
 3   know, if they have a heart issue, you probably
 4   want to listen to their heart, for example.  You
 5   don't need to move their knees about or anything
 6   like that to make sure -- because they didn't come
 7   in with a knee problem, for example.
 8           So the physical exam, you go system by
 9   system -- in general, on these rounds, you go
10   system by system as necessary.  So I'd listen,
11   generally -- as a surgeon, we're taught to listen
12   to the heart, taught to listen to the lungs.  And
13   most don't even do that because most don't even
14   carry a stethoscope.  You listen to the heart, you
15   listen to the lungs, you palpate their abdomen.
16   Because a lot of times what general surgeons are
17   doing is something to do with abdominal organs, in
18   testings, things like that.  And ask them how
19   they're doing.
20       Q.   What do you do as far as looking at
21   their charts, x-rays during pre-rounds?
22       A.   So it depends on what you want to do.
23   So everyone has their own personal style.  There's
24   no correct way to do it.  I would generally, you
25   know -- and it differs by service, too.
```

Joseph Papin 1/22/2021

```
 1              Medical students sometimes gather vitals
 2   for you.  So they come in slightly earlier than
 3   you.  They'd go through the list, and they'd put
 4   in, you know, blood pressure range, this and this,
 5   heart rate range, this and this, overnight, which
 6   is helpful.  And then sometimes they would also
 7   put the labs on there for you.  So that would
 8   sometimes be sufficient to just start your
 9   pre-rounds.
10              You look at the list, you have the labs,
11   you have the vitals, okay, they haven't had a
12   temperature, their heart rate has been good, they
13   haven't had, you know, anything wrong with their
14   labs.  So you can go -- you can go and pre-round,
15   get the exam, talk to them, you know, get how
16   they've been doing from them.  And then you can
17   sit down -- and the order differs depending on
18   style.  Then you can sit down and read notes,
19   anything that's come up, anything like that for
20   yourself so that you're prepared for table rounds.
21   Depending on the service.
22              Table rounds, you know, the attending
23   can or can't be there sometimes -- or may or may
24   not be there.  Usually, it was -- table rounds was
25   all the residents and nurse practitioners, the
```

Joseph Papin 1/22/2021

1    whole team minus the attending.  We'd all get our

2    patients discussed, things like that, and then

3    we're ready to discuss it with the attending as a

4    whole.  And that's going room to room.

5         Q.   All right.  See if I can remember all

6    this in order.  So you pre-round --

7         A.   Right.

8         Q.   Let me back up.  A med student may pre

9    pre-round, then you would pre-round?

10        A.   Right.

11        Q.   Then you may or may not table round?

12        A.   Right.

13        Q.   And then you would meet with the

14   attending and do the formal round?

15        A.   That's right.

16        Q.   As far as giving information to the

17   attending, that's you presenting the case?

18        A.   That's correct.  So usually -- it would

19   depend.  Sometimes the senior resident might just

20   take over and say, you know, this and this, if

21   they're really trying to expedite rounds,

22   something like that.  Usually the resident, the

23   intern whose patient it was, will just present

24   quick story, give some quick updates, things like

25   that.  And the senior resident was right there,

Joseph Papin 1/22/2021

1    they would jump in if they missed anything, things
2    like that.  And you would present outside your
3    patient's room.  The next patient might not be
4    yours.  That resident would take over and start
5    speaking.
6        Q.   Busier services, you divide and
7    conqueror; smaller services, you may have them
8    all.  Or if you're only the only intern assigned
9    to the service, you may have them if it's a small
10   service?
11       A.   I've never seen a service where it's
12   just an intern.  That would seem unsafe to me.  So
13   I've never seen a service where it was just an
14   intern.  Generally it was, you know, a few
15   residents, you would split up the list.  If
16   there's 60 people, 3 people, 3 residents,
17   whatever, you'd split it up, 20 each.
18       Q.   And then when the attending would come
19   on rounds, you said y'all would go to the room.
20   How did the rounds with the attending work?
21       A.   Sure.  So you would meet with the
22   attending usually at the entrance to the floor,
23   wherever it was that you guys wanted to meet,
24   you'd meet.  The attending would generally kind of
25   be a follower.  The senior resident would lead us

Joseph Papin 1/22/2021

1   down.  Okay, we have a patient here.  They would

2   kind of plan out the route.  We have a patient

3   here, then -- if it were my patient, I would

4   present on that patient.  Then we as a team would

5   usually enter the room.  The attending would talk

6   to the patient, do a physical, and we would

7   discuss the plan and move on to the next patient.

8        Q.   When he does a physical, is this an

9   in-depth physical or just kind of a cursory

10  physical?

11       A.   I would say it varied, but the depth was

12  as necessary.  I've seen many, many attendings

13  do -- you know, very in-depth physical exams.  And

14  then some, if they've only been operated on in

15  their abdomen, all you've got to do is press on

16  the abdomen a few times to make sure nothing is

17  going wrong with the surgery or something like

18  that.  I would call that more of an abbreviated

19  exam, but I've seen both.

20       Q.   So on the CV ICU rotation, tell me about

21  that.  What is that service?

22       A.   It's the cardiovascular intensive care

23  unit.  So generally patients that are admitted

24  that have some sort of really intense heart issue,

25  lung issue, something like that, can be directly

Joseph Papin 1/22/2021

```
 1    admitted.  Or if you've been operated on by a
 2    cardiac surgeon, for example, something like that,
 3    a heart transplant, whatever, those go to the
 4    cardiovascular ICU because these people see
 5    cardiac issues much more frequently than others.
 6    It's critical patients that are being seen.
 7         Q.   Being an ICU -- I'm obviously not a
 8    doctor, I'll cop to that all day long.  But
 9    they're more critical patients than, say, on the
10    standard floor?
11         A.   Absolutely.
12         Q.   They're not -- they may not be on
13    death's doorstep, but they're not well enough to
14    be in just a normal room?
15         A.   Right.
16         Q.   I believe -- somebody said they're in
17    state -- they could be up and down depending on
18    the moment?
19         A.   Not necessarily all of them.  It's just
20    people that -- nursing in the ICU.  There's a
21    higher -- I believe, at least before COVID, I
22    haven't been in them anymore, but it used to be
23    one-to-one.  So one nurse would be responsible for
24    one patient in the room, or maybe two-to-one at
25    most, whereas on the floor it's much more -- one
```

Joseph Papin 1/22/2021

```
 1   nurse could be responsible for many more patients.
 2   It allows for a high degree of supervision.  It
 3   doesn't necessarily mean that they're on death's
 4   door, anything like that.  In some people it's
 5   just the natural progression, you have your heart
 6   surgery, something like that, you're doing okay
 7   enough for a post-heart surgery patient, but you
 8   need to be monitored.
 9        Q.   That's why you have that one-to-one or
10   two-to-one ratio so they could be monitored all
11   day?
12        A.   Right.
13        Q.   As far as vitals, checking on the
14   patient, needs of a patient, is that done more
15   often in an ICU setting versus a floor setting?
16        A.   Checking on vitals or needs of the
17   patient?  Generally you order vitals, you know,
18   like every hour or so, something like that, in the
19   ICU.  You can do that on the floor, too.  I
20   wouldn't say necessarily that the frequency that
21   vitals are being checked are different in the ICU
22   from the floor.
23        Q.   Are there more -- because it's a
24   one-to-one ratio, is there more expected of a
25   nurse observing a person in the ICU than, say, on
```

Joseph Papin 1/22/2021

```
1    the floor?  Are there additional duties associated
2    with being in an ICU?
3         A.   You know, I couldn't comment on exactly
4    what a nurse -- what is expected as to, you know,
5    what a nurse does specifically on the floor versus
6    what they do in the ICU.  But, you know, their
7    attention is much less spread out.  As a
8    physician, that's all I've noticed.
9         Q.   What about for you as the intern on that
10   service?
11        A.   So I would generally have -- the ICU --
12   I don't know, it had maybe 10 to 15 beds,
13   something like that, the cardiovascular ICU had
14   maybe 10 to 15 beds.  And then not all of those
15   were CV ICU patient.  Sometimes, you know, there
16   is a -- there's a surgical ICU, the SICU,
17   sometimes that would get overflowed and they still
18   need ICU care, so they would come up to there.
19   Let's say there's 15 beds, I'm just guessing, not
20   all of those would be cardiovascular ICU patients
21   that we were seeing.  So maybe of the 15 we've got
22   8, 9, something like that.  And I would -- as a
23   very, very early intern, first month intern, I had
24   maybe two, three, something like that.
25        Q.   Would you be splitting the nurse load
```

Joseph Papin 1/22/2021

1  with the nurse practitioners?

2        A.    That's right.

3        Q.    Let's say there's nine people and

4  there's you and two nurse practitioners, you would

5  be responsible for three and each one of them

6  would be responsible for three?

7        A.    That sounds about right, yeah.  But the

8  way that it was done was kind of that they -- I

9  didn't take a pager.  So usually as an intern, you

10 take a pager and you're on call for things.  If

11 something happens with the patient, the nurse

12 pages you.  I never took a pager.  I had my

13 personal pager, but that's different than like the

14 service pager.

15        So I never took a pager.  I wasn't on

16 call.  If any nurse or anybody wanted to

17 communicate to the CV ICU team about a patient,

18 that only rotated amongst the nurse practitioners.

19 So if anything ever came up, it would have to flow

20 to one of the nurse practitioners and then to me.

21        Q.    Because of this supervision of

22 one-to-three or one-to-two, was it the expectation

23 that you would be in the ICU unit monitoring these

24 patients?

25        A.    No, because like I said, the -- at the

Joseph Papin 1/22/2021

```
 1   beginning of the rotation, Dr. Shake told me, you
 2   know, you round, the main expectations is for you
 3   to learn.  Just go through and learn all this.
 4   We're not -- you're a first month intern, we're
 5   not going to be expecting you to be saving lives
 6   first thing.  You're just in there to learn, and
 7   then when there's a lull you can go down to the
 8   operating room.
 9          Q.   I believe some of the nurse
10   practitioners had made complaints that you were
11   absent at times and they didn't know where you
12   were.  Have you heard those complaints?
13          A.   I -- what I had heard was -- I mean,
14   they knew that I was down in the operating room.
15   What I heard was that they were -- they didn't
16   voice this to me directly for a while, actually,
17   but what I had heard is that they -- I don't know
18   exactly who, I'm saying they, it could have just
19   been Josh, but I know at least Josh was getting
20   upset I was going to the operating room.
21          Q.   That would Josh Sabins?
22          A.   Sabins, yes.
23          Q.   So if you're in the operating room,
24   you're not operating, obviously, because you're a
25   first month surgery intern?
```

Joseph Papin 1/22/2021

```
 1        A.   No, you can scrub into cases.  You
 2   can -- operating as in, like, my name wouldn't be
 3   the attending physician on it.  But as an intern,
 4   you can operate from day one.  It's a graduated --
 5   it's graded responsibility.  So an intern
 6   usually -- like sutures, somebody that closes,
 7   something like that.  And then progressively
 8   toward the fifth year, maybe you're doing the
 9   operation.
10        Q.   You weren't doing the operations, you
11   were just observing when were you on the CV ICU
12   rotation?
13        A.   In general -- yeah, in general, that's
14   correct.
15        Q.   If an issue were to arise with one of
16   your three patients while you off in the operating
17   room, who would have handled that responsibility?
18        A.   Like I said, the pager -- if something
19   were to happen, the pager -- it would go -- if
20   Josh and I and somebody else were on and Josh was
21   carrying the pager, that information would go to
22   Josh, and then he was -- I told him please text me
23   or anything like that.  The same thing that would
24   have happened if I were, you know, not at my desk
25   at the moment.
```

Joseph Papin 1/22/2021

```
 1              It's a very common thing in surgery
 2    where, you know, if you're down in the operating
 3    room, most of the time you can get paged directly,
 4    and then you've already handed your pager to the
 5    operating room nurse.  And then if your pager goes
 6    off, she'll call back for you and let you know,
 7    and then you can go out and -- if there's an
 8    another attending there or something else that can
 9    take care of the operating things if you need to
10    step away.
11              But during that time, it would have been
12    handled by a nurse practitioner.  If they needed
13    my help or any questions asked, they could have
14    texted me, called me.  They had my phone number.
15       Q.    I heard you say that Josh Sabins was
16    getting upset or irritated that you were going
17    down to the operating room.
18       A.    That's right.
19       Q.    I believe on July the 29th, that the two
20    of you had an interaction that became heated.
21    Tell me about that.
22       A.    Yeah.  So I guess to give you some
23    context to that, if I remember correctly, he had
24    said something about it beforehand -- before that
25    day, maybe a week or so before, something like
```

Joseph Papin 1/22/2021

```
 1    that.  And then I said, okay -- you know, it
 2    wasn't an argument anything like that, he just
 3    told me --
 4         Q.   Clear up just for the record.  He had
 5    said something about what?
 6         A.   That I had been going down to the
 7    operating room, you know, that you need to be on
 8    the floor.  It wasn't an argument or anything at
 9    that point, but I tried to approach Dr. Shake and
10    let him know, hey, Dr. Shake, I know I'm the first
11    one to go through this, but I'm hearing from you
12    that I'm allowed to go down to the operating room.
13    I'm hearing from -- and I even met with Dr. Shake
14    about this, too.  I'm hearing from you that I'm
15    allowed to go down to the operating room, the
16    nurse practitioner seems to think that I should be
17    staying right there.  I'm happy do either, but
18    there's some miscommunications going on.  It seems
19    like there's no clarity here.  Is it possible for
20    to you kind of tell them whatever it is that you
21    want me to do?  If you want me to stay on the
22    floor the whole time, I'll do it.  If you want me
23    to -- I'm okay, that's fine.  He reiterated the
24    goal for you is to learn, don't worry about that,
25    is what he told me.
```

Joseph Papin 1/22/2021

```
 1        Q.   Now, I know were you listening in to the
 2   deposition of Josh Sabins, correct?
 3        A.   No, that's not correct.  I didn't hear
 4   that one.
 5        Q.   You didn't Zoom into that one?
 6        A.   No.
 7        Q.   He referred to a time where you were in
 8   the -- I'm going to ask this question first.  Was
 9   there like a lounge or workroom where y'all would
10   be putting stuff in the computers or a nurse
11   station, the layout of the CV ICU?
12        A.   Yeah.  So there was a room -- you want
13   the layout of it?  It's basically like a -- I
14   don't know, kind of like a C shape.  You enter,
15   it's kind of C shaped.  Patient rooms all along,
16   and then in the middle, middle-ish right here,
17   there's a room where we kind of gathered.  It's
18   smaller than this.  It's maybe like a 10-by-10
19   room with four computers, and the nurse
20   practitioners and the resident would hang out in
21   there.
22        Q.   Mr. Sabins testified that y'all were in
23   that room and Dr. Urencio was in that room, and he
24   had expected you to -- the expectation was for you
25   to be in the unit.  And even Miguel had told you
```

Joseph Papin 1/22/2021

```
 1   that the expectation would be for you to be in the
 2   unit.  Do you remember that conversation?
 3         A.   I do not.  That would be unusual
 4   because, like I said, Miguel wasn't in charge of
 5   the CV ICU.  He was a CT fellow, you know.  So his
 6   responsibility was, you know, operations and
 7   taking care of patients, but he wasn't formerly
 8   involved in the -- in that ICU rotation.
 9         Q.   All right.  Now, to -- that was
10   before -- Josh Sabins' comments to you, that
11   started a week before.  Now, let's move into the
12   29th.
13         A.   Okay.
14         Q.   I believe the 29th was a Friday and
15   would have been your last day in the unit?
16         A.   If that's what you're saying.  I don't
17   recall.  Yeah.
18         Q.   Tell us about that.  Did you work
19   Saturdays and Sundays in that unit?
20         A.   There were times that I did, yes.
21         Q.   In that rotation?
22         A.   Yes.
23         Q.   Do you know if you worked the 30th and
24   the 31st?
25         A.   I don't.
```

Joseph Papin 1/22/2021

```
 1          Q.   On the 29th, tell us what happened.
 2          A.    On the 29th, we rounded as we usually
 3    had in the morning, things like that.  Naturally
 4    there's kind of a lull once all the orders were
 5    in, the notes were in.  The procedures that needed
 6    to be done were done right around 1:00 or 2:00
 7    generally.
 8               So I told Josh, I said, Josh, I'm going
 9    down to the operating room, is there anything else
10    that you need from me?  But if not, you can reach
11    me.  And he said, you know, I told you before
12    you're not to go down to the operating room.  And
13    I said, well, you know, I'm hearing from Dr. Shake
14    that it's okay.  Do we have anything else to do?
15               He said, no, but you're staying here.
16    I'm your boss.  And I said, that's not -- that's
17    not what I've been hearing.  Every time I've had
18    to report, I report to Dr. Shake, and he's told me
19    I can go down to the operating room.
20               And he's like, where's your shit?  I'm
21    going to take -- where's your shit?  I said, Josh,
22    why are you asking for that?  He said, because I'm
23    moving you and your shit out.  And I told him, you
24    know -- more forcefully than I'm going to do it
25    now, but I told him, Josh, that's not happening.
```

Joseph Papin 1/22/2021

```
 1   You're not going to put your hands on me and
 2   you're not going to put your hands on my stuff.
 3   If you think you are, that's not happening.  And
 4   then he immediately sat down, like, dude, dude,
 5   calm down, relax.  That was really the extent of
 6   the conflict.
 7        Q.   I believe he testified that you pointed
 8   at him and said, don't you touch my shit.
 9        A.   I don't recall that.  That seems
10   inaccurate.  I told him forcefully he's not going
11   to be touching my person or my belongings.  I was
12   raised not to really put up with bullying, and I
13   certainly wouldn't have escalated it to a physical
14   altercation.  I don't get physical with anybody.
15   But if somebody is going to threaten me and my
16   belongings, things like that, I'm certainly not
17   going to allow that to happen.
18        Q.   Did Dr. Earl talk to you about that
19   incident?
20        A.   He did.  So in the meantime, once that
21   occurred -- obviously it's highly irregular, very
22   odd.  I've never seen that happen at any point
23   ever.  So there was no chief resident on the
24   service, it was just me and the nurse
25   practitioners.  So I went to a chief resident and
```

Joseph Papin 1/22/2021

```
 1   I told him about it.

 2        Q.   Who was that?

 3        A.   You know, I don't recall exactly who it

 4   was.  There's an e-mail to the effect.  I don't

 5   recall exactly who it was.  There is an e-mail

 6   where he describes exactly what I told him and he

 7   sends it to Dr. Earl.  And that's how Dr. Earl

 8   became aware of it because I told the chief

 9   resident who told Dr. Earl.

10             And I told him, you know, this is not

11   normal.  You know, this has happened because

12   there's some sort of a miscommunication between

13   what I should and shouldn't be doing.  I tried to

14   bring it to Dr. Shake's attention.  Didn't seem to

15   happen -- didn't seem to get clarified.  And then

16   Josh Sabins eventually got so angry he was

17   basically threatening me.  So I feel like I should

18   raise an alarm to somebody.

19             And so he made Dr. Earl aware, and then

20   at some point after the rotation ended, Dr. Earl

21   called me into his office after hearing the story.

22   He told me, listen, we need to de-escalate these

23   things.  I don't blame you for doing that.  I've

24   heard from people you didn't do anything wrong,

25   but the goal is to de-escalate these.  But if
```

Joseph Papin 1/22/2021

```
 1    someone is going to be in your face like that, I
 2    can't really tell you what you did was wrong, but
 3    try to avoid these situations in the future.  And
 4    that was it.
 5         Q.   Who is Dr. Berger?
 6         A.   Ines Berger, she was a cardiovascular
 7    ICU attending.  So she was an anesthesiology
 8    attending, but she rotated through sometimes on
 9    the CV ICU.
10         Q.   So her and Dr. Shake were kind of over
11    the CV ICU?
12         A.   That's right.
13         Q.   We've been going an hour.
14              (Off the record.)
15         Q.   (By Mr. Whitfield)  So your first
16    rotation was CV ICU?
17         A.   That's right.
18         Q.   You rotated every month; is that
19    correct?
20         A.   That's right.
21         Q.   So at the end of each rotation you get
22    evaluations.  And that's through the -- I believe
23    it's called, at the time, E-value system?
24         A.   There were a few, but E-value is one of
25    them.
```

Joseph Papin 1/22/2021

```
 1          Q.   Or E-hub -- I can't remember if it's Med
 2    Hub, then E-value, or E-value, then Med Hub.
 3          A.   Med Hub owns E-value.  So it's all one
 4    thing, but E-value was one method.  I think there
 5    was another one.  A jumble of things.  But yeah,
 6    E-value was one method to get evals.
 7          Q.   And you got evaluated through E-value?
 8          A.   That's right.
 9               (Exhibit 6 marked for identification.)
10          Q.   (By Mr. Whitfield)  I'm going to hand
11    you what's been marked Exhibit No. 6.  What I've
12    handed you is the master list of all the people
13    that evaluated you at UMC, but it also lists the
14    ones that you personally viewed yourself.
15          A.   Right.
16          Q.   Which the next to last column on the
17    right, it gives a date and time that you viewed --
18    or the date that you viewed the evaluation?
19          A.   Right.
20          Q.   I'm going to start on the last page on
21    Bates 38445.
22          A.   The last page, 38445?
23          Q.   Yes.
24          A.   Do you mind if I take a second to look
25    at this?
```

Joseph Papin 1/22/2021

```
 1        Q.   Sure.  So start on the back page.  It
 2   says that Dr. Shake completed an evaluation for
 3   you on August 19th, 2016.
 4        A.   That's right.
 5        Q.   But you never checked it?
 6        A.   That's what it looks like.  Yeah.  I
 7   don't know that -- I think you might have to
 8   get -- they might have to get released to me for
 9   me to be able to see them, because I certainly
10   would have been interested in every piece of
11   feedback that I got.  So I don't recall -- I don't
12   know on the program's end how often or how I would
13   see -- I'm looking at this for the VA, I think
14   it's like that, I saw all of these.
15             But yeah, to the best of my recollection
16   if I had seen -- I mean especially from the CV
17   ICU, if I had seen an eval pop up in my e-mail as
18   being viewable, I would have viewed it.
19        Q.   But you would agree with me it shows
20   that you didn't view this one?
21        A.   That's correct.
22        Q.   And the same for the evaluation of
23   Dr. Berger?
24        A.   That's correct.
25        Q.   And they were the two attendings on CV
```

Joseph Papin 1/22/2021

```
 1    ICU?

 2         A.    That's correct.

 3         Q.    Going to the next page -- page 38444, I

 4    see that Dr. Giorgio Aru from cardiothoracic

 5    surgery compiled an evaluation for you on

 6    August 30th, and you viewed it on October 3rd?

 7         A.    Right.

 8         Q.    Dr. Cresswell did one September 1st,

 9    2016, but you never viewed the one from

10    Dr. Cresswell?

11         A.    Yeah, according to this, I -- if I had

12    access to it, if there was some way -- usually,

13    the way that it would happen is, you get an e-mail

14    saying you have a new eval for your viewing or

15    something like that.  So according to this report,

16    it looks like I didn't see it.

17         Q.    Dr. de Delva did one on September 3rd,

18    but you viewed it on October 5th.  So you waited a

19    month to look at it?

20         A.    That's what it looks like, yeah.

21         Q.    It looks like you did not view the next

22    four up, which would be from Anthony Panos, Jacob

23    Moremen, Gretchen Shull, and Penny Vance?

24         A.    Anthony Panos doesn't look like he

25    completed one.  That says open.
```

Joseph Papin 1/22/2021

```
 1        Q.    Okay.
 2        A.    Jacob Moremen, Gretchen Shull, Penny
 3   Vance look like -- yeah, it looks like they
 4   completed theirs and I didn't get a chance to see
 5   them.  That's correct.
 6        Q.    You saw the ones from Dr. Carroll,
 7   Dr. Vick -- Kenneth Vick, Barney Nicholson, and
 8   Rajesh Kuruba?
 9        A.    That is correct.
10        Q.    Going to the next page, 38442, Shannon
11   Orr completed one and you viewed it the same day,
12   November 5th, 2016?
13        A.    Yes.
14        Q.    You did your self-evaluation, completed
15   it on November 28th?
16        A.    I see it right here, third row on 38442?
17        Q.    Yes.  Correct?
18        A.    That's correct.
19        Q.    And then John Harrison and Cheryl McCoy
20   did one.  Cheryl completed hers November 29th,
21   2016, and John Harrison December 12th, 2016, but
22   you didn't view either one of those?
23        A.    That's correct.
24        Q.    On the next page, the ones that were
25   completed were Shawn McKinney, Kenneth Vick,
```

Joseph Papin 1/22/2021

```
 1    Lonnie Frei, Larry Martin, and Shante Batson,

 2    Kelly Brister.  The only one you didn't view was

 3    Kelly Brister's?

 4        A.   Right.  That was completed on

 5    April 20th, 2017, which was three months after the

 6    day I worked and two months after my dismissal.

 7    To my knowledge, I didn't have access to that.  So

 8    the e-mails go to my UMMC inbox, so I never would

 9    have gotten any sort of notification or anything

10    like that even if it were released by that point.

11        Q.   So the feedback that was given by these

12    doctors that you didn't -- and the nurse

13    practitioners, you didn't review those, the ones

14    that say you didn't view them?

15        A.   That's correct.

16        Q.   Why would you not view it for those

17    doctors?

18        A.   I would have if I had seen it.  So the

19    only things I can think of is that -- I don't know

20    how the program releases it.  I don't know if they

21    have to -- once something is complete, that they

22    have to release it to me.  I seem to remember that

23    I would also have to complete an eval on that

24    person for me to be able to see their eval of me,

25    if I remember correctly.  So maybe they hadn't
```

Joseph Papin 1/22/2021

```
 1    released the eval for them to me.

 2              It could have gotten filtered out in

 3    e-mail spam filters, whatever that might be.  I

 4    don't know.  I was certainly interested.  So

 5    whenever I saw one, I would view it as quickly as

 6    I could.

 7        Q.   Let's talk about your next rotation.

 8    What did you go to after CV ICU?

 9        A.   That would have been August of 2016, and

10    that would have been CT surgery, cardiothoracic

11    surgery.

12        Q.   Who were the attendings on that service?

13        A.   Giorgio Aru, Pierre de Delva, Jacob

14    Moremen.  I'm going to use the list I've got in

15    front of me to cheat a little bit here.  Going

16    back to 38444.  I mentioned Jacob Moremen.

17    Anthony Panos was another one.  Pierre de Delva I

18    mentioned.  Lawrence Cresswell and Giorgio Aru.  I

19    believe those are all.  Let me check the last one.

20    Yeah, I believe that's all of them.

21        Q.   As far as nurses, would Penny Vance and

22    Gretchen Shull been the nurses on those?

23        A.   They were nurse practitioners, if I

24    recall.

25              (Exhibit 7 marked for identification.)
```

Joseph Papin 1/22/2021

```
1        Q.   (By Mr. Whitfield)  I'm going to hand
2    you what has been marked as Exhibit 7.  This is
3    the comments from your evaluations.  Have you seen
4    these comments before?
5        A.   I've seen them before.  It's a little --
6    there's a different view of them.  There's a
7    different view of them that I think is probably a
8    little bit more helpful where you can see exactly
9    the numeric grade that you were given and the
10   comments underneath.  So it kind of corresponds,
11   you got a two or a three or a five or whatever,
12   here's the comment for that.  But yes, I've seen
13   these before.
14       Q.   So let's walk through the ones from the
15   CT surgery service, which you say would be
16   Dr. Cresswell?
17       A.   That's right.
18       Q.   On September 1st, on the very first page
19   of Exhibit 7.  His first comment under Care for
20   Diseases and Conditions was that you did a good
21   job with initial evaluations with cardiac surgery
22   patients both pre-surgery and post-surgery.  Did
23   you get that feedback or is this one of the ones
24   that you didn't read?
25       A.   I think it was one of the ones that I
```

Joseph Papin 1/22/2021

```
 1    didn't see, and I was not given this feedback
 2    verbally, no.
 3         Q.   Then under Care for Diseases and
 4    Conditions, Dr. Cresswell writes, "In my personal
 5    interactions with Joe, I have not seen problems in
 6    this area, but I have had several negative reports
 7    from other non-physician members of our team.  In
 8    particular, heard reports of things that were
 9    deemed 'not my job' and incomplete follow-up with
10    assigned tasks as well as general problems
11    relating professionally to other non-physician
12    team members."
13         A.   Right.  So, yeah, I've seen this through
14    discovery, but I hadn't seen this -- I think it's
15    a little troubling that this happens.  Kind of a
16    theme throughout some of the reviews of me is
17    that, you know, he's saying I haven't seen any
18    problems personally.  He's an attending, but then
19    he's getting reports from nurses or nurse
20    practitioners, whoever they may be, of other
21    things, and then giving me a lower grade or
22    whatever as a result of what he's hearing from
23    others instead of what he's personally observing.
24    But, yes.
25         Q.   Isn't that how the grading system works
```

Joseph Papin 1/22/2021

```
 1    in the rotation, that they take feedback from
 2    their team members to make a final evaluation of
 3    you?
 4         A.   I don't know exactly what the guidance
 5    is, but many of these is supposed to -- it's
 6    really helpful, I think, to get feedback from the
 7    attending because, you know -- for example, if one
 8    person were to dislike you, they can shift the
 9    opinions of everybody and all of your grades can
10    drop.  It's really helpful, I think, to get
11    objective comments if possible.  Or at least just
12    the subject of opinion of the person who observed
13    you, instead of being marred.
14              If there's something going on, that
15    they're being told something that may or may not
16    necessarily be true, it's certainly very
17    prejudicial and it comes through in the comments.
18    He's directly stating that kind of conflict.  I
19    haven't seen anything with them, but I'm being
20    told something completely different.
21         Q.   Going on to page 472 under the next core
22    competency area under Surgery.  Dr. Cresswell
23    states, "I've seen only positive information
24    exchanged between Joe and patients/families.  I've
25    heard reports, though, of interpersonal and
```

Joseph Papin 1/22/2021

```
 1    communication skills, generally, that were less
 2    than satisfactory."
 3         A.    That's right.  I would say it's more of
 4    the same where he would have otherwise given me a
 5    great review, but here come the negative comments
 6    from others.
 7         Q.    Under Performance of Operations, he says
 8    he's had little opportunity to observe you in that
 9    area.
10         A.    Right.
11         Q.    Under Coordination of Care, he writes,
12    "There have been issues with care coordination,
13    particularly for the general thoracic surgery
14    patients.  Drs. de Delva and Moremen will be in a
15    better position to offer specific comments."
16         A.    Right.
17         Q.    That's from him personally?
18         A.    No.  Care coordination, that seems like
19    he's speaking directly to -- care coordination
20    wouldn't have been something that he would have
21    been privy to.  That's something more
22    administrative stuff, nurse practitioners and
23    residents would have handled.  That to me would
24    have been something he's speaking about what he's
25    heard from others.
```

Joseph Papin 1/22/2021

```
 1        Q.   And then Improvement of Care, "I'm
 2   concerned that Joe did not respond well to the
 3   feedback from Dr. Earl regarding difficulties
 4   during his July rotation in the CICU, and some of
 5   these problems persisted during this rotation."
 6        A.   Right.  The way I read that is, one,
 7   this is a separate rotation from the CV ICU.  So
 8   he's hearing what happened on the CV ICU.
 9   Objectively, the only thing that happened on the
10   CV ICU is the Josh Sabins' incident, and I think
11   that's been a theme, you know, as I carry that
12   Scarlet letter.  Josh Sabins I think was liked.
13   He had been there for a while, his wife is a nurse
14   there.  So the fact I had a conflict with him.
15   And then also these people work -- the CT surgery
16   people work very closely with Josh Sabins and, you
17   know -- I think this carried forward.
18             And unfortunately, it just kind of
19   marred the rest of my existence at UMMC.  This
20   comment is kind of -- events that -- what occurred
21   in the CV ICU continued to haunt me and was
22   brought forward.  They're saying the difficulties.
23   You know, I don't know what difficulties they are,
24   other than what he's saying is just difficulties.
25             But, you know, the only thing that was
```

Joseph Papin 1/22/2021

```
 1   really identified to me as happening in the CV ICU
 2   was, one, that there was breakdown in
 3   communication.  I was being told one thing by
 4   attending, another thing by the nurse
 5   practitioners.  I tried to resolve that.  It
 6   didn't get resolved, and it eventually ended in a
 7   conflict.  I don't see that as necessarily
 8   communication errors on my end.  I tried to fix
 9   that as much as I possibly could.  I can't force
10   the attending to say something to anybody.
11        Q.   And then under Performance of
12   Assignments and Administrative Tasks.
13   Dr. Cresswell writes, "This is a mix of good and
14   bad.  On the good side, for instance, Joe prepared
15   well for our monthly Journal Club and was an
16   active participant.  On the bad side, though,
17   there have been problems with patient care
18   follow-up as well as absence at assigned clinic
19   activities."
20        A.   Right.  So again, the patient care
21   follow-up, that seems like it would have to have
22   been comments from nurses because he wouldn't have
23   personally observed.  So that's more kind of like
24   administrative things that he would have -- that
25   he's delegated, all attendings do.  And I don't
```

Joseph Papin 1/22/2021

 1   know what he's referring to there.

 2       Q.   What about your "absence at assigned

 3   clinic activities?"

 4       A.   I was never absent, to my recollection,

 5   in any sort of assigned clinic activities.  It was

 6   difficult with clinic because things get shifted

 7   around, things get moved.  There were assigned

 8   clinic days, and sometimes they turned from a

 9   morning to an afternoon, or sometimes the first

10   few cases would get canceled and you get to come

11   in later or something like that.  Or the last few

12   patients would get canceled and you would get to

13   leave sooner.

14            To the best of my recollection, I've

15   never missed an assigned clinic activity.

16       Q.   Then the other doctor on -- one of the

17   other doctors on that service was Dr. de Delva?

18       A.   That's right.

19       Q.   You did review his comments?

20       A.   Dr. de Delva's?  Let's see.  I don't

21   recall, necessarily, because by this point I had

22   seen them all.  But yeah, it looks like I reviewed

23   that on October 5th.

24       Q.   So the feedback from Dr. de Delva was --

25   and we're going to continue these, because they're

Joseph Papin 1/22/2021

```
 1    broken down by core competency areas.  We'll just
 2    kind of work through them.  "Joe did a reasonable
 3    job in clinic, but failed to demonstrate that he
 4    owned the care of the inpatients.  He often did
 5    not seem to have a finger on the pulse of the
 6    patient's situation.  I often discovered issues
 7    and problems that I would have expected him to
 8    recognize."
 9         A.   Yeah, and, you know, this to me seems
10    like it's -- like the attendings aren't intimately
11    involved.  They'll kind of dictate at a high level
12    what the plan is, but, you know, how it gets
13    carried out, things like that, is a delegated
14    task.  There's residents, nurse practitioners,
15    things like that.  He never brought anything like
16    this up specifically.
17              This, again, seemed to be a case where
18    nurse practitioners are communicating to him -- or
19    somebody is communicating to him that I'm not
20    doing something.  I don't know what that is.  I
21    don't know what he's referring to, but he
22    certainly never brought this up to me.
23         Q.   But he did put it in your evaluation?
24         A.   He did.
25         Q.   That you were able to read?
```

Joseph Papin 1/22/2021

```
1        A.   Right.  But, you know, the nature of the
2   evaluations, you can see them, but, you know, what
3   do you -- there's nothing you can do, you just
4   read it.  And you can't e-mail them, hey, this is
5   wrong.
6        Q.   Did you go back and talk to Dr. de Delva
7   and say, what did I miss, what was I doing wrong?
8        A.    No.  There's sort of a cultural thing in
9   surgery where, you know, I was kind of afraid to
10   ask for, you know, specific feedback once they've
11   already given it, or if they give it to me, I
12   would ask in general.  I would make that a
13   practice to see how I could get better.  But I'd
14   been warned coming in that people can take things
15   the wrong way and if you ask clarification, it can
16   be seen as you questioning people.
17            So I was just, you know -- I'll take
18   this feedback, I'm going to do the best that I
19   possibly can to make sure that I coordinate
20   everything in the best possible way and work with
21   everybody as best I possibly can.  But no, I
22   didn't e-mail him.  I didn't want him to think
23   that I was, you know, questioning him in any way.
24        Q.   Not so much questioning, but even asking
25   for more details?
```

Joseph Papin 1/22/2021

```
 1       A.   Yeah.  That's a theme that comes out of
 2   this is always wanting more detail, but I thought
 3   that, okay, this is a negative review, I'm going
 4   to do my best.  I'll take my best guess at what
 5   this is and try to improve from this point
 6   forward.
 7       Q.   Then he also comments that, "Several
 8   team members commented on failure to develop
 9   rapport and trust with nurses and nurse
10   practitioners.  At times he was seen as dismissive
11   and above doing certain work.  I did not see this
12   personally, but heard back from team members.  I'm
13   afraid that if this is an ongoing issue, he will
14   undermine his ability to be a good team leader as
15   he rises in the program.  He needs to develop some
16   awareness and insight on how he is perceived by
17   others."
18       A.   Right.  And I think this kind of goes
19   back to that first comment that we just read.  I
20   think they're essentially the same one in that
21   somehow I'm being perceived as not communicating
22   well, and then that's kind of just inhibiting lots
23   of patient care activities, coordination
24   activities, things like that.  I think culturally,
25   I think the way that I speak and the way that I
```

Joseph Papin 1/22/2021

```
 1   handled myself --

 2            For example, at a grocery store in the

 3   north, people get angry behind you if you're

 4   talking to a clerk and you're holding them up.

 5   They want to get out.  They're like, hurry up,

 6   let's go, things like that.  That's not the way

 7   here.  So I was kind of learning how people kind

 8   of conduct themselves in the south.  You take the

 9   time, you say hello, and you talk for a little

10   bit.  Things move slower, you -- you know, take

11   the time to talk to people, really.  You know, I

12   had just been used to kind of go and you're

13   polite, you're not necessarily taking the time to

14   sit down and talk to people and things like that.

15            So I think in terms of the perception of

16   me, I think the cultural issue probably played a

17   role in that.  But, you know, to the best of my

18   recollection, there was never a time with Penny

19   Vance or with Gretchen Shull that I was ever rude,

20   condescending, anything like that.  I think a lot

21   of it was the cultural thing.  And then also,

22   carrying forward from the reputation that I had in

23   after CV ICU with the Josh Sabins' incident.

24       Q.   When you say a cultural thing, I want to

25   drill into that a little bit.  You're talking
```

Joseph Papin 1/22/2021

1    about north versus south, high-speed environment
2    versus laid-back environment; is that what you're
3    referring to about cultural differences?
4        A.   That's right.  Just kind of like the
5    nature of the differences between someone from,
6    say, Chicago, New York, something like that,
7    that's definitely a northern fast-paced
8    environment versus the south where people take the
9    time, they talk to each other, things like that.
10       Q.   I want to make sure.  In this lawsuit
11   you make law claims about being treated
12   differently for being Hispanic.  When you say
13   cultural, you're not referring to the Hispanic
14   culture?
15       A.   No.  That's correct.
16       Q.   Then Dr. de Delva --
17       A.   Are we on 472 now?
18       Q.   Getting there.
19       A.   Okay.
20       Q.   He gave you positive feedback that, "On
21   the limited interactions we had in the OR, he did
22   well."  Under Performance of Operations and
23   procedures on 472.
24       A.   Okay.  Let me catch up with you.  Okay.
25   Yeah.  And this is one, you know -- I just like to

Joseph Papin 1/22/2021

```
 1   kind of note that this is one where there are no
 2   nurse practitioners in the operating room, things
 3   like that.  So this is entirely his own
 4   experience.  So when he worked with me on his own
 5   and nobody else had commented, I got a good review
 6   it looks like -- it looks to me.  That was pretty
 7   good.
 8        Q.   Back to the first one.  He states --
 9   this is on 471.  "I often discovered issues and
10   problems that I would have expected him to
11   recognize."  He's talking about his own personal
12   observation?
13        A.   Yeah, I can't comment on what exactly he
14   means, because there was certainly nothing brought
15   up to me.  But what I would guess is that he's
16   discovering issues that are brought up to him by
17   nurses.  By nurses, I mean nurse practitioners.
18   Sorry.
19        Q.   I would assume they get really offended
20   for a nurse practitioner to be referred to as just
21   nurses?
22        A.   I don't know, but they've gone on,
23   they've earned the degree and things like that, so
24   I give them their due.  And it's also, you know,
25   they're different.
```

Joseph Papin 1/22/2021

1          Q.    Then on 473, he refers back to, again,
2     the feedback from non-physician team members.
3     "Joe appears burdened to interact with them and
4     take into consideration their opinion and
5     experience."
6          A.    473, I'm trying to find where you are.
7          Q.    Third one from the bottom.
8          A.    Okay.  Yeah, I mean, again, I was
9     never -- I always had the attitude, if you will,
10    that by this point I'm two months in -- by the end
11    of this point I was two months into my residency.
12    I had the opinion that I could learn from
13    everybody, everybody had something to teach me,
14    whether you're a nurse, nurse practitioner,
15    whoever, resident, attending.  These people are
16    much more experienced than I am in the -- just at
17    least in the day-to-day flow of everything,
18    understanding how to take care of these patients
19    specifically.
20              So I don't understand where I would have
21    seemed burdened to interact with them and take
22    into consideration the opinions and experience of
23    others.  I think that might speak to that kind of
24    cultural difference where maybe I was coming off
25    as just kind of short or something like that,

Joseph Papin 1/22/2021

1    because I'm from -- I spent time in Michigan, I'm
2    from Florida, which is technically geographically
3    the south, but not at all the south really.  So I
4    think that was a large part of where this is
5    coming from.  But other than that, I can't think
6    of a single time where I had a negative
7    interaction with any of them.
8         Q.   What I'm hearing you say is it's because
9    of your fast-paced lifestyle before living in
10   Michigan and Florida is that you came off as rude
11   and short with people?
12        A.   That's my best guess.  I don't think
13   I -- I didn't personally -- this is obviously an
14   issue with -- I never intended for it to happen.
15   I didn't personally think that I was.  But if
16   someone is perceiving you a certain way, then
17   there's obviously a reason for it.  And that's
18   what I'm thinking it is, it's a cultural issue.  I
19   probably didn't take the time to get to know them
20   enough or whatever.  Whatever it is that I was
21   missing, I just was missing that part of it.  It
22   wasn't that I was intentionally trying to be rude
23   or I was just rude.  I think it's just we grew up
24   in different environments and I was still learning
25   the Mississippi ways, I guess.

Joseph Papin 1/22/2021

```
1              (Exhibit 8 marked for identification.)
2         Q.   (By Mr. Whitfield)  I've handed you
3    what's been marked as Exhibit No. 8, which is an
4    e-mail from Dr. Berger to Dr. Earl, and an e-mail
5    from Dr. Shake to Dr. Earl on the back page.  This
6    was provided to you in discovery and was an
7    exhibit at the academic appeal hearing.  Have you
8    seen this document?
9         A.   I have.
10        Q.   I want to kind of go through.  So
11   Dr. Berger you said was the other attending on the
12   CV ICU rotation, which would have been your very
13   first rotation?
14        A.   That's correct.  There was one more, at
15   least, attending.  But yeah, she was one of them.
16        Q.   She reported directly to Dr. Earl about
17   some concerns and issues with you on the rotation.
18   That's the gist of this e-mail.  The first concern
19   is she talked about how you liked to go to the OR
20   after rounds to learn more about surgeries, "and
21   the nurse practitioners asked him to pull a chest
22   tube or teach him how to wire an A line or pull a
23   balloon pump up while he wants to go to the OR.
24   The perception of the nurse practitioner was he is
25   arrogant, like, 'you're not my boss, I'm a
```

Joseph Papin 1/22/2021

```
1    surgeon,' when I ask him to help or want to teach.
2    As he does not check in with them, they assume he
3    is gone or does not want to help until he comes
4    back from p.m. rounds."  Do you see that?
5         A.   I do.
6         Q.   Do you remember incidents where they
7    asked you about to help them with an A-line or a
8    balloon pump but you just wanted go to the OR?
9         A.   No, there was never a time -- I don't
10   know who said that, but there was never a time
11   where I would have refused any task -- to my
12   recollection, that I ever refused a task or told
13   them I'm going down to the operating room.  I'm
14   just going to go down to the operating room and
15   not do this task.
16        Q.   What about statements, "you're not my
17   boss, I'm a surgeon."  Have you ever said that to
18   the nurse practitioners?
19        A.   No, not that directly.  But when Josh,
20   that exchange -- I think you said it was on
21   July 29th.  The fact that this e-mail is on
22   July 29th makes me think that that wasn't -- yeah,
23   I did talk to Joe this afternoon.  So that makes
24   me think that July 29th was not the date of the
25   incident with Josh Sabins.  Regardless, it would
```

Joseph Papin 1/22/2021

1   have been pretty close to that.

2       Q.   Let me stop you.  Look at No. 3.

3       A.   Yeah.  I don't know.  It could have been

4   that day.  I don't think I spoke to Dr. Berger on

5   the exact same day that it happened.  I do

6   remember speaking to a chief resident.

7            But yeah, going back to your question,

8   "you are not my boss, I am a surgeon."  I never

9   said that in regards to a task.  The only time

10  that I said some variation of that is when Josh

11  was telling me, no, I'm your boss, you don't

12  listen to Dr. Shake, you stay here and you're not

13  going down to the operating room.  I said

14  something like, Dr. Shake is the one that I report

15  to.

16           But this seems to be -- I don't consider

17  that an arrogant statement.  I thought, you know,

18  he's telling me this is how it's going to go and

19  he was already starting to get heated, things like

20  that.  And I said, the person I report to is

21  Dr. Shake.

22      Q.   He says this in kind of the plural, the

23  nurse practitioners asked you to help with

24  something.  Why are they reporting that you're

25  not?  Why would you believe they're saying you're

Joseph Papin 1/22/2021

```
 1   not willing to help?
 2        A.   I don't know.  I wasn't privy to this
 3   conversation.  There was never a point when anyone
 4   brought this to my attention.  So, you know, I
 5   don't know why they would say that.
 6        Q.   But as you see the paper, it was -- you
 7   definitely see it was reported to Dr. Earl that
 8   this is what had happened?
 9        A.   Yeah.  I mean, that looks like what's
10   coming from Dr. Berger.
11        Q.   He talks about an incident where you
12   took coffee into a patient's room and there was --
13   tell me about that.
14        A.   Yeah.  So it seems to be a lot of
15   confusion about this.  So No. 2 is that I brought
16   coffee into a patient's room.  If I remember
17   correctly, this was day three of residency
18   overall, or maybe day two, something like that.  I
19   walked into a patient's room, I didn't notice that
20   all of the other providers had coffee but they
21   would put it on like the handrail outside of the
22   patient's room before they walked in.  So I walked
23   in with it.  I was in there listening to rounds,
24   and somebody, I guess it was Dawn, just kind of
25   yelled out in an angry way, but yelled to me, hey,
```

Joseph Papin 1/22/2021

```
 1    you can't bring coffee into a patient's room.  Oh,
 2    sorry.  I walked out, put it on the handrail where
 3    everybody else did, and that was the end of it.
 4         Q.    But that was day two or three?
 5         A.    Right.
 6         Q.    Then in No. 3 Dr. Berger refers to the
 7    argument between you and Josh Sabins?
 8         A.    That's correct, which happened much,
 9    much later.
10         Q.    And then Dr. Berger talks about how she
11    had a talk with you.  What do you remember of your
12    conversation with Dr. Berger?  She states that you
13    talked about perception, that it appears things
14    have gone in the wrong direction, the role of the
15    nurse practitioners, how to set yourself up for
16    success as an intern and expectation of the
17    surgical team.  We talked about the food/coffee in
18    the rooms.
19               This is her recollection of the
20    conversation.  What is your conversation?
21         A.    As I'm reading this now, this all looks
22    correct to me.  I don't remember anything more or
23    anything less of the conversation than what she's
24    kind of outlined.  At a high level -- she's one of
25    the only people that come to me as a mentor.  It
```

Joseph Papin 1/22/2021

```
 1   seemed like she was genuine, trying to give me
 2   advice and understanding when she heard the story
 3   of what happened and how to avoid things like
 4   this, and just kind of how to proceed going
 5   forward to ensure success.
 6        Q.   You did get an almost immediate feedback
 7   from her that day?
 8        A.   Yeah.  Her feedback -- once she heard
 9   the story -- and you can kind of see the evolution
10   of the story just in this e-mail chain.  Because
11   on page 2, Papin 439, the bottom is her initial
12   e-mail to Dr. Shake.  Then Dr. Shake later in
13   time.  Then Dr. Earl is e-mailing back her and
14   Dr. Shake.
15             You know, I think once the story evolved
16   and she understood what exactly happened, she
17   wasn't necessarily blaming me for what happened;
18   she was giving me strategies for how to avoid
19   having this situation even occur from the
20   beginning.
21        Q.   And then in her first e-mail from 12:51
22   that day, Dr. Berger talks about that you've had
23   falling outs with all four CV ICU nurse
24   practitioners this week.  There's also been issues
25   with the pharmacists.  Did y'all discuss that in
```

Joseph Papin 1/22/2021

```
 1    your meeting?
 2         A.   No, that's inaccurate.  That was her
 3    initial e-mail.  I assume she had spoken to
 4    someone who had given her inaccurate information.
 5    In my life, I have never had a dispute with a
 6    pharmacist.  I certainly don't recall having
 7    fallouts, at least on my end -- I mean, perception
 8    is different, but I've never had a fallout -- I
 9    didn't have a fallout with all four CV ICU nurse
10    practitioners that week.  To the best of my
11    recollection, it was just Josh.  Certainly.  That
12    was the only one where there was a discussion.
13         Q.   Now, we're kind of going back to
14    Dr. de Delva and his evaluation of you.  I'm on
15    page 475.
16         A.   All right.
17         Q.   It should be the fifth comment down.  It
18    says, "Joe seems to be a good person and capable
19    of being a good resident.  I think there is a
20    disconnect between the wanting to be a surgeon and
21    understanding the path to get there.  I hope he is
22    just -- I think he is having difficultly adjusting
23    to the reality of residency training and entering
24    the clinical environment.  I hope he will take the
25    feedback given in this rotation constructively.
```

Joseph Papin 1/22/2021

```
 1    Otherwise, I can envision him becoming
 2    increasingly frustrated and marginalized by those
 3    he will need to be successful in training."
 4           You got that feedback?
 5       A.   I did see this, yes.
 6       Q.   The other attending on that was
 7    Dr. Moremen, I believe you said?
 8       A.   Yeah, one of them -- and I think
 9    they're -- Dr. Aru is also the other one.  So it's
10    Moremen and Aru left that gave comments.
11       Q.   But you never read Dr. Moremen's
12    comments?
13       A.   Yeah, that looks to be correct from
14    this, but they did produce comments is what I was
15    saying.
16       Q.   So the first comment from Dr. Moremen is
17    on page 471, "Seen as frequently avoiding duties,
18    not present and accounted for during regular
19    hours."
20           Do you see that one?
21       A.   I do.
22       Q.   So he's giving feedback here saying
23    we're not seeing you, you're not present.  What
24    are you going do to fix those types of feedback
25    issues?
```

Joseph Papin 1/22/2021

1        A.    I mean, I didn't see this comment, but I
2   don't know -- this absolutely would have been
3   something that was reported to him and not
4   something that he's -- the attendings don't stand
5   around, you know, he's got operations to do,
6   things like that.  That absolutely would have been
7   something that was reported to him.  I don't know
8   what not present and accounted for during regular
9   hours were.  I was there.  There might be an issue
10  where as a resident you can go down to the
11  resident room and type notes, you can do that type
12  of thing.  Any open computer you can go.
13          So there's not necessarily an area you
14  need to be.  So I don't know how anyone would be
15  able to reasonably comment on anyone's position at
16  any given time in a hospital because you're not
17  expected to be in any one place if there's nothing
18  going on.
19      Q.   When you're on a rotation, do you have
20  like an assigned area that you deal with?
21      A.   Assigned meaning clinically where the
22  patients are located?
23      Q.   Yes.
24      A.   The CV ICU certainly, yes, we were all
25  on the CV ICU.  But I would say other than that,

Joseph Papin 1/22/2021

```
 1   patients could be spread pretty much anywhere
 2   around the hospital.
 3        Q.   And did you have -- like when you're on
 4   the CT surgery rotation in August, do you have a
 5   pager?
 6        A.   I do.
 7        Q.   But the nurses and Dr. Moremen are
 8   apparently reporting that they can't find you.
 9        A.   Yeah, I mean, you know, that wasn't
10   brought up to me for a very long time.  I can't
11   recall.  Probably around December-ish it was
12   brought up to me that that was even a concern or
13   anything.  But yeah, evidently from right there, I
14   guess that was a concern.
15        Q.   Then on top of page 472, Dr. Moremen
16   cites that you're an abysmal communicator,
17   complaints numerous.
18        A.   I mean, you know, I don't know the
19   context of that, you know, complaints numerous.
20   There's nothing actionable from that.  Where I
21   was -- I brought this up to Dr. Earl because in
22   one of our meetings, I think in -- I believe it
23   was after clinical competency, the semi-annual
24   review, I got the same comment.  And he would just
25   say you need to work on communication.
```

Joseph Papin 1/22/2021

```
1              I feel like -- not to be flipped or
2      anything, but I feel like he's speaking English on
3      communicating with people.  I don't understand
4      where this breakdown in communication is
5      happening.  Again, I don't really understand the
6      genesis of this.  I would have been happy to
7      improve in any way if I was told anything
8      specific, but I really don't know where I was not
9      communicating.
10         Q.   Then on page 474, Dr. Moremen states
11     that, "He seems almost never to be prepared or
12     recall facts from previous discussions."  This
13     would have been your interactions with him.
14         A.   Yeah, you know, to that, I would -- that
15     seems to be commenting on my intelligence or
16     preparation.  I was there; I had the information.
17     I'll say that in terms of my ability to recall
18     facts, intelligence, things like that, that's
19     never really been called into question by anybody
20     up until something like that.  So I would hardly
21     dispute that.
22         Q.   This would have been more, I assume,
23     your preparation for the patients and not being
24     able to recall the facts of that particular
25     patient?
```

Joseph Papin 1/22/2021

```
1        A.    Right.  Generally, you know, I read
2   something once and I can recall what the
3   information is, and I would have -- you know,
4   anytime you're rounding, I would have already
5   pre-rounded on the patients, known who they were,
6   known the pertinent facts and things like that.
7             So, again, this is obviously negative
8   feedback here.  Seemed to be prepared or
9   recall facts from previous discussions but --
10  seems almost never prepared.  When was I never
11  prepared?  When was I not able to recall facts?  I
12  can't take any sort of action from that, and I
13  would dispute the basis of it.
14       Q.    But you would agree with me that's
15  coming from the attending physician?
16       A.    I would.
17       Q.    Next one for him is also on 474, "Had to
18  be reoriented to miss details almost daily."
19       A.    Yeah.  Again, you know, this is coming
20  from the -- this is written by the attending.  I
21  think he might be misappropriating his own
22  observations or mislabeling -- he's not
23  necessarily saying I personally observed this, but
24  he's also not saying that this was told to me by
25  nurse practitioners or anything like that.
```

Joseph Papin 1/22/2021

```
 1              I don't really need re-orientation.  I
 2   don't really miss details that often, to my
 3   recollection ever, but, you know, this -- another
 4   piece of negative feedback that I have no idea
 5   where it was coming from.
 6        Q.   There were also two nurse practitioners
 7   on the service, Gretchen Shull and Penny Vance.
 8        A.   That's correct.
 9        Q.   And you didn't read their reviews
10   either?
11        A.   I think reading is a mischaracterization
12   of it.  I think that tends to imply that I had
13   access.  If I had seen and been able to access it,
14   I would have clicked into it immediately.  I think
15   everyone is curious, you know, what people are
16   saying about them.  I wouldn't have avoided
17   looking at these reviews.
18        Q.   Doesn't the system work that once it's
19   complete, the system sends you an e-mail saying,
20   hey, you can check on this?
21        A.   I don't know.  All I know is, on my end,
22   I would get an e-mail that would pop up and say
23   this is ready for your review or whatever it is,
24   some variation of that.  I don't know what it took
25   for that to actually pop up or who had to enable
```

Joseph Papin 1/22/2021

```
 1   that or whatever, I don't know.  But I do know I
 2   was always really curious about feedback and what
 3   people are saying and things like that.  Because
 4   it has implications, too, for not just, you know,
 5   I'd like to know how I did, but had I been able to
 6   continue, this has implications for promotion to
 7   the next year, things like that.
 8        Q.   Before I get into the nurse
 9   practitioner, we've been going just over an hour
10   again.  I'll give you a quick break.
11             (Off the record.)
12             (Exhibit 9 marked for identification.)
13        Q.   (By Mr. Whitfield)  I've handed you
14   what's been marked as Exhibit No. 9.  It's an
15   e-mail to you letting you know that there was an
16   evaluation completed on August 31st, 2016.  Is
17   this how you would be notified that one of your
18   evaluations had come in?
19        A.   That's correct.
20        Q.   So this generates -- when the person
21   completes it, you get a link saying it's complete,
22   you can view the evaluation?
23        A.   I don't know the exact process.  Like I
24   said, I don't know if they complete it, it auto
25   generates or if they completed it and it has to go
```

Joseph Papin 1/22/2021

1    through Renee and then be sent to me.  That I

2    don't know.  But this is what it looked like once

3    I -- in the end once I finally got it, this is

4    what it would look like.

5         Q.   The one that was completed on

6    August 31st would have been Jacob Moremen's?

7         A.   That looks right.  There are no others

8    that were completed on August 31st.  So that looks

9    right.

10        Q.   So once you got those e-mails, you just

11   click on the link and it takes you to the

12   evaluation?

13        A.   No.  So you have to complete your

14   evaluation of them and then I think you're able to

15   view it.  It says that right there under the link

16   kind of in the middle of the page there.  And I

17   don't recall how long it would take for it to

18   register that you put yours in for you to be able

19   to view theirs and stuff like that.  Or if it was

20   getting caught by my spam filter or whatever that

21   was.  Because these are kind of spammy e-mails.

22   It looks like something that a spam filter would

23   detect and drop for you.  But I did see these from

24   time to time.

25        Q.   To see it, you would have to go in and

Joseph Papin 1/22/2021

```
 1    complete your own evaluation?

 2         A.    That's right.

 3         Q.    Why would you have not gone in and

 4    completed the one for Dr. Moremen so you can see

 5    this evaluation?

 6         A.    The only reason I wouldn't -- it

 7    wouldn't have been willful.  It wouldn't have been

 8    I don't want to see what Jacob Moremen has to say

 9    about me.  It would have been I didn't see this

10    e-mail letting me know.

11         Q.    At this point you're aware that your

12    professors are assigned to do evals at the end of

13    the rotations?

14         A.    Right.  Yes.

15         Q.    If you wanted to know what Dr. Moremen

16    had said, you would have gone in and filled it

17    out?

18         A.    Well, I wouldn't have known.  So if I

19    didn't see this e-mail, I wouldn't have known that

20    Dr. Moremen -- because evals can come in at any

21    point, so I wouldn't have known that one was done

22    without any sort of -- I just relied on the

23    notifications.  If I got one, I got one, and then

24    I would go in and pull up the eval and look at it.

25    And if I didn't, I would have just assumed it
```

Joseph Papin 1/22/2021

```
 1   hadn't been done yet.
 2        Q.   You definitely got the e-mail to your
 3   system.  Now, whether you opened it or not is a
 4   different story.
 5        A.   Yeah.  This looks like it came to my
 6   e-mail.  I'm assuming this is my UMMC in box?
 7        Q.   Yes.
 8        A.   Yeah, it looks like it did, but, you
 9   know, whether I'm viewing it on my phone or
10   whatever, there's different spam filters that kind
11   of move them around so you don't -- I don't know
12   if I ever saw this e-mail or if I just missed it.
13   Had I seen it, I would have clicked it and
14   completed the eval and been curious what he had to
15   say.
16        Q.   Then with the nurse practitioner
17   Gretchen Shull, she gave you one as well on
18   October 3rd?
19        A.   That is correct, based on 38444.
20        Q.   And she cited under Care for Diseases,
21   "Basic skill and knowledge for patient care was
22   lacking."
23        A.   She did.  I dispute that.  I don't know
24   what basics skill and knowledge for patient care
25   is describing.  But the eval exists.  I don't
```

Joseph Papin 1/22/2021

1    think that -- I don't at all agree that I lacked

2    basic skill or knowledge about patient care.

3         Q.   She goes on to say under the next one

4    down in Care for Diseases, "I found him to be

5    disrespectful to nurses and female support staff.

6    I didn't appreciate when he would talk to me with

7    his back turned."

8         A.   Yeah, I'm sorry that she -- that she

9    ever felt disrespected by me in any way.  Again, I

10   disagree with this.  The eval certainly exists.  I

11   disagree with it.  You know, talking with your

12   back turned, I don't recall that specific

13   instance.  I'm thinking probably I was talking to

14   her and the initiating conversation, I turned

15   around to type on the computer or something like

16   that or whatever.  It was not meant to be any sort

17   of a shunning maneuver or anything.

18             So, you know -- I think this is probably

19   part of that kind of that cultural difference

20   where, you know, if someone is talking to me and

21   they turn and they type on their computer or

22   something like that, I don't consider that rude in

23   any way.  But to some it may and I just wasn't

24   noticing that.

25        Q.   I'm going to talk about Penny Vance as

Joseph Papin 1/22/2021

```
 1   well because she was also a nurse practitioner on
 2   that service.  So as we go through, to save time,
 3   I'm going to take their comments.  Penny did hers
 4   on September 16th.
 5        A.   Okay.
 6        Q.   Her first comment is under Performance
 7   of Operations and Procedures.  "Rotation goal at
 8   PGY1/intern level was to learn surgical care (CT
 9   specialty) in participating in clinic seeing
10   patients and rounding on floor with patients and
11   proper documentation.  Goal at this time was not
12   specifically to participate in surgical
13   procedures, although intern could if he/she had
14   time once his other responsibilities were
15   completed.  Was, however, observed with a higher
16   level resident in placing a sterile dressing post
17   sterile procedure on a patient, and observed with
18   a higher level resident in placing a sterile
19   dressing post sterile procedure on a patient, and
20   observer (Nurse educator for unit) offered to
21   teach intern how to properly apply sterile
22   dressing using sterile technique.  The nurse
23   educator reported intern repled that he didn't
24   need to know how to do that."
25             That's pretty specific feedback.
```

Joseph Papin 1/22/2021

```
 1        A.   Yeah.   A few things on that.   If you'll
 2   notice at the top of this, "Surgery: Performance
 3   of Operations and Procedures."  The heading on
 4   this is, "Resident demonstrates knowledge of
 5   operative procedures" -- which is specifically
 6   referring to the operating room.  "Technical
 7   skill," also an operating room thing.  "Tissue
 8   handling," also an operating room.  "And
 9   proficiency with instrumentation," also only in
10   the operating room appropriate for that level of
11   experience.
12             So my first comment on this, she really
13   should have abstained from writing an eval on
14   anything to do with the operating room because
15   they're just not in the operating room, ever.  So
16   this is another one of the things where she's
17   rating me.  And I remember this specifically
18   because I saw this in discovery, I get a low
19   rating on something that they don't really -- it's
20   not within their purview to be able to assess.
21             And then commenting on this
22   specifically, I don't -- I dispute basically all
23   of this.  "The goal at this time was not
24   specifically to participate in surgical
25   procedures."  And in the title of the rotation is
```

Joseph Papin 1/22/2021

1   cardiothoracic surgery.  As an intern, you want to
2   learn how to manage a patient, you want to learn
3   how to take care of patients first.  That's always
4   what you want.  And then you also learn surgery at
5   the same time.  That wasn't how it was presented
6   to me, that surgery was like, if you've got some
7   time, figure it out.  You're in surgical residency
8   to learn to be a surgeon.
9            And then, you know, putting on a
10  sterile -- I don't recall this.  This is something
11  that I would do multiple times daily.  This is
12  something that you learn as a third-year medical
13  student.  It's something that's so -- you know,
14  for an attorney, it would be like learning how to
15  turn on a computer or something like that.  It's
16  something so critical and so commonplace.
17           I mean, putting on a dressing sterilely
18  is something that's, you know, very easy to do and
19  taught very early.  So yes, I know how to put on a
20  sterile dressing.  I don't recall ever having to
21  be corrected or telling a nurse educator or even
22  having a nurse educator come up to me.  I didn't
23  need to know how to do that.  I don't know what a
24  nurse educator is.
25       Q.   You just don't recall the incident or it

Joseph Papin 1/22/2021

1   didn't happen?

2        A.   I mean, I don't recall the incident at

3   all.  I don't want to say necessarily that it

4   didn't happen, if someone came up and I just don't

5   recall that I was doing a sterile dressing.  But I

6   mean, placing a sterile dressing is something

7   that's done by any surgical resident multiple,

8   multiple, multiple times per day.  I certainly

9   don't recall this in any way.

10            And then, "At the end of it, nurse

11   educator reported that he didn't need to know how

12   to do that."  First of all, putting a sterile

13   dressing is, like I said, so fundamental that I do

14   need to know how to do that.  And I don't know

15   what a nurse educator is.  If that's like a nurse

16   who's educating me at that point or is that like a

17   formal title, like a nurse professor.  I don't

18   know.

19        Q.   The next one from Penny Vance, "Did not

20   personally observe intern in OR, as this was not

21   the goal of this rotation (as a PGY2 his focus on

22   CT surgery rotation will purely be to participate

23   in surgical procedures and complete consults.)  I

24   did instruct on procedure and was present, and he

25   did follow instructions well in this instance.

Joseph Papin 1/22/2021

```
 1    However, in several instances was instructed by
 2    myself and fellow to perform a procedure (after I
 3    signed out for the day) and he failed to perform
 4    the procedure as ordered by the attending, so it
 5    did not get done.
 6              Also, I offered to show him how to
 7    perform the procedure and he walked off, stating
 8    he would ask the fellow if he needed to this.  I
 9    spoke with fellow and he advised that he directed
10    him to perform the procedure (was a twice daily
11    medication dosing via chest tube, and I had
12    performed the a.m., and the p.m. procedure fell at
13    a time after I leave in the afternoon.)"
14              What do you remember about that chest
15    tube procedure?
16         A.   Nothing whatsoever.  I don't recall this
17    situation.  I would characterize this as
18    inaccurate because I don't ever recall this
19    happening.  Should something like this had
20    occurred, I would assume that the fellow would
21    have brought it up himself.  No, I don't recall
22    this ever occurring.
23         Q.   Once again, it didn't happen or you
24    don't recall this occurring?
25         A.   I don't recall this ever occurring.  To
```

Joseph Papin 1/22/2021

```
 1   my recollection, there was never a time when I was
 2   asked to do something and I didn't do it.  That's
 3   the first thing.  And then second, that I was
 4   asked to do a task and refused to do it.  It kind
 5   of falls under both of those.
 6              Again, this is another instance where
 7   Penny Vance, who is a nurse practitioner, is
 8   commenting under performance of operations and
 9   procedures.  "The resident communicates
10   effectively, efficiently and professionally in the
11   operating room."  Nothing about what she's
12   referring to.  She states it herself, she knows
13   that this is supposed to be in the operating room,
14   yet still comments and gives me a low grade.
15         Q.   She's also commenting about -- you're
16   not denying that she's commenting about specific
17   instances of conduct with you?  I know you dispute
18   whether they're accurate or not, but she's telling
19   UMC and you in your feedback that you walked off
20   and didn't do this procedure and said, I'll ask
21   the fellow.  She tells that in her statement,
22   right?
23         A.   If you're asking --
24         Q.   Those are the words on the page?
25         A.   Yeah, the words on the page are that.  I
```

Joseph Papin 1/22/2021

```
 1   mean, I don't -- I didn't see this eval, and it
 2   obviously wasn't mandatory for me to have seen
 3   this.  There was no sort of like catch -- if this
 4   was supposed to be like, hey, you're supposed to
 5   be absolutely seeing these all the time, this is
 6   your main method for getting feedback.  I mean,
 7   generally having gone through the MBA program,
 8   things like that, taught about how to manage
 9   people.  You should tell -- if you're not doing
10   something that you should be doing, you should
11   tell people directly and not put it into some sort
12   of an eval.  That's not necessarily -- things can
13   get lost, things happen.
14           So, yes, they're in here.  I dispute
15   that they occurred.  And, you know, I never saw
16   this until discovery.
17       Q.   Then Coordination of Care, still on
18   Penny Vance, "Did not communicate with CT team
19   well.  Was advised first day of rotation what his
20   responsibilities were by attending staff, and did
21   not report to cardiac surgery clinic on days
22   responsible, as well as on multiple occasions
23   asking another team member to perform his duties
24   that he did not want to perform."
25       A.   Yes, these statements are inaccurate.  I
```

Joseph Papin 1/22/2021

```
 1   would ask if you're telling me -- that's a pretty
 2   serious allegation to me, that I'm not showing up
 3   on days responsible.  It's pretty easy to verify
 4   in the medical record when was clinic, did Joe
 5   write any notes from that clinic, because I would
 6   have written notes and things like that.  You can
 7   go to the medical record, tell me which patients
 8   were there, and we can go to the medical record
 9   and pull that up.
10            And that's what I would love to happen,
11   because, I mean, at least this is verifiable, you
12   know, like that -- whether a procedure at a
13   patient's room occurred or didn't occur, whatever,
14   we don't necessarily document every single thing
15   like that.  This would be in the medical record.
16   So I would hope that we could check that.
17        Q.   Same category under Coordination of
18   Care, this is Gretchen Shull.  "Poor communicator
19   to the team about patient plans."
20        A.   Yes.  Gretchen Shull says that.  Again,
21   this isn't specific in any way.  I don't know what
22   a poor communicator to the team about patient
23   plans is.  I would have loved to have gotten
24   better, but we all rounded together, everybody
25   knew -- the plans were formulated -- it comes from
```

Joseph Papin 1/22/2021

```
 1   the attending.  I'm not making a plan on my own
 2   and coming off with how we're doing things.
 3             So they come from the attending, we're
 4   all rounding together with the attending.
 5   Whatever would get communicated is whether
 6   something was done or something like that.  But,
 7   you know, I would always communicate to them, you
 8   know, oh, this that was asked for by the attending
 9   is done, to the best of my recollection.  So I
10   don't know what this is or how I could have gotten
11   better from it, or how anyone could get better
12   from it.
13        Q.   And then Gretchen Shull under
14   Improvement of Care, "Poor insight into own
15   behavior."
16        A.   Yeah.  I mean, that to me -- I dispute
17   this.  I'm very introspective, I'm very
18   reflective.  This seems to me to imply -- when I'm
19   reading this, it seems to imply that she did any
20   sort of redirection or try to speak to me about my
21   behavior.  That certainly was not the case.  She
22   never spoke to me and said this behavior what
23   you're having, it's wrong or, you know, it's
24   misdirected or whatever it is.  We never had the
25   conversation.  I don't know where she's even
```

Joseph Papin 1/22/2021

1    basing this off of.  This seems like something

2    she's just inferred.

3        Q.    Then top of 474, back to Gretchen Shull.

4    "Would be late to clinic or not show entirely, and

5    even sometimes just disappear."

6        A.    I dispute this, too.  Late to clinic --

7    I mean, there were reasons to be late to clinic.

8    So clinic would occur -- I would have floor

9    patients and things like that, things going on,

10   you can get a page where something is going on

11   with a patient, I have to show up to that, I have

12   to be there because I'm the first call as the

13   intern.  So if something were to happen, sure, I

14   could be late to clinic.  I can't possibly pretend

15   that I was always on time to clinic, but there

16   would be a reason for it.  It wasn't just that,

17   you know, I decided to play tiddlywinks or

18   something.

19           If I were late, I was doing something to

20   do with patient care at the hospital.  And then

21   clinics where you have to drive, you know, through

22   traffic, who knows, whatever, you have to leave

23   campus and drive over to clinic.  But no, there

24   was never a time that I recall ever that I just

25   didn't show up entirely.

Joseph Papin 1/22/2021

```
 1              There were times sometimes when I would
 2    get a text from one of the nurses in charge and
 3    saying like, oh, there's just one patient here,
 4    you don't need to come in, something like that,
 5    but there was never a time where I was expected to
 6    show up, that I recall, and didn't show up.
 7         Q.   Do you have any of those text messages?
 8         A.   I can check.  It might have just been a
 9    page, too.  It's some sort of communication,
10    e-mail, text, something, where they say there's
11    only one patient, or this is canceled for the day,
12    something like that.
13              MR. WHITFIELD:  Y'all look and review
14    and produce any of those that you may have.
15              MR. MORGAN:  Sure.
16         Q.   (By Mr. Whitfield)  Bottom of 474,
17    Gretchen Shull, "Did not follow instructions
18    regarding communicating discharges and follow-up
19    instructions to our team."
20         A.   I don't know what she means here.
21    Because discharges, that can certainly be
22    communicated to our team, but that's usually
23    something that's communicated to -- you know, we
24    know it's happening.  That's something that's
25    usually communicated to the patient.  Follow-up
```

Joseph Papin 1/22/2021

```
 1    instructions is something that's exclusively
 2    communicated to the patient and generated by our
 3    team.  So I don't really know what she means here.
 4           I get the general theme is that, you
 5    know, somehow I'm not communicating things.
 6    Again, I don't know -- there's no specificity to
 7    this, there's no which patients did I not
 8    communicate a discharge to or about or whatever.
 9    This may be meaning to mean -- I don't know.  To
10    my recollection, there was never a time where I
11    didn't communicate a discharge or give follow-up
12    instructions to the team.  And moreover, when you
13    write out a discharge, it gets printed out and
14    given to the patient.  You have to have
15    instructions there.  Follow up, come back in six
16    weeks.  If you have fever, chills, nausea,
17    vomiting, something like that, call 911 or call
18    this office number or something like that.
19         Q.   Then on 475, it's under the Performance
20    of Assignment and Administrative Task column.
21    Penny Vance states, "Very disappointed with this
22    intern's performance on CT surgery rotation.
23    Would expect an intern being accepted to our
24    general surgery residency to be the cream of the
25    crop as is very competitive.  On a positive note,
```

Joseph Papin 1/22/2021

```
 1    his documentation was actually better than
 2    expected for an intern."
 3              Do you dispute that your documentations
 4    were better than expected for an intern?
 5         A.    To be honest, I didn't read everybody
 6    else's documentation, but I will gladly take one
 7    glimmer of hope from that.  It kind of seems to go
 8    in counter to everything else.  Documentation is a
 9    form of communication if I'm able to document --
10    if I'm able to keep it straight for documentation.
11    If I'm able to keep everything correct for
12    documentation, the plan, the history, the orders,
13    everything like that, all the stuff that
14    actually -- we gain -- we document -- all the
15    information we obtain, we document.  If I'm able
16    to do that, I don't know how I'm being
17    characterized as not communicating, as not knowing
18    anything.  I don't know.  This is only my second
19    month of residency, too.
20         Q.    Gretchen follows that with, "He has set
21    the bar quite low for the general surgery
22    residency here at UMC.  He seems to be unteachable
23    and lacks a general awareness of professionalism.
24    He lacked an understanding of basic care, but
25    refused to admit his shortcomings.  Was
```

Joseph Papin 1/22/2021

```
 1    consistently playing the blame game when he was
 2    approached.  It was a bad experience to work along
 3    side him."
 4         A.   I dispute -- I dispute this evaluation.
 5    I mean, it seems, you know, pretty biding, I would
 6    say, is the tone of this.  There was never a time
 7    where her and I ever spoke, there was never a time
 8    where her and I had any sort of interaction that
 9    was negative.  I can't comment on what she thinks
10    is professional and what's not, but lacking an
11    understanding of basic care -- she never brought
12    up shortcomings to me.  So I don't know how she
13    can say that I refused to admit shortcomings.
14              "Lacked an understanding of basic care."
15    That's not true.  And was consistently playing the
16    blame game when he was approached.  Again, never
17    approached during the rotation.  So I don't know
18    when I would have played a blame game or anything.
19    This is the first time that I've seen, you know --
20    this is like the final comment, I would assume?
21    This is like the overall kind of thing, I would
22    think?
23         Q.   It seems so.
24         A.   Yeah, so blame game -- who am I blaming?
25    There's no one else to blame.  It's me or the
```

Joseph Papin 1/22/2021

```
 1    nurse practitioners.  I don't know who I would
 2    have blamed.  It would have been her if we were
 3    working together.  She doesn't seem to be saying
 4    that I'm blaming her.  I don't understand.  I
 5    basically dispute everything on this.
 6         Q.   But you do not dispute that these are
 7    the words on the page that were reported in your
 8    evaluation?
 9         A.   That's correct.
10         Q.   So now, this is through your second
11    rotation.  So you've had CV ICU as your first
12    rotation and CT -- cardiothoracic surgery as your
13    second rotation?
14         A.   That's correct.
15         Q.   So if we're logging a tally here, we've
16    got reports that had a falling out with the nurse
17    practitioners and the pharmacist in the first
18    rotation, your incident with Josh in the first
19    rotation, and then it carries over.  Now we've had
20    three attendings that have given you negative
21    comments and the two nurse practitioners in your
22    second rotation that have given you negative
23    comments.
24         A.    No, I don't think that's the case.
25    Going back through your walk-through, I think
```

Joseph Papin 1/22/2021

```
 1   we're talking about Exhibit 8 here.  Dr. Berger
 2   was mistaken when she said four CV ICUs.  Not
 3   necessarily that she had misinterpreted, I think
 4   she had been given inaccurate information.  Then
 5   as these e-mails evolve, in her final summary
 6   where she seems much more, you know, abreast of
 7   the situation, she's not talking about how I've
 8   had fallout with all the NPs.  She's now narrowed
 9   it down to just Josh Sabins.  So no, I did not
10   have fallouts with all the nurse practitioners, it
11   was just Josh Sabins.  I've got a text message
12   with him, you know, the next day telling me, hey,
13   are we cool?  We don't need to report this.  I
14   don't remember the exact characterization if it,
15   but it was basically saying, like, are we cool?
16   We don't need to report this, something to that
17   effect.  I've got that text message.
18            So I didn't really have a fallout with
19   Josh.  I thought -- he told me the next day, you
20   know, I've been to anger management three times, I
21   have a temper if things can go wrong.  I'm like,
22   hey, man, it's cool.  Everybody -- you know,
23   whatever, it's fine.  I'm fine with it if you are.
24   By that time I had already reported it to the
25   chief resident.
```

Joseph Papin 1/22/2021

```
 1        Q.   These are the text messages you produced
 2   to us already?
 3        A.   I'm not 100 percent sure with Josh
 4   because they haven't come up necessarily.  I don't
 5   know if the Josh Sabins' text has been produced,
 6   but we certainly can.
 7        Q.   Is this the one where he said I didn't
 8   tell Dr. Berger?
 9        A.   That sounds like it -- that sounds like
10   part of it.  Yeah, that would have been the text,
11   or one of them, yeah.
12             And then you went through and you were
13   saying -- other than that, you'll notice the -- on
14   the CV ICU, Dr. Berger and Dr. Shakes, their
15   numerical evals -- which aren't in this, these are
16   just comments.  Their numerical evals of me were
17   good.  Dr. Shake and Dr. Berger were both, as far
18   as I recall, the two ICU attendings from that
19   first month that reviewed me.  Those were good.
20             Then the CT surgery, I mean, the CT
21   surgery attendings, residents -- not residents --
22   attendings, nurse practitioners, nurses, they're
23   all -- they're very close in time.  It's almost
24   like two of the same months.  I transitioned from
25   the -- instead of being in the ICU, I was now on
```

Joseph Papin 1/22/2021

```
 1    the floor.  Usually when they come from -- when
 2    they're on the floor, they've come from the ICU.
 3    So these people work together all the time.  You
 4    can kind of see how this information can kind of
 5    flow from Josh or whatever that I might be a jerk
 6    or whatever, I have this Scarlet letter already,
 7    very closely linked.
 8              Then you have people like Dr. Cresswell,
 9    things like that.  Even Dr. de Delva -- everything
10    I saw of him was good, but I've heard this.  So,
11    no, I wouldn't characterize those as like negative
12    evaluations from the attendings.  They were
13    outlining what they had heard.
14              But, you know, there seems to be a rift
15    between nurse practitioners, Gretchen Shull and
16    Penny Vance, and that's inclusive of, you know,
17    commenting on things that they really shouldn't
18    be, where I'm getting obviously terrible
19    evaluations from them, and then, you know, the
20    attendings who largely are saying I'm good from
21    what they've seen.
22    Q.    They also had things in theirs that you
23    had to be reoriented to details, having issues
24    keeping up with the pulse of the patient in their
25    evaluations.
```

Joseph Papin 1/22/2021

```
 1       A.   Right, which I think -- what I'm -- yes,
 2  those were -- I'm not agreeing with that.  I'm
 3  saying that those were in the evaluations
 4  themselves.  I suspect that that's from the
 5  nurses, the nurse practitioners.  Because, you
 6  know, like Earl has said it himself, lots and lots
 7  of people, I'm intelligent, you know.  Keeping
 8  details together has never really been an issue
 9  for me in terms of remembering patient details,
10  being prepared.  That's something that I pride
11  myself in is my preparation coming in and knowing
12  things about patients, just in general being
13  knowledgable.
14            So I don't think that they ever observed
15  that themselves.  I think that was something that
16  they were told and they were, you know, reporting,
17  or they were told it and it, you know, clouds or
18  colors your view of the world from that point
19  forward.
20       Q.   Now, you commented on Dr. Berger's first
21  e-mail being that she got more detail later.  Did
22  you talk to Dr. Berger about that or is that just
23  something you're supposing here on the spot?
24       A.   Well, we had met at this point, and then
25  we all met, all being Marita, myself, Josh Sabins,
```

Joseph Papin 1/22/2021

```
 1   and Dr. Berger and all met.  It was at this point
 2   that she made the e-mail.  She never brought
 3   anything up to me about having a fallout with all
 4   CV ICU nurse practitioners.  This is just me
 5   assuming because she never brought it up to me.
 6   It was just the Josh Sabins issue.
 7            The pharmacist thing, absolutely no idea
 8   where that came from.  I don't even know how I
 9   could have had a conflict with a pharmacist.  I
10   mean, they don't...
11       Q.   You will agree that Dr. Berger did write
12   that to Dr. Shake?
13       A.   Yeah, I do.  I do.  I don't know where
14   she got that information, but I'm just saying
15   that, you know, by the time she spoke to me, and
16   then subsequently wrote this e-mail on Papin 438,
17   that by the time she spoke to me, she never
18   brought up these issues.  And by the time she
19   wrote this e-mail, she's not writing about them
20   either.  The only thing that she's talking about
21   are these issues here.  It was never brought up to
22   her, I guess, in my presence, and then -- no
23   longer is it that I've had a fallen out with all
24   four CV ICU nurses and a pharmacist, you know.
25            I think the difference between these
```

Joseph Papin 1/22/2021

```
 1    e-mails is I was there in person to kind of, you
 2    know -- people aren't going say anything that they
 3    want to say when I'm present.  If that makes
 4    sense.  It's harder to say something about someone
 5    when they're right there to defend themselves.
 6         Q.   So that kind of concluded your CT
 7    surgery rotation.  And that would have ended at
 8    the end of August?
 9         A.   That's correct.
10         Q.   Where did you go next?
11         A.   Next was the VA, Veterans Affairs.
12         Q.   So as these evaluations had started
13    coming in at the end of the rotation, did you have
14    anymore conversations with Dr. Earl about the
15    evaluations and -- I believe in your talk with HR,
16    you told them that he had met with you several
17    times.
18         A.   Yeah.  I don't -- if you can tell me --
19    I would need some context on that.  He did meet
20    with me more than once.  I don't recall him
21    meeting with me more than once prior to the VA.  I
22    think we met one time, and it was just to talk
23    about, you know -- like the gist of it was that we
24    need to avoid these types of situations.  I don't
25    blame you for this occurring, but the goal is to
```

Joseph Papin 1/22/2021

```
 1    not have it come to blows.
 2          Q.    That was in reference to this Josh
 3    Sabins' incident?
 4          A.    That's correct.
 5          Q.    At that time you didn't have another
 6    meeting with him until when?
 7          A.    Give me a second here.  So if I recall
 8    correctly, the next time that I met with Dr. Earl
 9    would have been for the semi-annual evaluations on
10    or about November 29th, something like that.
11    November 20th, 29th, something like that.
12          Q.    Would that be the only in-person
13    meeting?  What about phone calls or other
14    conferences?
15          A.    To the best of my memory, that would
16    have been the next time that we had like an
17    in-person, you know, meeting about my progress.
18                Now, during that time, in November, I
19    would have, you know, talked with him and seen him
20    a bunch because I was on his service -- that would
21    have been October that I was on his service, I
22    believe.  Because now we're in September, which is
23    the VA; is that correct?
24          Q.    Uh-huh.  (Affirmative response.)
25          A.    And October was transplant.  So I would
```

Joseph Papin 1/22/2021

```
 1    have seen him and interacted with him, but we
 2    weren't talking specifically about any issues or
 3    my progress or anything like that.  In passing, in
 4    October, I told him, Dr. Earl, I really want to
 5    make sure I do a good job for you on the service,
 6    please let me know if anything comes up.
 7              And we had another conversation again
 8    just in passing towards the end of the rotation
 9    where I said, Dr. Earl, how did I do?  He said you
10    did great.  I've been checking up about you, I
11    haven't heard anything bad.  I asked his nurse
12    practitioner, Ashley Seawright, she told me I did
13    a great job.  There's text messages.  I think we
14    produced those to you.
15              The next formal meeting where it was
16    just anything more than that would have been, I
17    believe it was November 29th.
18         Q.   What about -- I read reference to a
19    meeting of you and him outside of OR-16.
20         A.   I have as well.  I don't recall that.
21         Q.   Don't recall the meeting?
22         A.   I don't recall that ever occurring.
23         Q.   Another incident that I want to talk
24    about was a phone call that the two of you had
25    when he was -- he was at the CCC meeting, and it
```

Joseph Papin 1/22/2021

1    was about leaving a note for sign out.

2         A.   Right.

3         Q.   What do you remember of that?

4         A.    I don't remember anything about that at

5    all.  I don't recall it occurring.  I do recall

6    him giving me a -- and I don't recall that ever --

7    let me make this clear.  I don't recall him ever

8    calling me about that and I don't recall and

9    dispute that that ever happened.  I never would

10   have just left a note, you know, like a Dear John

11   and just walked out.  That would have never been

12   something that I did.

13            I do recall one specific instance where

14   he called me.  I don't recall when it occurred,

15   but I was in clinic and the clinic was over in

16   Brandon, you know, 20, 25 minutes away from the

17   hospital and it was about a minute away from where

18   I lived.  And I got done like at 6:30, sign out

19   was at 6:00.  So I called the resident -- the

20   intern who I was supposed to sign out to, and I

21   said, hey, I'm 25 minutes away, is it okay if I

22   give you verbal sign out this one time?  Because

23   I'm a minute from my place and I have to come back

24   25 minutes, it won't be until 7:00 I get back and

25   it was 25 minutes back.  And I don't remember the

Joseph Papin 1/22/2021

```
 1    intern's name, but they were fine with it.
 2              Evidently, a senior resident became
 3    aware of that and reported it to Dr. Earl.
 4    Dr. Earl called me and told me, hey, we can't do
 5    that.  It has to be in person every time.  I said,
 6    okay.  That is what I recall.  And it never
 7    occurred ever again.
 8         Q.   Who is Dr. Laura Vick?
 9         A.   Dr. Laura Vick, she was a general
10    surgery attending.  I interacted with her on
11    general surgery B.
12         Q.   What is general surgery B?
13         A.   There's just -- there used to be an A
14    service, I think that's the only one.  It used to
15    be A and B for the general surgery for things like
16    gallbladders, things that weren't specialized.
17    Cardiothoracic, anything to do with the heart
18    surgery, that's on cardiothoracic.  If you come in
19    and you're in some sort of a trauma, that's on
20    trauma.  This would be like if you got your
21    gallbladder removed or part of your intestine or
22    something like that.  Something that didn't fall
23    anywhere else.  Just like the core general surgery
24    stuff that we would see -- was seen on general
25    surgery.  I think general surgery B.  There used
```

Joseph Papin 1/22/2021

```
 1    to be an A and a B, and it was just still called
 2    B.
 3          Q.    But she was over B?
 4          A.    She was over B, yes.
 5          Q.    Do you know if she's also the wound care
 6    doctor?
 7          A.    Yes, she kind of carved out a little
 8    niche for herself seeing wound care things.
 9          Q.    Why would she have reported to Dr. Earl
10    that you left a note for sign out if you hadn't
11    left a note for sign out?
12          A.    I don't recall that even being said.  I
13    think that might be -- someone is mistaken here.
14    I don't recall that was ever said.  The only time
15    I've ever heard that was in Dr. Earl's deposition.
16    That's the only time I've ever heard that.  And
17    from recollection, I don't think he said that,
18    that Dr. Vick told him that I didn't leave sign
19    out, because attendings aren't present for sign
20    out.  Whether I did or whether I didn't or anybody
21    did or didn't, she wouldn't have known the sign
22    out even occurred or when it was occurring or, you
23    know, the facts of it.  It was done in the
24    resident lounge and attendings weren't there.
25          Q.    Where is the resident lounge?
```

Joseph Papin 1/22/2021

```
 1        A.   So it's hard for me to remember if it
 2   was like -- when you enter the hospital, as you're
 3   walking, I think you kind of follow on the right
 4   side of the corridor, you'll see like the
 5   cafeteria, you go past that, and you keep going to
 6   the right.  It's kind of toward the end to the
 7   back on the way to the Children's Hospital.
 8        Q.   Okay.
 9        A.   Now, I don't remember if that was on the
10   ground floor or the first floor.  They were the
11   same thing.  If you remember where the cafeteria
12   is, I think it was on the same floor as the
13   cafeteria, kind of far to the back on the way to
14   the Children's Hospital.
15        Q.   Is it still in the main hospital?
16        A.   Yes.
17        Q.   Are you familiar with what the Clinical
18   Competency Committee, or CCC, is?
19        A.   I'm familiar with what it is.  I'm not
20   familiar with exactly what they did.
21             (Exhibit 10 marked for identification.)
22        Q.   (By Mr. Whitfield)  I'll hand you what
23   is marked as Exhibit No. 10, which are the notes
24   from the CCC meeting.  I want to refer you to the
25   back page first.
```

Joseph Papin 1/22/2021

```
 1        A.   Okay.

 2        Q.   These were documents that were produced

 3   in discovery.  Have you reviewed this document?

 4        A.   I don't believe so.  I'm not noticing

 5   the sad face between the P either.  I feel like I

 6   would have seen this before.  There's a

 7   handwritten "Papin" with a sad face in the P,

 8   second P.  I don't recall ever seeing this.

 9             Once more, on peds, I didn't do a

10   pediatric surgery rotation.  So my semi-annual

11   review would have been late November, we'll say, I

12   think it was the 29th, but it would have

13   been then.  At no point ever did I ever do a ped

14   surgery rotation.

15             I'm looking at this, "Multiple providers

16   had trouble working with him, poor communicator."

17   Never did a rotation on pediatric surgery, so I

18   don't know --

19        Q.   What about pediatric physicians?

20        A.   There were times where on call we would

21   have, you know -- like if something -- if a trauma

22   came into the -- if it was a kid, they would go to

23   the pediatric emergency room.  But I mean, I would

24   have incredibly minimal interaction with

25   attendings or anybody on the peds side.  It would
```

Joseph Papin 1/22/2021

```
 1   basically be me go get a story, write up a history
 2   and physical, and that was it.  Certainly never
 3   have -- I couldn't even tell you the name of a
 4   pediatric surgeon, honestly.  I never had a
 5   rotation on peds.
 6        Q.   Surgery B, it says, "Told senior faculty
 7   he had communicated risk factors and had not."
 8        A.   Yeah, I -- I don't know what that's
 9   referring to.  I can tell you there's never been a
10   time where I have said I've done something and
11   lied about it.  That's never happened.
12        Q.   On here it says, "Left a note for sign
13   out" and "be honest."  You see those two comments?
14        A.   I do see that.
15        Q.   As we're sitting here in the deposition,
16   have you ever left a note for sign out?
17        A.   I don't recall ever leaving a note for
18   sign out.  Sign-out procedure is you print out
19   your patient census, all the patients on your
20   list, and then their room numbers would be there,
21   a courtesy thing.  You hand that to the person
22   that you're out going to, and then they take notes
23   on that, and then that's their list for the night.
24   If anything occurs, they have a nice little list
25   there for themselves to write things in on.  It's
```

Joseph Papin 1/22/2021

```
 1    a way of them to keep track of who their patients
 2    are, where they are, things like that.  I don't
 3    know if they're referring to that, but that was
 4    done every day.  But no, there was never a time
 5    where I left a patient -- where I left a note for
 6    sign out and that was it.
 7              I do recall the time when I was -- had
 8    to stay late in clinic and called and asked if I
 9    could do a verbal sign out.  No, there was never a
10    time where I just left a note and walked away and
11    that was it, never.
12         Q.   Dr. Earl never called you about leaving
13    a note for sign out?
14         A.   Unless what he's saying -- I don't know
15    if he's mistaken.  It would be inaccurate to say
16    that he called me about leaving a note for sign
17    out.  The time that he did call was when I asked
18    if I could call verbally.  That was the time that
19    I recall.  And he did tell me not to do that
20    anymore.
21              (Exhibit 11 marked for identification.)
22         Q.   (By Mr. Whitfield)  I'm going to hand
23    you what is marked as Exhibit No. 11.  Do you
24    recognize these documents?
25         A.   Is the question have I ever seen this?
```

Joseph Papin 1/22/2021

```
 1        Q.    That's the first one.

 2        A.    This document here?

 3        Q.    Yes.

 4        A.    655 to -- where's 656?

 5        Q.    They're out of order.

 6        A.    I don't think I've ever seen 656.  These

 7   look like what were probably notes from somebody

 8   during the semi-annual review, would be my guess.

 9   But I do recall seeing 655 and 657 and being given

10   these in my semi-annual review.

11        Q.    So in the semi-annual on page 655, I'm

12   showing you, you had a grade of CD or critically

13   deficient in Systems-Based Practice 1, critically

14   deficient in Systems-Based Practice 2, critically

15   deficient in Practice-Based Learning & Improvement

16   PBLI3.  Critically deficient in Professionalism 1,

17   critically deficient in Interpersonal &

18   Communication Skills ISC1, critically deficient in

19   Interpersonal & Communication Skills ICS2, and

20   critically deficient in Interpersonal &

21   Communication Skills ICS3.

22        A.    I do see that.

23        Q.    Does that accurately state what's on the

24   page?

25        A.    It does.
```

Joseph Papin 1/22/2021

```
 1        Q.   At the end there's some notes.  Is that
 2   your signature and the date?
 3        A.   That looks like it, yes.
 4        Q.   And Dr. Earl, again, tells you there's
 5   communication and professionalism concerns,
 6   ownership of task, communicate concerns, must
 7   treat nurses and allied health staff with respect,
 8   do not be arrogant.
 9             So you received that feedback?
10        A.   I do, or I did.  This is what he said
11   and, you know, I don't know about anybody else,
12   but when someone tells me communication and
13   professionalism concerns, those are incredibly
14   broad.  I still to this day don't understand what
15   he meant.  Ownership of task -- I'm trying to be
16   as clear as possible here.  He refused to give any
17   more clarity into what this said.
18             Communicate concerns, I don't what -- is
19   he telling me that I want to communicate concerns,
20   that I should communicate more communicate
21   concerns?  I don't know.  Must treat nurses in
22   allied health with respect, but I still don't have
23   an instance where I can think of that I treated
24   someone without respect.  The only incident that I
25   can recall was the negative was the Josh Sabins
```

Joseph Papin 1/22/2021

```
 1   incident.  Do not be arrogant, again, overly
 2   broad.  I can't possibly know what that's
 3   referring to.
 4              And then on this sheet, you know,
 5   obviously to me in hearing -- I didn't know what
 6   the clinical milestones were and things like that.
 7   But hearing seven critical deficiencies, that
 8   sounded serious to me.
 9              And when I would ask, he became irate,
10   he became angry.  Joey, you always do this, you
11   know.  Feedback to you is a sign in the OR.  When
12   someone stops listening to your presentation,
13   that's your feedback.  When somebody tries --
14   there's a big push in surgery for feedback and --
15   I don't believe in that.  You need to start
16   figuring it out for yourself.
17              When I asked for any context, I would
18   just always get this.
19              Again, I'm looking at this, I still
20   don't understand this.  Patient Care PC1, what
21   does that mean?  A 1.0 evaluation 2.9.  When you
22   go down to System-Based Practice SBP1, it says CD
23   where Patient Care PC1 said 1.  And then
24   evaluations Q6 it says 2.9, and it says the exact
25   same thing for PC1 2.9, but PC1 is not a CD.  So I
```

Joseph Papin 1/22/2021

 1   don't know what scale this is on.  It doesn't seem
 2   to correspond to -- is it a mean, median average,
 3   standard deviation -- I don't know what it is, but
 4   I'm looking at this and I see 2.9 for SBP1, 2.9
 5   for PC1.  They're both the same number.  One is a
 6   critical deficiency, one is not.  When I asked
 7   about that, he told me to figure it out.
 8             This is unreadable to me.  And this is
 9   the extent of the feedback that I got.  It makes
10   it impossible to improve.
11        Q.   You actually had a meeting with Dr. Earl
12   where he was going over this with you?
13        A.   No, he didn't -- what he said was
14   basically this.  And then as I'm reading the
15   notes -- I mean, I don't remember the exact
16   entirety of the conversation, but the notes here
17   on 656 at the back of this were some of the things
18   that we discussed, you know -- these are notes
19   from -- I'm going to guess this is Renee, because
20   she was present.  Quiet around -- quiet, around,
21   do what needs to be done, only read -- only wrote
22   out -- you know.  I'm agreeing with statements.
23             Obviously, you know, hierarchy, trust,
24   respect must be earned -- hard to earn, easy to
25   break, things like that.  He did discuss this

Joseph Papin 1/22/2021

```
 1    hierarchy, trust and respect must be earned, but
 2    didn't give any sort of context into it.  You
 3    know, where am I losing trust?  Where am I losing
 4    respect?  Understanding feedback, things like
 5    that.
 6              So he went over generalities to the
 7    extent -- I mean, he summarizes exactly what he
 8    said right here on 657.  To me, it's nothing to go
 9    off of.  I was begging him, you know, Dr. Earl, I
10    would really, really like to know the context of
11    what's going on because I want to be better.  I
12    want to succeed here.  I want to do a good job.
13    If you're not giving me the context or where these
14    are coming from, what's happening, it makes it
15    really, really difficult for me.  Because I
16    clearly can't recall anytime where I've been
17    unprofessional or I've treated nurses without
18    respect, say, for the Josh Sabins incident.  And
19    even then, I thought I was respectful but firm.  I
20    just wasn't going to let myself be bullied.
21              He handed me this sheet, but I mean, he
22    gave me no more context than this.  I don't know
23    what SBP1 means.  I don't know what SBP2 means.  I
24    don't know what the scale means.  I don't know
25    what this is --
```

Joseph Papin 1/22/2021

```
 1                  Yes, he handed this to me; yes, we
 2       talked about it.  The highlights of which are
 3       written here in the margin.  But I was no better
 4       off leaving this meeting than before I went into
 5       it.
 6            Q.   The next meeting, would that have been
 7       your meeting with him on December 20th?
 8            A.   Yes, sir.
 9                 (Exhibit 12 marked for identification.)
10            Q.   (By Mr. Whitfield)  I'm going to hand
11       you what has been marked as Exhibit No. 12.  Have
12       you seen this e-mail before?
13            A.   Only through discovery, but yes.
14            Q.   So in this it says, "At our meeting with
15       Joe today we discussed the recurring issues of
16       professionalism that have been present through
17       much of the first six months of his residency.
18       These are well documented in his evaluations and I
19       have gotten feedback from nurses, co-residents,
20       and staff regarding his behavior.  Specific
21       examples of this behavior are:  Unwillingness to
22       help with tasks, leaving the hospital during duty
23       hours (to exercise), condescending tone to nurses
24       and fellow residents, leaving clinics without
25       telling anyone, and poor inter-professional
```

Joseph Papin 1/22/2021

```
 1    communication."
 2            Did he go over all of these with you in
 3    that meeting?
 4        A.   No, I don't believe that we discussed
 5    leaving clinics without telling anyone.  And I
 6    wasn't -- I would have assumed that I would have
 7    been the "To" on this e-mail, and then maybe Renee
 8    and himself would have been CCed.  I don't know
 9    why I was not included on this e-mail.  I would
10    assume because of that, but I don't know.
11            I was never told that I was leaving
12    clinics without telling anybody.  But we did go
13    over unwillingness to help with tasks.  We did go
14    over No. 2, leaving the hospital during duty hours
15    to exercise.  And if I recall correctly, that was
16    99 percent of what that meeting was.  It was
17    because he had been given a text message between
18    myself and Meghan Mahoney, and he was upset that I
19    had asked to go to -- I had asked to go on a run.
20    He didn't know that I didn't go.  I told him that.
21    I also clarified, Dr. Earl, it seems like you're
22    not operating with all of the facts.  I asked her,
23    however long ago, if I could go on a run and she
24    told me I could and she let me go.  So it seems
25    like a trap now when I'm asking.
```

Joseph Papin 1/22/2021

```
 1                  And I didn't go without permission.  I
 2     asked, waited and waited.  And when she told me I
 3     couldn't go, I didn't go.  Seems like you were
 4     told that I asked this time as if it were the
 5     first time and I hadn't been given permission
 6     beforehand.  I've got a text message to prove
 7     that.  Do you want to look at it?  No, I don't.
 8     And then we discussed a few of these other things.
 9          Q.   What did you discuss about unwillingness
10     to help with tasks?
11          A.   Just that.  He went into no more depth,
12     unwillingness to help with tasks than that.  I
13     told him, Dr. Earl, I can tell you, there's never
14     been a time where I just refused a task or I've
15     been unwilling to help with tasks.  Could you give
16     me some context in that?  Joey, you always ask
17     about this.  This is what it is, fix it.  Okay.
18                  Leaving the hospital during duty hours,
19     obviously that was the main theme of the whole
20     conversation, so that I had context to, because he
21     had identified the text message and that it came
22     from Meghan showing things like that.
23          Q.   What about the condescending tone to
24     nurses and fellow residents?
25          A.   He brought that up.  That is about as
```

Joseph Papin 1/22/2021

```
 1   good of a summary as the entirety of the
 2   conversation that he and I had.  And I can't
 3   recall ever being condescending to a nurse or a
 4   fellow resident.  If you wanted to call it
 5   condescending, the only text message, which I
 6   believe has been produced to you, and I think we
 7   might have been produced to you, is between Erin
 8   Moore on that code blue incident where he's
 9   telling me it's not a good look to not come to the
10   code blue.  I told him, you know what's not a good
11   look is for you to be standing there right next
12   me, you didn't move, you didn't run over there,
13   you did nothing.  When we finished, I walked out.
14   I didn't know it was a patient of mine, and now,
15   however many minutes later, you're telling me it's
16   not a good look that this happened.
17           So if that is called condescending, I
18   could see that, possibly, that I was standing up
19   for myself and, you know, defending my own
20   professionalism in some way.  It felt like kind of
21   a personal attack when someone attacks your work
22   ethic and how you take care of your patients.
23   That felt personal to me.
24           The last one, if we could just skip over
25   to that one, for inter-professional communication.
```

Joseph Papin 1/22/2021

1    Again, he said that, would give me no sort of

2    feedback or direction as to what that meant.  I

3    mean, I don't remember if it was the November 29th

4    meeting or this one, but like I described before,

5    I told him, Dr. Earl, I don't mean to be flip, but

6    I'm speaking English.  I don't know where or how

7    communication is breaking down.  I can't think of

8    an instance of this, but I feel like I'm

9    communicating to the best of my ability here.  And

10   as you and I are communicating, I feel like you're

11   understanding me.  Where is this breaking down?

12   If you could tell me, I could make an effort to

13   make this better.  And nothing.

14        Q.   Didn't the code blue happen over the

15   holiday time?

16        A.   I -- I don't recall.  I want to say I

17   don't think so, but I don't recall.

18        Q.   I wanted to clear that up for the

19   record.  I'm just asking.

20        A.   I don't recall.  I think there's

21   documents of when that happened.  It would have

22   been in a text message.  I can check my phone

23   right now, actually.  I can tell you in a second

24   when that occurred.

25             Yeah, it looks like December 12th, 2016

Joseph Papin 1/22/2021

```
 1   was when it happened, which would not have been
 2   the holidays.
 3       Q.    Speaking of the code blue, that occurred
 4   as you were signing out?
 5       A.    The code blue, I mean, this was a while
 6   ago.  But what I recall is the code blue came over
 7   after I had signed out.  I was still like on
 8   campus.  I was still in the resident lounge when
 9   it occurred.  It just said code blue, three north.
10   There's a lot of patients on three north.  It
11   didn't even occur to me that it would have been
12   one of my patients.  How ever long I had been at
13   UMMC to that point, a code blue had never been
14   called on one of my patients, you know, that I can
15   recall.  And certainly not when I was present.
16           So it's something that's so infrequent
17   and so rare, it just didn't even occur to me that
18   that could possibly be one of my patients.  I was
19   sitting there with the night team, because that's
20   who you sign out to, the people who are going to
21   be taking over for you at night.  So the night
22   team would have been the one to have been running
23   over there if they had known, too.  I'm sitting
24   with them, I talked a little bit, and then I ended
25   up leaving.
```

Joseph Papin 1/22/2021

```
 1              But yeah, no, I was -- Erin, who was the
 2   one who sent me the text message that said it was
 3   not a good look was the one I had signed out to.
 4   Now, if it was -- to me, it's kind of ridiculous
 5   that he was sending me this text message.  I'm
 6   standing right there with you.  If he would have
 7   started running, I would have started running.
 8   Nobody else was.  Nobody was doing anything.  It
 9   didn't even occur to me, didn't even think.  I
10   heard a code blue, but I didn't think it was one
11   of my patients.
12              I left and then I got a text message
13   from Will Bruch, who is another intern with me on
14   trauma service.  He told me about it.  I asked
15   what was going on.  And then I think in the
16   meantime I got a text from Erin saying it was a
17   bad look.  You know, a code was called on one of
18   your patients.  It just felt like an attack.
19   There was no call, hey, come back or anything like
20   that.
21        Q.   Was Erin a first-year intern?
22        A.   That's right.
23        Q.   So you, Erin and Will Bruch were all in
24   the same class so to speak?
25        A.   That's right.  Just one small
```

Joseph Papin 1/22/2021

1    clarification is that I was a general surgery

2    resident, they were urology residents, interns.

3    But their first year was entirely with us.  So

4    they were entirely part of the general surgery

5    program, but their second year forward, they were

6    solely with urology.  But yes, we were all on the

7    same level.  You could technically consider us all

8    general surgery residents at that point.

9         Q.   I guess I've heard the expectation would

10   have been because it was your patient, you should

11   have called or checked in on.  Because coming off

12   the dayshift, you would have had the most medical

13   knowledge of the patient for the team?

14        A.   I don't know that that was -- I've heard

15   that myself, too, subsequent to it.  I don't know

16   if that was an expectation, but certainly it would

17   have been an instinct of mine had I known this was

18   a patient -- had they said code blue three north

19   room number 317, or whatever the patient's

20   number -- I'm just guessing -- 317 and I had known

21   that that was my patient, I absolutely would have

22   gone.  Or if I had walked by and seen a code blue

23   occurring, I actually would have stepped in and

24   offered my assistance.

25              First, the role of an intern is minimal

Joseph Papin 1/22/2021

1  on the team.  But still, you know, if I can

2  provide anything, if I can do anything at all,

3  take notes, provide some sort of -- oh, he's

4  diabetic, not that he was, but just some minor,

5  like, way to help, I would have.

6       Q.   Looking back on it, hindsight is 20/20.

7  But as the intern, probably should have called and

8  just said, hey, whose patient is this?

9       A.   I mean, I wouldn't agree with that I

10  probably should have.  I would have wanted to for

11  my own.  But in terms of like, you know, formally

12  whose duty is it to take care of a patient, I had

13  already signed out the patient's care.  I know

14  there's some debate about whether it's a shift or

15  not.  The fact is, it was a shift from 6:00 a.m.

16  to 6:00 p.m.  I didn't consider it shiftwork.  You

17  know, you sign out at 6:00, if you've got more

18  things to do, there are more things pending, you

19  stay.  No problem with that whatsoever.

20            Formerly speaking, it was then Erin's

21  patient.  He had the sign out, he had the list, he

22  had everything he needed to know.  There was no

23  way to predict that this patient was going to have

24  a code blue, so there was nothing more that I

25  could have prepared him with.  Had I known,

Joseph Papin 1/22/2021

```
 1   absolutely I would have gone.
 2        Q.   All right.  We've made it about another
 3   hour and 15 minutes.
 4             (Off the record.)
 5        Q.   (By Mr. Whitfield)  So now we've gone
 6   through your rotations, and we've gone through CV
 7   ICU, CT surgery, then you went to VA, then you
 8   went to transplant, surgery B.  And then December
 9   of 2016 was trauma?
10        A.   That's right.
11        Q.   Who was your chief on the -- resident
12   chief on the trauma service?
13        A.   It would have been Meghan Mahoney.
14        Q.   She was a fourth year at that time?
15        A.   Yeah, she was clinically a fourth year.
16   She had done a fellowship in critical care
17   already.  So the residency is your first year
18   PGY1, PGY2, PGY3, 4, 5, and you're done.  She had
19   kind of taken a break and done a fellowship in
20   critical care where you have to take care of very
21   sick patients in an ICU setting.  She had been at
22   the hospital -- I think that was her fifth year,
23   but she's clinically a fourth year.
24        Q.   Does it matter when you take a
25   fellowship?  Can you take that at anytime or is it
```

Joseph Papin 1/22/2021

```
 1    like a set procedure for taking fellowships?
 2         A.   Yeah, usually most of them want you to
 3    have completed residency entirely.  There's a few
 4    that let you do in your third or fourth year.
 5    That's one of them.  But generally, for example,
 6    plastics is a fellowship.  Generally you have to
 7    have completed five years, or you apply in your
 8    fourth or fifth year.  But it's after you've
 9    completed your residency.  Most of them are like
10    that.
11         Q.   You came on to Meghan's service in
12    December?
13         A.   That's correct.
14         Q.   That was trauma?
15         A.   That's right.  Meghan started at that
16    time, too.
17         Q.   So both of you started December 1st?
18         A.   That's right.
19         Q.   Tell me about working with Meghan.
20         A.   Anything specifically?
21         Q.   How did y'all interact with one another?
22         A.   I guess I would characterize it as
23    somewhat difficult from the beginning.  I think
24    Meghan has a bit of a reputation.  I had worked
25    with her a few times on call.  Her nickname in the
```

Joseph Papin 1/22/2021

```
 1    program is the red dragon.  And when we first
 2    started, I remember her for the first week, it was
 3    the weirdest thing that she would say to me
 4    randomly -- we would be in the resident room just
 5    kind of hanging out with the other team members,
 6    and she would say, am I going to have a problem
 7    with you -- just out of nowhere, am I going to
 8    have a problem with you, Joe?  I said, no, Meghan.
 9    Is there any reason you think that?  And she
10    wouldn't answer or just say no or something like
11    that.  But she did that every single day for about
12    four days straight.
13            Finally, I said, Meghan, where is this
14    coming from?  I don't think I'm going to have a
15    problem with you.  Have you had one with me at
16    all?
17            No, I'm just watching you.
18            I'm like, okay.  And that was really
19    kind of how it started, but, you know, our
20    interactions I would say initially were
21    professional.  But she's always got kind of
22    like -- I don't know how to say it other than
23    she's got kind of a brusk quality about her.
24    She's just not a very -- I don't know if nice is
25    the right word, but she's just not a very nice
```

Joseph Papin 1/22/2021

```
 1    person.  But was professional.

 2            We would communicate with each other,

 3    you know, everything got done in the beginning.

 4    And then as we moved forward, I think things

 5    started to deteriorate.  You know, she started to

 6    say like, you know, ruder things or correct me

 7    about things in public.  Some things that weren't,

 8    you know, even necessarily my responsibility or my

 9    fault.  Not saying -- something that I had nothing

10    to do with.  It would be completely peripherally

11    related to trauma and she would yell at me because

12    something was going wrong, something like that.

13         Q.   Is this where the number list came up?

14         A.   That's where I was heading towards.

15    There was an interaction probably midway through

16    the rotation, mid-December, I couldn't tell you

17    exactly when it was.  We were down in the resident

18    reading room, I think it's called, for radiology.

19    It's right next to the emergency room on the

20    ground floor.  We were down there, there were

21    like -- I want to say urology -- urology resident,

22    I think there might have been more, orthopedic

23    surgery residents, urology residents, may or may

24    not have been some emergency medicine residents,

25    you know, radiology techs.  There were a bunch of
```

Joseph Papin 1/22/2021

```
 1  people there.
 2          I don't recall what it was that she
 3  yelled at me for, but she yelled at me.  And this
 4  had been how ever many -- it wasn't the first
 5  time, I'll say.  I told her, Meghan, happy to
 6  accept feedback, want to get better, but doing
 7  this in front of people is not the way to give me
 8  feedback.  Please reserve this for in private.  We
 9  can certainly talk in private.
10          She became enraged.  She asked me to
11  step outside the room.  She's telling me -- she's
12  angry at this point.  I have been warned by Renee
13  to watch out for you.  I have been told that you
14  could be a problem, so I'm watching out for you.
15  You're just getting difficult.  I'm going to give
16  you feedback whenever I want, whatever.
17          And I said, that's up to you.  I can't
18  stop you, but it's not really the best to give
19  this in public to try and humiliate me.  And
20  then -- I don't remember the rest of the
21  conversation.  It basically ended there.  And then
22  maybe that day, maybe the next day, she came up
23  with this numbering system.
24          The numbering system -- she came up with
25  it publicly.  It wasn't designed as another
```

Joseph Papin 1/22/2021

```
 1    humiliation technique.  It was 1 through 5.  Like
 2    No. 5 -- I don't remember the numbers.  One of
 3    them was, Joe, you're a douche, another one was,
 4    Joe, you're an asshole.  There were variations on
 5    that same theme.  All of them were some sort of
 6    insult towards me.  And from that point forward
 7    she would say, that's a 5.
 8            I got a text message from her where I
 9    was talking about -- I don't know if that's been
10    turned over.  I think it has, but I'm not sure --
11    but, you know, where she's telling me -- I told
12    her, oh, one of the nurses on whatever unit said I
13    was cute.  They're back in my good book or
14    something like that.  I was just joking with her.
15    And then she responded, 5.  I think that was the
16    douche.  You're being a douche.
17            And that's what it was.  It was just
18    another one of her tools to try and humiliate me
19    and embarrass me.  From what I can assume is that
20    Renee had clued her in to be watching out for me
21    and looking out for me.  It says right here, I'm
22    referring to Exhibit 12, 459, bottom paragraph.
23    "Additionally, I told him I would be soliciting
24    feedback regarding his performance from nurses,
25    residents and faculty."
```

Joseph Papin 1/22/2021

```
 1              And I would assume that the way that was
 2    done was through Renee.  And she told me in anger,
 3    oh, Renee told me to watch out for you.  This is
 4    just kind of more of the same -- I couldn't really
 5    understand where it was coming from.  She just
 6    seemed to be angry.  She's angry with everybody at
 7    all times.  She just seemed to be angrier with me.
 8    Didn't really know where it was coming from.
 9              So it just continued on right there.  So
10    I would say it progressed from just kind of at
11    least cordial, I would think, to some like weird
12    comments about, am I going to have a problem with
13    you, to just kind of outright dysfunctional the
14    way that she was speaking to me.  She would curse
15    at me over text messages, things like that.  I
16    think those would have been produced, things like
17    that.  Giving me feedback publicly, which I've
18    already discussed that.
19              These are all things that are just, you
20    know -- I would think that most managers, most
21    people managing people wouldn't be doing.  If you
22    want someone to genuinely improve, don't scream at
23    them without any sort of action.  She just
24    screamed to scream.  It's not like she's trying to
25    correct something and have me do better and tell
```

Joseph Papin 1/22/2021

1    me this is what should be done, whatever.  You can

2    scream at me, that's surgery.  I'm not -- people

3    scream, that's fine.  But, like the way that she

4    was doing it, it was just specifically to

5    humiliate and just to embarrass.  There was no

6    real point to it.

7              Finally, I took a little issue with it

8    and told her.  And then I would say that, from

9    that point forward, it was kind of a disfunctional

10   relationship.  I still communicated everything

11   that I needed to with her.  I still -- she's still

12   my superior, she's still my boss, technically.  If

13   there was ever a patient issue, I brought it up to

14   her, still communicated about patients.  That

15   never changed.

16       Q.   Now, one of the biggest issues that

17   apparently occurred on her service was with a

18   decubitus ulcer patient.  I'm sure you heard a lot

19   and read a lot on this particular patient.

20       A.   That's right.

21       Q.   Did she have a rule that you were

22   supposed to check the backsides on Mondays?

23       A.   She did.

24       Q.   Do you remember her asking you if you

25   had checked this patient's backside on the

1    Mondays?

2        A.   I don't recall if it was Mondays.  She

3    did have a rule that backsides needed to be

4    checked weekly.  I don't recall if it was Mondays,

5    but I do recall her asking me whether I checked

6    the patient's back, and whether I checked this

7    specific patient's back.

8             I think December 5th would have been the

9    first Monday.  Will Bruch had the patient.  I

10   don't know what was said or what was asked.  I

11   wasn't around for that.  I don't know if she even

12   asked him or not.  She did ask me at least once,

13   and I -- she told me, okay, it's time to check,

14   and then I would check it.  Because it's so

15   involved, it's such a process to -- we have so

16   many patients and so little time.  And to flip

17   somebody over, you have to get help from a nurse.

18   It takes a while.  So we wouldn't really do it

19   before rounds.

20            So pre-rounding, we wouldn't do it

21   before rounds.  We would go through, we would

22   round and things like that.  Sometimes the

23   attending would check the person's back and we

24   would go through that procedure.  But that was up

25   to them.  But when she had asked me to, I would

Joseph Papin 1/22/2021

```
1    come back later once we finished rounds and
2    everything, and then go back and look at it.  And
3    then during what we call p.m. rounds, afternoon
4    rounds, I would report to her.
5              (Off the record.)
6              (Exhibit 13 marked for identification.)
7         Q.   (By Mr. Whitfield)  So I'm handing you
8    what's been marked as Exhibit No. 13.  This is
9    your progress note for December 27th, 2016 on the
10   decubitus ulcer patient.
11        A.   Okay.
12        Q.   I'm going to take a few minutes and kind
13   of go through it with you.  On the first page
14   there's a section called Physical Exam.  Is that
15   where you document your physical exam of the
16   patient?
17        A.   That's correct.
18        Q.   So kind of walk me through your physical
19   exam and what you did.
20        A.   Sure.  So you start from the top, you
21   kind of look around.  So, Generally:  NAD, stands
22   for no acute distress.  So he's sitting, looking
23   pretty comfortably.  HENT, that's head, neck,
24   things likes that.  NCAT stands for normocephalic,
25   so nothing wrong with his head.  Atraumatic,
```

Joseph Papin 1/22/2021

```
 1    basically his head and neck looked okay,

 2    essentially.  His neck, he's got a Miami J collar

 3    on, which is a type of collar that they put over

 4    somebody's neck.

 5            Cardiovascular.  2 plus distal pulses.

 6    So you check their wrists, you check their -- the

 7    peripheral pulses in their ankles.  And 2 plus

 8    means he's got two pulses.

 9            Pulmonary/Chest.  Looked at his lungs.

10    He's got non-labored respirations, so he was

11    comfortable breathing.  And both sides are rising

12    equally.  I didn't notice anything wrong with his

13    breathing.

14            Abdominal exam.  You touch it, it looks

15    soft.  Looking for distention or anything like

16    that, any hardness because he might -- you know,

17    after surgery, you could you be at risk for like

18    stool getting trapped in your abdomen or something

19    like that, and it could cause an obstruction or

20    whatever, something like that.  You could be

21    worried about that.  Everything was fine there.

22            Musculoskeletal exam.  He's a

23    quadriplegic, so there's no need to assess his

24    strength and muscles and things like that.  Skin

25    is warm and dry.  No rash noted.  He's not
```

Joseph Papin 1/22/2021

```
 1    diaphoretic, meaning he's not sweating.  No
 2    redness.  Pallor is -- he isn't pale or anything
 3    like that.  I then noted that there's an abdominal
 4    pad over sacrum where that surgery occurred from
 5    three days prior -- four days prior.
 6              And then Psychiatric.  Normal mood and
 7    affect.  He didn't seem deranged or anything like
 8    that.
 9        Q.    Going -- I guess you've got the lab
10    results that follow that.
11        A.    That's right.  This comes auto-populated
12    into the note.
13        Q.    Everything after the physical exam was
14    auto -- or the vitals, ins and outs, physical
15    exam, everything else is auto-populated?
16        A.    No.  We can go through it.  So last 24
17    hours, patient states he's doing well and in no
18    pain.  Denies fever, chill, cough.  I typed that
19    in manually.  Vitals is pulled in, ins and outs
20    are pulled in.  Physical exam, I type that out.
21    Recent labs are pulled in.  At the top of 3402,
22    these are still labs.  Those are pulled in.
23              Imaging, they can pull some stuff in
24    automatically, but the way that it pulls in is
25    odd.  So it looks like I went in -- because I
```

Joseph Papin 1/22/2021

1    think the ultrasound -- if I remember correctly,

2    ultrasound isn't necessarily considered imaging,

3    so I went in.  Bilateral lower extremity

4    ultrasound 12:23.  I typed that in.  And then

5    active problemist, that's all auto-populated.

6              Assessment and Plan, I wrote.  And

7    then -- all of this looks like -- from A/P, I

8    wrote that.  And then all the way down, I wrote

9    that.  And all the way down.  The neurosurgery

10   recs, I would have copied those in.  But I went

11   and manually retrieved those.

12        Q.   Would you basically go to another note,

13   copy and paste?

14        A.   Yes.  So when I wrote neurosurgery recs

15   11:18, that's a copy and paste.  PT recs, I went

16   in -- I think you have to read those.  But, yeah,

17   they said acute rehab consult.  I think I typed

18   that in.  Endocrinology recs 12:22, I think I

19   copy/pasted that.  DM Type 2, that's diabetes,

20   Mellitus Type 2.  Will continue lantus 15 units

21   and stop premeal humalog.  That would be a

22   copy/paste on that.  That is something we did on

23   trauma regularly because it's a service that

24   requires heavily on consultants.

25              So neurosurgery, orthopedic surgery,

Joseph Papin 1/22/2021

```
1    endocrinology, rehab or physical therapy, you
2    know, different people have different
3    recommendations, and we're just kind of managing
4    it all.  Usually it's trauma does the initial
5    surgery, and then they're admitted under our
6    service, but everybody else comes in and does
7    their thing.
8              We did this as kind of a practice to
9    keep everything in one place so you didn't have to
10   go to the neurosurgery and go -- which would have
11   been a month-and-a-half back.  You could just keep
12   it all in one place, keep it updated, easy to keep
13   track.
14             (Exhibit 14 marked for identification.)
15        Q.   (By Mr. Whitfield)  So I've handed you
16   what's been marked as Exhibit No. 14.  It's a copy
17   of your transcript with Human Resources.
18        A.   Okay.
19        Q.   Have you had a chance to review that
20   document?
21        A.   I have in the past, you know, when it
22   came out in discovery.
23        Q.   I want to take you to on the bottom,
24   it's Bates labeled pages 35 and 36.
25        A.   Okay.
```

Joseph Papin 1/22/2021

```
1          Q.   So on page 35, it's the actual
2    transcript page 17.  This is where you're talking
3    to Ms. Whitlock about the decubitus ulcer patient?
4          A.   This is bottom right-hand corner --
5    bottom right quarter of the page; is that correct?
6          Q.   Correct.  And going on to the next page.
7          A.   Yes, sir.
8          Q.   She relays this concern to you that this
9    has been brought up, that you should -- "But the
10   premise is that with it being stage four, you
11   should have seen it.  That it would not have
12   occurred over a period of a day or two."
13              You said that you may have a gap in
14   knowledge base of looking at this wound.  That's
15   on page 18.
16         A.   Okay.  But the day or two thing, is that
17   line 21 of page 17?  That would not have
18   occurred over a period of a day or two --
19         Q.   Yes, starting there, and then going to
20   the next page.
21         A.   Okay.
22         Q.   You say, "Right.  Right.  No, you're
23   right.  And, I mean, if it's -- like I said, I
24   can't comment because I don't know exactly which
25   patient this is."  And you go into, "I think it
```

Joseph Papin 1/22/2021

```
 1   was more of a gap in knowledge."  It's on line 7
 2   of page 18 of the transcript.  "I think it was
 3   more a gap in knowledge than -- you know, it
 4   didn't look floridly terrible" -- is that right,
 5   "floridly terrible?"
 6        A.    Yeah.
 7        Q.    And this was -- "I'm talking about, the
 8   wound ostomy -- this is the day before I went on
 9   Christmas vacation, the wound ostomy nurse put it
10   the note that day, and I had seen it, too."
11        A.    Sure.
12        Q.    Would that be December 22nd, the day you
13   left to go on Christmas vacation?
14        A.    That's correct.
15        Q.    That's when you became aware of was when
16   the wound ostomy nurse came in on December 22nd?
17        A.    No.  I -- no, that is not the day -- and
18   that's not what's said either.  That's not the day
19   that I learned about it.  I had known about it for
20   quite sometime, and I had been relaying that
21   message to Meghan for quite sometime.  Their other
22   interns, Will Bruch had known about it.  It had
23   been discovered actually before any of us had come
24   onto the service.  November 30th, I believe.
25              This is the first time -- on this day,
```

Joseph Papin 1/22/2021

```
 1    this is the first time that anybody had ever told
 2    me that the allegation of lying, that Dr. Earl
 3    brought up to me on January 10th, that this was
 4    the allegation of lying.  This is the first time
 5    that I had heard about the allegation of lying and
 6    what -- I had been told about the allegation of
 7    lying.  This is the first time I had any
 8    specificity in context to what it was.
 9         Q.   You saw it and you said I didn't think
10    it was that bad?
11         A.   That's correct.
12         Q.   I believe you texted Meghan the day you
13    left town saying Mr. _____ has an early
14    decubitus wound?
15         A.   Right.  That's what I thought it was.
16    That day -- that early, early morning, during the
17    night, he had begun spiking fevers.  Usually
18    that's indicative of infection if there's
19    sustained fevers and not just a bad read or
20    something like that.  The intern on the night
21    service had ordered blood cultures, urinary
22    cultures, respiratory cultures.  And it takes
23    about 24 hours for the blood cultures and anything
24    to start coming back, and we didn't have a source
25    in knowing that this guy had a decubitus ulcer.  I
```

Joseph Papin 1/22/2021

```
 1    thought, well, this could possibly be a source of
 2    it.
 3             So I made sure in text messages to
 4    update her, again, ahead -- that was unprompted,
 5    the text messages.  It was just my way of saying
 6    he's got -- he's still got this decubitus ulcer,
 7    this could be another source.
 8        Q.    In your text you called it an early
 9    decubitus ulcer.
10        A.    That's right.  That's what I thought it
11    was.  What I'm referring to is in the gap in
12    knowledge, is when I look at something -- when you
13    open up a textbook just like you would as a lawyer
14    or something, when I'm learning what a sacral
15    decubitus ulcer is, you open it up -- and at least
16    I've never seen a book where you can -- it shows
17    you pictures, stage one goes down to whatever
18    level, stage two, stage three, stage four, full
19    thickness, whatever.  You never see it with a big
20    scab covering it.
21             From everything that I seen on my own
22    personal body, anytime I've ever gotten a scab,
23    the tissue underneath is healing.  So I assumed
24    incorrectly that a scab over something meant that
25    it was healing.  I couldn't see through the scab.
```

Joseph Papin 1/22/2021

```
 1    I thought it looked okay.  And then what confirmed
 2    that is this wound nurse would continue to see
 3    this patient.  And it just so happened on that day
 4    she had a picture of it and agreed.  I didn't
 5    think it was that bad, she didn't think it was
 6    that bad.  I was just letting her, her being
 7    Meghan, know.
 8              (Exhibit 15 marked for identification.)
 9         Q.   (By Mr. Whitfield)  Now I'm going to
10    hand you what's been marked as Exhibit 15, which
11    is your progress notes from December the 12th,
12    which is a Monday.
13         A.   Okay.
14         Q.   What did you type in on this note and
15    what was brought forward?
16         A.   We can just start from the top.  Surgery
17    Progress Note.  Pretty sure that would have been
18    brought forward.  The next line "NAEON," means no
19    acute events overnight.  I typed that.  And then,
20    "Complaining of some mild right shoulder pain.
21    Denies shortness of breath or chest pain."  That's
22    something that I typed.
23              The next line is vitals.  That would
24    have been like auto-populated.  Same with the
25    intakes.
```

Joseph Papin 1/22/2021

```
1                   Right here where it says AAOx3.  That's
2      my physical exam.  That means alert and oriented
3      times three.  Normocephalic atraumatic, that's the
4      NCAT that we saw before.  Aspen collar in place.
5      Adequately perfused, that means his pulses are
6      good.  Breathing comfortably and he's
7      quadriplegic.
8                   "No results for inputs."  That would
9      have been auto-populated.  The lab results are
10     auto-populated.  Recent labs, auto-populated.  No
11     results for inputs:  INR, LABPROT, that's all
12     auto-populated.
13                  Assessment and Plan.  This is where it
14     starts to be me again.  Assessment and Plan is me.
15                  Endocrinology.  This would have been
16     manually retrieved, meaning I would have had to
17     have gone and copied and pasted it from somewhere.
18     This was endocrinology's recommendations.  That's
19     what they're recommending, but it's not
20     auto-populated in that.  When it's auto-populated,
21     the note just pulls it instantly.  I don't have to
22     do anything.  It's completely automated.
23                  Discharge Planning.  This would have
24     been a copy/paste.
25                  Neurosurgery, also copy/paste.
```

Joseph Papin 1/22/2021

1           Trauma, this is where it's manually
2   inputted.  So IS, is incentive spirometry.  That's
3   to keep you blowing into this device.  Because
4   he's not moving around, to keep his lungs nice and
5   healthy.  Skin care.  So wound care recs noted.
6   There's a note to the decubitus ulcer wound care
7   nurse.  Because that was the only reason he was
8   being seen.  Those are noted.
9           I&O cath, DVT Prophylaxis, bowel
10  regimen, pain control, all this is all me.  CM for
11  home versus Acute Rehab placement, that continues.
12  This is copy/paste I'm sure.  Result of family
13  meeting was they would like patient to go to acute
14  rehab.  This might have been manual.
15          Then Wound Care Recs is the next line.
16  That would have been typed by me.  And then
17  recommendation one through five would have been a
18  copy/paste from the Wound Care Recs.
19      Q.   But on this, it doesn't show where you
20  did a physical exam on the backside.
21      A.   Right.  Like I said --
22      Q.   It's not listed in your physical exam
23  that you observed this person's backside or
24  anything in here -- up here in the first page,
25  AAOx3 through quadriplegic of your physical exam,

Joseph Papin 1/22/2021

```
 1   you don't list examining the backside?
 2        A.   Right.  Like I said, it was because
 3   turning him, it was labor intensive.  It requires
 4   multiple people.  You had to coordinate that, you
 5   have to get a nurse in the room, things like that.
 6   Like I said, we were moving so quickly before
 7   rounds that we wouldn't document a back exam, but
 8   when we did them -- and the 12th was a Monday.  So
 9   when we did them, we would report them to Meghan
10   verbally.  We would do them in the afternoon.
11   Notes go in -- when did this note go in?
12   8:00 a.m.  So notes were expected to go in because
13   you needed your plan and everything in so that
14   consultants and everything, anybody else looking
15   to see this person, they're counting on us as the
16   main team, they want to see this documentation.
17             So notes have to go in.  Nobody ever
18   documented a back exam on this patient throughout
19   the entire month of December.
20        Q.   Except for December 27th when you noted
21   yours?
22        A.   Well, on December 27th, then what you're
23   doing is -- there's an acute change in
24   circumstance then.  Now we're seeing him
25   postoperative for a surgery that was performed on
```

Joseph Papin 1/22/2021

```
 1    December 23rd.  So now you have -- you're looking
 2    at a post-surgical patient.  You've got to make
 3    that sure that wound isn't getting infected.
 4    You've got to look at the wound, things like that.
 5         Q.   So there's nothing in the medical record
 6    from the 12th to show that you examined the
 7    backside?
 8         A.   That's correct.  To be clear, in
 9    nobody's physical exams are there back exams.
10         Q.   But in yours, there's nothing in here to
11    document that you did it?
12         A.   That's correct.  Like I said, the same
13    of all other residents, attendings, everybody.
14              The 23rd -- the 23rd is the first time,
15    if I remember correctly, Dr. Kutcher -- no, it
16    would have been Dr. Carroll -- put in a note at
17    the very top where he had tested, you know, the
18    patient is going to the OR, exam revealed sacral
19    decubitus wound.  That was the first ever mention
20    in a progress note of -- you know, of specifically
21    of an exam.
22              Ronnie Keith Brown's note, if I recall
23    correctly, on that day doesn't have -- on the day
24    that it was -- you know, that it was discovered
25    that the wound that was bad, Ronnie Keith Brown
```

Joseph Papin 1/22/2021

```
 1    doesn't have a physical exam on that day either.
 2              (Exhibit 16 marked for identification.)
 3         Q    (By Mr. Whitfield) I'm going to do this
 4    as a composite exhibit.  So I've handed you your
 5    progress notes on this patient from December 13th
 6    through December 22nd.  Give you a chance to
 7    review them.  But are they all basically in
 8    similar format to the one of December 12th that we
 9    just went through?
10         A.   Yes, I would say so.
11         Q.   In any of these notes do you have a
12    documentation of where you rolled the patient over
13    and examined the backside?
14         A.   No, I don't.  But, no resident did.  Or
15    nurse practitioner.
16         Q.   I'm sure you've heard at this point, and
17    you heard at the hearing that we had back at the
18    Med Center appealing your termination, that
19    Dr. Mahoney testified.
20         A.   Yes.
21         Q.   And she testified that she specifically
22    asked you, did you turn the patient and was there
23    a wound on his backside?  And your answer was,
24    yes, I did, and no, there isn't.  And she felt
25    that you had lied to her about that because the
```

Joseph Papin 1/22/2021

```
 1    wound had been there prior to December 12th.
 2         A.   I would classify that.  I do recall
 3    that.  I would say that's wholly inaccurate.  She
 4    would ask me and I would tell her, yes, I looked
 5    at it; it doesn't look bad to me.  And this is
 6    what wound care also recommended as well.  So I
 7    think there's a little dispute there, too, because
 8    Earl at the beginning of the appeal transcript --
 9    Earl at the beginning of the appeal stated that
10    Meghan had told him that I would just reiterate
11    what was said in the wound care notes, which in
12    and of itself is notification that there is --
13    he's only being seen for one wound.  In and of
14    itself, if that were true, that's notification
15    there is a wound.
16              Then she's saying that I was saying that
17    there was no wound, which never happened.  And
18    now, I think -- I don't know what the latest story
19    is or anything like that, but I -- I always went
20    and did the exam that I said that I was going to
21    do.  And when I reported a finding, it was what I
22    thought -- or I had done it and was reporting what
23    I thought.  What I saw when I looked at this
24    patient's wound was that it's really not that bad,
25    there's a scar over it.  I thought the underlying
```

Joseph Papin 1/22/2021

1    tissue was healing.  It didn't look that bad.

2            Then, obviously when you take -- first,

3    do no harm.  So I'm not going to be peeling that

4    off.  I didn't know I needed to.  I thought it was

5    going to be healing.  I thought it looked okay.

6    But that's distinct from saying, there is no

7    wound, which is not what I said.  So eventually he

8    started developing fevers, and that's what clued

9    everybody in there's got to be some sort of

10   infection.  Blood cultures by the 23rd had been 24

11   hours, nothing there.  That's kind of a red flag.

12   You've got to go looking.  It's somewhere.

13   Where's the infection?  It's somewhere.

14            I think urine cultures -- all the

15   cultures have come back 24 hours.  He's got a

16   white blood cell count, which is an indication of

17   infection.  He's got a fever, another indication

18   of infection.  You've got to find it somewhere.

19            So they were cluing in just like I

20   thought.  As a doctor, you're supposed to have a

21   differential diagnosis, you're supposed to think

22   what the possibilities are for, you know, whatever

23   you're looking at, what is ailing a patient.  Just

24   like I thought, maybe it could be this decubitus

25   ulcer, maybe I'm wrong or something like that,

Joseph Papin 1/22/2021

```
 1   which is why I brought it up to her completely
 2   unprompted.  And then I brought it up to her again
 3   in our p.m. rounds right before I left and told
 4   her, hey, there's a picture in the records, too.
 5   You can go look.  There's a color picture right
 6   there.
 7        Q.   When you're saying you brought it up to
 8   her, you're referring to bringing it up to her in
 9   the text message on December 22nd?
10        A.   So I brought that up to her unprompted.
11   I told her, you know, Wound Care Recs are in, if I
12   remember correct, or something to that effect.
13   Wound Care Recs are in for _____ sacral decub,
14   or at least it could be decub, which is what I
15   thought it was.
16             Then later on, we met hours later for
17   p.m. rounds.  Basically me kind of signing off.
18   She was letting me leave slightly early, because
19   the flights at the Jackson airport -- you know how
20   it is.  In order to get a flight out, I had to
21   leave slightly early.  She was fine with that.  I
22   went to sign out to her, and I told her, he's
23   still got these fevers.  As I noted in my note,
24   too, he's still got fever on the 22nd.  All the
25   cultures are drawn, we're doing the workup for it.
```

Joseph Papin 1/22/2021

```
 1   And I looked at his wound, it didn't look that bad
 2   to me.  Wound Care saw it, too.  They got a note
 3   from today, picture of it.  And they always would
 4   put a picture in.  There's a picture from today,
 5   go look at it.
 6             And then I don't know what happened the
 7   next day, how they discovered it or anything like
 8   that.  I do remember getting a text message from
 9   her the very next day.
10             And when I got a text message from her
11   the very next day, I'll tell you, the way that it
12   was sent -- and we talked before about how her
13   tone is, how she kind of interacts with me.  She's
14   such a rude person that a neutral text message to
15   me kind of made me think, why is she sending this
16   to me, she knows who this patient is.  She knows
17   who has this decubitus wound, and the way that
18   she's sending it to me is very odd.  I made sure
19   what I was telling her was correct.  I responded
20   pretty quickly.  It was just an odd text message
21   for me to receive.
22             So it's not necessarily surprising that
23   later on, you know, she admits to having known
24   exactly who had the patient the whole time.  She
25   knew exactly who it was.  She admitted to it, said
```

Joseph Papin 1/22/2021

```
 1    that she knew.  Sent me the text message for no
 2    other reason than to try and trap me so that she
 3    could them blame me for not knowing what she
 4    should have known that was all over the record
 5    that I had been telling her, that I had texted her
 6    about.  I had done so many other things, and
 7    certainly no less than the other resident.
 8            But she sends that text message because
 9    ultimately it falls on her.  So she realized
10    through all of this, oh, I can blame it on Joe,
11    he's not here, he's on vacation, and people don't
12    really like him anyway.  I've been instructed by
13    Renee to kind of watch out for him.  So perfect
14    scapegoat.  I can't defend myself, can't do
15    anything.
16            So she sends that, what I think, to
17    catch me so she can point and say, see, I told you
18    he was lying, he doesn't even know who the patient
19    is.  I got immediate alarms when she sent me that
20    text message.  The rest is history, I guess.
21        Q.   Prior to December 22nd, do you have any
22    text messages or e-mails or anything where you
23    sent that telling Meghan this guy has a pressure
24    wound?
25        A.   I would have to check.  I would suspect
```

Joseph Papin 1/22/2021

```
 1   not, but I would have to check.  Because
 2   generally -- one, the reason why I sent it is
 3   because he's got a fever now.  And the fact that
 4   we know he has a decubitus wound, obviously that
 5   could be a possible source.  When I looked at it,
 6   it didn't look super red, it wasn't oozing around
 7   or anything like that.  Like the things that I'm
 8   taught to look for, I'm not seeing those.
 9              Usually when you have a decubitus wound,
10   there's like redness all around it.  It looks
11   angry.  Like an infection, if you've ever seen
12   one.  It's very easy to tell, usually, when
13   something is infected.  This didn't look like that
14   to me.  But I recognized it as a possible source.
15              So I texted her that to re-clue her in,
16   because I'm not going to be here tomorrow, to be
17   thinking about that, basically.  So I don't know
18   that I would have necessarily texted.  Because he
19   didn't have fevers or anything, he didn't have an
20   infection.  He had the wound, otherwise he was
21   doing okay.  It looked to be healing.
22              So I wouldn't have had a reason to
23   necessarily update her, other than in person.
24   Yeah, I rolled him over, I checked him, and it
25   looks not too bad to me.  And wound care dropped a
```

Joseph Papin 1/22/2021

```
 1   note the next day, they recommend continuing

 2   conservative treatment.

 3        Q.   But there's nothing other than the first

 4   text message on December 22nd where you said that?

 5        A.   There's nothing documented?

 6        Q.   Yes.

 7        A.   Not to my knowledge right now.  I might

 8   have another text messages or something like that.

 9   Certainly if I do, I'll produce it, but not to my

10   knowledge.

11        Q.   There's nothing in the medical record

12   that would have shown that you told her about it?

13        A.   No.  No.  I mean, other than the fact

14   that, you know, I'm copying Wound Care Recs every

15   single day without fail.  Wound Care Recs.  And

16   then there's five steps for each of them.  He's

17   only got one wound.  I'm copying them forward.  I

18   don't know what more I can say in the notes.  I

19   mean, they're pretty clear.  Wound care is

20   dropping in notes themself and describing the

21   wound itself.  I think what you're asking me is if

22   I documented a physical exam.  No, nobody ever

23   did.  But in my notes, Wound Care Recs, every

24   single day they're in there.

25        Q.   This person had multiple wounds.  Not
```

Joseph Papin 1/22/2021

1    necessarily pressure ulcers, but he had gunshots
2    all over, didn't he?
3         A.   Yeah, but a gunshot wound is tiny.
4    You're not going to be, you know, applying SANTYL
5    nickel thick to wound bed.  And I get what you're
6    saying, but there was never any sort of like wound
7    care consult out for that.  And if you ever have a
8    question about it, you can go to the wound care
9    note where I'm copying it from and you can ask me.
10   There's lots of different ways to get that sort of
11   information if you're confused.  That wouldn't be
12   something that anyone was confused about.
13        Q.   I'm not a doctor, so I don't know.
14   That's why I was asking.
15        A.   Yeah.
16        Q.   Pardon us lay people.
17        A.   Oh, no, no, no.
18        Q.   So basically, the issue with what you
19   told Dr. Mahoney on the 12th, the 19th, during
20   rounds or whatever, there's no documentation that
21   would back up either one of you as far as your
22   conversation?
23        A.   There's a text message on the 22nd, and
24   then there's -- while it's not part of the -- of
25   my notes, or anybody's notes in terms of a

Joseph Papin 1/22/2021

```
 1   physical exam.  I mean, Wound Care Recs, to me --
 2   if I were her and I were reading somebody's notes,
 3   assuming nothing else was said to me, which isn't
 4   true, but in this case, just assuming, if I were
 5   reading any of my residents' note, which she
 6   should have been doing at the very least, or just
 7   listening on rounds when things were presented, or
 8   anything, reading other provider notes, the wound
 9   care nurse, anything like that, you would have
10   picked up on Wound Care Recs.  It's in every
11   single one of them.  I would argue that there is
12   documentation all over the place.
13        Q.   As far as the conversation between the
14   two of you.
15        A.   You mean the specific --
16        Q.   It's he said, she said.  There's no
17   other documentation to support the conversation
18   one way or the other?
19        A.   Sorry.  If I'm understanding you
20   correctly, what you're saying is there's no
21   documentation that when I would go and look at the
22   wound and communicate to her in the afternoon,
23   that the wound looked okay to me, but still
24   present, and that Wound Care Recs were in for
25   whatever day, there's no documentation of that?
```

Joseph Papin 1/22/2021

```
 1          Q.    Of the conversation.
 2          A.    As far as I know, there isn't, no.
 3     Right.  As far as I know, on December 5th when it
 4     was Will Bruch's Monday, I don't think that
 5     there's documentation of that that I'm aware of
 6     either.
 7          Q.    So now, as we're moving through the
 8     Christmas holidays, we get to the first part of
 9     January.  That's when it seems like a lot of the
10     e-mails come in about what happened over the
11     holidays.  I'm sure you've seen all these e-mails
12     as they were produced in the packet.
13          A.    That's correct.
14          Q.    One from Colin Muncie dealing with the
15     admitting a patient to ICU, and that he had asked
16     you to facilitate -- I don't know what the process
17     entails, but you facilitate the process of getting
18     this person admitted to ICU or let them know
19     they're coming, and you didn't do it, is basically
20     Colin's version of events.
21          A.    Yeah.  That's essentially what Colin
22     said, but all he knows is what he was told by, I
23     guess, somebody in the ICU.  That's what he's
24     saying, he doesn't know whether anything occurred
25     or not.  What he's relaying is what he had been
```

Joseph Papin 1/22/2021

```
 1   told by the ICU.
 2            I think where it's inaccurate is that I
 3   had to go see this patient, you know, when they
 4   were in trauma, I had to go down and see them.  I
 5   would also like to say, I don't know exactly who
 6   this patient is.  The records haven't been turned
 7   over or anything like that.  I know that I would
 8   have had to have seen this patient, I would have
 9   had to have done a history and physical, I would
10   have had to have put in orders for their
11   medications, you know, their precautions, where
12   they're going to be admitted to, all these orders
13   had to have been in.  It's like a two-hour thing.
14   You have to go down, talk to the patient, do all
15   this, do a physical exam, and put the orders in.
16   All that stuff, so two hours of work.
17            And then, you know, just to ensure great
18   care, as a courtesy, you call the ICU and you tell
19   them, hey, I've got this patient here, they were
20   admitted for X, Y and Z, they're going to be
21   coming to you guys, this is their history.  Just
22   so you know, they're coming.  That's a quick
23   head's up.  And they can go read about them before
24   they come and do whatever they need to do.  But
25   the patient is still coming.  And all the orders
```

Joseph Papin 1/22/2021

```
 1   are in and all the work is in.

 2            So basically what I'm being accused of

 3   is -- I'm certain as soon as we get the medical

 4   records you would see.  It was never under dispute

 5   that I did all the work.  It's basically I do two

 6   hours of work and then skip the last 20 seconds.

 7            I'm telling you I did make the phone

 8   call.  There's shift change, who knows.  I don't

 9   know who he spoke to.  I didn't get a name on who

10   I spoke to.  It's just a verbal thing, but it's

11   one not required.  All the notes were in.  It's

12   not like this patient was abandoned.  They were

13   coming from ER to the ICU.  The fact that somehow

14   the ball got dropped amongst them and the message

15   wasn't relayed, I don't know anything about that.

16   But the patient was still taken care of.  It

17   wasn't like he was sitting in an elevator not

18   looked after.

19            What they're saying on the surface looks

20   damning, but really it's -- I did two hours of

21   work, and then they're saying I -- nobody could

22   prove that this phone call occurred or didn't

23   occur.  So now I'm forced to, you know -- it did

24   happen, but now I'm forced to dispute that when

25   I've got the record.  Certainly if we get it, it's
```

Joseph Papin 1/22/2021

1    going to show I did the two hours of work, or how
2    long it took --
3         Q.   You didn't notify -- according to them
4    you didn't notify the ICU?
5         A.   I did notify the ICU, but yes, according
6    to that -- well, not even according to Colin,
7    according to what Colin had been told, so third,
8    fourth hand by that point.  He did say that there
9    was a shift change and things like that.  I
10   honestly don't know.  I wasn't there.  I don't
11   know what happened in the conversation.  This
12   wasn't Colin's observations, this is what Colin
13   had been told.
14              Yes, that's what they were told.  Things
15   like that happen all the time.  We call someone,
16   things get lost in the shuffle.  That happens all
17   the time.  But the verifiable important things
18   that make them sure that a patient is cared for
19   and that, you know, people know what's going on in
20   the story -- the note was in there, that was
21   there.  The orders for how to take care of him,
22   that was there.  Whether the 20-second phone call
23   that it would take to let them know, hey, this
24   person is coming, here's a 20-second rundown.
25   That's what they're disputing.

Joseph Papin 1/22/2021

```
 1                 It happened.  I made the phone call, but
 2  I have no way to prove it -- and there's no way to
 3  prove or disprove.  How do I prove that I made a
 4  phone call at some point to somebody in the
 5  hospital?  There's no way.
 6          Q.   There's no way to prove that you did,
 7  there's no way to prove that you didn't?
 8          A.   Right.
 9          Q.   The next e-mail that came in was from
10  William Crews, who was, I believe, a medical
11  student at the time.
12          A.   Third-year medical student.
13          Q.   Do you remember Mr. Crews?
14          A.   I do.
15          Q.   I guess he's Dr. Crews now.
16          A.   Yeah.
17          Q.   He basically said that you weren't doing
18  the pre-rounds like you were supposed to, is the
19  gist of his complaint.  And that you were saying
20  things in rounds that the patients had not told
21  him or you weren't there for.
22          A.   That is what he said.  He said a few
23  more things than that.  We can go over those or we
24  can just touch on that.
25                 That I wasn't doing pre-rounds.  The
```

Joseph Papin 1/22/2021

1    issue with that -- and it's inaccurate and almost
2    intentionally misleading to allow someone like a
3    medical student to speak.  It's almost like you
4    coming into work and, say, you had an intern, and
5    the intern saying you weren't working.  You could
6    have been at home, you could have been at the
7    courthouse, you could have been anywhere.  You
8    don't need to check in with that person.  So how
9    would they possibly know what you're doing?
10          So the way that I would come in, just to
11   give some context, and everybody would come in, is
12   you come in in the morning, you're in the resident
13   room, the medical student isn't there.  So how
14   would they know what time you arrive?  You check
15   out or sign out from your patients.  This occurred
16   to your patients, they give you a list, they tell
17   you what happened.  Okay.  So now I've got, you
18   know, the vitals, I've got my patient list.
19          So I would just go and round.  Some
20   people would go to the computer and read some
21   things first.  Depends on what you wanted to do.
22   Sometimes I think Will would maybe stop off at the
23   resident room where the medical students were
24   hanging out on three north.
25          Q.   Which Will are you referring to?

Joseph Papin 1/22/2021

```
 1        A.    Will Bruch.

 2        Q.    Or Will Crews?

 3        A.    Will Bruch was the other intern on my

 4   service.  We would both go and get sign out at

 5   6:00 a.m., or sometimes 7:00 a.m., depending on

 6   the day, or whatever it was.  Weekends started

 7   later and there was other successions.  Generally,

 8   weekdays 6:00 a.m., we would go get sign out.

 9              Sometimes we would both split up the

10   list right then and there.  We would pretty much

11   always split up the list right then and there.

12   Say there's 60 patients and there would be one

13   nurse practitioner, one of us would notify the

14   nurse practitioner you've got the list from this

15   point down, and we've got these patients, and we

16   would split them up.

17        Q.    Will Bruch, B-R-U-C-H-S.

18        A.    There's no S.

19              Will Bruch and I would meet, get signed

20   out jointly, decide how we would split up the

21   list, let the nurse practitioner know by text

22   message or something like that -- usually it was

23   him that text the nurse practitioner or call or

24   whatever.  We would split it up.  Sometimes he

25   would go and sit down and drop off his stuff over
```

Joseph Papin 1/22/2021

```
 1   in the resident room on three north.  And I
 2   usually didn't bring a bag or anything like that,
 3   so I wouldn't go and drop anything off.  I would
 4   just go straight and see patients.  Sometimes he
 5   went straight, sometimes he wouldn't.
 6            I would go and see patients, go around,
 7   see them, come back into the room probably about
 8   6:45, and then read for patients until about -- it
 9   depended on when, but usually about 7:30 we would
10   table round with Meghan, which means Meghan would
11   come to that room, the second year resident would
12   come to that room.  Me and Will would be there and
13   the med students would be there.  And we would
14   table round, and then we would round, formal
15   round, at some point after that.
16            But to say that I'm not around or
17   anything, the first person who would notify
18   anybody that I never showed up is that person
19   who's supposed to give me handoff.  They would be
20   the first person to notify anybody, hey, I never
21   got handoff for half of trauma, or I never was
22   able to sign off to Joe.  So for a medical student
23   to say that, odd.
24       Q.   You would agree with me that just
25   because you got sign out doesn't mean you went on
```

Joseph Papin 1/22/2021

```
 1   the rounds?

 2        A.   I mean, certainly you could, but the

 3   issue that you brought up to me was that because

 4   Will Crews did not see me means that I didn't go

 5   on round.  That's what he said, if I'm

 6   interpreting things correctly.  What I'm saying

 7   is, he would have no way to know.  I agree with

 8   your statement that just because I showed up and

 9   took sign out doesn't necessarily mean that I went

10   and rounded.  I'm already there, what else am I

11   going to be doing?  I don't know why I wouldn't do

12   that.

13             But yeah, sure, but it's certainly not

14   the case that a medical student would ever -- if

15   he's not there when I sign in and I don't ever

16   have to speak to him at any point as a

17   requirement, then I don't understand how he could

18   possibly know where I am at any given time.

19        Q.   I believe he also testified that he was

20   getting different responses from the patients that

21   you were giving at formal rounds?

22        A.   Yeah.  Again, another thing that

23   probably would have come up from an attending, a

24   senior resident, another resident, something like

25   that.  I think, you know, when you go in -- having
```

Joseph Papin 1/22/2021

```
 1   been a medical student myself, I think when you go
 2   in, people don't really want to talk to you that
 3   much.  You're not a doctor yet, you're just
 4   learning, you know.  So it's very easy, patients
 5   forget.  You could ask a patient, you know, who
 6   was admitted a week before -- I had this happen
 7   all the time.  Have you ever been in the hospital?
 8   And I'm looking at the record, I know they have
 9   been.  No, I've never been in the hospital.
10   People just forget or they think you mean
11   something serious and being hospitalized for
12   diabetes isn't serious or something.
13            You wake them up at 4:00 in the morning,
14   they're on drugs, painkillers, things like that,
15   they may not know exactly who's who.  Usually
16   they'll remember, oh, that's a doctor, that's not
17   a doctor, something like that, but they're not
18   going to remember names.  The fact that he's
19   eliciting something different, if it were
20   material, it would have come up to somebody else
21   and not just the medical student raising the flag.
22   I think it's a very odd thing that it's a medical
23   student raising flags here and nobody else is
24   catching this.
25            I mean, it's tantamount to like, you
```

Joseph Papin 1/22/2021

```
 1    know, me going on rounds and just saying lies and
 2    nobody catching it and not rounding.  How would I
 3    know the information about these patients if I
 4    hadn't gone and rounded myself and seen the
 5    records and gotten sign off, things like that?  It
 6    would be really, really difficult to go on rounds
 7    and just guess correctly for every patient and
 8    pass the sniff test on every attending, senior
 9    resident and everything like that.  It's really
10    odd that he's commenting on that.
11         Q.   I believe that was the way -- it's odd
12    for a medical student to complain about anything?
13         A.   You know, I don't know.  I've never
14    been, you know, the medical student administration
15    or anything like that, so I don't know.  I've been
16    a medical student myself.  I definitely heard of
17    medical students complaining about abuse and
18    neglect and all this other stuff, but I couldn't
19    comment either way.
20         Q.   Who is Ashley Griffin?
21         A.   Ashley Griffin was a senior resident.
22    She was a fourth year general surgery resident.
23         Q.   She was on the same level as Meghan
24    Mahoney and Sid Desai?
25         A.   That's right.
```

Joseph Papin 1/22/2021

1       Q.   She also sent an e-mail listing out
2   several concerns.  The first one was about the
3   code, the code blue.  I think we've already talked
4   about that.  "Did not show up on time to pre-round
5   prior to start of shift during holidays or to get
6   sign out prior to the completion of the trip."
7       A.   I don't know what that -- I don't know
8   what that means, "prior to completion of the
9   trip."  I don't know what that means.
10      Q.   "Did not show up on time to pre-round
11  prior to start of shift during the holidays."
12      A.   What she's referring to is, if I
13  remember correctly, she had been told -- I wasn't
14  present for any of this.  She had been told from
15  Will that I had not been present to pre-round.
16      Q.   Which Will?
17      A.   Will Crews, the medical student, that I
18  had not been present to pre-round.  We already
19  discussed that point.  But what she, I guess,
20  doesn't remember or doesn't recall -- and I do
21  have a text message to that effect and I don't
22  know if it's been turned over or not, but we
23  certainly can.  But there was a point during the
24  holidays, and I've got the text message, where, as
25  a trauma resident, you carry -- or trauma intern,

Joseph Papin 1/22/2021

```
 1    you carry the trauma pager.  So if a trauma shows
 2    up to the University of Mississippi hospital, your
 3    expectations is to drop everything at any time and
 4    go down.  So that's what I did.
 5              It happened to come on during a time
 6    where I was in the middle of the pre-rounding, if
 7    I correctly, and I had to text Ashley, hey, can I
 8    have some more time, I'm still downstairs seeing
 9    two alphas, which are like the highest level of
10    acuity for traumas.  For some reason that hadn't
11    happened much in the mornings.  People tend to
12    either be asleep or not to cause too much trouble
13    that early in the morning.
14              So I was downstairs, I asked her for
15    more time, she said it was fine.  But I'm
16    assuming -- and that's the only thing that I can
17    assume -- and again, because Will never knew where
18    I was going.  He would never know that I got a
19    page and went down to go see traumas.  Because I
20    wouldn't go and let him know, hey, let me go tell
21    a medical student that I'm checking in.  Hey, I'm
22    about to go downstairs to see this.
23              So I went downstairs, saw these
24    patients, let Ashley know, hey, I'm going to be
25    late for rounds, can we push them a little bit, or
```

Joseph Papin 1/22/2021

```
 1    something to that effect.
 2             What she's referring to is information
 3    that she got from Will Crews, but it's incorrect.
 4    Q.    Next thing, talking about the two
 5    alphas, not necessarily those.  But, "He did not
 6    go to traumas during the holidays."
 7    A.    Yeah, that one, I do not have an idea
 8    what she's referring to.  If there was ever a time
 9    that I didn't go to a trauma, I'd like to know,
10    because I went to every single trauma.  Those
11    things do not shut up -- those pagers go off
12    nonstop until you go down.  Someone has to show up
13    or they keep going off and off and off.  There's
14    never a time, to my recollection, that I ever
15    didn't go to a trauma.
16             There were some times that I can recall
17    where -- this wouldn't have been with Ashley, this
18    would have been with Meghan -- where it's a beta
19    or something like that, and we would split those
20    up.  So Will would go to a beta, I would go to a
21    beta.  Will would go to another beta -- Will Bruch
22    would go to a beta, I would go to a beta, things
23    like that.  Will Crews had no responsibilities
24    whatsoever on the service.
25             A medical student's responsibility is
```

Joseph Papin 1/22/2021

```
 1   just to learn.  We would split those up, so
 2   sometimes I wouldn't go to those or whatever.
 3   There was never a time that I just, you know,
 4   wouldn't show up and there wasn't coverage already
 5   for it or something like that.  To that, I would
 6   love to see any sort of specificity on that, a
 7   patient that I didn't go and see.
 8        Q.   "He tried to send a patient home walking
 9   to car whose car was across the street at the VA
10   despite several nurses telling him the patient was
11   not competent."
12        A.   Actually, you know what, I've got a text
13   message to that.  I don't know if it's been sent
14   to you or not.  I'll certainly send these to you.
15   I'd like to read that, because it's kind of
16   troubling to read these sorts of things when I'm
17   trying to do the best thing for my patients.  So
18   I'm going to read you a text message between
19   myself and Ashley Griffin.
20             MR. MORGAN:  Make sure you say the date
21   of it.
22             THE WITNESS:  I will.
23             Okay.  Would you mind just rereading
24   me --
25        Q.   (By Mr. Whitfield)  "He tried to send a
```

Joseph Papin 1/22/2021

```
 1    patient home walking to car whose car was across
 2    the street at the VA despite several nurses
 3    telling him the patient was not competent."
 4         A.    Okay.  So --
 5         Q.    What's the date?
 6         A.    December 30th, 2016.  And it's 5:11 p.m.
 7               She writes to me -- Ashley Griffin
 8    writes to me, "Transfer Fonville to ortho."  I
 9    respond at 5:13 p.m., "Done."  And then I have
10    another text message, "Discharge nurse was
11    refusing to do it.  His nurse is continuing with
12    the discharge.  Last dose of Ativan was 10:39 a.m.
13    I told her it came from a chief."  That was at
14    5:57 p.m.
15               Then, again, I texted her at 6:05 p.m.,
16    "Now they're calling the attending.  I said that
17    was fine."  She writes at 6:15 p.m., "Uro," and
18    then again at 6:15 she writes, "Yep."
19         Q.    Uro?
20         A.    Yeah, urology.
21         Q.    Okay.
22         A.    But she just writes "Uro."  U-R-O is all
23    she wrote.  Then the "yep" text that came next at
24    6:15.  And then subsequent to that at 6:17, she
25    wrote, "Does he need a ride?  Is that the issue?"
```

Joseph Papin 1/22/2021

```
 1   At 6:18 I wrote, "He's going to drive himself
 2   home.  He has his car here parked at the VA."
 3              She writes at 6:18 p.m., "Hold benzo and
 4   DC in a.m.  They won't clear him to drive."  6:19
 5   p.m., "It was discontinued.  I'll discontinue the
 6   DC," meaning discharge, I didn't -- "I'll
 7   discontinue the DC, but he will probably leave
 8   AMA."  Then at 6:26 p.m. she wrote, "K."
 9              So, to me, it's troubling when I'm
10   informing -- which is exactly what an intern's
11   supposed to do.  There's an issue on bringing this
12   to my senior resident's attention.  I'm giving her
13   the exact information that I have.  I'm letting
14   her make the decisions, you know, keeping her
15   abreast.  Everything basically that she said is in
16   the text messages here except for the context that
17   I'm the one bringing it all up to her.  I'm not
18   trying to discharge.  I'm asking her what she
19   wants to do.  That seems kind of willful --
20        Q.   Without having -- I had heard you read
21   them.  Had you already done the discharge papers
22   and she told you to cancel them?
23        A.   Yeah.  So she wrote "hold benzo" at
24   6:18 p.m.  She wrote, "Hold benzo," which is a
25   mind-altering drug.  Benzo is kind of like
```

Joseph Papin 1/22/2021

1    alcohol.

2         Q.    Benzodiazepines?

3         A.    Yeah, it's a classification of drugs.

4    Ativan, which I mentioned earlier, is a benzo.  It

5    can give you the same affect as getting drunk.

6    She says, "Hold benzo and DC in a.m."  DC means

7    discharge, in a.m.  And then I said at 6:19 p.m.,

8    "It was discontinued.  I'll discontinue the DC,

9    but he will probably leave AMA."  AMA means

10   against medical device.

11        Q.    Was he trying to be discharged

12   originally in the evening and she said hold it

13   until in the morning?

14        A.    That's right.  That's what she's

15   referring to, that I tried to send a patient home

16   who had his car over at the VA, and in the

17   meantime, I'm telling her all the information.

18   All I can do is report directly.  You can twist

19   anything.  And that's what's happening here, is

20   you use something that's completely innocuous, I

21   did exactly objectively what anybody would want me

22   to do, and that's relay the information as it's

23   happening.  I'm telling her, you know, the nurses

24   are -- now they're calling the attending.  I said

25   that was fine.  When they're threatening to call

Joseph Papin 1/22/2021

```
 1    the attending, that's, okay, we disagree with what
 2    you're telling us.  And I'm saying this came from
 3    the chief.
 4              So they were threatening to call the
 5    attending.  I said that's fine.  And I let her
 6    know that, too.
 7        Q.   I guess I'm not understanding the
 8    timeline of what you're telling us.  Let me walk
 9    through what I've heard and you tell me where I go
10    wrong.
11        A.   Sure.
12        Q.   So you were discharging the patient?
13        A.   According to what she had told me to do,
14    yes.
15        Q.   And the nurses are saying, no, this
16    patient can't go and they're calling the
17    attending.  Then you contact Ashley and say the
18    nurses are -- I told them it's fine, they're
19    contacting the attending.  She tells you to stop
20    the discharge until in the morning and you said
21    she's going to leave without medical advice.
22        A.   She says --
23        Q.   Is that the general gist of --
24        A.   Yeah, she asks a few questions.  Does he
25    need a ride?  Is that the issue?  And then I tell
```

Joseph Papin 1/22/2021

```
 1   her he's going to drive himself home.  He has his
 2   car here parked at the VA.  Then she says, "Hold
 3   benzo and DC in a.m.  They won't clear him to
 4   drive."  And then I said, "It was discontinued,"
 5   meaning the benzo was discontinued.  And then I
 6   say, "I'll discontinue the DC, but he will
 7   probably leave AMA," to which she responds at
 8   6:26 p.m., "K."
 9           So I couldn't have given her any more
10   information, been any more transparent, relayed
11   anything more accurately and honestly than what's
12   there.  But this is kind of pattern and practice
13   where you do something and things get twisted and,
14   you know -- I certainly am not -- I don't think I
15   have anything at all to be ashamed of in this
16   exchange here.  I was relaying the information
17   exactly as it was being told to me.
18       Q.   According to the text, you had already
19   tried to do the discharge, the nurses wanted to
20   call the attending, and then you brought Ashley in
21   the loop and she said to discontinue the
22   discharge?
23       A.   No.
24       Q.   Where am I missing the step here?
25       A.   On rounds, we go through and we talk
```

Joseph Papin 1/22/2021

```
 1    about who needs to be discharged, things like
 2    that.  So we agree this person needs to be
 3    discharged, this person needs to be discharged.
 4    So I would have been told by Ashley on rounds with
 5    Ashley and the attending this person needs to be
 6    discharged.  I write that down, I notate it, and
 7    in addition to all the other things that I have to
 8    do for all the other patients.  So when I got this
 9    patient, I put in this discharge, as I had been
10    asked to do, and then all this stuff started to
11    come up.  And as it started to come up, the nurse
12    was like -- I don't remember the exact
13    conversation with the nurse, but she's telling me,
14    we don't like this.  Some variation of that.
15    We're going to contact the attending.  I said,
16    that's okay.  I've been told by the attending and
17    the resident -- this is coming from the resident,
18    this person is good for discharge.  If you want to
19    speak to the attending, that's fine, they'll say
20    the same thing.  And then I let her know more and
21    more.
22             So she had been on board, but she didn't
23    know about, you know, the new updates until I
24    updated her right after I knew about the updates.
25    So to portray that as if I was just doing this
```

Joseph Papin 1/22/2021

```
1    independently and trying to do it on my own, he
2    tried, that's just not true.
3         Q.    And then there's one about a wound
4    washout.
5         A.    A wound washout, yes.
6         Q.    Instructed you to wash out a wound.
7    Ashley testified at the hearing that she had to
8    come back in later and do it, that it had not been
9    done.
10        A.    Right.  So the wound washout -- again, I
11   don't have the patient's records for any of these
12   other than really the decubitus ulcer.  The wound
13   washout, my memory was, this patient came in
14   unconscious.  She was a large woman who had been
15   ejected from a motor vehicle.  She came in
16   unconscious.  She had a shoulder that was hanging
17   on basically by the skin on the top of her
18   shoulder -- I'm sorry, an arm that was hanging on
19   by the skin on the top of her shoulder.  I went
20   in, I examined her, everything like that.  She was
21   eventually moved to the ICU.
22             At some point somebody asked me to go
23   and wash it out again.  So she had the wound
24   washed out by the emergency room, then they packed
25   it a certain way, and then I was told to go in and
```

Joseph Papin 1/22/2021

1    rewash it, do kind of a more thorough wash.  The

2    ER, they're going quickly, they're trying to get

3    things done.  So just go in and do a more thorough

4    wash.

5             What I remember is, I went into the

6    room, there was an ophthalmology resident at the

7    head of the bed suturing one of her lacerations up

8    at the head of the bed.  He was already sterile.

9    This is all done sterile.  I had come in, do you

10   mind if I start prepping?  He was like, no

11   problem.  I think he was starting to run out of

12   suture.  I told him -- he told me, hey, you're not

13   scrubbed in yet, right?  And I was like, no.  He

14   said, would you mind getting me some suture from

15   my bag?  I said, yeah, no problem.

16            So I got him some suture from his bag.

17   We were talking.  I handed it to him sterilely.

18   In order to give it to him, if you give it to him

19   in such a way that he can maintain sterility,

20   things likes that.  So he was able to get his job

21   done without having to scrub out, lay everything

22   back out again just to put a couple more stitches

23   in.  So I ended up saving him probably 15 minutes,

24   something like that.

25            Then once he was done with that, I

Joseph Papin 1/22/2021

```
 1   started on mine, washed out the wound.  At some
 2   point I got a text message later -- I didn't tell
 3   anybody because you just go and do it, check it
 4   off the list, you're done.  That's how everybody
 5   operates.  You wouldn't drop in a note, you're not
 6   going to, hey, I did this.  You don't let
 7   everybody know every single step that you do in a
 8   day.
 9           And I got a text message from Sid Desai.
10   Sid Desai said something to the -- I'm
11   paraphrasing, but something to the effect, did you
12   wash that wound, wash that patient out?  I texted
13   him, I said, yeah, I've already done it.  I think
14   by that point I had already left.  I did it, I'm
15   already gone.  I left two minutes ago, something
16   to that effect.
17       Q.   He said, you wash that wound out or
18   what?
19       A.   Yeah, something like that.  I said,
20   yeah, I did it.  And I already left like two
21   minutes ago.  Shift change had occurred, I signed
22   out my patients, there was no issue with that.
23   And I don't know how I found out, but he had done
24   a wash himself.  I think he told me or maybe it
25   was in the text message.  I don't recall exactly
```

Joseph Papin 1/22/2021

```
 1    something, but he had done a wash.  So at this
 2    point it's ER wash, I wash, Sid washes.
 3              And then in the appeal -- I didn't hear
 4    anything more about this, you know, like
 5    specificity, that I can recall, until the appeal
 6    when Ashley came in, and Ashley was saying that I
 7    had been -- that I had not done it even though I
 8    said I had, and I had left her to do it and she
 9    was pulling sticks and twigs and whatever rubble,
10    pebbles out of the wound, things like that.
11              Now, where it's inaccurate is she
12    forgets in one of her own e-mails, one of those
13    very e-mails, she notes that she -- she said, I
14    left Sid and later herself to clean out the wound.
15    So she's using -- pulling sticks and twigs out of
16    the wound as evidence that I didn't do the wash.
17    She would also be criticizing the quality of the
18    wash from her own co-senior resident, Sid Desai.
19    And she neglected that -- she neglected to mention
20    Sid Desai at all ever doing a wash in the appeal
21    at all.  So, to me, that's evidence of, you know,
22    an inaccuracy, what we can call it.
23              But no, I always did it.  I always
24    maintained that I did it.  I did do it.  Sid did
25    it.  And then later on down the line, things are
```

Joseph Papin 1/22/2021

1    changing to where Ashley's saying I had to pull

2    sticks and twigs out.  And I'm not denying or

3    downing that she did.  Fluid, gravity tends to

4    settle things.  Like I said, she was a large

5    woman, things can travel in the layers of fat and

6    muscle, anything, things can get in there and you

7    might not see it perfectly.  Gravity, time just

8    settles things out.  The fluid just kind of rushes

9    things out.

10           So I'm not denying that it happened, but

11   if you're going to use that to say that the

12   quality of my wash -- I couldn't have done a wash

13   if she was pulling that out.  She's also calling

14   Sid Desai a liar because she, on her own, in an

15   e-mail said that Sid had -- leaving Sid and later

16   myself to wash.

17      Q.   But you heard her testify to all of that

18   at the hearing, that she had to come in it still

19   had the ER dressing on it and --

20      A.   Yes.  If you're discussing the ER

21   dressing, Sid would have come after me.  I don't

22   know what he put on.  You can stop off and get a

23   dressing anywhere.  I don't know.  I know that I

24   took the dressing off.  I know that I packed it.

25   I know that I did the wash.  If we get that

Joseph Papin 1/22/2021

```
 1    record, I'd be happy to try and get the name of
 2    that ophthalmology resident and see if you can
 3    talk to him.  He might remember me.
 4            But, you know, I never saw her after
 5    that, so I don't know what she was seeing or
 6    whatever.  But that would have been Sid's wash
 7    that -- by her own admission, that would have been
 8    Sid's wash that she was then looking at, not mine.
 9    Or Sid's packing of the wound that she had been
10    looking.  Sid would have taken mine off.
11        Q.    After hers -- after the wound washout,
12    then we get an e-mail from Meghan Mahoney.  I'm
13    sure you've seen that one as well, where she lists
14    off basically talking about the decubitus ulcer
15    again, correct?
16        A.    That's correct.
17        Q.    Talks about going for a run?
18        A.    Do you have a copy of that e-mail that I
19    could see?
20        Q.    I do.  You can take that one.  We'll
21    make that whole thing the next exhibit.
22            (Exhibit 17 marked for identification.)
23        Q.    (By Mr. Whitfield)  We'll make that
24    whole stack.
25        A.    I see that e-mail right here on 17, 445,
```

Joseph Papin 1/22/2021

```
 1   he left Sid and later me to do it.  It's on 445,
 2   Exhibit 17.
 3              Going back to the one that you were
 4   referencing --
 5       Q.   Go back to that.  She left leaving Sid
 6   -- she doesn't say that Sid did it, she just said
 7   you left it for him, and then later for her.
 8   Whether he did it or not, it doesn't really say.
 9              MR. MORGAN:  I would disagree.  It says
10   he left leaving Sid and later me to do it.  That
11   certainly insinuates "and later me to do it."
12   "And" not "or."
13              THE WITNESS:  And the other thing is,
14   wouldn't Sid be guilty of the same thing that I
15   did.  I mean, I did it and Sid did it, but if
16   you're leaving things and lying about it, like
17   leaving them for later, then we would, at the very
18   least, both be guilty of, you know, advocating
19   duty or leaving responsibilities open.
20              But going back to this, yes, I have seen
21   this e-mail through the course of discovery.
22   No. 1, I mean, I think we talked about this, going
23   for a run.  What you don't see here is, you
24   know --
25       Q.   (By Mr. Whitfield)  First text
```

Joseph Papin 1/22/2021

```
 1    permission --
 2         A.    Exactly.  That, to me, is misleading.  I
 3    told that to Earl from the very beginning when he
 4    met with me earlier in December.  You know, but
 5    she doesn't even notate that.  She never told him
 6    about that, because he told me he didn't know
 7    about that, you know.  So that's absolutely just
 8    intentionally misleading to me.
 9              I was told that in '19, in their second
10    year that Joe didn't respond --
11              I'll just let you go.  I don't know what
12    you want me --
13         Q.    That's the code blue that we talked
14    about in No. 2.
15              No. 3 was about logging cases.  You have
16    to log procedures; is that correct?
17         A.    Yeah, that's right.  So now that I've
18    been kind of on the other end, like in the
19    business world, this is like the equivalent of
20    logging your expenses.  It's something you have to
21    do, it's something that needs to be done.  It
22    needs to be done accurately.  It's sort of the
23    last things that you think about.  As long as
24    you're keeping track of it, all you have to do is
25    update this database.
```

Joseph Papin 1/22/2021

```
 1              I probably was delinquent in doing it a
 2     few times.  But from what I recall, you know, I
 3     said that I had -- this came up to Meghan, Meghan
 4     brought it up to me from Renee.  I said that I had
 5     done it because I had done it.  Turns out that was
 6     true.  So what Meghan is saying here was untrue
 7     or -- what Renee -- I don't know where the
 8     breakdown is, but the fact of the matter is, my
 9     cases were logged.
10          Q.   No. 4 is another one about the nurses
11     and your interactions with the nurses.
12          A.   Just give me a second to read this one.
13     This -- again, I had never personally had any sort
14     of complaints brought to my attention from three
15     north nurses.  And to my knowledge, there are no
16     documented complaints dealing specifically with
17     me.  I do know that throughout that month there
18     were things that were --
19              Like Will Bruch and I, the other
20     resident, looked very similar.  I guess two tall
21     white guys.  So they would get us confused.  There
22     was an instance -- here, I can read this one in,
23     too.  Let me just pull it up.  I don't know if
24     it's been produced or not, but we can certainly do
25     that, too.
```

Joseph Papin 1/22/2021

```
 1                MR. WHITFIELD:  I'd ask that he produce
 2     all the text messages that he's got with our
 3     people.
 4                MR. MORGAN:  I thought we did.
 5                MR. WHITFIELD:  I don't have any of
 6     these.
 7                MR. MORGAN:  Which one?
 8                THE WITNESS:  This one is Will Bruch.
 9                MR. WHITFIELD:  The ones with Ashley
10     Griffin and all that --
11                MR. MORGAN:  I'm not sure if all of them
12     were formerly under the request, but I'm happy to
13     produce --
14                MR. WHITFIELD:  They should have been in
15     disclosures.
16                THE WITNESS:  So this is December 15th.
17     I said at 5:57 p.m., I said, "Thanks, dude."  Next
18     text message at 5:57 p.m. again, I write, "I'm in
19     wiser checking on two turds."  That was Meghan
20     Mahoney's nickname for one patient.  And then at
21     6:56 p.m., I wrote, "You need any help?"  At 7:43
22     p.m. he responds to me, "No.  Hahaha.  One of the
23     three north nurses reportedly claimed she
24     overheard me say trauma nurses are dumbasses."
25                Yeah.  So there were comments --
```

Joseph Papin 1/22/2021

```
 1   certainly it wasn't just me.  I never had a
 2   complaint like that, to my knowledge, that I had
 3   ever said anything rude like that about a nurse.
 4   This isn't to, you know, point out anything that
 5   Will Bruch did or did wrong, but to say that this
 6   is only happening with me, that's not true.  There
 7   were also a lot of comments that were attributed
 8   to me that were him.  People confused us a lot.
 9            And no point did she ever bring up to me
10   like, hey, these are some specific nursing
11   complaints or nurses are complaining about you,
12   nothing like that.  No one ever said anything to
13   me.
14        Q.   (By Mr. Whitfield)  And then No. 5 is
15   back to Will Crews again.  That's relating to what
16   we talked about Will Crews?
17        A.   Yeah.  You know, I think with Will
18   Crews -- I mean, I just gotta tell you, I struggle
19   to find something that was accurate about what he
20   said.  The sexual harassments thing that was also
21   brought up when he said that -- in the appeal, the
22   appeal being the one at UMMC, when he relayed that
23   he had been told by this female medical student
24   firsthand that I had made her uncomfortable,
25   whatever.  And then subsequent to that, you know,
```

Joseph Papin 1/22/2021

1    in his deposition, I heard that he --
2            The whole time I'm struggling, where is
3    this coming from?  And then in deposition, now the
4    story changes to, oh, a resident told me.  I don't
5    remember which resident.  Now it's changing from
6    being firsthand information to third or fourth or
7    whatever hand information.  Now, you know, it's
8    not that he heard directly.
9            So Will Crews, I have a lot of trouble
10   finding accuracies in what he said.
11       Q.   No. 6 is the decubitus ulcer patient we
12   went through.
13       A.   Yes, we did talk about the decubitus
14   ulcer patient.  Yes.
15            Sorry, I just wanted to -- "For two
16   weeks Joe told me that a certain patient did not
17   have any skin changes."  So, again, she's saying
18   that I never saw a wound, and she kind of reverses
19   herself even in her own testimony, she's saying
20   here for two weeks in writing, "Joe told me that a
21   certain patient did not have any skin changes.
22   Wound care saw patient and reported sacral
23   decubitus they felt needed to be debrided.  It
24   wasn't until they placed a note that Joe told me
25   the guy had a wound."

Joseph Papin 1/22/2021

```
 1              I mean, that's just not true because
 2    wound care, Kisha Dyse, had been consulted on
 3    November 30th and placed at least two or three
 4    notes into the record prior to December 22nd.
 5    That wasn't her first note, and it also wasn't the
 6    first time that I had told Meghan about this.
 7              And then there's also accounts, like if
 8    you go to Earl's, Earl's saying that, not that I
 9    didn't say that there was anything, I was just
10    repeating what the wound care nurse said.
11              So, you know, the truth is, I had been
12    telling her the whole time, the wound care nurse
13    had been putting in notes, it couldn't have been
14    any clearer.  It's in my notes.  I told her about
15    it.  I'm the only one with documentation of a text
16    message telling her about it.
17         Q.   That text message was on December 22nd.
18         A.   That's right.  But that was before it
19    was discovered to be the big thing that it was.  I
20    thought, oh, maybe this could be something.  And,
21    you know, that was a gap in medical knowledge.
22         Q.   It was discovered the next morning.  You
23    sent the text in the afternoon.  When they looked
24    at it the next morning, that's when it was
25    discovered.
```

Joseph Papin 1/22/2021

```
 1        A.    That's right.  That sequence of events
 2   is correct, but Meghan knew.  I'll tell you --
 3   while we're on the topic, I'll tell you the
 4   mechanisms that Meghan would have known.  On
 5   November 30th -- Sid Desai was the trauma chief on
 6   through the end of November.  Whenever Sid Desai
 7   finished, Sid Desai would have given Meghan sign
 8   out on all the patients on the service for her to
 9   then take over to be the chief.  That was known
10   then.  I'm sure it was probably discussed.  I
11   wasn't privy to it, but it should have been
12   discussed then.
13             Then there were notes dropped in from
14   wound care periodically throughout the month.  All
15   of us were putting in wound care -- the Wound Care
16   Recs.  We were copying all the Wound Care Recs.
17   Everybody was aware except her somehow that this
18   patient had a decubitus ulcer.  It was in the
19   notes, it was in all of our notes copying forward.
20   There was no other wound that was being treated or
21   seen.  Kisha Dyse's notes are specifically without
22   question on that decubitus ulcer wound.
23             When I'm not there to say anything on
24   December 23rd, she blames me, I'm assuming, and
25   then sends me a text message trying to trap me.
```

Joseph Papin 1/22/2021

```
 1   And it's unfortunate that this all has to come to
 2   this, but that's really the reality that we're
 3   dealing with here.  There's tons of way that she
 4   could have and should have known.  I guarantee
 5   you, there are no PGY4 at any level or at any
 6   space, you know, job description, you know,
 7   requirements, anything like that, that will tell
 8   you that she should have just completely relied on
 9   interns to provide her information.  She should
10   know her patients.
11              If I had ever gotten a chance to be a
12   PGY4, you better believe I would have known about
13   my patients in reading about them.  I don't even
14   understand how Dr. Earl or Meghan can make the
15   assertion that it's totally fine to just not read
16   anything, not know anything, and rely entirely on
17   intern.
18              No. 1, I was telling her.  But No. 2,
19   you're relying on the least knowledgable person as
20   the only catch for errors in the system.  That
21   makes you no more intelligent -- that makes the
22   medical system no more intelligent than the least
23   knowledgable person on the team.  It doesn't seem
24   like a way that you would want to design your
25   health care system.
```

Joseph Papin 1/22/2021

```
 1        Q.   That it?

 2        A.   That's it.

 3        Q.   Okay.  You would agree with me that all

 4   these e-mails were turned in to the general

 5   surgery office or to UMC?

 6        A.   They were sent to Renee Greene, if I

 7   recall.  So I would agree, yes, that they were

 8   sent to Renee Greene.

 9        Q.   These five people, Colin Muncie, Ashley

10   Griffin, Meghan Mahoney, William Crews, they all

11   testified at the hearing?

12        A.   Yes.

13        Q.   And that would be the hearing for the

14   appeal of your termination?

15        A.   If that's what you're referring to, then

16   yes, I would agree with it.

17             (Exhibit 18 marked for identification.)

18        Q.   (By Mr. Whitfield)  I'll hand you now

19   what has been marked as Exhibit No. 18.  Is that

20   right?

21        A.   Yes.

22        Q.   This is a letter signed by you and

23   Dr. Earl on January 10th, 2017.  Do you remember

24   having this meeting with Dr. Earl?

25        A.   I do.
```

Joseph Papin 1/22/2021

```
1          Q.   In this letter he gives you specific
2     feedback and basically tells you you have 60 days
3     to improve.  Do you agree with that statement?
4          A.   Could you say that one more time?
5          Q.   That he's giving you specific feedback
6     and telling you that you have 60 days to improve?
7          A.   I would disagree with that.  I do not
8     think any part of this was specific.
9          Q.   He tells you these concerns of you dealt
10    with critical deficiencies in the SPB1, SPB2, SPB
11    I -- PR1 milestones, and that you have concerns
12    with lying and being untruthful about patient
13    care, leaving the hospital during duty hours,
14    dereliction of duty, unwillingness to help with
15    tasks, condescending tone to nurses and fellow
16    residents, and poor interprofessional
17    communication.  Is that what's in the letter?
18         A.   That is what's in the letter.  I would
19    not consider that specific in any way.  Poor
20    interprofessional communication, again, it's a
21    reoccurring theme of no specificity whatsoever.
22              I think if you'll notice going back to
23    Exhibit 12, he essentially copy/pasted what he
24    didn't send to me in Exhibit 12.  And then in
25    Exhibit 18 the language is almost identical.  Poor
```

Joseph Papin 1/22/2021

```
 1    interprofessional communication, exactly
 2    identical.  No. 5, No. 5.
 3              No. 4, leaving clinics without telling
 4    anyone, now that's removed.  But No. 4 is now
 5    replaced with condescending tones to nurses and
 6    fellow residents, which is No. 3 on December 20th.
 7              Then if we go up to No. 2, leaving the
 8    hospital during duty hours to exercise,
 9    dereliction of duty.  That was also No. 2 on
10    December 20th.
11              You'll notice No. 1 was unwillingness to
12    help with tasks on December 20th, that's now No. 3
13    here.  Lying and being untruthful has now been
14    made No. 1.
15              So the major difference is some
16    rearrangement.  Looks like he's trying to add like
17    an order of importance to these now.  He added
18    lying and being untruthful about patient care, and
19    he subtracted leaving clinics without telling
20    anyone.
21              So going back to the question, I don't
22    think this was specific at all and, you know,
23    there's new things that are coming up to which
24    there was no specificity even to the new things,
25    still to the old things.  And there are things --
```

Joseph Papin 1/22/2021

```
 1    I don't know if this means -- leaving clinics
 2    without telling anyone, is that no longer
 3    important or is that -- I don't know.  Why did he
 4    carry forward some of these and not others?
 5            And then in terms of the critical
 6    deficiencies, SBP1 means just that to me.  I don't
 7    know what that means.  Systems-Based Practice, I
 8    know that's probably what SBP stands for, but I
 9    don't know what that -- no surgical resident
10    expected to have that memorized.  You know,
11    there's no sort of specificity to anything.  I
12    don't know how --
13            If I take my car in, for example, and I
14    say, hey, the brakes don't work, they know to look
15    at the brakes.  When someone tells me there's poor
16    interprofessional communication and I'm not seeing
17    any sort of poor interprofessional communication,
18    it would be great to have some specificity so I
19    could fix that.  That's what I wanted to do, and I
20    never got it.
21            Lying and being untruthful about patient
22    care, he wouldn't tell me about it.  It was almost
23    like he wanted me to fail.  I don't know why -- I
24    played sports and things like that.  When I messed
25    up in anything else, I think that's part of why,
```

Joseph Papin 1/22/2021

```
 1    you know -- part of how you get better.  Whenever
 2    I messed up on a sports team or anything and
 3    someone tells me I did something wrong or I ask,
 4    they tell me what I can work on and fix it.
 5    That's what a coach does.
 6              It's really kind of what a program
 7    director is supposed to be, and I was never
 8    getting that.  Lying, being untruthful about
 9    patient care.  You would think that would be a
10    no-brainer for somebody to tell that person
11    exactly what it was regarding, but that never
12    happened.  So no, I disagree that there was any
13    specificity to this.
14         Q.   And then he comes in and says -- I don't
15    know how you want to count the paragraphs.  One
16    starts on Tuesday, December 20th.  He refers back
17    to the meeting that you're referring in the
18    e-mail.  That y'all met and discussed the issues.
19         A.   Yes.  So on December 20th he refers to
20    that.  What was your question?
21         Q.   He references that in the letter, the
22    meeting on December 20th.
23         A.   Yes, but -- and again, it's misleading
24    here.  "On Tuesday, December 20th, 2016, we met
25    (with Renee Greene present) and discussed these
```

Joseph Papin 1/22/2021

```
 1    issues."
 2              That's not true.  The list that he -- he
 3    never sent me this list.  But the lists aren't the
 4    same.  So if the lists change, probably a pretty
 5    good indication that we didn't discuss these
 6    things.  Lying and untruthfulness, never discussed
 7    with me.  These other things, yes, they were
 8    brought up, condescending tone to nurses and
 9    fellows.  Same thing with poor interprofessional
10    communication and leaving the hospital during duty
11    hours.  They were all just brought up.  And that
12    was it except for the leaving the hospital duty
13    hours.  He had information on that.  We talked
14    about that and I gave him more information.  And
15    discussed these issues, that's patently false.
16    Look at the two documents.  They're different.
17         Q.   He says, "This meeting is in addition to
18    several other meetings, including but not limited
19    to, the semi-annual review."  Did you have that
20    semi-annual review?
21         A.   We did have the semi-annual review, but
22    it seems what he's trying to do is incorporate all
23    of these items that came previously in this
24    January 10th contract letter, whatever you want to
25    call it, into all of these discussions, and it's
```

Joseph Papin 1/22/2021

1    just not true.

2        Q.    Did you get feedback from senior

3    residents?

4        A.    Not really, no, not that I can recall.

5    Specific feedback from senior residents where I

6    was sat down and we talked about issues.  I mean,

7    I got yelled at by Meghan.  I got -- many times.

8              There was one time about the code blue

9    where I sought kind of the advice from a more

10   senior resident who wasn't on my service.  He was

11   just kind of friend within the program.  And I

12   asked him, hey, man, these are the circumstances,

13   what do you think about this?  And he told me, you

14   didn't do anything wrong, something to that

15   effect.  But if you ever find out, if this happens

16   in the future, just call whose patient that is.  I

17   took that advice from him and I agreed with him.

18   Call next time -- if it's a floor, I think he said

19   -- if it's a floor -- if it's a floor with many of

20   your patients -- you service with your patients on

21   it, just call next time.  Good feedback.  And I

22   would have from that point forward.

23             But any sort of formality with senior

24   residents, sitting down and talking to them, no,

25   there was never any meetings.  There was the chief

Joseph Papin 1/22/2021

1    resident meeting that I called to talk about Josh
2    Sabins.  That wasn't to give me feedback, it was
3    to relay information from me to the chief
4    resident.
5        Q.   And you said you don't remember the
6    meeting in late November outside of OR-16?
7        A.   I don't think it occurred, and I don't
8    recall it.
9        Q.   At all?
10       A.   At all.
11       Q.   You didn't object to that being in here
12   on this letter when you signed it?
13       A.   Oh, I did.  I objected to basically
14   everything.  I told him, you know, this isn't -- I
15   can tell you straight up right now, patently false
16   that I ever lied and was untruthful about patient
17   care.  But it would be great to get some context
18   around that so I could know what you're talking
19   about, maybe we can clear this up.  Where did it
20   happen, everything.  He became angry.
21       Q.   Did y'all talk about this decubitus
22   ulcer patient?
23       A.   Not a single time in this meeting or
24   prior to it, ever.  Not once.  And I asked him,
25   never would tell me.  Told me, I don't need to

Joseph Papin 1/22/2021

```
 1    tell you, this is -- whatever, this is what it is.
 2    I said, okay, do you mind if I take this contract?
 3    I'd like to take some time and look over it and
 4    have somebody else look over it.  He told me,
 5    sure, but you're fired if you don't sign it right
 6    now.
 7              So I objected a lot to a lot of this,
 8    and he just didn't let me -- if I didn't sign it,
 9    I was fired right then and there on the spot.  And
10    he also said if I didn't go and get the fitness
11    for duty exam that he was going to take me to
12    afterwards, I was fired on the spot then, too.  So
13    I went and did that, too.  Everything was under
14    the threat of immediate dismissal.
15         Q.   And then after this you were placed on
16    administrative leave?  You didn't work after the
17    10th?
18         A.   Yeah, let's call it that.  I did not
19    work after the 10th.  I don't know what the term
20    is or anything like that, but I did not work
21    another minute after this.
22         Q.   But you were still getting paid from the
23    10th to your termination date?
24         A.   That's correct.
25         Q.   What do you call it, suspension leave,
```

Joseph Papin 1/22/2021

```
 1    whatever, you were being paid, but you weren't
 2    working after November 10th --
 3         A.   Right.
 4         Q.   Excuse me, January 10th, correct?
 5         A.   January 10th until -- yes, I was still
 6    getting paid.
 7         Q.   At some point you had a meeting with
 8    Human Resources?
 9         A.   Yes, that would have been on
10    January 27th, if I recall correctly.
11         Q.   And that's reflected in the transcript
12    that we've already entered into evidence.  I can't
13    remember the exhibit number.
14         A.   Yes.  One thing I would like to point
15    out that's come out, you know -- I don't even
16    drink.  So for someone to say that I've got a
17    happy hour to go to, you know, that's untrue.
18    That was off the record, too, that -- what they're
19    saying is when I called them to figure out where
20    HR was, that happened.  It was off the record.
21    Everything else in the record, you know, that is
22    what it is, it's in the record.  But I never
23    called and said I've got a happy hour to go to.  I
24    don't even drink, so I wouldn't have a happy hour
25    to get to.
```

Joseph Papin 1/22/2021

```
 1              Moreover, at that point I was on the
 2   outside looking in.  I'm not from Mississippi.  I
 3   don't know anybody from Mississippi.  So I
 4   wouldn't have had -- my friends were residents,
 5   but by that point I'm on the outside looking in.
 6   So who would I have had to get to happy hour with?
 7   So I just wanted to mention that.
 8        Q.   And then subsequent to that, you were
 9   terminated on February 22nd?
10        A.   That's correct.
11        Q.   And then your attorney wrote to the Med
12   Center requesting an appeal?
13        A.   Yeah.  And then in the meeting, I'd just
14   like to state in that February 28th --
15   February 22nd meeting with Dr. Earl, the
16   termination meeting, I knew what was happening.
17   As he was getting started -- before he had said
18   you're fired, you're terminated, whatever it is
19   that was said, I said, is there any chance, any
20   possibility to resign?  He told me, no, it's
21   already passed through legal, it's already passed
22   through HR.  This is what I want.  You're done.
23              I said, okay.  I can't possibly resign?
24              No.
25              Then he told me, we're letting you go,
```

Joseph Papin 1/22/2021

```
 1    you know, you lied about patient care.  We can't
 2    trust your integrity anymore.  About the decubitus
 3    ulcer.  I told him, that's not true.  But this is
 4    a battle for another venue, I guess.  Is there
 5    anything else?  He told me, no.  And that was the
 6    end of the meeting, basically.
 7         Q.   Do you remember him asking for your
 8    badge?
 9         A.   I do.
10         Q.   Did you give it to him?
11         A.   No, I didn't.
12         Q.   Why didn't you give it to him?
13         A.   I had lost my badge prior and I had just
14    paid 25 bucks for it, and I just wasn't really
15    inclined to give him the badge.  He didn't provide
16    me with any sort of documentation -- not that
17    there's a reason for that.  This is just in
18    addition, you know, period to the last statement,
19    separately.  He didn't provide me with any sort of
20    documentation.  He didn't give me anything
21    whatsoever.  He didn't have anything prepared that
22    it looked like.  It didn't look like he was ready
23    to hand me a piece of paper, anything like that.
24              I asked him if there was anything else.
25    He told me, I can't trust you no longer.  A lack
```

Joseph Papin 1/22/2021

```
 1    of integrity.  So no longer trust you anymore.  I
 2    said, that's not true.  We already went over this.
 3    He didn't hand me any documentation or anything.
 4              I was like, my dad owns Subways.  They
 5    get more ceremony when he lets somebody go than I
 6    got.  To the extent to which I was given any sort
 7    of documentation, any of sort of information, none
 8    really.
 9         Q.   That happened on the 22nd?
10         A.   That's right.
11         Q.   Then your lawyer on the 3rd sent in a
12    letter requesting an appeal?
13         A.   I don't recall the date, but that sounds
14    right.  He did at some point, yes.
15         Q.   Between that time and the hearing, did
16    you ever receive word that UMC had offered you the
17    opportunity to resign?
18         A.   No.  Sorry, between February 22nd and
19    March the 3rd you're saying is the date?
20         Q.   No.  The hearing.
21         A.   The appeal hearing, like July 17th or
22    whatever that was?
23         Q.   Correct.
24         A.   No, never.
25         Q.   Are you aware that it was offered to
```

Joseph Papin 1/22/2021

```
 1   your attorney?

 2        A.   No.

 3             MR. MORGAN:  I want to object because --

 4             MR. WHITFIELD:  I know we disagree on

 5   that.

 6             MR. MORGAN:  From the plaintiff's

 7   position, it was allegedly offered to his previous

 8   attorney.

 9             MR. WHITFIELD:  Fair enough.

10             THE WITNESS:  I found out -- just to be

11   clear, this was not known to me until whatever

12   deposition it was that you brought it up to Greg,

13   I believe.  You brought it up to Greg and Greg

14   relayed the information to me.  I told him -- it's

15   attorney/client privilege, but I'm telling you,

16   no, I --

17        Q.   (By Mr. Whitfield)  You were unaware?

18        A.   I was unaware.

19        Q.   That's all I was asking.

20        A.   Okay.

21             MR. WHITFIELD:  Let's take a five-minute

22   break real quick.

23             (Off the record.)

24        Q.   (By Mr. Whitfield)  Do you know who

25   Dakota King and John Shaughnessy are?
```

Joseph Papin 1/22/2021

```
 1        A.   Yes, I remember them.  They were M4s --
 2   fourth year medical students at the time.
 3        Q.   What service did you work on with the
 4   two of them?
 5        A.   You know, I don't recall.  I don't
 6   recall.
 7        Q.   Do you recall working with them?
 8        A.   I do.
 9        Q.   They have both come up and have now said
10   that during their time working with you, you would
11   log into the Epic system, the electronic patient
12   medical record system, and they would write notes
13   for you.  Do you recall that?
14        A.   I don't recall that.  I recall -- I
15   don't recall that.
16        Q.   You don't recall it happening or --
17   you're saying it didn't happen or you just don't
18   remember doing it?
19        A.   I would say both.  I would say that I
20   don't recall it ever happening, and if it did, you
21   know -- I don't recall it happening.  I recall
22   that being -- I don't recall myself ever doing
23   that, but I recall that being a practice that was
24   done.  I can't remember what service, because
25   forth year medical students don't really get the
```

Joseph Papin 1/22/2021

```
 1    opportunity to write notes.  Their notes are
 2    meaningless, essentially.  They can write a note,
 3    it's essentially meaningless.
 4             You can co-sign their note -- this is
 5    four or five years now.  You can co-sign their
 6    note, but then you still have to write one on your
 7    own.  If I remember correctly, I don't remember
 8    myself specifically doing this, but it was a
 9    practice that some would do where they would allow
10    someone to write a note on their account, then
11    they would review that, and then before hitting
12    submit, they would submit it.  I don't recall that
13    ever happening with me.
14        Q.   But it's possible?
15        A.   It's possible.  At end of the day, it
16    wouldn't have been their note, it would have been
17    mine, and it would have been reviewed.  But I just
18    don't recall that ever happening.  I've seen it
19    happen, but I don't recall that ever happening
20    with -- with myself.  And I don't recall what
21    service we were on together.
22        Q.   Could it have been in the fall of 2016
23    when you worked with them?
24        A.   I don't know about fall -- when is
25    winter, December?
```

Joseph Papin 1/22/2021

```
 1        Q.   I guess it would be the 2016, the first
 2   half of the first year.  You weren't here for the
 3   second half?
 4        A.   Yeah, I was here through a little bit of
 5   the beginning of 2017, through January 10th of
 6   2017.  I don't think it was on that service.  So
 7   yeah, it would have been I guess the second half
 8   of 2016, at some point, I was on with them,
 9   because I remember the two of them.
10        Q.   Now, when you had the appeal hearing,
11   when it was scheduled and Dr. Bondi was the
12   chair -- do you remember having that hearing?
13        A.   I do.
14        Q.   Now, you didn't come in person to the
15   hearing?
16        A.   That's correct.
17        Q.   You telephoned in remotely, or
18   conferenced in?
19        A.   Yeah.  I was given a phone number, I
20   just called into it.
21        Q.   But your attorney, Joel Dillard, was
22   physically present?
23        A.   That's correct.
24        Q.   During the hearing y'all would take
25   breaks so that you could have an opportunity to
```

Joseph Papin 1/22/2021

```
 1    consult with Mr. Dillard?

 2          A.    That's correct.

 3          Q.    Do you remember at the beginning of the

 4    hearing when Dr. Bondi was reviewing how the

 5    proceedings would go?

 6          A.    Give me a little more detail.

 7          Q.    You remember him saying that the

 8    expectations would be that you would call and

 9    question your own witnesses?

10          A.    That I would call and question my own

11    witnesses?  No, I don't recall that.  I was not

12    allowed to call or question my own witnesses.

13    What I believe his instruction was, was I will be

14    allowed to state a question to the committee and

15    the committee can then decide if they would like

16    to pose the question to the witness, which they

17    never did.

18                (Exhibit 19 marked for identification.)

19          Q.    (By Mr. Whitfield)  I'll hand you now

20    what has been marked as Exhibit 19, transcript of

21    the hearing.  I want to refer you to the bottom --

22    I'll use the bottom Bates number Papin 064.  The

23    actual page 9 of the transcript.

24          A.    Sure.

25          Q.    I want to point you out to lines 14
```

1    through 18 where your lawyer is talking with
2    Dr. Bondi and asked him, "So the expectation will
3    be that Dr. Papin would call witnesses and
4    question them himself?"  And Dr. Bondi responds,
5    "Yes, or have them speak in the narrative."
6              Do you see that?
7       A.    I do see that.
8       Q.    Now, when he said this, did you tell him
9    that you had witnesses to call?
10      A.    No.  I would assume -- what I assumed is
11   they were clarifying the witnesses that -- you
12   know, that UMMC had produced.  So there were
13   several witnesses that were named prior to the
14   appeal that -- that -- I would assume you and your
15   team produced a list of several witnesses that
16   could speak.  I would assume that I could call
17   from those specific witnesses.  But, you know, I
18   was never given the opportunity to list witnesses,
19   ever.  I was never given the opportunity to call
20   witnesses.  There was never a point where I could
21   call my own witnesses.
22             I mean, did Dr. Bondi ever open the
23   floor to me to call any of my witnesses, because I
24   didn't have any prep to be able -- I didn't know
25   what the format was going to be.  I didn't know

Joseph Papin 1/22/2021

```
 1    that I could call witnesses.
 2         Q.   When he announced this in the hearing,
 3    did you say, wait, Dr. Bondi, I have witnesses I'd
 4    like to call?
 5         A.   Frankly, I don't recall this being said.
 6    But I think -- what I think Joel was doing is
 7    highlighting kind of the hilarity and the format
 8    that I'm expected to be my own attorney and call
 9    witnesses and ask questions of other witnesses and
10    things like that, do my own cross, things like
11    that.
12         Q.   Did you have witnesses that you wanted
13    to bring on your behalf?
14         A.   I certainly would have had I been given
15    the opportunity prior to page 9 of the deposition
16    as it was ongoing.
17         Q.   But during this time, you nor your
18    attorney interposed an objection saying we have
19    witnesses we'd like to call?
20              MR. MORGAN:  Object to the form.  You
21    can answer if you can.
22              THE WITNESS:  Again, I don't recall
23    hearing this.  I don't recall this coming up.  But
24    what I do recall is -- what Mr. Dillard is doing
25    is kind of objecting to the hilarity of the
```

Joseph Papin 1/22/2021

```
 1    format.  This is a kangaroo court.
 2         Q.   (By Mr. Whitfield)  When Dr. Bondi did
 3    open the floor up for you to make your
 4    presentation, you didn't say, Dr. Bondi, I've got
 5    a witness I'd like to call?  Did you ever raise up
 6    to Dr. Bondi, I have a witness I'd like to
 7    testify?
 8         A.   Well, if I didn't hear him say this over
 9    the telephone, I don't know how I would have known
10    to -- I accepted that I wasn't given the ability
11    to produce witnesses.  And having not been given
12    the ability to produce witnesses, I wouldn't have
13    had any witnesses to produce that very second;
14    whereas UMMC had the ability to call their
15    witnesses, schedule them, have then present, be
16    there, things like that, had access to them to
17    prepare them in any way if necessary.  I didn't
18    have that ability, so --
19         Q.   Who --
20         A.   Just one second.  If I missed this being
21    said, I would have never been able to object or
22    interpose or anything like that.  And frankly,
23    this is exactly why you need an attorney present,
24    you know, to do these kinds of things.  I was
25    never given the opportunity, I was never told,
```

Joseph Papin 1/22/2021

```
 1    hey, you can have witnesses, which witnesses would
 2    you like to have appear?
 3              It sounds like it was said here.  I
 4    missed it.  But it's already too late here.  How
 5    can I produce witnesses while the hearing is
 6    ongoing?
 7         Q.   Did anybody tell you you could not have
 8    a witness?
 9         A.   I mean, I didn't speak to anybody at
10    UMMC.  So I think the last time I spoke with
11    anybody at UMMC was -- it wasn't February 22nd
12    because I remember having asked about benefits,
13    getting things like that.  It was specifically
14    about benefits.  But the last time I spoke was
15    much sooner than this.  So there was never any
16    sort of information going either way.  So I was
17    relying on the information that was being given to
18    me.
19              I was told to show up.  I was not told
20    that I could bring witnesses or anything like
21    that.  And I don't know how I really would have
22    produced witnesses.  It's difficult when you don't
23    have subpoena power or you don't have whatever
24    else, the powers of the court, everything like
25    that.  I would have had to have reached out to
```

Joseph Papin 1/22/2021

```
 1    these people, and they're still employees of the
 2    Medical Center.  So there's also conflicts here.
 3    And again, I was never given the opportunity to.
 4          Q.   My specific question is:  Did anybody
 5    from UMC tell you you could not call a witness?
 6    Yes or no.
 7          A.   I don't know.  Let's see.
 8          Q.   Prior to the hearing, did anybody tell
 9    you you couldn't bring a witness?
10          A.   I'll answer your first question here.
11    So as we're walking through the format, I'm
12    starting on Papin 62, line 23.  And I'll walk you
13    through Dr. Bondi.
14               This is Dr. Bondi:  "The specific
15    procedure today is going to be that Dr. Earl is
16    going to make his presentation first, then we'll
17    give Dr. Papin an opportunity to address the
18    committee, but not Dr. Earl.  We're going to
19    follow that by any witnesses that Dr. Earl thinks
20    is appropriate.  Dr. Papin will also have the
21    opportunity to specifically address issues that
22    are brought up at that time to the committee.
23    Once that's concluded, Dr. Papin will have an
24    opportunity to address the committee, and then
25    Dr. Earl will have an opportunity thereafter."
```

Joseph Papin 1/22/2021

```
 1                At no point in Dr. Bondi explaining this
 2     does he say that I can have witnesses, does he say
 3     that I should have had witnesses, does he say
 4     that -- he certainly outlines we're going to
 5     follow that by -- we're going to follow that by
 6     any witnesses that Dr. Earl thinks is appropriate.
 7     There's no Dr. Papin thinks is appropriate line in
 8     here.
 9                So the fact is, it was never
10     communicated to me or my attorneys that I could
11     have witnesses.  The fact that we're walking
12     through this line right here where he's walking us
13     through, then my attorney clarifies a question
14     intending to highlight the format of it for
15     purposes -- for what I assume is, you know, to
16     highlight the format of this is just incredibly
17     unfair.  Dr. Bondi walk through -- so, yes, there
18     was --
19                To answer your question, I was given
20     every indication that I couldn't call witnesses.
21          Q.    Even when it's addressed on page 9, and
22     we'll be asking questions -- talking about the
23     attorneys -- or won't be calling witnesses.  And
24     Dr. Bondi says, the attorneys won't be doing that,
25     but the individuals Dr. Earl and Dr. Papin can
```

Joseph Papin 1/22/2021

1    certainly do that as necessary.

2         A.   Like I said, I didn't hear that, but

3    having read it now, certainly it's on the

4    transcript, does seem to be in direct conflict

5    with the lines I just read to you, is what I would

6    respond to that.

7         Q.   But you raised no objection in the

8    hearing about, hey, Dr. Bondi, I've got witnesses

9    I'd like to get in here?  Yes or no.

10             MR. MORGAN:  Object to the form of the

11   question.  You can answer.

12             THE WITNESS:  This is why it would have

13   been great to have attorneys able to speak on our

14   behalf.  I'm not an attorney, I don't have a JD.

15   I don't know what to object to, I don't know how

16   to defend myself.  I think that's how the legal

17   profession has flourished, because it's necessary.

18   So the fact that I didn't object right then -- I

19   didn't hear this.  I don't know if it was breaking

20   up, I don't know.  But I did hear the beginning of

21   this where it's just Dr. Earl's witnesses, and I

22   never saw any sort of communication that invited

23   me to provide names of witnesses.

24        Q.   (By Mr. Whitfield)  Did your attorney on

25   your behalf make any objections during this time

Joseph Papin 1/22/2021

```
 1    when he's talking to Dr. Bondi saying, hey, we've
 2    got witnesses we want to call?
 3              MR. MORGAN:  Also going to object to the
 4    form of the question, but you can answer.
 5              THE WITNESS:  I think he made an
 6    objection just overall to the format.  I'd have to
 7    look through.  I don't recall exactly where it
 8    was.
 9        Q.   (By Mr. Whitfield)  I want to refer you
10    to the bottom of page 9.
11        A.   Page 9 of the transcript?
12        Q.   Yes.  He says, "Okay."  He doesn't say,
13    hey, we've got witnesses, hey, we've got other
14    people.
15        A.   I guess my question -- that's on the
16    transcript.  My question is, for argument sake, if
17    I did have a witness there and ready, what would
18    we have done?
19        Q.   Dr. Bondi told you.
20              MR. MORGAN:  Object to the form, but go
21    ahead.
22              THE WITNESS:  I would have had somebody
23    on the line, and I would have been able to present
24    them just -- because there was no procedure for
25    this outline.  I mean, there's no notice given.
```

Joseph Papin 1/22/2021

1    You can just take witnesses.  This doesn't seem to
2    be the format of the hearing as it was proposed to
3    me.  It certainly wouldn't seem fair to UMMC for
4    me to just jump in with a witness.
5        Q.   (By Mr. Whitfield)  You had the
6    assistance of counsel at this hearing?
7              MR. MORGAN:  Object to the form.  Go
8    ahead.
9              THE WITNESS:  I did not.  I had a
10   counselor present, but not his assistance.  I had
11   to question witnesses on my own.  By question
12   witness, I mean I could state questions.  They
13   never answered them.  I could -- Dr. Earl had the
14   ability to -- it was like semi-prosecutorial
15   fashion.  He had opening statements.  He -- he
16   acted, you know, like a prosecutor, essentially.
17             I've never been through one of these.  I
18   don't know where to have objections.  I don't know
19   where to have anything.  My attorney was not
20   allowed to speak at any point.  He had an
21   objection at one point, something like that, you
22   know.
23             Here Dr. Bondi, page 10, Papin 65, "He
24   is not going to be cross-examining the witnesses,
25   which I think is what you're getting at."  I'm not

Joseph Papin 1/22/2021

```
 1    really allowed to do anything.  I can state my
 2    case and hope and pray that people would
 3    investigate what I was telling them, and realize
 4    that no investigation had been done.  I'm putting
 5    pretty much everything -- I'm contesting pretty
 6    much everything they said, and hoping and praying
 7    that someone will listen and investigate it, but
 8    it just never happened.
 9            So to answer your question, no, I did
10    not have the assistance of an attorney.  I would
11    have loved it.
12        Q.    (By Mr. Whitfield)  Now, y'all did
13    confer during the hearing.  You broke, I think,
14    pretty much after every witness that testified and
15    had an opportunity to speak with Mr. Dillard?
16        A.    That's correct.
17        Q.    If you would have come physically in
18    person, you would have been there with him and
19    been able to confer with him in real time?
20        A.    It was still real time.  We just spoke
21    over the phone instead of in person.
22        Q.    I'm talking about as the witnesses are
23    testifying.
24        A.    I mean, I guess.  You still have to -- I
25    don't think we would have done anything
```

Joseph Papin 1/22/2021

```
 1   differently necessarily.  You still have to listen
 2   to what the witnesses are saying, you know, and an
 3   attorney who is trained is much better at
 4   identifying specific things, understanding what it
 5   is that needs to be pointed out, knowing which
 6   questions to bring up, knowing which objections to
 7   have.  They're able to articulate the law.
 8   There's lots of reasons why I would have wished
 9   that an attorney were able to help me in a fashion
10   that they usually can.
11             I'm still searching for Joel's
12   objection.
13        Q.   I'm going to switch gears for just a
14   minute.  You make claims in this lawsuit about
15   being treated differently because you're Hispanic.
16   What do you base your contention that UMMC treated
17   you differently because you're Hispanic?
18        A.   I think I was treated differently than
19   my white counterparts.  I washed out a wound, for
20   example.  Sid Desai told me that he washed out a
21   wound, but I'm dismissed partially because of
22   that.  I have to find that out later, I'm not told
23   about it, that's another issue.  At worst, he did
24   pretty much the same thing or he did it -- the
25   decubitus ulcer.  I did nothing more, nothing else
```

Joseph Papin 1/22/2021

```
 1    than Will Bruch except that I documented proof and
 2    I text messaged her, her being Meghan Mahoney, I
 3    let her know what was going on.  I told her what
 4    was happening.
 5              It was Monday, December 5th, where
 6    Mr. _____was his patient.  And, you know,
 7    theoretically, that was a rollover Monday,
 8    whatever it's called.  He had the opportunity to
 9    say something.  Why is it that I'm dismissed?  The
10    wound care nurse has 19 years of experience,
11    something like that, looking at these, seeing all
12    of them day after day after day, that's her
13    specialty.  She's has specialized training.
14    There's attendings who are going through, they
15    were attesting to notes, they were looking at
16    these wounds.  Nobody thinks it's that bad, so why
17    is it that I'm dismissed and Will Bruch -- Will is
18    white.  Nobody else is dismissed.  That's the
19    basis of the claim.
20         Q.   That's it?
21         A.   That's not necessarily it, but that's
22    part of the reason.
23         Q.   What else is it?
24         A.   I think it's coming up in discovery,
25    things like that.  I think a situation is still
```

Joseph Papin 1/22/2021

```
 1    evolving, but those are some of the reasons.
 2         Q.    As you sit here today, what other
 3    reasons do you have?
 4         A.    I don't know right now, but we can go
 5    through the documentation.  We can go through
 6    things and I can articulate it more.  I think
 7    that's something that's more left to the attorneys
 8    to argue the legal basis of the claim than I do.
 9    But I gave you a couple of the reasons why I
10    thought that I was treated differently based on my
11    Hispanic ethnicity.
12              MR. MORGAN:  I also do want to make a
13    formal objection that you're sort of asking for a
14    legal conclusion.  I understand you need to
15    investigate the facts underneath that basis.
16              MR. WHITFIELD:  I just want to know why
17    he feels that way.
18              MR. MORGAN:  That's why I let the
19    questions go, but I do want to state for the
20    record that it is very, very close to calling for
21    a legal conclusion.
22         Q.    (By Mr. Whitfield)  Did any of your
23    coworkers say or make any derogatory comments
24    towards you about being Hispanic?
25         A.    You know, I don't recall the specifics.
```

Joseph Papin 1/22/2021

```
 1    I mean, it's been years.  I really don't recall
 2    specifics and things like that.  There was at one
 3    point Josh Sabins, he'd joke around, he would say
 4    some racist things.  Not necessarily about
 5    Hispanics, but he would say some racist things.
 6    Any of the nurse practitioners could tell you
 7    they've heard him say that.  They would always
 8    warn him he's going to get fired for saying racist
 9    things.
10            He asked me one day, what's MD stand
11    for?  I said, I don't know, Josh.  What does it
12    stand for?  He tells me mini dick.  Just little
13    things like that.
14            I can't recall specifics about, you
15    know, what was said about me being Hispanic or
16    things like that.  I do know that I was
17    translating on Earl's transplant service on
18    October, there were Spanish speaking patients on
19    the service.  I was translating what they were
20    saying into English for the team, like that.
21    Certainly it's on page 1 on my ERAS application.
22    So the application to residency, page 1 right
23    there.
24        Q.   Did any of your coworkers know you were
25    Hispanic?
```

Joseph Papin 1/22/2021

1      A.   Yes, I'm sure.  I don't recall exactly
2  who.  It's not something I would walk in and tell
3  them, hey, I'm Hispanic.  But it came up.  I don't
4  recall with who or whatever.  Certainly any of the
5  residents that were with me on the transplant
6  service when I was translating for
7  Spanish-speaking patients, somebody asked me, I
8  think it was actually Seawright on rounds, how do
9  you know that?  I went to El Salvador, I'm
10  Hispanic, I went to El Salvador every summer from
11  age 6 to 18, things like that.
12      Q.   Other than that, you have no
13  recollection of anybody saying anything derogatory
14  to you about being Hispanic?
15      A.   I don't recall right now.  I'd have to
16  look over notes or whatever.  But as of right now,
17  I don't recall.
18           MR. WHITFIELD:  I think that's it.
19  EXAMINATION BY MR. MORGAN:
20      Q.   I have some brief follow-up.  Get the
21  appeal transcript hearing.  I'd like to turn it to
22  page 108.
23      A.   Bates stamp is 108?
24      Q.   Bates stamp Papin 163.  You don't need
25  to read it out loud in the record.  Toward the top

Joseph Papin 1/22/2021

```
 1    of that page, you can tell where Dr. Bondi is
 2    asking if anybody else has any other questions for
 3    Dr. Bar, because he was last witness called at the
 4    hearing and he was stepping down.  Do you see
 5    that?
 6         A.    I do.
 7         Q.    And then in the middle it's talking
 8    about let's take a brief break.  And then they
 9    come back, and it says -- Dr. Bondi says to you,
10    you're on the line, "This is your opportunity to
11    address concerns."  Do you see that paragraph
12    there?
13         A.    Yes.
14         Q.    Did Dr. Bondi tell you, Dr. Papin, this
15    is your opportunity to call your own witnesses?
16         A.    No.
17         Q.    I want to go back to Exhibit No. 18.
18    That is the January 10th remediation letter.  On
19    this letter, did you ask Dr. Earl if you could
20    take that letter with you and review it?
21         A.    I did.
22         Q.    And what was his response?
23         A.    No, you need to sign this letter right
24    now or you're fired.  And then I had to actually
25    -- he wouldn't even give me a copy of it, I had to
```

Joseph Papin 1/22/2021

```
 1   request it by e-mail.  And I got that, you know,
 2   at some point later in the future.
 3        Q.   Do you see in this letter in the middle
 4   section where it talks about you are on formal
 5   remediation and have 60 days to improve?
 6        A.   I do.
 7        Q.   You were fired before that 60 days ran,
 8   correct?
 9        A.   That's correct.
10        Q.   At any point in time prior to being
11   terminated, did you ever ask Dr. Earl whether you
12   could resign?
13        A.   I did.  I asked him if I could resign at
14   that February 22nd meeting where I was eventually
15   terminated.
16        Q.   What was his response when you asked him
17   if you could resign?
18        A.   No, we passed this through HR, we passed
19   this through legal, and this is what I want.  Some
20   variation of that.  It's already done.
21            MR. MORGAN:  No more questions.
22            (Time Noted: 3:30 p.m.)
23            SIGNATURE/NOT WAIVED
24   ORIGINAL:  MR. WHITFIELD, ESQ.
25   COPY:  MR. MORGAN, ESQ.
```

Joseph Papin 1/22/2021

```
 1              CERTIFICATE OF DEPONENT
 2  DEPONENT:  JOSEPH PAPIN
    DATE:  JANUARY 22, 2021
 3  CASE STYLE:  PAPIN vs. UMMC, ET AL
    ORIGINAL TO:  MR. WHITFIELD, ESQ.
 4          I, the above-named deponent in the
    deposition taken in the herein styled and numbered
 5  cause, certify that I have examined the deposition
    taken on the date above as to the correctness
 6  thereof, and that after reading said pages, I find
    them to contain a full and true transcript of the
 7  testimony as given by me.
            Subject to those corrections listed below,
 8  if any, I find the transcript to be the correct
    testimony I gave at the aforestated time and place.
 9  Page       Line                    Comments
        _____      _____      _____
10      _____      _____      _____
        _____      _____      _____
11      _____      _____      _____
        _____      _____      _____
12      _____      _____      _____
        _____      _____      _____
13      _____      _____      _____
        _____      _____      _____
14      _____      _____      _____
        _____      _____      _____
15      _____      _____      _____
        _____      _____      _____
16
17          This the _____ day of _____, 2021.
18                          _____
                            JOSEPH PAPIN
19  State of Mississippi
    County of _____
20
        Subscribed and sworn to before me, this the
21  _____ day of _____, 2021.
22  My Commission Expires:
23  _____      _____
24                                  Notary Public
25
```

Joseph Papin 1/22/2021

```
 1            CERTIFICATE OF COURT REPORTER

 2            I, Robin G. Burwell, Court Reporter and

 3   Notary Public, in and for the State of Mississippi,

 4   hereby certify that the foregoing contains a true

 5   and correct transcript of the testimony of JOSEPH

 6   PAPIN, as taken by me in the aforementioned matter

 7   at the time and place heretofore stated, as taken by

 8   stenotype and later reduced to typewritten form

 9   under my supervision by means of computer-aided

10   transcription.

11            I further certify that under the authority

12   vested in me by the State of Mississippi that the

13   witness was placed under oath by me to truthfully

14   answer all questions in the matter.

15            I further certify that, to the best of my

16   knowledge, I am not in the employ of or related to

17   any party in this matter and have no interest,

18   monetary or otherwise, in the final outcome of this

19   matter.

20            Witness my signature and seal this the 8th

21   day of February, 2021.

22

23                           _____
                             ROBIN G. BURWELL, #1651
24                           CRR, RPR, CCR
     My Commission Expires:
25   April 6, 2021
```