EXHIBIT "C" - Brasfield Deposition

Joseph Papin

vs.

University of Mississippi Medical

Deposition of:

Molly Brasfield

January 21, 2021

*Vol 1*



**PHIPPS REPORTING**

*Raising the Bar!*

Molly Brasfield
January 21, 2021

```
 1           IN THE UNITED STATES DISTRICT COURT
        FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
 2                   JACKSON DIVISION


 3
     JOSEPH PAPIN
 4                                          PLAINTIFF

 5
     V.          CIVIL ACTION NO. 3:17-CV-763-CWR-FKB
 6

 7   UNIVERSITY OF MISSISSIPPI
     MEDICAL CENTER; DR.
 8   LOUANN WOODWARD, IN HER
     OFFICIAL CAPACITY; AND
 9   DR. T. MARK EARL, IN HIS
     INDIVIDUAL CAPACITY
10                                          DEFENDANTS

11

12           DEPOSITION OF MOLLY BRASFIELD
     CORPORATE REPRESENTATIVE OF UMMC PURSUANT TO RULE
13                   1.310(b)(6)

14
             Taken at the instance of the Plaintiff at
15   Whitfield Law Group 660 Lakeland East, Suite 200
            Flowood, Mississippi 39232, on Thursday,
16                   January 21, 2021,
                 beginning at 9:10 a.m.
17

18

19

20

21

22

23

24                   REPORTED BY:

25           ROBIN G. BURWELL, CCR #1651
```

Molly Brasfield
January 21, 2021

Page 2

```
 1    APPEARANCES:

 2

 3         C. RYAN MORGAN, ESQ.
           Morgan & Morgan
 4         20 North Orange Avenue, Suite 1400
           Orlando, Florida 32801
 5         rmorgan@forthepeople.com

 6

 7              COUNSEL FOR PLAINTIFF

 8

 9         TOMMY WHITFIELD, ESQ.
           Attorney At Law
10         660 Lakeland East, Suite 200
           Flowood, Mississippi 39232
11         tommy@whitfieldlaw.org

12

13              COUNSEL FOR DEFENDANT

14

15

16

17

18

19

20

21

22

23

24

25
```

Molly Brasfield
January 21, 2021

1                        INDEX

2    Style and Appearances.......................1

3    Index   ....................................3

4    Certificate of Deponent  .................62

5    Certificate of Court Reporter ............63

6                      EXAMINATIONS

7    Examination By Mr. Morgan .................4

8                       EXHIBITS

9    Exhibit 1 House Staff Manual ..............12

10             2016-2017

11   Exhibit 2 2016-2017 Faculty Staff .........16

12             Handbook

13   Exhibit 3 Evaluation Policy and ...........19

14             Grievance Algorithm

15   Exhibit 4 Policy on Evaluation and .......21

16             Promotion and Dismissal of

17             Residents

18   Exhibit 5 Guidelines for Academic ........23

19             Remediation

20   Exhibit 6 Letter Papin-049 - 052 .........59

21

22

23

24

25

Molly Brasfield
January 21, 2021

Page 4

1                       MOLLY BRASFIELD,

2     having been first duly sworn, was examined and

3     testified as follows:

4     EXAMINATION BY MR. MORGAN:

5          Q.   Ms. Brasfield, if you could, state your

6     full name for the record, please?

7          A.   Molly Brasfield.

8          Q.   We just met a moment ago, Ms. Brasfield.

9     My name is Ryan Morgan.  I represent Dr. Joey

10    Papin on a case he has brought against UMC.  Have

11    you ever had your deposition taken before?

12         A.   I have.

13         Q.   How many times ballpark?

14         A.   A dozen.

15         Q.   What type of cases were you deposed in

16    before?

17         A.   Employment related.  All employment

18    related cases.

19         Q.   Similar to this where you're testifying

20    on certain corporate policies and things of that

21    sort?

22         A.   I've done that once before.  This is

23    only my second time doing that since assuming the

24    chief HR role at UMMC.  Prior, it was as a witness

25    to whatever case it was.

Molly Brasfield
January 21, 2021

Page 5

```
 1        Q.   Okay.  If you could, -- you sound like
 2   you're a pro at depositions.
 3        A.   No.
 4        Q.   I'm sure Tommy has done the same thing,
 5   too, we all kind of say the same dos and don'ts of
 6   depositions.  Yes or no answers are preferred over
 7   uh-huh.  (Affirmative response.) or Huh-huh.
 8   (Negative response.)  If it happens, I'm just
 9   going to prompt you.  Not trying to be a jerk,
10   just trying to make sure it's a clear yes or no on
11   the record.  If I ask a question that just does
12   not make sense -- I also can guarantee that will
13   happen -- then please ask me to rephrase.  Not
14   offended.  If you need a break, we'll take a
15   break.  Only exception is if there is a question
16   that is pending then answer the question and we
17   can take a break.  I don't think we're going to go
18   too long anyways but if you need one, great.
19             I do have to ask you two questions that
20   I hate to ask but I have to.  Number one is have
21   you ever been convicted of a crime before?
22        A.   No, I have not.
23        Q.   Perfect.  And number two is are you on
24   any sort of medication, drugs, allergy medicine,
25   whatever, that would affect your memory?
```

Molly Brasfield
January 21, 2021

Page 6

```
 1        A.    No, I am not.
 2        Q.    Good.  That makes it easy.  When you
 3   were -- let me back up.  If you could, give me
 4   kind of a brief general job history of yourself at
 5   UMC?
 6        A.    I started employment at UMMC in
 7   April 2009 for the first six months.  My title was
 8   something akin to manager of HRIS.  I transitioned
 9   to the director of human resources for academics
10   and research in around October 2009.  I remained
11   in that position until September of 2019.  At that
12   time, my title in the regular position changed to
13   executive director of human resources for
14   academics research and service areas and I
15   simultaneously accepted an interim role as the
16   chief human resources officer.  I served in both
17   of those roles until April 2020 when I accepted
18   the position of chief human resources officer.
19        Q.    And so the position of chief human
20   resource officer, is that -- you're overseeing all
21   the HR for the entire UMMC?
22        A.    Yes, sir.
23        Q.    Backing up a step before that, when you
24   were the executive director, you said the academic
25   research, and I know there were some other terms.
```

Molly Brasfield
January 21, 2021

1    If you could, just describe what kind of subset of

2    the University that was?

3        A.   Yes.  In both the executive director

4    position and the prior director position, I was

5    the leader for the business partner team that

6    supported the academic mission area, the research

7    mission area and all of our institutional service

8    areas such as finance, campus police.

9        Q.   Okay.  And under those descriptions,

10   that would also fall like the residency program

11   that we're here about today?

12       A.   Yes.  The house officer and residency

13   programs are considered to fall within the

14   academics research mission.

15       Q.   So when you were saying you've had prior

16   depositions where you were a witness, what type

17   of -- give me an example, if you can, of one where

18   you were the witness?

19       A.   A case in which I was the witness in a

20   communication meeting notifying an employee of a

21   change to their job.

22       Q.   Okay.  Have you ever had depositions

23   where you've been maybe not a direct witness but

24   the investigating the person for UMMC and were

25   deposed or no?

Molly Brasfield
January 21, 2021

Page 8

```
 1        A.   I'm pausing to think to make sure I'm
 2   accurate in my answer.  I conduct investigations,
 3   but I don't recall having yet been deposed on the
 4   contents of an investigation that I conducted.
 5        Q.   So for the ones where you were the
 6   witness, that would be where you interacted with
 7   an employee, that employee later brought a claim
 8   and then called you as a witness?
 9        A.   Correct.  I have also been deposed
10   because of a human resources business partner that
11   conducted an investigation and as their upline
12   supervisor, I was the supervisor that reviewed the
13   findings and recommendations.
14        Q.   Okay.  What's your educational history?
15        A.   I have a bachelor of art's degree in
16   psychology from Culver Stockton College and a
17   master's in science degree and psychology from
18   Illinois State University and post-master's
19   credits from University of Washington Seattle in
20   human resources management and organizational
21   behavior.
22        Q.   What brought you to Mississippi?
23        A.   My now ex-husband.
24        Q.   Did you work professionally prior to
25   UMMC?
```

Molly Brasfield
January 21, 2021

Page 9

 1      A.    I did.

 2      Q.    **Again, briefly describe your prior work**

 3   **history, please?**

 4      A.    Just prior to UMMC, I was employed in

 5   human resources at Blue Cross Blue Shield

 6   Mississippi in Jackson, Mississippi.  Prior to

 7   that, I was employed in Springfield, Missouri for

 8   Webco Incorporated/CES Group.  My occupation there

 9   was a combination of human resources, change

10   management, quality, document control.  Prior to

11   that, I was employed at Highline Community College

12   in the Seattle, Washington area and I was the

13   assistant director in the extended learning

14   program, which is akin to what you would think of

15   as continuing education in the colleges that we

16   have here in Mississippi.  Prior to that, I was

17   the choral music director for Jackson Academy here

18   in Jackson, Mississippi.

19      Q.    **Very cool.  You understand that today**

20   **you are here as a corporate representative for**

21   **UMMC?**

22      A.    I do.

23      Q.    **You are here to testify specifically**

24   **about two topics from our rather lengthy**

25   **deposition notice.  Is that fair to say?**

Molly Brasfield
January 21, 2021

Page 10

```
 1       A.    That's correct.
 2       Q.    We marked it yesterday as Exhibit 1 to
 3   Dr. Earl's deposition; I won't remark it again.
 4   I'll show it to you to make sure we are all on the
 5   same page.  You are here to testify as to topics 7
 6   and 10 as it relates to HR policies; is that
 7   accurate?
 8       A.    Yes.
 9       Q.    And just so we can read -- I'll just
10   read it into the record.  For No. 7 it is, "The
11   identities including name, address and employment
12   position of each and every individual who played a
13   decision-making, consultive or advisory role in
14   the termination of plaintiff's employment and each
15   such individual's role in the termination of
16   plaintiff's employment."  And No. 10 is "All UMMC
17   rules, policies and procedures, written or
18   unwritten, which apply to all performance
19   evaluation, remediation and/or disciplinary
20   actions (formal or informal, (preliminary or
21   final), concerning house officers and others in
22   plaintiff's former position."
23            I read those correctly, correct?
24       A.    Yes.
25       Q.    When you say that you're here to testify
```

Molly Brasfield
January 21, 2021

1    as to the HR side of things versus the GME side of

2    things, if you can, explain the difference between

3    the two?

4         A.    Our residency programs that are governed

5    under the ACGME and including the selection of

6    house officers for the programs are formed through

7    a specific academic related process.  So the

8    employment at UMMC is contingent upon the

9    selection to the program and the successful

10   continuation in the program.  And the academic

11   rules and guidelines are governed by the academic

12   mission area leaders, whereas the employment

13   related constructs are administered through human

14   resources.

15        Q.    I know there's several different

16   policies, we'll go through them in handbooks and

17   whatnot.  Are there some that are considered HR

18   and some that are considered academic?

19        A.    Yes.

20        Q.    And you'll be able to point out which

21   ones are which?

22        A.    Yes.

23        Q.    Let's go ahead and do that.  Let's get

24   to No. 10 here, which would be the rules, policies

25   and procedures.

Molly Brasfield
January 21, 2021

 1              (Exhibit 1 marked for identification.)

 2         Q.    (By Mr. Morgan)   This is not the entire

 3    one.   It's just a select few pages of it.   Do you

 4    recognize the house staff manual?

 5         A.    I have knowledge that it exists, but

 6    it's not a manual that I refer to or use.

 7         Q.    Do you know if this would be considered

 8    an academic policy or an HR policy?

 9         A.    It's published by the GME office and so

10    would be considered an ACGME and GME policy.   It

11    does appear that it is compiled with the support

12    of operational leaders.

13         Q.    Okay.   So --

14         A.    The welcome letter.

15         Q.    I am a little confused to be honest with

16    you.   So, would this be an academic or --

17         A.    Academic.

18         Q.    I think you said there's some

19    operational leaders in there as well?

20         A.    Correct.

21         Q.    Which would seem to insinuate to me,

22    correct me if I'm wrong, but seem to insinuate

23    that it could be also HR related if those

24    operation leaders are involved?

25         A.    My interpretation of it is that it is an

Molly Brasfield
January 21, 2021

Page 13

1   academic policy that has the endorsement of our

2   operational officials since the house officers are

3   doing their work within our hospital and health

4   system.

5        Q.   Just in general, when residents are

6   being disciplined or suspended or whatever the

7   case may be, how do you differentiate between

8   academic and HR policies and which one needs to

9   occur?

10       A.   The first question would be what the

11  rationale for it is.  If, for instance, the

12  resident is not progressing academically and

13  they've gone through the academic procedure and

14  are being placed on an academic suspension then

15  that would be an academic swim lane.  If the house

16  officer reported to have violated a University

17  employment policy then that would be considered an

18  HR matter.

19       Q.   Can it be both?

20       A.   Yes.

21       Q.   Are there some that qualify for HR and

22  the academic?

23       A.   Where we have policies that are

24  overlapping and policies that require the same

25  behavior, yes.

Molly Brasfield
January 21, 2021

1    **Q.   In those situations when that happens,**
2    **is it just two independent investigations or it is**
3    **all handled by one group?**
4    A.   Typically, because the academic comes
5    first, the academic policy and procedure would
6    conclude.  The academic findings and actions taken
7    would be reported to human resources for our
8    review and either concurring that there would be
9    no other employment related action or sanction
10   warranted and if there is then we would -- if it's
11   unclear whether or not we would concur then we
12   would conduct our own inquiry.
13   **Q.   When you say academic comes first, can**
14   **you explain that?  Is that a policy or is that**
15   **just how it works in reality?**
16   A.   It's how it works in reality since the
17   employment of a house officer is contingent on
18   there being satisfactory terms and enrolled in the
19   academic program.
20   **Q.   So, even if it's an issue with the house**
21   **officer that is covered under academic and HR**
22   **policies, you'll let academic go first and then do**
23   **your HR review?**
24   A.   If it's a dual violation.
25   **Q.   That's right.  Violating both?**

Molly Brasfield
January 21, 2021

Page 15

 1        A.    Yes.

 2        Q.    And just so we're totally clear on the

 3    record here, a house officer is a resident?

 4        A.    Correct.

 5        Q.    Have you seen this house staff manual

 6    before?  I know you said that you know it exists,

 7    but are you familiar with it at all?

 8        A.    No.

 9        Q.    At the very bottom there's these Bates

10    stamps labels, it says Papin dash something, if

11    you go to the one that says dash 212.  Really,

12    actually 213.  That first paragraph says, "House

13    staff shall have the rights of grievance

14    procedures as detailed in the handbook for

15    employees of the Medical Center."  Do you see

16    that?

17        A.    Yes.

18        Q.    Are you familiar with what the handbook

19    for employees of the Medical Center is?

20        A.    Yes.

21        Q.    And what is that?

22        A.    It is formerly called the faculty and

23    staff handbook.  It contains the employment

24    related policies that apply to our faculty and

25    staff.

Molly Brasfield
January 21, 2021

 1          Q.    It looks like this?

 2          A.    Yes.

 3          Q.    We'll get to that one next.  Is that

 4   handbook you were just describing, is that

 5   considered an HR policy or an academic policy?

 6          A.    The faculty and staff handbook is

 7   considered an employment policy.

 8          Q.    So that's HR?

 9          A.    Correct.

10          Q.    The next line it references a separate

11   house officer grievance policy.  Are you aware of

12   what that policy is?

13          A.    I'm aware that it exists but not aware

14   of the proceedings and the steps under it.

15          Q.    In your mind would that be an academic

16   policy then?

17          A.    Yes.

18                (Exhibit 2 marked for identification.)

19          Q.    (By Mr. Morgan) I'm handing you

20   Exhibit 2.  This is the faculty staff handbook,

21   correct?

22          A.    Correct.

23          Q.    But this is the same document we were

24   just referencing from Exhibit 1.  I know it uses a

25   little bit different name but they are one in the

Molly Brasfield
January 21, 2021

1    same, correct?

2         A.    Correct.

3         Q.    **Fair to say this faculty staff handbook**

4    **does that -- sort of in the title there -- but**

5    **does that cover every employee of the Medical**

6    **Center?**

7         A.    It does.

8              MR. WHITFIELD:  To clarify this is --

9    the Exhibit is just an excerpt of the...

10             MR. MORGAN:  Yes, it's the same thing as

11   Exhibit 1.  I didn't print the whole thing because

12   we're already killing all the trees, well most,

13   let's not kill them all.  But yes, the full

14   complete version has been produced and this is an

15   excerpt.

16        Q.    **(By Mr. Morgan)  If you turn to page --**

17   **if you look at the last two pages, if you look at**

18   **the second to last page, page 40, of the actual**

19   **handbook, near the bottom it talks about initial**

20   **employment period.  It talks about how -- I guess**

21   **it's third or fourth line from the bottom there,**

22   **"employees are entitled to written notice of**

23   **problems in their work, behavior or conduct that**

24   **could lead to termination."  Do you see that?**

25        A.    Yes.

Molly Brasfield
January 21, 2021

Page 18

```
 1        Q.    When it says written notice, what does
 2   that mean?  Is there a specific type of written
 3   notice or a specific form or anything like that?
 4        A.    There are boilerplates and templates
 5   available for managers to use but those are not
 6   prescriptive.  Any form of written notice
 7   including e-mails or internally-used forms are
 8   acceptable.
 9        Q.    When you say the forms, would this be
10   like a writeup form type thing?
11        A.    Correct, writeup memos, for instance,
12   coaching memos, any locally-used assessment
13   documents.
14        Q.    In your mind, even an informal e-mail
15   would count as written notice?
16        A.    Correct.
17        Q.    So even if it was something as simple as
18   you're doing a poor job at this, do better?
19        A.    Correct.
20        Q.    That counts?
21        A.    Yes.
22        Q.    I'm sure you would probably like more
23   detail, being in HR it's always better to be more
24   detailed, but even something as small as that
25   would be okay with you?
```

Molly Brasfield
January 21, 2021

Page 19

 1      A.   We tend to encourage managers to match

 2  the type of written notice and the content to the

 3  spirit and level of the performance issue.  For

 4  instance, documenting in a several-page memo for a

 5  first and not egregious performance notes would

 6  seem severe.  So in that case we would encourage

 7  e-mails or something that's a little less formal.

 8  As you can imagine, employees receiving memos that

 9  look like writeups for each and every concern can

10  seem punitive.

11      **Q.   Somebody is five minutes late the first**

12  **time, they don't need a 10-page written warning?**

13      A.   Correct.

14           (Exhibit 3 marked for identification.)

15      **Q.   (By Mr. Morgan)  Ms. Brasfield, I've**

16  **handed you Exhibit 3.  This is a UMMC Graduate**

17  **Medical Education Evaluation Policy and Grievance**

18  **Algorithm document.  Have you ever seen this**

19  **before?**

20      A.   I have.

21      **Q.   What is this in a nutshell?**

22      A.   The Academic Evaluation Policy and

23  Grievance Algorithm that the GME office publishes

24  for its residents.

25      **Q.   So, this would have covered Dr. Papin?**

Molly Brasfield
January 21, 2021

Page 20

```
 1        A.    Correct.
 2        Q.    Is this an academic policy?
 3        A.    Yes.
 4        Q.    But this is one that obviously the GME
 5   office would have to follow in suspending,
 6   terminating, disciplining residents?
 7        A.    Yes.  For academic reasons, of course.
 8        Q.    Fair to say that you would never need to
 9   be involved in applying this policy?
10        A.    Correct.  My only involvement would be
11   if as a result of this policy and procedure there
12   were employment related actions that needed to be
13   taken then me and my team would be involved in
14   doing that.  An example would be if a house
15   officer is being terminated for academic reasons,
16   there would be employment related logistics that
17   the HR team would need to handle, such as ending
18   e-mail access and Epic EHR access, collecting UMMC
19   property.
20        Q.    Right.  Okay.  Now, when you have a
21   situation like we were talking about a few minutes
22   ago where there's kind of a dual violation,
23   academic and HR, academic would do their review.
24   And let's say academic says, okay, this is a
25   violation and then we've gone through this current
```

Molly Brasfield
January 21, 2021

Page 21

1  Exhibit 3 evaluation policy we're looking at.

2  When HR then does its second review, are you

3  reviewing to make sure that the GME office

4  followed their own policies?

5      A.   I would not.  If I had a doubt at any

6  point that something didn't seem right then I

7  would refer to that leader, but it would not be

8  within my purview to ensure that they followed the

9  due process.

10          I would like to make a correction that

11  it's not that the GME office's inquiry into an

12  academic policy violation would or has to go

13  first, it just typically is because the issue is

14  escalated first up to the program director and

15  typically they don't then report it to human

16  resources until they have done a level of their

17  own inquiry.

18      Q.   Got it.  Understood.  So it's not a have

19  to have to but in the real world it usually works

20  out that way?

21      A.   Correct.

22          (Exhibit 4 marked for identification.)

23      Q.   (By Mr. Morgan)  I've handed you Exhibit

24  No. 4.  Is this -- are you familiar with this

25  document?

Molly Brasfield
January 21, 2021

Page 22

 1      A.    I have seen it before, yes.

 2      Q.    Would this be considered an academic or

 3    an employment/HR document?

 4      A.    Academic.

 5      Q.    So this is another one that the GME

 6    office would have to follow in regards to

 7    Dr. Papin or other residents?

 8      A.    Yes.

 9      Q.    Now when -- yesterday, Dr. Earl

10    testified about evaluations and things that

11    happened with Dr. Papin.  When those evaluations

12    occur, does HR keep a copy of them?

13      A.    No, HR is not involved in the academic

14    performance evaluations.

15      Q.    So for a resident like Dr. Papin, what

16    would be contained within the typical HR file for

17    him?  Prior to the termination stuff that happened

18    here, just kind of the basic beginning part.

19      A.    Benefits, enrollments, any requests for

20    leave, such as family medical leave.

21      Q.    What about like the contracts he signs

22    with --

23      A.    Those are retained by the GME office.

24      Q.    Do they have to fill out like an

25    employment application?

Molly Brasfield
January 21, 2021

Page 23

 1        A.    Yes.

 2        Q.    **I know they do like an application for**

 3   **the matching program, but then once they're**

 4   **official and they've matched do they then have to**

 5   **fill out an application through UMMC?**

 6        A.    They do, and it's a rudimentary

 7   application with only the necessary data points in

 8   order to create the profile in our human capital

 9   management system.

10              (Exhibit 5 marked for identification.)

11        Q.    **(By Mr. Morgan)  I'll hand you**

12   **Exhibit 5.  Have you seen this document before?**

13        A.    I don't recall ever reading through or

14   reviewing it but I do know of its existence.

15        Q.    **Fair to say this would be an academic**

16   **policy?**

17        A.    Yes.

18        Q.    **Not an HR policy?**

19        A.    Correct.

20        Q.    **So again, one of the ones that GME would**

21   **have to follow was disciplining any resident?**

22        A.    Yes, I have seen the protocol checklist

23   that is the third page of this document.  This is

24   a document that at times if an academic suspension

25   and probation has been followed and has not been

Molly Brasfield
January 21, 2021

Page 24

 1   successfully remediated, such that they are

 2   requesting termination, this is a document that's

 3   frequently included as the pack of information for

 4   our employee relations area to review to ensure

 5   appropriate documentation for HR purposes should

 6   we separate the employee and then receive, for

 7   instance, a claim for unemployment insurance or an

 8   EEOC charge, et cetera.  So I have seen this

 9   checklist before.

10        Q.   And that would be from prior incidents

11   where termination and suspension or something was

12   being requested and HR was doing that second

13   review?

14        A.   I don't recall ever seeing it as an HR

15   second review.  The times when I recall having

16   seen it was in a case of academic decision to

17   terminate the program and the packet that was

18   shared with human resources in responding to an

19   employment claim or an EEOC charge, et cetera.

20        Q.   If a resident was being let go for

21   academic reasons only, does HR still review that

22   decision?

23        A.   No.

24        Q.   At that point it's separately -- it's

25   dealt with through the academic GME side?

Molly Brasfield
January 21, 2021

Page 25

```
 1       A.    Correct.
 2       Q.    Let me go back and show you one of the
 3   exhibits from yesterday.  This is Exhibit 22 from
 4   Dr. Earl's deposition.  Have you seen this
 5   document before?
 6       A.    I don't recall seeing this specific
 7   document.
 8       Q.    This was a two-page letter that was
 9   entered into between Dr. Earl, the program
10   director, and Dr. Papin in January of 2017.  Do
11   you recall if you saw this during the time when
12   Dr. Papin --
13       A.    I don't recall.
14       Q.    I don't want to interrupt -- if you're
15   reading the whole thing, I'm not asking you any
16   more questions on it.
17       A.    Oh, okay.
18       Q.    Let me put it back in this so we don't
19   lose the order.
20       A.    Okay.
21       Q.    Are you aware of, other than the ones
22   we've gone through here now, any other written
23   rules, policies and procedures that would have
24   applied to Dr. Papin regarding performance
25   evaluations from the HR side?
```

Molly Brasfield
January 21, 2021

 1      A.    Performance evaluations specifically?

 2      Q.    Yes.

 3      A.    No, not aware of any additional

 4  policies.

 5      Q.    I'm taking it one at a time to make it

 6  easier.  Are you aware of any other written rules,

 7  policies and procedures on the HR side regarding

 8  remediation that we have not gone through?

 9      A.    No, I am not.

10      Q.    Same question.  Any other written rules,

11  policies and procedures on the HR side relating to

12  disciplinary actions whether formal, informal,

13  preliminary or final?

14      A.    The excerpt from the faculty and staff

15  handbook that deals with employment related

16  performance issues.

17      Q.    That's the one?

18      A.    And issues that are grieveable, issues

19  that are not grieveable, behaviors that are

20  acceptable, behaviors that are not acceptable.

21      Q.    None other than that from the HR side?

22      A.    Can you reread the question to make sure

23  I'm being thorough?

24      Q.    Is any written rules, policies and

25  procedures which apply to disciplinary actions

Molly Brasfield
January 21, 2021

```
 1    whether formal or informal, preliminary or final?

 2         A.   No, no others.

 3         Q.   Now, I'm going to ask the same questions

 4    again as far as any sort of unwritten rules,

 5    policies and procedures for performance

 6    evaluations that relate to house officers on the

 7    HR side?

 8         A.   Not aware of any, no.

 9         Q.   How about any unwritten rules, policies

10    and procedures on the HR side relating to house

11    officers and remediation?

12         A.   No.

13         Q.   And then last question on this.  Any

14    unwritten rules, policies and procedures on the HR

15    side relating to house officers for disciplinary

16    actions whether formal or informal, preliminary or

17    final?

18         A.   The practices that we follow could be

19    considered unwritten.

20         Q.   The two-step process we were talking

21    about a moment ago?

22         A.   That process, the process we follow if a

23    manager requests termination of an employee or a

24    final written warning of an employee and the

25    process we would follow to review that and make a
```

Molly Brasfield
January 21, 2021

Page 28

1    decision.

2         Q.   **What is your typical process to do that?**

3         A.   To request from a manager, if they

4    haven't already supplied it, the documentation to

5    support their request.  A review of that by the

6    human resources business partner as a preliminary.

7    If they feel the packet of documents is sufficient

8    and they are in support of the request, then it is

9    shared with our employee relations team.  If the

10   employee relations team concurs then they would

11   communicate that back to the human resources

12   business partner to assist the manager with the

13   notification meeting or the termination.

14        Q.   **Is that the process that was undertaken**

15   **here for Dr. Papin?**

16        A.   Yes.

17        Q.   **I think that's a good transition into**

18   **topic number seven.  On the HR side, can you list**

19   **each person who was involved in the decision**

20   **making or consulting or advisory role for**

21   **Dr. Papin's termination?**

22        A.   I would want to refer to the list of the

23   GME committee members since I'm not as familiar

24   with those from memory, but do have knowledge of

25   the committee members that were selected for that

Molly Brasfield
January 21, 2021

Page 29

1    scope.  For the HR related pieces, I can share the

2    people that were involved.

3        **Q.   I think you're here to testify on the HR**

4    **side, right?**

5            MR. WHITFIELD:  She was going to tell

6    you everybody that was in the process for seven.

7        **Q.   (By Mr. Morgan)  Okay.  Then let's do**

8    **that.  We'll do it for both sides and then go into**

9    **detail.**

10       A.   Okay.  For the human resources side, Pat

11   Whitlock, who is a human resources business

12   partner and the assigned partner for the GME

13   office.  Pam Greenwood, who is an HR service

14   partner in employee relations.  Cecelia Bass, our

15   director of employee relations.  Myself, at the

16   time serving as the upline leader for Pat Whitlock

17   in the director of academic research role.

18   Dr. Rick Barr, who is the associate Dean for

19   graduate medical education and the institutional

20   officer.

21       **Q.   When you say institutional officer, what**

22   **do you mean?**

23       A.   For residencies.  I believe the acronym

24   that's assigned is the DIO.

25       **Q.   What does that mean in the real world,**

Molly Brasfield
January 21, 2021

Page 30

1    he's just in charge of that?

2         A.   He's in charge of the residency program

3    and the following of the GME policies and the

4    ACGME governing policies.

5         Q.   Now, is Dr. Barr on -- when you're

6    listing this, is he on the HR side or on the

7    academic side or both?

8         A.   He would have been both.

9         Q.   The five names you've given me, these

10   would all be HR individuals?

11        A.   Yes.

12        Q.   But then Dr. Barr would be both?

13        A.   Correct.

14        Q.   On the academic side -- anybody else on

15   the HR side?

16        A.   Dr. Mark Earl as the manager of

17   Dr. Papin.

18        Q.   Now, would Dr. Earl be also both HR and

19   academic?

20        A.   Correct.

21        Q.   Anybody else from HR, on the HR side?

22        A.   No.

23        Q.   What about the academic side?

24        A.   Dr. Woodward, as the vice chancellor for

25   the institution.  Dr. Steve Bondi, who was the

Molly Brasfield
January 21, 2021

Page 31

```
1    head of the committee.  And then the respective

2    committee members whom I would need to refer to

3    the document to recall all of their names.

4         Q.   Would it be all the names that are

5    listed on Papin Bates stamped 54 in the bottom

6    right?

7         A.   Yes, that is correct.

8         Q.   Anybody else from the academic side?

9         A.   Not that I'm aware of.

10        Q.   So when you say Dr. Earl was on the HR

11   and academic side, what decision did he make on

12   the HR side?

13        A.   He did not make the decision, but he

14   made the request for HR to examine the employment

15   related aspects of the behaviors that had been

16   reported.

17        Q.   On the HR side, who or whom was the

18   ultimate decision makers to terminate Dr. Papin?

19        A.   Cecelia Bass.

20        Q.   So, ultimately it led to she was the one

21   who had to make the call?

22        A.   Correct.

23        Q.   Were you involved in the decision at

24   all?

25        A.   I was involved in the decision making,
```

Molly Brasfield
January 21, 2021

Page 32

1    yes.

2        Q.    Walk me through how that kind of worked?

3        A.    In the review of the packet supplied by

4    the program directorship, I was involved in

5    answering questions of Pam Greenwood, the service

6    partner I mentioned, and Cecelia Bass in helping

7    to distinguish which policies are academic

8    policies versus which policies are employment

9    related policies.

10        Q.    And why did you have to do that?

11        A.    Some of the questions that the service

12    partner was asking about the case were academic in

13    nature and therefore outside of our wheelhouse.

14        Q.    So, you were the one who would say hey,

15    this policy here we don't have to necessarily

16    review because that's academic only?

17        A.    Correct.

18        Q.    And did you make a recommendation to

19    Cecelia Bass about terminating Dr. Papin?

20        A.    I did not.

21        Q.    Do you know if anybody else made a

22    recommendation to her?

23        A.    I believe Pat Whitlock was in support of

24    the manager's request to terminate.  And I did

25    review and concurred, but I did not make the

Molly Brasfield
January 21, 2021

Page 33

1  recommendation formerly.

2       Q.    How does that happen formerly, is it

3  like an e-mail?

4       A.    Typically an e-mail between the business

5  partner to the employee relations team.

6       Q.    So Pat would have sent an e-mail to

7  Cecelia saying I support the termination?

8       A.    Yes.

9       Q.    But you didn't have to do that?

10      A.    Correct.

11      Q.    I don't want to put words in your mouth.

12  I would imagine you probably had either verbal

13  conversations or something that expressed you were

14  in support of that decision?

15      A.    Correct, the business part, part of our

16  internal business partner process is when a

17  business partner has conducted an investigation

18  and come to findings and recommendations.  They

19  include me in the communications so that in my

20  review if I see anything in oversight of what the

21  business partner did that seemed to be lacking or

22  amiss, I would have opportunity to talk with

23  employer relations about that.  And on occasion,

24  in addition to e-mails between the human resources

25  business partner team and the employee relations

Molly Brasfield
January 21, 2021

Page 34

1    team, we also have sitdown meetings to go through

2    documents and ask each other questions to ensure a

3    full understanding.  I don't believe that occurred

4    in this case, but I would not have been involved.

5        Q.    Are Pat, Pam and Cecelia still employees

6    of UMMC?

7        A.    They are.

8        Q.    Why was it ultimately up Cecelia, was

9    she just highest up on the hierarchy?

10       A.    As the director of employee relations,

11   our process that was in place is for the employee

12   relations director to endorse any decisions to

13   terminate employees at the Medical Center.

14       Q.    I was about to ask that.  Is she

15   involved in all the decisions?

16       A.    Correct.  She has a big job.

17       Q.    So, we sort of went over the

18   decision-making aspect.  For consulting or

19   advisory role are sort of similar.  Certainly

20   sounds like you gave at least an advisory opinion

21   verbally that you concurred with the termination.

22   Who else would have done something similar to

23   that, if you know?

24       A.    Given a verbal advisory --

25       Q.    Maybe it wasn't even verbal, maybe it

Molly Brasfield
January 21, 2021

Page 35

 1   was an e-mail advisory or --

 2        A.   I'm not aware of anyone else besides the

 3   four people that I named that were involved in

 4   that decision.

 5        Q.   What did Pam Greenwood do as far as

 6   advisory or consulting?

 7        A.   Much like Pat Whitlock would gather the

 8   documents initially and put together either

 9   support for a termination request or request other

10   documents, Pam Greenwood would be the first person

11   in the employee relations team to review what Pat

12   submitted and ensure she either endorsed it or

13   asked questions and received additional

14   information in order for her to then provide it to

15   Cecelia for her review.  That process is to be

16   most time efficient for Cecelia, so that those

17   kinds of reviews don't come to her until they are

18   fully reviewed and as comprehensive and complete

19   as could be to save her that time.

20        Q.   So it sort of starts with Pat -- oh, I'm

21   sorry, Pam, correct?

22        A.   In the employee relations piece, yes.

23        Q.   Starts with Pam, makes sure all the info

24   is there, she concurs with the recommendation and

25   then it would go to Pat?

Molly Brasfield
January 21, 2021

Page 36

1      A.   It would go to Cecelia.  Pam reports to

2   Cecelia.

3      **Q.   So then why does Pat make a formal**

4   **concurrence to Cecelia?**

5      A.   If a business partner receives a request

6   to terminate and in their professional opinion

7   believe that a different level of sanction would

8   be more appropriate then the business partner

9   talks with and works with the manager on that

10   keeping the employee relations team from having to

11   get involved in something that shouldn't advance

12   to that level of review.

13      **Q.   Before Pam sent everything to Cecelia,**

14   **is it -- you may have said this and I just**

15   **apologize -- did Pat get involved and also give**

16   **that concurrence at that time or when does that**

17   **occur?**

18      A.   Correct.  When the manager made the

19   request, Pat was involved in the initial meeting

20   to hear the request and rationale behind it and

21   she then was assigned as the business partner to

22   collect all the documents, pose questions as

23   needed to that manager and work her way through

24   her professional opinion about what sanction would

25   be warranted in this particular case.  And this

Molly Brasfield
January 21, 2021

Page 37

```
 1   process is again in the spirit of time efficiency.

 2   The employee relations team reviews all requests

 3   for the entire institution, whereas a business

 4   partner is assigned only a small subset of

 5   constituents making it a more manageable workload.

 6        Q.   What role did Dr. Earl have after making

 7   the request?

 8        A.   Answering questions posed by Pat and/or

 9   the employee relations team.

10        Q.   Did he have any further subsequent

11   decision-making role or --

12        A.   No.

13        Q.   Because I think at that time he had

14   already made the recommendation for --

15        A.   Correct.

16        Q.   -- termination.

17        A.   I would call it a request.

18             (Off the record.)

19        Q.   (By Mr. Morgan)  We were kind of going

20   through the list of names here of individuals who

21   were involved in the decision to terminate

22   Dr. Papin.  For Dr. Barr, you said he was both HR

23   and academic.  Can you explain what his role on

24   the HR side was?

25        A.   As the GME associate dean, he would give
```

Molly Brasfield
January 21, 2021

Page 38

1  oversight to Dr. Mark Earl and the request that he

2  was making.  Typically with any employee request

3  for sanctions, the upline leader of the manager is

4  also aware of and involved to whatever extent they

5  choose to be.

6      **Q.   So does that person, like Dr. Barr in**

7  **this situation, do -- does he make a formal**

8  **recommendation?**

9      A.   I don't believe he did in this case.  He

10  reviewed the matter and suggested to Dr. Earl that

11  it needed to be referred to human resources.

12      **Q.   Okay.  And then Dr. Earl referred it to**

13  **human resources with the recommendation of**

14  **termination?**

15      A.   He sent the information to Dr. Barr.

16  Dr. Barr included Dr. Earl in the request to meet

17  and discuss with human resources because he felt

18  that it needed to be escalated to human resources.

19  I don't recall seeing anything in writing other

20  than the request to have the meeting and the

21  meeting taking place.

22      **Q.   Okay.  Were you in that meeting?**

23      A.   I was.

24      **Q.   Who else was in that meeting?**

25      A.   I recall Dr. Barr, Dr. Earl, myself and

Molly Brasfield
January 21, 2021

Page 39

1   Pat Whitlock.

2       Q.   And did Dr. Earl make a verbal

3   recommendation regarding termination?

4       A.   I don't recall specifically what

5   Dr. Earl stated aside from overarching concern

6   about the behaviors.

7       Q.   So what was his request to HR then, what

8   did he want you all to do?

9       A.   I recall his desire being an appropriate

10  sanction for Dr. Papin for the behaviors and the

11  performance and the violations of policy.

12      Q.   So do you recall if Dr. Earl ever made a

13  recommendation that he wanted Dr. Papin to be

14  terminated?

15      A.   I don't recall, because I assigned the

16  matter to Pat Whitlock.  That would have been

17  handled by Pat and I don't recall seeing

18  specifically what, if anything, Dr. Earl was

19  asking for beyond us looking at it.

20      Q.   Okay.  So does HR just make an

21  independent decision by themselves after reviewing

22  this or do you go back to Dr. Earl and Barr to

23  consult with them and get their "okay"?

24      A.   The way I would word it is that we do

25  seek consensus and alignment around whatever HR

Molly Brasfield
January 21, 2021

Page 40

```
 1   recommendation we're making.
 2        Q.   So, who ultimately said this is a
 3   terminable offense?  I know you said it was
 4   Cecelia Bass.  But who was the one who said, okay,
 5   this is not just suspension or a discipline, this
 6   needs to be termination?
 7        A.   That would have started with Pat
 8   Whitlock, me endorsing it.  On the employee
 9   relations side, I wasn't part of the dialogue
10   between Cecelia and her employee Pam, but I'm
11   aware that Cecelia also felt it should be a
12   termination.
13        Q.   Let's go back and look.  This is an
14   exhibit from yesterday, Exhibit 23 to Dr. Earl's
15   deposition.  It's a series of e-mails.  If you
16   kind of go towards the back -- I guess it's on the
17   third page of this exhibit.  It has an e-mail from
18   Pat Whitlock from February the 6th, 2017.  Do you
19   see that?
20        A.   Yes.
21        Q.   And it looks like you were copied on
22   this e-mail, correct?
23        A.   Yes.
24        Q.   Who is Johnny Gilmore that's copied on
25   the e-mail?
```

Molly Brasfield
January 21, 2021

Page 41

1        A.    Johnny Gilmore was a senior service

2    partner reporting to Cecelia Bass in the employee

3    relations area.

4        **Q.    And who is Chris Morgan?**

5        A.    Chris Morgan is also a senior service

6    partner in the employee relations area reporting

7    to Cecelia Bass.

8        **Q.    Now, this e-mail is being sent to**

9    **Cecelia Bass, but then it looks like Pam responds,**

10   **if you look at page 2, with some additional**

11   **questions or additional information that she is**

12   **looking for.  Is that sort of the process you were**

13   **describing where Pam does the initial review to**

14   **make sure Cecelia has got everything she would**

15   **need to review?**

16       A.    Correct.

17       **Q.    And then you responded, it looks like,**

18   **regarding with some of the issues you were**

19   **describing earlier about academic policies and GME**

20   **policies?**

21       A.    Correct.

22       **Q.    So go back to that February 6th e-mail?**

23       A.    Yes.

24       **Q.    If you look at that first paragraph, at**

25   **the end of that line it says, the director of his**

Molly Brasfield
January 21, 2021

Page 42

```
 1    program feels that the liability is too great to
 2    have him continue.  Do you see that?
 3         A.   Yes.
 4         Q.   That to me certainly seems like Dr. Earl
 5    wanted termination at that time; is that fair to
 6    say?
 7         A.   Could be, yes, I would read it that way.
 8         Q.   When you get an e-mail like this, is
 9    this one where you're like, okay, I need to review
10    and get familiar with this right away, or is it
11    more of a, okay, I'm going to let a few more steps
12    occur before I really dive in and get involved?
13         A.   I wouldn't tend to get involved because
14    the HR business partner is expected to
15    independently review and make recommendation.  So
16    if the business partner articulates information
17    that she's gathered from the manager, I trust
18    that.
19         Q.   So from this February 6th e-mail
20    until -- looks like Pam responds February the
21    15th, so nine days later -- did you do anything in
22    response to this e-mail or was this sort of just a
23    wait-and-see-what-happens approach?
24         A.   I have one-on-one weekly meetings with
25    each of my business partners and so I would have
```

Molly Brasfield
January 21, 2021

Page 43

1    had my one-on-one meeting with Pat where we

2    discussed just the status of the case.

3        **Q.   No findings or recommendations yet at**

4    **that point?**

5        A.   Huh-huh.   (Negative response.)

6        **Q.   Now, if you go to the last page of the**

7    **exhibit --**

8        A.   I want to make sure I clarify.   No

9    findings or recommendations from employee

10   relations at that point.

11       **Q.   Yes.**

12       A.   Yes.

13       **Q.   If you go to the last page, the end of**

14   **Pat's original February 6th e-mail.  It says,**

15   **"Termination of Dr. Papin's employee is the**

16   **recommendation of the director School of**

17   **Medicine."  I'm going to stop there.  Who is that,**

18   **the director School of Medicine?**

19       A.   I don't know who she was referring to by

20   that title.  I could speculate but that would be

21   unhelpful.

22       **Q.   If you have a really good guess you can**

23   **do that, but if it's purely speculative don't do**

24   **that.  And continuing on the sentence --**

25       A.   I can deduce that she was referring to

Molly Brasfield
January 21, 2021

Page 44

1    Dr. Mark Earl.  She did not articulate his full

2    title as program director of the surgery resident

3    program in the School of Medicine.

4         Q.   The second clause says, "Concurred by

5    the associate dean graduate medical education" who

6    is Dr. Barr?

7         A.   Correct.

8         Q.   And so, you know from the facts of this

9    case that it was Dr. Earl and Dr. Barr who brought

10   this?

11        A.   Correct.

12        Q.   So, using our deduction skills would

13   seem to mean she meant Dr. Earl?

14        A.   Yes.

15        Q.   And so, in this first e-mail she's

16   making that recommendation and saying she agrees

17   with it right away?

18        A.   Correct.  And it does appear from the

19   lapse of time, she sent the e-mail a few days

20   following the last paragraph dated, which suggests

21   that during that time that was when she was

22   reviewing all of the facts and formulating her own

23   opinion.  But by February 6th, 2017 she had

24   concluded that termination was appropriate.

25        Q.   In the fourth page of this exhibit,

Molly Brasfield
January 21, 2021

Page 45

1    there's a January 19th, 2017 meeting reference

2    where it says you attended.

3        A.    Yes.

4        Q.    Do you recall this meeting?

5        A.    I do.

6        Q.    And what was -- besides what was

7    described in this paragraph, what else was

8    discussed or can you recall about that meeting?

9        A.    This was the meeting in which Dr. Barr

10   had requested to tell human resources about the

11   case and seek our advice from an HR perspective

12   for the performance issues and potential policy

13   violations.

14       Q.    How long did that meeting last ballpark?

15       A.    I don't recall.  Typically these

16   meetings are scheduled for 50 minutes or an hour.

17       Q.    For that 50 minutes to an hour, what

18   other items were discussed besides what's listed

19   here?

20       A.    I don't recall anything specific, but by

21   virtue of Jamie Christian the associate general

22   counsel being in attendance -- typically, our UMMC

23   legal counsel, when they're attending these

24   meetings, they're lending clarification between

25   the academic and the employment related constructs

Molly Brasfield
January 21, 2021

Page 46

1    to ensure that each area is staying inside their

2    lane from a legal perspective.

3         Q.   Do you remember that happening and

4    recall that happening in this meeting?

5         A.   I don't.

6         Q.   Do you remember if you said anything in

7    particular during the meeting, like if you recall

8    asking a question or making a comment about the

9    situation?

10        A.   I don't specifically recall, no.  I'm

11   sure I did, but I don't recall.

12        Q.   This is a very broad question but

13   anything else you can remember whatsoever about

14   that meeting we haven't discussed?

15        A.   I did concur that it needed an HR

16   review.

17        Q.   Was that your decision to make?

18        A.   It would have been mine had Pat not

19   concurred.

20        Q.   Was Pat at that meeting?

21        A.   It does not appear that she was in that

22   particular meeting, no.

23        Q.   But she would have been the one who

24   subsequently would have received the information

25   to start the process?

Molly Brasfield
January 21, 2021

Page 47

```
 1       A.   Correct, when I assigned it to her, if
 2  she would have disagreed and said I don't believe
 3  that this warrants an HR review, I would have been
 4  the decision maker to override that and say I
 5  disagree and I'm assigning you to do this.  But
 6  when I did refer the matter to her for human
 7  resources review, she concurred that it warranted
 8  an HR review.
 9       Q.   Did you review any of the documentation
10  in this matter besides like these e-mails, like
11  the actual attached documentation?
12       A.   I don't recall what I reviewed at that
13  time, but I do recall of course reviewing these in
14  preparation for today.  And I reviewed them in the
15  process of the request for the academic appeal.  I
16  do recall reviewing them at that time in order for
17  us to have aligned around offering Dr. Papin the
18  option to resign in lieu of termination.  I was
19  involved in that discussion.
20       Q.   We'll get to that in a minute.  For
21  example, did you know that there was a recorded
22  statement where Dr. Papin met with Pat and Pam to
23  discuss this situation?
24       A.   I was.
25       Q.   Did you review --
```

Molly Brasfield
January 21, 2021

Page 48

 1       A.    Let me correct.  My belief was that that

 2   meeting occurred with Brenda Traxler.

 3       Q.    You're right, it was Brenda.

 4             Would you have reviewed that statement

 5   prior to your informal concurrence on the

 6   termination?

 7       A.    No, not unless there was an indication

 8   that anything that Pat was putting forward was not

 9   trustworthy.

10       Q.    So when you're making your

11   recommendation -- I know it was kind of informal

12   advisory, not an formal-formal one -- besides the

13   e-mails that document the issues, do you go and do

14   like an independent investigation yourself and

15   look through any documentation that was like sent

16   by Dr. Earl, for example, originally or you're

17   really just relying upon the recitations in these

18   types of e-mails?

19       A.    I would do that if the summary that the

20   business partner was providing was less than

21   thorough, then I would dig deeper into it.

22       Q.    So if you read it and you were like,

23   okay, I'm satisfied, it seems to answer all the

24   questions and all of that, you wouldn't go to the

25   backup documentation?

Molly Brasfield
January 21, 2021

Page 49

1        A.    Correct.

2        Q.    So, do you remember here if you had to

3    go back to the backup documentation or was the

4    summary sufficient?

5        A.    I don't recall that I had any questions.

6        Q.    In your e-mail from February 15th, I was

7    just reading it one more time, you discuss what we

8    discussed earlier about how some of the questions

9    that Pam had asked were academic related and not

10   necessarily HR related, correct?

11       A.    Correct.

12       Q.    And at the end you described that these

13   types of trainee issues can be tricky.  And then

14   it looks like Cecelia responded to your e-mail two

15   days later saying that it appears tricky to me,

16   let's plan to discuss.  Do you see that?

17       A.    Yes.

18       Q.    Do you remember having that discussion

19   with Cecelia?

20       A.    I do, and I recall it wasn't just

21   Cecelia, it was meeting with her and all of her

22   service partners.

23       Q.    When you say all of her service

24   partners, who would that be?

25       A.    Pam Greenwood, Johnny Gilmore and Chris

Molly Brasfield
January 21, 2021

Page 50

1    Morgan.

2        Q.    All the people that are on this e-mail?

3        A.    Correct.

4        Q.    So when her Monday, February 20th e-mail

5    where she says, "Pat/Molly, thanks for making time

6    to speak with us," that would include everybody

7    that's copied on the e-mail?

8        A.    Correct.

9        Q.    What did you discuss at that meeting?

10       A.    The academic policies versus employment

11   policies, how the employment is contingent on the

12   trainee being in the program and where each of

13   those swim lanes reside.

14       Q.    So here, for Dr. Papin, was he

15   terminated under the HR policies because he was

16   being terminated under the academic policies?

17       A.    No, he was being terminated for

18   violations of employment policies.

19       Q.    Which ones specifically?

20       A.    Code of conduct and disruptive behavior.

21       Q.    Anything else?

22       A.    No.

23       Q.    That would be based upon the facts that

24   are elicited in the different paragraphs from Pat

25   Whitlock's February 6th e-mail?

Molly Brasfield
January 21, 2021

Page 51

```
 1      A.   Correct.
 2      Q.   You mentioned a second ago how when the
 3  appeal request came through, you were involved
 4  with I think pulling documentation, is that what
 5  it was or providing other information?
 6      A.   Correct.
 7      Q.   What was your role in that?
 8      A.   The request for appeal came through
 9  Dr. Papin's then attorney, who referenced a GME
10  policy, and in communication with the UMMC legal
11  counseling who was handling it at that time, which
12  was Mark Ray rather than Jamie Christian --
13          MR. WHITFIELD:  I'm going to object to
14  getting into what Mark Ray advised, other than
15  that you can testify as to what you did.
16          THE WITNESS:  Correct.  I answered
17  questions Mark had to propose a hopefully
18  amendable solution to the employment matter, which
19  was to offer Dr. Papin the option to resign in
20  lieu of termination.
21      Q.   (By Mr. Morgan)  I do want to ask about
22  that in a second.  As far as the appeal and the
23  appeal hearing goes, did you have any other
24  involvement besides answering questions for Mark
25  Ray?
```

Molly Brasfield
January 21, 2021

Page 52

```
 1       A.    Clarifying that a clause in one of the
 2  GME policies did not have a correct update to the
 3  contents of the then current faculty and staff
 4  handbook with regard to issues that are
 5  grieveable.
 6       Q.    What was that one?
 7       A.    May I refer to the faculty staff
 8  handbook?
 9       Q.    Yes.
10       A.    This would be the policy from this
11  exhibit on page 41.  That's not the right number.
12  I don't see this particular policy in the excerpt
13  that you've provided.
14       Q.    Do you remember what the policy was?
15            MR. WHITFIELD:  Here, I've got the full
16  book.
17            THE WITNESS:  I understand now why you
18  didn't print the whole thing out.  Page 46, which
19  is a subset of the problems, questions and
20  grievances policy for staff.
21       Q.    (By Mr. Morgan)  And what was changed?
22       A.    Under the section issues that are
23  grieveable, adverse employment actions such as
24  demotions and suspensions but not including
25  terminations.
```

Molly Brasfield
January 21, 2021

Page 53

1     Q.    So that was then amended to include
2  termination?
3     A.    The faculty and staff handbook excludes
4  terminations as grieveable actions, but the GME
5  policies had not been amended to reflect that.
6     Q.    So at the time there was no grievance
7  for the termination under the HR side?
8     A.    Correct.
9     Q.    Only on the academic side?
10    A.    Correct.
11    Q.    But then that was changed?
12    A.    When you say it?
13    Q.    Good question.  The policy you were just
14  referring to?
15    A.    In the faculty staff handbook?
16    Q.    Yes.
17    A.    No, the faculty staff handbook remains
18  as written that terminations are not grieveable.
19    Q.    Okay.  So, you were just clarifying that
20  point; is that what you were saying?  I thought a
21  second ago you said there was an amendment to a
22  policy?
23    A.    I believe the GME policy made reference
24  to terminations being grieveable which was
25  inconsistent with the faculty and staff handbook.

Molly Brasfield
January 21, 2021

Page 54

```
 1        Q.   How was that consistency fixed or is it

 2   not fixed?

 3        A.   I believe the academic group amended

 4   their policies to reflect current employment

 5   policies.

 6        Q.   If you know, the academic policies now

 7   say termination is not a grieveable?

 8        A.   I am unaware of what they say.

 9        Q.   You mentioned the offer of resignation

10   to Dr. Papin.  If you could, tell me about that

11   and how that came about?

12        A.   That came as part of my consult to UMMC

13   legal counsel to allow him to continue

14   conversation with Dr. Papin's attorney.

15        Q.   And how did it start?  Did you say hey,

16   by the way, we can offer resignation or was it

17   asked and requested of you?

18             MR. WHITFIELD:  Can we go off the record

19   for just a second?

20             MR. MORGAN:  Sure.

21             (Off the record.)

22             MR. WHITFIELD:  We just had a

23   conversation off the record regarding privilege

24   and inquiring into a matter that was concerning an

25   offer made to opposing counsel at the time.  We're
```

Molly Brasfield
January 21, 2021

Page 55

1    going to -- we've agreed to get into that without

2    waiving any other -- without waiving legal

3    privilege globally and we'll confine it to just

4    the discussions of the offer that was authorized

5    to be made without waiving any attorney-client

6    privilege.

7         Q.   (By Mr. Morgan)  So Ms. Brasfield, walk

8    me through, then, the offer of resignation how

9    that came up and what your role was in it?

10        A.   Anytime we have former employees that

11   are dissatisfied with the outcomes, my interest

12   is, whenever possible, to find an amenable

13   mutually agreed set of terms and to avoid this

14   sort of scenario we're in right now.  And as part

15   of understanding Dr. Papin's displeasure with the

16   outcome looking at potential ways to meet his

17   desired outcome was my interest, and part of a

18   concession I was willing to make was to provide

19   the option of resigning in lieu of termination.

20   My understanding was that was one of Dr. Papin's

21   concerns.

22        Q.   And so who first brought up the idea of

23   resignation, was that you --

24        A.   I did.

25        Q.   So, that would have just been in one of

Molly Brasfield
January 21, 2021

```
 1   the discussions with counsel, you said hey, why

 2   don't we offer this?

 3        A.   Yes.

 4        Q.   Did you have to get any sort of approval

 5   for that from anyone else?

 6        A.   No.

 7        Q.   Did you have to go talk to Dr. Earl or

 8   Dr. Barr or anybody like that?

 9        A.   No.

10        Q.   Or talk to Cecelia Bass?

11        A.   I would have typically conferred with

12   Cecelia.  I don't specifically remember doing so

13   in this case, but that is typical, yes.

14        Q.   Is there -- I don't want to say a line

15   in the sand, but that's really the only word I can

16   think of -- but some line where you say, hey, you

17   know what, up to this line we'll offer resignation

18   but if something is just so egregious, no chance

19   we would ever offer in lieu of resignation?

20        A.   Correct.

21        Q.   There is a line?

22        A.   Yes.

23        Q.   Where is that line?  Where does that

24   line trigger?

25        A.   An example would be someone whose
```

Molly Brasfield
January 21, 2021

Page 57

1    behavior was so egregious that not having a

2    termination for cause as the final outcome would

3    allow them future opportunities in the medical

4    field that we would feel uncomfortable with.  An

5    example of that would be sexual misconduct or

6    harassment.

7         **Q.   But here you did feel comfortable enough**

8    **to offer the resignation so that Dr. Papin could**

9    **try to remain in the medical field?**

10        A.   Correct.

11        **Q.   And so you instructed Mark Ray to make**

12   **this offer to Dr. Papin's original attorney?**

13        A.   Yes.

14        **Q.   And then were you ultimately told**

15   **that -- what happened after that in regards to the**

16   **offer of resignation, did you ever hear about it**

17   **again?**

18        A.   I received input that the offer was

19   declined.

20        **Q.   And then was it ever discussed again or**

21   **that was basically the end of it?**

22        A.   Only referred to in subsequent

23   conversations in preparation for and throughout

24   the hearing for the academic piece.

25        **Q.   Did you know that or hear that Dr. Papin**

Molly Brasfield
January 21, 2021

Page 58

1   had discussed resigning with Dr. Earl?

2        A.    No.

3        Q.    So when you say the resignation piece

4   was discussed on the academic side in preparation

5   for the appeal, in what way?  How would that have

6   come up?

7        A.    The preparation of Dr. Steve Bondi as

8   the chair of the appeals committee and the hearing

9   process.

10        Q.    Were you involved in helping prepare

11   Dr. Bondi for the hearing?

12        A.    No.

13        Q.    Were you involved in helping set the

14   hearing process?

15        A.    No.

16        Q.    So, when you say that, what do you mean

17   by that?  A second ago you just said those two

18   items.  Can you expand a little bit more on that,

19   please?

20        A.    I have seen as part of the preparation

21   for this correspondence in which that topic was

22   part of that academic process.

23        Q.    Where it's talking about the hearing

24   process, it's mentioning in there that an offer of

25   resignation had been made?

Molly Brasfield
January 21, 2021

Page 59

 1       A.    Correct.

 2       Q.    Give me one second.  Let's go off for

 3    just a second.

 4             MR. WHITFIELD:  I'm going to interpose

 5    an objection that if that was covered in

 6    attorney-client conversations in reference to

 7    other matters then it's privileged and not subject

 8    to disclosure.  She didn't identify who the

 9    correspondence was from, but if it was from

10    University counsel, that would have been

11    privileged and I would object.

12             (Off the record.)

13             (Exhibit 6 marked for identification.)

14       Q.    (By Mr. Morgan)  Ms. Brasfield, I've

15    handed you Exhibit 6, which is a letter from you

16    to Dr. Papin's original attorney, correct?

17       A.    Correct.

18       Q.    Did you draft this letter?

19       A.    In consult with UMMC legal, yes.

20       Q.    Did you do the first draft and then

21    consult it or how did it work?

22       A.    I don't recall.

23       Q.    Do you know why this letter was sent in

24    July when Dr. Papin was terminated in February,

25    five months before?  Why it took so long to send

Molly Brasfield
January 21, 2021

Page 60

1   this letter?

2        A.    My recollection is that during that

3   period of time UMMC legal was working with

4   Dr. Papin's attorney on issues, the terms, what

5   the questions were, in an attempt to work through

6   those questions.

7        Q.    **Your first line says, "This is in**

8   **receipt of your letter of March 3rd," so that**

9   **would have been four months before if my math is**

10  **right?**

11       A.    Correct.

12       Q.    **So, from that point until here, there**

13  **was discussions being had.  At some point those**

14  **discussions obviously broke down and then you made**

15  **this formal response?**

16       A.    I wasn't aware that communications broke

17  down.  My understanding was that UMMC legal

18  counsel was in communication with Dr. Papin's then

19  attorney.

20       Q.    **Okay.  At the third paragraph of this**

21  **letter it states that counsel will not be allowed**

22  **to participate and shall be there in an advisory**

23  **capacity.  Is that a decision you made or did you**

24  **get that from somewhere else?**

25       A.    That would have been under advisement in

Molly Brasfield
January 21, 2021

Page 61

1    consult with UMMC legal.

2              MR. MORGAN:  I don't have anymore

3    questions.

4              MR. WHITFIELD:  No questions.

5                (Time Noted:  10:45 a.m.)

6                  SIGNATURE/NOT WAIVED

7    ORIGINAL:  MR. MORGAN, ESQ.

8    COPY:  MR. WHITFIELD, ESQ.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Molly Brasfield
January 21, 2021

Page 62

1                    CERTIFICATE OF DEPONENT

2    DEPONENT:  Molly Brasfield, CORPORATE REPRESENTATIVE
     OF UMMC PURSUANT TO RULE 1.310(b)(6)
3    DATE:  January 21, 2021
     CASE STYLE:  Papin vs. UMMC, et al
4    ORIGINAL TO:  Mr. Morgan, ESQ.
               I, the above-named deponent in the
5    deposition taken in the herein styled and numbered
     cause, certify that I have examined the deposition
6    taken on the date above as to the correctness
     thereof, and that after reading said pages, I find
7    them to contain a full and true transcript of the
     testimony as given by me.
8              Subject to those corrections listed below,
     if any, I find the transcript to be the correct
9    testimony I gave at the aforestated time and place.
     Page      Line                     Comments
10   _____     _____     _____
     _____     _____     _____
11   _____     _____     _____
     _____     _____     _____
12   _____     _____     _____
     _____     _____     _____
13   _____     _____     _____
     _____     _____     _____
14   _____     _____     _____
     _____     _____     _____
15   _____     _____     _____
     _____     _____     _____
16   _____     _____     _____

17

18          This the _____ day of _____, 2021.

19                           _____
                             Molly Brasfield
20   State of Mississippi
     County of _____
21
            Subscribed and sworn to before me, this the
22   _____ day of _____, 2021.

23   My Commission Expires:

24   _____    _____

25                                 Notary Public

Molly Brasfield
January 21, 2021

Page 63

1               CERTIFICATE OF COURT REPORTER

2               I, Robin G. Burwell, Court Reporter and

3       Notary Public, in and for the State of Mississippi,

4       hereby certify that the foregoing contains a true

5       and correct transcript of the testimony of Molly

6       Brasfield, as taken by me in the aforementioned

7       matter at the time and place heretofore stated, as

8       taken by stenotype and later reduced to typewritten

9       form under my supervision by means of computer-aided

10      transcription.

11              I further certify that under the authority

12      vested in me by the State of Mississippi that the

13      witness was placed under oath by me to truthfully

14      answer all questions in the matter.

15              I further certify that, to the best of my

16      knowledge, I am not in the employ of or related to

17      any party in this matter and have no interest,

18      monetary or otherwise, in the final outcome of this

19      matter.

20              Witness my signature and seal this the

21      28th day of January, 2021.

22

23      *Robin G. Burwell*
        _____
24                  ROBIN G. BURWELL, #1651
                    CRR, RPR, CCR
        My Commission Expires:
25      April 6, 2021

**Exhibits**

**Exhibit 001 Brasfield**
  3:9 10:2 12:1
  16:24 17:11
**Exhibit 002 Brasfield**
  3:11 16:18,20
**Exhibit 003 Brasfield**
  3:13 19:14,16
  21:1
**Exhibit 004 Brasfield**
  3:15 21:22,
  23,24
**Exhibit 005 Brasfield**
  3:18 23:10,12
**Exhibit 006 Brasfield**
  3:20 59:13,15

**1**

**1**
  10:2 12:1
  16:24 17:11
**10**
  10:6,16 11:24
**10-page**
  19:12
**10:45**
  61:5
**15th**
  42:21 49:6
**19th**
  45:1

**2**

**2**
  16:18,20
  41:10
**2009**
  6:7,10
**2017**
  25:10 40:18
  44:23 45:1
**2019**
  6:11
**2020**
  6:17
**20th**
  50:4
**212**
  15:11
**213**
  15:12
**22**
  25:3
**23**
  40:14

**3**

**3**
  19:14,16 21:1
**3rd**
  60:8

**4**

**4**
  21:22,24
**40**
  17:18

**41**
  52:11
**46**
  52:18

**5**

**5**
  23:10,12
**50**
  45:16,17
**54**
  31:5

**6**

**6**
  59:13,15
**6th**
  40:18 41:22
  42:19 43:14
  44:23 50:25

**7**

**7**
  10:5,10

**A**

**a.m.**
  61:5
**academic**
  6:24 7:6
  11:7,10,11,18
  12:8,16,17
  13:1,8,13,14,
  15,22 14:4,5,
  6,13,19,21,22
  16:5,15 19:22
  20:2,7,15,23,
  24 21:12
  22:2,4,13
  23:15,24
  24:16,21,25
  29:17 30:7,
  14,19,23
  31:8,11 32:7,
  12,16 37:23
  41:19 45:25
  47:15 49:9
  50:10,16 53:9
  54:3,6 57:24
  58:4,22
**academically**
  13:12
**academics**
  6:9,14 7:14
**Academy**
  9:17
**acceptable**
  18:8 26:20
**accepted**
  6:15,17
**access**
  20:18
**accurate**
  8:2 10:7
**ACGME**
  11:5 12:10
  30:4
**acronym**
  29:23
**action**
  14:9
**actions**
  10:20 14:6
  20:12 26:12,
  25 27:16
  52:23 53:4

Molly Brasfield
January 21, 2021

2

actual
  17:18 47:11
addition
  33:24
additional
  26:3 35:13
  41:10,11
address
  10:11
administered
  11:13
advance
  36:11
adverse
  52:23
advice
  45:11
advised
  51:14
advisement
  60:25
advisory
  10:13 28:20
  34:19,20,24
  35:1,6 48:12
  60:22
affect
  5:25
affirmative
  5:7
agreed
  55:1,13
agrees
  44:16
ahead
  11:23
akin
  6:8 9:14

Algorithm
  19:18,23
aligned
  47:17
alignment
  39:25
allergy
  5:24
allowed
  60:21
amenable
  55:12
amendable
  51:18
amended
  53:1,5 54:3
amendment
  53:21
amiss
  33:22
and/or
  10:19 37:8
answering
  32:5 37:8
  51:24
answers
  5:6
anymore
  61:2
Anytime
  55:10
apologize
  36:15
appeal
  47:15 51:3,8,
  22,23 58:5
appeals
  58:8

appears
  49:15
application
  22:25 23:2,5,
  7
applied
  25:24
apply
  10:18 15:24
  26:25
applying
  20:9
approach
  42:23
approval
  56:4
April
  6:7,17
area
  7:6,7 9:12
  11:12 24:4
  41:3,6 46:1
areas
  6:14 7:8
art's
  8:15
articulate
  44:1
articulates
  42:16
aspect
  34:18
aspects
  31:15
assessment
  18:12
assigned
  29:12,24

  36:21 37:4
  39:15 47:1
assigning
  47:5
assist
  28:12
assistant
  9:13
associate
  29:18 37:25
  44:5 45:21
assuming
  4:23
attached
  47:11
attempt
  60:5
attendance
  45:22
attended
  45:2
attending
  45:23
attorney
  51:9 54:14
  57:12 59:16
  60:4,19
attorney-client
  55:5 59:6
authorized
  55:4
avoid
  55:13
aware
  16:11,13
  25:21 26:3,6
  27:8 31:9
  35:2 38:4

40:11 60:16

**B**

**bachelor**
  8:15
**back**
  6:3 25:2,18
  28:11 39:22
  40:13,16
  41:22 49:3
**Backing**
  6:23
**backup**
  48:25 49:3
**ballpark**
  4:13 45:14
**Barr**
  29:18 30:5,12
  37:22 38:6,
  15,16,25
  39:22 44:6,9
  45:9 56:8
**based**
  50:23
**basic**
  22:18
**basically**
  57:21
**Bass**
  29:14 31:19
  32:6,19 40:4
  41:2,7,9
  56:10
**Bates**
  15:9 31:5
**beginning**
  22:18
**behavior**

8:21 13:25
17:23 50:20
57:1
**behaviors**
  26:19,20
  31:15 39:6,10
**belief**
  48:1
**Benefits**
  22:19
**big**
  34:16
**bit**
  16:25 58:18
**Blue**
  9:5
**boilerplates**
  18:4
**Bondi**
  30:25 58:7,11
**book**
  52:16
**bottom**
  15:9 17:19,21
  31:5
**Brasfield**
  4:1,5,7,8
  19:15 55:7
  59:14
**break**
  5:14,15,17
**Brenda**
  48:2,3
**briefly**
  9:2
**broad**
  46:12

**broke**
  60:14,16
**brought**
  4:10 8:7,22
  44:9 55:22
**business**
  7:5 8:10
  28:6,12 29:11
  33:4,15,16,
  17,21,25
  36:5,8,21
  37:3 42:14,
  16,25 48:20

**C**

**call**
  31:21 37:17
**called**
  8:8 15:22
**campus**
  7:8
**capacity**
  60:23
**capital**
  23:8
**case**
  4:10,25 7:19
  13:7 19:6
  24:16 32:12
  34:4 36:25
  38:9 43:2
  44:9 45:11
  56:13
**cases**
  4:15,18
**Cecelia**
  29:14 31:19
  32:6,19 33:7
  34:5,8 35:15,

16 36:1,2,4,
13 40:4,10,11
41:2,7,9,14
49:14,19,21
56:10,12
**Center**
  15:15,19 17:6
  34:13
**cetera**
  24:8,19
**chair**
  58:8
**chance**
  56:18
**chancellor**
  30:24
**change**
  7:21 9:9
**changed**
  6:12 52:21
  53:11
**charge**
  24:8,19 30:1,
  2
**checklist**
  23:22 24:9
**chief**
  4:24 6:16,18,
  19
**choose**
  38:5
**choral**
  9:17
**Chris**
  41:4,5 49:25
**Christian**
  45:21 51:12
**claim**

8:7 24:7,19

**clarification**
45:24

**clarify**
17:8 43:8

**clarifying**
52:1 53:19

**clause**
44:4 52:1

**clear**
5:10 15:2

**coaching**
18:12

**Code**
50:20

**collect**
36:22

**collecting**
20:18

**College**
8:16 9:11

**colleges**
9:15

**combination**
9:9

**comfortable**
57:7

**comment**
46:8

**committee**
28:23,25
31:1,2 58:8

**communicate**
28:11

**communication**
7:20 51:10
60:18

**communications**
33:19 60:16

**Community**
9:11

**compiled**
12:11

**complete**
17:14 35:18

**comprehensive**
35:18

**concern**
19:9 39:5

**concerns**
55:21

**concession**
55:18

**conclude**
14:6

**concluded**
44:24

**concur**
14:11 46:15

**concurred**
32:25 34:21
44:4 46:19
47:7

**concurrence**
36:4,16 48:5

**concurring**
14:8

**concurs**
28:10 35:24

**conduct**
8:2 14:12
17:23 50:20

**conducted**
8:4,11 33:17

**conferred**
56:11

**confine**
55:3

**confused**
12:15

**consensus**
39:25

**considered**
7:13 11:17,18
12:7,10 13:17
16:5,7 22:2
27:19

**consistency**
54:1

**constituents**
37:5

**constructs**
11:13 45:25

**consult**
39:23 54:12
59:19,21 61:1

**consulting**
28:20 34:18
35:6

**consultive**
10:13

**contained**
22:16

**content**
19:2

**contents**
8:4 52:3

**contingent**
11:8 14:17
50:11

**continuation**
11:10

**continue**
42:2 54:13

**continuing**
9:15 43:24

**contracts**
22:21

**control**
9:10

**conversation**
54:14,23

**conversations**
33:13 57:23
59:6

**convicted**
5:21

**cool**
9:19

**copied**
40:21,24 50:7

**copy**
22:12 61:8

**corporate**
4:20 9:20

**correct**
8:9 10:1,23
12:20,22 15:4
16:9,21,22
17:1,2 18:11,
16,19 19:13
20:1,10 21:21
23:19 25:1
30:13,20
31:7,22 32:17
33:10,15
34:16 35:21
36:18 37:15
40:22 41:16,
21 44:7,11,18
47:1 48:1

Molly Brasfield
January 21, 2021

5

49:1,10,11
50:3,8 51:1,
6,16 52:2
53:8,10 56:20
57:10 59:1,
16,17 60:11

**correction**
21:10

**correctly**
10:23

**correspondence**
58:21 59:9

**counsel**
45:22,23
54:13,25 56:1
59:10 60:18,
21

**counseling**
51:11

**count**
18:15

**counts**
18:20

**cover**
17:5

**covered**
14:21 19:25
59:5

**create**
23:8

**credits**
8:19

**crime**
5:21

**Cross**
9:5

**Culver**
8:16

**current**
20:25 52:3
54:4

---

**D**

---

**dash**
15:10,11

**data**
23:7

**dated**
44:20

**days**
42:21 44:19
49:15

**deals**
26:15

**dealt**
24:25

**dean**
29:18 37:25
44:5

**decision**
24:16,22
28:1,19
31:11,13,18,
23,25 33:14
35:4 37:21
39:21 46:17
47:4 60:23

**decision-making**
10:13 34:18
37:11

**decisions**
34:12,15

**declined**
57:19

**deduce**
43:25

**deduction**
44:12

**deeper**
48:21

**degree**
8:15,17

**demotions**
52:24

**deposed**
4:15 7:25
8:3,9

**deposition**
4:11 9:25
10:3 25:4
40:15

**depositions**
5:2,6 7:16,22

**describe**
7:1 9:2

**describing**
16:4 41:13,19

**descriptions**
7:9

**desire**
39:9

**desired**
55:17

**detail**
18:23 29:9

**detailed**
15:14 18:24

**dialogue**
40:9

**difference**
11:2

**differentiate**
13:7

**dig**
48:21

**DIO**
29:24

**direct**
7:23

**director**
6:9,13,24
7:3,4 9:13,17
21:14 25:10
29:15,17
34:10,12
41:25 43:16,
18 44:2

**directorship**
32:4

**disagree**
47:5

**disagreed**
47:2

**disciplinary**
10:19 26:12,
25 27:15

**discipline**
40:5

**disciplined**
13:6

**disciplining**
20:6 23:21

**disclosure**
59:8

**discuss**
38:17 47:23
49:7,16 50:9

**discussed**
43:2 45:8,18
46:14 49:8
57:20 58:1,4

Molly Brasfield
January 21, 2021

6

discussion
47:19 49:18

discussions
55:4 56:1
60:13,14

displeasure
55:15

disruptive
50:20

dissatisfied
55:11

distinguish
32:7

dive
42:12

document
9:10 16:23
19:18 21:25
22:3 23:12,
23,24 24:2
25:5,7 31:3
48:13

documentation
24:5 28:4
47:9,11
48:15,25 49:3
51:4

documenting
19:4

documents
18:13 28:7
34:2 35:8,10
36:22

don'ts
5:5

dos
5:5

doubt
21:5

dozen
4:14

draft
59:18,20

drugs
5:24

dual
14:24 20:22

due
21:9

duly
4:2

---

**E**

e-mail
18:14 20:18
33:3,4,6 35:1
40:17,22,25
41:8,22 42:8,
19,22 43:14
44:15,19
49:6,14 50:2,
4,7,25

e-mails
18:7 19:7
33:24 40:15
47:10 48:13,
18

Earl
22:9 25:9
30:16,18
31:10 37:6
38:1,10,12,
16,25 39:2,5,
12,18,22 42:4
44:1,9,13
48:16 56:7
58:1

Earl's
10:3 25:4
40:14

earlier
41:19 49:8

easier
26:6

easy
6:2

education
9:15 19:17
29:19 44:5

educational
8:14

EEOC
24:8,19

efficiency
37:1

efficient
35:16

egregious
19:5 56:18
57:1

EHR
20:18

elicited
50:24

employed
9:4,7,11

employee
7:20 8:7 17:5
24:4,6 27:23,
24 28:9,10
29:14,15
33:5,25
34:10,11
35:11,22
36:10 37:2,9
38:2 40:8,10

41:2,6 43:9,
15

employees
15:15,19
17:22 19:8
34:5,13 55:10

employer
33:23

employment
4:17 6:6
10:11,14,16
11:8,12 13:17
14:9,17 15:23
16:7 17:20
20:12,16
22:25 24:19
26:15 31:14
32:8 45:25
50:10,11,18
51:18 52:23
54:4

employment/hr
22:3

encourage
19:1,6

end
41:25 43:13
49:12 57:21

ending
20:17

endorse
34:12

endorsed
35:12

endorsement
13:1

endorsing
40:8

enrolled
  14:18

enrollments
  22:19

ensure
  21:8 24:4
  34:2 35:12
  46:1

entered
  25:9

entire
  6:21 12:2
  37:3

entitled
  17:22

Epic
  20:18

escalated
  21:14 38:18

ESQ
  61:7,8

evaluation
  10:19 19:17,
  22 21:1

evaluations
  22:10,11,14
  25:25 26:1
  27:6

ex-husband
  8:23

EXAMINATION
  4:4

examine
  31:14

examined
  4:2

exception
  5:15

excerpt
  17:9,15 26:14
  52:12

excludes
  53:3

executive
  6:13,24 7:3

exhibit
  10:2 12:1
  16:18,20,24
  17:9,11
  19:14,16
  21:1,22,23
  23:10,12 25:3
  40:14,17 43:7
  44:25 52:11
  59:13,15

exhibits
  25:3

existence
  23:14

exists
  12:5 15:6
  16:13

expand
  58:18

expected
  42:14

explain
  11:2 14:14
  37:23

expressed
  33:13

extended
  9:13

extent
  38:4

---

**F**

facts
  44:8,22 50:23

faculty
  15:22,24
  16:6,20 17:3
  26:14 52:3,7
  53:3,15,17,25

fair
  9:25 17:3
  20:8 23:15
  42:5

fall
  7:10,13

familiar
  15:7,18 21:24
  28:23 42:10

family
  22:20

February
  40:18 41:22
  42:19,20
  43:14 44:23
  49:6 50:4,25
  59:24

feel
  28:7 57:4,7

feels
  42:1

felt
  38:17 40:11

field
  57:4,9

file
  22:16

fill
  22:24 23:5

final
  10:21 26:13
  27:1,17,24
  57:2

finance
  7:8

find
  55:12

findings
  8:13 14:6
  33:18 43:3,9

fixed
  54:1,2

follow
  20:5 22:6
  23:21 27:18,
  22,25

form
  18:3,6,10

formal
  10:20 19:7
  26:12 27:1,16
  36:3 38:7
  60:15

formal-formal
  48:12

formed
  11:6

forms
  18:7,9

formulating
  44:22

forward
  48:8

fourth
  17:21 44:25

frequently
  24:3

Molly Brasfield
January 21, 2021

8

**full**
4:6 17:13
34:3 44:1
52:15
**fully**
35:18
**future**
57:3

**G**

**gather**
35:7
**gathered**
42:17
**gave**
34:20
**general**
6:4 13:5
45:21
**Gilmore**
40:24 41:1
49:25
**give**
6:3 7:17
36:15 37:25
59:2
**globally**
55:3
**GME**
11:1 12:9,10
19:23 20:4
21:3,11 22:5,
23 23:20
24:25 28:23
29:12 30:3
37:25 41:19
51:9 52:2
53:4,23

**good**
6:2 28:17
43:22 53:13
**governed**
11:4,11
**governing**
30:4
**graduate**
19:16 29:19
44:5
**great**
5:18 42:1
**Greenwood**
29:13 32:5
35:5,10 49:25
**grievance**
15:13 16:11
19:17,23 53:6
**grievances**
52:20
**grieveable**
26:18,19
52:5,23 53:4,
18,24 54:7
**group**
9:8 14:3 54:3
**guarantee**
5:12
**guess**
17:20 40:16
43:22
**guidelines**
11:11

**H**

**hand**
23:11

**handbook**
15:14,18,23
16:4,6,20
17:3,19 26:15
52:4,8 53:3,
15,17,25
**handbooks**
11:16
**handed**
19:16 21:23
59:15
**handing**
16:19
**handle**
20:17
**handled**
14:3 39:17
**handling**
51:11
**happen**
5:13 33:2
**happened**
22:11,17
57:15
**happening**
46:3,4
**harassment**
57:6
**hate**
5:20
**head**
31:1
**health**
13:3
**hear**
36:20 57:16,
25
**hearing**

51:23 57:24
58:8,11,14,23
**helping**
32:6 58:10,13
**hey**
32:14 54:15
56:1,16
**hierarchy**
34:9
**highest**
34:9
**Highline**
9:11
**history**
6:4 8:14 9:3
**honest**
12:15
**hospital**
13:3
**hour**
45:16,17
**house**
7:12 10:21
11:6 12:4
13:2,15
14:17,20
15:3,5,12
16:11 20:14
27:6,10,15
**HR**
4:24 6:21
10:6 11:1,17
12:8,23 13:8,
18,21 14:21,
23 16:5,8
18:23 20:17,
23 21:2
22:12,13,16
23:18 24:5,

Molly Brasfield
January 21, 2021

9

12,14,21
25:25 26:7,
11,21 27:7,
10,14 28:18
29:1,3,13
30:6,10,15,
18,21 31:10,
12,14,17
37:22,24
39:7,20,25
42:14 45:11
46:15 47:3,8
49:10 50:15
53:7

**HRIS**
6:8

**Huh-huh**
5:7 43:5

**human**
6:9,13,16,18,
19 8:10,20
9:5,9 11:13
14:7 21:15
23:8 24:18
28:6,11
29:10,11
33:24 38:11,
13,17,18
45:10 47:6

---

**I**

---

**idea**
55:22

**identification**
12:1 16:18
19:14 21:22
23:10 59:13

**identify**
59:8

**identities**
10:11

**Illinois**
8:18

**imagine**
19:8 33:12

**incidents**
24:10

**include**
33:19 50:6
53:1

**included**
24:3 38:16

**including**
10:11 11:5
18:7 52:24

**inconsistent**
53:25

**Incorporated/ces**
9:8

**independent**
14:2 39:21
48:14

**independently**
42:15

**indication**
48:7

**individual**
10:12

**individual's**
10:15

**individuals**
30:10 37:20

**info**
35:23

**informal**
10:20 18:14

26:12 27:1,16
48:5,11

**information**
24:3 35:14
38:15 41:11
42:16 46:24
51:5

**initial**
17:19 36:19
41:13

**initially**
35:8

**input**
57:18

**inquiring**
54:24

**inquiry**
14:12 21:11,
17

**inside**
46:1

**insinuate**
12:21,22

**instance**
13:11 18:11
19:4 24:7

**institution**
30:25 37:3

**institutional**
7:7 29:19,21

**instructed**
57:11

**insurance**
24:7

**interacted**
8:6

**interest**
55:11,17

**interim**
6:15

**internal**
33:16

**internally-used**
18:7

**interpose**
59:4

**interpretation**
12:25

**interrupt**
25:14

**investigating**
7:24

**investigation**
8:4,11 33:17
48:14

**investigations**
8:2 14:2

**involved**
12:24 20:9,13
22:13 28:19
29:2 31:23,25
32:4 34:4,15
35:3 36:11,
15,19 37:21
38:4 42:12,13
47:19 51:3
58:10,13

**involvement**
20:10 51:24

**issue**
14:20 19:3
21:13

**issues**
26:16,18
41:18 45:12
48:13 49:13
52:4,22 60:4

Molly Brasfield
January 21, 2021

10

**items**
45:18 58:18

**J**

**Jackson**
9:6,17,18

**Jamie**
45:21 51:12

**January**
25:10 45:1

**jerk**
5:9

**job**
6:4 7:21
18:18 34:16

**Joey**
4:9

**Johnny**
40:24 41:1
49:25

**July**
59:24

**K**

**keeping**
36:10

**kill**
17:13

**killing**
17:12

**kind**
5:5 6:4 7:1
20:22 22:18
32:2 37:19
40:16 48:11

**kinds**
35:17

**knowledge**
12:5 28:24

**L**

**labels**
15:10

**lacking**
33:21

**lane**
13:15 46:2

**lanes**
50:13

**lapse**
44:19

**late**
19:11

**lead**
17:24

**leader**
7:5 21:7
29:16 38:3

**leaders**
11:12 12:12,
19,24

**learning**
9:13

**leave**
22:20

**led**
31:20

**legal**
45:23 46:2
51:10 54:13
55:2 59:19
60:3,17 61:1

**lending**
45:24

**lengthy**
9:24

**letter**
12:14 25:8
59:15,18,23
60:1,8,21

**level**
19:3 21:16
36:7,12

**liability**
42:1

**lieu**
47:18 51:20
55:19 56:19

**list**
28:18,22
37:20

**listed**
31:5 45:18

**listing**
30:6

**locally-used**
18:12

**logistics**
20:16

**long**
5:18 45:14
59:25

**lose**
25:19

**M**

**made**
31:14 32:21
36:18 37:14
39:12 53:23
54:25 55:5
58:25 60:14,

23

**make**
5:10,12 8:1
10:4 21:3,10
26:5,22 27:25
31:11,13,21
32:18,25 36:3
38:7 39:2,20
41:14 42:15
43:8 46:17
55:18 57:11

**maker**
47:4

**makers**
31:18

**makes**
6:2 35:23

**making**
28:20 31:25
37:5,6 38:2
40:1 44:16
46:8 48:10
50:5

**manageable**
37:5

**management**
8:20 9:10
23:9

**manager**
6:8 27:23
28:3,12 30:16
36:9,18,23
38:3 42:17

**manager's**
32:24

**managers**
18:5 19:1

**manual**
12:4,6 15:5

**March**
  60:8
**Mark**
  30:16 38:1
  44:1 51:12,
  14,17,24
  57:11
**marked**
  10:2 12:1
  16:18 19:14
  21:22 23:10
  59:13
**master's**
  8:17
**match**
  19:1
**matched**
  23:4
**matching**
  23:3
**math**
  60:9
**matter**
  13:18 38:10
  39:16 47:6,10
  51:18 54:24
**matters**
  59:7
**meant**
  44:13
**medical**
  15:15,19 17:5
  19:17 22:20
  29:19 34:13
  44:5 57:3,9
**medication**
  5:24
**medicine**
  5:24 43:17,18

  44:3
**meet**
  38:16 55:16
**meeting**
  7:20 28:13
  36:19 38:20,
  21,22,24 43:1
  45:1,4,8,9,14
  46:4,7,14,20,
  22 48:2 49:21
  50:9
**meetings**
  34:1 42:24
  45:16,24
**members**
  28:23,25 31:2
**memo**
  19:4
**memory**
  5:25 28:24
**memos**
  18:11,12 19:8
**mentioned**
  32:6 51:2
  54:9
**mentioning**
  58:24
**met**
  4:8 47:22
**mind**
  16:15 18:14
**mine**
  46:18
**minute**
  47:20
**minutes**
  19:11 20:21
  45:16,17

**misconduct**
  57:5
**mission**
  7:6,7,14
  11:12
**Mississippi**
  8:22 9:6,16,
  18
**Missouri**
  9:7
**Molly**
  4:1,7
**moment**
  4:8 27:21
**Monday**
  50:4
**months**
  6:7 59:25
  60:9
**Morgan**
  4:4,9 12:2
  16:19 17:10,
  16 19:15
  21:23 23:11
  29:7 37:19
  41:4,5 50:1
  51:21 52:21
  54:20 55:7
  59:14 61:2,7
**mouth**
  33:11
**music**
  9:17
**mutually**
  55:13

                N

**named**

  35:3
**names**
  30:9 31:3,4
  37:20
**nature**
  32:13
**necessarily**
  32:15 49:10
**needed**
  20:12 36:23
  38:11,18
  46:15
**negative**
  5:8 43:5
**Noted**
  61:5
**notes**
  19:5
**notice**
  9:25 17:22
  18:1,3,6,15
  19:2
**notification**
  28:13
**notifying**
  7:20
**number**
  5:20,23 28:18
  52:11
**nutshell**
  19:21

                O

**object**
  51:13 59:11
**objection**
  59:5

Molly Brasfield
January 21, 2021

12

occasion
  33:23

occupation
  9:8

occur
  13:9 22:12
  36:17 42:12

occurred
  34:3 48:2

October
  6:10

offended
  5:14

offense
  40:3

offer
  51:19 54:9,
  16,25 55:4,8
  56:2,17,19
  57:8,12,16,18
  58:24

offering
  47:17

office
  12:9 19:23
  20:5 21:3
  22:6,23 29:13

office's
  21:11

officer
  6:16,18,20
  7:12 13:16
  14:17,21 15:3
  16:11 20:15
  29:20,21

officers
  10:21 11:6
  13:2 27:6,11,
  15

official
  23:4

officials
  13:2

one-on-one
  42:24 43:1

operation
  12:24

operational
  12:12,19 13:2

opinion
  34:20 36:6,24
  44:23

opportunities
  57:3

opportunity
  33:22

opposing
  54:25

option
  47:18 51:19
  55:19

order
  23:8 25:19
  35:14 47:16

organizational
  8:20

original
  43:14 57:12
  59:16 61:7

originally
  48:16

outcome
  55:16,17 57:2

outcomes
  55:11

overarching
  39:5

overlapping
  13:24

override
  47:4

overseeing
  6:20

oversight
  33:20 38:1

—————————

P

pack
  24:3

packet
  24:17 28:7
  32:3

pages
  12:3 17:17

Pam
  29:13 32:5
  34:5 35:5,10,
  21,23 36:1,13
  40:10 41:9,13
  42:20 47:22
  49:9,25

Papin
  4:10 15:10
  19:25 22:7,
  11,15 25:10,
  12,24 28:15
  30:17 31:5,18
  32:19 37:22
  39:10,13
  47:17,22
  50:14 51:19
  54:10 57:8,25
  59:24

Papin's
  28:21 43:15
  51:9 54:14

55:15,20
57:12 59:16
60:4,18

paragraph
  15:12 41:24
  44:20 45:7
  60:20

paragraphs
  50:24

part
  22:18 33:15
  40:9 54:12
  55:14,17
  58:20,22

participate
  60:22

partner
  7:5 8:10
  28:6,12
  29:12,14
  32:6,12 33:5,
  16,17,21,25
  36:5,8,21
  37:4 41:2,6
  42:14,16
  48:20

partners
  42:25 49:22,
  24

Pat
  29:10,16
  32:23 33:6
  34:5 35:7,11,
  20,25 36:3,
  15,19 37:8
  39:1,16,17
  40:7,18 43:1
  46:18,20
  47:22 48:8
  50:24

Molly Brasfield
January 21, 2021                                                                                    13

Pat's
  43:14
Pat/molly
  50:5
pausing
  8:1
pending
  5:16
people
  29:2 35:3
  50:2
Perfect
  5:23
performance
  10:18 19:3,5
  22:14 25:24
  26:1,16 27:5
  39:11 45:12
period
  17:20 60:3
person
  7:24 28:19
  35:10 38:6
perspective
  45:11 46:2
piece
  35:22 57:24
  58:3
pieces
  29:1
place
  34:11 38:21
plaintiff's
  10:14,16,22
plan
  49:16
played
  10:12

point
  11:20 21:6
  24:24 43:4,10
  53:20 60:12,
  13
points
  23:7
police
  7:8
policies
  4:20 10:6,17
  11:16,24
  13:8,23,24
  14:22 15:24
  21:4 25:23
  26:4,7,11,24
  27:5,9,14
  30:3,4 32:7,
  8,9 41:19,20
  50:10,11,15,
  16,18 52:2
  53:5 54:4,5,6
policy
  12:8,10 13:1,
  17 14:5,14
  16:5,7,11,12,
  16 19:17,22
  20:2,9,11
  21:1,12
  23:16,18
  32:15 39:11
  45:12 51:10
  52:10,12,14,
  20 53:13,22,
  23
poor
  18:18
pose
  36:22
posed

37:8
position
  6:11,12,18,19
  7:4 10:12,22
post-master's
  8:18
potential
  45:12 55:16
practices
  27:18
preferred
  5:6
preliminary
  10:20 26:13
  27:1,16 28:6
preparation
  47:14 57:23
  58:4,7,20
prepare
  58:10
prescriptive
  18:6
print
  17:11 52:18
prior
  4:24 7:4,15
  8:24 9:2,4,6,
  10,16 22:17
  24:10 48:5
privilege
  54:23 55:3,6
privileged
  59:7,11
pro
  5:2
probation
  23:25

problems
  17:23 52:19
procedure
  13:13 14:5
  20:11
procedures
  10:17 11:25
  15:14 25:23
  26:7,11,25
  27:5,10,14
proceedings
  16:14
process
  11:7 21:9
  27:20,22,25
  28:2,14 29:6
  33:16 34:11
  35:15 37:1
  41:12 46:25
  47:15 58:9,
  14,22,24
produced
  17:14
professional
  36:6,24
professionally
  8:24
profile
  23:8
program
  7:10 9:14
  11:9,10 14:19
  21:14 23:3
  24:17 25:9
  30:2 32:4
  42:1 44:2,3
  50:12
programs
  7:13 11:4,6

Molly Brasfield
January 21, 2021

14

progressing
13:12

prompt
5:9

property
20:19

propose
51:17

protocol
23:22

provide
35:14 55:18

provided
52:13

providing
48:20 51:5

psychology
8:16,17

published
12:9

publishes
19:23

pulling
51:4

punitive
19:10

purely
43:23

purposes
24:5

purview
21:8

put
25:18 33:11
35:8

putting
48:8

— Q —

qualify
13:21

quality
9:10

question
5:11,15,16
13:10 26:10,
22 27:13
46:8,12 53:13

questions
5:19 25:16
27:3 32:5,11
34:2 35:13
36:22 37:8
41:11 48:24
49:5,8 51:17,
24 52:19
60:5,6 61:3,4

— R —

rationale
13:11 36:20

Ray
51:12,14,25
57:11

read
10:9,10,23
42:7 48:22

reading
23:13 25:15
49:7

real
21:19 29:25

reality
14:15,16

reasons

20:7,15 24:21

recall
8:3 23:13
24:14,15
25:6,11,13
31:3 38:19,25
39:4,9,12,15,
17 45:4,8,15,
20 46:4,7,10,
11 47:12,13,
16 49:5,20
59:22

receipt
60:8

receive
24:6

received
35:13 46:24
57:18

receives
36:5

receiving
19:8

recitations
48:17

recognize
12:4

recollection
60:2

recommendation
32:18,22 33:1
35:24 37:14
38:8,13 39:3,
13 40:1 42:15
43:16 44:16
48:11

recommendations
8:13 33:18
43:3,9

record
4:6 5:11
10:10 15:3
37:18 54:18,
21,23 59:12

recorded
47:21

refer
12:6 21:7
28:22 31:2
47:6 52:7

reference
45:1 53:23
59:6

referenced
51:9

references
16:10

referencing
16:24

referred
38:11,12
57:22

referring
43:19,25
53:14

reflect
53:5 54:4

regard
52:4

regular
6:12

relate
27:6

related
4:17,18 11:7,
13 12:23 14:9
15:24 20:12,
16 26:15 29:1

31:15 32:9
45:25 49:9,10

**relates**
10:6

**relating**
26:11 27:10,
15

**relations**
24:4 28:9,10
29:14,15
33:5,23,25
34:10,12
35:11,22
36:10 37:2,9
40:9 41:3,6
43:10

**relying**
48:17

**remain**
57:9

**remained**
6:10

**remains**
53:17

**remark**
10:3

**remediated**
24:1

**remediation**
10:19 26:8
27:11

**remember**
46:3,6,13
49:2,18 52:14
56:12

**rephrase**
5:13

**report**
21:15

**reported**
13:16 14:7
31:16

**reporting**
41:2,6

**reports**
36:1

**represent**
4:9

**representative**
9:20

**request**
28:3,5,8
31:14 32:24
35:9 36:5,19,
20 37:7,17
38:1,2,16,20
39:7 47:15
51:3,8

**requested**
24:12 45:10
54:17

**requesting**
24:2

**requests**
22:19 27:23
37:2

**require**
13:24

**reread**
26:22

**research**
6:10,14,25
7:6,14 29:17

**reside**
50:13

**residencies**
29:23

**residency**
7:10,12 11:4
30:2

**resident**
13:12 15:3
22:15 23:21
24:20 44:2

**residents**
13:5 19:24
20:6 22:7

**resign**
47:18 51:19

**resignation**
54:9,16 55:8,
23 56:17,19
57:8,16 58:3,
25

**resigning**
55:19 58:1

**resource**
6:20

**resources**
6:9,13,16,18
8:10,20 9:5,9
11:14 14:7
21:16 24:18
28:6,11
29:10,11
33:24 38:11,
13,17,18
45:10 47:7

**respective**
31:1

**responded**
41:17 49:14

**responding**
24:18

**responds**
41:9 42:20

**response**
5:7,8 42:22
43:5 60:15

**result**
20:11

**retained**
22:23

**review**
14:8,23 20:23
21:2 24:4,13,
15,21 27:25
28:5 32:3,16,
25 33:20
35:11,15
36:12 41:13,
15 42:9,15
46:16 47:3,7,
8,9,25

**reviewed**
8:12 35:18
38:10 47:12,
14 48:4

**reviewing**
21:3 23:14
39:21 44:22
47:13,16

**reviews**
35:17 37:2

**Rick**
29:18

**rights**
15:13

**role**
4:24 6:15
10:13,15
28:20 29:17
34:19 37:6,
11,23 51:7
55:9

Molly Brasfield
January 21, 2021

16

roles
  6:17

rudimentary
  23:6

rules
  10:17 11:11,
  24 25:23
  26:6,10,24
  27:4,9,14

Ryan
  4:9

**S**

sanction
  14:9 36:7,24
  39:10

sanctions
  38:3

sand
  56:15

satisfactory
  14:18

satisfied
  48:23

save
  35:19

scenario
  55:14

scheduled
  45:16

School
  43:16,18 44:3

science
  8:17

scope
  29:1

Seattle
  8:19 9:12

section
  52:22

seek
  39:25 45:11

select
  12:3

selected
  28:25

selection
  11:5,9

send
  59:25

senior
  41:1,5

sense
  5:12

sentence
  43:24

separate
  16:10 24:6

separately
  24:24

September
  6:11

series
  40:15

served
  6:16

service
  6:14 7:7
  29:13 32:5,11
  41:1,5 49:22,
  23

serving
  29:16

set
  55:13 58:13

several-page
  19:4

severe
  19:6

sexual
  57:5

share
  29:1

shared
  24:18 28:9

Shield
  9:5

show
  10:4 25:2

side
  11:1 24:25
  25:25 26:7,
  11,21 27:7,
  10,15 28:18
  29:4,10 30:6,
  7,14,15,21,23
  31:8,11,12,17
  37:24 40:9
  53:7,9 58:4

sides
  29:8

SIGNATURE/NOT
  61:6

signs
  22:21

similar
  4:19 34:19,22

simple
  18:17

simultaneously
  6:15

sir
  6:22

sitdown
  34:1

situation
  20:21 38:7
  46:9 47:23

situations
  14:1

skills
  44:12

small
  18:24 37:4

solution
  51:18

sort
  4:21 5:24
  17:4 27:4
  34:17,19
  35:20 41:12
  42:22 55:14
  56:4

sound
  5:1

sounds
  34:20

speak
  50:6

specific
  11:7 18:2,3
  25:6 45:20

specifically
  9:23 26:1
  39:4,18 46:10
  50:19 56:12

speculate
  43:20

speculative
  43:23

spirit

Molly Brasfield
January 21, 2021

17

19:3 37:1

**Springfield**
9:7

**staff**
12:4 15:5,13,
23,25 16:6,20
17:3 26:14
52:3,7,20
53:3,15,17,25

**stamped**
31:5

**stamps**
15:10

**start**
46:25 54:15

**started**
6:6 40:7

**starts**
35:20,23

**state**
4:5 8:18

**stated**
39:5

**statement**
47:22 48:4

**states**
60:21

**status**
43:2

**staying**
46:1

**step**
6:23

**steps**
16:14 42:11

**Steve**
30:25 58:7

**Stockton**
8:16

**stop**
43:17

**stuff**
22:17

**subject**
59:7

**submitted**
35:12

**subsequent**
37:10 57:22

**subsequently**
46:24

**subset**
7:1 37:4
52:19

**successful**
11:9

**successfully**
24:1

**sufficient**
28:7 49:4

**suggested**
38:10

**suggests**
44:20

**summary**
48:19 49:4

**supervisor**
8:12

**supplied**
28:4 32:3

**support**
12:11 28:5,8
32:23 33:7,14
35:9

**supported**
7:6

**surgery**
44:2

**suspended**
13:6

**suspending**
20:5

**suspension**
13:14 23:24
24:11 40:5

**suspensions**
52:24

**swim**
13:15 50:13

**sworn**
4:2

**system**
13:4 23:9

---

**T**

**taking**
26:5 38:21

**talk**
33:22 56:7,10

**talking**
20:21 27:20
58:23

**talks**
17:19,20 36:9

**team**
7:5 20:13,17
28:9,10 33:5,
25 34:1 35:11
36:10 37:2,9

**templates**
18:4

**tend**
19:1 42:13

**terminable**
40:3

**terminate**
24:17 31:18
32:24 34:13
36:6 37:21

**terminated**
20:15 39:14
50:15,16,17
59:24

**terminating**
20:6 32:19

**termination**
10:14,15
17:24 22:17
24:2,11 27:23
28:13,21 33:7
34:21 35:9
37:16 38:14
39:3 40:6,12
42:5 43:15
44:24 47:18
48:6 51:20
53:2,7 54:7
55:19 57:2

**terminations**
52:25 53:4,
18,24

**terms**
6:25 14:18
55:13 60:4

**testified**
4:3 22:10

**testify**
9:23 10:5,25
29:3 51:15

**testifying**

Molly Brasfield
January 21, 2021
18

4:19

**thing**
5:4 17:10,11
18:10 25:15
52:18

**things**
4:20 11:1,2
22:10

**thought**
53:20

**time**
4:23 6:12
19:12 25:11
26:5 29:16
35:16,19
36:16 37:1,13
42:5 44:19,21
47:13,16 49:7
50:5 51:11
53:6 54:25
60:3 61:5

**times**
4:13 23:24
24:15

**title**
6:7,12 17:4
43:20 44:2

**today**
7:11 9:19
47:14

**told**
57:14

**Tommy**
5:4

**topic**
28:18 58:21

**topics**
9:24 10:5

**totally**
15:2

**trainee**
49:13 50:12

**transition**
28:17

**transitioned**
6:8

**Traxler**
48:2

**trees**
17:12

**tricky**
49:13,15

**trigger**
56:24

**trust**
42:17

**trustworthy**
48:9

**turn**
17:16

**two-page**
25:8

**two-step**
27:20

**type**
4:15 7:16
18:2,10 19:2

**types**
48:18 49:13

**typical**
22:16 28:2
56:13

**typically**
14:4 21:13,15
33:4 38:2
45:15,22

56:11

---

**U**

**uh-huh**
5:7

**ultimate**
31:18

**ultimately**
31:20 34:8
40:2 57:14

**UMC**
4:10 6:5

**UMMC**
4:24 6:6,21
7:24 8:25
9:4,21 10:16
11:8 19:16
20:18 23:5
34:6 45:22
51:10 54:12
59:19 60:3,17
61:1

**unaware**
54:8

**unclear**
14:11

**uncomfortable**
57:4

**understand**
9:19 52:17

**understanding**
34:3 55:15,20
60:17

**Understood**
21:18

**undertaken**
28:14

**unemployment**

24:7

**unhelpful**
43:21

**University**
7:2 8:18,19
13:16 59:10

**unwritten**
10:18 27:4,9,
14,19

**update**
52:2

**upline**
8:11 29:16
38:3

---

**V**

**verbal**
33:12 34:24,
25 39:2

**verbally**
34:21

**version**
17:14

**versus**
11:1 32:8
50:10

**vice**
30:24

**violated**
13:16

**Violating**
14:25

**violation**
14:24 20:22,
25 21:12

**violations**
39:11 45:13
50:18

Molly Brasfield
January 21, 2021

19

virtue
  45:21

**W**

wait-and-see-
what-happens
  42:23
WAIVED
  61:6
waiving
  55:2,5
walk
  32:2 55:7
wanted
  39:13 42:5
warning
  19:12 27:24
warranted
  14:10 36:25
  47:7
warrants
  47:3
Washington
  8:19 9:12
ways
  55:16
Webco
  9:8
weekly
  42:24
whatnot
  11:17
whatsoever
  46:13
wheelhouse
  32:13
WHITFIELD

  17:8 29:5
  51:13 52:15
  54:18,22 59:4
  61:4,8
Whitlock
  29:11,16
  32:23 35:7
  39:1,16 40:8,
  18
Whitlock's
  50:25
Woodward
  30:24
word
  39:24 56:15
words
  33:11
work
  8:24 9:2 13:3
  17:23 36:23
  59:21 60:5
worked
  32:2
working
  60:3
workload
  37:5
works
  14:15,16
  21:19 36:9
world
  21:19 29:25
writeup
  18:10,11
writeups
  19:9
writing
  38:19

written
  10:17 17:22
  18:1,2,6,15
  19:2,12 25:22
  26:6,10,24
  27:24 53:18
wrong
  12:22

**Y**

yesterday
  10:2 22:9
  25:3 40:14