EXHIBIT "O" - Dyse Deposition

Joseph Papin

*vs.*

University of Mississippi Medical

Deposition of:

KISHA DYSE

November 16, 2020

Vol 01



PHIPPS REPORTING

*Raising the Bar!*

Kisha Dyse
November 16, 2020

```
 1            IN THE UNITED STATES DISTRICT COURT
         FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
 2                     JACKSON DIVISION


 3

    JOSEPH PAPIN
 4                                           PLAINTIFF

 5

    V.           CIVIL ACTION NO. 3:17-CV-763-CWR-FKB
 6

 7   UNIVERSITY OF MISSISSIPPI
     MEDICAL CENTER; DR.
 8   LOUANN WOODWARD, IN HER
     OFFICIAL CAPACITY; AND
 9   DR. T. MARK EARL, IN HIS
     INDIVIDUAL CAPACITY
10                                          DEFENDANTS

11

12              DEPOSITION OF KISHA DYSE

13

14   Taken at the instance of the Plaintiff at via Zoom
               Teleconference, on Monday,
15                 November 16, 2020,
                beginning at 2:00 p.m.
16

17

18

19

20

21

22

23

24              REPORTED BY:

25         ROBIN G. BURWELL, CCR #1651
```

Kisha Dyse
November 16, 2020

Page 2

```
 1    APPEARANCES:

 2

           JOLIE N. PALVOS, ESQ.
 3         C. RYAN MORGAN, ESQ.
           Morgan & Morgan
 4         20 North Orange Avenue, Suite 1400
           Orlando, Florida 32801
 5         rmorgan@forthepeople.com

 6

 7              COUNSEL FOR PLAINTIFF

 8

 9         TOMMY WHITFIELD, ESQ.
           Attorney At Law
10         660 Lakeland East, Suite 200
           Flowood, Mississippi 39232
11         tommy@whitfieldlaw.org

12

13              COUNSEL FOR DEFENDANT

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 3

```
 1                          INDEX
```

```
 2    Style and Appearances.......................1

 3    Index   ...................................3

 4    Certificate of Deponent  ..................76

 5    Certificate of Court Reporter ............77
```

```
 6                       EXAMINATIONS
```

```
 7    Examination By Mr. Morgan .................4

 8    Examination By Mr. Whitfield ..............72

 9    Examination By Mr. Morgan .................74
```

```
10                        EXHIBITS
```

```
11    Exhibit 1 Nov. 15 Consult ................30

12    Exhibit 2 Nov. 30 Consult ................36

13    Exhibit 3 Dec. 9 Consult .................42

14    Exhibit 4 Dec. 22 Consult ................48

15    Exhibit 5 Dec. 22 Papin Note .............56

16    Exhibit 6 Dec. 23 Carroll Note ...........58

17    Exhibit 7 Dec. 23 Op Note ................60
```

```
18

19

20

21

22

23

24

25
```

Kisha Dyse
November 16, 2020

Page 4

```
 1                  KISHA DYSE,
 2   having been first duly sworn, was examined and
 3   testified as follows:
 4   EXAMINATION BY MR. MORGAN:
 5        Q.   If you could, please state your full
 6   name for the record?
 7        A.   My name is Kisha, K-I-S-H-A, Lashawna,
 8   L-A-S-H-A-W-N-A, and my last name is Dyse,
 9   D-Y-S-E.
10        Q.   We met just a moment ago.  But my name
11   is Ryan Morgan, along with Jolie Pavlos on the
12   screen there as well, we represent Joseph Papin in
13   regards to a claim he has brought against the UMMC
14   entities and others.
15             Is this your first deposition?
16        A.   No, sir.
17        Q.   How many other depositions have you
18   given before, ballpark?
19        A.   I have had one before now.
20        Q.   Okay.  What type of case did you have to
21   give a deposition in?
22        A.   It was a case concerning a child that
23   was injured in a behavioral health facility.
24        Q.   Ballpark, how many years ago was that?
25        A.   That was 20 -- I believe it was 2010.
```

Kisha Dyse
November 16, 2020

Page 5

1        Q.    I'll go over it since it's been a little

2    while for you, and I'm sure probably Tommy

3    reiterated some of these grounds rules that

4    lawyers always like to give at the beginning of

5    depositions.

6        A.    Yes, sir.

7        Q.    Particularly true when we're doing it

8    this way on Zoom is to make sure that we take

9    turns responding.  Let me ask my question and I

10   have to let you, because I'm totally guilty of it

11   myself, of letting you finish your full answer.

12   That way Robin, the court reporter, can type out

13   everything and know exactly who is saying what.

14   Okay?

15       A.    Yes, sir.

16       Q.    Yes or nos are preferable to uh-huh

17   (affirmative response) or huh-huh (negative

18   response.)  It happens every deposition and I'll

19   just say hey, is that a yes or a no, just to make

20   sure the record is totally clear.  Okay?

21       A.    Yes, sir.

22       Q.    If I ask a question that just does not

23   make sense to you, please ask me to rephrase.  It

24   does not offend me at all.  You're an expert in

25   this field, I'm not.  So if something just doesn't

Kisha Dyse
November 16, 2020

Page 6

1    make sense, let me know.  Okay?

2        A.   Yes, sir, I will.

3        Q.   If you need a break at any point let me

4    know as well.  I usually break every hour give or

5    take anyways to stretch our legs.  But if you need

6    one for some reason, no problem, just let me know.

7        A.   Okay.  I will.

8        Q.   Other than the deposition that you were

9    describing a moment ago, have you ever testified

10   under oath in any other capacity?

11       A.   No, sir.

12       Q.   I have to ask this question -- two

13   questions to each person, so I apologize in

14   advance.

15       A.   Okay.

16       Q.   Number one is have you ever been

17   convicted of a crime before?

18       A.   No, sir.

19       Q.   Number two is are you on any sort of

20   medications or drugs that could impair your

21   ability to remember facts and things that happened

22   years ago?

23       A.   No, sir.

24       Q.   Makes it easy.  Good.  For this

25   deposition I don't want to know any sort of

Kisha Dyse
November 16, 2020

Page 7

1   substance that you spoke about with Tommy, but I

2   would assume you spoke with Tommy about this

3   deposition; is that correct?

4           MR. WHITFIELD:  Ryan, we lost you for

5   about 10 seconds there.

6           MR. MORGAN:  Sorry, can you hear me now?

7           (Off the record discussion)

8       Q.   (By Mr. Morgan)  Ms. Dyse, what I had

9   asked you was, I don't want any substance of your

10  conversation you had with Tommy, but I would

11  assume you spoke with Tommy about this deposition;

12  is that correct?

13      A.   Yes, sir.

14      Q.   How many times did you speak with Tommy

15  about this deposition?

16      A.   One time.

17      Q.   And when was that?

18      A.   I don't remember the date.

19      Q.   Was it last week or before that?

20      A.   It was before last week.

21      Q.   Okay.  Approximately how long was your

22  conversation to prepare for the deposition?

23      A.   I would say approximately one hour.

24      Q.   Did you speak with anybody else besides

25  Tommy regarding this deposition today?

Kisha Dyse
November 16, 2020

Page 8

```
 1        A.    No, sir.
 2        Q.    Did you review any documents to prepare
 3    for this deposition?
 4        A.    Yes, sir.
 5        Q.    What documents did you review?
 6        A.    My charting.
 7        Q.    Would that be the charting for the
 8    patient with the decubitus ulcer that we're going
 9    to be discussing?
10        A.    Yes, sir.
11        Q.    Any other documents that you reviewed
12    besides those?
13        A.    No, sir.
14        Q.    A couple of kind of background
15    questions, Ms. Dyse.  Are you married?
16        A.    Yes, sir.
17        Q.    How long have you been married?
18        A.    I've been married for 19 years.
19        Q.    Do you have any children?
20        A.    Yes, I do.
21        Q.    How old are they and what are their
22    genders?
23        A.    I have a 12-year old daughter and I have
24    a 17-year old son.
25        Q.    Where do you live?
```

Kisha Dyse
November 16, 2020

Page 9

```
 1        A.    I live in Brandon, Mississippi.
 2        Q.    If you could, walk me through your
 3   education background starting with high school up
 4   through present?
 5        A.    Okay.  So I graduated from high school
 6   in 1994 from Wingfield High School.  I then
 7   attended Hinds Community College.  I obtained my
 8   associate's degree in nursing.  I went back to
 9   school and obtained my bachelor's degree in
10   nursing from Alcorn State University.  And I
11   received my -- I have two wound care
12   certifications.  My first certification I obtained
13   in 2012, and my second wound care certification I
14   received in 2016.
15        Q.    Do you have any master's degrees?
16        A.    No, sir.
17        Q.    For the first wound care certification
18   in 2012, if you could, just walk me through the
19   process to get that certification?
20        A.    That process is I went to a five-day
21   course -- a five-day curriculum and I sat for a
22   national exam.
23        Q.    And is there a name for that
24   certification?
25        A.    It's just called wound care certified.
```

Kisha Dyse
November 16, 2020

Page 10

1    Yes, sir.

2          **Q.    What about the 2016 one?**

3          A.    That one is a wound ostomy and

4    continence nurse.  That one I went to nine months

5    of school and then I had clinicals, and after that

6    I had to take a national exam.

7          **Q.    When you say nine months of school, was**

8    **that a certain number of hours per week or are**

9    **you --**

10         A.    Actually, the school is a three-month

11   course for wound certification.  It's a

12   three-month course for ostomy and it's a

13   three-month course for continence.  But when you

14   get the certification, they're all combined

15   together.

16         **Q.    But during the regular schooling time,**

17   **is it an everyday schooling type thing?**

18         A.    It's online so you don't go every day.

19   You just have to have your casework finished by a

20   certain amount of time during that week.

21         **Q.    I'm trying to get sort of a flavor of**

22   **how rigorous this is.  Is this something that**

23   **you're doing 10 hours a week to study for, more or**

24   **less?**

25         A.    I wouldn't say 10 hours a week.  I would

Kisha Dyse
November 16, 2020

Page 11

```
 1    say -- I'm not sure, sir.  That's been awhile ago
 2    so I'm not sure how often I studied.
 3         Q.    Fair to say, though, you were doing this
 4    studying in addition to your regular full time
 5    job?
 6         A.    Yes.  Yes, sir.
 7         Q.    So it wasn't like you stopped working,
 8    went to the schooling for nine months and then
 9    came back?
10         A.    No, sir, I worked while I was
11    employed -- I worked while I was in school.
12         Q.    Do you have any sort of continuing
13    education that you have to comply with?
14         A.    No, sir.
15         Q.    So, we have your AA degree, your BA
16    degree, the two wound care certificates.  Any
17    other designations by your name or certifications
18    that you have received?
19         A.    Well, I'm continence certified and
20    ostomy certified.
21         Q.    So those are two separate ones from the
22    two wound care ones?
23         A.    Yes, sir.
24         Q.    So, in total you would have four
25    certifications?
```

Kisha Dyse
November 16, 2020

Page 12

1       A.    Yes, sir.

2       Q.    **What is ostomy?**

3       A.    Ostomy is people who have ileostomies,

4   colostomies or urostomies.  We take care of those.

5   That's when a person has a diverting surgery.  So,

6   say for instance the person would have a cancer or

7   something and they are no longer able to urinate

8   or defecate through the anus or the urinary

9   organs, so that person would have a stoma placed

10   on their abdomen and that's where they would

11   defecate or urinate.

12      Q.    **For the record, what is wound care?**

13   **When you say wound care, what do you mean by that?**

14      A.    Can you clarify that for me?

15      Q.    **Yes.  You were talking about you were**

16   **having wound care certificates and were talking**

17   **about that you're a wound care nurse and all that.**

18   **Just generally speaking, what does wound care**

19   **mean?**

20      A.    Wound care means an opening in the skin,

21   a break in the skin, and from there we would take

22   care of that or write recommendations for it.  I

23   guess you would say any break in the skin that's

24   not normal.  Your skin has broken down in some

25   way.

Page 13

1      Q.   I know what incontinence is, but can you

2  just explain that for the record.  I just want to

3  make sure you and I are on the same page about

4  things?

5      A.   Yes, sir.  Incontinence is when a person

6  can't control their bladder or bowels.

7      Q.   When you're working -- let me clarify,

8  are you still currently employed by UMMC?

9      A.   Yes, sir.

10      Q.   What is your position?

11      A.   I'm an internal stomal therapist.

12      Q.   What does that mean?

13      A.   That's a wound care nurse, a nurse that

14  specializes in wounds, ostomies and continence.

15      Q.   How long, ballpark, have you been in

16  that position?

17      A.   I started at UMC in February of 2016.  I

18  stopped working there in 2018, and I just started

19  back October 5th of this year.  So October 5th,

20  2020.

21      Q.   What was the reason for the gap in

22  employment with UMC?

23      A.   I took another position, a consulting

24  position at a nursing home.

25      Q.   So the -- were you in the same position

Kisha Dyse
November 16, 2020

Page 14

 1    the first two years from 2016 to 2018 that you are

 2    now?

 3         A.   Yes, sir.

 4         Q.   A moment ago you stated that there was

 5    no continuing education that you have to comply

 6    with for your license or anything like that.  Is

 7    there any sort of like established treatises or

 8    textbook or literature that you would consider or

 9    that the wound care community considers to be the

10    sort of gold standard?

11         A.   Yes, sir.  The certification that I

12    have, the WOCN is the gold standard, and you have

13    to recertify for that every five years.  So I'm

14    actually in the process of recertifying for that

15    now.

16         Q.   That would be the one you got in 2016?

17         A.   Yes, sir.

18         Q.   Generally speaking, what is the

19    recertification process like?

20         A.   You have to, of course, study.  And then

21    once you've completed your studying and you feel

22    like you're ready to take the examination, you

23    take it on your own terms.  You have a certain

24    amount of time to take it and you pay for your

25    test and you sit for that national exam.  It's

Kisha Dyse
November 16, 2020

Page 15

1  pretty much self-study.

2      Q.   Did you work in any capacity for UMC

3  prior to February '16, like a different position

4  or anything like that?

5      A.   No, sir.

6      Q.   If you could, walk me through your job

7  history prior to February '16, sort of kind of

8  going backwards?

9      A.   Okay.  Let's see.  As I said I was --

10  you want me to go backwards?  So I'll say before

11  coming to UMC I worked at Baylor All Saints in

12  Fort Worth, Texas as a wound ostomy nurse.  Before

13  that, I worked at Select Medical Center in Texas.

14  I was a ICU/floor nurse.  Before that, I worked at

15  Crossgates.  It's now called Merit Health.  I

16  worked on the burn unit as a staff nurse.  Before

17  that, I worked at Brentwood, I think it was called

18  Behavioral Health, as a staff nurse.  And before

19  that, I worked at Baptist Hospital as a staff

20  nurse.

21      Q.   Ballpark, when did you work for -- what

22  was the first one you said, you said it was

23  Baylor, Texas?

24      A.   Baylor All Saints in Fort Worth, Texas.

25  Yes, sir.

Page 16

1      Q.    How long did you work there, ballpark?

2      A.    I worked there from 2014 up until I

3  started here at UMC.

4      Q.    What about Select Medical?

5      A.    I worked at Select Medical from 2012 to

6  2014.

7      Q.    And about Merit Health?

8      A.    Merit Health I worked from 2010 to 2012.

9      Q.    And Brentwood Behavioral?

10      A.    Yes, sir, that was 2009 to 2010.

11      Q.    And then Baptist Hospital?

12      A.    That was 2008 to 2009.

13      Q.    What was the nursing home that you said

14  you took the consulting position with?

15      A.    I worked at -- it's called Pine Forest

16  Nursing and Rehab and it's in Jackson,

17  Mississippi.

18      Q.    If you could describe to me -- let me

19  ask it a different way.  Who do you report to?

20      A.    I report to a nurse manager and her name

21  is -- let me think, her name has changed.  It's

22  Mary Katy Melvin.

23      Q.    What do you call yourself?  Do you call

24  yourself a wound care nurse?  What terminology do

25  you use?

```
 1       A.   We call ourselves wound care nurses, but
 2   according to the hospital we're internal stomal
 3   therapists.
 4       Q.   How many wound care nurses are there at
 5   one time at the hospital?
 6       A.   We have five now.
 7       Q.   Is that typical when you were there in
 8   2016 and 2018?
 9       A.   In 2016, we had between three and two
10   depending on if somebody left or...
11       Q.   In 2016, did you also report to a nurse
12   manager?
13       A.   I did but it was a different nurse
14   manager.  Her name in 2016 was Lee Anne Lufkin.
15       Q.   I've seen some references in the record
16   to a Wound Care Center.
17       A.   Yes.  Yes, sir.
18       Q.   What is the Wound Care Center?
19       A.   It's in the pavilion.  It is an
20   outpatient clinic.
21       Q.   Would you also work in that facility at
22   times?
23       A.   No, sir.
24       Q.   Is it different nurses work there?
25       A.   Yes, sir, there are different nurses
```

Kisha Dyse
November 16, 2020

Page 18

1    that work there.

2         Q.    So the two to three in 2016 and around

3    five or so now would be working in the inpatient

4    hospital side of things?

5         A.    Yes, sir, that's right.

6         Q.    How do you get assigned patients?

7         A.    We receive wound care consults via Epic.

8         Q.    For the record, what is Epic?

9         A.    Epic is our medical records computer

10   system where we do our documentation and that type

11   of thing.

12        Q.    How does it work in real life, in

13   practice?  Is it just a rotating basis that you

14   just rotate who receives which consult or is there

15   a certain other way the work is divided up?

16        A.    Well, different physicians or nurses or

17   floors would put in a wound care consultation and

18   it's a rotating of whoever is available will see

19   that consult.  We work by the one that's next in

20   line per se.

21        Q.    Okay.  Is there 24-hour coverage with

22   the wound care consults or is it certain hours

23   typically you're working?

24        A.    No, sir, it's not 24-hour coverage.  Our

25   coverage is between 8:00 and 4:30, Monday through

Kisha Dyse
November 16, 2020

1    Friday.

2        Q.    A consult is entered, as an example,

3    noon on Saturday.  It's going to wait until Monday

4    morning when people come back to work?

5        A.    Yes, sir.

6        Q.    For the nurse manager, do you know who

7    the nurse manager reports to?

8        A.    No, sir, I'm not sure.

9        Q.    But as far as like giving feedback or

10    discussing work issues, Mary would currently be

11    the nurse manager you would go to?

12        A.    Yes, sir.

13        Q.    Is there a doctor that oversees the

14    group or no?

15        A.    No, sir.

16        Q.    Any sort of semi-scheduled meetings --

17    and by semi-scheduled, I mean do you have like a

18    weekly department meeting or monthly meeting or

19    anything like that?

20        A.    No, sir.

21        Q.    What are the most common types of wounds

22    that you're treating?

23        A.    I'm sorry, sir, I couldn't hear you.

24        Q.    I'm sorry.  What are the most common

25    type of wounds that you see when you're treating

Kisha Dyse
November 16, 2020

Page 20

1    patients?

2         A.    The most common type, I would say

3    pressure ulcers, venous stasis ulcers, sheer

4    friction, incontinence associated dermatitis,

5    cancer wounds, trauma wounds.  Those are the most

6    common.

7         Q.    What is a pressure ulcer?

8         A.    A pressure ulcer is a wound that

9    develops when a sustained amount of pressure has

10   caused an injury.  The tissue has lost blood flow

11   and so a wound will develop.

12        Q.    It could be like a bed sore, is another

13   common name?

14        A.    Yes, sir, bed sore is another common

15   name.

16        Q.    If you could, walk me through -- and I

17   know every patient is different -- but your

18   typical routine when you first see a patient and

19   you've been given a consult?

20        A.    Okay.  We will -- Epic will alert us

21   that we have a consult.  I will go to that

22   patient's room, I will assess that patient's wound

23   and I will write treatment recommendations based

24   on the assessment that I just had with that

25   patient.  And I would enter those wound care

Kisha Dyse
November 16, 2020

1    recommendations into the computer.

2        Q.    For your treatment recommendations, do

3    those have to be approved by a doctor?

4        A.    No, sir.

5        Q.    Is anybody else involved besides you in

6    the plan of care when you're treating the wounds?

7        A.    I'm sorry, I don't understand your

8    question.

9        Q.    Do you ever typically consult with

10   anybody else when you are sort of developing this

11   plan of care?  Like, do you talk to the attending

12   physician or anybody else who may be relevant or

13   is it really just on you?

14       A.    I just write a wound care

15   recommendation.

16       Q.    Are there times where you're, I don't

17   want to say stumped by one, but is it maybe a more

18   difficult one and you feel the need to consult

19   with the attending or someone else?

20       A.    I don't usually consult with the

21   attending over the wounds.  When a wound is --

22   when I see a wound and I write a recommendation,

23   that's just my recommendation for the wound.

24       Q.    Well, when you say a recommendation, to

25   me that implies somebody could not follow the

Kisha Dyse
November 16, 2020

Page 22

1    recommendation?

2        A.    That's right.  Yes, sir.

3        Q.    So who makes the decision then to follow

4    that recommendation or not?

5        A.    I'm not sure who makes that decision.  I

6    just put the recommendation as far as I see fit in

7    the computer, and if the doctor does not want to

8    comply with that he can delete my recommendation

9    and put what he sees fit in the computer.  He or

10   she.

11       Q.    So once you put it in there you really

12   don't see it anymore.  You're not sure what

13   happens subsequently unless you keep revisiting

14   the patient?

15       A.    Yes.

16       Q.    And after you've been assigned a

17   patient, is there any sort of standard like you go

18   see that patient daily or any sort of routine that

19   you use to treat the patient?

20       A.    No, sir.  What happens is once I've seen

21   the patient we are reconsulted if the wound

22   deteriorates or if the nurse or physician needs me

23   to look at it again.

24       Q.    That would be coming from a consult, a

25   new consult?

Page 23

 1     A.    Yes, sir.

 2     Q.    In a perfect world you come by, do your

 3     consult, make your recommendations and then you

 4     would not have to see that patient again?

 5     A.    That's right, yes, sir.

 6     Q.    Ballpark, how often does that happen

 7     where it's just a one consult and done?  Is that

 8     the majority of patients?

 9     A.    I don't know.  I don't know.  We see so

10     many patients, I'm not sure.

11     Q.    When you get a request for a second

12     consult --

13     A.    Yes, sir.

14     Q.    -- is there any sort of typical

15     timeframe which that occurs; is it a couple of

16     days later, could it be any point later?

17     A.    It could be any point later.  There's no

18     set way somebody consults.  It just varies

19     depending on the patient.

20     Q.    Do you ever consult with first year

21     residents on treatment?

22     A.    No, sir.

23     Q.    Do you remember Dr. Papin?

24     A.    No, sir.

25     Q.    So if you saw a picture of him -- you

Page 24

1    may recognize his face but you don't have an

2    independent recollection in your head right now of

3    who he is?

4         A.   No, sir.  I see so many, no, sir, I

5    wouldn't know him.

6         Q.   I know you said you've reviewed the

7    records for this case.  Do you recall this

8    situation?

9         A.   I do recall that patient, yes, sir.

10        Q.   Do you recall interacting with any

11   residents during that --

12        A.   I do not recall interacting with any

13   residents.

14        Q.   Would you agree with me that your role

15   as the wound care nurse, you had more experience

16   diagnosing and treating wounds than a first year

17   resident?

18             MR. WHITFIELD:  Object to the form.

19             THE WITNESS:  I don't know that.

20             MR. WHITFIELD:  I'm sorry, you can

21   answer.

22             THE WITNESS:  No, sir, I don't know.

23        Q.   (By Mr. Morgan)  But fair to say that

24   the hospital has designated you as the wound care

25   nurse as the go-to medical treater for those

Kisha Dyse
November 16, 2020

Page 25

1  wounds?

2       A.   Well, the hospital had designated me to

3  write treatment recommendations, and that's what I

4  do is write the recommendations.

5       Q.   You're designated -- I'm sorry.  I

6  apologize.  The hospital designates you as the

7  first line of defense so to speak to diagnose and

8  make recommendations for those wounds?

9       A.   We don't diagnose the wounds but we do

10  make recommendations.  As a nurse I can't

11  diagnose.

12       Q.   What do you mean by that?  Can you

13  expand on that a little bit?

14       A.   Yes, sir.  As a nurse I can't

15  specifically say -- diagnose a wound.  I can put

16  in my recommendations and I can also say based on

17  what I see that the wound is determined -- it

18  formed a certain way.  But I can't say for certain

19  that it is one thing or another because I can't

20  diagnose it.

21       Q.   Is it fair to say -- correct me if I'm

22  wrong, but is it fair to say when you're putting

23  in your notes you can write down what you believe

24  it is but it's not an official diagnosis?

25       A.   Yes, sir, based on the evidence of what

Page 26

```
 1    I've seen I can say that this wound was developed
 2    through pressure.
 3         Q.   But A doctor could look at it and
 4    disagree with you?
 5         A.   I'm so sorry, I didn't hear you.
 6         Q.   But a doctor could come in and look at
 7    it and disagree with you?
 8         A.   Yes, yes, sir.
 9         Q.   Could any residents come in and disagree
10    with you?
11         A.   I'm not sure.
12         Q.   When you're making those treatment
13    recommendations -- I just want to clarify
14    something, you sort of touched on this.  I know
15    you said you write them into the computer system,
16    correct?
17         A.   Yes, sir.
18         Q.   But do you also talk to the doctors,
19    typically, about those treatment options?
20         A.   No, sir.
21         Q.   It's just writing, that way there's a
22    written record of it?
23         A.   Yes, sir.
24         Q.   Could you also start those treatments on
25    your own?
```

Kisha Dyse
November 16, 2020

Page 27

```
 1        A.   No, sir.  I don't start the treatments,
 2   the nurses start the treatments.
 3        Q.   So if you're looking at a wound, you say
 4   hey, we need to start this process, the nurses
 5   that are there could actually do it?
 6        A.   Yes, sir.
 7        Q.   They don't have to wait for a doctor to
 8   say I approve it, they would just go ahead and
 9   start that treatment you recommended?
10        A.   Yes, sir.
11        Q.   Do you write orders?
12        A.   Do I write orders?
13        Q.   Yes.
14        A.   No, I only write wound care
15   recommendations.
16        Q.   Do you know what an intern is?
17        A.   No, sir, I don't know their
18   qualifications or anything.  I hear the name, but
19   I don't know them from a resident.  No, sir.
20        Q.   Intern -- we've seen some usage of the
21   word intern to mean resident.  So a resident or an
22   intern, do you know if a resident can write
23   treatment options for a wound care patient?
24        A.   I don't know if they can.
25        Q.   Do you know if a resident can make an
```

Kisha Dyse
November 16, 2020

Page 28

1    independent diagnosis of a wound care patient?

2         A.   I don't know.

3         Q.   Have you ever seen that happen?

4         A.   I have not seen that happen.

5         Q.   Have you seen where an attending

6    physician writes a recommendation for a wound care

7    patient?

8         A.   I've not seen an attending write a

9    recommendation.  I'm not saying it didn't happen,

10   but I have not seen that.

11        Q.   That was going to be my next question.

12   Can you recall any times where an attending

13   physician has disagreed with your recommended

14   treatment?

15        A.   I don't know.  I can't remember if one

16   has or has not.  I just don't know.

17        Q.   But as we sit here right now you can't

18   think of a specific time where a doctor -- and you

19   found out about it -- where a doctor disagreed

20   with you and ordered different treatment?

21        A.   No, sir.

22        Q.   Do any positions report to you?

23        A.   I'm sorry, I didn't hear you.

24        Q.   Do any positions, any employees report

25   to you?

Kisha Dyse
November 16, 2020

Page 29

1      A.   No, sir.

2      Q.   When -- I want to follow up on a minute

3  ago when we were talking about how you said that

4  once you are requested for a consult you do the

5  consult and then you don't go back to visit the

6  patient unless specifically requested, correct?

7      A.   Yes, sir.

8      Q.   So there's never a time where maybe hey,

9  I need to just come back every day for a few days

10 to keep checking up on this patient?

11     A.   No, that would have to be put in a

12 consult.  We work on consults only.

13     Q.   Okay.  You testified a moment ago that

14 you do remember this particular patient.  What do

15 you recall about this patient?

16     A.   I recall that he was paralyzed, I

17 believe, from a gunshot wound.

18     Q.   Do you recall anything else about like

19 course of treatment or anything?

20     A.   I do remember his course of treatment.

21     Q.   What do you remember about it?

22     A.   I remember that he -- that I initially

23 saw him and I believe he had a small wound and

24 then he ended up developing a pressure ulcer.

25     Q.   I'm going to pull up an exhibit here.

Page 30

```
 1              MR. MORGAN:  Y'all have a preference if
 2   I do a share screen or drop it in the chat?
 3   Doesn't matter to me, I can do both.
 4              MR. WHITFIELD:  Doesn't make any
 5   difference.  Just let me know which one you want
 6   to do because I need to change seats and
 7   manipulate the computer.
 8              MR. MORGAN:  Okay.  I'll do a share
 9   screen.
10        Q.   (By Mr. Morgan)  Ms. Dyse, do you see
11   this record on the screen?
12        A.   Yes, sir, I see it.
13        Q.   We will mark this as Exhibit No. 1 for
14   this deposition.
15        A.   Yes, sir.
16              (Exhibit 1 marked for identification.)
17        Q.   (By Mr. Morgan)  You can see my mouse
18   moving, can't you?
19        A.   Yes, sir, I can.
20        Q.   Great.  This looks like, just to kind of
21   get our bearings and all this, a consult was done
22   on November 15th, 2016 at 0900 hours which would
23   be 9:00 a.m.; is that correct?
24        A.   Yes, sir, that's correct.
25        Q.   And this looks like this was done by a
```

Kisha Dyse
November 16, 2020

1    different wound nurse than you, correct?

2         A.    That's correct.

3         Q.    Do you remember Kelly Pennock?

4         A.    Yes, I do remember Kelly.

5         Q.    Does she still work there or no longer?

6         A.    She does work there.

7         Q.    Would she be another wound nurse on

8    basically the same equivalent level as you?

9         A.    Yes, sir.

10        Q.    And so looks like here it talks about

11   how a wound care consult was ordered by Theresa

12   Robertson.  Do you see that?

13        A.    Yes, sir, I do.

14        Q.    Who is Dr. Robertson?

15        A.    I don't know.

16        Q.    This would follow what you described

17   earlier about the only way a wound nurse gets a

18   call is if a consult is ordered by somebody?

19        A.    Yes, sir.

20        Q.    And I see where it says here that this

21   patient was high risk for pressure ulcer?

22        A.    Yes, sir.

23        Q.    Do you know why they would be high risk?

24        A.    Yes, sir.

25        Q.    Why is that?

Kisha Dyse
November 16, 2020

Page 32

 1      A.    Because he was paralyzed.  And I believe

 2   he was incontinent as well.

 3      **Q.    And fair to say for somebody who is**

 4   **paralyzed because they're typically immobile and**

 5   **sitting on the same spots, that can lead to**

 6   **pressure ulcers?**

 7      A.    Yes, sir.

 8      **Q.    It says here for the recommendation,**

 9   **pressure ulcer risk/management order set.  Do you**

10   **see that?**

11      A.    Yes, sir, I do.

12      **Q.    Is that sort of a standard recommended**

13   **treatment?**

14      A.    Yes, sir, we have a protocol in place

15   for pressure ulcers.

16      **Q.    What does this mean to you right there,**

17   **that order set?**

18      A.    That means that just as she has listed

19   there we will reposition the patient every two

20   hours -- well, we wouldn't, but the nurses would

21   on the floor reposition the person every two

22   hours.  He would have perineal care.  We would

23   support his bony prominence and also apply

24   incontinence cream to protect his skin.

25      **Q.    I notice some of these, like number one**

Kisha Dyse
November 16, 2020

 1   and five, are bolded whereas the others are not

 2   bolded.  Is there any reason for that that you

 3   know of?

 4        A.   I'm not sure why she bolded them.

 5        Q.   She would have had to have physically

 6   hit Control-B to bold it?

 7        A.   I'm not sure, sir.  Yes, she would have

 8   to, you know, put the Control-B to make it bolded,

 9   but I'm not sure why she did.

10        Q.   Do you yourself ever bold certain

11   instructions?

12        A.   I don't know.

13        Q.   Some people do and some people don't.  I

14   was just trying to see if that's something that

15   you normally --

16        A.   I don't know.

17        Q.   Now on the bottom here it says monitor

18   and notify MD/NP.  Would that stand for a doctor

19   or a nurse practitioner?

20        A.   Yes, sir.

21        Q.   And then what does the WOCN stand for?

22        A.   That's our certification.  It's wound

23   ostomy and continence nurse.

24        Q.   That would be the -- currently the five

25   back -- back in 2016 the two or three nurses?

Kisha Dyse
November 16, 2020

Page 34

```
 1        A.    Yes, sir.
 2        Q.    So if they were going to notify the
 3   wound care team, that would be, again, that
 4   consult we've been describing?
 5        A.    Yes, sir.
 6        Q.    Does UMC have an ulcer prevention
 7   program?
 8        A.    We have a pressure ulcer prevention
 9   protocol, yes, sir.
10        Q.    What is that protocol?
11        A.    It's like what Kelly had listed there.
12   It lets the nurses know if the patient is high
13   risk, certain things to do.  That is to turn the
14   patient, that is to protect the skin with some
15   form of moisture barrier cream, that's to elevate
16   the prominences, and that's to possibly elevate
17   the feet with heel protected boots.
18        Q.    Is this one through six here, is that
19   kind of the standard pressure protocol?
20        A.    It's not UMC standard protocol, but it
21   is written in her own way.  So, yes, sir, I guess
22   you could say it's the protocol.
23        Q.    Is there somewhere in writing where that
24   standard UMC protocol would be written?
25        A.    Yes, sir.
```

Kisha Dyse
November 16, 2020

1     Q.    Where would that be?

2     A.    It's under a pressure ulcer order set.

3  You can put in pressure in Epic and it will pull

4  down a whole list of order sets and you would

5  click on it.

6     Q.    What is staging a wound?

7     A.    Staging is determining the depth of

8  tissue damage to the wound.  And that's only done

9  with pressure ulcers.

10     Q.    Can you stage a wound?

11     A.    Yes, sir.

12     Q.    Is that considered different than

13  diagnosing the wound?

14     A.    Yes, sir.

15     Q.    I guess I want to make sure we're on the

16  same page here.  When I say the word diagnose and

17  you're saying you can't do that, what does that

18  mean to you to diagnose?

19     A.    That means that I have assigned a

20  medical diagnosis to a patient with -- the

21  difference is with a wound, I can look at that

22  wound and determine that most likely it occurred

23  through pressure, and I do have the ability with

24  my certification to stage a pressure ulcer.

25     Q.    What is a decubitus ulcer?

Kisha Dyse
November 16, 2020

Page 36

```
 1        A.    It's another way of saying a pressure

 2   ulcer.  A wound that has occurred from sustained

 3   pressure between the bone and another surface.

 4        Q.    So a decubitus ulcer is a little bit

 5   fancier terminology for a pressure ulcer?

 6        A.    Yes, sir.

 7        Q.    Are pressure ulcers preventable?

 8        A.    Are they preventable?

 9        Q.    Yes.

10        A.    In some cases they are, yes, sir.  In

11   some cases they are not.

12        Q.    How would it be not preventable?  What

13   are some examples?

14        A.    Some examples would be if a person is

15   extremely compromised, say for instance that

16   patient has no blood flow to that area or if the

17   person is too unstable to turn, that would be an

18   example where you couldn't avoid a pressure ulcer.

19        Q.    I'm going to share with you what we're

20   going to mark as Exhibit 2.

21              (Exhibit 2 marked for identification.)

22        Q.    (By Mr. Morgan)  This was a consult done

23   by you here?

24        A.    Yes, sir.

25        Q.    On November 30th, 2016, looks about 4:30
```

Page 37

 1    in the afternoon?

 2         A.   Yes, sir.

 3         Q.   Is this -- when you were talking about

 4    records you were reviewing earlier, is this one of

 5    the records where you were tried reviewing?

 6         A.   Yes, sir.

 7         Q.   It looks like here, again, Dr. Robertson

 8    had ordered a second consult for this patient; is

 9    that accurate?

10         A.   I'm not sure if that was a second

11    consult, but it's definitely one of the consults.

12         Q.   This one says here a consult by

13    Dr. Robertson at November 30th?

14         A.   Yes, sir.

15         Q.   Morning.  Go back to Exhibit 1, it looks

16    like Dr. Robertson on November 14th.  Do you see

17    that?

18         A.   Yes, sir.

19         Q.   So it looks like to me, but correct me

20    if I'm wrong, this is a new second consult?

21         A.   Yes, sir.

22         Q.   Now it has this number here starting

23    with 941.  Does that mean anything to you?

24         A.   No, sir, I don't know what that means.

25         Q.   I didn't know if there was like -- is

Kisha Dyse
November 16, 2020

Page 38

 1    that a further record that might describe this

 2    situation?

 3         A.    I'm not sure.

 4         Q.    When you get the requested consult, does

 5    it ever tell you why or it just says flat out

 6    consult and then you kind of have to figure it out

 7    yourself?

 8         A.    Sometimes the consults will say why to

 9    see the patient.

10         Q.    Fair to say this one does not or you

11    wouldn't be able to tell from this record whether

12    it did?

13         A.    I just can't tell from that record.

14         Q.    So for here in this situation for some

15    reason Dr. Robertson ordered a second consult but

16    you can't tell from this record why that was

17    ordered?

18         A.    That's right, yes, sir.

19         Q.    It looks like in this situation here, it

20    looks like you -- I'm going to say the word

21    diagnose, but I don't want you to say you don't

22    diagnose.  What would you call it here, your

23    sentence that you says he has a partial thickness

24    abrasion.  Is that a diagnosis or you're just kind

25    of stating a fact?

Kisha Dyse
November 16, 2020

Page 39

 1       A.    I'm just stating what I see.

 2       Q.    **Okay.  When you say a partial thickness**

 3   **abrasion, put that in layman's terms for us?**

 4       A.    That means that the epidermis and the

 5   top portion of the dermis has sluffed away but it

 6   hasn't reached any deeper levels of the tissue

 7   like the subcutaneous tissue.

 8       Q.    **So when you say a partial thickness**

 9   **abrasion, is that different than a pressure ulcer?**

10       A.    Yes.  Yes, sir, it is.

11       Q.    **Are there similarities between the two?**

12       A.    They can look the same but the tissue

13   would behave differently.

14       Q.    **In what way?**

15       A.    With an abrasion I could do a test

16   called a blanching where I would press the tissue

17   and the tissue would turn white and from white it

18   will turn back pink.  That will let me know that

19   the blood supply is intact.  So that would not be

20   a pressure ulcer.

21       Q.    **Do you know if you did that type of**

22   **examination here for this -- on this date?**

23       A.    Yes, I would do that.  I know I did that

24   because I would have to do that to determine that

25   it was not pressure.

Kisha Dyse
November 16, 2020

Page 40

1        Q.    You wouldn't have entered that into the

2   note because that's just a normal practice you

3   have to do?

4        A.    Yes, that's just normal.

5        Q.    Is it ever difficult to tell between

6   those two things?

7        A.    I'm sorry, sir, I didn't hear it.

8        Q.    Is it ever difficult to tell between

9   those two, an abrasion or a pressure ulcer?

10       A.    Yes, sometime it is difficult to tell.

11   But we blanch the tissue and that helps us to

12   determine if it's pressure related or not.

13       Q.    When you say blanch the tissue, is that

14   the process you were describing?

15       A.    Yes, sir, that's where you press the

16   tissue and look for blood flow to fill the wound

17   bed.

18       Q.    Now, in this course of treatment here

19   that you were recommending.

20       A.    Yes, sir.

21       Q.    If your test had shown that it was a

22   pressure ulcer, would you have given a different

23   treatment diagnosis or recommendation?

24       A.    In this case, no, that would -- I would

25   not have done anything different.

Kisha Dyse
November 16, 2020

Page 41

1       Q.   Why not?  I'm just trying to understand

2  why.

3       A.   Because he has -- he's already on a

4  pressure redistribution mattress.  All of our

5  patients are.  And the protocol for that depth of

6  a wound is the zinc oxide, and I can tell that

7  that's on him because I can see it in the picture.

8       Q.   So, from a pressure ulcer perspective,

9  you were already -- and I say you, meaning the

10  hospital and the team, were already doing what is

11  typically used to treat that?

12       A.   Yes, sir.

13       Q.   There was nothing else, I guess, to be

14  done at that point?

15       A.   No, sir, at that point, no.

16            MR. MORGAN:  For the record, for Robin

17  and for Tommy, what's easier for you guys, do you

18  want me to just email you these exhibits at the

19  end of the deposition, drop them into the chat at

20  the end?

21            COURT REPORTER:  Email them will

22  probably be better.

23            MR. WHITFIELD:  Email is fine.

24            MR. MORGAN:  Okay.  That works for me.

25  I was going to go through like Bates stamps and

Page 42

```
 1   all that, but I'll just send them to you by email.

 2             We're going to mark Exhibit No. 3 here.

 3             (Exhibit 3 marked for identification.)

 4        Q.   (By Mr. Morgan)  I'm going to scroll

 5   down here because it starts here at the bottom,

 6   where you can see it looks another consult by you

 7   on December 9th.  Do you see that?

 8        A.   Yes, sir, I see it.

 9        Q.   And this would have been, it looks like,

10   again, Dr. Robertson ordered a third consult on

11   this?

12        A.   Yes, sir.

13        Q.   And you came, it looks like, the next

14   day to do the review?

15        A.   Yes, sir.

16        Q.   But fair to say, again, I don't see any

17   reason on this record about why Dr. Robertson

18   ordered the consult?

19        A.   No, I can't tell from that screen.

20        Q.   If a reason was listed, would it

21   normally be on a screen like this?

22        A.   The reason is usually listed under an

23   order set page under summaries in Epic.

24        Q.   Are these records we're looking at here,

25   is this part of the Epic system?  Do these look
```

Kisha Dyse
November 16, 2020

Page 43

1    familiar to you as far as format and structure?

2         A.   Well, the heading looks different.  In

3    Epic I think I will only see the pictures and the

4    part that I had written.

5         Q.   Do you remember this consult here and

6    what you did here?

7         A.   Yes, sir, I do.

8         Q.   Walk through what you are seeing on this

9    would be, I guess, the second time you had seen

10   this patient?

11        A.   Okay.  The second time I see him

12   compared to the first time, I can see that he has

13   eschar on the wound bed.

14        Q.   What is eschar?

15        A.   Eschar is sometimes moist or dry

16   necrotic tissue.

17        Q.   I hate to keep asking you what does this

18   mean, what does this mean, but I'm just doing this

19   to make sure we're on the same page and one day

20   this may be read to a jury.  But when you say

21   necrotic, what does that mean?

22        A.   It means it's non-living tissue or dead

23   tissue.

24        Q.   Okay.  I interrupted you.  Keep going.

25   I'm sorry.

Page 44

```
 1        A.    I was done.  I said it's necrotic tissue

 2   or dead tissue.

 3        Q.    And what did you recommend here at this

 4   point?

 5        A.    I recommended Santyl enzymatic debrider.

 6        Q.    And what are those?

 7        A.    Santyl is an enzyme that eats away at

 8   the necrotic tissue but leaves the intact tissue,

 9   leaves the healthy tissue alone.  It will only

10   attack the necrotic tissue.

11        Q.    At this point, it looks like you've

12   assessed that it's not an abrasion but an

13   unstageable pressure ulcer.  Do you see that?

14        A.    Yes, sir.

15        Q.    When you say an unstageable pressure

16   ulcer, what does that mean?

17        A.    That means that I am unable to fully see

18   the wound bed.  What I see is the eschar is

19   covering most of the wound so I can't tell the

20   depth of the wound.

21        Q.    I guess, how do you determine the depths

22   of the wounds?

23        A.    You can't tell until the eschar is fully

24   removed.

25        Q.    Is that when you can peel it back to
```

Page 45

1    look at it?

2         A.   I can't peel it back, a physician would.

3    But, yes, sir, when that eschar is gone you can

4    see the true depth of the wound.

5         Q.   I believe you said a physician can do

6    that?

7         A.   A physician, yes.  As a nurse I can't

8    sharp debris, which means I can't take a scalpel

9    or anything sharp to remove that eschar.  Only a

10   physician can do that.

11        Q.   For an unstageable pressure ulcer like

12   this, the recommendations that you've made here,

13   are those kind of a generally accepted treatment

14   options or are these something that's kind of out

15   of the norm?

16        A.   It's generally accepted.

17        Q.   Were there other options that you could

18   have given but chose not to?

19        A.   No, sir.

20        Q.   From your perspective this is a pretty

21   standard assessment in treatment option that you

22   diagnose?

23        A.   Yes, sir.

24        Q.   When I say diagnose, is there a

25   difference in your mind between a nurse diagnosis

Kisha Dyse
November 16, 2020

Page 46

 1   and a medical diagnosis?

 2        A.   Yes.  I just know that as a nurse we

 3   can't diagnose.  We can say what we see, but we

 4   can't diagnose it or call something officially a

 5   medical diagnosis.  We can just state what we see.

 6        Q.   Would that be what you see here where it

 7   says assessment?

 8        A.   Yes, sir.

 9        Q.   It talks about for number four, change

10   the dressing once daily.  Do you see that?

11        A.   Yes, sir, I do.

12        Q.   Fair to say that wouldn't be your job to

13   do, correct?

14        A.   No, sir, I would not do that.

15        Q.   Who typically would be the ones doing

16   that?

17        A.   The staff nurse or the nurse that is

18   assigned to that patient.

19        Q.   Do physicians typically change the

20   dressings or it's more so the nurses?

21        A.   I'm not sure.

22        Q.   I see on your -- I'll call it your

23   signature block here.

24        A.   Yes, sir.

25        Q.   What does the WCC -- is that the 2012

Page 47

1   certification we were talking about?

2        A.   Yes, sir, that's wound care certified.

3        Q.   And then the CWOCN one would be the 2016

4   certifications?

5        A.   Yes, sir.

6        Q.   For the record, RN is registered nurse.

7   But you're an RN?

8        A.   Yes, sir.

9        Q.   It looks like on this situation here for

10  this note, it looks like your date of service on

11  December 9th was 1340, which would be 1:40 in the

12  afternoon, correct?

13       A.   Yes, sir.

14       Q.   And it looks like going down to the next

15  page, did you come back at 1900 hours, which would

16  be 7 p.m.?

17       A.   I don't remember.

18       Q.   Because it looks like two different

19  entries to me.  So my question was whether you saw

20  this patient twice that day or is this just a

21  followup note that you added into the Epic system?

22       A.   It looks like I may have been

23  reconsulted for that patient and I put in a note

24  letting them know that I had already seen the

25  patient.

Kisha Dyse
November 16, 2020

Page 48

1     Q.   So do you remember if you went back and

2   saw the patient again or are you just responding

3   to that consult with you had already seen them

4   today?

5     A.   I was responding by letting whoever put

6   that consult in that he had already been seen.

7     Q.   Okay.  We've been going for almost an

8   hour.  Let's just take a quick two-minute break.

9          (Off the record.)

10    Q.   (By Mr. Morgan)  I'm going to mark

11  Exhibit No. 4.

12         (Exhibit 4 marked for identification.)

13    Q.   (By Mr. Morgan)  This is a consult

14  encounter note for December 22nd by you.  It looks

15  like another wound care consult by Dr. Robertson.

16  Do you see that?

17    A.   Yes, sir, I do.

18    Q.   If you could, walk me through -- walk me

19  through this one when you came back.  I guess this

20  would have been your third visit to this patient?

21    A.   Yes, sir.  You said walk you through it?

22    Q.   Yes.  What you saw and what you were

23  doing?

24    A.   I saw he still has his black eschar.

25  The wound has increased in size.  90 percent

Page 49

1   eschar, 10 percent pink viable tissue.  He has

2   serosanguinous drainage.  A small amount.  It's

3   irregular shaped and the wound edges are open and

4   macerated.  I recommend to continue the use of the

5   Santyl.

6        Q.   When you say the wound edges are

7   irregular and there's macerated edges, what does

8   that mean to you?

9        A.   Irregular means the shape isn't -- it

10  isn't a circle or a complete circle or a square.

11  It kind of has an irregular outline to the shape

12  of the wound.  And then macerated means that it's

13  moist.  It's just another name for something

14  that's moist.

15       Q.   And your recommendation to the continued

16  use of Santyl --

17       A.   Yes, sir.

18       Q.   -- was that, again -- my question from

19  before, is that the sort of standard response to

20  this situation or are there other courses of

21  treatment you could have chosen?

22       A.   At that moment when I looked at it,

23  Santyl was the best option.

24       Q.   At this point it was still an

25  unstageable one, because you testified you could

Kisha Dyse
November 16, 2020

Page 50

1    not use a scalpel to peel back the eschar?

2         A.   Yes, sir, that's correct.

3         Q.   Could you have asked somebody to do it?

4         A.   Could I ask someone to debride it?

5         Q.   Yes, so that you could stage it?

6         A.   Well, when I looked at it I saw what I

7    saw and I felt like Santyl was appropriate.

8         Q.   But if for some reason you saw the scab

9    or the eschar, could you have requested somebody

10   to peel that back to get a better look at it?

11        A.   Well, the Santyl is working.  From what

12   I see, the Santyl is working appropriately at that

13   moment that I looked at it.  It looks like it was

14   working appropriately.

15        Q.   So this exam by you would have been done

16   at 10:59 a.m.?

17        A.   Yes, sir.

18        Q.   So when it says date of service, that's

19   literally the time when you were there with the

20   patient doing your treatment?

21        A.   Yes, sir.

22        Q.   The pressure ulcer is now

23   four-and-a-half centimeters by five.

24        A.   Yes, sir.

25        Q.   How do you measure that?

Kisha Dyse
November 16, 2020

Page 51

```
 1        A.    You measure length.  Which was
 2   4.5-centimeters and length would be basically the
 3   length of -- the shape of the spine.  So from head
 4   to toe would be 4.5.  And 5.0 would be width or
 5   across the wound.
 6        Q.    During this exam would you have done
 7   that same test you had described earlier with the
 8   pressure on it?
 9        A.    No, sir, you can't do that with eschar.
10        Q.    So you did that with -- the first time
11   you saw this patient, correct?
12        A.    Yes, sir, because the wound bed wasn't
13   covered by eschar.
14        Q.    Would you have done it at the second
15   examination?  If you need to go back to that note
16   I can, on Exhibit 3?
17        A.    No, because the eschar is what's used to
18   stage it at that point.
19        Q.    What do you mean by that?
20        A.    The wound is beyond the depth of the
21   dermis so the blanching wouldn't be appropriate.
22   I could see the eschar on the wound bed which lets
23   me know that the wound is unstageable.
24        Q.    From the second time to the third time,
25   obviously, this ulcer is getting bigger, fair to
```

Kisha Dyse
November 16, 2020

Page 52

1    say?

2         A.    Yes, it is bigger.

3         Q.    And the eschar is getting to be larger?

4         A.    Yes, sir.

5         Q.    Is there a point in time where when

6    you're looking at a patient like this where --

7    maybe emergency is the right word.  Right, when

8    you're looking at something and you say my

9    goodness, this is really, really bad, this is an

10   emergency, we need a doctor in here right away.

11   Has that ever happened?

12        A.    It has happened before, yes, sir.

13        Q.    A situation like this here, what would

14   have needed to have occurred for you to kind of

15   take that course of action?

16        A.    What would make me take that action

17   would be if the eschar was what we call unstable.

18   That means that the eschar is lifted up and if the

19   wound was showing signs of infection.  And that

20   would require that a physician would immediately

21   get involved.

22        Q.    I was going to ask because I -- you were

23   saying you couldn't do that yourself?

24        A.    No, I cannot remove the eschar, no, sir.

25        Q.    So then what would cause you to request

Kisha Dyse
November 16, 2020

Page 53

1    a physician to do that?

2         A.    If the wound was showing signs of

3    infection or if the eschar was unstable then I

4    would request that a physician would see it.

5         Q.    So in this situation here on Exhibit 4,

6    this situation did not meet those two options?

7         A.    From my standpoint, no, sir.

8         Q.    Have you ever heard the term grossly

9    necrotic?

10        A.    Grossly necrotic?

11        Q.    Yes.

12        A.    No, sir.

13        Q.    We talked about what necrotic was

14   earlier.  Would you consider this at this point

15   here to be a necrotic wound?

16        A.    It is a necrotic wound, yes, sir.

17        Q.    You checked for whether the wound

18   smells?  I've seen some documents referring to it

19   as foul smelling.

20        A.    Yes.

21        Q.    Is it something as kind of a routine

22   check?

23        A.    Yes, sir.

24        Q.    So you would have checked it in this

25   situation for Exhibit 4, correct?

Page 54

1    A.    Yes, I would have.

2    Q.    And if it was foul smelling I would

3    imagine you would notate that in the record?

4    A.    Yes.

5    Q.    But you did not here?

6    A.    No, sir, I did not.

7    Q.    Walk me through how it kind of works in

8    real life.  I know you said earlier that -- I

9    don't want to put words in your mouth so correct

10   me if I'm wrong here.  That typically you would

11   make your assessment, but you're not like

12   assessing it with an attending physician there.

13   You enter your treatment in and the attending

14   physician see it there later.  But are there other

15   people in the room with you, typically, who are

16   there watching your treatment that you're talking

17   with and giving your thoughts to?

18   A.    No, sir.

19   Q.    It's usually just you?

20   A.    Yes, sir, or maybe a nurse helping me

21   position the patient.  But I'm the only one making

22   the decision.

23   Q.    Are there ever times where you leave

24   after doing a treatment like this with a patient

25   where you say you know what, I think I need to

Kisha Dyse
November 16, 2020

Page 55

1    talk to the physician or somebody else about this

2    particular case.  Maybe not quite as bad as the

3    emergency one we were talking about a moment ago,

4    but something where you felt you needed to do more

5    that just enter the note in the system?

6         A.   Can you repeat your question?

7         Q.   Yes, because it was not the greatest

8    question in the world.  A moment ago we talked

9    about how there can be situations where you look

10   at it and it's a true emergency.  Do you recall

11   that?

12        A.   Yes, sir.

13        Q.   Are there ever times where maybe it's

14   not an emergency but you still feel the need to go

15   seek out the physician or somebody else to discuss

16   that patient?

17        A.   Yes, sir, there are times when I've had

18   to do that.

19        Q.   What kind of situations would cause you

20   to do that?

21        A.   If the wound is infected or if I'm

22   seeing the eschar is unstable.

23        Q.   The two we just discussed?

24        A.   Yes, sir.

25        Q.   But to confirm, on this here for Exhibit

Kisha Dyse
November 16, 2020

Page 56

1   4, you did not see those two things?

2        A.   I did not, no, sir.

3             (Exhibit 5 marked for identification.)

4        Q.   (By Mr. Morgan)  We're going to mark

5   Exhibit 5.  It should be up on the screen now.

6        A.   Yes, sir.

7        Q.   So this is another note but this is the

8   one that is entered by Dr. Papin.  Do you see this

9   up here?

10       A.   Yes, sir, I do see it.

11       Q.   December 22nd.  7:51.  Which if you go

12   back to the previous one that you saw, you saw the

13   patient at December 22nd at just about 11:00 a.m.

14   Do you see that?

15       A.   Yes, sir.

16       Q.   So this Exhibit 5, Dr. Papin's note is

17   approximately just over three hours prior to when

18   you saw him, the patient.

19       A.   Yes, sir.

20       Q.   It describes how he saw Mr. Newesome

21   today with -- I'm sorry, this is the attending

22   physician, I believe.  Do you know who Dr. Batson

23   is?

24       A.   No, sir.

25       Q.   But she notates here that she saw

Kisha Dyse
November 16, 2020

Page 57

1    Mr. Newesome with the resident today and she

2    agrees with the note.  Do you see that?

3         A.   Yes, sir, I do.

4         Q.   Were you aware that residents and

5    attending physicians would round to the patients?

6         A.   I don't know what they do, sir.

7         Q.   Now it would be fair to say that if

8    Dr. Papin saw this patient about three hours prior

9    to when you saw the patient, that your assessment

10   here in Exhibit 4 would be fairly similar to what

11   Dr. Papin would have seen three hours prior?

12        A.   I don't know what he would have seen.

13        Q.   Any reason to believe that what he would

14   have seen would have been way worse than what you

15   saw?

16        A.   I don't know.

17        Q.   Can you think of any reason why that

18   would happen?

19        A.   No, sir, I don't have a reason why.

20        Q.   Or maybe the opposite way.  Is there any

21   reason why you seeing it three hours later it

22   would be way worse than when Dr. Papin saw it?

23        A.   No, I don't know.

24        Q.   Fair to say that they should be similar?

25        A.   I don't know.

Page 58

1      Q.   You don't think that the wound and what
2   you are looking at would be similar from three
3   hours before you saw it?
4      A.   I don't know what he would have seen.  I
5   just know what I saw, and what I saw is what I
6   documented there.
7      Q.   Let me go back to -- I'm sorry, you did
8   answer but let me just confirm.  I know I asked
9   you this and I apologize.  Here in Exhibit 4, the
10   November{sic} 22nd date you saw the patient.  If
11   it was infected, you would have notated that on
12   the record?
13           MR. WHITFIELD:  I'm going to object to
14   the form.  I think you just read the date wrong,
15   that's my only objection.  You said November and I
16   think it's December.
17      Q.   (By Mr. Morgan)  Sorry.  December 22nd
18   note.  If the wound had been infected, you would
19   have notated that?
20      A.   Yes, sir, if that sacrum wound is
21   infected, I would have notated that.
22           (Exhibit 6 marked for identification.)
23      Q.   (By Mr. Morgan)  We're showing here what
24   will be marked as Exhibit 6.  This is a note that
25   is entered here December 23rd.  So that would have

Page 59

```
 1   been the following day after the record we were

 2   just looking at, correct?

 3        A.   Yes, sir.

 4        Q.   It states that patient had been having

 5   fevers.  Examine, reveals sacral decubitus ulcer

 6   wound.  It says this patient needs to go to the

 7   OR -- which I imagine stands for operating room?

 8        A.   Yes, sir.

 9        Q.   -- today for exploration and

10   debridement.  What is debridement?

11        A.   That's removal of dead tissue.

12        Q.   This was done by a doctor, this looks

13   like.  This was a doctor's diagnosis; is that

14   correct?

15        A.   Yes, sir.

16        Q.   Do you know who Dr. Carroll is?

17        A.   No, sir.

18        Q.   It reveals a sacral decubitus ulcer.

19   That's similar to what you had diagnosed, correct?

20        A.   I didn't diagnose it but...

21        Q.   You assessed it?

22        A.   Yes, sir.

23        Q.   It's the same thing you had assessed?

24        A.   Yes, sir.

25        Q.   But a day later this doctor felt it was
```

Kisha Dyse
November 16, 2020

Page 60

1    necessary to operate, essentially?

2        A.   Yes, sir.

3        Q.   Is that normal in this area of medicine

4    for this type of situation to occur?

5        A.   I'm not sure.

6        Q.   Have you ever heard of it happening in a

7    different setting, besides this patient I mean?

8        A.   I don't recall.

9             (Exhibit 7 marked for identification.)

10       Q.   (By Mr. Morgan)  We'll mark this last

11   one here as Exhibit 7.  I'm going to scroll down

12   here.  You can see here -- let me go back up --

13   that this was a note that was originally entered

14   on December 23rd, 2016?

15       A.   Yes, sir.

16       Q.   The date of service there.  So that

17   would have been a little bit later in the day that

18   we were just looking at and one day after your

19   last visit to that patient?

20       A.   Yes, sir.

21       Q.   If you scroll down to the procedure

22   details.

23       A.   Yes, sir.

24       Q.   It talks about how the ulcer is now 10

25   by 10 centimeters?

Page 61

```
 1      A.    Yes, sir.

 2      Q.    Do you see that?

 3      A.    Yes, sir.

 4      Q.    If you go back to Exhibit 4, which was

 5   the day before, you had it at four-and-a-half by

 6   five centimeters?

 7      A.    Yes, sir.

 8      Q.    Is that normal for an ulcer to grow that

 9   rapidly in one day?

10      A.    I've never seen it grow that rapidly in

11   one day.

12      Q.    Is it possible that it was larger than

13   what you had notated in this record?

14      A.    I can't see the wound bed, I can only

15   see the small amount of eschar, the 4.5 by 5.0

16   amount of eschar, that's all I can see.  Because

17   as I stated before, I can't see the wound bed

18   behind the eschar.

19      Q.    So you believe that this 10 by 10 would

20   have been viewed from underneath the eschar or do

21   you know?

22      A.    It would have to be underneath it.

23   Because from what we see from my picture it's 4.5

24   by 5.0.

25      Q.    And you could see in this note it
```

Page 62

1    describes that the ulcer was foul smelling?

2         A.   Yes, sir.

3         Q.   But like we discussed, had you smelled a

4    foul smell the day before you would have notated

5    that on the record?

6         A.   Yes, sir.

7         Q.   And then it says here there's evidence

8    of grossly necrotic tissue present.  Do you see

9    that?

10        A.   Yes, sir.

11        Q.   That's why I asked you a few minutes ago

12   if you ever heard the term grossly necrotic.  Does

13   this help put in context what I was asking before

14   about that term?

15        A.   Yes, sir, eschar is necrotic tissue.

16        Q.   I guess more my question is there's a

17   difference between necrotic and then something

18   that's grossly necrotic or extremely necrotic.  Is

19   that an accepted terminology that you use in your

20   field when describing?

21        A.   I just use necrotic.

22        Q.   So even if it's the tiniest little bit

23   versus a very, very large amount, you would just

24   write necrotic?

25        A.   Yes, sir.

Kisha Dyse
November 16, 2020

Page 63

1      Q.   Have you ever seen pressure wounds like
2   this worsen so quickly?
3      A.   You said have I?
4      Q.   Have you, yes.
5      A.   No, sir.
6      Q.   Have you ever heard of them in any of
7   the literature or other case studies?
8      A.   I have not read the literature on them.
9      Q.   Based on your opinion, what do you think
10  happened here with this patient as it kept
11  progressively getting worse?
12           MR. WHITFIELD:  Object to the form.
13      Q.   (By Mr. Morgan)  You can answer,
14  Ms. Dyse.
15      A.   I'm not sure.  I can only go by what I
16  saw, and what I saw was what's in the picture.
17      Q.   So the day before on the 22nd when you
18  saw it you didn't notate any foul smell, and you
19  still believe that the proper course of treatment
20  was what you prescribed on that day?
21      A.   Yes, sir.
22      Q.   Following this patient -- did anybody
23  ever come to you and discuss the care for this
24  patient?
25      A.   No, sir.

Kisha Dyse
November 16, 2020

Page 64

```
 1        Q.   This is kind of the first time you've
 2   been talking about it since then?
 3        A.   Yes, sir.
 4        Q.   Did anybody ever come to you after the
 5   fact and talk to you about Dr. Papin and his role
 6   with this patient?
 7        A.   No, sir.
 8        Q.   Fair to say no one has mentioned
 9   Dr. Papin to you in several years?
10        A.   No, sir, no one has ever mentioned
11   Dr. Papin to me except in this encounter.
12        Q.   When was the first time you found out
13   about this deposition?
14        A.   When I came to Mr. Whitfield's office.
15        Q.   You were just told by somebody hey, you
16   need to go to Mr. Whitfield's office?
17        A.   I spoke with him on the telephone.
18             MR. WHITFIELD:  I'm going to object to
19   what we talked about, but go ahead.
20        Q.   (By Mr. Morgan)  Understood.  And I
21   don't want to get into attorney-client
22   communications.
23             Prior to your discussion with
24   Mr. Whitfield had anybody at the hospital or
25   anywhere else, besides Mr. Whitfield, talked to
```

Kisha Dyse
November 16, 2020

Page 65

1    you about Dr. Papin?

2         A.   No, sir.

3         Q.   Now during this timeframe -- because you

4    know these records span sort of mid-ish November

5    all the way through December, so roughly a five to

6    six-week period.  You saw this patient several

7    times, correct?

8         A.   I'm sorry.  Can you say that again?  I

9    just didn't hear the last part.

10        Q.   That's okay.  I asked that during this

11   timeframe you saw this patient several times,

12   correct?

13        A.   Yes, sir, I believe three times.

14        Q.   And attending physicians would have also

15   seen this patient, correct?

16        A.   I'm not sure.

17        Q.   Do you know if residents would have seen

18   this patient?

19        A.   I'm not sure.

20        Q.   Would you agree with me that nurses saw

21   this patient, besides you?

22        A.   Yes, sir.

23        Q.   Floor nurses and other assigned nurses

24   to the patient, correct?

25        A.   Yes, sir.

Kisha Dyse
November 16, 2020

Page 66

1      Q.   And fair to say you would expect that

2   they followed your instructions to change the

3   bandages and the dressings every day?

4      A.   I just wrote the recommendations.  I'm

5   not sure if they follow it or not.

6      Q.   Is it your experience at UMC that nurses

7   typically do not follow your recommendations?

8      A.   No, I just write the recommendations and

9   I'm not sure if they follow or not.  I'm not sure

10   if they follow.

11      Q.   Have you ever heard about somebody not

12   following your recommendations?

13      A.   No, sir.

14      Q.   We talked earlier about how a doctor can

15   override your instructions?

16      A.   Yes, sir.

17      Q.   If that was done, would you expect that

18   to be notated in the patient's file?

19      A.   I'm not sure, sir.

20      Q.   Would you expect there would be a doctor

21   note that followed yours saying something

22   different, that as a doctor I'm diagnosing this as

23   this with this treatment?

24      A.   No, sir, because the only time I would

25   have any other engagement with the patient would

Kisha Dyse
November 16, 2020

Page 67

1    be with another consult.  So I wouldn't know one

2    way or another if the doctor had done something

3    different.

4        Q.    But if you -- if you came back for a

5    second consult?

6        A.    Yes, sir.

7        Q.    And in between your first and second

8    consult a doctor had made other orders, would it

9    be fair to say that you would expect to see those

10   orders within the patient's file?

11       A.    Yes, sir.

12       Q.    That's what I'm getting at.  If there

13   was a time some doctor disagreed with your

14   assessment, it's not just a verbal disagreement,

15   it would be notated in the records?

16       A.    Yes, sir.

17       Q.    Do you think anybody is to blame for

18   this patient's care for this ulcer occurring?

19       A.    I don't know, sir.

20       Q.    You don't know, no or you just have no

21   idea?

22       A.    I don't know.  I just don't know one way

23   or another.

24       Q.    Do you know what an ICARE report is?

25       A.    Yes, sir.

Kisha Dyse
November 16, 2020

Page 68

1          Q.     Do you know if an ICARE report was done

2     on this patient?

3          A.     I don't know, sir.

4          Q.     Have you ever been involved in other

5     ICARE reports?

6          A.     No, sir.

7          Q.     What is an ICARE report for the record?

8          A.     To my knowledge it's a computer-based

9     form.  We go in and voice our opinions about

10    something that we felt like was done wrong.

11         Q.     Is that something that you prospectively

12    do yourself or are you requested to complete it or

13    both?

14         A.     I'm encouraged to do it if I need to do

15    one.  I've never done an ICARE report.

16         Q.     If a patient or a family member of a

17    patient or whatever complains about the care that

18    is given to a patient, typically the hospital is

19    the one to investigate that, correct?

20         A.     I'm not sure, sir.

21         Q.     Have you ever been involved in any sort

22    of investigation as to patient care for a patient

23    that you were seeing?

24         A.     No, sir.

25         Q.     Have you ever heard of it happening?

Kisha Dyse
November 16, 2020

Page 69

```
 1         A.    No, sir.

 2         Q.    You don't have any personal experience

 3    or knowledge from any other wound care nurse of

 4    that type of situation happening?

 5         A.    No, sir.

 6         Q.    I believe I asked this earlier but I

 7    just want to confirm.  After this timeframe that

 8    we're talking about, did anybody ever come to you

 9    and say that they believed you didn't give

10    sufficient care to this patient?

11         A.    No, sir.

12         Q.    From your perspective, you did

13    everything right with this patient?

14         A.    Yes, sir.

15         Q.    Let's take another couple minute break.

16               (Off the record.)

17         Q.    (By Mr. Morgan)  Ms. Dyse, we kind of

18    talked throughout this deposition about how a

19    doctor can override your assessment and your

20    course of treatment plans, correct?

21         A.    Yes, sir.

22         Q.    If that's the case, then all these

23    consults are being ordered by doctors.  I guess,

24    why are they reaching out to you for the wound

25    care team to make the assessments?
```

Kisha Dyse
November 16, 2020

Page 70

1      A.    You say why are they?

**2      Q.    Why are they?**

3      A.    I'm not sure.  I guess it's just -- the

4    reasons vary.  It kind of helps the physicians to

5    streamline the service.  By having us available we

6    could see the wounds and at least make

7    recommendations.

**8      Q.    Be fair to say that this is your world,**

**9    you see this every day, you've got multiple**

**10   certifications that you've achieved over the**

**11   years, you're a pretty authoritative figure when**

**12   it comes to wounds.  Is that a fair**

**13   characteristic?**

14           MR. WHITFIELD:  Object to the form.

**15      Q.    (By Mr. Morgan)  You can still answer.**

16      A.    Well, I just do my job every day.  I

17   wouldn't say I'm an authority.  Based on my

18   education, I just assess a wound and I make

19   recommendations based on what I see.

**20      Q.    Have you ever heard the term wound care**

**21   specialist?**

22      A.    Yes.

**23      Q.    Is that another name that they call your**

**24   position?**

25      A.    Yes, sir.

Kisha Dyse
November 16, 2020

Page 71

1        Q.    So you're a specialist in wound care?

2        A.    Yes, sir.

3        Q.    Have you seen some other cases like this

4    where -- notwithstanding the treatment that occur,

5    a pressure ulcer just ultimately somehow develops?

6        A.    Yes, sir.

7        Q.    It's something that happens in medicine;

8    is that fair to say?

9        A.    Yes, sir, it does happen.

10        Q.    Fair to say you can do all sorts of

11    treatments and sometimes pressure ulcers are just

12    going to happen?

13        A.    Yes, sir, they happen.  Yes, sir.

14        Q.    Does anyone at the hospital at UMC

15    review your work?  Do you get like a yearly review

16    or anything like that?

17        A.    Yes, sir, we get an annual review.

18    Evaluation.

19        Q.    Is that your nurse manager who does

20    that?

21        A.    Yes, sir.

22        Q.    As part of that review, do they review

23    your -- I don't want to say medical knowledge,

24    that's not the right term I'm looking for.  But

25    whether you're doing a good job assessing and

Page 72

1    treating patients?

2        A.    They just assess my behavior and how

3    I've carried myself at the job.  They don't review

4    patients or anything in the review.

5        Q.    If a wound care specialist was just, I

6    hate to say this, but just not very good and

7    screwing up, who would be the one who would say

8    look, this person is screwing up and just not a

9    good nurse?

10       A.    I don't know who -- my manager would

11   contact me, but I don't know who would contact

12   her.

13       Q.    Do you know if a doctor would?

14       A.    I don't know.

15       Q.    Ever heard of that occurring?

16       A.    I've never heard of it occurring.  It

17   hasn't happened to me.

18       Q.    Fair to say your reviews have been

19   positive?

20       A.    Yes, sir.

21             MR. MORGAN:  I don't have any more

22   questions.

23   EXAMINATION BY MR. WHITFIELD:

24       Q.    I just have a couple of clear-up, just a

25   few small things.

Page 73

```
 1      A.   Yes, sir.
 2      Q.   I don't remember what exhibit it was,
 3   but when he put up the note of Dr. Papin on
 4   December 22nd, 2016; do you remember that exhibit?
 5           MR. MORGAN:  I can pull it up.  It was
 6   Exhibit 5.
 7      Q.   (By Mr. Whitfield)  That was Dr. Papin's
 8   note for his view of the patient at seven
 9   something in the morning; is that correct?
10      A.   Yes, sir.
11      Q.   Is there any reason the record to show
12   where he even examined the wound or made notes of
13   what it looked like on that date?
14      A.   Not from what I see in front of me, no,
15   sir.
16           MR. WHITFIELD:  Can you scroll through
17   the --
18           MR. MORGAN:  Is this a good speed?
19           THE WITNESS:  Yes, sir, that's a good
20   speed.
21           MR. MORGAN:  This looks like a physical
22   therapist note at this point.
23      Q.   (By Mr. Whitfield)  You've had an
24   opportunity to look at the note there.  Was there
25   anything in the note there that showing where he
```

Kisha Dyse
November 16, 2020

Page 74

```
 1    personally examined the wound or his notes of his
 2    examination of the wounds?
 3         A.   No, I don't see that there.
 4         Q.   So there's nothing in the record that
 5    showed that he even looked at the wound?
 6         A.   Not that I see, no, sir.
 7         Q.   And when you're looking at that wound,
 8    that's a late stage decubitus ulcer, right, not an
 9    early stage?
10         A.   That's a late stage, yes, sir.
11         Q.   And if he would have examined it, you
12    would have expected to see something in the
13    record?
14         A.   Yes, sir.
15              MR. WHITFIELD:  Nothing further.
16    EXAMINATION BY MR. MORGAN:
17         Q.   I'm going to go back to Exhibit 5 here,
18    Ms. Dyse.  You see where it says Dr. Batson also
19    saw the patient with the resident today.  Do you
20    see that?
21         A.   Yes, sir, I do.
22         Q.   Do you see anywhere in this note where
23    Dr. Batson examined the patient?
24         A.   No, sir, not from what I see there.
25              MR. MORGAN:  No more questions.
```

Kisha Dyse
November 16, 2020

Page 75

1                     (Time Noted:  3:45 p.m.)

2                       SIGNATURE/NOT WAIVED

3

4     ORIGINAL:  MR. MORGAN, ESQ.

5     COPY:  MR. WHITFIELD, ESQ.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Kisha Dyse
November 16, 2020

Page 76

1                    CERTIFICATE OF DEPONENT

2     DEPONENT:  KISHA DYSE
      DATE:  November 16, 2020
3     CASE STYLE:  Papin vs. UMMC
      ORIGINAL TO:  Mr. Morgan, ESQ.
4          I, the above-named deponent in the
      deposition taken in the herein styled and numbered
5     cause, certify that I have examined the deposition
      taken on the date above as to the correctness
6     thereof, and that after reading said pages, I find
      them to contain a full and true transcript of the
7     testimony as given by me.
                Subject to those corrections listed below,
8     if any, I find the transcript to be the correct
      testimony I gave at the aforestated time and place.
9     Page      Line                    Comments
      _____     _____     _____
10    _____     _____     _____
      _____     _____     _____
11    _____     _____     _____
      _____     _____     _____
12    _____     _____     _____
      _____     _____     _____
13    _____     _____     _____
      _____     _____     _____
14    _____     _____     _____
      _____     _____     _____
15    _____     _____     _____
      _____     _____     _____
16

17          This the _____ day of _____, 2020.

18                          _____
                            KISHA DYSE
19    State of Mississippi
      County of _____
20
            Subscribed and sworn to before me, this the
21    _____ day of _____, 2020.

22    My Commission Expires:

23    _____      _____

24                                      Notary Public

25

Kisha Dyse
November 16, 2020

Page 77

1              CERTIFICATE OF COURT REPORTER

2              I, Robin G. Burwell, Court Reporter and

3      Notary Public, in and for the State of Mississippi,

4      hereby certify that the foregoing contains a true

5      and correct transcript of the testimony of KISHA

6      DYSE, as taken by me in the aforementioned matter at

7      the time and place heretofore stated, as taken by

8      stenotype and later reduced to typewritten form

9      under my supervision by means of computer-aided

10     transcription.

11             I further certify that under the authority

12     vested in me by the State of Mississippi that the

13     witness was placed under oath by me to truthfully

14     answer all questions in the matter.

15             I further certify that, to the best of my

16     knowledge, I am not in the employ of or related to

17     any party in this matter and have no interest,

18     monetary or otherwise, in the final outcome of this

19     matter.

20             Witness my signature and seal this the

21     30th day of November, 2020.

22

23     *Robin G. Burwell*
       _____
       ROBIN G. BURWELL, #1651

24     CRR, RPR, CCR
       My Commission Expires:

25     April 6, 2021

---

**Exhibits**

**Exhibit 001 Dyse**
  3:11 30:13,16
  37:15
**Exhibit 002 Dyse**
  3:12 36:20,21
**Exhibit 003 Dyse**
  1:5 3:13
  42:2,3 51:16
**Exhibit 004 Dyse**
  3:14 48:11,12
  53:5,25 55:25
  56:1 57:10
  58:9 61:4
**Exhibit 005 Dyse**
  3:15 56:3,5,
  16 73:6 74:17
**Exhibit 006 Dyse**
  3:16 58:22,24
**Exhibit 007 Dyse**
  3:17 60:9,11

---
**0**
---

**0900**
  30:22

---
**1**
---

**1**
  30:13,16
  37:15

**10**
  7:5 10:23,25
  49:1 60:24,25
  61:19
**10:59**
  50:16
**11:00**
  56:13
**12-year**
  8:23
**1340**
  47:11
**14th**
  37:16
**15th**
  30:22
**16**
  15:3,7
**17-year**
  8:24
**19**
  8:18
**1900**
  47:15
**1994**
  9:6
**1:40**
  47:11

---
**2**
---

**2**
  36:20,21
**20**
  4:25
**2008**
  16:12
**2009**

  16:10,12
**2010**
  4:25 16:8,10
**2012**
  9:13,18 16:5,
  8 46:25
**2014**
  16:2,6
**2016**
  9:14 10:2
  13:17 14:1,16
  17:8,9,11,14
  18:2 30:22
  33:25 36:25
  47:3 60:14
  73:4
**2018**
  13:18 14:1
  17:8
**2020**
  13:20
**22nd**
  48:14 56:11,
  13 58:10,17
  63:17 73:4
**23rd**
  58:25 60:14
**24-hour**
  18:21,24

---
**3**
---

**3**
  42:2,3 51:16
**30th**
  36:25 37:13
**3:45**
  75:1

---
**4**
---

**4**
  48:11,12
  53:5,25 56:1
  57:10 58:9
  61:4
**4.5**
  51:4 61:15,23
**4.5-centimeters**
  51:2
**4:30**
  18:25 36:25

---
**5**
---

**5**
  56:3,5,16
  73:6 74:17
**5.0**
  51:4 61:15,24
**5th**
  13:19

---
**6**
---

**6**
  58:22,24

---
**7**
---

**7**
  47:16 60:9,11
**7:51**
  56:11

---
**8**
---

**8:00**
  18:25

---

**9**

**90**
48:25

**941**
37:23

**9:00**
30:23

**9th**
42:7 47:11

---

**A**

**a.m.**
30:23 50:16
56:13

**AA**
11:15

**abdomen**
12:10

**ability**
6:21 35:23

**able**
12:7 38:11

**abrasion**
38:24 39:3,9,
15 40:9 44:12

**accepted**
45:13,16
62:19

**accurate**
37:9

**achieved**
70:10

**action**
52:15,16

**addition**
11:4

**advance**
6:14

**affirmative**
5:17

**afternoon**
37:1 47:12

**agrees**
57:2

**ahead**
27:8 64:19

**Alcorn**
9:10

**alert**
20:20

**amount**
10:20 14:24
20:9 49:2
61:15,16
62:23

**Anne**
17:14

**annual**
71:17

**anus**
12:8

**anyways**
6:5

**apologize**
6:13 25:6
58:9

**appropriate**
50:7 51:21

**appropriately**
50:12,14

**approve**
27:8

**approved**
21:3

**approximately**
7:21,23 56:17

**assess**
20:22 70:18
72:2

**assessed**
44:12 59:21,
23

**assessing**
54:12 71:25

**assessment**
20:24 45:21
46:7 54:11
57:9 67:14
69:19

**assessments**
69:25

**assigned**
18:6 22:16
35:19 46:18
65:23

**associate's**
9:8

**associated**
20:4

**attack**
44:10

**attended**
9:7

**attending**
21:11,19,21
28:5,8,12
54:12,13
56:21 57:5
65:14

**attorney-client**
64:21

**authoritative**
70:11

**authority**
70:17

**available**
18:18 70:5

**avoid**
36:18

**aware**
57:4

---

**B**

**BA**
11:15

**bachelor's**
9:9

**background**
8:14 9:3

**backwards**
15:8,10

**bad**
52:9 55:2

**ballpark**
4:18,24 13:15
15:21 16:1
23:6

**bandages**
66:3

**Baptist**
15:19 16:11

**barrier**
34:15

**basis**
18:13

**Bates**
41:25

**Batson**
56:22 74:18,
23

**Baylor**
  15:11,23,24
**bearings**
  30:21
**bed**
  20:12,14
  40:17 43:13
  44:18 51:12,
  22 61:14,17
**beginning**
  5:4
**behave**
  39:13
**behavior**
  72:2
**behavioral**
  4:23 15:18
  16:9
**believed**
  69:9
**better**
  41:22 50:10
**beyond**
  51:20
**bigger**
  51:25 52:2
**black**
  48:24
**bladder**
  13:6
**blame**
  67:17
**blanch**
  40:11,13
**blanching**
  39:16 51:21
**block**
  46:23

**blood**
  20:10 36:16
  39:19 40:16
**bold**
  33:6,10
**bolded**
  33:1,2,4,8
**bone**
  36:3
**bony**
  32:23
**boots**
  34:17
**bottom**
  33:17 42:5
**bowels**
  13:6
**Brandon**
  9:1
**break**
  6:3,4 12:21,
  23 48:8 69:15
**Brentwood**
  15:17 16:9
**broken**
  12:24
**burn**
  15:16

---

**C**

**cancer**
  12:6 20:5
**capacity**
  6:10 15:2
**care**
  9:11,13,17,25
  11:16,22
  12:4,12,13,

  16,17,18,20,
  22 13:13 14:9
  16:24 17:1,4,
  16,18 18:7,
  17,22 20:25
  21:6,11,14
  24:15,24
  27:14,23
  28:1,6 31:11
  32:22 34:3
  47:2 48:15
  63:23 67:18
  68:17,22
  69:3,10,25
  70:20 71:1
  72:5
**carried**
  72:3
**Carroll**
  59:16
**casework**
  10:19
**Center**
  15:13 17:16,
  18
**centimeters**
  50:23 60:25
  61:6
**certificates**
  11:16 12:16
**certification**
  9:12,13,17,
  19,24 10:11,
  14 14:11
  33:22 35:24
  47:1
**certifications**
  9:12 11:17,25
  47:4 70:10

**certified**
  9:25 11:19,20
  47:2
**characteristic**
  70:13
**charting**
  8:6,7
**chat**
  30:2 41:19
**check**
  53:22
**checked**
  53:17,24
**checking**
  29:10
**child**
  4:22
**children**
  8:19
**chose**
  45:18
**chosen**
  49:21
**circle**
  49:10
**claim**
  4:13
**clarify**
  12:14 13:7
  26:13
**clear-up**
  72:24
**click**
  35:5
**clinic**
  17:20
**clinicals**
  10:5

Kisha Dyse
November 16, 2020

4

College
  9:7

colostomies
  12:4

combined
  10:14

common
  19:21,24
  20:2,6,13,14

communications
  64:22

community
  9:7 14:9

compared
  43:12

complains
  68:17

complete
  49:10 68:12

completed
  14:21

comply
  11:13 14:5
  22:8

compromised
  36:15

computer
  18:9 21:1
  22:7,9 26:15
  30:7

computer-based
  68:8

concerning
  4:22

confirm
  55:25 58:8
  69:7

consider
  14:8 53:14

considered
  35:12

considers
  14:9

consult
  18:14,19 19:2
  20:19,21
  21:9,18,20
  22:24,25
  23:3,7,12,20
  29:4,5,12
  30:21 31:11,
  18 34:4 36:22
  37:8,11,12,20
  38:4,6,15
  42:6,10,18
  43:5 48:3,6,
  13,15 67:1,5,
  8

consultation
  18:17

consulting
  13:23 16:14

consults
  18:7,22 23:18
  29:12 37:11
  38:8 69:23

context
  62:13

continence
  10:4,13 11:19
  13:14 33:23

continued
  49:15

control
  13:6

Control-b

33:6,8

conversation
  7:10,22

convicted
  6:17

course
  9:21 10:11,
  12,13 14:20
  29:19,20
  40:18 52:15
  63:19 69:20

courses
  49:20

coverage
  18:21,24,25

covered
  51:13

covering
  44:19

cream
  32:24 34:15

crime
  6:17

Crossgates
  15:15

currently
  13:8 19:10
  33:24

curriculum
  9:21

CWOCN
  47:3

_____

        D

D-Y-S-E
  4:9

daily
  22:18 46:10

damage
  35:8

daughter
  8:23

days
  23:16 29:9

dead
  43:22 44:2
  59:11

debride
  50:4

debridement
  59:10

debrider
  44:5

debris
  45:8

December
  42:7 47:11
  48:14 56:11,
  13 58:16,17,
  25 60:14 65:5
  73:4

decision
  22:3,5 54:22

decubitus
  8:8 35:25
  36:4 59:5,18
  74:8

deeper
  39:6

defecate
  12:8,11

defense
  25:7

definitely
  37:11

degree

9:8,9 11:15,
16

**degrees**
9:15

**delete**
22:8

**department**
19:18

**depending**
17:10 23:19

**deposition**
4:15,21 5:18
6:8,25 7:3,
11,15,22,25
8:3 30:14
41:19 64:13
69:18

**depositions**
4:17 5:5

**depth**
35:7 41:5
44:20 45:4
51:20

**depths**
44:21

**dermatitis**
20:4

**dermis**
39:5 51:21

**describe**
16:18 38:1

**described**
31:16 51:7

**describes**
56:20 62:1

**describing**
6:9 34:4
40:14 62:20

**designated**
24:24 25:2,5

**designates**
25:6

**designations**
11:17

**details**
60:22

**deteriorates**
22:22

**determine**
35:22 39:24
40:12 44:21

**determined**
25:17

**determining**
35:7

**develop**
20:11

**developed**
26:1

**developing**
21:10 29:24

**develops**
20:9 71:5

**diagnose**
25:7,9,11,15,
20 35:16,18
38:21,22
45:22,24
46:3,4 59:20

**diagnosed**
59:19

**diagnosing**
24:16 35:13
66:22

**diagnosis**
25:24 28:1

35:20 38:24
40:23 45:25
46:1,5 59:13

**difference**
30:5 35:21
45:25 62:17

**differently**
39:13

**difficult**
21:18 40:5,8,
10

**disagree**
26:4,7,9

**disagreed**
28:13,19
67:13

**disagreement**
67:14

**discuss**
55:15 63:23

**discussion**
7:7 64:23

**diverting**
12:5

**divided**
18:15

**doctor**
19:13 21:3
22:7 26:3,6
27:7 28:18,19
33:18 52:10
59:12,25
66:14,20,22
67:2,8,13
69:19 72:13

**doctor's**
59:13

**doctors**
26:18 69:23

**documentation**
18:10

**documented**
58:6

**documents**
8:2,5,11
53:18

**Dr**
23:23 31:14
37:7,13,16
38:15 42:10,
17 48:15
56:8,16,22
57:8,11,22
59:16 64:5,9,
11 65:1 73:3,
7 74:18,23

**drainage**
49:2

**dressing**
46:10

**dressings**
46:20 66:3

**drop**
30:2 41:19

**drugs**
6:20

**dry**
43:15

**duly**
4:2

**Dyse**
4:1,8 7:8
8:15 30:10
63:14 69:17
74:18

**E**

**eats**
  44:7
**edges**
  49:3,6,7
**education**
  9:3 11:13
  14:5 70:18
**elevate**
  34:15,16
**email**
  41:18,21,23
  42:1
**emergency**
  52:7,10 55:3,
  10,14
**employed**
  11:11 13:8
**employees**
  28:24
**employment**
  13:22
**encounter**
  48:14 64:11
**encouraged**
  68:14
**ended**
  29:24
**engagement**
  66:25
**enter**
  20:25 54:13
  55:5
**entered**
  19:2 40:1
  56:8 58:25
  60:13

**entities**
  4:14
**entries**
  47:19
**enzymatic**
  44:5
**enzyme**
  44:7
**Epic**
  18:7,8,9
  20:20 35:3
  42:23,25 43:3
  47:21
**epidermis**
  39:4
**equivalent**
  31:8
**eschar**
  43:13,14,15
  44:18,23
  45:3,9 48:24
  49:1 50:1,9
  51:9,13,17,22
  52:3,17,18,24
  53:3 55:22
  61:15,16,18,
  20 62:15
**ESQ**
  75:4,5
**essentially**
  60:1
**established**
  14:7
**Evaluation**
  71:18
**everyday**
  10:17
**evidence**
  25:25 62:7

**exactly**
  5:13
**exam**
  9:22 10:6
  14:25 50:15
  51:6
**examination**
  4:4 14:22
  39:22 51:15
  72:23 74:2,16
**Examine**
  59:5
**examined**
  4:2 73:12
  74:1,11,23
**example**
  19:2 36:18
**examples**
  36:13,14
**exhibit**
  29:25 30:13,
  16 36:20,21
  37:15 42:2,3
  48:11,12
  51:16 53:5,25
  55:25 56:3,5,
  16 57:10
  58:9,22,24
  60:9,11 61:4
  73:2,4,6
  74:17
**exhibits**
  41:18
**expand**
  25:13
**expect**
  66:1,17,20
  67:9
**expected**

  74:12
**experience**
  24:15 66:6
  69:2
**expert**
  5:24
**explain**
  13:2
**exploration**
  59:9
**extremely**
  36:15 62:18

**F**

**face**
  24:1
**facility**
  4:23 17:21
**fact**
  38:25 64:5
**facts**
  6:21
**fairly**
  57:10
**familiar**
  43:1
**family**
  68:16
**fancier**
  36:5
**far**
  19:9 22:6
  43:1
**February**
  13:17 15:3,7
**feedback**
  19:9

feel
  14:21 21:18
  55:14
feet
  34:17
felt
  50:7 55:4
  59:25 68:10
fevers
  59:5
field
  5:25 62:20
figure
  38:6 70:11
file
  66:18 67:10
fill
  40:16
finish
  5:11
finished
  10:19
first
  4:2,15 9:12,
  17 14:1 15:22
  20:18 23:20
  24:16 25:7
  43:12 51:10
  64:1,12 67:7
fit
  22:6,9
five
  14:13 17:6
  18:3 33:1,24
  50:23 61:6
  65:5
five-day
  9:20,21

flat
  38:5
flavor
  10:21
floor
  32:21 65:23
floors
  18:17
flow
  20:10 36:16
  40:16
follow
  21:25 22:3
  29:2 31:16
  66:5,7,9,10
followed
  66:2,21
following
  59:1 63:22
  66:12
follows
  4:3
followup
  47:21
Forest
  16:15
format
  43:1
formed
  25:18
Fort
  15:12,24
foul
  53:19 54:2
  62:1,4 63:18
found
  28:19 64:12

four
  11:24 46:9
four-and-a-half
  50:23 61:5
friction
  20:4
Friday
  19:1
front
  73:14
full
  4:5 5:11 11:4
fully
  44:17,23
further
  38:1 74:15

———————————

**G**

gap
  13:21
genders
  8:22
generally
  12:18 14:18
  45:13,16
giving
  19:9 54:17
go-to
  24:25
gold
  14:10,12
goodness
  52:9
graduated
  9:5
greatest
  55:7

grossly
  53:8,10 62:8,
  12,18
grounds
  5:3
group
  19:14
grow
  61:8,10
guilty
  5:10
gunshot
  29:17

———————————

**H**

happens
  5:18 22:13,20
  71:7
hate
  43:17 72:6
head
  24:2 51:3
heading
  43:2
health
  4:23 15:15,18
  16:7,8
healthy
  44:9
hear
  7:6 19:23
  26:5 27:18
  28:23 40:7
  65:9
heel
  34:17
help
  62:13

helping
  54:20

helps
  40:11 70:4

hey
  5:19 27:4
  29:8 64:15

high
  9:3,5,6
  31:21,23
  34:12

Hinds
  9:7

history
  15:7

hit
  33:6

home
  13:24 16:13

hospital
  15:19 16:11
  17:2,5 18:4
  24:24 25:2,6
  41:10 64:24
  68:18 71:14

hour
  6:4 7:23 48:8

hours
  10:8,23,25
  18:22 30:22
  32:20,22
  47:15 56:17
  57:8,11,21
  58:3

huh-huh
  5:17

---

**I**

ICARE
  67:24 68:1,5,
  7,15

ICU/FLOOR
  15:14

idea
  67:21

identification
  30:16 36:21
  42:3 48:12
  56:3 58:22
  60:9

ileostomies
  12:3

imagine
  54:3 59:7

immediately
  52:20

immobile
  32:4

impair
  6:20

implies
  21:25

incontinence
  13:1,5 20:4
  32:24

incontinent
  32:2

increased
  48:25

independent
  24:2 28:1

infected
  55:21 58:11,
  18,21

---

infection
  52:19 53:3

initially
  29:22

injured
  4:23

injury
  20:10

inpatient
  18:3

instance
  12:6 36:15

instructions
  33:11 66:2,15

intact
  39:19 44:8

interacting
  24:10,12

intern
  27:16,20,21,
  22

internal
  13:11 17:2

interrupted
  43:24

investigate
  68:19

investigation
  68:22

involved
  21:5 52:21
  68:4,21

irregular
  49:3,7,9,11

issues
  19:10

---

**J**

Jackson
  16:16

job
  11:5 15:6
  46:12 70:16
  71:25 72:3

Jolie
  4:11

Joseph
  4:12

jury
  43:20

---

**K**

K-I-S-H-A
  4:7

Katy
  16:22

Kelly
  31:3,4 34:11

kept
  63:10

Kisha
  4:1,7

---

**L**

L-A-S-H-A-W-N-A
  4:8

large
  62:23

larger
  52:3 61:12

Lashawna
  4:7

late
74:8,10

lawyers
5:4

layman's
39:3

lead
32:5

leave
54:23

leaves
44:8,9

Lee
17:14

left
17:10

legs
6:5

length
51:1,2,3

level
31:8

levels
39:6

license
14:6

life
18:12 54:8

lifted
52:18

line
18:20 25:7

list
35:4

listed
32:18 34:11
42:20,22

literally
50:19

literature
14:8 63:7,8

live
8:25 9:1

long
7:21 8:17
13:15 16:1

longer
12:7 31:5

looked
49:22 50:6,13
73:13 74:5

lost
7:4 20:10

Lufkin
17:14

---

**M**

macerated
49:4,7,12

majority
23:8

manager
16:20 17:12,
14 19:6,7,11
71:19 72:10

manipulate
30:7

mark
30:13 36:20
42:2 48:10
56:4 60:10

marked
30:16 36:21
42:3 48:12
56:3 58:22,24

60:9

married
8:15,17,18

Mary
16:22 19:10

master's
9:15

mattress
41:4

MD/NP
33:18

meaning
41:9

measure
50:25 51:1

medical
15:13 16:4,5
18:9 24:25
35:20 46:1,5
71:23

medications
6:20

medicine
60:3 71:7

meet
53:6

meeting
19:18

meetings
19:16

Melvin
16:22

member
68:16

mentioned
64:8,10

Merit
15:15 16:7,8

met
4:10

mid-ish
65:4

mind
45:25

minute
29:2 69:15

minutes
62:11

Mississippi
9:1 16:17

moist
43:15 49:13,
14

moisture
34:15

moment
4:10 6:9 14:4
29:13 49:22
50:13 55:3,8

Monday
18:25 19:3

monitor
33:17

monthly
19:18

months
10:4,7 11:8

Morgan
4:4,11 7:6,8
24:23 30:1,8,
10,17 36:22
41:16,24 42:4
48:10,13 56:4
58:17,23
60:10 63:13
64:20 69:17
70:15 72:21

73:5,18,21
74:16,25 75:4

**morning**
19:4 37:15
73:9

**mouse**
30:17

**mouth**
54:9

**moving**
30:18

**multiple**
70:9

---

**N**

**national**
9:22 10:6
14:25

**necrotic**
43:16,21
44:1,8,10
53:9,10,13,
15,16 62:8,
12,15,17,18,
21,24

**negative**
5:17

**new**
22:25 37:20

**Newesome**
56:20 57:1

**nine**
10:4,7 11:8

**non-living**
43:22

**noon**
19:3

**norm**
45:15

**normal**
12:24 40:2,4
60:3 61:8

**normally**
33:15 42:21

**nos**
5:16

**notate**
54:3 63:18

**notated**
58:11,19,21
61:13 62:4
66:18 67:15

**notates**
56:25

**note**
40:2 47:10,
21,23 48:14
51:15 55:5
56:7,16 57:2
58:18,24
60:13 61:25
66:21 73:3,8,
22,24,25
74:22

**Noted**
75:1

**notes**
25:23 73:12
74:1

**notice**
32:25

**notify**
33:18 34:2

**notwithstanding**
71:4

**November**
30:22 36:25
37:13,16
58:15 65:4

**November{sic**
58:10

**number**
6:16,19 10:8
32:25 37:22
46:9

**nurse**
10:4 12:17
13:13 15:12,
14,16,18,20
16:20,24
17:11,13
19:6,7,11
22:22 24:15,
25 25:10,14
31:1,7,17
33:19,23
45:7,25 46:2,
17 47:6 54:20
69:3 71:19
72:9

**nurses**
17:1,4,24,25
18:16 27:2,4
32:20 33:25
34:12 46:20
65:20,23 66:6

**nursing**
9:8,10 13:24
16:13,16

---

**O**

**oath**
6:10

**object**

24:18 58:13
63:12 64:18
70:14

**objection**
58:15

**obtained**
9:7,9,12

**occur**
60:4 71:4

**occurred**
35:22 36:2
52:14

**occurring**
67:18 72:15,
16

**occurs**
23:15

**October**
13:19

**offend**
5:24

**official**
25:24

**officially**
46:4

**old**
8:21,23,24

**once**
14:21 22:11,
20 29:4 46:10

**ones**
11:21,22
46:15

**online**
10:18

**open**
49:3

opening
  12:20
operate
  60:1
operating
  59:7
opinion
  63:9
opinions
  68:9
opportunity
  73:24
opposite
  57:20
option
  45:21 49:23
options
  26:19 27:23
  45:14,17 53:6
ordered
  28:20 31:11,
  18 37:8
  38:15,17
  42:10,18
  69:23
orders
  27:11,12
  67:8,10
organs
  12:9
ORIGINAL
  75:4
originally
  60:13
ostomies
  13:14
ostomy
  10:3,12 11:20

12:2,3 15:12
33:23
outline
  49:11
outpatient
  17:20
override
  66:15 69:19
oversees
  19:13
oxide
  41:6

_____

P

p.m.
  47:16 75:1
page
  13:3 35:16
  42:23 43:19
  47:15
Papin
  4:12 23:23
  56:8 57:8,11,
  22 64:5,9,11
  65:1 73:3
Papin's
  56:16 73:7
paralyzed
  29:16 32:1,4
part
  42:25 43:4
  65:9 71:22
partial
  38:23 39:2,8
particular
  29:14 55:2
Particularly
  5:7

patient
  8:8 20:17,18,
  25 22:14,17,
  18,19,21
  23:4,19 24:9
  27:23 28:1,7
  29:6,10,14,15
  31:21 32:19
  34:12,14
  35:20 36:16
  37:8 38:9
  43:10 46:18
  47:20,23,25
  48:2,20 50:20
  51:11 52:6
  54:21,24
  55:16 56:13,
  18 57:8,9
  58:10 59:4,6
  60:7,19
  63:10,22,24
  64:6 65:6,11,
  15,18,21,24
  66:25 68:2,
  16,17,18,22
  69:10,13 73:8
  74:19,23
patient's
  20:22 66:18
  67:10,18
patients
  18:6 20:1
  23:8,10 41:5
  57:5 72:1,4
pavilion
  17:19
Pavlos
  4:11
pay
  14:24

peel
  44:25 45:2
  50:1,10
Pennock
  31:3
percent
  48:25 49:1
perfect
  23:2
perineal
  32:22
period
  65:6
person
  6:13 12:5,6,9
  13:5 32:21
  36:14,17 72:8
personal
  69:2
personally
  74:1
perspective
  41:8 45:20
  69:12
physical
  73:21
physically
  33:5
physician
  21:12 22:22
  28:6,13 45:2,
  5,7,10 52:20
  53:1,4 54:12,
  14 55:1,15
  56:22
physicians
  18:16 46:19
  57:5 65:14
  70:4

picture
    23:25 41:7
    61:23 63:16
pictures
    43:3
Pine
    16:15
pink
    39:18 49:1
place
    32:14
placed
    12:9
plan
    21:6,11
plans
    69:20
please
    4:5 5:23
portion
    39:5
position
    13:10,16,23,
    24,25 15:3
    16:14 54:21
    70:24
positions
    28:22,24
positive
    72:19
possible
    61:12
possibly
    34:16
practice
    18:13 40:2
practitioner
    33:19

preferable
    5:16
preference
    30:1
prepare
    7:22 8:2
prescribed
    63:20
present
    9:4 62:8
press
    39:16 40:15
pressure
    20:3,7,8,9
    26:2 29:24
    31:21 32:6,9,
    15 34:8,19
    35:2,3,9,23,
    24 36:1,3,5,
    7,18 39:9,20,
    25 40:9,12,22
    41:4,8 44:13,
    15 45:11
    50:22 51:8
    63:1 71:5,11
pretty
    15:1 45:20
    70:11
preventable
    36:7,8,12
prevention
    34:6,8
previous
    56:12
prior
    15:3,7 56:17
    57:8,11 64:23
probably
    5:2 41:22

problem
    6:6
procedure
    60:21
process
    9:19,20
    14:14,19 27:4
    40:14
program
    34:7
progressively
    63:11
prominence
    32:23
prominences
    34:16
proper
    63:19
prospectively
    68:11
protect
    32:24 34:14
protected
    34:17
protocol
    32:14 34:9,
    10,19,20,22,
    24 41:5
pull
    29:25 35:3
    73:5
put
    18:17 22:6,9,
    11 25:15
    29:11 33:8
    35:3 39:3
    47:23 48:5
    54:9 62:13
    73:3

putting
    25:22

_____

Q

qualifications
    27:18
quick
    48:8
quickly
    63:2
quite
    55:2

_____

R

rapidly
    61:9,10
reached
    39:6
reaching
    69:24
reasons
    70:4
receive
    18:7
received
    9:11,14 11:18
receives
    18:14
recertification
    14:19
recertify
    14:13
recertifying
    14:14
recognize
    24:1

Kisha Dyse
November 16, 2020                                                                                    13

recollection
  24:2
recommend
  44:3 49:4
recommendation
  21:15,22,23,
  24 22:1,4,6,8
  28:6,9 32:8
  40:23 49:15
recommendations
  12:22 20:23
  21:1,2 23:3
  25:3,4,8,10,
  16 26:13
  27:15 45:12
  66:4,7,8,12
  70:7,19
recommended
  27:9 28:13
  32:12 44:5
recommending
  40:19
reconsulted
  22:21 47:23
record
  4:6 5:20 7:7
  12:12 13:2
  17:15 18:8
  26:22 30:11
  38:1,11,13,16
  41:16 42:17
  47:6 48:9
  54:3 58:12
  59:1 61:13
  62:5 68:7
  69:16 73:11
  74:4,13
records
  18:9 24:7
  37:4,5 42:24

65:4 67:15
redistribution
  41:4
references
  17:15
referring
  53:18
regarding
  7:25
regards
  4:13
registered
  47:6
regular
  10:16 11:4
Rehab
  16:16
reiterated
  5:3
related
  40:12
relevant
  21:12
removal
  59:11
remove
  45:9 52:24
removed
  44:24
repeat
  55:6
rephrase
  5:23
report
  16:19,20
  17:11 28:22,
  24 67:24
  68:1,7,15

reports
  19:7 68:5
reposition
  32:19,21
represent
  4:12
request
  23:11 52:25
  53:4
requested
  29:4,6 38:4
  50:9 68:12
require
  52:20
resident
  24:17 27:19,
  21,22,25 57:1
  74:19
residents
  23:21 24:11,
  13 26:9 57:4
  65:17
responding
  5:9 48:2,5
response
  5:17,18 49:19
reveals
  59:5,18
review
  8:2,5 42:14
  71:15,17,22
  72:3,4
reviewed
  8:11 24:6
reviewing
  37:4,5
reviews
  72:18

revisiting
  22:13
rigorous
  10:22
risk
  31:21,23
  34:13
risk/management
  32:9
RN
  47:6,7
Robertson
  31:12,14
  37:7,13,16
  38:15 42:10,
  17 48:15
Robin
  5:12 41:16
role
  24:14 64:5
room
  20:22 54:15
  59:7
rotate
  18:14
rotating
  18:13,18
roughly
  65:5
round
  57:5
routine
  20:18 22:18
  53:21
rules
  5:3
Ryan
  4:11 7:4

**S**

sacral
  59:5,18
sacrum
  58:20
Saints
  15:11,24
Santyl
  44:5,7 49:5,
  16,23 50:7,
  11,12
sat
  9:21
Saturday
  19:3
scab
  50:8
scalpel
  45:8 50:1
school
  9:3,5,6,9
  10:5,7,10
  11:11
schooling
  10:16,17 11:8
screen
  4:12 30:2,9,
  11 42:19,21
  56:5
screwing
  72:7,8
scroll
  42:4 60:11,21
  73:16
se
  18:20

seats
  30:6
second
  9:13 23:11
  37:8,10,20
  38:15 43:9,11
  51:14,24
  67:5,7
seconds
  7:5
seek
  55:15
sees
  22:9
Select
  15:13 16:4,5
self-study
  15:1
semi-scheduled
  19:16,17
send
  42:1
sense
  5:23 6:1
sentence
  38:23
separate
  11:21
serosanguinous
  49:2
service
  47:10 50:18
  60:16 70:5
sets
  35:4
setting
  60:7

seven
  73:8
shape
  49:9,11 51:3
shaped
  49:3
share
  30:2,8 36:19
sharp
  45:8,9
sheer
  20:3
showed
  74:5
showing
  52:19 53:2
  58:23 73:25
side
  18:4
signature
  46:23
SIGNATURE/NOT
  75:2
signs
  52:19 53:2
similar
  57:10,24 58:2
  59:19
similarities
  39:11
sir
  4:16 5:6,15,
  21 6:2,11,18,
  23 7:13 8:1,
  4,10,13,16
  9:16 10:1
  11:1,6,10,14,
  23 12:1 13:5,

9 14:3,11,17
15:5,25 16:10
17:17,23,25
18:5,24 19:5,
8,12,15,20,23
20:14 21:4
22:2,20 23:1,
5,13,22,24
24:4,9,22
25:14,25
26:8,17,20,23
27:1,6,10,17,
19 28:21
29:1,7 30:12,
15,19,24
31:9,13,19,
22,24 32:7,
11,14 33:7,20
34:1,5,9,21,
25 35:11,14
36:6,10,24
37:2,6,14,18,
21,24 38:18
39:10 40:7,
15,20 41:12,
15 42:8,12,15
43:7 44:14
45:3,19,23
46:8,11,14,24
47:2,5,8,13
48:17,21
49:17 50:2,
17,21,24
51:9,12 52:4,
12,24 53:7,
12,16,23
54:6,18,20
55:12,17,24
56:2,6,10,15,
19,24 57:3,6,
19 58:20
59:3,8,15,17,

22,24 60:2,
15,20,23
61:1,3,7
62:2,6,10,15,
25 63:5,21,25
64:3,7,10
65:2,13,22,25
66:13,16,19,
24 67:6,11,
16,19,25
68:3,6,20,24
69:1,5,11,14,
21 70:25
71:2,6,9,13,
17,21 72:20
73:1,10,15,19
74:6,10,14,
21,24

**sit**
14:25 28:17

**sitting**
32:5

**situation**
24:8 38:2,14,
19 47:9 49:20
52:13 53:5,6,
25 60:4 69:4

**situations**
55:9,19

**six**
34:18

**six-week**
65:6

**size**
48:25

**skin**
12:20,21,23,
24 32:24
34:14

**sluffed**
39:5

**small**
29:23 49:2
61:15 72:25

**smell**
62:4 63:18

**smelled**
62:3

**smelling**
53:19 54:2
62:1

**smells**
53:18

**somebody**
17:10 21:25
23:18 31:18
32:3 50:3,9
55:1,15 64:15
66:11

**son**
8:24

**sore**
20:12,14

**sort**
6:19,25 10:21
11:12 14:7,10
15:7 19:16
21:10 22:17,
18 23:14
26:14 32:12
49:19 65:4
68:21

**sorts**
71:10

**span**
65:4

**speak**
7:14,24 25:7

**speaking**
12:18 14:18

**specialist**
70:21 71:1
72:5

**specializes**
13:14

**specific**
28:18

**specifically**
25:15 29:6

**speed**
73:18,20

**spine**
51:3

**spoke**
7:1,2,11
64:17

**spots**
32:5

**square**
49:10

**staff**
15:16,18,19
46:17

**stage**
35:10,24 50:5
51:18 74:8,9,
10

**staging**
35:6,7

**stamps**
41:25

**stand**
33:18,21

**standard**
14:10,12
22:17 32:12

34:19,20,24
45:21 49:19

**standpoint**
53:7

**stands**
59:7

**start**
26:24 27:1,2,
4,9

**started**
13:17,18 16:3

**starting**
9:3 37:22

**starts**
42:5

**stasis**
20:3

**state**
4:5 9:10 46:5

**stated**
14:4 61:17

**states**
59:4

**stating**
38:25 39:1

**stoma**
12:9

**stomal**
13:11 17:2

**stopped**
11:7 13:18

**streamline**
70:5

**stretch**
6:5

**structure**
43:1

studied
  11:2

studies
  63:7

study
  10:23 14:20

studying
  11:4 14:21

stumped
  21:17

subcutaneous
  39:7

subsequently
  22:13

substance
  7:1,9

sufficient
  69:10

summaries
  42:23

supply
  39:19

support
  32:23

surface
  36:3

surgery
  12:5

sustained
  20:9 36:2

sworn
  4:2

system
  18:10 26:15
  42:25 47:21
  55:5

---

            **T**

talks
  31:10 46:9
  60:24

team
  34:3 41:10
  69:25

telephone
  64:17

term
  53:8 62:12,14
  70:20 71:24

terminology
  16:24 36:5
  62:19

terms
  14:23 39:3

test
  14:25 39:15
  40:21 51:7

testified
  4:3 6:9 29:13
  49:25

Texas
  15:12,13,23,
  24

textbook
  14:8

therapist
  13:11 73:22

therapists
  17:3

Theresa
  31:11

thickness
  38:23 39:2,8

thing
  10:17 18:11
  25:19 59:23

third
  42:10 48:20
  51:24

thoughts
  54:17

three
  17:9 18:2
  33:25 56:17
  57:8,11,21
  58:2 65:13

three-month
  10:10,12,13

timeframe
  23:15 65:3,11
  69:7

times
  7:14 17:22
  21:16 28:12
  54:23 55:13,
  17 65:7,11,13

tiniest
  62:22

tissue
  20:10 35:8
  39:6,7,12,16,
  17 40:11,13,
  16 43:16,22,
  23 44:1,2,8,
  9,10 49:1
  59:11 62:8,15

toe
  51:4

Tommy
  5:2 7:1,2,10,
  11,14,25
  41:17

top
  39:5

total
  11:24

totally
  5:10,20

touched
  26:14

trauma
  20:5

treat
  22:19 41:11

treater
  24:25

treating
  19:22,25 21:6
  24:16 72:1

treatises
  14:7

treatment
  20:23 21:2
  23:21 25:3
  26:12,19
  27:9,23
  28:14,20
  29:19,20
  32:13 40:18,
  23 45:13,21
  49:21 50:20
  54:13,16,24
  63:19 66:23
  69:20 71:4

treatments
  26:24 27:1,2
  71:11

true
  5:7 45:4
  55:10

turn
  34:13 36:17
  39:17,18
turns
  5:9
twice
  47:20
two
  6:12,19 9:11
  11:16,21,22
  14:1 17:9
  18:2 32:19,21
  33:25 39:11
  40:6,9 47:18
  53:6 55:23
  56:1
two-minute
  48:8
type
  4:20 5:12
  10:17 18:10
  19:25 20:2
  39:21 60:4
  69:4
types
  19:21
typical
  17:7 20:18
  23:14
typically
  18:23 21:9
  26:19 32:4
  41:11 46:15,
  19 54:10,15
  66:7 68:18

_____

### U

ulcer
  8:8 20:7,8

29:24 31:21
32:9 34:6,8
35:2,24,25
36:2,4,5,18
39:9,20 40:9,
22 41:8
44:13,16
45:11 50:22
51:25 59:5,18
60:24 61:8
62:1 67:18
71:5 74:8
ulcers
  20:3 32:6,15
  35:9 36:7
  71:11
ultimately
  71:5
UMC
  13:17,22
  15:2,11 16:3
  34:6,20,24
  66:6 71:14
UMMC
  4:13 13:8
unable
  44:17
underneath
  61:20,22
unit
  15:16
University
  9:10
unstable
  36:17 52:17
  53:3 55:22
unstageable
  44:13,15
  45:11 49:25

51:23
urinary
  12:8
urinate
  12:7,11
urostomies
  12:4
usage
  27:20

_____

### V

varies
  23:18
vary
  70:4
venous
  20:3
verbal
  67:14
versus
  62:23
viable
  49:1
view
  73:8
viewed
  61:20
visit
  29:5 48:20
  60:19
voice
  68:9

_____

### W

wait
  19:3 27:7

WAIVED
  75:2
walk
  9:2,18 15:6
  20:16 43:8
  48:18,21 54:7
watching
  54:16
WCC
  46:25
week
  7:19,20 10:8,
  20,23,25
weekly
  19:18
white
  39:17
Whitfield
  7:4 24:18,20
  30:4 41:23
  58:13 63:12
  64:18,24,25
  70:14 72:23
  73:7,16,23
  74:15 75:5
Whitfield's
  64:14,16
width
  51:4
Wingfield
  9:6
WITNESS
  24:19,22
  73:19
WOCN
  14:12 33:21
word
  27:21 35:16
  38:20 52:7

**words**
  54:9
**worked**
  11:10,11
  15:11,13,14,
  16,17,19
  16:2,5,8,15
**working**
  11:7 13:7,18
  18:3,23
  50:11,12,14
**works**
  41:24 54:7
**world**
  23:2 55:8
  70:8
**worse**
  57:14,22
  63:11
**worsen**
  63:2
**Worth**
  15:12,24
**wound**
  9:11,13,17,25
  10:3,11
  11:16,22
  12:12,13,16,
  17,18,20
  13:13 14:9
  15:12 16:24
  17:1,4,16,18
  18:7,17,22
  20:8,11,22,25
  21:14,21,22,
  23 22:21
  24:15,24
  25:15,17 26:1
  27:3,14,23
  28:1,6 29:17,

23 31:1,7,11,
17 33:22 34:3
35:6,8,10,13,
21,22 36:2
40:16 41:6
43:13 44:18,
19,20 45:4
47:2 48:15,25
49:3,6,12
51:5,12,20,
22,23 52:19
53:2,15,16,17
55:21 58:1,
18,20 59:6
61:14,17
69:3,24
70:18,20 71:1
72:5 73:12
74:1,5,7
**wounds**
  13:14 19:21,
  25 20:5 21:6,
  21 24:16
  25:1,8,9
  44:22 63:1
  70:6,12 74:2
**write**
  12:22 20:23
  21:14,22
  25:3,4,23
  26:15 27:11,
  12,14,22 28:8
  62:24 66:8
**writes**
  28:6
**writing**
  26:21 34:23
**written**
  26:22 34:21,
  24 43:4

**wrong**
  25:22 37:20
  54:10 58:14
  68:10
**wrote**
  66:4

---
**Y**
---

**Y'ALL**
  30:1
**yearly**
  71:15

---
**Z**
---

**zinc**
  41:6
**Zoom**
  5:8