UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

JOSEPH PAPIN,

          Plaintiff,

                                              CASE NO:  3:17-CV-763 CWR-FKB

vs.

UNIVERSITY OF MISSISSIPPI
MEDICAL CENTER, LOU-ANN
WOODWARD, T. MARK EARL, DR.
STEVEN A. BONDI, and JOHN DOES

          Defendants.

_____ /

## MEMORANDUM OF LAW TO PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

## PLAINTIFF'S STATEMENT OF MATERIAL FACTS

**I.**     **Dr. Papin's Employment with UMMC**

At the time of his employment with UMMC, Plaintiff, Dr. Joseph Papin, was well on his way to becoming a surgeon –something he spent eight years of schooling and upwards of $260,000 on medical school alone to achieve. *See* Declaration of Plaintiff ("Papin Decl."), attached as **Exhibit "A."**  Dr. Papin graduated from the University of Florida in 2011 with a B.S. in Chemistry with the Howard M. Sheridan award for the top graduating student in Chemistry. *See* Plaintiff's Deposition Transcript ("Papin Depo.") (Doc. 144-2, at 7:21-24. After obtaining his undergraduate degree, Dr. Papin was accepted to and ultimately attended the University of Michigan Medical School in Ann Arbor. *See id.* at 7:25 – 8:1. According to U.S. News & World Report's "Best Graduate Schools," The University of Michigan Medical School ranked #10 of all medical schools in the United States at the time of Dr. Papin's matriculation. *See* U.S. NEWS, BEST GRADUATE SCHOOLS, UNIVERSITY OF MICHIGAN – ANN ARBOR, available at https://ur.umich.edu/1011/Mar21_11/2165-u-m-remains-

strong. Dr. Papin then went on to complete a one-year Postdoctoral Fellowship at the University of Michigan in House Services Research. *See* Papin Depo., at 8:2-6.

In 2015, Dr. Papin began applying for entry into surgical residency programs for the 2016 class cycle. *See id.* at 23:19 – 24:2. He interviewed at multiple institutions. *See id.* at 24:17-24. He ultimately matched with UMMC which was ranked towards the top of his list. *See id.* at 25:7-9. Dr. Papin thereafter moved to Mississippi and began his employment with UMMC on June 28, 2016. *See* Plaintiff's House Officer Contract, (Doc 144-3).

## II.   Dr. Papin's House Officer Contract

Residents like Dr. Papin are given a "House Officer Contract." *See id.* In this contract, Defendant, UMMC, agrees, among other things, that:

"It will provide an educational program for postgraduate training **in keeping with established standards**." *Id.* at ¶ II(1) (emphasis added).

It will "administer Physician's training program in accordance with the policies, rules and regulations of the Board of Trustees of Institutions of Higher Learning and the University of Mississippi." *Id.* at ¶ II(2).

"Physician shall have the right of appeal [of disciplines and grievances] as stated in the Handbook for Employees for matters related to employment, and general conduct; and shall have the right of appeal to the Graduate Medical Education Committee for all academic and medical matters." *Id.* at ¶ II(6).

The resident's contract will be terminated during a resident year only for "**malfeasance, inefficiency or contumacious conduct by Physician**." *Id.* at ¶ IV(1) (emphasis added).

UMMC also has an "Administrative Policies and Procedures Manual," a "UMMC Faculty and Staff Handbook," "Guidelines for Academic Remediation" and the "House Officer Grievance Policy" which are incorporated by reference in the House Officer Contract. *See* House Officer Contract, at Section II(1); Jimmy Stewart, Defendant's FRCP 30(b)(6) Corporate Representative's Deposition Transcript ("Stewart Depo.") (Doc 144-8 at 34:11-16, 44:9 – 45:1); Molly Brasfield, Defendant's FRCP 30(b)(6) Corporate Representative's Deposition Transcript ("Brasfield Depo."),

2

(Doc. 144-4, at 10:25 – 11:19); Dr. T. Mark Earl's Deposition Transcript ("Earl Depo.") (Doc 144-5 and 144-6, at 92:12-22).

These policies require UMMC to provide residents with regular evaluations, including formal written evaluations at least twice per year. *See* House Staff Manual, Doc 144-9, at p. 29; Faculty and Staff Handbook, Doc. 144-7, at p. 40; Evaluation Policy and Grievance Algorithm, attached as **Exhibit "B."** When substandard performance is identified UMMC is required to "counsel the employee on areas needing improvement <u>allowing the employee sufficient time to improve</u>." Faculty and Staff Handbook at p. 40. Additionally, "[e]mployees are entitled to written notice of problems in their work, behavior or conduct that could lead to termination." *Id.*; *see also* Evaluation Policy and Grievance Algorithm ("[p]erformance problems should be documented with clear suggestions regarding appropriate conduct for such situations in the future"). UMMC's corporate representative, Molly Brasfield, testified regarding the form and content of the written notice. *See* Brasfield Depo. at 18:1 – 19. Specifically, written notice can be either via email or via one of UMMC's internally used forms. *Id.* at 18:1-13. When deciding what method of written notice to use, UMMC Human Resources "encourage[s] managers to match the type of written notice and the content to the spirit and level of the performance issue." *Id.* at 19:1-10. Hence, less egregious conduct can be addressed by email whereas more egregious conduct should be addressed by a formal written notice. *See id.*

With regard to discipline, these policies generally require that issues with medical residents be addressed in discrete steps: 1) performance reviews and informal remediation; 2) formal remediation plan; 3) probation; and 4) termination. The exception is for behaviors which "significantly compromise patient care and safety or create a hostile work environment," which may justify skipping one or more of these steps. *See* Academic Remediation Guidelines, attached as **Exhibit "C"**; Evaluation Policy and Grievance Algorithm.

When residents like Dr. Papin are terminated, The Board of Trustees of Institutions of Higher Learning requires the Defendant medical center to provide the resident with a bona fide due process opportunity to appeal their termination, including "**the right of confrontation**, to deliver advance notice of documents to be used in the hearing as well as copies of such documents in advance of the hearing, a hearing officer who is either knowledgeable in due process matters or has access to legal counsel during the course of the hearing to ensure an impartial and fair hearing." Minutes of the Board of Trustees of State Institutions of Higher Learning, Opinion, (March 17, 2016) (emphasis added), Doc. 144-27.

In addition to the contract with the residents themselves, UMMC is also bound to follow the grievance and due process procedures provided by the Accreditation Council for Graduate Medical Education, including the "ACGME Institutional Requirements," the "ACGME Common Program Requirements," and the "ACGME Program Requirements for Graduate Medical Education in General Surgery." The requirements of these documents are binding on Defendants. *See* Stewart Depo. at 33:16 – 34:10 (acknowledging "established standards" refers to the ACGME guidelines). Plaintiff's expert, Dr. Anthony Watkins,[1] issued a report in this case explaining that ACGME guidelines require UMMC to provide "**documented** timely feedback." Watkins Report at p. 2, attached as **Exhibit "D."** Dr. Watkins stressed the importance of written feedback explaining it is "paramount to avoid any confusion that can occur with verbal feedback – not only is it common for trainees to misinterpret verbal feedback, but the delivery of this feedback by educators are often not clear and concise. The written format serves as a critical tool to mitigate these issues." *Id.*

He further opined that "[w]hen standard measures to improve are unsuccessful, an individual **must** undergo a formal remediation process where the specific deficiencies are

---

[1] Dr. Watkins serves as the Program Director for the General Surgery Residency Program at New York-Presbyterian Hospital/Weill Cornell Medicine. *See* Dr. Watkins CV, attached as **Exhibit "E."**

highlighted, an action plan and timeline for improving this performance is provided, and the ramifications if they are not met are defined." *Id.* at 2 (emphasis added). Remediation plans are "**strictly required** for anything short of blatant disregard for patient safety resulting in death, <u>which is not the case here</u>." *Id.* at 3 (emphasis added). Plaintiff's second expert, Dr. I. Michael Leitman,[2] authored a report concurring with the position taken by Dr. Watkins. Leitman Report at p. 2, attached as **Exhibit "F."** Specifically, Dr. Leitman explained that ACGME standards require providing a resident with the opportunity to remediate substandard performance. *See id.* at 3.

### III.  UMMC's Failure to Provide Dr. Papin with Detailed or Written Notice of Alleged Performance Deficiencies

In accordance with UMMC policies and procedures, Dr. Earl failed to provide Dr. Papin with written notice of performance deficiencies (either informally by email or formally using one of UMMC's internal forms) prior to his termination. UMMC's Human Resources Officer, Patricia Whitlock, testified that there were **no written warnings** in Dr. Papin's employee file from Dr. Earl regarding Dr. Papin's conduct or misconduct prior to January 10, 2017 – his last date of employment with UMMC. *See* Deposition of Patricia Whitlock ("Whitlock Depo.") at 153:16 – 25, attached as **Exhibit "G."**

Dr. Papin did receive reviews/evaluations by physician and staff members he worked with following his monthly rotations, but this type of written notice did not constitute the type of written notice required by Dr. Papin's contract, UMMC policies and procedures, or the mandates of due process because the reviews did not put Dr. Papin on notice that the complained of behavior could lead to termination and did not provide clear suggestions regarding appropriate conduct for such

---

[2] Dr. Leitman is the Dean for Graduate Medical Education and ACGME Designated Institutional Officer at the Icahn School of Medicine at Mount Sinai. Leitman Report at p. 1. Mount Sinai is the largest GME program in the United States with more than 2200 residents and fellows in more than 140 programs. *Id.* As the Chair of the Graduate Medical Education Committee, Dr. Leitman directs all policies and procedures to ensure compliance with all educational standards. *Id.* at p. 1-2. Through his background, training, and experience, Dr. Leitman is familiar with ACGME standards governing surgical residents, including the required remediation process due junior residents and others undergoing residency training. *Id.* at 2.

situations in the future. *See* Plaintiff's Evaluation Comments, Doc. 140-10. For example, Dr. De Delva stated, "Joe did a reasonable job in clinic, but failed to demonstrate that he owned the care of the inpatients. He often did not seem to have a finger on the pulse of the patient's situation. I often discovered issues and problems that I would have expected him to recognize." *Id.*; *see also* Papin Depo. at 64:2-8. Dr. De Delva never told Joe exactly what these "issues and problems" were for Dr. Papin to be able to correct that behavior moving forward. *See id.*, at 64:9-22. Critically, this review also does not put Dr. Papin on notice that this conduct could lead to termination.

Dr. Papin's first semi-annual review on November, 29, 2016, conducted by Dr. Earl, likewise does not constitute the required written feedback. *See id.*, at 119:25 – 120:10; *see also* Resident Performance Profile signed by Dr. Earl and Dr. Papin, Doc. 144-12. As reflected by Dr. Earl's notes, Dr. Earl's feedback was: "Communication & professionalism concerns. Ownership of tasks. Communicate concerns. Must treat nurses & allied health staff with respect. Do not be arrogant." Dr. Earl did not provide Dr. Papin with specific examples of when or how he failed to take ownership of tasks, when or how he failed to communicate a concern, or when or how he failed to treat nurses and allied health professionals with respect. *See* Papin Depo., at 121:9 – 122:3. When Dr. Papin asked Dr. Earl for clarification, Dr. Earl became irate and told him he "needed to start figuring it out for himself," *id.* at 122:9-18, and "Joe, you always do this. This is how feedback is in surgery. A sigh in the operating room or an attending no longer listening to your presentation, that's your feedback. You know, the big . . . there's a big movement in Surgery to get more feedback. I don't believe in it. I don't think so. I mean, you know most of the feedback that you get is nonverbal." *See* Appeal Tr., Doc. 144-11, at 36:1-10. Dr. Papin also had questions about the grading scale reflected on the "Resident Performance Profile." For example, he did not understand why a grade of 2.9 under "System-Based Practice SBP1" was a critical deficiency but a grade of 2.9 under

"Patient Care PC1" was not a critical deficiency. *See* Papin. Depo. at 122:19 – 123:6. When Dr. Papin asked for clarification on this Dr. Earl told him to "figure it out." *See id.* at 123:6-7.

Dr. Earl alleges that after Dr. Papin's semi-annual review, he continued to receive complaints about Dr. Papin's attitude and performance, which prompted him to call a meeting on December 20, 2016. *See* Appeal Tr., at 16:13-23. An email dated December 20, 2016, from Dr. Earl to Renee Greene, UMMC's Surgery Education Administrator, **with Dr. Papin notably absent from the email**, allegedly memorializes this conversation. Earl Depo., at 194:25 – 195:9. Again, Dr. Earl provides generalized complaints about Dr. Papin's performance including "unwillingness to help with tasks; leaving the hospital during duty hours (to exercise), condescending tone to nurses and fellow residents, leaving clinics without telling anyone, and poor inter-professional communication." *See* December 20, 2016 email, Doc. 144-13. Dr. Earl also informed Dr. Papin he would be "**soliciting feedback** regarding his performance from nurses, residents, and faculty."[3] *Id.* Dr. Earl acknowledges that this feedback was only provided to Dr. Papin verbally, and he was not afforded written notice of this or any other feedback for that matter. *See* Earl Depo. at 94:15 – 95:9.

Dr. Watkins opined that UMMC deviated from the ACGME guidelines by failing to provide Dr. Papin with the requisite written feedback. Specifically, he recognized "[t]here is a paucity of this documented feedback other than emails between individuals **other than Dr. Papin** and a milestone report (11/23/16) documenting critical deficiencies." Watkins Report at p. 2 (emphasis added). Dr. Watkins explained this lack of comprehensive feedback put Dr. Papin at a "severe disadvantage" because he did not have "clear details regarding milestones that needed improvement." *Id.*

---

[3] Dr. Earl later tries to argue the complaints received following this meeting were "unsolicited" which is entirely contradicted by this email memorializing his intent to solicit complaints. *See* Appeals Tr. at 31:10-11; Earl Depo. at 67:21-22, 135:12-17.

## IV.   <u>Dr. Papin's Termination</u>

Following the December 20, 2016 meeting, Dr. Papin went on Christmas vacation. *See* Papin Depo. at 149:12 – 14 (Dr. Papin's last day before his vacation was December 22, 2016). On December 22, 2016, Dr. Mahoney, the chief resident on Dr. Papin's rotation, alleges Dr. Papin informed her for the first time that a patient in their care was diagnosed with a decubitus ulcer (aka a bedsore). *See* Deposition of Meagan Mahoney ("Mahoney Depo."), Doc. 144-15 at 96:14-17. As explained more fully in Section VII below, the medical records do not support this allegation – the records support Dr. Mahoney was aware of the decubitus ulcer well before December 22. While Dr. Papin was on vacation, Dr. Earl and Renee Greene solicited written complaints from UMMC staff which were later used to justify Dr. Papin's termination. *Compare* December 20, 2016 email (Dr. Earl acknowledging he would be soliciting complaints) with email complaints from Dr. Papin's colleagues dated January 3, 2017 to January 10, 2017, Docs. 140-15, 17-19. With the exception of one complaint, the complaints were dated January 3, 2017 to January 10, 2017 and related to events that happened in 2016. *See* complaints, Docs. 140:15, 17-19. Dr. Watkins described this conduct as "concerning." *See* Watkins Report at p. 2 ("Equally concerning is the abundance of emails received on and after 1/3/17 (while Dr. Papin is near completion of a two week vacation) that **<u>suggests a concerted effort to obtain this data retrospectively to build a case for disciplinary action</u>**.[4] Of note, these emails include feedback from staff . . . [but] noticeably missing is **<u>faculty member comments</u>** who are ultimately the gold standard.") (emphasis added).

---

[4] As explained more fully in Memorandum of Law, Section II, UMMC has a documented pattern and practice of pressuring and soliciting co-workers to fabricate disparaging written statements concerning the lack of teamwork and poor professionalism of employees marked for termination. *See Smith v. Univ. of Mississippi Med. Ctr.*, 2018 WL 3231267, at *2 (S.D. Miss. Mar. 7, 2018) ("To be sure, Pigford's testimony is damaging to UMC. Management should not be asking employees to lie about their coworkers. And, unfortunately, this is not the first time a plaintiff has produced evidence that a UMC manager asked a subordinate to fabricate 'disparaging letters concerning [the plaintiff's] professionalism.'"); *see also Zhan v. Univ. of Mississippi Med. Ctr.*, 2016 WL 5374141, at *5 (S.D. Miss. Sept. 26, 2016).

Dr. Papin worked on January 9 and January 10 with **no new complaints** documented during this time frame. *See e.g.*, complaints Docs. 140-18 – 19 (complaints were emailed on January 9 and 10 but related to events in 2016). On January 10, 2017, Dr. Mahoney sent Dr. Earl and Renee Greene a solicited email accusing Dr. Papin of lying to her about the decubitus ulcer patient from his December 2016 rotation. Doc. 140-18.

After receiving this email, Dr. Earl called Dr. Papin into a meeting. *See* Papin Depo. at 203:22-25. Dr. Papin was not notified ahead of time as to the reason for the meeting. *See* Earl Depo. at 203:17-21. Dr. Earl created and presented Dr. Papin with a "remediation" contract which informed him he would be given sixty (60) days to improve his performance or would be subject to further discipline including "(1) [r]eferral to HR and GME Office for immediate termination for safety infractions deemed egregious by the PD, (2) non-renewal of contract, (3) placement on formal probation, (4) requirement to repeat year of training." *See* Remediation Contract, Doc. 144-18; Earl Depo. at 104:8 – 105:6; 199:19-20 (testifying that pursuant to the Guidelines for Academic Remediation, he had Dr. Papin sign a remediation contract; also testifying he personally drafted the Remediation Contract). As the Program Director, Dr. Earl had authority to contract with Dr. Papin to provide him with a remediation contract. *See* Earl. Depo. at 199:6 – 24. Dr. Papin asked Dr. Earl if he could have time to review the contract before signing which was unequivocally rejected. *See* Papin Depo. at 236:17 – 237:2. While Dr. Papin disagreed with the reasons for being placed on remediation, he signed the contract in Dr. Earl's presence as he ultimately had no other choice. *See id.* This was a take it or leave it proposition. Dr. Earl signed the contract the same day. *See* Remediation Contract, Doc 144-18; Earl Depo. at 198:15 – 19.

Notably, the only new complaint brought up during the January 10, 2017 meeting was "lying and being untruthful about patient care." *See id.*; *cf* Dec. 20 email. Per his custom, Dr. Earl did not inform Dr. Papin what he supposedly had lied about or the clinical facts regarding this event. *See*

Papin Depo. at 206:21-23; 207:6-13; *see also* Earl Depo. at 198:15-19 (testifying that the remediation agreement was his "direct feedback" to Dr. Papin during the January 10, 2017 meeting). In fact, as explained more fully below, it was not until January 27, 2017, when Dr. Papin was called into a meeting with UMMC Human Resources representatives, Patricia Whitlock and Brenda Traxler, that he learned the allegations of lying was in reference to the decubitus ulcer patient. *See* Dr. Papin's recorded interview ("Interview Tr."), Doc. 144-19, at 17:4 – 18:15.

Despite being promised, by contract, a sixty (60) day remediation period on January 10, 2017, UMMC immediately backtracked on their decision, breached the remediation contract and never permitted Dr. Papin to return to work again. *See* Appeal Tr. at 109:1-6. Following the execution of the remediation contract Dr. Earl reported Dr. Papin to UMMC Human Resources and Dr. Papin was pulled from duty. *See* Earl Depo. at 208:10 – 210:20.

On January 25, 2017, UMMC Director of Human Resources, Molly Brasfield, asked UMMC Human Resources Representative, Pat Whitlock, to set up an "interview" with Dr. Papin. *See* email dated January 25, 2017, Doc. 144-20. In the email, Ms. Brasfield made clear that Dr. Papin was inquiring about the reason for the meeting and she firmly explained they would not tell him the reason for the meeting and that they would discuss it in person during the interview. *See id.*

The interview was conducted two days later, on January 27, 2017. *See* Interview Tr. at 2:1-2. During the course of the interview, Dr. Papin was notified, for the first time, about several incidents that allegedly supported the basis for his termination. For example, Dr. Papin was told for the first time that the accusation of causing patient harm referred to the decubitus ulcer patient *See id.* at 17:4-16. He was told for the first time that there is a perception of him being in a hurry to leave. *See id.* 13:21 – 14:14:18. Other vague and non-descript complaints previously echoed by Dr. Earl were raised, yet no detail was provided for Dr. Papin to be able to provide any explanation or defense. For example, Ms. Whitlock echoed generalized complaints of "not seeing patients" (with no further

detail), *see id.* at 21:6-12; and "reports that have come back . . . that [he could] tend to be a little condescending with the nurse practitioners" (no indication of which nurse practitioner said this and what Dr. Papin said that was interpreted as condescending). *Id.* at 7:7-12.

On February 14 and February 20, 2017, Dr. Earl emailed Human Resources to inquire about the status of Dr. Papin's employment. *See* email thread dated February 20, 2017, Doc. 144-21. In his email on February 20, 2017, Dr. Earl stated:

> I have heard nothing. If he is not to be renewed in July, I have to fill the slot created by his absence. This must be done by Feb 22 due to National Resident Match Program requirementsI (sic) need to know ASAP and I have someone ready to fill his slot but she must withdraw from the Match no later than Feb 22. If I hear nothing, I will be forced to assume he will not be renewed and fill his residency position in which case he will not have a job here in July, no matter what the HR findings are. **Please help**.

*See id.* (emphasis added). Dr. Earl later testified what he meant by this email was that he believed, even if given a chance, Dr. Papin would inevitably fail remediation and be replaced either way. *See* Earl Depo. at 232:13 – 233:10. Dr. Earl also testified that if Human Resources failed to act before February 22, 2017, he would have potentially lost the opportunity to ensure a match with then preliminary resident, Aimee Sundeen, or even if UMMC did match with Dr. Sundeen, she would have had to enter as a first-year resident. *See id.* at 223:10 – 225:15. Several hours after Dr. Earl's February 20, 2017 email, Ms. Whitlock responded confirming approval to officially terminate Dr. Papin. *See* February 20, 2017 email, Doc. 144-21.

While UMMC Human Resources was involved in the decision to terminate Dr. Papin, UMMC's corporate representative testified, as the Program Director, Dr. Earl was **the ultimate decision maker** regarding Dr. Papin's termination. Stewart Depo. at 81:19 – 82:6 ("[I]t would be up to [Dr. Earl] to make the final decision as the program director. And again, that's what the ACGME vests in that one individual."). Dr. Earl approached UMMC Human Resources and informed them he wanted to terminate Dr. Papin. *See* Whitlock Depo. at 133:22 – 134:1. Cecilia Bass, UMMC's

Director of Employee Relations, simply "endorsed" Dr. Earl's decision to terminate Dr. Papin. *See* Brasfield Depo. at 34:8-13; *see also* Whitlock Depo. at 134:2 – 11.

UMMC's decision to revoke the Remediation Contract (which Dr. Earl <u>required</u> Dr. Papin to sign) and proceed with termination violated Dr. Papin's employment contract, UMMC policies and procedures, the Remediation Agreement and ACGME requirements. Dr. Watkins opined that UMMC clearly recognized the importance of a remediation plan by taking the initial steps but then deviated and moved straight to termination **<u>which was not warranted or justified</u>**. *See* Watkins report at p. 3. Dr. Leitman concurred, opining that UMMC deviated from the ACGME standards, which are incorporated by reference into his employment contract, when it offered Dr. Papin an opportunity to remediate and then decided to terminate his employment without any further transgressions by Dr. Papin. *See* Leitman Report at p. 5.

## V.     <u>Dr. Papin's Appeal</u>

On March 3, 2017, Dr. Papin, through counsel, sent a letter to UMMC requesting an appeal of the February 22, 2017, decision to terminate him. *See* March 3, 2017 letter, Doc. 144-22. On June 8, 2017, <u>nearly five (5) months after Dr. Papin was pulled from duty</u>, Dr. Earl submitted his evaluation of Dr. Papin for his October 2016 rotation (<u>eight months prior</u>) through Dr. Earl's Transplant service. *See* Earl Depo. at 121:15 – 122:3. One month later, Dr. Papin was notified that UMMC would finally hear his appeal on July 18, 2017. *See* July 5, 2017 letter from UMMC to Dr. Papin's attorney, Doc. 144-23.

The letter specifically stated Dr. Papin could have counsel present but his counsel would <u>not</u> be permitted to participate. *See id.* The letter included a list of witnesses UMMC intended to call but <u>did not</u> state that Dr. Papin was permitted to call witnesses. *See id.* The letter identified some of the individuals who had complained about him however many of the complaints relayed by the

witnesses were not based on personal observations but were based on complaints they had allegedly been told (and the letter did not indicate the identities of the original complainants). *See id.*

The appeal hearing was held on July 18, 2017. Dr. Woodward selected Dr. Steven Bondi to chair the hearing. *See* Appeal Tr. at 4:3-10. At UMMC, Dr. Bondi worked as a Pediatric Critical Care Physician and Director of Risk Management. *See* Steven Bondi's Deposition Transcript ("Bondi Depo"), Doc. 144-24 (Part 1 of 2) and 144-25 (Part 2 of 2), at 11:22 – 12:13. Prior to joining UMMC, Dr. Bondi was a practicing attorney and graduated from Harvard Law School. *See id.* at 8:4-6, 9:3-14. Dr. Bondi was involved in at least one prior termination appeal at UMMC prior to serving as the chair in Dr. Papin's appeal. Specifically, he was selected to chair a termination appeal hearing of a former employee, Dr. Eklund. *See* letter regarding Eklund hearing, Doc. 144-26. Prior to Dr. Eklund's hearing, the Board of the Trustees of State Institutions of Higher Learning ("IHL Board") reviewed Dr. Eklund's termination and specifically instructed UMMC to provide Dr. Eklund with a due process hearing that included "**the right of confrontation**," to deliver advance notice of documents to be used in the hearing as well as copies of such documents in advance of the hearing, and a hearing officer who is either knowledgeable in due process matters or has access to legal counsel during the course of the hearing to ensure an impartial and fair hearing. *See* March 17, 2016 IHL Board Opinion, Doc. 144-27.

Despite this IHL Board opinion issued less than a year prior to Dr. Papin's termination, and despite many of the issues coming down to an issue of credibility, Dr. Bondi, as the Chair of the Appeal Hearing, chose <u>not</u> to allow Dr. Papin to cross-examine witnesses or present the panel with a list of cross-examination questions to direct to the witnesses. *See* Appeal Tr. 10:1-3, 50:20 – 51:4; *see also id.* at 85:16-19 (one of the panel members recognizing that it's "[Dr. Papin's] word or [the witnesses'] word."). Additionally, during at least one portion of the hearing, Dr. Papin brought up a

question in response to witness testimony and Dr. Bondi refused to ask the question to the witness or otherwise direct a panel member to ask the question. *See id.* at 89:5-23.

Other comments were made by panel members at the hearing that indicated bias or could have biased other panel members. For example, early in the hearing, panel member, Dr. Luzardo, asked "what is the purpose of this lawsuit? What does he expect at the end of this lawsuit? What is he in search of? It seems to me that this is beyond a point of no return." *See id.* at 26:13-18. Later in the hearing, during the testimony of Dr. Meagan Mahoney, panel member, Dr. Williams, stated "I know Meagan pretty well and I've worked with her for a good while." *Id.* at 57:4-5.

The timing of Dr. Papin's appeal hearing is also suspect. All new residents for the 2017 residency training year began on July 1, 2017, including newly-hired residents from the match to fill first year resident positions and newly promoted residents to fill second year resident positions. *See* Papin Decl. at ¶ 9. Thus, as of the date of Dr. Papin's hearing on July 18, 2017, all General Surgery residency positions Dr. Papin would have qualified for were filled. *See id.* Accordingly, the appeal committee did not have the practical ability to reverse Dr. Earl's decision to terminate Dr. Papin because it would necessitate firing another resident to create a vacancy for Dr. Papin.

On July 24, 2017, Dr. Bondi sent Dr. LouAnn Woodward a letter memorializing the panel's decision following the appeal hearing. *See* July 24, 2017 letter, Doc. 144-28. The panel affirmed Dr. Papin's termination. *See id.* Dr. Woodward then ratified the panel's decision.

## VII.   <u>The Evidence Supports That UMMC Did Not Have Cause to Fire Dr. Papin</u>

The reasons UMMC set forth as the bases for Dr. Papin's termination are as follows:

1.   An incident between Dr. Papin and a Nurse Practitioner that occurred during Dr. Papin's first rotation in July 2016;

2.   An incident wherein Dr. Papin allegedly transferred a patient to the ICU without informing the ICU the patient was coming;

3.   Accusations of not performing rounds;

14

4. Accusations of leaving the hospital while on duty to exercise;

5. Accusations of failing to wash out a wound on a patient;

6. Accusations of sexual harassment; and

7. Accusations of lying about the decubitus ulcer.

*See* February 6, 2017 email (UMMC Human Resources' email endorsing Dr. Papin's termination; *see also* Earl Depo. at 215:9 – 18 (testifying as UMMC's corporate representative that the events identified in the February 6, 2017 email are the circumstances for why Dr. Papin was terminated). As explained more fully below, UMMC officials – Dr. Earl and Human Resources officers alike – failed to conduct a legitimate, independent investigation into any of these hearsay allegations. If they had, they would have discovered that the evidence does not support Dr. Papin engaged in any misconduct.

### 1.    The Incident with Nurse Practitioner Joshua Sabins

As a resident in UMMC's General Surgery program, Dr. Papin was assigned to monthly rotations where each month he would work in a new area of the hospital. *See* Papin Depo., at 50:15-20. The first rotation Dr. Papin was assigned was Cardiovascular ICU ("CV ICU"). *See id.* The two attending physicians over the CV ICU then were Dr. Ines Berger and Dr. Jay Shake. *Id.* at 50:5-12.

At the beginning of this rotation, Dr. Shake told Dr. Papin that the main expectation for his first rotation was to learn. *See id.* at 40:21 – 41:8. If there was a lull in attending to patients on the floor he could come down to the operating room to observe and/or assist. *See id.* at 40:21 – 42:14. If an issue were to arise with one of his patients on the floor while he was in the operating room a nursing staff member could notify him. *See id.* at 42:15 – 43:14. Given his goal of working as a surgeon post-residency, Dr. Papin took every available opportunity to observe/assist in the operating room. Unfortunately, this was taken the wrong way by one of the nurse practitioners,

Joshua Sabins, who felt like Dr. Papin should not be leaving the floor – even if there was a "lull." *See* Deposition of Joshua Sabins ("Sabins Depo."), Doc. 144-10, at 39:8 – 42:4.

On or about July 29, 2016, at the end of Dr. Papin's first rotation, Mr. Sabins' frustrations peaked and he admitted telling Dr. Papin "if you're going to go to the OR and you're not going to stay in the ICU on an ICU rotation, I said just get your bag and don't come back. Just don't come back to the ICU. Don't come back to this office. Anyway, because it was our office." *See id.*, at 41:23-25 - 42:1-3. Subsequently, an altercation ensued. *See* Papin Depo., at 47:1 – 48:17 (Dr. Papin's description); *see also* Sabins Depo., at 39:8 – 42:18 (Mr. Sabins' description). Dr. Papin and Mr. Sabins dispute many details of the altercation, including who was the aggressor and who was merely defending themselves. However, they do not dispute that what prompted the altercation was Dr. Papin informing Mr. Sabins that, given the ICU was slow and he had completed his necessary tasks, he was going to go down to the operating room. *See* Papin Depo., at 47:8-11; Sabins Depo., at 42:8-14. Mr. Sabins told Dr. Papin he was not permitted to go down to the operating room, to which Dr. Papin responded that Dr. Shake gave him permission to do so and he wanted to take advantage of that opportunity. *See* Papin Depo., at 47:11-14; Sabins Depo., at 42:18-23.

Following the incident, neither Dr. Papin nor Mr. Sabins were written up. *See* Sabins Depo. at 44:18 – 23. Dr. Earl conducted no investigation into this incident such as speaking with Mr. Sabins or speaking with the witnesses who were present. *See* Earl Depo. at 125:15 – 24; *see also* Sabins Depo. at 12:1 – 13 (explaining ICU Nurse Practitioner, Marita Ellis, was in the room during the July incident); *id.* at 46:3 – 5 (testifying Dr. Earl never spoke with Mr. Sabins following the incident). Had he talked with Mr. Sabins, Dr. Earl would have learned that Mr. Sabins prompted the incident, telling Dr. Papin to "get his bag and don't come back." Sabins Depo. at 41:23-25 - 42:1-3.

16

###### 2.    ICU Patient Transfer Incident

As a basis for termination, UMMC alleges Dr. Papin signed a patient out without informing the ICU the patient was on the way. *See* Dr. Muncie's email dated January 3, 2017, Doc. 140-15. Dr. Earl admitted there is no policy requiring a resident to notify the ICU if a patient is on the way. *See* Earl Depo. at 131:22 – 132:4. Policy or not, Dr. Papin maintains he spoke to someone in the ICU and informed them the patient was on the way.[5] *See* Papin Depo. at 167:7 – 171:5. Dr. Muncie alleges "a resident" (no name provided) told him the ICU was surprised and had not been notified the patient was coming. *See* Dr. Muncie's email dated January 3, 2017, Doc. 140-15. Dr. Muncie then spoke with an ICU Nurse Practitioner who said she talked to "everyone who had been on that day" (again, no names provided) and nobody reported having spoken with Dr. Papin. *See id.*

Again, Dr. Earl failed to conduct a reasonable investigation into this incident. He asserts he looked into this issue by speaking with Dr. Papin and Dr. Muncie; but Dr. Muncie was not a direct witness to this event. *See* Earl Depo. at 131:1 – 4 ("A" Why didn't I ask anybody? Q: Yes. A: Because Dr. Muncie told me what happened and the ICU had looked into it."). Instead of investigating these allegations to be sure Dr. Papin engaged in misconduct, Dr. Earl carelessly relied on double hearsay stemming from an unidentified witness as a basis for Dr. Papin's termination.[6]

###### 3.    Accusations of not performing rounds

---

[5] Dr. Papin bases this information on his best guess of the patient UMMC is referring to, which he has no choice but to do because UMMC never informed Dr. Papin of the identity of this patient. *See* Papin Depo. at 168:2-7. *Id.* at 168:2 – 169:6.

[6] During his deposition, Dr. Papin explained why UMMC's allegations are implausible. *See id.* at 168:2 – 169:6. In treating this patient, Dr. Papin would have performed a history and physical, put in orders for medication, and document where the patient was going to be transferred – a process which takes roughly two hours. *See id.* at 168:2-16. As a courtesy, Dr. Papin would then call the ICU to inform them the patient was on the way. *See id.* 168:17- 169:1. What UMMC is accusing Dr. Papin of is doing two hours of work and skipping the last 20 seconds of making a courtesy phone call. *See id.* at 169:2-6. Courtesy call or not (which Dr. Papin maintains he made), the patient was taken care of. *See id.* at 169:7-18.

One accusation that UMMC ultimately relied on as a grounds for termination came from a (then) third year medical student, William Crews. Mr. Crews accused Dr. Papin of showing up late and lying about having seen patients during "pre-rounds" that he did not actually see. [7] *See* Appeals Tr., at 90:21 – 91:7 (This is the same William Crews who, under oath recanted his prior testimony that a female medical student had confided in him that Dr. Papin had sexually harassed her).[8] During his deposition, Dr. Papin described "pre-rounds." *See* Papin Depo. at 171:17 – 174:23. He explained that, as a resident, he would arrive to work and report to the resident room (medical students would not be present in the resident room). *See id.* He would be given a list with the patients he would be seeing that day and a summary of patient history from the night before. *See id.* He would then take that list and start seeing his patients. *See id.* Given Mr. Crews was a medical student (an intern) Dr. Papin would have no reason to report his whereabouts to Mr. Crews.[9] Thus, Mr. Crews could not possibly know where Dr. Papin is and was at all times.

Dr. Papin vehemently denies that he ever arrived to work late or failed to perform his rounds. *See* Papin Depo. at 172:1 – 3. Most concerning is that UMMC could have easily verified whether Dr. Papin was arriving on time and performing his rounds but failed to do so. During Dr. Papin's appeal hearing, Dr. Luzardo recognized that the University has the ability to track what time the physicians are arriving and leaving campus. *See* Appeals Transcript, at 144:4 – 19. Specifically, each physician is provided a badge that is used for parking. *See id.* UMMC can pull data of the times the badge was swiped to enter and leave campus to determine whether a faculty or staff member is

---

[7] Dr. Ashley Griffin later relayed this same complaint about Dr. Papin. However, it was not an independent complaint. The complaint was originally communicated to her by Dr. Crews, which she then relayed to UMMC. *See id.* at 177:20 – 178:19. It is the same complaint.

[8] *See* Crews Depo. at 57:6 – 58:8. This is described in more detail in Section VII(6) below.

[9] During his deposition, Dr. Papin likened this to the relationship between an attorney and a legal intern. *See* Papin Depo. at 172:1 – 7. This scenario would be equivalent to a legal intern accusing an attorney of not performing his work. A legal intern would not be privy to the hour by hour tasks an attorney is performing.

present. *See id.* Dr. Luzardo mentioned the data had been used in previous cases where attendance of staff was in question. *See id.* Despite having this data available, and it being used previously in other cases, **nobody** from UMMC took initiative to gather this data to confirm whether these allegations were true. *See* Earl Depo. at 139:3 – 14 (admitting he could have asked someone to pull the data on Dr. Papin's arrival and departure times but did not do so). Moreover, if anyone would know Dr. Papin's arrival times, it would be the person doing the "handoff" in the morning – providing Dr. Papin with his patient list and going over the summary of the night's events. *See* Papin Depo. at 174:16 – 23. Surely, if Dr. Papin did not arrive on time for handoff, they would be the first person to notify UMMC that Dr. Papin failed to arrive on time for handoff of half of the trauma patients. *See id.* There is no such type of complaint here anywhere in the record.

### 4.   Accusations of leaving the hospital while on duty to exercise

On January 10, 2017, Dr. Mahoney emailed Dr. Earl and Ms. Green accusing Dr. Papin of asking to "go for a run" which she allegedly felt was unprofessional. *See* email, Doc. 144-15; *see also* Appeal Tr., at 51:18 – 52:22. During Dr. Papin's appeal hearing, Dr. Mahoney told the panel **she had never given Dr. Papin permission to go on a run previously**. *See* Appeal Tr., at 52:20 – 22. Dr. Papin attempted to inform Dr. Earl that he had been given permission on the prior occasion by Dr. Mahoney via text message but Dr. Earl refused to see it. *See* Appeal Tr., at 39:14-23; Papin Depo at 126:11-25, 127:1-8.

Text messages produced by Dr. Papin confirmed that **Dr. Mahoney lied**. *See* Dr. Mahoney text messages, Doc. 144-14. The text messages show that nine days prior Dr. Mahoney had explicitly given Dr. Papin permission to go on a run. *See id.* During her deposition, Dr. Mahoney recanted and admitted she incorrectly informed the panel about not having previously given Dr. Papin permission to go for a run. *See* Mahoney Depo., at 40:5 – 16 ("Q: Is it fair to say though, that that's not true

because you actually texted about it the week before on December the 6th? A: Right. That was incorrect on my part."). This direct lie by Dr. Mahoney draws her credibility directly into question.

     **5.**    <u>**Accusations that Dr. Papin failed to wash out a patient's wound**</u>

The evidence likewise does not support this accusation. On January 10, 2017, in one of the allegedly "unsolicited emails," titled "Another transgression," Dr. Ashley Ray Griffin accused Dr. Papin of failing "to wash out a massive wound on trauma patient in ICU . . . leaving Sid [Desai] and later me to do it." See Griffin email, Doc. 140-19. UMMC never told him which patient they were referring to, but given Dr. Griffin mentioned Sid Desai, Dr. Papin believes this is a reference to a patient who was involved in a bad motorcycle accident. *See* Papin Depo. at 188:5 – 21. During his deposition, Dr. Papin explained that this patient was admitted to the emergency room where emergency room staff performed an initial wound washout. *See id.* at 188:22 – 189:4. After the patient was moved to the ICU, he was asked to do a more thorough washout, <u>which he did</u>. *See id.* at 189:5 – 190:1. He later received a text message from Sid Desai asking him he had washed out the wound, to which Dr. Papin replied in the affirmative. *See id.* at 190:9 – 16; *see also* text message attached as **Exhibit "H."**

During the deposition of Sid Desai, Dr. Desai could not recall this incident specifically but testified there were <u>no specific instances</u> he could recall of Dr. Papin having been instructed to do something that he did not do.[10] *See* Deposition of Sid Desai ("Desai Depo.") at 11:10 – 12:9, attached as **Exhibit "I."** Unsurprisingly, despite knowing Dr. Desai was a witness to this incident, Dr. Earl did not interview Dr. Desai to obtain his version of events, and Dr. Desai was not called as

---

[10] Dr. Desai's testimony is far more credible than Dr. Griffin's. During the Appeal Hearing, Dr. Griffin testified that when she cleaned the wound she "pulled grass and dirt and gravel out of the wound." *See* Appeal Tr., at 78:15-21. During his deposition, Dr. Papin explained how this is implausible. because the patient would have initially had the wound washed out by emergency room personnel. *See* Papin Depo. at 188:22 – 189:4. Dr. Griffin also admits in her January email that Sid Desai cleaned out the wound before her. *See* email, Doc. 140-19. That Dr. Griffin would allege, even after emergency room personnel and Dr. Desai cleaned out the wound there was *still* grass and dirt and gravel, is simply implausible. *See* Papin Depo. at 191:11-22.

a witness at the appeal hearing. *See* Earl Depo. at 154:18 – 155:3; *see also* Appeal Tr., generally. This is yet another example of UMMC failing to do even a bare minimum investigation that would have directly drawn into question the veracity of this accusation.[11]

### 6.   Accusations that Dr. Papin engaged in sexual harassment

This accusation also originated from the third year medical student, Mr. Crews. During the appeal hearing, Mr. Crews testified that an <u>unnamed</u> female medical student confided in him that Dr. Papin made her feel very uncomfortable (suggesting sexual misconduct).[12] *See* Appeal Tr. at 93:10 – 20 (Mr. Crews testifying "[the female] expressed **to me** that she was feeling very uncomfortable with Joe. I didn't – you know, it was kind of a sensitive topic") (emphasis added). During his deposition, Mr. Crews <u>completely recanted</u> these allegations. He testified that he **did not** actually have a private conversation with this female but that <u>he heard from another resident</u> that the female student made this remark. *See* Deposition of William Crews ("Crews Depo."), attached as **Exhibit "K,"** at 57:6 – 58:8 ("Q: And when did Ms. Arnold come and tell you that Joe was making her feel a little bit uncomfortable? A: She did not specifically come to me about this… My understanding – I'm not sure of the details. I think she discussed it with another resident privately . . . **Q: And she didn't actually have a direct conversation with you about this ever? A: No."**). Mr. Crews further testified during his deposition that he did not believe Dr. Papin ever did anything inappropriate with regards to this student. *See id.* at 56:9 – 19 ("I feel that Dr. Papin never did

---

[11] Additionally, UMMC has no knowledge of the identity of this alleged patient. In Plaintiff's Request for Production, Number 6, Plaintiff sought all medical records which concern any matter addressed at Dr. Papin's appeal hearing (which would include the wound washout incident) and no records for this patient were produced. *See* UMMC's Response to Request for Production, Number 6, attached as **Exhibit "J."**

[12] This accusation was then relayed to Dr. Mahoney and Dr. Griffin who relayed the same complaint to UMMC. *See* Appeal Tr., at 59:16 – 23 (Dr. Mahoney testifying "one of the med students" told her "there was a female med student that had become uncomfortable around [Dr. Papin]"). Again, this was not a second independent complaint but a rumor simply spread from one person to the next.

anything inappropriate or disrespectful towards that medical student"). Like Dr. Mahoney, Mr. Crews' credibility is now directly in question based on this boldfaced lie.[13]

Moreover, UMMC conducted <u>no investigation</u> into these allegations which was a departure from prior instances where sexual harassment was alleged. For example, when a former UMMC resident (identified as Resident 76 in compliance with the Family Educational Rights and Privacy Act), was accused of sexual harassment, UMMC interviewed **ten (10) witnesses** (many of which provided recorded statements) and authored a seventeen (17) page report outlining the facts and evidence gathered regarding the complaint. *See* Resident 76 Report and Investigation of Findings, attached as **Exhibit "L."** UMMC's Human Resource officer testified that conducting an investigation into allegations of sexual harassment is standard protocol. *See* Whitlock Depo., at 16:1 – 22 ("Q: And once the report [of sexual harassment] comes into either of those offices then what takes place? A: There would be an investigation including interviews of the pertinent participants or whomever was engaged in it.").

Dr. Earl acknowledged that harassment is a serious accusation. *See* Earl Depo. at 144:20 – 145:4. When asked why he did not investigate this incident he backed off and said he did not actually interpret this as sexual harassment, however, Dr. Earl ended the appeals hearing using Will Crews as his anchor witness testifying regarding allegations of sexual harassment. *Id.* at 146:11 – 12.

### 7. The Decubitus Ulcer Patient

#### *i. Summary of Dr. Mahoney's Accusation*

On November 14, 2016, (weeks before Dr. Papin's arrival on the trauma rotation), a paralyzed victim of multiple gunshots with a bullet lodged in his spinal canal at C7(hereinafter

---

[13] As explained in Section III(A)(ii) below, this fact is material on Plaintiff's procedural due process claim. The female medical student who allegedly made this comment about Dr. Papin was not called as a witness at the appeal hearing. *See* Appeal Hearing Transcript, generally. Had Dr. Papin been provided the right to confront her at the hearing the panel would have learned that she <u>did not</u> have a private conversation with Dr. Crews, and that comments made about Dr. Papin, <u>if any</u>, did not relate to any inappropriate behavior.

referred to as "Ulcer Patient" in compliance with HIPAA), was admitted to the trauma unit. *See* excerpts of patient medical records ("Ulcer Patient Records"), Doc. 144-16, at Papin-3046. He was a recently discovered diabetic with nutritional issues and an alcoholic which, when compounded with his new immobility, set him up to develop pressure ulcers on his backside. *See id.* at 3090-91. On admission to the trauma unit, special orders were issued to prevent him from developing pressure sores, including for floor nurses to turn him every two (2) hours. *See id.* at 3100. Ulcer Patient's medical records are replete with nursing notes documenting his refusal to be turned every two hours. *See id.*

On November 30, 2016, Ulcer Patient developed a tear on his intergluteal cleft (butt cheek) resulting in a consult to UMMC's wound care team, including Nurse Kisha Dyse, with 19 years of wound care experience, who saw him on November 30, December 9, and December 22. *See id.* at 3090-93, 3095. On each of these dates, the experienced wound care team evaluated his lesion, photographed it, and left notes and wound care treatment recommendations in his medical record for daily dressing changes as well as a cream. *See id.* At no time did UMMC's wound care team suspect that Ulcer Patient's lesion was infected or needed surgical debridement. *See* Ulcer Patient Records at Papin-3090-93, 3095; *see also* Kisha Dyse's Deposition Transcript ("Dyse Depo."), Doc. 144-17, at 13:10-14.

On December 1, 2016, fourth year resident Dr. Meagan Mahoney was assigned as the chief resident to the trauma unit, which was the same day Dr. Papin was assigned to the trauma unit. *See* Papin Depo. at 11-3, 134:5-10. By the time Dr. Papin arrived on the rotation, <u>numerous medical professionals</u> had already been treating Ulcer Patient. *See* Ulcer Patient Records, Ex. M. It is thus abundantly clear from the notes in Ulcer Patient's medical records that he had a pressure ulcer and that numerous members of the trauma team were aware of this.

23

Unfortunately, pressure ulcers are common and not always preventable. *See* Mahoney Depo. at 70:13-17; Dyse Depo. at 36:7-11. It can be hard for a new resident, like Dr. Papin, to identify the difference between a healing, non-threatening pressure ulcer and one that demands more attention. *See* Papin Depo. at 151:8-25. Even Dr. Earl admits that he relies on Wound Care Nurses and Wound Care Physicians to develop treatment plans for wounds. *See* Earl Depo. at 168:1 – 25; 169:20 – 23 ("Q: Do you know if the treatment here using the Santyl and all that, is this considered a conservative course of treatment? A: I wouldn't be able to comment."). Dr. Papin examined Ulcer Patient's backside and saw the scab. However, the wound did not exhibit warning signs of infection like purulent drainage, redness, or foul smell. *See* Papin Depo. at 162:25 – 163:14. As such, it did <u>not</u> raise any alarm bells for Dr. Papin or the more experienced wound care team.  *See id.* at 150:9-11.

However, on December 22, 2016, Ulcer Patient spiked a fever overnight, which could be a sign of infection. Recognizing this warning sign, Dr. Papin sent a text message to Dr. Mahoney, informing her that "wound care" had made recommendations to continue conservative treatment with regard to Ulcer Patient's "early sacral decub." *See* Dec. 22 text message, Doc. 144-14.  Dr. Papin also met with Dr. Mahoney in the resident lounge to go over his patient list, which included Ulcer Patient, before leaving that evening for a scheduled Christmas holiday with his family. *See id.*

Dr. Mahoney alleges this was the first time Dr. Papin told her about the wound, that she had <u>never</u> reviewed Ulcer Patient medical records and depended on the new residents to tell her about pressure sores. *See* Mahoney Depo. at 25:19 - 26:4 Dr. Mahoney complained to Dr. Earl, accusing Dr. Papin of lying to her about having done an exam on this patient.[14] *See id.* at 117:14 – 118:4. Dr. Mahoney's allegations are contrary to the medical records and wound care notes. <u>Many medical professionals, including her,</u> had been treating this patient for a month and "rounding" on him twice

---

[14] Whether Dr. Papin told Dr. Mahoney about the wound prior to December 22, 2016 is disputed. However, as evidenced by the running incident, it would not be the first time Dr. Mahoney erroneously accused Dr. Papin of doing something he did not do.

per day. *See* Ulcer Patient Records, Ex. M; Mahoney Depo. at 63:7-9 (admitting that during this time

period she saw and treated Ulcer Patient); *id.* at 65:17 -22 ("Q: Do you review what the wound care

team states in the charts? A: Yes."); *see also* Earl Depo. at 171:3 – 172:12 (explaining that attending

physicians must review and sign all notes entered by residents).

   In keeping with his standard practice, Dr. Earl did <u>nothing</u> to investigate this allegation and

strictly accepted at face value Dr. Meagan Mahoney's accusation that Dr. Papin failed to tell her of

Ulcer Patient's pressure wound on his buttock. In fact, Dr. Earl willfully ignored HR's request to file

an I-Care report about this incident after breaching the remediation contract. Had Dr. Earl, or

anyone at UMMC, reviewed Ulcer Patient's records, he would have discovered the following

documented facts.

### ii. Ulcer Patient's Pertinent Medical History

   On November 14, 2016, Ulcer Patient was shot seven times as he was coming out of a

nightclub. *See* Ulcer Patient Records at Papin-3047. Fragments of one the bullets lodged in his spinal

canal at C-7, which rendered him a paraplegic. *See id.* at 3156. He could not use (or feel) his legs, but

he still had some use of his arms and hands. *See id.* at 3325. He could have repositioned himself.

However, it was painful for him to be repositioned every two (2) hours in bed per the doctors'

orders. Moreover, repositioning every two (2) hours interrupted his sleep and he refused to do it for

"several weeks." *See e.g., id.* at 3100, 3110.

   Ulcer Patient was considered high risk for pressure sores. *See id.* at 3072. He was a newly

discovered diabetic and had a history of consuming a fifth of alcohol a day. *See id.* at 3054. In the

hospital, he was given whiskey every day to prevent alcohol withdrawal. *See id.* at 3063, 3064, 3067.

His relative immobility from paraplegia, his diabetes and alcohol consumption (poor nutrition) all

made him a "set up" to develop pressure sores, which could worsen and go from stage 1 to stage 4.

Special precautions were ordered for Ulcer Patient to prevent pressure sores, including a special bed and orders that the nurses reposition the patient "Q2hours," or every two hours. *See e.g., id*. at 3072.

The fact that Ulcer Patient refused to be turned is notable. There are multiple nursing notes in Ulcer Patient's medical records by different nurses on the trauma floor reflecting that he refused to be turned for weeks, even after he had been educated on and understood the potential consequences of his decisions regarding not being turned every two (2) hours. Contemporaneous nursing notes documented problems or outright refusals by Ulcer Patient to be turned:

- November 20, 2016 – "PT complains of pain all over when he is moved, turned or repositioned." *Id.* at 3109 (Wendy Rayner RN).

- November 20, 2016 – "Attempted to turn patient several times this AM and patient refused each time. Family came into room and complained about patient not being turned. I explained to them that I had tried, patient refused, and I could not make him do it if he didn't want to.  It has been explained to patient many times about the importance of turning and what could result if he does not turn…" *Id.* at 3110 (C.H Gandy RN).

- November 30, 2016 – Ulcer Patient's response to being educated on the need for repositioning every two (2) hours was: "I ain't gone do this shit all night." *Id.* at 3114 (Alisha Matthews RN).

- "Per RN, patient refused Q2 hour turns for several weeks with continued progression of the wound." Id. at 3100 (Jan. 24, 2017 notes from Leila Lanning NP).

Like the nurses warned, by November 30, 2016, Ulcer Patient had developed a wound on his backside. A brief summary of his subsequent medical treatment history is as follows.

On November 30, 2016 (one day before Dr. Mahoney and Dr. Papin were assigned to the trauma floor), Ulcer Patient is first seen by wound care nurse Kisha Dyse. *See id.* at 3090. She examined his buttock wound, photographed it, made wound care notes and left treatment recommendations for a topical cream. She found no indications of infection.  *Id.* at 3090. On December 9, 2016, Ms. Dyse saw Ulcer Patient a second time and, again, noted no sign of infection and recommended continuing topical creams. *Id.* at 3091-93. On December 22, 2016 (one day

26

before Dr. Papin was scheduled to leave for his vacation), Ms. Dyse saw Ulcer Patient a <u>third</u> time. She, again, indicated there was no sign of infection recommended continuing topical cream. *Id.* at 3095. Several hours earlier, however, Dr. Papin discovered something that triggered cause for concern.  That same day, in the early morning hours there was a "shift to the left" in his white blood cell count, indicating a potential infection. Dr. Papin recommended a blood and urine culture to determine the source of the infection. *See id.* at 3382.. Dr. Papin then texted the following to Dr. Mahoney: "Wound Care recommended continuing santyl for [Ulcer Patient's] early sacral decub." *See* text messages, Doc. 144-14. Dr. Papin also met Dr. Mahoney later that day in the residents' lounge to discuss his patient list before leaving for his scheduled Christmas holiday in Florida from December 23 through December 26, 2016.  *See id.*

On December 23, 2016 (the first day of Dr. Papin's vacation), attending physician, Dr. Carroll, took Ulcer Patient to the Operating Room, where he was placed under anesthesia. *See* Ulcer Patient Records at 3419-50. The scab covering the wound was peeled back and revealed underlying infection and that the wound had channels running deeper into Ulcer Patient's sacrum. *See id.*. Later that day, Dr. Mahoney texted Dr. Papin "Sorry to bother you but who had he [sic] sacral decub wound. [Redacted] or [Ulcer Patient]?" *See* text messages, Doc. 144-14.

### *iii.  UMMC's Failure to Investigate*

On January 10, 2017, Dr. Mahoney emailed Dr. Earl making a number of accusations that are clearly contradicted by the medical records. *See* email, Doc. 140-18. She told Dr. Earl that Dr. Papin only reported the wound after wound care recommended surgical debridement. *See id.* However, as reflected in the records, wound care <u>never</u> recommended debridement. *See* Ulcer Patient Records at 3090-95. Additionally, the attending physician recommended debridement on December 23, 2016, <u>the day after</u> Dr. Mahoney alleges is the first time Dr. Papin reported the wound which was December 22, 2016. *See id.*

27

A simple review of the patient's medical records would have immediately dispelled this accusation. However, Dr. Earl never reviewed these records before accusing Dr. Papin of endangering patient safety. *See* Earl Depo. at 164:1 – 9. Had Dr. Earl, or anyone, reviewed Ulcer Patient's Audit Trail, he would have learned that Dr. Mahoney reviewed Ulcer Patients medical records 73 times between December 11, 2016 and December 20, 2016, refuting the notion she learned about the ulcer for the first time on December 22, 2016. *See* Ulcer Patient Audit Trail, attached as **Exhibit "N"** (evidencing each time Dr. Mahoney reviewed Ulcer Patient's file during the relevant time period). The only "investigation" he conducted into these allegations was speaking with Dr. Mahoney. *See id.* at 184:17-18. Nine minutes after receiving Dr. Mahoney's email he texted Dr. Papin to meet him in his office and forced Dr. Papin to sign the Remediation Agreement, then never permitted Dr. Papin to return to work again. *See* January 10 emails, attached as **Exhibit "O."**

That UMMC placed blame on Dr. Papin for this incident is preposterous. A mountain of evidence contained in Ulcer Patients records confirm that numerous medical professionals were aware of Ulcer Patient's condition and did nothing different from Dr. Papin, but UMMC picked Dr. Papin as the scapegoat to justify his termination.[15] If anyone is to blame[16] it would be UMMC's nursing staff. On February 23, 2017, Ulcer Patient's family complained to UMMC regarding the care he received on November 24, 2016 (prior to Dr. Papin's assignment to the trauma unit). *See* Complaint, attached as **Exhibit "P."** Specifically, they complained he was left in a pile of his own

---

[15] The conclusion that Dr. Earl used this only as a façade to justify Dr. Papin's termination is evidenced by the fact that Human Resources instructed him to file an iCare Report (a report used to document an issue with patient care) but he never did so. Earl Depo. at 107:1-5; see also February 6 and February 7, 2017 emails, attached as **Exhibit "Q"** ("The incident referenced above by Dr. Mahoney regarding the patient's ulcer was one of the items discussed. After inquiring if an ICare report had been submitted and, learning that it had not, been, it was recommended. However, I followed up today, 02.06 , and was told it had not been done."). Other attending physicians also attested to personally examining the Ulcer Patient during this time in question. See Ulcer Patient Records, generally.

[16] Kisha Dyse testified that pressure ulcers are not always preventable in individuals who are extremely compromised - for example "if the patient is too unstable to turn." *See* Dyse Depo., at 36:7-18.

feces for four (4) hours by UMMC nurses. *See id.* They pointed to this incident as leading to the development of an "outrageous wound." *See id.*

Ultimately, the facts, especially in Plaintiff's favor at this stage, do not support that Dr. Papin lied about the decubitus ulcer. A reasonable jury can easily believe that Dr. Papin told Dr. Mahoney about the ulcer and she either forgot that he told her or is intentionally using him as a scapegoat to avoid blame for the incident happening under her watch.

## VIII.   Dr. Papin's Mitigation of Damages

Plaintiff's retained experts both opined as to the insurmountable difficulty Dr. Papin faces being accepted into a future residency program with this termination on his record. Dr. Leitman opined that UMMC's termination of Dr. Papin makes it "impossible in the future for Dr. Papin to secure a position in an accredited general surgery program, or any other GME training program. This prevents him from obtaining a license to practice medicine and therefore denies him the opportunity to independently practice medicine as a physician or surgeon." Leitman Report at p. 4. Dr. Watkins opined that Dr. Papin's ability to acquire a general surgery residency position is severely diminished by his termination – a designation that undoubtedly will make most, if not all, programs reluctant to offer him a position. Watkins Report at p. 3. Even Defendant, Dr. Bondi, testified that Dr. Papin's chances of being accepted into another reputable residency program following his termination would be "extraordinarily difficult." Bondi Depo. at 177:11-22.

However, following his termination Dr. Papin still made an effort to salvage his medical career. Given the timing of his termination, in 2017 it was too late for him to enter the match program for the 2018 cycle so he could not apply to any residency programs. *See* Papin Depo. at 8:23 – 9:2; *see also* Papin Decl., at ¶ 11. In 2019, he applied to ten (10) residency programs for the 2020 cycle but received <u>no</u> interviews. *See id.* at 9:3 – 11:13; *see also* Papin Decl., at ¶ 14. Knowing the challenges that lay ahead in being accepted into a residency program, Dr. Papin made the decision to

go to business school and salvage what he could from his medical degree. *See* Papin Decl., at ¶ 8. Accordingly, he took the GMAT on May 10, 2017 and by December 15, 2017, he was accepted to the University of Michigan Ross School of Business. *Id.* at ¶ 12. He attended the University of Michigan from August 2018 to May 2020 and graduated with his Master's in Business Administration on May 1, 2020. *Id.* at ¶ 13. On August 21, 2019, prior to his graduation, he landed his first post-graduate job out as a medical consultant at Accenture. *Id.* at ¶ 15. While he has fortunately landed on his feet, it will never make up for the time and financial resources he sacrificed to complete four years of medical school and postdoctoral fellowship for a career that is now out of reach, as well as the disparity in financial income from becoming a surgeon. *Id.* at ¶ 16 (Plaintiff spent $264,737.49 to obtain his medical degree and $198,577.78 to obtain his MBA).

## **MEMORANDUM OF LAW**

### I.    **Summary Judgment Standard**

Pursuant to Fed. R. Civ. P. 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Once a movant submits a properly supported motion, the burden shifts to the nonmovant to show that the court should not grant the motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 321– 25 (1986). The nonmovant then must provide specific facts showing that there is a genuine dispute. *Id.* at 324; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). A dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In deciding a summary judgment motion, the court must draw all reasonable inferences in the light most favorable to the nonmoving party. *Id.* at 255.

## II.     Serious Fact Disputes Preclude Summary Judgment on Dr. Papin's Breach of Contract Claim

A mountain of evidence supports that UMMC breached multiple contracts and binding policies with respect to Dr. Papin's employment. "A breach-of-contract case has two elements: (1) 'the existence of a valid and binding contract,' and (2) a showing 'that the defendant has broken, or breached it.'" *Maness v. K & A Enterprises of Mississippi, LLC*, 250 So. 3d 402, 414 (Miss. 2018) (quoting *Bus. Commc'ns, Inc. v. Banks*, 90 So.3d 1221, 1224 (Miss. 2012)).[17] With regard to Plaintiff's contract of employment, the parties do not dispute the existence of a valid and binding contract. *See* DMSJ, Doc. 141, at p. 9 ("[Dr. Papin] is an employee under a one-year contract of employment"); *see also* Stewart Depo. at 32:16-26. However, whether UMMC broke or breached the contract is highly disputed, warranting denial of UMMC's summary judgment. Additionally, UMMC fails to address other contractual obligations it owed to Dr. Papin, including the remediation agreement, which precludes summary judgment on this claim.

### A.     Breach of Employment Contract

As explained more fully in Section II above, Dr. Papin entered into an employment contract with UMMC whereby UMMC promised "to provide an educational program for postgraduate training in keeping with established standards," House Officer Contract, Doc. 144-3, at ¶ II(1); to "administer [Dr. Papin's] training program in accordance with the policies, rules and regulations of the Board of Trustees of Institutions of Higher Learning and the University of Mississippi;" *id.* at ¶ II(2); and that it would only terminate Dr. Papin's contract for "malfeasance, inefficiency or contumacious conduct by Physician." *Id.* at ¶ IV(1). UMMC does not dispute that it was bound by this valid and binding contract. UMMC breached all three of these promises to Dr. Papin.

---

[17] Willfulness is not an element of a breach of contract case. However, if Plaintiff can prove the breach was "gross and willful," Plaintiff is entitled to punitive damages. *See Polk v. Sexton*, 613 So. 2d 841, 845 (Miss. 1993). A explained more fully herein, Plaintiff has presented evidence in which a reasonable jury could conclude Defendant, UMMC, willfully breached their contractual obligations to Dr. Papin.

UMMC breached their promise to provide an educational program in line with ACGME guidelines by failing to provide Dr. Papin with "**documented** timely feedback." Watkins Report at p. 2. This also violated UMMC's policies and procedures requiring written notice of alleged deficiencies to faculty and staff. *See* Faculty and Staff Handbook, Doc. 144-7, at p. 40 ("[e]mployees are entitled to written notice of problems in their work, behavior or conduct that could lead to termination"); Evaluation Policy and Grievance Algorithm, Ex. B, ("[p]erformance problems should be documented with clear suggestions regarding appropriate conduct for such situations in the future"). UMMC's Human Resources Officer, Patricia Whitlock, testified that there were **no written warnings** in Dr. Papin's employee file from Dr. Earl regarding Dr. Papin's conduct or misconduct prior to January 10, 2017 – his last date of employment with UMMC. *See* Whitlock Depo. at 153:16 – 25. The only documentation evidencing concerns about Dr. Papin's performance and conduct is the December 20, 2016 email from Dr. Earl to Green. However, this does not satisfy ACGME requirements because <u>Dr. Papin is not copied on the email</u>. *See* December 20, 2016 email, Doc. 144-13. Dr. Earl acknowledges that this feedback was only provided to Dr. Papin verbally, and he was not afforded written notice of this feedback or any other feedback. *See* Earl Depo. at 94:15 – 95:9.

UMMC also breached their promise to comply with the policies, rules and regulations of the Board of Trustees of Institutions of Higher Learning ("IHL"). The IHL mandates the right to confrontation in appeals proceedings. *See* MINUTES OF THE BOARD OF TRUSTEES OF STATE INSTITUTIONS OF HIGHER LEARNING (March 17, 2016), Doc. 144-27. The United States Supreme Court defines the "right to confrontation" as the right to be confronted with the witnesses against him or, in other words, a right that bars the "admission of testimonial statements of a witness who did not appear at trial." *Crawford v. Washington*, 541 U.S. 36, 53-54 (2004). As such, the IHL directs UMMC to provide an appeal that allows aggrieved residents to confront the

witnesses against him, or their statements should not be admitted.[18] By promising to follow all IHL rules, policies and procedures with regard to Dr. Papin's employment, UMMC was contractually obligated to provide Dr. Papin with the right to confrontation at his appeals hearing. It is undisputed that UMMC accused Dr. Papin of sexual harassment; *see* February 6, 2017 email, Ex. Q, (UMMC Human Resources' email endorsing Dr. Papin's termination); raised the sexual harassment complaint at his appeals hearing, *see* Appeal Tr. at 59:16 – 22, 93:4 – 20; and failed to present the complainant at the hearing so that Dr. Papin could confront the complainant regarding her accusations. *See id.*, generally. UMMC undeniably breached Dr. Papin's employment contract on this basis. Had UMMC provided the right to confrontation, as they were contractually obligated to do, the panel would have learned that Mr. Crews lied about the sexual harassment allegation. *See* Crews Depo. at 57:6 – 58:8.

Finally, UMMC breached Dr. Papin's employment contract because they terminated his contract for reasons other than "malfeasance, inefficiency or contumacious conduct." It is a "general principle of evidence law that the factfinder is entitled to consider a party's dishonesty about a material fact as 'affirmative evidence of guilt.'" *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 147 (2000) (citing *Wright v. West,* 505 U.S. 277 (1992); *Wilson v. United States,* 162 U.S. 613, 620–621 (1896); 2 J. Wigmore, Evidence § 278(2), p. 133 (J. Chadbourn rev. 1979)). Here, UMMC was dishonest about numerous material facts that they allege support Dr. Papin's termination. For example, UMMC alleged Dr. Papin sexually harassed a female student but Mr. Crews completely recanted that testimony. *See* Crews Depo. at 57:6 – 58:8. Dr. Mahoney alleged that she had never given Dr. Papin permission to go for a run while on duty but later recanted, admitting that she had. *See* Mahoney Depo., at 40:5 – 16. Dr. Mahoney also told Dr. Earl that she was not aware the ulcer patient had a wound until December 22, 2016; however, she reviewed the patient's medical records 73 times between December 11, 2016 and December 20, 2016. *See* Audit Trail, Ex. N. Finally, Dr.

---

[18] As explained more fully below, UMMC's failure to provide Dr. Papin with the right to confrontation also violated his procedural due process rights.

Mahoney told Dr. Earl that Dr. Papin only told her about the wound (on December 22, 2016) after wound care recommended debridement. Doc. 140-18. The attending physician – not wound care – recommended debridement and the recommendation was first made on December 23, 2016, the day after Dr. Mahoney alleges Dr. Papin told her about the wound for the first time. *See* Ulcer Patient Records at 3419-50..

Other incidents are not credible, and with all inferences of fact in Plaintiff's favor, require denying UMMC's motion. For example, regarding the incident with the Nurse Practitioner, Mr. Sabins admitted he told Dr. Papin, "if you're going to go to the OR and you're not going to stay in the ICU on an ICU rotation, I said just get your bag and don't come back;" *see* Sabins Depo. at 41:23-25 - 42:1-3. Regarding the ICU transfer incident, Dr. Muncie was the sole complainant but was not a direct witness to the event. Appeals Tr. at 87:3 – 13. Moreover, in treating this patient, Dr. Papin would have performed a history and physical, put in orders for medication, and document where the patient was going to be transferred – a process which takes roughly two hours. *See* Papin Depo., at 168:2-16. As a courtesy, Dr. Papin would then call the ICU to inform them the patient was on the way. *See id.* 168:17- 169:1. What UMMC is accusing Dr. Papin of is doing two hours of work and skipping the last 20 seconds of making a courtesy phone call. *See id.* at 169:2-6. Courtesy call or not (which Dr. Papin maintains he made), the patient was taken care of. *See id.* at 169:7-18. This is not plausible. Regarding the wound washout incident, Sid Desai testified that there were no specific instances he can recall of Dr. Papin having been instructed to do something that he did not do. *See* Desai Depo. at 11:10 – 12:9). Dr. Desai's testimony is far more credible than Dr. Griffin's. During the Appeal Hearing, Dr. Griffin testified that when she cleaned the wound she "pulled grass and dirt and gravel out of the wound." *See* Appeal Tr., at 78:15-21. During his deposition, Dr. Papin explained how this is implausible. Specifically, this patient would have initially had the wound washed out by emergency room personnel. *See* Papin Depo. at 188:22 – 189:4. Then, Dr. Griffin

admits in her January email that Sid Desai cleaned out the wound before her. *See* email, Doc. 140-19. That Dr. Griffin would allege, even after emergency room personnel and Dr. Desai cleaned out the wound there was *still* grass and dirt and gravel, is simply implausible. *See* Papin Depo. at 191:11-22. Regarding allegations Dr. Papin was failing to show up work on time, UMMC could have easily pulled his attendance records from his work badge which would have confirmed his timely attendance but they did not. *See* Appeals Transcript, at 144:4 – 19. If they had, they would have learned that Dr. Papin's attendance records are impeccable.

Most notably, the complaints that served the basis for Dr. Papin's termination were <u>solicited by Dr. Earl</u>. *See* December 20, 2016 email, Doc. 144-13. UMMC has a documented pattern and practice of pressuring and soliciting co-workers to fabricate disparaging written statements concerning the lack of teamwork and poor professionalism of employees marked for termination. *See Zhan v. Univ. of Mississippi Med. Ctr.*, 2016 WL 5374141, at *5 (S.D. Miss. Sept. 26, 2016); *Smith v. Univ. of Mississippi Med. Ctr.*, 2018 WL 3231267, at *2 (S.D. Miss. Mar. 7, 2018). In *Zhan*, the plaintiff presented testimony from a co-worker that UMMC asked him to collect letters from Zhan's Asian co-workers disparaging Zhan's professionalism and lack of teamwork. 2016 WL 5374141, at *5-6. <u>UMMC did not provide a response to this allegation</u>. *Id.* at *6. Judge Reeves held **this conduct "reek[ed] of animus"** and that UMMC would have to explain to a jury why it would solicit disparaging letters about Zhan. *Id.* (emphasis added). Two years later, in *Smith*, Judge Reeves admonished UMMC for continuing to engage in the same conduct. 2018 WL 3231267 at *2. In *Smith*, the plaintiff presented evidence that **her co-worker's manager asked the co-worker to write a false statement** alleging that Smith cursed at another employee. *Id.* at *1. Judge Reeves made the following statement in response: "To be sure, Pigford's testimony is damaging to UMC. **Management should not be asking employees to lie about their coworkers. And, unfortunately, this is not the first time a plaintiff has produced evidence that a UMC**

**manager asked a subordinate to fabricate 'disparaging letters concerning [the plaintiff's] professionalism.'"** *Id.* (quoting *Zhan*, 2016 WL 5374141, at *5) (emphasis added).

UMMC is up to the same tricks here, once again soliciting disparaging feedback regarding Plaintiff's professionalism and performance to create a case for termination. As Judge Reeves noted, this conduct reeks of animus. Considering UMMC's dishonesty on numerous material facts, and pattern and practice of soliciting disparaging feedback to create an illusion of cause, the facts viewed in the light most favorable to Plaintiff, are more than sufficient for a reasonable jury to find UMMC violated Dr. Papin's employment contract.

### B.    Breach of The Remediation Contract

UMMC does not specifically address this in their Motion, but the facts unequivocally support that UMMC breached the Remediation Contract with Dr. Papin. On January 10, 2017, UMMC entered into a formal Remediation Contract with Dr. Papin which was signed by Dr. Earl and Dr. Papin the same day. *See* Remediation Contract, Doc. 144-18. According to ACGME guidelines, which are incorporated by reference into Dr. Papin's employment contract, UMMC is required to provide a formal remediation process for anything short of blatant disregard for patient safety resulting in death, which is not the case here. Watkins Report at pp. 2 – 3. The contract specified that Dr. Papin would be provided with sixty (60) days to show significant improvement in the areas of competency domains outlined in the contract. *See id.* The contract further provided that if Dr. Papin did not demonstrate improvement or any event that seriously threatens patient safety occurs during the remediation period Dr. Papin would be subject to termination. *See id.*

As the Program Director, Dr. Earl had authority to contract with Dr. Papin to provide him with the remediation contract. *See* Earl. Depo. at 199:6 – 24. Dr. Earl personally drafted the contract and then both parties signed. *See id.* at 104:8 – 105:6; 198:15-19, 199:19-20; *see also* Papin Depo. at 236:17 – 237:2. After signing the agreement, it is undisputed that Dr. Papin was immediately pulled

from duty and never worked a single day for UMMC again. *See* Earl Depo. at 208:10 – 210:20. He was placed on probation and then officially terminated on February 20, 2017. *See* Papin Depo., at 178:12 – 16. Without question, Dr. Papin did not violate any of the terms and conditions of his remediation contract and as such, UMMC's termination of the contract was a material breach.

**III.   Dr. Papin Did Not Receive Procedural or Substantive Due Process**

    **A.   Plaintiff is Entitled to Summary Judgment on UMMC's Failure to Provide Procedural Due Process[19]**

        **i.   Pre-Deprivation Procedural Due Process[20]**

A plaintiff is entitled to the protections of due process if he has a property interest in his continued employment or education. *Davis v. Mann*, 721 F. Supp. 796, 798 (S.D. Miss. 1988), *aff'd*, 882 F.2d 967 (5th Cir. 1989) (citations omitted). Fifth Circuit case law is clear that government employees, dismissible only for cause, including medical residents of public institutions, have a property interest in their continued employment. *Walsh v. Hodge*, 975 F.3d 475, 481 (5th Cir. 2020); *Davis*, 721 F. Supp. at 799 (in a medical resident dismissal, the Southern District of Mississippi held plaintiff was entitled to fourteenth amendment procedural due process protections). This is because "the sanctions imposed by the University could have a substantial lasting impact on appellants' personal lives, educational and employment opportunities, and reputations in the community."

---

[19] Plaintiff filed a cross-Motion for Summary Judgment on this issue. Doc-144.

[20] Plaintiff brought procedural due process claims against UMMC under Miss. Const. Art. 3, § 14, which states: "No person shall be deprived of life, liberty, or property except by due process of law." Plaintiff brought procedural due process claims against Dr. T. Mark Earl, Dr. Steven Bondi, and Dr. LouAnn Woodward, in their individual capacities under 42 U.S.C.A. § 1983 which was passed for the express purpose of enforcing the provisions of the Fourteenth Amendment to the U.S. Constitution. *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 934 (1982). Like Miss. Const. Art. 3, § 14, the Fourteenth Amendment states: "[No state shall] deprive any person of life, liberty, or property, without due process of law." In Mississippi it is presumed that "similar sections of the United States Constitution and the Mississippi Constitution ought to be construed similarly." *Watts v. State*, 818 So. 2d 1207, 1210 (Miss. Ct. App. 2002) (quoting *McCrory v. State*, 342 So.2d 897, 900 (Miss.1977)). Accordingly, case law analyzing due process under 42 U.S.C.A. § 1983 can be equally applied to Plaintiff's claims brought under Miss. Const. Art. 3, § 14.

*Plummer v. University of Houston*, 860 F. 3d 767, 773 (5th Cir. 2017). This is even more true for medical residents, whose entire careers are destroyed by termination of the residency. *Cf. Smith v. St. Louis University*, 109 F. 3d 1261 (8th Cir. 1997) (discussing blacklisting of medical residents); *Univ. of Tex. Med. Sch. at Hous. v. Than*, 901 S.W.2d 926, 929-30 (Tex. 1995) (noting that a charge of "dishonesty" against a medical student causes "not only serious damage to his reputation but also the loss of his chosen profession as a physician. The stigma is likely to follow the student and preclude him from completing his education at other institutions."). Dr. Papin thus qualifies for the protections of due process in that he was employed by a public institution and was dismissible only for cause.

The elements of procedural due process are notice and an opportunity to respond. *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 546 (1985). The extent of due process owed is determined by weighing three factors set forth by *Mathews v. Eldridge*: (1) "the private interest"; (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards"; and (3) "the Government's interest", including the costs of providing additional procedural safeguards. 424 U.S. 319, 335 (1976). Due process is "flexible and calls for such procedural protections as the particular situation demands." *Gilbert v. Homar,* 520 U.S. 924, 903 (1997) (citation omitted). The procedures should be tailored, in light of the decision to be made, to "the capacities and circumstances of those who are to be heard." Mathews, 424 U.S. at 349 (quoting *Goldberg v. Kelly*, 397 U.S. 245 at 268-269 (1970)). And where the penalty is as serious as expulsion, this means something more than an "informal give-and-take." As the Supreme Court held in *Goss v. Lopez*, "[l]onger suspensions or expulsions for the remainder of the school term, or permanently, may require more formal procedures." 419 U.S. 565 at 584 (1975). The question regarding the process owed to Dr. Papin has already been answered by Judge Reeves, who in his opinion, held "Earl should have been even more aware that a heightened level of due process was due to Papin during the disciplinary hearing." Doc. 33, at p. 15.

Turning first to the notice requirement, for notice to be proper it must apprise the employee in "sufficient detail to permit him to show any error that may exist." *Wells v. Dallas Indep. Sch. Dist.*, 793 F.2d 679, 682 (5th Cir. 1986); s*ee also Davis*, 721 F. Supp. at 803. For example, in *Wells*, the Fifth Circuit Court of Appeals described the following complaints as "vague" and insufficient to establish the plaintiff received sufficiently detailed notice:

> 1. Negligence and misconduct in the management and supervision of the activities and affairs of the department under your control;
>
> 4. Approval by you and persons under your direct supervision and control of payments for charges that you knew or should have known were unreasonable and excessive on various construction and repair jobs performed throughout the District;
>
> 5. Failure to ensure adequate job site supervision either by DISD staff or outside architects and engineers under contract to the District for such purposes;
>
> 6. Attempting, by intimidation or other means, to require principals and other persons at various schools and job sites to improperly and falsely approve work performed on facilities under their control and supervision;
>
> 7. Failing to maintain adequate procedural and other safeguards as to competitive bidding;
>
> 8. Abuse and misuse of the emergency contract procedures and open purchase order procedures of the District by you and those under your supervision and control.

*Wells*, at 682–83.

In the instant case, the detail provided with respect to Dr. Papin's complaints was equal to, if not less than what is included above, particularly prior to his effective termination. During all of Dr. Earl's meetings or written communications with Dr. Papin, Dr. Earl used vague and generalized complaints about Dr. Papin's performance such as "poor inter-professional communication" and "condescending tone to nurses and fellow residents." *See* Dec. 20 email, Ex. K; *see also* Remediation Contract, Ex. P. Furthermore, the seminal event triggering the remediation was the allegations of causing "patient harm" and/or providing care for patients. *See* Remediation Contract, Ex. P; Appeal Tr. at 12:9-17, 17:16 – 19:14. Yet Dr. Papin <u>was never even told which patient it was</u>! As such, Dr.

Papin was left to rebut vague allegations of "patient harm" without any capability of rebuttal. *See* Interview Tr. at 17:4 – 18:15. Without the names of patients he allegedly harmed, the comments he made that were interpreted as condescending, or the identities of the individuals he allegedly upset, Dr. Papin cannot possibly defend himself against such allegations.

For notice to be perfected, notice must also be timely. *See Davis*, 721 F. Supp. at 803; *Coburn v. City of Bossier City*, 2012 WL 1071184, at *6 (W.D. La. Mar. 5, 2012), *modified on reconsideration*, 2012 WL 2427038 (W.D. La. June 26, 2012). In *Davis*, this Court held that notice was not timely where the plaintiff was presented with the charges at the hearing. 721 F. Supp. at 803. The Court held that "Davis could not have been expected to prepare and present on that day a defense to those charges of which he had not received detailed notice." *Id.* Likewise, in *Coburn*, the Western District of Louisiana held that plaintiff did not receive timely notice where the notice and opportunity to be heard occurred simultaneously with her termination. 2012 WL 1071184, at *6; *see also Samuel v. Holmes*, 138 F.3d 173 (5th Cir.1998) (holding notice inadequate for due process purposes where employee received first notice of possible termination twenty minutes prior to meeting).

To the extent UMMC construes Dr. Papin's January 27, 2017 "interview" as a pre-termination due process hearing, such argument will inevitably fail because Dr. Papin did not receive timely notice of the charges against him in advance of the hearing or the opportunity to review any of the relevant records from the patients which were brought to his attention. Prior to the interview, Dr. Papin inquired into the purpose of the meeting and UMMC intentionally withheld information from Dr. Papin regarding what would be discussed at the meeting. *See* Jan. 25 email, Doc. 144-20. Then, during the course of the meeting, UMMC raised brand new complaints or raised new details surrounding former complaints that Dr. Papin was learning for the first time. See Interview Tr. at 13:21 – 14:14-18, 17:4-16. By intentionally ambushing him with new information at the meeting, Dr. Papin did not have time to prepare and present a response.

Additionally, UMMC never told Dr. Papin that one of the allegations against him was one regarding sexual harassment and terminated him without allowing him to provide a response to that accusation. *See* Remediation Agreement; Interview Transcript. One case with similar facts found a violation of procedural due process on this same basis. *See Oliver v. Univ. of Texas Sw. Med. Sch.*, 2019 WL 536376, at *10 (N.D. Tex. Feb. 11, 2019). In *Oliver*, a student was dismissed from school following allegations of sexual harassment. When the complaint of sexual harassment was first made, the University interviewed Oliver and determined there was insufficient evidence to proceed with any misconduct charges. *See id.* at *2. However, the University later received an audio recording of the alleged incident (that was later proven to be doctored to support the alleged victim's claims) and dismissed Oliver before allowing him an opportunity to review the newly discovered evidence and respond. *See id.* at *3. The *Oliver* court held this violated Oliver's procedural due process. *See id.* at *9. Worse, here, UMMC fired Dr. Papin without conducting <u>any investigation</u> into the sexual harassment allegations or providing Dr. Papin with an opportunity to respond to those allegations. Additionally, Dr. Earl failed to provide Dr. Papin with the medical records regarding the decubitus ulcer patient which Dr. Papin could have used to dispel Dr. Mahoney's accusations. There is no question that Dr. Papin did not receive pre-termination due process.

### ii.   <u>Post-Deprivation Due Process</u>

While Dr. Papin was provided with a post-termination hearing, it too falls far short of the requisite procedural due process required by law. In a faculty dismissal case of a tenured professor, the Fifth Circuit Court of Appeals previously held a plaintiff was entitled to the following:

> (1) [To] be advised of the cause for his termination in sufficient detail so as to enable him to show any error that may exist; (2) be advised of the names and the nature of the testimony of the witnesses against him; (3) a meaningful opportunity to be heard in his own defense within a reasonable time; and (4) a hearing before a tribunal that possesses some academic expertise and an apparent impartiality toward the charges.

41

*Levitt v. Univ. of Texas at El Paso*, 759 F.2d 1224, 1228 (5th Cir. 1985). Dr. Papin's post-termination hearing provided him with almost none of the above.

As an initial matter, Dr. Papin did not receive sufficient detail supporting the causes of his termination. Many of the complaints addressed at the hearing were the same vague complaints raised in prior conversations between Dr. Earl and Dr. Papin, and likewise in Dr. Papin's "interview." *See* July 5, 2017 letter, Ex. U. As explained above, without sufficient detail regarding the precise conduct complained of and the identity of the individual(s) who witnessed the alleged conduct, Dr. Papin could not possibly prepare and present a defense. *See Wells*, 793 F.2d at 682. Furthermore, while Dr. Papin was eventually provided with the identity of the decubitus ulcer patient he allegedly caused harm to, UMMC failed to identify any other patients he allegedly caused harm to. UMMC could not do so because they admittedly <u>did not conduct any investigation</u> into these alleged instances of "patient harm" or review the medical charts for such patients either. *See* Earl depo. at 78:9 – 79:4.

Dr. Papin also did not receive a meaningful opportunity to be heard in that he was denied the right to confront the witnesses against him (namely, the female student who allegedly made sexual harassment allegations against him) and deprived of the opportunity to cross-examine witnesses, or otherwise present the panel with a list of questions for cross-examination. The Supreme Court has described cross-examination as "the law's most useful weapon against fabrication and falsehood. As a test of the accuracy, truthfulness, and credibility of testimony, there is no other means as effective." *Prewitt v. State*, 156 Miss. 731, 126 So. 824, 825 (1930). Recently, the Fifth Circuit Court of Appeals, in *Walsh v. Hodge*, 975 F.3d 475 (5th Cir. 2020), established that, in cases "where credibility of witnesses is critical and the sanction imposed would result in loss of employment," due process required that the plaintiff have an opportunity to test the witnesses' credibility. *Id.* at 484-85. Specifically, "due process in the university disciplinary setting requires 'some opportunity for real-time cross-examination, even if only through a hearing panel.'" *Id.* at 485

(citing *Haidak v. Univ. of Mass.-Amherst*, 933 F.3d 56, 69 (1st Cir. 2019)). The Fifth Circuit came short of requiring that cross-examination be conducted by the accused party, but noted "we have no reason to believe that questioning . . . by a neutral party is so fundamentally flawed as to create a categorically unacceptable risk of erroneous deprivation." *Id.* (citations omitted).

In light of the foregoing it is abundantly clear there is no legitimate reason why UMMC could not permit Dr. Papin to cross-examine the witnesses or, at a minimum, submit a list of questions for cross-examination to be asked by the panel members. UMMC's insistence on not permitting Dr. Papin to propound his own follow-up questions, going so far as to flagrantly ignore relevant questions Dr. Papin did actually raise at the hearing, evidences their outright disregard for Dr. Papin's due process rights. Had UMMC permitted Dr. Papin to submit a list of questions for cross-examination, they would have quickly learned that Dr. Crews' testimony regarding the sexual harassment complaint was not credible. When pressed about the details surrounding the complaint at his deposition, Mr. Crews readily admitted that he did not directly speak with the female student but received this information second hand from another resident. *See* Crews Depo. at at 57:6 – 58:8. He also admitted that he did not believe Dr. Papin did anything inappropriate with regard to this female student. *See id.* at 56:9 – 19. Likewise, had UMMC provided Dr. Papin with the opportunity to confront the female student at his hearing, the panel would have learned that Dr. Papin never engaged in any misconduct regarding this student whatsoever. The burden and cost to UMMC was minimal to allow Dr. Papin or his counsel to cross examine witnesses during the appeals hearing and to have access to the relevant medical records and audit trail before the hearing, subject to a protective order.  These safeguards would have cost UMMC next to nothing and prevented the destruction of Dr. Papin's surgical career, assuming the truth had come out during the appeals hearing, as it has in Federal Court.

It also became evident during the post-termination hearing that certain panel members evidenced bias towards UMMC and against Dr. Papin. "The Supreme Court has emphasized that a 'fair trial in a fair tribunal is a basic requirement of due process.'" *Walsh*, 875 F.3d at 482 (quoting *Withrow v. Larkin*, 421 U.S. 35, 46 (1975); *In re Murchison*, 349 U.S. 133, 136 (1955)). During the hearing two panel members made comments evidencing bias. Dr. Williams stated he knew Dr. Mahoney and worked with her for a good while. *See* Appeal Tr. at 57:4-5. More alarming, Dr. Luzardo, asked "what is the purpose of this lawsuit? What does he expect at the end of this lawsuit? What is he in search of? It seems to me that this is beyond a point of no return." *See id.* at 26:13-18. Such comments simply do not evidence a fair trial in a fair tribunal, and show a pre-ordained conclusion before the appeal hearing even began and that the appeal was nothing but a formality. The Chair on the Appeal Panel, Defendant Bondi, likewise evidenced bias. Consider Bondi's clever re-direction in this line of questioning to sway the conversation away from the truth which is that Dr. Papin asked Dr. Earl on February 22, 2017, if resignation was possible and Dr. Earl told him that he was already terminated (*see* Papin Depo. at 213:13-22):

> DR. LUZARDO: Was he given the opportunity to resign by HR, to anybody's knowledge?
>
> DR. EARL: No. We—he was terminated. And there was—he was— the determination was made to terminate with cause, and so that was—
>
> DR. LUZARDO: Yeah. But he could have resigned at any time before?
>
> DR. EARL: He could have resigned.
>
> DR. LUZARDO: He elected not to?
>
> DR. BONDI: I'd like to ask a follow-up question. So the summative evaluations, did anyone go over those with Dr. Papin?

*See* Appeal Transcript at 27:2-14.

Finally, Dr. Papin did not receive a meaningful opportunity to be heard in that his post-termination hearing was nothing more than a sham. In *Tercero v. Texas Southmost Coll. Dist.*, No. 1:16-CV-282, 2018 WL 4333996 (S.D. Tex. June 4, 2018), the Southern District of Texas addressed a similar issue. *Id.* at *4-5. The plaintiff, a college President, argued her termination hearing was nothing more than a sham because (1) her office had been cleared out before the hearing started, (2) TSC Board members had made comments to the local newspaper that could be interpreted as the board members having already decided to fire Tercero, and (3) TSC's interim president announced before the hearing that the District had started the search for a new president. *Id.* at *4. The court agreed and held this was sufficient evidence to allow a reasonable jury to believe the hearing was nothing more than a sham. *See id.* at *5.

The facts of this case go beyond those of *Tercero*. UMMC had already replaced Dr. Papin <u>four months</u> prior to his post-termination hearing. *See* email thread dated February 20, 2017, Doc. 144-21. By the time of his post-termination hearing he had not worked for the medical center for more than six (6) months. Additionally, there is evidence that the decision to terminate Dr. Papin was rushed to ensure a particular favored candidate would be secured the position. *See id.* All new residents for the 2017 residency training year began on July 1, 2017, including newly-hired residents from the match to fill first year resident positions and newly promoted residents to fill second year resident positions. Papin Decl. at ¶ 9. Thus, as of the date of Dr. Papin's hearing on July 18, 2017, all General Surgery residency positions Dr. Papin would have qualified for were filled. *See id.* Accordingly, the appeal committee did not have the practical ability to reverse Dr. Earl's termination because it would necessitate firing another resident to create a vacancy for Dr. Papin.

There is no question that the decision-makers in his case – the pre-termination decision-makers (Dr. Earl and HR), and the post-termination decision-makers, the hearing panel – were aligned in having prejudged the outcome of Dr. Papin's future long before the hearing ever began.

45

Such conduct could not possibly be construed as the requisite due process afforded to an individual being deprived of their employment and their lifelong dream of working as a surgeon.

**B.** **Substantial Evidence Supports That UMMC Acted Arbitrarily and/or Capriciously Which Bars Summary Judgment on Plaintiff's Substantive Due Process Claim.**

To state a violation of substantive due process under the Fourteenth Amendment, "the plaintiff must show . . . (1) that he had a property interest/right in his employment, and (2) that the public employer's termination of that interest was arbitrary or capricious." *Lawson v. City of Monroe*, 579 F. App'x 305, 310 (5th Cir. 2014) (citing *Lewis v. Univ. of Tex. Med. Branch of Galveston,* 665 F.3d 625, 630 (5th Cir. 2011). "In order to meet this second prong, Plaintiffs must show that the decision was 'made without a rational connection between the known facts and the decision or between the found facts and the evidence.'" *Id.* (quoting *Meditrust Fin. Servs. Corp. v. Sterling Chems., Inc.,* 168 F.3d 211, 215 (5th Cir.1999)). A dismissed student can succeed on a substantive-due-process claim if he shows "that the university's decision was not careful and deliberate." *Doe v. Univ. of Mississippi*, 361 F. Supp. 3d 597, 614 (S.D. Miss. 2019) (citing *Guse v. Univ. of S.D.*, No. 08-4119, 2011 WL 1256727, at *13 (D.S.D. Mar. 30, 2011 ("To show that a university's decision to dismiss a student was arbitrary and capricious, a student can show either that **the university handled her case differently than other students' cases or that the university's decision was not careful and deliberate**") (emphasis added); *Schuler v. Univ. of Minn.*, 788 F.2d 510, 516 (8th Cir. 1986)). In accordance with Supreme Court jurisprudence, this Court can infer UMMC acted arbitrarily and capriciously if UMMC's decision was "a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment." *Regents of Univ. of Michigan v. Ewing*, 474 U.S. 214, 225 (1985).

Without question, UMMC's decision to terminate Dr. Papin was not careful or deliberate. UMMC did not conduct an investigation into <u>any</u> of the complaints made against Dr. Papin. A

cursory investigation into any of these complaints would have revealed the weaknesses of the allegations. For example, an investigation into Mr. Crews' complaint of sexual harassment would have revealed that he was not told <u>anything</u> by a female student and did not believe Dr. Papin engaged in inappropriate behavior. An investigation into Dr. Papin's attendance records (via data obtainable from his work badge) would have revealed that Dr. Papin was always on time for work. An investigation into the decubitus ulcer patient would have revealed that Dr. Mahoney was aware of the decubitus ulcer and that Dr. Papin had no culpability whatsoever for the patient's care.

Additionally, comparing UMMC's investigation here with their investigation into Resident 76 is telling. After Resident 76 was accused of harassment, UMMC interviewed **ten (10) witnesses** (many of which provided recorded statements) and authored a seventeen (17) page report outlining the facts and evidence gathered regarding the complaint. *See* Resident 76 Report and Investigation of Findings, Ex. L. UMMC's investigation here, <u>not having interviewed any of the witnesses</u>, is a far cry from the one conducted in Resident 76's case.

Plaintiff's experts also testified that failing to follow through with Dr. Papin's remediation agreement was contrary to accepted norms in medical residency. *See* Leitman Report at pp. 4 – 5 ("[Dr. Papin] was not provided the required opportunity to remediate these behaviors. Neither Dr. Papin nor his actions posed a direct danger to patients, beyond that of any other PGY1 resident physician . . . Dr. Papin's termination was premature and a deviation from previously referenced ACGME, institutional and community standards. The failure by Dr. Earl and UMMC to adhere to these standards . . . denied him due process."); *see also* Watkins Report at pp. 2 – 3 ("When standard measures to improve performance are unsuccessful, an individual must undergo a formal remediation process . . . this was strictly required for anything short of blatant disregard for patient safety resulting in death, which is not the case here."). Given UMMC's substantial departure from clearly accepted norms in operating medical residency programs, the jury can infer that UMMC did

not exercise professional judgment. This evidence, taken in the light most favorable to Plaintiff, is more than sufficient to withstand summary judgment.

**IV.**    **Dr. Earl, Dr. Bondi, and Dr. Woodward Are Not Entitled to Qualified Immunity**

Once Plaintiff has established a violation of a constitutional right, to overcome qualified immunity Plaintiff need only demonstrate the added requirement that the law was "well established" at the time of the incident. *See Anderson v. Valdez*, 845 F.3d 580 (5th Cir. 2016)

**A.**    **Dr. Earl is Not Entitled to Qualified Immunity**

As the Program Director, Dr. Earl was the ultimate decision maker regarding Dr. Papin's termination. Stewart Depo. at 81:19 – 82:6. As the decision-maker, Dr. Earl had a constitutional duty to ensure Dr. Papin received procedural and substantive due process.  Instead, he did no independent investigation into any accusations at any point. *See e.g.*, Earl Depo. at 125:15 – 24, 131:1-4,  146:11-12. He also shut down requests for completion of an iCare report requested by UMMC Human Resources that would have triggered independent investigations. *See id.* at 107:1-5; *see also* February 6 and February 7, 2017 emails, Ex. Q. Dr. Earl also solicited false complaints regarding Plaintiff's performance to fabricate cause for his termination. *Compare* December 20, 2016 email (Dr. Earl acknowledging he would be soliciting complaints) with email complaints dated January 3 to January 10, 2017, Docs. 140-15, 17-19. Finally, Dr. Earl served as representative of UMMC at Dr. Papin's sham appeals hearing where he ended UMMC's case with anchor witness, William Crews, who he knowingly solicited false testimony from regarding Dr. Papin's alleged sexual harassment of an unnamed female medical student. *See* Appeal Tr. at 89:24 – 99:12.

As of January 2017, when Dr. Papin was terminated, the law was clear that procedural due process required Dr. Earl to provide Dr. Papin notice and an opportunity to respond. *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 546 (1985). For notice to be proper it must be apprise the employee in "sufficient detail to permit him to show any error that may exist." *Wells v. Dallas Indep. Sch. Dist.*,

793 F.2d 679, 682 (5th Cir. 1986); s*ee also Davis*, 721 F. Supp. at 803. Dr. Earl did not provide Dr. Papin with sufficient detail to show him that error may exist. During all of Dr. Earl's meetings or written communications with Dr. Papin, Dr. Earl used vague and generalized complaints about Dr. Papin's performance such as "poor inter-professional communication" and "condescending tone to nurses and fellow residents." *See* Dec. 20 email, Doc. 144-13; *see also* Remediation Contract, Doc. 144-18. Furthermore, the seminal event triggering the remediation was the allegations of causing "patient harm." *See* Remediation Agreement, Ex. P; Appeal Tr. at 12:9-17, 17:16 – 19:14. Yet Dr. Papin was never given the records for the patient which was identified and was never even told which patient it was! As such, Dr. Papin was left to rebut vague allegations of "patient harm" without any capability of rebuttal. *See* Interview Tr. at 17:4 – 18:15. Without the names of patients he allegedly harmed, the comments he made that were interpreted as condescending, or the identities of the individuals he allegedly upset, Dr. Papin cannot possibly defend himself against such allegations.

Due process also required Dr. Earl to provide Dr. Papin with an opportunity to respond. Dr. Earl never told Dr. Papin that one of the allegations against him was one regarding sexual harassment and terminated him without allowing him to provide a response to that accusation. Additionally, Dr. Earl failed to provide Dr. Papin with the medical records regarding the patient he allegedly harmed (the decubitus ulcer patient) which Dr. Papin could have used to dispel Dr. Mahoney's accusations. Both facts bring this case squarely in line with *Oliver v. Univ. of Texas Sw. Med. Sch.*, 2019 WL 536376. Given the law was clearly established on this issue, Dr. Earl is not entitled to the qualified immunity defense for violations of procedural due process.

The law is clearly established that substantive due process[21] required Dr. Earl to exercise professional judgment in making the decision to terminate Dr. Papin, making his decision carefully

---

[21] UMMC argues Plaintiff's substantive due process claim against Dr. Earl was dismissed at the Motion to Dismiss stage. *See* DMSJ, Doc. 141, at p. 26. Plaintiff does not read this Court's Order on the Motion to Dismiss the same way. *See* Order, Doc. 33, September 28, 2018. This Court dismissed Plaintiff's claims

and deliberately. *Regents of Univ. of Michigan v. Ewing*, 474 U.S. 214, 225 (1985); *Doe v. Univ. of Mississippi*, 361 F. Supp. 3d 597, 614 (S.D. Miss. 2019). Again, it is clear Dr. Earl did not exercise professional judgment in making the decision to terminate Dr. Papin because clearly established norms in medical residency required him to allow Dr. Papin an opportunity to remediate but Dr. Earl revoked the remediation agreement without cause. *See* Leitman Report at pp. 4 – 5; Watkins Report at pp. 2 – 3. As such, Dr. Earl is not entitled to summary judgment on this issue.

**B.**    <u>**Dr. Bondi is Not Entitled to Qualified Immunity**</u>

The law has long been clear that a fair tribunal is a basic requirement of due process *Withrow v. Larkin*, 421 U.S. 35, 46 (1975); *In re Murchison*, 349 U.S. 133, 136 (1955). During the appeal hearing, panel members Dr. Luzardo and Dr. Williams made comments evidencing their bias towards Dr. Papin. *See* Appeal Tr., at at 26:13-18; 57:4-5. Dr. Bondi is not entitled to qualified immunity because he was the person responsible for selecting this biased panel to preside over the appeals hearing. *See* email dated July 10, 2017 from Dr. Bondi, attached as **Exhibit "R"** (memorializing he was responsible for selecting the committee members for the appeal hearing). Dr. Bondi himself evidenced bias as reflected by his re-directing the panel when a panel member made a relevant inquiry into whether Dr. Papin had been given the opportunity to resign. *See* Appeal Tr. at 27:2-14.

Additionally, Dr. Bondi knew or should have known that based on the timing of the appeal, the panel's decision was a foregone conclusion. During his deposition, Dr. Bondi testified that he was a member of the Clinical Competency Committee for Pediatrics "which is the equivalent of a resident for review committee at the fellowship level at UMMC for the Pediatric Critical Care Fellows." *See* Bondi Depo. 105:14-18. Pursuant to the American Board of Surgery, residents must work an average of forty-eight (48) weeks over the first three (3) years of residency. *See* AMERICAN

---

against Dr. Earl for violation of substantive due process <u>under the Fourteenth Amendment</u>. *See id.* at p. 7. However, in Plaintiff's Second Amended Complaint, Plaintiff brought a claim for violation of substantive due process against Dr. Earl under Section 1983, Doc. 50, and Dr. Earl answered, Doc. 57. Therefore, Plaintiff's claim against Dr. Earl for violation of substantive due process under Section 1983 stands.

BOARD OF SURGERY, TRAINING & CERTIFICATION, available at
https://www.absurgery.org/default.jsp?certgsqe_training (last visited March 23, 2021). This means a
resident can miss no more than 12 weeks of residency in three years. *See id.*

By July 18, 2017, the date of the appeals hearing, Dr. Papin had already missed 29 weeks of
residency (more than the total amount allowed over a three (3) year period. Accordingly, Dr. Bondi
either knew or should have known that there was only one possible outcome for this appeals hearing
– to uphold Dr. Papin's termination. By virtue of his involvement in these decisions, Dr. Bondi is
not entitled to qualified immunity.

C. **Dr. Woodward is Not Entitled to Qualified Immunity**

Dr. Woodward is not entitled to qualified immunity because she made the decision to
appoint Dr. Bondi as the chair for the appeals hearing. *See* Bondi Depo. at 75:15 – 22. Dr. Bondi
should not have been appointed to chair the appeal hearing because he was involved in Dr. Papin's
termination. *Id.* at 25:8 – 21. Dr. Bondi testified that prior to Dr. Papin's termination, Dr. Earl
reached out to him (in his capacity as UMMC Risk Management) and asked him to perform a search
into whether there were any complaints made against Dr. Papin from a risk management standpoint.
*See id.* Dr. Bondi's office conducted the search and reported that there no complaints had been
made. *See id.* Again, the law is clear that Dr. Papin was entitled to a fair, unbiased tribunal. *Withrow v.
Larkin*, 421 U.S. 35, 46 (1975); *In re Murchison*, 349 U.S. 133, 136 (1955). Having Dr. Bondi serve as
the chair, being involved in Dr. Earl's decision to terminate Dr. Papin, should not have been
selected as the committee chair. Dr. Woodward is not entitled to qualified immunity.

V. **The Mississippi Tort Claims Act Does Not Apply to Constitutional Violations**

In their Motion for Summary Judgment, Defendants argued that the Mississippi Tort Claims
Act (MTCA) bars Dr. Papin's due process claims because the decision to terminate Dr. Papin was a
discretionary function. *See* DMSJ, Doc. 141, at p. 35. However, Mississippi Supreme Court

jurisprudence is clear that the MTCA does provide sovereign immunity where there has been a violation of an individual's constitutional rights. *City of Jackson v. Jordan*, 202 So. 3d 199, 205 (Miss. 2016); *Tucker v. Hinds Cty.*, 558 So.2d 869, 872 (Miss.1990). As the Tucker court noted, "**to allow the sovereign immunity defense to block suits based on [the due process] provision[ ] of the Mississippi Constitution would render [that provision] meaningless**." *Id.* (citing *Williams v. Walley*, 295 So.2d 286, 288 (Miss.1974)) (emphasis added). The cases cited by Defendants in their Motion are distinguishable because they do not involve violations of due process. In keeping with established Mississippi Supreme Court precedent, this Court should easily deny Defendants' Motion for Summary Judgment on this issue.

## VI.    Dr. Papin Can Seek Injunctive Relief Under Section 1983 Against Dr. Woodward in her Official Capacity

In their Motion for Summary Judgment, Defendants argued Plaintiff cannot pursue money damages against Dr. Woodward in her <u>official capacity</u>. See DMSJ, Doc. 141, at p. 43. To be sure, Plaintiff wants to make clear that, money damages aside, he can pursue Dr. Woodward in her official capacity for <u>injunctive relief</u>. *See Oliver*, 2019 WL 536376, at *5 (quoting Will v. Michigan State Department of Police, 491 U.S. 58, 71 n. 10 (1989)) ("a state official in his or her official capacity, when sued for *injunctive relief*, would [still] be a person under § 1983 because 'official-capacity actions for prospective relief are not treated as actions against the State.'").

## VII.    Dr. Papin Can Seek Punitive Damages

Plaintiff has set forth genuine disputes of fact that would allow for the recovery of punitive damages, and in turn, the recovery of attorneys' fees and costs. As noted by Defendants' in their Motion for Summary Judgment, Plaintiff is entitled to punitive damages in his breach of contract case if he can "prove by a preponderance that the breach was the result of an intentional wrong or that a defendant acted maliciously or with reckless disregard of the plaintiff's rights." *Hamilton v. Hopkins*, 834 So. 2d 695, 703 (Miss. 2003). Similarly, under Section 1983, Plaintiff is entitled to

punitive damages if he can show "the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Kohler v. Johnson*, 396 F. App'x 158, 161 (5th Cir. 2010).

This Court need not look any further than *Zhan* and *Smith*. 2016 WL 5374141, 2018 WL 3231267. As this Court previously recognized in those cases, UMMC's solicitation of disparaging letters against Dr. Papin evidences UMMC's animus. Likewise, an outright failure to investigate any of the complaints against Dr. Papin, in complete contradiction to University policy and practice, evidences UMMC's gross disregard for Dr. Papin's constitutionally protected rights. UMMC evidently <u>knew</u> they were supposed to conduct an investigation into such serious accusations launched at Dr. Papin but completely failed to do so.  Plaintiff has presented more than enough facts for a jury to conclude UMMC acted maliciously, or at a minimum, recklessly. Defendants' Motion for Summary Judgment should be denied on this issue.

## VIII.   <u>Dr. Papin Mitigated His Damages</u>

As to whether Plaintiff properly mitigated his damages, Defendants bear the burden of proof. *Overman v. City of E. Baton Rouge*, 656 F. App'x 664, 670 (5th Cir. 2016). Defendants have fallen woefully short of their burden here. Defendants argue that Dr. Papin failed to mitigate his damages because he failed to take reasonable steps to continue his medical education. *See* DMSJ, Doc. 141, at p. 41 – 42. However, the facts do not support this conclusion.

In accordance with Fifth Circuit precedent, Dr. Papin's efforts to mitigate his damages are sufficient. *See Overman v. City of E. Baton Rouge*, 656 F. App'x 664, 670-72. Specifically, the court held, "[t]he reasonableness of a [ ] claimant's diligence must be evaluated in the light of the 'individual characteristics of the claimant and the job market.'" *Id.* (quoting *Sellers v. Delgado Coll.*, 902 F.2d 1189, 1193 (5th Cir. 1990)). Plaintiff's retained experts both opined as to the insurmountable difficulty Dr. Papin faces being accepted into a future residency program with this termination on his record. Dr.

Leitman opined that UMMC's termination of Dr. Papin makes it "impossible in the future for Dr. Papin to secure a position in an accredited general surgery program, or any other GME training program. This prevents him from obtaining a license to practice medicine and therefore denies him the opportunity to independently practice medicine as a physician or surgeon." Leitman Report at p. 4. Likewise, Dr. Watkins opined that Dr. Papin's ability to acquire a general surgery residency position is severely diminished by his termination – a designation that undoubtedly will make most, if not all, programs reluctant to offer him a position. Watkins Report at p. 3. Even Defendant, Dr. Bondi, agreed it would be "extraordinarily difficult" for Dr. Papin to secure a residency position again with this termination on his record. *See* Bondi Depo. at 177:11 – 22. Therefore, Dr. Papin decided to apply to business school to obtain his MBA. Papin Decl. at ¶ 8.

Attending school in lieu of full time work does not always amount to a failure to mitigate. As explained by the *Overman* court, there is a distinction between plaintiffs who take themselves out of the job market to attend school, foregoing comparable employment in the meantime, and plaintiffs who attend school only after a diligent, but ultimately unsuccessful, job hunt. *Id.* at 670-71 (citing *Dailey v. Societe Generale*, 108 F.3d 451, 456–57 (2d Cir. 1997) (affirming an award of back pay when the plaintiff quit the job market to attend school only after an extensive job hunt failed to offer any comparable employment); *Miller v. Marsh*, 766 F.2d 490, 492–93 (11th Cir. 1985) (affirming denial of back pay award to plaintiff who withdrew from temporary employment to begin attending law school without first pursuing a comparable position as a legal stenographer)). Given the timing of Dr. Papin's termination, it was too late for him to enter the match program for the 2018 cycle so he could not apply to any residency programs. *See* Papin Depo. at 8:23 – 9:2; *see also* Papin Decl., at ¶ 11. Therefore, he moved forward with the next best option he had which was applying for business school and salvaging what he could from his medical degree. *See* Papin Decl., at ¶ 8. During the summer of 2017, when he could not be applying to residency programs anyways,

he studied from the GMAT and applied to business schools. *Id.* at ¶¶ 6, 8, 12. By December 15, 2017, he was accepted to and began attending the University of Michigan Ross School of Business, pursuing his MBA. *Id.* at ¶¶ 6, 12. In the meantime, he did not abandon his hope that he might be able to find a residency program that would accept him. In 2019, while in business school, he applied to numerous residency programs for the 2020 cycle but received no interviews. *See id.* at ¶ 14, *see also* Papin Depo. at 9:3 – 11:13. Without question, Dr. Papin did not take himself out the job market, forgoing comparable employment. When he applied to business school there simply was no comparable employment given the timing of Dr. Papin's termination, and Dr. Papin remained in the labor market, ready and willing to return to residency program if one would accept him. Unfortunately, no residency program he applied to accepted him. Dr. Papin graduated with his Master's in Business Administration on May 1, 2020. Papin Decl. at ¶ 13. On August 21, 2019, prior to his graduation, he landed his first post-graduate job as a medical consultant at Accenture. *Id.* at ¶ 15. The steps Dr. Papin took, in light of his circumstances and the job market, were sufficiently reasonable to support denial of Defendants' Motion for Summary Judgment on this issue.

<u>**CONCLUSION**</u>

Defendants' Motion, riddled with disputes of fact, is utterly inappropriate for summary judgment. Plaintiff has presented the requisite facts in which a reasonable fact finder could no doubt conclude that Defendants breached numerous employment contracts and binding policies with respect to Plaintiff's employment, and denied him due process of law in the manner they carried out his termination. To rule in Defendants' favor requires weighing UMMC's alleged reasons for termination against a mountain of evidence drawing into question each of the alleged performance deficiencies. Because this role is appropriately tasked to the jury, and the jury alone, Defendants' Motion for Summary Judgment must be denied.

Dated: <u>March 31, 2021</u>

**/s/ C. Ryan Morgan**
C. RYAN MORGAN, ESQ.
(*admitted pro hac vice*)
Florida Bar No.: 0015527
GREGORY R. SCHMITZ, ESQ.
(*admitted pro hac vice*)
Florida Bar No.:  0094694
20 North Orange Avenue, Suite 1400
Orlando, Florida 32801
Telephone:  (407) 204-2170
Facsimile:  (407) 245-3401
E-mail: gschmitz@forthepeople.com
         rmorgan@forthepeople.com
         mbarreiro@forthepeople.com
         egeorge@forthepeople.com

MARTIN R. JELLIFFE, ESQ.
Martin R. Jelliffe, Esq. (MSB#: 3067)
MORGAN & MORGAN, PLLC
4450 Old Canton Road, Suite 200
Jackson, Mississippi 39211
Phone:601-503-1676
Fax: 601-503-1625
Email: mjelliffe@forthepeople.com

***Attorneys for Plaintiff***

## CERTIFICATE OF SERVICE

I hereby certify that on March 31, 2021, I electronically filed the foregoing with the Clerk of

Court using the CM/ECF system, which will automatically send email notification of such filing to

all counsel of record.

*/s/ C. Ryan Morgan*
*C. RYAN MORGAN, ESQ.*
*(admitted pro hac vice)*