Joseph Papin

vs.

University of Mississippi Medical

---

Deposition of:

Pat Whitlock

---

December 02, 2020

*Vol 1*

# PHIPPS REPORTING

*Raising the Bar!*

Pat Whitlock
December 02, 2020

```
 1              IN THE UNITED STATES DISTRICT COURT
         FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
 2                     JACKSON DIVISION

 3
     JOSEPH PAPIN
 4                                            PLAINTIFF

 5
     V.                    CASE NO. 3:17-CV-763-CWR-FKB
 6

 7   UNIVERSITY OF MISSISSIPPI
     MEDICAL CENTER; DR.
 8   LOUANN WOODWARD, IN HER
     OFFICIAL CAPACITY; AND
 9   DR. T. MARK EARL, IN HIS
     INDIVIDUAL CAPACITY
10                                            DEFENDANTS

11

12             DEPOSITION OF PAT WHITLOCK

13

14   Taken at the instance of the Plaintiff at Via ZOOM
                         on Tuesday,
15                    December 2, 2020,
                  beginning at 9:00 a.m.
16

17

18

19

20

21

22

23

24                     REPORTED BY:

25             DAWN DILLARD, CCR #1763
```

Pat Whitlock
December 02, 2020

```
 1    APPEARANCES:                                    Page 2

 2

 3         GREGORY SCHMITZ, ESQ.
           Morgan & Morgan (Orlando)
 4         Suite 1400, 20 North Orange Avenue
           Orlando, Florida 32801
 5         gschmitz@forthepeople.com

 6

             COUNSEL FOR PLAINTIFF
 7

 8

           TOMMY WHITFIELD, ESQ.
 9         Whitfield Law Group
           660 Lakeland East, Suite 200
10         Flowood, Mississippi 39232
           tommy@whitfieldlaw.org
11

12           COUNSEL FOR DEFENDANT

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Pat Whitlock
December 02, 2020

```
                                              Page 3
1                        INDEX
2    Style and Appearances........................1
3    Index    ...................................4
4    Certificate of Deponent   ................220
5    Certificate of Court Reporter ...........221
6                     EXAMINATIONS
7    Examination By Mr. Schmitz ................5
8                      EXHIBITS
9    Exhibit 1 E-mail .........................32
10   Exhibit 2 E-mail .........................79
11   Exhibit 3 E-mail .........................94
12   Exhibit 4 GME Committee Hearings for .....101
13             House Officers since 2014
14   Exhibit 5 E-mail ........................119
15   Exhibit 6 E-mail .....................122 --
16   Exhibit 7 E-mail ........................125
17   Exhibit 8 E-mail ........................125
18   Exhibit 9 E-mail ........................127
19   Exhibit 10 E-mail .......................128
20   Exhibit 11 E-mail .......................130
21   Exhibit 12 E-mail .......................138
22   Exhibit 13 E-mail .......................138
23   Exhibit 14 E-mail .......................145
24   Exhibit 15 E-mail .......................148
25   Exhibit 16 House Staff Manual ...........156
```

Pat Whitlock
December 02, 2020

1    Exhibit 17 Remediation Guidelines ........161

2            and Grievance Algorithm

3    Exhibit 18 Policy on Sanctions for .......163

4            Plan Violations

5    Exhibit 19 House Officer Contract .......172

6    Exhibit 20 Papin HR Meeting .............177

7            Transcripts

8    Exhibit 21 E-mail ......................202

9    Exhibit 22 Document dated January .......207

10           10, 2017 Re: Joe Papin, MD

11   Exhibit 23 Academic Remediation and .....215

12           Protocol Checklist

13   Exhibit 24 Policy and Grievance .........215

14           Algorithm

15   Exhibit 25 Remediation Checklist ........216

16

17

18

19

20

21

22

23

24

25

Pat Whitlock
December 02, 2020

1                        PAT WHITLOCK,

2     having been first duly sworn, was examined and

3     testified as follows:

4     EXAMINATION BY MR. SCHMITZ:

5          Q.   Ms. Whitlock, can you state your full

6     legal name for the record please?

7          A.   Patricia Rosenthal Whitlock.

8          Q.   And have you ever had your deposition

9     taken before?

10         A.   I have.

11         Q.   Okay.  When were you last deposed?

12         A.   Not here, but it's been several years

13    ago with a different organization.

14         Q.   And what was that deposition regarding?

15         A.   I served as HR director for an

16    organization where an employee's contract was

17    severed and he filed claims to return to that

18    place of employment.

19         Q.   Okay.  Any other depositions?

20         A.   Yes.

21         Q.   Okay.  What other depositions?

22         A.   There was another situation many, many

23    years ago where the company that I worked for had

24    programs through which employees were retained or

25    separated and there was another situation where an

Pat Whitlock
December 02, 2020

Page 6

1   employee's employment was not retained.

2        Q.    And was that employee alleging

3   discrimination or retaliation or something along

4   those lines?

5        A.    Yes.

6        Q.    In the first case that you mentioned was

7   that also a discrimination retaliation?

8        A.    Yes.

9        Q.    Any other depositions that you've had?

10       A.    No, those are the only ones.

11       Q.    Well, I'm going to go over the ground

12   rules really quickly since it's been a couple of

13   years.  So today, you know, you and I will be

14   conversing back and forth, please try to make your

15   answers yes or no or some type of audible answer.

16   Shaking your head yes or no or anything like that,

17   uh-huhs (affirmative) and huh-uhs (negative) and

18   all that kind of stuff make it difficult for the

19   court reporter to pick that up, so if we could

20   please try to keep our answers audible and clear

21   so that she can type out the record easily.

22             If I ask you a question that you don't

23   understand, please do not hesitate to ask me to

24   rephrase it.  If you need a break please let me

25   know, the only thing I ask is that if I have a

Pat Whitlock
December 02, 2020

Page 7

1    question pending when you need a break that we

2    finish that question, then you can go on your

3    break for bathrooms or whatever reason.

4            I'm going to assume if you provide an

5    answer to my question that you fully understand

6    the question.

7            And what is your date of birth?

8    A.   10/2/53.

9    Q.   And what is your current address?

10   A.   102 Quail Run Drive, Madison,

11   Mississippi.

12   Q.   And have you ever testified at trial

13   before?

14   A.   No.

15   Q.   Okay.  Have you ever been convicted of a

16   crime?

17   A.   No.

18   Q.   Have you ever been arrested?

19   A.   No.

20   Q.   Are you under the influence of any drugs

21   of any kind today or do you have any medical

22   conditions which may prevent you from accurately

23   or truthfully answering my questions today?

24   A.   No.

25   Q.   What is your highest level of education?

Pat Whitlock
December 02, 2020

Page 8

1        A.   I have a master's degree.

2        Q.   In what?

3        A.   Sociology.

4        Q.   And what did you get your undergraduate

5   degree in?

6        A.   Sociology.

7        Q.   Sociology, okay.

8        A.   Yes.

9        Q.   Do you hold any other certificates or

10  professional credentials?

11       A.   I have certification as a professional

12  in human resources.

13       Q.   Okay.  Anything else?

14       A.   No.

15       Q.   Can you please tell me what you did

16  other than -- I don't want to know the substance

17  of your conversations potentially with Tommy or

18  anything like that because that would be protected

19  by attorney/client privilege, but can you tell me

20  what you did to prepare for this deposition in

21  terms of which documents you reviewed?

22       A.   I reviewed the transcript of my

23  interview with Dr. Papin and I also reviewed

24  various e-mails containing back and forth

25  conversations regarding his situation.

Pat Whitlock
December 02, 2020

Page 9

1        Q.    Okay.  Besides your counsel did you

2   speak with anybody else in preparation for your

3   deposition today?

4        A.    No.

5        Q.    Have you reviewed any of the expert

6   reports which have been exchanged in this case?

7        A.    I'm not familiar with what you're

8   referring to.

9        Q.    There's expert witnesses that have

10  rendered opinions in this case --

11       A.    No, I have not.

12       Q.    Okay.  Have you reviewed any other types

13  of abstracts or summaries that were prepared by

14  anybody in this case to prepare you for this

15  deposition today?

16       A.    No.

17       Q.    Have you reviewed the appeals transcript

18  from Joseph Papin's appeal of his termination?

19       A.    No.

20       Q.    So the only transcript you reviewed

21  would be the transcript from your interview with

22  Joseph Papin on January 27; is that correct?

23       A.    Yes.

24       Q.    Okay.  And what is your position at

25  UMMC?

Pat Whitlock
December 02, 2020

Page 10

1     A.    Human Resource Business Partner.

2     Q.    And what does that mean?  What are your

3  duties and responsibilities?

4     A.    I serve as a consultant to specified

5  departments.  It is a role that advises them,

6  helps them make strategies, anything pertaining to

7  their employees, any kind of situations with

8  employees, questions that they may have about

9  processes, it is my responsibility to listen, to

10  guide, and provide advice.

11    Q.    And which departments do you work with

12  at UMMC?

13    A.    There are several that I am responsible

14  for.  Those include -- I'll tell you in just a

15  second.  It's quite a few of them.

16    Q.    Not a problem, take your time.

17    A.    Pathology, dermatology, department of

18  medicine, which has 26 divisions.

19    Q.    Okay.

20    A.    Physiology, academic affairs, and that's

21  pretty much the sum of it.

22    Q.    Would your -- is academic affairs, that

23  would be considered sort of how you got involved

24  with this matter here, that would have been in --

25    A.    No, that is -- it was the department of

Pat Whitlock
December 02, 2020

Page 11

1    medicine, but also the graduate medical education

2    office.

3         Q.    Okay.  So you also help provide advice

4    to the graduate medical education office?

5         A.    Yes.

6         Q.    Okay.  How long have you been with UMMC?

7         A.    Seven years.

8         Q.    As an HR professional at UMMC what are

9    your interactions with residents, if at all, on

10   either a day to day or weekly, monthly basis?

11        A.    Only if they have questions regarding

12   benefits or compensation sometimes they will

13   contact me, otherwise I have very little

14   interaction.

15        Q.    Or also in disciplinary type of matters

16   as well, you typically get involved?

17        A.    With the supervisors or someone in the

18   department, but not necessarily with the employee.

19        Q.    So it's only if the program director

20   first would reach out to you then you would get

21   involved you're not actually going to be getting

22   involved in sort of the day to day --

23        A.    Yes.

24        Q.    (By Mr. Schmitz)  Okay.

25             MR. WHITFIELD:  Okay.  I know you're

Pat Whitlock
December 02, 2020

Page 12

1           eager, let him finish his question.

2                   THE WITNESS:  Okay.

3                   MR. WHITFIELD:  So you hear the whole

4           question before you answer.  And plus the

5           court reporter will be a lot nicer if we're

6           not talking over each other.

7                   MR. SCHMITZ:  And real quick, Tommy, is

8           there anybody else in the room with you guys

9           or is it just you two?

10                  MR. WHITFIELD:  Just us.

11                  MR. SCHMITZ:  Okay.

12          Q.    (By Mr. Schmitz)  Do you recall Joseph

13     Papin?

14          A.    Yes.

15          Q.    And at UMMC when did you first hear

16     about Dr. Papin?

17          A.    Mid January 2017.

18          Q.    Is that when Dr. Earl reached out to

19     you.

20          A.    Dr. Barr.

21          Q.    Dr. Barr with Dr. Earl?

22          A.    Yes.

23          Q.    So tell me about your involvement in

24     other resident discipline cases not including this

25     one?

Pat Whitlock
December 02, 2020

Page 13
1      A.    If there is a concern brought to HR in a

2   department that I provide support to I will then

3   follow whatever information has been provided.

4   Sometimes the department will provide concerns

5   that I will need to follow-up on or sometimes a

6   concern may come from an employee.  It just

7   depends on how the information gets to HR.

8      Q.    Okay.  And when you say follow-up on, so

9   a concern is typically brought to you regarding a

10  resident that my require discipline and then you

11  would conduct your own investigation into that

12  concern and make recommendations based on that?

13     A.    Yes.

14     Q.    What are the interactions between let's

15  say a program like the general surgery program at

16  UMMC and human resources?

17     A.    Would you clarify your question?

18     Q.    In terms of specifically with respect to

19  that department, what type of things do you do in

20  terms of advising the general surgery department

21  at UMMC?

22     A.    General surgery is a part of the

23  department of medicine.

24     Q.    Okay.

25     A.    And typically the concerns -- any kind

Pat Whitlock
December 02, 2020

Page 14

1    of concerns would come -- there's a hierarchy

2    within the department, so it would depend on what

3    the concern is, what the question is, how it would

4    come to HR.  Typically with the general surgery

5    department because those -- the program director

6    is considered a faculty staff person, many times

7    that direct interaction would not be with the HR

8    business partner it would be with the supervisor

9    of the HR business partner group.  And then if it

10   were deemed that whatever the concern is needed to

11   be further addressed or an investigation done,

12   that would be assigned to the HR business partner.

13        Q.   And who would be the supervisor HR

14   partner for the general surgery program at UMMC?

15        A.   It would be the same person who

16   supervises all of the HR business partners.

17   Currently that position is vacant.

18        Q.   Who was it back in 2017?

19        A.   It was Molly Brasfield.

20        Q.   Molly Brasfield, okay.  With respect to

21   resident discipline, would it be fair to say that

22   basically the program director and program kind of

23   calls the shots with respect to discipline and

24   then they would come to HR more or less just to

25   confirm their actions and make sure all the Ts are

Pat Whitlock
December 02, 2020

1   crossed and Is are dotted?

2           MR. WHITFIELD:  Object to the form.

3       Q.    (By Mr. Schmitz)   You can answer.

4       A.    Discipline at UMMC is a four-step

5   process and the first step would be informal.  The

6   second step would be a verbal counseling.  The

7   third step would be a written warning.  All

8   departments are at their discretion to administer

9   those.  Anything that falls outside that must come

10  to HR for consultation and ultimate approval.

11      Q.    What did you say the third step was?

12      A.    The written.  The first step is

13  informal.

14      Q.    Then you said it was written, and then

15  you said third was something else?

16      A.    Verbal.  The first step is an informal

17  counseling.

18      Q.    Okay.

19      A.    The second stop where the process

20  actually begins would be called a verbal

21  counseling although it is documented.  The next

22  step would be written.

23      Q.    And then what's the fourth step?

24      A.    Final written.  And the last one would

25  be termination.

Pat Whitlock
December 02, 2020

Page 16

1          Q.    Tell me about the procedures at UMMC

2     when an allegation of sexual harassment comes to

3     HR from an employee of UMMC, what are the typical

4     processes?

5          A.    The typical process would be for --

6               MR. WHITFIELD:  I'm going to make an

7          objection.  She's not our 30(b)(6) on these

8          procedures and all that.  She can answer to

9          her knowledge but not as to the institution's

10         knowledge.

11         Q.    (By Mr. Schmitz)  Sure.  Just to the best

12    of your knowledge?

13         A.    The process would -- it would depend on

14    to what location the allegations were made.  If it

15    were an employee it could come to the HR business

16    partner or it could go directly to our office of

17    employee relations.

18         Q.    And once the report comes into either of

19    those offices then what takes place?

20         A.    There would be an investigation

21    including interviews of the pertinent participants

22    or whomever was engaged in it.

23         Q.    Okay.  And then after the interviews

24    what would take place?

25         A.    Recommendations would be made both to

Pat Whitlock
December 02, 2020

Page 17

1    the department and to employee relations.

2       Q.    Recommendations with respect to how to

3    just deal with it with the scenario or what?

4       A.    Recommendations as to resolution of the

5    situation.

6       Q.    Okay.  And what would the typical

7    resolutions look like in that type of case?

8       A.    It would depend on the case.

9       Q.    Okay.  Sometimes termination would be on

10   the menu, correct?

11      A.    Yes.

12      Q.    Would separating the employees be on --

13   potentially on the menu?

14      A.    Please clarify what you mean by

15   separating.

16      Q.    You know, put them in different shifts

17   so that they don't have to interact with each

18   other anymore or, you know, just making it so

19   that, you know, I don't know, at UMMC it's a large

20   hospital, right, you could put somebody on the

21   other end of the hospital away from somebody else

22   who was allegedly bothering somebody and then they

23   don't have to see each other anymore?

24      A.    I've not been involved in a case of that

25   nature.

Pat Whitlock
December 02, 2020

Page 18

1        Q.    Okay.  Have you ever been involved in a

2   case where an employee was accused of sexual

3   harassment and that employee was suspended but

4   then allowed to come back?

5        A.    No.

6        Q.    So termination is usually the route to

7   go in that type of situation?

8             MR. WHITFIELD:  Object to form, you can

9        answer.

10            THE WITNESS:  In the situation that I

11       have been involved in.

12       Q.    (By Mr. Schmitz)  Okay.  When did you

13  first learn that Dr. Papin allegedly harassed and

14  made another resident feel uncomfortable?

15            MR. WHITFIELD:  Object to the form of

16       the question.

17            THE WITNESS:  Anything that I learned

18       regarding Dr. Papin would have been in

19       mid-January 2017.

20       Q.    (By Mr. Schmitz)  Are you aware that

21  Ashley Griffin, another resident, made UMMC aware of

22  this on January 9, 2017?

23       A.    I am not.

24       Q.    Do you have any idea why there was no

25  investigation completed with respect to the

Pat Whitlock
December 02, 2020

Page 19

1    alleged incident of harassment involving another

2    resident and Dr. Papin?

3              MR. WHITFIELD:  Object to the form.

4              THE WITNESS:  Although residents are

5         employees, because of the educational

6         component there are two tracks for any

7         interaction when there are concerns regarding

8         their performance or behavior.  The program

9         director, the graduate medical office would

10        be one track that would initially be

11        responsible for any interaction.  Once they

12        had done their due diligence, if they thought

13        it prudent then it would come to HR.

14        Q.   (By Mr. Schmitz)  Did you ever or did

15   anyone else in HR ever conduct any interviews

16   regarding alleged sexual harassment by Dr. Papin?

17        A.   I don't know, but I did not.

18        Q.   Okay.  Do you have any knowledge of the

19   ACGME requirements on residency programs?

20        A.   I do not.

21        Q.   Have you ever received any type of

22   training or anything like that with respect to

23   what the ACGME requires from residency programs?

24        A.   I have not.  The graduate medical office

25   handles -- the graduate medical education office

Pat Whitlock
December 02, 2020

Page 20

1    handles all of that.

2         Q.    So HR would have no involvement in any

3    type of whether someone is meeting ACGME

4    requirements or anything like that?

5         A.    No.

6         Q.    Have you ever been involved in the

7    termination of UMMC employees prior to 2017?

8         A.    Yes.

9         Q.    Did any of those cases involve house

10   officers?

11        A.    Yes.

12        Q.    Can you tell me about those cases?

13        A.    There was one case where there were

14   allegations of sexual harassment as well as the

15   offering of illegal drugs.  And because that

16   person was a house officer and others similarly

17   situated were involved, it was handled as a Title

18   IX case.

19        Q.    And what was the result of that case?

20        A.    I did not have involvement in it beyond

21   the initial interviews.

22        Q.    HR didn't make any recommendations with

23   respect to that resident whether that resident be

24   terminated or not?

25        A.    The recommendation from the department

Pat Whitlock
December 02, 2020

Page 21

1    was that the person be terminated and as the HR

2    business partner involved in a part of those

3    interviews that recommendation was supported and

4    then submitted to the office of employee

5    relations.

6         Q.   And in that case you conducted

7    interviews of the relevant persons that were

8    involved including those who made the allegations

9    against this resident?

10        A.   Yes.

11        Q.   About how many interviews did you

12   actually conduct in that case?

13        A.   I don't recall the exact number, but I

14   know there were more than five.

15        Q.   Okay.  Any other terminations involving

16   house officers prior to 2017?

17        A.   I don't know.

18        Q.   What about since 2017?

19        A.   I don't know.  If I am not directly

20   involved in them I would not have knowledge.

21        Q.   Are there a lot of cases where HR is not

22   involved in the termination of a house officer?

23        A.   I don't know.

24        Q.   So to your -- the best of your

25   recollection, the only other house officer

Pat Whitlock
December 02, 2020

Page 22

1    termination that you've been involved in was the

2    one that you just mentioned before?

3         A.    Yes.

4         Q.    Have you ever been involved in any type

5    of discipline of house officers not including

6    termination, other types of discipline on house

7    officers?

8         A.    Yes.

9         Q.    What are those cases?

10        A.    Several years ago after our electronic

11   records system was implemented, the office of

12   compliance did reviews to determine if anyone had

13   accessed medical records without a need to know

14   and as they discovered that they conducted the

15   interviews, they determined the discipline, and

16   then that information was forwarded to HR to

17   actually present the discipline to the employees.

18        Q.    And several residents were disciplined

19   as a result of that policy?

20        A.    They were.

21        Q.    Okay.   What was the discipline that was

22   given to those residents?

23        A.    It was a 10 day suspension without pay

24   and a final written warning.

25        Q.    Did anyone to the best of your knowledge

Pat Whitlock
December 02, 2020

Page 23

1    get terminated because of that?

2        A.    Not to my knowledge.

3        Q.    Do you or did you have the sole power to

4    terminate a house officer in 2017?

5        A.    I do not have power to terminate anyone.

6        Q.    In this case with Dr. Papin what

7    policies did you have to insure were being

8    complied with during his termination process at

9    UMMC?

10       A.    Would you repeat the question?

11       Q.    In this case what policies and

12   procedures were you making sure were being

13   complied with during Dr. Papin's termination

14   process?

15       A.    Based on the information that the

16   department provided I would have reviewed our

17   employee staff -- faculty staff handbook to

18   determine what kind of infractions were present.

19   They would have included lack of professionalism,

20   and I would have to review -- I would have to

21   actually look at the policy to give you all of

22   those but they were reviewed prior to the

23   concurrence in the department's request.

24       Q.    Okay.  Is there anything -- any other

25   policies and procedures, grievance procedures,

Pat Whitlock
December 02, 2020

Page 24

1    anything like that that would need to be complied

2    with or remediation procedures?

3        A.    Not from an HR standpoint, just

4    basically whatever those policies were that do

5    guide the performance and behavior of employees.

6        Q.    Okay.   Whose decision was it to

7    terminate Dr. Papin?

8        A.    The final authority rested with the --

9            MR. WHITFIELD:   I'm going to object to

10           the form, but you can answer to the best of

11           your knowledge.

12           THE WITNESS:   To the best of my

13           knowledge the final authority rested with the

14           office of employee relations in human

15           resources.

16       Q.    (By Mr. Schmitz)   So the program director

17   would not have had the authority to terminate

18   Dr. Papin?

19       A.    If they had been using the processes in

20   the graduate medical education office, they would

21   have had the authority to dismiss him from the

22   program, but because a house officer is considered

23   an employee as well as a trainee, it depends on

24   which approach is being requested.   The department

25   had requested termination as an employee and that

Pat Whitlock
December 02, 2020

1    is how HR became involved.

2        Q.   Okay.  So but someone's employment is

3    completely dependent -- when you're a resident

4    your employment is completely dependent on being

5    still part of that graduate medical education

6    program, correct?

7              MR. WHITFIELD:  Object to the form.

8              THE WITNESS:  At UMMC because house

9         officers are in a training program there can

10        be occasions where they are dismissed from

11        the program.  And as a result of that they

12        are no longer employees, but in terms of

13        their employment status it is not a

14        termination from an HR standpoint.

15        Q.   (By Mr. Schmitz)  Right.  Right, but

16    that's really just a form though, someone's -- if

17    you're terminated from a program and you're a

18    resident, you're no longer working at UMMC,

19    physically working at UMMC anymore, correct?

20        A.   Yes.

21        Q.   Okay.  I get the -- so just basically

22    there's just a distinction within UMMC of the

23    program being part of a program and then the

24    actual formal employment relationship that

25    residents have, so they kind of have like a dual

Pat Whitlock
December 02, 2020

Page 26

```
 1   employment, right, you know, where they have to be
 2   both part of the program as well as employees of
 3   UMMC to continue working at UMMC, correct?
 4        A.   Yes.
 5        Q.   Has there ever been a situation where
 6   someone has been terminated from a program but
 7   then continued to work at -- where a resident --
 8   let me rephrase.
 9             Has there ever been a situation where a
10   resident has been terminated from a program but
11   continued employment with UMMC?
12        A.   I don't know.
13        Q.   Do you recall any of those situations?
14        A.   I don't know.
15        Q.   Is it that you don't know or you're just
16   not aware of any situations?
17        A.   I'm not aware.  I do know that there is
18   a possibility that if someone were to seek
19   employment and be selected for that role they
20   could be hired, but I have not had any kind of
21   direct involvement with it.
22        Q.   Okay.  What do HR policies and
23   procedures require before a house officer can be
24   terminated?
25        A.   The policies and procedures for the
```

Pat Whitlock
December 02, 2020

Page 27

1   house officers would be no different from any

2   other employee in terms of employment.  And,

3   again, it would depend on what those policies are

4   contained in the faculty staff handbook.

5        Q.   Are there certain steps or something in

6   terms of resident though that are specific to

7   residents that need to be followed at least to

8   your knowledge from an HR perspective?

9        A.   No different from any other employee.

10       Q.   Do all employees at UMMC have the right

11  to appeal their termination if they are

12  terminated?

13       A.   I don't know.

14       Q.   Well, do the HR policies at UMMC dictate

15  who gets to appeal their termination or not?

16       A.   There are some actions listed in the

17  faculty staff handbook that are grievable.

18       Q.   Okay.  So depending on the situation

19  what policies could apply would be different to

20  each employee, correct?

21       A.   I don't know.

22       Q.   Other than the faculty staff handbook

23  were there any other policies or procedures

24  considered in terminating Dr. Papin's employment?

25       A.   Not to my knowledge.

Pat Whitlock
December 02, 2020

Page 28

1        Q.    UMMC has a contract with its residents;

2     is that correct?

3        A.    Yes.

4        Q.    Was Dr. Papin's contract and the

5     language within his contract considered prior to

6     terminating his employment?

7        A.    I would have to see the contract but I'm

8     not sure.

9        Q.    Did you review his contract prior to --

10       A.    Have I seen it?  Yes.

11       Q.    And you don't recall whether it was part

12    of your decision to recommend his termination or

13    not?

14       A.    I do know it was not a part of the

15    decision.

16       Q.    Okay.  Would you characterize the

17    process involved in terminating Dr. Papin as being

18    fair based on your personal knowledge and

19    involvement in the process?

20            MR. WHITFIELD:  Object to the form.

21            THE WITNESS:  The process was followed

22        appropriately based on what the practices and

23        the policies were at UMMC.

24       Q.    (By Mr. Schmitz)  So you would

25    characterize the process as used in terminating

Pat Whitlock
December 02, 2020

Page 29

1    Dr. Papin's employment at UMMC as complying with all

2    applicable policies and procedures at UMMC?

3         A.    Yes.

4         Q.    And those policies and procedures would

5    be the faculty staff handbook and that's it?

6         A.    They are outlined in the faculty staff

7    handbook, yes.

8         Q.    Do you have the ability to evaluate the

9    performance of medical residents?

10        A.    No.

11        Q.    What investigation did HR undertake

12   during the termination process for Dr. Papin?

13        A.    There was a review of the information,

14   the documentation that was provided from the

15   department, and there was an interview with

16   Dr. Papin.

17        Q.    Other than yourself who was else was

18   involved in the investigation of Dr. Papin's

19   termination?

20        A.    There was a second person now deceased

21   who was in the interview when Dr. Papin was

22   recorded.

23        Q.    Were there any other members of HR who

24   were involved in the process of terminating

25   Dr. Papin?

Pat Whitlock
December 02, 2020

1              MR. WHITFIELD:  Object to the form.

2              THE WITNESS:  The person that I just

3         referred to sat in on the interview.  The

4         determination for the termination was made by

5         the department of human resources employee

6         relations.

7         Q.   (By Mr. Schmitz)  And that's your

8    department though, correct?

9         A.   My -- the overall umbrella is HR, but

10   employee relations is a different division.

11        Q.   That would be -- oh, that's Molly

12   Brasfield?

13        A.   That would be Cecilia Bass.

14        Q.   Oh, Cecilia Bass, okay, thank you.

15        A.   Yes.

16        Q.   Do you or anyone else conduct in person

17   interviews of anyone who made allegations of any

18   type of misconduct or malfeasance against

19   Dr. Papin?

20        A.   I did not.  I don't know if anyone else

21   did.

22        Q.   Do you have any idea why that was not

23   done?

24        A.   The information that was provided with

25   the department was quite conclusive and in

Pat Whitlock
December 02, 2020

Page 31

1    Dr. Papin's interview with me he did not deny that

2    those things had occurred.

3         Q.   Okay.  So in your opinion because

4    Dr. Papin had not denied things -- denied the

5    thing that occurred there was not enough reason

6    for you to go out and speak to the people who were

7    making allegations against Dr. Papin?

8         A.   There was excessive documentation.

9    There was incidents of feedback provided to

10   Dr. Papin.  There was a document that Dr. Papin

11   signed acknowledging what was listed in the

12   document that he received, and it felt that it was

13   conclusive enough to support what the department

14   was requesting based on the documentation they

15   provided.

16        Q.   And the document you're talking about

17   that Dr. Papin signed, that would have been the

18   remediation plan that Dr. Earl gave to him?

19        A.   I'm not sure if that's what it was

20   called but it was a document presented by

21   Dr. Earl.

22        Q.   Okay.  Well, I guess we'll go through

23   that later.  Okay.  I'm going to show you an

24   exhibit now.

25              MR. WHITFIELD:  You doing the download

Pat Whitlock
December 02, 2020

Page 32

1           or you doing the share screen.

2                MR. SCHMITZ:  I do the share deal.

3                MR. WHITFIELD:  Okay.

4                (A brief recess was taken.)

5                (Exhibit 1 marked for identification.)

6      Q.    (By Mr. Schmitz)  Just let me know

7  whenever you're done reviewing.

8      A.    I see the document.

9                MR. WHITFIELD:  There's multiple --

10           which page do you want her to look at or all

11           of it?

12                MR. SCHMITZ:  Just, you know, if you

13           want -- yeah, just look at all of them and

14           then I'm going to -- I'll start from the top

15           and -- well, no, I'm probably going to

16           actually start from the bottom.  I'm going to

17           be all over the place on this one a little

18           bit, so.

19      A.    Okay.

20      Q.    (By Mr. Schmitz)  Just take a minute to

21  review it and then we'll talk.

22      A.    I have reviewed.

23      Q.    Okay.  All right.  I wanted to -- on the

24  first page there's an e-mail from Pamela Greenwood

25  dated Wednesday, February 15 at 10:22 a.m.  Do you

Pat Whitlock
December 02, 2020

Page 33

1    see that?

2        A.    Yes.

3        Q.    And that e-mail was sent to you.  And it

4    starts, good morning, Pat, after reviewing

5    documentation submitted additional information is

6    needed.

7              She asked you several questions so I'm

8    going to go through those questions.  She asked,

9    is there any supporting documentation of the

10   feedback/coaching sessions that Dr. Earl

11   referenced.

12             Was there any additional supporting

13   documentation regarding the feedback and coaching

14   sessions that Dr. Earl referenced or stated that

15   he had done with Dr. Papin?

16       A.    In some of the information that Dr. Earl

17   provided it did indicate when he had spoken with

18   Dr. Papin.

19       Q.    Okay.  But was there any contemporaneous

20   e-mails or feedback that were provided to

21   Dr. Papin in writing from Dr. Earl that you can

22   recall other than his evaluations?

23       A.    There were e-mails that referenced he

24   had spoken with Dr. Papin.

25       Q.    Okay.  Do you recall seeing anything

Pat Whitlock
December 02, 2020

Page 34

1    that Dr. Earl had sent to Dr. Papin prior to

2    January 10, 2017?

3        A.    I do not.

4        Q.    It states -- the next question is, is

5    there a complete signed academic remediation

6    protocol checklist showing all tasks have been

7    completed.

8        A.    We discussed -- we had a meeting with

9    Ms. Greenwood and Ms. Bass where it was determined

10   that many of the questions that she was asking

11   were more related to the academic environment

12   rather than the HR environment, and so it would

13   not have been relevant to the specific

14   investigation and recommendation for termination

15   based on the employee status.

16       Q.    When you say based on the employee

17   status, what does that mean?

18       A.    Because the termination was being

19   requested of Dr. Papin's employment, many of the

20   questions that Ms. Greenwood was asking would have

21   been more relevant to his status as a house

22   officer in a training program.

23       Q.    Yes, but isn't -- his employment had

24   already been decided that he was not going to be

25   part of the academic program; is that correct?

Pat Whitlock
December 02, 2020

Page 35

1       A.    I don't know if it had been formally

2   initiated.

3       Q.    **Well, the reason why you had sent all**

4   **this stuff there was a request for termination,**

5   **the subject line of the e-mail, that request for**

6   **termination came from Dr. Barr and Dr. Earl, isn't**

7   **that correct?**

8       A.    It is.  At UMMC there are two distinct

9   tracks, the academic component and then the

10  employee component.  The questions that

11  Ms. Greenwood raised would have been more relevant

12  to the academic component rather than the employee

13  component to which the recommendation for

14  termination was made.

15      Q.    **Doesn't that distinction -- I get that**

16  **there is a formal distinction but, again, as we**

17  **discussed before, if the academic program decides**

18  **to terminate a resident or wants to terminate a**

19  **resident, there's nothing HR can do to keep that**

20  **person still in the program, correct?**

21          MR. WHITFIELD:  Object to the form.

22          THE WITNESS:  They're just two separate

23      distinct tracks and they are operated

24      separately from each other.

25          If the program director decides that the

house officer is not meeting the expectations, they do not have to confer with HR in order to remove that person from the program. And the questions that Ms. Greenfield raised were all more in line with the academic component of Dr. Papin's status than they were of the employee component of his status and the employee component of his status was the basis for the request for termination.

**Q. (By Mr. Schmitz) In this case here, the first thing that came in how you -- how HR became involved was there was a request from the academic program to terminate Dr. Papin's employment, correct?**

A. Yes.

**Q. So if there is a request from the academic program to terminate a resident shouldn't the steps for terminating someone from an academic program be followed as well as the steps for terminating someone from an HR perspective also be followed?**

MR. WHITFIELD: Object to the form. You're mixing terms up.

**Q. (By Mr. Schmitz) You can answer if you**

Pat Whitlock
December 02, 2020

Page 37

1    can.

2         A.    When a house officer is in a training

3    program there are specific processes that the

4    graduate medical education office observes that I

5    don't have involvement in.  My only involvement

6    occurs when there is a request to HR based on the

7    employee status, and that is what was followed in

8    this case.  Anything that was done from the

9    graduate medical education office would have

10   existed separate from anything that HR did.

11        Q.    Has there ever been a case in your seven

12   years with UMMC where a -- someone in a residency

13   program where the residency program requested a

14   resident be terminated and HR did not ratify that

15   decision?

16        A.    I am not aware.

17        Q.    Has there been any cases you've been

18   involved with where a residency program has

19   requested that you look into a situation, we would

20   like to terminate X resident and where you

21   overruled the program and said that that resident

22   should not be terminated?

23        A.    No.

24        Q.    The next bullet point states here, how

25   were the performance issues/concerns that are

Pat Whitlock
December 02, 2020

Page 38

1    noted on the analysis trainee comments document

2    addressed?  Is there any supporting documentation?

3    Was there any supporting documentation for any of

4    these things?

5        A.    I don't know.  And, again, that would

6    have been part of the academic component.  HR

7    would not have any had any involvement in that.

8        Q.    Right above this in your e-mail that you

9    responded back to this on February 15, 2017, at

10   10:52 a.m., you stated to Molly Brasfield in

11   employee relations that, I felt this would be an

12   issue and I feel certain that the answer will be

13   no to all of these except the last two since he

14   has been off campus since 1/10.  Why would you

15   feel that this would be an issue if this is not

16   something that HR deals with or this isn't a

17   problem?

18       A.    The graduate medical education office

19   operates in totality apart from HR.  There are

20   times when the actions taken by the graduate

21   medical education office may tend to blur as to

22   whether or not it is academic or HR related.  And

23   that was the nature of my comments.

24       Q.    So in this situation you believe that

25   the involvement was blurred between the two

Pat Whitlock
December 02, 2020

Page 39

1    tracks, right, between the HR track and the

2    graduate medical education track, they were sort

3    of blurring together so you were concerned about

4    that?

5         A.    There's often a spill over because as

6    you have alluded, the person can not be an

7    employee without being in the program.  So

8    sometimes it is difficult to determine if it is

9    totally academic or if it is totally employee, and

10   so sometimes there is a blurring of where one

11   stops and where the other one starts.

12        Q.    Okay.  And in this case you believe

13   there was some blurring going on and that is why

14   you thought that there would be issues with this?

15        A.    I thought that there could be some

16   blurring but I also felt that based on the

17   documentation provided there was enough concrete

18   evidence to support the department's request for

19   termination.

20        Q.    Sure.  Going down back to what we were

21   looking at before, the bullet points that

22   Ms. Greenwood sent to you states the next one, how

23   is the disruptive incident addressed that occurred

24   between Dr. Papin and Joshua?  And that would have

25   been Joshua Stavins.  Did you conduct any

Pat Whitlock
December 02, 2020

Page 40

1    investigation into the incident between Dr. Papin

2    and I believe it was a nurse practitioner Josh

3    Stavins?

4         A.    I did not.

5         Q.    At UMMC when there is a complaint or the

6    HR becomes aware that two employees potentially

7    got into a violent encounter or physical

8    encounter, isn't that something that HR usually

9    looks into?

10        A.    If it is brought to HR's attention

11   either at the time it occurs or shortly after it

12   has occurred.  There are many incidents that the

13   departments handle without HR involvement and this

14   was one of those.

15        Q.    So after becoming aware of this you did

16   not deem it necessary as part of your

17   investigation function in human resources to look

18   into or at least go out and speak to Mr. Stavins

19   to see what the situation was with Dr. Papin and

20   him?

21        A.    I felt that the documentation provided

22   by the department was complete enough to support

23   their recommendation.

24        Q.    Next question states, can you provide a

25   copy of the expectations that were communicated by

Pat Whitlock
December 02, 2020

Page 41

1    Dr. Mahoney, I'm assuming to Dr. Papin.  Did you

2    ever see a copy of the expectations that

3    Dr. Mahoney stated that she had given to

4    Dr. Papin?

5        A.    Again, that would have been a part of

6    the academic component.  I did not.

7        Q.    So whether -- if someone is giving

8    somebody behavioral expectations, workplace

9    expectation as the senior chief resident, that

10   would have no factor whatsoever in whether HR was

11   going to terminate a resident's employment?

12            MR. WHITFIELD:  Object to the form.

13            THE WITNESS:  The decision to terminate

14       would have been based on the belief that

15       there was enough documentation presented by

16       the department to support their request.

17       Q.    (By Mr. Schmitz)  Did the department

18   provide you documentation from Dr. Mahoney stating

19   that the expectations which she stated that she had

20   given to Dr. Papin?

21       A.    I would have to go back and review.

22   Currently I do not recall.

23       Q.    Okay.  It states, the next one, since

24   2/6 follow-up on ICare report has this been

25   completed?  If so, provide a copy of the ICare

Pat Whitlock
December 02, 2020

Page 42

1    report.   What are ICare reports?

2         A.    I don't recall what the acronym is for

3    but the report allows employees, faculty members

4    to provide anonymous reporting of any situations

5    that they felt would be potentially endangering to

6    a patient.   That was the way it was previously

7    done when I first started at UMMC, and at some

8    point it also now has become where if an employee

9    feels that the behavior or performance of a

10   co-worker in terms of interaction is

11   inappropriate, it can also be reported through the

12   ICare report.   It is typically used only on our

13   clinical side of the enterprise.

14        Q.    And that's typically just to report if

15   there was a problem with patient care or an

16   irregularity of some sort that the hospital should

17   look into and investigate for the sake of patient

18   care?

19        A.    I've also seen ICare reports where one

20   employee has reported a co-worker because they did

21   not appreciate the way they were spoken to

22   regarding some kind of performance that they were

23   doing, not necessarily any more just pertaining to

24   potentially derelict patient care.

25        Q.    In this case it was about the ICare

Page 43
1   report that she was talking about was regarding
2   patient care though, correct, than it was --
3       A.   Yes.
4       Q.   Okay.  And do you know if an ICare
5   report was ever done regarding the derelict
6   patient care that Dr. Papin was accused of?
7       A.   There was not.
8       Q.   Why is that?
9       A.   I don't know.
10      Q.   You requested that an ICare -- even
11  after the fact, well after the fact, you had
12  requested but nobody ever went ahead and filled
13  that out; is that correct?
14      A.   I asked if one had been submitted.
15      Q.   Okay.  And when you asked whether one
16  had been submitted, who did you ask for that?
17      A.   I don't recall.  I think it was Renee
18  Greene who was the senior education administrator.
19      Q.   And in your request to ask for that --
20  well, tell me about this actually.  When an ICare
21  report is done and it's regarding patient care,
22  whether somebody was negligent or derelict as you
23  stated, in patient care somehow, what typically
24  follows in the wake of an ICare report derelict
25  patient care?  Is there an investigation done

Pat Whitlock
December 02, 2020

Page 44

1    regarding into that incident?

2        A.    There is a clinical committee that

3    reviews those ICare reports and determines what

4    kind of resolution should be recommended.  It is

5    not something that HR is involved in.

6        Q.    Okay.  And so because there was no ICare

7    report done here there would have been no

8    committee to review -- no clinical committee to

9    review Dr. Papin's alleged actions or negligence

10   as he was accused, correct?

11       A.    There would not be a clinical committee

12   as a result of the ICare report, but there would

13   be a review within the department for the -- under

14   Dr. Earl's purview to review it.

15       Q.    Okay.  So because there was no ICare

16   report done there was no prompt for Dr. Earl to

17   conduct a more thorough investigation into the

18   allegations that Dr. Papin had allegedly missed an

19   ulcer on the back of one of the patients he was

20   seeing?

21       A.    I can't attest to that.

22       Q.    The last one is, what progress was made

23   or not made by Dr. Papin since receiving the

24   remediation plan on 1/10/17 and being placed on

25   administrative leave.  Was there any other

Pat Whitlock
December 02, 2020

Page 45

1    incidents involving Dr. Papin since 1/10/17?  Are

2    you aware of any progress that was made or not

3    made by Dr. Papin since 1/10 after he was placed

4    on administrative leave?

5         A.    He was not on campus following that date

6    so I am not aware of anything else that may have

7    been done.

8         Q.    Is it typical for residents to get

9    placed on remediation plans if they're --

10        A.    I'm not --

11        Q.    -- issues?

12        A.    I'm not aware.

13        Q.    Have you seen that in other cases

14   involving resident discipline that you've been

15   involved in?

16        A.    No, not that I have been involved in.

17   But, again, please remember that the graduate

18   medical education office and those specific

19   departments operate totally within their own realm

20   in terms of the house officers.

21        Q.    Okay.  So when you say they operate

22   completely and totally in their own realm with

23   respect to house officers, so, again, these things

24   that Pamela Greenwood is bringing up to you that

25   you're saying aren't important from an HR

Pat Whitlock
December 02, 2020

Page 46

1   perspective, why are they not important?  Isn't
2   she just checking up here to see whether the
3   graduate medical department who are operating in
4   their own realm is doing the things that they're
5   supposed to do in a termination situation of a
6   resident?

7       A.   I would not say that they are not
8   important.  There are two totally different
9   responsibilities that the graduate medical
10  education office has based on the ACGME standards
11  and there's a totally different responsibility
12  that HR serves at UMMC.  And, again, everything
13  that Ms. Greenwood was asking was more -- would be
14  more in line with the purview of the graduate
15  medical education office from a teaching
16  standpoint rather than the role of HR in terms of
17  the employee performance.

18      Q.   And you just mentioned the ACGME
19  standards that govern the graduate medical
20  education program, so these would be certain
21  things that would potentially be implicated, the
22  things that they're talking about here that the
23  graduate medical education program would want to
24  be doing if they wanted to be in compliance with
25  ACGME standards?

Pat Whitlock
December 02, 2020

Page 47

1    A.   I can --

2         MR. WHITFIELD:  Object to the form.  You

3    can answer to the best of your knowledge.

4    She's not a 30(b)(6) on the ACGME standards.

5         THE WITNESS:  Right.  I can not address

6    those specifics.  I can only tell you that

7    there are two separate tracks for house

8    officers and the graduate medical education

9    office operates as that guardian for those.

10   And I do not have familiarity with that as

11   all of that is managed by a separate office.

12        Q.   (By Mr. Schmitz)  You stated earlier that

13   these two areas and tracks, they tend to blur

14   sometimes, so wouldn't it be incumbent and wise to

15   have some knowledge of the two different tracks so

16   that when you're making decisions in HR that you're

17   also aware of the potential ACGME implications and

18   graduate medical education implications of those

19   decisions?

20        A.   Any time there is a need to have that

21   information there is conferencing with those

22   people who are considered the subject matter

23   experts.

24        Q.   Okay.  I'm going to -- on this page, on

25   this exhibit here, if we scroll down to below

Page 48

1    Ms. Greenwood's e-mail to you with the bullet

2    points we have an e-mail which you drafted and you

3    said to Cecilia Bass.  It starts, good afternoon,

4    feedback sessions have been held.  Do you see

5    where I'm talking about?

6         A.    Yes.

7         Q.    That e-mail is dated February 6, 2017,

8    sent by you at 5:45 p.m.?

9         A.    Yes.

10        Q.    So this was on February 6 and you wrote,

11   feedback sessions have been held with this

12   employee but his performance continues to be less

13   than satisfactory.  How was Dr. Papin's

14   performance continuing to be less than

15   satisfactory since he was no longer on campus at

16   this point and had not been on campus for almost a

17   month at that point?

18        A.    The process for providing a summary to

19   the office of employee relations includes a

20   synopsis of everything that has been used to make

21   the determination.  And it always begins with a

22   summary statement and that statement would have

23   been based on a review of all of the

24   documentation.  As you can see the first date

25   would be 7/29/16, so that summary statement would

Pat Whitlock
December 02, 2020

Page 49

1   be to encompass everything that has occurred over

2   the course of whatever caused the concerns of that

3   employee.

4        Q.    You go on to say that some of his

5   actions are potentially a threat to patient safety

6   and the director of his program feels that the

7   liability is to great to continue -- to have him

8   continue.   What actions were potentially a threat

9   to patient safety in your opinion?

10       A.    There were several instances that the

11  documentation received from the department

12  included such as not conducting a review of a

13  patient to determine whether or not there were

14  wounds, for instance.   That was one of the things

15  that was included in the documentation received.

16       Q.    Anything else, or just that one

17  incident?  Was that the only incident you were

18  considering at that time?

19       A.    There was another incident where

20  Dr. Papin was paged toward the end of his shift,

21  there was a code given on one of his patients that

22  he did not answer.   There were other incidents

23  where Dr. Papin could not be found on the premises

24  during the day when he should have been on his

25  shift.

Pat Whitlock
December 02, 2020

1        Q.    Okay.   Okay.   We'll go through those.

2            MR. WHITFIELD:  Greg, if you're at a

3        quick stopping point, we've been going a

4        little over an hour, can we take about five?

5            MR. SCHMITZ:  Of course.

6            MR. WHITFIELD:  Or, you know, if you're

7        not at a stopping point I can wait a few more

8        minutes, but just...

9            MR. SCHMITZ:  Hold on, let me -- yes,

10       that's fine.  We can take a stop.

11           MR. WHITFIELD:  All right.

12           (A brief recess was taken.)

13    EXAMINATION BY MR. SCHMITZ:

14       Q.   All right, Ms. Whitlock, so going back

15    to what we were looking at prior to the break, I'm

16    looking at the e-mail that you had sent out on

17    February 6, 2017 at 5:45 to Cecilia Bass among

18    others within HR and employee relations

19    department.  So you have here under where it says,

20    Facts, Dr. Truman Earl, Director of School of

21    Medicine, referred Dr. Papin to employee health to

22    check for the presence of illegal substances and

23    those tests were negative.  Is that just a normal

24    standard procedure that in these types of

25    discipline type cases that the residents are

Pat Whitlock
December 02, 2020

Page 51

1    referred to go take a drug test?

2        A.    It is not.  I would presume that there

3    was some behavior that Dr. Earl deemed

4    questionable.  We do not have a standard random

5    drug policy but supervisors may refer an employee

6    if the behavior is such that they fill that there

7    is some outside substance causing a change in the

8    behavior.

9        Q.    Do you have any documentation or

10   anything with respect to that or that was just

11   only handled by Dr. Earl in the --

12       A.    It was only handled within the

13   department.  HR was not involved.

14       Q.    Then it goes on to say -- you then

15   state, he then placed Dr. Papin on administrative

16   leave and then consulted with human resources

17   regarding the next steps.  Dr. Earl was concerned

18   as Dr. Papin's was not up to the standards of a

19   surgical resident.  He was not truthful in

20   response to his inquiries and his negligence was

21   liable to result in patient safety issues leaving

22   Dr. Earl to conclude that the only remedy was

23   separation.

24           So Dr. Earl had concluded that the only

25   remedy was separation and then he consulted with

Pat Whitlock
December 02, 2020

Page 52

1    you guys for what?  For what purposes -- if he had

2    already concluded that the only remedy was

3    separation, for what purpose would HR need to get

4    involved?

5        A.    At UMMC any time a department recommends

6    termination of an employee it has to be approved

7    through the office of employee relations and that

8    information first comes to the HR business partner

9    who has a responsibility of summarizing the

10   situation and sending it on to employee relations.

11       Q.    And would the human resources department

12   also have the responsibility to investigate the

13   claims being made by the department to

14   substantiate the veracity of those claims?

15       A.    Yes.

16       Q.    Here you've got the first date in your

17   timeline of events for Dr. Papin, you've got on

18   7/29/2016, Dr. Papin was in the cardiovascular

19   rotation and was the first house officer to work

20   in the cardiovascular intensive care unit.  He was

21   not accustomed to the way nurse practitioners are

22   utilized at UMMC being able to run the day to day

23   operations of the cardiovascular intensive care

24   unit and his reactions and responses to them were

25   less than professional.  When NPs would ask to

Pat Whitlock
December 02, 2020

1    perform routine tasks or wish to teach him

2    something, he would arrogantly respond with such

3    statements -- by stating such as "you are not my

4    boss" or "I am a surgeon."  He would not check

5    with them -- check in with them and he would not

6    be seen until it was time for evening rounds.

7              Did you ever -- the nurse practitioners

8    that reference in this statement, did you ever

9    interview any of these nurse practitioners to

10   confirm that Dr. Papin had made these statements

11   such as "you are not my boss" or "I am a surgeon"?

12        A.   I did not.

13        Q.   You also state he would not check in

14   with them and would not be seen until it's time

15   for evening rounds.  Did you ever interview or

16   investigate anyone who stated that Dr. Papin did

17   not check in with them or that he had not seen

18   them until -- they would not see him until evening

19   rounds?

20        A.   I did not.

21        Q.   The next sentence states, Dr. Ines

22   Berger, Professor-Anesthesiology, discovered that

23   Dr. Papin had not been given the cardiovascular

24   intensive care policy at the beginning of the

25   rotation, was only given one after he carried

Pat Whitlock
December 02, 2020

Page 54

1    coffee into a patient's room which was against

2    policy and was confronted by an NP which almost --

3    which escalated into a heated exchange.  Did you

4    ever talk to Dr. Ines Berger regarding Dr. Papin's

5    behavior at cardiovascular intensive care unit?

6         A.   I did not.

7         Q.   Did you ever talk to the nurse

8    practitioner that he almost got into a heated

9    exchange -- that he got into a heated exchange

10   with?

11        A.   No.

12        Q.   When you say heated exchange, that

13   exchange based on your knowledge, it was an almost

14   violent exchange, correct?

15        A.   I can not attest to that, I was just

16   told that it was heated.

17        Q.   In incidents where there are heated

18   exchanges amongst employees isn't it incumbent

19   upon HR to conduct at least an interview or an

20   investigation into that or do --

21        A.   It depends on the situation and whether

22   or not the department has taken steps to handle

23   it.

24        Q.   Which steps did the department take to

25   handle the situation?

Pat Whitlock
December 02, 2020

Page 55

1      A.    It was my understanding that both of

2   those people were spoken with.  And, again, we're

3   talking about something that I received in January

4   of 2017 that had occurred six months prior.

5      Q.    Wouldn't an incident regardless of

6   whether it occurred six months ago or a year ago

7   of workplace bullying or harassment, especially of

8   the type that could potentially involve a physical

9   altercation be something that HR should always

10  want to look into?

11     A.    If the department has not handled it,

12  yes.

13     Q.    Well, you did see it necessary to talk

14  with Dr. -- when you interviewed Dr. Papin on

15  January 27, you did bring up this incident with

16  Dr. Papin, correct?

17     A.    I brought everything with him that had

18  been reported.

19     Q.    Right.  But you didn't bring the

20  incident up with the other nurse practitioner who

21  was also involved in the altercation?

22     A.    I did not.

23     Q.    So you then go on to state that

24  Dr. Berger then e-mailed Dr. Earl and Dr. Shake

25  and she indicated that Dr. Papin had issues with

Pat Whitlock
December 02, 2020

Page 56

1    all four cardiovascular nurse practitioners as

2    well as the pharmacist.  Did you ever go speak

3    with any of the cardiovascular nurse

4    practitioners -- the four cardiovascular nurse

5    practitioners or the pharmacist who had alleged

6    nondescript issues with Dr. Papin?

7        A.    No.

8        Q.    Are you aware if Dr. Papin was ever told

9    the identity and issues that these four

10   cardiovascular nurse practitioners and pharmacists

11   had with him?

12       A.    I don't know.

13       Q.    Yeah, and she assessed that he was

14   bright and motivated with a lot of potential but

15   needed help to mentor him to navigate the system

16   and get off to a good start.  Isn't that -- in

17   terms of residents at UMMC, residency program,

18   that's a training program, correct, for doctors?

19       A.    Yes.

20       Q.    So that they can advance into a full

21   fledged practice, medical practice, correct?

22       A.    Yes.

23       Q.    And this was -- Dr. Papin had only been

24   a resident, this was his first year of residency

25   at UMMC, correct?

Pat Whitlock
December 02, 2020

1    A.    Yes.

2         Q.    So in essence he was a first year intern

3    at UMC; is that correct?

4    A.    Yes.

5         Q.    Are the expectations on first year

6    intern residents at UMMC different from the

7    expectations from somebody who might be a fourth

8    or fifth year resident at UMMC?

9         A.    I'm not familiar with their specific

10   expectations.

11        Q.    Are you aware whether a first year

12   resident would have less expectations and

13   responsibilities than a fourth or fifth year

14   resident?

15        A.    I would presume they would have

16   expectations of their specific program, but I am

17   not familiar with that program.

18        Q.    Okay.  Then you have in your timeline

19   8/31/16 to 12/15/16.  That's a span of almost four

20   months there.  And you state that all house

21   officers receive evaluations for various rotations

22   for which they are assigned.  Although some

23   statements were complimentary, many of Dr. Papin's

24   were quite concerning.  There was a consensus that

25   he was intelligent and desirous to become an

Pat Whitlock
December 02, 2020

Page 58

1    excellent surgeon; however, he was absent for some

2    activities, did not seem prepared for others, and

3    resorted to the blame game when confronted with

4    his shortcomings.  Just going -- just these

5    allegations that you have here, he was absent for

6    some activities, did you ever -- do you recall

7    what specific activities he was absent from that

8    you uncovered during your investigation?

9         A.    I do not.  I would have to go back and

10   review the information that Dr. Earl had provided.

11        Q.    You also stated that he did not seem

12   prepared for others.  Do you recall the incidence

13   where he was not prepared for any activities that

14   he was doing as a first year resident at UMMC?

15        A.    I do not.

16        Q.    Do you recall where he resorted to the

17   blame game when confronted with his shortcomings?

18        A.    Again, I would have to go back and

19   review the information that was presented.

20        Q.    At UMMC are there policies and

21   procedures from an HR perspective that state that

22   all incidents of -- well, actually let me -- are

23   the HR -- is there an HR policy or procedure or

24   perhaps a zero tolerance policy for violence at

25   UMC?

Pat Whitlock
December 02, 2020

Page 59

1          A.    I would have to review that specifically

2    to determine that.  I'm not currently familiar.

3          Q.    If two employees get into a fight at

4    UMMC and there's a physical altercation, whether

5    that be pushing, hitting, kicking, anything like

6    that, is it your experience that those employees

7    are both terminated?

8          A.    I actually have not had an experience of

9    that nature.

10         Q.    Okay.  And you're not aware whether UMMC

11   has a zero tolerance policy for violence?

12         A.    Again, I would have to review that to

13   see how it is specifically stated.

14         Q.    Where would that be found?

15         A.    It would be found in the faculty staff

16   handbook.

17         Q.    Okay.  Then you have here on -- between

18   this 8/31 and 12/15 here, other than the

19   evaluations that Dr. Papin would have received in

20   the regular course you did not document that

21   anybody else had spoken to or had a -- how you put

22   it earlier, an informal verbal warning or written

23   verbal warnings or final written warnings at any

24   point in time during that process; is that

25   correct?

Pat Whitlock
December 02, 2020

Page 60

1      A.   Are you saying given to Dr. Papin?

2      Q.   Yes.

3      A.   That's correct.

4      Q.   Then on 1/3/17 through 1/10/17 you

5   state, Renee Green, Senior Education

6   Administrator, compiled e-mails concerning

7   Dr. Papin's performance.  When you say she

8   compiled e-mails, she was going around asking

9   Dr. Papin's co-workers I'm assuming if they had

10  any issues or experienced any issues with

11  Dr. Papin?

12     A.   I can't attest to that.  I don't know

13  the nature of those e-mails being received.

14     Q.   Okay.  But you summarized those e-mails

15  that were received afterwards, correct, so you are

16  aware that she did compile e-mails from the other

17  folks in the department, correct?

18     A.   Yes, but I don't know the impetuous for

19  that.

20     Q.   Okay.  Renee Greene as the Senior

21  Education Administrator for the general surgery

22  department, she worked closely hand in hand with

23  Dr. Earl?

24     A.   Yes.

25     Q.   Okay.  And she's sort of Dr. Earl's

Pat Whitlock
December 02, 2020

Page 61

1    administrative assistant, is that --

2        A.    No.

3        Q.    No?

4        A.    Her role is to ensure that the house

5    officers, residents, fellows are on track with all

6    of their requirements, and she would serve as

7    their main point of contact if they had questions

8    regarding any of their requirements.

9        Q.    Okay.  The first person that you mention

10   here is Dr. Colin Muncie.  You state that

11   Dr. Papin had -- she -- had been delegated the

12   admittance of a trauma patient to the ICU.  She

13   instructed Dr. Papin to enter orders and

14   communicate to the ICU.  He was informed by --

15   Dr. Colin Muncie was informed by another resident

16   that the ICU was never notified that the patient

17   was coming.

18            Did you ever do any investigation to --

19   with Dr. Muncie or speak with Dr. Muncie or

20   anybody in the ICU to confirm that Dr. Papin

21   dropped the ball in communicating with the ICU

22   department regarding this patient?

23       A.    I did not.

24       Q.    Are you aware of the identity of this

25   patient?

Pat Whitlock
December 02, 2020

Page 62

1       A.   No.

2       Q.   Did you receive any medical records to

3   substantiate that this patient's admittance into

4   the ICU department was delayed because of this

5   error?

6       A.   No.

7       Q.   Was there an ICare report filled out

8   regarding this incident involving this patient who

9   was not -- who was delayed being admitted into the

10  ICU?

11      A.   I don't know.

12      Q.   Stated, when he confronted Dr. Papin he

13  confidently told him that he'd spoken to someone

14  although he could not remember who it was.

15  Dr. Muncie followed up with the ICU nurse

16  practitioner who had spoken to everyone who had

17  been on duty and it was confirmed that Dr. Papin

18  never -- it was confirmed that Dr. Papin never

19  spoke to anyone on the ICU team.  Do you know who

20  the ICU nurse practitioner who Dr. Muncie

21  communicated with was?

22      A.   No.

23      Q.   Did you verify any of these allegations

24  with that nurse practitioner?

25      A.   No.

Pat Whitlock
December 02, 2020

Page 63

1      Q.    Did you direct anybody to verify the
2   allegations regarding this ICU nurse practitioner?
3      A.    No.
4      Q.    Did you ever have anyone try to figure
5   out who the identity of this person was?
6      A.    No.
7      Q.    So how can you state that it was
8   confirmed that Dr. Papin never spoke to anyone on
9   the ICU team with such confidence when you had
10  conducted no investigation or interviews into any
11  of these allegations whatsoever?
12     A.    I had to take the word of Dr. Earl in
13  his preparation for his recommendation.  As the
14  leader of that group it would have been his
15  responsibility to insure that everything that was
16  reported to him was accurate.  And as he was
17  providing us with the summary we decided to take
18  his word that these things had actually occurred.
19     Q.    But this wasn't a summary from Dr. Earl,
20  this was an actual e-mail that you had reviewed
21  from Dr. Muncie, correct?
22     A.    As a result of a compilation of those
23  things through Dr. Earl, yes.
24     Q.    Dr. Muncie is a research fellow, so
25  Dr. Muncie he is also -- that's a resident as

Pat Whitlock
December 02, 2020

Page 64

1   well, correct?

2       A.   Yes.

3       Q.   Okay.  So there was a report from a

4   resident regarding another resident and HR -- you

5   and HR did not deem it necessary to verify --

6   independently verify the validity of any of this

7   other resident's allegations regarding Dr. Papin?

8       A.   No.

9       Q.   In your opinion is it possible that

10  this -- that Dr. Papin did in fact make this call

11  down to the ICU and somebody else just maybe had

12  dropped the ball and didn't enter it and were

13  trying to cover for their own skin so that they

14  didn't get in trouble?

15      A.   It's possible, but it seems highly

16  unlikely.

17      Q.   But we don't know one way or the other?

18      A.   Correct.

19      Q.   But yet you stated it was confirmed that

20  he never spoke to anyone on the ICU team?

21      A.   It was perceived to be correct in

22  Dr. Muncie's assertion that, yes, it was confirmed

23  that Dr. Papin had never spoken with anyone.  The

24  ICU team would not have been so large that if

25  someone had spoken with Dr. Papin no one would

Pat Whitlock
December 02, 2020

Page 65

1    have remembered it.

2         Q.    Well, you can't tell one way or the

3    other because you didn't actually conduct any

4    investigation into that?

5         A.    Correct.

6         Q.    Would there have been a way to

7    independently check the phones within the hospital

8    to see if Dr. Papin had called from a certain

9    place in the hospital to another place in the

10   hospital at a certain specified time?

11        A.    I don't know.

12        Q.    Did you ever try to find that out?

13        A.    I did not.  So many times the house

14   officers use their personal phones, and I'm not

15   sure how long records of calls are maintained.

16        Q.    Are those -- when a house officer like a

17   resident is on -- they're given a UMMC pager; is

18   that correct?

19        A.    I'm not aware of all those processes.

20        Q.    Okay.  But there are phones all

21   throughout the hospital, correct?

22        A.    Yes.

23        Q.    And many times if someone is calling

24   from, let's say, one department down to the ICU

25   they would typically use a hospital phone; isn't

Pat Whitlock
December 02, 2020

Page 66

1    that correct?

2         A.    I don't know.

3         Q.    Did you ever ask Dr. Papin whether he

4    used a hospital phone or not?

5         A.    I did not.

6         Q.    Okay.  The next one is Dr. William

7    Crews, a PGY3 surgical resident, he was not a PGY3

8    surgical resident at that time, correct?

9         A.    Dr. Crews?

10        Q.    Yes.

11        A.    That's what was reported to me so I

12   don't know.

13        Q.    Okay.  He said that while working with

14   Dr. Papin he always seemed to show up just before

15   rounds without actually having seen any patients

16   but then he would lie to the residents about what

17   he had done.  Was there any investigation by you

18   or interviews by you of Dr. Crews to verify or

19   test the validity of the fact that Dr. Papin was

20   not showing up or just showing up right before

21   rounds and not seeing his patients?

22        A.    No.

23        Q.    Have you ever been involved in any kind

24   of -- for any employees, have you ever been

25   involved in any kind of investigation regarding an

Pat Whitlock
December 02, 2020

Page 67

1    employee showing up late to work or excessive

2    tardiness where that employee had to be

3    disciplined as a result?

4         A.   Yes.

5         Q.   And in -- during that, during those

6    investigations was there -- did the employees ever

7    deny that they were late or not was it -- or did

8    they always admit that they were late?

9         A.   No, any time we've done investigations

10   with employees regarding tardiness those have been

11   non-exempt employees who have to record all of

12   their time through the Kronos Time System, so it

13   would be easy to determine when they actually

14   clocked in.

15        Q.   Okay.  In this case the medical

16   residents -- at the parking garage at UMMC when

17   they pull in, they pull into a parking garage and

18   they swipe their card; isn't that correct?

19        A.   Yes.

20        Q.   So would it have been possible for you

21   in HR to pull the records for Dr. Papin's parking

22   card to see what time he was swiping in to park

23   his car in the morning?

24        A.   Yes.

25        Q.   But you didn't do that?

Pat Whitlock
December 02, 2020

Page 68

1    A.    No because you can swipe in the garage
2  to park but that doesn't necessarily indicate when
3  you actually arrive where you're scheduled to be.
4    Q.    But -- yes, while that might be true,
5  but wouldn't -- if he was arriving so late and
6  just right before rounds wouldn't you also have
7  been able to see that he was showing up and
8  swiping his card right before rounds and running
9  in, you know, and pretending like he had seen
10  patients when he had not?
11    A.    It would indicate what time he arrived
12  at the garage only.
13    Q.    Okay.  But you would have been able to
14  see that if he was arriving in the garage right
15  before his rounds were starting with the attending
16  physicians, correct?
17    A.    It would indicate what time he arrived
18  in the garage, correct.
19    Q.    But that would -- if you would have done
20  that step that would have tended to indicate
21  that -- whether Dr. Papin was being truthful or
22  not about the time he was showing up to work,
23  correct?
24    A.    It would indicate what time he arrived
25  at the garage.

Page 69

1    Q.    Okay.  What about when Dr. Papin -- when

2    the residents, when they come in to relieve each

3    other, right, there's a sign in/sign out process

4    where one resident comes in and says, hi, I'm here

5    to relieve you, you're on the -- one resident is

6    on the night shift and one is on the day shift and

7    they relieve each other?  They typically meet in

8    the resident lounge; isn't that correct?

9    A.    I'm not aware of what the exact process

10   is.

11   Q.    Is there a swipe card to get into the

12   resident lounge or is it just open to anybody?

13   A.    I don't know.

14   Q.    Are there any other points in time where

15   Dr. Papin would have to swipe his card to access

16   parts of the building into UMMC as he began his

17   day?

18   A.    There are many places on campus that are

19   badge accessible only, but I'm not familiar with

20   all of the different places Dr. Papin would have

21   been required to go.

22   Q.    When a doctor comes into the hospital

23   and they start seeing patients, I'm assuming

24   everything is done in patient charting, that's

25   done electronically on the computers and

Pat Whitlock
December 02, 2020

Page 70

1    everything like that, correct?

2         A.    It is.

3         Q.    And when somebody is doing their

4    charting or making observations or ordering things

5    for patients, they have their own specific log in;

6    isn't that correct?  Like Dr. Papin's log in at

7    UMMC so that whatever actions he takes or

8    recommended is then recorded electronically in

9    that system?

10        A.    Yes.

11        Q.    And that symptom would also record the

12   date and time whenever Dr. Papin would be doing

13   work on an electronic basis within that system;

14   isn't that correct?

15        A.    Yes.

16        Q.    Did we ever check the charts of

17   Dr. Papin to see what time he started charting

18   patients or seeing patients on any given day or

19   looking at any samples of that to see whether he

20   was showing up just before rounds as Dr. Crews

21   indicated here?

22        A.    I did not.

23        Q.    Do you know if anybody else ever did?

24        A.    I do not.

25        Q.    The next thing Dr. Crews, I'm still

Page 71

1    here, it says, when caught doing something wrong

2    he would blame a medical student for his own

3    error.  Do you recall what incident that was or

4    what medical student he blamed for his own error?

5         A.    I do not.  I would have to go back and

6    review all of the e-mails that this was compiled

7    from.

8         Q.    The next paragraph is Dr. Mahoney

9    e-mailed Dr. Earl and Ms. Greene regarding

10   numerous specific concerns.  One had to do with

11   Dr. Papin having told Dr. Mahoney that upon his

12   observation a patient did not have any skin

13   changes.  When the patient was seen by wound care

14   they reported a severe ulcer that was so

15   significant that surgery was required.  This could

16   not have happened over the course of a few days

17   and the resulting action could have been lessened

18   had Dr. Papin examined the patient and reported

19   it.

20            Are you aware that Dr. Papin had been

21   observing and examining that patient for weeks

22   prior to this wound becoming infected?

23        A.    I am not.

24        Q.    Are you aware that there was a wound

25   care nurse also attending to this patient who had

Pat Whitlock
December 02, 2020

Page 72

1    been applying creams and other topical ointments

2    to that wound for weeks prior to the wound

3    becoming infected?

4          MR. WHITFIELD:  Object to the form,

5       misstating prior testimony.

6       Q.   (By Mr. Schmitz)  You can answer.

7       A.   I am not.

8       Q.   Did you review any of the medical

9    records with respect to this patient that was

10   referenced by Dr. Mahoney?

11      A.   I did not.

12      Q.   So then how could you say with such

13   certainty in your summary that this could not have

14   happened over the course of a few days and the

15   resulting action could have lessened -- could have

16   been lessened had he examined the patient and

17   reported it?

18      A.   Again, the information provided here was

19   a summary of the e-mails that had been received

20   through Dr. Earl.

21      Q.   And there was no ICare report done on

22   this incident regarding this patient with the

23   ulcer that was so severe that surgery was

24   required?

25      A.   I don't know.

Pat Whitlock
December 02, 2020

Page 73

1      Q.   Is that normal where something that is

2  allegedly so severe that a patient is required an

3  unnecessary surgery and there's no ICare report

4  filled out?

5           MR. WHITFIELD:  Object to the form of

6           the question.  You can answer.

7           THE WITNESS:  ICare reports, again, are

8           submitted anonymously, so it would just

9           depend on whomever else was in contact with

10          that provider who determined that an ICare

11          report should have been submitted.  ICare

12          reports are not requirements.

13     Q.   (By Mr. Schmitz)  Sure.  But shouldn't

14  have, like you said, an independent clinical

15  committee have reviewed this to see where UMMC could

16  have done better with respect to the care of this

17  patient?

18     A.   If someone had noted that there was a

19  lack of appropriate attention given to the patient

20  they could have reported that within the

21  department and the department would have taken the

22  necessary steps to review.  ICare reports, again,

23  are not the only way that attention is given to

24  potentially dangerous situations.

25     Q.   Let me ask you this, when a resident is

Pat Whitlock
December 02, 2020

Page 74

1    seeing patients they typically do that under the

2    supervision of an attending physician, an actual

3    doctor, correct?  They're not allowed to just

4    freely practice medicine because they're just

5    interns, correct?

6         A.   Yes.

7         Q.   And so did you ever look or speak to the

8    attending physician who was also overseeing this

9    patient along with Dr. Papin?

10        A.   I did not.

11        Q.   Did you confirm whether the wound care

12   nurse or that attending physician who are subject

13   matters experts in those activities had any

14   different opinions other than what Dr. Papin had

15   with respect to the wound on this patient?

16        A.   I did not.

17        Q.   So the blame that you placed here on

18   Dr. Papin that the -- that the severity of this

19   wound could have been lessened had he examined the

20   patient and reported it, so that blame you place

21   on the first year resident and there was no

22   investigation or talks with the attending

23   physician, the wound care team, or any of the

24   other nurse practitioners who are actually

25   licensed to treat patients?

Pat Whitlock
December 02, 2020

Page 75

1           MR. WHITFIELD:  Object to the form.

2           THE WITNESS:  I did not confer with

3       anyone after reading the e-mails.

4       Q.    (By Mr. Schmitz)  So you just basically

5   took -- for all of these people you took their

6   allegations at face value without any investigation

7   or follow-up regarding any of these things?

8       A.    I believe that the leader of the program

9   had done the due diligence to determine that these

10  were accurate statements.

11      Q.    But you don't know what he did in terms

12  of due diligence one way or the other, correct?

13      A.    I do not.

14      Q.    In fact, before Ms. Greenwood had raised

15  a bunch of concerns regarding the lack of

16  documentation; isn't that correct, that which came

17  from Dr. Earl?  The concerns that we went through

18  before, all those bullet points that we went --

19  just before the break?

20      A.    Would you clarify your question?

21      Q.    In the last -- if you scroll up here the

22  e-mail from Pam Greenwood to you, good morning,

23  Pat, after reviewing documents additional

24  information is needed.  She asked for all of this

25  additional information and all of these things

Page 76

1   where she viewed things that Dr. Earl had done as

2   being deficient or not there as part of

3   Dr. Papin's file.  All of these things, but yet

4   you just assumed that -- what basis do you have to

5   assume that Dr. Earl did do his due diligence

6   after Ms. Greenwood had raised all these concerns

7   with you?

8        A.   Again, those concerns that she raised

9   would have been more pertinent to the academic

10   component of his status rather than what we were

11   reviewing in terms of the recommendation for

12   termination.  As Dr. Earl is the program director

13   he has the responsibility for insuring that the

14   house officers are meeting the expectations.  And

15   as the person who is trusted with that, it would

16   be my responsibility to believe that he is

17   appropriately conducting his requirements.

18        Q.   Did you ever ask him if he was

19   appropriately conducting his requirements?

20        A.   I did have conversations with Dr. Earl

21   where he reiterated all of the concerns that he

22   had but, no, I did not ask him if he were actually

23   appropriately doing his job.

24        Q.   Isn't that part of your job in HR to

25   make sure that other people are -- within UMMC are

Pat Whitlock
December 02, 2020

Page 77

1    following the proper policies and procedures in

2    doing their jobs with respect to employee

3    discipline and terminations?

4        A.    It is not.

5        Q.    So then what is the involvement of HR --

6    what is the point of HR being involved if all

7    you're going to do is not investigate anything,

8    take what somebody else at face value with no

9    investigation and then just regurgitate the same

10   thing?  What is the role of HR, just to summarize

11   everything that --

12           MR. WHITFIELD:  Object to the form, you

13        can answer.

14           THE WITNESS:  The role of HR is to act

15        as the conduit, the liaison, to determine

16        whether or not documentation that has

17        presented is sufficient enough to concur with

18        and then seek approval for the

19        recommendations that the department is

20        bringing forth.  When I reviewed all of the

21        information that Dr. Earl had provided, it

22        did appear conclusive enough to support the

23        recommendation.  I did review the evaluations

24        that had been given to Dr. Papin.  I did

25        review the letter that Dr. Earl had given to

Pat Whitlock
December 02, 2020

Page 78

1        him where he signed an acknowledgement that
2        all of those things had occurred.  So in my
3        estimation that was sufficient enough to
4        support the recommendation for the
5        termination.
6        Q.    (By Mr. Schmitz)  In the context of a
7   relationship between an attending physician and a
8   medical resident in terms of patient care,
9   ultimately the buck has to stop with the attending
10  physician; isn't that correct?
11       MR. WHITFIELD:  Object to the form.
12       She's not a 30(b)(6) witness as to the
13       relationships between residents and
14       attendings.
15       Q.    (By Mr. Schmitz)  You can answer if you
16  can.
17       A.    I don't know.
18       Q.    An attending physician is ultimately
19  responsible for patient care; isn't that correct?
20       MR. WHITFIELD:  Object to the form.
21       Once again she's not a 30(b)(6) on patient
22       care.
23       THE WITNESS:  I would presume that every
24       provider involved in patient care would be
25       responsible.

Page 79

1      Q.   (By Mr. Schmitz)  In the next part of this

2  e-mail, the next one says, Ashley Griffin, RN, cited

3  several incidents of inappropriate behavior by

4  Dr. Papin.

5           Now, I'm going to put as Exhibit 2, we're

6  going to kind of bounce back and forth between

7  those, but I'm going to give you Exhibit 2 now,

8  which is going to be what Ms. Griffin put in there.

9           (Exhibit 2 marked for identification.)

10          MR. SCHMITZ:  It's going to say

11      Exhibit 3 but it's really 2.  It's going to

12      be confusing, sorry, I'm going out of order.

13          MR. WHITFIELD:  Got to do better, Greg,

14      got to do better.

15          MR. SCHMITZ:  I can't relabel it now,

16      it's too late.

17          COURT REPORTER:  So how do you want to

18      identify it on the record?

19          MR. SCHMITZ:  It's Exhibit 2.

20          MR. WHITFIELD:  Oh, this is a picture.

21          MR. SCHMITZ:  Now, we're going to be

22      messed up for the rest of the day.  Sorry.

23          MR. WHITFIELD:  Can you read that?

24          THE WITNESS:  Uh-huh (affirmative).

25      Q.   (By Mr. Schmitz)  Let me know when you're

Pat Whitlock
December 02, 2020

Page 80

1    ready?

2         A.    I've read it.

3         Q.    Okay.  Was this the e-mail that you had

4    reviewed from Ashley Griffin where you noted

5    the -- cited seven incidents of inappropriate

6    behavior by Dr. Papin?

7         A.    Yes.

8         Q.    I want to -- there is one incident, the

9    first one on the first bullet point in her e-mail

10   states, left during a code while I was on night

11   float.  The code occurred approximately at 5:59

12   p.m.  Joe said he was at his car at 6:01 when he

13   found out it was his patient in the garage and

14   proceeded to leave.  He did hear the code called

15   overhead prior to 6:00 p.m.

16              Now, when a Code Blue is called out in a

17   hospital do they state the patient's name and who

18   it is or is it just Code Blue?

19        A.    I'm not certain, but I think they only

20   call out the specific code color and the location.

21        Q.    Okay.  And did you speak with Dr. Papin

22   regarding this?

23        A.    I did.

24        Q.    And what was his response?

25        A.    He indicated that he heard it but he did

Pat Whitlock
December 02, 2020

Page 81

1    not stop to check.  He never thought whether or

2    not it was his patient.  He said that he had

3    signed out and so he was headed out of the

4    hospital for the day.

5        Q.   Okay.  And so once a resident signs out

6    it would be the other resident's responsibility at

7    that point to go attend to any patients that would

8    be needed in that area; is that correct?

9        A.   I don't know what kind of information

10   they have been provided.

11       Q.   Okay.  Did you ever conduct any

12   investigation or ever speak to Ms. Griffin

13   regarding this incident?

14       A.   I did not.

15       Q.   Another -- the next bullet point, he did

16   not show up on time to pre-round prior to the

17   start of the shift -- the start of a shift during

18   the holidays or get sign out prior to completion

19   of trip.

20            Did you do any investigation regarding

21   this to verify the validity of what she's stating

22   here?

23       A.   I did not.

24       Q.   He did not go to traumas during the

25   day -- during holidays.

Pat Whitlock
December 02, 2020

Page 82

1         Do you know which trauma she's speaking

2     of?

3         A.    I do not.

4         Q.    Did you ever ask Dr. Earl which traumas

5     she was speaking of?

6         A.    I did not.

7         Q.    Next bullet point, he tried to send a

8     patient home walking to the car whose car was

9     across the street at the VA despite several nurses

10    telling him the patient was not competent.

11         Did you ever try to determine who this

12    patient was?

13        A.    No.

14        Q.    Did you ask Dr. Earl who this patient

15    was?

16        A.    I did not.

17        Q.    Did you ever try to obtain this person's

18    medical records?

19        A.    No.

20        Q.    He made -- the next bullet point, he

21    made a female trauma student incredible

22    uncomfortable and preferentially chooses and

23    favors her over the male.  He tries to be alone

24    with the female student as well.

25         Now, again, earlier you testified that

Pat Whitlock
December 02, 2020

Page 83

1    when someone makes an allegation of harassment at

2    UMMC that there's an investigation, correct?

3        A.    Yes.

4        Q.    Was there an investigation done here

5    regarding this alleged harassment by Dr. Papin of

6    this unknown resident?

7        A.    When it's a student I would need to know

8    specifically because if the person is a student

9    there would be a different office that would be

10   involved in handling those situations but, no, I

11   did not.

12       Q.    Did you over reach out to see if any

13   other offices had tried to handle this situation

14   or conducted an investigation?

15       A.    I did not.

16       Q.    Are you aware that it is an offense for

17   UMMC in harassment cases to conduct an

18   investigation and then also take prompt remedial

19   measures where the investigation warrants such

20   measures?  It's a legal defense for HR to do that?

21           MR. WHITFIELD:  I'm going to object,

22       asking for legal conclusions.

23           THE WITNESS:  I don't know.

24       Q.    (By Mr. Schmitz)  But it's the policy at

25   UMMC that whenever allegations of harassment are

Page 84

1    brought forward to the attention of HR that an

2    investigation is conducted, correct?

3              MR. WHITFIELD:   Object to the form as

4         she's not a 30(b)(6) on the policies.

5    Q.   (By Mr. Schmitz)   You can answer.

6    A.   I'm -- I don't know.

7    Q.   You don't know what?

8    A.   I don't know if the policy is that when

9    there's an allegation made because, again, it

10   would depend on who is making the allegation.  If

11   it's the person who has been aggrieved, if it is

12   someone just saying a student, so I would need to

13   know more specific information in order to

14   definitively respond.

15   Q.   In this situation involving a resident

16   with a trauma student when this investigation --

17   when this is brought to your attention and you're

18   reading this e-mail and making your summary that

19   you've typed up here, you did not see that it was

20   necessary or part of any -- did you check to see

21   if this was part of the policies and procedures to

22   conduct an investigation into these allegations of

23   sexual harassment which are brought forward to

24   your attention and that you reviewed?

25   A.   I did not.  And it does not specifically

Pat Whitlock
December 02, 2020

Page 85

1   say sexual harassment.  It said, preferentially
2   chooses and favors her.  So I can not infer
3   exactly what that means.  But, no, I did not seek
4   to see if anyone else had done an investigation
5   regarding that.
6       Q.   So making another female student
7   incredibly uncomfortable and trying to be alone
8   with that student as well, that didn't raise any
9   alarm bells on your head as an HR professional
10  with years and years of experience that that might
11  be something that needs to be looked into on
12  behalf of UMMC?
13      A.   It did not.
14      Q.   Do you think now looking back at that,
15  that that's something that you should have looked
16  into as an HR professional?
17      A.   I would have needed more information on
18  it.  And, again, I was basing my recommendation on
19  the totality of everything that had been
20  presented.  And in the course of -- from June 2016
21  until I was notified in January '17, I felt that
22  there were enough egregious acts by Dr. Papin to
23  support the department's recommendation.
24      Q.   What other information other than there
25  was a female trauma student and Dr. Papin and this

Pat Whitlock
December 02, 2020

Page 86

1    stuff, what other information were you looking --
2    I mean, do you need a smoking gun, do you need --
3    what else do you need?
4              MR. WHITFIELD:  Object to the form.
5              THE WITNESS:  I don't know Ashley
6        Griffin.  I don't know the context in which
7        she was reporting these.  She said he tries
8        to be alone with the female student.  I don't
9        know if he was alone.  I don't know if the
10       female student was specifically feeling that
11       he was trying to do something untoward.  So
12       there's so many unknowns in this situation.
13             Q.   (By Mr. Schmitz)  So with that many
14   unknowns, you as an HR professional sitting there
15   summarizing Ashley Griffin's e-mail to everybody
16   else in the human resources and employee relations
17   and then recommending a termination based upon the
18   seven incidents -- partially at least, upon the
19   seven incidents of inappropriate behavior by
20   Dr. Papin, you did not think it was incumbent upon
21   yourself with all the unknowns that you just
22   mentioned to pick up the phone and call Ashley
23   Griffin to determine at least the identity of this
24   student and --
25             A.   I did not.

Pat Whitlock
December 02, 2020

Page 87

1      Q.    -- and the name of student?

2      A.    I did not.

3      Q.    Thank you.

4            Your next paragraph states, Dr. Earl met

5      with Dr. Papin and discussed concerns that had

6      been raised regarding his lying or being

7      untruthful about patient care.

8            When did Dr. Earl meet with Dr. Papin?

9      Is that the January 10 meeting that you reference

10     where he signed that document?

11     A.    That is where the information was

12     summarized.  I am not sure on the specific dates

13     or date that Dr. Earl and Dr. Papin met.

14     Q.    You state that he was lying or being

15     untruthful about patient care.  I asked if that

16     was a fact but, again, you conducted no

17     investigation and only took whatever Dr. Earl

18     thought had happened, correct?

19     A.    Yes.

20     Q.    Leaving the hospital in the middle of

21     his shift to exercise.  Did you conduct any

22     investigation into that?

23     A.    Dr. Papin admitted that to me.

24     Q.    Okay.  That was during your -- the

25     transcript conversation that you had with him on

Pat Whitlock
December 02, 2020

Page 88

1   the 27th of January?

2        A.   Yes.

3        Q.   Unwillingness to help with tasks.

4             That would have been the I'm a surgeon,

5   you're not my boss, is that what you're

6   referencing there?

7        A.   Yes.

8        Q.   1/19/17 is the next bullet point, starts

9   with Molly Brasfield, HR director, and I met with

10  Dr. Rick Barr who is the Associate Dean of the

11  Graduate Medical Education; Dr. Truman Earl,

12  Director of Medicine; Jamie Christian, Associate

13  General Counsel; Renee Greene, Senior Education

14  Administrator; and Bryce Ainsworth, Project

15  Manager in the GME office.

16            What's a project manager in the GME

17  office?

18       A.   Project manager is the title but as the

19  personal who -- she's not longer at UMMC, but at

20  the time she was the person who coordinated all of

21  the activities of the graduate medical education

22  office.

23       Q.   You all sat down to discuss the

24  performance of Dr. Papin it states.  You put here,

25  Dr. Earl was adamant that he had no faith in

Page 89

1    Dr. Papin's honesty and was concerned about the

2    liability of his continued participation in the

3    surgery program.

4             What types of things was Dr. Earl being

5    so adamant about at this meeting with respect to

6    Dr. Papin?

7       A.    All of the things that have previously

8    been summarized.  His lack of preparation.  His

9    unwillingness to admit that he was not always

10   truthful, the concerns about his interaction with

11   other people with whom he had come in contact.

12      Q.    You go on to state that although he did

13   appear to be concerned about being a surgeon, he

14   was not concerned about what was required to get

15   to that point.  And you stated, the incident

16   referenced above by Dr. Mahoney regarding the

17   patient's ulcer is one of the items discussed.

18             Were there any other items discussed

19   regarding patient safety at this meeting?

20      A.    I don't recall.  I don't recall.

21      Q.    But the patient's ulcer that was the

22   primary topic of discussion regarding Dr. Papin's

23   patient safety issues?

24             MR. WHITFIELD:  Object to the form, you

25        can answer.

Pat Whitlock
December 02, 2020

Page 90

1          THE WITNESS:  It would have been one of

2      the items discussed.

3      Q.    (By Mr. Schmitz)  Okay.

4      A.    There was no transcript of that meeting

5   and we're talking about something that occurred

6   three years ago, so I do not have total recall of

7   everything that was discussed.

8      Q.    Fair enough.  You state, after inquiring

9   if an ICare report had been submitted and learning

10   that it had not it was recommended; however, I

11   followed up today and was told it still had not

12   been done.  So who did you recommend that an ICare

13   report be submitted?

14      A.    In that meeting, not to anyone specific,

15   just in that meeting.

16      Q.    Okay.  And an ICare report eventually

17   never was done on this incident?

18      A.    Not to my knowledge.

19      Q.    But you did recommend it to everybody

20   who was sitting at that meeting, correct?

21      A.    Yes.

22      Q.    Okay.

23      A.    Well, it would have been recommended

24   only to the people who would have been involved.

25   Some of those people would not have been involved

Pat Whitlock
December 02, 2020

Page 91

1    in doing an ICare report.  It would have been

2    specifically recommended to Dr. Earl to insure

3    that it would be done as he was the program

4    director.

5         Q.    But this was something you openly

6    announced at this meeting where all of these

7    people were in attendance, correct?

8         A.    Yes.

9         Q.    So Dr. Barr, Molly Brasfield, Jamie

10   Christian, Renee Greene, Bryce Ainsworth,

11   everybody would have heard you say that?

12        A.    Yes.

13        Q.    Okay.  Then you have here 1/27/17.

14   Dr. Papin had been contacted by phone to meet with

15   HR for an interview and was -- 3:00 was scheduled.

16   Dr. Papin called at 3:40 to inquire location for

17   his 4:00 appointment, arrived shortly thereafter.

18   Concerns above were discussed with him and he

19   provided a response for each.  He did not accept

20   accountability for his actions and indicated that

21   it was either someone else's fault or no one had

22   given him clear instructions.

23             When you state that he did not accept

24   accountability for his actions, what action was he

25   not accepting accountability for?

Pat Whitlock
December 02, 2020

Page 92

1       A.    All of the items that had been presented

2   as stated -- summarized above, and those things

3   that had been presented in the letter from

4   Dr. Earl as well as other e-mails that had been

5   reviewed were discussed with Dr. Papin.

6       Q.    Okay.  Goes on to say that he indicated

7   he had grown up in Florida, studied in Michigan,

8   the culture in Mississippi was different.  He did

9   not think he was being rude or condescending, and

10  once again pointed out that to him that this

11  was -- he once again pointed that this is he's

12  perceived and he was putting in an effort to

13  change.  He further maintained that neither

14  Dr. Earl nor anyone else had given him any

15  feedback that there were any concerns.

16             What your response to the fact or what

17  did your -- what were your thoughts in the fact

18  that he did not perceive that he was being rude to

19  other members of the staff or anything like that?

20  Did you believe that, or did you believe that he

21  was, in fact, being rude to other members of the

22  staff?

23      A.    My perception of Dr. Papin was that he

24  was rather cavalier.  There had been quite a bit

25  of effort put forth to try to get him to the

Page 93

1    meeting.  He had agreed to the 3:00 meeting.  As I

2    said, at 3:40 when he called to inquire where the

3    4:00 appointment was to be, he was reminded that

4    it was for 3:00.  When he came in he wanted to

5    know how long it would take because he had a happy

6    hour appointment.

7              So my perception was that if he were

8    taking a cavalier approach to being called to come

9    and speak with HR, then it did make me wonder if

10   he were being truthful about the other things.

11        Q.    So are you aware whether Dr. Papin

12   drinks alcohol or not?

13        A.    I am not.

14        Q.    He mentioned to you that he was going to

15   drink alcohol for a happy hour appointment when he

16   showed up?

17        A.    He did not say he was going to drink

18   alcohol.  He asked how long would the appointment

19   last because he had a happy hour appointment.  I

20   did not ask any questions because that was not

21   relevant to our discussion, but to make that kind

22   of comment when you know you're coming for a

23   discussion with HR just did pique my interest a

24   bit.

25        Q.    And he used the term happy hour

Pat Whitlock
December 02, 2020

Page 94

1    appointment when he said this; or did he said,

2    I've got to go meet some friends at happy hour?

3    What was exactly said?

4         A.   Again, this is three years ago, but in

5    my recollection he said happy hour appointment.

6         Q.   Okay.

7         A.   And he showed up almost 45 minutes late.

8         Q.   Right.  Did you -- had you set up the

9    meeting with him and you said 3:00 p.m.?

10        A.   The person who set it up is now

11   deceased, but we do have e-mail confirmation where

12   he did agree to that time.

13        Q.   Okay.

14             MR. WHITFIELD:  I'm looking at breaking

15        in about 30 for lunch.

16             MR. SCHMITZ:  That's fine.  I'm going to

17        try to rename these exhibits and number them

18        so that we can not get all messed up.  All

19        right, I'm sharing another exhibit with you.

20             MR. WHITFIELD:  So this is 3 again.

21             (Exhibit 3 marked for identification.)

22             MR. SCHMITZ:  This is -- yeah.

23        Actually, I'm trying to relabel things as I

24        go so it doesn't get all messed up.

25             MR. WHITFIELD:  I'm going to go back and

Pat Whitlock
December 02, 2020

Page 95

1          change that other one to 2 on my end.  Looks
2          like the same model but different.
3                THE WITNESS:  It's pertaining to --
4                MR. WHITFIELD:  I think that one is
5          different.  Or wherever it went.
6                THE WITNESS:  Scroll back up to the --
7          yeah, that's from Molly.
8                MR. WHITFIELD:  All right.
9          Q.   (By Mr. Schmitz)  We're not going to go
10    through your summary and all that other stuff again.
11    So you can just -- I'm only talking about the first
12    two pages here.
13                I'm just walking around.  You just tell me
14    when you're ready.
15          A.   I'm ready.
16          Q.   So I want to talk to you about -- it's
17    from Molly Brasfield and it's dated February 15,
18    2017 at 1:32 p.m.  And it's to Pamela Greenwood
19    and then you're also copied on that.  And Molly
20    Brasfield, she's the HR director?
21          A.   At that time she was.  She's currently
22    the chief HR officer.
23          Q.   Okay.  That's a promotion?
24          A.   Yes.
25          Q.   She states that HR has no scope of

Pat Whitlock
December 02, 2020

Page 96

1    involvement in the termination processes unless or

2    until a decision to dismiss is made by the

3    program; is that correct?

4        A.   Yes.

5        Q.   That's an accurate statement by

6    Ms. Brasfield.

7        A.   Yes.

8        Q.   This is what you were talking about

9    earlier before, the scope of the -- our

10   responsibility is to separate their employment

11   since it is dependent on their admission and

12   enrollment in an academic program, that's what

13   we've been discussing today?

14       A.   Yes.

15       Q.   So the decision here was made -- the

16   decision to dismiss here was made by the program

17   director and the director of the GME office first,

18   and then HR would confirm that, correct?  That's

19   basically what she's stating?

20           MR. WHITFIELD:  Object to the form.

21       Once again she's not the 30(b)(6) but she can

22       answer to her knowledge.

23       Q.   (By Mr. Schmitz)  That's fine.

24       A.   The program director and the GME office

25   director would determine that they no longer want

Page 97

1    a house officer in a learning program, which is

2    the academic track of status of the person.  On

3    the employee side it would have to go through HR

4    and ultimately through the office of employee

5    relations in order for employment to be

6    terminated.

7        Q.   Right.  But it's kind of like the

8    chicken and the egg, right?  Like, so the egg

9    would be the program and the chicken that comes

10   afterwards would be HR, right?

11       A.   In this case.  There are instances where

12   the GME office and the program director determine

13   that a person should not continue in a program and

14   there is mutual agreement between those entities

15   and the person may resign.  Some of those

16   instances never reach to the level of having HR

17   involvement.

18       Q.   Are you aware of whether Dr. Papin was

19   ever given or asked to resign by Dr. Earl from the

20   program?

21       A.   I'm not sure.  We were only informed

22   after Dr. Earl and the GME office had taken

23   certain steps.

24       Q.   Have you ever asked Dr. Earl did you --

25   did you ever ask Dr. Earl or have a conversation

Pat Whitlock
December 02, 2020

Page 98

1    regarding Dr. Papin potentially being given the

2    opportunity to resign?

3         A.   I did not.

4         Q.   Did you ever discuss with Dr. Earl or

5    anybody else at the GME office regarding any other

6    measures which could have potentially been taken

7    in this case other than the termination of

8    Dr. Papin?

9         A.   I did not.

10        Q.   You've been involved in other cases

11   involving residents however where other measures

12   were taken including suspension, remediation

13   plans, performance improvement plans, things of

14   that nature, where termination was then avoided?

15        A.   I can not recall.

16        Q.   Okay.  On the first page there's an

17   e-mail from Cecilia Bass to Molly Brasfield, Pam

18   Greenwood, Johnny Gilmore, Chris Morgan, and

19   yourself.  And she says, Molly, after reviewing

20   this it appears "tricky" to me.  Let's plan to

21   discuss.  I'll check your calender and send an

22   appointment to both you and Pat.

23             So I'm assuming after this you met with

24   Ms. Bass to discuss Dr. Papin's termination

25   along --

Pat Whitlock
December 02, 2020

Page 99

1      A.    Yes.

2      Q.    -- with Ms. Brasfield and Ms. Greenwood?

3      A.    Yes.

4      Q.    And when did that meeting take place?

5      A.    I do not recall.

6      Q.    It would have been within days of this

7  e-mail?

8      A.    Yes.

9      Q.    Okay.  And what was discussed at that

10 meeting?

11     A.    The same points that Ms. Greenwood had

12 initially raised in the e-mail to me.  And in that

13 meeting Molly Brasfield reiterated everything that

14 was included in her February 15 e-mail, and there

15 was just discussion about where the obligations

16 and responsibilities of GME office and the

17 programs are in relation to employment.

18           As I said, sometimes those relationships

19 can blur because even though the house officer is

20 an employee, he is ultimately in a training

21 program and all of that is guided by the program

22 direct and the GME office.  And that was why in

23 Ms. Brasfield's e-mail she indicated that those

24 issues can be tricky.

25     Q.    And you previously testified or is it

Pat Whitlock
December 02, 2020

Page 100

1    correct that you're not really sure about what the

2    requirements for discipline within a program of a

3    trainee actually require or don't require,

4    correct?

5         A.   I'm not aware of whether or not

6    discipline is even included in their guidelines.

7         Q.   Okay.  So you don't have any knowledge

8    about what --

9         A.   I do not.

10        Q.   -- to do?  Okay.  Without having

11   knowledge about what the program is supposed to do

12   or not do, how can you from an HR perspective from

13   the HR track that you've been discussing,

14   recommend and confirm a termination when you're

15   not even sure whether the program has dotted all

16   their Ts and, you know, dotted the Is and crossed

17   all the Ts?

18        A.   The recommendation that I made was based

19   on Dr. Papin's employee status, and I felt certain

20   based on the documentation that Dr. Earl had

21   provided, the meeting with Dr. Barr and Dr. Earl

22   that there were enough concerns that termination

23   could be upheld.

24        Q.   Go to the next exhibit.

25             (Exhibit 4 marked for identification.)

Pat Whitlock
December 02, 2020

Page 101

1           MR. WHITFIELD:  We got it up.

2      Q.    (By Mr. Schmitz)  You just let me know

3  whenever you're ready.

4      A.    I'm ready.

5      Q.    On the first page here you have GME

6  Committee Hearings for House Officers since 2014.

7  Do you see where it states that?

8           It states that there is a -- there was

9  an African American, Resident 78, who appealed his

10 nonrenewal of contract in 2015.  What is the

11 difference between a termination and a nonrenewal

12 of contract?

13     A.    Contracts are given for one year at a

14 time and there would be information that would

15 deem it not prudent to continue with that after

16 the end of that contract, and persons will need to

17 be notified at least 30 days in advance.  It

18 depends on -- there's a lot of information that

19 would depend on what their status is as to how

20 much advanced notice they would be given, but it

21 would need to be at least a 30 day notice.  And

22 they would be told that their contract would not

23 be renewed.  That would not be viewed in the same

24 light as a termination.

25     Q.    Did you ever discuss not renewing

Pat Whitlock
December 02, 2020

Page 102

1    Dr. Papin's contract with Dr. Earl rather than

2    terminating his employment?

3         A.    I did not.  Anytime there's a nonrenewal

4    of a contract all of those items would be

5    conducted by and through the GME office.

6              And, again, there is a distinct line of

7    demarcation with what occurs from the GME

8    standpoint and what occurs from the HR employee

9    standpoint.  So there are some actions by the GME

10   area that are never involving HR.

11        Q.    Do you recall with this resident why

12   their contract was not renewed, Resident 78?

13        A.    That would not have been one I was

14   involved in.

15        Q.    The African American resident, Resident

16   79, appealed academic probation.  Probation was

17   upheld in 2017.  This was around the same time as

18   Dr. Papin was terminated.  What were the

19   circumstances of Resident 79 being put on

20   probation?

21        A.    I was not involved in that one.

22        Q.    Were you involved in any of these other

23   than Dr. Papin?

24        A.    I was not.

25        Q.    Who was?  Who would have been involved

Pat Whitlock
December 02, 2020

Page 103

1    in these things?

2         A.    There are multiple HR business partners

3    and so it would depend on what department that

4    person would have been in as to who the business

5    partner was that was involved in it.

6         Q.    Okay.

7         A.    But, again, if it were a determination

8    solely by GME, there would not have been HR

9    involvement in that decision making.

10        Q.    **The next page is for surgical residents.**

11   **Do you see that -- now, you do oversee the**

12   **surgical residents, correct, from an HR**

13   **perspective at least?**

14        A.    I do consult with that department, yes.

15        Q.    **Okay.  The first one states ethnicity**

16   **was -- he was of Asian descent, Resident 23, had**

17   **a -- type of problem, anger management.  Do you**

18   **recall that resident?**

19        A.    Again, if these were handled within the

20   GME area HR would not have been involved.

21        Q.    **Is there a reason why Resident 23 with**

22   **anger management issues would have never gotten**

23   **escalated to HR at all?**

24        A.    If in the decision and discretion of the

25   GME office it was something that they would

Pat Whitlock
December 02, 2020

Page 104

1   handle, it would not come to HR.

2       Q.   Wasn't Dr. Papin also accused of

3   something similar to that, having some type of

4   anger management issue with respect to his

5   interaction with Nurse Practitioner Stavins, but

6   yet his issue was escalated to HR for termination,

7   and this resident got to just have a meeting with

8   his mentors and program directors?  In fact, this

9   resident was promoted from a preliminary resident

10  to a categorical resident after his second year?

11      A.   I can not respond to that.

12      Q.   Okay.  Can you explain the differential

13  treatment with respect to those two residents?

14      A.   I can not.  I don't know how the GME

15  operated in those instances.

16      Q.   Okay.  Resident 37, there was an

17  inappropriate sexual conversation.  Did you have

18  any involvement in that?

19      A.   I did not.

20      Q.   So, again, here, UMMC, there's

21  inappropriate sexual conversation and HR is not

22  getting involved to investigate a sexual

23  harassment sexual conversation between employees

24  and a resident?

25      A.   I don't know the specifics.  I don't

1    know what GME's or the program director's

2    determination was in that instance.

3        Q.    So it states here, the result was there

4    was -- this person was just warned by the program

5    director probably then to knock it off.  Again,

6    can you explain the differential treatment between

7    this white resident and Dr. Papin who is also

8    accused of having or trying to be alone and being

9    in -- making another resident or medical student I

10   believe, a female medical student feel incredibly

11   uncomfortable?  That was escalated to HR though,

12   but in this case this was kept within the

13   department.  Can you explain that differential

14   treatment?

15       A.    I can not.

16       Q.    Resident 44, were you involved at all

17   with that where the resident chose to resign due

18   to his medical -- lack of medical knowledge,

19   clinical abilities?

20       A.    I was not.

21       Q.    Okay.  Did you review any of the things

22   before today regarding these residents and their

23   numbers to get a familiarization for who these

24   folks were?

25              MR. SCHMITZ:  Tommy?

Pat Whitlock
December 02, 2020

1      MR. WHITFIELD:  She doesn't -- I don't

2   have my list in here.  I wasn't expecting the

3   numbers today for her for these people, so I

4   don't have it in here.  I can get it and --

5   print it out and get it.  We can go back to

6   this after lunch if you want.

7      MR. SCHMITZ:  Well, I'm just trying

8   to -- it's hard because I don't have the

9   numbers -- I only have numbers and I don't

10  have names, so I don't know who she would

11  have been involved with or not in terms of

12  the folks that were provided to us on these

13  lists?

14     MR. WHITFIELD:  I know you don't want my

15  knowledge, but I don't think she had any

16  involvement in any of these on the list

17  except for Papin.

18     MR. SCHMITZ:  I know she did on page 3,

19  she did mention earlier the Title IX.

20     MR. WHITFIELD:  I was talking about the

21  first two pages.  I was talking about the

22  first two pages.

23     MR. SCHMITZ:  All right.

24     MR. WHITFIELD:  Because the second page

25  is the HR page, and we do know who -- she

Pat Whitlock
December 02, 2020

```
 1          knows who Resident 76 is.

 2                  MR. SCHMITZ:  Okay.  All right.

 3          Q.   (By Mr. Schmitz)  Let's go to page 3 then

 4    where it says Human Resources House Officer Cases

 5    since January 2014.

 6                  The first four, 73, 74 and 75 -- or the

 7    first four boxes.  It says, violation of the

 8    compliance policy.  That's where the people were

 9    looking at the information that they didn't have a

10    need to be looking at.  They got suspended for 10

11    days for that.  Is that what that is?

12          A.   Yes.

13          Q.   What is FWW?

14          A.   Final written warning.

15          Q.   So all of these folks violated a policy

16    and they were all white and they only received a

17    final written warning and 10 day suspension as

18    opposed to Dr. Papin; is that correct?

19          A.   All of those situations where there was

20    a violation of compliance policy, those incidents

21    were reviewed and investigated by the Office of

22    Compliance.  It was the Office of Compliance that

23    determined the nature of the infraction and what

24    the discipline should be.  HR's only involvement

25    in that was to present what the discipline was.
```

Pat Whitlock
December 02, 2020

Page 108

1    Q.    Okay.  All right.  Resident 76, you were

2    involved directly in that case, correct?

3    A.    In the initial investigations, yes.

4    Q.    Tell me about your investigation into

5    that case?

6    A.    There were concerns brought to HR by an

7    interested third party, and as a result of that --

8    Q.    Can you be more specific who brought it

9    to your attention?

10         MR. WHITFIELD:  Hold on.  Before we -- I

11         want to make sure we protect these people's

12         privacy.

13    Q.    (By Mr. Schmitz)  You don't need to say

14    their names.  You can just say it was like another

15    resident or it was another, you know.

16    A.    It was a nurse.

17    Q.    It was a nurse, okay.  That's fine.

18    A.    The people involved in that particular

19    situation were either all nurses and nurse

20    practitioners.  The subject who was accused was

21    the only one who was a house officer.

22    Q.    Okay.

23    A.    There were some concerns brought forth

24    that he made unwanted inappropriate actions toward

25    these people.  Also there was information provided

Page 109

1    that he offered illegal drugs to several people

2    and that was what prompted the investigations in

3    that case.

4              My involvement in that was to interview

5    the nurse who brought forth the allegation.  And

6    then after the person who was considered the

7    potential victim was identified, she was

8    interviewed.  Some of the interaction occurred at

9    a party where several of these people were, so

10   they were each interviewed.  Then when it was

11   determined that it was a Title IX case my

12   involvement ended at that point.

13        Q.   Okay.  So when these allegations of

14   sexual misconduct or unwanted advances and stuff

15   like that, you did conduct interviews in that

16   case, correct?

17        A.   The initial --

18        Q.   You personally did that?

19        A.   Yes.

20        Q.   And then you proceeded to identify the

21   victims of this and interviewed those folks as

22   well?

23        A.   Yes.

24        Q.   But in this case when those -- when

25   allegations of potential unwanted advances or

Pat Whitlock
December 02, 2020

Page 110

1    wanting to be alone with somebody, you did not

2    conduct any interviews whatsoever?

3         A.    I did not.

4         Q.    Why the difference in treatment between

5    what happened to Resident 76 who was white and

6    what happened to Dr. Papin here who was

7    interviewed -- who did not have any interviews

8    conducted regarding the allegations to determine

9    the validity or veracity of those allegations?

10        A.    There was one incident referred -- in

11   regard to Dr. Papin that did not, in my

12   estimation, rise to the level of sexual harassment

13   and specifically as it relates to Resident 76.

14   That was one incident in the totality of all of

15   the acts that had been alleged by Dr. Papin.  And

16   it was felt that the documentation was conclusive

17   enough to warrant approval of the department's

18   recommendation.  Albeit from separating out that

19   one incident referred to him wanting to be alone

20   with a student.

21        Q.    So in Resident 76's case, you mentioned

22   before that there were multiple nurses involved,

23   correct?

24        A.    Yes.

25        Q.    There were multiple nurse practitioners

Pat Whitlock
December 02, 2020

Page 111

1    involved, correct?

2         A.    At least one or two.  I can't recall

3    specifically.

4         Q.    Sure.  And there were unwanted advances

5    made against several folks; is that correct?

6         A.    Yes.

7         Q.    And then -- so initially these reports

8    came in from a nurse regarding the involvement of

9    all these people, right?

10        A.    The nurse involving Resident 76 and one

11   person.  During the course of that interview

12   others were identified.

13        Q.    Okay.  So seeing how helpful interviews

14   can be in these types of situations to uncover

15   whether documentation is needed or whether

16   documentation is sufficient, shouldn't you have

17   also interviewed the folks that were allegedly,

18   potentially being harassed with Dr. Papin to see

19   if there was anything going on there whatsoever?

20        A.    Again, the totality of everything else

21   that had been alleged against Dr. Papin and the

22   length of time that it had occurred, that one

23   incident did not seem to take precedent over the

24   other things that were provided by Dr. Earl.

25        Q.    Did you interview or investigate any of

Pat Whitlock
December 02, 2020

Page 112

1    the totality of the other incidents that were

2    referenced to you or did you just take everything

3    as being -- all these -- what were essentially

4    unsubstantiated rumors to be as true and present

5    them as fact?

6         A.   I reviewed the evaluations.  I reviewed

7    the summary of the information that Dr. Earl

8    provided to Dr. Papin that he signed

9    acknowledging.  And it was determined that those

10   things were strong enough to support the

11   department's recommendation for termination.

12        Q.   If Dr. Papin had not signed that

13   document he would have been immediately terminated

14   and had no chance of remaining in the program,

15   correct?

16        A.   I can't attest to that.

17        Q.   Well, when he was presented that

18   document that he signed it was under the guise

19   that if he signed the document and he agreed to

20   remediate these alleged issues that were brought

21   forth against him that he would have 60 days to

22   remediate himself, correct?

23        A.   I was not in that meeting so I do not

24   know how that occurred, but Dr. Earl did later

25   indicate that he thought that he needed to give

Pat Whitlock
December 02, 2020

Page 113

1    Dr. Papin 60 days.  Dr. 1Earl provided that

2    information and met with Dr. Papin prior to HR

3    involvement.

4         **Q.   What's the basis for Dr. Earl thinking**

5    **that he needed to give -- he needed to give**

6    **Dr. Papin 60 days to remediate?**

7         A.   I don't know.  I would presume that that

8    was thought to be a part of the GME policy.  I'm

9    not sure.

10        Q.   Okay.

11             MR. WHITFIELD:  Greg, we're approaching

12        the hour.

13             MR. SCHMITZ:  Sure.  I'm going to be --

14        I'm either done right now and we can stop or

15        I have like just a couple short more

16        questions.  I just want to get through this

17        exhibit and then we can --

18             MR. WHITFIELD:  It's up to you.

19             MR. SCHMITZ:  Yeah.  I'm getting hungry

20        too.

21             MR. WHITFIELD:  I was going to say,

22        look, hunger, you know, that's my queue.

23        **Q.   (By Mr. Schmitz)  With respect to Resident**

24   **76 there were -- so there was multiple things going**

25   **on in that case, right, there was illegal drug**

Page 114

1   use -- alleged illegal drug use, there was alleged

2   sexual misconduct, there was alleged sexual assault

3   even, so there were multiple layers of the

4   circumstances that would have lead to that

5   resident's termination, correct?

6       A.   Yes.

7       Q.   And in Dr. Papin's case, again, there

8   were multiple layers involved in his termination

9   whether that would have been truthfulness, or his

10  alleged untruthfulness, or his alleged, you know,

11  being a danger to patients or, you know, his just

12  as you put it, his attitude issues that were

13  talking; is that correct?

14      A.   Yes.

15      Q.   But yet in the case of Resident 76 there

16  was a full investigation and interviews of

17  everybody involved by the human resources

18  department including yourself in that case,

19  correct?

20      A.   Yes.

21      Q.   But in Dr. Papin's case there was no

22  investigation into any of the things that were

23  brought forth from the GME office, I'm assuming

24  the GME office also brought forth some of these

25  allegations as well to you to review and approve

Page 115

1    the termination for Resident 76, correct?

2         A.    No.

3         Q.    So Dr. Earl or GME or nobody, this just

4    came straight to HR first?

5         A.    It came to HR through a report by a

6    nurse who was the co-worker of the person who had

7    the concerns.  During the course of that there was

8    discussion with the program director and the GME

9    office but not as the initiator.

10        Q.    Okay.  And so in that case, again, there

11   was a totality of circumstances with respect to

12   why Resident 76 was terminated, correct?

13        A.    Yes.

14        Q.    And there was a totality of

15   circumstances for why Dr. Papin was terminated as

16   well, correct?

17        A.    Yes.

18        Q.    But you had one Resident 76 got a full

19   investigation and Dr. Papin got not even a single

20   interview done by HR regarding any of the

21   allegations that were brought against him,

22   correct?

23             MR. WHITFIELD:  Object to the form.

24             THE WITNESS:  It was determined that the

25        program director and the GME office had done

Pat Whitlock
December 02, 2020

Page 116

1          due diligence.  That's their responsibility

2          when they're --

3          Q.   (By Mr. Schmitz)  I'm not asking about --

4     I'm not asking about the GME or what they did.  I'm

5     asking what you did.  I'm -- what -- with re --

6     because you took action with Resident 76.  You

7     didn't take any actions or do any interviews or

8     anything with respect to Dr. Papin, correct?

9               MR. WHITFIELD:  Object to the form.

10              THE WITNESS:  That is not correct.

11         Q.   (By Mr. Schmitz)  Okay.

12         A.   There was a review of all of the

13    information that Dr. Earl, as the program

14    director, had done.  It was presumed that

15    everything that he had done and presented was

16    complete enough to support the recommendation.

17    There was an interview with Dr. Papin when he did

18    not deny the things that had occurred.  And as a

19    result of the interview with him, as well as a

20    review of the various e-mails, evaluations, the

21    meeting with Dr. Papin by Dr. Earl, it was

22    determined that those were sufficient to warrant

23    support of the department's recommendation for

24    termination.

25         Q.   Dr. Earl, that was his first year being

Pat Whitlock
December 02, 2020

Page 117

1    the program director of the general surgery

2    department, correct?

3         A.    I don't know.

4         Q.    So you don't know -- who was the surgery

5    director before him?

6         A.    I don't know.

7         Q.    Don't you correspond with these folks

8    regularly as you oversee their department?

9         A.    I don't know.

10         Q.    So you have no idea how long Dr. Earl

11    had been the program director?

12         A.    I do not.  I know he is a physician.  He

13    was credentialed.  It was determined that he was

14    sufficiently qualified to be in that role.

15         Q.    Does he have any HR background or

16    employee discipline, or he's a surgeon background?

17         A.    He's a surgeon.

18         Q.    Okay.  So as an HR professional do you

19    think that a person who operates on other human

20    beings would have knowledge and sufficient

21    training on how to conduct an employee discipline

22    termination?  Didn't you have to receive a

23    certification to be a professional HR person to do

24    that same thing?

25         A.    I did receive certification for my HR

Pat Whitlock
December 02, 2020

Page 118

1    involvement, but anyone who is in a position of

2    leadership also has certain responsibility and

3    training that they must undergo.

4         Q.    But didn't you have a responsibility to

5    conduct at least a single interview of your own

6    knowledge just to verify -- do your own due

7    diligence, wouldn't you think your own due

8    diligence in this case should have included

9    reaching out to at least one of the people who

10   made these allegations against Dr. Papin instead

11   of just taking these hearsay rumors to be as fact?

12        A.    I did not.

13        Q.    And you think that that's reasonable?

14   This is a personal question, you think that that

15   was a reasonable course of action to take?

16        A.    In this situation, yes.

17        Q.    Why?  Why was it reasonable to

18   investigate Resident 76, do a whole federal case

19   and call everybody in and take notes and for you

20   to speak personally with everybody, but it was

21   unreasonable to do it in Dr. Papin's case?

22        A.    I spoke with Dr. Papin.  I reviewed his

23   evaluations.  I reviewed the e-mails that had been

24   provided by the department.  I reviewed the

25   information that Dr. Earl went over with

Page 119

1    Dr. Papin.  It was determined that that was

2    sufficient to warrant recommendation acceptance

3    from what the department had provided.

4         Q.    All right.  Let's take a lunch.

5               (A brief recess was taken.)

6               (Exhibit 5 marked for identification.)

7         Q.    (By Mr. Schmitz)  Ready?

8         A.    We're ready.

9         Q.    Okay.  Starting at the bottom of the

10   exhibit, page two, I'll just go in order because

11   that's the earliest first e-mail, the e-mail from

12   Rick Barr to yourself, Molly, and others within

13   the HR Department including also Dr. Earl.

14               The first question is who is Louise

15   Dove?

16        A.    Louise was Dr. Barr's administrative

17   support person.

18        Q.    Okay.  So Dr. Barr is reaching out to

19   you all at HR.  Is this typical whenever they have

20   an issue with residents where Dr. Barr will reach

21   out to guys in HR to consult with you regarding

22   these matters, types of matters?

23        A.    If they feel there is an HR involvement,

24   yes.

25        Q.    Okay.  It states that the issues are

Pat Whitlock
December 02, 2020

Page 120

1    serious enough, and also including serious patient

2    safety outcomes where return to work is not

3    desired.  Mark has an extensive paper trail.

4              And, again, the documents that were

5    provided to you by Dr. Earl that you discussed

6    today, can you just quickly run through those for

7    me?

8         A.    There were several evaluations of

9    Dr. Papin at various times in his time here.

10   There were e-mails that had come from his

11   colleagues and there was a letter that Dr. Earl

12   had provided in a meeting to Dr. Papin with

13   Dr. Papin.

14        Q.    Okay.  And that was the extent of what

15   was sent to you regarding Dr. Papin?

16        A.    Yes.

17        Q.    I want to go to the first page of the

18   second e-mail from the top, it's from Earl to

19   Ms. Brasfield January 13 at 12:48 p.m.?

20        A.    Yes.

21        Q.    Okay.  He states that -- after the first

22   sentence, I think there is a serious patient

23   safety issue here and I'm uncomfortable with him

24   taking care of patients.  I'm including the letter

25   that he had 60 days to show improvement because I

Pat Whitlock
December 02, 2020

1   thought I was required to give him the opportunity

2   to improve.

3          What would have given Dr. Earl the

4   impression or are you aware of anything at UMMC

5   procedures and policy wise that would have

6   required Dr. Earl to have given Dr. Papin 60 days

7   to improve?

8      A.   I am not.  I can only presume that he

9   must have thought it was something in keeping with

10  the GME requirements.

11     Q.   Okay.  Later down in this same e-mail he

12  says, please let me know if there's any other

13  documentation, evaluations, scores and milestones,

14  et cetera that you can provide.

15         Do you know whether evaluations, scores

16  and milestones or anything like that were ever

17  provided to you to review?

18     A.   There were evaluations but I'm not

19  familiar with milestones.

20     Q.   Okay.  Going to the next exhibit.

21       MR. WHITFIELD:  Out of curiosity, how

22    many have you got today?

23       MR. SCHMITZ:  You don't want to know,

24    Tommy.  There's only one that's going to take

25    a long time but I've got about 20, 21, 22 of

Pat Whitlock
December 02, 2020

Page 122

1      them.

2             MR. WHITFIELD:  Total?

3             MR. SCHMITZ:  Yeah.

4             MR. WHITFIELD:  Okay.  We were at like

5      19 with Renee the other day.

6             MR. SCHMITZ:  Yeah, this would be -- a

7      lot of these are quick like this one, a lot

8      of these are short.

9             (Exhibit 6 marked for identification.)

10     Q.    (By Mr. Schmitz)  You ready?

11     A.    Yes, sir.

12     Q.    All right.  So this is an e-mail here at

13     the top -- well, actually let me see.  The e-mail

14     at the bottom of page one from Joyce Olutade?

15     A.    Olutade.

16     Q.    Olutade to Bryce Ainsworth that

17     Dr. Papin passed his drug screen and blood ethanol

18     screen.

19            Now, let me ask you this.  If a resident

20     does fail and were to happen to have some type of

21     substance in their system, is that immediate

22     grounds for termination?  Is that automatic

23     termination at UMMC?

24     A.    It is not necessarily, no.

25     Q.    Okay.  Is it depending on the substance?

Page 123

1        A.    It depends on several factors.   When

2   there is a suspicion of an illegal substance the

3   process calls for the supervisor to -- there's a

4   checklist and the supervisor goes over that

5   checklist, then the employee is given the

6   opportunity to consent to being tested.

7              If the employee does not consent then

8   there is immediate suspension followed by

9   termination.

10             If the employee consents to being tested

11   there is paid administrative leave that they're

12   paid on pending the results of the test.   If the

13   results of the test are positive then there may be

14   rehabilitation through the benefits program for

15   that employee or some other program, or there may

16   be termination.

17        Q.   Okay.  So depending on the circumstances

18   some people would be allowed to go to some type of

19   rehabilitation program to break a potential

20   addiction problem or something like that and

21   others are terminated just depending on the

22   circumstances?

23        A.   Yes.

24        Q.   Okay.  All right.  Going back up to the

25   top e-mail -- well, I guess Dr. Earl had sent over

Pat Whitlock
December 02, 2020

Page 124

1    some language to Molly Brasfield and to you all to

2    review that he was going to send to Dr. Papin in

3    this e-mail.  Is this common, is this part of HR's

4    involvement in these types of incidences, you

5    know, when program directors are communicating

6    with their residents regarding sort of, I guess,

7    HR employment issues?

8         A.   Ms. Brasfield sent the language to

9    Dr. Earl.  This was a different situation in that

10   the department had determined a need for the drug

11   screening but concomitant with that were the

12   issues on professionalism and performance.  And

13   there had been communication via telephone between

14   Ms. Brasfield and Dr. Earl, and that was where

15   they had discussed the overall concerns with

16   Dr. Papin.

17             Because his drug screen was negative,

18   typically he would have been brought back on

19   campus and resumed his regular scheduling.  But

20   because of those other concerns that's why

21   Ms. Brasfield recommended the language to tell him

22   that he would be contacted for further

23   investigation rather than being immediately

24   returned to campus.

25        Q.   Okay.  Next exhibit.

Pat Whitlock
December 02, 2020

1            (Exhibit 7 marked for identification.)

2      Q.    I only have one question about this.

3   Are you ready?

4      A.    Yes.

5      Q.    All right.  Just let me know whenever

6   you're ready because I'm not --

7      A.    Sure.

8      Q.    I don't want to -- all right.  So this

9   is an e-mail from Ms. Brasfield to you and she's

10  delegating the task of setting up an interview to

11  interview Dr. Papin.  Is that typically your role

12  in HR, are you the one who typically handles the

13  interviews?

14     A.    If it's a department -- if it's a

15  department that I provide support to, yes.

16           MR. SCHMITZ:  Next.  It's there, Tommy,

17      number 8.

18           (Exhibit 8 marked for identification.)

19           THE WITNESS:  I'm ready.

20     Q.    (By Mr. Schmitz)  This is an e-mail from

21  you to Brenda Traxler regarding an interview that

22  you're going to sit -- you wanted her to sit in, and

23  you said you wanted to have a meeting to fill her in

24  on the specifics.  Can you tell me about that

25  meeting to fill her in on specifics, what you told

Pat Whitlock
December 02, 2020

Page 126

1    her and what about the situation that was happening?

2         A.    The HR process is to always have two

3    employees sitting in on any interviews that we

4    would have do with the employees.  And depending

5    on who the HR business partner was who supported

6    the department it would always be that person's

7    responsibility for the interview.

8              If there was not another HR business

9    partner available, Brenda Traxler, who at that

10   time was an associate HR business partner, would

11   be asked to sit in on the interviews.  And prior

12   to the interview she would be given specifics of

13   what the case entailed.  She also had the liberty

14   to ask questions in the interview.

15        Q.    The meeting that you had before the

16   interview, what was your discussion with

17   Ms. Traxler?

18        A.    She would have been given a copy.  She

19   would have been shown a copy of the information

20   that we had.

21        Q.    And those are the documents you told me

22   about before?

23        A.    Yes.

24        Q.    Did you give her any other details

25   regarding the situation and your thoughts or

Pat Whitlock
December 02, 2020

1    impressions of everything going on?

2         A.    No.

3         Q.    Moving right along here.  Number 9.

4               (Exhibit 9 marked for identification.)

5         Q.    Who is Bryce Ainsworth?

6         A.    She's no longer employed with UMMC but

7    at the time she was the person who managed the GME

8    office.

9         Q.    So it would be part of -- because you're

10   asking the GME office for the ICare report, that

11   would typically be something that would be handled

12   within the GME office if there were ICare report

13   issues about a resident or something like that?

14        A.    Not necessarily but because there had

15   been a meeting with Dr. Barr, who was the director

16   of the GME office, he would have been either in

17   possession of the ICare report, or Dr. Earl would

18   have discussed that with him.

19               Bryce was in attendance at the meeting,

20   the initial meeting that was held with Dr. Barr

21   and Dr. Earl when the question of whether or not

22   an ICare report existed was raised.

23        Q.    Okay.  That makes sense.  All right.

24   Exhibit 10.

25               (Exhibit 10 marked for identification.)

Pat Whitlock
December 02, 2020

Page 128

1      Q.   This is just the responses to your

2  question from the last e-mail.

3      A.   I'm ready.

4      Q.   Okay.  So Bryce sent this -- it looks

5  like Bryce sent your e-mail with your inquiry

6  regarding the ICare report over to Dr. Earl and

7  Ms. Shirley Schlessinger.  Who is Shirley

8  Schlessinger?

9      A.   Dr. Schlessinger was previously the GME

10  office director, and at that time she still had

11  some peripheral involvement.

12      Q.   Is there any reason why you didn't --

13  after Dr. Earl responded that there were no ICare

14  reports for that, is there any reason why you

15  didn't tell Dr. Earl to go ahead and submit one of

16  those?

17      A.   No, there wasn't.

18      Q.   But you had previously told, or

19  recommended at least, that the prior meeting that

20  you had with Dr. Earl, Barr, and other folks that

21  it was recommended that he fill out an ICare

22  report, correct?

23      A.   Yes.

24      Q.   And, again, you said after an ICare

25  report is filled out if it's about a patient care

Pat Whitlock
December 02, 2020

Page 129

1    issue then that patient care issue would be

2    flipped back to the department so that someone, a

3    committee within the department could review the

4    medical procedures that were followed and make a

5    determination on, you know, whether there was a

6    potential issue of care provided?

7                    MR. WHITFIELD:  Object to the form.

8            She's not our 30(b)(6) on policies.  She can

9            answer to the best of her knowledge.

10                   THE WITNESS:  The ICare report goes to a

11           specific database, it does not go to the

12           department.  When that ICare report goes to

13           the area, and I'm not sure the name of the

14           area responsible, but when the ICare report

15           goes to that specific area that is where the

16           determination is made for the committee's

17           involvement.

18               If there is no ICare report submitted

19           and if there are concerns brought within the

20           department then the department would be

21           responsible for investigating as was the case

22           with Dr. Papin.  ICare reports are not

23           mandatory.

24       Q.   (By Mr. Schmitz)  I guess my question is

25   do ICare reports typically trigger other things to

Pat Whitlock
December 02, 2020

Page 130

1    happen after -- I mean, what happens once it's -- I

2    mean, who is responsible for looking those things

3    over and making sure that it just doesn't fall

4    through the cracks and nobody cares?

5         A.   There's a specific department that I

6    can't -- I don't know the name of that area where

7    ICare reports are maintained, and it is that

8    area's responsibility to determine what course of

9    action will occur.

10        Q.   Kind of like risk management or

11   something like that?

12        A.   I can not be certain of the name of the

13   area.  It may be risk management but I'm not sure.

14        Q.   Okay.  So somebody does eventually

15   review all the ICare reports that are submitted,

16   somebody is looking at those things, right?

17        A.   Yes.  There is a specific area with

18   responsibility for those.

19        Q.   All right.  Next Exhibit 11.

20             (Exhibit 11 marked for identification.)?

21        A.   I'm ready.

22        Q.   (By Mr. Schmitz)  Okay.  Starting at the

23   bottom there's an e-mail from Dr. Earl February 14th

24   at 12:51 p.m.  Do you see where I'm talking about?

25        A.   Yes.

Pat Whitlock
December 02, 2020

1      Q.    That e-mail was sent to you, correct?

2      A.    Yes.

3      Q.    Okay.  In that Dr. Earl is -- says, Pat,

4   need some feedback on this as I need to fill his

5   slot before February 22nd, that February 22nd is

6   what eight days after he sent -- or eight days

7   later after he sent this e-mail.  What happens on

8   February 22nd that he needed to fill that slot?

9      A.    I'm not familiar with the process.  I

10  can only presume it has something to do with when

11  medical students match and when they are getting

12  assignments for the year that begins on July 1st.

13     Q.    Okay.  So is it your understanding that

14  he's basically promising you to say, hey, I need

15  an answer from you guys because I need to figure

16  out what I'm going to do with Dr. Papin's slot?

17     A.    He's inquiring about the status of his

18  request for termination.

19     Q.    Okay.  So then, again, he follows up

20  with you on February 20th at 9:15 a.m. saying that

21  he had heard nothing and if he is not to be

22  renewed in July I have to fill his slot created by

23  his absence.  This must be done by February 22nd

24  due to National Residence Match Program.  You were

25  correct.  So I need to know ASAP and I have

Pat Whitlock
December 02, 2020

Page 132

1    someone ready to fill his slot but she must

2    withdraw from the match no later than the 22nd.

3    If I hear nothing I will be forced to assume he

4    will not be renewed and fill his residency in

5    which case he will not have a job here in July no

6    matter what HR findings are.  Please help.

7           What does he mean if he fills his

8    residency slot, so regardless of HR findings or

9    whatever y'all were doing with respect to

10   Dr. Papin, he was going to fill his slot one way

11   or the other on the 22nd; is that correct?

12        A.    I can only presume that he meant that he

13   would take advantage of the academic avenue to

14   remove him from the program, but I can not attest

15   to that with certainty.

16        Q.    So is it your testimony here today that

17   Dr. Papin was only terminated for HR related

18   reasons, he was not terminated for academic

19   reasons, or is it a blur?

20           MR. WHITFIELD:  Object to the form.

21           THE WITNESS:  His employment was

22      terminated.  He was terminated as an employee

23      of UMMC.

24        Q.    (By Mr. Schmitz)  By HR?

25        A.    The ultimate decision was rendered by

Pat Whitlock
December 02, 2020

Page 133

1    the employee relations director.

2         Q.    But his participation and membership in

3    the residency program was terminated by the

4    program, correct?  That's what Dr. Earl was

5    implying here, correct?

6              MR. WHITFIELD:  Object to the form.

7              THE WITNESS:  I am not sure what the

8         process was for his removal from the program

9         as a result of his employee termination.  I

10        don't know whether or not there was some

11        specific document or some specific procedure

12        that had to occur.  He was terminated as an

13        employee.

14        Q.    (By Mr. Schmitz)  Right.  But he was

15   terminated as an employee, my understanding, I'm

16   just trying to -- he was terminated as an employee

17   because he was no longer going to be part of the

18   residency program and that decision was made by

19   Dr. Earl, correct?

20        A.    He was terminated as an employee based

21   on his performance and actions in the program.

22        Q.    Again, earlier you testified that

23   Dr. Earl and Dr. Barr came to you stating that

24   they wanted to terminate Dr. Papin, correct?

25        A.    That they no longer wanted him to

Pat Whitlock
December 02, 2020

Page 134

1    continue, yes.

2         Q.    Okay.  So the recommendation for

3    termination for Dr. Papin came from Dr. Barr and

4    Dr. Earl, correct?

5         A.    Yes.

6         Q.    Initially so?

7         A.    Yes.

8         Q.    And then HR reviewed their

9    recommendation and the documents provided and then

10   confirmed that termination, correct?

11        A.    Yes.

12        Q.    So on February 20 at 9:15 a.m. you

13   received this e-mail from Dr. Earl copying

14   Dr. Barr asking for what's going on, he only has

15   two days to make this decision.  At 3:40 p.m. on

16   the same day you reply back and state that the

17   employee relations has approved the termination of

18   Dr. Papin.  What happened on that day between 9:15

19   and 3:40 that caused his termination to be

20   approved at that point in time?

21        A.    When a recommendation is received from a

22   department for termination of an employee, as an

23   HR business partner I summarize everything and

24   submit it to employee relations where all of the

25   authorization must be given.  It is not uncommon

Pat Whitlock
December 02, 2020

Page 135

1    for a department to contact me to ask for the

2    status.

3              Typically I would e-mail or make a phone

4    call to employee relations and relay that request

5    to them that the department is inquiring about the

6    status.  I can only presume that after I received

7    the e-mail from Dr. Earl I would have made a phone

8    call to either Pamela Greenwood or Cecilia Bass to

9    inquire about the status of the request for

10   Dr. Papin.  And because I do not have an e-mail

11   here listed, again, I can only presume that there

12   must have been a phone call where they gave me the

13   authorization.

14        Q.   And did you also -- do you recall if you

15   alerted them that Dr. Earl was stating that

16   basically he only had like a day or two to make

17   this decision and that he needed an answer before

18   the 22nd?

19        A.   I do not recall.

20        Q.   Do you recall feeling pressured at all

21   to make your decision due to his e-mails stating

22   that he needed to fill that slot by the 22nd?

23        A.   I did not.

24        Q.   You didn't feel any pressure at all, no

25   sense of urgency from Dr. Earl's e-mail

Pat Whitlock
December 02, 2020

Page 136

1    whatsoever?

2        A.   I would not call it a sense of urgency
3    because I understand the role that employee
4    relations has.  There is a very small department
5    that is responsibility for the entire institution
6    and it would just depend on how many other cases
7    they had as to how long it would take them to
8    render a decision.

9            So it is not uncommon for me to have
10   sent them a request at the time that I sent that
11   and then it take several weeks before there is a
12   response.

13           So I did not necessarily sense or
14   consider Dr. Earl's inquire to the status a sense
15   of urgency that was presented to employee
16   relations.

17       Q.   So him stating this must be done by
18   February 22nd due to the National Match Program
19   requirement.  I need to know ASAP and I have
20   someone ready to fill his slot but she also must
21   withdraw from the match no later than February
22   22nd.  You didn't relay that to whoever you called
23   over at employee relations that Dr. Earl had these
24   sort of deadlines coming up with respect to
25   Papin's slot?

Pat Whitlock
December 02, 2020

Page 137

1      A.   I would have given them that information

2   at my initial inquiry of the status of their

3   review of the case.  When Dr. Earl initially asked

4   about it I would have given them that information.

5           But, again, because they represent the

6   entire institution I can not determine for them

7   how long it would take them to review how many

8   other cases they had or when they would get back

9   to me with a status on a particular case that I

10  have sent to them.

11          There are 11 or 12 other HR business

12  partners who also must send things through that

13  office for resolution.

14      Q.   Okay.  So do you recall in this specific

15  scenario of letting them know that, hey, I just --

16  whoever you called afterwards, hey, that Dr. Earl

17  is inquiring.  He said that, you know, the match

18  program is on -- did you remind them of that fact

19  that basically there was only a few days left to

20  do this?

21      A.   I can only presume that I would have

22  given that to them the first time Dr. Earl

23  inquired.  I do not recall from three years ago

24  whether or not I made a second phone call with

25  that same information.

Pat Whitlock
December 02, 2020

1      Q.    Fair enough.

2            (Exhibit 12 marked for identification.)

3      Q.    Exhibit 12, same e-mail only different

4  at the top.

5      A.    I'm ready.

6      Q.    So this would have been your reaching

7  out to the team that you just referenced, correct?

8      A.    After a phone call, yes.

9      Q.    Okay.  And who is Johnny Gilmore?

10     A.    He is no longer with UMMC but he was a

11  senior HR service partner.  It is the request of

12  the employee relations director that when anything

13  is sent to the office the entire team is copied.

14     Q.    Chris Morgan, another person?

15     A.    He's also a senior HR service partner.

16     Q.    And they both are in employee relations?

17     A.    Yes.

18     Q.    Along with Ms. Greenwood?

19     A.    Yes.

20     Q.    Along with Ms. Bass?

21     A.    Yes.

22     Q.    Okay.  All right, Exhibit 13.

23           (Exhibit 13 marked for identification.)

24     A.    I'm ready.

25     Q.    So looking at page, I'm not going to go

Pat Whitlock
December 02, 2020

Page 139

1    all the way down because the -- I'm going to start

2    at page two in the PDF.  I'm sorry, hold on.

3    Okay, yes, page two in the PDF.

4         A.    Okay.

5         Q.    And this is you and Dr. Earl talking

6    about where you're going to meet and what you're

7    going to do with the termination meeting for

8    Dr. Papin, correct?

9         A.    Yes.

10        Q.    And he states we can meet in his office,

11   that you all can meet in his office.  And he asked

12   you do you need to prepare anything?  Do I contact

13   him.  Does the GME office need to do anything?

14   This is all new to me.

15             At that point when he said, this is all

16   new to me, did anything go off in your head that

17   perhaps that Dr. Earl had maybe not done all the

18   due diligence he may have needed to do to

19   terminate Dr. Papin in the appropriate manner in

20   this case?

21        A.    I interpreted that to mean the

22   termination of the employee was new to him, the

23   actual process.

24        Q.    Right.  But before you testified, right,

25   that you were relying on Dr. Earl to do his job

Pat Whitlock
December 02, 2020

Page 140

1    and all the appropriate due diligence that he

2    needed to have done with respect to the

3    information he provided to you, correct?

4        A.   Yes.  My interpretation of his statement

5    was what was new to him was the physical logistics

6    of actually telling an employee that he was being

7    terminated.

8        Q.   Okay.  On page 1 at the bottom,

9    scrolling up a little bit, the bottom of the first

10   page of the PDF.  He stated the GME office may

11   contact him and ask him to come and meet you but

12   don't indicate what it's for.  I will prepare the

13   documentation and send to you prior to the

14   meeting.

15            What documentation did you have to

16   prepare and send to him prior to the meeting?

17       A.   Any time an employee is being separated

18   they will be given information about how they will

19   be contacted if they're interested in continuing

20   their benefits.  They will be asked to keep their

21   address updated for W2 purposes at the end of the

22   year.  They will also be told whether or not they

23   have any unused accrued personal leave and how

24   they will be compensated for that.

25       Q.   During Dr. Papin's termination meeting

Pat Whitlock
December 02, 2020

1   did he -- did you provide him with all these
2   documentations?
3        A.    At this point I do not recall.  I do
4   recall during the meeting as we were meeting with
5   him one of the other things that is required is
6   that the employee's ID badge is retrieved.  And
7   when Dr. Papin was asked for his badge he did not
8   give it and he got up and rushed from the room.
9   Dr. Earl attempted to go and catch him but he had
10  already left from that floor.
11       Q.    Did Dr. Papin sign any documents or do
12  anything during the termination meeting?
13       A.    There would not have been any documents
14  from an HR standpoint for him to sign.  I don't
15  recall if Dr. Earl had anything for him.
16       Q.    Okay.  Can you tell me about how the --
17  give me some more details.  So you met with
18  Doctor -- it was you and Dr. Earl meeting with
19  Dr. Papin, and how did the con -- were you doing
20  most of the talking or Dr. Earl?
21       A.    Dr. Earl was.
22       Q.    Okay.  Can you recall what Dr. Earl was
23  telling Dr. Papin?
24       A.    I do not recall.
25       Q.    Okay.  Did you say anything to

Pat Whitlock
December 02, 2020

Page 142

1    Dr. Papin?

2         A.    I attempted to share with him

3    continuation of benefits and the other items that

4    I have previously mentioned.  And then I asked for

5    his ID badge.

6         Q.    When you say he ran out of the room,

7    what do you mean?

8         A.    He got up from his chair and ran out the

9    door with the ID badge.

10        Q.    Did he say anything?

11        A.    There was some profanity that he spewed

12   out, but I can't recall specifically what it was.

13   He directed that at Dr. Earl.

14        Q.    You don't recall what he said though?

15        A.    I don't.

16        Q.    You said Dr. Earl went and tried to

17   chase after him?

18        A.    He got up -- Dr. Earl was seated behind

19   his desk.  Dr. Papin and I were seated across from

20   the desk.  When I asked for the ID badge Dr. Papin

21   got up and ran from the room.  Dr. Earl came from

22   around his desk and went out into the hall but

23   Dr. Papin was nowhere to be seen.

24        Q.    You spoke in your report now for the

25   first time that Dr. Papin used profanity with

Pat Whitlock
December 02, 2020

Page 143

1    respect to Dr. Earl, why was this never mentioned

2    before?

3         A.    Mentioned to whom or in what regard?

4         Q.    You hadn't mentioned this in any of your

5    other e-mails regarding the termination meeting

6    with respect to Dr. Papin prior to this or

7    afterwards in any e-mails you sent regarding the

8    meeting you had.

9         A.    I can not recall.  I guess I presumed

10   that it was not relevant to the situation.

11        Q.    Okay.  It wasn't like they got into like

12   a big screaming match or anything like that was

13   it?

14        A.    No.

15        Q.    Okay.

16        A.    There was no screaming match going on.

17   When I asked for the ID badge that's when

18   Dr. Papin got up from his seat.  Dr. Earl may have

19   said something to him and that was at the point

20   when he responded and -- as he was leaving the

21   office.

22        Q.    Okay.

23        A.    This all happened in a very short

24   duration.

25        Q.    Is it normal procedure for program

Pat Whitlock
December 02, 2020

Page 144

1    directors to try to physically restrain personnel

2    to keep them from leaving during a termination

3    meeting?

4         A.    You're misinterpreting what I said.  He

5    did not try to restrain him, he was only going

6    after him to try to retrieve the badge, the ID

7    badge.

8         Q.    Okay.  But he got up -- did he try to

9    block the door or block Dr. Papin in or he wasn't

10   fast enough?

11        A.    The way we were situated Dr. Earl was

12   behind his desk.  Dr. Papin and I were on the

13   opposite side of the desk.  Dr. Papin was closest

14   to the door.  Dr. Papin hurriedly got up from his

15   chair and exited the door.  Dr. Earl came from

16   around his desk to go out in the hallway but there

17   was no attempt to physically restrain Dr. Papin.

18        Q.    Okay.  Did Dr. Earl state anything to

19   him as he was going down the hallway like stop or

20   anything like that?

21        A.    By the time Dr. Earl got up from his

22   desk, came around the desk, and went out into the

23   hall he did not see Dr. Papin.  He did not go

24   further down the hall.

25        Q.    Okay.  At the top of page 1 of

Pat Whitlock
December 02, 2020

Page 145

1   Exhibit 13.  Good morning, what I will prepare is

2   documentation for termination of employment and

3   will look to you for any documentation as required

4   pertaining to his removal from the program.

5             In terms of documentation required for

6   removal of the program, did Dr. Earl have any

7   documentation prepared or was there anything that

8   he needed to give to Dr. Papin that he gave to him

9   that day or had him sign?

10       A.   I don't recall.

11       Q.   Exhibit 14.

12            (Exhibit 14 marked for identification.)

13       A.   I'm ready.

14       Q.   In this e-mail you state, the question

15   of whether Dr. Papin was terminated because of his

16   race is rather ironic.  Why do you think it was

17   ironic?

18       A.   This came about as a result of an

19   inquiry where Dr. Papin was appealing his

20   termination and there was a footnote on it from

21   the attorney representing him that he felt the

22   termination was due to his race that he was

23   Hispanic.  So there was irony in that because the

24   documentation that's attached to that e-mail there

25   indicates his ethnicity as white.

Page 146

1    Q.   The hallway outside of Dr. Earl's

2    office, how big is that hallway?  You said he was

3    already gone?

4    A.   I don't recall.  It's an older building

5    and I don't know dimensions of the hallway.  It's

6    a typical hallway.

7    Q.   Okay.  It's not just like a little --

8    it's not like, oh, he could have skirted around

9    the corner real quick?

10   A.   That day that I met with him was the

11   only time I've ever been in that office so I

12   really can't recall the specifics of it.

13   Q.   So essentially you all told Dr. Papin

14   he's being terminated and he just got up and

15   sprinted out the door as fast as he could?

16   A.   At the point that I asked for the ID

17   badge he did.

18   Q.   Okay.  Did Dr. Papin during that

19   conversation ever ask -- did he ask Dr. Earl if he

20   could resign in lieu of termination?

21   A.   I don't recall.

22   Q.   Do you recall Dr. Earl telling him that

23   that wasn't an option because the decision had

24   already been made?

25   A.   I don't recall.

Pat Whitlock
December 02, 2020

Page 147

1        Q.    Are you aware that someone can be more

2    than one race at the same time, for instance,

3    white and Hispanic?

4        A.    I understand that people can have a

5    multiplicity of backgrounds.  But, no, I'm not

6    familiar with what determines ethnicity.

7        Q.    What's the difference between ethnicity

8    and race?

9        A.    I'm not an expert on those

10   terminologies.  I don't know if that's semantics

11   or not.

12       Q.    But is it conceivable that someone with

13   multiple races or ethnicities may identify -- I

14   mean, there wasn't multiple places for him to

15   put -- on this sheet here, there wasn't multiple

16   places for him to put more than one option if

17   someone is multi-ethnic or multi-racial, right?

18   There would only be -- you have to pick one here

19   because you only get one choice, right?

20       A.    I don't know.

21       Q.    What don't you know?

22       A.    You were -- if you'll repeat the

23   question I'll give you a specific answer.

24       Q.    Sure.  Could he have put more than one

25   choice here on this ethnicity box, the pull down

Page 148

1    box here that's at the bottom of the e-mail?

2         A.    I don't know what those options are.

3         Q.    Okay.  Is it possible that he just

4    identified as white because that's the first box

5    that came up and then Hispanic he just was like,

6    well, I can't identify as both so I'll just go

7    with white, is that conceivable here?

8         A.    I don't know.

9         Q.    Okay.

10             MR. SCHMITZ:  Well, I'm going to take

11    one minute.

12             (A brief recess was taken.)

13        Q.    (By Mr. Schmitz)  Back on the record.  I'm

14    going to go to what is now Exhibit 15.

15             (Exhibit 15 marked for identification.)

16        A.    I'm ready.

17        Q.    (By Mr. Schmitz)  All right.  So this is

18    an e-mail from -- there is an e-mail from Cecilia

19    Bass to you stating that there was a charge.  Do you

20    see the charge.  Prepare for responding to the

21    charge, correct?

22        A.    Yes.

23        Q.    Okay.  And she said -- you asked, hasn't

24    a file already been started on him?  Isn't that --

25    wouldn't you have already prepared the file on

Pat Whitlock
December 02, 2020

Page 149

1    Dr. Papin at this point?

2        A.    Brenda Traxler prepared the files.

3        Q.    Okay.  You say, and, also, would you

4    please check in Lawson.  What's Lawson?

5        A.    Lawson was the employee system we were

6    using at that point.  In one of the previous

7    exhibits that showed his ethnicity, that would

8    have been a screen shot from Lawson.

9        Q.    Understood.  Okay.  Then it goes on to

10   say, please see -- you want the form.  I seem to

11   recall it being marked white in Lawson.  And then

12   you state, this is not going to be any easy one.

13   There's a lot to be desired in how it was handled

14   prior to HR being involved.

15           What did you mean by that statement?

16       A.    I meant that because of the program

17   director and the GME had already taken quite a bit

18   of action before HR was ever involved in it.

19       Q.    What actions were left to be desired

20   that they could have done differently before HR

21   had gotten involved?

22           MR. WHITFIELD:  Object.

23           THE WITNESS:  In a perfect world they

24       would have contacted HR prior to doing

25       anything, and at that point perhaps there

Pat Whitlock
December 02, 2020

Page 150

1    would have been more investigations from HR

2    rather than merely from the department.

3    Q.   (By Mr. Schmitz)   Okay.   So by placing him

4    on administrative leave prior to contacting HR, that

5    is what potentially held up the fact that, you know,

6    you guys were able to conduct an investigation into

7    these allegations that were being brought forth

8    against Dr. Papin?

9         MR. WHITFIELD:   Object to the form.   You

10        can answer.

11        THE WITNESS:   Not necessarily, but had

12        HR been involved prior to him being submitted

13        to employee health for the drug screening

14        there could have been some discussion as to

15        what the reasons were, what kind of behavior

16        was he exhibiting that warranted that.   And

17        there just could have been discussion with HR

18        so we could know what they were doing and why

19        they were doing it.

20        We were brought in after the fact with a

21        lot of what already had been done.

22   Q.   (By Mr. Schmitz)   What would you have done

23   differently other than what they had already done?

24   A.   I can't tell at this point.

25   Q.   Well, you have the information and you

Pat Whitlock
December 02, 2020

Page 151

1    know what they had already did when it was

2    presented to you, so what steps differently would

3    you have taken had they involved you, let's say,

4    in December, just hypothetically?

5        A.    I would have checked to see what kind of

6    documentation they had, what they were basing

7    their determinations on, what information had been

8    given for remediation to him, what their plan was,

9    had they provided some kind of step of

10   remediation, what kind of information had he

11   provided them as to why his behavior was such that

12   it was.

13       Q.    Would there have been any, you know, had

14   you all been involved earlier, would there have

15   been -- is it typical for you -- I guess I'll say

16   this, is it typical for you had you been involved

17   earlier where you would have actually had maybe

18   some conversations, prior conversations, with

19   Dr. Papin in addition to what Dr. Earl would have

20   done?

21       A.    Perhaps, but I can't say with certainty.

22       Q.    Sure.  So to understand you correctly

23   and just to summarize what you had just stated,

24   and if I misstate anything then please stop me,

25   but you basically -- you would have liked the

Pat Whitlock
December 02, 2020

Page 152

1    opportunity to have done a little bit more

2    investigation into the basis of their allegations

3    regarding why they were recommending Dr. Papin to

4    be terminated, correct?

5        A.    It's always best to have involvement

6    from the initiation of any action that is taken

7    toward an employee.

8        Q.    And that's why?  Why is that?

9        A.    Because it gives us the opportunity to

10   implore all of our best practices in trying to

11   fair it out whatever information the person making

12   the complaint, the person who the complaint is

13   made against.  Everything that we received had

14   occurred over a period of six months.

15       Q.    Right.  Did you feel that the

16   documentation that -- in terms of the counseling

17   and the follow-up of the counseling that Dr. Earl

18   had provided to you, or the lack thereof, was a

19   little bit spotty, it could have been better?

20       A.    I felt that it was sufficient to warrant

21   the termination.

22       Q.    Right.  But there were a lot of

23   instances where Dr. Earl had reported, well, I had

24   a talked to him about this, I had talked to him

25   about the nurses complaining that he was, you

Pat Whitlock
December 02, 2020

Page 153

1    know, had a bad attitude, but then there was no

2    e-mail follow-up.  Is that something that HR would

3    have corrected had they been involved earlier and

4    said, well, if you're going to talk to him then

5    send an e-mail memorializing that conversation

6    that you had with him, is that a best practice at

7    UMMC?

8         A.   In the world of HR document, document,

9    document is our mantra.

10        Q.   Right.  So would you, in that vein,

11   would you have liked to have seen Dr. Earl do a

12   better job of documenting, documenting,

13   documenting some of these alleged conversations

14   that he had?

15        A.   In a perfect world, yes.

16        Q.   Prior to January 10th when Dr. Earl and

17   Dr. Papin sat down and he signed that document,

18   which was part of your file that you've been

19   referencing for most of the day today, were there

20   any other written warnings that you recall being

21   in Dr. Papin's file from Dr. Earl regarding

22   Dr. Papin's conduct or misconduct?

23        A.   From an HR standpoint and in keeping

24   with our progressive discipline process, there

25   were no written warnings.

Pat Whitlock
December 02, 2020

Page 154

1    Q.   Okay.   When someone -- and I'm sure this

2  happens a lot from an HR perspective, you get

3  complaints about an employee having a bad

4  attitude, maybe not getting along with other

5  employees, that's typically something somebody

6  would get either a verbal or a written warning for

7  prior to termination, correct?

8    A.   At UMMC managers have the discretion in

9  how they manage their employees.  So if there are

10  cases of poor interpersonal interaction, there's

11  an expectation that the manager will take

12  necessary steps to talk to those people, to send

13  them to some kind of class, or to do whatever else

14  is required to resolve it.  Those are not things

15  that always come to the level of needing HR

16  intervention.

17    Q.   Not saying HR intervention but from a

18  management level, shouldn't Dr. Earl have given

19  him at least a written warning about some of this

20  stuff and put it in writing that, hey, people are

21  put off by the way that you talk to them sometimes

22  or, you know, I've gotten reports that, you know,

23  sometimes you're late for your rounds in the

24  morning?  Wouldn't those be the type of infraction

25  that UMMC that would typically warrant those

Pat Whitlock
December 02, 2020

1    **progressive discipline steps, requirements that**

2    **are set forth in the handbook?**

3        A.   Dr. Earl --

4             MR. WHITFIELD:  Uh-oh.

5             MR. SCHMITZ:  You're breaking up a

6        little bit.

7             MR. WHITFIELD:  Give us a second and let

8        the system re -- are you there?

9             MR. SCHMITZ:  I'm here.  Is the court

10       reporter still there?

11            COURT REPORTER:  I'm here.

12            MR. SCHMITZ:  Okay.  I think we're good

13       now.

14            MR. WHITFIELD:  We had a thing that

15       popped up that said the internet was

16       unstable.

17            MR. SCHMITZ:  Oh, okay.  Yeah, you're

18       good now.

19            MR. WHITFIELD:  All right.

20       A.   Based on the documentation that Dr. Earl

21   provided there were several instances where he

22   indicated that he had met with Dr. Papin.  I can

23   not tell you why Dr. Earl took the approach that

24   he did.  I can only surmise that he felt in

25   meeting with him and verbally sharing that

Pat Whitlock
December 02, 2020

1    feedback would have had a positive outcome.

2          Q.    Okay.  Exhibit 16 is the House Staff

3    Manual.

4                (Exhibit 16 marked for identification.)

5          Q.    And I'm going to ask you, I don't want

6    you to review the whole House Staff Manual, go to

7    page 29 of the document.  That's 29 within -- not

8    of the PDF but at the bottom of the page number of

9    the actual page 29 of the manual itself.

10               And we're going to be talking about

11   pages 29 through 31, so if you want to just

12   familiarize yourself with those for a moment that's

13   fine.

14         A.    Okay, I've reviewed it.

15         Q.    Okay.  Starting at page 31 of the

16   handbook.  Harassment, in bold right there.  It

17   refers to the GME website under administration and

18   policies.  You're not familiar with any of the GME

19   policies as you sit here today, correct?

20         A.    Correct, I am not.

21         Q.    You are familiar though with the faculty

22   and staff handbook and personnel procedures of

23   UMMC, correct?

24         A.    I'm familiar with the booklet.  I would

25   have to review it to make a specific response

Pat Whitlock
December 02, 2020

1    about something contained in it.

2         Q.   Okay.  Under discipline and behavior,

3    just scrolling up to the next part in bold there,

4    you see where I'm talking about?

5         A.   Yes.

6         Q.   Okay.  So it states that, in the second

7    paragraph, it starts with, interns, residents and

8    fellows, house officers are subject to the rules

9    and regulations that govern the hospital.  What

10   rules and regulations govern the hospital?

11        A.   That would pertain to all the policies

12   that are included in the faculty and staff

13   handbook.

14        Q.   Would that include other regulations

15   like -- such as the ACGME regulations and

16   guidelines?

17        A.   I'm not familiar with that.

18        Q.   So you're not sure whether those govern

19   the hospital or not?

20        A.   I don't know specifically what this

21   book -- what -- the information that I'm reading,

22   I don't know what that is pertaining to.

23        Q.   Okay.  It states that UHHS professional

24   behavior policy is available on the medical center

25   intranet and in the administrative policies and

Pat Whitlock
December 02, 2020

Page 158

1    procedures manual.  What's UHHS?  Do you know what

2    that stands for?

3         A.    At UMMC, University Medical Center,

4    there are separate divisions.  There's one called

5    UHHS, University Hospital and Health Systems, that

6    would be any of the medical clinics.  That would

7    include all of the nurses and any of the clinical

8    staff.

9              The area where I work is considered

10   academic service and research and it would be all

11   of the non-clinical areas.

12             There are some specific booklets and

13   guidelines for the UHHS employee binder that don't

14   pertain to the academic research and service side.

15        Q.    The next paragraph in this it states

16   that house staff shall have the right to grievance

17   procedures as detailed in the handbook for

18   employees at the medical center.  There is a

19   separate house officer grievance policy for

20   residents maintained in the graduate medical

21   education office and included on the GME website

22   under the administration policy/grievance.

23             Were you aware that house officers are

24   entitled to different procedures than just another

25   regular staff person at UMMC?

Pat Whitlock
December 02, 2020

Page 159

1     A.   I'm not familiar specifically with that.

2  But, again, keep in mind that they have a dual

3  status as the house officer on the academic side

4  to which this pertains, and then the employment

5  side to which the staff employee handbook would

6  reference.

7     **Q.   Right.  But in administering any type of**

8  **discipline, right, that is going affect the terms**

9  **and conditions of a resident's employment, whether**

10 **it comes from the HR side or the GME side,**

11 **wouldn't, you know, wouldn't HR have to abide by**

12 **the same things that the GME has to also abide by?**

13    A.   I'm not familiar with what is included

14 in the GME policy that is referred to here.

15          MR. WHITFIELD:  Greg, while you're

16     getting your next question together I've got

17     to step out for about 20 seconds.  We're not

18     pausing, we're not going offline.  I'll be

19     right back.

20          MR. SCHMITZ:  No problem.  Now I'm going

21     to ask you all the good stuff.  I'm just

22     kidding.

23          MR. WHITFIELD:  I'm back, Greg.

24          MR. SCHMITZ:  All right.

25    **Q.   (By Mr. Schmitz)  I'm at the bottom of**

Pat Whitlock
December 02, 2020

Page 160

```
 1    page 29.  It says, evaluation, 29 of the handbook.
 2    It states, evaluation and promotion and dismissal of
 3    residence policy.
 4         A.   Okay.
 5         Q.   So the second paragraph says, each
 6    program must establish criteria for promotion.
 7    Then after that next sentence states,
 8    unsatisfactory training performance may result in
 9    dismissal from the program of the house officer.
10    This decision will be made by the program director
11    in consultation with the chairman for the
12    department.
13              So the decision to dismiss the house
14    officer from the program, not employment, I know
15    the distinction now, is made by the program
16    director and the chairman of the -- who was the
17    chairman of the department in this case?
18         A.   The chairman of the Department of
19    Medicine is Dr. Javed Butler.
20         Q.   Okay.  And he was the chairman back --
21         A.   He was not at UMMC in 2017.
22         Q.   Who was the chairman in 2017?
23         A.   I don't recall.
24         Q.   Okay.  Just bear with me a second, I've
25    got to pull up this other document.  It's going to
```

Pat Whitlock
December 02, 2020

Page 161

1    be Exhibit 17.

2              (Exhibit 17 marked for identification.)

3        Q.    And I'm going to direct your attention

4    to what's Bates numbered 433 and 435 so you don't

5    have to review everything in that.

6        A.    I've reviewed it.

7        Q.    On Bates number 433, Papin 433, there's

8    a paragraph where the department chairman states,

9    unsatisfactory trainee performance may result in

10   dismissal from the program of the house officer.

11             Again, it reiterates here that this

12   decision will be made by the program director in

13   consultation with the chairman of the department.

14   That's in congruence with what we saw on the other

15   policy, correct?

16       A.    It appears to be.

17       Q.    The other policy in the House Staff

18   Manual that we were just looking at?

19       A.    It appears to be the same.

20       Q.    Okay.  And then under appeal from

21   departmental chair, house officer may appeal

22   grievable matters by petitioning in writing to the

23   vice chancellor for health affairs within 14

24   calendar days of notice of termination from the

25   program director or chairman, exclusive of UMMC

Pat Whitlock
December 02, 2020

Page 162

1    holidays.   Who is the vice chancellor of health

2    affairs?   Do you recall who that would have been?

3          A.    The vice chancellor at UMMC is

4    Dr. LouAnn Woodward.

5          Q.    Okay.   And she would have been presiding

6    over this as well back in 2017, she would have

7    been in the same position?

8          A.    Yes.

9          Q.    Down a little bit further if you skip

10   the -- it says, the appeals committee chair will

11   appoint an appeals committee of four additional

12   GMEC or RRSC members.   What is GMEC and RRSC

13   members?   What do these acronyms stand for?

14         A.    GME would be the Graduate Medical

15   Education Committee.   I'm not familiar with this

16   document so I don't know what the RRSC is.   I

17   presume it must have been referenced somewhere

18   earlier in this.

19         Q.    Okay.   The appeals committee chair will

20   promptly convene the committee to hear the appeal

21   generally within 10 business days.

22               Are you aware that it took until almost

23   six months later after Dr. Papin's termination for

24   him to receive his appeal hearing before the panel

25   that was appointed?

Pat Whitlock
December 02, 2020

Page 163

1     A.   I'm not familiar with that process.

2     Q.   **You've never had involvement in any of**

3  **the other termination decisions that -- like with**

4  **respect to Resident 76, how long it took for him**

5  **to have his appeal hearing?**

6     A.   I am not familiar.  As I indicated

7  earlier, all of these things are done in segments.

8  And with regard to Resident 76, my involvement

9  ended after those initial investigations.  I am

10 not sure what other areas were involved that

11 ultimately led to that termination.

12    Q.   **Are you aware of whether Dr. Papin did**

13 **receive his appeal within 10 business days?**

14    A.   I'm not.  I'm not familiar with that

15 process.

16    Q.   **Were you present at Dr. Papin's appeal**

17 **hearing at all?**

18    A.   I was only present with Dr. Papin twice;

19 when I interviewed him and again when I met with

20 Dr. Earl for the termination.  I had no other

21 involvement.

22    Q.   **Okay.  All right.  Okay, Exhibit 18.**

23         (Exhibit 18 marked for identification.)

24    A.   I've reviewed it.

25    Q.   **Okay.  Are you familiar with this**

Pat Whitlock
December 02, 2020

Page 164

1    document?

2        A.    I am not.

3        Q.    Do you see it's -- states Policy

4    Sanctions for Plan Violations.  At the top there's

5    employee action, there's another column on the

6    other side that says disciplinary action?

7        A.    Yes.

8        Q.    So it states for employees who willfully

9    provide materially false information or to UMMC, a

10   government, patient, insurer, or the like

11   disciplinary action shall be termination of

12   employment.  Do you see that part?

13       A.    Yes.

14       Q.    Okay.  Then if you go down it's got a

15   couple of other things after that.  And then there

16   are some lines.  And then there's employee

17   willfully viewing protected health information,

18   we're going to go past that then, down to the next

19   one.

20             Employees negligently providing

21   incorrect information to UMMC, government agency,

22   patient, or insurance -- insurer or the like.

23             So it states here that disciplinary

24   action shall range from counseling up to and

25   including termination.  Egregious situations may

Pat Whitlock
December 02, 2020

Page 165

1    result in suspension pending a termination.

2              Now, given the fact that there's

3    obviously a distinction here, do you see the

4    distinction I'm making between an employee

5    willfully providing materially false information

6    to UMMC and an employee negligently providing

7    incorrect information to UMMC.  The distinction

8    between willful and negligent, do you see that

9    there?

10       A.   Yes.

11       Q.   Did you conduct any investigation when

12   you were trying to approve or recommend

13   termination for Dr. Papin regarding whether

14   Dr. Papin willfully or negligently was just

15   providing incorrect information to UMMC?

16              MR. WHITFIELD:  I'm going to interpose

17         an objection once again.  She's not a

18         30(b)(6) witness and this is on the

19         compliance plan policies.

20       Q.   (By Mr. Schmitz)  You can answer.

21       A.   That was what I was going to say.  This

22   is totally involving any kind of sanctions for

23   compliance plan violations, not the totality of

24   the HR employee violations that would be contained

25   in the faculty staff handbook.

Pat Whitlock
December 02, 2020

Page 166

1      Q.   Well, I see the distinction that you're

2  making there but this just states if an employee

3  willfully provides materially false information to

4  UMMC then this document here states, this policy

5  document per UMMC, states that if you willfully do

6  that you will be fired; is that correct?

7      A.   In violation of the compliance plan.

8      Q.   But that's not what this says.  This

9  says right here, employee action willfully

10 providing materially false information to UMMC.

11 If an employee is found to have willfully done

12 that you will be fired, correct?

13     A.   It is the policy of UMMC to provide for

14 disciplinary actions to be taken against UMMC

15 employees who violate the provisions of the

16 compliance plan.  That is what this document

17 pertains to.

18     Q.   Okay.  Well, in terms of compliance

19 then, compliance with medical care provided to

20 patients, if a resident -- let's put this in the

21 situation of this case, if a resident is willfully

22 providing materially false information to UMMC

23 regarding a patient, would that be a violation of

24 the compliance plan?

25     A.   If it's contained in this document it

Pat Whitlock
December 02, 2020

Page 167

1    would be.

2         Q.   Okay.  So, again, my question is, was

3    there an investigation by you regarding whether

4    Dr. Papin willfully or negligently presented false

5    information to UMMC?

6              MR. WHITFIELD:  I want to interpose my

7         same objection that this is part of the

8         compliance plan not the faculty and staff and

9         she is not a 30(b)(6) witness on the

10        compliance plan.  She can answer whatever she

11        thinks, but I want my objection noted.

12             MR. SCHMITZ:  Yeah.  I'm not asking her

13        about the policies itself or whatever.  I'm

14        simply asking her, did she as the HR

15        professional who recommended termination in

16        this case, did she ever conduct an

17        investigation into whether Dr. Papin

18        willfully or negligently provided information

19        to UMMC?

20             THE WITNESS:  No.

21        Q.   (By Mr. Schmitz)  Okay.  Previously we

22   discussed a meeting that you had with Dr. Earl where

23   Dr. Earl was "adamant" about the fact that Dr. Papin

24   was not trustworthy and that he was a danger to

25   patients and he did not trust him to care for the

Pat Whitlock
December 02, 2020

Page 168

1    patients at UMMC anymore.  Do you recall that?

2         A.   Yes.

3         Q.    Part of Dr. Earl's statements that we

4    just talked about, part of his arguments that

5    Dr. Papin was a danger to patients was because of

6    his care of a patient who had an ulcer on his back

7    that Dr. Earl had felt Dr. Papin was not being

8    truthful about; is that correct?

9         A.   Yes.

10        Q.   Is it possible that a resident, a first

11   year resident may have misdiagnosed something on

12   the back of a patient, an ulcer, the severity or

13   grading of an ulcer and that could have just been

14   a learning experience to Dr. Papin instead of

15   intentionally concealing that by Dr. Papin?

16        A.   I don't know.  Dr. Papin had graduated

17   from medical school.  There are people who

18   graduate from medical school and go out into

19   practice, so I'm not familiar with the totality of

20   what he would have learned or retained prior to

21   coming to UMMC.

22        Q.    Was there any investigation into doing,

23   you know, well, hey, this is something that a lot

24   of people -- did you ever -- well, let me ask you

25   this.

Pat Whitlock
December 02, 2020

Page 169

1          Did you ever do any investigation

2     regarding whether the grading of -- or did you ask

3     anybody whether the grading of the severity of an

4     ulcer was something that a first year resident

5     should and ought to know, or whether that's

6     something that could be mistaken by someone who

7     just had a lack of knowledge rather than someone

8     who was lying about seeing a patient?

9          A.   No.

10          Q.   Are you aware if anybody else -- if

11     anybody else did any investigation into the

12     decubitus ulcer patient that was referenced by

13     Dr. Earl to identify whether this was an instance

14     of intentional concealment or negligence?

15          A.   No.

16          Q.   And, again, there was no ICare report

17     filled out regarding this?

18          A.   Not that I am aware.

19          Q.   If there would have been an ICare

20     investigation or typically an ICare investigation

21     involving a patient in patient harm or care, would

22     there be an investigation into whether a doctor or

23     resident intentionally harming a patient was

24     intentionally harming a patient or just

25     negligently harming a patient?  Would that be

Pat Whitlock
December 02, 2020

Page 170

1    something that would be looked into during the

2    ICare investigation process?

3         A.    I don't know, it's not a part of HR.

4         Q.    Is it your understanding that

5    intentionally misrepresenting something to UMMC

6    and negligently misrepresenting something to UMMC

7    carries a different disciplinary penalty at UMMC,

8    or would you weigh those two things differently

9    from an HR perspective at -- from UMMC?

10        A.    The only place where I see that is

11   delineated is in comparison to the compliance

12   plan.

13        Q.    Okay.  But just would you consider

14   something that was intentional versus something

15   that was negligent, is the negligent would be a

16   less egregious offense by somebody rather than

17   somebody intentionally just, you know, I'm lying

18   about seeing a patient versus I just didn't know

19   what I was looking at?

20        A.    I would presume it would depend on the

21   outcome of that action, because if there were a

22   patient harm I don't think it would matter whether

23   or not it was willful or negligent if there were a

24   detrimental outcome.

25        Q.    Have you ever been part of any other

Pat Whitlock
December 02, 2020

Page 171

1    cases where any residents have committed medical

2    malpractice?

3         A.    I have not.

4         Q.    Have you heard of residents at UMMC

5    committing medical malpractice?

6         A.    I can not say specifically.

7         Q.    But it does happen from time to time,

8    correct?

9         A.    I presume it does, yes.

10         Q.    Okay.  Who would handle that if a claim

11    of medical malpractice -- would that just go to

12    legal?

13         A.    There is a medical staff office there.

14    UMMC is quite compartmentalized and so there is a

15    medical staff office that I presume would handle

16    that in conjunction with the legal department.

17         Q.    Are you aware of any other residents not

18    just -- in any department, in any other

19    departments during your tenure at UMMC being

20    labeled as a danger to patients?

21         A.    I'm not sure.

22         Q.    Have you encountered any others?

23         A.    I have not been involved in any cases.

24         Q.    Okay.  Except this one?

25         A.    Yes.

Pat Whitlock
December 02, 2020

Page 172

1        Q.    Okay.  Exhibit 19.

2              (Exhibit 19 marked for identification.)

3        A.    I'm ready.

4        Q.    Okay.  I'm going to just skip down to

5   the part, this is a House Officer Contract between

6   UMMC and Joseph Papin; is that correct?

7        A.    Yes.

8        Q.    And these types of contracts are

9   provided to all different residents, all the

10  residents, correct?  They all sign something like

11  this?

12       A.    Yes.

13       Q.    Okay.  And in Roman Numeral II it says

14  that UMMC agrees further that number 1, it will

15  provide an educational program for post graduate

16  training in keeping with established standards.

17  The established standards -- such standards, would

18  that include the House Staff Manual?

19       A.    I'm not familiar with what those would

20  be.

21       Q.    Well, do you have any idea what those

22  would be or you have no idea what standards would

23  govern the employment of residents?

24       A.    I do not.

25       Q.    Well, can you tell me what standards you

Pat Whitlock
December 02, 2020

Page 173

1      do know that apply to employees and residents of

2      UMMC?

3           A.   From an employee standpoint it would be

4      what is contained in the faculty staff handbook.

5      But all programs have their own contracts that

6      would go through the legal office and then they

7      may have other documents that guide those programs

8      based on their standards or certifications that

9      would not be amenable to HR per se.

10          Q.   Okay.  And so you would have no idea

11     what the ACGME standards and stuff like that would

12     be the standards that they're talking about

13     here --

14          A.   I would not.

15          Q.   -- post graduate training?

16          A.   I would not.

17          Q.   It does specifically reference the UMMC

18     house staff manual here, so are you aware that

19     that would apply to the residents?

20          A.   I presume so, but I'm not familiar with

21     that.

22          Q.   Okay.  Number two states that it will

23     administer -- that UMMC will administer physicians

24     training program in accordance with the policies,

25     rules, and regulations of the Board of Trustees of

Pat Whitlock
December 02, 2020

Page 174

1    Institutions of Higher Learning and the University

2    of Mississippi.

3                 What is the Board of Trustees and

4    Institutions of Higher Learning?

5        A.    It is an entity that guides all of the

6    public institutions in the state of Mississippi.

7        Q.    Okay.  Would that be for like

8    accreditation standpoint?

9        A.    It would be for accreditation, all of

10   your practices, everything that is embodied in any

11   public institution is the -- IHL is the oversight

12   body for that.

13       Q.    Okay.  Number 4, it states, physician

14   shall not be required to perform duties other than

15   those related to the residency program.  Do you

16   recall in your investigation that there was an

17   incident with a nurse practitioner and Dr. Papin

18   in this case whereby the nurse practitioner was

19   asking Dr. Papin to do something that he felt was

20   outside the scope of the residency program?

21       A.    Yes.

22       Q.    Okay.  And so here do you see that that

23   fact was held against Dr. Papin but yet in this

24   contract which UMMC agreed that Dr. Papin would

25   not have to perform other duties that were not

Pat Whitlock
December 02, 2020

Page 175

1    related to his residency program; is that correct?

2         A.   Yes.

3         Q.   Looking at page 2 of the contract, Roman

4    Numeral IV says, both parties further agree that,

5    do you see where I'm talking about?

6         A.   Yes.

7         Q.   Okay.  States, that in accordance with

8    the Mississippi Constitution UMMC is empowered to

9    terminate this contract at any time for

10   malfeasance, inefficiency, or contumacious conduct

11   by the physician.  Do you have an idea sitting

12   here today what they mean by malfeasance,

13   inefficiency, or contumacious conduct by a

14   physician?

15             MR. WHITFIELD:  Object to the form again

16        because she's not our 30(b)(6) witness and

17        you're asking for legal conclusions as to the

18        meaning of this contract language.

19             THE WITNESS:  I do not.

20        Q.   (By Mr. Schmitz)  So not knowing what

21   these three things malfeasance, inefficiency, and

22   contumacious conduct mean, yet you still were able

23   to recommend the termination of Dr. Papin's contract

24   with UMMC and his employment with UMMC not knowing

25   what these three things encompass or embody?

Pat Whitlock
December 02, 2020

Page 176

1      A.    The recommendation for his termination

2    was based on the documentation that was provided

3    by the department.

4      Q.    All right.  But to terminate his

5    employment, his contract, which would mean his

6    employment, you would need to find malfeasance,

7    inefficiency, or contumacious conduct by the

8    physician.  And you just testified that you were

9    unaware what these terms meant?

10            MR. WHITFIELD:  I'm going to object to

11         the form of the question, and it required her

12         to make a legal conclusion as to the way you

13         worded the question.

14      Q.    (By Mr. Schmitz)  You can answer if you

15    can.

16      A.    I'm not aware of the legal

17    interpretation of those.  The recommendation that

18    I made was from an HR standpoint based on

19    documentation that the department provided and it

20    was in keeping with those things that Dr. Papin

21    violated in accordance with the faculty and staff

22    handbook.

23      Q.    So you weren't taking into consideration

24    this House Officer Contract when making your

25    decision to recommend his termination, is that

Page 177

1    correct?

2        A.   Not at all.

3        Q.   Okay.  Fair enough.  Now, this one we're

4    going to jump -- this is the -- the transcript

5    from your meeting, Exhibit 20, with Dr. Papin.  So

6    we're going to jump around here.  I don't want you

7    to review the whole thing, but I'll tell you which

8    page we're going to go to and then we'll -- once

9    you review the page then we can both be on the

10   same page, all right?

11                (Exhibit 20 marked for identification.)

12                MR. WHITFIELD:  First page.

13                MR. SCHMITZ:  First page is -- first

14       let's go to page 3 of the transcript, Tommy,

15       not the PDF page but actual page 3.  It's

16       broken down in blocks of four.

17                MR. WHITFIELD:  I forgot this one was in

18       the four page version.

19                MR. SCHMITZ:  Yeah, I prefer that

20       anyway.

21                MR. WHITFIELD:  I don't.  I like the

22       full page.

23                MR. SCHMITZ:  I know.

24                MR. WHITFIELD:  All right.  You said

25       page 3 of the actual transcript?

Page 178

1            MR. SCHMITZ:  Yeah, just page 3, yes.

2       So, you know, on the first page, the first

3       four.  It starts --

4            MR. WHITFIELD:  We got it.

5            MR. SCHMITZ:  Yeah, the first word is

6       since July 1.

7            THE WITNESS:  Yes, I see it.

8       Q.   (By Mr. Schmitz)  Okay.  Go ahead and take

9  a look at that.  And just really quick, this

10  interview took place, again, on January 27?

11       A.   Yes.

12       Q.   And you confirmed Dr. Papin's

13  termination with Dr. Earl on February -- I believe

14  it was the 20th, it was two days before the

15  deadline?

16       A.   Yes.

17       Q.   Okay.  Just let me know whenever you're

18  ready.

19       A.   I'm ready.

20       Q.   So this is you were talking to Dr. Papin

21  here about a run-in with one of the nurse

22  practitioners; is that correct?

23       A.   Yes.

24       Q.   This is the incident we talked about

25  where that became a heated exchange?

Pat Whitlock
December 02, 2020

Page 179

1      A.    Yes.

2      Q.    Okay.  So Dr. Papin explained to you
3    that he had been told by the attending physician
4    that he could go down to the operating room; is
5    that correct?

6      A.    Yes.

7      Q.    And in response to him trying to do that
8    a nurse practitioner got aggressive with him; is
9    that correct?

10     A.    Yes.

11     Q.    Okay.  And on page 4 Dr. Papin informed
12   you that he had told the chief resident about the
13   incident that day and they told Dr. Earl that day,
14   and then the nurse practitioner came and spoke to
15   him the next day and apologized; is that correct?

16     A.    That was Dr. Papin's statement, yes.

17     Q.    Okay.  Did you -- and I believe you
18   testified earlier, you never went and spoke to
19   this nurse who he had the incident with?

20     A.    I did not.

21     Q.    And HR typically does investigate and
22   conduct interviews in instances where a potential
23   violence or work place bullying is taking place?

24     A.    When things are reported.  But, again,
25   this was an incident that had occurred six months

Pat Whitlock
December 02, 2020

Page 180

1    prior.

2         Q.    Okay.  Can you go to page 10 for me.

3    This is -- you're still discussing the incident

4    with the run-in with the nurse here.  If you look

5    on line 12 you ask Dr. Papin, so was there anyone

6    who witnessed that exchange?

7         A.    Yes, I see that.

8         Q.    Okay.  And then he said, yes, Marita

9    Walton was in there.  And you said, who is that.

10   And he said, she's another nurse practitioner.

11   Did you ever reach out to Marita Walton to get her

12   side of the story of what happened during that --

13   for that heated exchange?

14        A.    I did not.  Again, this had occurred six

15   months prior to the conversation with Dr. Papin.

16        Q.    But this is part of the totality of

17   circumstances as you call them, which were used to

18   justify and which you used to recommend the

19   termination of Dr. Papin's employment, correct?  I

20   know it's not the whole reason but it's part of

21   the reason why Dr. Papin was terminated, correct?

22        A.    Yes.

23        Q.    Okay.  And yet there was no talking to

24   any of the witnesses or to the nurses by you

25   whatsoever?

Page 181

1    A.   No.

2    Q.   **What did you do to prepare for this**

3    **interview with Dr. Papin on the 27th?**

4    A.   I reviewed the documentation that had

5    been provided by the department?

6    Q.   **Okay.  And that's all the things that**

7    **you mentioned previously today?**

8    A.   Yes.

9    Q.   **Did you prepare a question outline for**

10   **this interview with Dr. Papin, did you do any**

11   **other preparations like that?**

12   A.   Typically I would prepare questions for

13   myself to prompt to ask questions, and I would

14   always ask the person that I was interviewing to

15   just share information.  I would let them know why

16   they were being interviewed and then I would just

17   allow them to talk, and as they talked I would ask

18   questions.  And then whatever notes I had already

19   written regarding the documentation that I had

20   already reviewed, there would be little triggers

21   for me to ask questions as well.  There is no

22   template for doing these investigations.

23   Q.   **Okay.  So you did have some questions**

24   **already or talking points at least mapped out**

25   **prior to the start of the interview?**

Pat Whitlock
December 02, 2020

Page 182

1      A.    Yes.

2          Q.    Did you provide those questions or that

3    outline or notes that you had prepared to Tommy so

4    that he could produce those to us?

5          A.    No.   I typically destroy those after

6    I've done the interview because all of the

7    interviews are recorded and everything that is

8    discussed is on the recording.

9          Q.    Okay.

10         A.    I never do an interview with the

11   perception that it is going to lead to some legal

12   proceeding.

13         Q.    So in all the interviews that you do

14   they're transcribed like this?

15         A.    They're recorded, they're only

16   transcribed if there is some kind of outside

17   action beyond UMMC.

18         Q.    Okay, that makes sense.   I'm going to go

19   to page 12, line 7 on page 12 you start asking him

20   about an instance supposedly where a code was

21   called and it was your patient but you didn't come

22   to check on him?

23         A.    Yes, I see that.

24         Q.    Where did you hear about this, like who

25   told you that?

Pat Whitlock
December 02, 2020

Page 183

1      A.    Everything that Dr. Papin was questioned
2  about was included in the documentation that I had
3  reviewed prior to interviewing him.
4      Q.    Okay.  And you stated earlier that
5  Dr. Papin basically admitted to all this stuff so
6  there was no reason to do a follow-up
7  investigation; is that correct?
8      A.    A follow-up investigation with him?
9      Q.    A follow-up investigation with anybody?
10     A.    I felt that the documentation was
11 conclusive.
12     Q.    You also said that the documentation was
13 conclusive, as well as during your interview with
14 Dr. Papin that Dr. Papin had admitted to almost
15 everything so there was no real reason to question
16 the validity of the documentation that you had
17 received?
18     A.    Yes.
19     Q.    Okay.  But Dr. Papin didn't admit that
20 he had caused a problem with this nurse
21 practitioner did he?
22     A.    Dr. Papin did not feel that his actions
23 were accurately perceived.
24     Q.    Okay.  And with respect to the code, the
25 patient being coded, Dr. Papin also had an

Page 184

1    explanation for that as to why he didn't come

2    back, correct?

3         A.   Yes.

4         Q.   And he had told you that basically he

5    was already too far gone already in the car before

6    he had known about the code?

7         A.   No, he said he heard the code but he had

8    already signed out and it did not occur to him --

9    because there were other patients on that floor --

10        Q.   Right.

11        A.   -- it did not occur to him that that may

12   have been his patient but he did not check because

13   he had already signed out.

14        Q.   Right.  And like you testified earlier

15   before, they don't call out patient, the name over

16   the loud speaker and say that patient is coding

17   right now, they just say patient on the third

18   floor there is a Code Blue, right?

19        A.   Correct.

20        Q.   Okay.  It wasn't until he was already

21   gone and in the car when he learned that it was

22   actually his patient, correct?

23        A.   That's what he said, yes.

24        Q.   At the bottom of page 13 you mentioned,

25   line 21, that there's a perception that he was

Pat Whitlock
December 02, 2020

Page 185

1   always in a hurry to leave.  And so you asked him

2   what his typical day was like.  And then on page

3   14 Dr. Papin explains that -- his day and what

4   that is like.  And then he states that he was

5   never in a hurry to leave and that this was

6   actually the first he had ever heard of that, on

7   line 13 and 14.

8           And then you followed up on line 15 of

9   page 14 stating that, so no one has ever told you

10  or said anything to you about that.  And he

11  stated, no, ma'am.

12          And so, again, this is another instance

13  where Dr. Papin is denying the fact that anyone

14  has ever told him that he was in a hurry to leave;

15  is that correct?

16      A.   That's what he said, yes.

17      Q.   Did you ever conduct any investigations

18  to follow up on those facts about Dr. Papin being

19  in a hurry to leave?

20      A.   Other than the review of the

21  documentation that had been provided, no.

22      Q.   All right.  So at the bottom of page 15,

23  line 25, you start -- you're asking him a

24  question, you say -- and if I'm going to too fast

25  please --

Pat Whitlock
December 02, 2020

Page 186

1      A.    No, I see it.

2      Q.    Okay.  You say, so tell me about you

3  leaving during your regular workday to tell people

4  you are going to exercise, right?  And he says,

5  right, right.  And then he said, one time I asked

6  the chief resident.  He said, it was a really slow

7  day.  And she said that -- you said, do you think

8  it's okay.  And she said, yes, just bring your

9  pager, you'll be fine to go.  So he went for 15

10 minutes, came back, didn't miss anything.  And he

11 said that Dr. Earl did bring that up multiple

12 times.

13           Are you aware or did you conduct any

14 investigation into whether Dr. Papin had asked for

15 permission to go for a quick run on campus --

16     A.    No.

17     Q.    -- or whether that permission was

18 granted?

19     A.    No.

20     Q.    Did you conduct any investigation into

21 whether that permission was later denied by that

22 same chief resident about a week later when

23 Dr. Papin posed the same question?

24     A.    I did not.

25     Q.    Dr. Papin on line 20 of page 16 said,

Pat Whitlock
December 02, 2020

Page 187

1    but I had permission and I had a written

2    conversation here, which if you would like to see

3    it I can bring it out.  Did you ever obtain that

4    written conversation from Dr. Papin so that you

5    could review it for your own eyes?

6        A.   I did not.

7        Q.   On page 17, line 4 you bring up the

8    incident with the ulcer patient.  And you say,

9    there were patients that are supposed to be

10   checked and you had indicated you had seen the

11   patient but this patient had a stage 4 decubitus

12   wound and you never mentioned that.  Do you recall

13   that situation?

14       A.   I see it.

15       Q.   On line 17 on page 17 you state, well,

16   the version we got was after someone else

17   discovered the wound.  Then you said, oh, yeah,

18   that patient does have a wound.  But the premise

19   being if it -- the premise is that with it being

20   stage 4 you should have seen it.  That would have

21   not occurred over a period of a day or two, that's

22   something that would have occurred over a long

23   time.  Who told you that that would have occurred

24   over a long time?  Where are you getting this

25   information regarding how stage 4 decubitus ulcer

Pat Whitlock
December 02, 2020

Page 188

1  wounds go one way or the other?

2      A.   I have done immanent research on what

3  those were because I needed to be familiar with

4  what decubitus was.

5      Q.   Okay.  So prior to the interview you

6  looked up on Google or something what a decubitus

7  ulcer was and how they act?

8      A.   Yes.

9      Q.   Okay.  Previously you testified that you

10  had not reviewed any of the patient records from

11  this decubitus ulcer patient; is that correct?

12      A.   That's correct.

13      Q.   So when making this statement you would

14  have not been aware that many other -- there were

15  several other providers including the wound care

16  nurse and other people who were in fact aware that

17  there was a wound on this patient's back for quite

18  a long time?

19      A.   That's correct.  But from the

20  information that Dr. Earl provided it was more so

21  that Dr. Papin was supposed to be checking those

22  patients and it appeared that he had not done what

23  he should have done in regard to seeing that

24  patient.

25      Q.   Okay.  But would that be an instance

Pat Whitlock
December 02, 2020

Page 189

1    where he was a first year resident and he was

2    trying to learn, this was a learning experience

3    for Dr. Papin, correct?

4        A.    I presume after that four years of

5    medical school he would have had some knowledge of

6    what a decubitus wound was and how it occurred.

7        Q.    But you don't -- you don't have -- of

8    course you don't have any medical background to

9    make that kind determination do you?

10       A.    No, but I was relying on the information

11   that the program director had provided.

12       Q.    Do you know if Dr. Earl had reviewed

13   this patient's records or seen this patient?

14       A.    The information about the incident with

15   the patient's wound was included in the

16   information that Dr. Earl provided.  I can not say

17   that he actually reviewed that patient's case.

18       Q.    So on page 18, line 7 Dr. Papin

19   responded to your question stating, I mean, I

20   think it was more of a gap of knowledge more than,

21   you know, it didn't look like floridly terrible or

22   anything like that because if the patient that I'm

23   talking about, the wound ostomy, this is the day I

24   went -- this is the day before I went on Christmas

25   vacation.  And the wound ostomy nurse printed a

Pat Whitlock
December 02, 2020

Page 190

1  note that day and I had seen it but didn't

2  think -- but then you stopped him and you stated,

3  but you had not voiced that it was there and

4  supposedly you had been seeing this patient.  He

5  said, oh, I had been.  So we alternate, I'm not

6  the only resident.  So, I mean, there was Wilbrook

7  and there were nurse practitioners that alternated

8  every day, so I was not the only person seeing the

9  patient.  And, yeah, I seen it and I didn't think

10  it was that bad.  So, I mean, it was an issue of

11  knowledge I think maybe.

12          So when Dr. Papin explains that I didn't

13  do this intentionally, I just didn't know exactly

14  what I was looking at and that it needed to be

15  reported because there were so many other people

16  also caring for this patient, wouldn't you think

17  that that is a reasonable explanation that should

18  be brought up to rebut what Dr. Earl thought was

19  just blatant lying on the part of Dr. Papin?

20      A.   I thought that if Dr. Papin was caring

21  for the patient and he knew he was supposed to be

22  checking the patient, if there was a concern with

23  a break in the skin he would have also reported it

24  to someone.  Whether that was willful or

25  negligent, he did not do that.

Pat Whitlock
December 02, 2020

Page 191

1      Q.   Okay.  But if a resident, a first year
2   trainee resident doesn't know what he's doing or
3   what he's looking at at that point in time, what
4   basis did you have to assume that this was a
5   willful act on his part?
6      A.   I did not say it was willful.  I said he
7   did not report it to anyone, and caring for that
8   patient was a part of what his responsibility was.
9      Q.   Again, and just based on your knowledge,
10   I know that you're not a medical expert or
11   anything like that, but when a patient is being
12   cared for by a resident, it's not just the
13   resident's responsibility, there's also another --
14   there's a whole other team of people who see a
15   patient, which would include nurses, nurse
16   practitioners, and attending physicians; is that
17   correct?
18      A.   Yes.
19      Q.   So then the responsibility, the lowest
20   man on the totem pole, not even a real -- has no
21   medical license --
22           MR. WHITFIELD:  Object to the form.
23      Q.   (By Mr. Schmitz)  -- the first year
24   resident is responsible for not recognizing this
25   wound on the back, or the severity of the wound on a

Pat Whitlock
December 02, 2020

Page 192

1   patient's back, not the atten -- in your opinion, it

2   would not be the nurses, it would not be the nurse

3   practitioners, or the doctors problem that they also

4   didn't notice the fact that this patient had a wound

5   on his back?

6       A.   I do not know what the process is or

7   what kind of acclamation the first year residents

8   have, what they are required to do, so I can not

9   respond to that.

10      Q.   Does that sound fair to you though that

11  a first year resident gets all the blame for

12  something that everybody else on the entire team

13  also missed until it became a stage 4 wound?

14      A.   I don't know whether or not there were

15  any other people held blameless, but since we were

16  dealing with Dr. Papin, this pertained to what his

17  responsibility was and what it was felt that he

18  did not carry out as a part of his responsibility.

19      Q.   You're not aware sitting here today

20  though that anybody else was put any blame on did-

21  or anybody else was disciplined, from HR at least?

22  Were any other doctors, nurse practitioners,

23  nurses, anybody else who saw this person, were

24  they disciplined as the result of their care of

25  this patient?

Pat Whitlock
December 02, 2020

Page 193

1      A.    There was no -- there was no other

2   information provided to me pertaining to that or

3   any other patient.

4      Q.    Okay.  So sitting here today to the best

5   of your knowledge, nobody else received any type

6   of discipline for the care of this decubitus ulcer

7   patient that --

8      A.    I don't know.

9      Q.    Okay.  You were not involved in the

10  discipline of anybody else who cared for this

11  patient, correct?

12     A.    That's correct.

13     Q.    Did you ever reach out to this Wilbrook,

14  the other resident Wilbrook, to ask him if he also

15  checked the back of this patient?

16     A.    I did not.

17     Q.    Is there any reason why you didn't reach

18  out to Wilbrook?

19     A.    I did not interview any other persons

20  involved with Dr. Papin's case.

21     Q.    Why is it that Dr. Papin gets labeled as

22  a danger to patients as a resident while Wilbrook,

23  who also saw this patient, did not get labeled and

24  terminated as a danger to patients?

25     A.    I can not attest to that, that would

1   have been Dr. Earl's call.

2       Q.   Between January 27 and February 20 when

3   you recommended and approved Dr. Papin's

4   termination you never thought it would be a good

5   idea to reach out to Wilbrook to see if Wilbrook

6   needed some type of discipline with respect to

7   this case?

8       A.   I did not.

9       Q.   On page 19, line 5, after he got done

10  saying it wasn't that bad you said, well, that's

11  bad.  And Dr. Papin on line 6 said, she asked me,

12  she said, oh, yeah, it doesn't look that bad.  The

13  wound ostomy nurse dropped in a note.  Wound

14  ostomy didn't mention anything about needing any

15  sort of surgical intervention.

16           So Dr. Papin did have a conversation

17  with a wound ostomy nurse who did also recognize

18  that the wound occurred and she also didn't

19  recommend surgical intervention; is that correct?

20      A.   That is stated.  And then if you will

21  look further down where Dr. Papin did say

22  eventually what the patient needed, but I don't

23  know what the timeframe was between the time he

24  said he talked with the ostomy nurse.

25      Q.   And are you aware that the ostomy nurse

Page 195

1    had been recommending conservative topical

2    treatments on this patient's wound for a period of

3    approximately two weeks prior to Dr. Papin being

4    accused of not ever reporting this wound?

5         A.   I am not.

6         Q.   Did you ever seek out to talk to the

7    wound ostomy nurse that Dr. Papin is talking about

8    here?

9         A.   I did not.

10        Q.   So do you think it would have been a

11   good idea to ask her if you thought that Dr. Papin

12   was actively trying to conceal the fact that this

13   person had a wound on his back that was getting

14   worse and worse by the day?

15        A.   I took the word of the leader of the

16   program that all of the concerns that had been

17   brought forth had been confirmed.

18        Q.   Okay.  Page 21, line 6, you brought up

19   the fact to Dr. Papin, well, there's another

20   concern to indicate that you've gone on rounds

21   when you actually haven't seen a patient?

22        A.   I see that.

23        Q.   Okay.  And then so Dr. Papin's response

24   says number 9, right, he mentioned that.  I'm

25   assuming he said Dr. Earl mentioned that to him.

Pat Whitlock
December 02, 2020

Page 196

1    And I still don't know what he's referring to

2    because I categorically deny ever saying I've seen

3    a patient and not seeing a patient.

4              So, again, here -- before -- you stated

5    before that Dr. Papin admitted to basically all of

6    the allegations, so there was no need to go

7    confirm any of this stuff.  But, yet, here, again,

8    he's categorically denying that he lied about

9    seeing patients that he hadn't -- that he had

10   seen.

11             So did you ever think here where there's

12   a categorical denial by Dr. 1Papin that, hey,

13   maybe I should go look into this and see if this

14   guy is full of it or not?

15   A.   I took the word of the leader of the

16   program because there was more than one report

17   from various co-workers to support these

18   allegations.

19   Q.   Didn't you say earlier that the mantra

20   of HR is document, document, document, correct?

21   A.   Yes.

22   Q.   In this case do you think that you did a

23   sufficient job from your perspective documenting,

24   documenting, documenting these facts as they were

25   presented to you or doing any type of

Pat Whitlock
December 02, 2020

Page 197

1    investigation regarding these facts?

2         A.    In reviewing all of the documentation

3    that was provided I felt that it was conclusive

4    enough to support the recommendation.   There was

5    no need for me to go back and redo what the

6    department had already done.

7         Q.    But this is a resident who was up for

8    potential termination and who had been discussed

9    for termination, I mean, don't you think that it

10   would have been prudent and best practices from HR

11   perspective to have looked into some of these

12   things, just at least to peak and check before

13   potentially ruining this resident's medical

14   career?

15        A.    I felt that the documentation provided

16   was sufficient.

17        Q.    Are you aware of the due process rights

18   that residents have with respect to their

19   entitlement to participate in residency programs?

20        A.    I am not.

21        Q.    So those, you know, alleged potential

22   due process rights that Dr. Papin would have

23   possessed did not factor into your investigation

24   or your recommendation to terminate Dr. Papin?

25        A.    No.

Pat Whitlock
December 02, 2020

Page 198

1          Q.    My notes were a little bit off.   I'm

2    sorry, let me get organized.

3               MR. WHITFIELD:   Greg, you want to take

4        our five minute hour break?

5               MR. SCHMITZ:   Yeah, that's fine.   Yeah.

6        I was actually just going to suggest that.

7               MR. WHITFIELD:   All right.

8               (A brief recess was taken.)

9          Q.    (By Mr. Schmitz)   Back on the record.

10   Page 23 of the transcript here starting at line 17.

11         A.    Yes.

12         Q.    So Dr. Papin just told you, I can tell

13   you honestly that I do want to improve.   And you

14   said, so what do you think it would take for them

15   to regain trust?   And you stated question -- or

16   there's no question about the potential and the

17   ability and the capacity that you have.   But there

18   is a concern that the motivation is not there, the

19   truthfulness is not there.   It's almost like

20   this -- like a cavalier type attitude that, well,

21   that's not my patient, or yeah, but then you go

22   and -- you go, oh yeah, I did that, but then you

23   go back and look at the records and find that

24   there's something missing.   What do you think

25   could be done in terms of support for you so that

Pat Whitlock
December 02, 2020

Page 199

1   you could feel sure that this person should be in

2   this program.

3          So you asked Dr. Papin what could be

4   done in terms of support.  Do you -- was anything

5   ever done after this interview in terms of trying

6   to support Dr. Papin's success in the program?

7   A.   I don't know.

8   Q.   You had never seen Dr. Papin in action

9   or anything like that, correct, worked along side

10  him, observed him working with his co-workers?

11  A.   No, I would have no reason to.

12  Q.   But yet you classified him as having

13  this cavalier type of attitude but yet you didn't

14  have any first-hand knowledge of whether he

15  actually did have that attitude, correct?

16  A.   His attitude was cavalier when I met

17  with him.  But what I was talking to him about

18  during the interview was based on the information

19  that had been provided by the department.

20  Q.   Okay.  Page 30, line 22, you're talking

21  about when feedback is given to him.

22  A.   Yes.

23  Q.   And you ask him, are you ever given the

24  specifics of which patient it was or which nurse

25  practitioner or what day and when these things

Pat Whitlock
December 02, 2020

Page 200

1    have occurred?  And Dr. Papin replies to you on

2    page 31, line 2 saying, never ever am I ever given

3    that.  And Dr. Earl, and this kind of a cultural

4    thing with surgery, with surgery it's kind of

5    you're told something is more militaristic in that

6    regard.  If you're told something that's gospel.

7    You don't question it.  You don't say anything.

8    You know, whatever they tell you is what it is.

9              So in stating that, that he was never

10   give specific feedback regarding his interactions

11   with other people or who it was or anything like

12   that, did you ever make an effort to try to give

13   Papin more details on these things so perhaps that

14   he could go back and apologize to these people or

15   connect with these people and say, hey, I think

16   we're just -- we're not connecting well and I just

17   wanted to say -- I want to apologize and I'm

18   working on that?  Was there any attempt by you to

19   facilitate any kind of discussions like that?

20        A.   That was not my role or responsibility,

21   no.

22        Q.   Are you aware of whether Dr. Earl -- did

23   you have any conversations with Dr. Earl after

24   this regarding, hey, can you provide Dr. Papin

25   with the specifics, he's saying that he didn't

Pat Whitlock
December 02, 2020

Page 201

1    have the specifics on these people that he was

2    making angry and he'd like to go back and try to

3    make amends with these folks so he can continue on

4    in this program?

5         A.   I did not.

6         Q.   Okay.  I want to go to the last line of

7    page 34, number 25, line 25 on 34.

8         A.   Yes.

9         Q.   You're wrapping up the interview and you

10   say, okay, well, as I said, we consider this a

11   fact-finding session.  Anytime concerns are

12   brought to us we do talk with the people involved

13   and then what we do is provide a summary and give

14   that to whomever has asked us to do an

15   investigation.

16             So you were asked to do an

17   investigation, it was a fact-finding thing, did

18   you talk to any of the people involved with this

19   case?

20        A.   Dr. Papin.

21        Q.   Just Dr. Papin, correct?

22        A.   Yes.

23        Q.   And you said, and then whatever the

24   ultimate outcome is it's left up to the

25   department, but this is a very confidential thing

Pat Whitlock
December 02, 2020

Page 202

1    so please keep it confidential and we ask you to

2    do the same.

3            So why did you state that it would

4    ultimately be the department's decision, I thought

5    you were part of the decision as well?

6        A.   I'm not a part of the decision.  I may

7    review and support the recommendation, but

8    ultimately HR's role is to give recommendations

9    and advice.  But in terms of terminations,

10   everything must be approved by employee relations.

11       Q.   Okay.  But you stated here that whatever

12   the ultimate outcome is it's left up to the

13   department, that would be a the general surgery

14   department, the GME, and all that kind of stuff?

15       A.   Yes, that was my reference.

16       Q.   Okay.  All right.  Let's get to the next

17   one.  Almost done.  That was the hard part.

18       A.   I've reviewed it.

19            (Exhibit 21 marked for identification.)

20       Q.   (By Mr. Schmitz)  Okay.  This is an e-mail

21   between Pam Greenwood and Cecilia Bass, Johnny

22   Gilmore, and Chris Morgan?

23       A.   Yes.

24       Q.   Regarding Papin and the request for

25   termination.  Cecilia is bringing up the fact

Pat Whitlock
December 02, 2020

1    that -- or Pam is bringing up the fact to Cecilia

2    that she's reviewed the documentation and she's

3    noted some concerns.  Did she say or share any of

4    these concerns with you?

5         A.    These are similar to the items that she

6    provided on that same date in an e-mail, and that

7    was the basis of Molly Brasfield's response that

8    what she was inquiring about was more from the

9    analysis of a standpoint from academics and not

10   from employee.

11        Q.    Don't you think these are normal kind of

12   things that would take place in an HR

13   investigation, correct, whether I guess it's

14   outside of the wheelhouse because there's this

15   distinction between program and HR and this and

16   that, but wouldn't these -- some of these things

17   that she's raising, the fact that there were

18   feedback sessions held -- it is known that

19   feedback sessions were held with Dr. Papin in

20   regards to unsatisfactory performance but did not

21   see any supporting documentation of the meetings

22   held to discuss the employee's performance

23   deficiency other than the letter issued to him by

24   the program director, Dr. Earl.

25              Wouldn't the fact that there was a lack

Pat Whitlock
December 02, 2020

Page 204

1    of documentation regarding prior meetings other

2    than the one that you've been referencing all day,

3    wouldn't that be something that is concerning to

4    you from an HR perspective, lack of documentation,

5    document, document, document?

6        A.    Document, document, document is what HR

7    does and it is what we recommend, but there are

8    often times when the departments will seek to do

9    verbal meetings.  They will say, well, I met with

10   Dr. Papin, I talked to him about this.

11             And keep in mind that HR is getting all

12   of this information after the fact, so we would

13   not ever tell anyone to go and recreate something

14   after it has occurred if they can not

15   specifically, accurately, and factually record

16   everything that has occurred from a previous

17   encounter.

18             MR. SCHMITZ:  Can you hold on, my wife

19        just got something with my daughter?  I'll be

20        right back.

21             MR. WHITFIELD:  All right.

22             (A brief recess was taken.)

23        Q.    (By Mr. Schmitz)  All right.  So back

24   to -- we're on Exhibit 21.  Bullet point number 2,

25   the academic remediation protocol checklist is

Pat Whitlock
December 02, 2020

Page 205

1    incomplete and is not signed by the resident or the

2    program director.

3              Did this cause any concern with respect to

4    your decision making process determining Dr. Papin?

5         A.   It did not.  Again, these were some of

6    the similar concerns that she sent in an e-mail to

7    me on that same day and those were all determined

8    to be in the academic vein rather than the

9    employee vein.

10        Q.   The fact that the next bullet point is

11   raises the issue that nothing is indicated

12   anywhere in the documentation, what measures were

13   taken to address Dr. Papin's performance issues

14   and concerns, you hadn't seen anything that would

15   warrant -- that wouldn't warrant you to do

16   anything further with respect to that?

17        A.   No, because, again, that has to do with

18   the academic component as a house officer under

19   the auspices of the GME.

20        Q.   If you're going to fire somebody from a

21   HR perspective, doesn't the fact that somebody,

22   you know, if they have some type of performance

23   issues, what type of remedial measures were taken

24   or conferences they would have or counseling they

25   were given, that's HR too, right?  You know,

Pat Whitlock
December 02, 2020

Page 206

1     that's not just GME, that would blur, right, into

2     what you do, right?

3          A.    From an HR standpoint it would be those

4     things that were not in compliance with what is

5     included in the faculty staff handbook.  The

6     analysis trainee comments document is specifically

7     referring to some component of his training

8     educationally, not anything in comparison to the

9     employee aspect of his status.

10         Q.    Right.  But the employee aspect of his

11    status would encompass behavioral problems,

12    correct?

13         A.    But the issues that Ms. Greenwood raised

14    would more be in line with the academic component.

15         Q.    So bullet point number 4, would this

16    also be an academic component, disruptive behavior

17    almost escalating into a physical fight, how was

18    this behavior addressed?  That seems like an HR

19    thing, right?

20         A.    It is, and it was included in the report

21    from Dr. Earl where he said he had spoken with

22    them.  And, again, that was from six months prior.

23         Q.    Okay.  All right.  Now, the next -- I

24    only have it in two separate pages, but it's all

25    going to be one page consisting of Exhibit 22.

Page 207

```
 1              (Exhibit 22 marked for identification.)
 2         MR. WHITFIELD:  Is it two separate down
 3    loads or is it one?
 4         MR. SCHMITZ:  Yes, it's going to be --
 5    they're both Exhibit 22 just different pages.
 6    For whatever reason I have them in like --
 7         MR. WHITFIELD:  Why did they switch to
 8    jpegs instead of PDF?
 9         MR. SCHMITZ:  I don't know.  I'm not a
10    computer guy.
11         MR. WHITFIELD:  Well, I gave them to you
12    in PDF.  What did y'all do?
13         MR. SCHMITZ:  Somehow they got turned
14    into a jpeg so we're going to roll with it.
15         MR. WHITFIELD:  All right.  I think I
16    got them up where we can read them.
17         THE WITNESS:  I see them.
18    Q.   (By Mr. Schmitz)  Okay.  Is this a
19    document that you've been talking about for most of
20    the day that both Dr. Papin and Dr. Earl had signed
21    whereby Dr. Papin had signed off on the fact that he
22    had done a lot of these things?
23    A.   Yes.
24    Q.   Okay.  The document -- this is
25    essentially what you would call in the HR world a
```

Pat Whitlock
December 02, 2020

Page 208

1    performance improvement plan; is that correct?

2         A.   No, it is not.

3         Q.   What is it?

4         A.   I perceived it as a document outlining

5    the concerns that were brought forth to this

6    particular employee.

7         Q.   And this also outlines that he had 60 --

8    or he was supposed to have 60 days to improve on

9    these things that are outlined in this document?

10        A.   It does.

11        Q.   Isn't that what a performance

12   improvement plan does, it gives a set time period

13   of things --

14        A.   A performance --

15        Q.   -- improve on and then --

16        A.   A performance improvement plan outlines

17   what the concerns are, then it divides -- it

18   devises what the process is for improvement with a

19   timeline.

20        Q.   Isn't that exactly what this document

21   does?

22        A.   It's similar to that, yes.

23        Q.   Okay.  So on January 10 Dr. Earl sat

24   down with Joe and said that many of these

25   issues -- the concerns raised regarding your

Pat Whitlock
December 02, 2020

Page 209

1    performance, many of these issues relate to

2    professionalism and system based practice issues

3    and raised concerns for patient safety.

4            Just paraphrasing says, these

5    concerns -- these include concerns with lying and

6    being untruthful about patient care.  And as we

7    discussed during your interview with Dr. Papin on

8    the 27th he denied that he was lying about patient

9    care, correct?

10       A.   Yes.

11       Q.   Leaving the hospital during duty hours

12   to exercise, dereliction of duty.  Now, during

13   your interview with Dr. Papin, Dr. Papin testified

14   that he -- that he had permission when he left the

15   one time to go, from the chief resident, to go

16   exercise for 15 minutes; isn't that correct?

17       A.   He did say that, yes.

18       Q.   Unwillingness to help with tasks.  He

19   did explain that he had received instructions from

20   an attending physician that he could go to the OR

21   if he wanted to observe instead of helping out

22   with other sort of more menial tasks --

23            MR. WHITFIELD:  Object to the form.

24            MR. SCHMITZ:  You can answer.

25            MR. WHITFIELD:  Misstating the prior

Pat Whitlock
December 02, 2020

Page 210

1          testimony, but go ahead.

2               THE WITNESS:  There were several

3          incidents, and I would have to go back and

4          review them specifically, but there were

5          other incidents where a nurse practitioner in

6          particular had attempted to show him how to

7          do something and I think his response was I'm

8          a surgeon.  So it was not just one incident

9          of unwillingness to help with tasks.

10         Q.   (By Mr. Schmitz)  Okay.  So on Tuesday, on

11    the Tuesday, December 20, we met with Renee Greene

12    present and discussed these issues.  This is in

13    addition to some other means including --

14              MR. WHITFIELD:  Greg, we can't hardly

15         hear you.

16              MR. SCHMITZ:  Oh, I'm sorry.

17         Q.   (By Mr. Schmitz)  It says on Tuesday,

18    December 20, we met with Renee Greene present to

19    discuss these issues.  This is in addition to

20    several other meetings including but not limited to

21    your semi-annual review, feedback from senior

22    residents, and a meeting in late November between

23    you and I outside of OR16.  You were told

24    significant improvement was needed in these areas in

25    the near future or we would have to implement formal

Pat Whitlock
December 02, 2020

Page 211

1    remediation.  Based on the feedback received, see

2    document attached, after our December 20 meeting it

3    is evident that no improvement has been made, and

4    most concerning we have serious issues with

5    truthfulness.  Therefore, we discussed, you are now

6    in formal remediation and you have 60 days from

7    today to show significant improvement.  Significant

8    improvement means zero confirmed suspicious reports

9    of lying, zero episodes of dereliction of duty,

10   improvement in evaluations of core competencies, I

11   don't know what those abbreviations mean, SBP, PBLI

12   and PROF.  And then number four states, zero reports

13   of unwillingness to complete a task unless patient

14   safety issues are raised.

15            Are you aware of whether Dr. Papin was

16   ever given any chance to improve on any of these

17   areas?

18        A.   I am not, because on that same date

19   Dr. Earl placed him on paid administrative leave

20   and he did not return to campus following this

21   date.

22        Q.   Okay.  There's some additional

23   requirements it states.  Number one would be

24   development and submission of a personal study and

25   action plan by January 17, 2017.  Are you aware of

Pat Whitlock
December 02, 2020

Page 212

1    whether Dr. Papin submitted that plan as required

2    by January 17?

3         A.   I am not.

4         Q.   Was that ever provided to you in the

5    documentation that Dr. Earl had?

6         A.   It was not.

7         Q.   Additional resources if desired, meet

8    with the Senior Associate Dean for the GME.   Who

9    was the Senior Associate Dean for the GME at that

10   time?

11        A.   I'm not familiar with that title.   There

12   is a person now who is a Vice Dean for the medical

13   school, and I can only presume that is who he was

14   referring to.

15        Q.   Who would that have been?

16        A.   Her name is Dr. Loretta Jackson

17   Williams.

18        Q.   Did you ever recommend that Dr. Papin go

19   see her?

20        A.   I did not.

21        Q.   What is the office of academic

22   development?

23        A.   I'm not familiar with what Dr. Earl is

24   referring.   In the Department of Academic Affairs

25   there is a psychologist who has responsibility for

Pat Whitlock
December 02, 2020

Page 213

1    meeting with professional students who either need

2    tutoring or who are having some kind of difficulty

3    or deficiencies in other areas.  That is not her

4    title and I can only presume that is who Dr. Earl

5    was referring to.

6        Q.    Page 2 of this.  It states many of these

7    behaviors are serious threats to patient safety

8    and therefore grounds for immediate action.  If

9    the improvement required above as determined by

10   the program director are not met within 60 days or

11   any event seriously threaten patient safety occurs

12   after remediation period, then the following may

13   be implemented, again, at the discretion of the

14   program director:  Referral to HR and the GME

15   office for immediate termination for safety

16   infractions deemed egregious by the PD.

17           Nonrenewal of contract, placed on a

18   formal probation, requirement to repeat a year of

19   training.

20           So then they both signed this on 1/10,

21   and then one day later Dr. Earl and the GME

22   office, Dr. Barr, you all received an e-mail

23   stating that they believed that he was no longer

24   rehabilitated -- he couldn't be rehabilitated,

25   correct?

Pat Whitlock
December 02, 2020

1     A.    Yes.

2          Q.    Are you aware of any events that

3     would -- any events that occurred between the 10th

4     and the 11th that would have placed patients in

5     jeopardy of serious harm?

6          A.    I am not privy to what led to Dr. Earl's

7     decision.

8          Q.    Okay.  Are you aware that basically they

9     just went with option one here the next day and

10    referred this case -- they did in fact refer this

11    thing over to you the next day, correct?

12         A.    Yes, it was referred the next day.

13         Q.    Did you ever have any conversations with

14    Dr. Earl or Dr. Barr regarding these other options

15    that were in this plan such as nonrenewal of

16    contract, placement on formal probation, or

17    requirement to repeat a year of the training?

18         A.    There were not.  In the meeting that was

19    subsequently held with Drs. Barr and Earl, the

20    decision was made that they did not feel confident

21    in Dr. Papin's ability or interaction to continue

22    in the program.

23         Q.    Are you aware of anything that would

24    have required them to try to at least remediate

25    Dr. Papin in these behaviors that they're stating

Pat Whitlock
December 02, 2020

Page 215

1    he exhibited?

2         A.   I am not.

3         Q.   Next Exhibit 23.  I am only asking you

4    about the final page of this, it's the Academic

5    Remediation and Protocol Checklist.

6              (Exhibit 23 marked for identification.)

7         A.   I see it.

8         Q.   This is an academic remediation protocol

9    checklist that was referenced in the e-mails that

10   we just went over from Ms. Bass.  There are

11   several things on here.  Are you aware of whether

12   any of these steps on this checklist would have

13   taken place between Dr. Earl and Dr. Papin?

14        A.   I am not.

15        Q.   Are you aware of any of these

16   guidelines, the guidelines going up to page 1, the

17   Guidelines for Academic Remediation Office of

18   Graduate Medical Education?

19        A.   I am not familiar with that.

20        Q.   Okay.  All right.  Next Exhibit 24.

21             (Exhibit 24 marked for identification.)

22        Q.   Before you start reading, are you

23   familiar with this UMMC Graduate Medical Education

24   Evaluation Policy and Grievance Algorithm?

25        A.   I am not.

Pat Whitlock
December 02, 2020

Page 216

1          Q.    Do you have any awareness of whether

2    Dr. Earl and Dr. Barr followed the policies and

3    procedures set forth in this?

4          A.    I do not.

5          Q.    Okay.  Last one.

6                MR. WHITFIELD:  I'm pretty sure that one

7          was a repeat.

8                THE WITNESS:  Uh-huh (affirmative).

9          Yeah, we saw that one earlier.

10               MR. SCHMITZ:  Okay.  You know, I think I

11         get different -- there's a couple of

12         different years with the different versions

13         so I think there's a little bit -- well,

14         that's all right.

15               Okay, last one.

16               (Exhibit 25 marked for identification.)

17         Q.    (By Mr. Schmitz)  This is the Academic

18   Remediation Protocol Checklist, seems to be filled

19   out by Dr. Earl here?

20         A.    Yes.

21         Q.    All right.  So on this checklist 1, 2,

22   3, 4, 5, 6, 7, 8, there's 8 things on this

23   checklist that they're supposed to go through; is

24   that correct?  You count the same as I'm counting?

25         A.    Yes.

Pat Whitlock
December 02, 2020

Page 217

1        Q.    And on here you see completion date and

2    there's only 1, 2, 3, there's 3 things completed;

3    is that correct?

4        A.    Yes.

5        Q.    So have you ever seen this document

6    before?

7        A.    I have seen -- yes, this particular one,

8    I've seen a copy of this.

9        Q.    This partially filled out document?

10       A.    Yes.

11       Q.    Okay.  So earlier you testified that you

12   had believed that Dr. Earl had done all his due

13   diligence so you just relied on Dr. Earl for all

14   the documents and all the things to have been

15   complete sufficient enough for you to conclude

16   that the termination of Dr. Joe Papin was

17   warranted, correct?

18       A.    From the HR standpoint in comparison to

19   the faculty staff handbook.  This particular

20   checklist would have to do with the academic

21   component of which I had no involvement.

22       Q.    Right.  But if you see only 3 out of the

23   8 things on the academic component are checked off

24   on a checklist, a UMMC checklist, wouldn't that

25   raise some concern in the mind of someone else who

Pat Whitlock
December 02, 2020

Page 218

1  is trying to review a termination decision?

2        A.   Not from the standpoint of the employee

3  component.  And this checklist evidently was done

4  on the same -- was begun on the same date that

5  Dr. Earl and Dr. Papin had their meeting when he

6  provided him with the letter that we recently

7  reviewed.

8        Q.   You see here where it says, submitted

9  written personal study or corrective action plan,

10 so it looks like Joseph Papin did that on 1/17 as

11 was required by the -- I call it performance

12 improvement plan, that we just reviewed?

13       A.   I don't know if that was the date it was

14 completed or if that the targeted date because I

15 do not have familiarity with this checklist.

16       Q.   Okay.  You also were not provided the

17 written personal study plan or corrective action

18 plan that Joe Papin submitted to Dr. Earl on

19 January 17?

20       A.   I was not.

21       Q.   Okay.  All right.  Well, thank you so

22 much for your time today.  Now, you can -- we're

23 all finished here, you can now either read the

24 transcript to correct any errors or you can waive.

25 I guess you and Tommy can talk about that.

Pat Whitlock
December 02, 2020

Page 219

1           MR. WHITFIELD:  Read and sign.

2           MR. SCHMITZ:  You're going to read and

3       sign.  All right.  No worries.

4           So I guess that concludes today's

5       deposition.  Thank you so much, Ms. Whitlock,

6       I appreciate your time today.  Sorry I kept

7       you for so long and I appreciate you both.

8       Thank you.

9           COURT REPORTER:  Mr. Whitfield, do you

10      need a copy of the transcript?

11          MR. WHITFIELD:  I do.

12          (Deposition concluded at 4:27 p.m.)

13              SIGNATURE/NOT WAIVED

14

15   ORIGINAL:  GREGORY SCHMITZ, ESQ.

16   COPY:  TOMMY WHITFIELD, ESQ.

17

18

19

20

21

22

23

24

25

Pat Whitlock
December 02, 2020

Page 220

1                    CERTIFICATE OF DEPONENT

2    DEPONENT:  PAT WHITLOCK
     DATE:  December 2, 2020
3    CASE STYLE:  JOSEPH PAPIN, MD vs. UNIVERSITY OF
     MISSISSIPPI MEDICAL CENTER, ET AL
4    ORIGINAL TO:  Gregory Schmitz, ESQ.
              I, the above-named deponent in the
5    deposition taken in the herein styled and numbered
     cause, certify that I have examined the deposition
6    taken on the date above as to the correctness
     thereof, and that after reading said pages, I find
7    them to contain a full and true transcript of the
     testimony as given by me.
8              Subject to those corrections listed
     below, if any, I find the transcript to be the
9    correct testimony I gave at the aforestated time
     and place.
10   Page       Line                    Comments

11   _____     _____        _____
                              _____
12   _____     _____        _____
                              _____
13   _____     _____        _____
                              _____
14   _____     _____        _____
                              _____
15   _____     _____        _____
                              _____
16   _____     _____        _____
                              _____
17   _____     _____        _____

18           This the _____ day of _____, 2020.

19                              _____
                                PAT WHITLOCK
20   State of Mississippi
     County of _____
21
             Subscribed and sworn to before me, this the
22   _____ day of _____, 2020.

23   My Commission Expires:

24   _____   _____

25                                    Notary Public

Pat Whitlock
December 02, 2020

Page 221

1              CERTIFICATE OF COURT REPORTER

2              I, Dawn Dillard, Court Reporter and

3       Notary Public, in and for the State of

4       Mississippi, hereby certify that the foregoing

5       contains a true and correct transcript of the

6       testimony of PAT WHITLOCK, as taken by me in the

7       aforementioned matter at the time and place

8       heretofore stated, as taken by stenotype and later

9       reduced to typewritten form under my supervision

10      by means of computer-aided transcription.

11             I further certify that under the

12      authority vested in me by the State of Mississippi

13      that the witness was placed under oath by me to

14      truthfully answer all questions in the matter.

15             I further certify that, to the best of

16      my knowledge, I am not in the employ of or related

17      to any party in this matter and have no interest,

18      monetary or otherwise, in the final outcome of

19      this matter.

20             Witness my signature and seal this the

21      1st day of January, 2021.

22

23                      *Dawn Dillard*

24                      DAWN DILLARD, #1763
                        CCR
        My Commission Expires:
25      March 2, 2021

Pat Whitlock
December 02, 2020
1

---
**Exhibits**

Exhibit 001 Whi
tlock
  3:9 32:5
Exhibit 003 Whi
tlock
  3:11 79:11
  94:21
Exhibit 004 Whi
tlock
  3:12 100:25
Exhibit 005 Whi
tlock
  3:14 119:6
Exhibit 006 Whi
tlock
  3:15 122:9
Exhibit 007 Whi
tlock
  3:16 125:1
Exhibit 008 Whi
tlock
  3:17 125:18
Exhibit 009 Whi
tlock
  3:18 127:4
Exhibit 010 Whi
tlock
  3:19 127:24,
  25
Exhibit 011 Whi
tlock
  3:20 130:19,
  20
Exhibit 012 Whi
tlock
  3:21 138:2,3

Exhibit 013 Whi
tlock
  3:22 138:22,
  23 145:1
Exhibit 014 Whi
tlock
  3:23 145:11,
  12
Exhibit 015 Whi
tlock
  3:24 148:14,
  15
Exhibit 016 Whi
tlock
  3:25 156:2,4
Exhibit 018 Whi
tlock
  4:3 163:22,23
Exhibit 019 Whi
tlock
  4:5 172:1,2
Exhibit 021 Whi
tlock
  4:8 202:19
  204:24
Exhibit 022 Pat
Whitlock
  4:9 206:25
  207:1,5

---
**1**
---

1
  32:5 140:8
  144:25 172:14
  178:6 215:16
  216:21 217:2
1/10
  38:14 45:3
  213:20

1/10/17
  44:24 45:1
  60:4
1/17
  218:10
1/19/17
  88:8
1/27/17
  91:13
1/3/17
  60:4
10
  22:23 34:2
  87:9 107:10,
  17 127:24,25
  162:21 163:13
  180:2 208:23
10/2/53
  7:8
102
  7:10
10:22
  32:25
10:52
  38:10
10th
  153:16 214:3
11
  130:19,20
  137:11
11th
  214:4
12
  137:11 138:2,
  3 180:5
  182:19
12/15
  59:18

12/15/16
  57:19
12:48
  120:19
12:51
  130:24
13
  120:19
  138:22,23
  145:1 184:24
  185:7
14
  145:11,12
  161:23 185:3,
  7,9
14th
  130:23
15
  32:25 38:9
  95:17 99:14
  148:14,15
  185:8,22
  186:9 209:16
16
  156:2,4
  186:25
17
  85:21 161:1,2
  187:7,15
  198:10 211:25
  212:2 218:19
18
  163:22,23
  189:18
19
  122:5 172:1,2
  194:9
1:32
  95:18

Pat Whitlock
December 02, 2020

2

**1earl**
113:1

**1papin**
196:12

**1st**
131:12

---

**2**

**2**
79:5,7,9,11,
19 95:1 175:3
200:2 204:24
213:6 216:21
217:2

**2/6**
41:24

**20**
121:25 134:12
159:17 177:5,
11 186:25
194:2 210:11,
18 211:2

**2014**
101:6 107:5

**2015**
101:10

**2016**
85:20

**2017**
12:17 14:18
18:19,22 20:7
21:16,18 23:4
34:2 38:9
48:7 50:17
55:4 95:18
102:17
160:21,22
162:6 211:25

**20th**
131:20 178:14

**21**
121:25 184:25
195:18 202:19
204:24

**22**
121:25 199:20
206:25 207:1,
5

**22nd**
131:5,8,23
132:2,11
135:18,22
136:18,22

**23**
103:16,21
198:10 215:3,
6

**24**
215:20,21

**25**
185:23 201:7
216:16

**26**
10:18

**27**
9:22 55:15
178:10 194:2

**27th**
88:1 181:3
209:8

**29**
156:7,9,11
160:1

---

**3**

**3**
79:11 94:20,

21 106:18
107:3 177:14,
15,25 178:1
216:22 217:2,
22

**30**
94:15 101:17,
21 199:20

**30(b)(6)**
16:7 47:4
78:12,21 84:4
96:21 129:8
165:18 167:9
175:16

**31**
156:11,15
200:2

**34**
201:7

**37**
104:16

**3:00**
91:15 93:1,4
94:9

**3:40**
91:16 93:2
134:15,19

---

**4**

**4**
100:25 174:13
179:11 187:7,
11,20,25
192:13 206:15
216:22

**433**
161:4,7

**435**
161:4

**44**
105:16

**45**
94:7

**4:00**
91:17 93:3

**4:27**
219:12

---

**5**

**5**
119:6 194:9
216:22

**5:45**
48:8 50:17

**5:59**
80:11

---

**6**

**6**
48:7,10 50:17
122:9 194:11
195:18 216:22

**60**
112:21 113:1,
6 120:25
121:6 208:7,8
211:6 213:10

**6:00**
80:15

**6:01**
80:12

---

**7**

**7**
125:1 182:19
189:18 216:22

| | | | |
|---|---|---|---|
| 7/29/16 | 9:15 | 216:17 | accustomed |
| 48:25 | 131:20 | 217:20,23 | 52:21 |
| 7/29/2016 | 134:12,18 | academics | ACGME |
| 52:18 | | 203:9 | 19:19,23 20:3 |
| 73 | A | accept | 46:10,18,25 |
| 107:6 | | 91:19,23 | 47:4,17 |
| 74 | a.m. | acceptance | 157:15 173:11 |
| 107:6 | 32:25 38:10 | 119:2 | acknowledgement |
| 75 | 131:20 134:12 | accepting | 78:1 |
| 107:6 | abbreviations | 91:25 | acknowledging |
| 76 | 211:11 | access | 31:11 112:9 |
| 107:1 108:1 | abide | 69:15 | acronym |
| 110:5,13 | 159:11,12 | accessed | 42:2 |
| 111:10 113:24 | abilities | 22:13 | acronyms |
| 114:15 115:1, | 105:19 | accessible | 162:13 |
| 12,18 116:6 | ability | 69:19 | act |
| 118:18 163:4, | 29:8 198:17 | acclamation | 77:14 188:7 |
| 8 | 214:21 | 192:7 | 191:5 |
| 76's | absence | accordance | action |
| 110:21 | 131:23 | 173:24 175:7 | 71:17 72:15 |
| 78 | absent | 176:21 | 91:24 116:6 |
| 101:9 102:12 | 58:1,5,7 | accountability | 118:15 130:9 |
| 79 | abstracts | 91:20,24,25 | 149:18 152:6 |
| 102:16,19 | 9:13 | accreditation | 164:5,6,11,24 |
| | academic | 174:8,9 | 166:9 170:21 |
| 8 | 10:20,22 | accrued | 182:17 199:8 |
| | 34:5,11,25 | 140:23 | 211:25 213:8 |
| 8 | 35:9,12,17 | accurate | 218:9,17 |
| 125:17,18 | 36:6,13,18,19 | 63:16 75:10 | actions |
| 216:22 217:23 | 38:6,22 39:9 | 96:5 | 14:25 27:16 |
| 8/31 | 41:6 76:9 | accurately | 38:20 44:9 |
| 59:18 | 96:12 97:2 | 7:22 183:23 | 49:5,8 70:7 |
| 8/31/16 | 102:16 | 204:15 | 91:20,24 |
| 57:19 | 132:13,18 | accused | 102:9 108:24 |
| | 158:10,14 | 18:2 43:6 | 116:7 133:21 |
| 9 | 159:3 204:25 | 44:10 104:2 | 149:19 166:14 |
| | 205:8,18 | 105:8 108:20 | 183:22 |
| 9 | 206:14,16 | 195:4 | actively |
| 18:22 127:3,4 | 212:21,24 | | 195:12 |
| 195:24 | 215:4,8,17 | | |

Pat Whitlock
December 02, 2020

4

activities
58:2,6,7,13
74:13 88:21

acts
85:22 110:15

actual
25:24 63:20
74:2 139:23
156:9 177:15,
25

adamant
88:25 89:5
167:23

addiction
123:20

addition
151:19
210:13,19

additional
33:5,12
75:23,25
162:11 211:22
212:7

address
7:9 47:5
140:21 205:13

addressed
14:11 38:2
39:23 206:18

administer
15:8 173:23

administering
159:7

administration
156:17 158:22

administrative
44:25 45:4
51:15 61:1
119:16 123:11

150:4 157:25
211:19

administrator
43:18 60:6,21
88:14

admission
96:11

admit
67:8 89:9
183:19

admittance
61:12 62:3

admitted
62:9 87:23
183:5,14
196:5

advance
56:20 101:17

advanced
101:20

advances
109:14,25
111:4

advantage
132:13

advice
10:10 11:3
202:9

advises
10:5

advising
13:20

affairs
10:20,22
161:23 162:2
212:24

affect
159:8

affirmative
6:17 79:24
216:8

African
101:9 102:15

afternoon
48:3

agency
164:21

aggressive
179:8

aggrieved
84:11

agree
94:12 175:4

agreed
93:1 112:19
174:24

agreement
97:14

agrees
172:14

ahead
43:12 128:15
178:8 210:1

Ainsworth
88:14 91:10
122:16 127:5

alarm
85:9

Albeit
110:18

alcohol
93:12,15,18

alerted
135:15

Algorithm
215:24

allegation
16:2 83:1
84:9,10 109:5

allegations
16:14 20:14
21:8 30:17
31:7 44:18
58:5 62:23
63:2,11 64:7
75:6 83:25
84:22 109:13,
25 110:8,9
114:25 115:21
118:10 150:7
152:2 196:6,
18

alleged
19:1,16 44:9
56:5 83:5
110:15 111:21
112:20 114:1,
2,10 153:13
197:21

allegedly
17:22 18:13
44:18 73:2
111:17

alleging
6:2

allowed
18:4 74:3
123:18

alluded
39:6

altercation
55:9,21 59:4

alternate
190:5

alternated
190:7

Pat Whitlock
December 02, 2020

5

amenable
  173:9

amends
  201:3

American
  101:9 102:15

analysis
  38:1 203:9
  206:6

anger
  103:17,22
  104:4

angry
  201:2

announced
  91:6

anonymous
  42:4

anonymously
  73:8

answering
  7:23

answers
  6:15,20

anymore
  17:18,23
  25:19 168:1

Anytime
  102:3 201:11

apologize
  200:14,17

apologized
  179:15

appeal
  9:18 27:11,15
  161:20,21
  162:20,24
  163:5,13,16

appealed
  101:9 102:16

appealing
  145:19

appeals
  9:17 162:10,
  11,19

appeared
  188:22

appears
  98:20 161:16,
  19

applicable
  29:2

apply
  27:19 173:1,
  19

applying
  72:1

appoint
  162:11

appointed
  162:25

appointment
  91:17 93:3,6,
  15,18,19
  94:1,5 98:22

approach
  24:24 93:8
  155:23

approaching
  113:11

appropriately
  28:22 76:17,
  19,23

approval
  15:10 77:18
  110:17

approve
  114:25 165:12

approved
  52:6 134:17,
  20 194:3
  202:10

approximately
  80:11 195:3

area
  81:8 102:10
  103:20
  129:13,14,15
  130:6,13,17
  158:9

area's
  130:8

areas
  47:13 158:11
  163:10 210:24
  211:17 213:3

arguments
  168:4

arrested
  7:18

arrive
  68:3

arrived
  68:11,17,24
  91:17

arriving
  68:5,14

arrogantly
  53:2

ASAP
  131:25 136:19

Ashley
  18:21 79:2
  80:4 86:5,15,
  22

Asian
  103:16

aspect
  206:9,10

assault
  114:2

assertion
  64:22

assessed
  56:13

assigned
  14:12 57:22

assignments
  131:12

assistant
  61:1

associate
  88:10,12
  126:10 212:8,
  9

assume
  7:4 76:5
  132:3 191:4

assumed
  76:4

assuming
  41:1 60:9
  69:23 98:23
  114:23 195:25

attached
  145:24 211:2

attempt
  144:17 200:18

attempted
  141:9 142:2
  210:6

atten
  192:1

Pat Whitlock
December 02, 2020                                                                6

| | | | |
|---|---|---|---|
| **attend** | **avenue** | 95:6 106:5 | 214:14,19 |
| 81:7 | 132:13 | 123:24 124:18 | 216:2 |
| **attendance** | **avoided** | 129:2 134:16 | **Barr's** |
| 91:7 127:19 | 98:14 | 137:8 148:13 | 119:16 |
| **attending** | **aware** | 159:19,23 | **based** |
| 68:15 71:25 | 18:20,21 | 160:20 162:6 | 13:12 23:15 |
| 74:2,8,12,22 | 26:16,17 | 168:6,12 | 28:18,22 |
| 78:7,9,18 | 37:16 40:6,15 | 184:2 186:10 | 31:14 34:15, |
| 179:3 191:16 | 45:2,6,12 | 188:17 191:25 | 16 37:6 39:16 |
| 209:20 | 47:17 56:8 | 192:1,5 | 41:14 46:10 |
| **attendings** | 57:11 59:10 | 193:15 195:13 | 48:23 54:13 |
| 78:14 | 60:16 61:24 | 197:5 198:9, | 86:17 100:18, |
| **attention** | 65:19 69:9 | 23 200:14 | 20 133:20 |
| 40:10 73:19, | 71:20,24 | 201:2 204:20, | 155:20 173:8 |
| 23 84:1,17,24 | 83:16 93:11 | 23 210:3 | 176:2,18 |
| 108:9 161:3 | 97:18 100:5 | **background** | 191:9 199:18 |
| **attest** | 121:4 147:1 | 117:15,16 | 209:2 211:1 |
| 44:21 54:15 | 158:23 162:22 | 189:8 | **basically** |
| 60:12 112:16 | 163:12 | **backgrounds** | 14:22 24:4 |
| 132:14 193:25 | 169:10,18 | 147:5 | 25:21 75:4 |
| **attitude** | 171:17 173:18 | **bad** | 96:19 131:14 |
| 114:12 153:1 | 176:16 186:13 | 153:1 154:3 | 135:16 137:19 |
| 154:4 198:20 | 188:14,16 | 190:10 | 151:25 183:5 |
| 199:13,15,16 | 192:19 194:25 | 194:10,11,12 | 184:4 196:5 |
| **attorney** | 197:17 200:22 | **badge** | 214:8 |
| 145:21 | 211:15,25 | 69:19 141:6,7 | **basing** |
| **attorney/client** | 214:2,8,23 | 142:5,9,20 | 85:18 151:6 |
| 8:19 | 215:11,15 | 143:17 144:6, | **basis** |
| **audible** | **awareness** | 7 146:17 | 11:10 36:9 |
| 6:15,20 | 216:1 | **ball** | 70:13 76:4 |
| **auspices** | | 61:21 64:12 | 113:4 152:2 |
| 205:19 | **B** | **Barr** | 191:4 203:7 |
| **authority** | **back** | 12:20,21 35:6 | **Bass** |
| 24:8,13,17,21 | 6:14 8:24 | 88:10 91:9 | 30:13,14 34:9 |
| **authorization** | 14:18 18:4 | 100:21 | 48:3 50:17 |
| 134:25 135:13 | 38:9 39:20 | 119:12,18,20 | 98:17,24 |
| **automatic** | 41:21 44:19 | 127:15,20 | 135:8 138:20 |
| 122:22 | 50:14 58:9,18 | 128:20 133:23 | 148:19 202:21 |
| | 71:5 79:6 | 134:3,14 | 215:10 |
| | 85:14 94:25 | 213:22 | **Bates** |

161:4,7

**bathrooms**
7:3

**bear**
160:24

**began**
69:16

**beginning**
53:24

**begins**
15:20 48:21
131:12

**begun**
218:4

**behalf**
85:12

**behavior**
19:8 24:5
42:9 51:3,6,8
54:5 79:3
80:6 86:19
150:15 151:11
157:2,24
206:16,18

**behavioral**
41:8 206:11

**behaviors**
213:7 214:25

**beings**
117:20

**belief**
41:14

**believed**
213:23 217:12

**bells**
85:9

**benefits**
11:12 123:14

140:20 142:3

**Berger**
53:22 54:4
55:24

**big**
143:12 146:2

**binder**
158:13

**birth**
7:7

**bit**
32:18 92:24
93:24 140:9
149:17 152:1,
19 155:6
162:9 198:1
216:13

**blame**
58:3,17 71:2
74:17,20
192:11,20

**blamed**
71:4

**blameless**
192:15

**blatant**
190:19

**block**
144:9

**blocks**
177:16

**blood**
122:17

**Blue**
80:16,18
184:18

**blur**
38:21 47:13

99:19 132:19
206:1

**blurred**
38:25

**blurring**
39:3,10,13,16

**Board**
173:25 174:3

**body**
174:12

**bold**
156:16 157:3

**book**
157:21

**booklet**
156:24

**booklets**
158:12

**boss**
53:4,11 88:5

**bothering**
17:22

**bottom**
32:16 119:9
122:14 130:23
140:8,9 148:1
156:8 159:25
184:24 185:22

**bounce**
79:6

**box**
147:25 148:1,
4

**boxes**
107:7

**Brasfield**
14:19,20
30:12 38:10

88:9 91:9
95:17,20 96:6
98:17 99:2,13
120:19 124:1,
8,14,21 125:9

**Brasfield's**
99:23 203:7

**break**
6:24 7:1,3
50:15 75:19
123:19 190:23
198:4

**breaking**
94:14 155:5

**Brenda**
125:21 126:9
149:2

**bright**
56:14

**bring**
55:15,19
186:8,11
187:3,7

**bringing**
45:24 77:20
202:25 203:1

**broken**
177:16

**brought**
13:1,9 40:10
55:17 84:1,
17,23 108:6,
8,23 109:5
112:20
114:23,24
115:21 124:18
129:19 150:7,
20 190:18
195:17,18
201:12 208:5

**Bryce**
88:14 91:10
122:16 127:5,
19 128:4,5

**buck**
78:9

**building**
69:16 146:4

**bullet**
37:24 39:21
48:1 75:18
80:9 81:15
82:7,20 88:8
204:24 205:10
206:15

**bullying**
55:7 179:23

**bunch**
75:15

**business**
10:1 14:8,9,
12,16 16:15
21:2 52:8
103:2,4
126:5,8,10
134:23 137:11
162:21 163:13

**Butler**
160:19

---

**C**

---

**calendar**
161:24

**calender**
98:21

**call**
64:10 80:20
86:22 118:19
135:4,8,12

136:2 137:24
138:8 180:17
184:15 194:1
207:25 218:11

**called**
15:20 31:20
65:8 80:14,16
91:16 93:2,8
136:22 137:16
158:4 182:21

**calling**
65:23

**calls**
14:23 65:15
123:3

**campus**
38:14 45:5
48:15,16
69:18 124:19,
24 186:15
211:20

**capacity**
198:17

**car**
67:23 80:12
82:8 184:5,21

**card**
67:18,22 68:8
69:11,15

**cardiovascular**
52:18,20,23
53:23 54:5
56:1,3,4,10

**care**
42:15,18,24
43:2,6,21,23,
25 52:20,23
53:24 54:5
71:13,25
73:16 74:11,

23 78:8,19,
22,24 87:7,15
120:24 128:25
129:1,6
166:19 167:25
168:6 169:21
188:15 192:24
193:6 209:6,9

**cared**
191:12 193:10

**career**
197:14

**cares**
130:4

**caring**
190:16,20
191:7

**carried**
53:25

**carries**
170:7

**carry**
192:18

**case**
6:6 9:6,10,14
17:7,8,24
18:2 20:13,
18,19 21:6,12
23:6,11 36:11
37:8,11 39:12
42:25 67:15
97:11 98:7
105:12 108:2,
5 109:3,11,
16,24 110:21
113:25 114:7,
15,18,21
115:10 118:8,
18,21 126:13
129:21 132:5

137:3,9
139:20 160:17
166:21 167:16
174:18 189:17
193:20 194:7
196:22 201:19
214:10

**cases**
12:24 20:9,12
21:21 22:9
37:17 45:13
50:25 83:17
98:10 107:4
136:6 137:8
154:10 171:1,
23

**catch**
141:9

**categorical**
104:10 196:12

**categorically**
196:2,8

**caught**
71:1

**caused**
49:2 134:19
183:20

**causing**
51:7

**cavalier**
92:24 93:8
198:20
199:13,16

**Cecilia**
30:13,14 48:3
50:17 98:17
135:8 148:18
202:21,25
203:1

center
  157:24 158:3,
  18
certainty
  72:13 132:15
  151:21
certificates
  8:9
certification
  8:11 117:23,
  25
certifications
  173:8
cetera
  121:14
chair
  142:8 144:15
  161:21
  162:10,19
chairman
  160:11,16,17,
  18,20,22
  161:8,13,25
chance
  112:14 211:16
chancellor
  161:23 162:1,
  3
change
  51:7 92:13
  95:1
characterize
  28:16,25
charge
  148:19,20,21
charting
  69:24 70:4,17
charts

70:16
chase
  142:17
check
  50:22 53:4,5,
  13,17 65:7
  70:16 81:1
  84:20 98:21
  149:4 182:22
  184:12 197:12
checked
  151:5 187:10
  193:15 217:23
checking
  46:2 188:21
  190:22
checklist
  34:6 123:4,5
  204:25 215:5,
  9,12 216:18,
  21,23 217:20,
  24 218:3,15
chicken
  97:8,9
chief
  41:9 95:22
  179:12 186:6,
  22 209:15
choice
  147:19,25
chooses
  82:22 85:2
chose
  105:17
Chris
  98:18 138:14
  202:22
Christian
  88:12 91:10

Christmas
  189:24
circumstances
  102:19 114:4
  115:11,15
  123:17,22
  180:17
cited
  79:2 80:5
claim
  171:10
claims
  5:17 52:13,14
clarify
  13:17 17:14
  75:20
class
  154:13
classified
  199:12
clear
  6:20 91:22
clinical
  42:13 44:2,8,
  11 73:14
  105:19 158:7
clinics
  158:6
clocked
  67:14
closely
  60:22
closest
  144:13
co-worker
  42:10,20
  115:6
co-workers

60:9 196:17
  199:10
coaching
  33:13
code
  49:21 80:10,
  11,14,16,18,
  20 182:20
  183:24 184:6,
  7,18
coded
  183:25
coding
  184:16
coffee
  54:1
Colin
  61:10,15
colleagues
  120:11
color
  80:20
column
  164:5
comment
  93:22
comments
  38:1,23 206:6
committed
  171:1
committee
  44:2,8,11
  73:15 101:6
  129:3 162:10,
  11,15,19,20
committee's
  129:16
committing

Pat Whitlock
December 02, 2020
10

171:5

common
124:3

communicate
61:14

communicated
40:25 62:21

communicating
61:21 124:5

communication
124:13

company
5:23

comparison
170:11 206:8
217:18

compartmentaliz
ed
171:14

compensated
140:24

compensation
11:12

competencies
211:10

competent
82:10

compilation
63:22

compile
60:16

compiled
60:6,8 71:6

complaining
152:25

complaint
40:5 152:12

complaints
154:3

complete
34:5 40:22
116:16 211:13
217:15

completed
18:25 34:7
41:25 217:2
218:14

completely
25:3,4 45:22

completion
81:18 217:1

compliance
22:12 46:24
107:8,20,22
165:19,23
166:7,16,18,
19,24 167:8,
10 170:11
206:4

complied
23:8,13 24:1

complimentary
57:23

complying
29:1

component
19:6 35:9,10,
12,13 36:6,8,
9 38:6 41:6
76:10 205:18
206:7,14,16
217:21,23
218:3

computer
207:10

computers

69:25

con
141:19

conceal
195:12

concealing
168:15

concealment
169:14

conceivable
147:12 148:7

concern
13:1,6,9,12
14:3,10
190:22 195:20
198:18 205:3
217:25

concerned
39:3 51:17
89:1,13,14

concerns
13:4,25 14:1
19:7 49:2
71:10 75:15,
17 76:6,8,21
87:5 89:10
91:18 92:15
100:22 108:6,
23 115:7
124:15,20
129:19 195:16
201:11 203:3,
4 205:6,14
208:5,17,25
209:3,5

conclude
51:22 217:15

concluded
51:24 52:2

219:12

concludes
219:4

conclusion
176:12

conclusions
83:22 175:17

conclusive
30:25 31:13
77:22 110:16
183:11,13
197:3

concomitant
124:11

concrete
39:17

concur
77:17

concurrence
23:23

condescending
92:9

conditions
7:22 159:9

conduct
13:11 19:15
21:12 30:16
39:25 44:17
54:19 65:3
81:11 83:17
84:22 87:21
109:15 110:2
117:21 118:5
150:6 153:22
175:10,13,22
176:7 179:22
185:17
186:13,20

Pat Whitlock
December 02, 2020

11

conducted
21:6 22:14
63:10 83:14
84:2 87:16
102:5 110:8

conducting
49:12 76:17,
19

conduit
77:15

confer
36:2 75:2

conferences
205:24

conferencing
47:21

confidence
63:9

confident
214:20

confidential
201:25 202:1

confidently
62:13

confirm
14:25 53:10
61:20 74:11
96:18 100:14
196:7

confirmation
94:11

confirmed
62:17,18 63:8
64:19,22
134:10 178:12
195:17 211:8

confronted
54:2 58:3,17
62:12

confusing
79:12

congruence
161:14

conjunction
171:16

connect
200:15

connecting
200:16

consensus
57:24

consent
123:6,7

consents
123:10

conservative
195:1

consideration
176:23

considered
10:23 14:6
24:22 27:24
28:5 47:22
109:6 158:9

consisting
206:25

Constitution
175:8

consult
103:14 119:21

consultant
10:4

consultation
15:10 160:11
161:13

consulted
51:16,25

contact
11:13 61:7
73:9 89:11
135:1 139:12
140:11

contacted
91:14 124:22
140:19 149:24

contacting
150:4

contained
27:4 157:1
165:24 166:25
173:4

contemporaneous
33:19

context
78:6 86:6

continuation
142:3

continue
26:3 49:7,8
97:13 101:15
134:1 201:3
214:21

continued
26:7,11 89:2

continues
48:12

continuing
48:14 140:19

contract
5:16 28:1,4,
5,7,9 101:10,
12,16,22
102:1,4,12
172:5 174:24
175:3,9,18,23
176:5,24

213:17 214:16

contracts
101:13 172:8
173:5

contumacious
175:10,13,22
176:7

convene
162:20

conversation
87:25 97:25
104:17,21,23
146:19 153:5
180:15 187:2,
4 194:16

conversations
8:17,25 76:20
151:18 153:13
200:23 214:13

conversing
6:14

convicted
7:15

coordinated
88:20

copied
95:19 138:13

copy
40:25 41:2,25
126:18,19
217:8 219:10,
16

copying
134:13

core
211:10

corner
146:9

Pat Whitlock
December 02, 2020

12

**correct**
9:22 17:10
25:6,19 26:3
27:20 28:2
30:8 34:25
35:7,20 36:15
43:2,13 44:10
54:14 55:16
56:18,21,25
57:3 59:25
60:3,15,17
63:21 64:1,
18,21 65:5,
18,21 66:1,8
67:18 68:16,
18,23 69:8
70:1,6,14
74:3,5 75:12,
16 78:10,19
81:8 83:2
84:2 87:18
90:20 91:7
96:3,18
100:1,4
103:12 107:18
108:2 109:16
110:23 111:1,
5 112:15,22
114:5,13,19
115:1,12,16,
22 116:8,10
117:2 128:22
131:1,25
132:11 133:4,
5,19,24
134:4,10
138:7 139:8
140:3 148:21
152:4 154:7
156:19,20,23
161:15 166:6,
12 168:8
171:8 172:6,
10 175:1
177:1 178:22
179:5,9,15
180:19,21
183:7 184:2,
19,22 185:15
188:11,12,19
189:3 191:17
193:11,12
194:19 196:20
199:9,15
201:21 203:13
206:12 208:1
209:9,16
213:25 214:11
216:24 217:3,
17 218:24

**corrected**
153:3

**corrective**
218:9,17

**correctly**
151:22

**correspond**
117:7

**counsel**
9:1 88:13

**counseling**
15:6,17,21
152:16,17
164:24 205:24

**count**
216:24

**counting**
216:24

**couple**
6:12 113:15
164:15 216:11

**court**
6:19 12:5
79:17 155:9,
11 219:9

**cover**
64:13

**cracks**
130:4

**creams**
72:1

**created**
131:22

**credentialed**
117:13

**credentials**
8:10

**Crews**
66:7,9,18
70:20,25

**crime**
7:16

**criteria**
160:6

**crossed**
15:1 100:16

**cultural**
200:3

**culture**
92:8

**curiosity**
121:21

**current**
7:9

---
**D**
---

**danger**
114:11 167:24
168:5 171:20

193:22,24

**dangerous**
73:24

**database**
129:11

**date**
7:7 45:5
48:24 52:16
70:12 87:13
203:6 211:18,
21 217:1
218:4,13,14

**dated**
32:25 48:7
95:17

**dates**
87:12

**daughter**
204:19

**day**
11:10,22
22:23 49:24
52:22 69:6,17
70:18 79:22
81:4,25
101:21 107:17
122:5 134:16,
18 135:16
145:9 146:10
153:19
179:13,15
185:2,3 186:7
187:21
189:23,24
190:1,8
195:14 199:25
204:2 205:7
207:20 213:21
214:9,11,12

Pat Whitlock
December 02, 2020

13

days
71:16 72:14
99:6 101:17
107:11 112:21
113:1,6
120:25 121:6
131:6 134:15
137:19 161:24
162:21 163:13
178:14 208:8
211:6 213:10

deadline
178:15

deadlines
136:24

deal
17:3 32:2

dealing
192:16

deals
38:16

Dean
88:10 212:8,
9,12

deceased
29:20 94:11

December
151:4 210:11,
18 211:2

decided
34:24 63:17

decides
35:17,25

decision
24:6 28:12,15
37:15 41:13
96:2,15,16
103:9,24
132:25 133:18

134:15
135:17,21
136:8 146:23
160:10,13
161:12 176:25
202:4,5,6
205:4 214:7,
20 218:1

decisions
47:16,19
163:3

decubitus
169:12
187:11,25
188:4,6,11
189:6 193:6

deem
40:16 64:5
101:15

deemed
14:10 51:3
213:16

defense
83:20

deficiencies
213:3

deficiency
203:23

deficient
76:2

definitively
84:14

degree
8:1,5

delayed
62:4,9

delegated
61:11

delegating
125:10

delineated
170:11

demarcation
102:7

denial
196:12

denied
31:4 186:21
209:8

deny
31:1 67:7
116:18 196:2

denying
185:13 196:8

department
10:17,25
11:18 13:2,4,
19,20,23
14:2,5 17:1
20:25 23:16
24:24 29:15
30:5,8,25
31:13 40:22
41:16,17
44:13 46:3
49:11 50:19
51:13 52:5,
11,13 54:22,
24 55:11
60:17,22
61:22 62:4
65:24 73:21
77:19 103:3,
14 105:13
114:18 117:2,
8 118:24
119:3,13
124:10

125:14,15
126:6 129:2,
3,12,20 130:5
134:22 135:1,
5 136:4 150:2
160:12,17,18
161:8,13
171:16,18
176:3,19
181:5 197:6
199:19 201:25
202:13,14
212:24

department's
23:23 39:18
85:23 110:17
112:11 116:23
202:4

departmental
161:21

departments
10:5,11 15:8
40:13 45:19
171:19 204:8

depend
14:2 16:13
17:8 27:3
73:9 84:10
101:19 103:3
136:6 170:20

dependent
25:3,4 96:11

depending
27:18 122:25
123:17,21
126:4

depends
13:7 24:23
54:21 101:18
123:1

Pat Whitlock
December 02, 2020

14

deposed
5:11
deposition
5:8,14 8:20
9:3,15 219:5,
12
depositions
5:19,21 6:9
derelict
42:24 43:5,
22,24
dereliction
209:12 211:9
dermatology
10:17
descent
103:16
desired
120:3 149:13,
19 212:7
desirous
57:25
desk
142:19,20,22
144:12,13,16,
22
destroy
182:5
detailed
158:17
details
126:24 141:17
200:13
determination
30:4 48:21
103:7 105:2
129:5,16
189:9

determinations
151:7
determine
22:12 23:18
39:8 49:13
59:2 67:13
75:9 77:15
82:11 86:23
96:25 97:12
110:8 130:8
137:6
determined
22:15 34:9
73:10 107:23
109:11 112:9
115:24 116:22
117:13 119:1
124:10 205:7
213:9
determines
44:3 147:6
determining
205:4
detrimental
170:24
development
211:24 212:22
devises
208:18
dictate
27:14
did-
192:20
difference
101:11 110:4
147:7
differential
104:12 105:6,
13

differently
149:20 150:23
151:2 170:8
difficult
6:18 39:8
difficulty
213:2
diligence
19:12 75:9,12
76:5 116:1
118:7,8
139:18 140:1
217:13
dimensions
146:5
direct
14:7 26:21
63:1 99:22
161:3
directed
142:13
directly
16:16 21:19
108:2
director
5:15 11:19
14:5,22 19:9
24:16 35:25
49:6 50:20
76:12 88:9,12
91:4 95:20
96:17,24,25
97:12 105:5
115:8,25
116:14 117:1,
5,11 127:15
128:10 133:1
138:12 149:17
160:10,16
161:12,25

189:11 203:24
205:2 213:10,
14
director's
105:1
directors
104:8 124:5
144:1
disciplinary
11:15 164:6,
11,23 166:14
170:7
discipline
12:24 13:10
14:21,23 15:4
22:5,6,15,17,
21 45:14
50:25 77:3
100:2,6
107:24,25
117:16,21
153:24 155:1
157:2 159:8
193:6,10
194:6
disciplined
22:18 67:3
192:21,24
discovered
22:14 53:22
187:17
discretion
15:8 103:24
154:8 213:13
discrimination
6:3,7
discuss
88:23 98:4,
21,24 101:25
203:22 210:19

discussed
  34:8 35:17
  87:5 89:17,18
  90:2,7 91:18
  92:5 99:9
  120:5 124:15
  127:18 167:22
  182:8 197:8
  209:7 210:12
  211:5
discussing
  96:13 100:13
  180:3
discussion
  89:22 93:21,
  23 99:15
  115:8 126:16
  150:14,17
discussions
  200:19
dismiss
  24:21 96:2,16
  160:13
dismissal
  160:2,9
  161:10
dismissed
  25:10
disruptive
  39:23 206:16
distinct
  35:8,23 102:6
distinction
  25:22 35:15,
  16 160:15
  165:3,4,7
  166:1 203:15
divides
  208:17

division
  30:10
divisions
  10:18 158:4
doctor
  69:22 74:3
  141:18 169:22
doctors
  56:18 192:3,
  22
document
  31:10,12,16,
  20 32:8 38:1
  59:20 87:10
  112:13,18,19
  133:11 153:8,
  9,17 156:7
  160:25 162:16
  164:1 166:4,
  5,16,25
  196:20 204:5,
  6 206:6
  207:19,24
  208:4,9,20
  211:2 217:5,9
documentation
  29:14 31:8,14
  33:5,9,13
  38:2,3 39:17
  40:21 41:15,
  18 48:24
  49:11,15 51:9
  75:16 77:16
  100:20 110:16
  111:15,16
  121:13
  140:13,15
  145:2,3,5,7,
  24 151:6
  152:16 155:20
  176:2,19

181:4,19
183:2,10,12,
16 185:21
197:2,15
203:2,21
204:1,4
205:12 212:5
documentations
  141:2
documented
  15:21
documenting
  153:12,13
  196:23,24
documents
  8:21 75:23
  120:4 126:21
  134:9 141:11,
  13 173:7
  217:14
door
  142:9 144:9,
  14,15 146:15
dotted
  15:1 100:15,
  16
Dove
  119:15
download
  31:25
drafted
  48:2
drink
  93:15,17
drinks
  93:12
Drive
  7:10

dropped
  61:21 64:12
  194:13
Drs
  214:19
drug
  51:1,5 113:25
  114:1 122:17
  124:10,17
  150:13
drugs
  7:20 20:15
  109:1
dual
  25:25 159:2
due
  19:12 75:9,12
  76:5 105:17
  116:1 118:6,7
  131:24 135:21
  136:18 139:18
  140:1 145:22
  197:17,22
  217:12
duly
  5:2
duration
  143:24
duties
  10:3 174:14,
  25
duty
  62:17 209:11,
  12 211:9

_____
        E
_____

e-mail
  32:24 33:3
  35:5 38:8

Pat Whitlock
December 02, 2020

16

48:1,2,7
50:16 63:20
75:22 79:2
80:3,9 84:18
86:15 94:11
98:17 99:7,
12,14,23
119:11 120:18
121:11
122:12,13
123:25 124:3
125:9,20
128:2,5
130:23 131:1,
7 134:13
135:3,7,10,25
138:3 145:14,
24 148:1,18
153:2,5
202:20 203:6
205:6 213:22

e-mailed
55:24 71:9

e-mails
8:24 33:20,23
60:6,8,13,14,
16 71:6 72:19
75:3 92:4
116:20 118:23
120:10 135:21
143:5,7 215:9

eager
12:1

Earl
12:18,21
31:18,21
33:10,14,16,
21 34:1 35:6
44:16 50:20
51:3,11,17,
22,24 55:24

58:10 60:23
63:12,19,23
71:9 72:20
75:17 76:1,5,
12,20 77:21,
25 82:4,14
87:4,8,13,17
88:11,25 89:4
91:2 92:4,14
97:19,22,24,
25 98:4
100:20,21
102:1 111:24
112:7,24
113:4 115:3
116:13,21,25
117:10 118:25
119:13 120:5,
11,18 121:3,6
123:25 124:9,
14 127:17,21
128:6,13,15,
20 130:23
131:3 133:4,
19,23 134:4,
13 135:7,15
136:23 137:3,
16,22 139:5,
17,25 141:9,
15,18,20,21,
22 142:13,16,
18,21 143:1,
18 144:11,15,
18,21 145:6
146:19,22
151:19
152:17,23
153:11,16,21
154:18 155:3,
20,23 163:20
167:22,23
168:7 169:13

178:13 179:13
186:11 188:20
189:12,16
190:18 195:25
200:3,22,23
203:24 206:21
207:20 208:23
211:19 212:5,
23 213:4,21
214:14,19
215:13 216:2,
19 217:12,13
218:5,18

Earl's
44:14 60:25
135:25 136:14
146:1 168:3
194:1 214:6

earlier
47:12 59:22
82:25 96:9
106:19 133:22
151:14,17
153:3 162:18
163:7 179:18
183:4 184:14
196:19 216:9
217:11

earliest
119:11

easily
6:21

easy
67:13 149:12

education
7:25 11:1,4
19:25 24:20
25:5 37:4,9
38:18,21 39:2
43:18 45:18

46:10,15,20,
23 47:8,18
60:5,21
88:11,13,21
158:21 162:15
215:18,23

educational
19:5 172:15

educationally
206:8

effort
92:12,25
200:12

egg
97:8

egregious
85:22 164:25
170:16 213:16

electronic
22:10 70:13

electronically
69:25 70:8

else's
91:21

embodied
174:10

embody
175:25

employed
127:6

employee
6:2 11:18
13:6 16:3,15,
17 17:1 18:2,
3 21:4 23:17
24:14,23,25
27:2,9,20
30:5,10
34:15,16

Pat Whitlock
December 02, 2020

17

35:10,12
36:7,8 37:7
38:11 39:7,9
42:8,20 46:17
48:12,19 49:3
50:18,21 51:5
52:6,7,10
67:1,2 77:2
86:16 97:3,4
99:20 100:19
102:8 117:16,
21 123:5,7,
10,15 132:22
133:1,9,13,
15,16,20
134:17,22,24
135:4 136:3,
15,23 138:12,
16 139:22
140:6,17
149:5 150:13
152:7 154:3
158:13 159:5
164:5,16
165:4,6,24
166:2,9,11
173:3 202:10
203:10 205:9
206:9,10
208:6 218:2

**employee's**
5:16 6:1
141:6 203:22

**employees**
5:24 10:7,8
17:12 19:5
20:7 22:17
24:5 25:12
26:2 27:10
40:6 42:3
54:18 59:3,6

66:24 67:6,
10,11 104:23
126:3,4
154:5,9
158:18 164:8,
20 166:15
173:1

**employment**
5:18 6:1
25:2,4,13,24
26:1,11,19
27:2,24 28:6
29:1 34:19,23
36:14 41:11
96:10 97:5
99:17 102:2
124:7 132:21
145:2 159:4,9
160:14 164:12
172:23 175:24
176:5,6
180:19

**empowered**
175:8

**encompass**
49:1 175:25
206:11

**encounter**
40:7,8 204:17

**encountered**
171:22

**end**
17:21 49:20
95:1 101:16
140:21

**endangering**
42:5

**ended**
109:12 163:9

**engaged**
16:22

**enrollment**
96:12

**ensure**
61:4

**entailed**
126:13

**enter**
61:13 64:12

**enterprise**
42:13

**entire**
136:5 137:6
138:13 192:12

**entities**
97:14

**entitled**
158:24

**entitlement**
197:19

**entity**
174:5

**environment**
34:11,12

**episodes**
211:9

**error**
62:5 71:3,4

**errors**
218:24

**escalated**
54:3 103:23
104:6 105:11

**escalating**
206:17

**ESQ**
219:15,16

**essence**
57:2

**essentially**
112:3 146:13
207:25

**establish**
160:6

**established**
172:16,17

**estimation**
78:3 110:12

**ethanol**
122:17

**ethnicities**
147:13

**ethnicity**
103:15 145:25
147:6,7,25
149:7

**evaluate**
29:8

**evaluation**
160:1,2
215:24

**evaluations**
33:22 57:21
59:19 77:23
112:6 116:20
118:23 120:8
121:13,15,18
211:10

**evening**
53:6,15,18

**event**
213:11

**events**
52:17 214:2,3

**eventually**

Pat Whitlock
December 02, 2020

18

90:16 130:14
194:22

**evidence**
39:18

**evident**
211:3

**evidently**
218:3

**exact**
21:13 69:9

**EXAMINATION**
5:4 50:13

**examined**
5:2 71:18
72:16 74:19

**examining**
71:21

**excellent**
58:1

**excessive**
31:8 67:1

**exchange**
54:3,9,12,13,
14 178:25
180:6,13

**exchanged**
9:6

**exchanges**
54:18

**exclusive**
161:25

**exercise**
87:21 186:4
209:12,16

**exhibit**
31:24 32:5
47:25 79:5,7,
9,11,19

94:19,21
100:24,25
113:17 119:6,
10 121:20
122:9 124:25
125:1,18
127:4,24,25
130:19,20
138:2,3,22,23
145:1,11,12
148:14,15
156:2,4
161:1,2
163:22,23
172:1,2
177:5,11
202:19 204:24
206:25 207:1,
5 215:3,6,20,
21 216:16

**exhibited**
215:1

**exhibiting**
150:16

**exhibits**
94:17 149:7

**existed**
37:10 127:22

**exited**
144:15

**expectation**
41:9 154:11

**expectations**
36:2 40:25
41:2,8,19
57:5,7,10,12,
16 76:14

**expecting**
106:2

**experience**
59:6,8 85:10
168:14 189:2

**experienced**
60:10

**expert**
9:5,9 147:9
191:10

**experts**
47:23 74:13

**explain**
104:12 105:6,
13 209:19

**explained**
179:2

**explains**
185:3 190:12

**explanation**
184:1 190:17

**extensive**
120:3

**extent**
120:14

**eyes**
187:5

---

**F**

**face**
75:6 77:8

**facilitate**
200:19

**fact**
43:11 64:10
66:19 75:14
87:16 92:16,
17,21 104:8
112:5 118:11
137:18 150:5,

20 165:2
167:23 174:23
185:13 188:16
192:4 195:12,
19 202:25
203:1,17,25
204:12
205:10,21
207:21 214:10

**fact-finding**
201:11,17

**factor**
41:10 197:23

**factors**
123:1

**facts**
50:20 185:18
196:24 197:1

**factually**
204:15

**faculty**
14:6 23:17
27:4,17,22
29:5,6 42:3
59:15 156:21
157:12 165:25
167:8 173:4
176:21 206:5
217:19

**fail**
122:20

**fair**
14:21 28:18
90:8 138:1
152:11 177:3
192:10

**faith**
88:25

**fall**

130:3

**falls**
15:9

**false**
164:9 165:5
166:3,10,22
167:4

**familiar**
9:7 57:9,17
59:2 69:19
121:19 131:9
147:6 156:18,
21,24 157:17
159:1,13
162:15 163:1,
6,14,25
168:19 172:19
173:20 188:3
212:11,23
215:19,23

**familiarity**
47:10 218:15

**familiarization**
105:23

**familiarize**
156:12

**fast**
144:10 146:15
185:24

**fault**
91:21

**favors**
82:23 85:2

**February**
32:25 38:9
48:7,10 50:17
95:17 99:14
130:23 131:5,
8,20,23

134:12
136:18,21
178:13 194:2

**federal**
118:18

**feedback**
31:9 33:13,20
48:4,11 92:15
131:4 156:1
199:21 200:10
203:18,19
210:21 211:1

**feedback/
coaching**
33:10

**feel**
18:14 38:12,
15 105:10
119:23 135:24
152:15 183:22
199:1 214:20

**feeling**
86:10 135:20

**feels**
42:9 49:6

**fellow**
63:24

**fellows**
61:5 157:8

**felt**
31:12 38:11
39:16 40:21
42:5 85:21
100:19 110:16
145:21 152:20
155:24 168:7
174:19 183:10
192:17 197:3,
15

**female**
82:21,24
85:6,25 86:8,
10 105:10

**fight**
59:3 206:17

**figure**
63:4 131:15

**file**
76:3 148:24,
25 153:18,21

**filed**
5:17

**files**
149:2

**fill**
51:6 125:23,
25 128:21
131:4,8,22
132:1,4,10
135:22 136:20

**filled**
43:12 62:7
73:4 128:25
169:17 216:18
217:9

**fills**
132:7

**final**
15:24 22:24
24:8,13 59:23
107:14,17
215:4

**find**
65:12 176:6
198:23

**findings**
132:6,8

**fine**
50:10 94:16
96:23 108:17
156:13 186:9
198:5

**finish**
7:2 12:1

**finished**
218:23

**fire**
205:20

**fired**
166:6,12

**first-hand**
199:14

**fledged**
56:21

**flipped**
129:2

**float**
80:11

**floor**
141:10 184:9,
18

**Florida**
92:7

**floridly**
189:21

**folks**
60:17 105:24
106:12 107:15
109:21 111:5,
17 117:7
128:20 201:3

**follow**
13:3 185:18

**follow-up**
13:5,8 41:24

75:7 152:17
153:2 183:6,
8,9
**footnote**
145:20
**forced**
132:3
**forgot**
177:17
**form**
15:2 18:8,15
19:3 24:10
25:7,16 28:20
30:1 35:21
36:23 41:12
47:2 72:4
73:5 75:1
77:12 78:11,
20 84:3 86:4
89:24 96:20
115:23 116:9
129:7 132:20
133:6 149:10
150:9 175:15
176:11 191:22
209:23
**formal**
25:24 35:16
210:25 211:6
213:18 214:16
**formally**
35:1
**forward**
84:1,23
**forwarded**
22:16
**found**
49:23 59:14,
15 80:13
166:11

**four-step**
15:4
**fourth**
15:23 57:7,13
**freely**
74:4
**friends**
94:2
**full**
5:5 56:20
114:16 115:18
177:22 196:14
**fully**
7:5
**function**
40:17
**future**
210:25
**FWW**
107:13

---
G
---

**game**
58:3,17
**gap**
189:20
**garage**
67:16,17
68:1,12,14,
18,25 80:13
**gave**
31:18 135:12
145:8 207:11
**general**
13:15,20,22
14:4,14 60:21
88:13 117:1
202:13

**generally**
162:21
**get all**
94:18,24
**Gilmore**
98:18 138:9
202:22
**give**
23:21 79:7
112:25 113:5
121:1 126:24
141:8,17
145:8 147:23
155:7 200:10,
12 201:13
202:8
**giving**
41:7
**GME**
88:15,16
96:17,24
97:12,22 98:5
99:16,22
101:5 102:5,
7,9 103:8,20,
25 104:14
113:8 114:23,
24 115:3,8,25
116:4 121:10
127:7,10,12,
16 128:9
139:13 140:10
149:17
156:17,18
158:21
159:10,12,14
162:14 202:14
205:19 206:1
212:8,9
213:14,21

**GME's**
105:1
**GMEC**
162:12
**good**
33:4 48:3
56:16 75:22
145:1 155:12,
18 159:21
194:4 195:11
**Google**
188:6
**gospel**
200:6
**govern**
46:19 157:9,
10,18 172:23
**government**
164:10,21
**grading**
168:13 169:2,
3
**graduate**
11:1,4 19:9,
24,25 24:20
25:5 37:4,9
38:18,20 39:2
45:17 46:3,9,
14,19,23
47:8,18
88:11,21
158:20 162:14
168:18 172:15
173:15
215:18,23
**graduated**
168:16
**granted**
186:18

Pat Whitlock
December 02, 2020

21

great
49:7
Green
60:5
Greene
43:18 60:20
71:9 88:13
91:10 210:11,
18
Greenfield
36:5
Greenwood
32:24 34:9,20
35:11 39:22
45:24 46:13
75:14,22 76:6
95:18 98:18
99:2,11 135:8
138:18 202:21
206:13
Greenwood's
48:1
Greg
50:2 79:13
113:11
159:15,23
198:3 210:14
GREGORY
219:15
grievable
27:17 161:22
grievance
23:25 158:16,
19 215:24
Griffin
18:21 79:2,8
80:4 81:12
86:6,23
Griffin's

86:15
ground
6:11
grounds
122:22 213:8
group
14:9 63:14
grown
92:7
guardian
47:9
guess
31:22 123:25
124:6 129:24
143:9 151:15
203:13 218:25
219:4
guide
10:10 24:5
173:7
guided
99:21
guidelines
100:6 157:16
158:13
215:16,17
guides
174:5
guise
112:18
gun
86:2
guy
196:14 207:10
guys
12:8 52:1
119:21 131:15
150:6

———————
H
———————
hall
142:22
144:23,24
hallway
144:16,19
146:1,2,5,6
hand
60:22
handbook
23:17 27:4,
17,22 29:5,7
59:16 155:2
156:16,22
157:13 158:17
159:5 160:1
165:25 173:4
176:22 206:5
217:19
handle
40:13 54:22,
25 83:13
104:1 171:10,
15
handled
20:17 51:11,
12 55:11
103:19 127:11
149:13
handles
19:25 20:1
125:12
handling
83:10
happen
122:20 130:1
171:7

happened
71:16 72:14
87:18 110:5,6
134:18 143:23
180:12
happening
126:1
happy
93:5,15,19,25
94:2,5
harassed
18:13 111:18
harassment
16:2 18:3
19:1,16 20:14
55:7 83:1,5,
17,25 84:23
85:1 104:23
110:12 156:16
hard
106:8 202:17
harm
169:21 170:22
214:5
harming
169:23,24,25
head
6:16 85:9
139:16
headed
81:3
health
50:21 150:13
158:5 161:23
162:1 164:17
hear
12:3,15 80:14
132:3 162:20
182:24 210:15

heard
  80:25 91:11
  131:21 171:4
  184:7 185:6

hearing
  162:24 163:5,
  17

Hearings
  101:6

hearsay
  118:11

heated
  54:3,8,9,12,
  16,17 178:25
  180:13

held
  48:4,11
  127:20 150:5
  174:23 192:15
  203:18,19,22
  214:19

helpful
  111:13

helping
  209:21

helps
  10:6

hesitate
  6:23

hey
  131:14
  137:15,16
  154:20 168:23
  196:12
  200:15,24

hierarchy
  14:1

Higher
  174:1,4

highest
  7:25

highly
  64:15

hired
  26:20

Hispanic
  145:23 147:3
  148:5

hitting
  59:5

hold
  8:9 50:9
  108:10 139:2
  204:18

holidays
  81:18,25
  162:1

home
  82:8

honestly
  198:13

honesty
  89:1

hospital
  17:20,21
  42:16 65:7,9,
  10,21,25 66:4
  69:22 80:17
  81:4 87:20
  157:9,10,19
  158:5 209:11

hour
  50:4 93:6,15,
  19,25 94:2,5
  113:12 198:4

hours
  209:11

house
  20:9,16
  21:16,22,25
  22:5,6 23:4
  24:22 25:8
  26:23 27:1
  34:21 36:1
  37:2 45:20,23
  47:7 52:19
  57:20 61:4
  65:13,16
  76:14 97:1
  99:19 101:6
  107:4 108:21
  156:2,6 157:8
  158:16,19,23
  159:3 160:9,
  13 161:10,17,
  21 172:5,18
  173:18 176:24
  205:18

HR
  5:15 11:8
  13:1,7 14:4,
  7,9,12,13,16,
  24 15:10
  16:3,15
  19:13,15
  20:2,22 21:1,
  21 22:16 24:3
  25:1,14 26:22
  27:8,14
  29:11,23 30:9
  34:12 35:19
  36:3,12,21
  37:6,10,14
  38:6,16,19,22
  39:1 40:6,8,
  13 41:10 44:5
  45:25 46:12,
  16 47:16
  50:18 51:13

52:3,8 54:19
55:9 58:21,23
64:4,5 67:21
76:24 77:5,6,
10,14 83:20
84:1 85:9,16
86:14 88:9
91:15 93:9,23
95:20,22,25
96:18 97:3,
10,16 100:12,
13 102:8,10
103:2,8,12,
20,23 104:1,
6,21 105:11
106:25 108:6
113:2 115:4,
5,20 117:15,
18,23,25
119:13,19,21,
23 124:7
125:12 126:2,
5,8,10 132:6,
8,17,24
134:8,23
137:11
138:11,15
141:14
149:14,18,20,
24 150:1,4,
12,17 153:2,
8,23 154:2,
15,17 159:10,
11 165:24
167:14 170:3,
9 173:9
176:18 179:21
192:21 196:20
197:10
203:12,15
204:4,6,11
205:21,25

206:3,18
207:25 213:14
217:18

**HR's**
40:10 107:24
124:3 202:8

**huh-uhs**
6:17

**human**
8:12 10:1
13:16 24:14
30:5 40:17
51:16 52:11
86:16 107:4
114:17 117:19

**hunger**
113:22

**hungry**
113:19

**hurriedly**
144:14

**hurry**
185:1,5,14,19

**hypothetically**
151:4

_____

**I**

**ICARE**
41:24,25
42:1,12,19,25
43:4,10,20,24
44:3,6,12,15
62:7 72:21
73:3,7,10,11,
22 90:9,12,16
91:1 127:10,
12,17,22
128:6,13,21,
24 129:10,12,

14,18,22,25
130:7,15
169:16,19,20
170:2

**ICU**
61:12,14,16,
20,21 62:4,
10,15,19,20
63:2,9 64:11,
20,24 65:24

**ID**
141:6 142:5,
9,20 143:17
144:6 146:16

**idea**
18:24 30:22
117:10
172:21,22
173:10 175:11
194:5 195:11

**identification**
32:5 79:9
94:21 100:25
119:6 122:9
125:1,18
127:4,25
130:20 138:2,
23 145:12
148:15 156:4
161:2 163:23
172:2 177:11
202:19 207:1
215:6,21
216:16

**identified**
109:7 111:12
148:4

**identify**
79:18 109:20
147:13 148:6

169:13

**identity**
56:9 61:24
63:5 86:23

**IHL**
174:11

**II**
172:13

**illegal**
20:15 50:22
109:1 113:25
114:1 123:2

**immanent**
188:2

**immediately**
112:13 124:23

**impetuous**
60:18

**implement**
210:25

**implemented**
22:11 213:13

**implicated**
46:21

**implications**
47:17,18

**implore**
152:10

**implying**
133:5

**important**
45:25 46:1,8

**impression**
121:4

**impressions**
127:1

**improve**
121:2,7

198:13 208:8,
15 211:16

**improvement**
98:13 120:25
208:1,12,16,
18 210:24
211:3,7,8,10
213:9 218:12

**in/sign**
69:3

**inappropriate**
42:11 79:3
80:5 86:19
104:17,21
108:24

**incidence**
58:12

**incidences**
124:4

**incident**
19:1 39:23
40:1 44:1
49:17,19
55:5,15,20
62:8 71:3
72:22 80:8
81:13 89:15
90:17 110:10,
14,19 111:23
174:17 178:24
179:13,19,25
180:3 187:8
189:14 210:8

**incidents**
31:9 40:12
45:1 49:22
54:17 58:22
79:3 80:5
86:18,19
107:20 112:1

Pat Whitlock
December 02, 2020

24

210:3,5

**include**
10:14 157:14
158:7 172:18
191:15 209:5

**included**
23:19 49:12,
15 99:14
100:6 118:8
157:12 158:21
159:13 183:2
189:15 206:5,
20

**includes**
48:19

**including**
12:24 16:21
21:8 22:5
98:12 114:18
119:13 120:1,
24 164:25
188:15
210:13,20

**incomplete**
205:1

**incorrect**
164:21 165:7,
15

**incredible**
82:21

**incredibly**
85:7 105:10

**incumbent**
47:14 54:18
86:20

**independent**
73:14

**independently**
64:6 65:7

**inefficiency**
175:10,13,21
176:7

**Ines**
53:21 54:4

**infected**
71:22 72:3

**infer**
85:2

**influence**
7:20

**informal**
15:5,13,16
59:22

**information**
13:3,7 22:16
23:15 29:13
30:24 33:5,16
47:21 52:8
58:10,19
72:18 75:24,
25 77:21 81:9
84:13 85:17,
24 86:1 87:11
101:14,18
107:9 108:25
112:7 113:2
116:13 118:25
126:19 137:1,
4,25 140:3,18
150:25 151:7,
10 152:11
157:21 164:9,
17,21 165:5,
7,15 166:3,
10,22 167:5,
18 181:15
187:25 188:20
189:10,14,16
193:2 199:18

204:12

**informed**
61:14,15
97:21 179:11

**infraction**
107:23 154:24

**infractions**
23:18 213:16

**initial**
20:21 108:3
109:17 127:20
137:2 163:9

**initially**
19:10 99:12
111:7 134:6
137:3

**initiated**
35:2

**initiation**
152:6

**initiator**
115:9

**inquire**
91:16 93:2
135:9 136:14

**inquired**
137:23

**inquiries**
51:20

**inquiring**
90:8 131:17
135:5 137:17
203:8

**inquiry**
128:5 137:2
145:19

**instance**
49:14 105:2

147:2 169:13
182:20 185:12
188:25

**instances**
49:10 97:11,
16 104:15
152:23 155:21
179:22

**institution**
136:5 137:6
174:11

**institution's**
16:9

**institutions**
174:1,4,6

**instructed**
61:13

**instructions**
91:22 209:19

**insurance**
164:22

**insure**
23:7 63:15
91:2

**insurer**
164:10,22

**insuring**
76:13

**intelligent**
57:25

**intensive**
52:20,23
53:24 54:5

**intentional**
169:14 170:14

**intentionally**
168:15
169:23,24

170:5,17
190:13

interact
17:17

interaction
11:14 14:7
19:7,11 42:10
89:10 104:5
109:8 154:10
214:21

interactions
11:9 13:14
200:10

interest
93:23

interested
108:7 140:19

intern
57:2,6

internet
155:15

interns
74:5 157:7

interpersonal
154:10

interpose
165:16 167:6

interpretation
140:4 176:17

interpreted
139:21

intervention
154:16,17
194:15,19

interview
8:23 9:21
29:15,21 30:3
31:1 53:9,15

54:19 91:15
109:4 111:11,
25 115:20
116:17,19
118:5 125:10,
11,21 126:7,
12,14,16
178:10 181:3,
10,25 182:6,
10 183:13
188:5 193:19
199:5,18
201:9 209:7,
13

interviewed
55:14 109:8,
10,21 110:7
111:17 163:19
181:16

interviewing
181:14 183:3

interviews
16:21,23
19:15 20:21
21:3,7,11
22:15 30:17
63:10 66:18
109:15 110:2,
7 111:13
114:16 116:7
125:13 126:3,
11 179:22
182:7,13

intranet
157:25

investigate
42:17 52:12
53:16 77:7
104:22 111:25
118:18 179:21

investigated
107:21

investigating
129:21

investigation
13:11 14:11
16:20 18:25
29:11,18
34:14 40:1,17
43:25 44:17
54:20 58:8
61:18 63:10
65:4 66:17,25
74:22 75:6
77:9 81:12,20
83:2,4,14,18,
19 84:2,16,22
85:4 87:17,22
108:4 114:16,
22 115:19
124:23 150:6
152:2 165:11
167:3,17
168:22 169:1,
11,20,22
170:2 174:16
183:7,8,9
186:14,20
197:1,23
201:15,17
203:13

investigations
67:6,9 108:3
109:2 150:1
163:9 181:22
185:17

involve
20:9 55:8

involved
10:23 11:16,
21,22 17:24

18:1,11 20:6,
17 21:2,8,20,
22 22:1,4
25:1 28:17
29:18,24
36:13 37:18
44:5 45:15,16
51:13 52:4
55:21 66:23,
25 77:6 78:24
83:10 90:24,
25 98:10
102:14,21,22,
25 103:5,20
104:22 105:16
106:11 108:2,
18 110:22
111:1 114:8,
17 149:14,18,
21 150:12
151:3,14,16
153:3 163:10
171:23 193:9,
20 201:12,18

involvement
12:23 20:2,20
26:21 28:19
37:5 38:7,25
40:13 77:5
96:1 97:17
103:9 104:18
106:16 107:24
109:4,12
111:8 113:3
118:1 119:23
124:4 128:11
129:17 152:5
163:2,8,21
217:21

involving
19:1 21:15

Pat Whitlock
December 02, 2020                                                              26

45:1,14  62:8
84:15  98:11
102:10  111:10
165:22  169:21

**ironic**
145:16,17

**irony**
145:23

**irregularity**
42:16

**issue**
38:12,15
104:4,6
119:20  120:23
129:1,6
190:10  205:11

**issued**
203:23

**issues**
39:14  45:11
51:21  55:25
56:6,9  60:10
89:23  99:24
103:22  112:20
114:12  119:25
124:7,12
127:13
205:13,23
206:13  208:25
209:1,2
210:12,19
211:4,14

**issues/concerns**
37:25

**items**
89:17,18  90:2
92:1  102:4
142:3  203:5

**IV**
175:4

**IX**
20:18  106:19
109:11

---

**J**

---

**Jackson**
212:16

**Jamie**
88:12  91:9

**January**
9:22  12:17
18:22  34:2
55:3,15  85:21
87:9  88:1
107:5  120:19
153:16  178:10
194:2  208:23
211:25  212:2
218:19

**Javed**
160:19

**jeopardy**
214:5

**job**
76:23,24
132:5  139:25
153:12  196:23

**jobs**
77:2

**Joe**
80:12  208:24
217:16  218:18

**Johnny**
98:18  138:9
202:21

**Joseph**
9:18,22  12:12
172:6  218:10

**Josh**
40:2

**Joshua**
39:24,25

**Joyce**
122:14

**jpeg**
207:14

**jpegs**
207:8

**July**
131:12,22
132:5  178:6

**jump**
177:4,6

**June**
85:20

**justify**
180:18

---

**K**

---

**keeping**
121:9  153:23
172:16  176:20

**kicking**
59:5

**kidding**
159:22

**kind**
6:18  7:21
10:7  13:25
14:22  23:18
25:25  26:20
42:22  44:4
66:23,25  79:6
81:9  93:21
97:7  130:10
150:15  151:5,

9,10  154:13
165:22  182:16
189:9  192:7
200:3,4,19
202:14  203:11
213:2

**knew**
190:21

**knock**
105:5

**knowing**
175:20,24

**knowledge**
16:9,10,12
19:18  21:20
22:25  23:2
24:11,13
27:8,25  28:18
47:3,15  54:13
90:18  96:22
100:7,11
105:18  106:15
117:20  118:6
129:9  169:7
189:5,20
190:11  191:9
193:5  199:14

**Kronos**
67:12

---

**L**

---

**labeled**
171:20
193:21,23

**lack**
23:19  73:19
75:15  89:8
105:18  152:18
169:7  203:25

204:4

**language**
28:5 124:1,8,
21 175:18

**large**
17:19 64:24

**late**
67:1,7,8 68:5
79:16 94:7
154:23 210:22

**Lawson**
149:4,5,8,11

**layers**
114:3,8

**lead**
114:4 182:11

**leader**
63:14 75:8
195:15 196:15

**leadership**
118:2

**learn**
18:13 189:2

**learned**
18:17 168:20
184:21

**learning**
90:9 97:1
168:14 174:1,
4 189:2

**leave**
44:25 45:4
51:16 80:14
123:11 140:23
150:4 185:1,
5,14,19
211:19

**leaving**
51:21 87:20

143:20 144:2
186:3 209:11

**led**
163:11 214:6

**left**
80:10 137:19
141:10 149:19
201:24 202:12
209:14

**legal**
5:6 83:20,22
171:12,16
173:6 175:17
176:12,16
182:11

**length**
111:22

**lessened**
71:17 72:15,
16 74:19

**letter**
77:25 92:3
120:11,24
203:23 218:6

**letting**
137:15

**level**
7:25 97:16
110:12
154:15,18

**liability**
49:7 89:2

**liable**
51:21

**liaison**
77:15

**liberty**
126:13

**license**
191:21

**licensed**
74:25

**lie**
66:16

**lied**
196:8

**lieu**
146:20

**light**
101:24

**limited**
210:20

**lines**
6:4 164:16

**list**
106:2,16

**listed**
27:16 31:11
135:11

**listen**
10:9

**lists**
106:13

**loads**
207:3

**location**
16:14 80:20
91:16

**log**
70:5,6

**logistics**
140:5

**long**
11:6 65:15
93:5,18
117:10 121:25

136:7 137:7
163:4 187:22,
24 188:18
219:7

**longer**
25:12,18
48:15 88:19
96:25 127:6
133:17,25
138:10 213:23

**looked**
85:11,15
170:1 188:6
197:11

**Loretta**
212:16

**lot**
12:5 21:21
56:14 101:18
122:7 149:13
150:21 152:22
154:2 168:23
207:22

**Louann**
162:4

**loud**
184:16

**Louise**
119:14,16

**lounge**
69:8,12

**lowest**
191:19

**lunch**
94:15 106:6
119:4

**lying**
87:6,14 169:8
170:17 190:19

209:5,8 211:9

---

**M**

**made**
16:14,25
18:14,21 21:8
30:4,17 35:14
44:22,23
45:2,3 52:13
53:10 82:20,
21 84:9 96:2,
15,16 100:18
108:24 111:5
118:10 129:16
133:18 135:7
137:24 146:24
152:13
160:10,15
161:12 176:18
211:3 214:20

**Madison**
7:10

**Mahoney**
41:1,3,18
71:8,11 72:10
89:16

**main**
61:7

**maintained**
65:15 92:13
130:7 158:20

**make**
6:14,18 10:6
13:12 14:25
16:6 20:22
48:20 64:10
76:25 93:9,21
108:11 129:4
134:15 135:3,
16,21 156:25

176:12 189:9
200:12 201:3

**makes**
83:1 127:23
182:18

**making**
17:18 23:12
31:7 47:16
70:4 84:10,18
85:6 103:9
105:9 130:3
152:11 165:4
166:2 176:24
188:13 201:2
205:4

**male**
82:23

**malfeasance**
30:18 175:10,
12,21 176:6

**malpractice**
171:2,5,11

**man**
191:20

**manage**
154:9

**managed**
47:11 127:7

**management**
103:17,22
104:4 130:10,
13 154:18

**manager**
88:15,16,18
154:11

**managers**
154:8

**mandatory**
129:23

**manner**
139:19

**mantra**
153:9 196:19

**manual**
156:3,6,9
158:1 161:18
172:18 173:18

**mapped**
181:24

**Marita**
180:8,11

**Mark**
120:3

**marked**
32:5 79:9
94:21 100:25
119:6 122:9
125:1,18
127:4,25
130:20 138:2,
23 145:12
148:15 149:11
156:4 161:2
163:23 172:2
177:11 202:19
207:1 215:6,
21 216:16

**master's**
8:1

**match**
131:11,24
132:2 136:18,
21 137:17
143:12,16

**materially**
164:9 165:5
166:3,10,22

**matter**

10:24 47:22
132:6 170:22

**matters**
11:15 74:13
119:22 161:22

**meaning**
175:18

**means**
85:3 210:13
211:8

**meant**
132:12 149:16
176:9

**measures**
83:19,20
98:6,11
205:12,23

**medical**
7:21 11:1,4
19:9,24,25
22:13 24:20
25:5 29:9
37:4,9 38:18,
21 39:2 45:18
46:3,9,15,19,
23 47:8,18
56:21 62:2
67:15 71:2,4
72:8 78:8
82:18 88:11,
21 105:9,10,
18 129:4
131:11 157:24
158:3,6,18,20
162:14 166:19
168:17,18
171:1,5,11,
13,15 189:5,8
191:10,21
197:13 212:12

215:18,23

medicine
10:18 11:1
13:23 50:21
74:4 88:12
160:19

meet
69:7 87:8
91:14 94:2
139:6,10,11
140:11 212:7

meeting
20:3 34:8
36:1 76:14
87:9 89:5,19
90:4,14,15,20
91:6 93:1
94:9 99:4,10,
13 100:21
104:7 112:23
116:21 120:12
125:23,25
126:15
127:15,19,20
128:19 139:7
140:14,16,25
141:4,12,18
143:5,8 144:3
155:25 167:22
177:5 210:22
211:2 213:1
214:18 218:5

meetings
203:21 204:1,
9 210:20

members
29:23 42:3
92:19,21
162:12,13

membership

133:2

memorializing
153:5

menial
209:22

mention
61:9 106:19
194:14

mentioned
6:6 22:2
46:18 86:22
93:14 110:21
142:4 143:1,
3,4 181:7
184:24 187:12
195:24,25

mentor
56:15

mentors
104:8

menu
17:10,13

messed
79:22 94:18,
24

met
87:4,13 88:9
98:23 113:2
141:17 146:10
155:22 163:19
199:16 204:9
210:11,18
213:10

Michigan
92:7

Mid
12:17

mid-january
18:19

middle
87:20

milestones
121:13,16,19

militaristic
200:5

mind
159:2 204:11
217:25

minute
32:20 148:11
198:4

minutes
50:8 94:7
186:10 209:16

misconduct
30:18 109:14
114:2 153:22

misdiagnosed
168:11

misinterpreting
144:4

misrepresenting
170:5,6

missed
44:18 192:13

missing
198:24

Mississippi
7:11 92:8
174:2,6 175:8

misstate
151:24

misstating
72:5 209:25

mistaken
169:6

mixing
36:24

model
95:2

Molly
14:19,20
30:11 38:10
88:9 91:9
95:7,17,19
98:17,19
99:13 119:12
124:1 203:7

moment
156:12

month
48:17

monthly
11:10

months
55:4,6 57:20
152:14 162:23
179:25 180:15
206:22

Morgan
98:18 138:14
202:22

morning
33:4 67:23
75:22 145:1
154:24

motivated
56:14

motivation
198:18

Moving
127:3

multi-ethnic
147:17

multi-racial
  147:17
multiple
  32:9 103:2
  110:22,25
  113:24 114:3,
  8 147:13,14,
  15 186:11
multiplicity
  147:5
Muncie
  61:10,15,19
  62:15,20
  63:21,24,25
Muncie's
  64:22
mutual
  97:14

_____

N

_____

names
  106:10 108:14
National
  131:24 136:18
nature
  17:25 38:23
  59:9 60:13
  98:14 107:23
navigate
  56:15
necessarily
  11:18 42:23
  68:2 122:24
  127:14 136:13
  150:11
needed
  14:10 33:6
  56:15 75:24
  81:8 85:17

111:15 112:25
113:5 131:8
135:17,22
139:18 140:2
145:8 188:3
190:14 194:6,
22 210:24
needing
  154:15 194:14
negative
  6:17 50:23
  124:17
negligence
  44:9 51:20
  169:14
negligent
  43:22 165:8
  170:15,23
  190:25
negligently
  164:20 165:6,
  14 167:4,18
  169:25 170:6
nicer
  12:5
night
  69:6 80:10
non-clinical
  158:11
non-exempt
  67:11
nondescript
  56:6
nonrenewal
  101:10,11
  102:3 213:17
  214:15
normal
  50:23 73:1

143:25 203:11
note
  190:1 194:13
noted
  38:1 73:18
  80:4 167:11
  203:3
notes
  118:19 181:18
  182:3 198:1
notice
  101:20,21
  161:24 192:4
notified
  61:16 85:21
  101:17
November
  210:22
NP
  54:2
NPS
  52:25
number
  21:13 94:17
  125:17 127:3
  156:8 161:7
  172:14 173:22
  174:13 195:24
  201:7 204:24
  206:15
  211:12,23
numbered
  161:4
numbers
  105:23 106:3,
  9
Numeral
  172:13 175:4

numerous
  71:10
nurse
  40:2 52:21
  53:7,9 54:7
  55:20 56:1,3,
  4,10 62:15,
  20,24 63:2
  71:25 74:12,
  24 104:5
  108:16,17,19
  109:5 110:25
  111:8,10
  115:6 174:17,
  18 178:21
  179:8,14,19
  180:4,10
  183:20 188:16
  189:25 190:7
  191:15 192:2,
  22 194:13,17,
  24,25 195:7
  199:24 210:5
nurses
  82:9 108:19
  110:22 152:25
  158:7 180:24
  191:15 192:2,
  23

_____

O

_____

object
  15:2 18:8,15
  19:3 24:9
  25:7 28:20
  30:1 35:21
  36:23 41:12
  47:2 72:4
  73:5 75:1
  77:12 78:11,

Pat Whitlock
December 02, 2020
31

20 83:21 84:3
86:4 89:24
96:20 115:23
116:9 129:7
132:20 133:6
149:22 150:9
175:15 176:10
191:22 209:23

**objection**
16:7 165:17
167:7,11

**obligations**
99:15

**observation**
71:12

**observations**
70:4

**observe**
209:21

**observed**
199:10

**observes**
37:4

**observing**
71:21

**obtain**
82:17 187:3

**occasions**
25:10

**occur**
130:9 133:12
184:8,11

**occurred**
31:2,5 39:23
40:12 49:1
55:4,6 63:18
78:2 80:11
90:5 109:8
111:22 112:24

116:18 152:14
179:25 180:14
187:21,22,23
189:6 194:18
200:1 204:14,
16 214:3

**occurs**
37:6 40:11
102:7,8
213:11

**offense**
83:16 170:16

**offered**
109:1

**offering**
20:15

**office**
11:2,4 16:16
19:9,24,25
21:4 22:11
24:14,20
37:4,9 38:18,
21 45:18
46:10,15
47:9,11 48:19
52:7 83:9
88:15,17,22
96:17,24
97:4,12,22
98:5 99:16,22
102:5 103:25
107:21,22
114:23,24
115:9,25
127:8,10,12,
16 128:10
137:13 138:13
139:10,11,13
140:10 143:21
146:2,11
158:21

171:13,15
173:6 212:21
213:15,22
215:17

**officer**
20:16 21:22,
25 23:4 24:22
26:23 34:22
36:1 37:2
52:19 65:16
95:22 97:1
99:19 107:4
108:21 158:19
159:3 160:9,
14 161:10,21
172:5 176:24
205:18

**officers**
20:10 21:16
22:5,7 25:9
27:1 45:20,23
47:8 57:21
61:5 65:14
76:14 101:6
157:8 158:23

**offices**
16:19 83:13

**offline**
159:18

**ointments**
72:1

**older**
146:4

**Olutade**
122:14,15,16

**open**
69:12

**openly**
91:5

**operate**
45:19,21

**operated**
35:23 104:15

**operates**
38:19 47:9
117:19

**operating**
46:3 179:4

**operations**
52:23

**opinion**
31:3 49:9
64:9 192:1

**opinions**
9:10 74:14

**opportunity**
98:2 121:1
123:6 152:1,9

**opposed**
107:18

**opposite**
144:13

**option**
146:23 147:16
214:9

**options**
148:2 214:14

**OR16**
210:23

**order**
36:3 79:12
84:13 97:5
119:10

**ordering**
70:4

**orders**
61:13

Pat Whitlock
December 02, 2020

32

organization
  5:13,16
organized
  198:2
ORIGINAL
  219:15
ostomy
  189:23,25
  194:13,14,17,
  24,25 195:7
outcome
  156:1 170:21,
  24 201:24
  202:12
outcomes
  120:2
outline
  181:9 182:3
outlined
  29:6 208:9
outlines
  208:7,16
outlining
  208:4
overhead
  80:15
overruled
  37:21
oversee
  103:11 117:8
overseeing
  74:8
oversight
  174:11

_____
        P
_____

p.m.
  48:8 80:12,15

94:9 95:18
120:19 130:24
134:15 219:12
paged
  49:20
pager
  65:17 186:9
pages
  95:12 106:21,
  22 156:11
  206:24 207:5
paid
  123:11,12
  211:19
Pam
  75:22 98:17
  202:21 203:1
Pamela
  32:24 45:24
  95:18 135:8
panel
  162:24
paper
  120:3
Papin
  8:23 9:22
  12:13,16
  18:13,18
  19:2,16 23:6
  24:7,18 28:17
  29:12,16,21,
  25 30:19
  31:4,7,10,17
  33:15,18,21,
  24 34:1 39:24
  40:1,19 41:1,
  4,20 43:6
  44:18,23
  45:1,3 49:20,
  23 50:21

51:15 52:17,
18 53:10,16,
23 55:14,16,
25 56:6,8,23
59:19 60:1,11
61:11,13,20
62:12,17,18
63:8 64:7,10,
23,25 65:8
66:3,14,19
68:21 69:1,
15,20 70:12,
17 71:11,18,
20 74:9,14,18
77:24 79:4
80:6,21 83:5
85:22,25
86:20 87:5,8,
13,23 88:24
89:6 91:14,16
92:5,23 93:11
97:18 98:1,8
102:18,23
104:2 105:7
106:17 107:18
110:6,11,15
111:18,21
112:8,12
113:1,2,6
115:15,19
116:8,17,21
118:10,22
119:1 120:9,
12,13,15
121:6 122:17
124:2,16
125:11 129:22
132:10,17
133:24 134:3,
18 135:10
139:8,19
141:7,11,19,

23 142:1,19,
20,23,25
143:6,18
144:9,12,13,
14,17,23
145:8,15,19
146:13,18
149:1 150:8
151:19 152:3
153:17 155:22
161:7 163:12,
18 165:13,14
167:4,17,23
168:5,7,14,
15,16 172:6
174:17,19,23,
24 176:20
177:5 178:20
179:2,11
180:5,15,21
181:3,10
183:1,5,14,
19,22,25
185:3,13,18
186:14,23,25
187:4 188:21
189:3,18
190:12,19,20
192:16 193:21
194:11,16,21
195:3,7,11,19
196:5 197:22,
24 198:12
199:3,8
200:1,13,24
201:20,21
202:24 203:19
204:10 205:4
207:20,21
209:7,13
211:15 212:1,
18 214:25

Pat Whitlock
December 02, 2020

33

215:13 217:16
218:5,10,18
**Papin's**
9:18 23:13
27:24 28:4
29:1,18 31:1
34:19 36:6,14
44:9 48:13
51:18 54:4
57:23 60:7,9
67:21 70:6
76:3 89:1,22
98:24 100:19
102:1 114:7,
21 118:21
131:16 136:25
140:25
153:21,22
162:23 163:16
175:23 178:12
179:16 180:19
193:20 194:3
195:23 199:6
205:13 214:21
**paragraph**
71:8 87:4
157:7 158:15
160:5 161:8
**paraphrasing**
209:4
**park**
67:22 68:2
**parking**
67:16,17,21
**part**
13:22 21:2
25:5,23 26:2
28:11,14
34:25 38:6
40:16 41:5

76:2,24 79:1
84:20,21
113:8 124:3
127:9 133:17
153:18 157:3
164:12 167:7
168:3,4
170:3,25
172:5 180:16,
20 190:19
191:5,8
192:18 202:5,
6,17
**partially**
86:18 217:9
**participants**
16:21
**participate**
197:19
**participation**
89:2 133:2
**parties**
175:4
**partner**
10:1 14:8,9,
12,14 16:16
21:2 52:8
103:5 126:5,
9,10 134:23
138:11,15
**partners**
14:16 103:2
137:12
**parts**
69:16
**party**
108:7 109:9
**passed**
122:17

**past**
164:18
**Pat**
5:1 33:4
75:23 98:22
131:3
**Pathology**
10:17
**patient**
42:6,15,17,24
43:2,6,21,23,
25 49:5,9,13
51:21 61:12,
16,22,25 62:8
69:24 71:12,
13,18,21,25
72:9,16,22
73:2,17,19
74:9,15,20
78:8,19,21,24
80:13 81:2
82:8,10,12,14
87:7,15
89:19,23
120:1,22
128:25 129:1
164:10,22
166:23 168:6,
12 169:8,12,
21,23,24,25
170:18,22
182:21 183:25
184:12,15,16,
17,22 187:8,
11,18 188:10,
11,24 189:13,
22 190:4,9,
16,21,22
191:8,11,15
192:4,25
193:3,7,11,

15,23 194:22
195:21 196:3
198:21 199:24
209:3,6,8
211:13 213:7,
11
**patient's**
54:1 62:3
80:17 89:17,
21 188:17
189:13,15,17
192:1 195:2
**patients**
44:19 49:21
66:15,21
68:10 69:23
70:5,18 74:1,
25 81:7
114:11 120:24
166:20 167:25
168:1,5
171:20 184:9
187:9 188:22
193:22,24
196:9 214:4
**Patricia**
5:7
**pausing**
159:18
**pay**
22:23
**PBLI**
211:11
**PD**
213:16
**PDF**
139:2,3
140:10 156:8
177:15 207:8,
12

Pat Whitlock
December 02, 2020

34

peak
  197:12

penalty
  170:7

pending
  7:1 123:12
  165:1

people
  31:6 47:22
  55:2 75:5
  76:25 89:11
  90:24,25 91:7
  106:3 107:8
  108:18,25
  109:1,9 111:9
  118:9 123:18
  147:4 154:12,
  20 168:17,24
  186:3 188:16
  190:15 191:14
  192:15
  200:11,14,15
  201:1,12,18

people's
  108:11

perceive
  92:18

perceived
  64:21 92:12
  183:23 208:4

perception
  92:23 93:7
  182:11 184:25

perfect
  149:23 153:15

perform
  53:1 174:14,
  25

performance

19:8 24:5
29:9 37:25
42:9,22 46:17
48:12,14 60:7
88:24 98:13
124:12 133:21
160:8 161:9
203:20,22
205:13,22
208:1,11,14,
16 209:1
218:11

period
  152:14 187:21
  195:2 208:12
  213:12

peripheral
  128:11

permission
  186:15,17,21
  187:1 209:14

person
  14:6,15 20:16
  21:1 29:20
  30:2,16 35:20
  36:3 39:6
  61:9 63:5
  76:15 83:8
  84:11 88:20
  94:10 97:2,
  13,15 103:4
  105:4 109:6
  111:11 115:6
  117:19,23
  119:17 127:7
  138:14
  152:11,12
  158:25 181:14
  190:8 192:23
  195:13 199:1
  212:12

person's
  82:17 126:6

personal
  28:18 65:14
  88:19 118:14
  140:23 211:24
  218:9,17

personally
  109:18 118:20

personnel
  144:1 156:22

persons
  21:7 101:16
  193:19

perspective
  27:8 36:21
  46:1 58:21
  100:12 103:13
  154:2 170:9
  196:23 197:11
  204:4 205:21

pertain
  157:11 158:14

pertained
  192:16

pertaining
  10:6 42:23
  95:3 145:4
  157:22 193:2

pertains
  159:4 166:17

pertinent
  16:21 76:9

petitioning
  161:22

PGY3
  66:7

pharmacist
  56:2,5

pharmacists
  56:10

phone
  65:25 66:4
  86:22 91:14
  135:3,7,12
  137:24 138:8

phones
  65:7,14,20

physical
  40:7 55:8
  59:4 140:5
  206:17

physically
  25:19 144:1,
  17

physician
  74:2,8,12,23
  78:7,10,18
  117:12 174:13
  175:11,14
  176:8 179:3
  209:20

physicians
  68:16 173:23
  191:16

Physiology
  10:20

pick
  6:19 86:22
  147:18

picture
  79:20

pique
  93:23

place
  5:18 16:19,24
  32:17 65:9
  74:20 99:4

points
39:21 48:2
69:14 75:18
99:11 181:24

pole
191:20

policies
23:7,11,25
24:4 26:22,25
27:3,14,19,23
28:23 29:2,4
58:20 77:1
84:4,21 129:8
156:18,19
157:11,25
165:19 167:13
173:24 216:2

policy
22:19 23:21
51:5 53:24
54:2 58:23,24
59:11 83:24
84:8 107:8,
15,20 113:8
121:5 157:24
158:19 159:14
160:3 161:15,
17 164:3
166:4,13
215:24

policy/
grievance
158:22

poor
154:10

popped
155:15

posed
186:23

position
9:24 14:17
118:1 162:7

positive
123:13 156:1

possessed
197:23

possession
127:17

possibility
26:18

post
172:15 173:15

potential
47:17 56:14
109:7,25
123:19 129:6
179:22 197:8,
21 198:16

potentially
8:17 17:13
40:6 42:5,24
46:21 49:5,8
55:8 73:24
98:1,6 111:18
150:5 197:13

power
23:3,5

practice
56:21 74:4
153:6 168:19
209:2

practices
28:22 152:10
174:10 197:10

practitioner
40:2 54:8
55:20 62:16,
20,24 63:2

170:10 178:10
179:23 203:12
215:13

placement
214:16

places
69:18,20
147:14,16

placing
150:3

plan
31:18 44:24
98:20 151:8
164:4 165:19,
23 166:7,16,
24 167:8,10
170:12 208:1,
12,16 211:25
212:1 214:15
218:9,12,17,
18

plans
45:9 98:13

point
37:24 42:8
48:16,17
50:3,7 59:24
61:7 77:6
80:9 81:7,15
82:7,20 88:8
89:15 109:12
134:20 139:15
141:3 143:19
146:16 149:1,
6,25 150:24
191:3 204:24
205:10 206:15

pointed
92:10,11

104:5 174:17,
18 179:8,14
180:10 183:21
199:25 210:5

practitioners
52:21 53:7,9
56:1,4,5,10
74:24 108:20
110:25 178:22
190:7 191:16
192:3,22

pre-round
81:16

precedent
111:23

prefer
177:19

preferentially
82:22 85:1

preliminary
104:9

premise
187:18,19

premises
49:23

preparation
9:2 63:13
89:8

preparations
181:11

prepare
8:20 9:14
139:12
140:12,16
145:1 148:20
181:2,9,12

prepared
9:13 58:2,12,
13 145:7

Pat Whitlock
December 02, 2020

36

148:25 149:2
182:3

**presence**
50:22

**present**
22:17 23:18
107:25 112:4
163:16,18
210:12,18

**presented**
31:20 41:15
58:19 77:17
85:20 92:1,3
112:17 116:15
136:15 151:2
167:4 196:25

**presiding**
162:5

**pressure**
135:24

**pressured**
135:20

**presume**
51:2 57:15
78:23 113:7
121:8 131:10
132:12 135:6,
11 137:21
162:17 170:20
171:9,15
173:20 189:4
212:13 213:4

**presumed**
116:14 143:9

**pretending**
68:9

**pretty**
10:21 216:6

**prevent**

7:22

**previous**
149:6 204:16

**previously**
42:6 89:7
99:25 128:9,
18 142:4
167:21 181:7
188:9

**primary**
89:22

**print**
106:5

**printed**
189:25

**prior**
20:7 21:16
23:22 28:5,9
34:1 50:15
55:4 71:22
72:2,5 80:15
81:16,18
113:2 126:11
128:19
140:13,16
143:6 149:14,
24 150:4,12
151:18 153:16
154:7 168:20
180:1,15
181:25 183:3
188:5 195:3
204:1 206:22
209:25

**privacy**
108:12

**privilege**
8:19

**privy**
214:6

**probation**
102:16,20
213:18 214:16

**problem**
10:16 38:17
42:15 103:17
123:20 159:20
183:20 192:3

**problems**
206:11

**procedure**
50:24 58:23
133:11 143:25

**procedures**
16:1,8 23:12,
25 24:2
26:23,25
27:23 29:2,4
58:21 77:1
84:21 121:5
129:4 156:22
158:1,17,24
216:3

**proceeded**
80:14 109:20

**proceeding**
182:12

**process**
15:5,19 16:5,
13 23:8,14
28:17,19,21,
25 29:12,24
48:18 59:24
69:3,9 123:3
126:2 131:9
133:8 139:23
153:24 163:1,
15 170:2
192:6 197:17,
22 205:4

208:18

**processes**
10:9 16:4
24:19 37:3
65:19 96:1

**produce**
182:4

**PROF**
211:12

**profanity**
142:11,25

**professional**
8:10,11 11:8
52:25 85:9,16
86:14 117:18,
23 157:23
167:15 213:1

**professionalism**
23:19 124:12
209:2

**Professor-
anesthesiology**
53:22

**program**
11:19 13:15
14:5,14,22
19:8 24:16,22
25:6,9,11,17,
23 26:2,6,10
34:22,25
35:17,20,25
36:4,14,18,20
37:3,13,18,21
39:7 46:20,23
49:6 56:17,18
57:16,17 75:8
76:12 89:3
91:3 96:3,12,
16,24 97:1,9,
12,13,20

Pat Whitlock
December 02, 2020

37

99:21 100:2,
11,15 104:8
105:1,4
112:14 115:8,
25 116:13
117:1,11
123:14,15,19
124:5 131:24
132:14 133:3,
4,8,18,21
136:18 137:18
143:25 145:4,
6 149:16
160:6,9,10,
14,15 161:10,
12,25 172:15
173:24
174:15,20
175:1 189:11
195:16 196:16
199:2,6 201:4
203:15,24
205:2 213:10,
14 214:22

**programs**
5:24 19:19,23
99:17 173:5,7
197:19

**progress**
44:22 45:2

**progressive**
153:24 155:1

**project**
88:14,16,18

**promising**
131:14

**promoted**
104:9

**promotion**
95:23 160:2,6

**prompt**
44:16 83:18
181:13

**prompted**
109:2

**promptly**
162:20

**proper**
77:1

**protect**
108:11

**protected**
8:18 164:17

**protocol**
34:6 204:25
215:5,8
216:18

**provide**
7:4 10:10
11:3 13:2,4
40:24 41:18,
25 42:4
121:14 125:15
141:1 164:9
166:13 172:15
182:2 200:24
201:13

**provided**
13:3 23:16
29:14 30:24
31:9,15
33:17,20
39:17 40:21
58:10 72:18
77:21 81:10
91:19 100:21
106:12 108:25
111:24 112:8
113:1 118:24
119:3 120:5,

12 121:17
129:6 134:9
140:3 151:9,
11 152:18
155:21 166:19
167:18 172:9
176:2,19
181:5 185:21
188:20
189:11,16
193:2 197:3,
15 199:19
203:6 212:4
218:6,16

**provider**
73:10 78:24

**providers**
188:15

**providing**
48:18 63:17
164:20 165:5,
6,15 166:10,
22

**provisions**
166:15

**prudent**
19:13 101:15
197:10

**psychologist**
212:25

**public**
174:6,11

**pull**
67:17,21
147:25 160:25

**purpose**
52:3

**purposes**
52:1 140:21

**purview**
44:14 46:14

**pushing**
59:5

**put**
17:16,20
59:21 79:5,8
88:24 92:25
102:19 114:12
147:15,16,24
154:20,21
166:20 192:20

**putting**
92:12

---

**Q**

**Quail**
7:10

**qualified**
117:14

**question**
6:22 7:1,2,5,
6 12:1,4
13:17 14:3
18:16 23:10
34:4 40:24
73:6 75:20
118:14 119:14
125:2 127:21
128:2 129:24
145:14 147:23
159:16 167:2
176:11,13
181:9 183:15
185:24 186:23
189:19
198:15,16
200:7

**questionable**

Pat Whitlock
December 02, 2020

38

51:4

**questioned**
183:1

**questions**
7:23 10:8
11:11 33:7,8
34:10,20
35:10 36:4
61:7 93:20
113:16 126:14
181:12,13,18,
21,23 182:2

**queue**
113:22

**quick**
12:7 50:3
122:7 146:9
178:9 186:15

**quickly**
6:12 120:6

_____

**R**

**race**
145:16,22
147:2,8

**races**
147:13

**raise**
85:8 217:25

**raised**
35:11 36:5
75:14 76:6,8
87:6 99:12
127:22 206:13
208:25 209:3
211:14

**raises**
205:11

**raising**
203:17

**ran**
142:6,8,21

**random**
51:4

**range**
164:24

**ratify**
37:14

**reach**
11:20 83:12
97:16 119:20
180:11
193:13,17
194:5

**reached**
12:18

**reaching**
118:9 119:18
138:6

**reactions**
52:24

**read**
79:23 80:2
207:16 218:23
219:1,2

**reading**
75:3 84:18
157:21 215:22

**ready**
80:1 95:14,15
101:3,4
119:7,8
122:10 125:3,
6,19 128:3
130:21 132:1
136:20 138:5,
24 145:13

148:16 172:3
178:18,19

**real**
12:7 146:9
183:15 191:20

**realm**
45:19,22 46:4

**reason**
7:3 31:5 35:3
103:21
128:12,14
180:20,21
183:6,15
193:17 199:11
207:6

**reasonable**
118:13,15,17
190:17

**reasons**
132:18,19
150:15

**rebut**
190:18

**recall**
12:12 21:13
26:13 28:11
33:22,25
41:22 42:2
43:17 58:6,
12,16 71:3
89:20 90:6
98:15 99:5
102:11 103:18
111:2 135:14,
19,20 137:14,
23 141:3,4,
15,22,24
142:12,14
143:9 145:10
146:4,12,21,

22,25 149:11
153:20 160:23
162:2 168:1
174:16 187:12

**receive**
57:21 62:2
117:22,25
162:24 163:13

**received**
19:21 31:12
49:11,15 55:3
59:19 60:13,
15 72:19
107:16
134:13,21
135:6 152:13
183:17 193:5
209:19 211:1
213:22

**receiving**
44:23

**recently**
218:6

**recess**
32:4 50:12
119:5 148:12
198:8 204:22

**recognize**
194:17

**recognizing**
191:24

**recollection**
21:25 94:5

**recommend**
28:12 90:12,
19 100:14
165:12 175:23
176:25 180:18
194:19 204:7
212:18

recommendation
  20:25 21:3
  34:14 35:13
  40:23 63:13
  76:11 77:23
  78:4 85:18,23
  100:18 110:18
  112:11
  116:16,23
  119:2 134:2,
  9,21 176:1,17
  197:4,24
  202:7

recommendations
  13:12 16:25
  17:2,4 20:22
  77:19 202:8

recommended
  44:4 70:8
  90:10,23 91:2
  124:21
  128:19,21
  167:15 194:3

recommending
  86:17 152:3
  195:1

recommends
  52:5

record
  5:6 6:21
  67:11 70:11
  79:18 148:13
  198:9 204:15

recorded
  29:22 70:8
  182:7,15

recording
  182:8

records
  22:11,13 62:2

65:15 67:21
72:9 82:18
188:10 189:13
198:23

recreate
  204:13

redo
  197:5

refer
  51:5 214:10

reference
  53:8 87:9
  159:6 173:17
  202:15

referenced
  33:11,14,23
  72:10 89:16
  112:2 138:7
  162:17 169:12
  215:9

referencing
  88:6 153:19
  204:2

Referral
  213:14

referred
  30:3 50:21
  51:1 110:10,
  19 159:14
  214:10,12

referring
  9:8 196:1
  206:7 212:14,
  24 213:5

refers
  156:17

regain
  198:15

regard
  110:11 143:3
  163:8 188:23
  200:6

regular
  59:20 124:19
  158:25 186:3

regularly
  117:8

regulations
  157:9,10,14,
  15 173:25

regurgitate
  77:9

rehabilitated
  213:24

rehabilitation
  123:14,19

reiterated
  76:21 99:13

reiterates
  161:11

relabel
  79:15 94:23

relate
  209:1

related
  34:11 38:22
  132:17 174:15
  175:1

relates
  110:13

relation
  99:17

relations
  16:17 17:1
  21:5 24:14
  30:6,10 38:11

48:19 50:18
52:7,10 86:16
97:5 133:1
134:17,24
135:4 136:4,
16,23 138:12,
16 202:10

relationship
  25:24 78:7

relationships
  78:13 99:18

relay
  135:4 136:22

relevant
  21:7 34:13,21
  35:11 93:21
  143:10

relied
  217:13

relieve
  69:2,5,7

relying
  139:25 189:10

remaining
  112:14

remedial
  83:18 205:23

remediate
  112:20,22
  113:6 214:24

remediation
  24:2 31:18
  34:5 44:24
  45:9 98:12
  151:8,10
  204:25 211:1,
  6 213:12
  215:5,8,17
  216:18

Pat Whitlock
December 02, 2020

40

**remedy**
51:22,25 52:2

**remember**
45:17 62:14

**remembered**
65:1

**remind**
137:18

**reminded**
93:3

**removal**
133:8 145:4,6

**remove**
36:3 132:14

**rename**
94:17

**render**
136:8

**rendered**
9:10 132:25

**Renee**
43:17 60:5,20
88:13 91:10
122:5 210:11,
18

**renewed**
101:23 102:12
131:22 132:4

**renewing**
101:25

**repeat**
23:10 147:22
213:18 214:17
216:7

**rephrase**
6:24 26:8

**replies**
200:1

**reply**
134:16

**report**
16:18 41:24
42:1,3,12,14
43:1,5,21,24
44:7,12,16
62:7 64:3
72:21 73:3,11
90:9,13,16
91:1 115:5
127:10,12,17,
22 128:6,22,
25 129:10,12,
14,18 142:24
169:16 191:7
196:16 206:20

**reported**
42:11,20
55:18 63:16
66:11 71:14,
18 72:17
73:20 74:20
152:23 179:24
190:15,23

**reporter**
6:19 12:5
79:17 155:10,
11 219:9

**reporting**
42:4 86:7
195:4

**reports**
9:6 42:1,19
44:3 73:7,12,
22 111:7
128:14
129:22,25
130:7,15
154:22 211:8,
12

**represent**
137:5

**representing**
145:21

**request**
23:23 35:4,5
36:10,13,17
37:6 39:18
41:16 43:19
131:18 135:4,
9 136:10
138:11 202:24

**requested**
24:24,25
34:19 37:13,
19 43:10,12

**requesting**
31:14

**require**
13:10 26:23
100:3

**required**
69:21 71:15
72:24 73:2
89:14 121:1,6
141:5 145:3,5
154:14 174:14
176:11 192:8
212:1 213:9
214:24 218:11

**requirement**
136:19 213:18
214:17

**requirements**
19:19 20:4
61:6,8 73:12
76:17,19
100:2 121:10
155:1 211:23

**requires**
19:23

**research**
63:24 158:10,
14 188:2

**residence**
131:24 160:3

**residency**
19:19,23
37:12,13,18
56:17,24
132:4,8
133:3,18
174:15,20
175:1 197:19

**resident**
12:24 13:10
14:21 18:14,
21 19:2 20:23
21:9 25:3,18
26:7,10 27:6
35:18,19
36:18 37:14,
20,21 41:9
45:14 46:6
51:19 56:24
57:8,12,14
58:14 61:15
63:25 64:4
65:17 66:7,8
69:4,5,8,12
73:25 74:21
78:8 81:5
83:6 84:15
101:9 102:11,
12,15,19
103:16,18,21
104:7,9,10,
16,24 105:7,
9,16,17 107:1
108:1,15

Pat Whitlock
December 02, 2020

41

110:5,13,21
111:10 113:23
114:15 115:1,
12,18 116:6
118:18 122:19
127:13 163:4,
8 166:20,21
168:10,11
169:4,23
179:12 186:6,
22 189:1
190:6 191:1,
2,12,24
192:11
193:14,22
197:7 205:1
209:15

**resident's**
41:11 64:7
81:6 114:5
159:9 191:13
197:13

**residents**
11:9 19:4
22:18,22
25:25 27:7
28:1 29:9
45:8 50:25
56:17 57:6
61:5 66:16
67:16 69:2
78:13 98:11
103:10,12
104:13 105:22
119:20 124:6
157:7 158:20
171:1,4,17
172:9,10,23
173:1,19
192:7 197:18
210:22

**resign**
97:15,19 98:2
105:17 146:20

**resolution**
17:4 44:4
137:13

**resolutions**
17:7

**resolve**
154:14

**resorted**
58:3,16

**Resource**
10:1

**resources**
8:12 13:16
24:15 30:5
40:17 51:16
52:11 86:16
107:4 114:17
212:7

**respect**
13:18 14:20,
23 17:2 18:25
19:22 20:23
45:23 51:10
72:9 73:16
74:15 77:2
89:5 104:4,13
113:23 115:11
116:8 132:9
136:24 140:2
143:1,6 163:4
183:24 194:6
197:18 205:3,
16

**respond**
53:2 84:14
104:11 192:9

**responded**
38:9 128:13
143:20 189:19

**responding**
148:20

**response**
51:20 80:24
91:19 92:16
136:12 156:25
179:7 195:23
203:7 210:7

**responses**
52:24 128:1

**responsibilitie
s**
10:3 46:9
57:13 99:16

**responsibility**
10:9 46:11
52:9,12 63:15
76:13,16 81:6
96:10 116:1
118:2,4 126:7
130:8,18
136:5 191:8,
13,19 192:17,
18 200:20
212:25

**responsible**
10:13 19:11
78:19,25
129:14,21
130:2 191:24

**rest**
79:22

**rested**
24:8,13

**restrain**
144:1,5,17

**result**
20:19 22:19
25:11 44:12
51:21 63:22
67:3 105:3
108:7 116:19
133:9 145:18
160:8 161:9
165:1 192:24

**resulting**
71:17 72:15

**results**
123:12,13

**resumed**
124:19

**retained**
5:24 6:1
168:20

**retaliation**
6:3,7

**retrieve**
144:6

**retrieved**
141:6

**return**
5:17 120:2
211:20

**returned**
124:24

**review**
23:20 28:9
29:13 32:21
41:21 44:8,9,
13,14 48:23
49:12 58:10,
19 59:1,12
71:6 72:8
73:22 77:23,
25 105:21

114:25
116:12,20
121:17 124:2
129:3 130:15
137:3,7
156:6,25
161:5 177:7,9
185:20 187:5
202:7 210:4,
21 218:1
**reviewed**
8:21,22,23
9:5,12,17,20
23:16,22
32:22 63:20
73:15 77:20
80:4 84:24
92:5 107:21
112:6 118:22,
23,24 134:8
156:14 161:6
163:24 181:4,
20 183:3
188:10
189:12,17
202:18 203:2
218:7,12
**reviewing**
32:7 33:4
75:23 76:11
98:19 197:2
**reviews**
22:12 44:3
**Rick**
88:10 119:12
**rights**
197:17,22
**rise**
110:12
**risk**

130:10,13
**RN**
79:2
**role**
10:5 26:19
46:16 61:4
77:10,14
117:14 125:11
136:3 200:20
202:8
**roll**
207:14
**Roman**
172:13 175:3
**room**
12:8 54:1
141:8 142:6,
21 179:4
**Rosenthal**
5:7
**rotation**
52:19 53:25
**rotations**
57:21
**rounds**
53:6,15,19
66:15,21
68:6,8,15
70:20 154:23
195:20
**route**
18:6
**routine**
53:1
**RRSC**
162:12,16
**rude**
92:9,18,21

**ruining**
197:13
**rules**
6:12 157:8,10
173:25
**rumors**
112:4 118:11
**run**
7:10 52:22
120:6 186:15
**run-in**
178:21 180:4
**running**
68:8
**rushed**
141:8

---

S

**safety**
49:5,9 51:21
89:19,23
120:2,23
209:3 211:14
213:7,11,15
**sake**
42:17
**samples**
70:19
**sanctions**
164:4 165:22
**sat**
30:3 88:23
153:17 208:23
**satisfactory**
48:13,15
**SBP**
211:11

**scenario**
17:3 137:15
**scheduled**
68:3 91:15
**scheduling**
124:19
**Schlessinger**
128:7,8,9
**Schmitz**
5:4 11:24
12:7,11,12
15:3 16:11
18:12,20
19:14 24:16
25:15 28:24
30:7 32:2,6,
12,20 36:11,
25 41:17
47:12 50:5,9,
13 72:6 73:13
75:4 78:6,15
79:1,10,15,
19,21,25
83:24 84:5
86:13 90:3
94:16,22 95:9
96:23 101:2
105:25 106:7,
18,23 107:2,3
108:13
113:13,19,23
116:3,11
119:7 121:23
122:3,6,10
125:16,20
129:24 130:22
132:24 133:14
148:10,13,17
150:3,22
155:5,9,12,17
159:20,24,25

165:20
167:12,21
175:20 176:14
177:13,19,23
178:1,5,8
191:23 198:5,
9 202:20
204:18,23
207:4,9,13,18
209:24
210:10,16,17
216:10,17
219:2,15
**school**
50:20 168:17,
18 189:5
212:13
**scope**
95:25 96:9
174:20
**scores**
121:13,15
**screaming**
143:12,16
**screen**
32:1 122:17,
18 124:17
149:8
**screening**
124:11 150:13
**scroll**
47:25 75:21
95:6
**scrolling**
140:9 157:3
**seat**
143:18
**seated**
142:18,19

**seconds**
159:17
**seek**
26:18 77:18
85:3 195:6
204:8
**segments**
163:7
**selected**
26:19
**semantics**
147:10
**semi-annual**
210:21
**send**
82:7 98:21
124:2 137:12
140:13,16
153:5 154:12
**sending**
52:10
**senior**
41:9 43:18
60:5,20 88:13
138:11,15
210:21 212:8,
9
**sense**
127:23 135:25
136:2,13,14
182:18
**sentence**
53:21 120:22
160:7
**separate**
35:22 37:10
47:7,11 96:10
158:4,19
206:24 207:2

**separated**
5:25 140:17
**separately**
35:24
**separating**
17:12,15
110:18
**separation**
51:23,25 52:3
**serve**
10:4 61:6
**served**
5:15
**serves**
46:12
**service**
138:11,15
158:10,14
**session**
201:11
**sessions**
33:10,14
48:4,11
203:18,19
**set**
94:8,10 155:2
208:12 216:3
**setting**
125:10
**severe**
71:14 72:23
73:2
**severed**
5:17
**severity**
74:18 168:12
169:3 191:25
**sexual**

16:2 18:2
19:16 20:14
84:23 85:1
104:17,21,22,
23 109:14
110:12 114:2
**Shake**
55:24
**Shaking**
6:16
**share**
32:1,2 142:2
181:15 203:3
**sharing**
94:19 155:25
**sheet**
147:15
**shift**
49:20,25 69:6
81:17 87:21
**shifts**
17:16
**Shirley**
128:7
**short**
113:15 122:8
143:23
**shortcomings**
58:4,17
**shortly**
40:11 91:17
**shot**
149:8
**shots**
14:23
**show**
31:23 66:14
81:16 120:25

210:6 211:7

showed
93:16 94:7
149:7

showing
34:6 66:20
67:1 68:7,22
70:20

shown
126:19

side
42:13 97:3
144:13 158:14
159:3,5,10
164:6 180:12
199:9

sign
69:3 81:18
141:11,14
145:9 172:10
219:1,3

SIGNATURE/NOT
219:13

signed
31:11,17 34:5
78:1 81:3
87:10 112:8,
12,18,19
153:17 184:8,
13 205:1
207:20,21
213:20

significant
71:15 210:24
211:7

signs
81:5

similar
104:3 203:5

205:6 208:22

similarly
20:16

simply
167:14

single
115:19 118:5

sir
122:11

sit
125:22 126:11
156:19

sitting
86:14 90:20
126:3 175:11
192:19 193:4

situated
20:17 144:11

situation
5:22,25 8:25
17:5 18:7,10
26:5,9 27:18
37:19 38:24
40:19 46:5
52:10 54:21,
25 83:13
84:15 86:12
108:19 118:16
124:9 126:1,
25 143:10
166:21 187:13

situations
10:7 26:13,16
42:4 73:24
83:10 107:19
111:14 164:25

skin
64:13 71:12
190:23

skip
162:9 172:4

skirted
146:8

slot
131:5,8,16,22
132:1,8,10
135:22
136:20,25

slow
186:6

small
136:4

smoking
86:2

Sociology
8:3,6,7

sole
23:3

solely
103:8

someone's
25:2,16

sort
10:23 11:22
39:2 42:16
60:25 124:6
136:24 194:15
209:22

sound
192:10

span
57:19

speak
9:2 31:6
40:18 56:2
61:19 74:7
80:21 81:12
93:9 118:20

speaker
184:16

speaking
82:1,5

specific
27:6 34:13
37:3 45:18
57:9,16 58:7
70:5 71:10
80:20 84:13
87:12 90:14
108:8 129:11,
15 130:5,17
133:11 137:14
147:23 156:25
158:12 200:10

specifically
13:18 59:1,13
83:8 84:25
86:10 91:2
110:13 111:3
142:12 157:20
159:1 171:6
173:17 204:15
206:6 210:4

specifics
47:6 104:25
125:24,25
126:12 146:12
199:24 200:25
201:1

spewed
142:11

spill
39:5

spoke
62:19 63:8
64:20 118:22
142:24
179:14,18

**spoken**
33:17,24
42:21 55:2
59:21 62:13,
16 64:23,25
206:21

**spotty**
152:19

**sprinted**
146:15

**staff**
14:6 23:17
27:4,17,22
29:5,6 59:15
92:19,22
156:2,6,22
157:12 158:8,
16,25 159:5
161:17 165:25
167:8 171:13,
15 172:18
173:4,18
176:21 206:5
217:19

**stage**
187:11,20,25
192:13

**stand**
162:13

**standard**
50:24 51:4

**standards**
46:10,19,25
47:4 51:18
172:16,17,22,
25 173:8,11,
12

**standpoint**
24:3 25:14
46:16 102:8,9

141:14 153:23
173:3 174:8
176:18 203:9
206:3 217:18
218:2

**stands**
158:2

**start**
32:14,16
56:16 69:23
81:17 139:1
181:25 182:19
185:23 215:22

**started**
42:7 70:17
148:24

**starting**
68:15 119:9
130:22 156:15
198:10

**starts**
33:4 39:11
48:3 88:8
157:7 178:3

**state**
5:5 51:15
53:13 55:23
57:20 58:21
60:5 61:10
63:7 80:17
87:14 89:12
90:8 91:23
134:16 144:18
145:14 149:12
174:6 187:15
202:3

**stated**
33:14 38:10
41:3,19 43:23
47:12 53:16

58:11 59:13
62:12 64:19
89:15 92:2
140:10 151:23
183:4 185:11
190:2 194:20
196:4 198:15
202:11

**statement**
48:22,25 53:8
96:5 140:4
149:15 179:16
188:13

**statements**
53:3,10 57:23
75:10 168:3

**states**
34:4 37:24
39:22 40:24
41:23 53:21
80:10 87:4
88:24 95:25
101:7,8
103:15 105:3
119:25 120:21
139:10 157:6,
23 158:15
160:2,7 161:8
164:3,8,23
166:2,4,5
173:22 174:13
175:7 185:4
211:12,23
213:6

**stating**
41:18 53:3
81:21 96:19
133:23
135:15,21
136:17 148:19
185:9 189:19

200:9 213:23
214:25

**status**
25:13 34:15,
17,21 36:7,8,
9 37:7 76:10
97:2 100:19
101:19 131:17
135:2,6,9
136:14 137:2,
9 159:3
206:9,11

**Stavins**
39:25 40:3,18
104:5

**step**
15:5,6,7,11,
12,16,22,23
68:20 151:9
159:17

**steps**
27:5 36:19,20
51:17 54:22,
24 73:22
97:23 151:2
154:12 155:1
215:12

**stop**
15:19 50:10
78:9 81:1
113:14 144:19
151:24

**stopped**
190:2

**stopping**
50:3,7

**stops**
39:11

**story**
180:12

straight
115:4

strategies
10:6

street
82:9

strong
112:10

student
71:2,4 82:21,
24 83:7,8
84:12,16
85:6,8,25
86:8,10,24
87:1 105:9,10
110:20

students
131:11 213:1

studied
92:7

study
211:24 218:9,
17

stuff
6:18 35:4
86:1 95:10
109:14 154:20
159:21 173:11
183:5 196:7
202:14

subject
35:5 47:22
74:12 108:20
157:8

submission
211:24

submit
128:15 134:24

submitted
21:4 33:5
43:14,16
73:8,11 90:9,
13 129:18
130:15 150:12
212:1 218:8,
18

subsequently
214:19

substance
8:16 51:7
122:21,25
123:2

substances
50:22

substantiate
52:14 62:3

success
199:6

sufficient
77:17 78:3
111:16 116:22
117:20 119:2
152:20 196:23
197:16 217:15

sufficiently
117:14

suggest
198:6

sum
10:21

summaries
9:13

summarize
77:10 134:23
151:23

summarized
60:14 87:12

89:8 92:2

summarizing
52:9 86:15

summary
48:18,22,25
63:17,19
72:13,19
84:18 95:10
112:7 201:13

supervises
14:16

supervision
74:2

supervisor
14:8,13
123:3,4

supervisors
11:17 51:5

support
13:2 31:13
39:18 40:22
41:16 77:22
78:4 85:23
112:10
116:16,23
119:17 125:15
196:17 197:4
198:25 199:4,
6 202:7

supported
21:3 126:5

supporting
33:9,12 38:2,
3 203:21

supposed
46:5 100:11
187:9 188:21
190:21 208:8
216:23

supposedly
182:20 190:4

surgeon
53:4,11 58:1
88:4 89:13
117:16,17
210:8

surgery
13:15,20,22
14:4,14 60:21
71:15 72:23
73:3 89:3
117:1,4 200:4
202:13

surgical
51:19 66:7,8
103:10,12
194:15,19

surmise
155:24

suspended
18:3 107:10

suspension
22:23 98:12
107:17 123:8
165:1

suspicion
123:2

suspicious
211:8

swipe
67:18 68:1
69:11,15

swiping
67:22 68:8

switch
207:7

sworn
5:2

**symptom**
70:11

**synopsis**
48:20

**system**
22:11 56:15
67:12 70:9,13
122:21 149:5
155:8 209:2

**Systems**
158:5

**T**

**takes**
16:19 70:7

**taking**
93:8 118:11
120:24 176:23
179:23

**talk**
32:21 54:4,7
55:13 95:16
153:4 154:12,
21 181:17
195:6 201:12,
18 218:25

**talked**
152:24 168:4
178:24 181:17
194:24 204:10

**talking**
12:6 31:16
43:1 46:22
48:5 55:3
90:5 95:11
96:8 106:20,
21 114:13
130:24 139:5
141:20 156:10
157:4 173:12
175:5 178:20
180:23 181:24
189:23 195:7
199:17,20
207:19

**talks**
74:22

**tardiness**
67:2,10

**targeted**
218:14

**task**
125:10 211:13

**tasks**
34:6 53:1
88:3 209:18,
22 210:9

**teach**
53:1

**teaching**
46:15

**team**
62:19 63:9
64:20,24
74:23 138:7,
13 191:14
192:12

**telephone**
124:13

**telling**
82:10 140:6
141:23 146:22

**template**
181:22

**tend**
38:21 47:13

**tended**
68:20

**tenure**
171:19

**term**
93:25

**terminate**
23:4,5 24:7,
17 35:18
36:14,18
37:20 41:11,
13 133:24
139:19 175:9
176:4 197:24

**terminated**
20:24 21:1
23:1 25:17
26:6,10,24
27:12 37:14,
22 59:7 97:6
102:18 112:13
115:12,15
123:21
132:17,18,22
133:3,12,15,
16,20 140:7
145:15 146:14
152:4 180:21
193:24

**terminating**
27:24 28:6,
17,25 29:24
36:19,21
102:2

**termination**
9:18 15:25
17:9 18:6
20:7 21:22
22:1,6 23:8,
13 24:25
25:14 27:11,
15 28:12
29:12,19 30:4
34:14,18
35:4,6,14
36:10 39:19
46:5 52:6
76:12 78:5
86:17 96:1
98:7,14,24
100:14,22
101:11,24
104:6 112:11
114:5,8 115:1
116:24 117:22
122:22,23
123:9,16
131:18 133:9
134:3,10,17,
19,22 139:7,
22 140:25
141:12 143:5
144:2 145:2,
20,22 146:20
152:21 154:7
161:24 162:23
163:3,11,20
164:11,25
165:1,13
167:15 175:23
176:1,25
178:13 180:19
194:4 197:8,9
202:25 213:15
217:16 218:1

**terminations**
21:15 77:3
202:9

**terminologies**
147:10

**terms**
8:21 13:18,20
25:12 27:2,6
36:24 42:10

45:20 46:16
56:17 75:11
76:11 78:8
106:11 145:5
152:16 159:8
166:18 176:9
198:25 199:4,
5 202:9

**terrible**
189:21

**test**
51:1 66:19
123:12,13

**tested**
123:6,10

**testified**
5:3 7:12
82:25 99:25
133:22 139:24
176:8 179:18
184:14 188:9
209:13 217:11

**testimony**
72:5 132:16
210:1

**tests**
50:23

**thereof**
152:18

**thing**
6:25 31:5
36:12 70:25
77:10 117:24
155:14 177:7
200:4 201:17,
25 206:19
214:11

**things**
13:19 31:2,4
38:4 45:23

46:4,21,22
49:14 63:18,
23 70:4 75:7,
25 76:1,3
78:2 89:4,7
92:2 93:10
94:23 98:13
103:1 105:21
111:24 112:10
113:24 114:22
116:18 129:25
130:2,16
137:12 141:5
154:14 159:12
163:7 164:15
170:8 175:21,
25 176:20
179:24 181:6
197:12 199:25
200:13
203:12,16
206:4 207:22
208:9,13
215:11 216:22
217:2,14,23

**thinking**
113:4

**thinks**
167:11

**thought**
19:12 39:14,
15 81:1 87:18
112:25 113:8
121:1,9
190:18,20
194:4 195:11
202:4

**thoughts**
92:17 126:25

**threat**
49:5,8

**threaten**
213:11

**threats**
213:7

**time**
10:16 40:11
47:20 49:18
52:5 53:6,14
59:24 65:10
66:8 67:9,12,
22 68:11,17,
22,24 69:14
70:12,17
81:16 88:20
94:12 95:21
101:14 102:17
111:22 120:9
121:25 126:10
127:7 128:10
134:20 136:10
137:22 140:17
142:25 144:21
146:11 147:2
171:7 175:9
186:5 187:23,
24 188:18
191:3 194:23
208:12 209:15
212:10 218:22
219:6

**timeframe**
194:23

**timeline**
52:17 57:18
208:19

**times**
14:6 38:20
65:13,23
120:9 186:12
204:8

**title**
20:17 88:18
106:19 109:11
212:11 213:4

**today**
6:13 7:21,23
9:3,15 90:11
96:13 105:22
106:3 120:6
121:22 132:16
153:19 156:19
175:12 181:7
192:19 193:4
211:7 218:22
219:6

**today's**
219:4

**told**
54:16 56:8
62:13 71:11
90:11 101:22
125:25 126:21
128:18 140:22
146:13 179:3,
12,13 182:25
184:4 185:9,
14 187:23
198:12 200:5,
6 210:23

**tolerance**
58:24 59:11

**Tommy**
8:17 12:7
105:25 121:24
125:16 177:14
182:3 218:25
219:16

**top**
32:14 120:18
122:13 123:25

138:4 144:25
164:4

**topic**
89:22

**topical**
72:1 195:1

**total**
90:6 122:2

**totality**
38:19 85:19
110:14 111:20
112:1 115:11,
14 165:23
168:19 180:16

**totally**
39:9 45:19,22
46:8,11
165:22

**totem**
191:20

**track**
19:10 39:1,2
61:5 97:2
100:13

**tracks**
19:6 35:9,23
39:1 47:7,13,
15

**trail**
120:3

**trainee**
24:23 38:1
100:3 161:9
191:2 206:6

**training**
19:22 25:9
34:22 37:2
56:18 99:20
117:21 118:3

160:8 172:16
173:15,24
206:7 213:19
214:17

**transcribed**
182:14,16

**transcript**
8:22 9:17,20,
21 87:25 90:4
177:4,14,25
198:10 218:24
219:10

**trauma**
61:12 82:1,21
84:16 85:25

**traumas**
81:24 82:4

**Traxler**
125:21 126:9,
17 149:2

**treat**
74:25

**treatment**
104:13 105:6,
14 110:4

**treatments**
195:2

**trial**
7:12

**tricky**
98:20 99:24

**trigger**
129:25

**triggers**
181:20

**trip**
81:19

**trouble**

64:14

**true**
68:4 112:4

**Truman**
50:20 88:11

**trust**
167:25 198:15

**trusted**
76:15

**Trustees**
173:25 174:3

**trustworthy**
167:24

**truthful**
51:19 68:21
89:10 93:10
168:8

**truthfully**
7:23

**truthfulness**
114:9 198:19
211:5

**Ts**
14:25 100:16,
17

**Tuesday**
210:10,11,17

**turned**
207:13

**tutoring**
213:2

**type**
6:15,21 11:15
13:19 17:7
18:7 19:21
20:3 22:4
30:18 50:25
55:8 103:17

104:3 122:20
123:18 154:24
159:7 193:5
194:6 196:25
198:20 199:13
205:22,23

**typed**
84:19

**types**
9:12 22:6
50:24 89:4
111:14 119:22
124:4 172:8

**typical**
16:3,5 17:6
45:8 119:19
146:6 151:15,
16 185:2

**typically**
11:16 13:9,25
14:4 42:12,14
43:23 65:25
69:7 74:1
124:18
125:11,12
127:11 129:25
135:3 154:5,
25 169:20
179:21 181:12
182:5

---

**U**

**Uh-huh**
79:24 216:8

**uh-huhs**
6:17

**Uh-oh**
155:4

**UHHS**

Pat Whitlock
December 02, 2020

50

157:23 158:1,
5,13
**ulcer**
44:19 71:14
72:23 89:17,
21 168:6,12,
13 169:4,12
187:8,25
188:7,11
193:6
**ultimate**
15:10 132:25
201:24 202:12
**ultimately**
78:9,18 97:4
99:20 163:11
202:4,8
**umbrella**
30:9
**UMC**
57:3 58:25
**UMMC**
9:25 10:12
11:6,8 12:15
13:16,21
14:14 15:4
16:1,3 17:19
18:21 20:7
23:9 25:8,18,
19,22 26:3,11
27:10,14
28:1,23 29:1,
2 35:8 37:12
40:5 42:7
46:12 52:5,22
56:17,25
57:6,8 58:14,
20 59:4,10
65:17 67:16
69:16 70:7

73:15 76:25
83:2,17,25
85:12 88:19
104:20 121:4
122:23 127:6
132:23 138:10
153:7 154:8,
25 156:23
158:3,25
160:21 161:25
162:3 164:9,
21 165:6,7,15
166:4,5,10,
13,14,22
167:5,19
168:1,21
170:5,6,7,9
171:4,14,19
172:6,14
173:2,17,23
174:24 175:8,
24 182:17
215:23 217:24
**unaware**
176:9
**uncomfortable**
18:14 82:22
85:7 105:11
120:23
**uncommon**
134:25 136:9
**uncover**
111:14
**uncovered**
58:8
**undergo**
118:3
**undergraduate**
8:4

**understand**
6:23 7:5
136:3 147:4
151:22
**understanding**
55:1 131:13
133:15 170:4
**Understood**
149:9
**undertake**
29:11
**unit**
52:20,24 54:5
**University**
158:3,5 174:1
**unknown**
83:6
**unknowns**
86:12,14,21
**unnecessary**
73:3
**unreasonable**
118:21
**unsatisfactory**
160:8 161:9
203:20
**unstable**
155:16
**unsubstantiated**
112:4
**untoward**
86:11
**untruthful**
87:7,15 209:6
**untruthfulness**
114:10
**unused**
140:23

**unwanted**
108:24
109:14,25
111:4
**unwillingness**
88:3 89:9
209:18 210:9
211:13
**updated**
140:21
**upheld**
100:23 102:17
**urgency**
135:25 136:2,
15
**utilized**
52:22

---
**V**

**VA**
82:9
**vacant**
14:17
**vacation**
189:25
**validity**
64:6 66:19
81:21 110:9
183:16
**vein**
153:10 205:8,
9
**veracity**
52:14 110:9
**verbal**
15:6,16,20
59:22,23
154:6 204:9

verbally
155:25

verify
62:23 63:1
64:5,6 66:18
81:21 118:6

version
177:18 187:16

versions
216:12

versus
170:14,18

vice
161:23 162:1,
3 212:12

victim
109:7

victims
109:21

viewed
76:1 101:23

viewing
164:17

violate
166:15

violated
107:15 176:21

violation
107:7,20
166:7,23

violations
164:4 165:23,
24

violence
58:24 59:11
179:23

violent
40:7 54:14

voiced
190:3

_____

W

W2
140:21

wait
50:7

waive
218:24

WAIVED
219:13

wake
43:24

walking
82:8 95:13

Walton
180:9,11

wanted
32:23 46:24
93:4 125:22,
23 133:24,25
200:17 209:21

wanting
110:1,19

warned
105:4

warning
15:7 22:24
59:22 107:14,
17 154:6,19

warnings
59:23 153:20,
25

warrant
110:17 116:22
119:2 152:20
154:25 205:15

warranted
150:16 217:17

warrants
83:19

website
156:17 158:21

Wednesday
32:25

week
186:22

weekly
11:10

weeks
71:21 72:2
136:11 195:3

weigh
170:8

whatsoever
41:10 63:11
110:2 111:19
136:1 180:25

wheelhouse
203:14

white
105:7 107:16
110:5 145:25
147:3 148:4,7
149:11

Whitfield
11:25 12:3,10
15:2 16:6
18:8,15 19:3
24:9 25:7
28:20 30:1
31:25 32:3,9
35:21 36:23
41:12 47:2
50:2,6,11
72:4 73:5

75:1 77:12
78:11,20
79:13,20,23
83:21 84:3
86:4 89:24
94:14,20,25
95:4,8 96:20
101:1 106:1,
14,20,24
108:10
113:11,18,21
115:23 116:9
121:21 122:2,
4 129:7
132:20 133:6
149:22 150:9
155:4,7,14,19
159:15,23
165:16 167:6
175:15 176:10
177:12,17,21,
24 178:4
191:22 198:3,
7 204:21
207:2,7,11,15
209:23,25
210:14 216:6
219:1,9,11,16

Whitlock
5:1,5,7 50:14
219:5

whomever
16:22 73:9
201:14

wife
204:18

Wilbrook
190:6 193:13,
14,18,22
194:5

Pat Whitlock
December 02, 2020

52

willful
165:8 170:23
190:24 191:5,
6
willfully
164:8,17
165:5,14
166:3,5,9,11,
21 167:4,18
William
66:6
Williams
212:17
wise
47:14 121:5
withdraw
132:2 136:21
witnessed
180:6
witnesses
9:9 180:24
Woodward
162:4
word
63:12,18
178:5 195:15
196:15
worded
176:13
work
10:11 26:7
52:19 67:1
68:22 70:13
120:2 158:9
179:23
workday
186:3
worked
5:23 60:22

199:9
working
25:18,19 26:3
66:13 199:10
200:18
workplace
41:8 55:7
world
149:23 153:8,
15 207:25
worries
219:3
worse
195:14
wound
71:13,22,24
72:2 74:11,
15,19,23
187:12,17,18
188:15,17
189:6,15,23,
25 191:25
192:4,13
194:13,17,18
195:2,4,7,13
wounds
49:14 188:1
wrapping
201:9
writing
33:21 154:20
161:22
written
15:7,12,14,
22,24 22:24
59:22,23
107:14,17
153:20,25
154:6,19

181:19 187:1,
4 218:9,17
wrong
71:1
wrote
48:10

_____

Y

_____

y'all
132:9 207:12
year
55:6 56:24
57:2,5,8,11,
13 58:14
74:21 101:13
104:10 116:25
131:12 140:22
168:11 169:4
189:1 191:1,
23 192:7,11
213:18 214:17
years
5:12,23 6:13
11:7 22:10
37:12 85:10
90:6 94:4
137:23 189:4
216:12