**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION**

JOSEPH PAPIN                                                                  PLAINTIFF

VS.                                                    CIVIL ACTION NO.:  3:17-CV-763 KHJ-FKB

UMMC, et al.                                                                 DEFENDANTS

---

**DEFENDANTS BRIEF IN OPPOSITION TO PLAINTIFF'S
MOTION FOR PARTIAL SUMMARY JUDGMENT**

---

**COME NOW**, the Defendants University of Mississippi Medical Center, Dr. T. Mark Earl in his individual capacity, Dr. LouAnn Woodward in her official and individual capacity, and Dr. Steven Bondi, in his individual capacity and files this, their Brief in Opposition to the Plaintiff's Motion for Summary for Partial Summary Judgment, and would respectfully show unto the Court the following:

**<u>FACTS:</u>**

Plaintiff Joseph  Papin was dismissed February 22, 2017 from his employment as a first-year medical resident at the University of Mississippi Medical Center (UMMC) in the General Surgery Residency Program for professionalism issues and violations of the UMMC Faculty and Staff Handbook code of conduct.  *See Dismissal Letter, ECF 140, Exh.1.*  Plaintiff chose to appeal  his dismissal through the Graduate Medical Education Program's grievance policy.  *ECF 140, Exh.31.*  After a hearing in which Plaintiff was allowed to hear all the witnesses and respond to each, the appeals committee recommended upholding his dismissal.  *See Appeals Committee Decision, ECF 140, Exh.2.* The decision of the appeals committee was submitted to Dr. Woodward, the Vice Chancellor of UMMC, and she affirmed the committee's decision.  *See Woodward Decision, ECF 140, Exh.3.*

**Plaintiff's Reported Performance Issues**

Plaintiff matched through the national residency matching program for a categorical surgical residency with UMMC and began working at UMMC in July 2016. *See House Officer Contract, ECF 140, Exh.4 and Deposition of Joe Papin pg 12, ECF 140, Exh.5.* As a first-year resident, Plaintiff worked on monthly rotations through various departments of UMMC. *See Deposition of Mark Earl pg. 31, ECF 140, Exh.6.* The reports about Plaintiff's performance issues began during his very first rotation.

Plaintiff's first rotation was in the cardiovascular intensive care unit (CVICU) during. *Id. at pg. 65.* On July 29, 2016, 28 days into his residency, two attending faculty members reported issues with Plaintiff to his program director, Dr. Mark Earl. *See Email of Dr.Ines Berger, ECF 140, Exh.7.* Dr. Inez Berger reported to Dr. Earl that four CVICU nurse practitioners and pharmacist had reported issues working with Plaintiff which included a heated exchange with Josh Sabins, one of the nurse practitioners in the unit.[1] *Id.* Dr. Berger also reported that there were issues with Plaintiff leaving during his shift when there was work to be done. She reported that the nurse practitioners stated that they would try to teach Plaintiff how to do a procedure, or ask him to pull a chest tube, and he would go to the operating room to observe. *Id.*

Dr. Berger reported that she met with Plaintiff about the perception of him based on the reports she had received and how it was impacting his work performance. *Id.* She also talked to him about the role of the nurse practitioners, how to set himself up for success, and the expectations of working with surgical teams. *Id.* Dr. Jay Shake, another attending physician on

---

[1]In his Motion, Plaintiff blames all of his future misconduct and performance issues during his other rotations at UMMC on the interaction with Nurse Practitioner Sabin in his first rotation in the CVICU. Plaintiff offers no evidence to support his speculative conclusion that NP Sabin had any influence on other reviews of Plaintiff in other departments and rotations at UMMC.

the rotation, talked to Dr. Earl about the very same issues initially reported to him by Dr. Berger, such the heated exchange with the nurse practitioner and him leaving during his shift to go to observe in the operating room. *ECF 140, Exh.6, at pg. 117.*

In response, Dr. Earl met with Plaintiff and discussed the issues brought to his attention by Drs. Shake and Berger, in addition to other issues of which he was aware. *See Email of Dr. Earl, ECF 140, Exh.8.* As it was his first rotation, Dr. Earl gave him the benefit of the doubt and instructed him to walk away from situations, to not be confrontational, and to improve his behavior at the workplace. *See ECF 140, Exh.6, at pg. 116 and ECF 140, Exh.16, pg. 14.* However, during this time, issues with Plaintiff's behavior continued, and Plaintiff received negative feedback through the online electronic evaluation system through his monthly evaluations from faculty, nurse practitioners and peers. ECF 140, Exh.10. As part of his training and feedback, Plaintiff was evaluated after each rotation by the faculty, nurse practitioners, and his peers.

In August 2016, Plaintiff rotated through the cardio thoracic (CT) surgery department. Once again, it was reported to Dr. Earl that he was having issues on this rotation. Dr. Jacob Moreman, an attending physician, reported to Dr. Earl that Plaintiff was not completing assigned tasks and was having difficult inter-professional relationships. *ECF 140, Exh.6, at pg. 160.* Also, there were continued complaints from nurse practitioners that Plaintiff was rude and condescending and that when they tried to teach him, he acted as though he had nothing to learn from them. *See Deposition of Renee Greene pg. 80-84, ECF 140, Exh.9.* At the end of his CT Surgery rotation, Plaintiff received his evaluations from the attending physicians and nurse

practitioners.   On- August 31, 2016, Dr. Moreman reported in Plaintiff's evaluation that he was:[2] 1)Seen frequently avoiding duties, not present and accounted for during regular hours; 2) an "abysmal communicator"; 3) he seemed almost never to be prepared or recall facts from previous discussions; and 4) he had to be reoriented to missed details almost daily. Other attending physicians reported numerous deficiencies in their evaluations of Plaintiff, including that he was unprofessional, dismissive and above doing certain work, and had issues with patient care follow-up.[3] [4]

The negative evaluations about Plaintiffs' CT Surgery rotation performance did not end with attending physicians.  Evaluations from nurse practitioners stated that Plaintiff failed to perform procedures when told, refused to be cooperative or learn when others offered to teach, as well as having poor communication with the team.[5]  Another reported that he was disrespectful to nurses and female support staff, was a poor communicator to the team, had poor insight into his own behavior, would not show up for clinic or be late, would disappear, did not follow instructions concerning discharges and follow up to the team, and that he seemed unteachable

---

[2]*See ECF 140, Exh.10, containing the E-value assessment comments by Dr. Jacob Moreman, Assoc. Professor, Papin 471.*

[3]*See ECF 140, Exh.10, containing the* E-value assessment comments by Dr. Peter De Delva, Assoc. Professor,

[4]*See ECF 140, Exh.10, containing the E-value assessment comments by Dr. Lawrence Creswell, Assoc. Professor, Papin 471.*

[5]*See ECF 140, Exh.10, containing the* E-value assessment comments by Penny Vance, Nurse Practitioner

with a lack of insight into his own professionalism.[7]

Dr. Moreman, Dr. Lawrence Creswell, Dr. Jay Shake, and Dr. Pierre de Delva all stopped by the Surgery office to complain about Plaintiff. *ECF 140, Exh.9 at pg. 96-99.* Not only did these physicians provide negative evaluations of Plaintiff, they each took the unusual step of coming by the surgery office to report directly on Plaintiff. Plaintiff was the only resident that they complained about to the General Surgery Residency office. *Id.* As a result, in September, Renee Greene, business administrator for the surgery department, met with Plaintiff and informed him that she was getting complaints about his behavior, so that he could address it before these complaints escalated further to his program director. *ECF 140, Exh.9 at pg. 93-94.*

Because of all the complaints against Plaintiff, Dr. Earl changed Plaintiff's rotation schedule for October 2016, placing him in Dr. Earl's own department, transplant surgery. *Id. at pg. 122-23.* Plaintiff was informed by email that this change was occurring due to the reports about performance issues. *See Green email to Papin, ECF 140, Exh.11.* This was the first time a resident had to be reassigned for observation by the program director due to complaints. ECF 140, Exh.9 at pg. 129.

In November 2016, Dr. Earl received a verbal complaint from Dr. Laura Vick, the attending faculty member overseeing Plaintiff's rotation in the General Surgery Department. *See Earl Deposition, ECF 140, Exh.6, at pg. 146.* Dr. Vick confronted Dr. Earl outside of the

---

[6]*See ECF 140, Exh.10, containing the* E-value assessment comments by Gretchen Shull, Nurse Practitioner

[7]The resident evaluation system is electronic, and when a doctor completes an evaluation, it is immediately available for the resident to review. *ECF 140, Exh.9 at pg. 100.* Once an evaluation is completed, the system sends an email notifying the resident, that there is an evaluation available for his review. *Id. at pg. 100.*

operating  room and informed him that Plaintiff was conducting rounds without actually seeing patients.  *Id.*  This complaint led to a meeting between Dr. Earl and Plaintiff outside of operating room 16.  *Id*.

On November 8, 2016, the Clinical Competency Committee (CCC) met to review the progress of Plaintiff during his residency.  Each residency program has a CCC.  For the general surgery residency program, the committee is made up of core faculty members within the department of surgery who meet biannually and evaluate the resident's progress based on faculty evaluations, in training exam performance, peer (co-resident) evaluations, grievances and all other available data.  *ECF 140, Exh.6 at pg. 97-98.*  The CCC scores each resident on 16 "milestones" that are specific to general surgery and based on the 6 core competencies.  The scores range from "critical deficiency" to 4.  Critical deficiencies are rare, even at the intern level. The milestones are not level specific, i.e. they are the same for 1st year and 5th year residents and meant to measure a resident's progression toward competent, independent practice.  *ECF 140, Exh.52.*  The CCC, of which Dr. Earl is not a member, rated Plaintiff to have seven (7) critical deficiencies out of sixteen (16) Milestones.[8]  *See Milestone Report on Papin, ECF 140, Exh.12.* Also while observing the CCC meeting, Dr. Earl learned that Plaintiff had broken protocol for patient sign outs by leaving a note instead of having a face to face exchange of information.  *See ECF 140, Exh.6, pg. 66, 75-76.*[9]

On November 29, 2016, Dr. Earl met with Plaintiff to perform his sem-annual review . During the meeting, Dr. Earl reviewed Plaintiff's CCC Milestones and his critical deficiencies. Dr. Earl informed Plaintiff of the communication and professionalism concerns brought by

---

[8]*See ECF 140, Exh.. 12. General Surgery Milestones.*

[9]*See ECF 140, Exh.6 pg. 49.*

medical and nursing staff.  Dr. Earl instructed Plaintiff to to take ownership of tasks, ECF 140, Exh.humility, and  to treat nurses and allied health staff with respect.  *See Semi-Annual Review, ECF 140, Exh.41.*  Plaintiff signed the semi-annual review acknowledging this counseling by Dr. Earl.  *Id*.  During the meeting, he was told that there must be significant improvement in his performance.  *See ECF 140, Exh.41, Meeting notes.*

After the semi-annual review, more complaints regarding Plaintiff's performance and behavior were reported.  Dr. Earl had a meeting with the chief resident on the trauma service, Dr. Mahoney, who reported issues with  Plaintiff's performance on the trauma surgery rotation.  *See ECF 140, Exh.6 at pg. 147.*  Based on these complaints, Dr. Earl met with Plaintiff again on December 20, 2016, to address Plaintiff's recurring issues of professionalism that had been present through much of the first six months of his residency.  *See Earl Dec. 20 email, ECF 140, Exh.13.*  This meeting specifically addressed:  (1) Plaintiff's unwillingness to help with tasks;  (2) Plaintiff leaving the hospital during duty hours to exercise; (3) Plaintiff's condescending tone to nurses and fellow residents;  (4) Plaintiff leaving clinics without telling anyone; and (5) Plaintiff's poor inter-professional communication.  *ECF 140, Exh.13.*

After this meeting, Plaintiff's performance did not improve and patient safety issues developed along with a continuation of his professionalism and other issues.  On December 28, 2016, Dr. Earl received an email from the Administrative Chief resident, Dr. Brian Sparkman who reported:

> On Papin, he has failed to do several duties this week, such as washing out wounds and completing his floor work per Sid and Ashley.  Ashley has some valid concerns about coverage over the holidays on trauma.  He is currently the only intern on over the holidays and her concern is for patient safety.  Do we have someone that we can swing over to cover trauma with him.

*See Sparkman Email, ECF 140, Exh.14.*

After the holiday rotations, Renee Greene, Senior Education Administrator, received emails concerning Plaintiff's performance.  On January 3, 2017, Dr. Colin Muncie, Pediatric Surgery Research Fellow, sent an email to Renee Greene outlining an incident that had occurred the prior weekend that reflected Papin's inefficiency and contumacious conduct.  *See Muncie Email, ECF 140, Exh.15.*  Dr. Muncie had delegated to Plaintiff the hand-off of a trauma patient to the ICU.  Plaintiff  was specifically instructed to enter orders and sign off to the ICU.  Dr. Muncie was informed by another resident at the end of shift that the ICU was surprised and never notified that the patient was coming. When Dr. Muncie confronted Plaintiff, he confidently told him that he had spoken with someone, although he could not remember who it was.  *Id*.  Dr. Muncie followed up with the ICU nurse practitioner, who spoke to everyone who had been on duty.  It was confirmed that Plaintiff never spoke with anyone on the ICU team;  he was untruthful about contacting the ICU; and, he failed to perform the tasks assigned to him.  *See ECF 140, Exh.15, and the Appeal Hearing Transcript, ECF 140, Exh.16 at pg. 87-88.*  During the hearing, Plaintiff admitted to the facts as described by Dr. Muncie.  *ECF 140, Exh.16 at pg. 89.*

William Crews, a third year medical student, sent an email on January 3, 2017, to Administrator Greene about issues of untruthfulness concerning patient care.  *See William Crews Email, ECF 140, Exh.17.*  Crews reported that Plaintiff always seemed to show up just before rounds without actually having seen any of the patients and then would lie to the residents about what he had done. *Id.*  Dr. Crews also spoke with Dr. Meagan Mahoney, one of the chief residents at this time, about Plaintiff's behavior. *Exhibit 43, pg. 57-59.*

On January 10, 2017, Dr. Mahoney emailed Dr. Earl and Administrator Greene about numerous concerns. These included: (1) Plaintiff's inattention to detail; (2) Plaintiff not knowing basic details about his patients during rounds; (3) Behavior issues that were addressed on

numerous occasions; and, (4) Plaintiff often displaying an attitude or reluctance to help with patients. *See Email of Dr. Mahoney, ECF 140, Exh.18.* Plaintiff would using the excuse "that isn't my patient." *Id.* Plaintiff had complaints from most of the nurses concerning rudeness and professionalism issues. And, it was also reported that Plaintiff was lying to the Chief resident about seeing patients before rounds. *Id.* In addition, Dr. Mahoney reported that she believed Plaintiff was dishonest about examining a patient that developed a sacral decubitus wound that required surgery. *Id.*

Dr. Ashley Griffin, another chief resident, also sent emails on January 9 and 10, 2017, citing seven incidents involving Plaintiff. These included: (1) Plaintiff leaving the hospital during a code of one of his patients; (2) Plaintiff not showing up on time to pre round or to get sign out; (3) Plaintiff not going to traumas during the holidays; (4) Plaintiff trying to send a patient home that was not competent despite being warned; (5) Plaintiff making the female trauma student incredibly uncomfortable; (6) Plaintiff trying to round with staff without having seen the patients; and (7) Plaintiff being told to washout a massive wound on a trauma patient in the ICU and he did not do it and left. *See Emails of Dr. Ashley Griffin, ECF 140, Exh.19.*

Based on these reports, Dr. Earl met with Plaintiff on January 10, 2017, in order to provide written documentation of the issues and place him on an academic remediation plan. Dr. Earl discussed the concerns that had been raised regarding him being untruthful about patient care, leaving the hospital in the middle of his shift to exercise, his unwillingness to help with tasks, his condescending tone to nurses and fellow residents, and his poor communication. Plaintiff signed acknowledging his receipt of the feedback. *See Jan. 10, 2017 signed feedback letter, ECF 140, Exh.20.*

**The Graduate Medical Education (GME) Office**

After meeting with Plaintiff, Dr. Earl met with Dr. Rick Barr, the Associate Dean for

Graduate Medical Education (GME), and informed him what had occurred and of his meeting with Plaintiff. *See Deposition of Dr. Rick Barr, ECF 140, Exh.21 at pgs. 21-22, 45-46.* During the meeting, Dr. Earl outlined his concerns with Plaintiff's performance, particularly about Plaintiff's untruthfulness and the difficult interactions with other members of the care team. *ECF 140, Exh.21 at pgs. 71-72.* Dr. Earl also reported his concerns with reports that Plaintiff was rounding unprepared and  not examining the patients. *ECF 140, Exh.21 at pg. 72.* Dr. Earl informed Dr. Barr that he intended to do an academic remediation plan with Plaintiff. Dr. Barr decided that this was not an academic issue, but a professionalism and patient safety issue that needed to be reported to human resources. *ECF 140, Exh.21 at pgs. 77 and 86-87.* Dr. Barr recommended immediately removing Plaintiff from service and placing him on administrative leave while human resources reviewed Papin's conduct and behavior. *See Appeal Hearing Transcript, ECF 140, Exh.16 at pg. 100.* Dr. Barr made this decision based on the obligation to protect patients. *ECF 140, Exh.21 at pgs. 92-93.* Dr. Barr emailed human resources on January 11, 2017, referring the matter to them. *See Barr Email, ECF 140, Exh.22.* Based on the instructions from Dr. Barr, Dr. Earl made the request for human resources to examine the employment related aspects of the behaviors that had been reported concerning Plaintiff. *See ECF 140, Exh.23, Deposition of Molly Brasfield at pg. 31.*

As a medical resident, Plaintiff occupies two roles at UMMC.  First, he is an employee under a one -year contract of employment.  Second, he is a trainee seeking to advance in the surgery residency program working toward becoming a surgeon capable of independent practice. Due to his status, he falls under two different sets of rules and policies, the Faculty and Staff Handbook which applies to all employees and the academic requirements and policies of the GME program for his training. *See ECF 140, Exh.24, Deposition of Dr. Jimmy Stewart at pg. 45-49.* Even though there may be overlap, these are two distinct areas, and Plaintiff's ability to

continue at UMMC requires him to remain in good standing for both.  Because Dr. Barr determined that the issues concerning Plaintiff's behavior were employee related and not academic, the matter was referred to human resources for review.

**Human Resources**

Upon receipt of the email from Dr. Barr, the  Human Resources Director for Academics and Research, Molly Brasfield, opened a review by human resources into Plaintiff.  Brasfield requested Dr. Earl provide any documentation so that human resources could review it.  *ECF 140, Exh.22.*  On January 13, 2017, Dr. Earl emailed Molly the evaluation feedback comments[10], the email complaints[11], and the signed January 10, 2017 letter[12], and described the issues with Plaintiff to her.  *See Dr. Earl email to HR, ECF 140, Exh.25.*  Brasfield assigned Human Resource Business Partner Patricia Whitlock to review the issues with Plaintiff.  *See ECF 140, Exh.23, Deposition of Brasfield, pg. 39  See also ECF 140, Exh.25, and ECF 140, Exh.26.*

On January 27, 2017, Plaintiff was interviewed by Whitlock.  The issues cited above were discussed with him and he provided a response for each.  *See ECF 140, Exh.27, Papin HR Statement Transcript.*  Whitlock believed that Plaintiff did not accept any accountability for his actions and indicated that it was either someone else's fault or no one had given him clear feedback. He did not think he was being rude or condescending and once it was pointed out to him that this was how he was perceived, he was putting forth effort to change.  *See ECF 140, Exh.28, Whitlock Recommendation email.*

Plaintiff further maintained that neither Dr. Earl, nor anyone else, had ever given him feedback that there were any concerns.  However, this is contradicted by his own statements to

[10]*See aggregate evaluation comments, ECF 140, Exh.10.*

[11]S*ee Emails, Exh.s 15, 17, 18, 19*

[12]*See Jan. 10, 2017 feedback letter, ECF 140, Exh.20*

Whitlock where he admits that Dr. Earl had called him in several times to discuss his professionalism issues.  *See ECF 140, Exh.27 at pg. 26-27.*

After her review, Whitlock recommended the dismissal of Plaintiff to the Employee Relations Director, Cecelia Bass, stating: "UMMC no longer has faith in Plaintiff's honesty and there is great concern regarding patient safety in allowing him to continue at UMMC."  *See ECF 140, Exh.28.*

After review by the Employee Relations Department of Human Resources at UMMC, Cecelia Bass, the Employee Relations Director approved the decision to dismiss Plaintiff for violating UMMC's policies.  *See ECF 140, Exh.29, Cecelia Bass email approving dismissal.*  The final decision maker to decide whether to dismiss Plaintiff prior to his hearing was Bass, and Dr. Earl had no role in the decision making after it was referred to human resources.  *ECF 140, Exh.53, Whitlock, pg. 23-26 and ECF 140, Exh.23, Dep. of Brasfield at pg. 31 and 37.*

After the decision was made by Bass to dismiss Plaintiff, human resources facilitated a meeting with Plaintiff on February 22, 2017, to inform him of his dismissal.  At the meeting, it was requested that he turn over his UMMC ID badge.  Plaintiff refused and stormed out of the room.  *See ECF 140, Exh.30, Email of Whitlock and ECF 140, Exh.5, Depo of Papin at pg 214.*

**The Appeal**

Plaintiff, through his attorney Joel Dillard, submitted a notice of appeal to UMMC.  *See ECF 140, Exh.31, Joel Dillard Letter.*  In the letter, Plaintiff requested to appeal his dismissal through **the GME grievance procedure**.  *Id*.  *See also ECF 140, Exh.48, Request for Admission No. 1.*  Steven Bondi. M.D., J.D., was selected chair of the appeals committee in accordance with the UMMC Evaluation Policy and Grievance Algorithm.  *See ECF 140, Exh.34, Woodward Affidavit, ECF 140, Exh.42, Deposition of Dr. Steven Bondi pg. 55, and ECF 140, Exh.35, Dr. Bondi Email to Bryce Ainsworth.*  Prior to the hearing, Plaintiff was provided with written notice

of complaints against him, the documents UMMC intended to rely on during the hearing, and the list of UMMC's potential witnesses. *See ECF 140, Exh.36 and 37, Notice Letter and documents.* The notice letter and documents were mailed and emailed to Joel Dillard, Plaintiff's attorney on July 5, 2017. *See ECF 140, Exh.38, Brasfield email to Joel Dillard.*

On July 18, 2017, the appeals committee convened and heard the appeal of Plaintiff's dismissal. *See ECF 140, Exh.16, Transcript of the Appeal Hearing. ECF 140, Exh.48, Request for Admission No. 2.* The appeals committee consisted of members of the GME committee and one member of the house staff (resident) in accord with the grievance policy, and the hearing was held approximately ten days after Dr. Bondi's appointment as the chair of the appeals committee. *See ECF 140, Exh.40, Evaluation Policy and Grievance Algorithm.* During the hearing, Plaintiff was able to hear the testimony of all the witnesses and respond to each witness. *ECF 140, Exh.48, No. 7 and 8.* In addition, the appeals committee was allowed to examine and question each witness and Plaintiff concerning the claims and their testimony. *See ECF 140, Exh.16, Hearing Transcript.*

After the hearing, the appeals committee decided to uphold the decision to dismiss Plaintiff's from his employment with UMMC, and that decision was provided in writing to Vice Chancellor Dr. LouAnn Woodward for her consideration. *See ECF 140, Exh.2, the Committee Letter.* Dr. Woodward upheld the decision to dismiss Plaintiff and deny his appeal, based on her independent review of the appeals committee's decision. *See ECF 140, Exh.3, Woodward Letter.*

## **ARGUMENT:**

**I.     The Defendant's are entitled to dismissal of Plaintiff's claims and his Motion for Partial Summary Judgment should be denied.**

On February 26, 2021, the Defendants filed a comprehensive Motion for Summary Judgment as to all claims by the Plaintiff. [ECF 140] and an accompanying brief [ECF 141].

For the reasons cited by the Defendants in their motion for summary judgment, Plaintiff's motion for partial summary judgment should be denied, and judgment entered for the Defendants.

II.     **UMMC has immunity under the Mississippi Tort Claims Act for Plaintiff's State law due process claims, and he is not entitled to partial summary judgment.**

Plaintiff's partial motion for summary judgment seeks judgment only on his state law due process claims against UMMC.  The Plaintiff specifically plead Counts II and III of his complaint pursuant to the Mississippi Tort Claims Act.  *See paragraphs 93 and 98 of Plaintiff's Second Amended Complaint [ECF 50]*.  As such, all claims for damages against the state are required to brought pursuant to the MTCA.  Since UMMC has immunity under the discretionary function immunity of the MTCA, Plaintiff's claims should be dismissed as a matter of law and his motion for partial summary judgment denied.

Under Mississippi Code Section 11-46-9(1)(d), UMMC  "shall not be liable for any claim ... [b]ased upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a governmental entity or employee thereof, whether or not the discretion be abused[.]"  Very recently, the Court returned to its traditional, two-part, public policy function test to determine when Section 11-46-9(1)(d) applies. *Wilcher v. Lincoln Cty. Bd. of Supervisors*, 243 So.3d 177 (Miss. 2018). "This Court first must ascertain whether the activity in question involved an element of choice or judgment." Montgomery, 80 So.3d at 795. If so, this Court also must decide whether that choice or judgment involved social, economic, or political-policy considerations. *Id.* Only when both parts of the test are met does a government defendant enjoy discretionary-function immunity.  Wilcher, 243 So. 3d at 187.  Under this test, "[t]his Court first must ascertain whether the activity in question involved an element of choice or judgment." *Id*. at 187 *(quoting Miss. Transp. Comm'n v. Montgomery*, 80 So.3d 789, 795

(Miss. 2012) ).

The decision of how to discipline employees has been held to be a discretionary function entitled to immunity.

> The manner in which a police department supervises, ***disciplines*** and regulates its police officers is a discretionary function of the government and thus the city is immune to suit under § 11–46–9(1)(d).

*City of Jackson v. Powell*, 917 So. 2d 59, 74 (Miss. 2005)(emphasis added).  The same applies to UMMC and the decision to discipline Plaintiff, and the manner in which UMMC choses to conduct disciplinary or termination hearings.  These are discretionary decisions based on personnel and disruption to the academic environment.

The second question is "whether the choice or judgment in involves social, economic or political policy alternatives." *Id*.   Unquestionably, the choice and judgments required of these state workers emanate from, or relate to, matters of human welfare. The policy underlying question (2) is that "[s]tate tort standards cannot adequately control those government decisions in which, to be effective, the decision maker must look to considerations of public policy and not merely to established professional standards or to standards of general reasonableness." *Womble v. Singing River Hosp.*, 618 So.2d 1252, 1263 (Miss.1993) (quoting *Pruett v. City of Rosedale*, 421 So.2d 1046, 1051–52 (Miss.1982)).

Moreover, "[w]hen established governmental policy, as expressed or implied by statute, regulation, or agency guidelines, allows a Government agent to exercise discretion, it must be presumed that the agent's acts are grounded in policy when exercising that discretion." Id. at 324, 111 S.Ct. 1267 (emphasis added).  *Dancy v. E. Mississippi State Hosp.*, 944 So. 2d 10, 17–18 (Miss. 2006).  Employment decisions made by government officials are discretionary functions. *See, e.g., Patton v. Hinds County Juvenile Det. Ctr. (Henley–Young)*, No. 3:10cv138, 2011 WL

2912897, at *6 (S.D.Miss. July 18, 2011) ("Employment decisions, like that about which Patton

complains, are classic discretionary functions ... since they require 'personal deliberation,

decision and judgment.' "); *DePree,* 2008 WL 4457796, at *9 ("An employment decision is a

classic discretionary function."); *Suddith*, 977 So.2d at 1179 (¶¶ 48–49) (holding that the

decision to offer a professor a one-year contract of employment, as opposed to a tenure track

position, was a discretionary act immune from liability under the MTCA).

> We further find that Drs. Lucas and Huffman's judgment regarding the hiring of a
> faculty member involved important social and public policy, such as providing the
> students of Mississippi at this public university with the best faculty members
> possible.

*Suddith v. Univ. of S. Mississippi*, 977 So. 2d 1158, 1179 (Miss. Ct. App. 2007)

Because the decision of whether to remove Plaintiff from patient care, and ultimately, to

terminate his employment, involved a choice or judgment that impacted UMMC's policy in

providing patient care and educating future medical professionals, UMMC's actions undoubtably

affect public policy in the second part of the analysis.  Since there is no statute or policy that

specifies how the hearing is to take place, the procedures fall within UMMC's discretionary

authority.  Therefore, UMMC is immune pursuant to the discretionary function immunity of the

Mississippi Tort Claims Act, and the Plaintiffs' claims should be dismissed as a matter of law.

**III.     Plaintiff Received all required pre-termination due process.**

Plaintiff's multiple meetings with his program director and his meeting with Human

Resources provided him with sufficient pre-termination due process.  The standards for a pre-

termination hearing are not stringent because of the expectation that a more formal

post-termination hearing will remedy any resulting deficiencies. "[T]he pre-termination

'hearing,' though necessary, need not be elaborate.... '[T]he formality and procedural requisites

for the hearing can vary, depending upon the importance of the interests involved and the nature

of the subsequent proceedings.' " *Loudermill*, 470 U.S. at 545, 105 S.Ct. at 1495 (*quoting Boddie*

*v. Connecticut*, 401 U.S. 371, 378, 91 S.Ct. 780, 786, 28 L.Ed.2d 113 (1971)). "[T]he pre-

termination hearing need not definitively resolve the propriety of the discharge. It should be an

initial check against mistaken decisions—essentially, a determination of whether there are

reasonable grounds to believe that the charges against the employee are true and support the

proposed action." *Id*. 470 U.S. at 545–46, 105 S.Ct. at 1495.

The pre-termination hearing is merely the employee's chance to clarify the most basic

misunderstandings or to convince the employer that termination is unwarranted. The pre-

termination hearing is intended to supplement, not duplicate, the more elaborate post-termination

hearing. *Powell v. Mikulecky*, 891 F.2d 1454, 1458 (10th Cir. 1989). As such the courts have

held that a brief face-to-face meeting with a supervisor provides sufficient notice and opportunity

to respond to satisfy the pre-termination due process requirements of *Loudermill*. *West v. Grand*

*Cty.*, 967 F.2d 362, 368 (10th Cir. 1992)(*citing Powell*, 891 F.2d at 1459). Further the courts

have held that nothing in *Loudermill* suggests that a public employee is entitled to some type of

"pre-notification notice" of the charges against him. Likewise, *Loudermill* does not imply that, in

conducting the pre-termination hearing, there must be a delay between the "notice" and the

"opportunity to respond" accorded to the public employee. *Powell v. Mikulecky*, 891 F.2d 1454,

1459 (10th Cir. 1989).

> We have held, however, that "advance notice is not required." *Gniote*k, 808 F.2d
> at 244. In *Copeland v. Philadelphia Police Dep't*, 840 F.2d 1139, 1142–46, we
> held that procedural due process was met where a policeman was told that he had
> tested positive for illegal drug use, was allowed to respond, and was told that he
> would be suspended with intent to dismiss, all in the course of a single interview.

*McDaniels v. Flick*, 59 F.3d 446, 457 (3d Cir. 1995)

In *Browning v. City of Odessa*, 990 F.2d 842, 844–45 (5th Cir.1993), a firefighter was

provided a thirty-minute pre-termination meeting with the fire chief, wherein the firefighter was notified of his pending dismissal, informed of the reasons for his dismissal, and given an opportunity to respond. In that case, the evidence clearly showed that the fire chief had met with the firefighter prior to his dismissal to discuss the reasons for termination and that the firefighter had been allowed to orally present his side of the story. *Id*. The firefighter failed to convince the chief that his termination was not warranted, and he was dismissed the same day. *Id*. at p. 843.

To support his position, the Plaintiff relies on *Coburn*, which the Court distinguished from *Browning*.

> In the instant case, there is no evidence before the Court that Plaintiff Coburn had received any prior warnings or previous discipline for this or any other offense. While there is a dispute as to the sequence in which Brice handed Plaintiff various documents, there is no dispute that Plaintiff was given notice and the opportunity to be heard essentially simultaneously with the termination.

*Coburn v. City of Bossier City*, No. 5:09-CV-01970, 2012 WL 1071184, at *6 (W.D. La. Mar. 5, 2012), modified on reconsideration, No. 5:09-CV-01970, 2012 WL 2427038 (W.D. La. June 26, 2012).  He also cites to Davis v. Mann, which is inapplicable to the pre-termination notice requirement because Davis dealt with notice provided for his final or post deprivation hearing. 721 F.supp 796 (S.D. Miss March 23, 1988).[13]

Unlike *Coburn*, Plaintiff Papin is analogous to the Fifth Circuit's holding in *Browning*. The record shows a pattern of warnings, poor evaluations, counselings, and meetings with the Plaintiff concerning his behavior that culminated with him being placed on administrative leave with pay and subsequently interviewed by Human Resources.  The District Courts in Mississippi have followed *Browning* in the university context holding that:

---

[13]In *Davis*, although Plaintiff received his notice on the day of the hearing, the Court still granted summary judgment because the hearing did not conclude and Plaintiff had a week to prepare his defense before the hearing resumed.

> In this regard, the Court notes that Harris met with Sutton . . . and discussed the removal of her administrative duties and responsibilities. Although this meeting only lasted a few minutes, it sufficed to afford Harris an opportunity to explain her position and to minimize the risk of erroneous deprivation. *See Browning*, 990 F.2d at 844 (stating thirty minute meeting with decision maker was sufficient pre-termination process where full post-deprivation was also available).

*Harris v. Mississippi Valley State Univ.*, 899 F. Supp. 1561, 1576 (N.D. Miss. 1995).

In support of his contention that he was due more process, the Plaintiff references the Faculty and Staff Handbook's Initial Employment Period policy to establish that he was entitled to written notice of issues that could lead to termination. [ECF 145, pg. 4]. The policy cited by the Plaintiff only refers to the "initial employment period for the first 90 days." **Handbook**, pg. 40. Plaintiff started work on July 1, 2016, and his 90 day initial or "probationary" period ended October 30, 2016. Therefore this policy is inapplicable to the Plaintiff's dismissal in February 2017. Notwithstanding the policy for the initial employment period, Plaintiff received written feedback and warning on many occasions during his short tenure with UMMC. Plaintiff received monthly written feedback of his poor performance through written evaluations by physicians and nurse practitioners.[14] *See ECF 140, Exh.10, Aggregate Comments.* Plaintiff admitted to human resources that Dr. Earl met with him on several occasions to address professionalism issues. *See ECF 140, Exh.27, Papin HR Statement at pg. 26.* During his semi-annual review, which Plaintiff signed, he again received written feedback which informed him that he was critically deficient in numerous categories, and informed him that there must be significant improvement. *See ECF 140, Exh.41, Semi-Annual Review and meeting notes.* He was put on notice again in his meeting with Dr. Earl on December 20, 2016, where his deficiencies were again expressed. *See ECF 140,*

---

[14]Although provided, Plaintiff admits he did not read  the evaluations provided by Dr. Creswell, Dr. Moreman, Penny Vance or Gretchen Schull. ***Exh. 4, Papin pg. 53-54 and Exh. 5, Evalue Report***

*Exh.13, Dr. Earl Email.*  Finally, on January 10, 2017, Plaintiff was placed on administrative

leave with pay.  This occurred after a meeting with Dr. Earl where he was provided additional

written feedback concerning his behavior and performance.  *See ECF 140, Exh.20, Feedback

Letter.*

After being placed on administrative leave, Plaintiff met with Human Resources Business

Partner Pat Whitlock who interviewed him as part of her review concerning the allegations

against him, and gave him an opportunity to respond.  *See ECF 140, Exh.27, Transcript of Papin

HR Interview.*  During the interview, Whitlock reviewed his argument with the nurse practitioner

in the CVICU [pg 3]; his declining tasks [pg. 11]; his leaving during a code [ pg. 13]; the

perception of him leaving the hospital early [pg. 14]; exercising during his shift [pg. 16]; his

lying about patient care and the decubitus ulcer patient [pg. 17]; his not going on rounds [pg. 21];

his not logging cases [pg. 22]; and the fact that Plaintiff had several meetings with Dr. Earl

concerning his performance [pg. 26-29].  *Id.*  During the questioning by Whitlock, Plaintiff was

able to offer his explanation for each.  *See ECF 140, Exh.27.*

Under the totality of the circumstances, the multiple meetings with Plaintiff prior to his

termination to discuss his professionalism issues coupled with his interview with human

resources satisfied his pre-termination due process notice and hearing requirements.  He was

informed of the allegations against him and given the opportunity to present his side of the story.

At this stage, that is all that due process requires.  Therefore, Plaintiff has not established a

violation of his procedural due process rights concerning lack of pre-termination due process,

and this claim should be dismissed as a matter of law.

**IV.     Post Deprivation Due Process**.

Plaintiff was informed of the decision to terminate his employment in a meeting with HR

Business Partner Pat Whitlock and Dr. Mark Earl on February 22, 2017.  After the meeting, the Plaintiff sent a letter from his attorney on March 3, 2017, requesting to appeal his termination. Plaintiff received all due process required under Mississippi and Federal law.  In his motion for partial summary judgment, the Plaintiff asserts four reasons that his post-deprivation due process rights were violated.  First, the notice did not provide enough detail.  Second, he was not allowed to cross-examine witnesses or present a "list of questions" for cross-examination.  Third, that certain panel members had a bias.  Finally, that the hearing was a "sham." [ECF 145, pg 21-23]. All of Plaintiff's allegations fail as a matter of law, and judgment should be entered for the Defendants.

### A. Notice

The Fifth Circuit has held that due process requires notice in sufficient detail to enable the Plaintiff to show any error that may exist.  *Stewart v. Bailey*, 556 F.2d 281 (5th Cir. 1977). The letter, supporting documents and transcript provided to the Plaintiff satisfied the notice requirements for Plaintiff's due process claim.  The letter listed specific instances of conduct by the Plaintiff and chronicled the complaints, the dates of the complaints, who made the complaints, and how they were received.  *ECF 140, Exh. 36, Letter*.  In addition, the actual written complaints made by other UMMC personnel were provided to the Plaintiff.  *See ECF 140, Exh. 37, Notice documents*.  The Plaintiff's contention is not that he didn't receive notice, but that the notice did not provide enough 'specific' detail, therefore it violated due process.  As the precedent establishes, the notice received by the Plaintiff satisfies the due process standard.

To begin, the Plaintiff points the Court to *Wells v. Dallas Independent School District,* 793 F.2d 679 (5th Cir. 1986), to establish his claim.  In *Wells*, the Fifth Circuit specifically held that two provisions of the provided notice were acceptably specific "allegations of misdeeds in

specific circumstances [that allowed the plaintiff] to prepare his defense."  Those provisions,

which are similar to Plaintiff's notice, read as follows:

> At the hearing the Administration will present evidence with regard to the
> following matters and charges forming the basis of your termination ...
>
> 2.   Insubordination and disobedience in participating in the execution of a
>      management contract with the Foundation for Quality Education in direct
>      opposition and defiance of orders of the General Superintendent.
>
> 3.   Negligence and mismanagement by you in your agreement to terms and
>      conditions and execution of documents related to a pledge of retainage by
>      Maxwell Construction Company to the Merchant's State Bank.

*Wells v. Dallas Independent School District,* 793 F.2d 679 (5th Cir. 1986)

Subsequent courts interpreting Wells have come to similar conclusions concerning the

types of notice required.  In *Tercero*, the Court granted summary judgment for the Defendants

which provided notice of nine different reasons for termination.  The *Torcero* notice provided:

> 1.   Deliberately or recklessly failing to timely and properly procure TWIA and
>      excess windstorm insurance policies;
> 2.   Deliberately or recklessly failing to seek Board action to timely and
>      properly procure TWIA and excess windstorm insurance policies;
> 3.   Deliberately or recklessly failing to follow state law and TSC policy and
>      procedures to have the TWIA and excess windstorm insurance policies
>      submitted for bids;
> 4.   Deliberately or recklessly exceeding your authority by renewing the TWIA
>      and excess windstorm policies without first seeking Board action and/or
>      approval;
> 5.   Deliberately or recklessly causing TSC checks to be stamped with
>      signature stamps for persons who are no longer trustees of the TSC Board;
> 6.   Deliberately or recklessly failing to timely search for and replace personnel
>      in the key position of Vice President for Finance and Administration;
> 7.    Deliberately or recklessly failing to timely and accurately inform the TSC
>      Board of the status of ADN nursing program for three years, and until such
>      program was placed on suspension by the Texas State Board of Nursing;
> 8.   Deliberately or recklessly failing to timely and accurately inform the TSC
>      Board of the status of the TWIA and excess windstorm insurance policies;
> 9.   Refusal to carry out the reasonable directives of the employee's supervisor.

Tercero v. Texas Southmost Coll. Dist., No. 1:16-CV-282, 2018 WL 4333996, at *3–4 (S.D.

Tex. June 4, 2018).  In reviewing the notice provided, the Court held that all were sufficient to

satisfy due process.  The Court held:

> Like the charges approved of in Wells, the grounds presented in the Defendants'
> notice letter set out the specific circumstances surrounding Tercero's alleged
> misdeeds. Those grounds gave her more than an adequate opportunity to
> understand the charges and develop her defense against them, as evidenced by her
> counsel's ability to present reasoned arguments in response to those made by the
> District's attorney.

*Tercero v. Texas Southmost Coll. Dist.*, No. 1:16-CV-282, 2018 WL 4333996, at *4 (S.D. Tex.

June 4, 2018)

    Further, just last year, the Fifth Circuit affirmed the District Courts grant of summary

judgment to the Defendants in *Jackson v. Pierre*, based on notice which stated the decision was

based on allegations of  family members.

> By her own allegation, the notice that Jackson received indicated that the
> allegations against her were "[b]ased on allegations made by the family members
> of Helen Plummer," which, like the Fifth Circuit-approved provisions above,
> ***provided a general context or point of reference for the alleged misconduct.***
> ***Jackson's notice also stated that she was charged with failure to perform duties***
> ***in a professional manner, unethical and/or immoral behavior, and conduct***
> ***seriously prejudicial to the Southern University Law Center***. Those charges are
> no more or less specific than the charges of negligence, mismanagement,
> insubordination, and disobedience that the Fifth Circuit found sufficient in *Wells*.

*Jackson v. Pierre*, No. CV 18-603-SDD-RLB, 2019 WL 4739294, at *4 (M.D. La. Sept. 27,

2019), aff'd, 810 F. App'x 276 (5th Cir. 2020).

    The notice letter to Plaintiff provided him with sufficient written notice of the reasons for

his dismissal, a list of the witnesses who would testify at the hearing, and a description of the

evidence that would be presented at his hearing.  *See ECF 140, Exh.36*.  The letter outlined

numerous incidents of specific conduct which more than apprised the Plaintiff of the general

context and point of reference for his alleged misconduct.  The letter outlined Dr. Muncie's

complaint that Plaintiff failed to properly sign off a patient to the ICU, Dr. Mahoney's report that

23

Plaintiff lied about a decubitous ulcer patient, Dr. Griffin and Dr. Mahoney's report Plaintiff

failed to respond to a code on a patient, medical student William Crews report that he was not

rounding on patients, Dr. Mahoney's report that Plaintiff lied about logging cases, Dr. Griffin's

report that Plaintiff did not go to trauma calls during the holidays, and Plaintiff's attitude and

condescending rude treatment of nurses and other staff members.  *See ECF 140, Exh. 36.*  All of

these examples and those in the letter met the threshold of notice required for due process.

Like *Jackson*, the Plaintiff, in addition to the letter, was provided with 48-pages of

documents which included the written email complaints against the Plaintiff by other residents

and a student, the evaluations and feedback provided to the Plaintiff, and the transcript of

Plaintiff's interview with human resources reviewing the complaints against him.  *Id. and ECF*

*140, Exh.37 the Notice Documents.*  The letter alone satisfied Plaintiff's due process notice

requirements, especially when viewed in light of the supporting documents supplied with it.

Under the totality of the circumstances, the Plaintiff received all the notice required under the due

process clause to apprise him of the general context and nature of the charges against him. As

such, Plaintiff's claims should be denied and dismissed.

      **B.**    **The Hearing**

Plaintiff received a full hearing as provided for in the Graduate Medical Education

policies, and the hearing more than satisfied Plaintiff's due process requirements.  If a public

university dismisses a student for "disciplinary reasons," the student is **not** entitled to a formal

hearing but instead to "an 'informal give-and-take' between the student and the administrative

body dismissing him that would, at least, give the student 'the opportunity to characterize his

conduct and put it in what he deems the proper context.' " *Perez v. Texas A & M Univ. at Corpus*

*Christi*, 589 F. App'x 244, 248–49 (5th Cir. 2014).

In the Plaintiff's Motion for Partial Summary Judgment, he alleges the hearing was deficient due to his inability to cross-examine the witnesses on his own or have the panel cross-examine the witness with questions he presents.  The Fifth Circuit has held that none of these are required in student disciplinary actions.

> A student subject to school disciplinary proceedings is entitled to some procedural due process. The student must be given notice of the charges against him, an explanation of what evidence exists against him, and "an opportunity to present his side of the story." ***The student is not entitled to the "opportunity to secure counsel, to confront and cross-examine witnesses supporting the charge, or to call his own witnesses to verify his version of the incident***."

*Willis v. Texas Tech Univ. Health Scis. Ctr.*, 394 F. App'x 86, 87 (5th Cir. 2010)(Unpublished).

> Before a student is dismissed for **disciplinary** reasons, procedural due process requires that he receive notice of the charges and a chance to rebut them. . . .***A court-like hearing that includes an opportunity to cross-examine witnesses is not required***, but the hearing must at least present the decisionmaker with the arguments of both sides in sufficient detail. *Id*.

*Dung Quoc Pham v. Blaylock*, 712 F. App'x 360, 363 (5th Cir. 2017), cert. denied, 138 S. Ct. 1548, 200 L. Ed. 2d 741 (2018)(unpublished).

Assuming the Plaintiff has a liberty interest, the process used did not violate his rights.

### i.      *Cross-Examination*

The Fifth Circuit recently addressed the issue of procedural due process in university hearings in *Walsh v. Hodge*, 975 F.3d 475, 483–84 (5th Cir. 2020).  Under the first prong of the immunity analysis, the Court examined whether the denial of the right to cross-examine a witness is a deprivation of procedural due process.

> we agree with the position taken by the First Circuit "that due process in the university disciplinary setting requires 'some opportunity for real-time cross-examination, ***even if only through a hearing panel***.' " We stop short of requiring that the questioning of a complaining witness be done by the accused party, as "we have no reason to believe that questioning ... by a neutral party is so fundamentally flawed as to create a categorically unacceptable risk of erroneous deprivation."

25

*Walsh v. Hodge*, 975 F.3d 475, 483–84 (5th Cir. 2020)(emphasis added).

Under the holding of *Walsh*, there was no deprivation of the Plaintiff's procedural due process because the appeals committee heard the witnesses' testimony and the committee was afforded the opportunity to question each witness. *ECF 140, Exh.16*. In *Walsh*, the accuser was not present at the hearing, and the panel relied on statements of the accuser made to a university investigator. The Court found that:

> we are persuaded that the substitute to cross-examination the University provided Walsh—snippets of quotes from Student #1, relayed by the University's investigator—was too filtered to allow Walsh to test the testimony of his accuser and to allow the Committee to evaluate her credibility, particularly here where the Committee did not observe Student #1's testimony.

*Walsh v. Hodge*, 975 F.3d at 483–84 (5th Cir. 2020)..

Unlike Walsh, who did not have the accuser present at the hearing, the appeals committee was able to observe and hear the testimony of the witnesses, Plaintiff was able to give his side of the story in real-time, and the appeals committee was able to cross-examine and question the witnesses as well as Plaintiff. *See ECF 140, Exh.16, Appeal Hearing Transcript*. Because the appeals committee was a neutral body that had the ability to observe the witnesses and their demeanor, as well as, ask questions of the witnesses, there was no procedural due process violation.[15]

### ii.    *Attorney Participation*

Plaintiff had his attorney, Joel Dillard, present in the hearing room. At the beginning of the hearing, Mr. Dillard participated in the hearing and sought clarification of the hearing procedures. *ECF 140, Exh.16, pg. 9-10*. In addition, the  appeals committee took breaks after

---

[15]*All witnesses testified in person except Plaintiff who chose to appear by telephone.  See Request for Admission No. , ECF 140, Exh.48.*

almost every witness to allow Plaintiff to confer with his attorney before proceeding with his

rebuttal or presentation.[16]  Although his attorney was not allowed to cross-examine witnesses, he

did participate in the hearing process.[17]  *See ECF 140, Exh.42, pgs. 101-102.*  The Mississippi

Courts have held that having an attorney cross-examine witnesses or present evidence is not

required under due process and the claim is without merit.  Jones v. Alcorn State Univ., 120 So.

3d 448, 452 (Miss. Ct. App. 2013)(Jones's attorney would only serve as an advisor and could

neither present evidence nor cross-examine witnesses).  Because cross-examination by Plaintiff

himself is not constitutionally required, cross-examination by his attorney is likewise not

required.  Because Plaintiff had the assistance of counsel at the hearing, this claim also fails as a

matter of law.

### iii.    Calling Witnesses

At the beginning of the hearing, Dr. Bondi informed Papin and his attorney of the

procedures for the hearing.  *ECF 140, Exh.16, pgs. 8-9.*    In an effort to clarify the procedures,

Joel Dillard, Plaintiff Papin's attorney asked questions of the chair of the appeals committee, Dr.

Bondi.

> Mr. Dillard:    **So the  - - expectation will be that Dr. Papin would call**
>                 **witnesses and question them himself?**
>
> Dr. Bondi:      **Yes, or have them speak their narrative, yes.**

*ECF 140, Exh.16, pg. 9*.

As the transcript plainly shows, Plaintiff had the opportunity to call witnesses in his own

---

[16]*The Committee took  breaks for Papin to confer with counsel after the testimony of Dr. Earl, transcript pg. 88-89, Megan Mahoney pg. 116, Ashley Griffin, pg. 132; Colin Muncie, pg. 144; Dr. Rick Barr, pg. 163, ECF 140, Exh.16.*

[17]*See ECF 140, Exh.16, pg. 9-10, 24, 33, 48, 61, 63-64, 77, 89, 105, 112-113 for Dillard's involvement in the hearing.*

defense, but he did not call any, nor did he inform the panel that he needed to call witnesses or had witnesses he wanted to call. *ECF 140, Exh.48, Admission No. 6*. Likewise, his attorney did not inform the committee that Plaintiff had witnesses to call in his own defense or wanted to call witnesses. *Id*.

Plaintiff's contention that he was denied procedural due process because he was not allowed to call witnesses is not supported by the undisputed transcript of the hearing where he and his attorney were specifically informed of his ability to call witnesses and neither raised the issue to the committee. Furthermore, as the Fifth Circuit precedent states, calling witnesses is not constitutionally required. As such, this claim fails as a matter of law.

### C.    *No Bias of the Committee Members*

Plaintiff alleges that he did not receive a hearing before an impartial hearing panel. To support this claim, he points to two members of the committee and alleges they made statements that inferred a bias against him. The Fifth Circuit has held that procedural due process requires proof of actual bias. "Alleged prejudice of university hearing bodies must be based on more than mere speculation and tenuous inferences." *Walsh v. Hodge*, 975 F.3d 475, 482–83 (5th Cir. 2020). The Plaintiff has not submitted any proof of actual bias by a committee member.

### i.    *Dr. Nilda Williams, House Officer:*

The first member Plaintiff alleges had a bias was Dr. Williams the medical resident (house officer) appointed to the hearing committee. To support his contention of bias, Plaintiff points to one statement in the transcript by Dr. Nilda Williams that she knew and worked with one of the witnesses, Dr. Mahoney. *See ECF 145, pg. 22*. Plaintiff's allegation is that because she knew Dr. Mahoney and worked with her she had an impermissible bias, however, the courts have held that this does not disqualify her from service on the appeals committee. Further, the

28

Plaintiff's conclusory allegation that she was biased, does not establish a violation.

In a nearly identical situation, the Fifth Circuit expressly rejected a claim that one of the hearing panel was biased because she knew the accuser.  In *Walsh*, one of the panel members served as the accuser's preceptor and worked with her weekly in various clinics.

> Walsh alleged that only one member of the eight-person Committee knew Student #1 from serving as one of her preceptors in medical school. That one Committee member knew the accuser in a university proceeding is not enough to establish a due process claim of bias in this instance**.  We find no merit to this argument**.

*Walsh v. Hodge*, 975 F.3d 475, 483 (5th Cir. 2020)(emphasis added).

Committee member Nilda Williams had previously worked with Dr. Mahoney as they were both House Officer's at UMMC, and under the precedent in *Walsh* and this Circuit, this does not disqualify her from serving on the appeal committee or overcome her presumption of honesty and fairness.  Other than this statement, the Plaintiff offers no evidence to establish bias on the part of Dr. Williams.  Further, the Plaintiff did not allege, nor has he produced any evidence to establish, that Williams had a financial or pecuniary interest in the outcome or that she held any animosity towards the Plaintiff.  Under Mississippi law, the Mississippi Supreme Court has held that even participation in the pre-hearing investigation is insufficient to show an impermissible bias to overcome the presumption of honesty and integrity in the hearing panel.

> In *Spradlin* the entire Board had participated in a pre-hearing investigation. We affirmed the teacher's dismissal on grounds he had not shown that any Board member had a personal or financial stake in the matter or that they bore any substantial personal animosity toward him. *Spradlin*, 515 So.2d at 898.

*Hoffman v. Bd. of Trustees, E. Mississippi Junior Coll.*, 567 So. 2d 838, 841 (Miss. 1990)

> Furthermore, a showing that the board was involved in the events preceding the teacher's termination is insufficient to rebut the presumption of honesty and integrity. There must also be a showing of either personal animosity or personal or financial interest in the outcome of the decision to overcome the presumption. *Spradlin* at 898.

*Byrd v. Greene Cty. Sch. Dist.*, 633 So. 2d 1018, 1022 (Miss. 1994).

Plaintiff has failed to establish any impermissible bias on the part of Dr. Williams and his

claim fails.

### ii.      *Dr. Luzardo, Program Director for Neurosurgery:*

The second member of the committee the plaintiff accuses of bias is Dr. Gustavo

Luzardo.   The bias asserted by the Plaintiff concerns statements made by Dr. Luzardo during the

hearing.  Dr. Luzardo asked:

> what is the purpose of this lawsuit?  What does he expect at the end of this
> lawsuit?  What is he in search of?  It seems to me that this is beyond the point of
> no return.

*ECF 140, Exh. 16, Hearing Transcript pg. 26, ln 13-18.*

Plaintiff does not allege anything other than this series of questions to establish a bias.

He offers no evidence of pecuniary interest or a financial stake in the outcome by Dr. Luzardo,

nor does he offer any evidence of animosity towards the Plaintiff.  These statements made after

hearing some of the evidence, do not establish any animosity, bias, or due process issues.

In addition to not meeting the standard to show bias to create a due process claim,

Plaintiff's allegations concerning Dr. Luzardo fail because Dr. Luzardo did not participate in the

decision of the committee.  Dr. Luzardo was called away and left during the middle of the

hearing, and he did not participate in the deliberations or the decision.  *ECF 140*, *Exh. 16, pg. 77.*

 *ECF 140, Exh. 2 - Appeals Committee Letter.*   Had Dr. Luzardo participated in the

deliberations, the presumption exists that hearing officers act with fairness and honesty. *Harrison*

*County Sch. Bd. v. Morreale*, 538 So.2d 1196, 1202 (Miss.1989). Plaintiff cannot overcome this

presumption and cannot show a personal or financial interest on the part of Dr. Williams or Dr.

Luzardo.  *Pub. Employees' Ret. Sys. v. Stamps*, 898 So. 2d 664, 677–78 (Miss. 2005) *Dampier v.*

*Lawrence County Sch. Dist*., 344 So.2d 130, 132–33 (Miss.1977).  As such, Plaintiff's claim for

partial summary judgment fails and judgment should be entered for the Defendants.

> **D.**       **The Hearing was Not a Sham**.

Plaintiff offers only speculation and conclusory allegations that the hearing was a sham

and that the hearing panel was "aligned in having prejudged the outcome." [ECF 145, pg. 23].

Plaintiff relies on *Torcero v. Texas Southwest Coll. Dist*., 2018 WL 4333996 (S.D. Texas. June

4, 2018) to support his contention.  *Torcero* involved the dismissal of the university president,

not a student.  In *Torcero*, the Court found a genuine issue of fact concerning the hearing because

Torcero's office had been cleaned out, the Board tasked with deciding the hearing had made

statements to the paper concerning her being dismissed, and the University had begun a search

for a new president.  These facts are very distinct and different from Plaintiff's case.

First, the Plaintiff has not presented any evidence to establish that the hearing committee

had any bias or pre-determination of the case.  Plaintiff only relies on his own unsupported

speculation.  The two appeal panel members cited by the Plaintiff did not make any comments

concerning a bias or prejudging the case. Second, unlike *Torcero* which concerned the singular

position of University President, Plaintiff was one of many medical residents in the surgery

program, and he would have returned to duty had the decision been reversed.  Dr. Earl

specifically testified that if HR had reversed the termination, and Plaintiff would have

successfully completed his academic remediation, he would have stayed at UMMC.  *Exh. 3, Earl

pg. 232-33.*  Dr. Earl testified that there are contingency plans and "we would have been fine no

matter what" had Plaintiff returned.  *Exh. 3, Earl pg. 224.*  Third, the Plaintiff cannot show any

facts or evidence to support that the appeals committee was aware that Dr. Sundeen had been

offered a second year categorical position after Plaintiff's termination.  This was never discussed

during the appeal hearing, and the Plaintiff has not alleged or presented any evidence to create a

genuine issue that the committee had any knowledge of Dr. Sundeen to support his conclusion.

*ECF 140, Exh. 27, Hearing Transcript.*

The record also establishes that the Committee had not pre-judged or pre-decided

Plaintiff's appeal.  Dr. Bondi when questioned on this issue, expressly stated that the outcome

was never pre-decided.  *Exh. 1, Bondi, pg. 165-167.*

> Q:   You had already made your decision to uphold the termination of Dr.
>       Papin?
>
> A:    No.  Of course, not.

*Exh. 1, Bondi, pg. 166.*  In Plaintiff's motion and brief, he fails to provide any evidentiary

support for his conclusion that the appeals committee was a sham or that they had pre-

judged/decided his case, and Plaintiff's reliance on a single statement made by Dr. Luzardo after

having heard part of the evidence that it "seems" beyond the point of no return does not create

an issue that he had pre-judged or that the hearing was a sham..

Not only did the Plaintiff fail to create an genuine issue of fact concerning the hearing

committee having pre-determined the appeal, he also fails to establish that Dr. Woodward had

any bias or pre-determination of his appeal before rendering her decision.  Because the Plaintiff

has failed to show the hearing committee had pre-judged or had a bias against him, his due

process claim fails and judgment should be entered for the Defendants.

### E.    *Plaintiff's Comparison to Professor Eklund is misplaced.*

Plaintiff compares his dismissal to that of former tenured Professor Neva Eklund, and this

comparison fails for several reasons.  First, Plaintiff was a medical intern under a one-year

contract of employment with UMMC, while Dr. Neva Eklund was a full tenured professor with a

contract of employment with the Board of Trustees for the State's Institution's of Higher

Learning [IHL].  As a tenured professor, Dr. Eklund the final decision maker for her dismissal was IHL, not UMMC, and under IHL faculty policies which do not apply to the Plaintiff.  The testimony in this case establishes that the contracts for faculty are different from those of residents.  *Exh. 2, Stewart pg. 30.*  Second, Dr. Steve Bondi, Plaintiff's hearing committee chair testified that although he was chosen to chair a hearing, he never conducted the hearing for Dr. Eklund since she resigned her employment prior to the hearing.  *Exh. 1, Bondi pg. 73-74.*

Third, after reviewing Dr. Eklund's appeal in executive session, [ECF 144, Exh. 27], whatever processes IHL requested specifically for her case based on the appeal has no bearing on whether or not Plaintiff received the required Constitutional due process under state and federal law.  Plaintiff points to no policy of IHL, even if it applied to Plaintiff, that requires a hearing with cross-examination for faculty members.  *Exh. 7, IHL Tenured Faculty Dismissal policies.*  Further, even assuming the policies for tenured faculty applied to residents like Plaintiff and the Plaintiff was correct that IHL polices required a specific type of hearing, his claim still fails.  The failure of a state agency to comply with its internal regulations is insufficient as a matter of law to establish a violation of Due Process, because constitutional minima nevertheless may have been met. *Franceski v. Plaquemines Parish School Board*, 772 F.2d 197, 199, 200 (5th Cir.1985). "There is not a violation of due process every time a university ... violates its own rules. *Brown v. Texas A & M Univ.*, 804 F.2d 327, 335 (5th Cir. 1986).  Plaintiff's due process notice and hearing met the constitutional minima for due process, therefore, his claims fail as a matter of law.

## V.   Breach of Contract

Plaintiff is correct that the state has waived immunity for a claim for breach of express contract, however, the State still maintains MTCA immunity for breach of an implied term of

contract, breach of the duty of good faith and fair dealing, and tortious breach of contract.  In addition to the immunity provided by the MTCA, UMMC is immune from the assessment of punitive damages or attorney's fees for Plaintiff's breach of contract claim.

> Punitive damages are to punish a wrong-doer. In the case of a community hospital, or any other governmental entity for that matter, the "punished" is the taxpayer, as it is their funds that pay the damages, or the insurance coverage for such damages. With that in mind, litigants should not be allowed to obtain punitive damages from the public treasury which is filled only by taxpayers. However, by statute, sovereign immunity is waived to the extent of insurance obtained. Miss.Code Ann. § 41–13–11(2). We have held that where insurance has been obtained to cover liability for damages or injury to persons or property that insurance also covers punitive damages as governed by the policy. *Old Security Cas. Ins. Co. v. Clemmer*, 455 So.2d 781, 783 (Miss.1984); *Anthony v. Frith*, 394 So.2d 867, 868 (Miss.1981). Accordingly, even though tax payers should not have to bear the burden of paying a punitive damages award assessed a governmental entity, neither should an insurance company be allowed to retain premiums and avoid the liability where insurance has been purchased to cover such damages. In the case at bar; however, we do not believe the facts support a punitive damages award against Southwest. For that reason, we reverse the award of punitive damages. Alternatively, were punitive damages affirmed, the award should only be allowed to the extent of the insurance coverage in existence.

*Sw. Mississippi Reg'l Med. Ctr. v. Lawrence*, 684 So. 2d 1257, 1267 (Miss. 1996)

The State of Mississippi has not waived immunity for punitive damages whether by contract or tort.  As such, Plaintiff's request for punitive damages relative to his breach of contract claim is barred by the State's immunity and public policy.

In addition to being barred by immunity, punitive damages are also barred by State law and the MTCA for Plaintiff's breach of contract claim.   Under Mississippi law, to qualify for punitive damages, the breaching party must tortiously breach the contract.

> (a) Punitive damages may not be awarded if the claimant does not prove by clear and convincing evidence that the defendant against whom punitive damages are sought acted with actual malice, gross negligence which evidences a willful, wanton or reckless disregard for the safety of others, or committed actual fraud.

Miss. Code. Ann. § 11-1-65 (West)

"To qualify for punitive damages in a breach of contract case, a plaintiff must prove by a preponderance that the breach was the result of an intentional wrong or that a defendant acted maliciously or with reckless disregard of the plaintiff's rights." *Hamilton v. Hopkins*, 834 So. 2d 695, 703 (¶26) (Miss. 2003).

*Hughes v. Shipp*, No. 2018-CA-01654-COA, 2020 WL 5525383, at *18 (Miss. Ct. App. Sept. 15, 2020), reh'g denied (Jan. 5, 2021). In other words, the Mississippi Supreme Court has only allowed for the recovery of punitive damages when the conduct rises to the level of an independent tort, i.e. tortious breach of contract, and the state has immunity for such claims under the MTCA.

## CONCLUSION

For the reasons stated herein, the Defendants request this Court dismiss the claims in Plaintiff's Second Amended Complaint, and/or grant the individuals Qualified Immunity.

Respectfully submitted, this the 31st day of March, 2021.

**University of Mississippi Medical Center, Dr. T. Mark Earl, Dr. Steven Bondi and Dr. LouAnn Woodward.**

**BY:**   */s/ Tommy Whitfield*
**TOMMY WHITFIELD, MSB# 102482**
**tommy@whitfieldlaw.org**

**WHITFIELD LAW GROUP, PLLC**
660 Lakeland East, Suite 200
Flowood, Mississippi 39232
(601) 863-8221 – Telephone
(601) 863-8231 – Facsimile

## <u>CERTIFICATE OF SERVICE</u>

I, Tommy Whitfield, of the Whitfield Law Group, PLLC, the undersigned attorney, do hereby certify that I have this day electronically filed the above and foregoing with the Clerk of the Court using the ECF system which sent notification of such filing to the following:

Ryan Morgan
Gregory Schmitz
Jolie Pavlos
Martin Jelliffe
Morgan & Morgan
20 N. Orange Avenue, 15th Floor
Orlando, FL 32801
*Counsel for Plaintiff*

THIS, the 31st day of March, 2021.

*/s/ Tommy Whitfield*
TOMMY WHITFIELD