UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

JOSEPH PAPIN,

            Plaintiff,

                                                CASE NO:  3:17-CV-763 CWR-FKB

vs.

UNIVERSITY OF MISSISSIPPI
MEDICAL CENTER, LOU-ANN
WOODWARD, T. MARK EARL, DR.
STEVEN A. BONDI, and JOHN DOES

            Defendants.

_____ /

## PLAINTIFF'S MEMORANDUM IN SUPPORT OF REPLY IN RESPONSE TO DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Plaintiff, JOSEPH PAPIN, files this Memorandum in Support of Reply in Response to Defendants' Memorandum in Opposition to Plaintiff's Motion for Partial Summary Judgment ("Response"), Doc. 152, and states:

## ARGUMENT

**I.**     **UMMC's STATEMENT OF MATERIAL FACTS MAKES MATERIAL MISREPRESENTATION OR ARE MISLEADING**

Several facts raised by UMMC in their Statement of Material Facts are misleading and warrant clarification. And when viewed in context, these facts support Plaintiff's procedural due process claim.

    **A.**     **Faculty and Staff Reviews Did Not Provide Dr. Papin with Sufficient Notice of Performance Issues as Required by Due Process**

UMMC asserts that prior to his termination Dr. Papin received notice of alleged deficiencies through faculty and staff evaluations. Dr. Papin admits he received reviews/evaluations by physician and staff members he worked with following his monthly rotations, but this type of written feedback

does not constitute the type of notice required by the mandates of due process because the reviews did not put Dr. Papin on notice that the complained of behavior could lead to termination and did not provide clear suggestions regarding appropriate conduct for such situations in the future. *See* Plaintiff's Evaluation Comments, Doc. 140-10. For example, Dr. De Delva stated, "Joe did a reasonable job in clinic, but failed to demonstrate that he owned the care of the inpatients. He often did not seem to have a finger on the pulse of the patient's situation. I often discovered issues and problems that I would have expected him to recognize." *Id.*; *see also* Papin Depo., Doc. 144-2, at 64:2-8. Dr. De Delva never told Dr. Papin exactly what these "issues and problems" were for Dr. Papin to be able to correct his behavior moving forward. *See id.*, at 64:9-22. Critically, this review also does not put Dr. Papin on notice that this conduct could lead to termination. Other reviews, as illustrated by Doc. 140-10, possess the same fatal flaws.

**B.    UMMC Solicited False Complaints Against Dr. Papin**

UMMC next asserts that they received a multitude of complaints about Dr. Papin's performance from December 28, 2016 to January 10, 2017. However, UMMC fails to mention that Dr. Earl self-servingly solicited these complaints. An email dated December 20, 2016, from Dr. Earl to Renee Greene, UMMC's Surgery Education Administrator, memorializes that Dr. Earl planned on "soliciting feedback regarding [Dr. Papin's] performance from nurses, residents, and faculty." *See* December 20 email, Doc. 140-13. Dr. Earl later tries to argue the complaints received following this meeting were "unsolicited" which is entirely contradicted by this email memorializing his intent to solicit complaints. *See* Appeals Tr., Doc. 140-16, at 31:10-11; Earl Depo., Doc. 144-5, at 67:21-22, 135:12-17. However, there is no question these "complaints" were solicited by Dr. Earl. With the exception of one complaint, the complaints were dated January 3, 2017 to January 10, 2017 and

related to events that happened in 2016.[1] *See* complaints, Docs. 140-15, 17-19.[2] Additionally, in her deposition, Ms. Greene admitted the complaints were solicited. *See* Excerpt of Deposition of Renee Green ("Green Depo"), attached as **Exhibit "A,"** at 241:8 – 244:2.

UMMC also fails to acknowledge that several of these "complaints" have since been <u>proven false</u>. For example, Dr. Mahoney's accusation of Dr. Papin leaving the hospital while on duty to exercise, without permission, has been proven false. Dr. Mahoney told the hearing panel during Dr. Papin's appeal hearing that she <u>never</u> gave him permission to go for a run. *See* Appeal Tr., Doc. 140-16, at 52:20 – 22. Text messages produced by Dr. Papin show that Dr. Mahoney had <u>explicitly</u> given Dr. Papin permission to go on a run on December 6, 2016. *See* text messages, Doc. 144-14. During her deposition, Dr. Mahoney recanted and admitted she incorrectly informed the panel about not having previously given Dr. Papin permission to go for a run. *See* Mahoney Depo., Doc. 144-15, at 40:5 – 16 ("Q: Is it fair to say though, that that's not true because you actually texted about it the week before on December the 6th? A: Right. That was incorrect on my part.").

Mr. William Crews' accusations of Dr. Papin sexually harassing a female medical student have also been proven false. During his deposition, Mr. Crews <u>completely recanted</u> these allegations. He testified that he <u>did not</u> actually have a private conversation with this female but that <u>he heard from another resident</u>, who he could not identify, that the female student made this remark. *See* Deposition of William Crews ("Crews Depo."), Doc. 149-9, at 57:6 – 58:8 ("Q: And when did Ms. Arnold come and tell you that Joe was making her feel a little bit uncomfortable? A: She did not

---

[1] The only "complaint" predating January 2017 is not even properly characterized as a complaint. It centers around the incident between Dr. Papin and Nurse Practitioner, Joshua Sabins, in which Mr. Sabins admitted he told Dr. Papin he was not allowed to go down to the operating room, despite Dr. Shake previously having given Dr. Papin permission to do so. *See* Pltf's Mot. for Partial Summ. J., Doc. 145, at pp. 6-9. Dr. Berger emailed Dr. Earl informing him of the incident and expressing the need for clarification on the role expectations of medical team members. *See* Doc. 140-7.

[2] Two of the complaints came in within almost thirty (30) minutes of each other. *See* Docs. 140-15 and 140-17.

specifically come to me about this... My understanding – I'm not sure of the details. I think she discussed it with another resident privately . . . Q: And she didn't actually have a direct conversation with you about this ever? A: No."). Mr. Crews further testified during his deposition that he did not believe Dr. Papin ever did anything inappropriate with regards to this student. *See id.* at 56:9 – 19 ("I feel that Dr. Papin never did anything inappropriate or disrespectful towards that medical student"). If UMMC actually believed this occurred, why didn't they conduct an investigation as they were required to do pursuant to Dr. Papin's House Officer Contract and the employee handbook incorporated by reference? *See* House Officer Contract, Doc. Doc. 144-3; Faculty and Staff Handbook, p. 37, attached as **Exhibit "B"**; Title IX Sexual Harassment Policy and Non-Discrimination Policy, https://www.umc.edu/policy/viewpolicy.aspx?pid=A-IP-GEN-GEN-PO-00126 ("Upon receipt of a report of Sexual Harassment, the Title IX Coordinator will promptly contact the Complainant, regardless of whether the Complainant was the individual who initiated the report").

Other incidents, while not definitively proven false, have now been seriously called into question based on evidence uncovered in discovery. For instance, the accusation by Mr. Crews that Dr. Papin was showing up late for rounds is highly implausible.[3] During his deposition, Dr. Papin described "pre-rounds." *See* Papin Depo., Doc. 144-2, at 171:17 – 174:23. He explained that, as a resident, he would arrive to work and report to the resident room (medical students would not be present in the resident room). *See id.* He would be given a list with the patients he would be seeing that day and a summary of patient history from the night before. *See id.* He would then take that list and start seeing his patients. *See id.* Given Mr. Crews was a third-year medical student, not a resident,

---

[3] Obviously, the credibility of Mr. Crews is seriously in question based on his admission that he fabricated the sexual harassment allegations.

Dr. Papin would have no reason to report his whereabouts to Mr. Crews.[4] Thus, Mr. Crews could not possibly know where Dr. Papin is and was at all times.

Dr. Papin vehemently denies that he ever arrived to work late or failed to perform his rounds. *See* Papin Depo., Doc. 144-2, at 172:1 – 3. Most concerning is that UMMC could have easily verified whether Dr. Papin was arriving on time and performing his rounds but failed to do so. During Dr. Papin's appeal hearing, Dr. Luzardo recognized that the University has the ability to track what time the physicians are arriving and leaving campus. *See* Appeals Transcript, Doc. 140-16, at 144:4 – 19. Specifically, each physician is provided a badge that is used for parking. *See id.* UMMC can pull data of the times the badge was swiped to enter and leave campus to determine whether a faculty or staff member is present. *See id.* Dr. Luzardo admitted the data had been used in previous cases where attendance of staff was in question. *See id.* Despite having this data available, and it being used previously in other cases, nobody from UMMC took initiative to gather this data to confirm whether these allegations were true. *See* Earl Depo., Doc. 144-5, at 139:3 – 14 (admitting he could have asked someone to pull the data on Dr. Papin's arrival and departure times but did not do so). Moreover, if anyone would know Dr. Papin's arrival times, it would be the person doing the "handoff" in the morning – providing Dr. Papin with his patient list and going over the summary of the night's events. *See* Papin Depo., Doc. 144-2, at 174:16 – 23. Surely, if Dr. Papin did not arrive on time for handoff, they would be the first person to notify UMMC that Dr. Papin failed to arrive on time for handoff of half of the trauma patients. *See id.* No such type of complaint was ever made, a very telling fact.

The accusation that Dr. Papin failed to washout a wound is also highly improbable. Dr. Ashley Ray Griffin accused Dr. Papin of failing "to wash out a massive wound on trauma patient in

---

[4] During his deposition, Dr. Papin likened this to the relationship between an attorney and a legal intern. *See* Papin Depo. at 172:1 – 7. This scenario would be equivalent to a legal intern accusing an attorney of not performing his work. A legal intern would not be privy to the hour by hour tasks an attorney is performing.

ICU . . . leaving Sid [Desai] and later me to do it." *See* Griffin email, Doc. 140-19. UMMC never told him which patient they were referring to (and still hasn't), but given Dr. Griffin mentioned Sid Desai, Dr. Papin believes this is a reference to a patient who was involved in a bad motorcycle accident. *See* Papin Depo., Doc. 144-2, at 188:5 – 21. During his deposition, Dr. Papin explained that this patient was admitted to the emergency room where emergency room staff performed an initial wound washout. *See id.* at 188:22 – 189:4. After the patient was moved to the ICU, he was asked to do a more thorough washout, which he did. *See id.* at 189:5 – 190:1. He later received a text message from Sid Desai asking him he had washed out the wound, to which Dr. Papin replied in the affirmative. *See id.* at 190:9 – 16; *see also* text message, Doc. 149-8. During the deposition of Sid Desai, Dr. Desai could not recall this incident specifically but testified there were no specific instances he could recall of Dr. Papin having been instructed to do something that he did not do.[5] *See* Desai Depo, Doc. 149-9, at 11:10 – 12:9

Finally, Dr. Mahoney's accusation that Dr. Papin lied about the decubitus ulcer patient is beyond belief.[6] Dr. Mahoney alleges that December 22, 2016 was the first time Dr. Papin told her about the wound; that she had never reviewed Ulcer Patient's medical records prior to this and depended on the new residents to tell her about pressure sores. *See* Mahoney Depo., Doc. 144-15, at 25:19 - 26:4 Dr. Mahoney complained to Dr. Earl, accusing Dr. Papin of lying to her about having

---

[5] Dr. Desai's testimony is far more credible than Dr. Griffin's. During the Appeal Hearing, Dr. Griffin testified that when she cleaned the wound she "pulled grass and dirt and gravel out of the wound." *See* Appeal Tr., Doc. 140-16, at 78:15-21. During his deposition, Dr. Papin explained how this is implausible because the patient would have initially had the wound washed out by emergency room personnel. *See* Papin Depo., Doc. 144-2, at 188:22 – 189:4. Dr. Griffin also admits in her January email that Sid Desai cleaned out the wound before her. *See* email, Doc. 140-19. That Dr. Griffin would allege, even after emergency room personnel and Dr. Desai cleaned out the wound, that there was *still* grass and dirt and gravel, is simply implausible. *See* Papin Depo. at 191:11-22. It certainly does not show Dr. Papin failed to perform any assigned task.

[6] The patient's pertinent medical history is more fully described in Plaintiff's Motion for Partial Summary Judgment on pages ten (10) through twelve (12).

done an exam on this patient.[7] *See id.* at 117:14 – 118:4. Dr. Mahoney's allegations are contrary to the medical records and wound care notes. <u>Many medical professionals, including her</u>, had been treating this patient for a month and "rounding" on him twice per day. *See* Ulcer Patient Records, Doc. 149-13; Mahoney Depo., Doc. 144-15, at 63:7-9 (admitting that during this time period she saw and treated Ulcer Patient); *id.* at 65:17 -22 ("Q: Do you review what the wound care team states in the charts? A: Yes."); *see also* Earl Depo., Doc. 144-6, at 171:3 – 172:12 (explaining that attending physicians must review and sign all notes entered by residents). Additionally, Ulcer Patient's Audit Trail revealed that Dr. Mahoney reviewed Ulcer Patients medical records <u>73 times</u> between December 11, 2016 and December 20, 2016, refuting the notion she learned about the ulcer for the first time on December 22, 2016. *See* Ulcer Patient Audit Trail, Doc. 149-14 (evidencing each time Dr. Mahoney reviewed Ulcer Patient's file during the relevant time period). Dr. Mahoney's accusation here is not supported by a single shred of evidence, yet UMMC did nothing to investigate this before terminating Dr. Papin.

It is also telling that UMMC moved straight to termination instead of allowing Dr. Papin the opportunity to remediate, which they were <u>required</u> to do pursuant to ACGME guidelines, which are incorporated by reference into Dr. Papin's employment contract.[8] Providing surgical residents with remediation is not only required, but very common. An eleven-year study published in the Journal of the American Medical Association found that almost one third of categorical general surgery residents require remediation during residency. Most of those remediated residents

---

[7] Whether Dr. Papin told Dr. Mahoney about the wound prior to December 22, 2016 is disputed. However, as evidenced by the running incident, it would not be the first time Dr. Mahoney erroneously accused Dr. Papin of doing something he did not do.

[8] UMMC is <u>required</u> to provide a formal remediation process for anything short of blatant disregard for patient safety resulting in death, which is not the case here. Watkins Report, Doc. 149-4, at pp. 2 – 3.

successfully completed their residency programs, and remediation was not associated with attrition from surgical residency (20% attrition for those remediated vs. 15% for those who were not).[9]

This is not the first time UMMC leadership has pressured and solicited co-workers to provide fabricated and disparaging written statements about an employee marked for termination. *See Zhan v. Univ. of Mississippi Med. Ctr.*, 2016 WL 5374141, at *5 (S.D. Miss. Sept. 26, 2016); *Smith v. Univ. of Mississippi Med. Ctr.*, 2018 WL 3231267, at *2 (S.D. Miss. Mar. 7, 2018). In *Zhan*, the plaintiff presented testimony from a co-worker that UMMC asked him to collect letters from Zhan's Asian co-workers disparaging Zhan's professionalism and lack of teamwork. 2016 WL 5374141, at *5-6. UMMC did not provide a response to this allegation. *Id.* at *6. Judge Reeves held this conduct "reek[ed] of animus" and that UMMC would have to explain to a jury why it would solicit disparaging letters about Zhan. *Id.* (emphasis added). Two years later, in *Smith*, Judge Reeves admonished UMMC for continuing to engage in the same conduct. 2018 WL 3231267 at *2. In *Smith*, the plaintiff presented evidence that her co-worker's manager asked the co-worker to write a false statement alleging that Smith cursed at another employee. *Id.* at *1. Judge Reeves made the following statement in response: "To be sure, Pigford's testimony is damaging to UMC. Management should not be asking employees to lie about their coworkers. And, unfortunately, this is not the first time a plaintiff has produced evidence that a UMC manager asked a subordinate to fabricate 'disparaging letters concerning [the plaintiff's] professionalism.'" *Id.* (quoting *Zhan*, 2016 WL 5374141, at *5) (emphasis added). UMMC is up to the same tricks here, once again soliciting (while denying it was doing so) disparaging feedback regarding an employee's professionalism and performance to create a case for termination.

---

[9] Yaghoubian A, Galante J, Kaji A, et al. General Surgery Resident Remediation and Attrition: A Multi-institutional Study. *Arch Surg.* 2012;147(9):829–833. doi:10.1001/archsurg.2012.1676.

### C.   The ICU Incident

Finally, UMMC's Statement of Facts describes an incident where Dr. Papin transferred a trauma patient to the ICU. *See* Response at p. 10. Dr. Colin Muncie alleges Dr. Papin never notified the ICU the patient was coming prior to transferring the patient. *See* Appeal Tr., Doc. 140-16, at 87:7 – 88:3. UMMC then incorrectly states, "[d]uring the hearing, Plaintiff admitted to the facts as described by Dr. Muncie." *See* Response at p. 10. The Hearing Transcript does not support this conclusion. *See* Doc. 140-16, at 87:7 – 89:18. Dr. Papin admitted that he transferred the patient to the ICU and that when Dr. Muncie asked him if he notified the ICU in advance he told Dr. Muncie that he did. But UMMC makes it seem like Dr. Papin admitted to lying at the Hearing which Dr. Papin <u>never admitted to</u> because he did not lie about this incident. *See id.*

UMMC's statements here in its Response are highly misleading.

### II.   The Mississippi Tort Claims Act Does Not Apply to Constitutional Violations

In their Response, Defendant argues that the Mississippi Tort Claims Act (MTCA) bars Dr. Papin's procedural due process claim because the decision to terminate Dr. Papin was a discretionary function. *See* Response at pp. 14-16. UMMC entirely misstates the law. Mississippi Supreme Court jurisprudence has long been clear that governmental entities are not entitled to immunity in cases regarding violations of an individual's <u>constitutional rights</u>. *City of Jackson v. Jordan*, 202 So. 3d 199, 205 (Miss. 2016); *Tucker v. Hinds Cty.*, 558 So.2d 869, 872 (Miss.1990); *Williams v. Walley*, 295 So.2d 286, 288 (Miss.1974). For example, in *City of Jackson*, the City sent Jordan a notice by certified mail to inform him that his property was subject to condemnation and demolition as a menace to the public health, and provided Jordan with a notice of hearing. 202 So. 3d at 201. The letter was sent to Jordan's address in Houston, Texas. *Id.* However, it was returned. *Id.* The house was subsequently demolished. *Id.* at 202. Jordan brought suit against the City alleging they violated his constitutional rights by depriving him of his property without due process of law based on failing

to receive notice of the condemnation hearing. *Id.* at 205. The City set forth the defense of sovereign immunity, pursuant to § 11-46-9, Miss. Stat., which the Supreme Court of Mississippi swiftly rejected. *Id.* The Court expressly held, "<u>sovereign immunity will not protect a political subdivision where there has been a violation by the subdivision of an individual's constitutional rights</u>." *Id.* (quoting *Tucker*, 558 So.2d at 872) (emphasis added). "[T]o allow the sovereign immunity defense to block suits based on [the due process] provision[ ] of the Mississippi Constitution would render [that provision] meaningless." *Id.* (quoting *Tucker*, 558 So.2d at 872 (citing *Williams*, 295 So.2d at 288)). As such, the Court held "the trial court did not err in denying the city's motion for summary judgment, for its immunity against tort claims does not encompass claims of constitutional violations." *Id.*

This holding makes sense, especially in the context of § 11-46-9(a)(d) (discretionary function immunity), because discretionary functions are those that involve an element of choice.[10] *See City of Jackson v. Sandifer*, 107 So. 3d 978, 984 (Miss. 2013) ("A two-part 'public policy function' test is applied to determine whether conduct is considered a discretionary function subject to immunity. <u>First, we must determine whether the conduct involved an element of choice</u>; if so, we must then determine whether that choice or judgment involved social, economic, or political-policy considerations.") (emphasis added); *see also Kmart Corp. v. Kroger Co.*, 963 F. Supp. 2d 605, 611 (N.D. Miss. 2013) (quoting *Miss. Transp. Comm'n v. Montgomery*, 80 So.3d 789, 795 (Miss.2012) ("<u>[a] duty is discretionary when it is not imposed by law</u> and depends upon the judgment or choice of the government entity or its employee") (emphasis added). Here, Plaintiff alleges that UMMC failed to provide him with procedural due process <u>which they were legally obligated to do</u> pursuant to Miss. Const. Art. 3, § 14. UMMC did not have a choice to make – they were required by law to provide Dr. Papin with procedural due process prior to terminating his employment (which deprives him of a protected property interest) – and they failed to do so.

---

[10] Defendant does not dispute that discretionary functions are only those functions which involve an element of choice. *See* Response at p. 14.

Because of this, the cases cited by Defendant in their Response are easily distinguishable. As an initial matter, every case cited by UMMC involved dismissal of tort claims. None involved dismissal of constitutional violations based on sovereign immunity. Additionally, each case involved a matter of choice, unlike UMMC's legal obligation to provide Dr. Papin with due process here.

For instance, the first case cited by UMMC is *City of Jackson v. Powell*, 917 So. 2d 59 (Miss. 2005). In *City of Jackson*, the plaintiff brought a claim against the City for negligent supervision of its officers after several police officers allegedly used excessive force on him. *Id.* at 61-62. The Court began its analysis by looking to Miss. Code Ann.§ 21–31–21, which deals with a police officer's tenure and grounds for discipline. *Id.* at 74. It contains a series of reasons for discipline but offers no automatic situations requiring discipline. *Id.* Thus, the statute required the City of Jackson to exercise its judgment in the manner in which it chose to supervise its officers. *Id.* Accordingly, the Court held discretionary function immunity applied because the manner in which the City supervises its police officers has an element of choice to it. *Id.* at 74.

*Patton v. Hinds Cty. Juv. Det. Ctr. (Henley-Young)*, 2011 WL 2912897 (S.D. Miss. July 18, 2011), another case cited by UMMC, is particularly notable. In that case, the court dismissed the plaintiff's tort claims based on discretionary function immunity. *See id.* at *13 (dismissing the plaintiff's claims for breach of fiduciary duty, negligent omission, breach of the implied covenant of good faith and fair dealing, fraudulent omission, wrongful termination, failure to train, failure to supervise, negligence, and bad faith). However, the plaintiff also brought claims for violations of due process which <u>were not dismissed</u> based on discretionary function immunity. *Id.* at *2, n. 6. The court held, "to the extent that Claim No. 15 seeks relief for a violation of the Due Process Clause's substantive aspect, <u>such a claim may be brought</u>." *Id.* (emphasis added). UMMC ignored this section of the holding in its Response.

Likewise, in *Suddith v. Univ. of S. Mississippi*, 977 So. 2d 1158 (Miss. Ct. App. 2007), the plaintiff brought claims in tort and for violations of due process. The court dismissed plaintiff's tort claims based on the discretionary immunity function exception to the MTCA. *Id.* at 1179. Plaintiff's due process claims were ultimately dismissed as well, <u>but not based on the University's immunity from suit</u>. *Id.* at 1174-75. Again UMMC ignores this critical context in its Response.

As such, UMMC's own cases <u>support</u> the conclusion that sovereign immunity does not apply to Dr. Papin's constitutional violations. This Court should easily dispose of UMMC's argument that the discretionary function immunity applies here. The only question is whether UMMC provided Dr. Papin with his constitutional right to procedural due process, which they did not.

## III. <u>Dr. Papin Did Not Receive Procedural Due Process</u>

With the exception of their sovereign immunity defense, UMMC does not otherwise dispute that Dr. Papin was entitled to procedural due process. *See* Response, generally. Rather, UMMC argues Dr. Papin received all the due process that was due. This conclusion is not supported by the case law or evidence here.

The extent of due process owed is determined by weighing three factors set forth by *Mathews v. Eldridge*: (1) "the private interest"; (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards"; and (3) "the Government's interest", including the costs of providing additional procedural safeguards. 424 U.S. 319, 335 (1976). Due process is "flexible and calls for such procedural protections as the particular situation demands." *Gilbert v. Homar,* 520 U.S. 924, 903 (1997) (citation omitted). The procedures should be tailored, in light of the decision to be made, to "the capacities and circumstances of those who are to be heard." *Mathews*, 424 U.S. at 349 (quoting *Goldberg v. Kelly*, 397 U.S. 245 at 268-269 (1970)).

And where the penalty is as serious as expulsion, this means something more than an "informal give-and-take." As the Supreme Court held in *Goss v. Lopez*, "[l]onger suspensions or expulsions for the remainder of the school term, or permanently, may require more formal procedures." 419 U.S. 565 at 584 (1975). This is because "the sanctions imposed by the University could have a substantial lasting impact on appellants' personal lives, educational and employment opportunities, and reputations in the community." *Plummer v. University of Houston*, 860 F. 3d 767, 773 (5th Cir. 2017) (quoting *Doe v. Cummins*, 662 Fed.Appx. 437, 446 (6th Cir. 2016) (unpublished) (citing *Goss*, 419 U.S. at 574–75)). This is especially true for medical residents, whose entire careers are destroyed by termination of the residency. *See Univ. of Tex. Med. Sch. at Hous. v. Than*, 901 S.W.2d 926, 929-30 (Tex. 1995) (noting that a charge of "dishonesty" against a medical student causes "not only serious damage to his reputation but also the loss of his chosen profession as a physician. The stigma is likely to follow the student and preclude him from completing his education at other institutions."); *see also Oliver v. Univ. of Texas Sw. Med. Sch.*, 2019 WL 536376, at *12 (N.D. Tex. Feb. 11, 2019) ("where there are significant factual disputes over whether the alleged misconduct occurred, additional procedural safeguards may be required such as presentation of the actual incriminating evidence, confrontation by adverse witnesses, and perhaps cross-examination of those witnesses. And these additional safeguard are even more warranted in serious cases where a student is permanently expelled from medical school for claims of quasi-criminal conduct."). Judge Reeves recognized this in ruling on Defendant Earl's Motion to Dismiss earlier in this very case. *See* Doc. 33 at 12. Specifically, Judge Reeves noted, "[h]ere, the loss of a professional training program and the allegations amongst professional colleagues of inappropriate behavior has had a great impact on Papin and his future." *Id.*

Applying the *Mathews* factors here, UMMC failed to provide the required procedural due process to Dr. Papin, considering the facts and circumstances of his case and what he stood to lose.

First, as a medical resident of a public institution, dismissible only for cause, Dr. Papin had a protected property interest in his continued employment with UMMC. *See Walsh*, 975 F.3d at 481. And because of the nature of the allegations against Dr. Papin (being considered a danger to patients and sexual harasser) and the serious nature of the penalty (termination), Dr. Papin's interests were seriously at stake in that the result of UMMC's sanctions will have a substantial lasting impact on his personal life, educational and employment opportunities, and his reputation in the community. *See Plummer v. University of Houston*, 860 F. 3d at 773. Turning to the second factor, the probable value of additional procedural safeguards was significant. Had UMMC provided Dr. Papin with medical records regarding the patients he allegedly harmed, the opportunity to call witnesses, and the right to confrontation and cross-examination, he would have exposed the falsity of the allegations against him as he has done here in his federal court case. Of course, Plaintiff recognizes that UMMC has a strong interest in the educational process, including maintaining a safe environment for its patients and a safe learning environment for all its medical students and residents, while preserving its limited academic resources. *Plummer*, 860 F.3d at 773 (citing *Goss*, 419 U.S. at 580, 583). However, the administrative burden and cost borne by UMMC in providing Dr. Papin with sufficient procedural safeguards was minimal. Indeed, UMMC has no made no argument that the administrative burden or cost was prohibitively high. These safeguards would have cost UMMC next to nothing and prevented the destruction of Dr. Papin's surgical career, allowing the truth to come out during the appeals hearing, as it has in federal court.

**A.   Pre-Deprivation Procedural Due Process**

As detailed in Plaintiff's Motion for Partial Summary Judgment, UMMC failed to provide Dr. Papin with pre-termination procedural due process by (1) failing to provide Dr. Papin with notice of the charges against him in advance of the pre-termination "interview" and (2) failing to provide Dr. Papin with sufficient detail regarding the allegations against him to allow Dr. Papin the

ability to provide a meaningful response. UMMC insists the issues regarding Dr. Papin's performance were discussed with him on numerous occasions prior to this interview but the evidence does not support this. UMMC states the reasons for Dr. Papin's termination are as follows:

1. An incident between Dr. Papin and a Nurse Practitioner that occurred during Dr. Papin's first rotation in July 2016;

2. An incident wherein Dr. Papin allegedly transferred a patient to the ICU without informing the ICU the patient was coming;

3. Accusations of not performing rounds;

4. Accusations of leaving the hospital while on duty to exercise;

5. Accusations of failing to wash out a wound on a patient;

6. Accusations of sexual harassment; and

7. Accusations of lying about the decubitus ulcer.

*See* February 6, 2017 email, Doc. 149-17 (UMMC Human Resources' email endorsing Dr. Papin's termination; *see also* Earl Depo., Doc. 144-6, at 215:9 – 18 (testifying as UMMC's corporate representative that the events identified in the February 6, 2017 email are the circumstances for why Dr. Papin was terminated). With the exception of alleged reason number one, <u>none</u> of the incidents Dr. Papin was actually terminated for were addressed with him prior to the date he was pulled from duty. And half of the reasons for his termination were not raised <u>until after he was already terminated</u>. Specifically, there is no evidence of UMMC providing Dr. Papin with an opportunity to explain the accusations in numbers 2, 5, and 6 prior to his termination. *See* Interview Tr., Doc. 144-19, generally. This is alarming, especially considering the very serious nature of the accusations in number 6 – sexual harassment.

With regard to the sexual harassment accusation specifically, we now know that had UMMC provided Dr. Papin with the name of the accuser or done even a basic investigation into the accusations, UMMC would have learned that the accusation was entirely fabricated! During his

deposition, Mr. Crews, the individual who alleged Dr. Papin sexually harassed a female student, completely recanted these allegations. He testified that he did not actually have a private conversation with this female but that he heard from another resident that the female student made this remark. *See* Crews Depo, Doc. 149-11, at 57:6 – 58:8. Mr. Crews further testified during his deposition that he did not believe Dr. Papin ever did anything inappropriate with regard to this student. *See id.* at 56:9 – 19. This alone casts extreme doubt on UMMC's credibility.

For the other accusations, UMMC failed to provide an appropriate level of detail to allow Dr. Papin to meaningfully respond to these allegations. For instance, until the date of Dr. Papin's interview, the only thing he was told in regard to reason number 7 was that he "caused patient harm," but Dr. Papin was never told which patient he allegedly harmed or how he harmed them! *See* Interview Tr., Doc. 144-19, at 17:4-16; 20:18-23; Appeal Tr., Doc. 140-16, at 35:19 – 36:22. During his interview, Dr. Papin learned for the first time that the incident regarding "patient harm" involved a decubitus ulcer. *See id.* Dr. Papin informed Ms. Whitlock during his interview that he thinks he knows who the patient is but could not be sure without being provided with a name. *See id.* at 18:1-7. He also informed Ms. Whitlock that the medical records would show that the wound ostomy nurse who specializes in treating wounds noted in the patient's records that the wound did not appear to require surgical intervention. *See id.* at 19:6-10.

Had Dr. Papin been given the benefit of this patient's medical records he would have very easily been able to show Ms. Whitlock how Dr. Mahoney's accusations are untrue. The medical records would have shown that numerous medical professionals were aware of Ulcer Patient's condition, including Dr. Mahoney, and did nothing different from Dr. Papin, but UMMC picked Dr. Papin as the scapegoat to justify his termination.[11] After Ulcer Patient developed a tear on his

---

[11] The conclusion that Dr. Earl used this only as a façade to justify Dr. Papin's termination is evidenced by the fact that Human Resources instructed him to file an ICare Report (a report used to document an issue with patient care) but he never did so. Earl Depo., Doc. 144-5, at 107:1-5; *see also* February 6 and February 7,

intergluteal cleft (butt cheek) UMMC's wound care team conducted consults on November 30, December 9, and December 22, to assess the wound and make recommendations for treatment. *See* Doc. 149-17 at 3090-93, 3095. At no time did UMMC's wound care team suspect that Ulcer Patient's lesion was infected or needed surgical debridement. *See id.* at Papin-3090-93, 3095; *see also* Dyse Depo., Doc. 144-17, at 13:10-14. Dr. Papin also personally examined Ulcer Patient's backside and saw the scab. However, the wound did not exhibit warning signs of infection like purulent drainage, redness, or foul smell. *See* Papin Depo., Doc. 144-2, at 162:25 – 163:14. As such, it did <u>not</u> raise any alarm bells for Dr. Papin or the more experienced wound care team.  *See id.* at 150:9-11.

Dr. Mahoney alleges she was completely unaware of the wound until Dr. Papin told her about it on December 22, 2016; that she had <u>never</u> reviewed Ulcer Patient medical records and depended on the new residents to tell her about pressure sores. *See* Mahoney Depo., Doc. 144-15, at 25:19 - 26:4. However, Ulcer Patient's Audit Trail shows that Dr. Mahoney reviewed Ulcer Patients medical records <u>73 times</u> between December 11, 2016 and December 20, 2016, refuting the notion she learned about the ulcer for the first time on December 22, 2016. *See* Ulcer Patient Audit Trail, Doc. 149-14. A basic investigation at the time would have uncovered these facts.

One case with similar facts to the instant matter found a violation of procedural due process on the same bases as those present here. *See Oliver v. Univ. of Texas Sw. Med. Sch.*, 2019 WL 536376, at *10 (N.D. Tex. Feb. 11, 2019).  In *Oliver*, a student was dismissed from school following allegations of sexual harassment. When the complaint of sexual harassment was first made, the University interviewed Oliver and determined there was insufficient evidence to proceed with any misconduct charges. *See id.* at *2. However, the University later received an audio recording of the alleged

---

2017 emails, Doc. 149-17 ("The incident referenced above by Dr. Mahoney regarding the patient's ulcer was one of the items discussed. After inquiring if an ICare report had been submitted and, learning that it had not, been, it was recommended. However, I followed up today, 02.06, and was told it had not been done."). Other attending physicians also attested to personally examining the Ulcer Patient during this time in question. *See* Ulcer Patient Records, Doc. 149-13.

incident (that was later proven to be doctored to support the alleged victim's claims) and dismissed Oliver before allowing him an opportunity to review the newly discovered evidence and respond. *See id.* at *3. The *Oliver* court held this violated Oliver's procedural due process rights. *See id.* at *9. UMMC has done exactly that here by failing to provide Dr. Papin with evidence supporting allegations that led to his termination and dismissing him without allowing him the opportunity to respond to those accusations. Had Dr. Papin been provided with this bare minimum amount of due process he could have quickly dispelled the very serious sexual harassment and patient harm accusations, as well as the other accusations made.

### B.    <u>Post-Deprivation Due Process</u>

UMMC then failed to correct the prior deficiencies post-termination through Dr. Papin's termination appeal hearing. With regard to Dr. Papin's post-termination hearing, Dr. Papin was entitled to the following:

> (1) [To] be advised of the cause for his termination in sufficient detail so as to enable him to show any error that may exist; (2) be advised of the names and the nature of the testimony of the witnesses against him; (3) a meaningful opportunity to be heard in his own defense within a reasonable time; and (4) a hearing before a tribunal that possesses some academic expertise and an apparent impartiality toward the charges.

*Levitt v. Univ. of Texas at El Paso*, 759 F.2d 1224, 1228 (5th Cir. 1985). Dr. Papin's post-termination hearing provided him with none of the above.

### i.    *UMMC's Post-termination Hearing Notice Was Deficient*

Dr. Papin's pre-hearing notice failed to properly advise him of the charges against him. UMMC provided Dr. Papin with a hearing notice outlining the causes for termination, but a quick review of the letter reveals how woefully deficient it is in providing the appropriate level of detail to enable Dr. Papin to provide a meaningful response at the hearing. For example, the letter states:

- "Dr. Papin was told to washout a massive wound on a trauma patient in the ICU." Which patient? When? By Whom?

- "Did not show up on time to pre-round or to get sign out." When did this allegedly happen? What evidence does UMMC have of this? Any examples?

- And the most egregious: "Dr. Papin made the female trauma student incredibly uncomfortable, tried to be alone with her, and preferentially chose her over the males." Which female student said this? When did she say this? How did Dr. Papin make her feel uncomfortable? Was it something he said? Or was it something he did?

*See* Doc. 144-23. How could Dr. Papin possibly provide a meaningful response to such vague accusations? Likewise, Dr. Papin was not provided with any documents supporting the alleged causes of termination (such as the decubitus ulcer patient or wound washout patient's medical records). As explained further above, Dr. Papin could have used these records at the hearing to illustrate the implausibility of Dr. Mahoney's accusations against him (not to mention Dr. Mahoney's untruthfulness which has been exposed on just a cursory review of written evidence). By denying Dr. Papin with this much needed information, UMMC deprived him of the opportunity to properly prepare for his appeal hearing.

### ii. The Hearing Procedures Did Not Provide Dr. Papin With the Ability to Meaningfully Defend Himself

#### a. Dr. Papin Had the Right to Cross-Examination Because Credibility of Witnesses Was Critical in His Case

The appeal hearing also contained numerous flaws. First and foremost, Dr. Papin was denied the right to confront the witnesses against him (especially the nameless female student who allegedly made sexual harassment allegations against him) and deprived of the opportunity to cross-examine witnesses, or otherwise present the panel with a list of questions for cross-examination. The Supreme Court has described cross-examination as "the law's most useful weapon against fabrication and falsehood. As a test of the accuracy, truthfulness, and credibility of testimony, there is no other means as effective." *Prewitt v. State*, 156 Miss. 731, 126 So. 824, 825 (1930). As explained in Plaintiff's Motion for Partial Summary Judgment, the Fifth Circuit Court of Appeals, in *Walsh v.*

*Hodge*, 975 F.3d 475 (5th Cir. 2020), established that, in cases "where credibility of witnesses is critical and the sanction imposed would result in loss of employment," due process required that the plaintiff have an opportunity to test the witnesses' credibility. *Id.* at 484-85. Specifically, "due process in the university disciplinary setting requires 'some opportunity for real-time cross-examination, even if only through a hearing panel.'" *Id.* at 485 (citing *Haidak v. Univ. of Mass.-Amherst*, 933 F.3d 56, 69 (1st Cir. 2019)). The Fifth Circuit came short of requiring that cross-examination be conducted by the accused party themselves, but noted "we have no reason to believe that questioning . . . by a neutral party is so fundamentally flawed as to create a categorically unacceptable risk of erroneous deprivation." *Id.* (citations omitted).  Here, Dr. Papin's case involved credibility of witnesses – especially the credibility of the witness Dr. Papin allegedly harassed – bringing this case squarely in line with the mandates of *Walsh*.

In their response, UMMC seems to initially suggest that Dr. Papin was not entitled to cross-examination by citing to two <u>pre-*Walsh*</u> cases that suggest cross-examination is not required in student disciplinary proceedings.[12] There are a multitude of reasons this Court can easily disregard these two cases. First, these cases were decided pre-*Walsh*, which is binding case law. Second, the two cases cited by UMMC involve accusations of cheating and accusations of threatening to bring a hand-gun to school. This case and *Walsh* involve allegations of sexual harassment. Third, these cases involve student terminations whereas this case and *Walsh* involve employment terminations. This is a particularly important distinction because the risk of an erroneous deprivation for a medical resident is much higher than it is for a student. *See Mathews*, 424 U.S. 319 at 335 (the risk of erroneous deprivation is a factor to consider in determining the appropriate level of due process required). Additionally, in *Willis* and *Dung Quoc Pham*, the two cases cited by Defendant, despite the

---

[12] UMMC cites to *Willis v. Texas Tech Univ. Health Scis. Ctr.*, 394 F. App'x 86 (5th Cir. 2010) and *Dung Quoc Pham v. Blaylock*, 712 F. App'x 360 (5th Cir. 2017) (unpublished).

plaintiffs being students, both received far greater protection than Dr. Papin. For example, prior to Willis' hearing, the university provided him with an explanation on how to submit evidence and call witnesses on his behalf at the hearing. 394 F. App'x at 87. Dr. Papin did not receive either of these safeguards. *See* Hearing Notice, Doc. 144-23. *Dung Quoc Pham* is notable because Pham was given the right to cross-examine witnesses during a supplemental hearing on his expulsion. 712 F. App'x at 362. The court simply noted that it was not required (at least not at that time and in that case). *Id.* at 363.

In their Response, UMMC failed to advance a single legitimate reason why they could not permit Dr. Papin to cross-examine the witnesses or, at a minimum, submit a list of questions for cross-examination to be asked by the panel members. UMMC's insistence on not permitting Dr. Papin to propound his own follow-up questions, going so far as to flagrantly ignore relevant questions Dr. Papin did actually raise at the hearing, evidences their outright disregard for Dr. Papin's due process rights. Had UMMC permitted Dr. Papin to submit a list of questions for cross-examination or confront the female student at the hearing, UMMC would have quickly learned that Dr. Crews' testimony regarding the sexual harassment complaint was fabricated, as Plaintiff's counsel easily did here during Dr. Crews' deposition. *See* Crews Depo., Doc. 149-11, at 56:9 – 19, 57:6 – 58:8. The burden and cost to UMMC was minimal to allow Dr. Papin or his counsel to cross examine witnesses during the appeals hearing and to have access to the relevant medical records and audit trail before the hearing, subject to a protective order.  These safeguards would have cost UMMC next to nothing and prevented the destruction of Dr. Papin's surgical career, assuming the truth had come out during the appeals hearing, as it has in federal court here.

Despite raising the student disciplinary cases, UMMC then seemingly goes on to concede that *Walsh* applies here but argues it's conduct complied with *Walsh*'s mandates. UMMC asserts that the panel developing their own questions for cross-examination is sufficient to satisfy the mandates

of due process. However, logic dictates this is not true. The panel members were not involved in the alleged incidents so could not possibly have known what questions to ask. For example, with the decubitus ulcer patient, Dr. Earl was never asked if he reviewed the patient's medical records (which would have shown the patient was seen by wound care specialists numerous times immediately prior to and during Dr. Papin's rotation on the service, and that numerous other physicians and hospital staff, including Dr. Mahoney, were rounding on this patient daily and all were keenly aware of his wound); Dr. Earl was never asked if he reviewed the Audit Trail to check whether Dr. Mahoney reviewed this patient's records (she reviewed the records 73 times between December 11, 2016 and December 20, 2016); and Dr. Earl was never asked if an ICare report was completed for this patient (which one was not even done after Dr. Earl was prompted to do so by HR, but he still refused). *See* Appeal Tr., Doc. 140-16, generally. If given the opportunity, Dr. Papin would have asked these questions which would have revealed the implausibility of Dr. Mahoney's accusations against Dr. Papin. However, even if this Court agrees with UMMC that the panel developing their own cross-examination questions was sufficient, the biggest omission made by UMMC was failing to present the female medical student Dr. Papin allegedly harassed at his hearing. <u>*Walsh*</u> <u>mandated her appearance</u>. Thus, it is indisputable that UMMC failed to afford Dr. Papin the minimum procedural due process required.

### b.  UMMC Denied Dr. Papin the Right to Call Witnesses

UMMC improperly states that Dr. Papin had the right to call witnesses, but this assertion is untrue. The hearing notice provided to Dr. Papin in advance of the hearing lays out the hearing procedures contemplated by UMMC. Doc. 144-23. It states that Dr. Steven Bondi has been selected as the chairman of the appeal committee; Dr. Papin may have counsel present at the hearing but will not be allowed to participate and shall be there only in an advisory capacity; and a record will be made of the hearing by a certified court reporter. *Id.* It then provided a list of potential witnesses

UMMC intended to call at the hearing. However, <u>nowhere</u> did it state that Dr. Papin would be allowed to call his own witnesses. There isn't a single piece of evidence in the record UMMC can point to that supports Dr. Papin was told in advance of the hearing that he could call witnesses.

At the hearing, UMMC stated <u>for the first time</u> that Dr. Papin could call witnesses. Appeal Tr., Doc. 140-16, at 9:2-18. But by the time the hearing is underway, Dr. Papin no longer had the practical ability to do so. He would have needed to coordinate with witnesses in advance of the hearing to make themselves available. For example, had Dr. Papin been granted the practical ability to call witnesses he would have called Sid Desai who is a witness to the alleged wound washout incident. Dr. Desai would have told the panel that there were <u>no specific instances</u> he could recall of Dr. Papin having been instructed to do something that he did not do.[13] *See* Desai Depo, Doc. 149-9, at 11:10 – 12:9.

### c.    Dr. Papin's Termination Was Pre-determined

Dr. Papin did not receive a meaningful opportunity to be heard in that his post-termination hearing was nothing more than a sham. UMMC argues this case is factually distinguishable from *Tercero v. Texas Southmost Coll. Dist.*, 2018 WL 4333996 (S.D. Tex. June 4, 2018) but it is not. By way of reminder, in *Tercero*, a college President, argued her termination hearing was nothing more than a sham because (1) her office had been cleared out before the hearing started, (2) TSC Board members had made comments to the local newspaper that could be interpreted as the board members having already decided to fire Tercero, and (3) TSC's interim president announced before the hearing that the District had started the search for a new president. *Id.* at *4. The court agreed and held this was sufficient evidence to allow a reasonable jury to believe the hearing was nothing more than a sham. *See id.* at *5.

---

[13] *See* FN 5, supra p. 7.

UMMC argues this case is distinguishable from *Tercero* because it involved a University President and this case involves a medical resident. Plaintiff fails to see the distinction. If anything, Dr. Papin's risk of an erroneous outcome is higher than the University President's entitling him to more protections. By virtue of his termination, especially the reasons he was terminated, UMMC effectively denied him the ability to work as a physician ever again. Plaintiff's retained experts both opined as to the insurmountable difficulty Dr. Papin faces being accepted into a future residency program with this termination on his record. Dr. Leitman opined that UMMC's termination of Dr. Papin makes it "impossible in the future for Dr. Papin to secure a position in an accredited general surgery program, or any other GME training program. This prevents him from obtaining a license to practice medicine and therefore denies him the opportunity to independently practice medicine as a physician or surgeon." Leitman Report, Doc. 149-6, at p. 4. Dr. Watkins opined that Dr. Papin's ability to acquire a general surgery residency position is severely diminished by his termination – a designation that undoubtedly will make most, if not all, programs reluctant to offer him a position. Watkins Report, Doc. 149-4 at p. 3. Even Defendant, Dr. Bondi, testified that Dr. Papin's chances of being accepted into another reputable residency program following his termination would be "extraordinarily difficult." Bondi Depo., Doc. 144-25, at 177:11-22.

UMMC also argues there is no evidence the hearing was pre-determined which is untrue. Based on the timing of Dr. Papin's post-termination hearing, his termination was a foregone conclusion. All new residents for the 2017 residency training year began on July 1, 2017, including newly-hired residents from the match to fill first year resident positions and newly promoted residents to fill second year resident positions. Papin Decl., Doc. 149-1, at ¶ 9. Thus, as of the date of Dr. Papin's hearing on July 18, 2017, all General Surgery residency positions Dr. Papin would have qualified for were filled. *See id.* Accordingly, the appeal committee did not have the practical ability to reverse Dr. Earl's termination because it would necessitate firing another resident to create

a vacancy for Dr. Papin. Additionally, by the time of his post-termination hearing he had not worked for the medical center for more than six (6) months. Pursuant to the American Board of Surgery, residents must work an average of forty-eight (48) weeks over the first three (3) years of residency. *See* AMERICAN BOARD OF SURGERY, TRAINING & CERTIFICATION, available at https://www.absurgery.org/default.jsp?certgsqe_training (last visited April 15, 2021). This means a resident can miss no more than 12 weeks of residency in three years. *See id.* By July 18, 2017, the date of the appeals hearing, Dr. Papin had already missed 29 weeks of residency, more than the total amount allowed over a three (3) year period. Accordingly, there was only one possible outcome for this appeals hearing – to uphold Dr. Papin's termination.

### d.    Comparison to Dr. Eklund is Entirely Appropriate

Finally, UMMC argues that Plaintiff's comparison to Dr. Eklund is misplaced. However, there is no reason why Dr. Eklund should have received more protection than Dr. Papin. As a tenured professor, Dr. Eklund already possessed her license to practice. Therefore, even if it was difficult for her to find another job, Dr. Eklund theoretically could have continued practicing by going into practice for herself. No termination would have denied her the ability to continue working as a doctor. Notably, since her termination, it appears Dr. Eklund is working in Pediatric Dentistry at Choctaw Health Center which confirms her termination has not prevented her from working in her chosen field. *See* https://choctawhealthcenter.org/CHC_News.html.

Dr. Papin, on the other hand, had more at stake than Dr. Eklund, and thus should have received at least equal to if not more protections that Dr. Eklund was entitled. *See Mathews*, 424 U.S. 319 at 335. Since his termination, Dr. Papin has applied to ten (10) residency programs and received no interviews, illustrating the insurmountably difficulty he faces entering the medical profession again. *See* Papin Depo., Doc. 144-2, at 9:3 – 11:13; *see also* Papin Decl., Doc. 149-1, at ¶ 14.

**IV.**    <u>**Dr. Papin Can Seek Punitive Damages in His Breach of Contract Case**</u>

In their Response, UMMC spontaneously argued that they are immune from the imposition of punitive damages in Plaintiff's Breach of Express Contract claims. UMMC cites *Sw. Mississippi Reg'l Med. Ctr. v. Lawrence*, 684 So. 2d 1257 (Miss. 1996). However, *Lawrence* does not represent the conclusion that UMMC is immune from punitive damages. In *Lawrence*, the Mississippi Supreme Court held that a plaintiff can recover punitive damages against a community hospital <u>up to the extent of the insurance coverage in existence</u>. *Id.* at 1267 (citing Miss. Code Ann. § 41–13–11).

> Punitive damages are to punish a wrong-doer. In the case of a community hospital, or any other governmental entity for that matter, the "punished" is the taxpayer, as it is their funds that pay the damages, or the insurance coverage for such damages. With that in mind, litigants should not be allowed to obtain punitive damages from the public treasury which is filled only by taxpayers. However, by statute, sovereign immunity is waived to the extent of insurance obtained. Miss.Code Ann. § 41–13–11(2). We have held that where insurance has been obtained to cover liability for damages or injury to persons or property that insurance also covers punitive damages as governed by the policy. *Old Security Cas. Ins. Co. v. Clemmer*, 455 So.2d 781, 783 (Miss.1984); *Anthony v. Frith*, 394 So.2d 867, 868 (Miss.1981). Accordingly, even though tax payers should not have to bear the burden of paying a punitive damages award assessed a governmental entity, neither should an insurance company be allowed to retain premiums and avoid the liability where insurance has been purchased to cover such damages. In the case at bar; however, we do not believe the facts support a punitive damages award against Southwest. For that reason, we reverse the award of punitive damages. Alternatively, were punitive damages affirmed, the award should only be allowed to the extent of the insurance coverage in existence.

*Id.* at 1267. Thus, if Plaintiff is awarded punitive damages here he can recover up to the extent of UMMC's insurance coverage for these claims, if any.

UMMC then alleges that Plaintiff can only recover punitive damages in his breach of contract case if he proves UMMC acted with malice or gross negligence, *see* Response at p. 34 (citing Miss. Code. Ann. § 11-1-65; *Hughes v. Shipp*, 2020 WL 5525383, at *18 (Miss. Ct. App. Sept. 15, 2020), reh'g denied (Jan. 5, 2021)); and that this conduct amounts to a tort in which the state has not

waived immunity for under the MTCA. *See* Response at p. 35. However, UMMC has indeed waived

liability for tort claims to the extent of the maximum amount of liability allowed under § 11-46-15,

Miss. Stat. *See* § 11-46-5, Miss. Stat., Waiver of Immunity. Thus, if the jury believes Dr. Papin is

entitled to punitive damages,[14] he can recover up to the extent of the insurance coverage in

existence.

## CONCLUSION

UMMC did not have discretion in choosing whether to provide Dr. Papin with procedural

due process. They were <u>required</u> by the Mississippi Constitution to do so. Moreover, because of the

nature of the allegations against Dr. Papin, and the serious personal and professional ramifications

Dr. Papin faced as a result of his termination, UMMC had a <u>heightened duty</u> to ensure against an

erroneous deprivation of Dr. Papin's rights. UMMC wholly failed by denying Dr. Papin basic rights

such as documentation supporting allegations of patient harm, allowing him the opportunity to call

witnesses at his appeal hearing, and allowing him the right to confront and cross-examine UMMC's

witnesses against him. Providing Dr. Papin with these rights would have cost UMMC nothing and

allowed Dr. Papin the ability to expose the falsity of the allegations against him, thereby salvaging his

surgical career. UMMC's Response does not explain why it could not provide Dr. Papin with these

safeguards and therefore fails. Because UMMC does not have sovereign immunity here and has

failed to satisfy that it provided Dr. Papin with mandatory procedures to ensure due process,

Plaintiff is entitled to summary judgment in his favor on his procedural due process claim.

Moreover, UMMC <u>admits</u> that it has waived sovereign immunity for Plaintiff's claims

sounding in breach of an express contract. Based on the facts of this case, Plaintiff is confident that

the jury will find cause to award punitive damages for UMMC's willful and malicious breach of

---

[14] For a thorough discussion on the facts supporting Plaintiff's entitlement to punitive damages, *see* Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment, Doc. 150, at pp. 52-53.

multiple express contracts. To the extent this result is achieved, the case law is clear Dr. Papin can recover up to the extent of the insurance coverage in existence.

For these reasons and more, this Court should GRANT Plaintiff's Motion for Partial Summary Judgment.

Dated: <u>April 19, 2021</u>

<u>**/s/ C. Ryan Morgan**</u>
C. RYAN MORGAN, ESQ.
(*admitted pro hac vice*)
Florida Bar No.: 0015527
GREGORY R. SCHMITZ, ESQ.
(*admitted pro hac vice*)
Florida Bar No.:  0094694
20 North Orange Avenue, Suite 1400
Orlando, Florida 32801
Telephone:  (407) 204-2170
Facsimile:  (407) 245-3401
E-mail: gschmitz@forthepeople.com
          rmorgan@forthepeople.com
          mbarreiro@forthepeople.com
          egeorge@forthepeople.com

MARTIN R. JELLIFFE, ESQ.
Martin R. Jelliffe, Esq. (MSB#: 3067)
MORGAN & MORGAN, PLLC
4450 Old Canton Road, Suite 200
Jackson, Mississippi 39211
Phone:601-503-1676
Fax: 601-503-1625
Email: mjelliffe@forthepeople.com

***Attorneys for Plaintiff***

**CERTIFICATE OF SERVICE**

I hereby certify that on April 19, 2021, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will automatically send email notification of such filing to all counsel of record.

*/s/ C. Ryan Morgan*
*C. RYAN MORGAN, ESQ.*
*(admitted pro hac vice)*