**IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION**

**JOSEPH PAPIN**                                                            **PLAINTIFF**

**VS.**                                        **CIVIL ACTION NO. 3:17-CV-763 CWR-FKB**

**UNIVERSITY OF MISSISSIPPI MEDICAL CENTER;
LOU-ANN WOODWARD (individual & official capacity);
T. MARK EARL (individual capacity); and
STEVEN A. BONDI (individual capacity)**                         **DEFENDANTS**

**DECLARATION OF DR. REBECCA MCALISTER
PURSUANT TO 28 U.S.C. SECTION 1746**

EXHIBIT
**1**

1.      I am an adult resident of the State of Missouri and over the age of twenty-one.  I

have personal knowledge as to the facts testified to in this declaration.

2.      I am a licensed physician and former Designated Institutional Official (DIO) and

Associate Dean of Graduate Medical Education at Washington University in St. Louis/Barnes

Jewish Hospital/St. Louis Children's Hospital Consortium.  I served in this position from 1997

until my retirement in October 2020.

3.      I served as the DIO for 99 training programs accredited by the Accreditation

Council for Graduate Medical Education [ACGME], as well as 40 additional non-ACGME

accredited subspecialty programs.  In this role I have dealt with many residents and fellows with

academic and behavioral/professional problems, have been involved in their remediation

planning, adverse academic actions including involuntary withdrawal from the program and in

their appeal to our institutional oversight mechanism. I have interviewed and counseled many

residents who were transferring from their original training program and who were leaving our

institution and developing their subsequent career plans.

4.      I instruct OBGYN Program Directors in a national faculty development program

that discusses recruitment and selection of applicants, dealing with attrition in OBGYN residency training, assessment and counseling of residents, and dealing with problem residents, both in remediation and adverse academic actions.  It is estimated that 75% of the present OBGYN residency program directors have graduated from this program. Additionally, I was a member of the Accreditation Council on Graduate Medical Education (ACGME) Residency Review Committee (RRC) from 2005-2012 and served as Vice Chair of the RRC from 2009-2012. I was the chair of the ACGME OBGYN Milestones writing group from 2010-2012.

5.       I was the lead author for a peer-reviewed paper that analyzed attrition in OBGYN residencies for the entering class of 2001. In this paper, we reviewed the AMA GME Database for all participants in ACGME programs and followed the OBGYN entering class of 2001 for 6 years. We were able to follow their unique identifiers through that time and identified approximately 20% of the class that did not graduate with their classmates. This is similar to the approximately 20% attrition seen in General Surgery residencies.

6.       The application process to enter the National Residency Matching Program (the Match) opens in September of the year prior to the matriculation.   In other words, to apply to the 2018 Match, the application period opens in September of 2017.  Typically, the applicants may begin submitting application materials to programs around September 15, and the last day to apply without incurring late fees is November 30.  Applicants will set up interviews during November, December and January.  In February both the program and the residents are required to finalize their respective rank lists.  During Match Week in March, results are finalized and announced as described below.

7.        In 2019, there were 35,185 positions offered in the Match but 1,768 of these positions went unfilled.  During Match Week in March, the initial results are reviewed and those programs that have not filled all their slots and those applicants that have not initially matched to

their selected programs are advised of this on Monday.  If a program or a candidate has indicated

that they wish to participate in the Supplemental Offer and Acceptance Program (SOAP), on

Tuesday, listings of unfilled programs and unmatched candidates are shared with each other and

each develop their preference lists. On Wednesday, "SOAP Rounds" begin with unfilled

programs contacting candidates they are interested in and making binding offers to their chosen

applicants. Applicants must accept or refuse within a given round. Each round lasts 2 hours and,

if not filled or selected, programs and applicants would roll over to the next round. There are 2

rounds on Wednesday and 2 on Thursday. On Friday at noon, all now final results of the Match

process are announced publicly. After that point any unfilled program or unmatched applicant

can negotiate freely outside of the NRMP Match process. In 2019, there were 35,185 positions

offered in the Match but 1,768 of these positions went initially unfilled. Subsequently,1,652 of

the 1,768 open positions were filled in the SOAP. In total, the post-SOAP fill rate was 98.7%.

8.      Although these Match numbers may appear as if it is difficult to secure a

residency position, the competitiveness of matching varies greatly and is directly dependent on

the specialty that is pursued and the quality of the applicant. Surgical subspecialties tend to be

more competitive to obtain when compared to primary care residencies. Residency programs

prefer to match U.S. graduates over international medical graduates (IMG) which is reflected by

the 2019 match rate for U.S. seniors was 93.9% vs 59% for IMGs. Herein, positions obtained by

IMGs mirror the competitiveness of the specific residencies. In 2019, the percentage of the

following specialties filled by IMGs were as follows: Family Medicine (61 %), Internal

Medicine (58.5%), and Pediatrics (40%).

9.      General Surgery internship is likely the one of the most demanding when

compared to the internship of other specialties. The quantity and intensity of "work" that is

performed on a daily basis by a General Surgery intern is so high that is it difficult to

comprehend for those not involved. As some interns are not prepared for this level of stress, it is not uncommon for interns to leave during or after the intern year for another specialty. The stress involved with interns that are not performing well or have feelings of inadequacy may cause behavioral problems that are not typical for that individual. In my experience, this is well-understood by program directors in surgical fields and in other specialties. The ability for an intern who leaves his initial training program to find additional residency training is usually dependent on the quality of applicant (e.g. U.S. graduate, USMLE scores, class rank, research, documented humanism, recommendation letters, etc) and the circumstances under which he left the program.

9.      I reviewed the ERAS application of Dr. Papin. Dr. Papin graduated from a prestigious U.S. medical school (University of Michigan), has USMLE scores above the average for some medical specialties, has evidence of good humanistic traits, excellent research experience, and has outstanding recommendation letters from surgeons that are well-respected internationally. The fact that he was able to obtain a categorical General Surgery position at the University of Mississippi also speaks to the quality of his application. Indeed, all of these factors are important in evaluating an applicant that has voluntarily withdrawn or been dismissed from another residency.

10.      With the approximately 20% annual attrition rate from General Surgery residencies, most of these physicians re-enter the Match and successfully identify a new training program to continue their medical career. Some choose to work in non-GME positions for short periods of time, often in medical research labs where they can establish a good work ethic and obtain recommendations to counteract the concerns of prospective PDs regarding problems in previous programs. Although Dr. Papin had taken this course after initially failing to match in Neurosurgery and subsequently successfully matching in UMMC General Surgery, he did not

choose to do this again. Dr. Papin did not choose to enter the Match after his termination initially and did not do so for 3 years after separating from UMMC. This gap is an additional red flag to subsequent GME programs which was brought about by Dr. Papin's failure to apply to other residencies.

11.     Success for re-entering residents is directly dependent on the specialty that is pursued and the quality of the applicant. The attrition rate from the first year of General Surgery is high and the ability to find another position is "usually dependent on the quality of the applicant" as seen in their original application through the ERAS application that is completed upon graduation from medical school for application to their first GME position. Dr. Papin is a qualified applicant for a preliminary General Surgery position, a position that is much less competitive than the categorical positions for General Surgery.  Dr. Papin is a viable candidate for subsequent GME positions in General Surgery (both categorical and preliminary) and other less competitive medical specialties.

12.     The ACGME uses the terms "categorical" and "preliminary" to identify the type of training commitment that the program has to the resident. A categorical resident enters a training program with the intent of completing training and graduating from the program. This applies both to a PGY1(first year) resident who just matched to a program and to an upper-level resident who transfers into the program with the intent of completing training. In contrast, a preliminary resident has a one- or two-year commitment to train in the program, with no intention of completing training in that specific program. There are differences within the preliminary resident designation as well, especially within the general surgery specialty. For example:

▪   Designated preliminary residents match into another specialty that requires residents to complete a year in general surgery as a prerequisite for their training. For example,

urology requires residents to complete one year of general surgery training before entering their urology residency program, and anesthesia requires one year of prerequisite training in either surgery or internal medicine.

- Non-designated preliminary residents are those who did not match into the training programs of their choice. They generally continue to interview during the PGY1 year and try to either match as categorical residents the following year or find positions as PGY2 categorical residents. This designation gives medical students who do not match into a program an opportunity to stay in the medical field and reapply to residency programs the following year.

- Depending upon whether vacancies occur, some training programs may also offer an open PGY2 categorical position or another preliminary year to a preliminary resident.

13.   The NRMP also reports on surveys of Program Directors asking which factors they value in assessing applicants for invitations to interview and for subsequent ranking. Dr. Papin's ERAS application would have placed him in a competitive position for General Surgery Program Directors to invite him for interview with a USMLE score in range for those invited, good letters of recommendation, and class ranking in the middle for a highly regarded US medical school. No professionalism issues were identified in his ERAS application or medical school records. 62% of General Surgery programs consider US graduate applicants and 12% consider all applicant groups. Again, this demonstrates there was ample opportunity for Dr. Papin to re-enter GME training through the Match and secure a training position in a new General Surgery program whether in a categorical or preliminary position, or apply to other less competitive fields.

14.   UMMC met the ACGME Requirements for General Surgery and Institutional Requirements in their termination of Joseph Papin, MD.  The essential ACGME requirements

regarding evaluation and disciplinary actions by ACGME accredited training programs such as

the General Surgery residency at the UMMC are contained within the Common Program

Requirements that are applicable to all General Surgery training programs.   See a true and

correct copy of the ACGME Common Program Requirements Attached as Exhibit "A."  and

Institutional Requirements attached as Exhibit "B."

   15. During Dr. Papin's training, the General Surgery program was entirely compliant

with these requirements. They provided:

     A. Competency based goals and objectives distributed to residents. Program

     Requirement (PR) I.V.A.2. These were referenced in the General Surgery

     Residency Handbook as being available on SharePoint which all residents could

     access on their own initiative and were emailed to residents as needed. In the first

     rotation in CVICU, these were apparently not emailed at the beginning of the

     rotation. This was quickly corrected when it became apparent that Dr. Papin had

     not received them.

     B. At all times Dr. Papin was adequately supervised by the UMMC faculty as

     described in PR V.I.A.2e1a.

     C. Direct observation, evaluation and feedback during educational

     assignments (Program Requirement V.A.1.a-c) The program has documented

     written evaluations commencing with the first clinical assignment on CVICU and

     throughout his clinical work in the program. Many of these document specific

     instances where he failed to meet expectations of those supervising him. As stated

     in the remarks of Dr. Earl the General Surgery Program Director (PD) in the

     appeal committee meeting, the residents had access to their evaluations 24/7

     consistent with PR V.A.1.f.  Additionally, there were many verbal

communications with Dr. Papin by those supervising him and by Dr. Earl giving

him specific examples of the concerns they had with his work and

recommendations on ways to improve his performance. As required, the feedback

was also multi-sourced from other health professionals, such as nurse

practitioners, that worked with Dr. Papin (PR V.A.I.c.1). This is an essential

component of evaluating a resident's competency in Interpersonal

Communication Skills and Professionalism, both areas where Dr. Papin struggled.

As the pattern of concerns continued unchanged despite this timely feedback, Dr.

Earl had multiple, "near monthly" discussions with him including the one that

occurred outside of OR 16 to highlight that his performance was not adequate and

required improvement.  This fulfilled the PDs responsibility in V.A.1.d.2 to

"assist residents in developing learning plans…and identify areas for growth."

Problems with professionalism such as were occurring with Dr. Papin are

particularly difficult to effectively remediate.

D.      The UMMC General Surgery program's Clinical Competency Committee

(CCC) met to review Dr. Papin's written evaluations on November 8, 2016 as per

PR V.A.1.c.2 and noted critical deficiencies in 7 of 16 Milestones, a remarkably

poor review.

E.      Dr. Earl met with Dr. Papin on November 29, 2016 to advise him of the

CCC's evaluations as per V.A.1.d.  This conversation was documented in a letter

which both Drs. Papin and Earl signed. He then met with him again on December

20, 2016, reiterated the recurring issues with professionalism and advised him that

"failure to change would have dire consequences." It was clearly stated in the

General Surgery Handbook Policies for Evaluation and Promotion and Dismissal

which was available to Dr. Papin, that unsatisfactory trainee performance may result in dismissal from the program, the decision to be made by the PD with consultation from the Department Chair.

F.      After the Dec 20, 2016 meeting, Dr. Earl continued to receive multisource reports on Dr. Papin's ongoing dishonesty, unreliability and overall failure to have corrected the behaviors that had been occurring throughout his training. Although Dr. Papin had limited clinical days due to scheduled vacations, Dr. Earl received new reports such as failing to notify the ICU of a patient's admission and subsequent dishonesty when confronted with this. The Chief Resident who had worked with him on Trauma service in December submitted a summary of multiple issues of professionalism, including patient abandonment in not responding to a code on his patient, leaving the hospital when on call to go running, poor communication with nursing, failing to wash out a dirty wound and inadequately assessing a patient's wound that resulted in patient harm by requiring a colostomy. Again, Dr. Papin did not take responsibility for these actions.

G.      Although he had misgivings as to the potential to effectively remediate these professionalism issues as noted in his statements in the appeals hearing, Dr. Earl moved to fulfill PR VA1d3 and develop plans for residents failing to progress, following institutional policies and procedures. This resulted in the letter he gave to Dr. Papin on January 10, 2017 which both he and Dr. Papin signed. After his January 10, 2017 meeting, Dr. Papin was appropriately removed from clinical duty due to concerns that he might cause harm to patients in his care. As described in the article by Lefebvre et al in the Journal of Graduate Medical

Education in June 2018, this was entirely appropriate and consistent with his ethical and legal obligation to prevent harm to patients. Per Lefebvre, "Delivery of substandard medical care is not required for dismissal and it is not necessary for a program to wait until injury occurs before terminating the clinical privileges of a trainee."  See Lefebvre article attached as Exhibit "C."

H.      The January 10, 2017 letter followed the UMMC policies for Academic remediation and therefore gave a 60 day timeframe of no tolerance of any further professionalism lapses. However, consistent with the policies of the Faculty and Staff Handbook of UMMC which was also available to Dr. Papin, Dr. Papin's behavior included multiple examples of professional misconduct (page 50) that were subject to disciplinary action by UMMC up to and including termination. To better understand how he should approach Dr. Papin's misconduct and professionalism issues, Dr. Earl appropriately consulted with Dr. Fredrick Barr, the Designated Institutional Official (DIO) at UMMC.  Dr. Barr felt that the list of Dr. Papin's misconducts documented by the program warranted an investigation by UMMC Human Resources (HR) to determine if they were sufficient to result in termination. This action was fulfilling the PR V.A.1.d.3 to follow institutional policies and procedures.

I.      HR for UMMC therefore conducted an appropriate investigation of Dr. Papin's behavior, reviewing the program's records and interviewing Dr. Papin to allow him to give his perspective on the events that the department had found unacceptable. It was their determination that these did constitute grounds for immediate dismissal under the UMMC policies and therefore overrode the Academic procedures initiated by Dr. Earl in his letter of January 10, 2017.

J.      Upon the recommendation of the UMMC HR for termination, Dr. Papin appropriately was given access to the UMMC appeals process for adverse actions. This was consistent with the ACGME Institutional Requirement IVC1 that written notice of dismissal be given to the resident and that a policy providing due process for appealing that decision be available to that resident. Dr. Papin did appeal this decision under the UMMC policy as described in the UMMC Graduate Medical Education Evaluation and Grievance Algorithm. Upon receipt of Dr. Papin's appeal, an appropriately constituted appeals committee was appointed by the Vice Chancellor for Health Affairs. That committee reviewed the actions of the PD, the Department of Surgery, and the recommendations of the HR investigation. Additionally and importantly, the appeals committee interviewed Dr. Papin giving him ample opportunity to relate his perception of the events that had transpired and thus all aspects of due process were fulfilled. These are described in Lefebvre et al as "notice of deficiencies, opportunity to review the evidence, and a chance to advocate for themselves." The appeals committee acted appropriately by confirming the decision for termination.

16.     UMMC fulfilled all aspects of the ACGME Common Program Requirements as applicable to residency training in General Surgery. Individual programs are expected to develop their own algorithms and are not held to rigid use of such terms as remediation, formal remediation or probation by the ACGME.  Dr. Papin was clearly advised of the department's expectations, when he did not meet them, and what the consequences of failing to change his behavior might be. Although clear direction as to what was needed for satisfactory performance was given, professionalism issues are very difficult to successfully remediate. As noted by Williams and Roberts in "The Hidden Costs of Failing to Fail Residents," the resident is in

control of the outcome and the program should "never assume the responsibility for fixing the problem." The department correctly moved to protect patient safety and appropriately pursue the correct institutional oversight for these behaviors. Dr. Papin was given access to the UMMC institutional appeals process which fulfilled all ACGME Institutional Requirements for due process and appropriately sustained the decision to terminate Dr. Papin.

**I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.**

_____

**Rebecca P. McAlister, MD**

# ACGME Program Requirements for Graduate Medical Education in General Surgery



DEFENDANT'S
EXHIBIT

**A**

ACGME-approved focused revision: June 13, 2020; effective July 1, 2020

## Contents

Introduction ....................................................................................................................3
   Int.A.   Preamble ................................................................................................3
   Int.B.   Definition of Specialty .........................................................................4
   Int.C.   Length of Educational Program ...........................................................4
I.   Oversight ................................................................................................................4
   I.A.   Sponsoring Institution ........................................................................4
   I.B.   Participating Sites ...............................................................................5
   I.C.   Recruitment .........................................................................................7
   I.D.   Resources ............................................................................................8
   I.E.   Other Learners and Other Care Providers .........................................9
II.   Personnel ...............................................................................................................9
   II.A.   Program Director ................................................................................9
   II.B.   Faculty ...............................................................................................15
   II.C.   Program Coordinator ........................................................................18
   II.D.   Other Program Personnel .................................................................19
III.   Resident Appointments ....................................................................................19
   III.A.   Eligibility Requirements ...................................................................19
   III.B.   Number of Residents ........................................................................21
   III.C.   Resident Transfers ...........................................................................21
IV.   Educational Program .........................................................................................22
   IV.A.   Curriculum Components ...................................................................22
   IV.B.   ACGME Competencies ......................................................................23
   IV.C.   Curriculum Organization and Resident Experiences ..........................29
   IV.D.   Scholarship .......................................................................................34
V.   Evaluation ............................................................................................................36
   V.A.   Resident Evaluation .........................................................................36
   V.B.   Faculty Evaluation ............................................................................40
   V.C.   Program Evaluation and Improvement ..............................................41
VI.   The Learning and Working Environment .........................................................45
   VI.A.   Patient Safety, Quality Improvement, Supervision, and Accountability ...........46
   VI.B.   Professionalism ................................................................................51
   VI.C.   Well-Being .........................................................................................53
   VI.D.   Fatigue Mitigation .............................................................................56
   VI.E.   Clinical Responsibilities, Teamwork, and Transitions of Care ..............57
   VI.F.   Clinical Experience and Education ....................................................59

**ACGME Program Requirements for Graduate Medical Education
in General Surgery**

**Common Program Requirements (Residency) are in BOLD**

Where applicable, text in italics describes the underlying philosophy of the requirements in that section. These philosophic statements are not program requirements and are therefore not citable.

---

The Specialty-Specific Background and Intent text in the boxes throughout these requirements provide detail regarding the intention behind specific requirements, as well as guidance on how to implement the requirements in a way that supports excellence in residency education. Programs will note that the General Surgery FAQs companion document has been integrated into this document and, where appropriate, guidance is given on additional Review Committee resource information.

---

**Introduction**

**Int.A.**    *Graduate medical education is the crucial step of professional development between medical school and autonomous clinical practice. It is in this vital phase of the continuum of medical education that residents learn to provide optimal patient care under the supervision of faculty members who not only instruct, but serve as role models of excellence, compassion, professionalism, and scholarship.*

*Graduate medical education transforms medical students into physician scholars who care for the patient, family, and a diverse community; create and integrate new knowledge into practice; and educate future generations of physicians to serve the public. Practice patterns established during graduate medical education persist many years later.*

*Graduate medical education has as a core tenet the graded authority and responsibility for patient care. The care of patients is undertaken with appropriate faculty supervision and conditional independence, allowing residents to attain the knowledge, skills, attitudes, and empathy required for autonomous practice. Graduate medical education develops physicians who focus on excellence in delivery of safe, equitable, affordable, quality care; and the health of the populations they serve. Graduate medical education values the strength that a diverse group of physicians brings to medical care.*

*Graduate medical education occurs in clinical settings that establish the foundation for practice-based and lifelong learning. The professional development of the physician, begun in medical school, continues through faculty modeling of the effacement of self-interest in a humanistic environment that emphasizes joy in curiosity, problem-solving, academic rigor, and discovery. This transformation is often physically, emotionally, and intellectually demanding and occurs in a variety of clinical learning environments committed to graduate medical education and the well-being of patients, residents, fellows, faculty members, students, and all members of the health care team.*

**Int.B.**          **Definition of Specialty**

The practice of surgery encompasses the provision of comprehensive care to the patient with surgical disorders of the abdomen and its contents, the alimentary tract, skin, soft tissues, and breast, endocrine organs, and trauma. The practice of surgery also encompasses the surgical evaluation and management of patients with oncologic, vascular, pediatric, and intensive care disorders. Furthermore, the practice of surgery entails adequate knowledge and experience for the assessment and requisite emergency surgical stabilization and management of severe conditions of the cardiothoracic, urologic, gynecologic, neurologic, and otolaryngologic systems and indications for specialty consultations. Comprehensive care includes (but is not limited to) the evaluation, diagnosis, and treatment (both operative and non-operative) of surgical disorders, as well as the appropriate disposition and follow-up of the patients with those disorders. In order to provide optimal comprehensive care, the surgeon must effectively function in interprofessional and, often, multidisciplinary teams, frequently in a leadership role.

**Int.B.1.**          The goal of a surgical residency program is to prepare the resident (1) to perform the role of a surgeon at the advanced level expected of a board-certified specialist, and (2) to direct interprofessional and multispecialty teams necessary for the care of surgical patients. The education of surgeons in the performance of general surgery encompasses (1) didactic instruction in the basic and clinical sciences of surgical diseases and conditions; (2) education in procedural skills and operative techniques; and (3) preparation for the life-long provision of comprehensive care to surgical patients. The educational process must lead to the acquisition of an appropriate fund of knowledge and skills, including technical and non-technical skills; the ability to integrate and apply the acquired knowledge into the clinical situation, including the ability to operate independently; the development of surgical judgment; and the ability to communicate effectively, to the patient and other caregivers, the plan for and results of care.

**Int.C.**          **Length of Educational Program**

The educational program in surgery must be 60 months in length. [(Core)]*

**I.**          **Oversight**

**I.A.**          **Sponsoring Institution**

***The Sponsoring Institution is the organization or entity that assumes the ultimate financial and academic responsibility for a program of graduate medical education, consistent with the ACGME Institutional Requirements.***

***When the Sponsoring Institution is not a rotation site for the program, the most commonly utilized site of clinical activity for the program is the primary clinical site.***

> **Background and Intent:** Participating sites will reflect the health care needs of the community and the educational needs of the residents. A wide variety of organizations may provide a robust educational experience and, thus, Sponsoring Institutions and participating sites may encompass inpatient and outpatient settings including, but not limited to a university, a medical school, a teaching hospital, a nursing home, a school of public health, a health department, a public health agency, an organized health care delivery system, a medical examiner's office, an educational consortium, a teaching health center, a physician group practice, federally qualified health center, or an educational foundation.

**I.A.1.**     The program must be sponsored by one ACGME-accredited Sponsoring Institution. (Core)

**I.B.**     **Participating Sites**

*A participating site is an organization providing educational experiences or educational assignments/rotations for residents.*

**I.B.1.**     The program, with approval of its Sponsoring Institution, must designate a primary clinical site. (Core)

**I.B.2.**     There must be a program letter of agreement (PLA) between the program and each participating site that governs the relationship between the program and the participating site providing a required assignment. (Core)

**I.B.2.a)**     The PLA must:

**I.B.2.a).(1)**     be renewed at least every 10 years; and, (Core)

**I.B.2.a).(2)**     be approved by the designated institutional official (DIO). (Core)

**I.B.3.**     The program must monitor the clinical learning and working environment at all participating sites. (Core)

**I.B.3.a)**     At each participating site there must be one faculty member, designated by the program director as the site director, who is accountable for resident education at that site, in collaboration with the program director. (Core)

> **Background and Intent:** While all residency programs must be sponsored by a single ACGME-accredited Sponsoring Institution, many programs will utilize other clinical settings to provide required or elective training experiences. At times it is appropriate to utilize community sites that are not owned by or affiliated with the Sponsoring Institution Some of these sites may be remote for geographic, transportation, or communication issues. When utilizing such sites the program must ensure the quality of the educational experience. The requirements under I.B.3. are intended to ensure that this will be the case.

> **Suggested elements to be considered in PLAs will be found in the ACGME Program Director's Guide to the Common Program Requirements. These include:**
> - **Identifying the faculty members who will assume educational and supervisory responsibility for residents**
> - **Specifying the responsibilities for teaching, supervision, and formal evaluation of residents**
> - **Specifying the duration and content of the educational experience**
> - **Stating the policies and procedures that will govern resident education during the assignment**

**I.B.4.**   **The program director must submit any additions or deletions of participating sites routinely providing an educational experience, required for all residents, of one month full time equivalent (FTE) or more through the ACGME's Accreditation Data System (ADS). (Core)**

I.B.5.   An accredited surgery program must be conducted in an institution that can document a sufficient breadth of patient care. At a minimum, the institution must routinely care for patients with a broad spectrum of surgical diseases and conditions, including all of the essential content areas in surgical education. In addition, these institutions must include facilities and staff for a variety of other services that provide a critical role in the care of patients with surgical conditions, including radiology and pathology. (Core)

I.B.6.   A participating site should supplement resident education by providing focused clinical experience not available, or insufficient for optimal education and training, at the primary clinical site. (Core)

I.B.6.a)   Assignment to participating sites must have a clear educational rationale. (Core)

I.B.6.b)   Advance approval of the Review Committee is required for resident assignment of six months or more at a participating site. (Core)

> Specialty-Specific Background and Intent: An Institutional Operative Data Worksheet can be found on the Documents and Resources page of the Surgery section of the ACGME website. The Institutional Operative Data Worksheet allows programs to demonstrate that a participating site has the operative resources specific to the breadth of surgery and supports the justification of rotations at that site. If rotations at the site are in general surgery, the program needs to complete the worksheet; however, if rotations are limited to specific subspecialties (e.g., pediatric surgery, transplant, burn, breast), the program may complete those specific sections of the worksheet. Programs requesting approval for resident assignments of six months or more at any participating site, cumulatively over the duration of the program, need to provide a complete listing of institutional operative data specific to the rotations at that site.

I.B.6.c)   Advance approval of the Review Committee is not required for resident assignment of less than six months, but the educational rationale and operative resources for such assignments will be

evaluated at the time of each site-visit and accreditation review.
(Core)

I.B.6.d)  The program director must designate other well-qualified surgeons to assist in the supervision and education of the residents. (Core)

I.B.6.e)  The program director must be responsible for all clinical assignments and input into the teaching staff appointments at all sites. (Core)

I.B.6.f)  Participating site[s] should be in geographic proximity to allow all residents to attend core conferences. If the site is geographically remote and joint conferences cannot be held, an equivalent educational program of lectures and conferences at the site must occur and must be fully documented. Morbidity and mortality reviews must occur at each participating site or at a combined central location. (Core)

I.B.6.g)  All trainees in both ACGME-accredited and non-accredited programs at the primary clinical site and participating site[s] that may impact the educational experience of the surgery residents must be identified, and their relationship to the surgery residents must be detailed and reported to the DIO and Graduate Medical Education Committee (GMEC) at least annually. (Core)

I.B.6.h)  Chief residents (residents in the PGY-5 or residents in the PGY-4 and PGY-5 with approved chief rotations):

I.B.6.h).(1)  must not be assigned to a participating site that sponsors another ACGME-accredited general surgery residency program; and, (Detail)

I.B.6.h).(2)  must have clinical experiences in the essential content areas as outlined in IV.C.8.b).(2).(a) when rotating at a participating site. (Core)

I.B.6.h).(2).(a)  Exceptions must be approved by the Review Committee and will be considered case-by-case on the basis of educational value. (Core)

**I.C.  The program, in partnership with its Sponsoring Institution, must engage in practices that focus on mission-driven, ongoing, systematic recruitment and retention of a diverse and inclusive workforce of residents, fellows (if present), faculty members, senior administrative staff members, and other relevant members of its academic community. (Core)**

**Background and Intent:** It is expected that the Sponsoring Institution has, and programs implement, policies and procedures related to recruitment and retention of minorities underrepresented in medicine and medical leadership in accordance with the Sponsoring Institution's mission and aims. The program's annual evaluation must

include an assessment of the program's efforts to recruit and retain a diverse workforce, as noted in V.C.1.c).(5).(c).

**I.D.** **Resources**

**I.D.1.** **The program, in partnership with its Sponsoring Institution, must ensure the availability of adequate resources for resident education.** (Core)

I.D.1.a) These resources must include:

I.D.1.a).(1) a common office space for residents that includes a sufficient number of computers and adequate workspace at the primary clinical site and at each participating site; (Core)

I.D.1.a).(2) Internet access to appropriate full-text journals and electronic medical reference resources for education and patient care at all participating sites; and, (Core)

I.D.1.a).(3) software resources for production of presentations, manuscripts, and portfolios; and, (Core)

I.D.1.a).(4) online radiographic and laboratory reporting systems at the primary clinical site and all participating sites. (Core)

I.D.1.b) Programs must provide for simulation and skills laboratories. (Core)

**I.D.2.** **The program, in partnership with its Sponsoring Institution, must ensure healthy and safe learning and working environments that promote resident well-being and provide for:** (Core)

**I.D.2.a)** **access to food while on duty;** (Core)

**I.D.2.b)** **safe, quiet, clean, and private sleep/rest facilities available and accessible for residents with proximity appropriate for safe patient care;** (Core)

**Background and Intent:** Care of patients within a hospital or health system occurs continually through the day and night. Such care requires that residents function at their peak abilities, which requires the work environment to provide them with the ability to meet their basic needs within proximity of their clinical responsibilities. Access to food and rest are examples of these basic needs, which must be met while residents are working. Residents should have access to refrigeration where food may be stored. Food should be available when residents are required to be in the hospital overnight. Rest facilities are necessary, even when overnight call is not required, to accommodate the fatigued resident.

**I.D.2.c)** **clean and private facilities for lactation that have refrigeration capabilities, with proximity appropriate for safe patient care;** (Core)

> **Background and Intent:** Sites must provide private and clean locations where residents may lactate and store the milk within a refrigerator. These locations should be in close proximity to clinical responsibilities. It would be helpful to have additional support within these locations that may assist the resident with the continued care of patients, such as a computer and a phone. While space is important, the time required for lactation is also critical for the well-being of the resident and the resident's family, as outlined in VI.C.1.d).(1).

**I.D.2.d)**　　　　security and safety measures appropriate to the participating site; and, (Core)

**I.D.2.e)**　　　　accommodations for residents with disabilities consistent with the Sponsoring Institution's policy. (Core)

**I.D.3.**　　　　**Residents must have ready access to specialty-specific and other appropriate reference material in print or electronic format. This must include access to electronic medical literature databases with full text capabilities. (Core)**

**I.D.4.**　　　　**The program's educational and clinical resources must be adequate to support the number of residents appointed to the program. (Core)**

I.D.5.　　　　The institutional volume and variety of operative experience must be adequate to ensure a sufficient number and distribution of basic and complex cases (as determined by the Review Committee) for each resident in the program. (Core)

**I.E.**　　　　**The presence of other learners and other care providers, including, but not limited to, residents from other programs, subspecialty fellows, and advanced practice providers, must enrich the appointed residents' education. (Core)**

**I.E.1.**　　　　**The program must report circumstances when the presence of other learners has interfered with the residents' education to the DIO and Graduate Medical Education Committee (GMEC). (Core)**

> **Background and Intent:** The clinical learning environment has become increasingly complex and often includes care providers, students, and post-graduate residents and fellows from multiple disciplines. The presence of these practitioners and their learners enriches the learning environment. Programs have a responsibility to monitor the learning environment to ensure that residents' education is not compromised by the presence of other providers and learners.

**II.**　　　　**Personnel**

**II.A.**　　　　**Program Director**

**II.A.1.** **There must be one faculty member appointed as program director with authority and accountability for the overall program, including compliance with all applicable program requirements.** (Core)

**II.A.1.a)** **The Sponsoring Institution's GMEC must approve a change in program director.** (Core)

**II.A.1.b)** **Final approval of the program director resides with the Review Committee.** (Core)

> **Background and Intent: While the ACGME recognizes the value of input from numerous individuals in the management of a residency, a single individual must be designated as program director and made responsible for the program. This individual will have dedicated time for the leadership of the residency, and it is this individual's responsibility to communicate with the residents, faculty members, DIO, GMEC, and the ACGME. The program director's nomination is reviewed and approved by the GMEC. Final approval of program directors resides with the Review Committee.**

**II.A.1.c)** **The program must demonstrate retention of the program director for a length of time adequate to maintain continuity of leadership and program stability.** (Core)

II.A.1.c).(1)  The program director's initial appointment should be for at least six years. (Detail)

> **Background and Intent: The success of residency programs is generally enhanced by continuity in the program director position. The professional activities required of a program director are unique and complex and take time to master. All programs are encouraged to undertake succession planning to facilitate program stability when there is necessary turnover in the program director position.**

**II.A.2.** **At a minimum, the program director must be provided with the salary support required to devote** 30 percent **FTE of non-clinical time to the administration of the program.** (Core)

II.A.2.a)  Associate program directors must be appointed and additional salary support for the associate program director(s) must be provided based on program size as follows: (Core)

| Number of Approved Categorical and Preliminary Resident Positions | Minimum Number of Associate Program Directors | Minimum FTE per Associate Program Director(s) |
| --- | --- | --- |
| 0-20 | 0 | 0 |
| 21-50 | 1 | 0.1 |
| 51 or more | 2 | 0.1 |

II.A.2.b)  Program directors should devote their principal non-clinical effort to the program. (Detail)

II.A.2.b).(1)     The associate program director's initial appointment should be for at least three years. (Detail)

> **Background and Intent: Thirty percent FTE is defined as one and one half days per week.**
>
> **"Administrative time" is defined as non-clinical time spent meeting the responsibilities of the program director as detailed in requirements II.A.4.-II.A.4.a).(16).**
>
> **The requirement does not address the source of funding required to provide the specified salary support.**

II.A.3.     Qualifications of the program director:

II.A.3.a)     must include specialty expertise and at least three years of documented educational and/or administrative experience, or qualifications acceptable to the Review Committee; (Core)

> **Background and Intent: Leading a program requires knowledge and skills that are established during residency and subsequently further developed. The time period from completion of residency until assuming the role of program director allows the individual to cultivate leadership abilities while becoming professionally established. The three-year period is intended for the individual's professional maturation.**
>
> **The broad allowance for educational and/or administrative experience recognizes that strong leaders arise through diverse pathways. These areas of expertise are important when identifying and appointing a program director. The choice of a program director should be informed by the mission of the program and the needs of the community.**
>
> **In certain circumstances, the program and Sponsoring Institution may propose and the Review Committee may accept a candidate for program director who fulfills these goals but does not meet the three-year minimum.**

II.A.3.b)     must include current certification in the specialty for which they are the program director by the American Board of Surgery or by the American Osteopathic Board of Surgery, or specialty qualifications that are acceptable to the Review Committee; (Core)

> Specialty-Specific Background and Intent: Sponsoring Institutions considering candidates for appointment as program director holding qualifications equivalent to those of the American Board of Surgery or the American Osteopathic Board of Surgery (e.g., Royal College of Physicians and Surgeons Canada) may submit a request for consideration and approval of qualifications to the executive director of the Review Committee. In accordance with Program Requirement II.A.4.a).(16) all requests must be co-signed by the DIO.
>
> There may be situations in programs when a qualified program director cannot be immediately appointed or when a temporary absence of the permanent program director is anticipated. In situations where an interim program director is needed as a temporizing measure to provide stability to a program, a request should be entered into ADS, and

"interim" chosen as the term of appointment. Included in the submission of the request for approval, the institution/program will be required to submit an action plan outlining the support (e.g., institutional, division, department, and program) that will be provided to the interim program director, the plan for recruitment or placement of a qualified permanent program director, and the anticipated timeline until such placement. The program will be expected to submit a progress report six months following the request for approval of the interim program director if a qualified program director has not been appointed and approved by the Review Committee. Instructions for the submission of an interim program director may be found at: https://www.acgme.org/Specialties/Documents-and-Resources/pfcatid/24/Surgery.

**II.A.3.c)**          **must include current medical licensure and appropriate medical staff appointment; (Core)**

**II.A.3.d)**          **must include ongoing clinical activity; and, (Core)**

**Background and Intent: A program director is a role model for faculty members and residents. The program director must participate in clinical activity consistent with the specialty. This activity will allow the program director to role model the Core Competencies for the faculty members and residents.**

II.A.3.e)          must include scholarly activity in at least one of the areas of scholarly activity delineated in Section IV.D. of this document. (Detail)

Specialty-Specific Background and Intent: The Committee recommends that the program director's scholarly activities be reflective of the institution's and program's scholarly environment, and should align with the program's mission and aims.

**II.A.4.**          **Program Director Responsibilities**

**The program director must have responsibility, authority, and accountability for: administration and operations; teaching and scholarly activity; resident recruitment and selection, evaluation, and promotion of residents, and disciplinary action; supervision of residents; and resident education in the context of patient care. (Core)**

**II.A.4.a)**          **The program director must:**

**II.A.4.a).(1)**          **be a role model of professionalism; (Core)**

**Background and Intent: The program director, as the leader of the program, must serve as a role model to residents in addition to fulfilling the technical aspects of the role. As residents are expected to demonstrate compassion, integrity, and respect for others, they must be able to look to the program director as an exemplar. It is of utmost importance, therefore, that the program director model outstanding professionalism, high quality patient care, educational excellence, and a scholarly approach to work. The program director creates an environment where respectful discussion is welcome, with the goal of continued improvement of the educational experience.**

**II.A.4.a).(2)**    design and conduct the program in a fashion consistent with the needs of the community, the mission(s) of the Sponsoring Institution, and the mission(s) of the program; (Core)

> **Background and Intent:** The mission of institutions participating in graduate medical education is to improve the health of the public. Each community has health needs that vary based upon location and demographics. Programs must understand the social determinants of health of the populations they serve and incorporate them in the design and implementation of the program curriculum, with the ultimate goal of addressing these needs and health disparities.

**II.A.4.a).(3)**    administer and maintain a learning environment conducive to educating the residents in each of the ACGME Competency domains; (Core)

> **Background and Intent:** The program director may establish a leadership team to assist in the accomplishment of program goals. Residency programs can be highly complex. In a complex organization, the leader typically has the ability to delegate authority to others, yet remains accountable. The leadership team may include physician and non-physician personnel with varying levels of education, training, and experience.

**II.A.4.a).(4)**    develop and oversee a process to evaluate candidates prior to approval as program faculty members for participation in the residency program education and at least annually thereafter, as outlined in V.B.; (Core)

**II.A.4.a).(5)**    have the authority to approve program faculty members for participation in the residency program education at all sites; (Core)

**II.A.4.a).(6)**    have the authority to remove program faculty members from participation in the residency program education at all sites; (Core)

**II.A.4.a).(7)**    have the authority to remove residents from supervising interactions and/or learning environments that do not meet the standards of the program; (Core)

> **Background and Intent:** The program director has the responsibility to ensure that all who educate residents effectively role model the Core Competencies. Working with a resident is a privilege that is earned through effective teaching and professional role modeling. This privilege may be removed by the program director when the standards of the clinical learning environment are not met.
>
> There may be faculty in a department who are not part of the educational program, and the program director controls who is teaching the residents.

| II.A.4.a).(8) | submit accurate and complete information required and requested by the DIO, GMEC, and ACGME; (Core) |
|---|---|

| II.A.4.a).(9) | provide applicants who are offered an interview with information related to the applicant's eligibility for the relevant specialty board examination(s); (Core) |
|---|---|

| II.A.4.a).(10) | provide a learning and working environment in which residents have the opportunity to raise concerns and provide feedback in a confidential manner as appropriate, without fear of intimidation or retaliation; (Core) |
|---|---|

| II.A.4.a).(11) | ensure the program's compliance with the Sponsoring Institution's policies and procedures related to grievances and due process; (Core) |
|---|---|

| II.A.4.a).(12) | ensure the program's compliance with the Sponsoring Institution's policies and procedures for due process when action is taken to suspend or dismiss, not to promote, or not to renew the appointment of a resident; (Core) |
|---|---|

> **Background and Intent:** A program does not operate independently of its Sponsoring Institution. It is expected that the program director will be aware of the Sponsoring Institution's policies and procedures, and will ensure they are followed by the program's leadership, faculty members, support personnel, and residents.

| II.A.4.a).(13) | ensure the program's compliance with the Sponsoring Institution's policies and procedures on employment and non-discrimination; (Core) |
|---|---|

| II.A.4.a).(13).(a) | Residents must not be required to sign a non-competition guarantee or restrictive covenant. (Core) |
|---|---|

| II.A.4.a).(14) | document verification of program completion for all graduating residents within 30 days; (Core) |
|---|---|

| II.A.4.a).(15) | provide verification of an individual resident's completion upon the resident's request, within 30 days; and, (Core) |
|---|---|

> **Background and Intent:** Primary verification of graduate medical education is important to credentialing of physicians for further training and practice. Such verification must be accurate and timely. Sponsoring Institution and program policies for record retention are important to facilitate timely documentation of residents who have previously completed the program. Residents who leave the program prior to completion also require timely documentation of their summative evaluation.

**II.A.4.a).(16)**    **obtain review and approval of the Sponsoring Institution's DIO before submitting information or requests to the ACGME, as required in the Institutional Requirements and outlined in the ACGME Program Director's Guide to the Common Program Requirements.** [(Core)]

**II.B.**    **Faculty**

*Faculty members are a foundational element of graduate medical education – faculty members teach residents how to care for patients. Faculty members provide an important bridge allowing residents to grow and become practice-ready, ensuring that patients receive the highest quality of care. They are role models for future generations of physicians by demonstrating compassion, commitment to excellence in teaching and patient care, professionalism, and a dedication to lifelong learning. Faculty members experience the pride and joy of fostering the growth and development of future colleagues. The care they provide is enhanced by the opportunity to teach. By employing a scholarly approach to patient care, faculty members, through the graduate medical education system, improve the health of the individual and the population.*

*Faculty members ensure that patients receive the level of care expected from a specialist in the field. They recognize and respond to the needs of the patients, residents, community, and institution. Faculty members provide appropriate levels of supervision to promote patient safety. Faculty members create an effective learning environment by acting in a professional manner and attending to the well-being of the residents and themselves.*

> **Background and Intent:** "Faculty" refers to the entire teaching force responsible for educating residents. The term "faculty," including "core faculty," does not imply or require an academic appointment or salary support.

**II.B.1.**    At each participating site, there must be a sufficient number of faculty members with competence to instruct and supervise all residents at that location. [(Core)]

**II.B.2.**    Faculty members must:

**II.B.2.a)**    be role models of professionalism; [(Core)]

**II.B.2.b)**    demonstrate commitment to the delivery of safe, quality, cost-effective, patient-centered care; [(Core)]

> **Background and Intent:** Patients have the right to expect quality, cost-effective care with patient safety at its core. The foundation for meeting this expectation is formed during residency and fellowship. Faculty members model these goals and continually strive for improvement in care and cost, embracing a commitment to the patient and the community they serve.

II.B.2.c)  demonstrate a strong interest in the education of residents; (Core)

II.B.2.d)  devote sufficient time to the educational program to fulfill their supervisory and teaching responsibilities; (Core)

II.B.2.e)  administer and maintain an educational environment conducive to educating residents; (Core)

II.B.2.f)  regularly participate in organized clinical discussions, rounds, journal clubs, and conferences; and, (Core)

II.B.2.g)  pursue faculty development designed to enhance their skills at least annually: (Core)

> Background and Intent: Faculty development is intended to describe structured programming developed for the purpose of enhancing transference of knowledge, skill, and behavior from the educator to the learner. Faculty development may occur in a variety of configurations (lecture, workshop, etc.) using internal and/or external resources. Programming is typically needs-based (individual or group) and may be specific to the institution or the program. Faculty development programming is to be reported for the residency program faculty in the aggregate.

II.B.2.g).(1)  as educators; (Core)

II.B.2.g).(2)  in quality improvement and patient safety; (Core)

II.B.2.g).(3)  in fostering their own and their residents' well-being; and, (Core)

II.B.2.g).(4)  in patient care based on their practice-based learning and improvement efforts. (Core)

> Background and Intent: Practice-based learning serves as the foundation for the practice of medicine. Through a systematic analysis of one's practice and review of the literature, one is able to make adjustments that improve patient outcomes and care. Thoughtful consideration to practice-based analysis improves quality of care, as well as patient safety. This allows faculty members to serve as role models for residents in practice-based learning.

II.B.3.  Faculty Qualifications

II.B.3.a)  Faculty members must have appropriate qualifications in their field and hold appropriate institutional appointments. (Core)

II.B.3.b)  Physician faculty members must:

II.B.3.b).(1)  have current certification in the specialty by the American Board of Surgery or the American Osteopathic Board of Surgery, or possess

qualifications judged acceptable to the Review Committee; and, <sup>(Core)</sup>

II.B.3.b).(2)                have current certification in their designated specialty or subspecialty if they are not surgical faculty members, or possess qualifications judged acceptable to the Review Committee. <sup>(Core)</sup>

Specialty-Specific Background and Intent: Programs need to submit a request to the executive director of the Review Committee for consideration and approval of qualifications of any faculty member who is not currently certified by the American Board of Surgery, another ABMS member board, or the American Osteopathic Association. In accordance with Program Requirement II.A.4.a).(16), all requests must be co-signed by the DIO.

**II.B.3.c)**               **Any non-physician faculty members who participate in residency program education must be approved by the program director. <sup>(Core)</sup>**

**Background and Intent: The provision of optimal and safe patient care requires a team approach. The education of residents by non-physician educators enables the resident to better manage patient care and provides valuable advancement of the residents' knowledge. Furthermore, other individuals contribute to the education of the resident in the basic science of the specialty or in research methodology. If the program director determines that the contribution of a non-physician individual is significant to the education of the residents, the program director may designate the individual as a program faculty member or a program core faculty member.**

**II.B.4.**               **Core Faculty**

**Core faculty members must have a significant role in the education and supervision of residents and must devote a significant portion of their entire effort to resident education and/or administration, and must, as a component of their activities, teach, evaluate, and provide formative feedback to residents. <sup>(Core)</sup>**

**Background and Intent: Core faculty members are critical to the success of resident education. They support the program leadership in developing, implementing, and assessing curriculum and in assessing residents' progress toward achievement of competence in the specialty. Core faculty members should be selected for their broad knowledge of and involvement in the program, permitting them to effectively evaluate the program, including completion of the annual ACGME Faculty Survey.**

**II.B.4.a)**               **Core faculty members must be designated by the program director. <sup>(Core)</sup>**

**II.B.4.b)**               **Core faculty members must complete the annual ACGME Faculty Survey. <sup>(Core)</sup>**

II.B.4.c)                For each approved chief resident position there must be at least one core faculty member with current board certification in surgery

in addition to the program director (i.e., if there are three approved chief residents, there must be at least three core faculty members in addition to the program director). (Core)

II.B.4.d)   The associate program director(s) must be designated as core faculty members. (Core)

| |
|---|
| Specialty-Specific Background and Intent: In addition to the above specified requirements, the Review Committee will accept faculty members that are retired and not clinically active if they have engaged in an amnesty pathway through their certifying board; board eligible physicians; and, physicians who are currently certified in a specialty/subspecialty other than surgery. |

II.B.5.   The associate program director should have demonstrated experience in, or obtain special instruction in, resident education and mentoring. (Detail)

**II.C.**   **Program Coordinator**

**II.C.1.**   **There must be a program coordinator. (Core)**

**II.C.2.**   **At a minimum, the program coordinator must be supported at** 100 percent **FTE for administration of the program. (Core)**

II.C.2.a)   Additional support must be provided based on program size as follows: (Core)

| Number of Residents | Minimum FTE Coordinator Support |
|---|---|
| 0-20 | 1.0 |
| 21-29 | 1.5 |
| ≥30 | 2.0 |

| |
|---|
| **Background and Intent: One hundred percent FTE is defined as five days per week.** |
| **The requirement does not address the source of funding required to provide the specified salary support.** |
| **Each program requires a lead administrative person, frequently referred to as a program coordinator, administrator, or as titled by the institution. This person will frequently manage the day-to-day operations of the program and serve as an important liaison with learners, faculty and other staff members, and the ACGME. Individuals serving in this role are recognized as program coordinators by the ACGME.** |
| **The program coordinator is a member of the leadership team and is critical to the success of the program. As such, the program coordinator must possess skills in leadership and personnel management. Program coordinators are expected to develop unique knowledge of the ACGME and Program Requirements, policies, and procedures. Program coordinators assist the program director in accreditation efforts, educational programming, and support of residents.** |

> **Programs, in partnership with their Sponsoring Institutions, should encourage the professional development of their program coordinators and avail them of opportunities for both professional and personal growth. Programs with fewer residents may not require a full-time coordinator; one coordinator may support more than one program.**

> Specialty-Specific Background and Intent: The Review Committee recognizes that some surgical program coordinators support large programs, that some support multiple programs, including other surgical specialties, and that some support other administrative functions within their Sponsoring Institution in addition to residency/fellowship programs. Support of large and/or multiple programs requires a facile working knowledge of each specialty's requirements, as well as the ability to manage the day-to-day requirements of large/multiple programs and their required data. The Committee believes that program coordinators who support general surgery programs and are assigned to support other specialties should only support surgical specialties, as these specialties have more similarities in their execution than non-surgical specialties. To ensure that residency coordinators have sufficient support for performing those functions, the Review Committee has limited the number of residents/fellows that a single coordinator should manage to no more than 20, including both categorical and preliminary residents. For coordinators managing a single program or multiple programs with more than 20 residents, the Review Committee has instituted a requirement for additional administrative support, which can take many forms, such as an additional coordinator, an assistant coordinator, or an administrative assistant.

II.D.        **Other Program Personnel**

**The program, in partnership with its Sponsoring Institution, must jointly ensure the availability of necessary personnel for the effective administration of the program. (Core)**

II.D.1.                Personnel should be available for administration of program components, including support for faculty member and resident scholarly activity, and for simulation. (Core)

> **Background and Intent: Multiple personnel may be required to effectively administer a program. These may include staff members with clerical skills, project managers, education experts, and staff members to maintain electronic communication for the program. These personnel may support more than one program in more than one discipline.**

III.        **Resident Appointments**

III.A.        **Eligibility Requirements**

III.A.1.                **An applicant must meet one of the following qualifications to be eligible for appointment to an ACGME-accredited program: (Core)**

III.A.1.a)                        **graduation from a medical school in the United States or Canada, accredited by the Liaison Committee on Medical Education (LCME) or graduation from a college of osteopathic medicine in the United States, accredited by the**

American Osteopathic Association Commission on Osteopathic College Accreditation (AOACOCA); or, (Core)

**III.A.1.b)**     graduation from a medical school outside of the United States or Canada, and meeting one of the following additional qualifications: (Core)

**III.A.1.b).(1)**     holding a currently valid certificate from the Educational Commission for Foreign Medical Graduates (ECFMG) prior to appointment; or, (Core)

**III.A.1.b).(2)**     holding a full and unrestricted license to practice medicine in the United States licensing jurisdiction in which the ACGME-accredited program is located. (Core)

**III.A.2.**     All prerequisite post-graduate clinical education required for initial entry or transfer into ACGME-accredited residency programs must be completed in ACGME-accredited residency programs, AOA-approved residency programs, Royal College of Physicians and Surgeons of Canada (RCPSC)-accredited or College of Family Physicians of Canada (CFPC)-accredited residency programs located in Canada, or in residency programs with ACGME International (ACGME-I) Advanced Specialty Accreditation. (Core)

**III.A.2.a)**     Residency programs must receive verification of each resident's level of competency in the required clinical field using ACGME, CanMEDS, or ACGME-I Milestones evaluations from the prior training program upon matriculation. (Core)

> **Background and Intent:** Programs with ACGME-I Foundational Accreditation or from institutions with ACGME-I accreditation do not qualify unless the program has also achieved ACGME-I Advanced Specialty Accreditation. To ensure entrants into ACGME-accredited programs from ACGME-I programs have attained the prerequisite milestones for this training, they must be from programs that have ACGME-I Advanced Specialty Accreditation.

> Specialty-Specific Background and Intent: Eligibility for the residency program ideally includes a focused preparatory experience often addressing education pertaining to surgical anatomy and physiology, pathophysiology, basic surgical technique, and documentation of patient care, including the history and physical examination, progress notes, operative report, discharge summary. Programs are urged to develop such an experience within the program or provide access to other preparatory courses for incoming residents who did not have access to such focused preparatory experiences in their medical schools.

**III.A.3.**     A physician who has completed a residency program that was not accredited by ACGME, AOA, RCPSC, CFPC, or ACGME-I (with Advanced Specialty Accreditation) may enter an ACGME-accredited residency program in the same specialty at the PGY-1 level and, at the discretion of the program director of the ACGME-accredited program and with approval by the GMEC, may be advanced to the PGY-2 level based on ACGME Milestones evaluations at the ACGME-

accredited program. This provision applies only to entry into residency in those specialties for which an initial clinical year is not required for entry. (Core)

**III.B.**       **The program director must not appoint more residents than approved by the Review Committee. (Core)**

**III.B.1.**       **All complement increases must be approved by the Review Committee. (Core)**

III.B.1.a)       Residency positions must be allocated to one of two groups: categorical or preliminary positions. (Detail)

III.B.1.a).(1)       Categorical (C) residents are accepted into the residency program with the expectation of completing the surgery program, assuming satisfactory performance. (Core)

III.B.1.a).(1).(a)       The number of categorical residents at each PG level must not exceed the number of approved chief resident positions. (Core)

III.B.1.a).(2)       Preliminary residents are accepted into the program for one or two years before continuing their education. (Core)

III.B.1.a).(2).(a)       The total number of preliminary positions in the PG-1 and PG-2 years must not exceed 300 percent of the number of approved categorical chief resident positions. (Core)

III.B.1.a).(2).(b)       Documentation of continuation in graduate medical education for the preliminary residents must be provided in the "Major Changes and Other Updates" section at the time of each ADS Annual Update. (Core)

III.B.1.a).(2).(c)       The experience of the preliminary resident(s) must largely resemble that of the categorical residents; deviations in rotation schedule are acceptable when it is in the best interest of the preliminary resident's education and career goals. (Core)

III.B.1.a).(2).(d)       It is the responsibility of the program director to counsel and assist preliminary residents in obtaining future positions. (Core)

**III.C.**       **Resident Transfers**

**The program must obtain verification of previous educational experiences and a summative competency-based performance evaluation prior to acceptance of a transferring resident, and Milestones evaluations upon matriculation. (Core)**

III.C.1.                 The final two years of residency education (i.e., PGY-4 and PGY-5) must
                         be spent in the same program. (Core)

**IV.     Educational Program**

*The ACGME accreditation system is designed to encourage excellence and
innovation in graduate medical education regardless of the organizational
affiliation, size, or location of the program.*

*The educational program must support the development of knowledgeable, skillful
physicians who provide compassionate care.*

*In addition, the program is expected to define its specific program aims consistent
with the overall mission of its Sponsoring Institution, the needs of the community
it serves and that its graduates will serve, and the distinctive capabilities of
physicians it intends to graduate. While programs must demonstrate substantial
compliance with the Common and specialty-specific Program Requirements, it is
recognized that within this framework, programs may place different emphasis on
research, leadership, public health, etc. It is expected that the program aims will
reflect the nuanced program-specific goals for it and its graduates; for example, it
is expected that a program aiming to prepare physician-scientists will have a
different curriculum from one focusing on community health.*

**IV.A.            The curriculum must contain the following educational components: (Core)**

**IV.A.1.              a set of program aims consistent with the Sponsoring Institution's
                       mission, the needs of the community it serves, and the desired
                       distinctive capabilities of its graduates; (Core)**

**IV.A.1.a)              The program's aims must be made available to program
                         applicants, residents, and faculty members. (Core)**

**IV.A.2.              competency-based goals and objectives for each educational
                       experience designed to promote progress on a trajectory to
                       autonomous practice. These must be distributed, reviewed, and
                       available to residents and faculty members; (Core)**

> **Background and Intent: The trajectory to autonomous practice is documented by
> Milestones evaluation. The Milestones detail the progress of a resident in attaining
> skill in each competency domain. They are developed by each specialty group and
> allow evaluation based on observable behaviors. Milestones are considered formative
> and should be used to identify learning needs. This may lead to focused or general
> curricular revision in any given program or to individualized learning plans for any
> specific resident.**

**IV.A.3.              delineation of resident responsibilities for patient care, progressive
                       responsibility for patient management, and graded supervision; (Core)**

> **Background and Intent: These responsibilities may generally be described by PGY
> level and specifically by Milestones progress as determined by the Clinical**

> **Competency Committee. This approach encourages the transition to competency-based education. An advanced learner may be granted more responsibility independent of PGY level and a learner needing more time to accomplish a certain task may do so in a focused rather than global manner.**

IV.A.4.          a broad range of structured didactic activities; (Core)

IV.A.4.a)          **Residents must be provided with protected time to participate in core didactic activities.** (Core)

> **Background and Intent: It is intended that residents will participate in structured didactic activities. It is recognized that there may be circumstances in which this is not possible. Programs should define core didactic activities for which time is protected and the circumstances in which residents may be excused from these didactic activities. Didactic activities may include, but are not limited to, lectures, conferences, courses, labs, asynchronous learning, simulations, drills, case discussions, grand rounds, didactic teaching, and education in critical appraisal of medical evidence.**

IV.A.5.          advancement of residents' knowledge of ethical principles foundational to medical professionalism; and, (Core)

IV.A.6.          advancement in the residents' knowledge of the basic principles of scientific inquiry, including how research is designed, conducted, evaluated, explained to patients, and applied to patient care. (Core)

IV.B.          **ACGME Competencies**

> **Background and Intent: The Competencies provide a conceptual framework describing the required domains for a trusted physician to enter autonomous practice. These Competencies are core to the practice of all physicians, although the specifics are further defined by each specialty. The developmental trajectories in each of the Competencies are articulated through the Milestones for each specialty.**

IV.B.1.          **The program must integrate the following ACGME Competencies into the curriculum:** (Core)

IV.B.1.a)          Professionalism

          **Residents must demonstrate a commitment to professionalism and an adherence to ethical principles.** (Core)

IV.B.1.a).(1)          **Residents must demonstrate competence in:**

IV.B.1.a).(1).(a)          compassion, integrity, and respect for others; (Core)

IV.B.1.a).(1).(b)          responsiveness to patient needs that supersedes self-interest; (Core)

> **Background and Intent:** This includes the recognition that under certain circumstances, the interests of the patient may be best served by transitioning care to another provider. Examples include fatigue, conflict or duality of interest, not connecting well with a patient, or when another physician would be better for the situation based on skill set or knowledge base.

**IV.B.1.a).(1).(c)**  respect for patient privacy and autonomy; (Core)

**IV.B.1.a).(1).(d)**  accountability to patients, society, and the profession; (Core)

**IV.B.1.a).(1).(e)**  respect and responsiveness to diverse patient populations, including but not limited to diversity in gender, age, culture, race, religion, disabilities, national origin, socioeconomic status, and sexual orientation; (Core)

**IV.B.1.a).(1).(f)**  ability to recognize and develop a plan for one's own personal and professional well-being; and, (Core)

**IV.B.1.a).(1).(g)**  appropriately disclosing and addressing conflict or duality of interest. (Core)

**IV.B.1.b)**  **Patient Care and Procedural Skills**

> **Background and Intent:** Quality patient care is safe, effective, timely, efficient, patient-centered, equitable, and designed to improve population health, while reducing per capita costs. (See the Institute of Medicine [IOM]'s *Crossing the Quality Chasm: A New Health System for the 21st Century*, 2001 and Berwick D, Nolan T, Whittington J. *The Triple Aim: care, cost, and quality. Health Affairs.* 2008; 27(3):759-769.). In addition, there should be a focus on improving the clinician's well-being as a means to improve patient care and reduce burnout among residents, fellows, and practicing physicians.
>
> These organizing principles inform the Common Program Requirements across all Competency domains. Specific content is determined by the Review Committees with input from the appropriate professional societies, certifying boards, and the community.

**IV.B.1.b).(1)**  **Residents must be able to provide patient care that is compassionate, appropriate, and effective for the treatment of health problems and the promotion of health.** (Core)

IV.B.1.b).(1).(a)  Residents must develop competence in and execute comprehensive patient care plans appropriate for the resident's level. (Core)

IV.B.1.b).(1).(b)  Residents must demonstrate a commitment to continuity of comprehensive patient care. (Core)

**IV.B.1.b).(2)**          **Residents must be able to perform all medical, diagnostic, and surgical procedures considered essential for the area of practice. (Core)**

IV.B.1.b).(2).(a)          Residents must demonstrate competence in manual dexterity appropriate for their level. (Core)

IV.B.1.b).(2).(b)          Residents must demonstrate competence in technical and non-technical skills sufficient to safely perform essential/core procedures with an appropriate level of independence based on the individual resident's required level of supervision. (Core)

**IV.B.1.c)**          **Medical Knowledge**

**Residents must demonstrate knowledge of established and evolving biomedical, clinical, epidemiological and social-behavioral sciences, as well as the application of this knowledge to patient care. (Core)**

IV.B.1.c).(1)          Residents must demonstrate competence in the critical evaluation and demonstration of knowledge of pertinent scientific information; (Core)

IV.B.1.c).(2)          Residents must demonstrate knowledge of the fundamentals of basic science as applied to clinical surgery; and, (Core)

IV.B.1.c).(2).(a)          Residents must participate in an educational program that includes: applied surgical anatomy and surgical pathology; the elements of wound healing; homeostasis, shock and circulatory physiology; surgical infection; hematologic disorders; immunobiology and transplantation; oncology; surgical endocrinology; surgical nutrition, fluid and electrolyte balance; and the metabolic response to injury, including burns. (Core)

IV.B.1.c).(3)          Residents must demonstrate knowledge of the principles of immunology, immunosuppression, and the management of general surgical conditions arising in transplant patients. (Core)

**IV.B.1.d)**          **Practice-based Learning and Improvement**

**Residents must demonstrate the ability to investigate and evaluate their care of patients, to appraise and assimilate scientific evidence, and to continuously improve patient care based on constant self-evaluation and lifelong learning. (Core)**

> **Background and Intent:** Practice-based learning and improvement is one of the defining characteristics of being a physician. It is the ability to investigate and evaluate the care of patients, to appraise and assimilate scientific evidence, and to continuously improve patient care based on constant self-evaluation and lifelong learning.
>
> The intention of this Competency is to help a physician develop the habits of mind required to continuously pursue quality improvement, well past the completion of residency.

| | |
|---|---|
| **IV.B.1.d).(1)** | **Residents must demonstrate competence in:** |
| **IV.B.1.d).(1).(a)** | **identifying strengths, deficiencies, and limits in one's knowledge and expertise;** (Core) |
| **IV.B.1.d).(1).(b)** | **setting learning and improvement goals;** (Core) |
| **IV.B.1.d).(1).(c)** | **identifying and performing appropriate learning activities;** (Core) |
| **IV.B.1.d).(1).(d)** | **systematically analyzing practice using quality improvement methods, and implementing changes with the goal of practice improvement;** (Core) |
| **IV.B.1.d).(1).(e)** | **incorporating feedback and formative evaluation into daily practice;** (Core) |
| **IV.B.1.d).(1).(f)** | **locating, appraising, and assimilating evidence from scientific studies related to their patients' health problems; and,** (Core) |
| **IV.B.1.d).(1).(g)** | **using information technology to optimize learning.** (Core) |
| IV.B.1.d).(2) | Residents must participate in mortality and morbidity conferences that evaluate and analyze patient care outcomes. (Core) |
| IV.B.1.d).(3) | Residents must utilize an evidence-based approach to patient care. (Core) |
| **IV.B.1.e)** | **Interpersonal and Communication Skills** |
| | **Residents must demonstrate interpersonal and communication skills that result in the effective exchange of information and collaboration with patients, their families, and health professionals.** (Core) |
| **IV.B.1.e).(1)** | **Residents must demonstrate competence in:** |

**IV.B.1.e).(1).(a)**                 **communicating effectively with patients, families, and the public, as appropriate, across a broad range of socioeconomic and cultural backgrounds;** (Core)

**IV.B.1.e).(1).(b)**                 **communicating effectively with physicians, other health professionals, and health-related agencies;** (Core)

**IV.B.1.e).(1).(c)**                 **working effectively as a member or leader of a health care team or other professional group;** (Core)

**IV.B.1.e).(1).(d)**                 **educating patients, families, students, residents, and other health professionals;** (Core)

**IV.B.1.e).(1).(e)**                 **acting in a consultative role to other physicians and health professionals; and,** (Core)

**IV.B.1.e).(1).(f)**                 **maintaining comprehensive, timely, and legible medical records, if applicable.** (Core)

**IV.B.1.e).(2)**                 **Residents must learn to communicate with patients and families to partner with them to assess their care goals, including, when appropriate, end-of-life goals.** (Core)

---

**Background and Intent:** When there are no more medications or interventions that can achieve a patient's goals or provide meaningful improvements in quality or length of life, a discussion about the patient's goals, values, and choices surrounding the end of life is one of the most important conversations that can occur. Residents must learn to participate effectively and compassionately in these meaningful human interactions, for the sake of their patients and themselves.

Programs may teach this skill through direct clinical experience, simulation, or other means of active learning.

---

**IV.B.1.f)**                 **Systems-based Practice**

                **Residents must demonstrate an awareness of and responsiveness to the larger context and system of health care, including the social determinants of health, as well as the ability to call effectively on other resources to provide optimal health care.** (Core)

**IV.B.1.f).(1)**                 **Residents must demonstrate competence in:**

**IV.B.1.f).(1).(a)**                 **working effectively in various health care delivery settings and systems relevant to their clinical specialty;** (Core)

> **Background and Intent:** Medical practice occurs in the context of an increasingly complex clinical care environment where optimal patient care requires attention to compliance with external and internal administrative and regulatory requirements.

**IV.B.1.f).(1).(b)**          coordinating patient care across the health care continuum and beyond as relevant to their clinical specialty; (Core)

> **Background and Intent:** Every patient deserves to be treated as a whole person. Therefore it is recognized that any one component of the health care system does not meet the totality of the patient's needs. An appropriate transition plan requires coordination and forethought by an interdisciplinary team. The patient benefits from proper care and the system benefits from proper use of resources.

**IV.B.1.f).(1).(c)**          advocating for quality patient care and optimal patient care systems; (Core)

**IV.B.1.f).(1).(d)**          working in interprofessional teams to enhance patient safety and improve patient care quality; (Core)

**IV.B.1.f).(1).(e)**          participating in identifying system errors and implementing potential systems solutions; (Core)

**IV.B.1.f).(1).(f)**          incorporating considerations of value, cost awareness, delivery and payment, and risk-benefit analysis in patient and/or population-based care as appropriate; (Core)

**IV.B.1.f).(1).(g)**          understanding health care finances and its impact on individual patients' health decisions; (Core)

IV.B.1.f).(1).(h)          practicing high quality, cost-effective patient care; (Core)

IV.B.1.f).(1).(i)          demonstrating knowledge of risk-benefit analysis; and, (Core)

IV.B.1.f).(1).(j)          demonstrating an understanding of the role of different specialists and other health care professionals in overall patient management, and actively participating in interprofessional and multispecialty teams. (Core)

**IV.B.1.f).(2)**          **Residents must learn to advocate for patients within the health care system to achieve the patient's and family's care goals, including, when appropriate, end-of-life goals. (Core)**

**IV.C.**          **Curriculum Organization and Resident Experiences**

**IV.C.1.**          **The curriculum must be structured to optimize resident educational experiences, the length of these experiences, and supervisory continuity. (Core)**

IV.C.1.a)          Resident experiences in clinical surgery should be for a minimum of four contiguous weeks in duration. To enhance continuity and promote appropriate supervision, the PGY-4 and PGY-5 years should consist of more extended experiences. (Core)

---

**Background and Intent: In some specialties, frequent rotational transitions, inadequate continuity of faculty member supervision, and dispersed patient locations within the hospital have adversely affected optimal resident education and effective team-based care. The need for patient care continuity varies from specialty to specialty and by clinical situation, and may be addressed by the individual Review Committee.**

---

**IV.C.2.**          **The program must provide instruction and experience in pain management if applicable for the specialty, including recognition of the signs of addiction. (Core)**

IV.C.2.a)          Instruction must include the application and principles of local and regional anesthesia and conscious sedation for the mitigation of peri-procedural pain. (Core)

IV.C.3.          The program must implement a level-specific, simulation-based curriculum that complements clinical rotations in the development of technical and non-technical skills. (Core)

IV.C.4.          Resident acquisition and maintenance of technical and non-technical skills must be assessed using competency-based evaluation. (Core)

IV.C.5.          The program must identify and designate an individual to manage the portfolio of simulation activities. (Core)

IV.C.6.          The program must ensure that residents have required experience with evolving diagnostic and therapeutic methods. (Core)

---

Specialty-Specific Background and Intent: Evolving diagnostic and therapeutic methods include, but are not limited to, experience in minimally invasive surgical techniques; endoscopic surgical techniques; catheter-based surgical techniques; and diagnostic ultrasound.

---

IV.C.7.          The program must ensure that residents have experiential learning in the provision of all elements of the comprehensive care of surgical patients. (Core)

IV.C.8.          The program must document a clinical curriculum that is sequential, comprehensive, and organized from basic to complex. (Core)

IV.C.8.a)                          The clinical assignments should be carefully structured to ensure
                                   that graded levels of responsibility, continuity in patient care, a
                                   balance between education and service, and progressive clinical
                                   experiences are achieved for each resident. (Core)

IV.C.8.b)                          The 60-month clinical program should be organized as follows:
                                   (Core)

IV.C.8.b).(1)                      At least 54 months of the 60-month program must be spent
                                   on clinical assignments in surgery, with documented
                                   experience in emergency care and surgical critical care in
                                   order to enable residents to manage patients with severe
                                   and complex illnesses and with major injuries. (Core)

IV.C.8.b).(2)                      42 months of these 54 months must be spent on clinical
                                   assignments in the essential content areas of surgery. (Core)

IV.C.8.b).(2).(a)                       The essential content areas are: the abdomen and
                                        its contents; the alimentary tract; skin, soft tissues,
                                        and breast; endocrine surgery; head and neck
                                        surgery; non-cardiac thoracic surgery; pediatric
                                        surgery; surgical critical care; surgical oncology;
                                        trauma and non-operative trauma (burn experience
                                        that includes patient management may be counted
                                        toward non-operative trauma); and the vascular
                                        system. (Core)

IV.C.8.b).(3)                      A formal rotation in burn care, gynecology, neurological
                                   surgery, orthopaedic surgery, plastic surgery, cardiac
                                   surgery, and urology is not required. Clearly documented
                                   goals and objectives must be presented if these
                                   components are included as rotations. (Detail)

IV.C.8.b).(4)                      Knowledge of burn physiology, and clinical experience with
                                   initial burn management is required. (Core)

IV.C.8.b).(5)                      A formal solid organ transplant experience is required. It
                                   must include patient management. (Core)

IV.C.8.b).(5).(a)                       Clearly documented goals and objectives must be
                                        presented for this transplant experience. (Detail)

IV.C.8.b).(6)                      No more than six months total may be allocated to
                                   research or to non-surgical disciplines such as
                                   anesthesiology, internal medicine, pediatrics, or surgical
                                   pathology. (Core)

IV.C.8.b).(6).(a)                       Gastroenterology is exempt from this limit if this
                                        rotation provides endoscopic experiences. (Detail)

IV.C.8.b).(7)                    No more than 12 months may be devoted to surgical discipline other than the principal components of surgery. (Core)

---

Specialty-Specific Background and Intent: The block diagram is used to document a clinical curriculum that is sequential, comprehensive, and organized. The block diagram should align with the participating sites and should remain current at all times. The Review Committee requests that programs format their block diagrams similar to the example provided in ADS under the "Participating Sites" tab. This format provides for a clear explanation of rotation site, content of rotation, percent of outpatient experience for each rotation, and percent of time allowed for research. Programs should clearly identify the transplant and burn experience on the block diagram. Programs are advised to provide a legend in the footnote of the block diagram providing the name of each site and its corresponding site number, definitions for all abbreviations or non-standard terms, explanation of allowed elective rotations, or other information necessary to fully understand the program's curriculum. If the burn experience will be combined with another rotation (e.g., non-operative trauma, plastic surgery), that should be indicated either within the content of the rotation block or in the footnote.

---

IV.C.8.c)                        Chief Resident Experience

IV.C.8.c).(1)                    Clinical assignments at the chief level should be scheduled in the final (fifth) year of the program. (Core)

IV.C.8.c).(1).(a)                To take advantage of a unique educational opportunity in a program, up to six months of the chief year may be served in the next to the last year (fourth). (Detail)

IV.C.8.c).(1).(a).(i)            This experience must not occur any earlier than the fourth clinical year. (Detail)

IV.C.8.c).(1).(a).(ii)           Any special program of this type must be approved in advance by the Review Committee. (Detail)

IV.C.8.c).(1).(a).(iii)          Operative cases counted as the chief cases must be performed during the 12 months designated as chief experience. (Detail)

IV.C.8.c).(2)                    There must be a minimum of 48 weeks, and a maximum of 52 weeks, of clinical assignments at the chief level. (Core)

IV.C.8.c).(3)                    The clinical assignments during the chief experience must be scheduled at the primary clinical site or at an approved participating site. (Core)

IV.C.8.c).(3).(a)                Chief experiences must not be assigned to a participating site that sponsors a general surgery residency program. (Core)

IV.C.8.c).(3).(a).(i)                    All exceptions must be reviewed in advance
                                          by the Review Committee. (Core)

IV.C.8.c).(4)                             A chief resident and a fellow (whether the fellow is in an
                                          ACGME-accredited position or not) must not have primary
                                          responsibility for the same patient except that general
                                          surgeon and surgical critical care fellows may co-manage
                                          the non-operative care of the same patient. (Core)

IV.C.8.c).(5)                             Clinical assignments during the chief year must be in the
                                          essential content areas of general surgery. No more than
                                          six months of the chief year may be devoted exclusively to
                                          only one essential content area. (Core)

IV.C.8.c).(6)                             Non-cardiac thoracic surgery and transplantation rotations
                                          may be considered an acceptable chief resident
                                          assignment as long as the chief resident performs an
                                          appropriate number of complex cases with documented
                                          participation in pre and post-operative care (program
                                          director may use the flexibility outlined in Program
                                          Requirement IV.A.6.a).(2).(g).(i).(a)). (Detail)

IV.C.8.c).(7)                             Chief residents must have sufficient opportunity to
                                          demonstrate the ability to operate with indirect supervision
                                          for the more frequent types of core operations, including
                                          appendectomy, cholecystectomy, hernia repair,
                                          adhesiolysis, and intestinal anastomosis. (Core)

IV.C.8.d)               Operative and Clinical Experience

IV.C.8.d).(1)                             The program must assess each resident for progress
                                          towards competence in technical and non-technical
                                          operative skills. (Core)

IV.C.8.d).(1).(a)                              This assessment must be completed, discussed
                                               with the resident, and documented in the resident's
                                               program file at least semiannually. (Core)

IV.C.8.d).(2)                             The volume and variety of operative experience must
                                          ensure a sufficient number and distribution of complex
                                          cases, as determined by the Review Committee. (Outcome)

IV.C.8.d).(2).(a)                              Performance of this minimum number of cases by a
                                               resident must not be interpreted as an equivalent to
                                               competence achievement. (Core)

IV.C.8.d).(3)                             The program must ensure that each resident performs at
                                          least 850 major cases as Surgeon during the 60 months of
                                          education, which must include a minimum of: (Outcome)‡

| IV.C.8.d).(3).(a) | experience in 250 operations by the beginning of the PGY-3; (Outcome) |
| IV.C.8.d).(3).(b) | 25 cases as Teaching Assistant; and, (Outcome) |
| IV.C.8.d).(3).(c) | 200 major cases in the resident's chief experience. (Outcome)‡ |

> Specialty-Specific Background and Intent: The defined category minimum numbers and credit roles are available on the Documents and Resources page of the Surgery section of the ACGME website.

| IV.C.8.d).(4) | The program must ensure that residents have required experience with a variety of endoscopic procedures, including esophogastro-duodenoscopy, colonoscopy, and bronchoscopy, as well as experience in advanced laparoscopy. (Core) |
| IV.C.8.d).(5) | When justified by experience, a PGY-4 or PGY-5 (chief) resident must be given adequate opportunities to act as a teaching assistant (TA) to a more junior resident with appropriate faculty member supervision. TA cases may not count towards the 200 minimum cases needed to fulfill the operative requirements for the chief resident year. The junior resident performing the case will also be credited as surgeon for these cases. (Core) |
| IV.C.8.e) | The program must document that residents are performing a sufficient breadth of complex procedures to graduate qualified surgeons. (Core) |
| IV.C.8.f) | All residents (categorical and preliminary residents in ACGME-accredited positions) must enter their operative experience concurrently during each year of the residency in the ACGME Case Log System. (Core) |
| IV.C.8.g) | A resident may be considered the surgeon only when he or she can document a significant role in the following aspects of management: determination or confirmation of the diagnosis, provision of pre-operative care, selection, and accomplishment of the appropriate operative procedure, and direction of the post-operative care. (Core) |
| IV.C.8.h) | Each program is required to provide residents with an outpatient experience to evaluate patients both pre-operatively, including initial evaluation, and post-operatively. (Core) |
| IV.C.8.i) | At least 75 percent of the assignments in the essential content areas must include an outpatient experience of at least one half-day per week. (An outpatient experience is not required for |

assignments in the secondary components of surgery or surgical critical care). (Detail)

IV.C.9.              Didactics and Conferences

IV.C.9.a)           The program director, along with the faculty, must be responsible for the preparation and implementation of a comprehensive, effective, and well-organized educational curriculum; (Core)

IV.C.9.b)           The program must ensure that conferences are scheduled to permit resident attendance on a regular basis, and resident time must be protected from interruption by routine clinical duties. Documentation of attendance by 75 percent of residents at the core conferences must be achieved; (Core)

IV.C.9.c)           The program must ensure that the following types of conferences exist within a program:

IV.C.9.c).(1)            a course or a structured series of lectures that ensures education in the basic and clinical sciences fundamental to surgery, including technological advances that relate to surgery and the care of patients with surgical diseases, as well as education in critical thinking, design of experiments and evaluation of data; (Core)

IV.C.9.c).(2)            regular organized clinical teaching, such as grand rounds, ward rounds, and clinical conferences; (Core)

IV.C.9.c).(3)            a weekly morbidity and mortality or quality improvement conference. (Core)

IV.C.9.c).(3).(a)            Sole reliance on textbook review is inadequate.

**IV.D.      Scholarship**

*Medicine is both an art and a science. The physician is a humanistic scientist who cares for patients. This requires the ability to think critically, evaluate the literature, appropriately assimilate new knowledge, and practice lifelong learning. The program and faculty must create an environment that fosters the acquisition of such skills through resident participation in scholarly activities. Scholarly activities may include discovery, integration, application, and teaching.*

*The ACGME recognizes the diversity of residencies and anticipates that programs prepare physicians for a variety of roles, including clinicians, scientists, and educators. It is expected that the program's scholarship will reflect its mission(s) and aims, and the needs of the community it serves. For example, some programs may concentrate their scholarly activity on quality improvement, population health, and/or teaching, while other programs might choose to utilize more classic forms of biomedical research as the focus for scholarship.*

IV.D.1.                  **Program Responsibilities**

IV.D.1.a)                **The program must demonstrate evidence of scholarly activities consistent with its mission(s) and aims.** (Core)

IV.D.1.b)                **The program, in partnership with its Sponsoring Institution, must allocate adequate resources to facilitate resident and faculty involvement in scholarly activities.** (Core)

IV.D.1.c)                **The program must advance residents' knowledge and practice of the scholarly approach to evidence-based patient care.** (Core)

---

**Background and Intent: The scholarly approach can be defined as a synthesis of teaching, learning, and research with the aim of encouraging curiosity and critical thinking based on an understanding of physiology, pathophysiology, differential diagnosis, treatments, treatment alternatives, efficiency of care, and patient safety. While some faculty members are responsible for fulfilling the traditional elements of scholarship through research, integration, and teaching, all faculty members are responsible for advancing residents' scholarly approach to patient care.**

**Elements of a scholarly approach to patient care include:**
- **Asking meaningful questions to stimulate residents to utilize learning resources to create a differential diagnosis, a diagnostic algorithm, and treatment plan**
- **Challenging the evidence that the residents use to reach their medical decisions so that they understand the benefits and limits of the medical literature**
- **When appropriate, dissemination of scholarly learning in a peer-reviewed manner (publication or presentation)**
- **Improving resident learning by encouraging them to teach using a scholarly approach**

**The scholarly approach to patient care begins with curiosity, is grounded in the principles of evidence-based medicine, expands the knowledge base through dissemination, and develops the habits of lifelong learning by encouraging residents to be scholarly teachers.**

---

IV.D.2.                  **Faculty Scholarly Activity**

IV.D.2.a)                **Among their scholarly activity, programs must demonstrate accomplishments in at least three of the following domains:** (Core)

- **Research in basic science, education, translational science, patient care, or population health**
- **Peer-reviewed grants**
- **Quality improvement and/or patient safety initiatives**
- **Systematic reviews, meta-analyses, review articles, chapters in medical textbooks, or case reports**

- **Creation of curricula, evaluation tools, didactic educational activities, or electronic educational materials**
- **Contribution to professional committees, educational organizations, or editorial boards**
- **Innovations in education**

**IV.D.2.b)**            **The program must demonstrate dissemination of scholarly activity within and external to the program by the following methods:**

> **Background and Intent: For the purposes of education, metrics of scholarly activity represent one of the surrogates for the program's effectiveness in the creation of an environment of inquiry that advances the residents' scholarly approach to patient care. The Review Committee will evaluate the dissemination of scholarship for the program as a whole, not for individual faculty members, for a five-year interval, for both core and non-core faculty members, with the goal of assessing the effectiveness of the creation of such an environment. The ACGME recognizes that there may be differences in scholarship requirements between different specialties and between residencies and fellowships in the same specialty.**

**IV.D.2.b).(1)**          **faculty participation in grand rounds, posters, workshops, quality improvement presentations, podium presentations, grant leadership, non-peer-reviewed print/electronic resources, articles or publications, book chapters, textbooks, webinars, service on professional committees, or serving as a journal reviewer, journal editorial board member, or editor;** (Outcome)‡

**IV.D.2.b).(2)**          **peer-reviewed publication.** (Outcome)

**IV.D.3.**          **Resident Scholarly Activity**

**IV.D.3.a)**          **Residents must participate in scholarship.** (Core)

> Specialty Background and Intent: Exposure to, and participation in, multiple modes of scholarly activity that include clinical and/or laboratory research is strongly encouraged for all residents.

**V.**          **Evaluation**

**V.A.**          **Resident Evaluation**

**V.A.1.**          **Feedback and Evaluation**

> **Background and Intent: Feedback is ongoing information provided regarding aspects of one's performance, knowledge, or understanding. The faculty empower residents to provide much of that feedback themselves in a spirit of continuous learning and**

self-reflection. Feedback from faculty members in the context of routine clinical care should be frequent, and need not always be formally documented.

Formative and summative evaluation have distinct definitions. Formative evaluation is *monitoring resident learning* and providing ongoing feedback that can be used by residents to improve their learning in the context of provision of patient care or other educational opportunities. More specifically, formative evaluations help:
- residents identify their strengths and weaknesses and target areas that need work
- program directors and faculty members recognize where residents are struggling and address problems immediately

Summative evaluation is *evaluating a resident's learning* by comparing the residents against the goals and objectives of the rotation and program, respectively. Summative evaluation is utilized to make decisions about promotion to the next level of training, or program completion.

End-of-rotation and end-of-year evaluations have both summative and formative components. Information from a summative evaluation can be used formatively when residents or faculty members use it to guide their efforts and activities in subsequent rotations and to successfully complete the residency program.

Feedback, formative evaluation, and summative evaluation compare intentions with accomplishments, enabling the transformation of a neophyte physician to one with growing expertise.

| V.A.1.a) | Faculty members must directly observe, evaluate, and frequently provide feedback on resident performance during each rotation or similar educational assignment. (Core) |

Background and Intent: Faculty members should provide feedback frequently throughout the course of each rotation. Residents require feedback from faculty members to reinforce well-performed duties and tasks, as well as to correct deficiencies. This feedback will allow for the development of the learner as they strive to achieve the Milestones. More frequent feedback is strongly encouraged for residents who have deficiencies that may result in a poor final rotation evaluation.

| V.A.1.b) | Evaluation must be documented at the completion of the assignment. (Core) |

| V.A.1.b).(1) | For block rotations of greater than three months in duration, evaluation must be documented at least every three months. (Core) |

| V.A.1.b).(2) | Longitudinal experiences, such as continuity clinic in the context of other clinical responsibilities, must be evaluated at least every three months and at completion. (Core) |

**V.A.1.c)**     **The program must provide an objective performance evaluation based on the Competencies and the specialty-specific Milestones, and must:** (Core)

**V.A.1.c).(1)**     **use multiple evaluators (e.g., faculty members, peers, patients, self, and other professional staff members); and,** (Core)

**V.A.1.c).(2)**     **provide that information to the Clinical Competency Committee for its synthesis of progressive resident performance and improvement toward unsupervised practice.** (Core)

**V.A.1.d)**     **The program director or their designee, with input from the Clinical Competency Committee, must:**

**V.A.1.d).(1)**     **meet with and review with each resident their documented semi-annual evaluation of performance, including progress along the specialty-specific Milestones;** (Core)

**V.A.1.d).(2)**     **assist residents in developing individualized learning plans to capitalize on their strengths and identify areas for growth;** (Core)

**V.A.1.d).(3)**     **develop plans for residents failing to progress, following institutional policies and procedures;** (Core)

V.A.1.d).(4)     include a detailed review of case volume, breadth, and complexity, and must ensure that residents are entering cases concurrently; and, (Core)

V.A.1.d).(5)     specifically monitor the resident's knowledge by use of a formal exam. (Core)

V.A.1.d).(5).(a)     Test results should not be the sole criterion of resident knowledge, and should not be used as the sole criterion for promotion to a subsequent PGY level. (Core)

---

**Background and Intent:** Learning is an active process that requires effort from the teacher and the learner. Faculty members evaluate a resident's performance at least at the end of each rotation. The program director or their designee will review those evaluations, including their progress on the Milestones, at a minimum of every six months. Residents should be encouraged to reflect upon the evaluation, using the information to reinforce well-performed tasks or knowledge or to modify deficiencies in knowledge or practice. Working together with the faculty members, residents should develop an individualized learning plan.

Residents who are experiencing difficulties with achieving progress along the Milestones may require intervention to address specific deficiencies. Such

---

> intervention, documented in an individual remediation plan developed by the program director or a faculty mentor and the resident, will take a variety of forms based on the specific learning needs of the resident. However, the ACGME recognizes that there are situations which require more significant intervention that may alter the time course of resident progression. To ensure due process, it is essential that the program director follow institutional policies and procedures.

V.A.1.e)              At least annually, there must be a summative evaluation of each resident that includes their readiness to progress to the next year of the program, if applicable. (Core)

V.A.1.f)              The evaluations of a resident's performance must be accessible for review by the resident. (Core)

V.A.2.               Final Evaluation

V.A.2.a)              The program director must provide a final evaluation for each resident upon completion of the program. (Core)

V.A.2.a).(1)           The specialty-specific Milestones, and when applicable the specialty-specific Case Logs, must be used as tools to ensure residents are able to engage in autonomous practice upon completion of the program. (Core)

V.A.2.a).(2)           The final evaluation must:

V.A.2.a).(2).(a)           become part of the resident's permanent record maintained by the institution, and must be accessible for review by the resident in accordance with institutional policy; (Core)

V.A.2.a).(2).(b)           verify that the resident has demonstrated the knowledge, skills, and behaviors necessary to enter autonomous practice; (Core)

V.A.2.a).(2).(c)           consider recommendations from the Clinical Competency Committee; and, (Core)

V.A.2.a).(2).(d)           be shared with the resident upon completion of the program. (Core)

V.A.3.               A Clinical Competency Committee must be appointed by the program director. (Core)

V.A.3.a)              At a minimum, the Clinical Competency Committee must include three members of the program faculty, at least one of whom is a core faculty member. (Core)

V.A.3.a).(1)           Additional members must be faculty members from the same program or other programs, or other health

**professionals who have extensive contact and experience with the program's residents.** (Core)

Background and Intent: The requirements regarding the Clinical Competency Committee do not preclude or limit a program director's participation on the Clinical Competency Committee. The intent is to leave flexibility for each program to decide the best structure for its own circumstances, but a program should consider: its program director's other roles as resident advocate, advisor, and confidante; the impact of the program director's presence on the other Clinical Competency Committee members' discussions and decisions; the size of the program faculty; and other program-relevant factors. The program director has final responsibility for resident evaluation and promotion decisions.

Program faculty may include more than the physician faculty members, such as other physicians and non-physicians who teach and evaluate the program's residents. There may be additional members of the Clinical Competency Committee. Chief residents who have completed core residency programs in their specialty may be members of the Clinical Competency Committee.

| | |
|---|---|
| V.A.3.b) | The Clinical Competency Committee must: |
| V.A.3.b).(1) | review all resident evaluations at least semi-annually; (Core) |
| V.A.3.b).(2) | determine each resident's progress on achievement of the specialty-specific Milestones; and, (Core) |
| V.A.3.b).(3) | meet prior to the residents' semi-annual evaluations and advise the program director regarding each resident's progress. (Core) |
| V.B. | Faculty Evaluation |
| V.B.1. | The program must have a process to evaluate each faculty member's performance as it relates to the educational program at least annually. (Core) |

Background and Intent: The program director is responsible for the education program and for whom delivers it. While the term "faculty" may be applied to physicians within a given institution for other reasons, it is applied to residency program faculty members only through approval by a program director. The development of the faculty improves the education, clinical, and research aspects of a program. Faculty members have a strong commitment to the resident and desire to provide optimal education and work opportunities. Faculty members must be provided feedback on their contribution to the mission of the program. All faculty members who interact with residents desire feedback on their education, clinical care, and research. If a faculty member does not interact with residents, feedback is not required. With regard to the diverse operating environments and configurations, the residency program director may need to work with others to determine the effectiveness of the program's faculty performance with regard to their role in the educational program. All teaching faculty members should have their educational efforts evaluated by the residents in a confidential and

anonymous manner. Other aspects for the feedback may include research or clinical productivity, review of patient outcomes, or peer review of scholarly activity. The process should reflect the local environment and identify the necessary information. The feedback from the various sources should be summarized and provided to the faculty on an annual basis by a member of the leadership team of the program.

V.B.1.a)    This evaluation must include a review of the faculty member's clinical teaching abilities, engagement with the educational program, participation in faculty development related to their skills as an educator, clinical performance, professionalism, and scholarly activities. (Core)

V.B.1.b)    This evaluation must include written, anonymous, and confidential evaluations by the residents. (Core)

V.B.2.    Faculty members must receive feedback on their evaluations at least annually. (Core)

V.B.3.    Results of the faculty educational evaluations should be incorporated into program-wide faculty development plans. (Core)

Background and Intent: The quality of the faculty's teaching and clinical care is a determinant of the quality of the program and the quality of the residents' future clinical care. Therefore, the program has the responsibility to evaluate and improve the program faculty members' teaching, scholarship, professionalism, and quality care. This section mandates annual review of the program's faculty members for this purpose, and can be used as input into the Annual Program Evaluation.

V.C.    Program Evaluation and Improvement

V.C.1.    The program director must appoint the Program Evaluation Committee to conduct and document the Annual Program Evaluation as part of the program's continuous improvement process. (Core)

V.C.1.a)    The Program Evaluation Committee must be composed of at least two program faculty members, at least one of whom is a core faculty member, and at least one resident. (Core)

V.C.1.b)    Program Evaluation Committee responsibilities must include:

V.C.1.b).(1)    acting as an advisor to the program director, through program oversight; (Core)

V.C.1.b).(2)    review of the program's self-determined goals and progress toward meeting them; (Core)

V.C.1.b).(3)    guiding ongoing program improvement, including development of new goals, based upon outcomes; and, (Core)

V.C.1.b).(4)                    review of the current operating environment to identify strengths, challenges, opportunities, and threats as related to the program's mission and aims. (Core)

---

Background and Intent: In order to achieve its mission and train quality physicians, a program must evaluate its performance and plan for improvement in the Annual Program Evaluation. Performance of residents and faculty members is a reflection of program quality, and can use metrics that reflect the goals that a program has set for itself. The Program Evaluation Committee utilizes outcome parameters and other data to assess the program's progress toward achievement of its goals and aims.

---

V.C.1.c)                    The Program Evaluation Committee should consider the following elements in its assessment of the program:

V.C.1.c).(1)                    curriculum; (Core)

V.C.1.c).(2)                    outcomes from prior Annual Program Evaluation(s); (Core)

V.C.1.c).(3)                    ACGME letters of notification, including citations, Areas for Improvement, and comments; (Core)

V.C.1.c).(4)                    quality and safety of patient care; (Core)

V.C.1.c).(5)                    aggregate resident and faculty:

V.C.1.c).(5).(a)                    well-being; (Core)

V.C.1.c).(5).(b)                    recruitment and retention; (Core)

V.C.1.c).(5).(c)                    workforce diversity; (Core)

V.C.1.c).(5).(d)                    engagement in quality improvement and patient safety; (Core)

V.C.1.c).(5).(e)                    scholarly activity; (Core)

V.C.1.c).(5).(f)                    ACGME Resident and Faculty Surveys; and, (Core)

V.C.1.c).(5).(g)                    written evaluations of the program. (Core)

V.C.1.c).(6)                    aggregate resident:

V.C.1.c).(6).(a)                    achievement of the Milestones; (Core)

V.C.1.c).(6).(b)                    in-training examinations (where applicable); (Core)

V.C.1.c).(6).(c)                    board pass and certification rates; and, (Core)

V.C.1.c).(6).(d)             graduate performance. (Cor

V.C.1.c).(7)             **aggregate faculty:**

V.C.1.c).(7).(a)             **evaluation; and,** (Core)

V.C.1.c).(7).(b)             **professional development.** (Core)

V.C.1.d)             **The Program Evaluation Committee must evaluate the program's mission and aims, strengths, areas for improvement, and threats.** (Core)

V.C.1.e)             **The annual review, including the action plan, must:**

V.C.1.e).(1)             **be distributed to and discussed with the members of the teaching faculty and the residents; and,** (Core)

V.C.1.e).(2)             **be submitted to the DIO.** (Core)

V.C.2.             **The program must complete a Self-Study prior to its 10-Year Accreditation Site Visit.** (Core)

V.C.2.a)             **A summary of the Self-Study must be submitted to the DIO.** (Core)

---

**Background and Intent:** Outcomes of the documented Annual Program Evaluation can be integrated into the 10-year Self-Study process. The Self-Study is an objective, comprehensive evaluation of the residency program, with the aim of improving it. Underlying the Self-Study is this longitudinal evaluation of the program and its learning environment, facilitated through sequential Annual Program Evaluations that focus on the required components, with an emphasis on program strengths and self-identified areas for improvement. Details regarding the timing and expectations for the Self-Study and the 10-Year Accreditation Site Visit are provided in the *ACGME Manual of Policies and Procedures*. Additionally, a description of the Self-Study process, as well as information on how to prepare for the 10-Year Accreditation Site Visit, is available on the ACGME website.

---

*V.C.3.*             *One goal of ACGME-accredited education is to educate physicians who seek and achieve board certification. One measure of the effectiveness of the educational program is the ultimate pass rate.*

                                  *The program director should encourage all eligible program graduates to take the certifying examination offered by the applicable American Board of Medical Specialties (ABMS) member board or American Osteopathic Association (AOA) certifying board.*

V.C.3.a)             **For specialties in which the ABMS member board and/or AOA certifying board offer(s) an annual written exam, in the preceding three years, the program's aggregate pass rate of those taking the examination for the first time must be higher**

than the bottom fifth percentile of programs in that specialty. **(Outcome)**

**V.C.3.b)**    For specialties in which the ABMS member board and/or AOA certifying board offer(s) a biennial written exam, in the preceding six years, the program's aggregate pass rate of those taking the examination for the first time must be higher than the bottom fifth percentile of programs in that specialty. **(Outcome)**

**V.C.3.c)**    For specialties in which the ABMS member board and/or AOA certifying board offer(s) an annual oral exam, in the preceding three years, the program's aggregate pass rate of those taking the examination for the first time must be higher than the bottom fifth percentile of programs in that specialty. **(Outcome)**

**V.C.3.d)**    For specialties in which the ABMS member board and/or AOA certifying board offer(s) a biennial oral exam, in the preceding six years, the program's aggregate pass rate of those taking the examination for the first time must be higher than the bottom fifth percentile of programs in that specialty. **(Outcome)**

**V.C.3.e)**    For each of the exams referenced in V.C.3.a)-d), any program whose graduates over the time period specified in the requirement have achieved an 80 percent pass rate will have met this requirement, no matter the percentile rank of the program for pass rate in that specialty. **(Outcome)**

---

**Background and Intent:** Setting a single standard for pass rate that works across specialties is not supportable based on the heterogeneity of the psychometrics of different examinations. By using a percentile rank, the performance of the lower five percent (fifth percentile) of programs can be identified and set on a path to curricular and test preparation reform.

There are specialties where there is a very high board pass rate that could leave successful programs in the bottom five percent (fifth percentile) despite admirable performance. These high-performing programs should not be cited, and V.C.3.e) is designed to address this.

---

**V.C.3.f)**    Programs must report, in ADS, board certification status annually for the cohort of board-eligible residents that graduated seven years earlier. **(Core)**

---

**Background and Intent:** It is essential that residency programs demonstrate knowledge and skill transfer to their residents. One measure of that is the qualifying or initial certification exam pass rate. Another important parameter of the success of the program is the ultimate board certification rate of its graduates. Graduates are eligible for up to seven years from residency graduation for initial certification. The ACGME will calculate a rolling three-year average of the ultimate board certification rate at seven years post-graduation, and the Review Committees will monitor it.

---

> The Review Committees will track the rolling seven-year certification rate as an indicator of program quality. Programs are encouraged to monitor their graduates' performance on board certification examinations.
>
> In the future, the ACGME may establish parameters related to ultimate board certification rates.

VI.    **The Learning and Working Environment**

*Residency education must occur in the context of a learning and working environment that emphasizes the following principles:*

- *Excellence in the safety and quality of care rendered to patients by residents today*

- *Excellence in the safety and quality of care rendered to patients by today's residents in their future practice*

- *Excellence in professionalism through faculty modeling of:*

  o  *the effacement of self-interest in a humanistic environment that supports the professional development of physicians*

  o  *the joy of curiosity, problem-solving, intellectual rigor, and discovery*

- *Commitment to the well-being of the students, residents, faculty members, and all members of the health care team*

> Background and Intent: The revised requirements are intended to provide greater flexibility within an established framework, allowing programs and residents more discretion to structure clinical education in a way that best supports the above principles of professional development. With this increased flexibility comes the responsibility for programs and residents to adhere to the 80-hour maximum weekly limit (unless a rotation-specific exception is granted by a Review Committee), and to utilize flexibility in a manner that optimizes patient safety, resident education, and resident well-being. The requirements are intended to support the development of a sense of professionalism by encouraging residents to make decisions based on patient needs and their own well-being, without fear of jeopardizing their program's accreditation status. In addition, the proposed requirements eliminate the burdensome documentation requirement for residents to justify clinical and educational work hour variations.
>
> Clinical and educational work hours represent only one part of the larger issue of conditions of the learning and working environment, and Section VI has now been expanded to include greater attention to patient safety and resident and faculty member well-being. The requirements are intended to support programs and residents as they strive for excellence, while also ensuring ethical, humanistic training. Ensuring that flexibility is used in an appropriate manner is a shared responsibility of the program and residents. With this flexibility comes a responsibility for residents and faculty members

> to recognize the need to hand off care of a patient to another provider when a resident is too fatigued to provide safe, high quality care and for programs to ensure that residents remain within the 80-hour maximum weekly limit.

**VI.A.** **Patient Safety, Quality Improvement, Supervision, and Accountability**

**VI.A.1.** **Patient Safety and Quality Improvement**

*All physicians share responsibility for promoting patient safety and enhancing quality of patient care. Graduate medical education must prepare residents to provide the highest level of clinical care with continuous focus on the safety, individual needs, and humanity of their patients. It is the right of each patient to be cared for by residents who are appropriately supervised; possess the requisite knowledge, skills, and abilities; understand the limits of their knowledge and experience; and seek assistance as required to provide optimal patient care.*

*Residents must demonstrate the ability to analyze the care they provide, understand their roles within health care teams, and play an active role in system improvement processes. Graduating residents will apply these skills to critique their future unsupervised practice and effect quality improvement measures.*

*It is necessary for residents and faculty members to consistently work in a well-coordinated manner with other health care professionals to achieve organizational patient safety goals.*

**VI.A.1.a)** **Patient Safety**

**VI.A.1.a).(1)** **Culture of Safety**

*A culture of safety requires continuous identification of vulnerabilities and a willingness to transparently deal with them. An effective organization has formal mechanisms to assess the knowledge, skills, and attitudes of its personnel toward safety in order to identify areas for improvement.*

**VI.A.1.a).(1).(a)** **The program, its faculty, residents, and fellows must actively participate in patient safety systems and contribute to a culture of safety.** (Core)

**VI.A.1.a).(1).(b)** **The program must have a structure that promotes safe, interprofessional, team-based care.** (Core)

**VI.A.1.a).(2)** **Education on Patient Safety**

Programs must provide formal educational activities that promote patient safety-related goals, tools, and techniques. (Core)

> Background and Intent: Optimal patient safety occurs in the setting of a coordinated interprofessional learning and working environment.

VI.A.1.a).(3)   **Patient Safety Events**

*Reporting, investigation, and follow-up of adverse events, near misses, and unsafe conditions are pivotal mechanisms for improving patient safety, and are essential for the success of any patient safety program. Feedback and experiential learning are essential to developing true competence in the ability to identify causes and institute sustainable systems-based changes to ameliorate patient safety vulnerabilities.*

VI.A.1.a).(3).(a)   **Residents, fellows, faculty members, and other clinical staff members must:**

VI.A.1.a).(3).(a).(i)   **know their responsibilities in reporting patient safety events at the clinical site;** (Core)

VI.A.1.a).(3).(a).(ii)   **know how to report patient safety events, including near misses, at the clinical site; and,** (Core)

VI.A.1.a).(3).(a).(iii)   **be provided with summary information of their institution's patient safety reports.** (Core)

VI.A.1.a).(3).(b)   **Residents must participate as team members in real and/or simulated interprofessional clinical patient safety activities, such as root cause analyses or other activities that include analysis, as well as formulation and implementation of actions.** (Core)

VI.A.1.a).(4)   **Resident Education and Experience in Disclosure of Adverse Events**

*Patient-centered care requires patients, and when appropriate families, to be apprised of clinical situations that affect them, including adverse events. This is an important skill for faculty physicians to model, and for residents to develop and apply.*

| | |
|---|---|
| **VI.A.1.a).(4).(a)** | **All residents must receive training in how to disclose adverse events to patients and families.** (Core) |
| **VI.A.1.a).(4).(b)** | **Residents should have the opportunity to participate in the disclosure of patient safety events, real or simulated.** (Detail) |
| **VI.A.1.b)** | **Quality Improvement** |
| **VI.A.1.b).(1)** | **Education in Quality Improvement** |
| | ***A cohesive model of health care includes quality-related goals, tools, and techniques that are necessary in order for health care professionals to achieve quality improvement goals.*** |
| **VI.A.1.b).(1).(a)** | **Residents must receive training and experience in quality improvement processes, including an understanding of health care disparities.** (Core) |
| **VI.A.1.b).(2)** | **Quality Metrics** |
| | ***Access to data is essential to prioritizing activities for care improvement and evaluating success of improvement efforts.*** |
| **VI.A.1.b).(2).(a)** | **Residents and faculty members must receive data on quality metrics and benchmarks related to their patient populations.** (Core) |
| **VI.A.1.b).(3)** | **Engagement in Quality Improvement Activities** |
| | ***Experiential learning is essential to developing the ability to identify and institute sustainable systems-based changes to improve patient care.*** |
| **VI.A.1.b).(3).(a)** | **Residents must have the opportunity to participate in interprofessional quality improvement activities.** (Core) |
| **VI.A.1.b).(3).(a).(i)** | **This should include activities aimed at reducing health care disparities.** (Detail) |
| **VI.A.2.** | **Supervision and Accountability** |
| **VI.A.2.a)** | ***Although the attending physician is ultimately responsible for the care of the patient, every physician shares in the responsibility and accountability for their efforts in the provision of care. Effective programs, in partnership with their Sponsoring Institutions, define, widely communicate,*** |

*and monitor a structured chain of responsibility and accountability as it relates to the supervision of all patient care.*

*Supervision in the setting of graduate medical education provides safe and effective care to patients; ensures each resident's development of the skills, knowledge, and attitudes required to enter the unsupervised practice of medicine; and establishes a foundation for continued professional growth.*

VI.A.2.a).(1)
Each patient must have an identifiable and appropriately-credentialed and privileged attending physician (or licensed independent practitioner as specified by the applicable Review Committee) who is responsible and accountable for the patient's care. (Core)

VI.A.2.a).(1).(a)
This information must be available to residents, faculty members, other members of the health care team, and patients. (Core)

VI.A.2.a).(1).(b)
Residents and faculty members must inform each patient of their respective roles in that patient's care when providing direct patient care. (Core)

VI.A.2.b)
*Supervision may be exercised through a variety of methods. For many aspects of patient care, the supervising physician may be a more advanced resident or fellow. Other portions of care provided by the resident can be adequately supervised by the appropriate availability of the supervising faculty member, fellow, or senior resident physician, either on site or by means of telecommunication technology. Some activities require the physical presence of the supervising faculty member. In some circumstances, supervision may include post-hoc review of resident-delivered care with feedback.*

Background and Intent: There are circumstances where direct supervision without physical presence does not fulfill the requirements of the specific Review Committee. Review Committees will further specify what is meant by direct supervision without physical presence in specialties where allowed. "Physically present" is defined as follows: The teaching physician is located in the same room (or partitioned or curtained area, if the room is subdivided to accommodate multiple patients) as the patient and/or performs a face-to-face service.

VI.A.2.b).(1)
The program must demonstrate that the appropriate level of supervision in place for all residents is based on each resident's level of training and ability, as well as patient complexity and acuity. Supervision may be exercised through a variety of methods, as appropriate to the situation. (Core)

**VI.A.2.b).(2)** **The program must define when physical presence of a supervising physician is required.** <sup>(Core)</sup>

**VI.A.2.c)** **Levels of Supervision**

**To promote appropriate resident supervision while providing for graded authority and responsibility, the program must use the following classification of supervision:** <sup>(Core)</sup>

**VI.A.2.c).(1)** **Direct Supervision:**

**VI.A.2.c).(1).(a)** **the supervising physician is physically present with the resident during the key portions of the patient interaction.** <sup>(Core)</sup>

**VI.A.2.c).(1).(a).(i)** **PGY-1 residents must initially be supervised directly, only as described in VI.A.2.c).(1).(a).** <sup>(Core)</sup>

VI.A.2.c).(1).(a).(i).(a) The program must define those physician tasks for which PGY-1 residents may be supervised indirectly, with direct supervision available, and must define "direct supervision" in the context of the program. <sup>(Detail)</sup>

VI.A.2.c).(1).(a).(i).(b) The program must define those physician tasks for which PGY-1 residents must be supervised directly until they have demonstrated competence as defined by the program director, and must maintain records of such demonstrations of competence. <sup>(Detail)</sup>

VI.A.2.c).(1).(a).(i).(c) The program should use the template of definitions provided in the FAQ or a variation of the template to develop these definitions. <sup>(Detail)</sup>

**VI.A.2.c).(2)** **Indirect Supervision: the supervising physician is not providing physical or concurrent visual or audio supervision but is immediately available to the resident for guidance and is available to provide appropriate direct supervision.** <sup>(Core)</sup>

VI.A.2.c).(3)                    Oversight – the supervising physician is available to provide review of procedures/encounters with feedback provided after care is delivered. (Core)

VI.A.2.d)                    The privilege of progressive authority and responsibility, conditional independence, and a supervisory role in patient care delegated to each resident must be assigned by the program director and faculty members. (Core)

VI.A.2.d).(1)                    The program director must evaluate each resident's abilities based on specific criteria, guided by the Milestones. (Core)

VI.A.2.d).(2)                    Faculty members functioning as supervising physicians must delegate portions of care to residents based on the needs of the patient and the skills of each resident. (Core)

VI.A.2.d).(3)                    Senior residents or fellows should serve in a supervisory role to junior residents in recognition of their progress toward independence, based on the needs of each patient and the skills of the individual resident or fellow. (Detail)

VI.A.2.e)                    Programs must set guidelines for circumstances and events in which residents must communicate with the supervising faculty member(s). (Core)

VI.A.2.e).(1)                    Each resident must know the limits of their scope of authority, and the circumstances under which the resident is permitted to act with conditional independence. (Outcome)

| Background and Intent: The ACGME Glossary of Terms defines conditional independence as: Graded, progressive responsibility for patient care with defined oversight. |
|---|

VI.A.2.f)                    Faculty supervision assignments must be of sufficient duration to assess the knowledge and skills of each resident and to delegate to the resident the appropriate level of patient care authority and responsibility. (Core)

VI.B.        Professionalism

VI.B.1.            Programs, in partnership with their Sponsoring Institutions, must educate residents and faculty members concerning the professional responsibilities of physicians, including their obligation to be appropriately rested and fit to provide the care required by their patients. (Core)

VI.B.2.            The learning objectives of the program must:

VI.B.2.a)          be accomplished through an appropriate blend of supervised patient care responsibilities, clinical teaching, and didactic educational events; (Core)

VI.B.2.b)          be accomplished without excessive reliance on residents to fulfill non-physician obligations; and, (Core)

Background and Intent: Routine reliance on residents to fulfill non-physician obligations increases work compression for residents and does not provide an optimal educational experience. Non-physician obligations are those duties which in most institutions are performed by nursing and allied health professionals, transport services, or clerical staff. Examples of such obligations include transport of patients from the wards or units for procedures elsewhere in the hospital; routine blood drawing for laboratory tests; routine monitoring of patients when off the ward; and clerical duties, such as scheduling. While it is understood that residents may be expected to do any of these things on occasion when the need arises, these activities should not be performed by residents routinely and must be kept to a minimum to optimize resident education.

VI.B.2.c)          ensure manageable patient care responsibilities. (Core)

Background and Intent: The Common Program Requirements do not define "manageable patient care responsibilities" as this is variable by specialty and PGY level. Review Committees will provide further detail regarding patient care responsibilities in the applicable specialty-specific Program Requirements and accompanying FAQs. However, all programs, regardless of specialty, should carefully assess how the assignment of patient care responsibilities can affect work compression, especially at the PGY-1 level.

VI.B.3.          The program director, in partnership with the Sponsoring Institution, must provide a culture of professionalism that supports patient safety and personal responsibility. (Core)

VI.B.4.          Residents and faculty members must demonstrate an understanding of their personal role in the:

VI.B.4.a)          provision of patient- and family-centered care; (Outcome)

VI.B.4.b)          safety and welfare of patients entrusted to their care, including the ability to report unsafe conditions and adverse events; (Outcome)

Background and Intent: This requirement emphasizes that responsibility for reporting unsafe conditions and adverse events is shared by all members of the team and is not solely the responsibility of the resident.

VI.B.4.c)          assurance of their fitness for work, including: (Outcome)

Background and Intent: This requirement emphasizes the professional responsibility of faculty members and residents to arrive for work adequately rested and ready to care

for patients. It is also the responsibility of faculty members, residents, and other members of the care team to be observant, to intervene, and/or to escalate their concern about resident and faculty member fitness for work, depending on the situation, and in accordance with institutional policies.

**VI.B.4.c).(1)**    management of their time before, during, and after clinical assignments; and, (Outcome)

**VI.B.4.c).(2)**    recognition of impairment, including from illness, fatigue, and substance use, in themselves, their peers, and other members of the health care team. (Outcome)

**VI.B.4.d)**    commitment to lifelong learning; (Outcome)

**VI.B.4.e)**    monitoring of their patient care performance improvement indicators; and, (Outcome)

**VI.B.4.f)**    accurate reporting of clinical and educational work hours, patient outcomes, and clinical experience data. (Outcome)

**VI.B.5.**    All residents and faculty members must demonstrate responsiveness to patient needs that supersedes self-interest. This includes the recognition that under certain circumstances, the best interests of the patient may be served by transitioning that patient's care to another qualified and rested provider. (Outcome)

**VI.B.6.**    Programs, in partnership with their Sponsoring Institutions, must provide a professional, equitable, respectful, and civil environment that is free from discrimination, sexual and other forms of harassment, mistreatment, abuse, or coercion of students, residents, faculty, and staff. (Core)

**VI.B.7.**    Programs, in partnership with their Sponsoring Institutions, should have a process for education of residents and faculty regarding unprofessional behavior and a confidential process for reporting, investigating, and addressing such concerns. (Core)

**VI.C.**    **Well-Being**

*Psychological, emotional, and physical well-being are critical in the development of the competent, caring, and resilient physician and require proactive attention to life inside and outside of medicine. Well-being requires that physicians retain the joy in medicine while managing their own real-life stresses. Self-care and responsibility to support other members of the health care team are important components of professionalism; they are also skills that must be modeled, learned, and nurtured in the context of other aspects of residency training.*

*Residents and faculty members are at risk for burnout and depression. Programs, in partnership with their Sponsoring Institutions, have the same responsibility to address well-being as other aspects of resident*

*competence. Physicians and all members of the health care team share responsibility for the well-being of each other. For example, a culture which encourages covering for colleagues after an illness without the expectation of reciprocity reflects the ideal of professionalism. A positive culture in a clinical learning environment models constructive behaviors, and prepares residents with the skills and attitudes needed to thrive throughout their careers.*

> **Background and Intent: The ACGME is committed to addressing physician well-being for individuals and as it relates to the learning and working environment. The creation of a learning and working environment with a culture of respect and accountability for physician well-being is crucial to physicians' ability to deliver the safest, best possible care to patients. The ACGME is leveraging its resources in four key areas to support the ongoing focus on physician well-being: education, influence, research, and collaboration. Information regarding the ACGME's ongoing efforts in this area is available on the ACGME website.**
>
> **As these efforts evolve, information will be shared with programs seeking to develop and/or strengthen their own well-being initiatives. In addition, there are many activities that programs can utilize now to assess and support physician well-being. These include culture of safety surveys, ensuring the availability of counseling services, and attention to the safety of the entire health care team.**

**VI.C.1.**    **The responsibility of the program, in partnership with the Sponsoring Institution, to address well-being must include:**

**VI.C.1.a)**    **efforts to enhance the meaning that each resident finds in the experience of being a physician, including protecting time with patients, minimizing non-physician obligations, providing administrative support, promoting progressive autonomy and flexibility, and enhancing professional relationships;** (Core)

**VI.C.1.b)**    **attention to scheduling, work intensity, and work compression that impacts resident well-being;** (Core)

**VI.C.1.c)**    **evaluating workplace safety data and addressing the safety of residents and faculty members;** (Core)

> **Background and Intent: This requirement emphasizes the responsibility shared by the Sponsoring Institution and its programs to gather information and utilize systems that monitor and enhance resident and faculty member safety, including physical safety. Issues to be addressed include, but are not limited to, monitoring of workplace injuries, physical or emotional violence, vehicle collisions, and emotional well-being after adverse events.**

**VI.C.1.d)**    **policies and programs that encourage optimal resident and faculty member well-being; and,** (Core)

**Background and Intent: Well-being includes having time away from work to engage with family and friends, as well as to attend to personal needs and to one's own health, including adequate rest, healthy diet, and regular exercise.**

VI.C.1.d).(1)         Residents must be given the opportunity to attend medical, mental health, and dental care appointments, including those scheduled during their working hours. **(Core)**

**Background and Intent: The intent of this requirement is to ensure that residents have the opportunity to access medical and dental care, including mental health care, at times that are appropriate to their individual circumstances. Residents must be provided with time away from the program as needed to access care, including appointments scheduled during their working hours.**

VI.C.1.e)            attention to resident and faculty member burnout, depression, and substance abuse. The program, in partnership with its Sponsoring Institution, must educate faculty members and residents in identification of the symptoms of burnout, depression, and substance abuse, including means to assist those who experience these conditions. Residents and faculty members must also be educated to recognize those symptoms in themselves and how to seek appropriate care. The program, in partnership with its Sponsoring Institution, must: **(Core)**

**Background and Intent: Programs and Sponsoring Institutions are encouraged to review materials in order to create systems for identification of burnout, depression, and substance abuse. Materials and more information are available on the Physician Well-being section of the ACGME website (http://www.acgme.org/What-We-Do/Initiatives/Physician-Well-Being).**

VI.C.1.e).(1)          encourage residents and faculty members to alert the program director or other designated personnel or programs when they are concerned that another resident, fellow, or faculty member may be displaying signs of burnout, depression, substance abuse, suicidal ideation, or potential for violence; **(Core)**

**Background and Intent: Individuals experiencing burnout, depression, substance abuse, and/or suicidal ideation are often reluctant to reach out for help due to the stigma associated with these conditions, and are concerned that seeking help may have a negative impact on their career. Recognizing that physicians are at increased risk in these areas, it is essential that residents and faculty members are able to report their concerns when another resident or faculty member displays signs of any of these conditions, so that the program director or other designated personnel, such as the department chair, may assess the situation and intervene as necessary to facilitate access to appropriate care. Residents and faculty members must know which personnel, in addition to the program director, have been designated with this responsibility; those personnel and the program director should be familiar with the**

> **institution's impaired physician policy and any employee health, employee assistance, and/or wellness programs within the institution. In cases of physician impairment, the program director or designated personnel should follow the policies of their institution for reporting.**

**VI.C.1.e).(2)**  **provide access to appropriate tools for self-screening; and,** (Core)

**VI.C.1.e).(3)**  **provide access to confidential, affordable mental health assessment, counseling, and treatment, including access to urgent and emergent care 24 hours a day, seven days a week.** (Core)

> **Background and Intent: The intent of this requirement is to ensure that residents have immediate access at all times to a mental health professional (psychiatrist, psychologist, Licensed Clinical Social Worker, Primary Mental Health Nurse Practitioner, or Licensed Professional Counselor) for urgent or emergent mental health issues. In-person, telemedicine, or telephonic means may be utilized to satisfy this requirement. Care in the Emergency Department may be necessary in some cases, but not as the primary or sole means to meet the requirement.**
>
> **The reference to affordable counseling is intended to require that financial cost not be a barrier to obtaining care.**

**VI.C.2.**  **There are circumstances in which residents may be unable to attend work, including but not limited to fatigue, illness, family emergencies, and parental leave. Each program must allow an appropriate length of absence for residents unable to perform their patient care responsibilities.** (Core)

**VI.C.2.a)**  **The program must have policies and procedures in place to ensure coverage of patient care.** (Core)

**VI.C.2.b)**  **These policies must be implemented without fear of negative consequences for the resident who is or was unable to provide the clinical work.** (Core)

> Specialty-Specific Background and Intent: The Review Committee recognizes circumstances in which residents may need additional/extended time away from the program. Residents may take additional leave for medical illness, parental care (all circumstances), or caring for a sick immediate family member. Residents are responsible for communicating with their intended certifying board to ensure their understanding of the board's leave policies.

> **Background and Intent: Residents may need to extend their length of training depending on length of absence and specialty board eligibility requirements. Teammates should assist colleagues in need and equitably reintegrate them upon return.**

**VI.D.**  **Fatigue Mitigation**

**VI.D.1.**          **Programs must:**

**VI.D.1.a)**          educate all faculty members and residents to recognize the signs of fatigue and sleep deprivation; (Core)

**VI.D.1.b)**          educate all faculty members and residents in alertness management and fatigue mitigation processes; and, (Core)

**VI.D.1.c)**          encourage residents to use fatigue mitigation processes to manage the potential negative effects of fatigue on patient care and learning. (Detail)

---

**Background and Intent:** Providing medical care to patients is physically and mentally demanding. Night shifts, even for those who have had enough rest, cause fatigue. Experiencing fatigue in a supervised environment during training prepares residents for managing fatigue in practice. It is expected that programs adopt fatigue mitigation processes and ensure that there are no negative consequences and/or stigma for using fatigue mitigation strategies.

This requirement emphasizes the importance of adequate rest before and after clinical responsibilities. Strategies that may be used include, but are not limited to, strategic napping; the judicious use of caffeine; availability of other caregivers; time management to maximize sleep off-duty; learning to recognize the signs of fatigue, and self-monitoring performance and/or asking others to monitor performance; remaining active to promote alertness; maintaining a healthy diet; using relaxation techniques to fall asleep; maintaining a consistent sleep routine; exercising regularly; increasing sleep time before and after call; and ensuring sufficient sleep recovery periods.

---

**VI.D.2.**          Each program must ensure continuity of patient care, consistent with the program's policies and procedures referenced in VI.C.2–VI.C.2.b), in the event that a resident may be unable to perform their patient care responsibilities due to excessive fatigue. (Core)

**VI.D.3.**          The program, in partnership with its Sponsoring Institution, must ensure adequate sleep facilities and safe transportation options for residents who may be too fatigued to safely return home. (Core)

**VI.E.**          **Clinical Responsibilities, Teamwork, and Transitions of Care**

**VI.E.1.**          **Clinical Responsibilities**

                   The clinical responsibilities for each resident must be based on PGY level, patient safety, resident ability, severity and complexity of patient illness/condition, and available support services. (Core)

---

**Background and Intent:** The changing clinical care environment of medicine has meant that work compression due to high complexity has increased stress on residents. Faculty members and program directors need to make sure residents function in an environment that has safe patient care and a sense of resident well-being. Some Review Committees have addressed this by setting limits on patient admissions, and it is an

---

> essential responsibility of the program director to monitor resident workload. Workload should be distributed among the resident team and interdisciplinary teams to minimize work compression.

**VI.E.2.**          **Teamwork**

**Residents must care for patients in an environment that maximizes communication. This must include the opportunity to work as a member of effective interprofessional teams that are appropriate to the delivery of care in the specialty and larger health system. (Core)**

VI.E.2.a)          The provision of optimal care is a continuum from the initial encounter with the patient until the patient's surgical disorder(s) is appropriately and completely treated. (Detail)

VI.E.2.b)          During the residency education process, surgical teams should be made up of attending surgeons, residents at various PGY levels, medical students (when appropriate), and other health care providers. (Detail)

VI.E.2.c)          The work of the caregiver team should be assigned to team members based on each resident's level of education, experience, and competence. (Detail)

VI.E.2.d)          Care of the surgical patient requires the effective involvement of nurses, therapists, advanced practice providers, and other personnel, and often requires the involvement of physicians from other disciplines. Residents must demonstrate an unwavering respect for the skills and contributions of other members of the surgical care team, as well as commitment to the optimal comprehensive care of the patient. (Core)

VI.E.2.e)          Residents must collaborate with attending surgeons, other residents, and other members of interprofessional and multidisciplinary teams to formulate treatment plans for a diverse patient population. (Core)

VI.E.2.f)          Residents must assume personal responsibility to complete all tasks to which they are assigned (or which they voluntarily assume) in a timely fashion. These tasks must be completed in the hours assigned, or, if that is not possible, residents must learn and utilize the established methods for handing off remaining tasks to another member of the resident team so that patient care is not compromised. (Detail)

VI.E.2.g)          Lines of authority should be defined by programs, and all residents must have a working knowledge of these expected reporting relationships to maximize quality care and patient safety. (Detail)

**VI.E.3.**          **Transitions of Care**

| | |
|---|---|
| **VI.E.3.a)** | **Programs must design clinical assignments to optimize transitions in patient care, including their safety, frequency, and structure.** (Core) |
| **VI.E.3.b)** | **Programs, in partnership with their Sponsoring Institutions, must ensure and monitor effective, structured hand-over processes to facilitate both continuity of care and patient safety.** (Core) |
| **VI.E.3.c)** | **Programs must ensure that residents are competent in communicating with team members in the hand-over process.** (Outcome) |
| **VI.E.3.d)** | **Programs and clinical sites must maintain and communicate schedules of attending physicians and residents currently responsible for care.** (Core) |
| **VI.E.3.e)** | **Each program must ensure continuity of patient care, consistent with the program's policies and procedures referenced in VI.C.2-VI.C.2.b), in the event that a resident may be unable to perform their patient care responsibilities due to excessive fatigue or illness, or family emergency.** (Core) |

**VI.F.**  **Clinical Experience and Education**

*Programs, in partnership with their Sponsoring Institutions, must design an effective program structure that is configured to provide residents with educational and clinical experience opportunities, as well as reasonable opportunities for rest and personal activities.*

> **Background and Intent:** In the new requirements, the terms "clinical experience and education," "clinical and educational work," and "clinical and educational work hours" replace the terms "duty hours," "duty periods," and "duty." These changes have been made in response to concerns that the previous use of the term "duty" in reference to number of hours worked may have led some to conclude that residents' duty to "clock out" on time superseded their duty to their patients.

**VI.F.1.**  **Maximum Hours of Clinical and Educational Work per Week**

**Clinical and educational work hours must be limited to no more than 80 hours per week, averaged over a four-week period, inclusive of all in-house clinical and educational activities, clinical work done from home, and all moonlighting.** (Core)

> **Background and Intent:** Programs and residents have a shared responsibility to ensure that the 80-hour maximum weekly limit is not exceeded. While the requirement has been written with the intent of allowing residents to remain beyond their scheduled work periods to care for a patient or participate in an educational activity, these additional hours must be accounted for in the allocated 80 hours when averaged over four weeks.

*Scheduling*

While the ACGME acknowledges that, on rare occasions, a resident may work in excess of 80 hours in a given week, all programs and residents utilizing this flexibility will be required to adhere to the 80-hour maximum weekly limit when averaged over a four-week period. Programs that regularly schedule residents to work 80 hours per week and still permit residents to remain beyond their scheduled work period are likely to exceed the 80-hour maximum, which would not be in substantial compliance with the requirement. These programs should adjust schedules so that residents are scheduled to work fewer than 80 hours per week, which would allow residents to remain beyond their scheduled work period when needed without violating the 80-hour requirement. Programs may wish to consider using night float and/or making adjustments to the frequency of in-house call to ensure compliance with the 80-hour maximum weekly limit.

*Oversight*

With increased flexibility introduced into the Requirements, programs permitting this flexibility will need to account for the potential for residents to remain beyond their assigned work periods when developing schedules, to avoid exceeding the 80-hour maximum weekly limit, averaged over four weeks. The ACGME Review Committees will strictly monitor and enforce compliance with the 80-hour requirement. Where violations of the 80-hour requirement are identified, programs will be subject to citation and at risk for an adverse accreditation action.

*Work from Home*

While the requirement specifies that clinical work done from home must be counted toward the 80-hour maximum weekly limit, the expectation remains that scheduling be structured so that residents are able to complete most work on site during scheduled clinical work hours without requiring them to take work home. The new requirements acknowledge the changing landscape of medicine, including electronic health records, and the resulting increase in the amount of work residents choose to do from home. The requirement provides flexibility for residents to do this while ensuring that the time spent by residents completing clinical work from home is accomplished within the 80-hour weekly maximum. Types of work from home that must be counted include using an electronic health record and taking calls from home. Reading done in preparation for the following day's cases, studying, and research done from home do not count toward the 80 hours. Resident decisions to leave the hospital before their clinical work has been completed and to finish that work later from home should be made in consultation with the resident's supervisor. In such circumstances, residents should be mindful of their professional responsibility to complete work in a timely manner and to maintain patient confidentiality.

During the public comment period many individuals raised questions and concerns related to this change. Some questioned whether minute by minute tracking would be required; in other words, if a resident spends three minutes on a phone call and then a few hours later spends two minutes on another call, will the resident need to report that time. Others raised concerns related to the ability of programs and institutions to verify the accuracy of the information reported by residents. The new requirements are not an attempt to micromanage this process. Residents are to track the time they spend on clinical work from home and to report that time to the program. Decisions regarding whether to report infrequent phone calls of very short duration will be left to the individual resident. Programs will need to factor in time residents are spending on

clinical work at home when schedules are developed to ensure that residents are not working in excess of 80 hours per week, averaged over four weeks. There is no requirement that programs assume responsibility for documenting this time. Rather, the program's responsibility is ensuring that residents report their time from home and that schedules are structured to ensure that residents are not working in excess of 80 hours per week, averaged over four weeks.

*PGY-1 and PGY-2 Residents*
PGY-1 and PGY-2 residents may not have the experience to make decisions about when it is appropriate to utilize flexibility or may feel pressured to use it when unnecessary. Programs are responsible for ensuring that residents are provided with manageable workloads that can be accomplished during scheduled work hours. This includes ensuring that a resident's assigned direct patient load is manageable, that residents have appropriate support from their clinical teams, and that residents are not overburdened with clerical work and/or other non-physician duties.

| | |
|---|---|
| VI.F.2. | Mandatory Time Free of Clinical Work and Education |
| VI.F.2.a) | The program must design an effective program structure that is configured to provide residents with educational opportunities, as well as reasonable opportunities for rest and personal well-being. (Core) |
| VI.F.2.b) | Residents should have eight hours off between scheduled clinical work and education periods. (Detail) |
| VI.F.2.b).(1) | There may be circumstances when residents choose to stay to care for their patients or return to the hospital with fewer than eight hours free of clinical experience and education. This must occur within the context of the 80-hour and the one-day-off-in-seven requirements. (Detail) |

Background and Intent: While it is expected that resident schedules will be structured to ensure that residents are provided with a minimum of eight hours off between scheduled work periods, it is recognized that residents may choose to remain beyond their scheduled time, or return to the clinical site during this time-off period, to care for a patient. The requirement preserves the flexibility for residents to make those choices. It is also noted that the 80-hour weekly limit (averaged over four weeks) is a deterrent for scheduling fewer than eight hours off between clinical and education work periods, as it would be difficult for a program to design a schedule that provides fewer than eight hours off without violating the 80-hour rule.

| | |
|---|---|
| VI.F.2.c) | Residents must have at least 14 hours free of clinical work and education after 24 hours of in-house call. (Core) |

Background and Intent: Residents have a responsibility to return to work rested, and thus are expected to use this time away from work to get adequate rest. In support of this goal, residents are encouraged to prioritize sleep over other discretionary activities.

**VI.F.2.d)**    **Residents must be scheduled for a minimum of one day in seven free of clinical work and required education (when averaged over four weeks). At-home call cannot be assigned on these free days.** (Core)

Background and Intent: The requirement provides flexibility for programs to distribute days off in a manner that meets program and resident needs. It is strongly recommended that residents' preference regarding how their days off are distributed be considered as schedules are developed. It is desirable that days off be distributed throughout the month, but some residents may prefer to group their days off to have a "golden weekend," meaning a consecutive Saturday and Sunday free from work. The requirement for one free day in seven should not be interpreted as precluding a golden weekend. Where feasible, schedules may be designed to provide residents with a weekend, or two consecutive days, free of work. The applicable Review Committee will evaluate the number of consecutive days of work and determine whether they meet educational objectives. Programs are encouraged to distribute days off in a fashion that optimizes resident well-being, and educational and personal goals. It is noted that a day off is defined in the ACGME Glossary of Terms as "one (1) continuous 24-hour period free from all administrative, clinical, and educational activities."

**VI.F.3.**    **Maximum Clinical Work and Education Period Length**

**VI.F.3.a)**    **Clinical and educational work periods for residents must not exceed 24 hours of continuous scheduled clinical assignments.** (Core)

Background and Intent: The Task Force examined the question of "consecutive time on task." It examined the research supporting the current limit of 16 consecutive hours of time on task for PGY-1 residents; the range of often conflicting impacts of this requirement on patient safety, clinical care, and continuity of care by resident teams; and resident learning found in the literature. Finally, it heard a uniform request by the specialty societies, certifying boards, membership societies and organizations, and senior residents to repeal this requirement. It heard conflicting perspectives from resident unions, a medical student association, and a number of public advocacy groups, some arguing for continuation of the requirement, others arguing for extension of the requirement to all residents.

Of greatest concern to the Task Force were the observations of disruption of team care and patient care continuity brought about with residents beyond the PGY-1 level adhering to differing requirements. The graduate medical education community uniformly requested that the Task Force remove this requirement. The most frequently-cited reason for this request was the complete disruption of the team, separating the PGY-1 from supervisory faculty members and residents who were best able to judge the ability of the resident and customize the supervision of patient care for each PGY-1. Cited nearly as frequently was the separation of the PGY-1 from the team, delaying maturation of clinical skills, and threatening to create a "shift" mentality in disciplines where overnight availability to patients is essential in delivery of care.

The Task Force examined the impact of the request to consider 16-consecutive-hour limits for all residents, and rejected the proposition. It found that model incompatible

with the actual practice of medicine and surgery in many specialties, excessively limiting in configuration of clinical services in many disciplines, and potentially disruptive of the inculcation of responsibility and professional commitment to altruism and placing the needs of patients above those of the physician.

After careful consideration of the information available, the testimony and position of all parties submitting information, and presentations to the Task Force, the Task Force removed the 16-hour-consecutive-time-on-task requirement for PGY-1 residents. It remains crucial that programs ensure that PGY-1 residents are supervised in compliance with the applicable Program Requirements, and that resident well-being is prioritized as described in Section VI.C. of these requirements.

| | |
|---|---|
| VI.F.3.a).(1) | Up to four hours of additional time may be used for activities related to patient safety, such as providing effective transitions of care, and/or resident education. (Core) |
| VI.F.3.a).(1).(a) | Additional patient care responsibilities must not be assigned to a resident during this time. (Core) |

Background and Intent: The additional time referenced in VI.F.3.a).(1) should not be used for the care of new patients. It is essential that the resident continue to function as a member of the team in an environment where other members of the team can assess resident fatigue, and that supervision for post-call residents is provided. This 24 hours and up to an additional four hours must occur within the context of 80-hour weekly limit, averaged over four weeks.

| | |
|---|---|
| VI.F.4. | Clinical and Educational Work Hour Exceptions |
| VI.F.4.a) | In rare circumstances, after handing off all other responsibilities, a resident, on their own initiative, may elect to remain or return to the clinical site in the following circumstances: |
| VI.F.4.a).(1) | to continue to provide care to a single severely ill or unstable patient; (Detail) |
| VI.F.4.a).(2) | humanistic attention to the needs of a patient or family; or, (Detail) |
| VI.F.4.a).(3) | to attend unique educational events. (Detail) |
| VI.F.4.b) | These additional hours of care or education will be counted toward the 80-hour weekly limit. (Detail) |

Background and Intent: This requirement is intended to provide residents with some control over their schedules by providing the flexibility to voluntarily remain beyond the scheduled responsibilities under the circumstances described above. It is important to note that a resident may remain to attend a conference, or return for a conference later in the day, only if the decision is made voluntarily. Residents must not be required to

> stay. Programs allowing residents to remain or return beyond the scheduled work and clinical education period must ensure that the decision to remain is initiated by the resident and that residents are not coerced. This additional time must be counted toward the 80-hour maximum weekly limit.

**VI.F.4.c)**          A Review Committee may grant rotation-specific exceptions for up to 10 percent or a maximum of 88 clinical and educational work hours to individual programs based on a sound educational rationale.

The Review Committee for Surgery will not consider requests for exceptions to the 80-hour limit to the residents' work week.

**VI.F.4.c).(1)**          In preparing a request for an exception, the program director must follow the clinical and educational work hour exception policy from the *ACGME Manual of Policies and Procedures.* (Core)

**VI.F.4.c).(2)**          Prior to submitting the request to the Review Committee, the program director must obtain approval from the Sponsoring Institution's GMEC and DIO. (Core)

> Background and Intent: The provision for exceptions for up to 88 hours per week has been modified to specify that exceptions may be granted for specific rotations if the program can justify the increase based on criteria specified by the Review Committee. As in the past, Review Committees may opt not to permit exceptions. The underlying philosophy for this requirement is that while it is expected that all residents should be able to train within an 80-hour work week, it is recognized that some programs may include rotations with alternate structures based on the nature of the specialty. DIO/GMEC approval is required before the request will be considered by the Review Committee.

**VI.F.5.**          Moonlighting

**VI.F.5.a)**          Moonlighting must not interfere with the ability of the resident to achieve the goals and objectives of the educational program, and must not interfere with the resident's fitness for work nor compromise patient safety. (Core)

**VI.F.5.b)**          Time spent by residents in internal and external moonlighting (as defined in the ACGME Glossary of Terms) must be counted toward the 80-hour maximum weekly limit. (Core)

**VI.F.5.c)**          PGY-1 residents are not permitted to moonlight. (Core)

> Background and Intent: For additional clarification of the expectations related to moonlighting, please refer to the Common Program Requirement FAQs (available at http://www.acgme.org/What-We-Do/Accreditation/Common-Program-Requirements).

**VI.F.6.**          In-House Night Float

**Night float must occur within the context of the 80-hour and one-day-off-in-seven requirements. (Core)**

VI.F.6.a)                Night float rotations must not exceed two months in duration, four months of night float per PGY level, and 12 months for the entire program. (Core)

> **Background and Intent: The requirement for no more than six consecutive nights of night float was removed to provide programs with increased flexibility in scheduling.**

**VI.F.7.**            **Maximum In-House On-Call Frequency**

**Residents must be scheduled for in-house call no more frequently than every third night (when averaged over a four-week period). (Core)**

**VI.F.8.**            **At-Home Call**

**VI.F.8.a)**            **Time spent on patient care activities by residents on at-home call must count toward the 80-hour maximum weekly limit. The frequency of at-home call is not subject to the every-third-night limitation, but must satisfy the requirement for one day in seven free of clinical work and education, when averaged over four weeks. (Core)**

**VI.F.8.a).(1)**            **At-home call must not be so frequent or taxing as to preclude rest or reasonable personal time for each resident. (Core)**

**VI.F.8.b)**            **Residents are permitted to return to the hospital while on at-home call to provide direct care for new or established patients. These hours of inpatient patient care must be included in the 80-hour maximum weekly limit. (Detail)**

> **Background and Intent: This requirement has been modified to specify that clinical work done from home when a resident is taking at-home call must count toward the 80-hour maximum weekly limit. This change acknowledges the often significant amount of time residents devote to clinical activities when taking at-home call, and ensures that taking at-home call does not result in residents routinely working more than 80 hours per week. At-home call activities that must be counted include responding to phone calls and other forms of communication, as well as documentation, such as entering notes in an electronic health record. Activities such as reading about the next day's case, studying, or research activities do not count toward the 80-hour weekly limit.**
>
> **In their evaluation of residency/fellowship programs, Review Committees will look at the overall impact of at-home call on resident/fellow rest and personal time.**

***

*Core Requirements: Statements that define structure, resource, or process elements essential to every graduate medical educational program.

†**Detail Requirements**: Statements that describe a specific structure, resource, or process, for achieving compliance with a Core Requirement. Programs and sponsoring institutions in substantial compliance with the Outcome Requirements may utilize alternative or innovative approaches to meet Core Requirements.

‡**Outcome Requirements**: Statements that specify expected measurable or observable attributes (knowledge, abilities, skills, or attitudes) of residents or fellows at key stages of their graduate medical education.

**Osteopathic Recognition**
For programs with or applying for Osteopathic Recognition, the Osteopathic Recognition Requirements also apply (www.acgme.org/OsteopathicRecognition).



**Accreditation Council for Graduate Medical Education**

# ACGME

# Institutional Requirements



DEFENDANT'S
EXHIBIT

**B**

ACGME approved focused revision: February 4, 2018; effective July 1, 2018

**ACGME Institutional Requirements**

I.        Structure for Educational Oversight

I.A.              Sponsoring Institution

I.A.1.                    Residency and fellowship programs accredited by the Accreditation Council for Graduate Medical Education (ACGME) must function under the ultimate authority and oversight of one Sponsoring Institution. Oversight of resident/fellow assignments and of the quality of the learning and working environment by the Sponsoring Institution extends to all participating sites. (Core)*

I.A.2.                    The Sponsoring Institution must be in substantial compliance with the ACGME Institutional Requirements and must ensure that each of its ACGME-accredited programs is in substantial compliance with the ACGME Institutional, Common, and specialty-/subspecialty-specific Program Requirements, as well as with ACGME Policies and Procedures. (Outcome)

I.A.3.                    The Sponsoring Institution must maintain its ACGME institutional accreditation. Failure to do so will result in loss of accreditation for its ACGME-accredited program(s). (Outcome)

I.A.4.                    The Sponsoring Institution and each of its ACGME-accredited programs must only assign residents/fellows to learning and working environments that facilitate patient safety and health care quality. (Outcome)

I.A.5.                    The Sponsoring Institution must identify a:

I.A.5.a)                        Designated Institutional Official (DIO): The individual who, in collaboration with a Graduate Medical Education Committee (GMEC), must have authority and responsibility for the oversight and administration of each of the Sponsoring Institution's ACGME-accredited programs, as well as for ensuring compliance with the ACGME Institutional, Common, and specialty-/subspecialty-specific Program Requirements; and, (Core)

I.A.5.b)                        Governing Body: The single entity that maintains authority over and responsibility for the Sponsoring Institution and each of its ACGME-accredited programs. (Core)

I.A.6.                    A written statement must document the Sponsoring Institution's commitment to GME by providing the necessary financial support for administrative, educational, and clinical resources, including personnel, and which must be reviewed, dated, and signed at least once every five years by the DIO, a representative of the Sponsoring Institution's senior administration, and a representative of the Governing Body. (Core)

I.A.7.                    Any Sponsoring Institution or participating site that is a hospital must maintain accreditation to provide patient care. (Core)

| | |
|---|---|
| I.A.7.a) | Accreditation for patient care must be provided by: |
| I.A.7.a).(1) | an entity granted "deeming authority" for participation in Medicare under federal regulations; or, (Core) |
| I.A.7.a).(2) | an entity certified as complying with the conditions of participation in Medicare under federal regulations. (Core) |
| I.A.8. | When a Sponsoring Institution or major participating site that is a hospital loses its accreditation for patient care, the Sponsoring Institution must notify and provide a plan for its response to the Institutional Review Committee (IRC) within 30 days of such loss. Based on the particular circumstances, the ACGME may invoke its procedures related to alleged egregious and/or catastrophic events. (Core) |
| I.A.9. | When a Sponsoring Institution's or participating site's license is denied, suspended, or revoked, or when a Sponsoring Institution or participating site is required to curtail activities, or is otherwise restricted, the Sponsoring Institution must notify and provide a plan for its response to the IRC within 30 days of such loss or restriction. Based on the particular circumstances, the ACGME may invoke its procedures related to alleged egregious and/or catastrophic events. (Core) |
| I.B. | GMEC |
| I.B.1. | Membership |
| I.B.1.a) | A Sponsoring Institution with multiple ACGME-accredited programs must have a GMEC that includes at least the following voting members: (Core) |
| I.B.1.a).(1) | the DIO; (Core) |
| I.B.1.a).(2) | a representative sample of program directors (minimum of two) from its ACGME-accredited programs; (Core) |
| I.B.1.a).(3) | a minimum of two peer-selected residents/fellows from among its ACGME-accredited programs; and, (Core) |
| I.B.1.a).(4) | a quality improvement or patient safety officer or designee. (Core) |
| I.B.1.b) | A Sponsoring Institution with one program must have a GMEC that includes at least the following voting members: |
| I.B.1.b).(1) | the DIO; (Core) |
| I.B.1.b).(2) | the program director when the program director is not the DIO; (Core) |

I.B.1.b).(3)  a minimum of two peer-selected residents/fellows from its ACGME-accredited program or the only resident/fellow if the program includes only one resident/fellow; (Core)

I.B.1.b).(4)  the individual or designee responsible for monitoring quality improvement or patient safety if this individual is not the DIO or program director; and, (Core)

I.B.1.b).(5)  one or more individuals from a different department than that of the program specialty (and other than the quality improvement or patient safety member), within or from outside the Sponsoring Institution, at least one of whom is actively involved in graduate medical education. (Core)

I.B.2.  Additional GMEC members and subcommittees: In order to carry out portions of the GMEC's responsibilities, additional GMEC membership may include others as determined by the GMEC. (Detail)

I.B.2.a)  Subcommittees that address required GMEC responsibilities must include a peer-selected resident/fellow. (Detail)

I.B.2.b)  Subcommittee actions that address required GMEC responsibilities must be reviewed and approved by the GMEC. (Detail)

I.B.3.  Meetings and Attendance: The GMEC must meet a minimum of once every quarter during each academic year. (Core)

I.B.3.a)  Each meeting of the GMEC must include attendance by at least one resident/fellow member. (Core)

I.B.3.b)  The GMEC must maintain meeting minutes that document execution of all required GMEC functions and responsibilities. (Core)

I.B.4.  Responsibilities: GMEC responsibilities must include:

I.B.4.a)  Oversight of:

I.B.4.a).(1)  the ACGME accreditation status of the Sponsoring Institution and each of its ACGME-accredited programs; (Outcome)

I.B.4.a).(2)  the quality of the GME learning and working environment within the Sponsoring Institution, each of its ACGME-accredited programs, and its participating sites; (Outcome)

I.B.4.a).(3)  the quality of educational experiences in each ACGME-accredited program that lead to measurable achievement of educational outcomes as identified in the ACGME Common and specialty-/subspecialty-specific Program Requirements; (Outcome)

I.B.4.a).(4)                    the ACGME-accredited program(s)' annual program evaluations and self-studies; (Core)

I.B.4.a).(5)                    all processes related to reductions and closures of individual ACGME-accredited programs, major participating sites, and the Sponsoring Institution; and, (Core)

I.B.4.a).(6)                    the provision of summary information of patient safety reports to residents, fellows, faculty members, and other clinical staff members. At a minimum, this oversight must include verification that such summary information is being provided. (Detail)

I.B.4.b)                        review and approval of:

I.B.4.b).(1)                    institutional GME policies and procedures; (Core)

I.B.4.b).(2)                    annual recommendations to the Sponsoring Institution's administration regarding resident/fellow stipends and benefits; (Core)

I.B.4.b).(3)                    applications for ACGME accreditation of new programs; (Core)

I.B.4.b).(4)                    requests for permanent changes in resident/fellow complement; (Core)

I.B.4.b).(5)                    major changes in each of its ACGME-accredited programs' structure or duration of education; (Core)

I.B.4.b).(6)                    additions and deletions of each of its ACGME-accredited programs' participating sites; (Core)

I.B.4.b).(7)                    appointment of new program directors; (Core)

I.B.4.b).(8)                    progress reports requested by a Review Committee; (Core)

I.B.4.b).(9)                    responses to Clinical Learning Environment Review (CLER) reports; (Core)

I.B.4.b).(10)                   requests for exceptions to clinical and educational work hour requirements; (Core)

I.B.4.b).(11)                   voluntary withdrawal of ACGME program accreditation; (Core)

I.B.4.b).(12)                   requests for appeal of an adverse action by a Review Committee; and, (Core)

I.B.4.b).(13)                   appeal presentations to an ACGME Appeals Panel. (Core)

I.B.5.        The GMEC must demonstrate effective oversight of the Sponsoring Institution's accreditation through an Annual Institutional Review (AIR).
(Outcome)

I.B.5.a)        The GMEC must identify institutional performance indicators for the AIR, to include, at a minimum: (Core)

I.B.5.a).(1)        the most recent ACGME institutional letter of notification; (Core)

I.B.5.a).(2)        results of ACGME surveys of residents/fellows and core faculty members; and, (Core)

I.B.5.a).(3)        each of its ACGME-accredited programs' ACGME accreditation information, including accreditation statuses and citations. (Core)

I.B.5.b)        The DIO must annually submit a written executive summary of the AIR to the Sponsoring Institution's Governing Body. The written executive summary must include: (Core)

I.B.5.b).(1)        a summary of institutional performance on indicators for the AIR; and, (Core)

I.B.5.b).(2)        action plans and performance monitoring procedures resulting from the AIR. (Core)

I.B.6.        The GMEC must demonstrate effective oversight of underperforming program(s) through a Special Review process. (Core)

I.B.6.a)        The Special Review process must include a protocol that: (Core)

I.B.6.a).(1)        establishes criteria for identifying underperformance; and, (Core)

I.B.6.a).(2)        results in a report that describes the quality improvement goals, the corrective actions, and the process for GMEC monitoring of outcomes. (Core)

II.        Institutional Resources

II.A.        Institutional GME Infrastructure and Operations: The Sponsoring Institution must ensure that:

II.A.1.        the DIO has sufficient financial support and protected time to effectively carry out his or her educational, administrative, and leadership responsibilities; (Core)

II.A.2.        the DIO engages in professional development applicable to his or her responsibilities as an educational leader; and, (Core)

II.A.3.     sufficient salary support and resources are provided for effective GME administration. (Core)

II.B.     Program Administration: The Sponsoring Institution, in collaboration with each ACGME-accredited program, must ensure that:

II.B.1.     the program director(s) has (have) sufficient financial support and protected time to effectively carry out his/her (their) educational, administrative, and leadership responsibilities, as described in the Institutional, Common, and specialty-/subspecialty-specific Program Requirements; (Core)

II.B.2.     the program(s) receives (receive) adequate support for core faculty members to ensure both effective supervision and quality resident/fellow education; (Core)

II.B.3.     the program director(s) and core faculty members engage in professional development applicable to their responsibilities as educational leaders; (Core)

II.B.4.     the program coordinator(s) has (have) sufficient support and time to effectively carry out his/her (their) responsibilities; and, (Core)

II.B.5.     resources, including space, technology, and supplies, are available to provide effective support for each of its ACGME-accredited programs. (Core)

II.C.     Resident/Fellow Forum: The Sponsoring Institution with more than one program must ensure availability of an organization, council, town hall, or other platform that allows all residents/fellows from within and across the Sponsoring Institution's ACGME-accredited programs to communicate and exchange information with other residents/fellows relevant to their ACGME-accredited programs and their learning and working environment. (Core)

II.C.1.     Any resident/fellow from one of the Sponsoring Institution's ACGME-accredited programs must have the opportunity to directly raise a concern to the forum. (Core)

II.C.2.     Residents/fellows must have the option, at least in part, to conduct their forum without the DIO, faculty members, or other administrators present. (Core)

II.C.3.     Residents/fellows must have the option to present concerns that arise from discussions at the forum to the DIO and GMEC. (Core)

II.D.     Resident Salary and Benefits: The Sponsoring Institution, in collaboration with each of its ACGME-accredited programs and participating sites, must provide all residents/fellows with financial support and benefits to ensure that they are able to fulfill the responsibilities of their ACGME-accredited program(s). (Core)

II.E.            Educational Tools

II.E.1.                    Communication resources and technology: Faculty members and
                          residents/fellows must have ready access to adequate communication
                          resources and technological support. (Core)

II.E.2.                    Access to medical literature: Faculty members and residents/fellows must
                          have ready access to specialty-/subspecialty-specific electronic medical
                          literature databases and other current reference material in print or
                          electronic format. (Core)

II.F.            Support Services and Systems

II.F.1.                    The Sponsoring Institution must provide support services and develop
                          health care delivery systems to minimize residents'/fellows' work that is
                          extraneous to their ACGME-accredited program(s)' educational goals and
                          objectives, and to ensure that residents'/fellows' educational experience
                          is not compromised by excessive reliance on residents/fellows to fulfill
                          non-physician service obligations. These support services and systems
                          must include: (Core)

II.F.1.a)                 peripheral intravenous access placement, phlebotomy, laboratory,
                          pathology and radiology services and patient transportation
                          services provided in a manner appropriate to and consistent with
                          educational objectives and to support high quality and safe patient
                          care; and, (Core)

II.F.1.b)                 medical records available at all participating sites to support high
                          quality and safe patient care, residents'/fellows' education, quality
                          improvement and scholarly activities. (Core)

III.     The Learning and Working Environment

III.A.           The Sponsoring Institution and each of its ACGME-accredited programs must
                 provide a learning and working environment in which residents/fellows have the
                 opportunity to raise concerns and provide feedback without intimidation or
                 retaliation, and in a confidential manner, as appropriate. (Core)

III.B.           The Sponsoring Institution is responsible for oversight and documentation of
                 resident/fellow engagement in the following: (Core)

III.B.1.                   Patient Safety: The Sponsoring Institution must ensure that
                          residents/fellows have:

III.B.1.a)                access to systems for reporting errors, adverse events, unsafe
                          conditions, and near misses in a protected manner that is free
                          from reprisal; and, (Core)

III.B.1.b)                opportunities to contribute to root cause analysis or other similar
                          risk-reduction processes. (Core)

III.B.2.        Quality Improvement: The Sponsoring Institution must ensure that
                residents/fellows have:

III.B.2.a)              access to data to improve systems of care, reduce health care
                        disparities, and improve patient outcomes; and, [Core]

III.B.2.b)              opportunities to participate in quality improvement initiatives. [Core]

III.B.3.        Transitions of Care: The Sponsoring Institution must:

III.B.3.a)              facilitate professional development for core faculty members and
                        residents/fellows regarding effective transitions of care; and, [Core]

III.B.3.b)              in partnership with its ACGME-accredited program(s), ensure and
                        monitor effective, structured patient hand-over processes to
                        facilitate continuity of care and patient safety at participating sites.
                        [Core]

III.B.4.        Supervision and Accountability

III.B.4.a)              The Sponsoring Institution must oversee:

III.B.4.a).(1)                 supervision of residents/fellows consistent with institutional
                               and program-specific policies; and, [Core]

III.B.4.a).(2)                 mechanisms by which residents/fellows can report
                               inadequate supervision and accountability in a protected
                               manner that is free from reprisal. [Core]

III.B.5.        Clinical Experience and Education

III.B.5.a)              The Sponsoring Institution must oversee:

III.B.5.a).(1)                 resident/fellow clinical and educational work hours,
                               consistent with the Common and specialty-/subspecialty-
                               specific Program Requirements across all programs,
                               addressing areas of non-compliance in a timely manner;
                               [Core]

III.B.5.a).(2)                 systems of care and learning and working environments
                               that facilitate fatigue mitigation for residents/fellows; and,
                               [Core]

III.B.5.a).(3)                 an educational program for residents/fellows and core
                               faculty members in fatigue mitigation. [Core]

III.B.5.b)              The Sponsoring Institution, in partnership with its ACGME-
                        accredited program(s), must ensure adequate sleep facilities and
                        safe transportation options for residents/fellows who may be too
                        fatigued to return safely home. [Core]

III.B.5.b).(1)                    Sleep facilities must be safe, quiet, and private, and must
                                  be available and accessible for residents/fellows to support
                                  education and safe patient care. (Core)

III.B.6.              Professionalism

III.B.6.a)                        The Sponsoring Institution, in partnership with the program
                                  director(s) of its ACGME-accredited program(s), must provide a
                                  culture of professionalism that supports patient safety and
                                  personal responsibility. (Core)

III.B.6.b)                        The Sponsoring Institution, in partnership with its ACGME-
                                  accredited program(s), must educate residents/fellows and faculty
                                  members concerning the professional responsibilities of
                                  physicians, including their obligation to be appropriately rested
                                  and fit to provide the care required by their patients. (Core)

III.B.6.c)                        The Sponsoring Institution must provide systems for education in
                                  and monitoring of:

III.B.6.c).(1)                    residents'/fellows' and core faculty members' fulfillment of
                                  educational and professional responsibilities, including
                                  scholarly pursuits; and, (Core)

III.B.6.c).(2)                    accurate completion of required documentation by
                                  residents/fellows. (Core)

III.B.6.d)                        The Sponsoring Institution must ensure that its ACGME-
                                  accredited program(s) provide(s) a professional, respectful and
                                  civil environment that is free from unprofessional behavior,
                                  including mistreatment, abuse and/or coercion of
                                  residents/fellows, other learners, faculty members, and staff
                                  members. (Core)

III.B.6.d).(1)                    The Sponsoring Institution, in partnership with its ACGME-
                                  accredited program(s), must have a process for education
                                  of residents/fellows and faculty membersregarding
                                  unprofessional behavior, and a confidential process for
                                  reporting, investigating, monitoring, and addressing such
                                  concerns. (Core)

III.B.7.              Well-Being

III.B.7.a)                        The Sponsoring Institution must oversee its ACGME-accredited
                                  program's(s') fulfillment of responsiblity to address well-being of
                                  residents/fellows and faculty members, consistent with the
                                  Common and specialty-/subspecialty-specific Program
                                  Requirements, addressing areas of non-compliance in a timely
                                  manner. (Core)

III.B.7.b)              The Sponsoring Institution, in partnership with its ACGME-accredited program(s), must educate faculty members and residents/fellows in identification of the symptoms of burnout, depression, and substance abuse, including means to assist those who experience these conditions. This responsibility includes educating residents/fellows and faculty members in how to recognize those symptoms in themselves, and how to seek appropriate care. (Core)

III.B.7.c)              The Sponsoring Institution, in partnership with its ACGME-accredited program(s), must: (Core)

III.B.7.c).(1)              encourage residents/fellows and faculty members to alert their program director, DIO, or other designated personnel or programs when they are concerned that another resident/fellow or faculty member may be displaying signs of burnout, depression, substance abuse, suicidal ideation, or potential for violence; (Core)

III.B.7.c).(2)              provide access to appropriate tools for self screening; and, (Core)

III.B.7.c).(3)              provide access to confidential, affordable mental health assessment, counseling, and treatment, including access to urgent and emergent care 24 hours a day, seven days a week. (Core)

III.B.7.d)              The Sponsoring Institution must ensure a healthy and safe clinical and educational environment that provides for: (Core)

III.B.7.d).(1)              access to food during clinical and educational assignments; and, (Core)

III.B.7.d).(2)              safety and security measures for residents/fellows appropriate to the participating site. (Core)

IV.      Institutional GME Policies and Procedures

IV.A.              Resident/Fellow Recruitment

IV.A.1.              Eligibility and Selection of Residents/Fellows: The Sponsoring Institution must have written policies and procedures for resident/fellow recruitment and appointment, and must monitor each of its ACGME-accredited programs for compliance. (Core)

IV.A.2.              An applicant must meet one of the following qualifications to be eligible for appointment to an ACGME-accredited program: (Core)

IV.A.2.a)              graduation from a medical school in the United States or Canada, accredited by the Liaison Committee on Medical Education (LCME); or, (Core)

| | |
|---|---|
| IV.A.2.b) | graduation from a college of osteopathic medicine in the United States, accredited by the American Osteopathic Association (AOA); or, (Core) |
| IV.A.2.c) | graduation from a medical school outside of the United States or Canada, and meeting one of the following additional qualifications: (Core) |
| IV.A.2.c).(1) | holds a currently-valid certificate from the Educational Commission for Foreign Medical Graduates prior to appointment; or, (Core) |
| IV.A.2.c).(2) | holds a full and unrestricted license to practice medicine in a United States licensing jurisdiction in his or her current ACGME specialty-/subspecialty program; or, (Core) |
| IV.A.2.c).(3) | has graduated from a medical school outside the United States and has completed a Fifth Pathway** program provided by an LCME-accredited medical school. (Core) |
| IV.A.3. | An applicant invited to interview for a resident/fellow position must be informed, in writing or by electronic means, of the terms, conditions, and benefits of appointment to the ACGME-accredited program, either in effect at the time of the interview or that will be in effect at the time of his or her eventual appointment. (Core) |
| IV.A.3.a) | Information that is provided must include: financial support; vacations; parental, sick, and other leaves of absence; and professional liability, hospitalization, health, disability and other insurance accessible to residents/fellows and their eligible dependents. (Core) |
| **IV.B.** | **Agreement of Appointment/Contract** |
| IV.B.1. | The Sponsoring Institution must ensure that residents/fellows are provided with a written agreement of appointment/contract outlining the terms and conditions of their appointment to a program. The Sponsoring Institution must monitor each of its programs with regard to implementation of terms and conditions of appointment. (Core) |
| IV.B.2. | The contract/agreement of appointment must directly contain or provide a reference to the following items: (Core) |
| IV.B.2.a) | resident/fellow responsibilities; (Core) |
| IV.B.2.b) | duration of appointment; (Core) |
| IV.B.2.c) | financial support for residents/fellows; (Core) |

| | |
|---|---|
| IV.B.2.d) | conditions for reappointment and promotion to a subsequent PGY level; (Core) |
| IV.B.2.e) | grievance and due process; (Core) |
| IV.B.2.f) | professional liability insurance, including a summary of pertinent information regarding coverage; (Core) |
| IV.B.2.g) | hospital and health insurance benefits for residents/fellows and their eligible dependents; (Core) |
| IV.B.2.h) | disability insurance for residents/fellows; (Core) |
| IV.B.2.i) | vacation, parental, sick, and other leave(s) for residents/fellows, compliant with applicable laws; (Core) |
| IV.B.2.j) | timely notice of the effect of leave(s) on the ability of residents/fellows to satisfy requirements for program completion; (Core) |
| IV.B.2.k) | information related to eligibility for specialty board examinations; and, (Core) |
| IV.B.2.l) | institutional policies and procedures regarding resident/fellow clinical and educational work hours and moonlighting. (Core) |

IV.C.        Promotion, Appointment Renewal and Dismissal

IV.C.1.        The Sponsoring Institution must have a policy that requires each of its ACGME-accredited programs to determine the criteria for promotion and/or renewal of a resident's/fellow's appointment. (Core)

IV.C.1.a)        The Sponsoring Institution must ensure that each of its programs provides a resident/fellow with a written notice of intent when that resident's/fellow's agreement will not be renewed, when that resident/fellow will not be promoted to the next level of training, or when that resident/fellow will be dismissed. (Core)

IV.C.1.b)        The Sponsoring Institution must have a policy that provides residents/fellows with due process relating to the following actions regardless of when the action is taken during the appointment period: suspension, non-renewal, non-promotion; or dismissal. (Core)

IV.D.        Grievances: The Sponsoring Institution must have a policy that outlines the procedures for submitting and processing resident/fellow grievances at the program and institutional level and that minimizes conflicts of interest. (Core)

IV.E.        Professional Liability Insurance

IV.E.1.  The Sponsoring Institution must provide residents/fellows with professional liability coverage, including legal defense and protection against awards from claims reported or filed during participation in each of its ACGME-accredited programs, or after completion of the program(s) if the alleged acts or omissions of a resident/fellow are within the scope of the program(s). (Core)

IV.E.2.  The Sponsoring Institution must provide official documentation of the details of liability coverage upon request of the individual. (Core)

IV.F.  Health and Disability Insurance

IV.F.1.  The Sponsoring Institution must provide health insurance benefits for residents/fellows and their eligible dependents beginning on the first day of insurance eligibility. (Core)

IV.F.1.a)  If the first day of health insurance eligibility is not the first day that residents/fellows are required to report, then the residents/fellows must be given advanced access to information regarding interim coverage so that they can purchase coverage if desired. (Core)

IV.F.2.  The Sponsoring Institution must provide disability insurance benefits for residents/fellows beginning on the first day of disability insurance eligibility. (Core)

IV.F.2.a)  If the first day of disability insurance eligibility is not the first day that residents/fellows are required to report, then the residents/fellows must be given advanced access to information regarding interim coverage so that they can purchase coverage if desired. (Core)

IV.G.  Vacation and Leaves of Absence

IV.G.1.  The Sponsoring Institution must have a policy for vacation and other leaves of absence, consistent with applicable laws. (Core)

IV.G.2.  This policy must ensure that each of its ACGME-accredited programs provides its residents/fellows with accurate information regarding the impact of an extended leave of absence upon the criteria for satisfactory completion of the program and upon a resident's/fellow's eligibility to participate in examinations by the relevant certifying board(s). (Core)

IV.H.  Resident Services

IV.H.1.  Behavioral Health: The Sponsoring Institution must provide residents/fellows with access to confidential counseling and behavioral health services. (Core)

IV.H.2.  Physician Impairment: The Sponsoring Institution must have a policy, not necessarily GME-specific, which addresses physician impairment. (Core)

IV.H.3.         Harassment: The Sponsoring Institution must have a policy, not necessarily GME-specific, covering sexual and other forms of harassment, that allows residents/fellows access to processes to raise and resolve complaints in a safe and non-punitive environment consistent with applicable laws and regulations. (Core)

IV.H.4.         Accommodation for Disabilities: The Sponsoring Institution must have a policy, not necessarily GME-specific, regarding accommodations for disabilities consistent with all applicable laws and regulations. (Core)

IV.I.      Supervision

IV.I.1.         The Sponsoring Institution must maintain an institutional policy regarding supervision of residents/fellows. (Core)

IV.I.2.         The Sponsoring Institution must ensure that each of its ACGME-accredited programs establishes a written program-specific supervision policy consistent with the institutional policy and the respective ACGME Common and specialty-/subspecialty-specific Program Requirements. (Core)

IV.J.      Clinical and Educational Work Hours: The Sponsoring Institution must maintain a clinical and educational work hour policy that ensures effective oversight of institutional and program-level compliance with ACGME clinical and educational work hour requirements. (Core)

IV.J.1.         Moonlighting: The Sponsoring Institution must maintain a policy on moonlighting that includes the following:

IV.J.1.a)             residents/fellows must not be required to engage in moonlighting; (Core)

IV.J.1.b)             residents/fellows must have written permission from their program director to moonlight; (Core)

IV.J.1.c)             an ACGME-accredited program will monitor the effect of moonlighting activities on a resident's/fellow's performance in the program, including that adverse effects may lead to withdrawal of permission to moonlight; and, (Core)

IV.J.1.d)             the Sponsoring Institution or individual ACGME-accredited programs may prohibit moonlighting by residents/fellows. (Core)

IV.K.      Vendors: The Sponsoring Institution must maintain a policy that addresses interactions between vendor representatives/corporations and residents/fellows and each of its ACGME-accredited programs. (Core)

IV.L.      Non-competition: The Sponsoring Institution must maintain a policy which states that neither the Sponsoring Institution nor any of its ACGME-accredited programs will require a resident/fellow to sign a non-competition guarantee or restrictive covenant. (Core)

IV.M.      Disasters: The Sponsoring Institution must maintain a policy consistent with ACGME Policies and Procedures that addresses administrative support for each of its ACGME-accredited programs and residents/fellows in the event of a disaster or interruption in patient care. (Core)

IV.M.1.      This policy should include information about assistance for continuation of salary, benefits, and resident/fellow assignments. (Core)

IV.N.      Closures and Reductions: The Sponsoring Institution must maintain a policy that addresses GMEC oversight of reductions in size or closure of each of its ACGME-accredited programs, or closure of the Sponsoring Institution that includes the following: (Core)

IV.N.1.      the Sponsoring Institution must inform the GMEC, DIO, and affected residents/fellows as soon as possible when it intends to reduce the size of or close one or more ACGME-accredited programs, or when the Sponsoring Institution intends to close; and, (Core)

IV.N.2.      the Sponsoring Institution must allow residents/fellows already in an affected ACGME-accredited program(s) to complete their education at the Sponsoring Institution, or assist them in enrolling in (an)other ACGME-accredited program(s) in which they can continue their education. (Core)

*** 

***Core Requirements:** Statements that define structure, resource, or process elements essential to every graduate medical educational program.
**Detail Requirements:** Statements that describe a specific structure, resource, or process, for achieving compliance with a Core Requirement. Programs and sponsoring institutions in substantial compliance with the Outcome Requirements may utilize alternative or innovative approaches to meet Core Requirements.
**Outcome Requirements:** Statements that specify expected measurable or observable attributes (knowledge, abilities, skills, or attitudes) of residents or fellows at key stages of their graduate medical education.

**Footnote for IV.A.2.c).(3): A Fifth Pathway program is an academic year of supervised clinical education provided by an LCME-accredited medical school to students who meet the following conditions: (1) have completed, in an accredited college or university in the United States, undergraduate premedical education of the quality acceptable for matriculation in an accredited United States medical school; (2) have studied at a medical school outside the United States and Canada but listed in the World Health Organization Directory of Medical Schools; (3) have completed all of the formal requirements of the foreign medical school except internship and/or social service; (4) have attained a score satisfactory to the sponsoring medical school on a screening examination; and (5) have passed either the Foreign Medical Graduate Examination in the Medical Sciences, Parts I and II of the examination of the National Board of Medical Examiners, or Steps 1 and 2 of the United States Medical Licensing Examination (USMLE).



J Grad Med Educ. 2018 Jun; 10(3): 253–257.      PMCID: PMC6008017

doi: 10.4300/JGME-D-17-00813.1      PMID: 29946378

# Legal Considerations in the Remediation and Dismissal of Graduate Medical Trainees

Cedric Lefebvre, MD[⊠]

Kelly Williamson, MD

Peter Moffett, MD

Angela Cummings, JD

Beth Gianopulos, JD

Elizabeth Winters, JD

Mitchell Sokolosky, MD



DEFENDANT'S EXHIBIT
C

[⊠]Corresponding author.

**Cedric Lefebvre, MD,** is Associate Professor, Department of Emergency Medicine, Wake Forest School of Medicine; **Kelly Williamson, MD,** is Associate Professor, Department of Emergency Medicine, University of Illinois, Chicago, Advocate Christ Medical Center; **Peter Moffett, MD,** is Assistant Professor, Department of Emergency Medicine, Virginia Commonwealth University; **Angela Cummings, JD,** is Partner, Ford Harrison LLP; **Beth Gianopulos, JD,** is Senior Legal Counsel, Wake Forest Baptist Medical Center; **Elizabeth Winters, JD,** is Associate Attorney, Kilpatrick Townsend Attorneys at Law; and **Mitchell Sokolosky, MD,** is Associate Professor, Department of Emergency Medicine, Wake Forest School of Medicine.

Corresponding author: Cedric Lefebvre, MD, Wake Forest School of Medicine, 1 Medical Center Boulevard, Winston Salem, NC 27157, 336.716.2190, clefebvr@wakehealth.edu

Copyright Accreditation Council for Graduate Medical Education 2018

Some percentage of residents and fellows across all specialties require remediation during training. Graduate medical education leaders must navigate remediation steps to optimize resident learning and acquisition of skills, preserve patient safety, and maintain the standards of the specialty.[1,3] Standardized approaches to performance management are available for program leaders to achieve favorable remediation results.[4,9] In 2015–2016, 1110 of 129720 (0.86%) residents left or did not successfully complete their training program, including 843 residents who withdrew, 249 who were dismissed, and 18 who did not successfully complete training.[10] The potential legal implications of successful and unsuccessful remediation are often overlooked. An understanding of the legal landscape surrounding the remediation process is important to protecting stakeholders, including trainees.

## Taxonomy of Remediation Terms

A systematic approach to remediation with the use of consistent language is important, as is agreement on terminology by all parties. Remediation is any additional training, supervision, or assistance above what is typical for training in the specialty.[6] Two levels of remediation are widely accepted: informal

Legal Considerations Concerning Remediation and Dismissal of Graduate Medical Trainees

and formal.[7] Informal remediation is directed at improving performance and is part of clinical education for a subset of learners. It is generally managed by the program and typically is not reported in future performance reports for the trainee. Formal remediation is based on a decision that the performance or conduct of a learner falls short of program requirements. This may include unsuccessful efforts of informal remediation. Unsuccessful formal remediation has potential long-standing consequences that include further remediation, non-promotion, probation, and even dismissal. Formal remediation may be reported on future reference letters for a trainee, even when completed successfully. Designated Institutional Official notification should occur in all cases of formal remediation and may be advisable with informal remediation in some cases.

Probation constitutes a kind of last chance for a trainee to correct unacceptable conduct or performance. When making a decision to place a trainee on probation, program leaders should review their institutional policies to confirm their understanding of institutional due process policies for trainees. It is key to note that a program's responsibility to remediate a trainee's performance does not supersede its duty to protect patients from potential harm.[11] Therefore, dismissal, nonrenewal of contract, and/or non-reappointment may be necessary if probation fails, or if egregious conduct occurs. Probation status is generally reported on future letters of reference and to licensing boards and employers.

To preserve the standards of a medical specialty, programs must be prepared to withhold credentials from those who are unable to meet minimum acceptable criteria.[11,12] Annually, a small number of trainees complete their program but are deemed to have not met the criteria of successful entry into unsupervised practice or recommendation for eligibility for the board certification examination in the specialty or subspecialty.

## Employee and Learner: A Unique Employment Classification

Residents and fellows are in a unique position as they are hospital employees and learners simultaneously. They are expected to perform day-to-day patient care tasks required of them, and, concurrently, they are expected to demonstrate progression in their educational curriculum. Training programs must prepare learners for unsupervised practice after graduation. Human resources policies often do not adequately address the complexities of this unique employee/learner situation.

When a program identifies that a trainee has deficiencies in knowledge, clinical skills, professionalism, or another competency, it has a responsibility to intervene and remediate. If remediation is unsuccessful, removal of the trainee from the training program may be indicated. Disciplinary interventions and negative educational assessments during training may affect attainment of professional goals and future employment. Legal questions can arise from both successful and unsuccessful remediation.

A resident's claim to residency training is legally viewed as a "property interest deserving of appropriate due process before it is removed."[12] To protect trainees from capricious or arbitrary removal, the Accreditation Council for Graduate Medical Education (ACGME) institutional requirements specify that sponsoring institutions must have a policy that provides residents and fellows with due process upon suspension, nonrenewal, non-promotion, or dismissal. The sponsoring institution must provide the resident or fellow with written notice of intent when contract renewal or promotion is withheld.[14] The ACGME Common Program Requirements charge the program director with ensuring compliance with mandates for trainees to raise a grievance and have the benefit of due process.[15]

Remediation and disciplinary action should follow institutional due process, and the course of this should be documented in detail.[12,16] Trainees should be given notice of deficiencies, an opportunity to review the evidence, and a chance to advocate for themselves.[13,17] Trainees may avail themselves of

institutional appeals processes. However, medical education programs are afforded considerable discretion regarding disciplinary intervention, and a formal hearing is not required by law.[17] Courts have long recognized the qualification and discretion of universities to settle academic issues.[18] Collaboration among the resident, program director, Clinical Competency Committee, Designated Institutional Official, human resources, and legal counsel is necessary at the latter stages of performance management (remediation, probation, dismissal).

## Critical Legal Questions Around Performance Management

### Can a Trainee Pursue Successful Legal Action Against a Program for Negative Language in Its Evaluation of That Trainee?

If evaluative comments are made without malice and are restricted to objective appraisals of performance, legal action will likely be unsuccessful. Case law supports educators' critical evaluation of a trainee's performance and abilities. Such negative comments are protected from libel action because they are a recognized component of academic evaluation, and the learner gives implied consent to be evaluated when enrolling in an educational program. Furthermore, the *Kraft v William* decision upholds the dissemination of this information within an educational institution. When faculty share evaluative comments with institutional stakeholders, such intraschool publication is protected from defamation claims by the common interest privilege of faculty and by the implied consent of the learner.[19] This privilege was later qualified to include only communications made without malice.[20]

### Is Recovery of Damages Likely if a Trainee Sues a Program (or Its Sponsoring Institution) for Disclosing Disciplinary Action Sustained During the Trainee's Tenure to Outside Parties?

It is unlikely for a trainee to recover damages after an educational record containing negative reports is shared with outside parties in good faith. Unprofessional conduct and other problematic behaviors in medical school are associated with subsequent disciplinary action by state medical boards.[21, 23] State licensing boards and hospital credentialing departments issue increasingly detailed inquiries about graduates' disciplinary histories.[24] Educators are bound by an ethical obligation and professional duty to truthfully report formal remediation and/or probation (when solicited) on future letters of reference, licensing forms, and credentialing documents. Such reporting can affect a trainee's future career and employment eligibility. Legal action could potentially be sought by the trainee if he or she believes the probation status was unwarranted and/or inaccurate, or the disclosure of his or her status was improper. To defend a claim of unwarranted probation, the use of clear and consistent language is important during performance management. Written notification by the program and acknowledgment by the trainee that future reporting will occur, as well as contemporaneous documentation of such, are also crucial.[24] There is no legal precedent to date that restricts a program's good faith disclosure of disciplinary action on a licensing or credentialing inquiry. When disclosing negative disciplinary events about a trainee to inquiring parties, it is prudent to seek legal counsel to confirm appropriate scope and phrasing of such disclosures. State medical boards often require institutions to report adverse actions that result in changes to a physician's staff privileges. Program leaders should consult their state licensing boards to ensure compliance with mandatory reporting. Unsolicited disclosure of a resident's disciplinary history to outside parties without a legitimate interest is not protected and should be avoided.[12] When a medical school issued negative statements about a student to the Association of American Medical Colleges, a US Court of Appeals considered them to be stigmatizing and potentially restricting to the student's freedom to pursue other medical education opportunities.[17]

### What Legal Risks Do Institutions Incur by Dismissing a Trainee?

Case 3:17-cv-00763-JJH-FKB Document 153-1 Filed 04/19/21 Page 98 of 102

While unsuccessful remediation resulting in dismissal poses possible liability, institutions are generally on solid legal ground. Courts have determined that no distinction exists between postgraduate continuing education programs and degree-granting institutions requiring successful achievement of program goals before granting a certificate.[19] A sponsoring institution, therefore, is not in breach of contract if it withholds a certificate from a trainee who does not complete work satisfactorily. Courts have also recognized educators' ability to determine eligibility of trainees for credentials, as well as their prerogative to withhold certificates when performance criteria are not met.[16,19] When dismissal decisions are made with just cause, and in accordance with institutional policy, programs and institutions may reasonably expect them to be upheld.[11,12,16]

A resident contract may require the capitulation of the institutional appeals process upon resignation. A trainee may be tempted to resign in an effort to avoid formal dismissal or disciplinary action. While this option may be attractive to both the trainee and the program because it expedites closure of the matter, programs should be wary of allowing resignations when unethical or egregious conduct has occurred. The purpose of providing truthful information to outside parties is to protect future employers' patients. Allowing resignation before a disciplinary record is established impedes that purpose. In instances of personal hardship or changes of career interest, resignation is often the most appropriate action.

### Do Programs and Sponsoring Institutions Bear Legal Liability for Injuries Caused by a Current Resident?

Faculty and the sponsoring institution have an obligation to supervise trainees and ensure patient safety, and they can be held liable in cases of negligent injury caused by a resident or fellow during training.[11,12,25] The ethical and legal obligation to prevent harm to patients may necessitate dismissal of poorly performing trainees. However, delivery of substandard medical care is not required for dismissal, and it is not necessary for a program to wait until injury occurs before terminating the clinical privileges of a trainee.[26]

### Can a Program or Sponsoring Institution Be Held Liable for Injuries Caused by a Graduate Who Demonstrated Deficiencies During Matriculation but Ultimately Received a Certificate of Completion?

Successful completion of a training program implies that the graduate is competent to practice in that field of medicine, and to our knowledge there is no published case law to suggest that a program can be held liable for injuries caused by a graduate who ultimately completed the program. Courts have upheld educational institutions' authority in determining certification eligibility, and they have been reluctant to recognize a complaint of educational malpractice in the litigation of medical malpractice claims.[27,28]

### Can a Graduate Whose Adverse Patient Outcomes Suggest Incompetence Sue a Training Program for Insufficient Education or Educational Malpractice?

Courts have refused to recognize the tort of educational malpractice, and current case law does not provide sufficient grounds for legal action against training programs or sponsoring institutions for educational malpractice.[12,25,29,41]

## Special Circumstances: Personal Issues in Trainees

If a trainee exhibits concerning behavior stemming from a personal matter or a medical condition, deliberate steps must be taken to protect the individual and his or her patients. Generally, program directors and faculty should limit their evaluations to objective clinical performance and should not attempt to diagnose a medical condition. However, if a direct threat is perceived, based on medical

knowledge or objective evidence, the trainee should be relieved of clinical responsibilities. An administrative leave of absence may be helpful to collect information and strategize appropriate next steps.

According to the US Equal Employment Opportunity Commission, if an employer has a reasonable belief that an employee's ability to perform essential job-related duties is impaired, or that the employee poses a direct threat due to a medical condition, the employer may make disability-related inquiries and/or require the employee to submit to a medical examination.[43] While a resident cannot be forced to seek treatment, securing appropriate treatment to maintain fitness for duty is that individual's responsibility.[24] A program may require a trainee to be determined fit for duty by a medical professional before returning to clinical duty.

When a disability is discovered during training, programs should protect the resident by collaborating with institutional officials familiar with the Americans with Disabilities Act. The trainee (employee) usually initiates the request for accommodation; however, if the disability is obvious or apparent, the employer has a duty to explore reasonable accommodations. If a trainee discloses a disability and requests accommodation, the program should initiate an interactive process to identify a reasonable accommodation.

Job restructuring, modified scheduling, and reassignment are considered reasonable accommodations in many work environments.[45] However, these alterations can present considerable challenges in residency training settings. An employer does not need to provide accommodation if this causes undue hardship. Factors that determine hardship include the cost and nature of the accommodation, as well as the type, structure, and function of the employer's operation.[45] Program leadership must determine if the requested accommodation is compatible with the educational requirements of that program, which often reflect the demands of that medical specialty. Institutional officials should be consulted when a trainee's circumstances require consideration of the Americans with Disabilities Act.

## Conclusion

Standardized, effective performance management is important to optimize medical trainee success and maximize patient safety. Familiarity with the legal implications of remediation and adherence to institutional due process enable training programs and sponsoring institutions to protect programs, trainees, and their current and future patients (see summary Box).

---

> **Box  Summary Points**
>
> ▪ Sponsoring institutions and their training programs must provide residents and fellows with due process in cases of contract nonrenewal, nonpromotion, suspension, or dismissal.
> ▪ Adherence to remediation policy, use of consistent remediation language, and documentation of all phases of remediation are important to optimize outcomes and to limit legal liability when dismissal occurs.
> ▪ Programs are generally on solid legal ground when they exercise due process for the remediated resident or fellow, when they take actions based on educational standards and patient safety, and when they only disclose educational records to inquiring parties in good faith.
> ▪ Courts have consistently declined to consider the tort of educational malpractice.

## References

1. Silverberg M., Weizberg M., Murano T., et al. What is the prevalence and success of remediation of emergency medicine residents? *West J Emerg Med*. 2015; 16 6: 839– 844. [PMC free article] [PubMed] [Google Scholar]

2. Yaghoubian A., Galante J., Kaji A., et al. General surgery resident remediation and attrition. *Arch Surg*. 2012; 147 9: 829– 833. [PubMed] [Google Scholar]

3. Zbieranowski I., Takahashi S., Verma S., et al. Remediation of residents in difficulty: a retrospective 10-year review of the experience of a postgraduate board of examiners. *Acad Med*. 2013; 88 1: 111– 116. [PubMed] [Google Scholar]

4. Katz ED., Dahms R., Sadosty AT., et al. Guiding principles for resident remediation: recommendations of the CORD remediation task force. *Acad Emerg Med*. 2010; 17 suppl 2: 95– 103. [PubMed] [Google Scholar]

5. Palamara K., Kauffman C., Stone V., et al. Promoting success: a professional development coaching program for interns in medicine. *J Grad Med Educ*. 2015; 7 4: 630– 637. [PMC free article] [PubMed] [Google Scholar]

6. Riebschleger MP., Haftel HM. Remediation in the context of the competencies: a survey of pediatrics residency program directors. *J Grad Med Educ*. 2013; 5 1: 60– 63. [PMC free article] [PubMed] [Google Scholar]

7. Smith J., Lypson M., Silverberg M., et al. Defining uniform processes for remediation, probation and termination in residency training. *West J Emerg Med*. 2017; 18 1: 110– 113. [PMC free article] [PubMed] [Google Scholar]

8. Dupras D., Edson R., Halvorsen A., et al. "Problem residents": prevalence, problems and remediation in the era of core competencies. *Am J Med*. 2012; 125 4: 421– 425. [PubMed] [Google Scholar]

9. Hauer K., Ciccone A., Henzel T., et al. Remediation of the deficiencies of physicians across the continuum from medical school to practice: a thematic review of the literature. *Acad Med*. 2009; 84 12: 1822– 1832. [PubMed] [Google Scholar]

10. Accreditation Council for Graduate Medical Education. *ACGME Data Resource Book*. 2015–2016. http://www.acgme.org/About-Us/Publications-and-Resources/Graduate-Medical-Education-Data-Resource-Book. Accessed April 10, 2018.

11. Capozzi J., Rhodes R. Decisions regarding resident advancement and dismissal. *J Bone Joint Surg*. 2005; 87 10: 2353– 2355. [PubMed] [Google Scholar]

12. Schenarts P., Langenfeld S. The fundamentals of resident dismissal. *Am Surg*. 2017; 83 2: 119– 126. [PubMed] [Google Scholar]

13. *Stretten v Wadsworth, 537 F2d 361, 367 (9th Cir*. 1976).

14. Accreditation Council for Graduate Medical Education. *ACGME Institutional Requirements*. https://www.acgme.org/Portals/0/PDFs/FAQ/InstitutionalRequirements_07012015.pdf. Accessed April 10, 2018.

15. Accreditation Council for Graduate Medical Education. *ACGME Common Program Requirements*. https://www.acgme.org/Portals/0/PFAssets/ProgramRequirements/CPRs_2017-07-01.pdf. Accessed April 10, 2018.

16. Irby D., Milam S. The legal context for evaluating and dismissing medical students and residents. *Acad Med*. 1989; 64 11: 639– 643. [PubMed] [Google Scholar]

17. *Greenhill v Bailey, 519 F2d 5, 8 (8th Cir.* 1975).

18. *Board of Curators of University of Missouri v Horowitz*, 435 US 78, 89– 91 (1978). [Google Scholar]

19. *Kraft v William Alanson White Psychiatric Foundation*, 498 A2d 1145, 1149– 1150 ( DC Ct App 1985). [Google Scholar]

20. *Wallace v Skadden, Arps, Slate, Meagher & Flom*, 715 A2d 873, 879– 880 ( DC Ct App 1998). [Google Scholar]

21. Papadakis M., Hodgson C., Teherani A. Unprofessional behavior in medical school is associated with subsequent disciplinary action by a state medical board. *Acad Med*. 2004; 799 3: 244– 249. [PubMed] [Google Scholar]

22. Papadakis M., Teherani A., Banach M., et al. Disciplinary action by medical boards and prior behavior in medical school. *N Engl J Med*. 2005; 353 25: 2673– 2682. [PubMed] [Google Scholar]

23. Papadakis M., Arnold G., Blank L., et al. Performance during internal medicine residency training and subsequent disciplinary action by state licensing boards. *Ann Intern Med*. 2008; 148 11: 869– 876. [PubMed] [Google Scholar]

24. Domen R. Resident remediation, probation, and dismissal basic considerations for program directors. *Am J Clin Pathol*. 2014; 141 6: 784– 790. [PubMed] [Google Scholar]

25. Kachalia A., Studdert D. Professional liability issues in graduate medical education. *JAMA*. 2004; 292 9: 1051– 1056. [PubMed] [Google Scholar]

26. *Marmion v Mercy Hospital and Medical Center*, 193 Cal Rptr 225, 232– 35 ( Cal Ct App 1983). [Google Scholar]

27. *Swidryk v Saint Michael's Medical Center*, 493 A2d 641, 642 (NJ Super Ct 1985).

28. *Moore v Vanderloo*, 386 NW2d 108, 113– 14 ( Iowa 1986). [Google Scholar]

29. *Ross v Creighton University*, 957 F2d 410, 414 (7th Cir 1992).

30. *Glorvigen v Cirrus Design Corporation*, 796 NW2d 541, 553– 555 (Minn Ct App 2011), 816 N.W.2d 572 (Minn 2012). [Google Scholar]

31. *Arnold v University of North Carolina at Chapel Hill*, 798 SE2d 442, 443 (NC Ct App 2017).

32. *Bittle v Oklahoma City University* P3d 509, 515 (Okla Civ Ap 2000).

33. *Christensen v Southern Normal School*, 790 So2d 252, 254– 255 (Ala 2001). [Google Scholar]

34. *Ogbaegbe v Hampton University*, 141 F Appendix 100, 101 (4th Cir 2005).

35. Magone M. Educational malpractice—does the cause of action exist? *Mont Law Rev*. 1988; 49 1: 10. [Google Scholar]

36. *Blane v Alabama Commercial College Inc*, 585 So2d 866 (Ala 1991).

37. *DSW v Fairbanks North Star Borough School District*, 628 P2d 554, 555– 556 ( Alaska 1981). [Google Scholar]

38. *Peter W v San Francisco Unified School District*, 131 Cal Rptr 854, 861 (Cal Ct App 1976).

39. *Tubell v Dade County Public Schools*, 419 So2d 388, 389 (Fla Dist Ct App 1982).

40. *Wickstrom v North Idaho College*, 725 P.2d 155, 157– 158 ( Idaho 1986). [Google Scholar]

41. *Rich v Kentucky Country Day Inc*, 793 SW2d 832, 834– 837 ( Ky Ct App 1990). [Google Scholar]

42. *Hunter v Board of Education*, 439 A2d 582, 583– 584 ( Md 1982). [Google Scholar]

43. *Donohue v Copiague Union Free School District*, 391 NE2d 1352, 1354 (NY Ct App 1979).

44. *Hoffman v Board of Education*, 400 NE2d 317, 319– 320 (1979). [Google Scholar]

45. US Equal Employment Opportunity Commission. *Disability discrimination*. https://www.eeoc.gov/laws/types/disability.cfm. Accessed April 10, 2018.

Articles from Journal of Graduate Medical Education are provided here courtesy of **Accreditation Council for Graduate Medical Education**