UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION


JOSEPH PAPIN                                                    PLAINTIFF


V.                                    CIVIL ACTION NO.  3:17-CV-763-KHJ-FKB


UNIVERSITY OF MISSISSIPPI MEDICAL                    DEFENDANTS
CENTER; LOU-ANN WOODWARD, in her official
and individual capacities; T. MARK EARL, in his individual capacity;
and STEVEN A. BONDI, in his individual capacity



ORDER

    This matter is before the Court on the Motion for Summary Judgment [140]

filed by Defendants University of Mississippi Medical Center ("UMMC"), Dr. Lou-

Ann Woodward in her official and individual capacities, Dr. T. Mark Earl in his

individual capacity, and Dr. Steven A. Bondi in his individual capacity (collectively

"Defendants"), and the Motion for Partial Summary Judgment [144], Motion for

Leave to File Sur-reply [160], and Motion to Strike [161] filed by Plaintiff Dr.

Joseph Papin. For the reasons below, the Court grants in part and denies in part

Defendants' Motion for Summary Judgment [140] and grants in part and denies in

part Dr. Papin's Motion for Partial Summary Judgment [144]. The Court denies the

remaining motions as moot.

I.      Facts and Procedural History

        A.      Facts

        Dr. Papin graduated from the University of Michigan Medical School in 2015.

Second Am. Compl. [50], ¶ 11. After completing a one-year fellowship, he applied for

resident training through the National Resident Matching Program. *Id.*, ¶¶ 11-12.

Dr. Papin matched with UMMC and signed a House Officer Contract with UMMC.

*Id.*, ¶ 16; [140-4]. He began his surgical residency in July 2016. [50], ¶ 16.

        Dr. T. Mark Earl is the Program Director of UMMC's Surgery Residency

Program. Earl Depo. Vol. 1 [144-5] at 17:23-18:3. Dr. Steven A. Bondi is UMMC's

Director of Risk Management and was on the panel deciding Dr. Papin's appeal.

Bondi Depo. Vol. 1 [144-24] at 24:19-24; Appeal Tr. [140-16] at 1. Dr. Lou-Ann

Woodward is the Vice Chancellor for Health Affairs and Dean of the School of

Medicine at UMMC. Woodward Aff. [140-34], ¶ 2.

        1.      Dr. Papin's Residency Performance[1]

        The first year of Dr. Papin's residency was a rotational program during which

he completed one-month long terms with different surgical subspecialties within

UMMC. Dr. Earl Deposition [140-6] at 31. Dr. Papin's residency began with a

---

[1] Most of the facts surrounding Dr. Papin's performance are disputed. Because these facts
bear on Defendants' Motion for Summary Judgment [140] and because Dr. Papin, as the
party with the burden on his claims at trial, has the burden to produce evidentiary support
of his claims on summary judgment, *see Bayle v. Allstate Ins. Co.*, 615 F.3d 350, 355 (5th
Cir. 2010) (citations omitted), the Court presents the facts as presented by Dr. Papin. The
Court does not weigh evidence or judge credibility at this stage of litigation. *Klocke v.
Watson*, 936 F.3d 240, 246 (5th Cir. 2019) (citation omitted).

rotation in the cardiovascular intensive care unit ("CVICU"). [144-5] at 65:17-20. Starting with this first rotation and continuing throughout his tenure with UMMC, Dr. Papin received negative feedback and accusations of wrongful conduct. [140-6] at 65; Berger Email [140-7] at 1. The Court discusses each major incident in turn.

### a.   CVICU Rotation and Conflict with Josh Sabins

While on rotation with the CVICU in July 2016, a conflict ensued between Dr. Papin and one of the nurse practitioners, Josh Sabins. Dr. Papin contends that one of his supervisors, Dr. Jay Shake, told him that "the main expectation [during the rotation] [was] for [him] to learn" and that he could "go down to the operating room" when there was a "lull" in regular work duties. Papin Depo. [144-2] at 40:25-41:8. According to Dr. Papin, this caused a problem with Sabins, who became upset upon learning Dr. Papin would not always be on the CVIUC floor and believed Dr. Papin would risk one of his patients needing him.[2] [144-2] at 41:9-43:17; Sabins Depo. [144-10] at 39:8-41:3.

This matter escalated into a heated, near-physical, interaction between Dr. Papin and Sabins on July 29, 2016, when Dr. Papin told Sabins he was leaving to go to the operating room, and Sabins responded that he could take his bag and not come back. [144-2] at 47:8-48:9; [144-10] at 41:18-42:4. Dr. Papin testified that Sabins said he was "moving [him] and [his] shit out," to which Dr. Papin "forcefully" responded that Sabins was not "going to put [his] hands on [him] and [he's] not

---

[2] Sabins testified that his discontentment with Dr. Papin's absence was not for taking educational observation time in the operating room, but for not communicating that he was doing so, leading to potentially dangerous situations for patients. [144-10] at 39:11-41:3.

going to put [his] hands on [his] stuff." [144-2] at 47:20-48:2. Sabins stated that he told Dr. Papin he was being removed from the CVICU rotation so he should not come back to the ICU. [144-10] at 41:23-42:10. Dr. Papin "got very mad" and told Sabins, "[D]on't ever touch my shit." [144-10] at 41:23-42:10. Sometime during this interaction, Dr. Papin contends that Sabins said, "I'm your boss, you don't listen to Dr. Shake," and Dr. Papin responded with "something like, 'Dr. Shake is the one that I report to.'" [144-2] at 73:19-74:15.

Afterward, Dr. Papin contends that he reported the incident to the chief resident, who relayed it to Dr. Earl. [144-2] at 48:25-49:9. Dr. Papin testified that he "tried" to discuss the miscommunication with Dr. Shake but received no further clarity. *Id.* at 49:10-18. Dr. Earl, however, spoke with Dr. Papin about the incident. Dr. Earl called Dr. Papin into his office and, according to Dr. Papin, told him "we need to de-escalate these things. I don't blame you for doing that. I've heard from people you didn't do anything wrong, but the goal is to de-escalate . . . try to avoid these situations in the future." *Id.* at 49:19-50:4.

The day of the Sabins conflict, Dr. Ines Berger, the other CVICU attending physician, emailed Dr. Earl and Dr. Shake. Berger Email [140-7] at 1. She stated Dr. Papin was not receptive to tasks the nurse practitioners asked him to do, stating things like, "You are not my boss. I am a surgeon," and refusing to check in with them. *Id.* Dr. Berger also stated Dr. Papin brought a cup of coffee into a patient's room, which he allegedly did not know was against policy. *Id.* She also told Dr. Earl and Dr. Shake about the argument between Dr. Papin and Sabins, saying

4

Dr. Papin told her it "almost escalated into a physical fight" and that Sabins "made him feel apprehensive." *Id.* She later called Dr. Papin "a bright and motivated young doctor" who "wants to do his best" and who would "benefit from a mentor who can help him navigate the system and get him off to a good start." *Id.* at 2. Dr. Berger also warned the Sabins incident "constitute[d] a potential hostile work environment." *Id.*

Dr. Papin testified there was never a time he refused to do a task a nurse practitioner asked of him and never told anyone they were not his boss. [144-2] at 73:9-19. The only time he recalled ever saying something close to "you are not my boss" was during the argument with Sabins, when Sabins said, "I'm your boss, you don't listen to Dr. Shake," and Dr. Papin responded with "something like, 'Dr. Shake is the one that I report to.'" *Id.* at 73:19-74:15. Dr. Papin stated he did not know why the nurse practitioners reported he would not perform tasks to Dr. Berger. *Id.* at 74:22-75:5.

### b. Cardiothoracic Rotation

Dr. Papin's next rotation was in cardiothoracic ("CT") surgery under attending doctors Giorgio Aru, Pierre de Delva, Jacob Moremen, Anthony Panos, and Lawrence Cresswell. *Id.* at 56:7-20. Although he received generally positive reviews on his pre-surgery and post-surgery work, Dr. Papin received notable negative feedback in his evaluations. *See id.* at 57:18-58:12.

Dr. Cresswell documented negative reports from non-physician members of the CT surgery team that alleged Dr. Papin said certain tasks were not his job. *Id.*

Dr. de Delva noted that he "discovered issues and problems that [he] would have expected [Dr. Papin] to recognize" but he did not. *Id.* at 64:3-8. Dr. de Delva also commented on Dr. Papin's dismissive attitude and inability "to develop rapport and trust with nurses and nurse practitioners." *Id.* at 66:7-18. Dr. Papin's evaluations for this rotation also mentioned concern about absences during duty hours. *Id.* at 79:16-25.

Dr. Papin disputes how his supervisors characterized his performance in his written evaluations. Dr. Papin testified that the Sabins incident "haunt[ed]" his residency and, while his superiors kept telling him there were difficulties, they never told him what they were. *Id.* 61:18-24. He stated his supervisors only ever identified the Sabins conflict as a performance problem; nothing else. *Id.* at 61:25-62:3. Dr. Papin contends that negative comments on his performance came from the nursing staff— not from the doctors' own observations. *Id.* at 64:9-22. Dr. Papin also asserts that he did not receive any feedback about the deficiencies in his communication abilities at work, other than general feedback to "work on communication." *Id.* at 81:18-82:9.

Further, Dr. Papin insists he was never absent. *Id.* at 63:2-13. He explained that the hospital did not require him to stay in a specific area because "patients could be spread pretty much anywhere around the hospital." *Id.* at 80:1-81:2. Dr. Papin further testified no one voiced concerns over their inability to find him until around December 2016. *Id.* at 81:7-14.

6

Dr. Papin explained the problems with his attitude and professionality as a cultural difference between the North and South. *Id.* at 66:18-68:9. He assumed others perceived him as rude because of the differences between Michigan and Florida, where he lived before, and Mississippi. Rudeness, however, was not his intent, and he did not know of any negative interactions. *Id.* at 70:20-71:25.

c.   Decubitus Ulcer Patient

While on rotation in the trauma unit, Dr. Papin received another complaint about his performance. Dr. Meghan Mahoney was the chief resident in the trauma unit. [144-2] at 134:5-13. Dr. Mahoney's testimony, included in the Notice Letter detailing the reasons for his dismissal, alleged Dr. Papin lied about conducting an exam on a patient with a decubitus ulcer so severe it required surgery. Notice Letter [140-36] at 3; Mahoney Depo. [144-15] at 23:12-24:5. Dr. Mahoney testified she instructed Dr. Papin to examine this patient's backside and that he told her the patient "did not have any wounds on their back." *Id.*

Dr. Papin, however, submits evidence that he reported this patient's wound to Dr. Mahoney when he sent Dr. Mahoney a text message about Wound Care's recommendation for the patient's decubitus ulcer. Mahoney Text Messages [144-14] at 4. Dr. Mahoney explained that, because Dr. Papin said the ulcer was in the "early" stages, she did not understand the seriousness of the situation and made a note to look at it the next day. [144-15] at 99:2-17. Dr. Mahoney testified that the next day she remembered being "angry" because she "had been told for the past two Mondays that there was no wound there. And when [she] saw it . . . [she] felt that

this did not happen overnight and this was not an early sacral wound as [Dr. Papin] had said in his text the previous day." *Id.* at 107:11-18.

Dr. Papin admits he had a "gap in knowledge" because he "incorrectly" assumed "that a scab over something meant that it was healing." [144-2] at 151:10-20. He said his conversation with the wound nurse seemed to confirm his assessment that it was not "that bad." *Id.* at 151:21-152:7.

### d.   ICU Patient Transfer

UMMC also documents an accusation of Dr. Papin failing to notify ICU personnel of a trauma patient's transfer to the ICU. [140-36]. Dr. Colin Muncie recounted this incident in a January 2017 email, stating Dr. Papin was "specifically instructed to enter orders and communicate to the ICU" about the patient transfer. Muncie Email [140-15]. Dr. Papin "confidently told" Dr. Muncie that he spoke with "someone in the resident room but he could not tell [him] who it was." *Id.* When the ICU nurse practitioner spoke with "everyone who had been on [duty] that day," no one on the ICU team claimed to have spoken to Dr. Papin. *Id.* In his deposition, Dr. Papin maintained he "did make the phone call" but explained he made the call during shift change, and maybe "the ball got dropped amongst them and the message wasn't relayed." [144-2] at 169:7-18.  He also stressed that because "[a]ll the notes were in," he did not have to warn the ICU by phone. *Id.* at 169:10-11.

### e.   Failure to See Patient Prior to Rounds

William Crews, a then third-year medical student, emailed Renee Greene, administrator of the surgery department, accusing Dr. Papin of not seeing his

patient before rounds. Crews Email [140-17]. Instead, Dr. Papin would "always show up right before rounds without actually seeing any of his patients" and would then blame medical students if he made a mistake. *Id.*

Dr. Papin denies not seeing patients, explaining Crews, as a medical student, did not know how Dr. Papin allocated his time each day and would not know whether he saw patients before rounds. [144-2] at 171:22-172:24. Dr. Papin said he would "get sign[ed] out" at 6:00 or 7:00 A.M. and go straight to seeing his patients. *Id.* at 173:3-174:5. He would then go to the resident room around 6:45 and read to patients until around 7:30, when he would attend rounds. *Id.* at 175:6-15. He insists Crews would have had no way of knowing when he saw his patients. *Id.* at 175:2-12.

f.   Wound Washout

Sometime during Dr. Papin's time at UMMC, a woman came to the ER with a serious shoulder wound, and the ER transferred her to the ICU. *Id.* at 188:10-21. The ER staff first washed out and packed the wound before sending her to the ICU, but Dr. Papin was asked to wash it out again more thoroughly. *Id.* at 188:22-189:4. Dr. Papin said he washed the wound. *Id.* at 189:25-190:1.

Later, Dr. Sid Desai sent him a text message, asking if he washed the wound. *Id.* at 190:9-12. Dr. Papin responded he did and told him that he had left. *Id.* at 190:13-16. Dr. Papin later discovered that, distrustful of his account, Dr. Desai also washed the wound after he had left. *Id.* at 190:23-191:2. Dr. Ray claims that she found sticks and dirt in the wound after Dr. Papin claimed to have washed it. *Id.* at 192:1-2. Dr. Papin does not deny Dr. Ray's experience, but maintains that he

9

washed the wound and asserts that because the patient was a "large woman, things can travel in the layers of fat and muscle" and that "[g]ravity [and] time just settles things out." *Id.* at 192:2-9.

### g. Failure to Respond to Patient Code

During another alleged instance, Dr. Papin signed out at 5:00PM and, as he left, a "code blue, third floor" was called over the PA system. [140-27] at 12:15-22. Dr. Papin did not inquire into the situation and left. He explained he did not know it involved his patient and that "[a]ll [he] heard was the code blue, and for some reason, it just didn't process." *Id.* at 12:21-13:7. Another intern brought it to his attention later, and Dr. Papin reported it to the chief resident, apologizing and calling it "an absentminded mistake." *Id.*

### h. General Demeanor

Throughout his residency, Dr. Papin received complaints about his lack of professionalism. Reports reflected that Dr. Papin was "always in a hurry to leave." *Id.* at 13:21-14:1. There were also instances of Dr. Papin leaving work to exercise. *Id.* at 15:22-16:2. [144-2] at 126:13-25. For example, on December 6, Dr. Papin asked Dr. Mahoney, by text message, for permission to go on a run while on call. Dr. Mahoney granted Dr. Papin permission to go for a run around campus "while it's dead" under the condition that his "pagers work." [144-14] at 1. A little over a week

later, when he asked for permission to run again, Dr. Mahoney sent the questions "Excuse me?" and "Like exercise?" in response.[3] *Id.* at 2.

Dr. Papin insisted that he only left to exercise once with his attending physician's permission. [140-27] at 16:3-11. Additionally, Dr. Papin said he was gone for only 15 minutes and missed nothing during this instance of exercise on duty, but Dr. Earl kept bringing that up, despite other residents routinely exercising while on duty with authorization. *Id.* at 16:12-22.

### 2. Pre-Termination Meetings

Dr. Earl met with Dr. Papin for his semi-annual review near the end of November 2016. *See* Papin Milestone Report [140-12]; Resident Performance Profile [144-12]. This review listed seven "critical deficiencies." *See* [140-12]; [144-12]. Dr. Papin testified he "didn't know what the clinical milestones were" but "hearing seven criminal deficiencies . . . sounded serious to [him]." [144-2] at 122:4-8. Dr. Papin also stated Dr. Earl "became irate" when he asked about the context for his scores: "[f]eedback to you is a sign in the OR" and "[w]hen someone stops listening to your presentation, that's your feedback." *Id.* at 122:9-18. He claims Dr. Earl told him he did not "believe" in feedback, and Dr. Papin "need[ed] to start figuring it out for [him]self." *Id.* at 122:13-16. Dr. Papin stated the milestone report was the only feedback he received, but he did not understand the scoring system. *Id.* at 122:19-123:6; *see also* [144-12]. When he questioned Dr. Earl about the system, Dr. Earl

---

[3] Dr. Mahoney also sent the message "Are you fucking kidding me?" but it is unclear if this is referring to a different message Dr. Papin sent containing redacted information. [144-14] at 2.

told him "to figure it out." [144-2] at 123:6-7. Dr. Papin testified he felt "no better off leaving this meeting than before [he] went into it." *Id.* at 125:1-5.

Dr. Earl met with Dr. Papin again near the end of December 2016. *Id.* at 125:6-8. According to Dr. Papin, he and Dr. Earl discussed his unwillingness to help with tasks during their meeting, but Dr. Earl refused to go into detail, saying Dr. Papin "always ask[ed] about this" and Dr. Earl just wanted him to "fix it." *Id.* at 127:9-17. They also discussed Dr. Papin leaving the hospital during duty hours, which Dr. Papin said was the "main theme of the whole conversation." *Id.* at 127:18-22.

On January 10, 2017, Dr. Earl again met with Dr. Papin after receiving more complaints about his performance. [144-2] at 203:22-204:21; Earl Depo. Vol. 2 [144-6] at 203:1-205:7. In this meeting, Dr. Earl reviewed a letter—referred to by Dr. Papin as the Remediation Agreement—discussing the concerns with Dr. Papin's performance. [144-2] at 204:1-8; [144-6] at 203:1-205:7. The Remediation Agreement ("Agreement") stated Dr. Papin's evaluations revealed these concerns:

1) Lying and being untruthful about patient care.
2) Leaving the hospital during duty hours (to exercise) – dereliction of duty[.]
3) Unwillingness to help with tasks[.]
4) Condescending tone to nurses and fellow residents[.]
5) Poor inter-professional communication.

[144-18] at 1. The Agreement warned Dr. Papin that he was "now on formal remediation" after making no improvement since his December 20, 2016 meeting with Dr. Earl. *Id.* It gave Dr. Papin 60 days from the date of the Agreement to "show significant improvement," which it defined as:

1)      zero confirmed or highly suspicious reports of lying[.]
2)      zero episodes of dereliction of duty[.]
3)      improvement in evaluations mapped to the competencies of SBP,
        PBLI and PROF, and the majority of all evaluation questions be
        >3 (as expected).
4)      Zero reports of unwillingness to complete to task unless concerns
        over patient safety are raised.

*Id.* Dr. Papin also had to develop and submit a "Personal Plan and Action Plan"
within a week and attend bimonthly meetings with Dr. Earl to discuss progress and
feedback. *Id.* The Agreement warned that the listed concerns were "serious threats
to patient safety and therefore grounds for immediate action" and that if Papin did
not improve in the 60-day remediation period, UMMC would take disciplinary
action. *Id.* at 3. Both Dr. Earl and Dr. Papin signed the agreement. *Id.*

Dr. Papin "objected to basically everything" in the letter and complained that
Dr. Earl provided no context to any of the listed concerns. [144-2] at 210:11-20.
When he asked if he could take the letter home to review before signing, Dr. Earl
told him, "sure, but you're fired if you don't sign it right now." *Id.* at 210:25-211:6.
Dr. Papin also said Dr. Earl forced him to take a fitness for duty exam under threat
of termination. *Id.* at 211:7-14. Dr. Earl placed him on administrative leave after
this meeting. *Id.* at 211:15-21.

3.   Dr. Papin's Employment Termination[4]

The day after Dr. Earl placed Dr. Papin on administrative leave, Dr. Rick
Barr, Senior Associate Dean for Graduate Medical Education at UMMC, emailed
the Human Resources ("HR") department, advising that Dr. Earl placed Dr. Papin

---

[4] The facts surrounding Dr. Papin's employment termination and the procedures employed
by UMMC are largely undisputed.

on administrative leave and saying his "return to work [wa]s not desired." [140-22].
On January 27, 2021, Dr. Papin met with HR representatives Patricia Whitlock and
Brenda Traxler. *See* Interview Tr. [140-27].

During this interview-style meeting, Whitlock and Traxler asked Dr. Papin
about the specific instances of negative occurrences and feedback during his
residency. They discussed: the altercation with Sabins, *id.* at 3:6-4:18; the
accusation that Dr. Papin refused tasks nurse practitioners gave him, *id.* at 9:19-
12:6; Dr. Papin's failure to answer a code called on one of his patients, *id.* at 12:7-13;
reports that Dr. Papin was "always in a hurry to leave," *id.* at 13:21-14:1; instances
of Dr. Papin leaving work to exercise, *id.* at 15:22-16:2; the incident with the ulcer
patient, *id.* at 17:4-19:24; lying about seeing patients, *id.* at 21:9-12; and having a
cavalier attitude, *id.* at 25:6-10.

Dr. Papin largely denied these accusations. When asked why people were
bringing these problems to his superiors, Dr. Papin guessed that "there's a concern
that [he wasn't] . . . up to par as a resident," but stated again that he wanted to
improve. *Id.* 23:9-16. Dr. Papin emphasized he "never, . . . lied about patient care."
*Id.* at 24:8-12. He said he did not know what more he could do other than
"meticulously document everything." *Id.* at 24:8-25:5.

Dr. Papin asserted that no one ever directly addressed any complaints with
him, but they would come up later in evaluations with no specifics of the situation
given to him. *Id.* at 25:10-22. For example, during Dr. Papin's semiannual
evaluation, Dr. Earl gave him feedback to improve his demeanor with the nurses,

however, Dr. Papin could not do so because he did not understand how his demeanor came off as rude. *Id.* at 27:5-18.

At the end of the interview, Whitlock informed Dr. Papin that UMMC would contact him, not the HR department. *Id.* at 35:18-36:4. About a week later, she emailed Cecelia Bass, UMMC's Employee Relations Director, recommending Dr. Papin's employment be terminated. Whitlock Email [140-28]. Bass approved this recommendation on February 20, 2017. Bass Email [140-29]. Dr. Earl issued a dismissal letter two days later. Dismissal Letter [140-1].

### 4.  Dr. Papin's Appeal

#### a.  UMMC's Notice Letter

A few weeks later, Dr. Papin's attorney sent a letter requesting an appeal of the decision to terminate his residency to Dr. Woodward as the Dean of the Medical School. Request for Appeal [140-31]. On July 5, 2017, UMMC sent Dr. Papin a letter, signed by HR Director Molly Brasfield, acknowledging receipt of his request for an appeal and setting the date for an appeal hearing ten days from the date of the letter. Notice Letter [140-36] at 1. It informed Dr. Papin that UMMC selected Dr. Bondi as chair of his appeal panel and that, while his attorney could be present, he could only participate in an advisory capacity. *Id.* The letter listed the potential witnesses UMMC may call to testify at the appeal. *Id.* at 4.

UMMC's letter also purports to provide "notice . . . concerning Mr. Papin's dismissal," citing these reasons for Dr. Papin's termination: the incident with Sabins; unprofessional interactions with the nurse practitioners in CVICU;

"unwillingness to help with tasks;" "leaving clinics without telling anyone;" being unaccounted for unless it was time for rounds; taking a cup of coffee into a patient's room against policy; "issues of professionalism;" "leaving the hospital during duty hours to exercise;" "condescending tone to nurses and fellow residents;" "poor inter-professional communication;" failure to communicate the admittance of an ICU patient to the ICU team[5]; failure to see patients before rounds; blaming errors on medical students; "inattention to detail;" not knowing basic details about his patients during rounds;" "[b]ehavior issues that were addressed on numerous occasions;" "leaving without permission when he was on first call to go for a run;" "fail[ing] to respond to a code being called on one of his patients;" "display[ing] an attitude or reluctance to help with patients;" "display[ing] a lack of honesty concerning the logging of cases;" "rudeness and professionalism issues" with the nurses; "lying to the Chief resident about seeing patients before rounds;" lying about examining the decubitus ulcer patient; "[l]eaving the hospital during a code;" "not show[ing] up on time to pre round or to get sign out;" "not go[ing] to traumas during the holidays;" "tr[ying] to send a patient home that was not competent despite being warned;" "ma[king] a female trauma student incredibly uncomfortable;" doing rounds "without having seen the patients;" and failing to "washout a massive wound on a trauma patient in the ICU." *Id.* at 2-4.

---

[5] According to the Notice Letter, "[i]t was confirmed that Dr. Papin never spoke with anyone on the ICU team, was untruthful about contacting the ICU, and failed to perform the tasks assigned to him." [140-36] at 2.

The Notice Letter further explained that "Dr. Earl has continuously met with Dr. Papin" about these issues. *Id.* It addressed Dr. Papin's HR interview, explaining Dr. Papin "did not accept any accountability," and noting that Dr. Papin instead stated, "that neither Dr. Earl, nor anyone else, had ever given him feedback that there were any concerns." *Id.* at 4. As a result of Dr. Papin's conduct, the letter concluded that "UMMC no longer has faith in Dr. Papin's honesty and there is great concern regarding patient safety in allowing him to continue at UMMC." *Id.*

### b.   The Appeal Hearing

A panel comprised of Dr. Bondi, Dr. Ayman Asfour, Dr. Demondes Haynes, Dr. Gustavo Luzardo, Dr. Ricky Clay, and Dr. Lillian Joy Houston heard Dr. Papin's appeal in July 2017. Appeal Tr. [140-16] at 1. The panel did not allow Dr. Papin to cross-examine witnesses at this hearing. *Id.* at 9:19-10:3. Dr. Papin was, however, allowed to call his own witnesses and respond to the allegations against him by each witness. *Id.*

Dr. Earl, Dr. Mahoney, Dr. Ashley Ray, Dr. Muncie, Crews, and Dr. Barr all testified on behalf of UMMC. Dr. Papin did not call any witnesses. The Court addresses each of their testimony in turn.

### i.   Dr. Earl's Opening Remarks

After some introductory remarks by the panel, Dr. Earl discussed Dr. Papin's employment, beginning with a general overview of what he called "a pattern of difficult interprofessional relationships" and how this led to the December meeting, HR interview, and subsequent employment termination. *Id.* at 11:12-13:13. He then

recounted Dr. Papin's rotation in CVICU "where there were multiple reports from nurse practitioners, nurses, as well as e-mails to [Dr. Earl] from [CVICU] faculty about difficult interprofessional relationships" and complaints that Dr. Papin refused to perform tasks the nurse practitioners asked him to do. *Id.* at 14:3-10. Dr. Earl stated these issues "were documented in the evaluations from that rotation." *Id.* at 14:10-11.

Dr. Earl stated that professional and performance issues came up with Dr. Papin in all his rotations through December. *Id.* at 15:24-16:17. He explained that, at that point, there were concerns about patient safety. *Id.* at 17:16-19. He cited Dr. Papin's untruthfulness about the decubitus ulcer patient, stating that he "did not feel like this was an issue that [he] could educate somebody out of." *Id.* at 17:19-25; 18:10-11. He testified that he "would, as a program director, never feel comfortable about him Dr. Papin working alone or trust anything that he said about patient care." *Id.* at 18:21-23.

Dr. Earl said he discussed a 60-day period with Dr. Papin for him to improve, but he only did that "because he thought he had to." *Id.* at 19:5-8. When he met with Dr. Barr, though, Dr. Earl told him Dr. Papin could do nothing where "he w[ould] be able to come back and where [Dr. Earl] c[ould] trust him." *Id.* at 19:8-14. Dr. Barr suggested referring the matter to HR because they "needed to get him out of the hospital as soon as [they] could." *Id.* at 19:22-20:4. Dr. Earl then stated that HR recommended terminating Dr. Papin's employment. *Id.* at 20:5-10.

When asked about other specific instances of untruthfulness, Dr. Earl mentioned the ICU patient transfer incident, the wound washout incident, accusations that Dr. Papin did not see patients before rounds, Dr. Papin's runs while on duty, and failure to respond to a code on his patient. *Id.* at 30:18-24; 30:25-31:9; 31:10-22; 32:1-19.

In response to Dr. Earl's remarks, Dr. Papin first stated, "in the six months [he] was there, [he] was never really given an opportunity to show any sort of improvement," and, "wasn't given any sort of feedback." *Id.* at 34:7-13. He testified Dr. Earl would tell him he received "reports from nurses," but "he wouldn't give [him] anything specific." *Id.* at 34:23-35:2. Dr. Earl "gave [him] absolutely no specific instances when something was happening, which [he] would have found incredibly helpful" because "obviously there's a disconnect between . . . these reports and anything that [he was] seeing or experiencing." *Id.* at 35:2-8.

Dr. Papin then addressed the specific instances of dishonesty Dr. Earl mentioned. First, for the decubitus ulcer patient, Dr. Papin claimed Dr. Earl "never mentioned [this patient] specifically to [him]," but he only discovered the accusations about his care of this patient in the January HR interview. *Id.* at 35:19-36:13.

As for the allegation that he did not wash out a wound according to instructions, Dr. Papin claimed he did and said the ophthalmology resident could corroborate his account. *Id.* at 37:16-38:2. Dr. Papin further stated he did not know "the genesis of th[e] story" where he did not see patients before rounds, saying he

never heard that accusation until his attorney received documents for the hearing. *Id.* at 38:8-19. He said he would sign out with the other interns as soon as he arrived at the hospital, see patients, and then do rounds, and could not comment on allegations that he did not see patients "other than to say that that never happened." *Id.*

Turning to the allegation that he left the hospital to exercise, Dr. Papin explained how he had asked Dr. Mahoney to do so and received permission, but when he asked again, "she became irate" and "started cursing over the text message." *Id.* at 38:24-39:13. He testified he never left the hospital to exercise without permission and that he only "did it one time with permission." *Id.* at 39:14-23. When he offered to show the text messages to Dr. Earl in one of their meetings, Dr. Earl refused to see them. *Id.* at 39:22-23. Dr. Papin said this was "kind of a pattern" and he "was never really able to give any sort of evidence to refute or even know the circumstances under which most things occurred." *Id.* at 39:24-40:2.

Finally, Dr. Papin denied failing to communicate a patient transfer to the ICU staff. *Id.* at 40:3-21. Dr. Papin stated that he "put in the admission orders of this patient to go to the ICU," that he "communicated everything about this patient, status and everything, to the senior residents," that "the note was in," and that he "had spoken to the ICU." *Id.* at 40:10-14.

Dr. Papin testified that he continuously asked Dr. Earl for more specific feedback when told Dr. Earl was receiving negative reports about him, but "he would become irate that [Dr. Papin] would even ask." *Id.* at 40:25-41:25. He also

20

said there were allegations, such as "walking out of the operating room" and "[b]eing late frequently," which were never communicated to him before those reports were sent to his attorney. *Id.* at 42:1-10.

### ii.  Dr. Mahoney's Testimony

The panel next heard from Dr. Mahoney. *Id.* at 50:12-13. She testified about Dr. Papin texting her to say he was leaving to exercise while on duty. *Id.* at 51:18-25. She stated she "found it very unprofessional for him to ask to go running during hours when he's in-house and he is first call for trauma." *Id.* at 52:4-7.

Dr. Mahoney then discussed the decubitus ulcer patient. *Id.* at 54:5-15. She testified that Dr. Papin did not report the patient's ulcer and told Dr. Mahoney "everything [wa]s okay." *Id.* at 54:16-19. When she looked at the ulcer the next morning, though, she discovered it required surgery. *Id.* at 55:4-8. Because it was so large, she knew it could not have formed in a week. *Id.* at 55:9-11. Dr. Mahoney, however, admitted the wound had a black scab on it when she saw it. *Id.* at 56:5-10.

Dr. Mahoney also stated the nurses she worked with told her Dr. Papin was "very unprofessional" and that "they felt like he wouldn't listen to them." *Id.* at 58:1-5. She said she spoke to him about these issues and would point them out to him as they came up, using a numbering system to avoid embarrassing him. *Id.* at 58:12-24. Dr. Mahoney also reported that a female medical student "had become uncomfortable around him." *Id.* at 59:16-22.

Dr. Papin responded after Dr. Mahoney finished her testimony. *Id.* at 61:12-13. He testified that she had permitted him to go on a run while on duty only if his

pager was working. *Id.* at 61:16-62:21. For the decubitus ulcer patient, Dr. Papin
once again stated the patient had the ulcer before he started his rotation and was in
the patient's medical chart. *Id.* at 65:1-9. He claimed he did tell Dr. Mahoney about
the ulcer, but he also thought it was only a black scab. *Id.* at 65:1-66:9. Dr. Papin
then addressed the nurses' complaints by stating the nurses never complained to
him directly and that they would often confuse the other intern on service with him.
*Id.* at 66:23-67:12. He agreed Dr. Mahoney had devised a numbering system for
him, but he stated it did not "make logical sense." *Id.* at 68:22-69:1. He said, "[s]he
would blurt out a number that would indicate that [he] was lying to her," and she
often used another number for "being a douche." *Id.* at 69:1-7. He claimed it was "a
way to embarrass [him] because everybody else knew the code." *Id.* at 69:10-12. Dr.
Papin concluded by stating no one had ever told him he had made a female medical
student uncomfortable and that he only heard about it from the documents sent to
his attorney after he requested an appeal. *Id.* at 69:15-23.

            iii.    Dr. Ashley Griffin Ray's Testimony

     Dr. Ray recounted the incident where Dr. Papin's patient coded a minute or
two before his scheduled sign out time. *Id.* at 72:21-73:1. According to Dr. Ray, Dr.
Papin signed out and left when the patient coded, despite normal procedure for a
surgery resident responding to a code. *Id.* at 73:2-14. She stated Dr. Papin admitted
to hearing the code but did not check if it was one of his patients and did not come
back to help. *Id.* at 73:15-23. Dr. Ray also said that "several times" Dr. Papin told
her he was ready for rounds, but medical students would then pull her aside and

inform her Dr. Papin had seen no patients. *Id.* at 75:10-13. Dr. Ray then addressed the wound Dr. Papin failed to wash out. *Id.* at 78:4-21. She stated Dr. Papin was on shift during the day and was told to wash out the wound. *Id.* at 78:15-17. An ICU nurse, however, paged Dr. Ray at midnight because the wound had not been cleaned out. *Id.* at 78:17-19. She stated she "personally washed the wound out at midnight and pulled grass and dirt and gravel out of this wound." *Id.* at 78:20-21.

The panel then gave Dr. Papin a chance to respond to Dr. Ray's testimony. *Id.* at 80:5-8. Dr. Papin stated that when the code was called, he was "with the entire night team" and "[n]obody rushed out" or called to check who the code was called on. *Id.* He therefore "thought nothing of it and just walked out to [his] car," and he stated that no one asked him to return. *Id.* at 80:25-81:3.

Dr. Papin moved on to the accusation that he failed to see patients prior to rounds. *Id.* at 83:17-18. He "guess[ed]" a medical student told this to Dr. Ray, but he "categorically" denied it because "there was never a time when [he] didn't see patients in the morning and claim[ed] that [he] had or claimed that [he] was ready to see patients when [he] never seen any of them." *Id.* at 83:18-24. He explained standard procedure was not for a resident to check in with medical students before seeing patients and that he "just went to work immediately." *Id.* at 84:2-5.

Finally, he reiterated he washed out the wound he allegedly did not clean. *Id.* at 84:6-12.

### iv.   Dr. Muncie's Testimony

The panel next heard from Dr. Muncie. *Id.* at 86:16-17. Dr. Muncie recounted how he instructed Dr. Papin to admit an ER patient to the ICU, and Dr. Papin failed to warn the ICU staff the patient was being transferred. *Id.* at 87:7-17. He said Dr. Papin told him "he had spoken to someone in . . . the resident work room and that they were aware the patient was coming." *Id.* at 87:18-21. Dr. Muncie said the senior nurse practitioner on call in the ICU was "unable to identify anyone that had spoken with [Dr. Papin] about that particular patient." *Id.* at 87:22-88:3.

Dr. Papin agreed with Dr. Muncie's explanation of the incident but stated he never said he had communicated with a nurse. *Id.* at 89:6-9.

### v.   Crews' Testimony

The panel then heard testimony from William Crews. *Id.* at 90:6-12. Crews stated that "sometimes Dr. Papin would show up maybe later than he needed to" and would not see patients before reporting on them. *Id.* at 91:1-7. Crews said he would see the other resident, Will Brook, come into the work room where the medical students were, grab the list, and see patients. *Id.* at 91:8-21. Crews admitted he only worked with Dr. Papin for "maybe a little over a week" and that he "had worked with him before and didn't see a problem." *Id.* at 92:15-21. He "felt like [he] should say something because [he] had been warned multiple times for [sic] my classmates about his behavior" *Id.* at 92:21-23. Crews stated his classmates told him Dr. Papin "gives false reports on patients, and if he makes a mistake, he'll

blame it on the med student sometimes." *Id.* at 93:1-3. He also said he "personally didn't ever have a problem with [Dr. Papin]." *Id.* at 94:18-19.

Crews also stated a female medical student "expressed to [him] that she was feeling very uncomfortable with [Dr. Papin]." *Id.* at 93:10-12. He never saw Dr. Papin "ma[k]e any physical moves on her," but he would "go out of his way to where it would just be him and [Crews'] female partner." *Id.* at 93:14-20.

Dr. Papin responded to Crews' allegations by first explaining it was impossible to see patients prior to sign-out because he would have no idea who his patients were. *Id.* at 95:19-22. He said that, when Crews saw him in the mornings, it would have generally been after sign-out and after he began seeing patients. *Id.* at 95:1-18. He also stated he never heard this allegation before his Notice Letter and that Dr. Earl and HR only told him about the allegation that he did not see the decubitus ulcer patient. *Id.* at 96:4-14. Dr. Papin also pointed to the accusation that he made a female medical student "uncomfortable" as another instance of UMMC "blind-siding" him with a previously unaddressed issue before his termination. *Id.* at 96:15-22.

### vi.     Dr. Barr's Testimony

Dr. Barr was the last UMMC witness. *Id.* at 99:14-18. He testified that Dr. Earl came to him "with serious concerns" and "wanting guidance as to next steps with Dr. Papin." *Id.* at 99:19-22. Dr. Barr recommended "immediately remov[ing] Dr. Papin from any clinical service" by putting him on administrative leave until after a formal investigation. *Id.* at 100:10-17. He said HR investigated and that

"'legal' did not feel that this was worthy of probation with remediation." *Id.* at 100:25-101:3. He also personally believed Dr. Papin's "lying and dereliction of duty . . . were profound enough that [it] could not be remediated." *Id.* at 101:3-7. Dr. Barr stated he supported the final decision for termination. *Id.* at 101:10-12.

### vii.    Dr. Papin's Final Remarks

Dr. Papin had a chance to address the panel after they had heard from all witnesses. *Id.* at 108:18-25. He brought up the Remediation Agreement he and Dr. Earl signed and stated that he never got a chance to improve as the agreement purported. *Id.* at 109:1-14. He also stated the only issue he knew about before his termination was the allegation that he did not tell the truth about examining the decubitus ulcer patient. *Id.* at 109:15-19. He claims both he and the wound care team saw the ulcer and were wrong about its severity, and he did not lie about it. *Id.* at 109:19-23.

Dr. Papin again said, "everything else has been brought up for the first time today" and that "[i]f the intent was for [him] to improve on this[,] . . . those issues would have been brought up at any time while [he was] still an employee." *Id.* at 109:24-110:4. He stated, "[he] was always asking for feedback, and if [he] had ever been given the chance to improve on concrete actual feedback, [he] would have proven to the institution that [he] can do this job." *Id.* at 110: 8-12.

### viii.    The Panel's Decision

Less than a week after the hearing, Dr. Bondi sent a letter to Dr. Woodward explaining the panel's decision. Appeal Committee Letter [140-2]. Dr. Bondi

reported the panel unanimously found "1) Dr. Papin was given sufficient notice of his deficiencies and the opportunity to improve; 2) Dr. Papin's performance did not improve, but rather, worsened; and 3) Dr. Papin's performance and conduct appropriately warranted termination." *Id.* at 2.

5.    Dr. Papin's Subsequent Schooling and Employment

After UMMC's dismissal, Dr. Papin took the GMAT and was admitted to the University of Michigan's school of business. [144-2] at 13:6-18. Because he was completing this program, he did not try to match with residency programs in the 2018 and 2019 cycles. *Id.* Dr. Papin explained that former classmates advised him that once you are dismissed from a residency program, it "pretty much disqualifies you from just about everything." *Id.* at 13:12-21. Still, he did apply to match with a program for the 2020 cycle but did not receive any interviews. *Id.* at 11:5-13.

Dr. Papin currently is employed at Accenture as a senior strategy consultant in New York. *Id.* at 17:15-18:3; *see also* [140-39]. His base salary upon employment in 2019 was $155,000. [140-39] at 1.

B.    Procedural History

Dr. Papin sued UMMC, Dr. Woodward in her official capacity, and Dr. Earl in his individual capacity in September 2017. *See* [1]. He amended his complaint twice, adding claims against Dr. Woodward in her individual capacity and Dr. Bondi in his individual capacity. *See* [18]; [50]. Dr. Papin brings these claims against UMMC: breach of contract for alleged breaches of the House Officer Contract and the Remediation Agreement; violation of Section 213-A of the

27

Mississippi Constitution under the Mississippi Tort Claims Act; violation of the due process clause of the Mississippi Constitution under the Mississippi Tort Claims Act; and discrimination and retaliation claims under Title VI and VII of the Civil Rights Act.[6] [50], ¶¶ 81-98, 105-14.

Dr. Papin also brings claims for violating his federal due process rights under 42 U.S.C. § 1983 against Dr. Woodward in her official and individual capacities, Dr. Earl in his individual capacity, and Dr. Bondi in his individual capacity. *Id.*, ¶¶ 99-104. Parties move for summary judgment. Defendants move for summary judgment on all Dr. Papin's claims. Dr. Papin moves for summary judgment on the Mississippi due process claims against UMMC and the Defendants' Mississippi Tort Claims Act ("MTCA") defense.

## II.   Standard

When considering a motion under Federal Rule of Civil Procedure 56, the Court must "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is 'material' if, under the applicable substantive law, 'its resolution could affect the outcome of the action.'" *Patel v. Tex. Tech Univ.*, 941 F.3d 743, 747 (5th Cir. 2019) (quoting *Sierra Club, Inc. v. Sandy Creek Energy Assocs., L.P.*, 627 F.3d 134, 138 (5th Cir. 2010)). "An issue is 'genuine' if 'the evidence is such that a reasonable [factfinder] could return a verdict for the nonmoving party.'" *Jones v. United States*, 936 F.3d 318, 321 (5th Cir. 2019)

---

[6] The parties dismissed Dr. Papin's Title VI and VII claims by stipulation. *See* [139].

(quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). In analyzing a motion for summary judgment, "the judge's function is not [her]self to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Klocke v. Watson*, 936 F.3d 240, 246 (5th Cir. 2019) (quoting *Anderson*, 477 U.S. at 249).

"If the burden at trial rests on the non-movant, the movant must merely demonstrate an absence of evidentiary support in the record." *Bayle v. Allstate Ins. Co.*, 615 F.3d 350, 355 (5th Cir. 2010) (quoting *Hamilton v. Segue Software, Inc.*, 232 F.3d 473, 477 (5th Cir. 2000)). Once the movant meets this requirement, "the burden shifts to the non-movant to produce evidence of the existence of such an issue for trial." *Id.* (quoting *Miss. River Basin All. v. Westphal*, 230 F.3d 170, 174 (5th Cir. 2000)). The non-movant must present more than "speculation, improbable inferences, or unsubstantiated assertions." *Jones*, 936 F.3d at 321 (quoting *Lawrence v. Fed. Home Loan Mortg. Corp.*, 808 F.3d 670, 673 (5th Cir. 2015)). "A failure on the part of the nonmoving party to offer proof concerning an essential element of its case necessarily renders all other facts immaterial and mandates a finding that no genuine issue of fact exists." *Adams v. Travelers Indem. Co. of Conn.*, 465 F.3d 156, 164 (5th Cir. 2006) (citing *Saunders v. Michelin Tire Corp.*, 942 F.2d 299, 301 (5th Cir. 1991)).

III.   Defendants' Motion for Summary Judgment [140]

Defendants contend the Court should grant them summary judgment on all Dr. Papin's claims. They assert: Dr. Papin cannot establish a violation of his

procedural or substantive due process rights under the Mississippi and U.S. Constitutions, [141] at 13-23; even if the Court finds a constitutional violation, Dr. Woodward, Dr. Earl, and Dr. Bondi in their individual capacities are entitled to qualified immunity, *id.* at 23-34; Dr. Papin's Section 231-A claim against UMMC fails as a matter of law because the MTCA bars Dr. Papin's due process and Section 213-A claims against UMMC *id.* at 34-37; Dr. Papin cannot establish UMMC breached the House Officer Contract and that, even if he could establish contractual breach, Dr. Papin failed to mitigate his damages. *id.* at 37-42; and finally, monetary damages are unavailable under § 1983 against UMMC or Dr. Woodward in her official capacity and that Dr. Papin is not entitled to punitive damages. *Id.* at 42-44. The Court addresses each of these issues in turn.

A.  Procedural Due Process Claim

Dr. Papin brings procedural due process claims against Defendants under both the U.S. Constitution and the Mississippi Constitution.[7] Defendants contend these claims fail because Dr. Papin received notice of his termination and his appeal hearing was constitutionally sufficient process. [141] at 14-21.

"Procedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment." *Walsh v. Hodge*,

---

[7] The analysis of a due process claim under the Mississippi Constitution is identical to the analysis of a federal due process claim. *See Walters v. Blackledge*, 71 So. 2d 433, 444 (Miss. 1954) ("The due process required by the Federal Constitution is the same 'due process of law' required by Section 14 of the Constitution of the State of Mississippi . . . ."). The Court therefore refers only to federal precedent in its analysis.

975 F.3d 475, 481 (5th Cir. 2020) (quoting *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976)). Defendants do not dispute that Dr. Papin had a constitutionally protected property interest in his employment with UMMC. *See* [141] at 13-21.

"An essential principle of due process is that a deprivation of life, liberty, or property 'be preceded by notice and opportunity for hearing appropriate to the nature of the case.'" *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985) (quoting *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 313 (1950)). Dr. Papin claims Defendants failed to provide the required procedural due process both before and after the termination of his employment.

### 1.    Pre-Termination Procedural Due Process

In cases involving public employment, "the state must . . . accord a public employee 'some kind of hearing' before termination," though "this may consist of no more than a meeting at which the employer states the grounds for dismissal and gives the employee an opportunity for rebuttal." *Caine v. Hardy*, 943 F.2d 1406, 1412 (5th Cir. 1991) (quoting *Loudermill*, 470 U.S. at 546). This type of informal process satisfies constitutional due process requirements only when "it is coupled with more formal post-termination proceedings." *Id.* That said, this informal meeting requires UMMC to provide Dr. Papin with "oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story." *Loudermill*, 470 U.S. at 546 (citations omitted).

UMMC afforded Dr. Papin several pre-termination meetings to put him on notice of his performance deficiencies. Dr. Papin and Dr. Earl met in November

2019 for Dr. Papin's semi-annual review. [140-41]. This review detailed the "critical deficiencies" identified by Dr. Papin's evaluators. *Id.* Dr. Earl formally met with Dr. Papin on at least two other occasions to discuss the negative feedback Dr. Papin received from the various health professionals with whom he worked. After their last meeting on January 27, 2017, Dr. Earl placed Dr. Papin on administrative leave.

Whitlock, UMMC's HR representative, conducted an interview with Dr. Papin after UMMC placed him on administrative leave. [144-2] at 211:15-212:10. In this interview, she notified Dr. Papin of his performance deficiencies, including his treatment of nurse practitioners, his leaving to exercise while on duty, an incident where he examined a patient but did not note a serious ulcer, allegations that he lied about going on patient rounds or doing the necessary charting, and complaints of his unprofessional demeanor. [140-27] at 6:17-34:21. Whitlock afforded Dr. Papin an opportunity to explain each of these deficiencies. *Id.* She then informed Dr. Papin the interview would be used to inform any employment decisions UMMC would make. *Id.* at 35:18-36:4.

The Court finds UMMC satisfied the requirements of pre-termination due process under *Caine* and *Loudermill.* Dr. Earl met with Dr. Papin at least three separate times to review his performance deficiencies before taking any action. Further, when placed on administrative leave, UMMC granted Dr. Papin a formal HR interview during which he was extensively questioned about the grounds for his

potential termination. As evidenced in the record, Dr. Papin had ample opportunity to respond to these accusations. *See* [140-27].

As a matter of law, this meeting fulfills the purpose of a pre-termination hearing — to serve as "an initial check against mistaken decisions" by making "a determination of whether there are reasonable grounds to believe the charges against the employee are true and support the proposed action." *Loudermill*, 470 U.S. at 545-46.

2.     Post-Termination Procedural Due Process

In the context of university employment, UMMC must also provide Dr. Papin with a formal post-termination proceeding, in which he must

> (1) be advised of the cause for his termination in sufficient detail so as to enable him to show any error that may exist; (2) be advised of the names and the nature of the testimony of the witnesses against him; (3) a meaningful opportunity to be heard in his own defense within a reasonable time; and (4) a hearing before a tribunal that possesses some academic expertise and an apparent impartiality toward the charges.

*Walsh*, 975 F.3d at 482 (quoting *Levitt v. Univ. of Tex. at El Paso*, 759 F.2d 1224, 1228 (5th Cir. 1985)). The Court addresses each of these requirements in turn.

a.   Advised Causes for Termination

Together with the numerous meetings with UMMC officials about his performance, Dr. Papin received a Notice Letter detailing the causes for his termination. *See* [140-36]. UMMC's Notice Letter lists specific reasons for Dr. Papin's dismissal, such as the argument with Sabins; lying about examining the decubitus ulcer patient; the cup of coffee taken into a patient's room; the failure to communicate the transfer of a patient to the ICU; Dr. Papin leaving while on duty

to go on a run; his failure to respond to a code on his patient; discharging a patient not competent to leave; and failing to wash out a wound after being told to do so. [140-36] at 2-4. The Court finds that Dr. Papin was "advised of the cause for his termination in sufficient detail so as to enable him to show any error that may exist." *Id.*

Dr. Papin cites the Fifth Circuit's decision in *Wells v. Dallas Independent School District* for support that UMMC's given reasons for his termination were too vague. 793 F.2d 679 (5th Cir. 1986); [150] at 39. Admittedly, UMMC's Notice Letter contained grounds for termination that did not come with examples, such as: : "less than professional" interactions with the nurse practitioners in CVICU; failure to do tasks asked of him and not checking in with the nurse practitioners; unspecified issues with the pharmacists while on his CVICU rotation; "issues of professionalism;" "condescending tone to nurses and fellow residents;" "leaving clinics without telling anyone;" "poor inter-professional communication;" not seeing patients before rounds and blaming errors on medical students; "Dr. Papin's inattention to detail;" "not knowing basic details about his patients during rounds;" "[b]ehavior issues that were addressed on numerous occasions;" "display[ing] an attitude or reluctance to help with patients;" "display[ing] a lack of honesty concerning the logging of cases;" "rudeness and professionalism issues" with the nurses; "lying to the Chief resident about seeing patients before rounds;" and "ma[king] a female trauma student incredibly uncomfortable." *Id.* at 2-4.

The difference between *Wells* and this case, however, is that Dr. Papin was provided with four separate meetings with UMMC personnel to discuss his performance and was placed on administrative leave before his ultimate termination. Wells, on the contrary, first learned of his termination by watching a local television broadcast on the evening news. *Wells*, 793 F.2d at 681. Unlike *Wells*, Dr. Papin's lack of professionalism was a consistent main topic of his meetings with Dr. Earl, including during his semi-annual review, providing him with notice to dispute this conduct. *See* December 20 Email from Dr. Earl [144-13]. Dr. Papin was on notice about his problematic conduct for several months before UMMC terminated his employment, and he had many opportunities to fix his concerning behavior to the extent it was vague. And UMMC cites multiple instances of specific, unacceptable conduct as reasons for Dr. Papin's termination.

The Court thus finds that Dr. Papin was "advised of the cause for his termination in sufficient detail so as to enable him to show any error that may exist." *See Walsh*, 975 F.3d at 482 (citation omitted).

b.      Advised of the Witnesses Against Him

Dr. Papin does not dispute he was advised of the witnesses against him. The Notice Letter he received contained a narrative of the allegations against him, attributing each allegation to one of the listed potential witnesses listed at the end of the letter. [140-36] at 1-4. The Court therefore finds this element of procedural due process satisfied.

c.       Meaningful Opportunity to Be Heard

Dr. Papin contends he did not receive a meaningful opportunity to be heard.

He states, "he was denied the right to confront the witnesses against him (namely,

the female student who allegedly made sexual harassment allegations against him)

and deprived of the opportunity to cross-examine witnesses, or otherwise present

the panel with a list of questions for cross-examination." [150] at 42-43.

*Walsh* involved accusations of sexual harassment and assault by an

unidentified student, referred to as "Student #1", who was not present at the

hearing and whose testimony the deciding committee did not observe. 975 F.3d at

484-85. The accuser's testimony was presented to the committee only through

"snippets of quotes . . . relayed by the University's investigator." *Id.* at 485. The

Fifth Circuit explained that cross-examination by Walsh would not have

"significantly increased the probative value of the hearing," but "the Committee or

its representative should have directly questioned Student #1, after which Walsh

should have been permitted to submit questions to the Committee to propound to

Student #1." *Id.* The *Walsh* Court held "that due process in the university

disciplinary setting requires 'some opportunity for real-time cross-examination,

even if only through a hearing panel.'" *Id.* (quoting *Haidak v. Univ. of Mass.-*

*Amherst*, 933 F.3d 56, 69 (1st Cir. 2019)).

Parties interpret the holding of *Walsh* differently. Dr. Papin understands

*Walsh* to hold that the accused must be allowed to submit questions to the tribunal

if the proceeding is to comport with due process requirements. UMMC argues the

tribunal's questioning is enough to satisfy procedural due process, citing the *Walsh* court "stop[ping] short of requiring that the questioning of a complaining witness be done by the accused party" because there was "no reason to believe that questioning . . . by a neutral party is so fundamentally flawed as to create a categorically unacceptable risk of erroneous deprivation." *Id.* (alteration in original) (quoting *Haidak*, 933 F.3d at 69).

The Court agrees with UMMC's reading of *Walsh*. The Fifth Circuit explicitly stated that a neutral party's opportunity to question a witness is procedurally adequate so long as there is no reason to believe that such questioning "is so fundamentally flawed as to create a categorically unacceptable risk of erroneous deprivation." *Id.* All witnesses who testified against Dr. Papin faced questioning by the tribunal, and Dr. Papin had multiple opportunities to respond with both his own testimony and witnesses. [144-11] at 7:23-8:9, 9:10-24.

Because Dr. Papin has no right to cross examine witnesses with his own questions, and because he could call his own witnesses and respond with his own testimony, this Court finds Dr. Papin had a meaningful opportunity to be heard.

### d.  Hearing Before a Competent Tribunal

The panel that heard Dr. Papin's appeal included Dr. Bondi, Dr. Ayman Asfour, Dr. Demondes Haynes, Dr. Ricky Clay, and Dr. Lillian Joy Houston. [140-16] at 1. Dr. Papin argues this panel was biased, and he was constitutionally entitled to an unbiased decisionmaker. [150] at 50-51.

37

The Supreme Court has held, "Not only is a biased decisionmaker constitutionally unacceptable but 'our system of law has always endeavored to prevent even the probability of unfairness.'" *Withrow v. Larkin*, 421 U.S. 35, 47 (1975) (quoting *In re Murchison*, 349 U.S. 133, 136 (1955)). The Fifth Circuit identifies these classes of decisionmakers as unconstitutionally biased: (1) decisionmakers with "a pecuniary interest in the outcome of the case;" (2) decisionmakers that "ha[ve] been the target of personal abuse or criticism from the party before him;" and (3) decisionmakers who have "exercise[d] both investigative and adjudicative responsibilities." *Ford Motor Co. v. Tex. Dep't of Transp.*, 264 F.3d 493, 511-12 (5th Cir. 2001) (citations omitted).[8] Dr. Papin does not argue any member of the panel had a pecuniary interest in his case, were the target of abuse or criticism from him, or served an investigative role in the case against him. He has therefore failed to establish the panel was a biased decisionmaker.

For these reasons, Dr. Papin was afforded adequate pre-termination and post-termination due process. The Court therefore grants UMMC's motion for summary judgment on Dr. Papin's state and federal procedural due process claims.

B.    Substantive Due Process Claim

Dr. Papin also brings a substantive due process claim against Defendants. "To succeed with a claim based on substantive due process in the public

---

[8] Dr. Papin cites no precedent establishing how the panel was unconstitutionally biased against him beyond citing Supreme Court precedent from *Withrow* and *In re Murchison* holding the panel had to be unbiased. [150] at 50-51.

employment context, the plaintiff must show two things: (1) that he had a property interest/right in his employment, and (2) that the public employer's termination of that interest was arbitrary or capricious." *Moulton v. City of Beaumont*, 991 F.2d 227, 230 (5th Cir. 1993) (citing *Honore v. Douglas*, 833 F.2d 565, 568 (5th Cir. 1987)). Defendants concede Dr. Papin had a property interest or right in his employment, but they argue that his termination was not arbitrary or capricious because UMMC terminated Dr. Papin's employment based on complaints of its employees.[9] [141] at 21-23.

To prove that termination of the property interest or right was arbitrary or capricious, "an employee must show that a public employer's decision 'so lacked a basis in fact' that it could be said to have been made 'without professional judgment.'" *Jones v. La. Bd. of Supervisors of Univ. of La. Sys.*, 809 F.3d 231, 240 (5th Cir. 2015) (quoting *Finch v. Fort Bend Indep. Sch. Dist.*, 333 F.3d 555, 562-63 (5th Cir. 2003)). "A dismissed student can succeed on a substantive-due-process claim if he shows 'that the university's decision was not careful and deliberate.'"

---

[9] Defendants argue that, because they were acting on complaints from other employees, they acted on good faith and there can be no substantive due process claim. [141] at 21-22. Defendants rely on case law from the Fifth Circuit about discrimination under the Age Discrimination in Employment Act and an unpublished case from the Southern District of Texas alleging arbitrary grading as the basis for a substantive due process claim. *Jackson v. Cal-Western Packaging Corp.*, 602 F.3d 374, 377-80 (5th Cir. 2010); *Chan v. Bd. of Regents*, No. H-12-0325, 2012 WL 5832494, at *4 (S.D. Tex. Nov. 16, 2012). Neither case holds that UMMC is allowed to rely on its employees' complaints in its decision to dismiss a resident for purposes of substantive due process.

*Doe v. Univ. of Miss.*, 361 F. Supp. 3d 597, 614 (S.D. Miss. 2019) (quoting *Guse v. Univ. of S. Dakota*, No. 08-4119, 2011 WL 1256727, at *13 (D.S.D. Mar. 30, 2011)).[10]

Dr. Papin points to two reasons why UMMC's decision to terminate his employment was "not careful and deliberate." First, Dr. Papin argues UMMC did not investigate the complaints against him, pointing specifically to the sexual harassment allegation and his attendance. [150] at 46-47. Second, Dr. Papin compares the investigation against him with UMMC's investigation of another resident. *Id.* at 47.

The Court first disposes of Dr. Papin's comparison of his case to the Resident 76 investigation. Dr. Papin bases this argument on an unpublished opinion from the District Court of South Dakota, and the Court need not consider it. But even if it did, the comparison between Dr. Papin's case and Resident 76's is unpersuasive. UMMC terminated Dr. Papin's employment based on the identified problems with his professionalism at work. *See generally* [140-36]. In contrast, the case against Resident 76 involved sexual assault allegations at an off-campus party. [150-12] at 5. Any UMMC investigation of professional misconduct occurring *at* UMMC is necessarily going to differ from an investigation of off-campus sexual misconduct. A comparison of the two investigations, then, does not affect whether UMMC's decision was careful and deliberate.

---

[10] Dr. Papin cites this case and argues the District of South Dakota case holds a decision is arbitrary and capricious where a university handles one student's case differently than others. [150] at 46. Because neither this Court nor the Fifth Circuit has explicitly adopted this reasoning, however, the Court will not apply this principle to its analysis here.

As to his other argument, Dr. Papin points to two ways the investigation against him was deficient. First, he argues UMMC failed to investigate the sexual harassment claim against him. [150] at 47. Dr. Papin, however, was not accused of sexual harassment but UMMC brought the allegation that "a female med student . . . had become uncomfortable around him" as another example of Dr. Papin's "unprofessional behavior." [140-16] at 114:16-20. Dr. Papin does not establish UMMC should have investigated this one allegation for its decision to be careful and deliberate.

Second, Dr. Papin contends an investigation into his attendance from the data available when he clocked in using his work badge would show that he "was always on time for work." [150] at 47. UMMC did not accuse Dr. Papin of arriving late to work, though. Rather, UMMC's notice states Dr. Papin left work while on duty and showed up late to rounds. [140-36] at 2-3.

The Court finds UMMC's process of terminating Dr. Papin's employment was careful and deliberate. UMMC gathered the complaints against Dr. Papin, and its HR representatives discussed these complaints with him. *See* [140-27]. The HR representatives then sent a recommendation for termination to UMMC, documenting several doctors' complaints about Dr. Papin and his refusal to take accountability for his actions. [140-28] at 1-3. After Dr. Papin's termination, UMMC conducted an appeal hearing in front of a competent panel of doctors. *See generally* [140-16]. That process of his termination was procedurally flawed does not mean UMMC's process was not careful and deliberate. *See Conroe Creosoting Co. v.*

41

*Montgomery Cnty., Tex.*, 249 F.3d 337, 341 (5th Cir. 2001) (citation omitted) (holding a substantive due process claim only lies where "the behavior of the government officer is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience").

The Court finds the concrete examples of Dr. Papin's alleged misconduct, though disputed by Dr. Papin, are related enough to UMMC's decision so as not to "'so lack[] a basis in fact' that it could be said to have been made 'without professional judgment.'" *See Jones*, 809 F.3d at 240 (quoting *Finch*, 333 F.3d at 562-63). The Court therefore grants UMMC's motion as to Dr. Papin's state and federal substantive due process claims.

C.    Qualified Immunity

Defendants argue qualified immunity bars the due process claims under § 1983 against Dr. Earl, Dr. Bondi, and Dr. Woodward in their individual capacities. To rebut Defendants' assertion of qualified immunity, Dr. Papin must establish each of the individual capacity defendants "(1) violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct." *Brinsdon v. McAllen Indep. Sch. Dist.*, 863 F.3d 338, 347 (5th Cir. 2017) (quoting *Morgan v. Swanson*, 659 F.3d 359, 371 (5th Cir. 2011) (internal quotations omitted).

Because the Court grants summary judgment to UMMC on both due process claims, there is no constitutional right violated by any of the Defendants. The Court

therefore grants the Defendants' summary judgment on their claims of qualified immunity.

> D.      Claims under § 213A of the Mississippi Constitution

Dr. Papin brings a claim under § 213A of the Mississippi Constitution against UMMC. Defendants argue this claim fails as a matter of law as it applies only to employees of the Board of Trustee for the Mississippi State Institutions of Higher Learning ("IHL"). [141] at 34-35. Dr. Papin does not respond to this argument. *See generally* [150].

Section 213-A gives management and control of Mississippi's universities to the IHL and holds that "all deans, professors[,] and other members of the teaching staff, and all administrative employees" shall be elected for terms not to exceed four years. Miss. Const. art. 8, § 213A. The section then states the IHL may terminate these term contracts "at any time for malfeasance, inefficiency, or contumacious conduct, but never for political reasons." *Id.* Dr. Papin does not argue he had a contract of employment under this section, and the Court finds he does not fit into the categories of employees covered by § 213A. Further, § 213A places limitations only on when IHL may terminate an employee's contract. Dr. Papin brings no claim against IHL. The Court therefore grants summary judgment for Defendants on this claim.

> E.      Mississippi Tort Claims Act

Defendants contend Dr. Papin's due process and 213A claims against UMMC under the Mississippi Constitution fail pursuant to the MTCA because UMMC's

actions here falls under the "discretionary function" exception to the statute. Because the Court grants summary judgment to Defendants on these claims, it does not address the MTCA as a defense and denies the Defendants' motion as moot.

Dr. Papin contends that Defendants assert the MTCA as a defense for his breach of contract claim. [144-1] at 24. Although the MTCA waives sovereign immunity for specific instances of tortious conduct, it does not apply when there is no sovereign immunity for the claims asserted in the first place. The Mississippi Supreme Court has held sovereign immunity does not apply to breach of contract claims. *See Stewart ex rel. Womack v. City of Jackson*, 804 So.2d 1041, 1050 (Miss. 2002) (holding that "[s]overeign immunity does not bar actions against the state or its political subdivisions brought on a breach of contract theory") (citation omitted). Thus, to the extent that UMMC asserts the MTCA as a defense for Dr. Papin's breach of contract claim, the Court denies UMMC's Motion for Summary Judgment.

F.      Breach of Contract Claim

UMMC argues Dr. Papin cannot establish his breach of contract claim on the House Officer Contract. [141] at 37-41. Dr. Papin asserts two contracts as the basis of his breach of contract claim—the House Officer Contract and the Remediation Agreement. 2d Am. Compl. [50], ¶¶ 69-80; Memo. in Opp. [150] at 31-37. Because UMMC raises the Remediation Agreement only in the Defendants' Reply [158] and accompanying memorandum [159], the Court denies summary judgment on the Remediation Agreement. *See United States v. Jackson*, 426 F.3d 301, 304 n.2 (5th

Cir. 2005) (citing *Knighten v. Comm'r*, 702 F.2d 59, 60 n.1 (5th Cir. 1983))

("Arguments raised for the first time in a reply brief . . . are waived.").

Dr. Papin contends UMMC breached these provisions for the House Officer

Contract:

(1)     UMMC "will provide an educational program for postgraduate training in keeping with established standards," [140-4] at II.1;

(2)     UMMC "will administer [Dr. Papin's] training program in accordance with the policies, rules and regulations of the Board of Trustee of Institutions of Higher Learning and the University of Mississippi," *id.* at II.2; and

(3)     "UMMC is empowered to terminate this contract at any time for malfeasance, inefficiency or contumacious conduct by [Dr. Papin]." *Id.* at IV.1.

The Court addresses each of these provisions in turn.

### 1.     Educational Program within Established Standards

Dr. Papin argues UMMC breached its contractual duty to provide an

educational program within established standards by failing to issue any written

warnings prior to terminating his employment. [150] at 32. Dr. Papin cites the

opinion of his expert, Dr. Anthony Watkins, to support his contention that a

program "in keeping with established standards" would require UMMC to provide

written evaluations of the deficiencies in his performance before termination.[11]

---

[11] Citing only to the general summary judgment standard of review, UMMC argues Dr. Papin's expert report is not competent summary judgment evidence. [150] at 8 n.7. UMMC

[144-5] at 2. He also points to UMMC's own policies and procedures in the Faculty and Staff Handbook and Evaluation Policy and Grievance Algorithm, both of which require written notice of deficiencies. *See* [144-7] at 40; [150-2] at 1. Dr. Papin points to Whitlock's deposition testimony that Dr. Papin had received no previous written warning about his conduct. [150-7] at 153:16-156:1. But Dr. Papin admits in his deposition that he *did* receive written evaluations of his performance at the end of each of his rotations. [144-2] at 50:21–51:19. While Dr. Papin believes these evaluations did not have enough specific explanations of his feedback, he does not explain how they are not enough to satisfy UMMC's policies. The Court therefore grants summary judgment on the breach of this provision.

2.      Policies, Rules, and Regulations of the Board of Trustees

Dr. Papin also contends UMMC breached the contract by failing to abide by the policies, rules, and regulations of the Board of Trustees because it failed to provide Dr. Papin an opportunity to cross-examine the witnesses against him. [150] at 32-33. In support, Dr. Papin submits only the minutes of a meeting of the Board of Trustees, where the Board voted to require another due process hearing with a right of confrontation for Dr. Neva Eklund, a tenured faculty member UMMC was seeking to fire. [144-27]. But in those minutes, the Board of Trustees does not adopt a general policy or rule requiring a right of confrontation in all termination proceedings, but specifically addresses only Dr. Eklund's hearing. *Id.* The Court

---

has not moved to exclude Dr. Watkins' testimony at trial, however, and makes no argument that his report does not comply with Fed. R. Civ. P. 26(a)(2)(B).

finds Dr. Papin's evidence does not support a breach of this provision and grants summary judgment as to this issue.

### 3. Malfeasance, Inefficiency, or Contumacious Conduct

Dr. Papin also argues UMMC breached the House Office Contract because it terminated his employment for reasons other than "malfeasance, inefficiency, or contumacious conduct." [150] at 33. Dr. Papin misreads the contractual language. Though UMMC is "*empowered* to terminate this contract at any time for malfeasance, inefficiency or contumacious conduct," [140-4] at IV.1 (emphasis added), the contract does not state UMMC can terminate for those reasons only. Rather, the Faculty and Staff Handbook, which Dr. Papin admits is incorporated into the House Officer Contract, [150] at 32, states that UMMC "reserves the right to discipline, suspend or terminate an employee for cause," including "leaving work early or leaving the job during working hours without authorization;" "violation of department work rules or procedures;" "inefficiency, negligence in the performance of duty or lack of attention to work;" "incompetence, inefficiency, or conduct detrimental to patient care or general safety;" "refusal to perform duties as required by supervisors, insubordination, neglect of or inattention to duty;" "sleeping or leaving your assigned work area during work hours without permission of your supervisor;" "failure to maintain satisfactory interpersonal relationships with co-workers and supervisors;" "inappropriate behavior toward, or discourteous treatment of patients, students, visitors, or co-workers including the use of

profanity and other harassing statements;" and "violation of the disruptive behavior policy." [140-46] at 46-47.

Nevertheless, because Dr. Papin produces evidence refuting each of the specific allegations of misconduct against him, the Court finds a genuine issue of fact exists as to whether UMMC had cause to dismiss him. In its Notice Letter for Dr. Papin's appeal, UMMC lists only eight specific instances of misconduct as cause for his termination: (1) the argument with Sabins; (2) lying about checking the decubitus ulcer patient; (3) the cup of coffee taken into a patient's room; (4) the failure to communicate the transfer of a patient to the ICU; (5) Dr. Papin leaving while on duty to go on a run; (6) his failure to respond to a code on his patient; (7) attempting to discharge a patient not competent to leave; and (8) failing to wash out a wound after being told to do so. [140-36] at 2-4.

Dr. Papin testified his argument with Sabins was based on a miscommunication between what Sabins told him and what Dr. Shake told him. [144-2] at 40:25-42:10. In an email to Dr. Earl, Dr. Berger, an attending physician on Dr. Papin's rotation, did not suggest the incident was cause for termination but stated Dr. Papin would "benefit from a mentor who can help him navigate the system and get him off to a good start." [140-7] at 2. She even hinted that Sabins was an issue because Dr. Papin felt "apprehensive" of him and believed the situation could produce "a potential hostile work environment." *Id.* She also explained Dr. Papin did not receive the CVICU policy that he could not have coffee in a patient's room. *Id.*

48

Dr. Papin categorically denies ever lying about examining the ulcer patient, failing to tell ICU staff about an incoming transfer, or failing to wash out the wound of a patient as ordered. [144-2] at 149:17-24, 167:14-170:25, 188:6-191:2. And he claims to have only gone on a run while on duty with Dr. Mahoney's permission. *Id.* at 126:11-25; *see also* Mahoney Text Messages [144-14] at 1.

Dr. Papin explains not responding to his patient coding by saying he did not know it was his patient. [144-2] at 130:5-25. He said he never had a patient code before and that the PA system announces the code and the floor but not the patient or doctor. *Id.* He testified he did not learn it was his patient until after he left, and no one ever told him to return. *Id.* at 131:12-20.

Finally, as for the attempt to discharge a patient, Dr. Papin said the orders to discharge "came from the chief," meaning Dr. Ray,[12] and he just reported them to the discharge nurse, who refused to do it. *Id.* at 182:6-14. When Dr. Ray asked him if the patient needed a ride and if that was why the nurse refused to discharge, Dr. Papin explained the patient was planning to drive his own car. *Id.* at 182:24-183:2. Dr. Ray then told him to hold discharge because he would not be clear to drive, which Dr. Papin did, but advised the patient would likely leave against medical advice. *Id.* at 183:3-8.

The Court finds a genuine dispute of fact exists as to whether UMMC had cause to terminate Dr. Papin's employment, and this issue is appropriate for the jury to resolve. It therefore denies summary judgment on this claim.

---

[12] Dr. Ashley Griffin Ray is also called "Dr. Griffin" in the record.

G.     Mitigation

Defendants argue Dr. Papin failed to mitigate his damages and should

therefore be "denied any monetary damages for loss of earning capacity/income as a

physician/surgeon." [141] at 41-42. Failure to mitigate is an affirmative defense,

and Defendants bear the burden to establish this claim at trial. *See, e.g.*, *Equal*

*Emp. Opportunity Comm'n*, 172 F. Supp. 3d 941, 958 (N.D. Miss. 2016); *Fed.*

*Deposit Ins. Corp. v. Niblo*, 821 F. Supp. 441, 453 (N.D. Tex. 1993); *Fed. Sav. &*

*Loan Ins. Corp. v. Shelton*, 789 F. Supp. 1367, 1372 (M.D. La. 1992). To obtain

summary judgment on this defense, Defendants "must establish beyond

peradventure *all* of the essential elements of the claim or defense to warrant

judgment in [their] favor." *Dewan v. M-I, L.L.C.*, 858 F.3d 331, 334 (5th Cir. 2017)

(emphasis in original) (quoting *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th

Cir. 1986)). "[T]he 'beyond peradventure' standard is 'heavy.'" *GoForIt Ent., LLC v.*

*DigiMedia.com LP*, 750 F. Supp. 2d 712, 722 (N.D. Tex. 2010) (quoting *Carolina*

*Cas. Ins. Co. v. Sowell*, 603 F. Supp. 2d 914, 923 (N.D. Tex. 2009)).

Though Defendants argue Dr. Papin failed to mitigate damages because he

did not attempt to match with another residency program in 2017, 2018, or 2019,

[141] at 42, Dr. Papin explains he sought more education during this time and,

though he believed seeking a match would be futile, he did enter the matching

program in 2020 and failed to obtain a placement. [144-2] at 11:5-13:21. The Court

finds this evidence is enough to prevent Defendants from meeting their "heavy"

burden of establishing Dr. Papin failed to mitigate damages "beyond peradventure." The Court denies Defendants' motion on this issue.[13]

> H.   Money Damages against UMMC and Dr. Woodward in her official capacity

Defendants argue Dr. Papin cannot seek monetary damages against UMMC and Dr. Woodward in her official capacity for violating his due process rights under § 1983. [141] at 42-43. The Court notes that Dr. Papin does not bring a § 1983 claim against UMMC but brings only a due process claim under the Mississippi Constitution. *See* [50]. Dr. Papin further specifies he is seeking only injunctive relief under § 1983 against Dr. Woodward in her official capacity. [150] at 52. As a precautionary measure, though, the Court grants summary judgment on this issue, and Dr. Papin will not be allowed to seek monetary damages on any § 1983 claim against UMMC or Dr. Woodward in her official capacity.

> I.   Punitive Damages

Defendants contend Dr. Papin's claims for punitive damages against Defendants fail as a matter of law. [141] at 43-44. Dr. Papin responds he is entitled to punitive damages for his § 1983 claims and his breach of contract claims. Because Dr. Papin admitted he is not entitled to, nor does he seek, any monetary damages

---

[13] The Court further notes that the case Defendants largely rely on, *Powers v. Northside Independent School District*, speaks specifically of the duty to mitigate under the Texas Whistleblower Act and does not apply here. 951 F.3d 298, 308-09 (5th Cir. 2020). The other cases cited either recognize that "[m]itigation of damages is ordinarily a question of fact for the jury to decide," *Off. of the Att'y Gen. of Tex. v. Rodriguez*, 535 S.W.3d 54, 85 (Tex. Ct. App. 2017) (citation omitted) or discuss mitigation as a generally available defense in Mississippi jurisprudence with no further analysis. *Gulf Coast Rsch. Lab. v. Amaraneni*, 722 So. 2d 530, 544 (Miss. 1998).

against Dr. Woodward in her official capacity, *see supra* Section III.H, the Court must determine whether summary judgment is appropriate on Dr. Papin's request for punitive damages based on breach of contract claims against UMMC.

The Mississippi Supreme Court has explicitly stated that "the State is not immune from suit from breach of its written contractual obligations." *Weible v. Univ. of S. Miss.*, 89 So. 3d 51, 60 (Miss. Ct. App. 2011) (citing *City of Jackson v. Estate of Stewart ex rel. Womack*, 908 So. 2d 703, 710-11 (Miss. 2005). Because § 11-46-15(2) applies only to actions where immunity has been waived by the MTCA and because immunity does not apply to either the breach of contract or violation of state due process claims, the MTCA does not bar punitive damages against UMMC for these claims.

IV.    Dr. Papin's Motion for Partial Summary Judgment [141]

Dr. Papin argues the Court should grant summary judgment on his Mississippi procedural due process claims against UMMC and Defendants' defense under the MTCA on his breach of contract claim. [145] at 18-25. When the plaintiff moves for summary judgment on a claim, he bears the burden of proof, he "must establish beyond peradventure *all* of the essential elements of the claim or defense to warrant judgment in [their] favor." *Dewan*, 858 F.3d at 334 (emphasis in original) (quoting *Fontenot*, 780 F.2d at 1194 (5th Cir. 1986)). "[T]he 'beyond peradventure' standard is 'heavy.'" *GoForIt Ent.*, 750 F. Supp. 2d at 722 (quoting *Carolina Cas. Ins. Co.*, 603 F. Supp. 2d at 923 (N.D. Tex. 2009)).  If Dr. Papin meets this burden,

Defendants must "establish an issue of fact that warrants trial." *Id.* (citing *Smith v. Reg'l Transit Auth.*, 827 F.3d 412, 420 n.4 (5th Cir. 2016)).

A.      Procedural Due Process Claims

The facts surrounding the notice and process Dr. Papin received are undisputed. As the Court discussed, UMMC afforded Dr. Papin a proper pre-termination hearing and an opportunity to be heard during his post-termination hearing, and therefore did not violate his right to procedural due process. *See supra* Section III.A. For those reasons, the Court finds Dr. Papin is not entitled to summary judgment against UMMC on his due process claim under the Mississippi Constitution and denies his motion.

B.      Application of Mississippi Tort Claims Act to Dr. Papin's Breach of Contract Claim

Dr. Papin asks the Court for summary judgment on the MTCA's inapplicability to his breach of contract claim. As explained above, UMMC is not immune from suit for breach of contract under the MTCA. *See supra* Section III.E. The Court grants Dr. Papin's motion on this issue.

V.    Dr. Papin's Remaining Motions

Dr. Papin's remaining motions both involve improper arguments and evidence Defendants raised in their summary judgment reply briefs. His Motion for Leave to File Sur-reply [160] requests an opportunity to respond to new arguments Defendants raised in their Reply [158] and Memorandum in Support [159]. His Motion to Strike [161] asks the Court to strike the expert testimony and opinions of

Dr. Rebecca McAlister attached as exhibits to Defendants' Reply [158].[14] Because it did not rely on these new arguments or the challenged exhibits in its rulings, the Court denies these motions as moot.

VI.     Conclusion

The Court has considered all the arguments set forth by the parties. Those arguments not addressed would not have changed the outcome of the Court's decision. For these reasons, the Court GRANTS IN PART and DENIES IN PART the Defendants' Motion for Summary Judgment [140]. The Court DISMISSES WITH PREJUDICE these claims: (1) the procedural due process claim under the United States and Mississippi Constitutions against UMMC; (2) the substantive due process claim under the United States and Mississippi Constitutions against UMMC; (3) the substantive due process claims against Dr. Woodward in her official capacity; (4) all claims against Dr. Earl, Dr. Woodward, and Dr. Bondi in their individual capacities; (5) the Section 213-A claim against UMMC; (6) the breach of contract claim against UMMC based on the failure to provide an educational program within established standards as required by the House Officer Contract; (7) the breach of contract claim against UMMC based on the failure to abide by the policies, rules, and regulations of the Board of Trustees as required by the House Officer Contract; and (8) any claim for monetary damages under § 1983 against UMMC and Dr. Woodward in her official capacity.

---

[14] Dr. Papin's Motion to Strike [161] is not a motion to exclude Dr. McAlister at trial, as such as motions were due February 26, 2021, over a month before Dr. Papin moved to strike. *See* Text-Only Order dated June 23, 2020.

The Court also GRANTS IN PART and DENIES IN PART Dr. Papin's Motion for Partial Summary Judgment [144]. The Court finds UMMC afforded Dr. Papin a proper pre-termination hearing and presented him with an adequate opportunity to be heard in his post-termination hearing. UMMC therefore did not violate his right to procedural due process under the Mississippi Constitution, and the Court denies partial summary judgment on this claim.

The Court further finds UMMC is not immune from suit for breach of contract under the MTCA. The Court grants Dr. Papin's partial summary judgment as to this defense.

The Court further denies as moot Dr. Papin's Motion for Leave to File Sur-reply [160] and Motion to Strike [161].

SO ORDERED AND ADJUDGED this the 31st day of August, 2021.

s/ *Kristi H. Johnson*
UNITED STATES DISTRICT JUDGE