IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION


JOSEPH PAPIN                          PLAINTIFF

VS.                                   CIVIL NO. 3:17-CV-00763

UNIVERSITY OF MISSISSIPPI             DEFENDANT
MEDICAL CENTER




JURY TRIAL

VOLUME I


BEFORE THE HONORABLE KRISTI H. JOHNSON
UNITED STATES DISTRICT JUDGE

OCTOBER 11, 2022
JACKSON, MISSISSIPPI




APPEARANCES:

FOR THE PLAINTIFF:
 C. RYAN MORGAN, ESQUIRE
 JOHN A. WAITS, ESQUIRE
 GREGORY SCHMITZ, ESQUIRE


FOR THE DEFENDANT:
 PAUL B. WATKINS, JR., ESQUIRE
 JOHN ANDREW MAULDIN, ESQUIRE



REPORTED BY:  SHERRI L. PENNY, RPR, FCRR
              Mississippi CSR #1609
              2012 15th Street, Suite 403
              Gulfport, Mississippi  39501
              (228) 563-1781

1                        **TABLE OF CONTENTS**

2                           **VOLUME I**

3

4       Exhibits J-1 through J-16 Admitted   ...................3

5     Voir Dire Examination by The Court   ...................17

6     Voir Dire Examination by Mr. Morgan   ..................44

7     Voir Dire Examination by Mr. Watkins   .................62

8   Preliminary Instructions to the Jury   ..................108

9   Opening Statement by Mr. Morgan   .......................116

10  Opening Statement by Mr. Watkins   ......................135

11  WITNESSES CALLED ON BEHALF OF THE PLAINTIFF:

12  PATRICIA WHITLOCK

13    Direct Examination By Mr. Schmitz   ...................149

14      Exhibit P-67   ....................................160

15      Exhibit P-25   ....................................207

16  Reporter's Certificate ................................220

17                              - - -

18

19

20

21

22

23

24

25

1      (EXHIBITS J-1 THROUGH J-16 MARKED)

2        **THE COURT:**  So I mentioned at the pretrial conference

3  how we're having the jurors fill out the COVID questionnaires.

4  So we got lucky this time, and we only have one that has some

5  type of indication that they may have been exposed to COVID.

6  Mr. Allen has brought that juror up.  So before we dive in and

7  bring the rest of the jurors in, I'm going to bring this juror

8  in and see exactly what her exposure is before we put her with

9  the group and bring them in here.  So we're going to go ahead

10  and do that.

11      If you will, Mr. Allen, if you will bring her in.

12  Counsel, this is Juror No. 22.  Her name is Lisa Willoughby.

13      Good morning, Ms. Willoughby, if you will come forward for

14  me at the podium.  Good morning.

15        **MS. WILLOUGHBY:**  Good morning.

16        **THE COURT:**  How are you?

17        **MS. WILLOUGHBY:**  I am good, thank you.

18        **THE COURT:**  We have had all the jurors fill out this

19  questionnaire just to make sure before we bring everybody in

20  the room and expose each other to something, I just want to

21  make sure that know one has been recently exposed to COVID.

22  With respect to your questionnaire, it looks like that you have

23  no symptoms whatsoever, but the reason I brought you up is you

24  have checked the box that says that you have had contact with

25  someone in the last 14 days that has tested positive for COVID?

1          **MS. WILLOUGHBY:**  I work in a pharmacy, so that's -- I

2     am around it, yes, ma'am.  I'm around it every day, but I just

3     wanted to be truthful about that.  But I have no symptoms.  I

4     mean, I do wait on them, but I have been vaccinated, so I think

5     I'm -- I just wanted to be truthful that I do work in a

6     pharmacy, around it most days, but I have not -- like a family

7     member or anything like that, no, I have not been exposed.

8          **THE COURT:**  With respect to co-workers, has anyone

9     recently tested positive?

10         **MS. WILLOUGHBY:**  No, ma'am.

11         **THE COURT:**  Wonderful.  And no symptoms whatsoever?

12         **MS. WILLOUGHBY:**  No, ma'am.

13         **THE COURT:**  Any questions from plaintiff's side?

14         **MR. MORGAN:**  No.

15         **THE COURT:**  Any from the defense?

16         **MR. WATKINS:**  No, Your Honor.

17         **THE COURT:**  Thank you so much.  Mr. Allen, if you

18    will bring her back with the rest of the jurors, I just need a

19    couple more minutes with the attorneys and we'll bring the rest

20    of the jurors up here.  Thank you.  First of all, good morning.

21         **MR. MORGAN:**  Good morning.

22         **THE COURT:**  I think right now this may be -- last

23    week we had the most jurors we ever had in the courtroom.  I

24    assisted with selecting grand jury, but I think today is the

25    most folks we have had at counsel table so far.  I am going to

1    go ahead -- I want to talk about a couple of matters before we

2    bring the jury in.  The first thing I want to take up, looking

3    through the jury instructions over the weekend, and because of

4    the -- because of Mississippi law, how it works with respect to

5    punitive damages is, counsel, you can't get into punitives

6    until there's a finding of liability.  And because the verdict

7    form, the way it was drafted from the plaintiffs, punitives

8    were included in that verdict form.  So I just wanted to make

9    clear that we won't get into a punitive damage phase until

10   there's a finding of liability.  So if there is a finding of

11   liability, we'll have the jury leave the room, I will let

12   counsel for both sides make an argument why punitives are or

13   are not appropriate.  I will make the decision then whether

14   they're appropriate.  If they are, then the jury will come back

15   in, I will allow you to make argument to the jury as to why

16   punitives are or are not appropriate, and then we will send

17   them back to deliberate a second time.

18       So I just wanted to be clear.  I don't know how it is in

19   other states, but there's a particular statute in Mississippi

20   that says there has to be a finding of liability first.

21       Also, we took up, I think it was last week, we took up the

22   matter of some subpoenas that were issued.  And we had a

23   telephone conference on October 3 with respect to subpoenas

24   that the plaintiff had issued to a number of UMMC employees.

25   And in the call, I allowed counsel to make argument for both

1   sides and then gave plaintiff's counsel time to file an actual

2   -- actually, both sides, because I think at that point the

3   defense hadn't filed an actual motion yet.  So they have now

4   filed their motion to quash; the plaintiff was given an

5   opportunity to respond.  And I simply did a text order for

6   purposes of expediency on the docket, but just want to state

7   briefly on the record there were some individuals that

8   subpoenas were issued, and from that phone conversation, the

9   takeaway was that the plaintiff wanted these individuals for

10  purposes of exhibits, which involve an audit trail.  And there

11  were some discussions about the actual nature of the testimony.

12  My initial thought was that the testimony was simply going to

13  be to authenticate the audit trail, and it sounds like the

14  defense doesn't have any objection to the authenticity of the

15  audit trail.  But from the discussions, it sounded like the

16  plaintiff needed it more for explaining what the audit trail

17  was.  And so because of that, I found that that testimony is

18  substantive in nature, and because of it these witnesses, at

19  least one of them, should've been identified in discovery.

20  Here, discovery ended I think it's back in February of 2021.

21  So any individual that was going to be used for substantive

22  testimony would need to have been disclosed by then.

23       Under Rule 37(c), Federal Rules of Civil Procedure, if a

24  party fails to provide information or identify a witness as

25  required by Rule 26(a) or (e), the party is not allowed to use

1    that information or a witness to supply the evidence on a

2    motion at a hearing or at trial unless the failure was

3    substantially justified or is harmless.

4        I have read through the arguments made by plaintiff and

5    their motion and I don't find that the failure was

6    substantially justified.  It was a matter of the plaintiff

7    wasn't aware the nature of the objections to the document until

8    after the pretrial conference; however, the plaintiff wouldn't

9    know the objections to, really, any of their exhibits before

10   the close of discovery.  So because of that, as a preemptive

11   measure, these witnesses should've been identified.  So for

12   that reason, the Court granted the motion to quash.

13       I saw yesterday evening that the defense has filed a trial

14   brief with respect to testimony or evidence coming in as to

15   other residents, which is the basis of a motion in limine that

16   I had ruled on.  And I looked back over that over the weekend

17   and then have read the trial brief.

18       Anything that I have ruled on a motion in limine, it is a

19   preliminary ruling in the sense of you can take it up at any

20   point.  So if there's something that is raised during the trial

21   with respect to another resident, if defense counsel wants to

22   object to that particular entry of evidence, then I can take it

23   up then.

24       Anything else we need to take up before we bring the jury

25   in?  Do we want to kind of go back over the jury selection

1    process and how many jurors or does everybody remember that?

2            **MR. MORGAN:**  I would like to go over that briefly,

3    but I did have two other things that I did want to ask the

4    Court.

5            **THE COURT:**  Okay.

6            **MR. MORGAN:**  In regards to the motion in limine you

7    were just touching on, if you recall there were some objections

8    to certain exhibits, as well as one of the witnesses as it

9    relates to future lost damages.  And, obviously, in your order

10   on the motion in limine you ruled that we cannot seek that.

11           **THE COURT:**  Correct.

12           **MR. MORGAN:**  We have researched this, and I know it's

13   a preliminary ruling.  As you just said, it could theoretically

14   change at any point in time.  But for efficiency in trying to

15   coordinate schedules, I was hoping to get a confirmation of

16   that order from Your Honor on the record as such so we don't

17   have to have all that evidence -- we could basically withdraw

18   those objections and whatnot and sort of make things more

19   efficient and quicker here.

20           **THE COURT:**  Are you talking about with respect to

21   your expert that was going to testify as to future lost wages?

22           **MR. MORGAN:**  Correct.  Also, there's a few exhibits

23   that sort of relate to that, too.

24           **THE COURT:**  With respect to that ruling, I stand by

25   that ruling in that in this breach of contract, the plaintiff

1    is not entitled to future lost wages.  So whatever evidence you

2    have, whether it be witnesses or exhibits, those will not be

3    allowed at trial.

4             MR. MORGAN:  Thank you.  And then the second question

5    was on the jury instructions about just kind of timing of when

6    we would discuss those and work that out because, obviously,

7    they are drastically different from one another.

8             THE COURT:  Right.  So what I typically do is closer

9    to the end of trial, so I would think maybe mid next week,

10   maybe even early next week, I will send out to both sides the

11   Court's draft jury instructions, and it's something I will have

12   cobbled together from the instructions that have been submitted

13   by both parties.  I'll give you enough time to review the

14   proposed instructions.  We will go back in the conference room

15   off the record and talk through the jury instructions, let both

16   sides make arguments or suggestions as to those jury

17   instructions.  We will tweak them accordingly, if we see fit,

18   then we'll come back in the courtroom with the court reporter

19   and put any remaining objections on the record.

20            MR. MORGAN:  Okay.

21            THE COURT:  So it will be sometime -- given the

22   length of trial that the parties predict, I do it about

23   three-fourths of the way through the trial.

24            MR. MORGAN:  Okay.

25            THE COURT:  Does that help?

1        **MR. MORGAN:**  It does because I wanted to be sure we

2   were able to make some legal argument against defendant's

3   instructions.

4        **THE COURT:**  Yes, you will certainly get that

5   opportunity.  Also, just kind of a recap on the jury selection

6   process, if you remember from the pretrial conference we're

7   going to be doing blind strikes, so you're going to get three

8   strikes per side.  We are going to select eight jurors total.

9   If all jurors are left standing at the end, we have no

10   alternates, in essence.  So if all are left standing at the

11   end, then all eight will deliberate.  Okay?

12        **MR. MORGAN:**  The only other question I did have, Your

13   Honor, was on -- plaintiffs had filed a motion for judicial

14   notice, I believe it was on Thursday or Friday of last week,

15   and the defendants filed a response either yesterday or the day

16   before.

17        **THE COURT:**  And I have seen the motion and I have

18   seen the response.  My thought is let's get to the point in the

19   trial where you're intending to use it so I can see what the

20   relevance of it is, and then I can make that ruling then.

21        **MR. MORGAN:**  Perfect.  Thank you.

22        **THE COURT:**  And I'll let you make arguments then,

23   too, if necessary.  Just based on the motion and the response,

24   the response, in essence, is you haven't said how it's

25   relevant.  So I think that if we get in trial and I can see

```
 1   where we're going with it, then it will be an easier ruling to
 2   say judicial notice, we'll let it in.
 3               MR. MORGAN:  Understand.
 4               THE COURT:  I'm going to have both sides, just for my
 5   benefit, can everybody stand up and just say who you were.  I
 6   know most of the attorneys.
 7               MR. MORGAN:  Ryan Morgan.
 8               MR. SCHMITZ:  Gregory Schmitz.
 9               MR. PAPIN:  Joe Papin.
10               MR. WAITS:  John Waits for the plaintiff.
11               THE COURT:  All right.
12               MR. WATKINS:  Paul Watkins.
13               MR. MAULDIN:  Drew Mauldin.
14               DR. EARL:  Dr. Mark Earl.
15               THE COURT:  Great.  Thank, you all.  You may be
16   seated then.  So it's Papin; right?
17               MR. PAPIN:  That's right.
18               THE COURT:  We have said it both ways, so I wanted to
19   doublecheck.
20       Anything else before we bring in the jury?  I think we're
21   ready, Mr. Allen.  Do you need anything else from me?
22               COURT SECURITY OFFICER:  No, ma'am.
23               THE COURT:  I am going to leave the courtroom, that
24   way she can open court formally.
25           (PROSPECTIVE JURORS IN AT 9:16 A.M.)
```

1          **THE COURT:**  Counsel, if you wish you can turn your

2   chairs around.  I know it's not the most comfortable set-up.

3   You can also, if you need to, you can pull your chairs to the

4   other side of the table.  Whatever you would like to do is fine

5   with me.  Are the parties ready to proceed, I will ask the

6   plaintiff first?

7          **MR. MORGAN:**  Yes, Your Honor.

8          **THE COURT:**  Is the defense ready to proceed?

9          **MR. WATKINS:**  Yes, Your Honor.

10          **THE COURT:**  Thank you.  Good morning.  Today we are

11   here in the case of Papin versus University of Mississippi

12   Medical Center, it's case number 3:17cv763.

13          My name is Kristi Johnson and I am one of the United

14   States District Court judges here in the Southern District of

15   Mississippi.  And you have been summoned here today as a panel

16   of potential jurors to serve on a civil case.  So this is a

17   civil case, not a criminal case.  But I want to welcome you to

18   the Court, and I want to say thank you for being here this

19   morning.  I am fully aware that there are other places that you

20   would rather be.  I promise you that if you are selected to

21   serve as a juror and as you go through this process, that I

22   will respect your time.

23          I hope that you recognize that jury service is one of the

24   highest duties of citizenship.  Our system of justice depends

25   on good jurors like yourself, good citizens like yourself to

1    serve in our federal courtrooms throughout the nation every

2    day.  And I know that if any of you were ever a party to a

3    case, whether as a plaintiff or a defendant, you would want

4    jurors much like yourself to serve.

5        I will say that at the end of every trial that I have ever

6    had, I go and speak to the jurors afterwards, and most of them

7    confess that they were not excited that they were selected, but

8    they really truly did enjoy the process and were surprised of

9    how much they did enjoy the process.  So please keep an open

10   mind as we go through this jury selection process today.

11       I want to introduce a couple folks in the courtroom today,

12   some of the Court staff.  In front of me is Ms. Rita Thomas,

13   she's my courtroom deputy.  She's going to be the keeper of the

14   exhibits and keep me on track as we go through this trial.  I

15   also have law clerks, which are folks that have gotten out of

16   law school, and all three have passed the bar, and this is

17   their first stop before they go into private practice.

18   Ms. Elena Peters is over here in the corner.  She's going to be

19   the lead law clerk on this case.  I have Mr. Will Brand and

20   Mr. Hunter Ransom, who are over here sitting in the jury box.

21   Our Court Security Officer, who I know you have already met,

22   Mr. Richard Allen, he's going to help navigate you all through

23   this process as we do jury selection.  And then also, we have

24   Ms. Sherri Penny, who is our court reporter today.  And it's

25   her responsibility to take down everything that any of us say.

1    So it's very important if you are asked to stand and speak that

2    you speak loudly, clearly and slowly to make sure that we are

3    creating a good record today.

4        I am going to introduce or have the lawyers introduce

5    themselves to you a little bit later.  But if you have seen any

6    of them in the courtroom or in the courthouse so far and they

7    have not spoken to you or smiled at you, please do not take

8    that out on them.  They know what the Court rules are, and it's

9    that they have to avoid the appearance of any type of

10   impropriety, so they cannot speak to you.  I know it's not very

11   southern, but we have to be careful to make sure that someone

12   doesn't see an attorney talking to you and then another side

13   think some impropriety has occurred.  So just keep that in mind

14   if you see any attorney or any of the parties and they don't

15   speak to you or refuse to get on the elevator with you.

16       Now, I am going to talk just very briefly about COVID

17   procedures.  You all filled out that questionnaire just to make

18   sure we don't bring anybody in here that has any symptoms.  I

19   see everyone either has on no mask or has on a jury shield,

20   which is exactly what I was going to say next.  If you want to

21   wear a mask or a jury shield during the jury selection process,

22   I need it to be a jury shield.  The right to select a jury is a

23   constitutional right, so the parties need to not only hear what

24   you say, but they need to see your non-verbal expressions and

25   see your faces, so thank you all.  When you are ultimately

1    selected to serve on a jury, no one has to wear a mask, you

2    don't have to wear a face shield unless you just want to.  But

3    once you are selected, if you would prefer to wear a mask you

4    are certainly welcome to, but during this process, I need you

5    to wear a shield.

6         Now, one of the privileges and honors that I get serving

7    as a United States District Judge is I get to preside over

8    naturalization ceremonies, and it's when individuals have spent

9    years and years trying to gain citizenship the legal way in

10   this country.  And surprisingly, one of the rights that they

11   are most excited about after they are naturalized and become a

12   citizen is jury service.  So please do keep that in mind as we

13   go through this process.  Our system of justice is designed in

14   such a way that we resolve disputes in the courtroom, we don't

15   take it out back and fight it out.  We resolve them in a

16   courtroom with a jury of our peers making the decision for us.

17   So I think it's one of the many things that make our country so

18   great, and you're going to participate in that process today.

19        Now, as this case progresses, I am going to do everything

20   I can to make sure that we move along at the appropriate pace.

21   There's going to be a lot of times during the trial that I am

22   meeting with the lawyers after-hours; I am meeting with them in

23   the mornings, after you leave for the day, sometimes on the

24   lunch break.  And I am doing that to make sure your time is

25   respected, but keep in mind that there will be delays.  It's

1  trial.  It's not like we see on TV where we start at 9:00, end
2  at 10:00 and we come to a resolution.  Just keep in mind if you
3  are ever sitting back in the jury room and you're wondering
4  what the heck is going on in here, I promise you all that we
5  are not goofing off, we are trying to handle business and
6  trying to move things along quickly.

7      I am going to tell you a little bit about this case.
8  Again, I said it's a civil case.  But keep in mind that nothing
9  that I say is evidence.  I am simply giving you a little bit of
10 information so that when we ask you questions, we can ask
11 appropriate questions and you know how to respond given what
12 the general idea of the case is.

13     For example, we need to find out have you seen anything
14 about this case, have you heard anything about this case.  So
15 in order for me to ask those questions, I need to give you a
16 general overview to make sure we get a jury that's going to be
17 fair and impartial.

18     So here the plaintiff in this case is Joseph Papin.  He is
19 a medical doctor.  Defendant, University of Mississippi Medical
20 Center, also known as UMMC, you will here that acronym probably
21 throughout today, employed Dr. Papin as a surgical medical
22 resident.  Dr. Papin and UMMC had an employment contract.  The
23 contract allowed UMMC to fire Dr. Papin only in certain
24 circumstances.  In 2017, UMMC terminated Dr. Papin's
25 employment.

1    Dr. Papin alleges that UMMC breached the employment

2    contract by firing him for a reason other than those allowed by

3    the contract.  UMMC denies the allegation arguing it had proper

4    grounds to fire him because of performance issues.

5    The attorneys predict that the trial will last nine days,

6    that's counting today, depending how quickly we can get through

7    jury selection.  We'll start each day at 9:00 and end at 5:00.

8    Along with lunch breaks, we'll have a morning break every

9    morning and we'll have an afternoon break.

10    Again, my goal is to make the process as comfortable as

11    possible for the jurors that are ultimately selected because I

12    want this experience to be so pleasant you go tell your family

13    and friends so then they show up for jury duty.

14                **VOIR DIRE EXAMINATION BY THE COURT**

15    **THE COURT:**  What we're going to do now is we're going

16    to select the jury.  And this is a process that you probably

17    have heard on TV called voir dire.  It is a French term that

18    simply means to speak the truth.  It's where I am going to ask

19    you some questions, and then I am going to give the attorneys

20    an opportunity to ask you some questions to figure out who from

21    this group are the best jurors to serve in this particular

22    case.

23    None of the questions that any of us are going to ask

24    today are designed to embarrass anyone.  I don't anticipate we

25    have any questions like that; however, if at any point I ask

1   you something or an attorney asks you something that you don't

2   want to respond for the entire group to hear, just let me know

3   and we can do a sidebar.  And it is simply you will come up

4   here to the bench with the attorneys with me, and you can

5   disclose to me then what it is you need to tell me.  So keep

6   that in mind if there's anything I ask you that you would

7   rather not disclose to the entire room.

8       So at this point, we are going to go ahead and start that

9   process.  Before we start picking the jury, I have to make sure

10  each of you are actually qualified to serve as a juror in the

11  United States District Court for the Southern District of

12  Mississippi.  So I am going to list a number of qualifications.

13  And listen carefully because I am just going to read through

14  this list slowly, and when I get to the end I need you to raise

15  your hand if you fail to meet any of these qualifications.

16      In order to qualify to serve on a jury in the United

17  States District Court for the Southern District of Mississippi,

18  you must meet these qualifications:  You must be a citizen of

19  the United States; you must be at least 18 years old; you must

20  have resided at least one year in the Southern District of

21  Mississippi; you must be able to read, write, and understand

22  English well enough to have filled out the jury qualification

23  form; you must be able to speak the English language; you must

24  be mentally and physically capable of rendering satisfactory

25  jury service; and there must not be any pending charges against

1   you or convictions in state or federal court of any crime

2   punishable by imprisonment for more than one year for which

3   your civil rights have not been restored.

4        If you fail to meet any of those qualifications, please

5   raise your hand for me.  I see no hands.

6        Next, I'm going to tell you about certain exemptions from

7   jury service.  If you fall within one of them, you are actually

8   barred from serving on a jury.  So listen to this list

9   carefully for me.  If you are an active duty member of the

10  Armed Forces of the United States; you are a member of the fire

11  or police department of any state, district, territory,

12  possession, or subdivision thereof; or you are a public

13  official in the executive, legislative, or judicial branches of

14  government who are actively engaged in the performance of

15  official duties.  Does anyone fall under those categories?  I

16  see a hand.

17        **PROSPECTIVE JUROR:**  Volunteer firefighter, does that

18  sound --

19        **THE COURT:**  What was your juror number?

20        **PROSPECTIVE JUROR:**  Number 19.

21        **THE COURT:**  Number 19.  It will have you fall under

22  the next category, so not yet.  You said you're number 19,

23  Mr. Cantrell?

24        **PROSPECTIVE JUROR:**  Yes, ma'am.

25        **THE COURT:**  Thank you.  If everybody will stand up

1    for me and raise your right hand, I'm going to swear everybody

2    in.

3          (Prospective Jurors' Oath Administered)

4          **THE COURT:**  Thank you so much, you may be seated.

5    Keep in mind this oath that you just took, the oath applies not

6    only to these qualification questions, but it applies to the

7    questions that we're going to ask you a little later on.

8          Now, the exemptions I just went through, Mr. Cantrell

9    stood up and said he was a volunteer firefighter.  Is there

10   anyone else that meets any of those exemptions?  All right, I

11   see no other hands.

12         Next, these are excusals, which mean even if you meet one

13   of these requirements, you can still serve if you wish to

14   serve, but you can ask to be excused if you fall under any of

15   these.  Number 1, you are 70 years of age or older; you

16   previously served as a grand or petit juror in a state or

17   federal court during the past two years immediately preceding

18   your call to serve here; three, and Mr. Cantrell this would

19   apply to you, three, you serve a public agency without

20   compensation as volunteer safety personnel, such as

21   firefighter, member of rescue squad or ambulance crew members

22   for a public agency; or serving on this jury would cause you

23   undue hardship.

24         So please raise your hand if any of these exemptions apply

25   to you, or excusals apply to you.  All right.  Let's start with

1   the first row.  And when you get the microphone, please say

2   your juror number first.

3            **PROSPECTIVE JUROR:**  Number 3, Gabe Patton.  I just

4   can't afford to miss work right now.

5            **THE COURT:**  Where do you work, Mr. Patton?

6            **PROSPECTIVE JUROR:**  Elcon Electrical.

7            **THE COURT:**  And do you have the type of job you're

8   paid only if you show up?

9            **PROSPECTIVE JUROR:**  (Nods head).

10           **THE COURT:**  Is that a yes?

11           **PROSPECTIVE JUROR:**  Yes, ma'am.

12           **THE COURT:**  Is that why you are saying you can't

13   afford to miss work, are y'all low on workers or --

14           **PROSPECTIVE JUROR:**  No, we're not low, I just can't

15   afford it.

16           **THE COURT:**  Thank you.  Yes, sir.

17           **PROSPECTIVE JUROR:**  Juror No. 4, Joseph Powell.  I'd

18   like to be excused because I am 70 years old.

19           **THE COURT:**  All right.  Thank you, Mr. Powell.  I

20   think we have got -- yes, ma'am?

21           **PROSPECTIVE JUROR:**  Juror No. 6.  I have two doctors'

22   appointments tomorrow, and I also drive a school bus, and we

23   are short.

24           **THE COURT:**  Now, where are you a bus driver,

25   Ms. Wise?

1        **PROSPECTIVE JUROR:**  Jackson Public Schools.

2        **THE COURT:**  With respect to your doctors'

3  appointments, if you are ultimately selected to serve, can you

4  get those rescheduled?

5        **PROSPECTIVE JUROR:**  Yes.

6        **THE COURT:**  I think we have Juror No. 1, too,

7  Mr. Allen.

8        **PROSPECTIVE JUROR:**  Juror No. 1, Keith Hammitt.  I

9  bought a business two years ago and we're shorthanded, and no

10  one gets paid, vendors or employees, if I am not there.

11        **THE COURT:**  When you say no one gets paid, how often

12  are you doing payroll?

13        **PROSPECTIVE JUROR:**  Payroll is every two weeks, but

14  the vendors don't get paid, and I have to be there to write the

15  checks, and that's daily.

16        **THE COURT:**  Have you ever taken a vacation since you

17  opened this business?

18        **PROSPECTIVE JUROR:**  No, ma'am.

19        **THE COURT:**  What happens if you're sick?

20        **PROSPECTIVE JUROR:**  I show up to work.

21        **THE COURT:**  Okay.  What hours do you keep at your

22  company, like how many hours a day?  I know it's not 8:00 to

23  5:00 if it's construction, but what time do y'all start?

24        **PROSPECTIVE JUROR:**  7:00 to 5:00 every day.

25        **THE COURT:**  If we started trial at 9:00, would that

1   give you time in the morning to cut checks if you needed to?

2                   **PROSPECTIVE JUROR:**  Maybe so.

3                   **THE COURT:**  All right.  Who else?

4                   **PROSPECTIVE JUROR:**  Number 11, Dazell Jackson.

5                   **THE COURT:**  Hold on one second for me.  You said

6   Juror No. 11?

7                   **PROSPECTIVE JUROR:**  11.

8                   **THE COURT:**  Ms. Jackson?

9                   **PROSPECTIVE JUROR:**  I am 72, but I do choose to stay.

10                  **THE COURT:**  Thank you.  I was about to ask you that.

11  Do you wish to still stay, so you do?

12                  **PROSPECTIVE JUROR:**  Yes.

13                  **THE COURT:**  Great, thank you.

14                  **PROSPECTIVE JUROR:**  I am number 16, Sarah Hanson.

15  And we just recently had a co-worker pass away, so we're

16  shorthanded, and another one is going on vacation at the end of

17  the week and will be gone for a week.  So it's just going to be

18  me in the office.

19                  **THE COURT:**  Where do you work, Ms. Hanson?

20                  **PROSPECTIVE JUROR:**  Racer Pharmaceuticals.

21                  **THE COURT:**  How many people work in the office?

22                  **PROSPECTIVE JUROR:**  Just in the accounting office,

23  it's just the three of us.

24                  **THE COURT:**  Is this a local company or is it a

25  national company?

1          **PROSPECTIVE JUROR:**  It's national.  The accounting

2     office is local, though.

3          **THE COURT:**  If you are ultimately selected to serve,

4     are there individuals from other offices that can step in in

5     the interim?

6          **PROSPECTIVE JUROR:**  The other offices are just sales

7     reps.

8          **THE COURT:**  So is the only accounting office for the

9     national company here?

10          **PROSPECTIVE JUROR:**  It's in Ridgeland.

11          **THE COURT:**  Thank you.  Who else?

12          **COURT SECURITY OFFICER:**  That's all, Your Honor.

13          **THE COURT:**  Thank you.  The Court finds that the

14     remaining potential jurors are qualified and willing to serve.

15     So we're now going to get into voir dire.

16          Does everybody have their pieces of paper?  Okay.  I am

17     going to start with Juror No. 1, and I am going to let you kick

18     us off.  If you will, on your piece of paper, if you will state

19     your juror number and your name, and then go through those

20     questions and answer those for me.  It's going to be your

21     highest level of education, your spouse's employment, and if

22     you have ever served in a civil or criminal case, and then what

23     do you like to do in your free time.  And if you all will just

24     pass the mic along, and we'll go by juror number.

25          **PROSPECTIVE JUROR:**  Juror No. 1, Keith Hammitt.

1   Highest level of completed education, college.  Spouse's
2   employment, financial manager.  And no, I have not.
3              THE COURT:  You have never served on a jury?
4              PROSPECTIVE JUROR:  Never.  I watch college football.
5              THE COURT:  With respect to your wife being a
6   financial manager, what company does she work for?
7              PROSPECTIVE JUROR:  Raytheon.
8              THE COURT:  Thank you so much.
9              PROSPECTIVE JUROR:  Good morning.
10             THE COURT:  Good morning.
11             PROSPECTIVE JUROR:  I am Juror No. 2.  My name is
12  Esinam Attipoe.  I have a Master's of Science in biomedical
13  sciences.  I have no spouse, I have never served, and I like
14  fishing and traveling.
15             THE COURT:  Thank you.
16             PROSPECTIVE JUROR:  Juror No. 3, Gabe Patton.  I am
17  in college right now at Hinds, no spouse, I have never served
18  on a case before, and I like to hunt and watch football.
19             THE COURT:  With respect -- I have a follow-up for
20  you -- with respect to being in college, are you going at
21  night?
22             PROSPECTIVE JUROR:  Yeah, from 6:00 to 10:00.
23             THE COURT:  6:00 to 10:00 every night?
24             PROSPECTIVE JUROR:  Yes, ma'am, except Fridays.
25             THE COURT:  So four days a week?

1          **PROSPECTIVE JUROR:**  Yes, ma'am.

2          **THE COURT:**  Thank you.

3          **PROSPECTIVE JUROR:**  Juror No. 4, Joseph Powell.

4   Junior college education.  Divorced.  I served on jury duty for

5   a civil case about 20 years ago, and I like to ride my

6   motorcycle.

7          **THE COURT:**  Mr. Powell, I didn't ask you.  You stood

8   up and said you are 70.  Do you wish to be excused?

9          **PROSPECTIVE JUROR:**  Yes, ma'am.

10         **THE COURT:**  I am still going to make you go through

11  the process, though.

12         **PROSPECTIVE JUROR:**  That's okay.

13         **PROSPECTIVE JUROR:**  Juror No. 5, Michael Stanford.

14  Twelfth grade.  Divorced.  Never served.  And I like to fish.

15         **THE COURT:**  Thank you.

16         **PROSPECTIVE JUROR:**  Juror No. 6, Tabitha Wise.  Some

17  college.  Spouse is a forklift operator for Nissan.  I have

18  served on a criminal case, and I love to watch television.

19         **THE COURT:**  On your criminal case, how long ago was

20  that?

21         **PROSPECTIVE JUROR:**  Probably over 20 years ago.

22         **THE COURT:**  Do you know what county it was in?

23         **PROSPECTIVE JUROR:**  Hinds.

24         **THE COURT:**  Do you remember what type of case it was?

25         **PROSPECTIVE JUROR:**  Murder.

1          **THE COURT:**  Guilty or not guilty?

2          **PROSPECTIVE JUROR:**  Hung jury.

3          **THE COURT:**  Do you recall if you served as the jury

4    foreperson, like the -- I don't want to call it a head juror,

5    but the juror that would be leading the deliberations?

6          **PROSPECTIVE JUROR:**  No.

7          **THE COURT:**  Thank you so much.

8          **PROSPECTIVE JUROR:**  I am Juror No. 7, Paul Nations.

9    I've got a college education.  My wife is a nurse at UMMC.  I

10   have served on a criminal case, and I like to do anything in

11   the outdoors.

12         **THE COURT:**  Now, on your criminal case that you

13   served, do you recall how long ago that was?

14         **PROSPECTIVE JUROR:**  Probably about 25 years ago.

15         **THE COURT:**  Do you remember what type of case it was?

16         **PROSPECTIVE JUROR:**  DUI.

17         **THE COURT:**  Guilty or not guilty?

18         **PROSPECTIVE JUROR:**  Guilty, I believe.

19         **THE COURT:**  Do you recall if you served as the jury

20   foreperson?

21         **PROSPECTIVE JUROR:**  I did not.

22         **THE COURT:**  Thank you.  And you said your wife is a

23   nurse at UMMC?

24         **PROSPECTIVE JUROR:**  Yes, ma'am.

25         **THE COURT:**  Thank you.

1          **PROSPECTIVE JUROR:**  Juror No. 8, John Evans.  Juror

2     No. 8.  John Evans.  I have a bachelor's degree in marketing.

3     My wife, Kim, works as a medical biller for Home Health Pro in

4     Ridgeland.  And I have served on a civil case and a criminal

5     case.  In my free time, I like to read, study history, and I

6     target shoot.

7          **THE COURT:**  And you target shoot?

8          **PROSPECTIVE JUROR:**  Yes, ma'am.

9          **THE COURT:**  With respect to your jury service, how

10    long ago was your civil trial?

11         **PROSPECTIVE JUROR:**  Ten years ago.

12         **THE COURT:**  Do you recall what type of case it was?

13         **PROSPECTIVE JUROR:**  A lady had an employment problem

14    with the federal government.  I was eliminated during voir

15    dire, so I don't know what the outcome of it was.  The criminal

16    case was a DUI, and as a jury we never got to vote innocent or

17    guilty.  About halfway through, the defendant took a deal and

18    plead guilty.

19         **THE COURT:**  I see.  So with respect to that civil

20    case, you got to this process, like jury --

21         **PROSPECTIVE JUROR:**  Oh, yes, ma'am.

22         **THE COURT:**  So you weren't ultimately selected to

23    serve on the civil jury?

24         **PROSPECTIVE JUROR:**  Yes, ma'am.

25         **THE COURT:**  Thank you.

1          **PROSPECTIVE JUROR:**  Juror No. 9, Angela Stewart.  My

2     highest level of education is a master's in public history.  I

3     am not married.  I have never served on a civil or criminal

4     trial.  And I like to read and study the Bible.

5          **THE COURT:**  Thank you.

6          **PROSPECTIVE JUROR:**  Juror No. 10, Loachell Osborne.

7     Highest level of education, Hinds Community College, business

8     administration and accounting.  My husband works for

9     (inaudible) construction.  Never served for criminal or civil.

10    And in my free time, I like to read all genres of books.

11         **THE COURT:**  You like to read what, now?

12         **PROSPECTIVE JUROR:**  All types of books.

13         **THE COURT:**  All types of books, great.

14         **PROSPECTIVE JUROR:**  Dazell Jackson, Juror No. 11.  My

15    highest education is a bachelor's degree in education.

16         **THE COURT:**  Ms. Jackson, I need you to put that

17    microphone under that shield a little bit for me.  You said

18    your highest degree of education is what?

19         **PROSPECTIVE JUROR:**  Bachelor's degree in education.

20         **THE COURT:**  Yes, ma'am.

21         **PROSPECTIVE JUROR:**  And my spouse retired from the

22    Navy and also from Rolls Royce as a jet engine mechanic.  I

23    served on a jury in a criminal case.  And I like to garden.

24         **THE COURT:**  Now, with respect to your jury service on

25    the criminal case, do you recall how long ago that was?

1          **PROSPECTIVE JUROR:**  The early '80s.

2          **THE COURT:**  Do you recall what type of case?

3          **PROSPECTIVE JUROR:**  It was an abduction.

4          **THE COURT:**  Was it Lauderdale County?

5          **PROSPECTIVE JUROR:**  Virginia Beach.

6          **THE COURT:**  Oh, Virginia Beach.  Do you recall what

7     the verdict was?

8          **PROSPECTIVE JUROR:**  Guilty.

9          **THE COURT:**  And did you serve as the jury foreperson?

10         **PROSPECTIVE JUROR:**  No.

11         **THE COURT:**  Thank you so much, Ms. Jackson.

12         **PROSPECTIVE JUROR:**  I am number 12, Terry Corely.

13    Highest education completed is high school with some vocational

14    classes in the next two years.  My spouse is employed as a

15    logistics coordinator at KLLM in their Jackson office.  I have

16    never served criminal or civil.  And I like to go to estate

17    sales and auctions in my free time.

18         **THE COURT:**  Thank you.

19         **PROSPECTIVE JUROR:**  Jana Robertson, Juror No. 13.

20    Education, junior college.  I am separated.  I have never

21    served in civil or criminal.  And in my spare time, I am with

22    my son while he is playing baseball.

23         **THE COURT:**  All right.

24         **PROSPECTIVE JUROR:**  Juror No. 14, Bryan Carpenter.

25    BSN in nursing.  My wife is a registered nurse at Inhabit Home

1    Health and Hospice.  I have never served on a jury case.  And I

2    enjoy playing music in my free time.

3            THE COURT:  Thank you, Mr. Carpenter.

4            PROSPECTIVE JUROR:  Juror No. 15, Andrea Cooper.  I

5    have two master's degrees.  My husband owns a martial arts

6    school.  I have never served on a case.  And I enjoy gardening

7    and reading.  And I don't know if now is when I am supposed to

8    tell you, but I am supposed to be in Texas Monday and Tuesday

9    for work.  And so I am happy to serve, but I am supposed to be

10   gone Monday and Tuesday.

11           THE COURT:  Let me back up a little bit.  With

12   respect to your master's degrees, what do you have masters in?

13           PROSPECTIVE JUROR:  One in wildlife science and one

14   in public relations.

15           THE COURT:  And I know this is on the questionnaire,

16   but I am not going to dig it out.  Where are you employed?

17           PROSPECTIVE JUROR:  Ducks Unlimited.

18           THE COURT:  And your travel on Monday and Tuesday, is

19   it for a conference?

20           PROSPECTIVE JUROR:  For a project dedication.

21           THE COURT:  A project dedication?

22           PROSPECTIVE JUROR:  Yes, ma'am.

23           THE COURT:  Where is that travel to?

24           PROSPECTIVE JUROR:  In Corpus Cristi, Texas.

25           THE COURT:  Would your role be as a planner or as an

1    attendee?

2          **PROSPECTIVE JUROR:**  My role there is to steward our

3    foundation partners and to do the photography for the event.

4          **THE COURT:**  Thank you.

5          **PROSPECTIVE JUROR:**  Juror No. 16, Sarah Hanson.  I

6    have bookkeeping classes from Hinds, is the highest level of

7    education.  My spouse's employment is he owns a landscape

8    company.  I have served on a civil jury case before.  And I

9    like to watch college baseball and football in my free time.

10         **THE COURT:**  With respect to the civil jury,

11   Ms. Hanson, do you recall what type of case that was?

12         **PROSPECTIVE JUROR:**  It was a wreck.  A trucking

13   company had hit somebody and they were found not guilty.

14         **THE COURT:**  The trucking company was found not

15   guilty?

16         **PROSPECTIVE JUROR:**  Yes.

17         **THE COURT:**  How long ago was that?

18         **PROSPECTIVE JUROR:**  About 15 years ago.

19         **THE COURT:**  And did you serve as the jury foreperson?

20         **PROSPECTIVE JUROR:**  I did not.

21         **THE COURT:**  Thank you so much.

22         **PROSPECTIVE JUROR:**  Juror No. 17, Selisa Taylor.  I

23   have a bachelor's degree in communicative disorders.  No

24   spouse.  I have never served a civil or criminal case.  And in

25   my free time I like to travel.

1          **THE COURT:**  Thank you.

2          **PROSPECTIVE JUROR:**  Juror No. 18, Charlotte Phillips.

3     My highest education is an associate's in accounting with high

4     honors.  My spouse's employment is retired.  I did serve on a

5     criminal case in Copiah County six years ago; it only lasted

6     half a day.  I guess the defendant plead out.  My free time, I

7     enjoy spending time in the country where I live and -- well, we

8     have property, and traveling to see family.

9          **THE COURT:**  Thank you.

10         **PROSPECTIVE JUROR:**  Juror No. 19, my name is Gordon

11    Cantrell.  I have some college.  I am a widower, and I have

12    served on a jury.  I was Juror No. 14 in Lauderdale County, and

13    spending my free time going fishing, goofing off.

14         **THE COURT:**  With respect to your jury service, what

15    type of trial was that?

16         **PROSPECTIVE JUROR:**  I have -- like I said, we were

17    just seated and the defendant plead out.

18         **THE COURT:**  Okay.  So you didn't even know what type

19    of case.  Now, with your volunteer firefighter status, you're

20    under one of those categories kind of like 70 or older category

21    in the sense you can serve if you wish, but you don't have to.

22    Would you like to still serve?

23         **PROSPECTIVE JUROR:**  It will be an honor.

24         **THE COURT:**  Thank you so much.

25         **PROSPECTIVE JUROR:**  Number 20, Lydia Duke.  I have a

1   specialist degree in school psychology.  My husband is the

2   assistant pastor at Lakeland Presbyterian Church.  I have never

3   served on a jury.  And I like to spend time with my

4   grandchildren.

5           THE COURT:  Great, thank you.

6           PROSPECTIVE JUROR:  Hi, I am Juror No. 21, my name is

7   Jimmy Finley.  I have a high school education.  My wife is a

8   secretary.  I have served on a criminal case, and I like

9   fishing in my free time.

10          THE COURT:  Where does your wife work?

11          PROSPECTIVE JUROR:  She works for a local bank.

12          THE COURT:  A local bank, okay.  And you like to fish

13  in your free time.

14          PROSPECTIVE JUROR:  Number 22, Lisa Willoughby.  I

15  have an associate's degree.  My spouse is a pharmacist.  I have

16  never served, and I have a new grandbaby that I love spending

17  time with right now.

18          THE COURT:  You said your spouse is a pharmacist?

19          PROSPECTIVE JUROR:  Yes, ma'am.

20          THE COURT:  Where is he a pharmacist?

21          PROSPECTIVE JUROR:  Polks Drugs in Florence,

22  Mississippi.

23          THE COURT:  And a new grandbaby.  Is this the first

24  grandbaby?

25          PROSPECTIVE JUROR:  Yes, ma'am.

1          THE COURT:  Congratulations.

2          PROSPECTIVE JUROR:  Juror No. 23, Shakerriaa Houston.

3    My highest level of education is a BS in psychology from

4    Jackson State University.  I don't have a spouse.  I have never

5    served.  And I like to roller skate, journal and draw in my

6    free time.

7          THE COURT:  I heard roller skate, but I didn't hear

8    the rest.

9          PROSPECTIVE JUROR:  Roller skate, journal and draw in

10   my free time.

11         THE COURT:  Okay.

12         PROSPECTIVE JUROR:  Juror No. 24, my name is Michael

13   Dixon.  Education, I went to some college.  My spouse is a

14   nurse.  Never served.  What do I like to do?  I like to read

15   the Bible and watch football.

16         THE COURT:  You said your spouse is a nurse?

17         PROSPECTIVE JUROR:  Yes, ma'am.

18         THE COURT:  Where is she a nurse?

19         PROSPECTIVE JUROR:  She's a traveling nurse.

20         THE COURT:  Okay.  And you said you have never

21   served?

22         PROSPECTIVE JUROR:  Never served.

23         THE COURT:  And you said college football?

24         PROSPECTIVE JUROR:  Yes, ma'am.

25         THE COURT:  What about NFL?

 1               **PROSPECTIVE JUROR:**  I will watch it sometimes, too.

 2               **THE COURT:**  You prefer college, though?

 3               **PROSPECTIVE JUROR:**  Yeah, because they're young and

 4     they're fresh.

 5               **THE COURT:**  All right, thank you.

 6               **PROSPECTIVE JUROR:**  Number 25, Henry Welch.  Two

 7     years of college, no spouse, served on a criminal -- a civil

 8     case before, and play golf.

 9               **THE COURT:**  Do you recall in your civil case what

10     type of case it was?

11               **PROSPECTIVE JUROR:**  Yeah, it was a county against an

12     individual.  They sprayed some poison, killed some of his

13     cattle, but it was quite a few years ago.

14               **THE COURT:**  Do you recall what the outcome was?

15               **PROSPECTIVE JUROR:**  They reached a settlement.

16     Actually, it was -- the jury decided, I think, guilty, and the

17     judge set a settlement on it, maybe?

18               **THE COURT:**  Okay.

19               **PROSPECTIVE JUROR:**  $75,000, something like that.

20               **THE COURT:**  Okay.  Thank you.

21               **PROSPECTIVE JUROR:**  Juror No. 26, Elton Edwards.

22     High school education.  My wife is a housewife, is her

23     employment.  I have never served on a jury.  And my free time,

24     I like to fish and ride motorcycles.

25               **THE COURT:**  Thank you so much, Mr. Edwards.

1          **PROSPECTIVE JUROR:**  Juror No. 27, Edward Johnson.

2    Highest level of college, I have some college, over three

3    years.  I am divorced.  I have served on a jury case, it was a

4    civil case.  What do I do in my free time?  I split it

5    between -- I am a sports enthusiast, I'm either somewhere

6    watching sports activities or on TV, may be watching movies or

7    somewhere hanging out with friends.

8          **THE COURT:**  With respect to your civil trial, do you

9    remember what type of case that was?

10         **PROSPECTIVE JUROR:**  Yes, it was in 1990.  It was a

11   district court in Vicksburg.  There was a lady from Natchez

12   that her business had burned down.  The insurance company was

13   -- there were two factors we had to judge on.  They were saying

14   she burned it down herself, and, of course, we had to rule on

15   was she going to get insurance money.  We didn't rule that she

16   burned it down herself, but we did rule that there was some

17   negligence, so that left some wiggle room for the insurance

18   company, for the judge and insurance company on what she was

19   going to be awarded.

20         **THE COURT:**  Okay.  You have a much better memory than

21   I do that you remember that.  Thank you.

22         I know that public speaking is not for everyone, so thank

23   you all for doing that.  I know it may be a little

24   uncomfortable, so thanks.  Y'all did a great job.  I am going

25   to ask the attorneys now to introduce themselves.  And if you

1    want to, you can have just one spokesperson for each side to
2    introduce, or you all can introduce yourselves.  I'll let you
3    all decide.
4        Mr. Morgan, I am going to start with you to allow you to
5    introduce -- now, as he introduces the individuals, the
6    attorneys and his client, I want everyone to listen carefully
7    to the names on both sides to see if you know anybody because I
8    am going to ask, once they're introduced, if you know them at
9    all.
10       **MR. MORGAN:**  Good morning.  My name is Ryan Morgan
11   from the law firm of Morgan & Morgan.  This is my colleague,
12   Gregory Schmitz, and next to him is our client, Dr. Joseph
13   Papin.  And then we have here another attorney in my law firm,
14   John Waits.  And Mary Shedy is a consultant with us, as well as
15   Tyler Owens.
16       **THE COURT:**  Does anyone know any of them, any of the
17   individuals that were just introduced?  All right.  Mr.
18   Mauldin, are you going to do the introductions or Mr. Watkins?
19       **MR. MAULDIN:**  Mr. Watkins.
20       **THE COURT:**  Mr. Watkins.  Hold on one second.  So our
21   court reporter -- if you will pull the microphone.  And same
22   for you, Mr. Morgan.  In a little while, I am going to ask both
23   sides to read the witness list, so everybody just make sure
24   they are speaking into the microphones; otherwise, Ms. Penny
25   can't pick up what you're saying.

1    **MR. WATKINS:**  This better?

2    **THE COURT:**  Much better.

3    **MR. WATKINS:**  I am Paul Watkins with the law firm of

4    Mayo Mallette.  This is my law partner, Drew Mauldin.  We

5    represent the University of Mississippi Medical Center.  And

6    Dr. Mark Earl is here as a representative of the medical

7    center.

8    **THE COURT:**  Does anyone know any of the individuals

9    that were just introduced on behalf of the defense?  Any former

10   relationship, business relationship?  I see no hands.

11       I'm going to go back to you, Mr. Morgan.  I am going to

12   ask you to slowly read through the witness list for the

13   plaintiff.  I want you to keep in mind, as he goes through this

14   list, the defense is then going to read their list.  A lot of

15   these names are probably going to overlap.  As he is going

16   through this list, especially any of you that have family

17   members that are employed by UMMC or any of you that may have

18   actually gone to UMMC for treatment or otherwise, just pay

19   attention to these names.  If it's a William Smith, for

20   example, be thinking of other variations of that, like Bill

21   Smith.  Because what we don't want to happen is you get

22   selected to serve on the jury, and then we're halfway through

23   trial and you realize, I know that person.  So do your best to

24   listen and try to drum up any memories of these names.

25       Mr. Morgan, you may proceed.  Just read slowly for me.

1    **MR. MORGAN:**  Obviously, Joseph Papin; Molly

2    Brasfield, who is in HR; Dr. Mark Earl, who you met; Dr. Jimmy

3    Stewart; Joshua Sabines, who is a nurse practitioner; Dr. Megan

4    Mahoney; Kisha Dyse, who is a wound care nurse; Dr. Steven

5    Bondi; Renee Green, who is an administrator; Patricia Whitlock,

6    who is also in HR; Dr. Sid Desai; Dr. Aimee Sundeen; Elizabeth

7    Toony, who is in administration at UMMC; Dr. Richard Barr;

8    Ashley Seawright, who is a nurse practitioner; Dr. William

9    Crews; Dr. Anthony Watkins; and Dr. Michael Leitman.

10    **THE COURT:**  Does anyone know any of the individuals

11    that were just named?  We have one hand.  Yes, ma'am.  Give me

12    your juror number again.

13    **PROSPECTIVE JUROR:**  15, Andrea Cooper.  My mother has

14    seen Dr. Jimmy Stewart and I was with her.  So I have met him,

15    but I don't have a personal relationship.

16    **THE COURT:**  All right.  Is there anything about that

17    experience, the fact that Dr. Stewart has been a physician to

18    your mom, would that prevent you from being fair and impartial

19    in this case if you were ultimately selected?

20    **PROSPECTIVE JUROR:**  No, ma'am.

21    **THE COURT:**  Could you hear the evidence for both

22    sides and still be fair and impartial despite that

23    relationship?

24    **PROSPECTIVE JUROR:**  Yes, ma'am.

25    **THE COURT:**  Thank you.  Anyone else?

1        **PROSPECTIVE JUROR:** I am not sure, but is Dr. Crews

2 an obstetrician/gynecologist? I know a Crews, but I wasn't

3 sure if that was the Dr. Crews.

4        **THE COURT:** I don't know the answer to that, but let

5 me ask you this. So you said you know a Dr. Crews?

6        **PROSPECTIVE JUROR:** I used to see him, and I know

7 that he switched over to UMMC, so I just wasn't sure if that

8 was the same Crews.

9        **THE COURT:** You're Juror No. 2?

10        **PROSPECTIVE JUROR:** Yes, ma'am, number 2.

11        **THE COURT:** How long ago was Dr. Crews your doctor?

12        **PROSPECTIVE JUROR:** Probably 2018, yes, ma'am.

13        **THE COURT:** If Dr. Crews was ultimately brought in as

14 a witness, because, again, they're listing everyone who is a

15 potential witness, but if Dr. Crews came in and was a witness

16 in this case, would you give his testimony more credibility

17 than any other witness or would you listen to the evidence and

18 treat both sides fairly and impartially?

19        **PROSPECTIVE JUROR:** Both sides fairly, yes, ma'am.

20        **THE COURT:** Are you automatically going to believe

21 everything Dr. Crews says simply because he was your doctor?

22        **PROSPECTIVE JUROR:** No, ma'am.

23        **THE COURT:** Thank you so much.

24     Anyone else? I see another hand.

25        **PROSPECTIVE JUROR:** Number 25. If it's the same

1    Renee Green, she's my first cousin.

2              THE COURT:  And is it your understanding that Renee

3    Green, your cousin, works at UMMC?

4              PROSPECTIVE JUROR:  I am not sure.

5              THE COURT:  Do you know what her -- not necessarily

6    where she works, but do you know what her trade is?

7              PROSPECTIVE JUROR:  No.

8              THE COURT:  When is the last time you saw your cousin

9    Renee Green?

10             PROSPECTIVE JUROR:  I saw her car parked at her

11   mother's house a couple weeks ago.

12             THE COURT:  Just the towns, not the address, where

13   does your cousin Renee Green, live?

14             PROSPECTIVE JUROR:  Madison.  Her mother lives in

15   West.

16             THE COURT:  So you saw her car in West, all right.

17   Anyone else?  Let me ask you this, we'll try to drill down on

18   that and figure out if it is your cousin Renee Green, because

19   that sounds like a pretty common name.  I am not going to ask

20   follow-up on that right now.  I will hold that.

21             PROSPECTIVE JUROR:  I can tell you how old she

22   probably is.

23             THE COURT:  She may not appreciate that, but you can

24   give me a ballpark.

25             PROSPECTIVE JUROR:  Around 60.

1          **THE COURT:**  Okay.  Thank you.  That may help us

2     figure out if there's any relation.

3          Anyone else recognize any of those names?

4          **THE COURT:**  Mr. Watkins, I am going to have you now

5     do the same thing.  If you will read into the microphone your

6     list.  Again, keep in mind some of these names are going to be

7     probably the same, but we just want to make sure we cover it

8     all.

9          **MR. WATKINS:**  Molly Brasfield; Cecelia Bass; Truman

10    Mark Earl; Renee Green; Jimmy Stewart; Richard Barr; Josh

11    Sabins; Inez Berger; Jay Shake; Penny Vance; Gretchen Shull;

12    Jacob Moremen; Lawrence Creswell; Laura Vick; Colin Muncie;

13    William Crews; Ashley Griffin-Ray; Meghan Mahoney; Rebecca

14    McAlister; John Simmons; Robert Alexander; Kisha Dyse; Steve

15    Bondi; Lou Ann Woodward; Pierre DeDelva; Dakota King; Jon

16    Shaughnessy.

17         **THE COURT:**  Besides any of the names we have already

18    spoken about with the jurors, does anybody else recognize any

19    of those names, have any relationship with anybody on that

20    list?  Okay.  I see no hands.

21         Now, I just gave you a general overview earlier of what

22    the case is about, so I know you don't have a lot of

23    information yet.  And, again, anything I say is not evidence.

24    But does anyone have any type of specific knowledge about this

25    case beyond what I have said?  Has anybody read or seen

1    anything in the news or otherwise about this case?  I don't

2    expect there's been anything out there, but I just want to make

3    sure.  Does anybody think they have read anything about this

4    case?  Is everyone here willing to listen to both sides and

5    hear evidence from both sides?  Okay.

6        Now, based on what you have heard so far, is there

7    anything that would prevent you from listening to the evidence

8    with an open mind and deciding the case fairly and impartially

9    based solely on the evidence that's presented here in court?

10   Raise your right hand if you feel like you can't do that.

11       At this time, I am going to allow the attorneys to ask

12   questions.  Mr. Morgan, if you would like, there's a podium

13   right here.  If you would like to pull that microphone to that

14   podium, or you're welcome to do it from where you are, but I

15   think the podium may make it easier on you, and you can pull

16   that microphone over.  Ms. Thomas, you may have to -- there you

17   go.

18               **VOIR DIRE EXAMINATION BY MR. MORGAN**

19       **MR. MORGAN:**  May it please the Court.  Good morning,

20   again.  My name is Ryan Morgan as you heard a few minutes ago.

21   And I am going to be asking some questions about life

22   experiences, opinions you may have that could influence you if

23   you were a juror on this case.

24       When people hear that, they sort of get defensive, like I

25   can be fair and reasonable.  But I like to use an analogy to

 1    try to explain what this process is supposed to help with.  For
 2    me, I am a huge fan of pizza.  You can probably tell, I eat
 3    more than I should.  I really like pizza.  However, I don't
 4    love vegetable pizza.  I am more of a traditionalist, I like
 5    meat-lovers, supreme, kind of the classics, if you will.  So if
 6    there's a contest between a meat-lover pizza and a vegetable
 7    pizza, would we all agree that it's fair for the contestants to
 8    know my sort of slight lean towards meat-lovers or a supreme
 9    pizza?  Would we all agree with that?  Would anybody disagree
10    with that premise?
11        And that's really what this process is supposed to help
12    with.  Nobody is coming in here saying I am not going to listen
13    to the evidence or things of that sort, it's more of being
14    honest with yourself, is there something where you may not just
15    be able to be equal to both sides just because of life
16    upbringing, certain opinions or certain ways of how you feel
17    about that.  It is very normal for that to happen.  Like I
18    said, I would have to be honest in that situation.
19        Now, of course this case is not about pizza, that would be
20    more fun in some respects, but it's a breach of employment
21    agreement case.  And of course, our client is alleging that the
22    hospital did not honor the contract and they breached that
23    contract when they terminated him.
24        There's a lot of people here, so I am going to ask a lot
25    of questions, and I will probably do it by row to make it

1    easier so we can keep track of which way you're answering and

2    then ask some follow-up as needed.

3        So the first question I want to ask everybody is are you

4    more of a big-picture person, or are you more of a devil's in

5    the details person?  Now, doesn't mean you don't care about one

6    or the other, you don't care about details, but there's some

7    people that everything has to fit into a perfect little spot,

8    and it's got to be a perfect little jigsaw puzzle that all goes

9    together, and there are other people -- I look at the big

10   picture.  I look more at the forest from the trees in most

11   instances.

12       So with that being said, on the first row here, if you can

13   raise your hand, who would be more of a big-picture person?

14   Juror No. 3.  So the opposite question for everybody else.

15   Would you consider yourself to be a devil's in the details

16   person?  Is that a yes?

17       I am going to go to the second row.  Second row, who would

18   consider yourself to be more of a big-picture person versus a

19   devil's in the details person?  Juror No. 8.  Anybody else in

20   row two?  So just to confirm, everybody else in row two, you

21   would feel more comfortable describing yourself as a devil's in

22   the details person; is that correct?

23       Row 3, who would describe themselves as more of a

24   big-picture person?  Would everyone on that row consider

25   themselves more to be the devil is in the details person?

1    Thank you for shaking, that helps.

2        And then now row 4, on row 4 who would consider themselves

3    to be more of a big-picture person versus devil's in the

4    details?  You're Juror No. 25 and -7, it looks like?

5        We'll go row by row here again.  But have you or your

6    spouse ever been part of a union?  First row, if it's a yes,

7    please raise your hand.  If you were a member of a union or

8    your spouse was a member of a union.  Row 1, looks like nobody.

9    Row 2, we have Juror No. 8 and 11.  Sir, could you pass the

10   microphone.  I do want to ask a follow-up there.

11       For Juror No. 8, as that microphone is coming down, can

12   you just briefly describe, was it yourself in a union, was it a

13   spouse, a family member?

14       **PROSPECTIVE JUROR:**  Yes, sir.  Juror No. 8, John

15   Evans.  I was in the union when I worked for the Veterans

16   Administration.  It was the American Federation of Government

17   Employees.

18       **MR. MORGAN:**  Ballpark, what years did you work for

19   the V.A.?

20       **THE COURT:**  Please stand for me, Mr. Evans.

21       **PROSPECTIVE JUROR:**  I'm sorry.  I worked from 1997 to

22   2010, but I wasn't a member of the union that entire time.

23       **MR. MORGAN:**  Thank you very much.  And Juror No. 11,

24   Ms. Jackson, on the union question, was that you personally or

25   a spouse or family member?

1            **PROSPECTIVE JUROR:**  My spouse.

2            **MR. MORGAN:**  And I believe, is that with Nissan?

3            **PROSPECTIVE JUROR:**  Rolls Royce.

4            **MR. MORGAN:**  Rolls Royce.  Is he still a member of

5       that union or no longer?

6            **PROSPECTIVE JUROR:**  He is retired.

7            **THE COURT:**  Thank you.  Row number 3, any union

8       members or spouse, family members parts of a union?

9            **PROSPECTIVE JUROR:**  Gordon Cantrell.  I was part of

10      the electrical union back in the '80s.

11           **THE COURT:**  Mr. Cantrell, are you Juror No. 19?

12           **PROSPECTIVE JUROR:**  Yes, ma'am.

13           **THE COURT:**  Okay.

14           **MR. MORGAN:**  And Mr. Finley, I believe?

15           **PROSPECTIVE JUROR:**  Juror No. 21.  I was part of a

16      union at Hitachi ABB in Crystal Springs for 18 years.

17           **MR. MORGAN:**  The fourth row, anyone, themselves or

18      spouses?  Mr. Welch?

19           **PROSPECTIVE JUROR:**  Number 25, CWA.  Worked for AT&T

20      from '72 to 2020.

21           **MR. MORGAN:**  Is that where you retired from, sir?

22           **PROSPECTIVE JUROR:**  Yes.

23           **MR. MORGAN:**  I want to ask a question.  Same thing

24      here, and I am sorry because we get limited time so we have to

25      try to move as quick as we can on these questions.  Has anyone

1    here, the question is going to be whether you or your spouse

2    have had an employment agreement before, yourself or your

3    spouse?  I guess row one, looks like Juror No. 1 has had one?

4              COURT SECURITY OFFICER:  They didn't hear you.

5              MR. MORGAN:  The question was whether you or your

6    spouse had an employment agreement with a company.  Juror

7    No. 1.

8              PROSPECTIVE JUROR:  Juror No. 1, Keith Hammitt.  When

9    I bought the company two years ago, I don't know if this

10   applies, but I had an employee that had an agreement with me,

11   contract.

12             MR. MORGAN:  So you had it from the employer's side

13   of view?

14             PROSPECTIVE JUROR:  Correct.

15             MR. MORGAN:  Row number 2, has anybody had an

16   employment agreement, or a spouse, family member with an

17   employment agreement?  Ms. Stewart.

18             PROSPECTIVE JUROR:  Yes, I am Juror No. 3.  And I am

19   trying to understand how you are defining employment agreement

20   because I have a contract with my employer, so...

21             MR. MORGAN:  That's a good question.  It would be

22   more like a contract.  So I am carving out kind of your -- like

23   if you got an offer letter, saying, hey, we would like to hire

24   you at this position, here is this, we'll see you on Monday.

25   This would be more of a contract signed by both -- multiple

 1    parties, something along those lines.  So I think, certainly, a

 2    contract for you would qualify, yes.  When did you have one?

 3            **PROSPECTIVE JUROR:**  We work under annual contracts,

 4    so I have to sign one every year.

 5            **MR. MORGAN:**  Thank you.

 6            **PROSPECTIVE JUROR:**  Number 11, Dazell Jackson.  I

 7    sign an annual contract every year as an educator.

 8            **THE COURT:**  What was that last part, Ms. Jackson?

 9    You said you sign an annual contract every year as what?

10            **PROSPECTIVE JUROR:**  An educator, teacher.

11            **THE COURT:**  Educator.  Thank you.

12            **PROSPECTIVE JUROR:**  Juror No. 14, Bryan Carpenter.  I

13    may have misunderstood, but I sign like non-compete clauses.

14            **MR. MORGAN:**  Very close, but a little different, but

15    you're right.  Thank you, though.  Row number 3?

16            **PROSPECTIVE JUROR:**  Number 20, Lydia Duke.  I sign a

17    contract yearly for education.

18            **MR. MORGAN:**  And then row number 4?

19            **PROSPECTIVE JUROR:**  Number 27, Edward Johnson.  I

20    don't know if this really counts.  I have a basketball

21    recruiting service that I do, and every year the schools have

22    to re-up with me as far as yearly payment.

23            **MR. MORGAN:**  What is your role in that basketball?

24            **PROSPECTIVE JUROR:**  I am a scout and I provide them

25    the scouting report.

1          **MR. MORGAN:**  So you are going out scouting the

2    players and whatnot --

3          **PROSPECTIVE JUROR:**  I'm looking at players, and I

4    have to send them a report, I send it out about four times a

5    year.  But at the end of that year, every year they renew the

6    contract, more or less renew their service with me.

7          **MR. MORGAN:**  So every year?

8          **PROSPECTIVE JUROR:**  I pick some up every year.

9          **MR. MORGAN:**  Thank you.

10         **COURT SECURITY OFFICER:**  One more, sir.

11         **PROSPECTIVE JUROR:**  25.  With AT&T.

12         **MR. MORGAN:**  Thank you.

13         **PROSPECTIVE JUROR:**  They had thousands of them.

14         **MR. MORGAN:**  I am going to ask, again, sort of like

15   the first question we went through of where you feel you fall

16   on this spectrum here.  And the question is, do you believe --

17   are you more of a stick to your guns person or are you more of

18   a compromise person?  Stick to your guns, or are you more of a

19   compromise person?

20        Row number 1, who would view themselves as more of a stick

21   to your guns perspective?  Number 7.  So then for one through

22   six, you would view yourselves as more on the compromise side

23   of the scale?

24        Row number 2, who would consider themselves to be a more

25   of a stick to your guns person?  Number 14, sir?  And so that

1   would be 8 through 13 would view themselves more as on the

2   compromise side of that scale; is that correct?

3       Row number 3, who views themselves more as a stick to your

4   guns type person?  Okay.  Seems like everybody, don't want to

5   put words in mouth, but everybody views themselves more on the

6   compromise side; is that correct?  Thank you.

7       Row number 4, who would view themselves as a stick to your

8   guns type person?  Numbers 26 and 27; is that correct?

9       I want to ask a couple questions about this type of case

10  and awarding damages.  When you hear the description that Judge

11  Johnson gave to you about how my client, Dr. Papin, feels his

12  contract was breached and he was terminated wrongfully by UMC,

13  does anybody else any sort of automatic, just I don't like

14  hearing that term "wrongfully terminated," I don't believe in

15  wrongful termination type cases?  Does anybody get a feeling

16  like that?  Does anybody roll their eyes when they hear that

17  term?

18      Now, a subset of that is if Dr. Papin prevails on his

19  claim, he will be asking for money damages to make up for what

20  he views as the breach of the contract.  We all hear those

21  terms in our everyday life about pain and suffering and mental

22  anguish, non-economic damages they are called.  When you hear

23  those terms, does that make anybody roll their eyes or

24  immediately sort of give pause?

25      The defendant here is the University of Mississippi

1    Medical College, Ole Miss.  Does anyone have any affiliation

2    with Ole Miss Or feel they went to Ole Miss and they may have a

3    problem and hurt them in serving as a juror in this case?  I

4    saw you started to raise.

5              THE COURT:  Wait until you have your microphone for

6    me.

7              PROSPECTIVE JUROR:  I work at UMC, but I don't feel

8    like it would hurt me.

9              MR. MORGAN:  I saw that on the questionnaire, you're

10   a current employee?

11             PROSPECTIVE JUROR:  Yes, sir.

12             MR. MORGAN:  And which department to you work in?

13             PROSPECTIVE JUROR:  I work in pharmacology research,

14   so not in the hospital, on the academic side.

15             MR. MORGAN:  What building do you work in?

16             PROSPECTIVE JUROR:  Guyton.

17             THE COURT:  You're Juror No. 2?

18             PROSPECTIVE JUROR:  Yes, ma'am.

19             THE COURT:  And what's the name of the building?

20             PROSPECTIVE JUROR:  Guyton, G-U-Y-T-O-N.

21             THE COURT:  Thank you.

22             MR. MORGAN:  While we're on that subject, I know a

23   few people had mentioned spouses who had worked at UMMC.  Does

24   anybody else have any close friends or other family members who

25   worked at UMMC?

1        **PROSPECTIVE JUROR:**  My sister works in the medical

2   ICU at UMC, RN.  But she is PRN right now, she's traveling, but

3   she works every month at least.

4        **MR. MORGAN:**  So she would work in the main hospital

5   itself when she's here?

6        **PROSPECTIVE JUROR:**  Yes, sir.

7        **MR. MORGAN:**  I think I saw number 9, Ms. Stewart.

8        **PROSPECTIVE JUROR:**  Yes.  I am Juror No. 3, and my

9   sister works in human resources at UMMC.

10       **THE COURT:**  Ms. Stewart -- we have you as Juror

11  No. 9.

12       **PROSPECTIVE JUROR:**  I am sorry, Juror No. 9.

13       **THE COURT:**  It's okay.  Just for the sake of the

14  record, whenever Mr. Morgan was asking about employment

15  contracts, I think you said you were Juror No. 3 then, so for

16  the record to reflect this is Juror No. 9.

17       **PROSPECTIVE JUROR:**  Juror No. 9, yes.

18       **MR. MORGAN:**  What is your sister's name, ma'am?

19       **PROSPECTIVE JUROR:**  Monica Wilson.

20       **MR. MORGAN:**  Thank you.  Anybody else on row 2?  We

21  have some on row 3.

22       **PROSPECTIVE JUROR:**  I have a stepdaughter that works

23  for UMMC.  She's a respiratory therapist.

24       **MR. MORGAN:**  You're Juror No. 18?

25       **PROSPECTIVE JUROR:**  Yes, sir.

1          **MR. MORGAN:**  Do you know what -- your stepdaughter,

2     was that right, is a respiratory therapist.  Do you know if she

3     works in a specific part of the hospital or for a specific

4     group?

5          **PROSPECTIVE JUROR:**  I don't know.

6          **MR. MORGAN:**  Thank you.

7          **PROSPECTIVE JUROR:**  Juror No. 10.  I am not sure if

8     this counts, my sister-in-law works for UMMC, her name is

9     Dolores Bankston, for medical coding and billing, but I am not

10    sure which department.

11         **MR. MORGAN:**  You said medical coding?

12         **PROSPECTIVE JUROR:**  Medical coding and billing.

13         **MR. MORGAN:**  You did the right thing, it's always

14    better to be safe than sorry and mention something than not.

15         **PROSPECTIVE JUROR:**  Okay.

16         **PROSPECTIVE JUROR:**  Juror No. 23, my mother works at

17    UMMC in the pavilion.

18         **MR. MORGAN:**  Your mother did?

19         **PROSPECTIVE JUROR:**  She does now still.

20         **MR. MORGAN:**  What is her position there?

21         **PROSPECTIVE JUROR:**  She works at the desk, like she

22    checks people in.

23         **MR. MORGAN:**  So like in the admissions department?

24         **PROSPECTIVE JUROR:**  I think so, I am not sure.

25         **MR. MORGAN:**  Thank you very much.

1         **PROSPECTIVE JUROR:**  You're welcome.

2         **MR. MORGAN:**  Your Honor, is it okay if we take a

3 five-minute break?  I would like to consult with my colleagues.

4         **THE COURT:**  Are you in the middle or do you think you

5 are about to wrap up?

6         **MR. MORGAN:**  I would say closer to the end, two

7 thirds-ish.

8         **THE COURT:**  Okay.  Let's take about a five to --

9 let's say 10 minutes since there's so many of you all.  Now,

10 keep in mind when we take breaks it's very important because

11 what you have to remember is you cannot discuss the case, you

12 can't discuss the lawyers, you can't discuss anything that you

13 have heard so far with each other.  So please keep that in mind

14 when we take this break.

15      Also, I know that they have confiscated your cell phones,

16 they're probably all in your car.  The other thing I also say

17 is no independent research.  So there are bathrooms on this

18 floor, there's bathrooms on other floors, too, if you would

19 like to take the elevator and do that, you are welcome to.  But

20 I want you to look at your neighbor on both sides and find that

21 seat when you come back in here and then confirm for me when

22 you get back in here that your neighbor is back in here.  Let's

23 take about a 10-minute break.  It's 10:30 right now.  Everyone

24 be back in your seat by 10:40.  Court will be in recess.

25        **(PROSPECTIVE JURORS OUT AT 10:30 A.M.)**

1      **(RECESS TAKEN AT 10:30 A.M. UNTIL 10:43 A.M.)**

2           **THE COURT:**  You may proceed.

3           **MR. MORGAN:**  May it please the Court.  I want to ask,

4      again, kind of the row by row questions here.

5           Has anyone here been accused of something that ended up

6      not being true?  Anybody in row 1 have that experience before?

7      No?  Anyone in row 2 have that experience where you have been

8      accused of something that ended up not being true?  I am going

9      to ask it a different way to row 1.  Has there ever been a

10     situation where you have accused someone of something that

11     ended up not being true?  And I am not talking about a formal

12     criminal complaint or anything like that.  I am also not

13     talking about, hey, you took that extra slice of pizza and you

14     say you didn't.  You know, something serious.  But in row 1,

15     has anybody ever accused someone of something that ended up not

16     being true and you felt bad about it?

17          Row number 2, anybody?

18          What about row number 3, has anyone both ways, accused

19     someone of doing something that ended up not being true, or you

20     yourself accused of something that ended up not being true?

21     Anyone?  No?  Okay.

22          Row number 4, last row.  Anyone there?  Juror No. 27.

23          **THE COURT:**  Hold on one second.  Stand up for me.

24     Tell me your juror number.

25          **PROSPECTIVE JUROR:**  Juror No. 27.  At work I had a

1    situation where another gentleman kind of didn't get along, get

2    along, but he always accused me of being extra loud at work.

3    Just always was writing the supervisor saying I was extra loud

4    at work.  I have a voice that carries, but I wasn't the only

5    one.  But in whatever situation, he referred it to me.  It so

6    happened one morning that he accused me of it, and I wasn't

7    even at work.  So I immediately referred that to the supervisor

8    and we kind of got it taken care of.

9           **MR. MORGAN:**  I was going to ask, how do you fix that

10   situation?

11          **PROSPECTIVE JUROR:**  He messed up.  He accused me one

12   morning, wrote it, said it was me when I wasn't even there.  I

13   immediately wrote a letter to my supervisors and I asked them

14   to take care of that.

15          **MR. MORGAN:**  That's a really good example.  Anybody

16   have any similar experiences in their work history, again, both

17   ways where anything like that has ever happened?  Anything?

18          **THE COURT:**  Mr. Morgan, before you move on to your

19   next question, anybody raise your hand if your neighbor is not

20   next to you.  If your neighbor is missing after the break.

21   Thank you.

22          **MR. MORGAN:**  Juror No. 1, I wanted to ask a follow-up

23   question to you.  The employee agreement.  While the microphone

24   is coming down, what I want to ask you, sir, is obviously you

25   are in that situation, the employer and you have an employment

1    agreement with this employee; correct?

2           **PROSPECTIVE JUROR:**  Correct.

3           **MR. MORGAN:**  And is that going to allow you to be

4    fair in this case and be able to judge all of the evidence

5    equally or are you going to have just a little bit of an edge

6    to the employer because you're familiar in sitting in that

7    situation like they are?

8           **PROSPECTIVE JUROR:**  I think I will be fair.

9           **MR. MORGAN:**  If it's a tie, are you going to side

10    with the employer, though, when there's ties?

11           **PROSPECTIVE JUROR:**  No.

12           **MR. MORGAN:**  You will judge it independently and

13    listen to the evidence and the law as the judge instructs it?

14           **PROSPECTIVE JUROR:**  Correct.

15           **MR. MORGAN:**  Thank you.  Juror No. 2, I did want to

16    ask you some follow-up as well.  You work for UMMC?

17           **PROSPECTIVE JUROR:**  Yes, sir.

18           **MR. MORGAN:**  So is that going to be uncomfortable for

19    you at the workplace if you have to render a verdict against

20    the place that you work?

21           **PROSPECTIVE JUROR:**  No, sir.

22           **MR. MORGAN:**  You don't think there would be anybody

23    coming to you and talking to you about that or any reservations

24    from you about that?

25           **PROSPECTIVE JUROR:**  No, sir.

1      **MR. MORGAN:**  And then the similar question about --

2  are you going to be predisposed, if there's some sort of tie in

3  the evidence or whatnot, to side with UMMC because you work

4  there?

5      **PROSPECTIVE JUROR:**  No, sir.

6      **MR. MORGAN:**  So if UMMC does something wrong, you

7  want to hold them accountable?

8      **PROSPECTIVE JUROR:**  Yes.

9      **MR. MORGAN:**  If you view all this information and

10  believe the contract was breached, you would rule against UMMC?

11      **PROSPECTIVE JUROR:**  Exactly.

12      **MR. MORGAN:**  Juror No. 7?

13      **THE COURT:**  Please stand for me.

14      **PROSPECTIVE JUROR:**  Yes, sir.

15      **MR. MORGAN:**  I want to ask you kind of similar

16  questions because I know your wife works at UMMC.  Would that

17  create any tension with you in making decisions on this case

18  that you could be adversely affecting your wife's employer?

19      **PROSPECTIVE JUROR:**  I don't think so.

20      **MR. MORGAN:**  If it's a tie again, would you side with

21  UMMC over the plaintiff?

22      **PROSPECTIVE JUROR:**  No, sir.

23      **MR. MORGAN:**  You would independently, on your own

24  volition, your own mind weigh the evidence and law and make

25  your own decision, not weight it at all by any affiliation or

1    whatnot to UMMC?

2              **PROSPECTIVE JUROR:**  That's correct.

3              **MR. MORGAN:**  Thank you.  Juror No. 14, I know you

4    don't work for UMMC, but obviously you and your wife are both

5    in the medical field as nurses; correct?

6              **PROSPECTIVE JUROR:**  Yes, sir.

7              **MR. MORGAN:**  Does that give you a sort of tie or

8    feeling that you want to protect the medical industry in any

9    sort of way in this type of case?

10             **PROSPECTIVE JUROR:**  No, sir.

11             **MR. MORGAN:**  If you view the evidence and you believe

12   UMMC violated these contracts, you're willing to render a fair

13   verdict in favor of Dr. Papin?

14             **PROSPECTIVE JUROR:**  Right, yes, sir.

15             **MR. MORGAN:**  So being a nurse or your wife being a

16   nurse in no way will affect your decision-making process?

17             **PROSPECTIVE JUROR:**  No, sir.

18             **MR. MORGAN:**  Okay.  Thank you.  Thank you very much.

19   I have one more kind of the big picture questions again here

20   for everybody.  We'll go row by row again.

21        I am going to ask you to kind of choose between these two

22   equilibriums here:  Are you a person who has to see hard proof,

23   or are you someone who can hear it from somebody else and

24   accept it?  And I know that's tough because most people are

25   somewhere in the middle, right, you're not all the way here or

1    you're not all the way here, but if you had to put it with that

2    50/50 marker right in the middle, would you lean one way or the

3    other?  Again, it's you must have to see hard proof, or if you

4    hear it from someone you will believe it, you would believe it,

5    you don't need to see the hard proof.

6         I will start with row one.  Who has got to see the hard

7    proof, they want to see the hard evidence?  Looks like

8    everybody, one through seven.

9         Row 2?  I'm sorry, the hard evidence, yes.  You got to see

10   hard evidence.  You got to see direct evidence, you got to see

11   where it says that it can't be, you know, I heard this that

12   heard this from that neighbor?  Looks like everybody again;

13   correct?

14        Row 3, is everybody on that row, or is anybody, if I hear

15   it -- start over.  Who is on the hard evidence side of the

16   equation?  Everybody.  And then row 4, who is on the hard

17   evidence side of the equation?

18        15 seconds, Your Honor?

19             **THE COURT:**  Yes.

20             **MR. MORGAN:**  Thank you very much for your time.  I do

21   not have any more questions.

22             **THE COURT:**  Thank you, Mr. Morgan.  Mr. Watkins?

23             **MR. WATKINS:**  Thank you, Your Honor.

24                 **VOIR DIRE EXAMINATION BY MR. WATKINS**

25        Morning everybody.  Appreciate y'all's patience for

1    bearing with us here.  Ryan alluded to the fact that y'all

2    would all be great jurors at some point, but it's just the

3    truth that maybe there are certain cases that certain people

4    aren't particularly well suited for, and that's why we go

5    through this exercise.

6         **THE COURT:**  Mr. Watkins, I hate to interrupt you.

7    You are soft spoken, I can already tell.  If you will pull that

8    microphone close to you to make sure Ms. Penny can pick up

9    everything you're saying.

10        **MR. WATKINS:**  Yes, ma'am.  Can y'all hear me okay

11   back there?  Okay.  I'll try to keep that in mind.

12        I do want to remind everybody that as we are going

13   through, the judge mentioned earlier that if any of you has a

14   response to a question that you don't necessarily want to say

15   in front of everybody in the courtroom, just raise your hand

16   and let us know and we can go up and speak in private to the

17   judge.  We don't want to embarrass anybody or make you feel put

18   out or anything.

19        So we represent the University of Mississippi Medical

20   Center.  You all are all familiar with the medical center, I'm

21   sure.  The medical center is affiliated with the University of

22   Mississippi, but it's not the same thing as the main university

23   campus up in Oxford, right.  The medical center is housed down

24   here.  And it has the hospital, obviously.  It's also got the

25   School of Medicine, School of Dentistry.  So there's a lot of

1    different things going on, and that's a long-winded way of me

2    wanting to point out to y'all that the medical center does not

3    have its own football team, okay?

4         Is there anybody who is sitting out there with us today

5    that would have a problem sitting on a jury and being impartial

6    to the medical center because it's affiliated in any way with

7    the University of Mississippi?  Is that a half raise over

8    there?

9              **PROSPECTIVE JUROR:**  I graduated from State, but I

10   will be fair-minded in this situation.

11             **MR. WATKINS:**  You're sure about that?

12             **THE COURT:**  Hold on one second.  If we're going to

13   talk, I need a microphone.

14             **MR. WATKINS:**  That's number 8; is that right?

15             **PROSPECTIVE JUROR:**  Juror No. 8, John Evans.

16             **MR. WATKINS:**  So you said you're a Mississippi State

17   graduate?

18             **PROSPECTIVE JUROR:**  Yes, sir.

19             **MR. WATKINS:**  So I know who you're rooting for during

20   the Egg Bowl; right?

21             **PROSPECTIVE JUROR:**  Yes, you better believe it.

22             **MR. WATKINS:**  You're not necessarily rooting against

23   the medical center though; right?

24             **PROSPECTIVE JUROR:**  No, sir.

25             **MR. WATKINS:**  Do you think you being a Mississippi

1    State fan is going to impact the way you view this case at all?

2              **PROSPECTIVE JUROR:**  Not at all.

3              **MR. WATKINS:**  And to borrow a phrase from my fellow

4    counsel over here, if there's a tie are you going to give it to

5    the side that's not the medical center because of your

6    affiliation with State?

7              **PROSPECTIVE JUROR:**  No, sir.

8              **MR. WATKINS:**  Thank you.  We went through a lot of

9    questions asking about whether anybody knew some of the

10   witnesses and any of the parties or anything.  As y'all looked

11   around at each other, is there anybody out here in the jury

12   pool that knows any other member of the jury pool?  Any of

13   y'all ever -- yes, ma'am.  Number -- this is number 15?

14             **PROSPECTIVE JUROR:**  Number 15.

15             **MR. WATKINS:**  Ms. Cooper.

16             **PROSPECTIVE JUROR:**  Yes.  I know Ms. Jana from a very

17   long time ago.  Her sister used to baby-sit me.

18             **THE COURT:**  It looks like Ms. Jana is Juror No. 13.

19             **MR. WATKINS:**  Ms. Cooper, sorry -- I let him take the

20   microphone away from you.  While it's passing back down, what I

21   wanted to ask you if the two of y'all ended up on the jury

22   together, do you think your judgment would be independent of

23   hers and you would be able to exercise your own judgment based

24   on your view of the evidence?

25             **PROSPECTIVE JUROR:**  I suspect we could be

1   independent.

2          **MR. WATKINS:**  Could we pass the microphone up,

3   please, to Ms.  Robertson, too.  Ms. Robertson, you heard me

4   ask Ms. Cooper that question; I'll ask the same question to

5   you.  If y'all both ended up on the jury, do you think you

6   could exercise your own independent judgment?

7          **PROSPECTIVE JUROR:**  Yes.

8          **MR. WATKINS:**  Okay.  Y'all know by now we haven't

9   gotten into the details of the case, but this is an employment

10  case.  Dr. Papin alleges that the medical center breached its

11  employment contract with him.  Has anybody out there, and let's

12  start with the first row because that seems like a good

13  approach, does anybody out there or a family member not gotten

14  a job or been terminated from a job under circumstances that

15  they didn't think were fair?

16      Same question to the second row, have any of y'all ever

17  not gotten a job or lost a job under circumstances that you

18  didn't believe were fair?  Yes, ma'am, number -- is that 12,

19  Ms. Corely?

20         **PROSPECTIVE JUROR:**  No. 12, Ms. Corley.  I would say

21  it was about 18 years ago.  I was working as an accountant and

22  receptionist/secretary for a law firm.  I don't think the head

23  of the law firm really -- I don't think our personalities --

24  they just one day just fired me.  I never got the reason.  They

25  stood there while I cleared out my desk.  I didn't like it.

1    And I was not given a reason, just that they had the right.

2         **MR. WATKINS:**  Thank you very much.  That was the

3    second row.  Moving back to the third row, same question.  Has

4    anybody ever -- anybody themselves or a family member lost a

5    job or not gotten a job under circumstances they didn't think

6    were fair?  Yes, ma'am, number --

7         **PROSPECTIVE JUROR:**  Juror 18.

8         **MR. WATKINS:**  Yes, ma'am.

9         **PROSPECTIVE JUROR:**  This was, I don't know, 15 or so

10   years ago.  I was let go from a position.  The reason given was

11   I didn't perform -- the letter of exit said that I did fine.

12   When I filed for unemployment, they told unemployment that I

13   wasn't doing my job, so I provided this letter stating that it

14   had nothing to do with me personally or my job duties.  And so

15   it was resolved, and I did receive my unemployment, but the --

16   how the employer handled it was sneaky and they were caught.

17        **MR. WATKINS:**  You mentioned that in the letter that

18   you got they said that your performance was fine.  What was the

19   reason they gave you for letting you go?

20        **PROSPECTIVE JUROR:**  I was no longer needed.  They

21   created the position for me.  I was a call coordinator for a

22   tech center.  And a year later they uncreated -- they dissolved

23   the position.

24        **MR. WATKINS:**  Ms. Phillips, let me ask you, do you

25   think that in this case where somebody has made an allegation

1   that they were unfairly let go, do you think maybe that

2   experience would sort of give you a different perspective on

3   the facts of this case?

4       **PROSPECTIVE JUROR:**  No.  I had proof, and so I am a

5   proof person.  It wasn't -- I wasn't going to just, oh, well

6   they said that, that's done.  No.  I look at the facts.  I

7   provided facts.

8       **MR. WATKINS:**  When you say that you were trying to

9   get those unemployment benefits, did you have to go through a

10  hearing with the Employment Security Commission, then, at the

11  time?

12      **PROSPECTIVE JUROR:**  No, it didn't go that far.  The

13  unemployment people evidently came back to the tech center and

14  said, we have a copy of this proof that said that she did

15  perform her duties.

16      **MR. WATKINS:**  And after that, they awarded you those

17  unemployment benefits?

18      **PROSPECTIVE JUROR:**  Yes.

19      **MR. WATKINS:**  Okay.  Thank you very much.  We made it

20  to the third row.  Let's go to the fourth row and ask the same

21  question.  Has anybody themselves or a family member either not

22  gotten a job or lost a job under circumstances that they didn't

23  think were fair?  Yes, sir.  That's 25; is that correct?

24      **PROSPECTIVE JUROR:**  25, yes.  We had a big layoff,

25  and they only laid off 80 percent of the new-hires, and I

1    didn't think that was fair.  And also, my dad had a job on

2    staff with AT&T and he was getting on up in age and they pushed

3    him out.  So he wasn't quite ready, but those are the two

4    cases.

5            **MR. WATKINS:**  Let me back up to the first case you

6    were talking about.  You said there was a layoff and only

7    80 percent of the new-hires were laid off; is that right?

8            **PROSPECTIVE JUROR:**  Right.

9            **MR. WATKINS:**  So does that mean there were also a

10   portion of workers that had been there for a while that were

11   laid off?

12           **PROSPECTIVE JUROR:**  No, not at that time.  They did

13   it by age, but somehow or another they were able to keep

14   20 percent of the new-hires.

15           **MR. WATKINS:**  And were you laid off at that time?

16           **PROSPECTIVE JUROR:**  I was.

17           **MR. WATKINS:**  And was that AT&T?

18           **PROSPECTIVE JUROR:**  Well, it was called Western

19   Electric at the time, but it was an affiliate of AT&T.

20           **MR. WATKINS:**  About how long ago was that?

21           **PROSPECTIVE JUROR:**  Forty something years ago,

22   forty-six years ago.

23           **MR. WATKINS:**  You mentioned something similar with

24   your dad about AT&T, I think.  Tell me about that situation.

25           **PROSPECTIVE JUROR:**  Yeah, he was on the staff, and

1    you know, had gotten on up there pretty good.  They hired a

2    young guy to cut some heads, I guess, and he was one of them.

3    And he was going to retire probably in a year or two, but they

4    pushed him on out.

5            **MR. WATKINS:**  Did you or your dad pursue any legal

6    action or anything against those employers at the time?

7            **PROSPECTIVE JUROR:**  No.

8            **MR. WATKINS:**  Is it fair to say that those

9    experiences left sort of a bad taste in your mouth?

10           **PROSPECTIVE JUROR:**  Yeah, sure.

11           **MR. WATKINS:**  Thank you.  Circle back around real

12   quick and ask whether anybody on row 1 has ever been

13   responsible for hiring employees?  Number 1, number 3 and

14   Number 7.  Talk to Mr. Hammitt again real quick.

15           **PROSPECTIVE JUROR:**  Number 1, Keith Hammitt.

16           **MR. WATKINS:**  And I understand you're a small

17   business owner; right?

18           **PROSPECTIVE JUROR:**  Yes, sir.

19           **MR. WATKINS:**  So how many employees do you have?

20           **PROSPECTIVE JUROR:**  Twenty.

21           **MR. WATKINS:**  Twenty. what's your turnover like?

22           **PROSPECTIVE JUROR:**  Pretty rapid.

23           **MR. WATKINS:**  Pretty regular?  What kind of workers

24   do you have?  What, generally, are you hiring folks to do?

25           **PROSPECTIVE JUROR:**  Labor, helping delivery, things

 1  like that.

 2          **MR. WATKINS:**  So about how often do you have to go

 3  hire a new worker, you think?

 4          **PROSPECTIVE JUROR:**  Once a month.

 5          **MR. WATKINS:**  Once a month.  Is that because you have

 6  lost somebody else for some reason?

 7          **PROSPECTIVE JUROR:**  Correct.

 8          **MR. WATKINS:**  Do you ever have to fire anybody?

 9          **PROSPECTIVE JUROR:**  No.

10          **MR. WATKINS:**  Do you have folks that sometimes

11  no-show?

12          **PROSPECTIVE JUROR:**  I have fired someone.  As a

13  matter of fact, I am in a lawsuit right now for the same exact

14  situation I am here for, wrongful termination.

15          **MR. WATKINS:**  Who is the name of that employee that

16  you are in the lawsuit with?

17          **PROSPECTIVE JUROR:**  My company is Hammitt Contractors

18  Millwork, and one of the previous owners worked for me after

19  the buy, and I had to fire her.

20          **MR. WATKINS:**  Was this the employee that had the

21  employment contract?

22          **PROSPECTIVE JUROR:**  No.

23          **MR. WATKINS:**  Okay.  And so she -- this employee did

24  not have a contract with you?

25          **PROSPECTIVE JUROR:**  Correct.

1          **MR. WATKINS:**  Do you know, just off the top of your

2     head, what the allegations in that lawsuit are?

3          **PROSPECTIVE JUROR:**  Just wrongful termination, far as

4     I know.

5          **MR. WATKINS:**  Do you know what court that's in?

6          **PROSPECTIVE JUROR:**  County Court, Rankin.

7          **MR. WATKINS:**  Rankin County Court.  Have y'all had to

8     go to any live hearings or trials or anything like that?

9          **PROSPECTIVE JUROR:**  Depositions start in a week.

10         **MR. WATKINS:**  So you have not yet been deposed?

11         **PROSPECTIVE JUROR:**  Correct.

12         **MR. WATKINS:**  Do you know when your deposition is

13    scheduled?

14         **PROSPECTIVE JUROR:**  I do not.

15         **MR. WATKINS:**  Okay.  Thank you.  If you could pass

16    down to number 3, please, Mr. Patton.  Mr. Patton, tell me

17    about your experience.

18         **PROSPECTIVE JUROR:**  Number 3, Gabe Patton.  My last

19    job, Blue Ribbon Kennels, I trained dogs, like hunting and

20    stuff.  I was in charge of going out and looking for other

21    people that kind of knew what they were doing, if that makes

22    sense.

23         **MR. WATKINS:**  Once you went and would recruit those

24    people and hire them in, were you responsible for supervising

25    them?

1          **PROSPECTIVE JUROR:**  Yeah.  I was responsible for

2     teaching them the way we did stuff.  I couldn't fire anybody,

3     but pretty much showing them how to do things.

4          **MR. WATKINS:**  Were you the one who ultimately hired

5     them or did you just bring them in and say, I think this would

6     be a good person?

7          **PROSPECTIVE JUROR:**  Yeah, more like recommendation

8     type thing.  I'd bring them in and say, hey, I think this is a

9     good fit, boss be like, yeah.

10          **MR. WATKINS:**  Okay.

11          **PROSPECTIVE JUROR:**  He had the final say on both

12     sides of it.

13          **MR. WATKINS:**  Were you ever involved in any

14     performance evaluations or anything like that?

15          **PROSPECTIVE JUROR:**  Yeah, he'd ask me how they were

16     doing.

17          **MR. WATKINS:**  Did you ever do any written performance

18     evaluations?

19          **PROSPECTIVE JUROR:**  Video them sometimes.

20          **MR. WATKINS:**  Like how they were doing with the dogs?

21          **PROSPECTIVE JUROR:**  Yeah.

22          **MR. WATKINS:**  Thank you, I appreciate it.  Pass it

23     down to number 7.  I think, Mr. Nations, you raised your hand?

24          **PROSPECTIVE JUROR:**  Number 7, Paul Nations.

25          **MR. WATKINS:**  And you said you were responsible for

1    hiring or supervising employees at some time?

2         **PROSPECTIVE JUROR:**  My previous job, I was a branch

3    operations manager, so I pretty much hired and fired folks.

4         **MR. WATKINS:**  About how many folks worked under you

5    at any given time?

6         **PROSPECTIVE JUROR:**  Probably had about eight total.

7         **MR. WATKINS:**  Just generally, what were their

8    responsibilities?

9         **PROSPECTIVE JUROR:**  We sold building materials, and I

10   had warehouse workers, I had truck drivers, I had people that

11   did sales inside, we just --

12        **MR. WATKINS:**  Did y'all have a decent turnover rate?

13   I mean, did you have to hire people a lot?

14        **PROSPECTIVE JUROR:**  We had to hire a few here and

15   there, and we kind of expanded, had to get new truck drivers,

16   some things happened and people had to be let go, and things

17   happen sometimes.

18        **MR. WATKINS:**  And were you directly involved and have

19   to let folks go?

20        **PROSPECTIVE JUROR:**  On several occasions, yes, sir.

21        **MR. WATKINS:**  And generally speaking, what kind of

22   infractions did you have to let folks go for?

23        **PROSPECTIVE JUROR:**  Just not doing their job

24   correctly, making mistakes, insubordination in one case.

25   People just -- had a new boss come in that wanted to hire a

1   bunch of temp workers, and it didn't really work out, and we

2   had to clear all that out and it caused a bunch of problems.

3           **MR. WATKINS:**  Understood.  Thank you.  I appreciate

4   your time.

5       Move back to row 2 and ask the same type of question.  Has

6   anybody ever been responsible for hiring or supervising

7   employees back on row two?  Yes, ma'am, number -- is that 11,

8   Ms. Jackson?

9           **PROSPECTIVE JUROR:**  Number 11.

10          **MR. WATKINS:**  Tell me about your experience when you

11  had to hire people.

12          **PROSPECTIVE JUROR:**  I've been selected several times

13  on the interview committee.  I've never hired, but I was on the

14  interview committee to interview potential employees for the

15  school.

16          **MR. WATKINS:**  And this was all in the educational

17  field?

18          **PROSPECTIVE JUROR:**  Right.

19          **MR. WATKINS:**  Did you do K-12 education?

20          **PROSPECTIVE JUROR:**  I did K through 12.

21          **MR. WATKINS:**  What district were you in?

22          **PROSPECTIVE JUROR:**  Meridian Public School.

23          **MR. WATKINS:**  Did you ever work in administration?

24          **PROSPECTIVE JUROR:**  No, I didn't.

25          **MR. WATKINS:**  So in those cases, the interview

1  committee is going to make a recommendation, I guess, up to

2  your principal, who makes the final decision; right?

3      **PROSPECTIVE JUROR:**  That's right.

4      **MR. WATKINS:**  Thank you very much.  I don't think I

5  saw anybody else on row two.

6      Same question to row 3.  Has anybody on row 3 ever been

7  responsible for hiring employees?  Yes, sir.

8      **PROSPECTIVE JUROR:**  Juror No. 19, Gordon Cantrell.  I

9  am an environmentalist at my facility.  I am over the

10  housekeeping, laundry and maintenance.  And I routinely hire

11  people and have to terminate people.

12      **MR. WATKINS:**  About how many people work for you?

13      **PROSPECTIVE JUROR:**  About 15.

14      **MR. WATKINS:**  And what's your turnover rate look like

15  just generally?

16      **PROSPECTIVE JUROR:**  Well, it's not that bad.  Most of

17  my employees have been with me for a long time, but currently

18  there's several employees that -- it's about once a month they

19  don't work out.

20      **MR. WATKINS:**  Okay.

21      **PROSPECTIVE JUROR:**  The maintenance department.

22      **MR. WATKINS:**  And what's the most common reason or

23  reasons that they don't work out?

24      **PROSPECTIVE JUROR:**  They don't show up.

25      **MR. WATKINS:**  That's not going to work out, is it?

1    Thank you very much, I appreciate you.

2         I don't think anybody else on row 3.  Row 4, anybody back

3    on row 4 ever been responsible for hiring employees?  Yes, sir,

4    26, I believe?

5              **PROSPECTIVE JUROR:**  26, Elton Edwards.

6              **MR. WATKINS:**  Tell me about that, Mr. Edwards.

7              **PROSPECTIVE JUROR:**  I work at a retail outlet, I work

8    for Wal-Mart, so we hire folks all the time.  And we terminate

9    people all the time, too, for different reasons of termination,

10   could be from breaking policy, for not coming to work, or for

11   not doing their jobs like they're supposed to and stuff.  I've

12   been with the company for like 30 years, so I've hired and

13   terminated a lot of people in my lifetime.

14             **MR. WATKINS:**  And a big retail operation like that, I

15   imagine you've probably seen it all; right?

16             **PROSPECTIVE JUROR:**  Right.

17             **MR. WATKINS:**  Thank you, I appreciate it.  I am going

18   to circle back around, and I am trying not to take too much

19   time because Mr. Morgan and the Court handled a lot of the

20   preliminaries so we can skip through some of that.

21        Mr. Nations, number 7, your wife is a nurse at the medical

22   center.  Remind us, what is it that she does, what department

23   is she in over there?

24             **PROSPECTIVE JUROR:**  I am number 7, Paul Nations.  She

25   actually works for -- she's not in medical now, she's kind of

1    administrative.  She reviews charts for the Cancer Institute

2    for people getting approvals, to make sure their insurance

3    covers what their treatment is, and has to deal with doctors

4    and administrators and all the technical people that handle --

5    billing folks, I guess.  So she deals with that.

6              MR. WATKINS:  Everybody.

7              PROSPECTIVE JUROR:  Everybody.

8              MR. WATKINS:  Thank you, I appreciate that.

9         Is it Attipoe; is that right?

10             PROSPECTIVE JUROR:  Attipoe.

11             MR. WATKINS:  Sorry, number 2.  You mentioned you had

12   seen Dr. Crews, is that spelled C-R-E-W-S?

13             PROSPECTIVE JUROR:  No.

14             MR. WATKINS:  Was this a younger guy or an older guy?

15             PROSPECTIVE JUROR:  Older.

16             MR. WATKINS:  Over 30?

17             PROSPECTIVE JUROR:  Yes, sir.

18             MR. WATKINS:  Thank you.  Ms. Stewart, number 9.

19   You're over at Jackson State; is that right?

20             PROSPECTIVE JUROR:  Yes.

21             MR. WATKINS:  What's your position over there?

22             PROSPECTIVE JUROR:  I'm the archivist over the

23   Margaret Walker Center at Jackson State University.

24             MR. WATKINS:  Are you considered a member of faculty?

25             PROSPECTIVE JUROR:  No, I'm a professional staff

1   person.

2         **MR. WATKINS:**  You're just on a series of one-year

3   contracts?

4         **PROSPECTIVE JUROR:**  Yes.

5         **MR. WATKINS:**  Are there faculty members in your

6   department?

7         **PROSPECTIVE JUROR:**  Yes.  Our director is a tenured

8   faculty member.

9         **MR. WATKINS:**  Thank you, I appreciate that.

10        I am going to ask the whole group, and we may need to hone

11   in a little bit, has anybody ever been treated or had a family

12   member treated at the medical center?  That's what I figured.

13        Let me ask this instead of going down and asking every one

14   of you:  Has anybody ever had, either because of themselves

15   being treated at the medical center or a family member being

16   treated at the medical center, an experience there that just

17   sort of left a bad taste in your mouth?  Let's start with

18   number 2, Ms. Attipoe again.  Tell me a little bit about that,

19   please.

20        **PROSPECTIVE JUROR:**  I got treated at the family

21   medicine clinic on Lakeland.  I don't remember her name, but I

22   did submit a complaint.  It was just rudeness for what I came

23   in for.  It was like judgment and everything.

24        **MR. WATKINS:**  Was this a doctor or a nurse

25   practitioner?

1          **PROSPECTIVE JUROR:**  A physician, MD, yes, sir.

2          **MR. WATKINS:**  Say that again.

3          **PROSPECTIVE JUROR:**  A physician, yes, sir.

4          **MR. WATKINS:**  Number 3, I think you held your hand

5     up, too?

6          **PROSPECTIVE JUROR:**  A couple years ago I broke my

7     leg.  And back then, I think I was in the Children's Hospital

8     for some reason.  I was under 18, so I guess that's the reason.

9     They just -- every time I would call and ask for something it

10    would take like a real long time, like they didn't really have

11    no urgency for me.

12         **MR. WATKINS:**  Were you an inpatient, were you in the

13    hospital?

14         **PROSPECTIVE JUROR:**  I was in the hospital for a week.

15         **MR. WATKINS:**  When you say you called for something,

16    you're like hitting the button on the bed?

17         **PROSPECTIVE JUROR:**  Yeah, I am hitting the button.

18    And they would say, yeah, we'll bring it, and forgot about me

19    and throw it on the back burner.

20         **MR. WATKINS:**  Thank you.  I appreciate that.  Anybody

21    else on row one that had their hand raised?  Saw somebody on

22    row two, maybe number 10?

23         **THE COURT:**  I think Mr. Nations.

24         **MR. WATKINS:**  I'm sorry, Mr. Nations.

25         **PROSPECTIVE JUROR:**  I am number 7.  My daughter has

1    been treated at Madison.  And right now, they're going through

2    that whole insurance thing and it's causing a lot of issues.

3    We are having to find different insurance.  It's not a good

4    thing.

5              **MR. WATKINS:**  So y'all are covered by BlueCross

6    BlueShield?

7              **PROSPECTIVE JUROR:**  Yeah, she has her own separate

8    policy, now she has to find another policy.  My wife works

9    there, she's got the BlueCross whatever.  It's causing some

10   problems.

11             **MR. WATKINS:**  I hear you, thank you.  Appreciate it.

12   Was that number 10 I saw?  Okay.

13             **PROSPECTIVE JUROR:**  I was scheduled for a C-section

14   at UMC.  And at the time of the C-section, they had a nurse to

15   come in and give me the epidural.  She was having trouble

16   giving me the epidural, so they called somebody else in, and

17   she was having complications, well, problems giving me the

18   epidural.  So they called a supervisor, whoever he was.  He

19   came in and he still couldn't figure it out.  So finally, they

20   took me under.  Well, when I woke up from it, I was having

21   complications.  I couldn't hold my baby in the hospital or

22   anything.  And when I went home, I still had complications.  I

23   couldn't stand up straight due to whatever they were doing,

24   trying to, I guess, insert the epidural or whatever.  I just

25   had major complications from that, I just -- I just said I

1    wouldn't go back to that hospital.

2            **MR. WATKINS:**  Ms. Osborne, would you agree with me

3    maybe that this might not be the best case for you to sit on a

4    jury given your experience with the medical center?

5            **PROSPECTIVE JUROR:**  I think so.

6            **MR. WATKINS:**  I appreciate your candor.  Anybody else

7    on row two had their hand raised?  What about three?  Anybody

8    else on three?  Anybody on four have their hand raised?  Yes,

9    sir, Mr. Welch?

10           **PROSPECTIVE JUROR:**  Number 25.  Excuse me.  I had a

11   collapsed lung one time, went to UMMC.  It seemed like they

12   were taking forever to get it back up.  They were having

13   problems with the -- I think they called it a Heimlich valve,

14   something like that.  And so my doctor said I needed to get

15   transferred to another hospital, so I did.  So kind of a, I

16   don't know, like he said, lack of importance on my case.

17           **MR. WATKINS:**  About how long ago was that?

18           **PROSPECTIVE JUROR:**  30 years.

19           **MR. WATKINS:**  Okay.  Was this something, were you in

20   the emergency department when that was going on?

21           **PROSPECTIVE JUROR:**  I came into the emergency.

22   That's the way I entered, through the emergency department.

23           **MR. WATKINS:**  Thank you, I appreciate it.

24           **PROSPECTIVE JUROR:**  Also, my first cousin is being

25   treated right now in the UMMC.

1          **MR. WATKINS:**  What's your cousin being treated for?

2          **PROSPECTIVE JUROR:**  He went in and they thought it

3   was radiation, eleopathy or something like that.  And since

4   when he went in, they found out he had a couple of tumors that

5   were in his colon and it had swollen.  They had to do immediate

6   surgery.  And they had not put contrast on the first CAT scan,

7   so it didn't show up.  So he was in severe pain for about a

8   week before they did another CAT scan and then they found that.

9   Also spots on his liver.  In the meantime after the surgery,

10  his heart rate went up to about 135, they couldn't get it

11  stabilized, put him in ICU; finally, back to another room.

12  They do have it stabilized, and he was doing better the last

13  time I saw him but he's been through a hard time.

14          **MR. WATKINS:**  Thank you.  I appreciate that.

15  Mr. Nations mentioned a few moments ago his family had trouble

16  with insurance issues with the medical center in trying to get

17  a family member's condition covered.  Is there anybody else in

18  the jury pool today that has had an insurance issue related to

19  not being able to get coverage for something at the medical

20  center?  Is there anybody that has been affected by coverage

21  through BlueCross BlueShield or some other private insurance

22  that wasn't accepted at the medical center?

23          We know that -- we find out there are a good number of

24  y'all that either are healthcare providers or have healthcare

25  providers in your family.  Is anybody familiar with the term

1   "resident" in the context of a hospital?  Raise your hand.

2   Y'all have heard that word.  I was telling my wife about the

3   case, and she said, yeah, anybody who's watching an episode of

4   "Gray's Anatomy" is going to know what you're talking about

5   there.

6        If you stick around and serve on this jury pool, you're

7   going to hear a lot about residents and residencies.  A

8   resident is basically a doctor apprentice.  You finish medical

9   school and you go on to be a doctor and learn additional

10  skills.

11       Does anybody have any ideas about what the medical center

12  ought to be doing with their residents and how they ought to be

13  training them?  Nothing specific?  Does anybody, and this can

14  just be a show of hands, does anybody think it's important for

15  medical residents to be able to work well with nurses and nurse

16  practitioners?

17       We talked a minute ago to a potential juror who said he

18  had been a party to a lawsuit, or that his company was a party

19  to a lawsuit.  Has anybody else ever been party to a lawsuit?

20  You were sued or somebody sued you?  Ms. Cooper, I think?  Pass

21  it down to her, please.

22            **PROSPECTIVE JUROR:**  Juror No. 15, that's right.  I

23  had a car wreck in college and ended up having to sue for

24  personal injury.

25            **MR. WATKINS:**  Did that case end up going to trial?

1          **PROSPECTIVE JUROR:** It did not. It ran on for eight

2     years.

3          **MR. WATKINS:** For eight years?

4          **PROSPECTIVE JUROR:** Yes.

5          **MR. WATKINS:** Did that end up settling?

6          **PROSPECTIVE JUROR:** Yes.

7          **MR. WATKINS:** About how long ago was that?

8          **PROSPECTIVE JUROR:** 2011.

9          **MR. WATKINS:** Was that in the State of Mississippi?

10         **PROSPECTIVE JUROR:** Yes.

11         **MR. WATKINS:** What county?

12         **PROSPECTIVE JUROR:** Lowndes.

13         **MR. WATKINS:** Over in Columbus.

14         **PROSPECTIVE JUROR:** Uh-huh.

15         **MR. WATKINS:** I know there were other hands raised.

16    Number 8?

17         **PROSPECTIVE JUROR:** Yes, sir. I am sorry. Number 8,

18    John Evans. My wife was involved in a lawsuit about four years

19    ago. And it was the same type of situation, it was an

20    automobile accident, and the other insurance company didn't

21    want to settle. We wound up suing them. After we sued them,

22    then they came up with the money. But it was for her injuries.

23    They paid for the car right away, but they didn't want to pay

24    for her injuries.

25         **MR. WATKINS:** So y'all --

1        **PROSPECTIVE JUROR:**  We didn't go to trial, no.

2        **MR. WATKINS:**  Okay.  Is there anything about that

3    experience that you think would affect your ability to be

4    partial -- impartial to both sides here?

5        **PROSPECTIVE JUROR:**  No.  Unless they work for Safeway

6    Insurance.

7        **MR. WATKINS:**  Does anybody here work for Safeway

8    Insurance?  Just kidding.  There was one more -- Mr. Welch, you

9    had your hand up for the lawsuit question, I think?

10       **PROSPECTIVE JUROR:**  I am currently involved in one.

11   I own a building in Durant, Holmes County.  We have been trying

12   to get an eviction on these people.  We have been to court two

13   or three times.  There was a loophole in the agreement.  We

14   financed the building, so -- they never would pay.  And so now

15   I am still in the middle of it.  As a matter of fact, was

16   thinking about calling my attorney this week but I said I

17   better not.

18       **MR. WATKINS:**  Well, don't tell him I sent you, okay?

19   Yes, sir, 27?

20       **PROSPECTIVE JUROR:**  27, Edward Johnson.  About '91 or

21   '92, I took a gentleman to small claims court.  I was over in

22   Jackson Square leaving from over that way at -- I think it was

23   an Army registration place.  I am driving down through normal

24   lanes.  This guy was barreling down across the parking lot, the

25   middle of the parking lot going across lanes and just rammed

1   me.   And I took him to small claims court for damages to the
2   car because he had no insurance or anything.   So I had to take
3   him to small claims court.

4           **MR. WATKINS:**  Thank you, I appreciate that
5   information.   And your recall of the early '90s continues to
6   impress us.

7           In this case, because Dr. Papin is the plaintiff, that
8   means that he has the burden to prove his case.   The Court will
9   tell you more about that later.   But Dr. Papin has to show
10  proof to support every element of his claim.   So he gets the
11  chance to go first, right?   He gets to put on all his
12  witnesses, he gets to ask them questions.   And only when he is
13  finished putting on his witnesses does the medical center have
14  a chance to put on its own witnesses.

15          So is there anybody out there that thinks they would have
16  a problem waiting to hear the whole story and reserving
17  judgment until the medical center has a chance to put on its
18  witnesses?   Anybody going to have a problem doing that?   We can
19  all agree you will hear the whole story before you make your
20  decision?   Thank you.

21          We talked a few minutes ago about -- let me ask this
22  question:   I asked a few minutes ago if anybody had had any
23  experience with the medical center with themselves or a family
24  member that sort of left a bad taste in their mouth.   Let me
25  ask the same question, not for the medical center but for any

1   other hospital.  Has anybody for themselves or a family member

2   ever been in a hospital that was not the medical center that

3   left a bad taste in their mouth?  Yes, ma'am, number 9 over

4   here, Ms. Stewart.

5        **PROSPECTIVE JUROR:**  I lost my mother to a brain stem

6   stroke.  She was treated at St. Dominic Hospital, and I was not

7   satisfied with her treatment at St. Dominics.

8        **MR. WATKINS:**  I don't want to pry into personal

9   details, but can you give me some idea of what you weren't

10  satisfied with?

11       **PROSPECTIVE JUROR:**  The level of interaction she had

12  with the person who was supposed to be treating her.  They were

13  going through a policy where she couldn't have her own doctors

14  come in and look over her charts or anything.  And it was just

15  whenever the neurosurgeon or neurologist, or I don't know what

16  the title was, would come in.  She just didn't -- I didn't

17  think she was well supervised in terms of what was going on.

18       **MR. WATKINS:**  Thank you.  I think I saw one more

19  hand.  Ms. Cooper, yes, ma'am?

20       **PROSPECTIVE JUROR:**  I had a pretty bad experience at

21  Oktibbeha County Hospital in Starkville.

22       **MR. WATKINS:**  Was that an experience with doctors

23  there or --

24       **PROSPECTIVE JUROR:**  Very, very slow care when I had

25  my car wreck.

1          **MR. WATKINS:**  Was this the same car wreck from 2011?

2          **PROSPECTIVE JUROR:**  Uh-huh.

3          **MR. WATKINS:**  Thank you.  Did anybody else have a

4   hand raised for that question?  Thank you.

5          At some point, I imagine we have all been in a hospital,

6   but has anybody ever been in a hospital environment where they

7   saw doctors being disrespectful to nurses?

8          Could I have one moment, Your Honor?

9          **THE COURT:**  You may.

10         **MR. WATKINS:**  That's all we have, Your Honor.

11         **THE COURT:**  Thank you.

12         Now, you have heard questions from me and you have heard

13  questions from counsel for both sides.  If there's anyone who

14  is sitting there thinking, I wish he would've asked me this, I

15  would've given her this answer to say that I am not the best

16  juror for this case.  Is there anybody who has been sitting

17  there saying, I've been waiting for her to ask me this question

18  and she hasn't asked me this yet?  I think it's Juror No. 25.

19  Yes, sir?

20         **PROSPECTIVE JUROR:**  Do you enjoy driving 65 or

21  75 miles to Jackson for jury duty?

22         **THE COURT:**  Are you saying that's how far --

23         **PROSPECTIVE JUROR:**  Yeah, I would've said, no, I

24  don't enjoy it.

25         **THE COURT:**  I follow you.  Are you saying you're not

1    the best juror for this case because of that?

2           **PROSPECTIVE JUROR:**  Yeah.

3           **THE COURT:**  I'm following you.  Anybody else?  Yes,

4    ma'am, we have Juror No. 2.

5           **PROSPECTIVE JUROR:**  Number 2, you said this was going

6    to last around nine days.  Next Friday, I won't be in town.

7    Will it land on that Friday, also?

8           **THE COURT:**  It could.  Is it a prepaid trip, is it a

9    work trip?

10          **PROSPECTIVE JUROR:**  It's a flight out of New Orleans,

11   but it's not a work trip.

12          **THE COURT:**  Okay.  And when does it return?

13          **PROSPECTIVE JUROR:**  Sunday.

14          **THE COURT:**  Do you leave to go down there Thursday

15   night or is it a Friday morning flight?

16          **PROSPECTIVE JUROR:**  We're going to leave around like

17   1:00 in the morning on Friday.  Our flight is like 4:00 a.m.

18          **THE COURT:**  Okay.

19          **PROSPECTIVE JUROR:**  Thank you.

20          **THE COURT:**  Yes, sir?

21          **PROSPECTIVE JUROR:**  Number 7, Paul Nations.  I work

22   for a national company, but real small branch of this national

23   company.  We have four people there, and I got two guys in the

24   back working.  My role is to run the up front, answer the

25   phone, take orders, whatever like that.  And our boss is

1    outside sales, he is in and out, in and out all day long.  Nine

2    days is a pretty big of a strain for me to be gone.  Not saying

3    I couldn't do it, but it's going to put a strain on everything.

4    We don't even take week vacations most of the time, it's like

5    two or three days here.  We can rotate people in and out.  Just

6    throwing that out there.

7              **THE COURT:**  Okay.  Thank you.  Similar question.  If

8    one of the attorneys or myself have asked a question and you

9    should've raised your hand but you didn't, does anybody need to

10   raise their hand on a question that we have already asked that

11   you didn't get a chance to respond to?

12        The next stage of the process is we're -- oh, yes, sir?

13             **PROSPECTIVE JUROR:**  Juror No. 14, Bryan Carpenter.

14   Y'all had asked when you were going through the names, there's

15   a name that I knew, but I have no personal relationship.  My

16   daughter, when she was young, went to school with this

17   particular physician's daughter and cheered together.  But if

18   this particular doctor walked in, I wouldn't know her, I just

19   know the name.

20             **THE COURT:**  Do you remember the last name?

21             **PROSPECTIVE JUROR:**  LouAnn Woodward.

22             **THE COURT:**  So just to follow up on that a little

23   bit, so you couldn't pick this person out of a line-up, it

24   sounds like?

25             **PROSPECTIVE JUROR:**  No, ma'am.

1          **THE COURT:**  You just had --

2          **PROSPECTIVE JUROR:**  All I know is my daughter

3    cheered, 6th, 7th grade.  But, I mean, if she walked in I

4    wouldn't recognize her.  I just know the name, but no personal

5    relationship.

6          **THE COURT:**  Is there anything about that connection,

7    the fact they have cheered together, would you give more

8    credibility to the testimony of the doctor because of that?

9          **PROSPECTIVE JUROR:**  No, ma'am.

10          **THE COURT:**  Could you still look at the facts in

11   evidence and be fair and impartial to both sides?

12          **PROSPECTIVE JUROR:**  Yes, ma'am.

13          **THE COURT:**  Thank you for letting me know that.  Yes,

14   ma'am, Juror No. 2.  Everybody else be thinking, too, of any

15   questions that we need to follow-up on that we've asked

16   previously.

17          **PROSPECTIVE JUROR:**  Juror No. 2, I know I said I work

18   at UMMC, so Dr. Woodward is my boss also.  I forgot to mention

19   that.

20          **THE COURT:**  When you say boss, does she do your

21   performance reviews?

22          **PROSPECTIVE JUROR:**  No, ma'am.  She's not my boss,

23   but she's, I guess, the CEO, but she signs my checks.

24          **THE COURT:**  Thank you.  Let me ask you this, I know

25   you have already been asked questions about that very pointedly

1  by Mr. Morgan about the fact that you work at UMMC, would that

2  affect impact your ability to be fair and impartial to both

3  sides?

4        **PROSPECTIVE JUROR:**  No, ma'am.

5        **THE COURT:**  Anybody else?  All right.  So the next

6  step is we're going to take a break so the lawyers can confer

7  with each other and they can confer with their notes and then

8  confer with me and we're going to pick a jury.  But I'm going

9  to have y'all go out of the courtroom while we're doing that,

10 it's probably going to be about a 30-minute break.  When you

11 come back in, we'll announce the jury and then release the rest

12 of you.  I am going to not make Mr. Powell sit through this

13 process since he is over 70 or 70 -- are you exactly 70 or over

14 70?

15       **PROSPECTIVE JUROR:**  Over 70.

16       **THE COURT:**  I won't ask exactly how much older.

17 Because of that, he can exercise his exemption, which he has,

18 so I'll go ahead and let you go.  I want everybody back in here

19 at 12:05.  It's a fast process once you come back at 12:05 for

20 those that are not selected.  So everybody come back in at

21 12:05.  Please remember the instructions that I have given

22 before.  You can visit with each other about anything but this

23 case and about the lawyers or anything that you've heard in

24 this courtroom so far.  I know that's enough time to go back to

25 your car if you need to check your phones, but please don't do

1     any type of independent research about anything touching on

2     this case, the parties, the judge, the lawyers.  I will see

3     everyone back in here at 12:05.

4          **(PROSPECTIVE JURORS OUT AT 11:36 A.M.)**

5               **THE COURT:**  I'm going to give both sides about five

6     minutes or so because we need to take up challenges for cause,

7     and then I will give you a significant period of time to talk

8     about what your blind strikes will be, but it's hard to pick

9     your blind strikes unless you know what I'm going to strike for

10    cause.  If you all want to take about five minutes or so to

11    figure out who you want to argue to strike for cause.  And we

12    have witness rooms.  If anybody needs to go in the witness room

13    to collaborate, you can.

14         (OFF THE RECORD)

15              **THE COURT:**  I think probably the best way to do this

16    is let's just -- I'll start with the plaintiff and let's go one

17    by one.  And there may be some that the defense agrees on and

18    we won't have to hear argument on it.  Who is your first juror,

19    Mr. Morgan, that you ask the Court strike for cause?

20              **MR. MORGAN:**  The first juror is number 1,

21    Mr. Hammitt, who is currently in a lawsuit involving a very,

22    very similar allegation.  I understand he said he could be

23    fair, but I don't see how that can be true.  If he is involved

24    in the same allegations, he also obviously has an employment

25    agreement with somebody else viewing it from the employer's

1  perspective.  I think to be on the safe side, he should be

2  stricken for cause.  Good news, we have 27 jurors.  So I don't

3  think we are going to have any issues getting a panel seated.

4          **THE COURT:**  All right.  Mr. Watkins?  Everybody make

5  sure your microphones are on, too.

6          **MR. WATKINS:**  Your Honor, I don't think that rises to

7  the level of for-cause strike just because he happens to be a

8  business owner who has a dissatisfied former employee.  If they

9  want to use a peremptory on him, I think that's fine, but I'm

10 not sure his circumstance is much different than anybody else

11 who's ever supervised employees.

12         **THE COURT:**  Let me ask you this, Mr. Watkins:  I have

13 his notes about his other lawsuit, but I was actually more

14 swayed about his work situation with being the owner and the

15 cutting of the checks and things like that.  He says that every

16 day he needs to be there to cut checks.  It sounds like we

17 could potentially accommodate him because he is working 7:00 to

18 5:00.  So he could go into work in the mornings to cut checks

19 to do it.

20     So what's your response -- because the other challenges

21 for cause, I am taking into consideration some of their

22 employment factors that they're dealing with.  And I have

23 concerns that in the back of his mind he is thinking about

24 what's going on at my place of business, because it's not just

25 that he is an employee, he is the actual owner who may be

1    distracted by this nine-day trial.  His actual employment may

2    be distracting him from this nine-day trial.  So what are your

3    thoughts with respect do that?  You don't have any concerns

4    that he is going to be thinking about checks are being cut and

5    not thinking about the testimony?

6          **MR. WATKINS:**  Your Honor, as the guy who signs the

7    checks at my small business, I am sure, and is going to have a

8    stack when I get back, I am sure that is going to be on the

9    back of his mind.  We heard from a lot of folks who have

10   questions about employment responsibilities and business

11   responsibilities that they're going to have to attend to.  And

12   I certainly sympathize, but, I mean, if everybody who is going

13   to miss some of their responsibilities is going to be cut off

14   the bat starting with number 1, I do worry a little bit how far

15   that's going to go.

16         **THE COURT:**  Okay.  Any response, Mr. Morgan?

17         **MR. MORGAN:**  Hardship is certainly a real one, and

18   that is a concern I have with maybe a couple others as well

19   about they're -- especially for nine days.  Two-day trial, a

20   different story, they'll survive.  For such a long period of

21   time, that is certainly a concern.  I do think with number 1,

22   in particular, once he started mentioning the lawsuit, to me

23   that really put it over the edge as far as a cause, but when

24   you combine that with a hardship I do think he should be

25   excused.  Just for the big picture, I know we're going one by

1    one, I don't think we have that many cause and hardships,

2    really, when you look at the overall here.  They kind of seem

3    to be front-loaded here on the panel, but not so much in the

4    middle and the back.

5            **THE COURT:**  I am going to strike one for cause.

6    What's the next one, Mr. Morgan?

7            **MR. MORGAN:**  The next one we had was number 2, who

8    she works for UMMC.  I asked very pointed questions about that.

9    And what really, I think, takes it over that edge, though, is

10   her comment near the end about Dr. LouAnn Woodward signs her

11   checks.  She signs her checks, she's the person on the checks

12   to do that.  I do not see how she can be fair.  I think it's

13   going to impair her ability to be impartial.  She does have

14   that little hardship at the very, very end.  That's one little

15   thing, it's not as big as one or three, but that's in there as

16   well.  I think the fact that she's employed by the people we

17   are suing is enough to strike her for cause.

18           **THE COURT:**  Let's talk about -- you say she's got

19   this little thing right here at the end.  But if we run into

20   Friday, we're going -- I have done this before.  I was just

21   telling one of the law clerks where I didn't strike someone for

22   cause when they had a conflict expecting one of the parties to,

23   and the parties didn't.  And we ended up losing a juror near

24   the end of trial, which we can handle it that way, it's just

25   not ideal to handle it that way banking on the fact that we

1    would finish next Thursday to keep her on the jury.

2         Mr. Watkins, you stood.  I think you have a response to

3    it.

4         **MR. WATKINS:**  What my response to what you just said

5    is that Ryan could hurry up and we wouldn't have to worry about

6    it.  But Your Honor, with respect to the comment about

7    Dr. Woodward, I haven't seen number 2's paycheck, but if

8    Dr. Woodward signed her paycheck, she signed everybody's.  She

9    is the top of the food chain at the medical center.  So the

10   question for the Court is, do we automatically disqualify

11   anybody that works for the medical center?

12        **THE COURT:**  Well, I think the answer to that is no,

13   because she has said that she can be fair and impartial, but I

14   am concerned about her scheduling conflict.  I mean, I really

15   am in the sense of the pretrial order says 10 to 12 days, is

16   how long you said this is going to last, Mr. Morgan.  And Mr.

17   Schmitz has assured me they want out of here by next Friday at

18   the latest, so we're banking on that.  But I am fully ready and

19   able to stay through next Friday, but we're going to lose her

20   if we don't strike her for cause now.  So is it something y'all

21   want to deal with now or do y'all want to deal with it on

22   Thursday night when she says I'm flying out tomorrow?  Because

23   I am going to let her go on her trip.

24        **MR. MORGAN:**  Then we need to deal with it now.

25   That's not a good position to be in when you don't have an

1   alternate and things of that sort to deal with that.

2        **MR. WATKINS:**  Your Honor, we can take it up now.

3   What we have talked about the whole time is we have been

4   putting together the pretrial order, is that we have a cushion

5   of two jurors built in.  And then if we lose up to two of them

6   we can still go forward.

7        **THE COURT:**  But I don't want to go in knowing now

8   that I am going to lose a juror.  I want to go in thinking I

9   have eight jurors that are ready, willing and able to serve

10  through the end of next week.  She's telling me now, I can't be

11  here next Friday.

12       **MR. WATKINS:**  If it means anything to the Court, as

13  much as Ryan and Greg want to be out of here, we do too.  Based

14  on what we think we know about how the case is going to go, the

15  defendants are not -- our defendant is not going to try to drag

16  out its case in chief.  We're going to try to be as efficient

17  as possible.  If at all possible, I want us to be out of here

18  before Friday.  I know that's not a promise, but that's how I

19  am looking at it right now.

20       **THE COURT:**  Let's hold 2 for right now.  Let's go

21  through -- what's the next one, Mr. Morgan?

22       **MR. MORGAN:**  We do not have any others for cause.  We

23  have a couple hardships concerns, but not to cause.

24       **THE COURT:**  When I say for cause, I am letting

25  hardship fall under it, too.  So who else do you have as for

1    hardship?

2           **MR. MORGAN:**  For hardship we have 3 and 7 with the

3    other two we had.  Three was very clear about he's a daily,

4    hourly worker and missing nine days would be -- and he is going

5    to school every night was another concern.  That's a lot to

6    take on and actually concentrate on what's going on.

7           **THE COURT:**  Let's start with number 3, Mr. Watkins.

8           **MR. WATKINS:**  I think I have to agree with number 3

9    if the fellow is going to school every night until 10:00 and

10   he's got a financial concern, that's a double whammy.

11          **THE COURT:**  Well, for some reason this courtroom puts

12   jurors to sleep in these chairs sometimes, so if we know we

13   have a guy that's going to be here all day and have go to

14   school from 6:00 to 10:00, and has a job that he doesn't get

15   paid if he doesn't show, I think we can let 3 go for cause.

16       What's the next number you said, Mr. Morgan?

17          **MR. MORGAN:**  Seven, the gentleman on the end who is

18   the only one.  I guess he's the front operations manager and in

19   sort of same -- being gone for two days would be much more

20   bearable; being gone nine, he was very concerned with.  So it's

21   one of those situations where you don't want someone sitting

22   there thinking about the office and running out to their car

23   every moment and not concentrating on what they hopefully

24   should be concentrating on.

25          **THE COURT:**  Mr. Watkins, as to 7?

1          **MR. WATKINS:**  Yes, ma'am.  I think 7 is different in

2     kind to number 1, who is a small business owner and the guy

3     cutting all the checks and making all the decisions.

4     Mr. Nations said that he works in a branch of a large national

5     company.  His absence would be noted, but that can be said for

6     any juror who is employed.

7          **THE COURT:**  Well, I had made a little mark on 7, but

8     I will say that he didn't raise it, either, until the end when

9     I was kind of probing everybody, can you come up with any other

10    reason under the sun.  So I don't think it was at the forefront

11    of his mind when we started.  And so for that reason, I am not

12    going to strike him for cause.  I do think he can make

13    accommodations.

14       What's the next one, Mr. Morgan?

15          **MR. MORGAN:**  We do not have any others from our side.

16          **THE COURT:**  No other hardships?  Okay.  Mr. Watkins?

17          **MR. WATKINS:**  Your Honor, the only other cause strike

18    we would have is number 10, Ms. Osborne.  This is the juror

19    that told us about the negative experience she had at the

20    medical center and agreed with me that she didn't think she

21    should serve on the jury.

22          **THE COURT:**  Any response?

23          **MR. MORGAN:**  She said she wouldn't be the best juror,

24    but she did not say she would be unfair, she did not say she

25    would not weigh all the evidence from the questioning from Mr.

1   Watkins.

2          **THE COURT:**  I am going to strike her for cause.

3      Any other, Mr. Watkins, is that the only other one?

4          **MR. WATKINS:**  That was the only one.

5          **THE COURT:**  Let me scan my notes.  I had a couple

6   that I had marked for hardships that I want to discuss.  I've

7   got our Juror No. 15.  This is our Ducks Unlimited gal who has

8   a work trip scheduled for Monday and Tuesday of next week, and

9   I did probe to make sure she's not simply a participant in the

10  event.  She's actually, sounds like, playing an integral role

11  in the sense she's at least responsible for the photography of

12  the event in Texas.  Any response with respect to number 15?

13         **MR. MORGAN:**  From plaintiff's side, I heard,

14  obviously, the testimony about her trip.  It was hard to tell

15  how, I guess, absolutely necessary it was.  I think it was a

16  dedication, is that what she said it was?  I hate, obviously,

17  to make people miss that, but it seemed a little bit more

18  discretionary than a must be there, have to be there type thing

19  in my book.

20         **THE COURT:**  Mr. Watkins?

21         **MR. WATKINS:**  I don't know that I disagree, Your

22  Honor.  It sounded like she was going out there for fund

23  raising, Ducks Unlimited.

24         **THE COURT:**  Yeah.

25         **MR. WATKINS:**  Not that there's anything wrong with

1  that.

2      **THE COURT:**  No, I understand.  I am going to mark her

3  as an aside for right now.  Because we do have so many jurors,

4  I don't want to force someone onto a jury when we have jurors

5  that can serve and are able to serve that don't have scheduling

6  conflicts, so I am going to just mark her for right now, not

7  for cause, but I'll go through the rest of these before we

8  decide.

9      I also had made a mark on 16.  This is our accountant who

10  says that one accountant passed away, the other is on vacation,

11  so she's it, and apparently, is the only accountant for the

12  nation with the company.  I tried to pull out of her that they

13  have temporary workers or somebody from another office that can

14  fill in, but it sounds like the other individuals from the

15  other offices are sales, not accountants.

16      **MR. MORGAN:**  From plaintiff's perspective, Your

17  Honor, it's a tough situation.  Obviously, somebody passing

18  away unexpectedly of that sort.  To me, though, it does -- 16

19  and 7 are sort of similar, right?  It's not impossible, it's

20  difficult, they prefer not to if they can avoid it.  I guess

21  that's --

22      **THE COURT:**  For me, I agree with you -- 7, I felt

23  like there's a lot of other employees.  I feel like it's going

24  to be an inconvenience for work for 7 to serve, but he could

25  make it happen.  I feel like with 16 it's a little different in

1    that she doesn't really have back-up.  Like it's her.  Her

2    back-up, one passed away and one is already out.  Mr. Watkins,

3    I will hear from you on 16.

4         **MR. WATKINS:**  I think she can be accommodating, Your

5    Honor.  I just looked it up.  It looks like it's a small

6    company.  We don't have any reason to think that she's not

7    being truthful about her being there by herself after the death

8    of a co-worker.  It's not a motion that we would make, but I am

9    not going to put up a fight about it if the Court thinks she

10   needs to be accommodated.

11        **THE COURT:**  Okay.  Any others?

12        **MR. MORGAN:**  None from plaintiff's side.

13        **MR. WATKINS:**  Not from us.  Your Honor, did you

14   decide that you were going to strike 16?

15        **THE COURT:**  I'm about to go back through.  Who we

16   have left is -- I am going to strike 2 for cause, Juror No. 2.

17   I am going to strike 15 and 16.  And it's already 12:00.  I am

18   going to let you all talk for about 10 minutes.  Is that enough

19   time?

20        **MR. MAULDIN:**  Yes.

21        **THE COURT:**  I'll come back in about 10 minutes and

22   you can give me your blind strikes then.

23      **(RECESS TAKEN AT 12:01 P.M. UNTIL 12:13 P.M.)**

24        **THE COURT:**  Does everybody have their blind strikes?

25   Mr. Allen, I think somebody may be trying to come in the back.

1   Just walk it up and turn it in like that.

2       I am going to go ahead and read the strikes for each side,

3   let you write them down, then I will count out our jurors.  The

4   plaintiff strikes Juror No. 7, Juror No. 9, Juror No. 14.  And

5   then defense strikes Juror No. 5, Juror No. 12, and Juror

6   No. 18.

7       Once everybody has a chance to write those down, I am

8   going to read out our jurors and see if we have the same.  Is

9   everybody ready for me to read out the jurors?  Okay.

10       Mr. Watkins, are you ready?

11           **MR. WATKINS:**  Yes, ma'am.

12           **THE COURT:**  Juror No. 1, Juror No. 6, Wise; Juror

13   No. 2, Juror No. 8, Evans; Juror No. 3 is going to be Juror

14   No. 11, Jackson; Juror No. 4 is going to be Juror No. 13,

15   Robertson; Juror No. 5 is going to be Juror No. 17, Taylor;

16   Juror No. 6 is going to be Cantrell, which is Juror No. 19;

17   Juror No. 7 is going to be Juror No. 20, Duke; and Juror No. 8

18   is going to be Juror No. 21, Finley.

19       Does everybody agree with that?

20           **MR. MORGAN:**  Yes, Your Honor.

21           **MR. WATKINS:**  Yes, ma'am.

22           **THE COURT:**  All right.  Are there any objections to

23   the jury selection process so far?

24           **MR. MORGAN:**  No, ma'am.

25           **MR. WATKINS:**  Not for defendants.

1          **THE COURT:**  Before we bring the jury in, here is my

2     thought, and I want to get your take on it.  It is the lunch

3     hour for the jurors we're going to seat.  Do you all have any

4     preference with respect to me going ahead and swearing them in

5     and reading their preliminary instructions to them?  It should

6     probably take about 10 minutes.  That way we can have their

7     instructions and then after lunch you can start with your

8     openings?

9          **MR. MORGAN:**  I think that makes sense.  And it also

10    dovetails with the first witness is at a medical appointment

11    right now, but she's supposed to be here at 3:00.  If we plan

12    this out, I think we should land right there if we do that

13    schedule.

14         **THE COURT:**  Does that work?

15         **MR. WATKINS:**  Yes, ma'am.

16         **THE COURT:**  You can bring them in, Mr. Allen.  Thank

17    you.

18        Does everyone see their neighbor, with the exception of I

19    did let Juror No. 4 go.  Does everybody else see their

20    neighbor?  Is anybody missing anybody?  Okay.

21        When I say your name and number, I am going to ask you to

22    go over here and sit in the jury box.  And you will find that

23    those seats are much more comfortable than you're currently

24    seated.  Our first juror, Juror No. 1, is going to be Juror

25    No. 6, Ms. Tabitha Wise.  Juror No. 2 is going to be Juror

1   No. 8, Mr. Evans.   Juror No. 3 is going to be Juror No. 11,

2   Ms. Jackson.   Juror No. 4 is going to be Juror No. 13,

3   Ms. Robinson -- Robertson, excuse me.   Juror No. 5 is going to

4   be Juror No. 17, Taylor, Ms. Taylor, excuse me.   Juror No. 6 is

5   going to be Juror No. 19, Mr. Cantrell.   Juror No. 7 is going

6   to be Juror No. 20, Lydia Duke.   And our final juror, Juror

7   No. 8 is going to be Juror No. 21, Mr. Finley.

8        To the rest of you, thank you so much for being here.   I

9   appreciate you being here timely and coming back from the

10  breaks timely.   It made it move very smoothly.   As I understand

11  it, you are not excused for the rest of the month.   You still

12  have to call back in, but you are excused for the rest of the

13  week for me.   So thank you again for being here and have a

14  great rest of your day.

15       I know it's lunchtime, 12:20, so I am going to let you

16  have a lunch, promise.   I am going to go ahead -- Ms. Thomas is

17  going to go ahead and swear you in as the jurors who have been

18  selected.   So if you will all raise your right hand for me.

19  Please stand.   Thank you.

20       (Juror's Oath Administered)

21            **THE COURT:**   I am going to read some preliminary

22  instructions to you all.   These are brief instructions.   You

23  will get more instructions at the end of trial, but these are

24  just some preliminary instructions, and then I am going to let

25  you take a lunch break.

**PRELIMINARY INSTRUCTIONS**

**THE COURT:** Members of the jury, now that you have been sworn I will give you some preliminary instructions to guide you in your participation in this trial. It will be your duty to find from the evidence what the facts are. You and you alone are the judges of the facts. You will then have to apply those facts to the law as the Court will give to you.

You must follow the law whether you agree with it or not. Nothing the Court may say or do during the course of trial is intended to indicate or should be taken by you as indicating what your verdict should be.

The evidence from which you will find the facts will consist of the testimony of witnesses, documents or other things received into the record as exhibits, and any facts that the lawyers agree to or stipulate to or that the Court may instruct you to find. Certain things are not evidence and must not be considered by you. I will list them for you now: Statements, arguments, and questions by lawyers are not evidence. Objections to questions are not evidence. Lawyers have an obligation to their clients to make objections when they believe evidence being offered is improper under the rules of evidence. You should not be influenced by the objection or by the Court's ruling on it. If the objection is sustained, ignore the question. If it is overruled, treat the answer like any other.

1    If you are instructed that some item of evidence is
2  received for a limited purpose only, you must follow that
3  instruction.  Testimony that the Court has excluded or told you
4  to disregard is not evidence and must not be considered.
5  Anything you may have seen or heard outside of the courtroom is
6  not evidence and must be disregarded.  You are to decide the
7  case solely on the evidence presented here in this courtroom.

8    There are two kinds of evidence, direct and circumstantial
9  evidence.  Direct evidence is direct proof of a fact, such as
10  testimony of an eyewitness.  Circumstantial evidence is proof
11  of facts from which you may infer or conclude that other facts
12  exist.  I will give you further instructions on these, as well
13  as other matters, at the end of the case, but keep in mind you
14  may consider both kinds of evidence.  It will be up to you to
15  decide which witnesses to believe, which witnesses not to
16  believe, and how much of any witness's testimony to accept or
17  reject.  I will give you some guidelines for determining the
18  credibility of witnesses at the end of the case.

19    As I stated earlier, this is a civil case.  The plaintiff
20  has the burden of proving his case by a standard that's called
21  the preponderance of the evidence.  That means the plaintiff
22  has to produce evidence which, considered in the light of all
23  the facts, lead you to believe that what the plaintiff claims
24  is more likely true than not.  To put it differently, if you
25  were to put the plaintiff's and the defendant's evidence on

1    opposite sides of the scales, the plaintiff would have to make

2    the scales tip point somewhat on his side.  If the plaintiff

3    fails to meet this burden, the verdict must be for the

4    defendant.

5         Those of you who have sat on criminal cases will have

6    heard the proof -- the burden of proof is beyond a reasonable

7    doubt.  That requirement does not apply in a civil case, so

8    therefore you have to put that burden out of your mind, that

9    standard.

10         Now, a few words about your conduct as jurors and I

11    touched on this a little bit earlier.  Until the trial is over,

12    do not discuss this case with anyone, and do not permit anyone

13    to discuss this case in your presence.  This includes your

14    spouse, children, relatives, friends, co-workers, and people

15    with whom you communicate daily.

16         During your jury service, you must not communicate any

17    information about this case by any means, by conversation, or

18    with tools of technology.  For example, do not talk

19    face-to-face or use any electronic device or media, such as the

20    telephone, smart phones, recording devices, Internet, text

21    messages.  The script now lists all the things on the Internet

22    like SnapChat, Facebook.  I am not going to be able to name

23    them all, but you get the idea.  Do not communicate with anyone

24    in any manner about this case until I accept your verdict or

25    excuse you as a juror.  Do not even discuss the case with other

1   jurors until the end of the case when you retire to deliberate.

2       It is unfair to discuss the case before all of the

3   evidence is in because you may become an advocate for one side

4   or the other.  The parties, the witnesses, the attorneys, and

5   the persons associated with this case are not allowed to

6   communicate with you as I noted earlier.  And you may not speak

7   with anyone around the courthouse other than your fellow jurors

8   or court personnel.  Do not make any independent investigation

9   of this case.  You must rely solely on what you hear in the

10  courtroom and see in the courtroom.  Do not try to learn about

11  anything about this case from any other source.  In particular,

12  again, with respect to electronic devices, do not do any

13  research on this case, either through the Internet or

14  otherwise.  Do not read any newspaper accounts of this trial,

15  if there are any, or do not listen to any radio or television

16  newscast about it.  Do not visit or view any place discussed in

17  this case and do not use these Internet programs to view any of

18  the places that are discussed in this case.

19      In sum, you may not research any information about this

20  case, the law, or the people involved, including the parties,

21  the witnesses, the lawyers, or the judge until after you have

22  been excused as jurors.

23      If you want to take notes during the trial, you may do so;

24  however, it is difficult to take detailed notes and pay

25  attention to what the witnesses are saying at the same time.

1   If you do take notes, be sure that your note-taking does not

2   interfere with your listening to and considering all of the

3   evidence.

4        Also, if you do take notes, do not discuss them with

5   anyone before you begin your deliberations.  Do not take your

6   notes with you at the end of the day, be sure to either leave

7   them in your chair or in this jury room that we're going to

8   show you once we break.  I assure you no one will look at your

9   notes and they are kept in a safe place.

10       If you choose not to take notes, remember it is your

11  individual responsibility to listen carefully to the evidence.

12  You cannot give this responsibility to someone who is taking

13  notes.  We depend on the judgment of all the members of the

14  jury.  You all must remember -- you all must remember the

15  evidence in this case independently.

16       So after lunch, the trial will begin.  First, each side

17  will make an opening statement.  And an opening statement is

18  neither evidence nor argument.  It is an outline of what the

19  party intends to prove offered to help you follow the evidence.

20       Next, the plaintiff will present his witnesses and the

21  defendant may cross-examine them.  Then the defendant will

22  present its witnesses and the plaintiff may cross-examine them.

23       After all the evidence is in, the Court will give you

24  instructions on the law and the parties will present their

25  closing arguments to summarize and interpret the evidence for

1   you.

2        You will then retire to deliberate on your verdict.   Keep

3   an open mind during the entire trial.   Do not decide the case

4   until you have heard all the evidence, my instructions on the

5   law, and the closing arguments.

6        Again, after lunch is when we're going begin our opening

7   statements.   It's going to feel like Groundhog Day every time

8   you come in and come out of here because I'm going to ask you

9   the same questions every time, and it's going -- jurors start

10  rolling their eyes at me, and I can feel their disdain every

11  time I ask the question, but it's very important for the

12  record.   So what I'm going to ask you is, by show of hands, who

13  remembers the Court's instructions.   And the Court's

14  instructions are, you are not to talk with anybody about this

15  case and you are not to do any independent research.   So I am

16  going to ask you by a show of hands when you come back if you

17  remember my instructions, and then I am going ask by show of

18  hands who followed my instructions.   So just be ready for that.

19       It looks like it's about 12:30.   Because you were not

20  intending to being selected as a juror today, I am going to

21  give you a little longer lunch than usual to kind of get your

22  bearings in downtown Jackson.   It's 12:30, I am going to have

23  everyone come back and be in the jury room and ready to go by

24  2:00.   Mr. Allen is going to walk you out this way because he

25  is going to go ahead and show you your new home, which is back

1    here behind me.  So I will see everyone back here ready to go

2    by 2:00.

3         And let me ask you this question, by show of hands who

4    like afternoon coffee?  Okay.  We'll have coffee ready for

5    those who want it back there when you come back.  You all may

6    be excused.

7         **(JURY OUT AT 12:32 P.M.)**

8         **THE COURT:**  We can, if you all would like, we can go

9    ahead -- I don't know if anyone plans to use any of the joint

10   exhibits in their opening, but for the sake of the record, the

11   joint exhibits, which would be J-1 through J-16, are admitted

12   into evidence.  And then, counsel, I believe we discussed this

13   at the pretrial conference, but I will need a reminder on what

14   we decided.  With respect to the stipulations, J-1 is now

15   admitted into evidence, which is our stipulations.  Do you all

16   want me to read those into the record before or after or at

17   all?  Not at all?

18        **MR. MORGAN:**  I think they can go back with the jury.

19   They'll probably forget if we read them now.

20        **THE COURT:**  I am perfectly fine with that.  The final

21   instructions to the jury, there will be an instruction that

22   gives them some indication of what a stipulation is and how

23   they can use it.

24        Anything we need to take up before we retire for lunch?

25        **MR. WATKINS:**  Do we need to go ahead and provide the

marked copies of the joint exhibits?

        **THE COURT:**  That would be great.  Thank you.  We will leave the courtroom -- we don't lock up for lunch, do we, Rita? We'll leave the courtroom unlocked if you need to set up anything before the jury comes back in for opening.  I ask that you all do that while we are on the lunch break, not right at 2:00 so we will be ready to go at 2:00.  Okay?  We'll be in recess until 2:00.

      **(RECESS TAKEN AT 12:34 P.M. UNTIL 2:01 P.M.)**

        **THE COURT:**  Thirty minutes for both sides, five-minute warning for the plaintiffs, three minutes for the defense.  Do we need to take up anything before we bring the jury in?

        **MR. MORGAN:**  I don't believe so.

        **MR. WATKINS:**  I don't think so.

        **THE COURT:**  Bring the jury in.

     **(JURY IN AT 2:02 P.M.)**

        **THE COURT:**  As promised, I have a couple questions for you all.  By show of hands, who recalls the Court's instructions?  I see all hands?  By show of hands, who followed the Court's instructions?  Great.

    We're about to do opening statements.  We'll start into a witness after opening statements, and then we'll take an afternoon break where you can enjoy some of the coffee that we have made, and there are snacks and other things back there.

If at any time you need to take a break and I am still trucking these lawyers along, please get Mr. Allen's attention and he will let me to know if you need a break.  I am going to try to keep an eye on you all and make sure everybody is awake and not staring at me like you need a break.  But if at any point you need a break before I call for a break, please let us know. You all are the most important people in the room, I promise. So we want you to be comfortable when you go through this process, so let us know if you need anything as we go along.

    Mr. Morgan, are you ready to proceed?

        **MR. MORGAN:**  Yes, ma'am.

        **THE COURT:**  Go ahead.

**OPENING STATEMENT BY MR. MORGAN**

        **MR. MORGAN:**  Before we get started, I did want to thank each and every one of you for being here and taking the time out of your days to be here.  I want to thank you on behalf of all of us, on behalf of the parties, the lawyers, the Court, everyone here.  We understand the sacrifice it is taking for you to be here, but this is important, and justice is important.  In America, we believe in justice, we fight for it, go to war, bleed for it.  In our civil justice system, this is where justice happens, in courtrooms like this when people are willing to take their time, listen to differences and make rulings.  May it please the Court.

        **THE COURT:**  You may proceed.

**MR. MORGAN:** As you heard earlier, my name is Ryan Morgan, and I am excited to now be able to tell you the facts about this case and what you are going to hear and see over the next week and a half.

Meet Joe Papin, who is sitting there in the middle. Joe grew up in a very small town in Florida called DeBary, which is about halfway between Orlando and Daytona Beach. He had a lifelong dream of becoming a surgeon, a doctor. He graduated with honors from the University of Florida in four years, then he was accepted into the University of Michigan Medical School. So he went up north and spent four years of his life there graduating from medical school. He then did another year of what they call a post-doctoral fellowship for one year. At that point, he matched into the University of Mississippi Medical College, UMMC's general residency program here in town, which you will hear about is an ultra competitive process, literally hundreds of applications to just fill a couple spots.

Joe began his residency July 1, 2016. A week or so before that, you come in, you come for orientation. And during that orientation, you sign a contract. That contract's terms, which I am going to show you here in a second, and you will also see more of in the evidence stage, says that UMMC can terminate Joe's contract for malfeasance, inefficiency or contumacious conduct.

Go to the Elmo here and show it to you. If we may publish

that for the jury, Joint Exhibit 2.

      **THE COURT:**  Okay.

      **MR. MORGAN:**  You can see here, this is the House Officer Contract between UMMC and Joe Papin.  On the second page of this contract, you will see the signatures by all parties involved.  And if you look kind of near the top there under number 1, in accordance with the Mississippi Constitution, Article B, Section 213A, UMMC is empowered to terminate this contract at any time for malfeasance, inefficiency, or contumacious conduct by a physician, who is considered Joe Papin in this scenario.

      Those are obviously big words and very serious words, but what is important to remember is that doctors and residents are not like me or most of us where they're at-will employees.  I can be fired for literally any reason.  My boss can say, I don't like this tie, get out, you're fired.  Different for Joe Papin.  He has a contract that both he and UMMC must follow.  And not only is there a contract, but UMMC admits it also must follow ACGME guidelines for residents.  Now, what is that?  That is the Accreditation Counsel for Graduate Medical Education.  Basically, the national organization that covers accredited residencies like the one here.

      You will hear from expert witnesses, one who was a program director themselves much like Dr. Earl, one who was a DIO, the Designated Institutional Officer, for his institution, which is

basically like the top-level person as it relates to the AGGME
in communicating with the ACGME.  You will hear these witnesses
talk and discuss the ACGME guidelines and what they require
when you employ residents and you have to train them.  You will
hear how these guidelines are implemented to provide a
consistent training environment for residents who, in their
first year, are called inturns, where they can learn, they can
train under the supervision of older residents, under the
supervision of attending physicians.  You will hear how the
ACGME also requires formal remediation to occur when a
resident's performance becomes deficient.

        Let's fast forward here.  Joe started July 1, 2016.  By
February of 2017, Joe was fired and terminated by UMMC, six,
seven months later.  Obviously, Joe was devastated by this.  He
had to leave Mississippi, go back, move in with his parents in
DeBary, Florida.  He tried to gain employment initially, you
will hear about that.  He couldn't do it.  Couple years later,
tried to match again into a residency program, could not do
that.  Joe could not fulfill his dream of becoming a surgeon.

        He went back to the University of Michigan where he then
graduated with honors from business school.  He had to
completely pivot his life and go back to business school, and
now he works as a consultant for Accenture.  But Joe will never
become a surgeon like he wanted to be, and he has wasted six
years of his life pursuing that dream.

You are probably saying here, what's the catch?  What did
he do wrong?  Why did he get fired so suddenly after starting
his residency?  You are going to hear a lot of reasons that
come from UMMC about why they fired Joe.  And I am glad, if you
remember back to jury selection, about being hard-proof people.
You are going to hear reason after reason, and I ask you to
look for the hard proof.  You are going to hear about lying
about patient safety.  I am going to come back to that one in a
minute.

Overall, what we believe this evidence will show is that
UMMC violated not only this one contract you looked at, but a
second contract.  You will hear evidence and testimony that on
January 10th, 2017, Joe was summoned by his program director of
the surgery residency, Dr. Mark Earl, into his office to sign a
document which outlined that Joe was being placed on formal
remediation and was being given 60 days to improve.  You will
see this signed agreement in the evidence stage, probably in
the next day or two.  However, Joe was not given the 60 days.
He was placed on administrative leave that day, ordered to take
a fitness-for-duty exam, which he passed that week, but was
then told he could not come back because of an HR complaint
against him.  So despite signing this contract giving him 60
days to improve, Joe never worked for UMMC again.

You will hear that the HR complaint came from Dr. Earl,
who after signing that contract we had just discussed met with

Dr. Rick Barr, who was the DIO of UMMC.  And that after that
meeting, they referred the matter to HR to investigate and
determine whether Joe should be fired by these allegations that
I am about to walk through in a second, despite the fact that
Dr. Earl himself had signed this contract giving Joe 60 days
the day before.

You will hear testimony and evidence about this HR
investigation.  The only person that they spoke to and
investigated was Joe Papin.  They met with him in late January
to discuss the allegations, all of which he denied, and he even
offered to provide evidence refuting the allegations.  What did
HR do after the meeting?  Did they go interview those other
individuals to hear it from the horse's mouth or ask Joe to
send them this evidence?  No.  They didn't interview anyone
else, they didn't pull any other records or documents.  A few
weeks later, they rubber-stamped Dr. Earl's recommendation and
terminated Joe.

Let's talk about these allegations.  You're going to see
-- everybody knows throw in everything but the kitchen sink.
That's the approach being taken here by UMMC.  You're going to
see allegations and emails about, I heard about this or I heard
about that about Joe.  Remember, Joe's contract dictates he can
only be terminated for malfeasance, inefficiency or
contumacious conduct.  It has to be cause.

First, you are going to hear a lot about a decubitus ulcer

patient.  We're going to try not to say his name because
there's HIPAA issues here and whatnot, so you will often hear
him being referred to this way.  This man was a gunshot wound
victim who came into UMMC in mid-November 2016.  In December,
Joe rotated onto the trauma unit and started helping this
patient.  Now remember, he is a first-year intern.  So there's
a chief resident above him, and then also an attending doctor
above him, who was ultimately responsible for the care of that
patient.

   During December, this patient started developing this
decubitus ulcer, which is also called a pressure wound, which
is also called a bedsore.  The bedsore got to the point in late
December where surgery was needed on this patient on
December 23rd to clean out the tissue from the sore.  The chief
resident on this rotation, Dr. Megan Mahoney, blames Joe for
this and alleges he lied about inspecting the wound on a weekly
basis, which was something she had asked her interns to do on
Mondays.  And Joe will testify, and you will hear it straight
from the horse's mouth that he did do and did tell her.

   But most importantly, you're going to get to see medical
records about this patient, that hard proof, which shows the
many, many treaters who saw this patient.  Ten other providers
besides -- actually, more than ten other providers besides Joe,
including other residents at Joe's same level, other more
senior residents, nurse practitioners, board certified

attending physicians, and even a trained and certified wound care specialist who was called in to specifically examine this pressure wound.

In fact, the records will show that that wound care specialist, her name is Kisha Dyse, you will hear from her in the next couple days, saw this patient the day before the surgery, December 22, did not notice any escalation in his condition from when she saw him two other times in December, continued her recommended treatment plan for the patient and his wound.

You will see these records from board certified attending physicians who also saw the patient a few days before that in the mid-December 15th to 16th range where they claimed they personally examined this patient and they agreed with the residents' notes at that time.

You will hear from Dr. Mahoney that she was allegedly somehow unaware of this wound, despite it being plastered all over the patient's notes. Dr. Mahoney ran to Dr. Earl and alleged Joe lied about this incident and somehow it was his fault, despite him being the lowest doctor on the totem pole we were just discussing for this patient's care.

You will also hear that subsequent to this, HR asked whether an ICARE report was done on this incident. ICARE stands for I Communicate At-Risk Events. It's the hospital's reporting system where anybody can go online or call in or

whatever and put in information about patient safety risks.
They see something happening, they're supposed to put in an
ICARE report.  No ICARE report was ever done on this patient.
None was ever done even though a direct plea was made to
Dr. Earl to do one.  In fact, there's no ICARE report for any
patient that Joe participated in the care of throughout his
tenure at UMMC.  Now, did anyone speak to these other
individuals about their care of this patient?  No.  Did anybody
else get in trouble for the care of this patient?  No.  HR
interview them?  No.  The truth matters.

So when you hear from UMMC, make sure they are going to
give you all the facts in their evidence and not just
cherrypick facts and the secondhand information.  While on
that, let's discuss Dr. Mahoney.  This is the doctor who said
Joe lied about the patient a second ago.  She made other
allegations against Joe, too, like that he left to go for a run
without permission while on first call.  You will hear
testimony that occasionally residents go for exercise, quickly
run when it is slow in the hospital.  But you will see a text
message that we have between Dr. Mahoney and Joe where she gave
him express permission to go for a 15-minute run when it was
slow.

Later on, a few weeks later, he asked, can I go again, and
she said no, and he did not go.  Yet, despite this text
message, Dr. Mahoney repeatedly claimed and even testified at

the appeals hearing that she never gave Joe permission to go for a run.

Context matters, too.  Facts and then context matters, too.  And here is an example of one of the allegations where context really matters.  You will hear an allegation that Joe failed to inform ICU about a patient being transferred from the ER to ICU and that this was a patient safety issue.  But when you hear this, it makes you think of like a patient sitting on a gurney in a hallway by themselves having just pushed them into the ICU and hopefully they get taken care of.  Well, what you will hear and see in the evidence is that Joe spent nearly two hours with this patient in the ER.  First he responded to the page and had to hustle down from the trauma resident room where they are waiting for pages.  He had to get the patient admitted.  He had to perform a comprehensive medical physical exam on the patient.  He then had to write in all the notes into the electronic system, the chart for diagnosis, plans of action.  Then when all of this is done, Joe's completed his workup, he hits finish, he closes the button.  That information gets sent automatically to ICU so they know that this patient is coming.

This also triggers the transport team, the people who physically move people around hospitals and whatnot, to actually come and transfer the patient to ICU where they wait for somebody to take custody and care of that patient.  So

really what UMMC is alleging Joe didn't do, which by the way he completely denies and says he did do, was pick up the phone and give a 15 to 20-second heads up to ICU that this patient was coming, even though they had the electronic records on there, and even though Joe had just spent an hour or two getting this patient care completed, notes entered, and transferred over there.

You will hear an allegation, one of the allegations that Joe brought a cup of coffee into a patient's room on day 3 of his residency.  It's against policies.  You're also going to hear that he didn't get a copy of those policies, so he didn't know better.  He walked out, went outside, put the coffee down, came back inside, never was an issue again.

You will hear about an argument that Joe got into with a nurse practitioner during his first month of rotation in the CV-ICU, which is the cardiovascular ICU.  He was the first intern to ever have been on that rotation.  You will hear that Joe was told by his supervisor, Dr. Shake, that Joe could go to the operating room to watch surgeries when the times were slow in CV-ICU.  Well, one of the nurse practitioners, Josh Sabins, did not like that.  He did not like Joe was leaving to go learn about surgeries in the OR.  He thought he should stay there in the CV-ICU.  You will hear that this escalated into a verbal altercation between Joe and Josh Sabins on this incident.

You will also hear that after this verbal disagreement,

Joe spoke with Dr. Earl about it, who told him, you have to stand your ground, it's not your fault necessarily, but let's try to deescalate these situations in the future.  This incident was very early on in Joe's tenure.  And following this incident, you'll hear these general allegations from nurse practitioners that Joe was rude, a poor communicator and whatnot.  The Josh Sabins incident, unfortunately, was a black cloud that seemed to follow him as he went through with other nurse practitioners, even though Joe denies being rude and being a poor communicator.  And you will get to judge his credibility on the witness stand.  You know, even Dr. Earl admits being rude by itself is not a terminable offense for a doctor.  You don't fire somebody for that type of reason.

After receiving some of these general complaints, though, this is important to note, Dr. Earl had Joe switch from his second month rotation at the VA to Dr. Earl's transplant rotation in October.  He wanted to kind of see this for himself.  What you will see, though, is a text message between Joe and Ashley Seawright, who is Dr. Earl's kind of head nurse practitioner on that transplant rotation, that was complimentary of Joe.  And no mention of him being rude, just painfully shy as she described it.

Another incident where all the context matters and the facts matters is you will hear that Joe allegedly tried to discharge a patient that was not competent despite warnings not

to do so.  Sounds bad when you just say it like that.  But what those UMMC emails don't disclose is that Joe is texting with his chief resident during this, you will get to see the text message, and the chief resident instructed Joe to stop a certain medication, which Joe had already done and said so in the text message, and then told him to discontinue the discharge, which Joe did.

Joe then told his chief the patient was likely going to leave anyway AMA, that means against medical advice.  The chief responded, hey, like okay, yet somehow this is Joe's fault.

A very serious accusations leveled against Joe was that he made a female student uncomfortable and inferring some sort of harassment had occurred.  Joe wasn't even informed of this allegation until months after his termination.  You will hear from Dr. Will Crews, who testified in the appeals hearing about this, but later in his deposition in this case admitted to not actually talking to the female student, but hearing it secondhand.  You will also hear witnesses from HR who admit they never investigated this situation, did not believe it to be harassment in any way, but despite this, UMMC still cites it as a basis for termination.

You will likely hear from UMMC that Joe had several negative reviews given by physicians in his rotations, that he had several critical deficiencies, they're called, discussed at his semiannual review in November.  Yes, Joe did have some

negative reviews in there.  He also had some positive reviews in there, so you will get to see those for yourself.

You will also hear from Dr. Earl that these critical deficiencies were not enough to place him on formal remediation at that time in November, let alone serve as a basis for termination later.

You will also likely hear general allegations that Joe didn't do tasks, he would miss clinics or traumas, or didn't even allegedly pre-round some days on his patients.  You will see these allegations generally described in those emails talked about secondhand.  You won't see hard specific facts.  You won't see text messages saying, Joe, where are you, you're not here, or emails with someone saying, hey, Joe missed the X, Y, Z clinic, or he missed the Smith trauma.  You will hear from Joe that you have to pre-round each day to be prepared to fully round with the other doctors that come onto the team.  And you won't see any records produced from UMMC, like garage card times or other electronic records, which would show Joe coming in late where he couldn't pre-round.

Here is another thing, if Joe wasn't pre-rounding, that means he was not there at 6:00 a.m.  Because at 6:00 a.m. is when sign-out occurs, you're kind of taking over from the night team, passing the baton, who is going to take care of these patients next on your list.

If Joe wasn't there and wasn't pre-rounding, you better

believe those people would be complaining and the record would
be full of complaints about having to wait for Joe after
6:00 a.m. because he wasn't there.

You will likely hear that Joe wasn't logging cases or that
medical residents were saying the complete orders under his
name.  Joe did get behind on logging cases.  Lots of people got
behind on logging cases.  Other residents got behind on logging
cases, but Joe did log his cases and he got caught up.  They
will try to say -- UMMC will try to say he lied about coming
into Renee Green's office to do these cases, but he did do
them, they got done.

Another allegation against Joe was that he failed to
respond to a "code blue" that involved one of his patients.
Again here, context really, really matters.

You will hear evidence that the code blue, which happens
multiple times a day in a hospital, generally say, 3 North, or
whatever it is.  It will only indicate the area of the
hospital, won't indicate who the patient is.  They don't want
to put that over the loud speaker, obviously.  This occurred
just after Joe had signed out for the night at 6:00 p.m. here.
No one, including the night team that he had just signed out
with, dropped what they were doing and ran.  Why?  Because UMMC
has a code blue team that responds to codes.  The code blue
team responded.

Joe will tell you that he had witnessed codes before, he

had been there before and saw this code blue team in action,
and the senior providers run in, and he stands off to the side
and, in essence, watches.  Remember, Joe had already signed out
and later learned it was one of his patients.  By then the code
was over and there was nothing for Joe to even do.  Even
Dr. Earl agrees that if Joe had signed out, he may call it poor
form, but it's not a terminable offense.

You will also likely hear that UMMC will say one time Joe
left a note for sign-out instead of talking in person to the
person he was signing out to.  Joe denies he left a note and he
will explain what really happened.  First, the testimony will
show this happened around November from a secondhand source and
that Dr. Earl then called Joe and said, don't ever do it again.
If it's a terminable offense, or even a remediable offense, why
didn't that happen right there in November when this allegedly
occurred?

Now, what Joe will tell you happened was that he was
actually working at a clinic in Brandon, 20, 25 minutes away,
not including time to get up from the parking garage to the
right area of the hospital.  So when it got to be 6:00 and he
is still at the clinic, he pulled out his cell phone and he
called the night team who was taking it off, and they verbally
walked through the list themselves right there.  Never happened
again.  That was the extent of it.

One last allegation -- I am sorry, I am doing my best to

get through these for you.  One last allegation was that Joe
didn't do a wound wash-out when he says he did.  Ashley Griffin
alleges this.  What the evidence will show is that this patient
came into the ER, and the ER is the first one who washes out
the wound, that kind of first line of defense if you will.
Then Joe will testify that he did do a later wash-out.  You
will see a text message between Joe and another senior
resident, a gentleman named Sid Desai, who Sid asked Joe, have
you washed out the wound, to which Joe responds, I just
finished.

        You will hear Dr. Desai's testimony where he doesn't
personally remember Joe not doing any tasks that he was
assigned.  And to make matters worse here, when you look at
that email from Ashley Griffin where she says Joe didn't do it,
she says it left Sid, and then later her, to do it.  She also
testified in the appeals hearing that when she washed it out,
it looked like no one had done it.  So that would mean ER
didn't do it, Joe didn't do it, and Sid Desai all did not wash
it out, and it does not match up with the hard proof you'll see
in evidence.

        Now, one may be thinking here, let's check all these
records, let's check all the medical records, let's see who is
right.  We agree with you.  We would love to check those
records, but UMMC does not know who these patients are despite
us asking for such records.  So you're not going to see any of

these records for wound wash-out or the ICU patient or anything
of that sort.

**THE COURT:**  Five minutes, Mr. Morgan.

**MR. MORGAN:**  Thank you.  In fact, other than that
pressure wound/bedsore patient, there's no records for anything
else that you're going to see.  Why no records?  Because no
investigation was ever actually done, no ICARE reports were
actually ever done.  You will hear from HR that they didn't go
pull that information, they didn't talk to anybody to find out
who this was, who was this patient, let's hear about what else
happened here, let's try to get to the bottom and to the truth.

HR recognized this, and they recognized this in the
evidence that was given to them from Dr. Earl and Dr. Barr
calling it tricky, but they still failed to do any independent
investigation.  You're going to hear from the investigator, Pat
Whitlock, who will admit she did no other investigation.  She
didn't pull any records, she did not speak to any other
witnesses besides Joe, who denied everything.  Instead,
Dr. Earl pressured HR to push through Joe's termination
quickly, even though Dr. Earl didn't actually put the effort in
to remediate Dr. Papin despite him signing this remediation
contract right before that said, you get 60 days.  And HR
relented and concurred with Dr. Earl after conducting no
investigation into these incidents, which could have been
verified by UMMC at several different forks in the road.  Why,

because they simply wanted Joe fired.  They wanted him gone so
they could fill his spot with somebody else.

As I indicated earlier, you're going to hear from several
expert witnesses who are familiar with these ACGME guidelines
and the supervision and the remediation of residents.  You will
hear from our experts, Dr. Watkins and Dr. Leitman, how UMMC
did not follow these required guidelines for remediation like
they were supposed to.  And that even if each and every item
that we all just went through was true, he still deserved to be
put on remediation under those ACGME standards and not just
fired as he was in breach of his contract and in breach of the
remediation contract.

You're, of course, going to hear from Joe, he is -- we are
going to walk through those issues and those allegations with
him so you can hear it.  You can judge his credibility
yourself.  You will hear about all of this.  You will hear
about what this has done to his life.  This termination
obviously cost Joe the income he was earning from UMMC.  But
now that medical degree he spent four years getting, the
post-doctoral fellowship, he spent hundreds of thousands of
dollars on that.  He spent thousands and thousands of hours
going to school studying for that, gone.  His dreams of being a
surgeon, what he wanted to be since childhood, gone.

You will hear how this affected Joe right after his
termination, trying to get a new job, moving back in with his

parents, how it affected him in business school even when he picked himself up and said, I got to do something else now, back to business school, it affected him there.  It still affects him today when people ask him, Joe, why do you have a medical degree but you're not a practicing doctor?  He has to explain that.

I thank you for your time and I look forward to presenting our evidence to you.  Thank you.

THE COURT:  Thank you, Mr. Morgan.  Before you leave the podium, I was going to ask the parties, do you all wish to invoke the rule?

MR. MORGAN:  Yes.

THE COURT:  The rule will be invoked.  What that simply means is, if we have any witnesses that enter the courtroom and they plan to testify at some point, they can't be in the courtroom.  They can't sit in the courtroom and listen until they testify.  That doesn't apply to the plaintiff and it doesn't apply to UMMC representative, Dr. Earl, who is at the table.

Counsel, I don't know all the witnesses so I need you to keep an eye on everybody coming in and out.  The rule won't apply to experts, of course, but it will to anybody else.

Mr. Watkins.

### OPENING STATEMENT BY MR. WATKINS

MR. WATKINS:  May it please the Court.  Ladies and

gentlemen, this is a case about the employment contract between Dr. Papin and the medical center.  The question is whether Dr. Papin can prove that the medical center terminated his contract without cause.  The proof that you are going to hear in this case is going to show several things.  It's going to show, number 1, that Dr. Mark Earl, who is sitting over here with us, selected, himself, Dr. Papin, for his highly competitive general surgery residency program back in 2016.  It's going to show that Dr. Papin came into the program and that everybody was excited about all the residents and wanted them to succeed. It's also going to show that almost immediately problems arose with Dr. Papin as he started to work through the program.

It's going to show that Dr. Earl repeatedly counseled Dr. Papin about the problems that he was having and gave him opportunities to improve.  But unfortunately, it's also going to show that those problems did not improve; in fact, they escalated over the course of his time at the medical center and eventually resulted in a series of incidents that was a potential threat to patient safety.  So ultimately, the medical center terminated Dr. Papin's contract because of those failures.  The proof is going to show that the medical center does not owe Dr. Papin anything for that termination.

Now, y'all have heard the word "resident" quite a bit, and a first year resident is an intern.  But proof is going to show that you that residency is a different animal than most jobs.

Becoming a surgeon, as you might imagine, is a long, difficult process.  It should be.  We want it to be.  You have to finish college, you've got to get out of college and you have to apply to and be accepted into medical school.  You have to successfully complete medical school and get your medical degree.  And you have got to apply for and match to or be accepted into a residency program.  A residency program is like an apprenticeship for doctors.  A resident is actually a medical doctor.  They are able to see and treat patients, they are able to perform procedures.  But at the same time that they're doing that, they are also learning additional surgical skills with the hope that after the progression of a few years they will have learned enough experience, learned enough procedures that they can go out and be unsupervised, attending doctors who have furthered their skills.

    First and foremost, you're hired to work as a doctor.  The employment contract that you saw a few minutes ago is just that.  It sets out job responsibilities of the doctor, to treat patients.  It sets out what they're going to be paid for it, it sets out what the term of the contract is.  The surgical program at the medical center is a five-year program to be -- so you completed your residency, you have to go through five years.  But residents work on one-year contracts.  And in order to get a contract for your second year or your third year and so on, you're judged on your performance every year.  You're

evaluated by the attending physicians who work with you.  You
can be evaluated by the other staff members who work with you.
And you have to show that you are doing your job and that you
are making academic progress in order to be able to move
forward.

In addition to the contract that says, as Mr. Morgan
pointed out, you can be fired for a couple of reasons, there's
also a faculty and staff handbook that applies to all employees
of the medical center.  And the handbook also says the medical
center reserves the right to terminate employees for cause, and
lists a number of reasons why an employee can be terminated.
And a resident, even though they are learning, is also an
employee.  They are employed as a doctor with the job to see
patients.  So those policies apply to them just like it applies
to people who work in the physical plant, just like it applies
to the nurses, just like it applies to all faculty and staff
members at the medical center.

Now, the way residency, at least during the first year,
the intern year works, is these interns rotate through
different departments in the hospital.  They don't stay in one
place all the time because they are learning about what
different departments do.  So that means they are seeing a new
group of doctors, a new group of nurses, a new group of nurse
practitioners every month, being exposed to a whole new group
of people.  Interns generally work in surgical teams, is part

of what you're going to hear.  These teams are different
depending on what department you're in, but they can be made up
of attending physicians, and attending physicians are permanent
staff doctors who have completed their residencies.  They can
be made up of other senior residents, that's people who have
progressed beyond their intern years, or their intern year,
nurse practitioners, nurses, and other healthcare professionals
can all be a part of that team.  And every member of that team
is ultimately charged with doing their part towards patient
care.  Again, a big goal of the residency program is learning,
but the primary goal here is that the patients have to be taken
care of.

Some of these rotations look a lot different from others,
some involve more time in the operating room, some involve less
time in the operating room because interns are learning about
nonsurgical parts of patient care.

Now Dr. Papin did come to the medical center as a
first-year resident, an intern, in July of 2016.  That year,
there were more than 500 applications to come into the general
residency program.  Dr. Earl is the director of that program,
so he is the one who makes the decisions about who comes in.
Dr. Earl, and four other doctors, Dr. Papin -- excuse me -- and
four other doctors were chosen to be a part of that five-year
program.  So that's less than one in 100 applicants who applied
got in.  Dr. Earl wanted Dr. Papin to be there.  He had come

with a recommendation from a colleague of Dr. Earl's from up in Michigan where Dr. Papin had gone to medical school.  So he was excited about him being there.  He was excited about the whole class.  He told his colleagues we have a really good residency class, we're ready for them to come in.  He wanted Dr. Papin to succeed like he wanted all the rest of the interns to succeed. In fact, there's no reason for the medical center or for Dr. Earl not to want any of these folks to succeed.  Number one, because they want to be successful in their mission of turning out experienced doctors.  But number two, if they have a resident leave the program, people know that, they have to report that.  That's something that happened that people -- they don't want people to leave the program.  They want people to move through, finish the program and go on to careers in surgery, that's why they were selected into the program to start with.

When Dr. Papin came through -- from Florida by way of Michigan, he was new to Mississippi.  He didn't know anybody here.  He didn't know anybody at the medical center other than the folks he had met during the interviews that he had done trying to get that residency.  There was nobody he was butting heads with, there was nobody who was out to get him.  Again, Dr. Earl selected him out of hundreds and hundreds of other applicants.  But from the very first month, the very first month that Dr. Papin was here there was trouble.

Dr. Earl -- and Dr. Earl, by the way, is not just responsible for supervising residents, interns.  He is a transplant surgeon, so he has his own surgical practice that he has to attend to and his own team that he has to supervise. And in addition to that, he manages the surgery residency program with the help with the program coordinator, Ms. Renee Green, who you'll hear from later.

Dr. Earl started hearing there may be issues with this new intern, with Dr. Papin.  He got an email from the attending doctors, the attending physicians in the cardiovascular ICU that said that this intern, Dr. Papin, has had run-ins with all four of our nurse practitioners and the pharmacist during the -- I think it was the third week of July, so we're not even a month into that first month, and one of those escalated into a big argument.

The attending physicians also said that he comes across to the nurse practitioners as arrogant, and that he tells them, I don't have to do that because I am a surgeon, that he didn't want to do tasks that were beneath him.  Dr. Earl took this feedback, he went and talked to Dr. Papin, he told him he wanted him to succeed, and told him let's move forward.  That's the point of the program, is to help everybody succeed, not to run anybody out on the rails.  But the problems continued.

As you heard Mr. Morgan say, there were many problems. Nearly every month Dr. Earl or Ms. Green would receive

complaints, either verbally, in the form of emails, or in the form of formal evaluations that were filled out by healthcare professionals that were working with Dr. Papin, about his attitude and his performance.

The residency program had a software platform where anybody who was involved with a resident could log on and submit a little rating of the resident's performance in different areas, and there was an area where they could leave comments in there, too.  You will hear Ms. Green talk about that, how she begs people to log on and leave evaluations because that's feedback that the residents get.  They can read that and they can figure out, how can I improve, what am I doing right, what do I need to work on.

Now, Dr. Papin received some positive comments.  He received -- some doctors said he was doing a good job.  But he also received some very consistent negative comments, comments like, I have heard reports of things that were deemed not my job and incomplete follow-up with assigned tasks, as well as general problems relating professionally to other non-physician team members, nurses, nurse practitioners.

Another provider said at times he seemed dismissive and above doing certain work.  Another provider, I found him disrespectful to nurses and female support staff.  An attending physician said he was an abysmal communicator, complaints are numerous.

Another provider, would be late to clinic or not show up entirely and even sometimes just disappear.  He lacked an understanding of basic care, but refused to admit his shortcomings, and he was consistently playing the blame game when he was approached.  It was a bad experience to work alongside him.  So that's the feedback.

These evaluations are done for the purpose of going up to the surgery residency office so the program director can get a feel for how it's going.  Now, they're also there for the purpose of allowing the residents to see.  The residents can log onto the system themselves 24 hours a day and look at the comments that are there and be able to take that feedback and go forward with it.

After Dr. Earl started seeing some of these comments come in, he counseled Dr. Papin.  He said, here are the perceptions of you.  Our nurses, our nurse practitioners think you're arrogant, they think you're talking down to them, they think you don't want to do tasks that you feel like are beneath you.  You need to work with these people.  He told him he needed to correct these issues if he wanted to move forward with the program.

In November, Dr. Papin received a semiannual review from an independent committee and received critical deficiencies.  That's the lowest score you can get.  It's a scale of one to five, and critical deficiencies is below one.  He received

critical deficiencies in 7 out of 16 areas, which is extremely unusual.  Getting all those negative reviews was extremely unusual for a first-year intern.

Dr. Earl took this semiannual evaluation the committee had done, sat down with Dr. Papin and said, here are the continuing areas that we're not seeing improvement in, you need to work on issues that are related to your professionalism.  Because most of the complaints that were being received were not related to whether Dr. Papin could successfully learn surgical procedures. Nobody said Dr. Papin was not intelligent, nobody said that he could not be taught, it was that he was unable to communicate with people and he could not comport himself in a professional way, and that was bleeding over into all the ways that he served his patients and worked with his teams.

The evaluation process, by the way, and the rating scale that the independent committee used when they came up with this semiannual evaluation, that was an ACGME process.  They're the ones who put out that score that Dr. Earl had to give to the committee to evaluate Dr. Papin with.

Dr. Earl met with Dr. Papin again in mid-December to counsel him again because more complaints had continued to be received.

Finally, complaints grew more serious.  And you heard Mr. Morgan go over some of the issues, and we'll hear folks testify about what happened.  But it was reported that Dr. Papin failed

to clean out a trauma patient's wound when he had been told to, when the senior resident went to go look at it that there were sticks and leaves in the wound.  This was a patient who had been in a car accident.

And, finally, after being told to regularly check a patient for pressure wounds, a patient who was at high-risk for pressure wounds, a senior resident reported Dr. Papin failed to inform her about a serious wound that the patient had.  Again, this is a member of the surgery team who needed to report to other surgeons whether there was a wound that might need a surgical consult.  The patient ultimately did require multiple surgeries to treat that wound.

Finally, in January of 2017, Dr. Earl met with Dr. Papin one more time and provided him with a remediation plan and said, here is everything that has been deficient, here are all the things that you need to do if you are going to stay in the program.  He placed him on leave pending the results of a drug test and a fitness for duty test.  However, he was still concerned with whether or not it was safe for Dr. Papin to see patients.  So he went to go see Dr. Rick Barr.  Dr. Barr, who is not at the medical center anymore, had responsibilities that were over more than just the surgical residency program.  The medical center has a bunch of different residencies you can be in.  You can be a pediatric resident, internal medicine resident.  So Dr. Barr was kind of overseeing all of those.

And Dr. Barr decided that because of the nature of the complaints that had come in and the pattern of behavior, that the issue with Dr. Papin was not an academic issue.  It wasn't an issue that he was failing to progress academically, that he could not learn things, that he could not be taught.  The issue was an employment issue, and that when looking at the medical center's policies, that the things that were reported that he had done, being untruthful, being untrustworthy, being absent when he was supposed to be there, were things that would violate the medical center's policies no matter who had done them, whether it be a doctor or anybody else.

So Drs. Barr and Earl referred the matter to human resources, which opened a review.  Dr. Earl gave human resources all the information he had, he forwarded all the emails, all the evaluations, everything that he had been given and recommended that he be terminated because there was a violation of employment policies.

The human relations department had a representative sit down, meet with Dr. Papin and ask him about all these things, gave him a chance to respond to all of these things, and even after having sitting through his response and interviewing him and asking him about all these things agreed that the recommendation of termination should go forward.

It went forward to the employee relations director, who ultimately has the final say.  She reviewed the entire file,

including the recommendation of the HR representative, and agreed termination was in order.  So his employment was terminated.

But that wasn't the end of the story.  After the HR department processed the termination, Dr. Papin, under the medical center's graduate medical education policies, asked for and received an appeal.  The medical center appointed an attending physician who had not been with Dr. Papin during his residency, wasn't affiliated with him at all, and a panel of other attendings who had some involvement with graduate medical education, but not with Dr. Papin.  And they held a hearing. And the witnesses who had seen these things, all these instances that Mr. Morgan went through, came in, explained what they had seen.  And Dr. Papin had an opportunity to respond to all of those things at that time.  And the panel of doctors, of experienced attending physicians who had experience working with residents for years and years, concluded that his termination from the program was appropriate.  And it was appropriate because of his poor work ethic, his lack of professionalism, his poor communication with his co-workers and ultimately his lack of integrity and honesty.

From there, their recommendation went to Dr. LouAnn Woodward, who is the vice-chancellor, or top boss, of the medical center, and she also approved that recommendation.  So even after the initial HR termination went through, there was a

whole other process of physicians who were not interested, who took a second look at it and agreed with that decision.

So as you will see, the medical center did terminate Dr. Papin's contract, but it terminated his contract for cause.  It terminated his contract because of the reasons that came before it.  There will be no proof in the record that they terminated it because they were trying to get rid of him or make way for somebody else; it was because of his own behavior.

Thank you, Your Honor.

**THE COURT:**  Thank you.  Mr. Morgan, who do you call as your first witness?

**MR. SCHMITZ:**  Patricia Whitlock.

**THE COURT:**  Whitlock.  One of the counsel, if you will get that podium back where it was for me, that way the microphone is -- thank you.

Ms. Whitlock, if you'll come forward for me to this witness box.  Before you are seated, if you will place your left hand on the Bible right there and raise your right hand, the clerk who is standing up is going to swear you in.

(Oath Administered)

**THE COURT:**  You may be seated.  Ms. Whitlock, if you see, we've got some Plexiglas right there.  So if you will remove your mask for me, if you are comfortable doing that. The court reporter is going to take down all of your testimony today, so it's important that you speak loudly and clearly into

that microphone, so if you will pull it close to you.  I think

that green light is on.  Will you confirm for me?

        **WITNESS:**  It's on.

        **THE COURT:**  Thank you so much.

                **PATRICIA WHITLOCK,**

**having first been duly sworn, testified as follows:**

               **DIRECT EXAMINATION**

**BY MR. SCHMITZ:**

Q.  Good afternoon, Ms. Whitlock.

A.  Afternoon.

Q.  Can you state your full name for the record?

A.  Patricia Rosenthal Whitlock.

Q.  Have you ever had your deposition taken before?

A.  Yes.

Q.  And have you ever testified in a trial before?

A.  No.

Q.  So I am just going to go through a couple just basic

ground rules with you.  It's important, because as Your Honor

stated, that we say yes or no answers, no shaking your head, no

uh-huhs.  Those won't be able to be recorded.  So that's

important.  If you don't understand a question, please don't

hesitate to ask me to rephrase it or say it in another way, I

will be happy to do so.  I am going to assume that if you

provide an answer to my question, that you have understood it.

And you said you had been deposed before.  I know, obviously,

DIRECT - WHITLOCK

in this case we talked once before.  Was there any other times
you have been deposed?

A.  Yes, at previous places of employment.

Q.  And in what instances were those?

A.  They both were terminations of employment.

Q.  And I know -- are you under the influence of any drugs of
any kind or have any medical conditions which may prevent you
from you accurately and truthfully testifying today?

A.  No.

Q.  What is your highest level of education, Ms. Whitlock?

A.  Master's Degree.

Q.  What's your degree in?

A.  Sociology.

Q.  Sociology.  What did you get your bachelor's in?

A.  Sociology.

Q.  Any other certifications or anything?

A.  I received two professional certifications in human
resources.

Q.  And what was your official position at UMMC?

A.  Human Resources Business Partner.

Q.  And how long did you work at UMMC?

A.  Eight years.

Q.  Eight years.  What did you do before you worked at UMMC?

A.  I was in various capacities in human resources departments
in other organizations.

Q.  If you had to summarize it, how many years of HR
experience do you have?

A.  Over 40.

Q.  Over 40 years, okay.  Did you do anything to prepare for
your testimony here today?

A.  I went back over the deposition that was taken.  I also
went back over the interview that had been recorded with Dr.
Papin, as well as various emails pertaining to that case.

Q.  Okay.  And I don't want to know the substance of your
conversation, but obviously you met with counsel for UMMC and
they provided you those documents; is that correct?

A.  Yes.

Q.  Did you review any of the expert reports?

A.  No.

Q.  Did you review the appeals transcript from Dr. Papin's
appeal hearing that he had?

A.  No.

Q.  Were you present at the appeal hearing?

A.  No.

Q.  So as an HR professional at UMMC -- and the official title
was HR Business Partner, was that what you said?

A.  Yes.

Q.  As an HR Business Partner at UMMC, what were your job
duties day-to-day?

A.  The HR Business Partner role is a consultative role where

we provided advice and guidance to various departments
regarding any matters that had to do with any employee matters.

Q.  And did you frequently have interactions with medical
residents?

A.  No.

Q.  No, okay.  When would you say that you would interact with
medical residents?

A.  If there were a particular situation involving their
employment status.

Q.  Okay.

A.  Then I would, perhaps, have some interaction.

Q.  So, essentially, in disciplinary type situations that
would be the only time you would ever interact with the
residents?

A.  Or if they had questions regarding their benefits or
anything that pertained to them being an employee.

Q.  Okay.  When did you first hear about Dr. Papin when you
were at UMMC?

A.  I don't recall, but probably early 2017.

Q.  Earlier, you said you were involved with their employment,
the residents' employment.  You were also aware of the ACGME
requirements on residency programs as well?

A.  No.

Q.  You had no awareness of those requirements?

A.  I am aware that they exist, but that was handled totally

DIRECT - WHITLOCK

by the Office of Graduate Medical Education, not HR.

Q.  Okay.  What about the employment agreements and the contracts that the residency programs execute with residents when they begin their residency?

A.  Also handled by the GME office.

Q.  Were you familiar with those agreements and what they required?

A.  I have seen them, but do not have total familiarity.

Q.  Now, in terms of other people who are not residents or physicians, you have been involved in their termination on just regular staff members; is that accurate?

A.  Yes.

Q.  Do the regular staff members at UMMC, do the same rules apply to them that also -- all the rules applied to medical residents and physicians, or are the rules a little bit different for each one?

A.  The rules apply to all employees.  As a resident, that person is involved in a training program, so there are specific requirements from the ACGME that details what they do.  So that would be in addition to whatever employees are bound by through the faculty/staff employee handbook.

Q.  Are there some additional rights that physicians and residents have than, say, someone who -- the receptionist at the hospital would not have?

A.  I don't understand your question.

Q.   Would they have additional rights in terms of the right to remediate their behavior or have to go through certain processes that maybe someone who is considered a staff member would not have that same right?

A.   I don't know.

Q.   Are you aware or do you know of which ACGME policies were considered in Dr. Papin's termination?

A.   I cannot repeat those to you verbatim, but I did see them at the time of that occurrence.

Q.   Do you have any examples of any of the ones that you know?

A.   I do not recall.

Q.   As a member of HR, did you have the power to terminate Dr. Papin's house officer contract?

A.   I did not.

Q.   Who had that power?

A.   The department that he was involved in would have made that recommendation.  And once that recommendation was reviewed, then the ultimate decision would have been made by the Office of Employee Relations, which is a part of human resources.

Q.   So just to get it straight, so first the recommendation comes from the graduate medical education program?

A.   Comes from the department that the resident is in.

Q.   So that would've been, in this case, Dr. Earl's department?

A.   Yes.

Q.   So Dr. Earl would come to you -- I'm just trying to get it straight -- he would come to you and say, I have a resident and they have done X, Y, Z, and I believe he should be terminated. And as a member of HR, you would do a follow-up investigation, look into everything, and then it would proceed to employee relations who would say thumbs up or thumbs down as to whether the termination was approved?

A.   Yes.

Q.   Do you know -- or I guess -- what do UMMC's policies and procedures require before a house officer, which is a resident, before they can be terminated?

A.   I am not aware of what would be required under ACGME, but as an employee, it would have to do with whatever those egregious acts were as outlined in the employee staff handbook.

Q.   Would that typically involve investigations, looking into things, all that kind of before someone is terminated?

A.   Yes.

Q.   Would you characterize the processes used to terminate Dr. Papin in this case as complying with, at least in your knowledge, all the applicable policies and procedures at UMMC?

          **MR. MAULDIN:**  Objection to leading, Your Honor.

          **THE COURT:**  I am going to overrule the objection. You may answer if you know.

A.   Would you repeat the question?

BY MR. SCHMITZ:

Q.   No problem.   Would you characterize the processes used in terminating Dr. Papin as complying with all of the applicable policies and procedures?

A.   There would have been an investigation where he would have been interviewed.   Following the interview of him, there would also be a review of any of the documentation that the department would have provided.   Once that was done, based on the recommendation from the department, a synopsis would have been provided to the Office of Employee Relations.   And once they did their review, they would then determine whether or not the department's recommendation would be approved or disapproved.

Q.   And turning to the investigation, I guess the first part of what you said, that would be from the department as well as HR, kind of at your level as well as at Dr. Earl's level; correct?

A.   Yes.

Q.   Do you have the ability, as a member of HR, to evaluate the performance of a medical resident?

A.   No.

Q.   No.   Is that because that would require medical knowledge about whether they're doing something right or wrong?

A.   It would require adherence to the ACGME policies.

Q.   What investigation did HR undertake during the termination

process for Dr. Papin?

A.  In addition to the interview of him, there was a review of all of the investigative work that had been done by Dr. Earl in his area.

Q.  Who was involved in that review?  Obviously, yourself was there.  Anyone else involved in that review?

A.  I did the initial interview and review of all of the work that Dr. Earl's area had done.  Following that, I provided a synopsis to the Office of Employee Relations.

Q.  Did anyone else have to chime in or submit an opinion with respect to Dr. Papin's termination?

A.  Employee Relations would have reviewed all of the documentation that Dr. Earl had provided in addition to the interview that I had done.  And if they had questions, they would bring those questions to me.

Q.  And who, specifically, was involved -- let's talk about, I guess, first HR, your colleagues in HR who were involved in this, as well as at the Employee Relations level just so that the jury can be familiar with it?

A.  The employee relations department, area, it's an area within HR, it consisted of a director, and then it consisted of Employee Relations partners, and there were three of those. There are times when all three of them would have been involved, but there was one particular person who would have been assigned to the same departments that I had assignment to.

Q. And who was that person?

A. Her name was Pamela Greenwood.

Q. Was there anyone else from Employee Relations who had an opinion that was aligned with HR's recommendation?

A. Cecelia Bass is the director.

Q. Was there anybody else -- so it was you, Cecelia Bass and Pam Greenwood. Was there anybody else?

A. Molly Brasfield, at one point, was the director of HR who supervised the business partners. At the time of the termination, she had been promoted to another role, but she was still within the HR department.

Q. Can you tell me about the policies and procedures at UMMC when there is an allegation of harassment between a male and female or female and a male?

A. If it has to do with staff to staff, then it would be handled within the HR Business Partner area first. If it had to do with someone who was in a teaching -- excuse me, in a student or learning role, it would have been handled by the Title IX director.

Q. When you say it would be handled, what does that mean? That means there's an investigation --

A. The allegation would have been heard, and an investigation would have ensued.

Q. As part of that investigation, they would go talk to both parties, I am assuming, the accuser and the accused?

A.   Sometimes if the accuser or the accused is not the person who brought forth that allegation, then other parties would also be interviewed.

Q.   Anyone related would usually be called by HR or somebody in charge of investigating for a sit-down internal investigation interview of that person; right?

A.   Yes.

Q.   Ms. Whitlock, I am going to show you what's marked as Plaintiff's Exhibit 67.  Publish that to the witness.

THE COURT:  Rita, don't publish that to the jury, just the witness.  What number is that, Mr. Schmitz?

MR. SCHMITZ:  67.

BY MR. SCHMITZ:

Q.   Mrs. Whitlock, do you recognize this email -- I realize this is only the first page of it, but there's several other pages.  Do you recognize the emails on this page?

A.   Is it supposed to be on this screen?  I see it now.  Would you repeat your question?

Q.   Do you recognize your email on the page?

A.   Yes.

Q.   That was your email when you were an employee at UMMC?

A.   Yes.

MR. SCHMITZ:  Plaintiff moves to move Exhibit 67 into evidence.

THE COURT:  Any objection?

          **MR. MAULDIN:**  No objection, Your Honor.

          **THE COURT:**  Plaintiff's Exhibit 67 will be admitted.
You may publish it to the jury.

     (EXHIBIT P-67 MARKED)

          **THE COURT:**  Can the jurors see that on their screens?
Anytime in trial you hear me say "publish it to the jury" and
you can't see it, also wave at me.  Those screens work
99 percent of the time, but every now and then we have a
glitch, so just let me know if for some reason you can't see.
You may proceed, Mr. Schmitz.

**BY MR. SCHMITZ:**

 Q.  The email consists of five pages, so I am going to go
through them in the order.  It starts at the top at the last
email, but the first email in the conversation is this one.

     Ms. Whitlock, do you see the email that you composed on
February 6 and was sent at 5:45 p.m.?

 A.  Yes.

 Q.  Now, do you recall sending this email?

 A.  Yes.

 Q.  And this would've been after your interview of Dr. Papin,
I believe, on January 27th?

 A.  It would've been after my interview, yes.

 Q.  Your email states "Dr. Truman Earl, Director School of
Medicine," you see where I am reading from?

 A.  Yes.

DIRECT - WHITLOCK

Q.  "Referred Dr. Papin to Employee Health to check for the
presence of illegal substances and those tests were negative.
He then placed Dr. Papin on administrative leave and then
consulted with human resources on the next steps.  Dr. Earl was
concerned that Dr. Papin's performance was not up to the
standards of a surgical resident, he was not truthful in
responses to inquiries and his negligence was liable to result
in safety patient issues leading Dr. Earl to conclude that the
only remedy was separation."

So earlier when we were talking about this, you stated
that Employee Relations has the power to terminate?

A.  They make the final decision, yes.

Q.  That decision never gets on an Employee Relations's plate
unless it first comes from Dr. Earl, would that be correct?

A.  In this particular instance, yes.

Q.  So would it be fair to say that there were multiple people
who made the decision to terminate Dr. Papin in this case?

A.  The way your question is worded, I was responding based on
what is typical in this case.  There are numerous avenues to
how an employee may be terminated.

Q.  I am only talking about this case.

A.  Okay.

Q.  And just a question, overarching question about this
email.  This was sort of your summary email of what you had
found after you had reviewed the materials that Dr. Earl

provided to you?

A.  Yes.

Q.  Are you aware Dr. Papin's residency would've started in or around July of 2016, were you aware of that?

A.  Yes.

Q.  So your first bullet point here -- you make a timeline. And I'll just kind of preview it for the jury so they can see where we're going to go.  We're going to go through the timeline here.  About a month or so into his residency, or within the first month of his residency, you noted that "Dr. Papin was in the cardiovascular rotation and was the first house officer to work in the cardiovascular Intensive Care Unit."  What do you mean he was the first officer to work in that unit?

A.  That was a particular program that was being initiated.

Q.  Was it unusual for a first-year intern to be working in that Cardiovascular Intensive Care Unit?

A.  No.  Previously, patients would be in an Intensive Care Unit, but this one was specifically for cardiovascular patients.

Q.  You next state that "he was not accustomed to the way NPs" -- when you say NPs, that means nurse practitioners?

A.  Nurse practitioners.

Q.  "Are utilized at UMMC, being able to run the day to day operations of a CV-ICU, cardiovascular intensive care unit";

correct?

A.   Yes.

Q.   "And his reactions/responses to them were less than
professional.  When NPs would ask him to perform routine tasks,
he arrogantly responded with such statements such as, you are
not my boss, or I am a surgeon."  Do you know what residents or
which NPs made those statements to you regarding Dr. Papin?

A.   This was a combination, culmination of information from
Dr. Earl.  They did not say that to me specifically.

Q.   Did you ever speak, or did Dr. Earl ever write the names
of any of these folks that made these comments to you?

A.   I don't recall.

Q.   Did you ever try to go speak to them back at that time?

A.   No.

Q.   You further state that "he would not check in with them,
and then he would not be seen until it was time for evening
rounds."  So this would be, I guess, again, from the same
undisclosed folks that you didn't speak to as well?

A.   This would be from Dr. Earl.

Q.   From Dr. Earl.  But Dr. Earl didn't tell you who made
these comments, these weren't his personal observations?

A.   I don't know.

Q.   Then it states, "Dr. Inez Berger, Professor of
Anesthesiology, discovered that Dr. Papin had not been given a
cardiovascular ICU policy at the beginning of his rotation and

was only given one after he carried a cup of coffee into a patient's room, which was against policy." You are reporting that here, but also noting that he was unaware of that policy, so that wasn't something that was a real concern to you at the time?

A.   The summary that you are looking at is based on the process that HR uses.  When we are providing a recommendation based on the department's recommendation, we're responsible to provide a timeline of everything that has been provided to us. So whatever you see in this particular summary would be based on the documentation that Dr. Earl had provided.  And this -- all of this would have occurred six months prior to HR being involved.

Q.   That makes sense.  You also state that he was confronted by a nurse practitioner which escalated into a heated exchange. Do you know any other details regarding that exchange?

A.   There were some other things that were provided by Dr. Earl, as well as Dr. Papin when he was interviewed.

Q.   And do you recall what those things were?

A.   I do not.

Q.   Did you ever interview the nurse practitioner that he got into the exchange with?

A.   I did not.

Q.   You go on to say, Dr. Berger met with Dr. Papin, I guess after the incident, talked to him about his perception, the

role of nurse practitioners and what he needed to do to be
successful.  She then emailed Dr. Earl and Dr. Jay Shake,
associate professor of surgery and director of the
Cardiovascular ICU.  You indicated that Dr. Papin had issues
with all four cardiovascular NPs, as well as a pharmacist.  Did
you ever ask Dr. Berger who those cardiovascular nurse
practitioners were, or the pharmacist?

A.  No.  But again, I am only summarizing what has been
provided to me that occurred over a six-month prior period.

Q.  So you were summarizing with Dr. Earl.  Did you think that
it would've been prudent to maybe speak with some of these
people to get the whole story instead of just taking what Dr.
Earl had sent to you?

A.  Had it been something that were more recent.  At UMMC,
there is a lot of autonomy within the department.  And there's
a lot of autonomy within specific areas where teaching occurs.
And if Dr. Earl was the director of the School of Medicine,
then we went under the presumption that he had carried out all
of the due diligence and had handled many of these situations;
otherwise, they would've come to HR much sooner.

Q.  Are you aware that at this time this was Dr. Earl's first
year as a program director?

A.  I was not.

Q.  Were you aware that Dr. Earl also maintained his practice
as a transplant surgeon while he was also a program director?

A.  I was not aware of that specifically, but there are many physicians at UMMC who continue to work in their professional area and also have administrative duties.

Q.  You finished with stating that, "Dr. Berger assessed that Dr. Papin was bright, motived with lots of potential, but needed a mentor to help him navigate the system and get him off to a good start."  What do you mean by that part?  Did you speak to -- I guess you did not speak to Dr. Berger at all at any point with regard to the termination of Joseph Papin?

A.  No.

Q.  At the top here you say, "Dr. Earl responded to Dr. Berger sharing that he, too, had been apprised some of the issues and he would follow up with Dr. Papin."  Do you know if he ever followed up with Dr. Papin in that first year or first month or so of his residency?

A.  I do not.

Q.  Did you ever obtain any documents showing that Dr. Earl had followed up with Dr. Papin within that first month of his residency?

A.  I do not recall the dates, but there were other documents that showed meetings that Dr. Earl did have with Dr. Papin.

Q.  But you do not recall any of these meetings in the beginning of Dr. Papin's residency?

A.  I do not know.

Q.  Then the timeline moves on to -- I guess we jumped from

July 29th to a month later on August 31 of 2016 through

December.  You state, all house officers receive evaluations

from various rotations to which they are assigned.  Although

some statements were complimentary, many of Dr. Papin's -- I

guess you were talking about their evaluations -- were quite

concerning.  There was a consensus that he was intelligent and

desires to become an excellent surgeon; however, he was absent

for some activities, did not seem prepared for others, and

resorted to the blame game when confronted with his

shortcomings.  And then you cite the evaluations that were

included as attachment 1.

     Did you speak to any of these evaluators attached in the

attachment 1 about Dr. Papin?

 A.  No.

 Q.  Is there any reason why you didn't think it would be

necessary to speak with them and kind of get a little bit more

detail than what was put on a couple sentences on the box?

 A.  Again, all of this would've occurred under the auspices of

the GME.  And because HR was getting involved six, seven months

later, we always take the presumption, again, that these people

are the ones who are professional and are knowledgeable of the

areas for which they have responsibility.  Had this been

brought to HR in August, or anytime between August and

December, were it something pertaining on the employee side, HR

would have delved into it.  But because this was something

brought to HR six to seven months after it had occurred with consideration of the autonomy that the departments have, again it was presumed that Dr. Earl in his area had already handled these things.

Q.  What would you say would be the role if it is presumed that everything has already been handled?  What is the role of HR, then, in this process if everything is just going to be taken from the academic side and, for lack of a better term, regurgitated by you six months later?

A.  When someone is in a training role, the department that is responsible for them, the graduate medical office, they have the opportunity to no longer retain their person in the program.  Had Dr. Earl sought to do that, HR would not have been involved in this at all.  But because he decided that these were situations that were more of an employee type, then that is how HR became involved in it.  There are times when house officers, residents are removed from the program because of their inability or unwillingness to adhere to ACGME standards that HR is not involved in.  It is only when the department feels that it rises to the level that requires HR involvement that HR does get involved.

Q.  In this case, though, HR was involved to recommend whether Dr. Papin should be terminated or not?

A.  HR was involved to present the recommendation of the department.  It was the department's request that Dr. Papin be

DIRECT - WHITLOCK

terminated.

Q.  Right.  So Dr. Earl presented you with a recommendation that he be terminated?

A.  Yes.

Q.  Then you also aligned with that recommendation to terminate Dr. Papin after Dr. Earl --

A.  I summarized it and forwarded that to Employee Relations.

Q.  With a recommendation that he be terminated?

A.  That Dr. Earl had made that recommendation, and yes, I was aligned with it.

Q.  And then the third level would be Employee Relations saying okay, we're going to go ahead and terminate you?

A.  Yes.

Q.  In your over 40 years experience as an HR professional, typically when you're brought with employee issues, some issue with an employee, whether it be performance or some type of misconduct issue, HR always conducts an investigation, isn't that true?

A.  In my experience, yes, but this was my first foray into anything in an academic medical setting.

Q.  You had not been involved in any discipline or termination cases of residents in the past?

A.  Yes.

Q.  You had been?

A.  Yes.

Q.  So this was not your first foray?

A.  The one that I recall being involved in, though, had to do with a Title IX situation, and so I did not make a recommendation.  I did an initial investigation, and after it was determined that it was more Title IX, then I was no longer involved.

Q.  And what did that initial investigation consist of in that case?

A.  Interviewing the persons who had brought forth the allegations.

Q.  Okay.  So in that case, you had actually interviewed everyone?

A.  Yes.

Q.  You went and spoke face-to-face with those folks?

A.  Yes.

Q.  But you did not do that here with Dr. Papin's case?

A.  No.

Q.  Is there any reason why Dr. Papin wasn't given the same treatment as that?

        **MR. MAULDIN:**  Objection, Your Honor.  May we approach?

        **THE COURT:**  You may.

    (THE FOLLOWING BENCH CONFERENCE WAS HELD OUTSIDE THE
    HEARING OF THE JURY:)

        **MR. MAULDIN:**  Your Honor, I think specifically --

**THE COURT:** Not too loud.

**MR. MAULDIN:** Mr. Schmitz is about to discuss treatment of other residents and specifically --

**THE COURT:** Ms. Thomas, can you turn that up?

**MR. MAULDIN:** I'm a loud talker.  Both other residents, and then, specifically, Title IX investigations, which is subject to both our objections on those records, the documents themselves.  And we would argue that those are both irrelevant and unduly prejudicial and outside the --

**THE COURT:** Let me do this.  I think it's really the afternoon lunch break.  Let me get them out of the room, that way we can --

**(END OF BENCH CONFERENCE)**

**THE COURT:** Rather than fight with the white noise right now while you are in the room, it is 3:30 and it's a great time to take our afternoon break anyway.  So it worked out for us.  Let's go ahead and do that.  Please remember the Court's instructions.  You're, of course, just now starting to hear the evidence.  You have not heard everything yet, so don't begin discussing the case.  But it's about 3:30.  Let's take about a 15, 20-minute break, drink some coffee and get a snack, and we'll get you back in here.

**(JURY OUT AT 3:30 P.M.)**

**THE COURT:** Ms. Whitlock, we're on a break, so you can be on a break, too.  The jurors are back there, so you're

welcome to go out in the hallway and use that restroom.  I am

going to hear argument from the lawyers.

        **THE WITNESS:**  So I need to leave?

        **THE COURT:**  Yes, ma'am.  But you're welcome to go to

the restroom and then come back into one of the witness rooms

if you'd like and we'll get you after the break is over.  Thank

you.

    Mr. Mauldin, I am going to let you start over because I,

in all candor, was half listening because I was worried the

jury was hearing you, so I was trying to navigate that.  So I

will let you start over.

        **MR. MAULDIN:**  I have been told I am not a good

whisperer.  It seems as though Mr. Schmitz was about to take a

detour into discussing the Title IX investigation process at

UMMC, how that relates to Dr. Papin and the treatment of other

residents.  We have previously objected to a number of exhibits

related to the treatment of those other residents.  And again,

this is outlined in our trial brief we filed regarding that as

well.

    Our argument, Your Honor, is that those instances are

irrelevant to whether the university had cause to terminate Dr.

Papin here.  And all of that evidence is really irrelevant and

barred by Rule 403, as well.

        **THE COURT:**  Okay.  Mr. Schmitz, I will hear from you.

Let me say, just for the record, I did read UMMC's trial brief

that I received yesterday and then you filed one today in response, and I have read that over the lunch break.

          **MR. SCHMITZ:**  Thank you.  Your Honor, respectfully, I disagree.  I believe that the comparator evidence here -- as you know, what we're arguing here is the breach of the agreement, specifically the three terms, malfeasance, inefficiency and contumacious conduct.  To define where the line is and what rises to that level of those three words, at least in the minds of UMMC, they're specific GME and HR departments, I think it is essential and crucial that we be able to at least discuss how they treated other residents, which residents crossed that line and led to their termination, and which residents', let's say, conduct justified a lesser penalty, either suspension, non-reenrollment, resignation.  There's a million other things that could take place.

     I think it's crucial for the jury to be able to see and hear the difference between terminable and non-terminable offenses to at least give them a baseline to understand what malfeasance, inefficiency and contumacious conduct means.  In the case law we had cited to you, there was a great case I saw, it was *B.D. versus Kansas Athletics*.  And in that case, there was a -- I believe he was a coach.  And they first had told the coach that he was going to be fired without cause, and then it appears that they realized they were going to have to pay him a $3 million severance in doing so.  Quickly thereafter, they

changed their reason and said that he was being terminated for cause.  Well, he requested comparator evidence, and that comparator evidence showed that other coaches had been terminated without cause who had NCAA investigations pending against them, and the reason why they said he was being fired for cause was an NCAA investigation.  And the Court there found that a reasonable fact finder could conclude that by looking at the comparator evidence that the school had fabricated that reason to terminate him to avoid paying the severance.

So I think in this case, obviously it goes to what the meaning of those three words are.  And also, it can be evidenced that UMMC fabricated the reasons for Dr. Papin's termination because -- especially if you look at some of these reasons, most of the things that he is accused of are relatively minor and things that other residents were not fired for.

And to the extent we're able to show the jury our proof to them, that some of the more major incidents that they rely on, especially with respect to patient safety, were not Dr. Papin's fault, then all you're left at are these smaller violations, which would not have been a terminable offense.  I think it's important.

THE COURT:  Let me say this.  As I was looking back over my orders over the weekend in preparing for trial, looking at the motion in limine, I do feel like there's some

DIRECT - WHITLOCK

inconsistency in the order where I say that the motion in
limine was granted as to resident 76, but then say that the
plaintiff can get into treatment of other residents.  But in
the sense of -- you're shaking your head yes, Mr. Schmitz, but
you're not going to like the direction I am going -- in the
sense of we have a breach of contract, and this is about Dr.
Papin's breach of contract.  I am okay with the line that you
have gone down so far with this witness of, do you typically do
investigations in these circumstances, I am okay with that.
And her saying, yes, we do, and these are the reasons for why
we did it then and why we didn't do it now.  But what I don't
want to happen is I don't want to get into the facts of another
resident.  I don't want -- if we do anything more than what you
have done so far with the line of questioning, I don't want to
get into the specifics.  If we do that, we're going to have
many trials within this trial and it truly will confuse the
jury and confuse the issues here.  We need the jury focused on
what did UMMC do with respect to Dr. Papin, what is his
contract, what are his alleged activities that caused them to
terminate the contract, and not go down any rabbit trails of
how did they treat other residents.

Now, in the Title VII Age Discrimination Act, Americans
with Disabilities Act, comparators are important, and I suspect
that's part of the reason why that information was sought in
discovery.  But for purposes of breach of contract, I feel like

it's going to take us too far afield of what the issues are and we risk confusing the jury.

So because of that, I'm going to give you the leeway of what you have done so far, and you can have that same leeway with other witnesses if you want to say, do you typically do this, is this typically how you handle things.  But with respect of, did Tom Smith, this resident, did you do this for him and why not?  I don't want to go down that trail.  Or what did Tom Smith to do to get himself terminated, or what did he do and you did not terminate him.  I don't want to go down that trail.  So for that reason -- Mr. Morgan, do you have something to say?

**MR. MORGAN:**  More of a clarifying question on that, because I do intend to ask the questions tomorrow of witnesses.  So --

**THE COURT:**  Is your mic on, Mr. Morgan?

**MR. MORGAN:**  It is now.  I intend to go down this tomorrow with a couple witnesses as well.  So is it okay to just kind of ask generally, hey, resident one, kind of the ten-second what happened there.  And then, was an investigation done, and then what happened?  Is that okay -- I understand we don't want to go down the rabbit hole and spend an hour --

**MR. SCHMITZ:**  We just want to know general allegations made against people and what the outcome of what happened to that person.

          THE COURT:  Are you talking about going through
specific residents?

          MR. MORGAN:  We have them marked so that there's no
name violations under FERPA.  They're numbered resident 73,
resident 76 here.  It's more like, okay, what was 73 accused
of?  I'm just making this up.

          THE COURT:  I guess my problem, Mr. Morgan, that I am
still not -- I have read the brief and I understand what
plaintiff's position is, but how is how UMMC treated another
resident relevant to whether they breached a contract with Dr.
Papin?

          MR. MORGAN:  As an example, one of the residents got
a zero on a test score.  We have heard how Dr. Papin had all of
these critical deficiencies, 7 out of 16 or 20 or whatever the
number was.  The person with a zero still got probation.  They
still got a chance to remediate.  So it's internally
inconsistent to say he violates the contract, or he is properly
being terminated for such an allegation when other people are
not.

          THE COURT:  But see, this is why I am worried it's
going to confuse the jury is because you say this resident got
a zero, but even from your own opening it's not simply a score
that we're looking at.  So I don't want the jury to have to
keep track of resident 1 had a zero and he did all these
things.  I think we're going to end up comparing apples to

oranges and I don't want to do that.  I truly do think it's

going to confuse the jury if we get into too many residents.

   As for general, you can say, like so far it's happened

with Ms. Whitlock and Mr. Schmitz asking her, does HR do

investigations, and she said, yes, we typically do, we didn't

in this circumstance, and this is the reason why we didn't.

Generally, in that circumstance, not resident by resident.

   **MR. MORGAN:**  Where I am admittedly struggling with it

is thinking back to like deposition testimony.  Like when we

went through these residents, some could be longer, most of

them were a page of questions, right, maybe 8 to 10 questions.

Hey, what was this resident accused of?  Okay, they were

accused of this.  What happened there?  They were given formal

remediation.  Did they remediate?  Yes, they did, or no, they

didn't remediate and they were either terminated or

non-renewed, moving on.

   **THE COURT:**  I still don't think it goes to whether

UMMC breached the contract with Dr. Papin.  I think it goes to

what happened with that resident and whether that resident was

properly terminated or whether that resident should've been

kept or not.  I don't think it goes to whether UMMC breached

the contract with Dr. Papin.

   **MR. MORGAN:**  I think it dovetails back into Mr.

Schmitz's argument of same language, same house officer

contract for all those of what is malfeasance, contumacious

conduct and inefficiency.  And using that information from others, including some involving Dr. Earl and the other witness who will testify tomorrow, does show whether UMMC believed in whether Joe actually did do these things.

THE COURT:  Well, I don't have any issue if you want to attack whether the reasons are false or not with respect to Dr. Papin.  Of course y'all can attack that on cross with any of these witnesses if you think that the reasons that UMMC has given are false.  But I am not going to get into -- I am not going to allow any testimony as to the individual, any resident that's not Dr. Papin, which is in line with the order on my motion in limine with respect to resident 76, but then there was also a more general ruling with respect to other residents. On that, I had initially denied the motion in limine, but I am going to grant it with respect to the other residents.

MR. MORGAN:  So are we even allowed to mention those other residents, then, to other witnesses?

THE COURT:  For what purpose?  Like mention in what way?

MR. MORGAN:  Because a moment ago you said you're okay kind of where Mr. Schmitz had been going, so I don't want to go -- if I go a couple steps in, I am okay, but where is that step where you're going to get mad at me?

THE COURT:  When it doubt, approach.  But so far, Mr. Schmitz has not asked about an individual.  He has asked

generally about how investigations work and how she has handled investigations in the past.  So not any specific resident she is talking about.  She's saying generally speaking and how it differs from her investigation of Dr. Papin.

**MR. MORGAN:**  So just to use an example, I am just trying to think on the fly of an example that could come up, would you be okay or not okay with us asking about, has another situation come up with another resident who was accused of being rude, and was that investigated, and were they all for remediation or not, something more general and generic like that?

**MR. SCHMITZ:**  Not specific, just generally.

**THE COURT:**  You can -- let's do this.  Yes.  You can ask the general question of that.  If I feel like we're going down a rabbit trail, I am going to reign it in, how about that?

**MR. SCHMITZ:**  That's fair.

**MR. MORGAN:**  I understand.  I don't want to get into the 20 pages of transcripts.  We agree.

**THE COURT:**  Let's take a break while we can and I'll be back in here in about 10 minutes -- 15 minutes.

**(RECESS TAKEN AT 3:43 P.M.  UNTIL 4:00 P.M. )**

**THE COURT:**  Do we need to take up anything before we bring the jury back?

**MR. SCHMITZ:**  No, ma'am.

**MR. MORGAN:**  Your Honor, I do want to -- I did want

to bring up one thing as just a reminder.  We had a little

incident a moment ago where two witnesses were talking to each

other in the hallway and I think, actually, a third walked up.

I spoke to counsel, they reminded the rule, but -- to follow

the rule.

        **THE COURT:**  That's fine.  Just make sure, for both

sides, too.  I know witnesses don't know all the rules, and

sometimes we forgot to tell them the rules.  Just make sure all

of our witnesses know that they don't need to be conversing

with each other.

        **MR. WATKINS:**  My witnesses, I have told them that

they first have to go through me then through you if they

violate the rules.  So we'll make sure --

        **THE COURT:**  I appreciate that.  Ms. Whitlock, we're

going to bring the jury back in.

    **(JURY IN AT 4:25 P.M. )**

        **THE COURT:**  The first day I always get tickled

because everybody is confused about where to sit, but y'all

will be walking in like soldiers pretty soon.  I was just

telling the attorneys, apparently the air got shut off for

whatever reason like to the courthouse, but maintenance has it

up and running now, so you'll probably feel it cool off a

little bit.  I see faces.  I encourage you to bring layers of

clothes because it's likely it's going to be cold in here

versus hot.  So bring layers, that way you can take them off if

you need to.  You may proceed, Mr. Schmitz.

          **MR. SCHMITZ:**  Thank you, Your Honor.

**BY MR. SCHMITZ:**

Q.  Just to close out where we left off, we were talking about another resident who you were involved in their discipline. And you had testified that you did conduct an investigation with multiple in-person, face-to-face interviews as part of that investigation in that case?

A.  Yes.

Q.  About how many people did you speak with?

A.  Twelve.

Q.  Twelve, okay.  And then you provided summaries of those to others after that, of your face-to-face conversations with those folks?

A.  I did not.  I provided -- they were recorded and I provided the recordings.

Q.  Okay.  And this is your summary of, I guess, the events that took place in Dr. Papin's case.  So we have from August 31st to December 15th, this is your comment, during that time period -- so other than the -- sometimes he was perceived -- Dr. Papin was perceived to being absent, didn't seem prepared or playing the blame game, there was no other events that you were aware of that were worthy of, I guess, in your mind at least, of reporting to everyone else about?

A.  There were none that were reported to me.

Q.  Okay.  And I am going to move on to the next.  There's
this time period here of -- I guess there's a gap in the time
period between December 15th and January 3rd, so there were no
reports of anything around that time that were reported to you?

A.  Nothing was reported to me.

Q.  So if you want, if you could please just read your bullet
points that you put between that January 3 and January 10th.
And I am going to ask you some questions about each one of
those.

A.  Yes, sir.

Q.  Let me know whenever you're ready.

A.  I am ready.

Q.  Okay.  I guess we'll first speak about Dr. Colin Muncie's,
what you were reporting with respect to that.  This was an
incident involving, allegedly involving Dr. Papin where a
patient was transferred to the ICU, and allegedly Dr. Papin was
accused of not making a call to the ICU; is that a fair
depiction of that event?

A.  Yes.

Q.  And was this reported to you by Dr. Muncie or who was this
reported to?

A.  Everything that I reviewed was reported to me through Dr.
Earl's office.

Q.  Okay.  And who at Dr. Earl's office, specifically, was the
one making these reports to you?

A.  Some of the emails would come from him, some of the information received was hard copies, some of it came through the graduate medical education office.  So there was a variety of sources.  I do not recall specifically what came from which place.

Q.  No problem.  Was some of these -- you mentioned a name up top, Renee Green.  Who is Renee Green?

A.  I am not sure what her title is, but she is an employee in the surgery department.

Q.  And she works with Dr. Earl's --

A.  She did at the time when I was there, yes.

Q.  At the time when this was all happening; right?

A.  Yes.

Q.  And you said she was compiling emails concerning Dr. Papin's performance; is that --

A.  At this point, I do not recall.  We're talking about something I wrote five years ago, and so I really do not have total recall on all of it.  I can only presume based on what is written here.

Q.  Okay.  So with respect to Dr. Colin Muncie and his report, you report back that allegedly there was no call made down to the ICU that this patient is coming.  Dr. Papin denied those allegations; is that your memory of that?

A.  I am not sure.

Q.  Would your notes here refresh your memory as to --

DIRECT - WHITLOCK

A.   Everything, again, in this summary is based on either what
was told to me or emails that I read.  My specific knowledge
would be based on my interview with Dr. Papin and going
forward.  But the January 3rd through January 10th would've
been prior to me meeting Dr. Papin.

Q.   And during your interview with Dr. Papin when you spoke to
him about this incident, did he admit that he had failed to
make the call to alert --

A.   I don't know if it was that specific incident.  I do not
recall.

Q.   In your notes here, you also reference that someone in the
ICU -- Dr. Muncie called an ICU nurse practitioner who said
that they didn't receive a call from Dr. Papin.  Did you ever
follow up with that, with Dr. Muncie to ask who that ICU nurse
practitioner was?

A.   I am not sure of your question based on what this
particular paragraph is.

Q.   What I am asking is, you reference an ICU nurse
practitioner in this paragraph; it comes up a couple times.

A.   This is saying that they confirmed that Dr. Papin never
spoke with anyone.

Q.   Okay.  It said, Dr. Muncie followed up with the ICU nurse
practitioner who had spoken to everyone who had been on duty
and confirmed that Dr. Papin never spoke with anyone.

A.   Right.  And again, this is based on either conversations I

had or emails that were provided to me.  This is not based on
my investigation.

 Q.  Okay.  But the reason why you're just saying ICU nurse
practitioner is because you don't know the identity of that
person; right?

 A.  I don't recall.

 Q.  Do you recall ever asking Dr. Muncie who the identity of
that person was?

 A.  I never spoke with Dr. Muncie.

 Q.  When someone makes a call from one unit to another in the
hospital, they're going to be using the hospital's phone
system; is that right?

 A.  I am not familiar.  My office was not in the hospital.

 Q.  Okay.  Would it be possible, or had you have wanted to, do
you believe it would've been possible for you to check the
phone records in the various locations in the hospital maybe
asking Dr. Papin which phone he made the call from?

          **MR. MAULDIN:**  Objection, calls for speculation.

          **THE COURT:**  Please stand.  What's your objection?

          **MR. MAULDIN:**  Calls for speculation.

          **THE COURT:**  Re-ask your question for me.

**BY MR. SCHMITZ:**

 Q.  Would it have been possible at the time for you to check
the hospital's phone records to see if Dr. Papin ever made the
call to the ICU or not?

THE COURT:  I am going to overrule the objection and you can answer.

A.  I have no idea.  There are so many different extensions in that huge place, and whether he would have called from an extension, it would not have specifically indicated that he made that call.  It would only have been a one-minute call from extension 2 to extension 3, so there would not have been anything to specifically identify that call with him.

BY MR. SCHMITZ:

Q.  Are you aware whether the medical records you would've been able to hone in on the time because the medical records would've shown that the transfer team took possession of a patient at a certain time, and then you could've looked for a phone call, whether Dr. Papin made a phone call around that time?

A.  I have no idea.  I don't know.

Q.  Did you try?

A.  No.

Q.  The next one I want to ask you about is Dr. Crews.  Are you up to speed where I can speak with you about this next paragraph here?

A.  I have read it, yes.

Q.  So Dr. Crews -- you reported Dr. Crews told you that Dr. Papin seemed to always show up before rounds without actually having seen any patients, but would then lie to the residents

about what he had done.  Dr. Crews, you state here that he is a

surgical resident.  Do you know whether he was a resident or

whether he was just a med student?

A.  I did not interview Dr. Crews.  This would have been

information provided to me.  So I presume that what was

provided to me was accurately depicted.

Q.  Okay.  You're not sure one way or the other?

A.  No.

Q.  And you never actually spoke to Dr. Crews, did you?

A.  No.  All of these notes from January 3 through

January 10th are based on either conversations that were held

with me or provided to me through emails.

Q.  Have you ever been involved in another case where someone

is accused of either showing up late or, you know, consistent

absenteeism and where they were disciplined employee-side,

resident-side, anywhere --

A.  Yes.

Q.  In those cases, did you ever conduct an investigation to

find if the person was denying whether they were late, or they

said no, I was actually just downstairs or something, I was not

late, some other way of verifying whether that person was

actually, in fact, late or not?

A.  Most of the ones that I have been involved in were

pertaining to non-exempt employees who are responsible for

clocking in and out.  So you would have an ID badge number

where you could go back and specifically see when employee 1
clocked in.

Q.   And Dr. Papin is a resident, he is an exempt employee, so
he would not be clocking in and out to record his time to get
paid; correct?

A.   Correct.

Q.   And are there any other things that non-exempt employees
would have to do in order to, let's say, enter the building at
UMMC or to begin their duties or to park their car where they
would have to have some kind of electronic timestamp record to
show whenever they were showing up to work or not?

A.   If an employee parked in a garage or in a surface lot that
required badge access you could determine, but all employees
did not have to do that.

Q.   Did you check where Dr. Papin, where he typically parked
required a parking card or not?

A.   I did not.

Q.   Did you ever ask Dr. Papin?

A.   I did not.  A parking card would've indicated at what
point he entered the premises of the hospital, but not
necessarily where he appeared where he was assigned.

Q.   And also, would there be anything else between the parking
lot and the building that he would need a key card to grant him
access to certain areas in the hospital, whether it would be
timestamped Dr. Papin's card, get into this door, to that door,

anything like that?

A.  There are some areas, but I am not familiar with where he would've entered.

Q.  Have you ever had to use that as part of any other investigations to track where people are or where they say they are?

A.  Yes.

Q.  But you didn't see fit to do that here with Dr. Papin?

A.  No.

Q.  Is there any reason why you just took all of these things that could've been verified by you independently to determine whether Dr. Papin was being truthful or not, you took all of these allegations or reports from Dr. Earl without any verification of whether he actually -- these things are true or not?

A.  There was documentation regarding evaluations and some of the other items.  But again, most of these had occurred more than six months prior to HR involvement.  And with the ACGME standards, and Dr. Earl's position, and the people who Dr. Earl would have had access to give directives to, HR would have presumed that with their autonomy, they had done their due diligence.

Q.  Isn't it HR's primary function to document and investigate incidents that are reported to them with anyone at UMMC, though?

A.  HR does document, but again, there are extenuating circumstances.  If a department has concerns and the department has done what they feel is necessary before coming to HR, and they have results or they have resolution, then HR would not go back and redo what they have already done.

Q.  So you believe that Dr. Earl's work prior to you getting involved, you had no issues or concerns with anything that he did?

A.  I did not.

Q.  Let's talk about -- you also report here that Dr. Crews said something to the effect that, when caught doing something wrong, Dr. Papin would blame a medical student for his own error.  Do you have any examples or is that another unsubstantiated allegation?

A.  There may have been some information provided in the information that was given to me, but I do not recall specifically.

Q.  I am going to move to the next paragraph here about Dr. Mahoney, and you let me know when you are ready to speak about this.

A.  I am ready.

Q.  This is -- you reference here that Dr. Mahoney, she was the chief resident overseeing Dr. Papin at that time.  Is that a fair representation of who she is?

A.  That's not in this email, so I would have to go back and

look at what other information I had been given pertaining to what her title was.

Q.  For our purposes here, I will just represent to you she was the chief resident over Dr. Papin at the time.  You said, "Dr. Mahoney emailed Dr. Earl and Ms. Green with numerous concerns.  One concern had to do with Dr. Papin having told Dr. Mahoney that upon her observation, a patient did not have any skin changes.  When the patient was seen by wound care, they reported a severe ulcer that was so significant surgery was required.  This could not have happened over the course of a few days, and the resulting action could have been lessened had Dr. Papin examined the patient and reported it."

Do you recall -- first, are you qualified to determine or make an opinion on whether someone's actions or inaction in any medical case would have lessened the extent of a damage done to a patient?

A.  I am not, and I was not attempting to do that in this case.  I was reporting on information that had been provided to me by someone who did have that qualification.

Q.  And who was that?

A.  It would have been -- everything that was given to me was through Dr. Earl's office.  So this Dr. Mahoney evidently was the person who had made this observation, and I was reporting based on what I had read.

Q.  And so in this case, did you ever -- this was about a

specific patient who we kind of, as we discussed and we have talked with the jury about, called the decubitus ulcer patient. Did you ever obtain the medical records of the decubitus ulcer patient, or do you know if anybody else had reviewed them prior to making this report to you regarding Dr. Papin's actions with this?

A.  I do not recall.

Q.  You said the patient was seen by wound care.  Do you know who in wound care saw the patient?

A.  I do not.

Q.  Did you ever ask?

A.  I did not.

Q.  In instances where there's, let's say, something, for lack of a better term, doesn't go well with a patient, in the hospital there's certain risk management procedures that are usually followed to report those incidents so that they can be reviewed; is that accurate?

A.  I am not sure.

Q.  Do you know what ICARE reports are?

A.  I have seen them, yes.

Q.  What is an ICARE report?

A.  It's an acronym.  I am not familiar, I can't recall what that acronym stands for, but it was a system whereby employees could, or any employee could submit a report if there was a concern regarding a fellow employee's actions or work.  When I

first started working at UMMC, it was specifically regarding

issues that may have been about patient safety.  And I don't --

again, I am not familiar with the area that is responsible for

those, but later on I started seeing ICARE reports that had

more to do with interpersonal relationships between employees

and not just patient safety.

Q.  Do you recall whether an ICARE report was ever done

regarding this patient incident?

A.  I do not.

Q.  Do you recall ever asking Dr. Earl whether he had done an

ICARE report about this patient?

A.  I recall asking whether or not an ICARE report had been

done about one of the allegations brought forth about Dr.

Papin, but I don't recall if it was this particular patient.

Q.  And that's just because that was five years ago, and

sitting here today you don't know?

A.  I do not.

Q.  Why would you believe that, or why would you feel it

necessary to ask Dr. Earl whether an ICARE report had been

done?

A.  Because if this is a serious allegation of egregious

behavior, in many instances similar to this a fellow employee

would have submitted an ICARE report.  So I was familiar with

ICARE reports being submitted by employees regarding other

employees.

DIRECT - WHITLOCK

Q.   Okay.  And when an ICARE report is submitted, what happens after that to that report, it goes to somebody else?

A.   It's submitted to a database.  It can be submitted anonymously.  And I am not sure the name of the department that handles it, but if it were anything, for instance, an employee action that may have violated a specific standard or policy, there were times when employees would be referred to HR. That's in the instance where I have seen ICARE reports.

Q.   Have you ever seen instances where ICARE reports were made about a doctor who, let's say, was alleged to have made a mistake on a patient, and then that report resulted in some sort of committee review or risk management review that takes place between the doctors to determine whether there was any negligence on the part of the doctor --

A.   I am not sure.  I do know there's a department that would have reviewed allegations that were brought forth, not just specifically about a physician, but I can't recall the name of that area.

Q.   What about if a family is not satisfied with the care of their loved one while staying at the hospital, they are allowed to submit ICARE reports?

A.   No.

Q.   No.  Only employees?

A.   Only employees submit ICARE reports.  There are other avenues for patients.

DIRECT - WHITLOCK

Q.  And you're not sure which departments handle the patient complaints or the ICARE complaints?

A.  They are handled in different areas.

Q.  Do you know what those areas are?

A.  I do not.

Q.  The next paragraph you reference that Ashley Griffin, a registered nurse, cited seven incidents of inappropriate behavior by Dr. Papin.  Do you recall what those incidents were?

A.  I do not.

Q.  At the bottom last paragraph you have for this time period -- and just for reference, Dr. Papin, the last day he worked at UMMC was January 11th of 2017; is that your recollection?

A.  I don't recall the specific day.

Q.  Does it make sense that it's right around this time period?

A.  I know it was in January, but I do not recall.

Q.  You had spoken to him in January -- you had spoken to him on January 27th, and that was your interview with him at that time?

A.  Yes.

Q.  So it would've been a week or two before his interview with you?

A.  I recall that he had been placed on administrative leave,

but during that period he was still considered employed.

Q.   Okay.  Because earlier you were testifying that these incidents had all occurred a long time ago and that's why HR didn't get involved, but you have this timeline here with these incidents occurring sort of January 3rd through January 10th?

A.   And again, those are incidents that were reported to me.

Q.   You said when things are recently reported to you, earlier, that you would typically conduct your own investigation because it would be more fresh?

A.   Had there been any concern that what had previously been surmised by the department brought concern, yes, but everything that the department had presented going to the preceding six months did not warrant, in our opinion, anything to redo what the department had already done.

Q.   In that final paragraph you state, Dr. Earl met with Dr. Papin, discussed some concerns, being untruthful about patient care.  In that incident, are you referencing the incident above here where there was the ICU patient that wasn't transferred, and the wound, decubitus ulcer patient, those are the two incidents you're referencing?

A.   I am not sure.  It's whatever is in that letter that is referred to as the attachment.

Q.   I don't have that with me, but okay.  The next part, you state that it was discussed with Dr. Papin about the fact of him leaving the hospital in the middle of his shift to

exercise.  Do you recall what that incident was all about?

A.  I do not.

Q.  You do not.  Did you ever ask Dr. Papin about that incident when you interviewed him?

A.  Whatever was in the information presented by the department was shared with Dr. Papin during the interview with HR.

Q.  And this was your email like seven days after that?

A.  Everything up until the point that I interviewed Dr. Papin was based on information that was provided to me by the department.

Q.  But you had also conducted your own interview of Dr. Papin, I believe, on the 27th, and this email was drafted by you on February 6.  So it would've been a little bit of both from your interview, as well as what was reported to you?

A.  Yes, but what I specifically would have reported my knowledge of would have been based on what Dr. Papin told me in our interview.

Q.  Do you recall Dr. Papin telling you during that interview that he had text message proof that Dr. Mahoney had allowed him to go during his shift to exercise for a brief run?

A.  I don't recall.

Q.  Then at the end here you reference during this discussion between Dr. Earl and Dr. Papin, that Dr. Earl presented Dr. Papin, I guess, with a letter that contained requirements and

DIRECT - WHITLOCK

suggestions, and both Dr. Papin and Earl signed this letter, and Dr. Papin was given a copy?

A.  Yes.

Q.  Do you remember talking to Dr. Earl about that letter in that meeting with Dr. Papin?

A.  I don't recall.

Q.  So that would have been when he met with Dr. Papin, Dr. Earl, that would've been somewhere, to the best of your recollection since it's in this timeframe, somewhere between January 3rd and January 10th?

A.  Yes.

Q.  And the next reference, you reference down here at the bottom January 19th, Molly Brasfield, who you discussed earlier, HR director, yourself and Rick Barr and Dr. Earl all had a meeting to discuss Dr. Papin?

A.  Yes.

Q.  Do you recall that meeting?

A.  I am reading this.  I do not specifically recall it.

Q.  Yeah, I will give you a second so you can refresh your recollection.

A.  I have read it.

Q.  At this meeting, do you recall Dr. Earl expressing that he wanted Dr. Papin to be terminated?

A.  I do not recall.

Q.  Do you recall, after reviewing this email, that was your

impression of this meeting?

A.  It evidently was because that's what is summarized, but I do not have specific memory of that meeting.

Q.  Okay.  At some point, though, within 10 days, 10 to 14 days prior to that, Dr. Earl, as you had suggested above, he did meet with Dr. Papin and he gave -- and they came to some sort of agreement where Dr. Papin could have some additional time to remediate his performance issues; do you recall that?

A.  I would have to see that letter.  I don't recall.

Q.  Do you know if there was anything changed -- that changed between that January 3 to January 10 time period and January 19th that would have made Dr. Earl go from wanting to remediate Dr. Papin to being, as your words, adamant that he had no faith in Dr. Papin?

A.  I don't recall.

Q.  At the bottom here, you kind of have it in italics, you state that, "The incident referenced above by Dr. Mahoney regarding the patient's ulcer was one of the items discussed." Do you recall what was discussed regarding that incident at the meeting?

A.  I can only presume that it was the fact that there was a decubitus ulcer that Dr. Papin did not report after being assigned that patient.

Q.  And then you state, after inquiring if an ICARE report had been submitted, who did you inquire with?

DIRECT - WHITLOCK

A.  In that meeting.

Q.  In that meeting, okay.  And then you said learning that had it not been, it was recommended.  Why would you recommend that an ICARE report be submitted?

A.  It was my presumption that if a fellow employee thought that it was a serious enough nature, then it would have been reported through the ICARE process for an investigation on the hospital side.

Q.  Ultimately, do you have any recollection of whether an ICARE report was ever submitted for this decubitus ulcer patient?

A.  I do not.  As of the date that I was writing that, I said I followed up and was told that it had not been done.

Q.  Did you ever follow up again after this time period about an ICARE report?

A.  I don't recall.

Q.  Do you think it would have been important to have received an ICARE report prior to recommending and agreeing that Dr. Papin be terminated, an ICARE report about this decubitus ulcer patient?

A.  An ICARE report after the fact would not have given me any other specific information.

Q.  What if the ICARE investigation -- let's just say hypothetically the ICARE investigation revealed that Dr. Papin had really nothing to do with this patient and these

allegations were false, would that have changed your viewpoint

on Dr. Papin's continued employment with UMMC?

A.  Not about this specific case.  A decubitus ulcer is a very

serious incident.  And had a physician who was assigned to a

patient, had been watching that patient's skin, they would have

known whether or not a decubitus ulcer existed.  I am familiar

with what a decubitus ulcer is.

Q.  It's a bedsore?  Your understanding is a bedsore?

A.  Yes.

Q.  At the hospital when someone is being treated for a

bedsore or just someone who has been admitted at the hospital

for a long time, is that person only treated by one healthcare

provider or are they treated by a team of healthcare providers?

A.  I don't know.

Q.  Is it ever the case where a first-year resident intern is

solely responsible for the care of a patient or are they

usually overseen by a doctor, a board certified physician in

that area, nurse practitioners, other nurses all see the same

patient?

A.  I am not familiar with the protocol.

Q.  In eight years of working in a hospital, you're unable to

describe how patients are taken care of in a hospital?

        MR. MAULDIN:  Objection, Your Honor.  Asked and

answered.

        THE COURT:  Sustained.

**BY MR. SCHMITZ:**

Q.  So this is referencing, and I think I have already talked about this already, your January 27th, 2017, interview with Dr. Papin.  Do you need a moment --

A.  Yes, I have read that.

Q.  -- before I start talking to you about it?

A.  I have read it.

Q.  First, you start off by noting that Dr. Papin called you at 3:40 to inquire about the location for his 4:00 p.m. appointment with you.  And then I guess he arrived shortly thereafter.  But you believe that the meeting was scheduled for 3:00 and he thought it was 4:00; there was some type of misunderstanding?

A.  It was confirmed by him for 3:00 when he was contacted.

Q.  But somehow he believed that it was for 4:00 and he was showing up for the 4:00 meeting?

A.  I presume so.

Q.  You state in sort of the middle there, Dr. Papin did not accept any accountability for his actions.  What do you mean by that?

A.  I reviewed all of the information that Dr. Earl's office had provided.  And for each of those situations, I shared with Dr. Papin what we had been told and asked him for his response.  In each of those situations, it was -- he did not deny that the occurrence happened, but there was always a reason for it, or

it was based on negligence that someone else had done and not anything he was responsible for.  I do recall in our recorded interview he kept referring to the fact that he was not a southerner, and that in the hospital people were expecting you to have pleasantries before you asked them to do anything.  And he compared it to being in the military and coming out as an officer, but the enlisted people telling you what to do.  And he said that he was not familiar with how nurse practitioners had the responsibilities that they did.  And so he cited it for cultural differences.  He said he was not condescending, he was never rude, but he would question things.  And he kept alluding to the fact that he was not a Mississippian or a southerner, and sometimes he would just broach a subject with asking a question rather than saying "good morning" or "how are you," and he later learned that that was what was expected.

Q.  In terms of the more serious things other than just his -- let's call those interpersonal reactions with others, in terms of the more serious things, was it your feeling that he was not taking accountability for those incidents as well?

A.  There was one specific incident where a pager went off in the hospital and he said he had already signed out, and he left for the day.  And later on he was told that that was his patient, he said that he had no way of knowing it was his patient because when the code was called it merely said the code and the color, code number or whatever, and the floor, and

he had no idea that that was his patient.  But because he was already signing out for the day, he never went back to check to see if it was his patient.

Q.  Did you do any investigation into that incident or speak to any of the folks that were involved with respect to that?

A.  I did not.

Q.  So you don't know whether he was telling the truth about that one way or the other?

A.  Again, all of these things had occurred at least six months prior to the HR involvement.  I am not sure how I would've checked to see whether or not he had already signed out and was leaving and heard the code overhead and didn't know it was his patient.

Q.  So based on your understanding that all these events had occurred so many months prior, what was the impetus or the reason for why they were wanting to terminate him at this point?

A.  When someone is in a training position and the position he was training for was to be a surgeon, there are so many facets of that work that is required.  If the person who is responsible for training the resident loses the faith that he cannot be a harm to patients, then we respect the fact that that person who is over the program, has years of experience, he has worked with residents, whether or not he is in the specific director role, and we relied upon his judgment to

bring forth information that he thought would be in the best
interest of the hospital.

Q.  Okay.  But he brought you that information seeking your
recommendation because human resources, Employee Relations
matters, stuff like this involving a termination that's not --
(inaudible) transplant surgeon, not why he would need to bring
it to HR?

A.  It would not be his primary function from an employee
standpoint.  Were he only wanting to remove a resident from the
program, then he would be able to do that under the guidelines
of the ACGME.

Q.  Right.  So you're saying Dr. Earl lacked the authority
alone, by himself, to terminate Dr. Papin, he needed to come to
you in human resources in order to get that done?

A.  No, I am saying he was not requesting, specifically, per
se, to have Dr. Papin removed from the program, he was
requesting termination of his employment status.

Q.  Really, one can't be doing the residency program and not
be an employee or vice versa, be an employee but not be in the
residency program, they both go hand-in-hand at the same time?

A.  They do, but they are very specific separate, distinct
guidelines that operate those.  An academic medical institution
is a unique organization.

Q.  Right.  And you're just not familiar because -- you're
very familiar with the HR guidelines and rules, but you're just

not familiar with the academic graduate medical education rules

and rights, whatever Dr. Papin may have had in those

circumstances?

 A.  That's correct.

          **MR. SCHMITZ:**  I'm going to show the witness what's

marked as Exhibit 25.

          **THE COURT:**  Is that J-25 or --

          **MR. SCHMITZ:**  Plaintiff's 25.

          **THE COURT:**  You may show the witness.

**BY MR. SCHMITZ:**

 Q.  Ms. Whitlock, do you recognize this email?

 A.  Yes.

 Q.  You wrote this email?

 A.  Yes.

          **MR. SCHMITZ:**  Plaintiff moves to admit number 67 --

25, sorry.

          **THE COURT:**  Any objection to P-25?

          **MR. MAULDIN:**  No objection.

          **THE COURT:**  P-25 is admitted.  You may publish it to

the jury.

     (EXHIBIT P—25 MARKED)

**BY MR. SCHMITZ:**

 Q.  When we were speaking just a few minutes ago,

Ms. Whitlock, I asked you if Dr. Earl -- if you had any issues

or you thought there was anything wrong with the investigation

that Dr. Earl completed on Dr. Papin in what was presented to you, and I believe your answer was no, that you did not have any issues with that.  Was that your testimony?

A.  That's correct.

Q.  In this email dated February 15th, it looks like, first, you were emailed by a Pamela Greenwood.  Pamela Greenwood, she was your HR Business Partner as well?

A.  She's an HR service partner who works in the Office of Employee Relations.

Q.  So she emails you, it looks like, at 10:22 a.m.  Good morning to you.  After reviewing the documentation submitted, and I am assuming that would be the documentation submitted by Dr. Earl, which you had summarized in the prior email that we just spent a long time going over?

A.  Yes.

Q.  Additional information -- some additional information is needed.  She brings out the fact that, is there any supporting documentation of the feedbacks/coaching sessions that Dr. Earl references.  The next point she said, is there a complete signed academic remediation protocol checklist showing that all of those tasks had been completed.  Next, she asks you, how were the performance issues/concerns that are noted in the analysis, trainee comments document addressed, is there any supporting documentation of those things?  How was the disruptive incident addressed that occurred between Dr. Papin

and Joshua?  Can you provide me with a copy of the expectations

that were communicated by Dr. Mahoney?  Since your

2/6 follow-up on the ICARE report -- and I believe that's when

you followed up with Dr. Earl about the ICARE report?

 A.  It was in a meeting with Drs. Earl, Barr and several other

people.

 Q.  Has this been completed, if so please provide a copy.  And

finally she asked, what progress has been made or not by Dr.

Papin since receiving the remediation plan on January 10th,

2017, and being placed on administrative leave?  Was there any

other incidents involving Dr. Papin since January 10, 2017?

Your response, I felt that this would be an issue, and I feel

certain that the answer will be no to all of these except the

last two since he has been off campus since January 10th.

    Why did you feel that some of these things would be an

issue?

 A.  Because here again, Dr. Papin was in a hybrid role.  He

was an employee of UMMC, but he was also a trainee in a program

to be a surgeon.  And as I have alluded before, there are two

separate, very distinct tracks that this resident operates

under.  And so everything that Ms. Greenwood is referencing

would have been those items that Dr. Earl's area would have

handled, or the graduate medical education office would have

handled.

 Q.  So Dr. Earl, before you get to it, Dr. Earl, as part of

the graduate medical education, he was supposed to have checked off all these boxes before presenting the information that he presented to you about Dr. Papin?

A.   Everything that Dr. Earl's area had done would have been in keeping with the ACGME standards, or with the specific program that Dr. Earl was in, not so much so based on the employee staff handbook that non-residents or people who are not in training capacities are expected to adhere to.

Q.   Okay.  But Dr. Papin is expected to adhere to the graduate medical education -- Dr. Earl and Dr. Papin are both bound by the policies and procedures for the graduate medical -- the academic side part of Dr. Papin's training program; is that your understanding?

A.   Dr. Papin would have been expected to adhere to both, whatever the ACGME standards were and whatever was in the employee staff handbook.

Q.   As well as Dr. Earl, he was expected to also adhere to those sort of academic policies and procedures that were part of the residency program?

A.   Dr. Earl would have been responsible for administering them.

Q.   Fair enough.  Again, so the last email we were looking at, if you recall, that was drafted by you on February 6, and now here we are 11 days -- nine days later, sorry, and Pam Greenwood was asking whether there was an ICARE report.  Did

DIRECT - WHITLOCK

you follow up with Dr. Earl about the ICARE report or anybody else during this time period?

A.  I don't recall.

Q.  What about all these other issues that she brings up?  Do you know what an academic remediation protocol checklist is?

A.  I do not.  I can only presume that Ms. Greenwood must have consulted with the GME office to inquire about these because these are not things that, from a regular standpoint, the HR department would have had knowledge of or access to.

Q.  In regards to the -- there's seven bullet points.  In answer to whether there's basically supporting documentation or whether we have certain documents, like a checklist that shows all the tasks needed to be completed, and whether we have any documentation regarding the expectations of Dr. Mahoney or Dr. Papin, all of that, you didn't have any of that as of February 15, 2017?

A.  I had copies of evaluations.  And I can't recall the other documents that I had, but I had quite a stack of documents that had been provided.

Q.  All these things are brought up to you nine days after your letter.  In your last letter on February 26, you recommended Dr. Papin's termination and aligned with Dr. Earl at the end of your letter?

A.  Yes.

Q.  Did any of these things brought up by Ms. Greenwood give

you any pause after recommending his termination that, hey,
maybe we need to go back, in you recognizing there's some
issues with the investigation, did you ever inquire with
anybody about maybe going back and rethinking this before
actually moving forward with Dr. Papin's termination?

A.   I did not because, again, there are specific standards
that the ACGME has.  And there are different protocols that the
graduate medical education office has that would have afforded
Dr. Papin to go through these things or to have this
information shared with him prior to Dr. Earl providing that to
HR.  There's quite a bit of autonomy within the medical school.
And so the medical school is allowed to operate under that
specific guideline that the ACGME has, as well as whatever
guidelines they have for the specific departments.

Q.   Earlier you testified, though, you weren't really sure
what all the ACGME guidelines were; right?

A.   I have looked at them, but to have total familiarity with
them I do not.

Q.   At the time on February 6 when you recommended Dr. Papin's
termination, you didn't know one way or the other whether Dr.
Earl had complied with the ACGME, or administered all the ACGME
and graduate medical education policies and procedures with
respect to Dr. Papin?

A.   I do not.

          MR. SCHMITZ:  I am going to show the witness, it's

Joint Exhibit Number 4.

**THE COURT:**  You may.  You may publish it to the jury as well.

**BY MR. SCHMITZ:**

Q.  Let me know when you're ready.

A.  I have looked at it.

Q.  This is the -- it says "Academic Remediation Protocol Checklist."

A.  Yes.

Q.  I believe in the last document we were looking at, Ms. Greenwood references the Academic Remediation Protocol Checklist and she was asking you, have all the tasks been completed in that?  And at the time you believed that the answer was no?

A.  Because if this was presented on January 10th, I am presuming that was at the same time when Dr. Papin was placed on the administrative leave.

Q.  That would be correct, yes.  So there's a checklist here. Do you know what this checklist represents?

A.  It says "specific competency areas to be remediated."

Q.  And are you aware of whether this is something that Dr. Earl was required to at least check through or go through prior to bringing the issues that he brought to you and HR regarding Dr. Papin?

A.  Again, the issues that Dr. Earl brought to HR were more of

an employee nature, they were not specific to the ACGME
requirements.

Q.  What's the purpose -- do you know what the purpose of this
document is to ensure that -- is this the document that is to
ensure Dr. Earl was following all the ACGME protocols?  There's
a checklist.

A.  I do not.

Q.  Does it look like, just from your review, that all of the
boxes are checked off?

A.  All I see is what evidently is an expected completion
date.

Q.  Did you ever talk to Dr. Earl about the Academic
Remediation Protocol Checklist?

A.  No.

Q.  Did you ever talk to Pam Greenwood about it other than
just this exchange in the last email I showed you?

A.  There was a meeting that followed that email from
Ms. Greenwood that was held in person between Molly Brasfield,
Pam Greenwood, Cecelia Bass and me where all of those things
were discussed.

Q.  Was it discussed that not all of these things were
completed at that meeting?

A.  My recollection, and that meeting was not recorded, but my
recollection is that Molly Brasfield went into great detail to
provide for Pam Greenwood the differences in what Dr. Earl

would have been looking for from the standpoint of Dr. Papin
being a trainee in comparison to the employee requirements for
recommending the termination.

Q.  Okay.  So Ms. Brasfield was telling Ms. Greenwood that
that was an academic thing as opposed to an HR thing, is that
what you're trying to say?

A.  That everything that Dr. Earl had provided us with would
substantiate the termination.

Q.  Okay.  And you didn't have any concerns or issues at that
time that all of these things, like meet with an academic
counselor, meeting with the associate dean with the GME,
rotation/schedule adjustments if needed, simulation
assignments, conference attendance goals -- it does look like
Dr. Papin submitted a written personal study or corrective
action plan on 1/17.  But all the rest of these things, that
didn't give you any pause that maybe Dr. Earl at that point had
not done everything he needed to do on his side to recommend
his termination to have HR review it?

A.  It did not.

Q.  I want to show the witness Defendant's Exhibit 28.

        **THE COURT:**  All right.  I think it's a good stopping
point right now.  We're right about 5:00, 4:57.  It's our
jurors' first day.  They probably did not have any idea they
would be here by 5:00, so I don't want to keep them late on the
first day.

I have noticed that some of our jurors, a couple of y'all
have quite a distance to drive.  If you live more than 50 miles
away, you can talk to Donnie Dennis downstairs and you can get
a hotel room if you would like; you don't have to.  But
tomorrow if you decide you want to do that, when you come in in
the morning, let Donnie know and we can make those
arrangements.

Also, we have snacks in the back, but you're welcome to
bring whatever snacks that you want to stick in the jury room
if you want to supplement what's back there, if you don't like
what's back there.  If it is hard to get out of here and get
lunch, because sometimes it is to get back to where your car
is, you're welcome to bring your lunch everyday if you would
like.  We have a space downstairs that you can warm your food
up or put it in the refrigerator in the mornings.  So keep that
in mind.

I am going to go ahead and let you go today.  Be back
downstairs -- Mr. Allen, I'm looking at you.  They meet in the
jury assembly room first.  So be here downstairs by 8:45, that
way Mr. Allen can get you up here and we can get going by
9:00 in the morning.  I ask you -- this is the first time I am
letting you completely go.  So, again, remember the Court's
instructions:  Don't discuss -- your family is going to ask you
if you have been selected for a jury, and you can tell them
yes, and you can tell them it is a civil case.  But beyond

that, just share -- save the details until this trial is completely over.  No independent research of anything remotely touching on this case or the parties in this case.

I hope everybody has a good night and a safe ride home, and I will see everyone tomorrow at 9:00, but 8:45 downstairs.

**(JURY OUT AT 4:59 P.M.)**

**THE COURT:**  Ms. Whitlock, I would ask that you be here probably about the same time, about 8:45.  Just make sure that you are here and ready to go by 9:00, but you are excused. Now, you are under oath right now and we're receiving your testimony.  So it's important that you don't discuss your testimony with anybody else, okay?

**WITNESS:**  Yes.

**THE COURT:**  Thank you so much.  You may step down.

Do the parties have anything that we need to take up? I'll let Ms. Whitlock leave the room before we do, but is there anything we need to take up before tomorrow morning that we can handle this afternoon?

**MR. MORGAN:**  I do not believe so.

**MR. WATKINS:**  I don't think so.

**MR. MORGAN:**  We're coordinating on schedules to do that.  I guess the only thing I could add was, I know we were talking about a second zoom tomorrow.  I think I had originally told you maybe 2:00 or 3:00, still might be that time, but maybe we could just do it at 1:00 to be safe.  I don't know

when that second one will go, kind of depends on how long this one goes.

THE COURT:  When is the first one supposed to go?

MR. MORGAN:  10:30 would be Elizabeth Toony because she is not available until that time.

THE COURT:  And you expect a second one maybe in the afternoon?

MR. MORGAN:  In the afternoon at some point in time.

THE COURT:  We will be ready for that.  Anything else?  I would ask, and it sounds like you all are doing this, the night before just make sure the other side knows who the witnesses are, that way no one is caught off-guard.  I imagine that y'all are having to coordinate because so many folks are employees.  Please do that.  And if there are any objections to exhibits that you all can work out before the next day, that's always good, it'll move things along.  No pressure to do that, but if you can do it, it's always great.  Anything else?

MR. MORGAN:  No, ma'am.

MR. WATKINS:  No, ma'am.

THE COURT:  I'll see everyone -- if something comes up, sometimes this happens at trial that something comes up in the evening that you all think I need to take up first thing in the morning, if you will just shoot an email to the chamber's box copying each other to give me heads up, so that way we may have to come in here early and talk it out before 9:00.  So I

can say, well, everybody needs to be here at 8:30.  Just let me

know by email rather than springing it on me at 9:00 and we

have the jury waiting on us.  Everybody have a good night.

I'll see you in the morning.

(TRIAL RECESSED)

- - -

CERTIFICATE OF COURT REPORTER


    I, Sherri L. Penny, RPR, FCRR, Official Court Reporter for the United States District Court for the Southern District of Mississippi, appointed pursuant to the provisions of Title 28, United States Code, Section 753, do hereby certify that the foregoing is a correct transcript of the proceedings reported by me using the stenotype reporting method in conjunction with computer-aided transcription, and that same is a true and correct transcript to the best of my ability and understanding.

    I further certify that the transcript fees and format comply with those prescribed by the Court and the Judicial Conference of the United States.




*S/ Sherri L. Penny*
OFFICIAL COURT REPORTER