UNITED STATES DITRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION


JOSEPH PAPIN                                             PLAINTIFF


V.                             CIVIL ACTION NO. 3:17-CV-763-KHJ-FKB


UNIVERSITY OF MISSISSIPPI
MEDICAL CENTER                                           DEFENDANT

## ORDER

Before the Court is Defendant University of Mississippi Medical Center's

("UMMC") [258] Motion for Judgment Notwithstanding the Verdict,[1] or in the

Alternative, for a New Trial. For the following reasons, the Court grants the motion.

I.      Background

Plaintiff Dr. Joseph Papin sued UMMC for wrongful termination from its

medical-residency program. The below summarizes the events leading to this

lawsuit.

        A.  Dr. Papin's Residency

Dr. Papin graduated from the University of Michigan Medical School in 2015.

*See* Trial Tr. vol. 3 [263] at 25, 156. After applying to surgical-residency programs

across the country, he "matched" at UMMC. *Id.* at 157–64. Before beginning his

---

[1] The correct terminology under Rule 50(b) is a "renewed motion for judgment as a matter of law." Fed. R. Civ. P. 50(b); *see also Hebert v. Titan Int'l, Inc.*, 778 F. App'x 275, 277 (5th Cir. 2019) (referring to appellants' judgment notwithstanding the verdict as a renewed motion for judgment as a matter of law). The Court uses that terminology.

surgical residency in July 2016, he signed a House Officer Contract. *Id.* at 173–74; Joint Trial Ex. 2.

The House Officer Contract outlined the terms of Dr. Papin's employment. It provided him with a one-year term of employment, subject to renewal before each new year of the residency program. Trial Tr. vol. 2 [262] at 145; Joint Trial Ex. 2 at 1. It also stated Dr. Papin could be terminated at any time for "malfeasance, inefficiency, or contumacious conduct." Joint Trial Ex. 2 at 2. Dr. Papin, the Vice Chancellor for Health Affairs, and the Associate Dean for Graduate Medical Education signed the contract. *Id.*

But Dr. Papin did not finish his first year of residency. During the first six months of the program, UMMC physicians and staff documented examples of Dr. Papin's performance falling below UMMC's expectations. For example, the jury heard testimony from witnesses alleging Dr. Papin's poor care of a patient suffering from a decubitus ulcer, [263] at 35–37; his impermissibly leaving shifts, [262] at 31–33, Def.'s Trial Ex. 25; his subpar rapport with colleagues, [262] at 24–25; and his failure to improve his performance after receiving negative feedback from superiors, Trial Tr. vol. 4 [264] at 32–33.

Dr. Meghan Mahoney—a senior resident—formally reported Dr. Papin in January 2017 for failing to properly treat the decubitus ulcer patient. [263] at 35; Def.'s Trial Ex. 25. Dr. Truman Earl—the director of Dr. Papin's residency program—later scheduled a meeting with Dr. Papin on January 10, 2017. [264] at 42–43; Trial Tr. vol. 5 [265] at 28, 101. He presented Dr. Papin with a "Remediation

Agreement" at that meeting. *Id.* at 101–03; Pl.'s Trial Ex. 2. The Agreement gave Dr. Papin 60 days "to show significant improvement" as a surgical resident or face termination. [265] at 103; Pl.'s Trial Ex. 2 at 1. Only Dr. Earl and Dr. Papin signed the Agreement. Pl.'s Trial Ex. 2 at 2.

Dr. Papin never returned to work after his meeting with Dr. Earl, however. [264] at 47–48. Instead, UMMC terminated his employment on February 22, 2017, well before the Remediation Agreement's 60-day period expired. *Id.* at 52.

### B.  The Lawsuit

Dr. Papin sued UMMC, among others, on September 20, 2017. Compl. [1]. His Second Amended Complaint brought claims against UMMC and other defendants for breach-of-contract; violation of Section 213-A of the Mississippi Constitution; state due-process violations; federal due-process violations under 42 U.S.C. § 1983; and violations of Title VI and Title VII of the Civil Rights Act of 1964. Am. Compl. [50]. The Court dismissed all of Dr. Papin's claims except the breach-of-contract claim against UMMC. Summ. J. Order [170] at 54–55. The Court also entered an Order on September 22, 2021, limiting Dr. Papin's recoverable damages to the House Officer Contract's one-year term. Order [192] at 12–13.

### C.  Trial

Trial began on October 11, 2022. Trial Tr. vol. 1 [257] at 107. Dr. Papin was present, along with Dr. Earl, who served as UMMC's representative. *Id.* at 11. Dr. Papin contended UMMC breached both the House Officer Contract and the Remediation Agreement. *Id.* at 17.

Over seven days, the jury heard from 13 witnesses, including Dr. Papin and Dr. Earl. After Dr. Papin rested his case-in-chief on October 19, UMMC moved for a directed verdict.[2] Trial Tr. vol. 7 [267] at 72; [265] at 3. It argued:

1) Dr. Papin failed to prove the Remediation Agreement was a legally enforceable contract;

2) Dr. Papin failed to prove UMMC breached the House Officer Contract when it terminated Dr. Papin's employment;

3) Dr. Papin failed to prove punitive damages were warranted;

4) Even if punitive damages were warranted, UMMC has not waived its immunity as to punitive damages; and

5) Dr. Papin failed to prove he suffered a separate, intentional tort to warrant the imposition of emotional damages.

[265] at 3–10. The Court denied the motion. *Id.* at 24.

UMMC also rested its case-in-chief on October 19. [267] at 73.[3] It renewed its motion for judgment as a matter of law, which the Court denied again. *Id.* at 53–54. The Court instructed the jury on the law after considering the parties' objections to the Court's proposed jury instructions. *Id.* at 74–85. The parties then presented closing arguments. *Id.* at 85–157.

After closing arguments, the Court explained the verdict form to the jury. *Id.* at 157–60. The verdict form asked the jury these questions:

_____

[2] For trial scheduling purposes, UMMC actually moved for a directed verdict on October 17—two days before Dr. Papin rested his case-in-chief.

[3] UMMC provisionally rested on October 17, reserving the opportunity to call witnesses after Dr. Papin's expert witness testified. [265] at 191.

1) Do you find that Dr. Joseph Papin has proven, by a preponderance of the evidence, that the Defendant University of Mississippi Medical Center breached the House Officer Contract?

2) Do you find that the January 10, 2017, remediation document is a contract?

3) Do you find that Dr. Joseph Papin has proven, by a preponderance of the evidence, that the Defendant University of Mississippi Medical Center breached the January 10, 2017, remediation document?

4) If you answered "YES" to Question #1 or Question #3, provide the amount of damages that would compensate Dr. Joseph Papin for harm caused by Defendant University of Mississippi Medical Center's breach of contract.
   A. Past lost earnings
   B. Past physical pain and suffering, mental suffering, or emotional distress
   C. Future physical pain and suffering, mental suffering, or emotional distress

[245]. The jury then began deliberations. [267] at 160.

The jury found Dr. Papin failed to show, by a preponderance of the evidence, that UMMC breached the House Officer Contract. [245]. But it concluded the Remediation Agreement was a contract and that UMMC breached it. *Id.* The jury awarded Dr. Papin $14,651 in lost earnings; $600,000 for past physical pain and suffering, mental suffering, or emotional distress; and $886,000 for future physical pain and suffering, mental suffering, or emotional distress. *Id.* The Court polled the jury, and each member confirmed that was their verdict. Trial Tr. vol. 8 [268] at 4.

After the jury retired, the Court heard arguments about whether it should present punitive damages to the jury. *Id.* at 6. UMMC reasserted its argument that

it had not waived its immunity from liability for punitive damages, and Dr. Papin

disagreed. *Id.* at 6–21. The Court was "not completely satisfied" that punitive

damages were allowed in the case. *Id.* at 17–18.  Still, the Court decided it was

better to give a punitive damages instruction to the jury and reconsider the issue on

post-trial motions if necessary. *See id.* at 17–21. It accordingly instructed the jurors

on punitive damages, allowed the parties to present their arguments, and sent the

jurors to deliberate. *Id.* at 21–30. The jury returned a punitive damages award of

$5,000,000 for Dr. Papin. [247]. The Court polled the jury, and each member

confirmed that was their award. [268] at 32–33.

UMMC now contends it is entitled to judgment as a matter of law, or in the

alternative, a new trial. [258].

## II.    Standard

Judgment as a matter of law is appropriate if "the court finds that a

reasonable jury would not have a legally sufficient evidentiary basis to find for the

party on that issue." Fed. R. Civ. P. 50(a)(1). "[S]uch a motion is a challenge to the

legal sufficiency of the evidence supporting the jury's verdict." *Miss. Chem. Corp. v.

Dresser-Rand Co.*, 287 F.3d 359, 365 (5th Cir. 2002). Consequently, "judgment as a

matter of law should not be granted unless the facts and inferences point so

strongly and overwhelmingly in the movant's favor that reasonable jurors could not

reach a contrary conclusion." *Flowers v. S. Reg'l Physician Servs. Inc.*, 247 F.3d 229,

235 (5th Cir. 2001) (quotation omitted). To survive a Rule 50 motion, the nonmoving

party "must at least establish a conflict in substantial evidence on each essential

element of their claim." *N. Cypress Med. Ctr. Operating Co., Ltd. v. Aetna Life Ins. Co.*, 898 F.3d 461, 473 (5th Cir. 2018) (quoting *Goodner v. Hyundai Motor Co.*, 650 F.3d 1034, 1039 (5th Cir. 2011)).

In reviewing the motion, the Court should consider all evidence in the record, but it should disregard "all evidence favorable to the moving party that the jury is not required to believe." *Reeves v. Sanderson Plumbing Prods. Inc.*, 530 U.S. 133, 151 (2002). Additionally, it must draw all reasonable inferences in the nonmoving party's favor. *Id.* It may not make credibility determinations or reweigh the evidence because those are jury functions. *Id.* at 150.

III.   Analysis

A.  Judgment as a Matter of Law

UMMC argues it is entitled to judgment as a matter of law for three reasons: (1) the Remediation Agreement was not a valid contract; (2) Dr. Papin offered insufficient proof to support damages for emotional distress; and (3) punitive damages cannot be recovered against an arm of the State of Mississippi. Mem. Supp. Def.'s Mot. J. Notwithstanding Verdict [259] at 6–25.

i.   The Remediation Agreement

UMMC first contends it is entitled to judgment as a matter of law because the Remediation Agreement was not a valid contract. [259] at 6–14.

"Whether a contract exists involves both questions of fact and questions of law." *Jackson HMA, LLC v. Morales*, 130 So. 3d 493, 497–98 (Miss. 2013) (quoting *Ham Marine, Inc. v. Dresser Indus., Inc.*, 72 F.3d 454, 458 (5th Cir. 1995)). But

"where the existence of a contract turns on consideration of conflicting evidence, that presents a 'question of fact properly presented to, and determined by, the jury.'" *Id.* at 498 (quoting *Ham Marine*, 72 F.3d at 461). Contrarily, if there is "insufficient evidence from which a jury could find an express contract between the parties," then a court should direct the verdict for the party denying the existence of a valid contract. *See Weible v. Univ. of S. Miss.*, 89 So. 3d 51, 59–64 (Miss. Ct. App. 2011).

"Under Mississippi law, a plaintiff asserting [a] breach-of-contract claim has the burden to prove by a preponderance of the evidence (1) that a valid and binding contract exists; and (2) that the defendant . . . breached it . . . ." *White v. Jernigan Copeland Att'ys, PLLC*, 346 So. 3d 887, 896 (Miss. 2022) (citation omitted). For a valid and binding contract to exist, there must be "(1) two or more contracting parties, (2) consideration, (3) an agreement that is sufficiently definite, (4) parties with legal capacity to make a contract, (5) mutual assent, and (6) no legal prohibition precluding contract formation." *Id.*

UMMC argues the Remediation Agreement was not a contract for two reasons. First, it argues that Dr. Earl lacked the legal capacity to enter a contract on behalf of UMMC. *Id.* at 6–10. Second, it argues the Remediation Agreement was not sufficiently definite and lacked consideration. *Id.* at 10–14.

As to UMMC's first argument, Dr. Earl lacked legal capacity to enter a contract on behalf of UMMC. In Mississippi, a party generally has the legal capacity to contract on behalf of another if it possesses actual, apparent, or implied

authority. *See Newsome v. People Bancshares*, 269 So. 3d 19, 28–32 (Miss. 2018). This agency principle does not apply, however, to public contracts. *See, e.g.*, *Bruner v. Univ. of S. Miss.*, 501 So. 2d 1113, 1115 (Miss. 1987) (concluding appellant's argument that the university's head football coach had apparent authority to enter employment contract with an assistant coach "simply [did] not wash").

If "a particular manner of contracting is prescribed" for a public contract, "the manner is the measure of power and *must* be followed to create a valid contract." *Id.* (emphasis added) (quoting *Am. Book Co. v. Vandiver*, 178 So. 598, 600 (Miss. 1938)). In other words, that "particular manner of contracting . . . is the *only* way" for the public institution to create a contract. *Id.* So a person dealing with a public institution's agent "must know at his peril the extent of the agent's authority to bind his principal." *Id.* at 1116 (collecting cases).

UMMC is a public institution, governed by the Mississippi Institutions of Higher Learning ("IHL"). *See* Miss. Const. art. 8 § 213A.  The Mississippi Constitution and Mississippi Code define the IHL's power. *See id.*; Miss. Code Ann. § 37-101-15(c). The IHL "[has] general supervision of the affairs of all the institutions of higher learning, including the departments and the schools thereof." Miss Code Ann. § 37-101-15(b). This includes "general supervision of . . . the business methods and arrangement of accounts and records; the organization of the administrative plan of each institution; and all other matters incident to the proper functioning of the institutions." *Id.* It also has the power to "adopt such bylaws and regulations from time to time as it deems expedient for the proper supervision and

9

control of the several institutions of higher learning. . . ." *Id.* § 37-101-15(c). Those bylaws prescribe the "manner of contracting" for Mississippi's Institutions of Higher Learning, including UMMC. *See, e.g., Weible,* 89 So. 3d at 60 ("[t]he [IHL] Board adopted Bylaw 707.1 to govern the approval and execution of contracts."). But which statute or bylaws apply to an employment contract between a medical resident— i.e., Dr. Papin—and UMMC is not entirely clear.

UMMC points to two authorities to argue that Dr. Earl lacked authority to bind it to a contract. First, UMMC suggests that "all institutional employment contracts are subject to final approval by the [IHL] board." [259] at 7 (quoting *Nichols v. Univ. of S. Miss.*, 669 F. Supp. 2d 684, 700 (S.D. Miss. 2009)). It relies on the Mississippi Constitution and Miss. Code Ann. § 37-101-15(f), which give the IHL Board the "power and authority to elect the heads of the various institutions of higher learning, and to contract with all deans, professors, and other members of the teaching staff, and all administrative employees of said institutions for a term not exceeding four (4) years." *See id.* at 7.

UMMC's first argument fails for two reasons. First, those provisions only apply to UMMC's "deans, professors, . . . other members of the teaching staff, and . . . . administrative employees." *See* Miss. Const. art. 8, § 213A; Miss. Code Ann. § 37-101-15(f). As a medical resident, Dr. Papin does not fit into any of those categories. UMMC conceded as much in an earlier motion. *See* Defs' Mem. Supp. Mot. Summ. J. [141] at 34. Second, UMMC presents no evidence that the Board approved Dr. Papin's original House Officer Contract, and no member of the Board signed that

10

contract. *See* Def.'s Trial Ex. 1 at 2. That lack of evidence undermines UMMC's position that the Remediation Agreement was not a valid contract absent the IHL Board's approval.

Next, UMMC points to IHL Bylaw 707, which governs the contracting policies for the IHL. [259] at 7–8. That bylaw allows the "Institutional Executive Officers and the Commissioner . . . to approve and execute on behalf of their respective institutions all other land, personal property[,] and service contracts." Policies and Bylaws, § 707.01(E), Miss. Bd. Trs. State Insts. Higher Learning, (last amended Feb. 16, 2023) [hereinafter "Policies and Bylaws"], http://www.mississipp i.edu/board/downloads/policiesandbylaws.pdf. It also permits "[t]he Institutional Executive Officer of each institution, *or a designee as evidenced in writing*, . . . to sign all other official documents for and on behalf of the institution for which he or she is responsible." *Id.* § 707.02 (emphasis added). Bylaw 707 aligns with UMMC's Faculty and Staff Handbook, which provides that "the chancellor of the University of Mississippi and the vice chancellor for health affairs are the only persons authorized to sign contracts, agreements[,] and other documents for and on behalf of [UMMC]. However, board policy allows the vice chancellor to delegate signature authority." Pl.'s Trial Ex. 16 at 15.

UMMC contends that IHL Bylaw 707 and its Faculty and Staff Handbook required "the chancellor, vice chancellor, or their written designee" to sign the Remediation Agreement to make it a valid contract. *See* [259] at 9–10. It reasons Bylaw 707 applied to the Remediation Agreement because the Vice Chancellor for

Health Affairs signed Dr. Papin's House Officer Contract. *See id.*; Def.'s Trial Ex. 1. It also maintains that Dr. Papin introduced no evidence that the Vice Chancellor designated Dr. Earl to sign contracts on her behalf, and Dr. Earl testified he could not do so. [265] at 54–55, 105–06.

Although UMMC's second argument is more persuasive, the Court is not convinced that IHL Bylaw 707 governs in this situation. That bylaw primarily concerns "Land, Property, and Service Contracts," not employment contracts. *See* Policies and Bylaws § 707.01. Similarly, the policies UMMC refers to in its own handbook are in the "General Policies and Regulations" section, which does not mention employment policies or employment contracts. *See* Pl.'s Trial Ex. 16 at 13–24.

Yet both the IHL Bylaws and the UMMC handbook contain entire sections devoted to employment practices. *See* Policies and Bylaws §§ 400, 801; Pl.'s Trial Ex. 16 at 36–61. It is more fitting that the "manner of contracting" for UMMC would be found in those sections. IHL Bylaw 401 "empowers the Commissioner and the Institutional Executive Officers of the several institutions to make all appointments and promotions of faculty and staff," except in certain circumstances. Policies and Bylaws, § 401.0102. But "[t]he [IHL] Board requires that each institution develop, maintain, and follow written employment and/or hiring procedures for both faculty and staff." *Id.* § 801.06. UMMC's Handbook contains its written employment and hiring procedures for medical residents, also known as house officers:

> Recruitment, screening, and hiring of house officers are
> responsibilities of the training program director
> (department head) or designee and are subject to approval
> by the appropriate budget officers and the associate dean
> for graduate medical education in the School of Medicine.

Pl.'s Trial Ex. 16 at 39. Bylaw § 401.102's and § 801.06's applicability to the

Remediation Agreement is supported by the Associate Dean for Graduate Medical

Education's signing of Dr. Papin's House Officer Contract. *See* Def.'s Trial Ex. 1.

No matter if Bylaw 707 or 801 prescribed the manner of contracting between

medical residents and UMMC, the creation of the Remediation Agreement complied

with neither policy. If Bylaw 707 applied, then the Vice Chancellor for Health

Affairs's signature was required. And if Bylaw 801 applied, the Associate Dean for

Graduate Medical Education's signature was required. But only Dr. Earl and Dr.

Papin signed the Remediation Agreement. Dr. Papin presented no evidence that

either the Vice Chancellor or the Associate Dean for Graduate Medical Education

delegated their signatory power to Dr. Earl. Accordingly, Dr. Earl—by himself—

lacked authority to enter a binding contract with Dr. Papin on UMMC's behalf.

Dr. Papin seemingly concedes that the "chancellor, vice chancellor, or their

written designee" needed to sign the Remediation Agreement for it to become a

valid contract. Pl.'s Mem. Opp'n Def.'s Mot. J. Notwithstanding Verdict [278] at 11.

But, contrary to UMMC, he argues Dr. Earl had authority to enter a valid contract

with Dr. Papin because UMMC authorized him to enter into remediation

agreements—i.e., he was their "written designee." *See id.* Specifically, he points to

the Accreditation Council for Graduate Medical Education ("ACGME") guidelines,

which "authorizes program directors to enter into remediation agreements with medical residents." *Id.* at 12.

This argument fails because authorization to enter into a remediation agreement differs from authorization to execute employment contracts. UMMC correctly notes that, although "Dr. Earl may have been granted authority to write up remediation plans for his surgical residents, there was no proof that he had authority to override UMMC's employment policies . . . or to bind UMMC to a contract." [259] at 10. The record supports that argument. First, Dr. Earl testified that he had no authority to sign employment contracts for UMMC. [265] at 54–55, 105–06. Second, Dr. James Stewart testified that there was nothing in the "ACGME policies or guidelines that prohibits a member institution or a participant institution from carrying out its own human resource policies." [262] at 147. Dr. Papin points to no authority allowing ACGME guidelines to override Mississippi law and UMMC's own employment policies.

Based on the IHL Bylaws, UMMC's employment policies, and trial testimony, there was not a legally sufficient evidentiary basis for the jury to conclude that Dr. Earl had the legal capacity to enter a contract on UMMC's behalf. Dr. Papin failed to establish the first breach-of-contract element: the existence of a valid, binding contract.  UMMC is therefore entitled to judgment as a matter of law.

 Because Dr. Earl did not have the legal capacity to enter a contract on UMMC's behalf, the Court will only briefly address UMMC's arguments that the Remediation Agreement was not sufficiently definite and lacked consideration. The

Court, however, finds the agreement terms were sufficiently definite, but the agreement lacked new consideration. When a subsequent agreement modifies a written contract, the "agreement must be supported by new or additional consideration." *Thompson v. First Am. Nat. Bank*, 19 So. 3d 784, 787 (Miss. Ct. App. 2009). A promise to fulfill a legal obligation or a preexisting duty under the original contract is not valid consideration for the new agreement. *E.g., id.* Courts, including the Fifth Circuit, are hesitant to apply this rule. *See Johnson v. Seacor Marine Corp.,* 404 F.3d 871, 875 (5th Cir. 2005) ("A court should no longer accept this rule as fully established. It should never use it as the major premise of a decision, at least without giving careful thought to the circumstance of the particular case, to the moral desserts of the parties, and to the social feelings and interests that are involved."). Still, the Court finds it applies here because the Remediation Agreement was merely a performance-improvement plan to measure Dr. Papin's compliance with the educational requirements he had already agreed to fulfill under the House Contract.

ii.     Emotional Distress

The Court has found UMMC is entitled to judgment as a matter of law on whether the Remediation Agreement is a contract. That ruling effectively sets aside the entire jury verdict, including the emotional distress and punitive damage awards. But "[i]f the court grants a renewed motion for judgment as a matter of law, it must also conditionally rule on any motion for a new trial . . . [in case] the judgment is later vacated or reversed." Fed. R. Civ. P. 50(c)(1). Though UMMC

moves for judgment as a matter of law—not a new trial—as to the issues of emotional damages and punitive damages, the principle underlying Rule 50(c) still applies. So, the Court will address UMMC's alternative arguments for judgment as a matter of law in case the Fifth Circuit vacates or reverses its finding that the Remediation Agreement is not a contract.

UMMC next contends it is entitled to judgment as a matter of law because Dr. Papin failed to offer sufficient evidence for a jury to award him emotional damages. [259] at 14–17. "[The Mississippi Supreme Court] traditionally has held that emotional distress and mental anguish damages [were] not recoverable in a breach of contract case in the absence of a finding of a separate independent intentional tort." *Univ. S. Miss. v. Williams*, 891 So. 2d 160, 172 (Miss. 2004).[4] But that is no longer the case. *See id.* Now, a plaintiff need only show "(1) that mental anguish was a foreseeable consequence of the particular breach of contract, and (2) that he or she actually suffered mental anguish." *Id.* at 173.

Two principles help determine when emotional damages are warranted in a case. First, a plaintiff need not prove a "physical manifestation" of an injury, but "[s]uch generalizations as 'it made me feel bad,' or 'it upset me' are not sufficient." *Id.* at 172–73. Second, "the nature of the incident" is important for two reasons: (1) it is "essential in establishing whether emotional distress is foreseeable," and (2) the

---

[4] UMMC cites two recent Mississippi Court of Appeals cases holding that proof of a separate independent intentional tort is still required. *See Rudd v. State Farm Fire Cas. Co.*, 295 So. 3d 579, 585 n.5 (Miss. Ct. App. 2020); *Woodkrest Custom Homes Inc. v. Cooper*, 108 So. 3d 460, 465 (Miss. Ct. App. 2013). But *Rudd* erroneously relies on a 1992 Mississippi Supreme Court decision that predates *Williams*, and *Woodkrest* misstates the holding in *Williams*.

more egregious a defendant's conduct is, the smaller the plaintiff's burden of establishing specific proof of emotional distress. *Id.* at 173; *see also Swartzfager v. Saul*, 213 So. 3d 55, 61 (Miss. 2017) (upholding chancellor's award of $50,000 in emotional damages in breach-of-contract case where defendant's conduct was "clearly and intentionally made in self-serving bad faith").

UMMC contends emotional damages are not warranted because (1) Dr. Papin's emotional distress was not a foreseeable consequence of UMMC's breach of the Remediation Agreement and (2) Dr. Papin failed to show he actually suffered emotional distress. [259] at 16–17. The Court disagrees.

First, a reasonable jury could find that Dr. Papin's emotional distress was foreseeable considering the nature of his medical residency. Dr. Papin testified that attending medical school and becoming a doctor was a "lifelong dream" of his, [263] at 150; that it cost him "around $200,000" to attend medical school, [264] at 78; and that it would be very hard for him to get into another residency program after being terminated by UMMC, [264] at 61, 74–76. It is foreseeable that being terminated from a program that would likely end Dr. Papin's dreams of becoming a doctor and for which he expended considerable money would cause him emotional distress. Dr. Earl, as the program director for the general-surgery-residency program at UMMC, should have foreseen the significance of terminating Dr. Papin from his residency position. *Cf. Morris Newspaper Corp. v. Allen*, 932 So. 2d 810, 819 (Miss. Ct. App. 2005) (concluding emotional distress was foreseeable "given [the defendants'] knowledge of [the plaintiff's] strong desire to work as [a news] anchor").

Second, a reasonable jury could find that Dr. Papin actually suffered emotional distress. Dr. Papin testified that, after his termination, he felt "defeated" and "isolated" and struggled with talking to his family. [264] at 81–83. He also began seeing a therapist after leaving UMMC and continues to see that therapist today. *Id.* at 83. He added that his termination "touches on every aspect of [his] life" because the information about his termination is "out there" on the internet. *Id.* at 83. That kept him from doing things he otherwise would have done in business school, "to hopefully avoid people Googling [him]."[5] *Id.* at 83–84. Dr. Papin's evidence amounts to more than mere "generalizations." *See Williams*, 891 So. 2d at 172. Considering the nature of being terminated from a medical-residency program and Dr. Papin's testimony at trial, there was sufficient evidence for a jury to award Dr. Papin damages for emotional distress. Accordingly, UMMC is not entitled to judgment as a matter of law as to emotional damages.

### iii.    Punitive Damages

Finally, UMMC argues it is entitled to judgment as a matter of law because the Mississippi Tort Claims Act ("MTCA") bars punitive damages against UMMC. It contends Dr. Papin's claim for punitive damages is the same as a tortious breach-of-contract claim. [259] at 17–23; [281] at 10 ("[I]f you seek punitive damages for a breach of contract claim, you're alleging a tortious breach of contract."). And because the MTCA covers "any wrongful or *tortious* act," UMMC contends that

---

[5] After his termination from UMMC, Dr. Papin attended business school at the University of Michigan. [264] at 69–70.

punitive damages are barred by § 11-46-15(2) (emphasis added). [259] at 17–23. Alternatively, it argues that, even if punitive damages are allowed against UMMC, they are not warranted in this case. *Id.* at 23–26.

The MTCA "governs the liability of state and local governmental entities and their employees for acts committed by the employees within the course and scope of employment." Phillip McIntosh, Encyclopedia of Mississippi Law § 41:15 (Jeffrey Jackson et al. eds., updated October 2022). UMMC is a state entity covered by the MTCA. *See* Miss. Code Ann. § 11-46-1(j). The MTCA first provides that state entities are "immune from suit at law or in equity on account of any wrongful or *tortious* act or omission or breach of implied term or condition of any warranty or contract . . . ." *Id.* § 11-46-3(1) (emphasis added). "Notwithstanding the immunity granted in Section 11-46-3," the state has waived its immunity "from claims for money damages arising out of the torts of such governmental entities and the torts of their employees while acting within the course and scope of their employment." *Id.* § 11-46-5. But even for cases where the state has waived its immunity, the plaintiff still cannot recover punitive damages. *Id.* § 11-46-15(2) ("No judgment against a governmental entity or its employee for any act or omission for which immunity is waived under this chapter shall include an award for exemplary or punitive damages . . . .").

Although "[t]he provisions of [the] MTCA have no application to a pure breach of contract action," they do apply to a tortious breach-of-contract claim. *City of Grenada v. Whitten Aviation, Inc.*, 755 So. 2d 1208, 1213 (Miss. Ct. App. 1999),

*overruled on other grounds by City of Jackson v. Est. of Stewart ex rel. Womack*, 908 So. 2d 703 (Miss. 2005); *see also Springer v. Ausbern Const. Co., Inc.*, 231 So. 3d 980, 988 (Miss. 2017) (finding that a "tortious breach of contract claim may be subject to the presuit notice requirements of the Tort Claims Act"); *Womack*, 908 So. 2d at 710 (declining an interpretation of the MTCA that would not include tortious breach of contract claims); *Aries Bldg. Sys., LLC v. Pike Cnty. Bd. of Supervisors*, 2017 WL 902905, at *4 (S.D. Miss. Mar. 7, 2017) ("The clear intent of the [L]egislature in enacting [the MTCA] was to immunize the State and its political subdivisions from any tortious conduct, including tortious breach of . . . contract."); *Papagolos v. Lafayette Cnty Sch. Dist.*, 972 F. Supp. 2d 912, 932 (N.D. Miss. Sept. 16, 2013) (same). Accordingly, a plaintiff cannot recover punitive damages against the state for a tortious breach-of-contract claim. *See* § 11-46-15(2).

But Dr. Papin contends that law is irrelevant. Contrary to UMMC, he argues his sole claim was for breach of an express contract, not tortious breach of contract.[6] And because the MTCA does not cover express breach of contract claims, he contends that § 11-46-15(2) does not apply here.

UMMC is correct: a claim for punitive damages for breach-of-contract is necessarily a claim for tortious breach of contract. The Mississippi Supreme Court has used nearly identical language in discussing what is required to recover punitive damages in a breach-of-contract claim and what is required to prove a

---

[6] At trial, Dr. Papin's attorney agreed that "[i]f [Dr. Papin] had styled [his claim] as an intentional tort and styled this as a tort, it wouldn't have passed the motion to dismiss stage." [268] at 15.

tortious breach-of-contract claim. *Compare, e.g.*, *Springer v. Ausbern Constr. Co., Inc.*, 231 So. 3d 980, 988 (Miss. 2017) ("In order to constitute tortious breach of contract alleged by a plaintiff, some intentional wrong, insult, abuse, or negligence so gross as to constitute an independent tort must exist."), *with Tideway Oil Programs, Inc. v. Serio*, 431 So. 2d 454, 465–66 (Miss. 1983) ("Punitive damages may be imposed for breach of contract where such breach is attended by intentional wrong, insult, abuse, or such gross negligence as amounts an independent tort."). In both instances, a plaintiff must show conduct that arises to the level of an independent tort. In other words, the plaintiff must prove a "*tortious* act," which the MTCA covers. *See* Miss. Code Ann. § 11-46-3(1) (emphasis added).

Dr. Papin argues "[t]he fact that the standard for punitive damages sounds similar to the tort claim standard does not 'bootstrap' such a claimed breach of contract damage into a tort." [278] at 29. But the two standards do not just sound similar; the substance of the claims are the same. And courts should "look to the substance of the claim, not its label" to determine whether the MTCA applies. *See Jones v. Miss. Insts. of Higher Learning*, 264 So. 3d 9, 27 (Miss. Ct. App. 2018). "[E]fforts to re-label tort suits as something else in order to avoid some part of the MTCA are ineffective." *Id.* (quoting *Kelley, LLC v. Corinth Pub. Utils. Comm'n*, 200 So. 3d 1107, 1118–19 (Miss. Ct. App. 2016)). Accordingly, Dr. Papin cannot re-label his tortious breach-of-contract claim as a simple breach-of-contract claim to avoid § 11-46-15(2).

21

The Court's holding aligns with the widely recognized policy that plaintiffs should not be allowed to recover punitive damages against government entities. *See* Barry A. Lindahl, Modern Tort Law: Liability and Litigation § 20:25 (last updated May 2022). The Mississippi Supreme Court explained the reasoning for this policy in *Southwest Mississippi Regional Medical Center v. Lawrence*:

> Punitive damages are to punish a wrong-doer. In the case of a community hospital, or any other governmental entity for that matter, the punished is the taxpayer, as it is their funds that pay the damages, or the insurance coverage for such damages. With that in mind, litigants should not be allowed to obtain punitive damages from the public treasury which is filled only by taxpayers.

684 So. 2d 1257, 1267 (Miss. 1996). The Mississippi legislature embraced this policy in the MTCA by disallowing punitive damages for "any act or omission for which immunity is waived under the MTCA." Miss. Code Ann. § 11-46-15(2). Accepting Dr. Papin's argument would undermine the MTCA and create absurd results. It would mean that the Mississippi legislature chose to prohibit punitive damages against the state for tortiously killing people but allowed punitive damages against the state for breach of contract claims. *Cf. Daniel v. Nat'l Park Serv.*, 891 F.3d 762, 771 (9th Cir. 2018) (holding that appellant could not recover punitive damages against the United States under the Fair Credit Reporting Act).

Dr. Papin does not cite any Mississippi decisions awarding punitive damages against the State, and the Court finds no authority to place the burden of punitive damages on Mississippi taxpayers. For the reasons stated above, the MTCA bars

punitive damages against UMMC. UMMC is therefore entitled to judgment as a matter of law as to punitive damages.[7]

### B.  Motion for a New Trial

After granting a renewed motion for judgment as a matter of law, a Court must also conditionally rule on any motion for a new trial in case its judgment is later vacated or reversed. Fed. R. Civ. P. 50(c)(1). A court may grant a new trial "after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). "Courts do not grant new trials unless it is reasonably clear that prejudicial error has crept into the record or that substantial justice has not been done, and the burden of showing harmful error rests on the party seeking the new trial." *Jordan v. Maxfield & Oberton Holdings, L.L.C.*, 977 F.3d 412, 417 (5th Cir. 2020) (quoting *Sibley v. Lemaire*, 184 F.3d 481, 487 (5th Cir. 1999)).

UMMC argues the Court should grant a new trial for three reasons: (1) it was prejudiced by the admission of certain evidence; (2) the jury's award of damages was excessive; and (3) the Court erred in instructing the jury. *Id.* 26–33.

### i.    Prejudicial Evidence

UMMC first argues that it is entitled to a new trial because the Court improperly admitted evidence of an audit-trail document and evidence of Dr. Papin's educational expenses.

---

[7] Because the MTCA bars punitive damages against UMMC, the Court does not consider UMMC's argument that Dr. Papin's evidence at trial did not support an award of punitive damages. *See* [259] at 23–2.

1.  Audit Trail

Dr. Papin introduced an audit trail of medical providers who had reviewed and accessed certain patient files at UMMC, including the decubitus ulcer patient. [263] at 168–173. The exhibit showed that Dr. Megan Mahoney accessed that patient's chart. Accordingly, he used the exhibit to impeach her testimony that, because she did not review the patient's charts and relied on Dr. Papin to relay the patient's information to her, she was unaware of the patient's ulcer. [259] at 26, [278] at 35. UMMC contends that the Court erred in admitting the exhibit because (1) Dr. Papin failed to lay a proper foundation and (2) it was irrelevant.

As to foundation, the "proponent [of evidence] must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901(a). To do so, a witness with knowledge may testify "that an item is what it is claimed to be." *Id.* 901(b)(1). The Fifth Circuit "does not require conclusive proof of authenticity before allowing the admission of disputed evidence." *Daneshjou v. JPMorgan Chase Bank, N.A.*, 799 F. App'x 296, 298 (5th Cir. 2020) (citing *Nester v. Textron, Inc.*, 888 F.3d 151, 160 (5th Cir. 2018)).

Dr. Papin testified that, during his residency orientation, the audit trail system was explained and that he was shown an example of an audit-trail document. [263] at 167–69. He also testified about the contents of the document in detail. *Id.* at 170–72. Based on this testimony, the Court determined that a proper foundation had been laid, and it does not change its ruling now. *See id.* at 173.

As to relevance, "evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401. The audit trail is relevant because UMMC terminated Dr. Papin partly based on Dr. Mahoney's allegation that he lied to her about his treatment of the decubitus ulcer patient. *See* [263] at 34–36. The audit trail made it less probable that Dr. Mahoney's testimony about her interactions with the ulcer patient and Dr. Papin were credible. The jury could therefore weigh this evidence in determining Dr. Mahoney's credibility.

And finally, as to prejudice, the probative value of this evidence was not substantially outweighed by any unfair prejudice. Accordingly, a new trial is not warranted.

### 2.  Education Expenses

UMMC maintains that Dr. Papin's educational-expenses evidence was irrelevant to his emotional distress claim and unduly prejudicial. [259] at 28–29.

As discussed above, "the nature of the incident" is key for whether emotional distress damages are recoverable. *See Williams*, 891 So. 2d at 173. It is "essential in establishing whether emotional distress is foreseeable." *Id.* Evidence of the money Dr. Papin spent on obtaining his medical degree and business degree was relevant to understanding the nature of Dr. Papin's termination. It revealed the substantial investment he made in getting accepted to UMMC's residency program, and the investment he had to make to start a new career after being terminated from the

25

residency program. This evidence was relevant in determining whether Dr. Papin's emotional distress was foreseeable because of UMMC's actions.

UMMC also argues that the evidence was unduly prejudicial and that the damages the jury awarded Dr. Papin for past pain and suffering "correlate[d] directly with [his] testimony about his outstanding student loan debt." [259] at 29. Evidence should be excluded if its probative value is substantially outweighed by unfair prejudice. Fed. R. Evid. 403. "Unfair prejudice . . . is not to be equated with testimony simply adverse to the opposing party." *Dollar v. Long Mfg., N.C., Inc.*, 561 F.2d 613, 618 (5th Cir. 1977). But when the evidence has an "undue tendency to move the tribunal to decide [an issue] on an improper basis," that evidence should be excluded. *See Savoie v. Otto Candies, Inc.*, 692 F.2d 363, 371 (5th Cir. 1982) (quotation omitted). As discussed below, the jury's award for emotional damages was excessive. *See infra* Part III.B.ii.1. Based on the similarity between the jury's award for past pain and suffering and Dr. Papin's testimony about his student loan debt, it seems that Dr. Papin's testimony moved the jury to determine its award for emotional damages on an improper basis. Accordingly, as discussed in more detail below, UMMC is entitled to remittitur of Dr. Papin's emotional damages or a new trial on damages. *See id.*

    ii.    Damages

UMMC next argues that "the Court must reduce the amount of damages if it does not vacate the verdict entirely." [259] at 29. It argues (1) the jury's award of $14,651 for economic damages was unsupported by the record; (2) the emotional

damages award was excessive; and (3) the punitive damages award was excessive. *Id.* at 29–32. The Court has already ruled that the MTCA bars punitive damages against UMMC. *See supra* Part III.A.iii. It examines UMMC's remaining arguments in turn.

## 1.   Economic Damages

UMMC contends the jury's award of $14,651 for economic damages was unsupported by the record because "the Remediation Agreement did not promise Papin the remainder of his annual salary." [259] at 29–30. But assuming the Remediation Agreement was a contract for this conditional ruling, the jury could have reasonably found that UMMC intended for Dr. Papin to be paid at the same rate established in the House Officer Contract. Accordingly, Dr. Papin was entitled to the amount of his salary left unpaid under the House Officer Contract.

## 2.   Emotional Damages

UMMC next argues the jury's award for emotional damages was excessive and should be reduced or submitted to a new jury. [259] at 30–31. "[S]tate law governs 'review of the size of jury verdicts' in diversity cases." *Longoria v. Hunter Express, Ltd.*, 932 F.3d 360, 364 (5th Cir. 2019) (quoting *Gasperini v. Ctr. for Humans., Inc.*, 518 U.S. 415, 430–31 (1996)).[8]

---

[8] This is not a diversity case, but the same principle still applies. Subject-matter jurisdiction arose from Dr. Papin's federal claims. *See* Second Am. Compl. [50] ¶ 1. After the Court dismissed Dr. Papin's federal claims, it continued to exercise supplemental jurisdiction over his state-law claims. *See* Order [216]. "A federal court exercising supplemental jurisdiction over state law claims must apply the substantive law of the state in which it sits." *Doe 1 v. Baylor Univ.*, 240 F. Supp. 3d 646, 666 (W.D. Tex. 2017) (citing *Sommers Drug Stores Co Emp. Profit Sharing Tr. v. Corrigan*, 883 F.2d 345, 353 (5th Cir. 1989)). Accordingly, Mississippi substantive law applies.

To determine whether a jury award is excessive under Mississippi law, a court must consider whether the award "is entirely disproportionate to the injury sustained." *Robinson v. Corr*, 188 So. 3d 560, 572 (Miss. 2016) (quoting *Est. of Jones v. Phillips ex rel. Phillips,* 992 So. 2d 1131, 1150 (Miss. 2008)). Mississippi law allows a trial court to remit damages if "(1) the jury or trier of the facts was influenced by bias, prejudice, or passion, or (2) the damages awarded were contrary to the overwhelming weight of credible evidence." Miss. Code Ann. § 11-1-55; *State v. Murphy*, 202 So. 3d 1243, 1262 (Miss. 2016) (quoting *Entergy Miss., Inc. v. Bolden*, 854 So. 2d 1051, 1058 (Miss. 2003)).

The jury's award of $1,486,000 in emotional damages was disproportionate to the injuries sustained by Dr. Papin and contrary to the overwhelming weight of evidence presented at trial. As discussed above, Dr. Papin's evidence of emotional damages at trial was limited to his own testimony. *See* [264] at 74–84. He testified that he felt "defeated" and "isolated"; that he struggled to talk to his family; that he started seeing a therapist after his termination; and that his termination from UMMC "touches on every aspect of [his] life." *See id.* Although this evidence was sufficient for a jury to award Dr. Papin damages for emotional distress, no Mississippi cases uphold such a high verdict in a breach of contract case based on similarly limited evidence. *See Williams*, 891 So. 2d at 172–74 (remanding $800,000[9] general verdict for a new trial on damages and instructing the trial court

---

[9] That verdict, rendered in July 2002, would equal about $1.3 million in October 2022. This conversion—and all similar conversions in this Order—were calculated using the Bureau of Labor Statistic's CPI Inflation Calculator, available at

to "carefully instruct[]" the jury to distinguish between emotional damages for the breach of contract and emotional damages for the defendant's tortious conduct); *Morris Newspaper Corp.*, 932 So. 2d at 816–20 (affirming award for $227,000[10] in damages); *Stewart v. Gulf Guar. Life Ins. Co.*, 846 So. 2d 192, 199–200 (Miss. 2002) (upholding jury award of $500,000[11] for emotional distress); *see also* [259-1] at 1 (collecting Mississippi emotional distress cases).

*Stewart* is the only Mississippi case Dr. Papin cites to argue that the jury's emotional damages award should stand. [278] at 23–24. There, Stewart purchased disability insurance from Gulf Guaranty Life Insurance Company ("Gulf Guaranty") on a loan he obtained from a bank. *Stewart*, 846 So. 2d at 195. After he was diagnosed with spinal arthritis, Stewart filed a claim with Gulf Guaranty, which it denied. *Id.* at 195–96. Stewart then sued Gulf Guaranty for breach of contract, among other things. *Id.* at 196. At trial, Stewart testified that "because of the economic strain caused by Gulf Guaranty's denial of his claim, his family was forced to file for food stamps, a source of embarrassment for Stewart." *Id.* at 199. He also testified that "he suffered from anxiety, crying spells, and difficulties sleeping and eating." *Id.* Additionally, Stewart's wife testified about his emotional distress, and

---

https://data.bls.gov/cgi-bin/cpicalc.pl. *See Puga v. RCX Sols., Inc.*, 922 F.3d 285, 298 n.12 (5th Cir. 2019) (using the Bureau of Labor Statistic's CPI Inflation Calculator).

[10] That verdict, rendered in March 2002, would equal about $378,348.57 in October 2022.

[11] That verdict, rendered in May 2000, would equal about $868,839.65 in October 2022.

that "he had no such problems prior to Gulf Guaranty's denial of his claim." *Id.*
Finally, Stewart's treating physician testified that "Stewart was severely depressed,
extremely anxious, and suffered from stress-induced obsessive-compulsive
disorder." *Id.* at 199–200. Based on the testimony, the jury awarded Stewart
$500,000 in emotional damages, which the Mississippi Supreme Court upheld on
appeal. *See id.*

But Dr. Papin's reliance on *Stewart* is flawed for two reasons. First, the
amount the jury awarded Stewart—$868,839.65 in 2022 dollars—was significantly
less than the amount the jury awarded Dr. Papin—$1,486,000.[12] Second, unlike Dr.
Papin, Stewart presented expert medical testimony to support his emotional
distress claim. *See Stewart*, 846 So. 2d at 199–200.

The Mississippi Supreme Court recently discussed the relevance of expert
medical testimony for emotional distress claims in *Parsons v. Walters*, 297 So. 3d
250, 262 (Miss. 2020). There, the plaintiffs sued their lawyer for lying to them about
a settlement offer for a work accident. *Id.* at 253–255. After a trial on damages, the
jury awarded the plaintiffs $2,850,002 for fraud and emotional distress. *Id.* at 256.
The defendant moved for judgment notwithstanding the verdict, and the trial court
remitted the verdict to $1,134,666.67, attributing $365,000 of that to emotional
distress. *Id.* On appeal, the defendant argued the trial court erred in entering
judgment for the plaintiffs because it was not based on sufficient evidence. *Id.* at

---

[12] Based on Dr. Papin's calculation, the $500,000 verdict in *Stewart* would equal
about $1.1 million dollars in 2022. The Court follows the Fifth Circuit's example and relies
on the CPI Inflation Calculator's estimate of $868,839.65. *See supra* note 11.

257. The Court compared the jury's award to other emotional-distress awards it had previously upheld and found that "it [was] abundantly clear that the award here was not based on sufficient evidence." *Id.* at 259–263. It distinguished the plaintiffs' claims from *Stewart* because they "presented no medical expert testimony to corroborate or support [their] claim of depression or for any other emotional distress they had suffered." *Id.* at 262. The Court recognized that "[e]xpert testimony is not always required" to recover emotional damages, but "because the evidence of depression [was] based solely on the plaintiff's own speculation, assertion or self-diagnosis of depressions, such a large recovery [was] not warranted." *Id.*

Similarly, Dr. Papin did not provide expert testimony to support his emotional damages claim. Rather, his evidence of emotional distress hinged on his own speculation, assertion, and self-diagnosis. Accordingly, the jury's verdict for emotional damages was against the weight of credible evidence, and such a large recovery was not warranted.

Accordingly, if the Fifth Circuit vacates or overturns the Court's judgment setting aside the entire verdict, the Court would remit Dr. Papin's emotional damages or order a new trial on the issue.[13] *See Eiland v. Westinghouse Elec. Corp.,* 58 F.3d 176, 183 (5th Cir. 1995) ("[T]his circuit's case law provides for remittitur if

---

[13] Setting remittitur requires the Court to examine relevant caselaw in Mississippi to find an "analogous, published decision." *See Longoria v. Hunter Express, Ltd.,* 932 F.3d 360, 365 (5th Cir. 2019). The parties have not had an adequate opportunity to brief the Court on this issue. Accordingly, if the Fifth Circuit vacates or overturns the Court's judgment, the Court will allow both parties to file briefs before setting remittitur.

the award is excessive, and [a] new trial on damages alone if the plaintiff declines the remitted award.").

### iii.   Jury Instructions

Finally, UMMC argues it is entitled to a new trial because the Court erred in giving certain jury instructions. [259] at 32–33.

First, it argues that the Court erred in instructing the jury to decide whether the Remediation Agreement was a contract. [259] at 32. But "[w]hether a contract exists involves both questions of fact and questions of law." *Jackson HMA, LLC*, 130 So. 3d at 497–98. And "where the existence of a contract turns on consideration of conflicting evidence, that presents a 'question of fact properly presented to, and determined by, the jury." *Id.* at 498. Accordingly, the Court properly submitted to the jury the question of whether the Remediation Agreement was a contract.[14]

Second, UMMC argues that the Court erred when it instructed the jury to consider whether punitive damages should be awarded. [259] at 32–33. The Court agrees. But a new trial is not warranted on that basis because the Court already vacated the punitive damages award. *See supra* Part III.A.iii.

Finally, UMMC argues the Court erred when it instructed the jury on emotional damages "because Papin did not provide substantial proof of compensable emotional distress." [259] at 33. Alternatively, it contends that "even if the instruction was not improper as a whole," the jury should have been instructed that:

---

[14] At first glance, this conclusion might seem contrary to the Court's analysis in *supra* Part III.A.i. But there, the Court held that no reasonable jury could have found the Remediation Agreement was a contract. If that holding is later reversed, then the question of whether the Remediation Agreement is a contract was properly submitted to the jury.

> [E]motional distress damage requires a showing of 'specific
> suffering during a specific time frame,' that
> 'generalizations are not sufficient,' and that testimony that
> 'it made me feel bad' or 'it upset me' cannot support an
> award of emotional distress damages, and that such
> damages must have been foreseeable to the defendant for
> the alleged breach of contract.

*Id.* Both arguments fail.

As to UMMC's first argument, the Court has already explained that Dr. Papin did provide adequate proof of emotional distress to warrant a jury instruction on the issue. *See supra* Part III.A.ii.

As to UMMC's second argument, "[a] trial judge has considerable discretion in choosing the language of an instruction so long as the substance of the relevant point is adequately expressed." *Boyle v. United States*, 556 U.S. 938, 946 (2009). At trial, the Court provided these instructions regarding emotional damages to the jury:

> You are instructed that should you find for Dr. Papin in
> this case, you may award damages as you deem reasonable
> to the plaintiff, you should first consider the nature of the
> defendant's conduct.
>
> If you find from a preponderance of the evidence that the
> defendant's behavior was malicious, intentional, willful,
> wanton, grossly careless, indifferent, or reckless, you may
> award the plaintiff damages for mental anguish without
> proof of a demonstrable harm or injury to the plaintiff.
>
> If, however, you find the defendant was simply negligent in
> its behavior, you may only award the plaintiff damages for
> mental suffering if the plaintiff proves by a preponderance
> of the evidence that he has suffered some sort of
> demonstrable harm or injury and that said harm or injury
> was reasonably foreseeable to the defendant.

[267] at 83–84. This language adequately expresses the substance of what is required to recover damages for emotional distress under Mississippi law—(1) that mental anguish was a foreseeable consequence of the particular breach of contract, and (2) that the plaintiff actually suffered mental anguish. *See Williams*, 891 So. 2d 160. Accordingly, the jury instructions on emotional damages do not warrant a new trial.

## IV.    Conclusion

The Court has considered all the arguments set forth by the parties. Those not addressed would not have changed the outcome. For the reasons stated above, the Court GRANTS Defendant UMMC's [258] Renewed Motion for Judgment as a Matter of Law and sets aside the jury's verdict in its entirety.

In the event the judgment as a matter of law is later vacated or reversed on appeal, the Court:

- Sets aside the jury's punitive damages award of $5,000,000; and

- Gives Dr. Papin the choice between remittitur of his emotional damages or a new trial on damages; but

- UMMC is not otherwise entitled to a new trial.

SO ORDERED AND ADJUDGED, this the 18th day of May, 2023

s/ *Kristi H. Johnson*
UNITED STATES DISTRICT JUDGE

34